UNITED STATES FEDERAL COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **AARON MALDONADO, *et al*,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Case No. 5:21-cv-85-OLG** |
| | § | |
| **MAMMOTH ENERGY SERVICES, INC.,** | § | |
| **COBRA ACQUISITIONS, LLC, HIGHER** | § | |
| **POWER ELECTRICAL, LLC AND 5 STAR** | § | |
| **ELECTRIC, LLC** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Respectfully Submitted,

**WELMAKER LAW, PLLC**

/s/  Douglas B. Welmaker
Douglas B. Welmaker
State Bar No. 00788641
Welmaker Law, PLLC
409 N. Fredonia, Suite 118
Longview, Texas 75601
Phone: (512) 799-2048
Email: doug@welmakerlaw.com

**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing  has been electronically served on all counsel of record via Notice of Electronic Filing on a known Filing User through the CM/ECF system on August 2, 2024.

/s/ Douglas B. Welmaker
Douglas B. Welmaker

I.    **INTRODUCTION**

Plaintiffs are ten former electrical utility restoration workers who were employed by Defendants to restore electrical power in Puerto Rico after Hurricane Maria devastated the island. While working on the island, Plaintiffs worked well over forty (40) hours, in most, if not all, workweeks.  During the relevant period, Plaintiffs were paid a day rate, a fact which is not subject to any real dispute.  This is because Defendants set up their pay plan as a day rate, recruited Plaintiffs with a promised day rate, referred to day rates *ad nauseum* in internal rate sheets and emails, and paid day rates as evidenced by both time reports and pay stubs.[1]

Defendants' lawyers told Defendants that because day rates would require additional overtime pay, Defendants could, instead, pay by the hour with overtime at rates fitting Defendants' desired "budget."  Defendants ignored this advice, choosing instead to fabricate fictitious hourly and overtime rates that were reverse engineered from Plaintiffs' day rates to make it look as if Defendants were paying Plaintiffs hourly with overtime compensation.   Defendants also created fictitious time sheets to accompany the fictitious hourly and overtime rates.

Defendants' payment of a day rate manifested itself in the payroll records in three different ways.  Defendants usually artificially apportioned the day rate pay between regular and overtime pay using artificial hourly rates derived from a hypothetical workweek of 7-days, at 16-hours per day.[2]

However, in workweeks in which Plaintiffs worked fewer than 7 days, Defendants' reverse engineered formula broke down, resulting in a shortfall between the invented hourly pay and the actual, promised day rate pay.  In such weeks, Defendants would then "gross-up" Plaintiffs' pay to ensure that Plaintiffs were compensated at their day rate pay for each day worked; typically, this gross

---

[1] Indeed, Plaintiffs' paychecks invariably reflected that their total compensation consisted of nothing more than their promised day rate multiplied by their days worked.

[2] This gave each Plaintiff 80 regular hours and 144 overtime hours per two week pay period (16 hours x 7 days=112 hours x 2 weeks)

up was reflected on Plaintiffs' paychecks, timesheets or both as a "day rate."[3]  At other times, Defendants simply paid day rates without apportioning such payments between regular and overtime pay.

Defendants' attempts to disguise their day rates as hourly and overtime pay are not new. Courts have consistently rejected virtually identical schemes for decades due to the FLSA's prohibition of artificial apportionment between "regular" and "overtime" pay.

Plaintiffs seek summary judgment on the following issues: (1) Defendant Mammoth Energy Services, Inc. jointly employed Plaintiffs (along with Higher Power Electrical, LLC or Five Star Electric, LLC) and are, thus, jointly and severally liable for any and all FLSA violations; (2) Plaintiffs were paid on a day rate basis, not hourly with overtime, and were therefore not compensated for any overtime hours worked during the relevant period; (3) and Defendants' FLSA violations were willful. Because there are no genuine issues of material fact as to these issues, the only remaining inquiry at trial is whether Cobra Acquisitions, LLC also employed Plaintiffs, and how many overtime hours Plaintiffs worked in order to determine damages owed under the FLSA.

## II.   **FACTS**

Defendant Mammoth Energy Services, Inc. is the parent company of about fifty-three companies, including Defendant Cobra Acquisitions, LLC, Defendant Higher Power Electrical, LLC, and Defendant 5 Star Electric, LLC.  *See* Deposition of Mark Layton ("Layton Dep.") April 15, 2022, *Cantu v. Mammoth Energy Services, Inc.* et al., Case No. 5:19-cv-00615 (W.D. Tx.) ("Cantu"), attached hereto as Exhibit A, at 11:7-10; 16:18-25; 54:24-55:12.[4]

On October 19, 2017, Keith Ellison, in his capacity as president of Cobra Acquisitions, LLC,

---

[3] It is worth noting that the phrase "gross up" is a term Defendants themselves utilized internally in reference to the additional payments made to Plaintiffs during weeks in which Plaintiffs worked less than 7 days.   While Mark Layton gamely tries to categorize such payments as "discretionary performance bonuses" intended to preserve morale, this mischaracterization is undercut by Defendants' own internal documents.

[4] Mammoth Energy Services, Inc. formed Defendant Cobra Acquisitions, LLC in 2017. Exh. A at 17:10-25; 18:1-16.  In July 2017, Mammoth Energy Services, Inc. acquired Defendants Higher Power and 5 Star.  Exh. A 19:6-16.

secured a contract with the Puerto Rico Electric Power Authority ("PREPA") to restore electrical power to Puerto Rico after Hurricane Maria. Deposition of Keith Ellison, May 4, 2022, *Cantu,* attached hereto as Exhibit B, at 30:15-31:5; 32:3-9.

Later that same day, Ellison, on behalf of Cobra Acquisitions, emailed Scott Whitsell of Five Star and Robert Malcolm of Higher Power, among others, explaining that Cobra Acquisitions had been awarded the PREPA contract and would be paying all workers in Puerto Rico the rates he set forth in his email.  Exh. B, 31:3-25; 32:1-20; 32:3-9.  The email read as follows:

From: Keith Ellison
Sent: Thursday, October 19, 2017 1:02 PM
To: Ken Kinsey <kkinsey@cobratd.com>; Scott Whitsell <swhitsell@5-starelectricllc.com>; Robert Malcom <rm@hpeservices.net>
Steve Wolfe <swolfe@cobratd.com>; Ken Godwin <kgodwin@hpeservices.net>
Cc: Jared Chappell <jchappell@Mammothenergy.com>
Subject: Puerto Rico storm restoration

All,

We are awarded a 120 day minimum contract for 250 linemen in Puerto Rico

We need 210 distribution resources, 25 Transmission, 15 Substation

We are paying the following.

GF.  - $1400. Per day
Foremen-   $1,250.00 per day
Journeymen Linemen-  $1000 per day
A class - $900
B class - $800
Hot apprentice $700
Apprentice / Groundman- $600

Exh. C, Bates Fed 002305.

With respect to the rates he listed in his email, Ellison testified that as long as an employee showed up for work, he would be entitled to receive the full rate for each of the positions delineated in the email. Exh. B, 32:16-25.  As President of Cobra Acquisitions, LLC, Ellison admitted that he was involved in setting rates of pay for all of the workers in Puerto Rico.  Exh. B, 27:23-25.

Everyone in the "To" line of Ellison's October 19, 2017 email was involved in and responsible for recruiting employees to come work Puerto Rico,  Exh. B, 33:3-17, including Robert  Malcolm of Higher Power and Scott Whitsell of 5 Star.  *Id*.  Indeed, the purpose behind sending this email was

3

so that the email recipients could get started recruiting employees to begin the restoration work in Puerto Rico. Exh. B, 33:18-21. To accomplish this work, all Defendants employed thousands of workers, including linemen, ground men, mechanics, and similar workers (variously "linemen" or "storm workers"). Exh. B, 56:8-11.

The day rates specified by Mr. Ellison were subsequently communicated to Plaintiffs both in recruitment emails and in emails sent to Plaintiffs prior to their orientations. For example, Missy Davis, Human Resources Manager for Five Star, sent out the following email several days after Ellison's email, repeating the exact same day rates, and explaining 1) the maximum period of time to be worked per day was 12 hours, as that is "all they will allow" and 2) "Your daily pay is the same no matter what the hours are."

```
> On Oct 23, 2017, at 10:58 AM, Missy Davis <missy.davis@5-starelectricllc.com> wrote:
>
> Below is the payscale for Puerto Rico. We will be working no more than 12 hour days
because that's all they will allow. Your daily pay is the same no matter what the hours
are. All expenses, meals and lodging are covered. We are also providing immunizations
before you go. I've attached an application. Get it back to me ASAP with your driver's
license, uniform sizes and glove/sleeve sizes.
>
> 120 day minimum contract and 40 day rotations available. Leaving on Nov. 3rd from New
Orleans, having an orientation that is still being determined as of now, details may
change, but that's what we are aiming for. Thanks,
>
> Foremen- $1,250.00 per day
> Journeymen Linemen- $1000 per day
> A class - $900
> B class - $800
> Hot apprentice $700
> Apprentice / Groundman- $600
>
> Missy Davis
> Human Resources Manager
```

Exh. D, Bates Fed 002216.

Notably, more than four months later, those rates remained the same, as evidenced by Missy Davis' March 14, 2018 email to Aaron Maldonado:

> You will have an offer letter in your new hire
> packet that you receive at orientation. The pay
> scale is below.
>
> Foreman $1250/day                                    JL
> $1000/day
> Class A $900/day
> Class B $800/day
> Hot Apprentice $700/day
> Groundman $600/day

Exh. E.

On October 20, 2017, outside counsel Stephen Broussard advised Jeff Beagle, Mammoth's Energy Services Inc.'s Human Resources Director, about the plan to pay day rates to the storm workers. Exh. F, Deposition of Steven Broussard, April 14, 2022, *Cantu*, at 10:14-21; 12:21- 23; 15:14-16:16. Broussard gave Beagle two options to comply with the FLSA: (1) if the linemen (storm workers) were paid a day rate, they would have to be paid additional pay under the FLSA to compensate them for the required time-and-a-half for overtime hours; or (2) the company could pay by the hour and pay overtime at time-and-a-half at rates that resulted in pay that was within the desired budget. Exh. F at 22:3-23:19; 38:18-39:10; Exh. G, Bates Fed 002373-74, October 20, 2017 email from Steven Broussard to Jeff Beagle explaining overtime payment methods.

Broussard did not review Defendants' actual pay practices to check Defendants' compliance with his advice, nor was he aware which of the two options he presented to Defendants was ultimately selected. Exh. F at 22:22- 23:2.

Additionally, Broussard did not advise Defendants about mixing day rates and hourly rates, Exh. F at 39:18-40:3, nor did Broussard advise Defendants about paying hourly and grossing up the pay to the day rate amount or paying day rates in addition to hourly rates. Exh. F at 28:5-23.

After being told by Broussard that payment of a day rate also required payment of overtime premiums, Defendants then ran the numbers, and determined exactly how much they would have to

pay if they were to comply with their attorney's advice.  This can be seen in the Exhibit H below, a spreadsheet prepared by Jeff Beagle.  Exh. I, Deposition of Jeff Beagle, April 18, 2022, *Cantu*, at 27:15-25; 28:1-25; 29:1-25; 30:25; 31:1-17.  In this spreadsheet, Columns B through J reflect Mammoth attempting to derive an hourly rate (Column K) from the promised day rates (Column I).  Notably, Columns L-Q actually show Mammoth calculating how much overtime pay would be owed to each Plaintiff were Mammoth to comply with the FLSA and pay day rates with the required overtime (Column Q), as Broussard had counseled.

| | A | B | C | D | E | F | G | H | I | J | K | L | M | N | O | P | Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Title | Days Per Week | Hours Per Day | Total Hours | Reg | OT | Adjusted OT Hours | Total Hours Adjusted | Budget Day Rate | Gross Weekly at Day Rate | Hourly Rate | Check Figure | | | | | |
| 1 | | | | | | | | | | | | | | | | | |
| 2 | Foreman | 7 | 16 | 112 | 40 | 72 | 108 | 148 | $ 1,250.00 | $ 8,750.00 | $ 59.12 | $ 8,750.00 | | $ 78.13 | $ 39.06 | $ 2,812.50 | $ 11,562.50 |
| 3 | J Lineman | 7 | 16 | 112 | 40 | 72 | 108 | 148 | $ 1,000.00 | $ 7,000.00 | $ 47.30 | $ 7,000.00 | | $ 62.50 | $ 31.25 | $ 2,250.00 | $ 9,250.00 |
| 4 | A Class | 7 | 16 | 112 | 40 | 72 | 108 | 148 | $ 900.00 | $ 6,300.00 | $ 42.57 | $ 6,300.00 | | $ 56.25 | $ 28.13 | $ 2,025.00 | $ 8,325.00 |
| 5 | B Class | 7 | 16 | 112 | 40 | 72 | 108 | 148 | $ 800.00 | $ 5,600.00 | $ 37.84 | $ 5,600.00 | | $ 50.00 | $ 25.00 | $ 1,800.00 | $ 7,400.00 |
| 6 | Hot apprentice | 7 | 16 | 112 | 40 | 72 | 108 | 148 | $ 700.00 | $ 4,900.00 | $ 33.11 | $ 4,900.00 | | $ 43.75 | $ 21.88 | $ 1,575.00 | $ 6,475.00 |
| 7 | Apprentice/Ground sman | 7 | 16 | 112 | 40 | 72 | 108 | 148 | $ 600.00 | $ 4,200.00 | $ 28.38 | $ 4,200.00 | | $ 37.50 | $ 18.75 | $ 1,350.00 | $ 5,550.00 |

Exh. H, Bates Fed 002018, Native Spreadsheet.

Instead of following their attorney's advice and paying overtime premiums, Defendants decided it would be cheaper to simply pay day rates, but make it look like Plaintiffs were paid on an hourly basis, with overtime, so they reverse engineered an hourly rate from the promised day rate (Column K).  Indeed, as calculated by Beagle in the above spreadsheet, Defendants saved, on average, approximately $2,000 per week per Plaintiff by violating the FLSA (compare Column Q with Column J).   Mammoth's HR Director Jeff Beagle calculated hourly rates using the day rates set forth by Ellison in his October 19, 2017 email, and to make the calculations worked, assigned each employee 16-hour days and 7 days per week, which is 40 regular hours and 72 overtime hours in a workweek.  Exh. I at 24:7-25:21; 26:2-27:14; 27:15-29:4.

As noted above, Defendants took the promised day rate, multiplied it by 7 days, and then divided it by 148 hours to reverse engineer an hourly rate.   Exh. I at 24:7-25:21; 26:2-27:14.  Beagle

calculated the hourly rate for each position's day rate in the Excel file. Exh. I at 27:15-29:4.

Higher Power listed the same day rates set by Ellison. Exh. B at 66:15-67:5; 5 Star listed in its orientation letters, even as late as March 14, 2018, the same day rates set by Ellison. Exh. D; Exh. E, *supra*.

Because Defendants' formula is built upon the assumption that linemen would work 7 days each week, 16 hours per day[5] (Columns B and C above), the formula breaks down when lineman works less than 7 days in one week. In that situation, in order to bring a lineman's pay back up to the promised day rate, Defendants were forced to use "gross ups" or "day rate boosts" to make up the difference.[6] For example, Plaintiff Gerardo Garcia was promised a day rate of $1,000. The following is a one-page demonstrative summary of Garcia's time and pay records for the two week period of July 9, 2018 through July 22, 2018:

| Day | Date | Pay Code | In | Out | Missing | Dollars | Total Hrs. | Total Hrs./Day |
|---|---|---|---|---|---|---|---|---|
| Mon | 7/9/18 | | n/a | n/a | | | | 0 |
| Tue | 7/10/18 | | n/a | n/a | | | | 0 |
| Wed | 7/11/18 | | n/a | n/a | | | | 0 |
| Thu | 7/12/18 | | n/a | n/a | | | | 0 |
| Fri | 7/13/18 | | n/a | n/a | | | | 0 |
| Sat | 7/14/18 | | n/a | n/a | | | | 0 |
| Sun | 7/15/18 | | n/a | n/a | | | | 0 |
| | | | | Total Units/Hours For Week: | | | | |
| Mon | 7/16/18 | | n/a | n/a | | | | 0 |
| Tue | 7/17/18 | Fixed: (DYR) | n/a | n/a | | $405.20 | | 16 |
| Wed | 7/18/18 | Fixed: (R) | n/a | n/a | | | | 16 |
| Thu | 7/19/18 | Fixed: (R) | n/a | n/a | | | | 16 |
| Fri | 7/20/18 | Fixed: (R) | n/a | n/a | | | | 16 |
| Sat | 7/21/18 | | n/a | n/a | | | | |
| Sun | 7/22/18 | | n/a | n/a | | | | |
| | | | | Total Units/Hours For Week: | | | | |
| | | | | | | | | |
| Paycheck | 07/09/18 - 07/22/18 | | | | Day Rate | Full Days Worked | Total | |
| Regular Hrs | 40 | 47.30 | $1,892.00 | | $0 | 4 | $0 | |
| Overtime | 24 | 70.95 | $1,702.80 | | | | | |
| Day Rate | | $405.20 | $405.20 | | | | | |
| | | | $4,000.00 | | | | | |

During this two-week period, Garcia only worked four days. Using Defendants' reverse engineered

---

[5] If a Plaintiff worked at all on a day in Puerto Rico, J. Kinsey, the payroll manager, entered "16.00" hours for the day in the Time Detail Report ("TDR"). Exhibit J, April 22, 2022 Deposition of J. Kinsey, *Cantu,* at 53:16-21; 60:10-16; 67:15-18, 92:4-13.

[6] As noted in Footnote 3, Mammoth's CFO Mark Layton unconvincingly argued that these gross ups were nothing more than "discretionary bonuses" that were given simply to "keep up morale." The fact that these "morale bonuses" occurred in *every single pay period* in which a Plaintiff worked less than 14 days serves to place Mr. Layton's testimony in its proper light.

hourly and overtime rates, Garcia was $405.20 short of the $4,000.00 he should have received for the pay period (4 days x $1,000 per day=$4,000).  As noted above, working less than 7 days in a week throws Defendants' formula off, and the resulting gross ups reveal Defendants' pay scheme for what it truly is: a day rate with no overtime.  In this particular instance, Defendants paid Garcia a gross up of $405.20 (shaded in orange) to make up for the fact that their reverse engineered pay shorted him on his promised day rate.   The words "Day Rate" next to the amount "$405.23" actually appear on Garcia's check.  Exhibit K, Bates Fed 000133.  Garcia's pay had to be "grossed up" to reach his promised $1,000 day rate x 4 days.  This pattern repeats itself over and over throughout Plaintiffs' paychecks.

Jeff Beagle, Mammoth's HR Manager, explained the gross up concept to Missy Davis with Five Star in the fourth paragraph from the top:

**From:** Jeff Beagle
**Sent:** Friday, November 17, 2017 8:15 AM
**To:** Missy Davis <missy.davis@5-starelectricllc.com>; Ken Kinsey <kkinsey@cobratd.com>
**Cc:** JD Kinsey <jkinsey@cobratd.com>; Shelly Wheeler <swheeler@hpeservices.net>; Alexander Kalman <akalman@Mammothenergy.com>
**Subject:** RE: Payroll

That's great Missy! We appreciate all you have done in this process and what you continue to do!

On the spreadsheets, if we could get a sheet by 12:00pm CST with the issues that we are aware of by that time, that should give us enough time to submit a payroll today for payout on Monday.

Anything we get after that noon spreadsheet is submitted if we could track on a new sheet and then we can submit that Monday for payment on Tuesday (if a second sheet is needed).

The other item will be on the gross up for pay.  Since we are paying 16 hours per day to ge the daily rate for the week, as you noted depending on when the employee arrived (the day of the week) they may have been "shorted" some pay as it did not calculate out to the full day rate since it was not a full week.  I am calculating that "gross up" now so any mid-week employees are made whole and we will submit that today.  So if that is an issue that is brought up, know it is being resolved.

**Jeff Beagle, HR Director**

Phone: 405.608.8195
Fax: 405.437.2550
Email: jbeagle@mammothenergy.com

14201 Caliber Drive Ste 300, Oklahoma City, OK 73134

Exhibit L, Bates Fed 001935.  Beagle is referring to linemen who arrive in the middle of a week, and

who will necessarily work less than 7 days in a one week period, *id.,* but the same concept applies when a lineman worked less than 7 days in any one week period for any reason.

These gross ups occurred in all ten Plaintiff's pay every time they worked less than 7 days in a one week period.[7] In these situations, JD Kinsey with Cobra Energy calculated the gross-up amounts necessary to bring the hourly pay up to the expected day rate pay amount, and he would enter that amount into the payroll system.  Exh. J, Kinsey Depo. at 1-:15-21; 53:16-55:14; 112:2-17.  James Kinsey also calculated and entered the gross-up amounts for all the workers in Puerto Rico for Cobra, Higher Power, and 5 Star.  Exh. J, Kinsey Depo. at 71:6-14.

Importantly, Jeff Kalman, Payroll Coordinator for Mammoth Energy, admitted that Defendants' gross up policy *was Defendants' way of paying day rates*.  Exhibit M, Deposition of Alexander Kalman, April 21, 2022, *Cantu*, at 85:14-86:4.  And Defendants had been warned by their counsel Broussard that if they did pay day rates, they would have to pay overtime compensation, which was an expensive proposition, as Jeff Beagle demonstrated in the spreadsheet above. Exh. H.

Sometimes, instead of grossing up Plaintiffs' pay, Defendants would just hard code Plaintiffs' day rate directly onto their timesheets instead of keying in the standard 16 hours, such as in this Time Detail Report for Aaron Maldonado, who was being paid $1,000 per day:

| Total Units/Hours For Week: | | | | | | | | 0.00 |
|---|---|---|---|---|---|---|---|---|
| Mon (05/14) | Fixed: (DYR) | n/a | n/a | [PR] 5 STAR ELECTRIC LLC–Unassigned---Unassigned-- | | $1000.00 | 0.00 | 0.00 |
| Tue (05/15) | Fixed: (DYR) | n/a | n/a | [PR] 5 STAR ELECTRIC LLC–Unassigned---Unassigned-- | | $1000.00 | 0.00 | 0.00 |
| Wed (05/16) | Fixed: (DYR) | n/a | n/a | [PR] 5 STAR ELECTRIC LLC–Unassigned---Unassigned-- | | $1000.00 | 0.00 | 0.00 |
| Thu (05/17) | Fixed: (DYR) | n/a | n/a | [PR] 5 STAR ELECTRIC LLC–Unassigned---Unassigned-- | | $1000.00 | 0.00 | 0.00 |
| Fri (05/18) | Fixed: (DYR) | n/a | n/a | [PR] 5 STAR ELECTRIC LLC–Unassigned---Unassigned-- | | $1000.00 | 0.00 | 0.00 |
| Sat (05/19) | | --- | --- | | | | | |

Exhibit N, Bates Fed 000256.

---

[7] And if, in the unlikely event that they did not occur, most likely in workweeks outside the relevant period, these were isolated incidents and occurred simply because they were overlooked, not because of the fact that any sort of discretion was exercised not to pay them.

Each hard code reflected the exact day rate promised to Plaintiffs. Each time Defendants hard coded Plaintiffs' pay, their Time Daily Reports would appear as they do in Plaintiff Aaron Maldonado's Time Daily Reports, above. Notably, in each of these instances, Defendants didn't even bother to apportion the day rate pay as hourly pay, in either the Time Daily Reports or the corresponding paychecks. Maldonado's paystub for the same period confirms he was paid for 5 days at $1,000 a day for a total of $5,000.00 and this amount is not apportioned to hourly pay. Exhibit O, Mammoth-Maldonado-Fed 000250. Instead, it appears as a "Day Rate" of $5,000.00 for the two week paycheck.

As noted above, Defendants' own internal documents demonstrate that they understood they were paying Plaintiffs day rates as opposed to hourly rates. The email below from JD Kinsey, Payroll/HR for Puerto Rico, states that in early July 2018, Cobra is "getting ready to transition from *Day Rate to Hourly rate* here in Puerto Rico." (emphasis added). Indeed, the change from day rate to hourly rates occurred on July 23, 2018, which is why the relevant period of recovery in this litigation ends July 23, 2018. Kinsey even notes that this change will entail *tracking of time*, and that most of the men in the field *have never done this before*.

| From: | JD Kinsey </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=29CC5EB7E809476BA9CDDE9F34860D60-JKINSEY> |
|---|---|
| To: | Bethany Stone |
| CC: | Michelle Menneke |
| Sent: | 7/5/2018 4:46:28 PM |
| Subject: | Client Access |

Hey Beth, we are getting ready to transition from Day Rate to Hourly rate here in Puerto Rico. With that will come the need for the guys in the field to clock themselves in and out of paycom. However most if not all of them will have never done this before and will not have access to the Client screen. Is there a way that Michelle and I can generate those access logins for the guys in the field? We will have to start working on putting everyone in the correct work group which means those supervisors will need to be able to see them.

JD Kinsey
Payroll/HR for Puerto Rico
Cell: 432-638-3885
Email: jkinsey@cobratd.com
Address:
48 Avenida Luis Munoz Rivera
Aqua Blue at the Golden Mile
San Juan, PR 00918

COBRA

Exhibit P, Bates Fed 001983.

Indeed, and key to this case, Defendants *did not track* actual hours worked by Plaintiffs in Puerto Rico prior to July 23, 2018. Exh. M, Kalman Depo. at 46:10-14; 82:25-83:5. Instead, Defendants tracked daily work attendance for Plaintiffs in Puerto Rico.  Exh. M, Kalman Depo. at 83:6-17; Exh. J, J. Kinsey Depo. at 60:10-16; 67:15-18.  If a Plaintiff worked at all on a day in Puerto Rico, J. Kinsey, the payroll manager, entered "16.00" hours for the day in the Time Detail Report ("TDR"). Exh. J, J. Kinsey Depo. at 53:16-21; 60:10-16; 67:15-18, 92:4-13, as in the Time Detail Report for Aaron Maldonado:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mon (05/21) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Tue (05/22) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Wed (05/23) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Thu (05/24) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned- | | | 16.00 | 16.00 |
| Fri (05/25) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Sat (05/26) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Sun (05/27) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Total Units/Hours For Week: | | | | | | | | 112.00 |
| Mon (05/28) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Tue (05/29) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Wed (05/30) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Thu (05/31) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Fri (06/01) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Sat (06/02) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Sun (06/03) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 |
| Total Units/Hours For Week: | | | | | | | | 112.00 |

Exhibit Q, Bates Fed 000257.  Almost without exception, the Time Detail Reports for all Plaintiffs during the relevant period all reflected 16 hours per day for every day they happened to show up, even though Missy Davis explained lineman could not work more than 12 hours per day (Exhibit D) and all linemen agreed they worked only from sunup to sun down.

III.     **ARGUMENT AND AUTHORITY**

A.      **DEFENDANT MAMMOTH ENERGY SERVICES, INC. JOINTLY EMPLOYED PLAINTIFFS WITH HIGHER POWER AND FIVE STAR**

While Defendants readily admit that Plaintiffs were employed by either Higher Power Electrical, LLC or Five Star Electric, LLC, the evidence in this case establishes that Plaintiffs were also employed by Mammoth Energy Services, Inc.  Under the FLSA, "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d).  Indeed, the FLSA defines an employer "more broadly than the term [is] interpreted in traditional common law applications." *McLaughlin v. Seafood, Inc*., 867 F.2d 875, 877 (5th Cir.) (*per curiam*). Under this expansive definition, various owners, corporate officers and even supervisors have been deemed employers. *See Donovan v. Sabine Irrigation Co*., 695 F.2d 190 (5th Cir. 1983). Employees can have two or more employers who are jointly and severally liable for the wages. Consistent with the "broad remedial purposes" of the FLSA, "joint employment" is also construed expansively. Richard J. Burch, A Practitioner's Guide to Joint Employer Liability Under the FLSA, 2 Hous. Bus. & Tax L. J. 393, 406 (2002).

The Fifth Circuit employs a four-factor "economic realities" test, which considers whether the alleged employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). Under this test, "no single factor is determinative." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947); *see also Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) ("[A] party need not establish each element in every case."); *Murillo v. Coryell County Tradesmen, LLC*, 2017 WL 2780750, at *9 (E.D. La. June 27, 2017) ("[N]o one factor in the 'economic reality' test is determinative."). Ultimately, the "touchstone" is "dependency"—the extent to which the putative employer's business depends on the employee's work. *Carnero v. Patterson Structural Moving and*

*Shoring LLC*, 2015 WL 225362, at *2 (E.D. La., Jan. 15, 2015, No. CIV.A. 14-2064). In joint employment contexts, each employer must meet the economic realities test. G*ray v. Powers,* 673 F.3d 352, 355 (5th Cir. 2012).

Under the test set forth above, Mammoth Energy Services, Inc. is also Plaintiffs' employer. First, even though evidence may not exist reflecting that Mammoth Energy Services could directly hire and fire Plaintiffs, this factor is not dispositive. *Rutherford,* 331 U.S. at 730; *Orozco,* 757 F.3d at 448. Mammoth Energy Services, Inc. exercised extensive, if not exclusive, control over timekeeping and payroll practices. Such conduct is "directly related" to two economic realities factors—(1) the supervision and control of employee schedules or conditions of employment and (2) the determination of the rate of pay and method of payment.

Mammoth Energy Services, Inc. is a publicly traded entity. Mark Layton testified that Mammoth Energy Services does not have any employees, but he acknowledged that it does have a slate of directors and officers. Layton testified Jeff Beagle was employed by, and received his paychecks from, Mammoth Energy, Inc. (not a party to this lawsuit). Exh. A, 32:12-15. Yet Beagle is listed as the Director of Human Resources for Mammoth Energy Services on the Insider Trading paperwork that was provided to multiple Plaintiffs, such as the document set forth below that was provided to a number of Plaintiffs, including Gerardo Garcia, and his emails make no distinction between Mammoth Energy Services, Inc. and Mammoth Energy, Inc.[8]

---

[8]   *See, e.g.*, MammothMaladonado-Fed02364, among multiple examples, listing Mr. Beagle's email as jbeagle@mammothenergy.com.



Mammoth Energy Services
14201 Caliber Drive, Suite 300
Oklahoma City, OK 73134
May 7, 2018

Team members,

Part of being employed at a public company involves the security of the information you may come in contact with during the normal course of your duties.  As such please see the attached Insider trading and unauthorized disclosure of information policy that every team member at Mammoth Energy is expected to follow.

If you have any questions regarding the policy please contact Don Crist, our Director of Investor Relations, at (405) 608-6048 or Dcrist@mammothenergy.com

Please click here to review and sign the insider trading and unauthorized disclosure of information policy.


Regards,

Jeff Beagle
Director of Human Resources
Mammoth Energy Services

Exhibit R, Bates Fed 001007-1014 (signed by Gerardo Garcia on May 28, 2018).

As Human Resources Director on behalf of Mammoth Energy Services, Beagle directly communicated with Steve Broussard, outside legal counsel, regarding the work hours and compensation structure for Plaintiffs on numerous occasions leading up to the implementation of the practices at issue in this matter. *See* Exhibit G.

The attached evidence reflects that Beagle, acting on behalf of Mammoth Energy Services, developed the schedules, conditions of employment, payroll practices, and timekeeping practices at issue in this case. The evidence further reflects that Beagle, acting on behalf of Mammoth Energy Services, imposed those conditions and practices upon employees of 5 Star and Higher Power, including Plaintiffs in this action.  Exhibit S, Mammoth Fed 002331 (Beagle giving instructions on how to apply the practices at issue in this case to Scott Whitsell of 5 Star); Exhibit T, Mammoth Fed 2023-2025 (Beagle giving instructions to Missy Davis of 5 Star on how to apply the gross up practices at issue in this case); Exhibit L, *supra*, (Beagle explaining that if anyone works a short week (less

14

than 7 days) their pay will be grossed up); Exhibit U, Mammoth Fed 2245 (Beagle explaining to Mark Layton that "hourly employees" get "an effective day rate at a 16 hour shift"); Exhibit V, Mammoth Fed 2241 (Beagle explaining to JD Kinsey how to reverse engineer day rates to hourly rates).

Additionally, Beagle, functioning as HR Director for Mammoth Energy Services, devised the very mechanics of the Plaintiffs' pay rates.  In his email to J.D. Kinsey, Beagle explained: "If you take the 16-hour days with seven days in a workweek, you'll get 112 hours. Anything over 40 in a workweek is time and a half. So if you take for the week 40 hours times the base, then 72 hours times the base times one and a half, you'll get the equivalent of the day rate times seven." Exhibit V.

Further, deposition testimony reflects Beagle instituted the gross-up policy.  Exhibit W, Deposition of Missy Davis, April 19, 2022, *Cantu*, at 54:16-25; Exh. M, Kalman Depo. at 52:13-19; 108:10-20, and the process for grossing-up linemen's pay was the same for Cobra, Higher Power, and 5 Star. Exh. M, Kalman Depo. at 59:24-60:5; 108:13-17.  *See Murillo v. Coryell County Tradesmen*, LLC, 2017 WL 2780750, at *11 (alleged employer determined rate and method payment where it "was substantially involved in compensating [workers] and ultimately determining when and how much [workers] were paid").

Where, as here, an entity possesses "managerial responsibilities and substantial control of the terms and conditions of the work of the employees," it is an employer. *Harville v. Texas A&M University*, 833 F.Supp.2d 645, 654 (S.D. Tex. 2011) (citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973)).

Additionally, maintenance of employment records also weighs in favor of finding that Mammoth Energy Services, Inc. was Plaintiffs' employer. Specifically, the Benefits Enrollment/Change forms, the Insider Trading cover letter and policy, and various other Mammoth Energy Services, Inc. benefits documents all suggest that Mammoth Energy Services was Plaintiffs' employer.  *See*, e.g., Exhibit R; see also, for example, Exhibit X, Mammoth Energy Services, Inc.

Enrollment Change Form Mammoth Fed 000763, Mammoth Energy Services, Inc. Spousal Surcharge Affidavit, Mammoth Fed 000765, both for Plaintiff Jorge Luis Rivera

And, many records, including time detail reports, referred to Mammoth Energy without making any distinction between the Mammoth Energy entities.  *See, e.g.*, Exhibit N (Time Detail Report reflecting "Mammoth Energy" in the top left hand corner, which appeared on every Plaintiffs' Time Detail Report).

Finally, current guidelines suggest that a joint employment relationship may exist where, as here, "the employee performs work which simultaneously benefits two or more employers," where "one employer is acting directly or indirectly in the interest of the other employer," or "where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee." 29 C.F.R. § 791.2(b) (2000). Thus, there is more than sufficient evidence supporting the fact that Mammoth Energy Services, Higher Power Electrical, and 5 Star Electric were all joint employers of Plaintiffs.

B.   **THE FLSA REQUIRES OVERTIME BE PAID BASED ON THE "REGULAR RATE."**

The FLSA requires employees be paid at one and one-half times their "regular rate" of pay for hours worked over forty in a workweek. 29 U.S.C. § 207(a)(1). The FLSA broadly defines "regular rate" as the hourly rate actually paid the employee for "all remuneration for employment." 29 U.S.C. § 207(e); *see also Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 42 (1944).

1.   **The Regular Rate Depends on the Actual Mode and Amount of Payment—Not Labels.**

"The regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." *Bay Ridge Operating Co. v. Aaron*, 334 U.S. 446, 461 (1948). The "regular rate" becomes a mathematical computation once the parties decide on the amount of wages and the mode of payment, which is

unaffected by any designation to the contrary in the wage contract. *Id*. The "regular rate" is not an arbitrary label—it is an actual fact. *Gagnon v. United Technisource, Inc*., 607 F.3d 1036, 1041 (5th Cir. 2010) (citing *Bay Ridge Operating Co*., 334 U.S. at 461; *Newman v. Advanced Tech. Innovation Corp*., 749 F.3d 33, 37 (1st Cir. 2014); *Walling v. Halliburton Oil Well Cementing Co*., 331 U.S. 17, 27 (1947). For example, in *Newman v. Advanced Tech. Innovation Corp*., the First Circuit held that "the goal is to pierce labels that parties affix to the payments and instead look to the realities of the method of payment. *Newman*, 749 F.3d at 40. Using this principle, the First Circuit in Newman held that the amount of compensation labeled as "per diem" in the employer's payroll records could not be excluded from the regular rate calculation when determining overtime owed to employee when the "per diem" was in fact based on the hours the employee worked, not the number of days the employee worked each week. *Id*. at 38-40.

Although the regular rate is an hourly rate, the FLSA does not require employers to pay employees on an hourly basis. See 29 C.F.R. § 778.109. The DOL regulations provide mathematical formulas to calculate the regular rate under various compensation schemes. *Id*. at § 778.107-122. For workers paid a daily shift amount, like Plaintiffs here, the regular rate is calculated by dividing the total weekly compensation by all hours worked in the workweek. 29 C.F.R. § 778.112. Such workers are "entitled to extra half-time pay at this rate for all hours worked in excess of 40 in a workweek." *Id*.

### 2.  The FLSA Prohibits "Pay Plans Which Circumvent the Act."

Because the regular rate is an actual fact based on the amount of and mode of payment, labels are not controlling. *Mitchell v. Brandtjen & Kluge, Inc.*, 228 F.2d 291, 298 (1st Cir. 1955) ("It is not enough that the contract of employment may name an hourly rate and label it the 'regular rate of pay', where it is obvious that such hourly rate is merely an arbitrary and fictitious figure not really meant by the parties to be the basis upon which the agreed compensation is to be calculated.") This prevents

employers from designating a portion of the pay as an artificially low regular rate upon which it bases overtime pay. *See, e.g.,* 29 C.F.R. § 778.500 (examples of "Devices to Evade the Overtime Requirements" using "Artificial Regular Rates" under the Subpart "Pay Plans Which Circumvent the Act"). For example, an employer cannot pay a fixed salary and claim it "compris[es] both straight time and overtime compensation." *Id*. at § 778.500(b). Nor can an employer set artificially low regular rates and corresponding overtime rates that yield pay that is short of what is due under a piece rate agreement, for example, and make up the difference in the form of a "bonus." *Id.* at § 778.500(e).

Examples of "regular rate violations" are varied and numerous because there are multiple ways to apportion pay in terms of an artificial regular rate that is lower than required and a corresponding overtime rate. For example, in *Gagnon*, the employees agreed to a regular rate of $5.50, a "per diem" of $12.50 per hour, and an overtime rate of $20. *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1039 (5th Cir. 2010). The Fifth Circuit found that this pay plan violated the FLSA despite the parties' agreement because $5.50 was an artificially low regular rate—the proper regular rate should have included the hourly per diem payments and overtime pay should was required to be calculated based on the true regular rate, inclusive of the supposed "per diems." *Id* at 1042.

### 3.  Defendants' Day Rate Pay Does Not Include Overtime Pay.

The FLSA does not allow a day rate to be apportioned between regular and overtime pay. This is far from an issue of first impression.  Courts have repeatedly held that pay schemes such as that employed by Defendants here violate the FLSA.

For example, in *Mumby v. Pure Energy Servs*., defendant paid a day rate but contended that it constituted a regular rate for eight hours of regular work per day, and four hours of overtime every workday.  *See Mumby v. Pure Energy Servs. (USA), Inc*., 636 F.3d 1266, 1268-69 (10th Cir. 2011). The Tenth Circuit held that such a pay scheme—virtually identical to that utilized by Defendants here—violated the FLSA because defendant should have paid overtime for all hours worked over

forty but instead "paid only what it believed was a day rate which included, by its calculations, four hours of overtime per day." *Id*.

The Fourth Circuit also rejected the notion that an employer could split a day rate into regular and overtime pay. *Lee v. Vance Exec. Prot., Inc.*, 7 Fed. Appx. 160, 165 (4th Cir. 2001). In *Lee*, the Fourth Circuit found there was no genuine issue of material fact that the employees were paid a day rate. *Id*. at 165. There, all record evidence, except defendant's payroll records that indicated hourly rates, like the case at bar, indicated that employees were paid a day rate. *Id*. ("[T]he pay stubs did reflect a regular and double-time component, but the stubs standing alone cannot compete with the plethora of evidence indicating that the [employees] were paid a day rate."); *see also Brennan v. Elmer's Disposal Serv., Inc*., 510 F.2d 84, 88 (9th Cir. 1975) (holding that pay stubs alone were not sufficient to establish an employee's regular rate). As the Fourth Circuit explained in *Lee:*

> The alleged hourly rate paid to the Agents is in reality but a form of mathematical legerdemain used by Vance to avoid the implications of the FLSA. Accordingly, the district court erred in awarding summary judgment to Vance on the grounds that the Agents were paid by the hour and that no overtime was owed in light of the premium paid to the Agents.

*Lee*, 7 F. App'x at 165.

Here, as further explained below, as in *Mumby*, *Lee*, and *Walling*, the hourly rates manifested in Defendants' records are a fiction, and an attempt to evade the FLSA's requirements. *See also Ramos v. Al-Bataineh,* 2013 WL 10372446, at *3 (S.D. Tex. Nov. 1, 2013), aff'd, 599 F. App'x 548 (5th Cir. 2015) ("The 'legal fiction'… is inapplicable in the FLSA overtime context."); *Koch v. Jerry W. Bailey Trucking, Inc*., 482 F. Supp. 3d 784, 793 (N.D. Ind. 2020) ("The FLSA is remedial in nature and is intended to identify responsible parties without obfuscation by legal fictions…"); *Doucette v. DIRECTV, Inc.*, 2015 WL 2373271, at *2 (W.D. Tenn. May 18, 2015) ("[U]nder the FLSA, the Court must look beyond mere labels and contractual agreements".).

Defendants acknowledge that the purported hourly rates in Defendants' pay records were

reverse engineered backward using the standard seven-day, sixteen-hour work week in order for Plaintiffs and the other linemen to roughly estimate the promised daily rate for each day worked.  This is impermissible under the FLSA because linemen, including Plaintiffs, received the same daily wage for straight time and overtime hours—ranging from $600 to $1,250 per day. Plaintiffs received their promised day rate, without overtime, irrespective of the hours they worked each week.  Thus, there is no genuine issue of material fact that Plaintiffs were paid a day rate.

### 4.   "Bonuses" Cannot Lawfully Be Used to "Gross-up" the Wages Due.

The FLSA's overtime requirements cannot be skirted by grossing up the difference between the pay calculated using artificial regular rates and the pay the workers were promised or can expect to receive as part of their normal pay. *See, e.g., Acosta v. Min & Kim Inc*., 2018 WL 500333 (E.D. Mich. Jan. 22, 2018), aff'd, 919 F.3d 361 (6th Cir. 2019). In *Acosta*, the employer paid a flat day rate for each day worked based on the salary desired by the employee. *Id*. at 3. The employer calculated an hourly wage to target the salary when the worker worked 13 overtime hours in a workweek according to the formula: weekly salary = x*40 + x*1.5*13 where "x" equals the hourly rate. *Id*. at *2-3. The employer contended that it "paid" regular hours at the backwards-calculated hourly rate and overtime hours at 1.5 times. *Id*. at *3. When the amount based on the hourly calculation was less than the day rate pay, the employer paid the difference as a "bonus." *Id.* The court held that such a pay plan was illegal because the regular rate for day rate employees is total remuneration divided by total hours and the amount of overtime due is equal to half that amount times the hours worked over forty in the workweek. *Id*. at *5-6.

While truly discretionary bonuses do not impact the regular rate, regular payments mis-labeled as "bonuses" do impact the regular rate. The regular rate must include all remuneration to an employee except where:

> both the fact that payment is to be made and the amount of the payment are
> determined at the sole discretion of the employer at or near the end of the period

and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly.

29 U.S.C. § 207(e)(3).

29 C.F.R. § 778.211 provides the following helpful hypothetical for considering whether this standard has been met: Suppose an employer promises their sales associates that they will give them a monthly bonus of one cent for each item they sell. But the bonus will only be given when the employer decides, in their discretion, that the financial condition of the company warrants such bonuses. According to § 778.211, the employer "has abandoned discretion with regard to the amount of the bonus though not with regard to the fact of each payment." Thus, for a bonus to be excepted from the regular rate under § 207(e), the employer must maintain discretion over whether to give the bonus and the amount given. 29 C.F.R. § 778.211(b). Accordingly, to be excluded from the regular rate, a bonus "must not be paid pursuant to any prior contract, agreement, or promise." *Id*. at § 778.211(c).

"Bonuses" that vary, getting smaller the more a salaried employee works are not compliant with the FLSA because they indicate they are amounts used to gross-up the workers' pay to the weekly salary. *Acosta*, 2018 WL 500333, at *9. As such, the employer "has abandoned discretion with regard to the amount of the bonus." 29 C.F.R. § 778.211(b). "The general rule may be stated that wherever the employee is guaranteed a fixed or determinable sum as their wages each week, no part of this sum is a true bonus and the rules for determining overtime due on bonuses do not apply." 29 C.F.R. § 778.502(e). Thus, an employer cannot use "bonuses" to justify paying an employee a lower hourly rate upon which overtime compensation is based; rather, all of the compensation should be used to determine the "regular" rate of pay. *Acosta*, 2018 WL 500333 at *9. Here, just as in *Acosta*, Defendants "grossed up" Plaintiffs' pay in weeks in which they otherwise would not have earned their promised day rates. For the same reasons the *Acosta* court held such a practice to violate the FLSA, it is also illegal, here.

## C.  DEFENDANTS PAID A DAY RATE.

Defendants set up a day rate pay plan and recruited workers by promising them day rates. *See supra* at pp. 3-5.  The fact that Defendants paid a day rate is evident by Defendants' practice of merely taking attendance and recording "16.00" hours per day in the TDR, instead of tracking the hours Plaintiffs actually worked, as one would for workers who are truly paid by the hour.  *See supra* at p. 11.

Defendants were warned about paying overtime if they utilized a day rate, and then proceeded to ignore this advice and paid a day rate anyway, without paying overtime.  Defendants promised a day rate, they put this promise in writing, and Defendants own internal documents are rife with references to the fact that Plaintiffs were paid a day rate, not an hourly rate.

Defendants' purposeful attempt to disguise day rate pay as hourly pay by artificially apportioning it as regular and overtime pay is a practice that violates the FLSA. *Acosta*, 2018 WL 500333, at *9; *Mumby*, 636 F.3d at 1268-69; Lee, 7 Fed. Appx. 160 at 163-65; 29 C.F.R. § 778.501; *see also Walsh v. Fusion Japanese Steakhouse, Inc.*, 548 F. Supp. 3d 513, 525 (W.D. Pa. July 12, 2021) (granting summary judgment to plaintiff for owed overtime where employer "work[ed] backwards to calculate hourly rate[s] of the employees based on the day rate").

The FLSA prohibits artificially splitting pay into regular pay and overtime pay because otherwise an employer could pay a fixed salary regardless of the number of hours worked in excess of 40 in a workweek and "merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked." *Senegal v. Fairfield Indus., Inc.*, No. CV H-16-2113, 2018 WL 6079354, at *5 (S.D. Tex. Nov. 21, 2018) (quoting 29 C.F.R. § 778.310).

Similarly, and germane to this arbitration "the FLSA prohibits paying a fixed daily sum where the hours vary, but never go above a set maximum." *Id*. at *6. For example, it would be proper to pay

$1,060 each week for exactly 84 hours of work each week and to characterize it as a $10 per hour base-rate because the employee is actually working exactly those hours. *Id.* (showing math as $10*84 + $5*44 = $880 + $220 = $1,060).  However, "it would be improper to pay the same rate of $1,060 per week for a *varying* number of hours worked each week even if the varying number of hours never exceeded 84." *Id.* (emphasis added). Although this latter pay arrangement seems to benefit the worker as he would make the same pay, never work more than he did under the first scenario, and may even work less, "such a scenario is expressly prohibited because it is against the purpose of the FLSA to 'effectuate a maximum hours standard.'" *Id.* (quoting 29 C.F.R. § 778.310).

Defendants will likely argue that their backwards-calculated hourly rates are not a sham because the total pay does not come out to the day rate pay exactly. Not only is this wrong because it is nothing more than a rounding error, but it is also wrong because the number of hours Defendants "paid" are not the hours actually worked by the Plaintiffs. *Hickman v. TL Transportation, LLC*, 318 F. Supp. 3d 718, 724–25 (E.D. Pa. 2018); *see also Senega*l, 2018 WL 6079354, at *6.  Instead, Defendants use the same hypothetical maximum daily shift of "16.00" hours that they used to formulate their pay plan. Although "16.00" hours worked might happen occasionally, it is impossible to repeat day-after-day for hundreds of workers.

In *Hickman*, the defendant apportioned day rates into artificial hourly rates, rounded them, and used them in its payroll system that divided each day into 8 regular and 2 overtime hours per day. *Id*.  The court held the pay plan was a day rate notwithstanding the fact that the actual pay calculated under the artificial rate was slightly different from the day rate pay. *Id*. ("[plaintiff] received $814.80 for fifty-six 'regular' hours and $302.55 for 'overtime' hours, reflecting payment for seven days of work at $160 per day.").

Defendants violated the FLSA because rather than pay overtime for hours worked in excess of forty each workweek, they decided in advance how much days are worth regardless of hours

worked and then labeled portions of the day rate pay as regular and overtime using backwards-calculated rates. Such "hypothetical retrospective construction" of a rate structure that supposedly includes overtime thwarts "the goals of the [FLSA]." *United States Dep't of Lab. v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 286 (4th Cir. 2019) (quoting *Brennan v. Valley Towing Co.*, 515 F.2d 100, 106 (9th Cir. 1975)). Defendants' fraudulent bookkeeping is designed to make their pay plan look hourly when it was really a day rate plan.

Defendants calculated Plaintiffs' hourly rate backwards from their day rate using a hypothetical workweek of 16 hours per day, 7 days per week, with the following formula: Day Rate*7 = 40*x + 72*1.5*x, where x is the hourly rate for the first 40 hours worked in a workweek.  In all relevant respects, this is the same formula the court in Acosta rejected as artificially apportioning the day rate as hourly pay. *Acosta*, 2018 WL 500333, at *2-3, aff'd, 919 F.3d 361 (6th Cir. 2019). This formula is also the same type of mathematical legerdemain used by the defendant in Lee to avoid the implications of the FLSA that the court rejected. *Lee*, 7 F. App'x at 165.  Mathematically simplified, Defendants' formula for calculating the hourly rates for all linemen, including Plaintiffs, was x=Day Rate*7/148.  Defendants' "gross-up" amounts are not "discretionary bonuses" because Defendants promised day rates.  *See, e.g.,* Exhibits C, D and E.  This is true even if Defendants claim they retained discretion over when to pay the gross ups because, as demonstrated *supra*, Defendants abandoned discretion as to their amounts. *Acosta*, 2018 WL 500333 at *9; 29 U.S.C. § 207(e)(3); 29 C.F.R. § 778. 211; 29 C.F.R. § 778.502. Accordingly, Plaintiffs are entitled to summary judgment on the issue of whether they were paid on a day rate basis.

### D.    PLAINTIFFS HAVE ESTABLISHED WILLFULNESS

Defendants' conduct is the textbook definition of willfulness under the FLSA. "Under the FLSA, a violation is 'willful' if the employer either 'knew or showed reckless disregard for . . . whether its conduct was prohibited by statute." *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821 (5th

Cir. 2003) (quoting *Reich v. Bay, Inc*., 23 F.3d 110, 117 (5th Cir. 1994). As examples, "[e]mployers act willfully when they know their pay structures violate the FLSA or ignore complaints brought to their attention." *Mohammadi v. Nwabuisi*, 605 Fed. Appx. 329, 332 (5th Cir. 2015).

### 1.      Purposeful Manipulation of Pay Records

Defendants affirmatively tried to manipulate and disguise their use of day rate payments as hourly rates through clever accounting on the paystubs.  Mammoth's HR Specialist Kalman admitted this fact under oath.  Plaintiffs have made the necessary showing for a willful violation to be found. *See, e.g., Donovan v. Grantham*, 690 F.2d 453, 458 (5th Cir. 1982) (finding noncompliance willful as a matter law where "there is evidence that [defendant's] violation was willful in the intentional sense in light of his manipulation of the payroll records to disguise his failure to pay overtime); *see also Chao v. Hotel Oasis*, 493 F.3d 26, 36 (1st Cir. 2007)  (noting that willfulness is found where employer "intentionally and consistently failed to keep accurate records of the time worked . . . disguised minimum wage, as well as overtime pay violations . . ); *Solis v. El Matador, Inc*,  No. 08-CV-2237, at *9 (C.D. Ill. May 3, 2011) (intentional efforts to conceal Defendants' noncompliance with the FLSA that resulted in false payroll records demonstrate willful violations of the FLSA).

### 2.      Ignoring Counsel's Advice

Defendants will attempt to argue that Plaintiffs cannot show willfulness  because Defendants sought to have their pay plan blessed by counsel.  This ignores the fact that Defendants *ignored* their counsel, who warned them to either pay overtime in addition to day rates or pay by the hour with overtime.  Instead of paying by the hour, Defendants promised their workers, including Plaintiff, day rates and paid day rates. Defendants paid artificially apportioned day rates between regular and overtime hours when they worked a full week. When they worked less than a full week, Defendants grossed-up their artificial hourly pay to the day rate pay amount.  And, at other times, Defendants paid day rates directly, without apportioning the rates into regular and overtime pay. Further,

Defendants did not track and pay actual hours worked; they simply recorded "16.00" hours each day regardless of the actual hours worked. Because Defendants ignored their counsel's advice, the fact that they sought such advice means nothing in the context of a willfulness analysis.

Defendants' own records, including e-mails from upper management, confirm the day rate pay scale and the illegal gross ups in order to ensure their workers would receive the promised day rate amount when their artificial hourly rates resulted in less than the promised day rate.

### 3.   Alexander Kalman's Damning Testimony

While there is an abundance of internal documents demonstrating that Defendants knew beyond a shadow of a doubt they were paying day rates and not hourly rates, probably the most consequential proof of this fact came from the deposition of Alexander Kalman, Mammoth's HR Specialist, who admitted in his deposition that Defendants were in fact paying day rates, and that the hourly payment system plus the day rate "true ups" (or "gross ups") were nothing more than Defendants trying to find a way around the fact that they were paying Plaintiffs day rates:

```
                                          Page 84
 1  specific user access groups, which are not shown on time
 2  card information.
 3      Q   Can you think of a reason why -- let's look --
 4  before I do that, so in this Exhibit 170, I'm scrolling
 5  down to Mammoth 23, that's the Bates number.  And it's a
 6  pay stub for Robby Alvear from May -- I'm sorry.  April
 7  30th to May 13 is the pay period.  Do you see that?
 8      A   Yes.
 9      Q   Okay.  We see here another instance where it's
10  just a straight day rate amount entered here.  Do you
11  see that?
12      A   Yes.
13      Q   Okay.  This is a different type.  It's not the
14  gross up or true up type of day rate adjustment.  This
15  is just plain day rates entered into the system;
16  correct?
17      A   Correct.
18      Q   Okay.  Let's take a look at the time detail
19  report.  So it's the pay period April 30th to May 13th,
20  so it looks like it's the first one.  April 30th to May
21  13th.  Can you see here that there are eight days
22  entered at $800 per day?
23      A   Yes.
24      Q   Okay.  And this was approved by JD Kinsey;
25  right?
```

```
    A    That's Correct.
    Q    Is JD Kinsey when he's entering this, is he
doing it wrong or is there something with Paycom that
made it difficult for him to be able to do it in, like,
with the 16th that we're seeing down here below?  Do you
know anything about this?
    A    I do not recall anything with regards to this.
I would -- I would not have suggested using the 800 or
the fixed dollar amount.
    Q    Why not?
    A    Well, because then we're just paying them day
rates and that's against FSLA standards as far as I'm
aware.
    Q    Oh, I see.  Okay.  Did you review -- with the
true ups that were done that we see, did you view that
as being a way of paying day rates or did you do it
differently?
    A    Are you asking for my professional opinion?
    Q    Yes.
    A    My professional opinion is yes, they were
paying day rates and they were finding a way around it.
    Q    Okay.  And why do you feel that way?
    A    Because Keith said that this is what we were
paying them as day rates, and then we were required to
find a way around that.
```

```
                                            Page 86
1    Q    Okay.  So by finding a way around, you're
2 talking about coming up with this hourly system plus
3 these true ups that end up paying them their day rates?
4    A    Yes.
```

Exhibit M, Kalman Depo, 84-86:4.

   Mr. Kalman's testimony is more than sufficient to establish willfulness, as it reflects not just Mammoth's understanding of the FLSA's overtime requirements, but it also demonstrates that Mammoth was actively engaged in a scheme to "find a way around" application of the FLSA's protections to Plaintiffs by making it appear that Plaintiffs were paid hourly when they were instead pay a day rate.

27

Defendants will attempt to use the fact that they "consulted" with an attorney about their pay scheme to disprove willfulness, but it is important to remember that Mr. Broussard advised Defendants, before work began on the island, that should they choose to pay a day rate, *they would need to pay overtime premiums*. Exhibit G. However, exactly one month after Mr. Broussard explained that Defendants must pay overtime premiums if they paid a day rate, and after work had already started on the island, on November 20, 2017, Keith Ellison, President of Cobra Acquisitions, LLC, reiterated that the lineworkers would be paid a day rate:

On Nov 20, 2017, at 3:12 PM, Keith Ellison <kellison@Mammothenergy.com> wrote:

> Only Management, was to ever receive base plus a day rate. All GF's and below are to be purely the day rate while on island.
>
> Gotta get a handle on this stuff now.
>
> KE

Exhibit Y, Bates Fed 01942.

As noted above, Several months after Ellison's email, in advance of a March 2018 orientation, Five Star Electric was still notifying new hires such as Aaron Maldonado that they would be paid on a day rate basis, setting out the day rate payments in detail, day rates that were identical to those contained in Ellison's October 19, 2017 email. Exhibit E.

By refusing to pay overtime, and by manipulating Plaintiffs' paychecks and timesheets to cover up this refusal, Defendants not only violated the FLSA, but they also willfully violated the FLSA. The fact that Defendants engineered Plaintiffs' paychecks to make them appear as if Plaintiffs were paid on an hourly basis (even though they did not track time), and the fact that Defendants consistently had to true up or gross up Plaintiffs' "hourly" pay in order to match Plaintiffs' promised day rates proves that Defendants were actually trying to cover up the fact that they were not paying overtime. In addition to the purposeful manipulation of paychecks and timesheets to cover up their

failure/refusal to pay overtime,  Defendants engaged in this course of action against the explicit advice of their attorney to pay overtime should they pay day rates.   Defendants' violation of the FLSA is the poster child for a showing of willfulness.

Based on the foregoing, Plaintiffs respectfully request a summary judgment finding that: (1) Mammoth Energy Services, Inc. jointly employed Plaintiffs along with Higher Power Electrical LLC and 5 Star Electric, LLC and is thus jointly and severally liable for any and all FLSA violations; (2) Plaintiffs were paid on a day rate basis and were thus not compensated for any overtime hours worked during the relevant period and (3) Defendants violation of the FLSA was willful.