**EXHIBIT A**

**MARK LAYTON - April 15, 2022**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FRANCISCO CANTU, et al.        )
                               )
                               )
vs.                            )  CASE NO. 5:19-cv-00615
                               )
MAMMOTH ENERGY SERVICES,       )
INC., et al.                   )


ORAL AND VIDEOTAPED DEPOSITION OF
MARK LAYTON
APRIL 15TH, 2022
(Volume 1)


        The ORAL AND VIDEOTAPED DEPOSITION OF MARK LAYTON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 15th day of April, 2022, from 8:44 a.m. to 3:47 p.m., before Robin Rios, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at Porter Hedges, LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

**MARK LAYTON  -  April 15, 2022**

---

Page 2

```
 1                    APPEARANCES
 2
 3  FOR PLAINTIFFS:
 4      Mr. David I. Moulton
        Bruckner Burch, PLLC
 5      11 Greenway Plaza
        Suite 3025
 6      Houston, Texas 77046
 7  FOR DEFENDANTS:
 8      Mr. William R. Stukenberg
        Porter Hedges, LLP
 9      1000 Main Street
        36th Floor
10      Houston, Texas 77002
11  FOR DEFENDANTS:
12      Mr. Harris M. Stamey
        Porter Hedges, LLP
13      1000 Main Street
        36th Floor
14      Houston, Texas 77002
15  ALSO PRESENT:
16      The Videographer
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1                     INDEX
 2  April 15th, 2022
                                              PAGE
 3
    Appearances ...................................    2
 4
    Witness Sworn .................................    4
 5
    MARK LAYTON
 6    Examination by Mr. Moulton ..............    7
 7    Examination by Mr. Stukenberg ...........  256
 8    Examination by Mr. Moulton ..............  258
 9  Changes and Signature .....................  261
10  Reporter's Certification ....................  263
11
12
13              EXHIBIT INDEX
14  PLAINTIFFS' EXHIBITS
15  NO.   DESCRIPTION                          PAGE
16    1   Carlos Benevides Employment Offer Packet  103
17   52   James Tanner Offer of Employment       103
18  131   Email Chain, October 2017 (3577-3580)   67
19        Re: Puerto Rico Storm Restoration
20  137   Pay Class Document                      82
21  138   5 Star Offer Letter                     85
22  139   Higher Power Offer Letter and Wage Scale  84
23  140   Email Chain, November 2017 (3151-3153)   78
24        Re: Hourly/Salary Employees in PR
25  145   Daniel Wood Employment Offer Packet     95
```

---

Page 4

```
 1              EXHIBIT INDEX (CONTINUED)
 2  PLAINTIFFS' EXHIBITS
 3  NO.   DESCRIPTION                          PAGE
 4  146   Michael Fair Offer of Employment      101
 5  151   Cobra Energy Services 2017 Crew        94
 6        Wage Scale
 7  152   Plaintiffs' Amended Notice of          12
 8        Deposition of Mark Layton
 9  153   Mark Layton's LinkedIn Information     14
10  154   Announcement of 2017 Operational       17
11        and Financial Results for
12        Mammoth Energy Services, Inc.
13  155   OIG Report on FEMA's Eligibility       20
14        Determination of PREPA/Cobra
15        Acquisitions Contract
16  156   Mammoth Energy Services, Inc.          35
17        2018 Employee Benefits Guide
18  157   Paycom Letter and Form 499R-2/W-2PR    40
19        for Darrell Thomas
20  158   Paycom Letter, Re: 2018 PR Wages       44
21  159   Copy of BCBS Insurance Card            48
22        for Don Wimberley, Jr.
23  160   Darrell Thomas' 401(k) Statement       49
24  161   November 28, 2017, Email Chain         50
25        Re: Payroll Estimates (3463-3464)
```

---

Page 5

```
 1              EXHIBIT INDEX (CONTINUED)
 2  PLAINTIFFS' EXHIBITS
 3  NO.   DESCRIPTION                          PAGE
 4  162   November 28, 2017, Email Chain         57
 5        Re: Payroll Estimates (3468-3469)
 6  163   Paycom App Screenshot of Employee Pay  61
 7  164   Cobra/PREPA Contractor Badge for       64
 8        Don Wimberley
 9  165   November 21, 2017, Email Chain         81
10        Re: Updated Pay Structure (3247-3249)
11  166   November 13, 2017, Email Chain         86
12        Re: Pay Rates (3290-3291)
13  167   Excel Spreadsheet (3292)               87
14  168   Alan Pierson Employment Documents     104
15  169   Email Chain, January 2018 (3154-3160) 109
16        Re: Weekly Report Update 4
17  170   Pay Stubs and Time Detail Reports     118
18  171   Mammoth Energy Services, Inc. Form 10-K  164
19  172   Email Chain, January 2018 (3146-3148) 172
20        Re: Weekly Update for 1/26
21  173   Excel Spreadsheet (3149)              186
22  174   Deposition Amended Excel Spreadsheet (3292)  230
23
24
25
```

**MARK LAYTON - April 15, 2022**

Page 6

1          THE VIDEOGRAPHER:  All right.  Today is
2 Friday, April 15th, 2022.  We're on the record at
3 8:44 a.m.
4          MR. STUKENBERG:  Let the record reflect
5 that Mr. Moulton noticed this deposition on Good Friday.
6 The office is closed.  We're all here anyway.
7          MR. MOULTON:  And this was the date that
8 the defendants offered for this witness and indicated
9 they had very limited time and that's the way I
10 understand that to be true.  So today is the day.  So I
11 blame defendants, but I digress.  Let's go ahead and
12 start the depo.
13          THE REPORTER:  Would you raise your right
14 hand and be sworn?
15          (The witness was sworn.)
16          MR. MOULTON:  All right.  Before we get
17 started, could we just have announcements of who's here
18 for the record?  I have -- well, I'm David Moulton for
19 the plaintiffs.  And who else do we have in the room?
20          MR. STUKENBERG:  Will Stukenberg, Porter
21 Hedges for defendants.
22          MR. STAMEY:  Harris Stamey, Porter Hedges
23 for the defendants.
24          MR. MOULTON:  And, of course, we have the
25 witness.

Page 7

1          MARK EVERETT LAYTON,
2 having been first duly sworn, testified as follows:
3                 EXAMINATION
4 BY MR. MOULTON:
5     Q     Sir, what is your full name?
6     A     Mark Everett Layton.
7     Q     What's your date of birth, sir?
8     A     September 10th, 1974.
9     Q     And what is your address where you live?
10    A     8533 Rock Cliff Way.
11    Q     Where?
12    A     Piedmont, Oklahoma.
13    Q     What's the zip?
14    A     73078.
15    Q     How long have you lived at that address?
16    A     Almost six years.
17    Q     And what's your work address?
18    A     It's 14201 Caliber Drive, Oklahoma City,
19 73134.
20    Q     And what's your cell phone number?
21    A     (405)226-0963.
22    Q     What's your carrier?
23    A     I believe that one is with Verizon.
24    Q     Do you have more than one cell phone?
25    A     I do.

Page 8

1     Q     What's your other number?
2     A     (405)812-6613.
3     Q     Who's the carrier?
4     A     Sprint or T-Mobile.
5     Q     Any other cell phones?
6     A     Nope.
7     Q     What -- what do -- do you have an office
8 phone?
9     A     I do.
10    Q     What's the number?
11    A     (405)563-9961.
12    Q     Other than your cell phones and your office
13 number, are -- are there any other numbers that you use
14 for work?
15    A     Well, to bifurcate, I have one cell phone
16 that's personal and one that's for work.  So there's one
17 cell phone for work and an office phone.
18    Q     Which -- which one is the -- which one of the
19 cell phones is your -- is a work cell phone?
20    A     The 226 number.
21    Q     Do you use your -- do you have a home phone?
22    A     I do.
23    Q     Okay.  What's that number?
24    A     (405)373-5396.
25    Q     Are -- are there any other phone number -- or,

Page 9

1 yeah.  Are there any other phones that you use besides
2 the ones we just talked about?
3     A     No.
4     Q     No burners?
5     A     No.
6     Q     Okay.  Sir, this is not the first time you've
7 given a deposition regarding workers that were staffed
8 to Puerto Rico as part of electrical restoration work;
9 is that correct?
10    A     That's correct.
11    Q     Okay.  How many depositions have you done in
12 this regard?
13    A     One.
14    Q     Okay.  And what cases were those?
15    A     It was a case regarding some arbitrations held
16 in Puerto Rico.  I don't recall the exact styling.
17    Q     Okay.  Now, you -- and you have testified now
18 in several of those arbitrations, correct?
19    A     I testified one time --
20    Q     Okay.
21    A     -- in connection with those arbitrations.
22 That is correct.
23    Q     Okay.  So in Puerto Rico you -- you've been on
24 the stand once?
25    A     That's correct.

**MARK LAYTON  -  April 15, 2022**

Page 10

1    Q    Okay.  And in a couple weeks you'll be out
2  there again to testify again?
3    A    That's undetermined whether I'll be there or
4  not, but I don't believe it will be to testify again.
5    Q    Got it.  Okay.  Are there any other -- are
6  there any other depositions or trials where you're --
7  coming up that you'll be testifying about wage-an-hour
8  matters for Mammoth or its subsidiaries?
9    A    By Mammoth or its subsidiaries, you'll need to
10 be more specific on legal entity.  There are a couple of
11 Mammoth entities.
12   Q    How about any entities you're associated with?
13   A    There are, I think, a matter that's defended
14 by Akin Gump that presumably will -- I'll appear for a
15 deposition at some point in the next month or two.
16   Q    Okay.  And what is that matter?
17   A    It's a wage-an-hour case.  I don't recall the
18 exact styling.
19   Q    Who -- which of the entities that you're
20 affiliated with is getting sued?
21   A    I don't recall the exact defendants in -- in
22 that matter.
23   Q    Even -- even if you don't recall the exact
24 name of the defendant, do you remember any part of the
25 name of the defendant?

Page 11

1    A    Without limiting the -- the number of
2  defendants, I believe that Cobra as well as probably
3  Higher Power and 5 Star are involved with that one.  I'm
4  not sure whether Mammoth Energy Services, Inc., is named
5  or not.  I'd have to -- to look at the styling to
6  confirm one way or the other.
7    Q    Okay.  Well, Cobra and Higher Power and 5 Star
8  are all affiliated with Mammoth, correct?
9    A    By "affiliated," they are indirect
10 subsidiaries of Mammoth Energy Services, Inc.
11   Q    Okay.  Is that a case that's with Morgan &
12 Morgan out of Florida?
13   A    I don't recall who the plaintiff's attorneys
14 are.
15   Q    Okay.
16        Okay.  Besides that case, are there any
17 others?
18   A    No, sir --
19   Q    Okay.
20   A    -- not that I recall.
21   Q    Do you recall the wage-an-hour lawsuit against
22 Archer Well?
23   A    Against Archer Well or one of its
24 subsidiaries?
25   Q    Okay.  Were you affiliated with that company

Page 12

1  at that time?
2    A    That was a question.  Archer Well or one of
3  its subsidiaries?
4    Q    Yes.
5    A    Archer Well had a number of subsidiaries.  So
6  I don't understand your question.
7    Q    Well, let's just do this.  Before I get to
8  that, let's just take care of a housekeeping matter.
9        (Plaintiffs' Exhibit 152 marked.)
10   Q    (By Mr. Moulton) I'm going to show you what's
11 been marked as Plaintiff's Exhibit 152.  This is
12 Plaintiff's Amended Notice of Deposition of Mark Layton,
13 Individually as a 30(B)(6) Witness.  Are you familiar
14 with this document?
15   A    I'm familiar with the document.  I didn't know
16 whether you were showing it to me or not.
17   Q    Oh, it's -- oh, you're not on.
18   A    I don't see anything.
19   Q    You're not on to the --
20        MR. STUKENBERG:  There's nothing on my
21 screen either.
22        MR. STAMEY:  We're on.  I don't see you
23 on.
24        MR. MOULTON:  Are you on today's Zoom?
25        MR. STAMEY:  Whatever this was.

Page 13

1        MR. MOULTON:  Is that from yesterday?
2        MR. STAMEY:  I don't know.  It's what was
3  on the table.
4        MR. MOULTON:  Oh, let me see.  Yeah.
5  That's from Scott Whitsell's.  It's not today's.
6        MR. STAMEY:  Do you have one for today to
7  tell us what to log into?
8        MR. MOULTON:  Yeah, or I can just -- if
9  everybody's on Scott's, I'll just go back to yesterday's
10 and do that.
11        MR. STUKENBERG:  Is your screen on here?
12        THE WITNESS:  It's on, but it just has my
13 name.
14        MR. MOULTON:  We're just in different
15 meetings.
16        THE WITNESS:  You flashed up here
17 briefly, so it looks like you're probably connected.
18   Q    (By Mr. Moulton) All right.  So Exhibit 152.
19 Mr. Layton, are you familiar with this deposition
20 notice?
21   A    Yes.
22   Q    Okay.  And you understand you've been
23 designated as the person most knowledgeable to testify
24 about the matters that are listed here?
25   A    Yes, sir.

# MARK LAYTON  -  April 15, 2022

Page 14

1          (Plaintiffs' Exhibit 153 marked.)

2     Q    (By Mr. Moulton) Okay.  Let me show you

3 Plaintiff's Exhibit 153.  Do you recognize this as

4 information from your LinkedIn page?

5          MR. STUKENBERG:  First of all, the

6 exhibit's not up.  Second, I'm going to go ahead and

7 object to using documents that were not produced in

8 advance of the deposition.  We've had a lot of discovery

9 fights, and to pull out documents at this stage of

10 litigation that haven't been produced is improper.  So

11 any questioning related to LinkedIn pages or other

12 documents that haven't been produced, we're going to

13 object to.

14     Q    (By Mr. Moulton) All right.  Mr. Layton, have

15 you been the CFO of a company called Stingray Pressure

16 Pumping?

17     A    Yes, I have.

18     Q    Okay.  And you were also the controller of

19 Archer - the well company?

20     A    I was controller of the pressure pumping

21 entity that was wholly owned by Archer Well.

22     Q    Okay.  And Stingray and Archer have both been

23 the subjects of wage-an-hour lawsuits, correct?

24     A    By "Archer," if you're referencing Archer

25 Pressure Pumping, I don't recall any wage-an-hour

Page 15

1 matters in regards to Archer Pressure Pumping.

2     Q    Now -- and I realize you have a very technical

3 knowledge of every single one of these entities and

4 which ones are which, but that's not my question.

5          My question is:  Were you affiliated with

6 Archer or any of its affiliates that were the subject of

7 a wage-an-hour lawsuit?

8     A    What I'm telling you is I worked for Archer

9 Pressure Pumping --

10     Q    Uh-huh.

11     A    -- for the time period referenced.  I worked

12 for Archer Well for a couple of months towards the tail

13 end of that.  In my capacity in those roles, I'm not

14 aware of any FLSA matters regarding Archer Pressure

15 Pumping.  While I was at Archer Well for that short

16 stint, I wasn't involved in any FLSA matters.

17     Q    Did you -- have you -- besides the -- the

18 cases involving Mammoth and its subsidiaries that we've

19 already covered, have you provided any testimony about

20 wage-an-hour matters in -- in the past?

21     A    In regards to testimony on wage-an-hour

22 matters, I -- I don't recall any testimony other than

23 that testimony that I referenced earlier in the

24 deposition today.

25     Q    Were you a chief financial officer with

Page 16

1 Stingray Pressure Pumping when Stingray was the subject

2 of a wage-an-hour lawsuit?

3     A    Yes, I was.

4     Q    Okay.  What was your -- did you have any role

5 in that lawsuit at all?

6     A    Ancillarily, I was involved.  I don't believe

7 I offered any testimony in that matter.

8     Q    What was the nature of the claim?

9     A    I believe that was a wage-an-hour matter, as I

10 recall.

11     Q    Do you remember what kind?

12     A    No, sir.  I don't -- I don't recall off the

13 top of my head.

14     Q    Okay.  Was it one of the ones that my firm

15 brought?

16     A    I don't recall who the plaintiffs in the

17 matter were.

18     Q    All right.  So Mammoth Energy owns Cobra and

19 Higher Power, correct?

20     A    That's incorrect.

21     Q    Okay.  Why is it incorrect?

22     A    Mammoth Energy Services, Inc., owns Mammoth

23 Energy Partners, LLC.  Mammoth Energy Partners, LLC,

24 owns Lion Power.  Lion Power owns Higher Power and

25 5 Star.

Page 17

1          (Plaintiffs' Exhibit 154 marked.)

2     Q    (By Mr. Moulton) I'm going to show you what's

3 been labeled as Plaintiff's Exhibit 154.

4          MR. STUKENBERG:  So has this been

5 produced?

6          MR. MOULTON:  Yes.  It's produced by you,

7 Will, just like it says at the bottom.

8          MR. STUKENBERG:  Okay.

9          MR. MOULTON:  Yes.

10     Q    (By Mr. Moulton) Mr. Layton, looking at

11 exhibit -- Plaintiff's Exhibit 154, do you recognize

12 this as Mammoth Energy Services, Inc.'s, announcement of

13 their operational and financial results for 2017?

14     A    Appears to be the case, yes.

15     Q    Yeah.  You see in the very first paragraph

16 that Mammoth Energy Services, Inc., is referred to as

17 "Mammoth" or the "Company"?

18     A    I see that.

19     Q    Okay.  If we go to the very next page, 3792,

20 it says here, "During 2017, Mammoth broadened its

21 service offerings by expanding into the utility

22 infrastructure business with the formation of Cobra

23 Acquisitions, LLC, ('Cobra')."

24          Do you see that?

25     A    I see that.

**MARK LAYTON - April 15, 2022**

Page 18

1    Q    That's a true statement, isn't it?

2    A    It's a statement regarding the -- the company.
3 So it doesn't say that Mammoth Energy Services, Inc.,
4 owns Mammoth Energy Partners, which owns the
5 subsidiaries, nor does it have to.

6    Q    No.  I'm just -- I'm just -- I have a simple
7 question.  I know you want to give a speech, but my
8 question is:  Is this accurate or not?

9    A    I'm not giving a speech.  I'm giving you the
10 technical detail, and you're trying to --

11    Q    No.

12    A    -- parse a paragraph.

13    Q    No.  I just want to know if that statement is
14 true or not.  Is it true or -- do you agree with it or
15 no?  Yes or no?

16    A    It's a true statement --

17    Q    Okay.  Then let's --

18    A    -- but you're parsing --

19    Q    Thanks.

20    A    -- detail that's missing from the statement --

21    Q    No, that's --

22    A    -- so --

23    Q    -- not what I'm asking.

24         MR. STUKENBERG:  The witness needs --

25    Q    (By Mr. Moulton) That's fine.  Thank you.

Page 19

1         MR. STUKENBERG:  If the witness needs to
2 finish his answer to give context, please allow him to
3 do so.

4         MR. MOULTON:  That's -- I -- I will
5 ask -- if I want context, I'll ask for context.

6    Q    (By Mr. Moulton) All right.  Now, let's keep
7 going in the sentence.  "Mammoth broadened its service
8 offerings by expanding into utility infrastructure
9 business with the formation of Cobra Acquisitions" -- we
10 covered that -- and the acquisitions of Higher Power
11 Electrical, LLC, and 5 Star Electric, LLC, in July of
12 2017.

13         Do you agree with the rest of that
14 sentence that we just read?

15    A    That is correct with the caveat that I gave
16 you earlier regarding context to the matter.

17    Q    So in -- I'm going to have -- ask you for a
18 little while -- we're going to talk about Mammoth Energy
19 and its affiliates with respect to work in Puerto Rico,
20 the work that is the subject matter of this case with
21 the workers that are suing Mammoth and Cobra and Higher
22 Power for overtime pay.

23         Do you under -- just -- I'm kind of --
24 just kind of letting you know that.  Do you understand
25 that?

Page 20

1    A    I understand the generalization.  I object to
2 the characterization that Mammoth Energy Services, Inc.,
3 did any work in Puerto Rico.  It did not.  Mammoth
4 Energy Services, Inc., has no employees.  As such,
5 Mammoth Energy Services, Inc., did no work in Puerto
6 Rico and had no employees to do any work in -- in Puerto
7 Rico, underneath that legal entity.  The subsidiaries
8 did work.  Mammoth Energy Services, Inc., did not.

9         MR. MOULTON:  I'm going to object to all
10 that as nonresponsive.

11         (Plaintiffs' Exhibit 155 marked.)

12    Q    (By Mr. Moulton) All right.  Sir, let's go to
13 Exhibit 155.  Are you familiar with an audit that was
14 performed by FEMA that's Exhibit 155?

15    A    I don't believe this is an audit.  I'm
16 familiar with this document.

17    Q    What would you call it?

18    A    It's labeled on the front, but it's certainly
19 not an audit.

20    Q    What do you call this document?

21    A    I call it audit with a -- that it's named, but
22 an audit has a technical connotation that's not the
23 case --

24    Q    Okay.

25    A    -- for this particular document.

Page 21

1    Q    For purpose of this deposition, to make this
2 easier between me and you so we don't, like, go back and
3 forth over who's using which word, what word do you
4 prefer to talk to -- when we talk about this document?

5    A    The document's labeled as it is, and I'll let
6 it speak for itself.

7    Q    Okay.  We'll call it Exhibit 155.  Is that
8 okay with you?

9    A    Sure.

10    Q    Okay.

11         All right.  So in Exhibit 155, I want to
12 direct your attention to Page 771.  And this is talking
13 about a company -- one of the affiliates of Mammoth --
14 Mammoth services -- Mammoth Energy Services, Inc.,
15 called Cobra, correct?

16    A    Indirectly, yes.

17    Q    Okay.

18    A    We've already gone through the technical
19 legal --

20    Q    All right.

21    A    -- structure.

22    Q    So Cobra got a contract to perform work in
23 Puerto Rico to restore power after Hurricane Maria,
24 correct?

25    A    There were two separate contracts.

## MARK LAYTON  -  April 15, 2022

Page 22

1    Q    Okay.  So what are the two contracts?

2    A    There was a contract entered into in October,
3  2017, regarding the -- the restoration of power services
4  in Puerto Rico between Cobra Acquisitions and the Puerto
5  Rico Electric Power Authority.  There's a second
6  separate contract entered into in 2018 between those two
7  entities.

8    Q    Okay.  And that was -- the first one was
9  restoration.  The 2018 contract, what do you -- what do
10  you call it?

11    A    It was restoration as well, but it had some
12  reconstruction aspects.

13    Q    Okay.  Restoration and reconstruction in 2018;
14  is that correct?

15    A    Yes, sir.

16    Q    All right.  So looking at the highlighted part
17  on your screen that's Bates numbered 771 in Exhibit 155,
18  we -- we show here a summary of what the Cobra contract
19  included.

20         Do you agree with that summary?

21    A    That's a high-level summary of the amounts
22  that PREPA agreed to compensate Cobra for services under
23  that contract.

24    Q    Okay.  So on that -- the first bullet point of
25  the highlight, "A 250-lineman crew, including labor and

Page 23

1  equipment, at a daily blended rate of $4,000 per day --
2  or per skilled lineman per day."

3         Do you agree with that?

4    A    That's what the statement says, yes.

5    Q    Okay.  And do you agree with the next one?  "A
6  550-person camp, including meals, lodging, power, and
7  laundry, at a daily rate of $155,000."

8    A    That's correct.

9    Q    Okay.  And do you agree with that -- the
10  contract also provided for, "A 104-person security team
11  at $2,000 per person per day"?

12    A    That's what it states, yes.

13    Q    And, "A 50-person logistics team at $2500
14  person -- per person per day"?

15    A    That's correct, yes.

16    Q    And, "A 30-person management, operations, and
17  safety team at 2500 per person per day."

18         Do you agree with that as well?

19    A    Yes, sir.

20    Q    Okay.  Where did Cobra get the money to pay
21  for all this?

22    A    These are the rates that Cobra was paid by
23  PREPA.

24    Q    Right.  Okay.  So -- so PREPA paid Cobra
25  for -- to provide all this?

Page 24

1    A    Those are the contracted rates for those
2  items.

3    Q    Okay.  How is it, then -- I mean, because the
4  reason why I was a little confused is you're aware of
5  the fact that, like, you know, Higher Power didn't have
6  enough money to meet the first payroll on the island.

7         Does that sound familiar to you?

8    A    That's an incorrect statement that you've
9  made.

10    Q    Okay.  Why -- why -- why is that incorrect?

11    A    I think you're overgeneralizing a treasury
12  service.  So to make a flamboyant statement that Higher
13  Power did not have the money to fund payroll is -- is
14  technically incorrect.  It's not part of the treasury
15  system.  So I think that you lack some -- some detail
16  to -- to make that conclusory statement.

17    Q    Okay.  Well, does Higher Power have its own
18  bank account?

19    A    Yes, it does.

20    Q    Okay.  So was there enough money in its bank
21  account to make the first payroll?

22    A    Higher Power made all of its payrolls.

23    Q    And how did it make its payroll?

24    A    Through a treasury management system.

25    Q    What's the treasury management system?

Page 25

1    A    The treasury management system is managed by
2  Mammoth Energy, Inc.

3    Q    Okay.

4    A    Cash is swept daily from the subsidiary level,
5  Higher Power being one of those subsidiaries, up to
6  Mammoth Energy Partners, LLC.  Those entries are
7  recorded on all of the subsidiary books in and out of
8  their own legal bank accounts.  Cash is pushed up and
9  down as necessary under that consolidated treasury
10  management system between the legal entities, as I
11  mentioned, managed by Mammoth Energy, Inc.

12    Q    And what's Mammoth Energy, Inc.'s,
13  relationship to Mammoth Energy Services, Inc.?

14    A    Mammoth Energy Services, Inc., owns Mammoth
15  Energy Partners, LLC.  Mammoth Energy Partners, LLC,
16  owns Mammoth Energy, Inc.

17    Q    And I'm -- and I believe you've testified
18  earlier that the -- the term y'all use is cash sweeping
19  down and up?

20    A    As part of a broader answer regarding a
21  treasury management system between the entities.

22    Q    Okay.  So Mammoth Energy, Inc., can push cash
23  down the line to subsidiaries like Higher Power.  It can
24  also sweep the cash up; is that right?

25    A    That's not what I testified to.

## MARK LAYTON - April 15, 2022

Page 26

1    Q    I'm asking you is that true because that's
2  what it sounds like you're saying to me.  I'm just
3  asking you to verify.
4    A    What I said to you was Mammoth Energy, Inc. --
5    Q    Uh-huh.
6    A    -- managed the processes, meaning the
7  employees inside of Mammoth Energy, Inc. --
8    Q    Right.
9    A    -- managed that process.  The cash is moved
10 between Mammoth Energy Partners, LLC, and various
11 subsidiaries, including Higher Power.
12   Q    Okay.  So it -- but Mammoth Energy, Inc.,
13 manages that entire process?
14   A    Mammoth Energy, Inc., employs the individuals
15 through a shared services agreement.  So in that
16 context, yes.
17   Q    So it's --
18   A    Those shared services are billed to each one
19 of those entities on a monthly basis.  So in other
20 words, in this generalized example that you've given, if
21 Higher Power pushed money to Mammoth Energy Partners,
22 LLC, Higher Power would record that on their financials
23 and their bank account.
24   Q    Uh-huh.
25   A    Mammoth Energy Partners, LLC, would record it

Page 27

1  on their financials; and it would hit their bank
2  account.  Mammoth Energy, Inc., who has the employees
3  that manage this process, would invoice both Mammoth --
4  would record a charge to both Mammoth Energy Partners,
5  LLC, as well as Higher Power for those shared services
6  provided on a monthly basis.
7    Q    Okay.  So if a company like 5 Star or -- or
8  Higher Power needs money for payroll, they can get that
9  money through this process?
10   A    Overgeneralized; but, yes, that's the
11 high-level context.
12   Q    Right.  And you said with the shared resources
13 that -- are some employees in the shared resources
14 group?
15   A    Mammoth Energy, Inc., does have employees,
16 yes.
17   Q    Right.  But when you said "shared resources,"
18 is -- are -- are the folks in that shared resource group
19 with Mammoth Energy, Inc., only employed by Mammoth
20 Energy, Inc.; or are they also employed by other
21 companies?
22   A    The employees that are employed by Mammoth
23 Energy, Inc., are employed by Mammoth Energy, Inc.
24 That's who their paychecks come from.  That's what their
25 W-2s state.  Their services, to the extent they perform

Page 28

1  services to the other entities, when specifically
2  identifiable, are recorded to those entities.  When
3  they're not specifically identifiable, they are
4  allocated to entities for which Mammoth Energy, Inc.,
5  performs services on a monthly basis.
6    Q    So I guess maybe more directly, is -- does
7  Higher Power have any employees that are on this shared
8  resources employee group during the time we're talking
9  about?
10   A    Higher Power employees are Higher Power
11 employees.
12   Q    Uh-huh.
13   A    Mammoth Energy, Inc., employees are Mammoth
14 Energy, Inc., employees.
15   Q    Okay.  So the -- the sweeping that's managed
16 by MEI doesn't have -- the employees that are doing that
17 don't have any Higher Power guys on it -- or any Higher
18 Power employees on it?
19   A    As I mentioned, Mammoth Energy, Inc.,
20 employees are Mammoth Energy, Inc., employees.  Higher
21 Power employees are Higher Power employees.  To the
22 extent there are shared services, then those shared
23 services are billed across the legal entities.
24        MR. MOULTON:  And -- and I'll object to
25 that as nonresponsive.

Page 29

1    Q    (By Mr. Moulton) I wasn't asking about how
2  it's billed.  I just wanted to make sure -- because
3  there's -- without having to go name everybody, because
4  I -- there's no point in that.  For Mammoth Energy,
5  Inc., that have managed this financial sweeping process,
6  I just have a simple question:  The folks that are
7  managing that financial sweeping process at Mammoth
8  Energy, Inc., none of them are also employees of Higher
9  Power.  Yes or no?
10   A    The employees in both legal entities have
11 single employers.
12   Q    Okay.  So the answer is no, there aren't --
13 there aren't any -- there's no mixing there.  Like,
14 there's no Higher Power people on the MEI folk -- in the
15 MEI group of people that manage the sweeping of the
16 money?
17   A    You're -- you're conflating issues and I
18 realize that you're -- you're intentionally leaving that
19 vague, but you're leaving out detail.
20   Q    I don't know why you're --
21   A    The employees --
22   Q    Look, Man, you don't --
23   A    If you'll let me finish --
24   Q    No, hold on.
25   A    -- I'll finish.

**MARK LAYTON - April 15, 2022**

Page 30

1    Q    You're -- okay.  This deposition is not going
2 to go anywhere if you keep impugning my motives and my
3 questions.  That's not your job, and I'm -- and we're
4 not going to have anymore of it.  You answer questions.
5 That's what your job is.  If I have something -- if
6 there's something wrong with my question, you can point
7 that out, okay?
8              MR. STUKENBERG:  And that's what he's
9 doing.
10             MR. MOULTON:  And I'm -- and --
11             MR. STUKENBERG:  He's answering --
12             MR. MOULTON:  -- I'm not trying --
13             MR. STUKENBERG:  -- questions.
14             MR. MOULTON:  No.  I'm not -- I don't --
15 I'm not -- I'm not -- I'm just trying to understand
16 this.
17    Q    (By Mr. Moulton) Let's back up, okay?  Mammoth
18 Energy, Inc., has a group of shared resources people
19 that manage the sweeping of the money.  Yes or no?
20    A    You're parsing my testimony.  I said Mammoth
21 Energy, Inc., has employees.  Some of those employees
22 provide shared services to other legal entities.
23    Q    What does that mean?
24    A    That means Mammoth Energy, Inc., has employees
25 that provide shared services to other legal entities

Page 31

1 including treasury, insurance, consulting on matters
2 such as HR, payroll, IT, back-office type services.
3    Q    Okay.  These employees that are providing the
4 shared services, what does it mean to provide a shared
5 service?
6    A    It means that those employees are providing
7 services to more than one legal entity, for which they
8 charge those legal entities.
9    Q    Okay.  That would include then folks that are
10 shared services -- that are providing services for
11 Higher Power?
12    A    Higher Power, amongst other legal entities --
13    Q    Okay.
14    A    -- would be the recipient of --
15    Q    And I realize there's a whole -- we're talking
16 about a huge conglomerate of companies, and I'm not
17 asking about them right now.  I'm asking --
18    A    I'm asking to speak without you talking over
19 the top of my answer.
20    Q    Yeah.  Well, we're going to be here all day if
21 you just keep on adding stuff that we're not talking
22 about, okay?  So I want to know a simple question.  With
23 the -- can we call it MEI, Mammoth Energy, Inc.?
24             Mammoth --
25    A    Sure.

Page 32

1    Q    -- Energy, Inc., the shared resources.  There
2 are folks in that shared resources that are providing
3 services for Higher Power as well as others, correct?
4    A    That is correct.
5    Q    Okay.  And those services will
6 include treasury services, correct?
7    A    Among others, yes.
8    Q    And insurance, correct?
9    A    Yes.
10    Q    And HR services, correct?
11    A    Yes.
12    Q    As far as HR services go, is Jeff Beagle one
13 of those people?
14    A    Jeff Beagle would be employed by Mammoth
15 Energy, Inc., yes.
16    Q    Who are the -- who are the folks that would
17 have worked with Higher Power for the treasury shared
18 services from Mammoth Energy, Inc.?
19    A    From Mammoth Energy, Inc., I am an employee of
20 Mammoth Energy, Inc.  My W-2 comes from Mammoth Energy,
21 Inc.  Bill Short would have provided some treasury
22 services from Mammoth Energy, Inc., to other legal
23 entities.
24    Q    So for Higher Power to meet its first payroll,
25 did it utilize these shared services?

Page 33

1    A    To -- meet its first payroll is not the
2 correct connotation.  So we've already gone through the
3 treasury management service.  The cash, whether it for
4 payroll or for vendor disbursements, would routinely be
5 requested by Higher Power; and then that would be sent
6 to Mammoth Energy, Inc.  Mammoth Energy, Inc., as part
7 of its shared services, would manage that treasury
8 function.
9    Q    Now, regarding Higher Power with the workers
10 on the island in Puerto Rico, okay?  We have workers
11 that are using all kinds of trucks, equipment, you know,
12 all -- all sorts of things that they need to be able to
13 restore the power.  Can you give me a brief overview of
14 what equipment that was that they were using?
15    A    In the context of -- of Higher Power?
16    Q    Yes, sir, Higher Power.
17    A    Their equipment would consist of bucket
18 trucks, pressure diggers, from time to time, brush
19 clearing equipment such as dozers, pole trailers, pickup
20 trucks, as well as ancillary support equipment.
21    Q    Do you know who -- which entity actually owned
22 the equipment you just mentioned?
23    A    Higher Power Electric had their own equipment
24 in Puerto Rico.  Higher Power also leased equipment to
25 perform some services in Puerto Rico.

## MARK LAYTON - April 15, 2022

Page 34

1   Q    Who would they lease to?
2   A    From.
3   Q    Oh, lease from.  Who would they lease from?
4   A    Higher Power likely had some leases from
5 various rental companies as well as there -- there may
6 have been some leases from either Cobra Acquisitions or
7 from 5 Star Electric.
8   Q    Are you aware of workers for Higher Power in
9 Puerto Rico taking company logos, specifically Cobra
10 logos, and putting them over Higher Power logos and
11 5 Star logos?  Have you heard of that?
12  A    I have not.
13  Q    Okay.  Do you have an opinion either way about
14 whether or not that would be true?
15  A    I have --
16       MR. STUKENBERG:  Objection, form.
17  A    I have no opinion.  I'm -- I'm not aware of
18 that instance.
19  Q    (By Mr. Moulton) Okay.
20  A    But to -- to the extent that there were
21 intercompany leases relative to equipment, there very
22 possibly could have been new logos placed on -- on some
23 equipment to reflect the entity leasing the equipment.
24  Q    Mammoth Energy Services, Inc., provides
25 employee benefits for the plaintiffs, correct?

Page 35

1   A    Mammoth is -- Mammoth Energy Services, Inc.,
2 and its subsidiaries have employee benefits underneath a
3 multiemployer benefit plan.
4       (Plaintiffs' Exhibit 156 marked.)
5   Q    (By Mr. Moulton) I'm going to show you what's
6 been labeled as -- or numbered as Plaintiff's Exhibit
7 50 -- 156.  We have an email here from Jeff Beagle dated
8 November 6th -- November 6th, 2017.
9       Do you see it?
10  A    Yes, sir.
11  Q    Okay.  And this is an email about 2018
12 benefits open enrollment, correct?
13  A    Yes, sir.
14  Q    So for -- Mammoth -- what -- for what's -- for
15 what entities does Mammoth Energy provide the -- the
16 employee benefits?
17  A    Each one of the legal entities provide their
18 own benefits, as I mentioned, through a multiemployer
19 plan.  So there are approximately 53 legal entities.
20 Some of which have employees and benefits, some of which
21 do not.
22  Q    Okay.  So on the page here that's been Bates
23 numbered 853 in Exhibit 156, what's the name of the
24 company above the "2018 Employee Benefits Guide"?  Can
25 you read that for me?

Page 36

1   A    The logo is Mammoth Energy Services, Inc.
2   Q    In this benefits guide on 854, can you read to
3 me who it's addressed to?
4   A    Are you talking about the -- the first line
5 there?
6   Q    Yeah.  Who -- who -- who is this -- this
7 document, this employee benefits, who is it addressed
8 to?  Maybe it doesn't say on here.  Maybe it's -- yeah,
9 it doesn't say on here, I guess.  I thought it did, but
10 could you tell me who it's addressed to?
11  A    I don't see that it's addressed specifically
12 to anyone.
13  Q    Okay.  Well, it was sent by Jeff Beagle,
14 right?
15  A    That's correct.
16  Q    And he sent it to himself?  You see that?
17  A    Yes, sir.
18  Q    Okay.  But this is a document that gets
19 distributed to workers like employees of Higher Power
20 for instance, right?
21  A    I believe that's a presumption.
22  Q    Do you know?
23  A    I can't tell the recipients based on the --
24 the line that you've shown.
25  Q    Okay.  Well, do you have knowledge of this

Page 37

1 document being sent to the employees of Higher Power?
2   A    Very possibly could have been sent to the
3 employees of -- of Higher Power as part of the
4 multiemployer benefit plan.  That's correct, yes.
5   Q    Okay.
6       All right.  So on Page 855 in this
7 exhibit, talks about eligibility.  It says, "When am I
8 eligible for coverage?  Your benefits are effective the
9 first of the month following your date of hire.  You
10 must be a full-time employee working 30 or more hours
11 per week."
12       Do you agree with that?
13  A    That's what it says, yes.
14  Q    All right.  Where on this document does it say
15 Higher Power, 5 Star, or any of the other 53 companies?
16  A    I haven't flipped through the entire document.
17  Q    Well, on this page does it say which entity
18 you had to be an employee of?
19  A    It says you have to be an employee.  This
20 would have been pushed out through -- presumably through
21 Paycom, it appears, which is the HR/IS provider for
22 which each one of the employees would log in to -- to
23 their specific account.  They would make the elections.
24 Depending on their elections, then their employer --
25 which in your example, Higher Power -- Higher Power

MARK LAYTON  -  April 15, 2022

Page 38

1 would withhold any premiums from their -- that
2 employee's payroll.
3        Q    All right.  So Mammoth Energy -- Mammoth
4 Energy's employee benefit plan includes all the services
5 here on Page 856 in Exhibit 156, correct?
6             MR. STUKENBERG:  Can you repeat that?
7 Sorry.  I missed it.  Would you mind repeating it?
8        Q    (By Mr. Moulton) So Mammoth Energy's benefits
9 plan includes all the services right here on Page 856 in
10 Exhibit 156, correct?
11            MR. STUKENBERG:  Objection, form.
12       A    Mammoth Energy Services, Inc., and the
13 employers that are part of this benefit plan, all of
14 those legal entities under this multiemployer plan
15 offered the benefits outlined on this page for the 2018
16 plan year.  Those offerings were from each of those
17 employers inside of that multiemployer plan.
18       Q    (By Mr. Moulton) And I realize you say that
19 now, but this document doesn't say that.
20            MR. STUKENBERG:  Objection, form.
21       Q    (By Mr. Moulton) It says it's Mammoth Energy
22 Services, Inc., as we've already established, right?
23       A    We've already established it's a multiemployer
24 plan, and the offerings were from those employers in
25 that multiemployer plan to their employees.

Page 39

1        Q    We're -- I mean, we're scrolling through this
2 document and I have yet to see any of these other 53
3 companies on here.  I mean, you tell me when you see it.
4            Do you see it?
5        A    As fast as you flipped through there, I
6 couldn't see a lot.  It's a multiemployer plan, and each
7 one of those employers offer the benefits outlined for
8 the 2018 plan year.
9        Q    Okay.  So it's your testimony that the Mammoth
10 Energy Services, Inc., 2018 Employee Benefits Guide is
11 actually another company's benefits guide?
12            MR. STUKENBERG:  Objection.  That
13 mischaracterizes his testimony.
14       A    That's not at all what I testified to.
15       Q    (By Mr. Moulton) Okay.  So it is Mammoth
16 Energy Services, Inc.'s benefit guide?
17       A    This is a benefit guide for a multiemployer
18 plan.
19       Q    If Mammoth -- so let me just make sure.
20 You've -- you kind of voluntarily offered that Mammoth
21 Energy Services, Inc., doesn't have any employees.  It
22 doesn't own any equipment.  Did -- is that what you
23 said?
24       A    I don't believe I said anything about Mammoth
25 Energy Services, Inc., and their equipment.  Mammoth

Page 40

1 Energy Services, Inc., does, in fact, not have any
2 employees.  There are no employees that receive a W-2
3 from Mammoth Energy Services, Inc., or that ever have
4 received a W-2 from Mammoth Energy Services, Inc.
5        Q    So does Mammoth Energy Services, Inc., own
6 equipment or not?
7        A    Mammoth Energy Services, Inc., does not own
8 any equipment.
9        Q    Okay.
10            (Plaintiffs' Exhibit 157 marked.)
11       Q    (By Mr. Moulton) All right.  We're going to
12 show you Exhibit 157.  Have you seen this letter before?
13       A    I don't recall seeing this particular letter,
14 no, sir.
15       Q    If Mammoth Energy has no employees, why does
16 it write to its employees?
17            MR. STUKENBERG:  Objection, form.
18       A    You're mischaracterizing my testimony.  My
19 testimony was that Mammoth Energy Services, Inc.,
20 doesn't have any employees.  I've already testified that
21 Mammoth Energy, Inc., has employees and performs shared
22 services for other legal entities.
23       Q    (By Mr. Moulton) Okay.  So Mr. Darrell Thomas,
24 the second page of this exhibit, his W-2 employer is
25 Higher Power Electrical, LLC.

Page 41

1            Do you see that?
2        A    I see that.
3        Q    Okay.  Why does he get a letter saying "Dear
4 Mammoth Energy Employees"?
5        A    I believe this is addressed to probably
6 multiple different employers.  Mammoth Energy is not a
7 legal -- Mammoth Energy is not a legal name in this
8 document.
9        Q    Okay.  So which Mammoth Energy company sent
10 this letter?
11       A    Well, there's -- that's not a legal name
12 that's in this document.
13       Q    Right.
14       A    We've already testified that --
15       Q    Not we, you, but anyways go ahead.
16       A    Appreciate the context there.
17            Mammoth Energy, Inc., provides shared
18 services to -- to other legal entities.
19       Q    Okay.  My -- I have a real simple question.
20 On the face of this document, Plaintiff's Exhibit 157,
21 you can't tell me which Mammoth Energy entity sent this
22 letter?
23       A    There's not a legal name on this letter.
24       Q    That's -- right.  So -- but --
25       A    But I can tell you --

## MARK LAYTON - April 15, 2022

Page 42

1    Q    Go ahead.
2    A    -- that Mammoth Energy Services, Inc., has no
3 employees, has -- has no shared services function.  So
4 to the extent that there's a communication regarding the
5 loose legal term of, quote, unquote, Mammoth, that would
6 be from a Mammoth Energy, Inc., employee --
7    Q    All right.
8    A    -- as part of that shared services function
9 that Mammoth Energy, Inc., employees perform for other
10 entities.
11   Q    So this loose language was written by a
12 Mammoth company but certainly not by one of the
13 plaintiffs, correct?
14   A    This communication was a cover letter that was
15 sent that outlines the employee, in this instance, their
16 legal employer --
17   Q    All right.
18   A    -- in Box 2.
19   Q    So the -- what I'm just -- what I'm trying to
20 just pin down is just want to make sure that this loose
21 language you've referred to is the fault of someone in a
22 Mammoth Energy company, like Mammoth Energy, Inc., or
23 Mammoth Energy Services, Inc., but one of them, correct?
24   A    Mammoth Energy Services, Inc., has no
25 employees.  So it has no ability to communicate.  So to

Page 43

1 the -- to the extent you're trying to say that Mammoth
2 Energy Services, Inc., sent this communication, that's
3 not physically possible.  There are three individuals
4 that have an officer role in Mammoth Energy, Inc., and
5 none of those three individuals sent this out.
6    Q    Okay.  So -- so you're confident then that
7 this was sent out by Mammoth Energy, Inc.?
8    A    There is not a legal entity --
9    Q    Well, who --
10   A    -- on here.
11   Q    -- else could it be?
12   A    Can I finish my --
13   Q    Yeah.
14   A    -- answers, or are you going to talk over me
15 all day?
16   Q    Who else could it be?  Besides Mammoth Energy,
17 Inc., who else could it be?
18   A    Mammoth Energy, Inc., is the only entity that
19 provides shared services to other entities across the
20 portfolio.
21   Q    So --
22   A    So --
23   Q    -- no one else?
24   A    -- to the extent that Mammoth is usely -- used
25 in this communication, Mammoth Energy, Inc., would be

Page 44

1 the only legal entity that would be able to push that
2 out.
3    Q    And in that legal entity, there's only three
4 people that could have sent it, right?
5    A    That's not what I said.
6    Q    Yes or no?
7    A    That's not what I said.
8    Q    Well, how many people could have sent it?
9    A    There are three people inside of Mammoth
10 Energy Services, Inc. --
11   Q    Okay.
12   A    -- that have officer roles.  You said Mammoth
13 Energy, Inc.  You're conflating two different legal
14 entities and --
15   Q    I thought you were --
16   A    -- that's incorrect.
17   Q    That's fine.
18   A    That's procedurally incorrect.
19   Q    I hear you.  I just thought you said -- I just
20 got the name wrong.  So who sent this letter?
21   A    I can't tell from this who sent this letter,
22 but it wasn't any of the three individuals that have
23 officer roles at Mammoth Energy Services, Inc.
24             (Plaintiffs' Exhibit 158 marked.)
25   Q    (By Mr. Moulton) All right.  I'm going to show

Page 45

1 you Exhibit 158.  Exhibit 158 is a letter from -- or to
2 Mammoth Energy about errors in W-2s, correct?
3    A    Appears to be, yes.
4    Q    Okay.  And it actually -- it's informing these
5 folks that because there's been an error with their W-2,
6 that they can get help dealing with their IRS issues by
7 going with this lawyer, Allison Harvey of McAfee & Taft,
8 correct?
9    A    It's a general statement of the context.
10   Q    Is that true?
11   A    I've said you've made a generalized statement.
12   Q    Is it true or no?  Do you agree with it?
13   A    Do I agree that it's a letter to wages earned,
14 for -- in this instance, Higher Power Electrical to
15 employees of Higher Power to -- that they could reach
16 out for help from McAfee & Taft, yes, that's a
17 generalized statement.
18   Q    Okay.  So who paid for the legal services to
19 have folks get their W-2s paid -- fixed?
20   A    In this instance, Paycom.
21   Q    Paycom.  Is -- how does Paycom -- how does it
22 fit into the Mammoth empire?
23   A    I don't know what the context of the "Mammoth
24 empire" is.
25   Q    Is Paycom a subsidiary?

**MARK LAYTON  -  April 15, 2022**

Page 46

1    A    No, sir.

2    Q    Okay.  Who -- is Paycom related at all to

3 Mammoth or Cobra or any of the companies we're talking

4 about?

5            MR. STUKENBERG:  Objection, form.

6    A    Paycom is a publically traded HR/IS provider.

7    Q    (By Mr. Moulton) Okay.

8    A    So to the extent you're conflating ownership,

9 there is no cross-ownership.  Paycom is a service

10 provider to Mammoth Energy, Inc., as well as other

11 subsidiaries owned inside of the broader Mammoth

12 portfolio.

13    Q    Why would Mammoth Energy write folks that

14 worked for Higher Power about their W-2 with Higher

15 Power?  Why wouldn't it come from Higher Power?

16            MR. STUKENBERG:  Objection, the letter is

17 from Paycom.

18            MR. MOULTON:  No, it --

19    A    This -- this letter is on Paycom letterhead

20 and sent out by Paycom, not by Mammoth Energy.  So to

21 try to intertwine a letter from Mammoth when it clearly

22 came from Paycom is -- is incorrect.

23    Q    (By Mr. Moulton) Paycom is just a service.

24    A    Paycom sent out this letter.

25    Q    Paycom sent out the letter because someone in

Page 47

1 Mammoth Energy told to send this letter out, right?

2    A    No, sir.

3    Q    Paycom, on its own accord, sent out this

4 letter?

5    A    Paycom sent out this letter.

6    Q    Without any input from Mammoth?

7    A    The input, if any, would have been between

8 Mammoth Energy, Inc., as shared service provider, to

9 Paycom, relative to issues that Paycom had as a service

10 provider, relative to reporting for Higher Power

11 Electrical as well as other entities.  This letter came

12 clearly from Paycom.

13    Q    Right.  But the initiation came from Mammoth

14 Energy, Inc.?

15    A    The initiation came from Paycom due to errors

16 associated with reporting of Puerto Rico wages that were

17 made by Paycom.

18    Q    Allison Harvey, who's paying her bills?

19    A    Paycom.

20    Q    Who's paying Paycom for those?

21    A    Paycom is paying Allison Harvey vis-a-vis

22 McAfee & Taft for these services.

23    Q    So Mammoth Energy has not contributed -- or

24 any Mammoth Energy companies or affiliates have not

25 contributed any money to that?

Page 48

1    A    In regards to a Mammoth Energy, Inc., entity

2 or other subsidiary of Mammoth Energy Partners, LLC,

3 none of those entities have compensated Paycom in

4 regards to charges incurred by Paycom for McAfee & Taft.

5    Q    So the -- the screwup with the W-2s, was it

6 Paycom's fault?

7    A    As I mentioned, there was an error in

8 reporting that was Paycom's fault for which Paycom is

9 incurring the fees of McAfee & Taft.

10    Q    So the -- the mistake that Paycom made wasn't

11 due to, well, inadequate or -- or incorrect reporting by

12 any of the Mammoth companies, correct?

13    A    The characterization of reporting by Mammoth

14 companies is technically loose.  So each one of the

15 legal entities would input their own payroll and report

16 information to Paycom through their own accounts.  The

17 reporting issues incurred by Paycom and the errors were

18 Paycom's fault.  They took responsibility for it, and

19 Paycom sent this letter out.

20            (Plaintiffs' Exhibit 159 marked.)

21    Q    (By Mr. Moulton) Plaintiff's Exhibit 159.

22 We've got the medical insurance card for Don Wimberley,

23 who's an employee of Higher Power, correct?

24    A    I'd have to look at Mr. Wimberley's employee

25 file to find his legal employer.  We've already covered

Page 49

1 that the benefits are part of a multiemployer plan.

2    Q    So the -- the company on his health insurance

3 card is Mammoth Energy Services, Inc., correct?

4    A    The logo on his card and the name on it, as

5 part of the multiemployer plan, the plan holder is

6 Mammoth Energy Services.  Again, it's a multiemployer

7 plan.  We've covered that ad nauseam.

8            (Plaintiffs' Exhibit 160 marked.)

9    Q    (By Mr. Moulton) All right.  So the -- let's

10 talk about his 401(k).  Darrell Thomas' 401(k)

11 statement, Plaintiff's Exhibit 160.  We see not Higher

12 Power at the top but it's from Mammoth Energy Partners,

13 LP.

14            Do you see that?

15    A    Again, that's a multiemployer plan.

16    Q    So now it's Mammoth Energy Partners, LP, that

17 has the multiemployer plan, or is it Mammoth Energy

18 Services, Inc., that has the multiemployer plan?

19            MR. STUKENBERG:  Which -- which

20 multiemployer plan are you talking about, the 401(k) or

21 the medical?

22            MR. MOULTON:  Let's let the witness

23 clarify.  I'm obviously --

24            MR. STUKENBERG:  Sure.

25            MR. MOULTON:  -- ignorant to this.

Page 14 of 67 (Pages 50-53)

## MARK LAYTON - April 15, 2022

Page 50

1    Q    (By Mr. Moulton) So tell me -- tell me what
2 the answer is.
3    A    For the 401(k) plan, it's a multiemployer plan
4 that -- this one is sponsored by Mammoth Energy
5 Partners.
6             (Plaintiffs' Exhibit 161 marked.)
7    Q    (By Mr. Moulton) We're going to look at
8 Exhibit 161, which is an email about payroll.  So it
9 involves Jeff Beagle, Bill Short, Samantha Nall,
10 Alexander Kalman, Missy Davis, and Shelly Wheeler.
11 We've covered before that Bill Short and Jeff Beagle are
12 part of the shared services with Mammoth Energy, Inc.,
13 correct?
14    A    Yes, sir.
15    Q    Okay.  And this -- this email chain is about
16 making sure the entities working in Puerto Rico have the
17 funds they need to make the first payroll, correct?
18    A    This email appears to be a -- a
19 treasury-related email, yes.
20    Q    So the -- the first email here, there's some
21 estimates here.  It looks like Higher Power is going to
22 need almost $4 million.
23             Do you agree with that?
24    A    Yes, sir.
25    Q    Okay.  And 5 Star is going to need about

Page 51

1 $2 million?
2    A    Yes, sir.
3    Q    Okay.  And then there's a discussion here also
4 about what Cobra needs because Cobra has its own
5 employees on the island as well, correct?
6    A    That's correct.
7    Q    Okay.  And so it looks like Cobra may have had
8 enough just for their 15 employees.  Is -- is that what
9 this is saying?
10    A    I think in this instance it looks like Cobra
11 Energy has about 15 employees in Puerto Rico, and
12 there's an estimate in regards to Puerto Rico wages
13 versus lower 48 wages for Cobra Energy.
14    Q    Is Cobra in -- does Cobra participate in the
15 shared treasury services that we described earlier -- or
16 that you talked about earlier?
17    A    Cobra Energy, yes, would -- would be the
18 beneficiary of shared services provided by Mammoth
19 Energy, Inc.
20    Q    Okay.  So that -- that would be one -- through
21 the treasury services then, whether it's for payroll or
22 for whatever Cobra would need money for, that money
23 could be swept down from Mammoth Energy, Inc., correct?
24    A    Cobra Energy -- through the treasury function,
25 among other functions provided by Mammoth Energy, Inc.,

Page 52

1 Cobra Energy could request funds through that treasury
2 function; but that cash would be provided by Mammoth
3 Energy Partners, not Mammoth Energy, Inc.
4    Q    And that's the same process for Higher Power
5 and for -- and for 5 Star?
6    A    That is correct.
7    Q    So the -- the actual funds come from Mammoth
8 Energy Partners?
9    A    Mammoth Energy Partners would both pull and
10 push cash through that treasury function to subsidiaries
11 of Mammoth Energy Partners.
12    Q    And Mammoth Energy Partners is a subsidiary of
13 Mammoth Energy Services, Inc., correct?
14    A    Yes, sir.
15    Q    Okay.  Who's the CEO of Mammoth Energy
16 Partners?
17    A    Arty Straehla is the CEO of Mammoth Energy
18 Partners.
19    Q    Is he also the CEO of Mammoth Energy Services,
20 Inc.?
21    A    Yes, he is.
22    Q    Okay.  Who's the CFO of Mammoth Energy
23 Partners?
24    A    I am the CFO of Mammoth Energy Partners.
25    Q    And are you also the CFO of Mammoth Energy

Page 53

1 Services, Inc.?
2    A    I am the CFO, secretary, and compliance
3 officer for Mammoth Energy Services, Inc.
4    Q    Okay.  With Mammoth Energy Partners, do you --
5 do you have any other roles besides CFO?
6    A    No, sir.
7    Q    Okay.  Now, I think you said with Mammoth
8 Energy Services, Inc., there's only three people,
9 three -- three employees?
10    A    I believe I've testified about ten times now
11 that there are no employees of Mammoth Energy Services,
12 Inc.
13    Q    Oh, I meant -- so is it Mammoth Energy -- I
14 get confused.  Mammoth Energy, Inc., without the
15 "services."  Mammoth Energy, Inc., is the one that has
16 three?
17    A    No, sir.
18    Q    How many employees does MEI have?
19    A    Mammoth Energy, Inc., probably has somewhere
20 in the ZIP code of 70 to a hundred employees depending
21 on the time frame.
22    Q    Okay.  During the Puerto Rico time?
23    A    I don't recall the exact number, but it would
24 have been between 70 and a hundred.
25    Q    How many -- how many employees of Mammoth

## MARK LAYTON - April 15, 2022

Page 54

1 Energy Partners?

2     A     Mammoth Energy Partners does not have any

3 employees.

4     Q     Okay.  So in your role as CFO, you're not an

5 employee?

6     A     I'm an officer of Mammoth Energy Partners.

7     Q     Okay.

8     A     I'm -- I'm not -- I'm not an employee of

9 Mammoth Energy Partners.  I'm employed by Mammoth

10 Energy, Inc.

11     Q     Do you have an ownership interest in

12 Mammoth -- Mammoth Energy Partners?

13     A     No, sir.

14     Q     Do you have an ownership interest in Mammoth

15 Energy Services, Inc.?

16     A     Yes, I do.

17     Q     What is your ownership interest?

18     A     It's in public filings with the SEC.

19     Q     And what is it?

20     A     It's roughly 325,000 shares or thereabouts.

21     Q     What percentage is that?

22     A     It would be in the ZIP code of probably

23 seven-tenths of 1 percent.

24     Q     Do you have a -- a significant ownership of

25 any of the companies in -- that are affiliated with

Page 55

1 Mammoth Energy Services, Inc., as subsidiaries?

2             MR. STUKENBERG:  Objection, form.

3     A     So I have an ownership in Mammoth Energy

4 Services, Inc.

5     Q     (By Mr. Moulton)  Uh-huh.

6     A     Mammoth Energy Services, Inc., owns Mammoth

7 Energy Partners, LLC.  It owns all of the membership

8 interest in -- in that LLC.  That LLC owns the interest

9 in a number of legal entities, approximately 53 legal

10 entities.  I do not have any direct ownership in those

11 entities.  My ownership interest is at Mammoth Energy

12 Services, Inc.

13     Q     Okay.  And -- now, outside of the Mammoth

14 empire, do you have any ownership interest in any other

15 companies besides, like, normal stocks?  I mean, like,

16 as, like -- like an owner of a company.

17     A     I have ownership interest in two LLCs outside

18 of the, quote, unquote, Mammoth umbrella.

19     Q     Umbrella.  Okay.  What are those companies?

20     A     The companies outside of the Mammoth --

21     Q     Yes, sir.

22     A     -- umbrella?

23             Layton Cattle Company, LLC, is one

24 entity.  I own a hundred percent of the interest in that

25 entity.  I also own an interest in Mark & Phil, LLC.

Page 56

1     Q     I'm assuming the Layton Cattle Company is a --

2 a ranch or a farm or something?

3     A     It's a ranch.

4     Q     Okay.  And what is Mark & Phil, LLC?  What

5 kind of company is that?

6     A     It's an LLC.

7     Q     No.  I mean what does it do?

8     A     It is a real estate development company.

9     Q     And what's your ownership percentage in Mark &

10 Phil?

11     A     I have a 50 percent profits interest in that

12 entity.

13     Q     Is -- what's Phil's name?

14     A     Are you talking about my partner in that deal?

15     Q     Yeah.

16     A     Phil Boevers.

17     Q     Boevers?

18     A     Yes, sir.

19     Q     Is -- is Phil Boevers, has he ever worked for

20 anybody under the Mammoth umbrella?

21     A     No, sir.

22     Q     Okay.  Do you have any relatives inside the

23 Mammoth umbrella that work for the -- at -- for any of

24 the companies?

25     A     I have no relatives that work for Mammoth

Page 57

1 Energy Services, Inc., or any of its affiliated

2 companies.

3             (Plaintiffs' Exhibit 162 marked.)

4     Q     (By Mr. Moulton)  I'm going to -- we're going

5 to look at Plaintiff's Exhibit 162, which is another

6 email chain; and I think you would describe this as a

7 treasury-related email; is that correct?

8     A     It appears to be part of the same chain that

9 you brought up earlier.

10     Q     Right.  It's -- it's just a different branch,

11 if you will, of the email chain that we just saw in 161;

12 but this one is dealing with 5 Star, correct?

13     A     Appears to be, yes.

14     Q     Okay.  Is -- is this statement by Samantha

15 Nall correct, that the current available balance in the

16 5 Star account is 34,421 -- I'm sorry, yeah, and 53

17 cents?  "We will need 100 percent of the funds

18 transferred to our account to be able to cover payroll";

19 is that true?

20     A     I would presume that that is true, yes.

21     Q     Do you know what the figure in the Higher

22 Power account was?

23     A     I do not.  I don't believe that there's a

24 Higher Power amount on this particular email chain.

25     Q     There's not.  And I -- and I've looked, and I

**MARK LAYTON  -  April 15, 2022**

---

Page 58

1 don't have one.  That's why I'm asking you.  Do you --
2 do you even know approximately how much money Higher
3 Power had?
4    A    I have no way of knowing the exact balance on
5 November 28th, no, sir.
6    Q    No.  I mean even approximately?
7    A    If you put a document in front of me, I'll be
8 happy to --
9    Q    I'm telling you --
10   A    -- look at it but --
11   Q    -- I don't have one.  Yeah.
12   A    -- in regards to off the top of my head, I
13 don't have a specific number to give you, no, sir.
14   Q    Okay.  Do you -- do you know if Higher Power
15 was in the same position as 5 Star as needing funds
16 transferred?
17   A    I don't know whether or not Higher Power
18 needed funds.  I would not be surprised, however, if --
19 if Higher Power requested funds for -- for payroll given
20 the -- the size of the payroll.
21   Q    That would have been a request that would have
22 been approved is what you're saying?
23   A    Yes.  Given that every payroll has been made,
24 then certainly that -- there would have been funds
25 requested and -- and funds that were pushed down from

---

Page 59

1 Mammoth Energy Partners to -- to both Higher Power and
2 5 Star.
3    Q    So what we saw there in Exhibit 162 --
4 actually, I want to pull it back up again.  I'm sorry.
5         In Exhibit 162, to me, it -- it looks
6 like the process was that Bill Short -- oh, well,
7 actually, no.  Let me ask you:  How -- how does it work?
8 Like, does -- does Mammoth Energy, Inc., look at 5 Star
9 and high power -- Higher Power to monitor things and
10 make sure they're going to be able to have the money; or
11 do they wait for a request to come up the chain?  How
12 does -- how does that typically work with the treasury
13 functions, or can it be just depending on the situation?
14   A    So the treasury function would be managed by
15 individuals at Higher Power and 5 Star through
16 communication with individuals at Mammoth Energy, Inc.,
17 to manage cash needs and to both be able to collectively
18 invest that cash for return, minimize interest expense,
19 and -- and manage that -- that cash inside of the
20 portfolio both up and down, as needed by the
21 subsidiaries.
22   Q    So if one of the -- if one of the entities,
23 like Higher Power or 5 Star, needs cash, does -- do --
24 is it a requirement that they actually ask for it; or
25 are there times when either Mammoth Energy, Inc., or

---

Page 60

1 Mammoth Energy Partners recognizes the need and goes --
2 and goes ahead and does it?
3    A    Mammoth Energy, Inc., has the employees that
4 are involved in that treasury function.  So via
5 communication from either Higher Power or 5 Star to the
6 employees at Mammoth Energy, Inc., then the Mammoth
7 Energy, Inc., employees would process that cash movement
8 in and out of Mammoth Energy Partners, LLC.
9    Q    Okay.  So there's no monitoring from MEI or
10 MEP to make sure that subsidiaries like Higher Power or
11 5 Star are going to have enough money?
12   A    As I mentioned, the individuals at Higher
13 Power and 5 Star communicate their needs and --
14   Q    I'm asking you a different question.  I want
15 to know if there's any monitoring from -- from the
16 perspective of MEI or MEP of these subsidiaries that
17 they -- that are -- that are under them to see if
18 they're going to actually -- make sure that they're
19 going to be okay?
20         MR. STUKENBERG:  Objection, form.
21   A    The -- I don't necessarily follow the -- the
22 context of monitoring.  In as much as the context of
23 monitoring is that Mammoth Energy, Inc., employees are
24 aware of cash balances at 5 Star and Higher Power, then
25 that would be the case.  To the extent that the context

---

Page 61

1 is Mammoth Energy, Inc., somehow having all of the
2 knowledge of Higher Power or 5 Star, I believe that to
3 be inaccurate.  The Higher Power and 5 Star employees
4 are communicating what those needs are to Mammoth
5 Energy, Inc.; and Mammoth Energy, Inc., is assisting
6 them and providing that cash as requested.
7    Q    (By Mr. Moulton) Okay.  So -- but folks at MEI
8 and MEP are -- are aware of -- at least at a high level
9 of -- of how much money the -- the subsidiaries have and
10 what potential needs they may have?
11   A    That mischaracterizes what I said, first of
12 all.
13   Q    Yeah, I'm not -- and I'm not trying to
14 characterize.  I'm asking you a question, sir.  Do you
15 agree with that or no?
16   A    Well, you tossed in Mammoth Energy Partners --
17   Q    Okay.
18   A    -- which has no employees.  The Mammoth
19 Energy, Inc., employees are aware of what the cash
20 balances are.  They're not necessarily aware of what the
21 needs are vis-a-vis communications such as this where
22 the entities at Higher Power and 5 Star are
23 communicating cash needs to Mammoth Energy, Inc.
24         (Plaintiffs' Exhibit 163 marked.)
25   Q    (By Mr. Moulton) All right.  We're going to

---

**MARK LAYTON - April 15, 2022**

Page 62

1 look at Plaintiff's Exhibit 163.
2          MR. MOULTON:  And, yes, Will, this has
3 been produced as Plaintiff's 871.
4          MR. STUKENBERG:  Good.
5          MR. MOULTON:  Yeah.
6     Q    (By Mr. Moulton) All right.  Mr. Layton, do
7 you recognize what this is?
8     A    Appears to be a screenshot of an employee's
9 pay for a period of time.
10    Q    Okay.  When you -- for your own pay, can you
11 access your pay information on Paycom?
12    A    Yes, I can.
13    Q    Do you have that app on your phone?
14    A    No, sir.
15    Q    Okay.  But you've seen screenshots of it for
16 sure, haven't you?
17    A    This is the first screenshot I've -- I've seen
18 of -- of pay records in regards to access through
19 someone's mobile phone.
20    Q    Okay.  Can you explain why when an employee
21 of, say, Higher Power logs into Paycom to see his
22 payroll that he sees, "Current View:  Employee,
23 Currently logged in as," his number, "Mammoth Energy"?
24          Do you know why that is?
25    A    I believe OM062 is -- is actually an account

Page 63

1 code.  So the parent code for the account with Paycom is
2 under Mammoth Energy.  If you click on any one of these
3 pay stubs, then it will tell you exactly who this
4 employee's employer is.  In other words, it'll say
5 Higher Power, 5 Star, Mammoth Energy, Inc., whoever
6 their legal employer is.
7          MR. MOULTON:  Object to that as
8 nonresponsive.
9     Q    (By Mr. Moulton) My question is:  Do you know
10 why it says "Mammoth Energy" when they log in, like it
11 says right here, like you can see on your screen?
12    A    I answered that.
13          MR. STUKENBERG:  Objection.  He just
14 answered that question.
15    Q    (By Mr. Moulton) Why does it say "Mammoth
16 Energy"?
17    A    I answered that, and I'll reincorporate my
18 testimony.
19    Q    You did not answer that question.  Why does it
20 say Mammoth -- you -- you said what they'll see if they
21 keep clicking through the system.
22          MR. STUKENBERG:  No.  He told you that's
23 the parent code.
24    Q    (By Mr. Moulton) No.  You said OM062 [sic] is
25 the parent code.

Page 64

1          MR. STUKENBERG:  Right.
2     Q    (By Mr. Moulton) Is that what you said?
3     A    I went further and answered the question, and
4 I'll reincorporate that testimony as my answer.
5     Q    So you're -- you're saying that Mammoth Energy
6 is the parent code, and that's why it shows here?
7     A    OM062 is the prefix when I log in to my
8 personal account.  OM062 is just a prefix for the parent
9 code, and I'll reincorporate my previous testimony as it
10 relates to Mammoth Energy being the parent and that if
11 any employee clicks through their pay stubs, it will
12 reference the legal entity for which that employee is
13 employed by.
14    Q    Wouldn't it be a lot easier if it -- according
15 to you guys, if they're only employed by Higher Power
16 that it just says "Higher Power" when they log in?
17          MR. STUKENBERG:  Objection, form, what's
18 easier.
19    A    The employees that are employed by Higher
20 Power have pay stubs that say Higher Power.
21    Q    (By Mr. Moulton) So the answer is no?
22          MR. STUKENBERG:  Same objection.
23    A    We've covered repeatedly multiemployer type
24 plans as well as shared services agreements.
25          (Plaintiffs' Exhibit 164 marked.)

Page 65

1     Q    (By Mr. Moulton) All right.  We're going to go
2 to Exhibit 164.
3          MR. STUKENBERG:  When you get to a
4 stopping point, Dave, not -- if you want to get through
5 this, that's fine, just a quick bathroom break whenever
6 you get --
7          MR. MOULTON:  Yeah.  We can cover --
8          MR. STUKENBERG:  -- to a good spot.
9          MR. MOULTON:  -- this one.  This won't
10 take very long.
11          MR. STUKENBERG:  Sure.
12          MR. MOULTON:  Okay.
13    Q    (By Mr. Moulton) Mr. Layton, do you -- do you
14 recognize Plaintiff's Exhibit 164 as a Cobra PREPA
15 contractor badge for Don Wimberley?
16    A    It's very fuzzy, but this generally looks like
17 a badge for which various employees of Cobra Energy as
18 well as Cobra Acquisitions subcontractors might use to
19 access either Cobra's office location or the housing
20 provided by Cobra Acquisitions to both its employees as
21 well as subcontractor employees.
22    Q    Okay.  So plaintiffs in this lawsuit were
23 issued badges like this one in -- in 164, correct?
24    A    Badges like this --
25    Q    Uh-huh.

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

## MARK LAYTON - April 15, 2022

Page 66

1    A    -- were issued to various employees as well as
2  subcontractors of Cobra Acquisitions for the access I
3  referenced earlier.
4    Q    So the answer to that is "yes"?
5    A    The answer is as I gave it.
6         MR. MOULTON:  Yeah, we can take a break.
7         THE VIDEOGRAPHER:  All right.  We're off
8  the record at 10:02 a.m.
9         (Recess from 10:02 a.m. to 10:12 a.m.)
10        THE VIDEOGRAPHER:  All right.  We're back
11 on the record at 12 minutes after 10:00.
12   Q    (By Mr. Moulton) Mr. Layton, we talked a
13 little earlier -- we talked a little bit earlier about
14 Cobra getting the contract to provide electrical
15 restoration work in Puerto Rico.
16        Do you recall that?
17   A    Yeah; and just to be specific, there are a
18 number of Cobra entities.  Cobra Acquisitions is the
19 legal entity that received the contract from PREPA in
20 regards to the restoration of services, and we also
21 talked about the second contract that Cobra Acquisitions
22 won later in 2018.
23   Q    Right.  And so which entity is the entity that
24 would have -- would have assigned the work to Higher
25 Power and 5 Star?

Page 67

1    A    Cobra Acquisitions was the legal entity that
2  won the contract and would have assigned work to
3  subcontractors, which included both Higher Power and
4  5 Star.
5    Q    Isn't there also an entity called Cobra
6  Energy?
7    A    There was an entity called Cobra Energy.  That
8  entity has since been renamed.
9    Q    To what?
10   A    Lion Power.
11   Q    Okay.  At the time that -- of the restoration
12 work in Puerto Rico, was there a Cobra Energy?
13   A    There was a -- a Cobra Energy that would have
14 been a subcontractor to Cobra Acquisitions just like
15 Higher Power and 5 Star.
16   Q    Okay.  So Cobra Energy, 5 Star, Higher Power
17 would all get their work from Cobra Acquisitions?
18   A    Cobra Acquisitions was the prime, yes.
19        (Plaintiffs' Exhibit 131 marked.)
20   Q    (By Mr. Moulton) I'm going to show you an
21 exhibit that has previously been labeled as Exhibit 131.
22 We used this yesterday.  You were present for
23 Mr. Whitsell's deposition yesterday, correct?
24   A    Yes, I was.
25   Q    And also for Mr. Broussard's?

Page 68

1    A    Yes, sir.
2    Q    Okay.  I want to direct your attention on this
3  email chain, which I'm sure you're familiar with by now.
4  I'm going to scroll down to the bottom, the part that I
5  want to focus on.  There's an email here from Keith
6  Ellison to Ken Kinsey, Scott Whitsell, Robert Malcom,
7  Steve Wolfe, Ken Godwin, and Jared Chappell.
8         Do you see that?
9    A    Yes, sir.
10   Q    Okay.  And before we get to the substance of
11 the email, I notice with the email addresses that there
12 are domain names.
13        Do you see them?
14   A    Yes, sir.
15   Q    Okay.  "Cobratd" that we see for Ken Kinsey,
16 what entity is that?
17   A    "Cobratd" is -- is not a legal entity.  I
18 believe at -- at this time, Mr. Kinsey was employed by
19 Cobra Energy.
20   Q    And Mr. Chappell, his shows
21 "Mammothenergy.com."  What entity would that be with?
22   A    Mr. Chappell would be an employee of Mammoth
23 Energy, Inc.
24   Q    Okay.  If -- who -- what companies used a
25 Mammothenergy.com domain?

Page 69

1    A    The employees of Mammoth Energy, Inc., have
2  Mammothenergy.com email addresses.
3    Q    Okay.  Who owns the Mammothenergy.com domain?
4    A    Regards to the ownership of the domain name?
5    Q    Yeah.
6    A    I would -- I would have to request that
7  ownership from the IT department.
8    Q    Okay.  But sitting here today, you don't know
9  if it's Mammoth Energy Services, Inc., Mammoth Energy,
10 Inc., or Cobra or anybody?
11   A    Well, Mammoth Energy, Inc., has the domain
12 name; and I would presume that -- that any fees incurred
13 relative to that domain name would be paid by Mammoth
14 Energy, Inc.
15   Q    Okay.  So what is the role of Mammoth Energy
16 Services, Inc., in the umbrella?  What does it do?
17   A    Mammoth Energy Services, Inc., is the
18 publically traded entity.  It also has a revolving line
19 of credit with a number of banks led by PNC, and that's
20 it.
21   Q    All right.  Let's go back to Keith Ellison's
22 email here in Exhibit 131.  He says: "All, We are
23 awarded 120 day minimum contract for 250 linemen in
24 Puerto Rico.  We need 210 distribution resources, 25
25 Transmission, and 15 Substation.  And we are paying the

**MARK LAYTON - April 15, 2022**

Page 70

1 following," and then he lists what they're paying for
2 some positions here.
3         Do you agree with Mr. Ellison's email;
4 that is --
5         MR. STUKENBERG:  Object --
6     Q    (By Mr. Moulton) -- do you agree that it's
7 correct?
8         MR. STUKENBERG:  Objection, form.
9     A    So I think to -- to give -- give context to --
10 to this email, which I think is important, this is prior
11 to the notice to proceed under the October 2017
12 contract.  And Mr. Ellison is indicating that Cobra
13 Acquisitions has been awarded a contract, lists out some
14 target head-count numbers, and then lists out some
15 target pay rates.  So to reiteration that a little bit,
16 this is prior to the notice to proceed and prior to the
17 hiring of any employees.
18     Q    (By Mr. Moulton) The word "target" does not
19 appear in this email, correct?
20     A    Nor does it have to.
21     Q    I'm sorry.  Does it -- does it include the
22 word "target" in his email?
23     A    The -- that specific term is not in there.
24     Q    Okay.  The terms he was using were "per day,"
25 correct?

Page 71

1     A    In this email in which he's communicating to
2 operational heads, yes, he's communicating per day
3 target wages.
4     Q    All right.  And this email gets passed on to
5 folks like Jeff Beagle, right?
6     A    So Mr. Chappell passes this email along to
7 Mr. Beagle, which is important contextually because
8 Mr. Beagle would be the individual ultimately tasked for
9 establishing pay practices.
10    Q    And he's with Mammoth Energy, Inc., correct?
11    A    Yes, sir.
12    Q    And then this gets passed also to Mr. Kalman
13 and Ken Kinsey -- or no, he was already on -- and Scott
14 Whitsell, Robert Malcom, right?  See these people are
15 getting this?
16        Do you agree with that?
17    A    I agree that Mr. Ellison communicates these
18 items to operational heads and to -- to Mr. Chappell,
19 who -- who was an accountant.  Mr. Chappell forwards
20 this to Mr. Beagle, who was an HR resource.
21    Q    Okay.  And to kind of get to the point, these
22 rates were communicated -- communicated to people who
23 are responsible for recruiting workers, like Mr. Scott
24 Whitsell, correct?
25    A    This is communicated to operational heads in

Page 72

1 regards to targeted earnings.
2     Q    All right.  That's not -- that's not what I'm
3 asking.
4         Scott Whitsell is the president of
5 5 Star, correct, at this time?
6     A    Yes, sir.
7     Q    Okay.  And he testified yesterday that he was
8 recruiting workers to go to the island, correct?
9     A    He testified that, yes, one of his job
10 responsibilities was -- was recruiting.
11    Q    Do you disagree with that?
12    A    I don't disagree that one of --
13    Q    Okay.
14    A    -- his job responsibilities was recruiting.
15    Q    All right.  And do -- do you agree that he
16 used this information to recruit people?
17    A    He used this information as well as other
18 information and detail to recruit people.
19    Q    Do you know -- can you say either way when he
20 started recruiting?
21    A    He would have started recruiting, at least in
22 regards to communicating target earnings levels, about
23 the 19th to, say, the 21st or 22nd in regards to early
24 outreach to potential employees.  And while he didn't
25 have all of the -- the details, he communicated target

Page 73

1 earnings and would have, you know, floated that to
2 potential employees as well as potential subcontractors.
3     Q    And so would the -- a person working for him,
4 which is Missy Davis, correct?
5     A    That's correct.
6     Q    And so would Robert Malcom, who's the
7 president of Higher Power at the time, correct?
8     A    Yes, sir.
9     Q    And by the time it gets out there, there could
10 be any number of people recruiting based on what you
11 call these target rates in this email, right?
12        MR. STUKENBERG:  Objection, form.
13    A    There were communications from -- from these
14 individuals as -- as well as others in regards to
15 targeted earnings amounts; but in this time period
16 that -- that we've referenced, no employees were either
17 hired or onboarded.
18    Q    (By Mr. Moulton) All right.  But the -- but
19 the information is getting out there.  I mean, it's all
20 over the internet at this point, correct?
21    A    The information in regards to targeted
22 earnings is being used to -- to recruit; however, no
23 employees had been hired --
24    Q    I understand.
25    A    -- or onboarded.

**MARK LAYTON - April 15, 2022**

---

Page 74

1    Q    I understand that. That's not what I'm
2 asking. I appreciate that. We all know that, okay? I
3 mean, I'll accept that as true for right now from you
4 until I find out otherwise.
5            Now -- but by the targeted rate, you mean
6 the rates that are shown in this email because there
7 aren't any hourly rates that are established yet, right?
8    A    There's not even a pay practice that's
9 established as of the date of this email.
10   Q    Okay. So you don't think it's a -- a pay
11 practice that's being -- oh, I hear what you're saying.
12 Y'all haven't decided on what you're going to do as far
13 as a pay practice, correct?
14   A    There's been no determination as to pay
15 practice at --
16   Q    All right.
17   A    -- this point in time and you'll see --
18   Q    That --
19   A    -- numerous iterations of dialogue between
20 Mr. Beagle and Mr. Broussard, as well as others, in
21 regards to the analysis and development of what
22 ultimately was the pay practice.
23   Q    And what I'm asking right now though is that
24 you agree that these rates -- and just like this from
25 Mr. Ellison, written like this -- those were blasted out

---

Page 75

1 to lots of people before the pay practice was actually
2 established?
3            MR. STUKENBERG: Objection, form.
4    A    I believe that mischaracterizes what I've
5 testified to.
6    Q    (By Mr. Moulton) No. I'm asking do you agree
7 with that statement or no?
8            MR. STUKENBERG: Same objection.
9    A    And I'll reincorporate my previous testimony.
10   Q    (By Mr. Moulton) So you do agree with that
11 statement, yes?
12           MR. STUKENBERG: Same objection.
13   A    That's not what I said. I reincorporated my
14 previous answers --
15   Q    (By Mr. Moulton) Yeah. You don't --
16   A    -- to the same question.
17   Q    (By Mr. Moulton) That's -- it's not the same
18 question. It's not the same question. You can't keep
19 referring back to some testimony about a different
20 question. That's not what I'm asking you, and the way
21 this works is you answer my questions. So just please
22 answer this question.
23           Do you know or not whether or not the
24 information just like in this email was blasted out to
25 all sorts of people for recruiting efforts before the

---

Page 76

1 actual pay plan was established? Yes --
2            MR. STUKENBERG: Objection --
3    Q    (By Mr. Moulton) -- or no?
4            MR. STUKENBERG: Objection, form.
5    A    This email as written here --
6    Q    (By Mr. Moulton) Uh-huh.
7    A    -- was not blasted out to anybody for
8 recruiting purposes.
9    Q    And I'm not -- I didn't say this email, sir.
10 I said the information in this email.
11   A    You said just like this email, and this email
12 was not blasted out for recruiting purposes.
13   Q    Okay. So the -- the rates that Mr. Ellison
14 has listed in this email, were they shared with people
15 before the pay plan was established or no?
16   A    One, you're mischaracterizing these rates.
17 These are -- these are target, quote, unquote, rates.
18   Q    All right. You're being --
19   A    Were these targeted --
20   Q    You're being completely evasive.
21           This -- is --
22           MR. STUKENBERG: Let him -- let him --
23           MR. MOULTON: No. Hold on.
24           MR. STUKENBERG: Let him finish his
25 answer.

---

Page 77

1    Q    (By Mr. Moulton) Are you telling me that
2 that's not a rate in Mr. Ellison's email? 12 -- 1400
3 per day. Is that a rate or not?
4    A    This is not a rate in that at this point in
5 time the pay practice was not established.
6    Q    I understand that. I'm asking --
7    A    And so --
8    Q    -- is $1400 per day a rate?
9    A    Sir, I'd ask that you kindly --
10           MR. STUKENBERG: Objection, form.
11   A    -- let me finish my answer.
12   Q    No. I'm asking you a simple question. Is
13 $1400 per day a rate or no?
14   A    $1400 per day is a target. This email
15 precedes any implementation --
16   Q    Not --
17   A    -- of a pay practice --
18           MR. MOULTON: Objection, nonresponsive.
19   Q    (By Mr. Moulton) I'm not even trying to -- to
20 get you to say otherwise. I don't care about that right
21 now, okay? I'm asking you a simple question.
22           Is $1400 per day, that expression, is
23 that a rate or no?
24           MR. STUKENBERG: Objection, form. I
25 don't know what you mean "is that a rate?"

---

## MARK LAYTON  -  April 15, 2022

1       MR. MOULTON:  Yeah, is it a rate.

2    A    I don't know what a --

3       MR. STUKENBERG:  A rate of what?

4    A    -- rate is.

5    Q    (By Mr. Moulton) Is it a pay rate?

6    A    It is a targeted amount of earnings that

7 Mr. Ellison is communicating to a bunch of operational

8 personnel, which is then forwarded to the HR department,

9 which is the responsible party for establishing the pay

10 practice.  So Mr. Ellison is not establishing a pay

11 practice in this email.  He's establishing targeted

12 earnings amounts.

13   Q    Mr. Ellison was the president of Cobra Energy

14 at this time, correct?

15   A    At this time, yes, Mr. Ellison was the

16 president of Cobra Energy as well as a couple of other

17 entities.

18   Q    Was he the president of Cobra Acquisitions?

19   A    Yes, sir, he was.

20   Q    Okay.  He also says, "We cover all expenses.

21 No alcohol"; is that true?

22   A    That's what the email states, yes, sir.

23       (Plaintiffs' Exhibit 140 marked.)

24   Q    (By Mr. Moulton) In exhibit -- that's

25 previously been marked as Exhibit 140, that we also

1 reviewed yesterday.  So you should be familiar with this

2 by now.  There's an email from Mr. Kalman that includes

3 some input from Ken Kinsey that he inserted -- inserted

4 into the email -- do you agree with that -- on

5 November 9th?

6    A    Just a second.  Let me get my bearings here.

7 You're moving up and down.  I can't --

8    Q    Sure.  You want --

9    A    -- necessarily see what's --

10   Q    You want to --

11   A    -- going on.

12   Q    -- start at the top, or you want to start at

13 the bottom?

14   A    I'd prefer to stop at the -- or start at the

15 bottom if -- if possible.

16   Q    Absolutely.  No problem.  Just tell me when

17 you want me to scroll up.

18   A    Okay.

19   Q    Okay.  Just tell me when you want to scroll up

20 again.

21   A    I'm good.

22   Q    Okay.

23   A    Okay.

24       Okay.

25       All right.

1    Q    Okay.  Exhibit 140, you've had a chance to

2 review it now, right?

3    A    Yes, sir.

4    Q    Okay.  So I want to focus on the Question

5 No. 2 in the November 9th email from Alexander Kalman.

6 Do you see how there's a question there where it says,

7 "In the same vein, can we confirm that hourly employees

8 should only receive their day rate, and not their hourly

9 rate in addition to their day rate correct?"

10       Did I read that question correct?

11   A    That appears to be the -- the -- the question

12 as stated in the email, yes.

13   Q    Right.  And after that, in a different color

14 there, is the answer from Keith and Ken, right?

15   A    The -- the answer is from Ken, presumably

16 based on the language via a conversation with Keith.

17   Q    Okay.  So the answer that -- that Ken gave is,

18 "All hourly employees will get their PR rate only."

19       Did I read that right?

20   A    That's what it states, yes.

21   Q    And "PR" means Puerto Rico?

22   A    Yes.

23   Q    Okay.  And by the "Puerto Rico rate," we're

24 talking about the -- the pay scale that -- that got

25 established for Puerto Rico, correct?

1    A    We're talking about the -- the pay rate for

2 employees.  I don't know what the context of -- of pay

3 scale necessarily means, but he's talking about the

4 appropriate pay rate for employees.

5    Q    But specifically the Puerto Rico rates, right?

6    A    Yes, this email references employees in Puerto

7 Rico.

8    Q    Yes.

9       (Plaintiffs' Exhibit 165 marked.)

10   Q    (By Mr. Moulton) We're going to look at

11 Exhibit 165.  I'll start at the bottom here for

12 Exhibit 165 and let you get familiar with it.

13   A    Okay.

14   Q    Okay.  So this email is about a -- a pay

15 structure that's been agreed to for Puerto Rico,

16 correct?

17   A    I believe this email starts out with a

18 discussion of salaried employees and goes into some

19 dialogue about the pay structure for a couple of

20 salaried employees.

21   Q    Okay.  So this is not talking about pay

22 classifications for anybody else?

23   A    I'm seeing this -- this page for the first

24 time.  My answer was about where this email started.

25   Q    And, well, I guess what -- what -- the -- the

**MARK LAYTON - April 15, 2022**

Page 82

1 important point here is that there's an attachment
2 called "pay class.xlsx."
3            Do you see that?
4    A    I see that, yes.
5            (Plaintiffs' Exhibit 137 marked.)
6    Q    (By Mr. Moulton) Okay.  So I'm -- let's go
7 ahead and look at that, pay class, which has previously
8 been introduced as Exhibit 137.
9            Is this the pay class that was referenced
10 in the email?
11   A    This is the -- the exhibit that's referenced
12 in the email.
13   Q    Right -- or the attachment you mean?
14   A    Yes.
15   Q    Yeah, Exhibit 137.  And here we see the pay
16 rates for several positions and people, and we get down
17 to the bottom.  It's just for the positions.  We see,
18 like, "General Foreman, Foreman, Journeyman Lineman,
19 A Lineman, B Lineman, Operator, C Lineman/Apprentice,
20 and Groundman."
21            These are positions that would have been
22 performing electrical work in Puerto Rico, correct?
23   A    These are positions that -- that would have
24 worked in Puerto Rico, yes.
25   Q    All right.  And we see -- over to the right,

Page 83

1 we see figures listed for their day rates, correct?
2    A    There is a day rate column, yes.
3    Q    Yes.  And this is -- this agrees with the
4 email that Keith Ellison sent about what he said would
5 be paid?
6            MR. STUKENBERG:  Objection, form.
7    A    This is not a -- I think you're
8 mischaracterizing Mr. Ellison's --
9    Q    (By Mr. Moulton) Let me try my question again.
10   A    Let me --
11   Q    These are --
12   A    -- finish.
13   Q    No, that's okay.  I -- I get my question was
14 bad and I'll -- I'll give you a different question
15 because I don't -- we don't have to explain it every
16 time.
17            These aren't different rates than what
18 Mr. Ellison had in his email.  Do you remember those
19 numbers?
20            MR. STUKENBERG:  Objection, form.
21   A    Mr. Ellison did not communicate a pay
22 practice.  What he communicated was target earnings, and
23 this particular attachment is in reference to these
24 individuals that are highlighted in yellow that are
25 salaried employees.

Page 84

1    Q    (By Mr. Moulton) So Mr. Ellison didn't say a
2 thousand for a journey lineman?
3    A    Mr. Ellison communicated targeted earnings --
4    Q    Yes or no?
5    A    -- inside of his email --
6    Q    Did his email say a thousand for journey
7 lineman or not?
8    A    I believe his email referenced a targeted
9 earning amount for a journeyman lineman as well as other
10 positions.
11   Q    All right.  So let's go back to Exhibit 131
12 and look at Mr. Ellison's email.
13            1400 for general foreman.  Now, in 137,
14 oh, it's the same number.
15            Do you agree with that?
16   A    I agree that it's the same for that position,
17 yes.
18   Q    Right.  And for the rest of them here, it's
19 the same?
20   A    It appears to be, yes.
21            (Plaintiffs' Exhibit 139 marked.)
22   Q    (By Mr. Moulton) Exhibit 139, which has been
23 previously numbered as 139, offer letter from Higher
24 Power.  We see the same numbers for the under "Puerto
25 Rico Storm - Per Day" for the same positions, correct?

Page 85

1    A    Those appear to be the -- the same targeted
2 earnings amounts, yes.
3            (Plaintiffs' Exhibit 138 marked.)
4    Q    (By Mr. Moulton) 5 Star, in what's been
5 previously marked as Exhibit 138, in their offer letter
6 has the same rates?
7    A    This doesn't necessarily look like an offer
8 letter.  This looks like an invitation to an onboarding
9 session; but in regards to -- in regards to targeted
10 rates, these appear to -- to mirror the targeted rates
11 in other communications you've brought up.
12   Q    And not just mirror, they're -- they're
13 exactly the same, right?
14   A    I'll take your word at it.  They look very
15 similar, yes.
16   Q    Okay.  Now, at some point the -- the rates
17 that we've seen on these sheets were -- were used to
18 calculate an hourly rate, correct?
19   A    I disagree with -- with the context a little
20 bit.  So Mr. Ellison communicated target earnings rates
21 through communications with HR personnel as well as
22 consultation with Mr. Broussard.  The targeted earnings
23 rates were used to calculate hourly rates based on hours
24 and days worked, and I believe that calculation was
25 shared back and forth with Mr. Broussard a couple of

MARK LAYTON - April 15, 2022

Page 86

1 times.

2                (Plaintiffs' Exhibit 166 marked.)

3    Q    (By Mr. Moulton) All right.  In Exhibit 166,
4 you're kind of jumping the gun with me, but I think this
5 is -- we're going to lead into that discussion in
6 detail.  But on Exhibit 166, we have an email from Jeff
7 -- actually, I'm sorry, from Missy Davis -- she's with
8 HR in Higher -- in 5 Star -- to Jeff Beagle, who's part
9 of the shared services with Mammoth Energy, Inc., and
10 also with Alexander Kalman.

11                She's asking about how -- a mathematical
12 explanation on the PR pay rates, correct?

13    A    Yes.

14    Q    Okay.  And specifically, how to process it
15 because she's -- she's having to put pencil to paper,
16 right?

17    A    She's not necessarily asking how to physically
18 process it.  She's asking for a mathematical explanation
19 as to how the payroll for the Puerto Rico employees will
20 be processed.

21    Q    And Jeff Beagle delivers.  In his email he
22 gives her a spreadsheet that's going to outline that for
23 her, correct?

24    A    It appears that, yes, he sends her a -- a
25 calculation.

Page 87

1    Q    Okay.  Did you ever talk with Missy about what
2 she felt about the calculations?

3    A    I don't recall any conversations between
4 myself and -- and Missy in regards to the calculations.

5    Q    Okay.

6                (Plaintiffs' Exhibit 167 marked.)

7    Q    (By Mr. Moulton) All right.  So in
8 Exhibit 167, we're going to look at it in native format
9 because it's an Excel spreadsheet and Excel spreadsheets
10 have formulas, which I'm sure you're familiar with,
11 right?

12    A    Yes, sir.

13    Q    Okay.  CFO, you're -- you're pretty
14 experienced with spreadsheets.  Is that fair to say?

15    A    I can operate in Excel, yes.

16    Q    Okay.  So if we look at, like, cells and see
17 what the formulas are doing, you can -- you would --
18 you'll understand them, at least on basic ones?

19    A    Hopefully.

20    Q    Okay.

21                All right.  We're going to look at this
22 then and like I say, we're --

23                MR. MOULTON:  I can't put a sicker
24 necessarily on the front of it for the court reporter
25 maybe later we'll figure out how to label it, but this

Page 88

1 is -- this Excel spreadsheet is Bates numbered Mammoth
2 3292 confidential dot xlsx.  That's the -- that's the
3 name of the document.

4    Q    (By Mr. Moulton) Now, earlier you were telling
5 me about a process for coming up with hourly rates that
6 fit with what you call a -- the targeted rates, correct?

7    A    Generally, yes.

8    Q    All right.  On this spreadsheet, those
9 targeted rates are under the column I, "Budget Day
10 Rate," correct?

11    A    Yes, sir.

12    Q    Okay.  Do you understand how these hourly
13 rates were figured, or do we have to walk through it?

14    A    I have an understanding, yes.

15    Q    Okay.  So basically if we take the budget day
16 rate and we multiply it by 7 and divide by 148, we'll
17 get the hourly rate, correct?

18                MR. STUKENBERG:  Objection, form.

19    A    I believe you -- you oversimplified the -- the
20 calculation.

21    Q    (By Mr. Moulton) All right.  Let's kind of
22 back up then.  In K where I'm -- where I'm highlighting,
23 there's a rate that says 59.12.  That corresponds to a
24 foreman, which corresponds to a budget day rate of 1250.
25 It's all on the same row, correct?

Page 89

1    A    Yes, sir.

2    Q    Okay.  So in that cell we have 8,750, which is
3 7 times 1,250 divided by 148, correct?

4    A    That's correct.

5    Q    Okay.  So the hourly rate is determined by
6 taking the day rate times 7 and dividing it by 148.  Do
7 you agree with me now?

8    A    That's the -- that's the day rate divided by
9 the -- the total hours adjusted for overtime, yes.

10    Q    Right.  And it's -- and in this -- in the pay
11 plan that was established, you guys were targeting a
12 16-hour day, right?

13    A    There was a 16-hour day that was required of
14 employees in Puerto Rico --

15    Q    Right.

16    A    -- yes, where they were either working or on
17 call to work.

18    Q    All right.  So -- and, like, I'm not trying to
19 get into all that right now, but just trying to
20 understand the spreadsheet.

21                So the target here is 7 times 16 hours is
22 112 under the total, correct?

23    A    Yes, sir.

24    Q    Okay.  And this is -- this is kind of a neat
25 solution to make it simple for calculating your hourly

**MARK LAYTON  -  April 15, 2022**

Page 90

1 rates if you ask me because what they do is they take
2 the -- they divide that 112 into 40 and 72.  You can see
3 that there, right, on Columns E and F, right?
4     A   Yes.
5     Q   Okay.  And then if you take your overtime
6 hours of 72 and multiply them by one and a half, that's
7 going to give you the overtime adjusted of a hundred and
8 eight hours, correct?
9     A   That's correct.
10    Q   So now you kind of normalize it and kind of
11 say, okay, the total hours adjusted is 148, which
12 becomes the number you're dividing by for the -- these
13 hourly rate calculations, correct?
14    A   Yes, sir.
15    Q   Okay.  Did you prepare -- did you prepare this
16 spreadsheet?
17    A   No, sir.
18    Q   Do you know who did it?
19    A   I believe this spreadsheet was prepared by
20 Mr. Beagle based on my review of the documents.
21    Q   Okay.
22        All right.  So the hourly rate here is --
23 we can count -- for these -- for these budget day rates,
24 we can get to the hourly rate figure just by multiplying
25 it by 7 and dividing by 148, correct?

Page 91

1        MR. STUKENBERG:  Objection, form --
2     A   Run that through me -- run that calculation
3 through me again, please.
4     Q   (By Mr. Moulton) Yeah.  For these hourly rates
5 that are listed in Column K, which going to -- which are
6 the hourly rates you guys used on the island, correct?
7 We can get them -- we can calculate them by just taking
8 the budget day rate times 7 and dividing by 148.
9        That's what that figure is, right?
10    A   Yes.
11    Q   Okay.  Now, over here between N and Q columns,
12 there's several numbers calculated here.  Do those
13 numbers mean anything to you?
14        If you need to see any cell, let me know.
15    A   Can I look at P?
16    Q   Yes, sir.
17        MR. STAMEY:  Did you freeze?
18    Q   (By Mr. Moulton) Are you not seeing P?
19    A   No, sir.  I'm still in N.
20    Q   I'll just try refreshing the screen and see
21 what happens.  Do you see it now?
22    A   No, sir.
23    Q   All right.
24        MR. STUKENBERG:  There you go.  Now
25 you're moving.

Page 92

1     A   It's in P now, but for some reason I'm not
2 seeing the formula on -- on my screen.
3     Q   (By Mr. Moulton) Can you see it now?
4     A   No, sir.
5        Okay.  Now I've got it.
6     Q   Okay.
7        Have you had a chance to look at that
8 now?
9     A   Yeah.  Can I look at N again?
10       Okay.
11    Q   So do you recognize what these calculations
12 are between N and Q?
13    A   This appears to -- to be a high-level analysis
14 of what the pay may look like if a day rate pay practice
15 is established.
16    Q   Right.  And specifically it would -- it shows
17 how much overtime extra would have to be paid and what
18 the total pay would have to be, correct?
19    A   It shows what it would look like if a pay
20 practice was established to pay the day rate at the
21 amounts in Column I.  So this is part of the analytics
22 and the iterative dialogue between Mr. Beagle and
23 Mr. Broussard.
24    Q   Right.
25       Okay.  So if -- if the company had

Page 93

1 adopted a pay -- a day rate plan, these calculations
2 between N and Q are showing what -- what the payroll
3 would -- would look like?
4        MR. STUKENBERG:  Objection, form.
5     A   It shows what it would look like if the
6 entities established a day rate plan and if the entities
7 adopted the amounts in Column I in regards to day rate.
8     Q   (By Mr. Moulton) Okay.  And what -- and you --
9 you heard Mr. Broussard testify yesterday.  Do you agree
10 that there was a discussion between either a day rate
11 plan or an hourly plan with him?  Do you recall that?
12    A   Yes, there were several discussions with
13 Mr. Broussard about compliant plans and structure.
14    Q   Right.  And the -- but there was basically --
15 basically it was narrowed down to two options.  Either
16 the company would go with an hourly plan, or it was
17 thinking about a day rate plan.  And -- and he didn't
18 know what y'all -- what y'all went with.  But do you
19 know which one y'all went with?
20    A   Mr. Broussard provided two compliant options.
21 One being an hourly and overtime plan.  The other being
22 a day rate plan with overtime applied to those day
23 rates.
24    Q   Okay.  And which one did the companies go
25 with?

**MARK LAYTON  -  April 15, 2022**

---

Page 94

1    **A**    The employers, as it relates to this matter,
2 adopted an hourly and overtime plan.

3    Q    Okay.  That's your testimony.  That's what you
4 believe?

5    **A**    That's not only my testimony, that's what the
6 pay records indicate.

7    Q    Okay.  We'll look at that in a minute.

8           (Plaintiffs' Exhibit 151 marked.)

9    Q    (By Mr. Moulton) Now, I also want to show you
10 what's been previously marked as Exhibit 151, which was
11 introduced by your counsel yesterday.  And does
12 Exhibit 151 reflect the final version of Cobra's pay
13 scale?

14    **A**    That appears to mirror the -- the hourly rates
15 of the pay scales that were adopted by Cobra
16 Acquisitions, Higher Power Electrical, and 5 Star.

17    Q    And not Cobra?

18    **A**    I mentioned Cobra Acquisitions.

19    Q    Okay.  So Cobra Acquisitions and it -- and its
20 subsidiaries performing in -- performing work in Puerto
21 Rico used this pay scale in Exhibit 151?

22    **A**    To -- to clarify your -- your question, Cobra
23 Acquisitions acquired Higher Power and 5 Star.  Once
24 the -- the Puerto Rico contract was won by Cobra
25 Acquisitions, then Cobra Acquisitions transferred its

---

Page 95

1 membership interest in both Higher Power and 5 Star to
2 Cobra Energy, Inc.

3    Q    So --

4    **A**    So Cobra Acquisitions no longer had membership
5 interest in either Higher Power or 5 Star; and thus, had
6 no subsidiaries.

7    Q    So Exhibit 151 is the pay scale that applied
8 to the plaintiffs in this case that were working for
9 Higher Power?

10    **A**    In this particular matter, I don't believe
11 Cobra Acquisitions is a defendant in this matter.

12    Q    That -- I'm not asking that.  I just want to
13 know -- ignore -- I'm not even asking you about who's
14 sticker's on top right now.  These numbers, the numbers
15 that y'all determined -- like, we just saw the
16 spreadsheet.  These are the figures in PR -- "PR Storm -
17 Per Hour," "PR Storm - Per Day," these positions, this
18 is the pay scale for the guys in Higher Power and 5 Star
19 working on the island in Puerto Rico, correct?

20    **A**    This is the hourly scale that was established
21 for the employees of Higher Power and 5 Star.

22    Q    Thank you.

23           (Plaintiffs' Exhibit 145 marked.)

24    Q    (By Mr. Moulton) Here's an exhibit previously
25 marked as 145, Plaintiff's Exhibit 145.  We have an

---

Page 96

1 offer letter for Daniel Wood, and the first couple pages
2 aren't signed.  Let's go to the one that's signed.

3           So Mammoth 2725 in this exhibit.  Looks
4 like his start date is going to be on July 8th, 2018,
5 correct?

6    **A**    Yes, sir.

7    Q    Okay.  And if you'll notice here, it says,
8 "Puerto Rico Storm Rate (on island) 42.57 at 16 hours
9 per day at $900 per day."

10           Do you agree with that -- that that's
11 what that says?

12    **A**    That's what's written in there, yes.

13    Q    Yes.  Okay.

14           And then if we go back to Exhibit 151,
15 the pay scale, that appears in there, right?  Don't we
16 see, like, for example, Class A Lineman is 900 at 42.57?

17    **A**    It's 42.57 at 16 hours per day, which equates
18 to $900 per day if the employee works seven days a week
19 and is available to work or works for 16 hours per
20 shift.

21    Q    All right.  I'm so glad you clarified that
22 because as you've -- as you pointed out, if you take 16
23 times any of these PR storm per hour rates in
24 Exhibit 151, you don't get the day rate, correct?

25         MR. STUKENBERG:  You mean the per day?

---

Page 97

1    Q    (By Mr. Moulton) Yeah.  You don't get the
2 storm per day numbers.  Do you agree with that?

3    **A**    If you just take 16 times any of these per
4 hour rates?

5    Q    Right.

6    **A**    No.

7    Q    Right.  And if -- and -- and so -- and by
8 extension, the way I understand the payroll to have
9 worked, be -- what y'all would do is basically pay --
10 according to you guys, you'd pay 16 hours per day.
11 Where I'd call it credit, you'd call it, you know -- if
12 he works one day on the island, you're going to -- on
13 the payroll documents, you're going to show 16 for his
14 hours, correct?

15    **A**    If an employee shows up for work in Puerto
16 Rico and works and/or is available to work, then there
17 is 16 hours recorded for that employee for the day --

18    Q    Right.

19    **A**    -- for time worked and for time on call.

20    Q    Okay.  And you would then take these rates and
21 do the math for what the hourly and the overtime would
22 be depending on the hours you were crediting, like, 16,
23 32, 48, and so on?

24    **A**    Well, to back up, so the -- the pay practice
25 was these employees were hourly.  They were input into

---

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

**MARK LAYTON - April 15, 2022**

Page 98

1 the HR/IS system as hourly employees, reflected on their
2 pay stubs as hourly employees, went along with their
3 hourly rates.  And based on each employee's hours worked
4 and/or hours on call, that employee's appropriate rate
5 for regular and for overtime was applied to their hours
6 worked in each pay period.
7          MR. MOULTON:  Objection, nonresponsive.
8     Q    (By Mr. Moulton) I'm -- I'm not even -- I'm
9 just trying to be real simple.  Like, just -- I'm -- I'm
10 talking about the mechanics, okay?  If a guy like --
11 like we just saw, Mr. Daniel Wood.  We were looking at
12 his offer letter in Exhibit 145, for example.  It shows
13 his rate at 42.57 at 16 hours a day at 900, right?
14    A    His rate is 42.57, and that's exactly how he
15 was input into the HR/IS system in his hourly rate.
16    Q    Well, I mean, that's not what it says; but
17 I -- I hear you.  You're saying you use the 42.57 is
18 your testimony, right?
19    A    I'm saying hourly employees were set up as
20 hourly --
21    Q    Did you use 42.57 --
22    A    -- with an hourly rate --
23    Q    -- or no for him?
24    A    Can I finish?
25    Q    You're -- I'm not asking all that.  I'm asking

Page 99

1 are you using 900, or are you using 42.57?
2    A    This employee as well as all of the employees
3 that are plaintiffs were established as hourly employees
4 with hourly rates and paid regular and overtime based on
5 those hourly rates for their shifts to the extent they
6 either worked or were on call to work up to 16 hours per
7 day during this time period.  If they worked over, then
8 we'd capture that and would have -- and would have paid
9 for those hours either regular or overtime.
10    Q    Are you aware of anyone ever working over 16
11 hours a day?
12    A    Based on my review of the data, I've not seen
13 anyone that's exceeded.  However, we had processes in
14 place with our supervisors in order to capture any of
15 that time.
16    Q    So you're saying it just never happened?
17    A    I've not seen any reports of an employee
18 exceeding 16 hours, but we had processes in place to
19 capture any hours in excess of 16 hours per day.
20    Q    So let me ask you this:  Let's take Mr. Wood's
21 rate, 42.57, and go back to the pay scale in 151.  If he
22 works one day of 16 hours, what is he going to get paid?
23    A    If he works one day and one day only --
24    Q    Yes.
25    A    -- of 16 hours in any pay period?

Page 100

1    Q    Yes.
2    A    Then this employee would be credited with 16
3 hours at $42.57.
4    Q    Okay.  So if in the payroll records we show
5 that when that would happen, they got paid $900, what
6 would you say?
7    A    An example where this employee worked one day
8 at 16 hours, this employee should have been paid 16
9 hours times 42.57.  If it -- if the payroll system
10 reflects something other than that, then I would
11 characterize that as an input error.
12    Q    Okay.  So if there are hundreds if not
13 thousands of instances of folks being boosted up from
14 their hourly pay to their PR storm per day rate, all of
15 those are errors?
16          MR. STUKENBERG:  Objection,
17 mischaracterizes his testimony.  If you want to ask him
18 about payroll records, show him the payroll records.
19    A    If you've got specific documents --
20    Q    (By Mr. Moulton) Oh, we do.
21    A    -- I'll look at them.
22    Q    We do, but I want to know what your opinion is
23 before we look at them.
24    A    I've given you my testimony on the example
25 that you gave --

Page 101

1    Q    Okay.
2    A    -- and I characterize that as an error to the
3 extent that there was something that reflected something
4 different than -- than the calculation in your example.
5    Q    Okay.  Errors.
6          Let's look at another offer letter for
7 Michael Fair, which has previously been marked as
8 Exhibit 138.
9          That's the wrong one.  Let's do -- oh,
10 no, I'm sorry.  I just have the wrong exhibit number on
11 it.  Okay.
12          MR. STAMEY:  So are we going with
13 Exhibit 146 or 138?
14          MR. STUKENBERG:  While you figure that
15 out, Dave, I'll be right back.
16          MR. MOULTON:  Sure.  We can continue
17 without you?  Is that all right?
18          MR. STUKENBERG:  If Harris can object on
19 my behalf.
20          MR. MOULTON:  Okay.
21          (Plaintiffs' Exhibit 146 marked.)
22    Q    (By Mr. Moulton) This is 146.  We used it
23 yesterday.
24    A    And we can get through your questions on this;
25 but when you get to a stopping point after your

**MARK LAYTON - April 15, 2022**

Page 102

1 questions on this, can we take a restroom break?

2    Q    Absolutely.  We had the same problem with this

3 exhibit yesterday.  It was a little fuzzy.

4    A    Yeah.  It's very illegible on my screen.

5    Q    Go ahead and take your break.  I'll have it up

6 here in a second.

7         THE VIDEOGRAPHER:  All right.  We're off

8 the record at 11:03.

9         (Recess from 11:03 a.m. to 11:12 a.m.)

10        THE VIDEOGRAPHER:  We're back on the

11 record at 11:12.

12   Q    (By Mr. Moulton) All right.  Mr. Layton, we're

13 looking at Exhibit 146 right now.  Can you see it

14 clearly on your screen now?

15   A    Yes, sir.

16   Q    Okay.  We have an offer letter for Michael

17 Fair on May 17th, 2018, correct?

18   A    Yes, sir.

19   Q    And what it says for his "Puerto Rico Storm

20 Rate (on island)" is 1,250 per day at $59.12 per hour,

21 correct?

22   A    Yes, sir.

23   Q    Okay.  And that corresponds to that pay scale

24 in 151 that we've been looking at before, right?

25   A    Yes, sir.

Page 103

1    Q    Okay.  And that's all -- that's all we need

2 for that.  Let's go on to the next one.

3         We have one for Carlos Benevidez here, an

4 offer letter --

5         MR. STUKENBERG:  It hasn't come up.

6         MR. MOULTON:  Oh.  Oh.  You know what?

7 That's because I need to share the right screen.  We're

8 back to normal screen sharing.

9         (Plaintiffs' Exhibit 1 marked.)

10   Q    (By Mr. Moulton) So we have what's been

11 previously introduced as Exhibit 1, offer letter for

12 Carlos Benevidez dated July 1st, 2018.

13        Do you see this?

14   A    Yes, sir.

15   Q    Okay.  If we zoom in, the rate that's stated

16 on his offer letter is $800 per day at 37.84 per hour.

17        Do you see that?

18   A    I do.

19   Q    Okay.  And that's -- and that's a rate that

20 we'll see on the 151, which was the -- the final pay

21 scale that was determined, correct?

22   A    Yes.

23        (Plaintiffs' Exhibit 52 marked.)

24   Q    (By Mr. Moulton) Looking at another example of

25 an offer letter, which has previously been introduced as

Page 104

1 Exhibit 52 for James Tanner, start -- and the start date

2 is May 2nd, 2018.

3         Do you see this?

4    A    Yes, I do.

5    Q    Okay.  And his rate, as stated on this -- his

6 Puerto Rico storm rate, 16-hour paid shift on island, is

7 $800 per day that will be broken down hourly over 16

8 hours daily.

9         Do you see that?

10   A    Yes, sir.

11   Q    Okay.  And this one doesn't have an hourly

12 rate on it, correct?

13   A    No, sir.

14   Q    Do you know what a Personnel Action Form is?

15   A    Yes, sir.

16        (Plaintiffs' Exhibit 168 marked.)

17   Q    (By Mr. Moulton) We have one, which is --

18 well, we have a set of documents that includes a

19 Personnel Action Form for Alan Pierson, which is

20 Exhibit 168; and if we look not at that first one

21 because that's after but for Puerto Rico on his

22 Personnel Action Form, do you see how it says PR $800

23 per day?

24        Do you see that?

25   A    I see that.

Page 105

1    Q    Okay.  And "PR" means "Puerto Rico," correct?

2    A    Yes, sir.

3    Q    Okay.  And there's not an hourly rate

4 established for him, right?

5         MR. STUKENBERG:  On this document.

6    Q    (By Mr. Moulton) On this document?

7    A    Not on this particular document.  That would

8 be contained in the HR/IS system.

9    Q    Okay.  When -- now, you mentioned earlier that

10 with the -- the hourly rates that were established, when

11 the worker works a full week, they can expect then to

12 receive those storm day rates when it's averaged out

13 over the week, correct?

14        MR. STUKENBERG:  Objection, form.

15   A    That wasn't my exact testimony; but to the

16 extent an employee works their hours at the hourly rates

17 over a full week, they would get very close to those

18 target rates.  It would very likely if ever be exactly

19 those targeted rates because of the application of

20 regular and overtime hourly rates.

21   Q    (By Mr. Moulton) Right.  It's basically

22 because of rounding?

23   A    It's basically because of the mechanical

24 calculation in paying employees hourly.

25        MR. STUKENBERG:  It's math.

Page 106

1        MR. MOULTON:  I know, but, you know,
2 he's --
3     Q    (By Mr. Moulton) All right.  Let's go back to
4 Exhibit 167.  I don't know if you ever noticed, but in
5 this spreadsheet -- let me go back to the hourly rates
6 that were calculated, that 1 times 7 divided by 148,
7 it's showing, like, on this first one, 59.12.
8        Do you see that?
9     A    I see that.
10    Q    Okay.  Now, obviously, if we see the full
11 calculation, I mean, it's going on and on.  But if you
12 just use 59.12 and you do this "Check Figure" on L,
13 you're going to be off by a few pennies by -- based on
14 the application of the math you're talking about,
15 correct?
16    A    And the math matters --
17    Q    Right.  The --
18    A    -- and the mechanics matter.
19    Q    It does, and you love to say that.  And I
20 agree with you.  Mechanics matter.  We'll go look at
21 mechanics.
22        MR. STUKENBERG:  Objection to the side
23 bar.
24    Q    (By Mr. Moulton) But my point is -- is that if
25 you use 59.12 instead of this whole number here or this

Page 107

1 long, you know, unrounded number, the amount you
2 calculate that he will get for the week will be slightly
3 off of what the -- the target day rate is, correct?
4     A    In this instance 59.12 is the hourly rate.
5 The employee works the hours.  The mechanics and the
6 math work out however they work out in regards to
7 regular and overtime.
8     Q    And he's not going to get exactly 8750 to the
9 dot, right?  It's going to be a little off?
10    A    This employee would get whatever their
11 calculation is for regular and overtime --
12    Q    Right.  And we'll --
13    A    -- based on their hourly rate.
14    Q    Right.  So at 59.12 is it 8,750; or is it
15 8,750 and a few pennies?  Do you know?
16    A    It's 59.12 times however many hours the
17 employee works during the pay period.
18    Q    Okay.  In Puerto Rico what typically happened
19 was every day worked was credited 16 hours, correct?
20    A    In Puerto Rico what happened was that
21 employees that showed up and either worked or were
22 available to work on call, we recorded 16 hours per day
23 for those employees.  To the extent those employees
24 worked more than their 16 hours, we had processes and
25 procedures in place through the chain of command to

Page 108

1 capture that such that the employee would be
2 compensated.
3     Q    Have you done an analysis to see for the --
4 when people are working in Puerto Rico how many -- like,
5 what percentage of the time that the hours on their time
6 sheet is not 16.00?
7     A    I've looked at a number of time sheets.  Some
8 would be less than -- than 16 hours.  The majority of
9 the time that I've seen, based on my review, is that the
10 employees would be paid for the 16 hours that they
11 either worked or were on call.
12    Q    So what it's going to show in the payroll
13 records then overwhelmingly, like over 99 percent of the
14 time, is 16.00 because they were there working or on
15 call, correct?
16    A    That was the standard shift during the
17 requisite time period for which employees either worked
18 or were on call to work --
19    Q    So --
20    A    -- in Puerto Rico.
21    Q    So overwhelmingly then, in the payroll records
22 on -- for days, it's 16.00 hours per day?
23    A    16 hours was the hours worked and/or on call
24 for the employees in Puerto Rico.  That was the standard
25 shift.

Page 109

1     Q    I mean but exactly 16.00, right?
2     A    That would be the majority of the time.  There
3 were some incidences where it would have been different
4 than 16 hours.
5     Q    Do you know how many?
6     A    I don't have the -- the calculus on that.
7     Q    Okay.  Very small minority?
8     A    Based on my review of the records, it would be
9 a minority of the time that there would be something
10 different than 16 hours worked or available to work for
11 the employees in Puerto Rico.
12        (Plaintiffs' Exhibit 169 marked.)
13    Q    (By Mr. Moulton) Are you aware of -- so we're
14 going to go to Plaintiff's Exhibit 169, and let's start
15 at the bottom here.  Let's kind of work our way through.
16 It's a little -- little long.  They're talking about
17 making corrections, JD Kinsey and these people were
18 talking about making corrections to the payroll.
19        Do you agree with that?
20    A    That's what the email says.
21    Q    Okay.  So JD Kinsey's asking, on January 9th,
22 at 3 -- of 2018 at 3:17, this email on -- spans 3158 and
23 3159 as far as the Bates numbers.  So JD Kinsey's
24 asking, "Hey Alex and Bethany, here is an updated
25 spreadsheet.  To the best of my knowledge I have added

**MARK LAYTON - April 15, 2022**

Page 110

1 all hourly employees that did not work a full 14 day
2 schedule.  I put how many days they worked, the
3 classification, their rate, and what they 'should'
4 receive for the check.  I don't know what you want to
5 process this or adjust amount owed versus the amount
6 their hourly rate shows."
7         Do you know what he's talking about?
8     A    Yes, I do.
9     Q    Okay.  What does he mean?
10    A    So Mr. Kinsey is saying we've got these hourly
11 employees that have worked something less than a 14-day
12 schedule.  Running through the mechanics of that
13 calculation, their hourly rate for regular and overtime
14 wages, he's identified a small population of employees,
15 it appears, that based on that regular and overtime
16 calculation, these employees would earn an amount
17 different than their targeted earning amount, which
18 would be an amount of -- that you brought up several
19 times of X amount per day in the event the employee
20 works each day during the payroll period at the hours
21 for each shift.
22    Q    Right.  So the correction would be to -- to
23 reconcile -- or to bring up the -- what the date -- what
24 the hourly pay was up to that targeted amount, correct?
25    A    I wouldn't characterize that as a correction.

Page 111

1 That would be a calculation of a discretionary amount
2 that could either be paid to the employee for employee
3 goodwill or not paid to the employee based on the
4 decision of the employee's managers.
5     Q    Okay.  So these adjustments that we're talking
6 about are, in your opinion, a bonus?
7     A    These adjustments would be discretionary
8 amounts related to employee goodwill that could be
9 either paid or not paid based on the discretion of their
10 managers.
11    Q    Okay.  Did you ever talk to JD Kinsey about
12 this?
13    A    Did I personally ever talk to Mr. Kinsey?
14    Q    Uh-huh, about this.
15    A    No, sir.
16    Q    Okay.  So you wouldn't know why Mr. Kinsey
17 believes that these adjustments are owed or not, as he
18 says?
19         MR. STUKENBERG:  Where does he say owed?
20 I don't see where he says that.
21    A    Yeah, I don't believe that is --
22    Q    (By Mr. Moulton) "I don't know how you" --
23    A    -- stated.
24    Q    "I don't know how you want to process this or
25 adjust amount owed versus the amount their hourly rate

Page 112

1 shows."
2         Do you know what he means?
3     A    He's saying I've identified these amounts this
4 can either be processed for employee goodwill or not
5 processed.  Mr. Kinsey's a clerk.  It's not his job to
6 either approve or disprove.  He's identified these
7 instances, but he has no ability to approve or not
8 approve any of these items that he's identified.
9     Q    So do you know why he thinks they're owed or
10 not?
11         MR. STUKENBERG:  He doesn't say.
12    Q    (By Mr. Moulton) I'm asking you do you know.
13    A    This email doesn't say.
14    Q    Okay.  Well, do you know apart from this
15 email?
16    A    I've testified as to what the calculation
17 represents.
18    Q    So you don't know why JD Kinsey thinks its
19 owed?
20         MR. STUKENBERG:  That doesn't say that he
21 thinks it's owed.
22         MR. MOULTON:  Yeah, he does.
23         MR. STUKENBERG:  Where?
24         MR. MOULTON:  It just says right there
25 the word "owed."  It says that --

Page 113

1         MR. STUKENBERG:  It says, I don't know
2 how you want to process this or adjust the amount.  He's
3 not saying you owe money.
4         MR. MOULTON:  Owed -- "adjust amount owed
5 versus the amount their hourly rate shows."
6     Q    (By Mr. Moulton) Do you know what this means?
7 Just tell me.  I mean, do you know what he means by all
8 that?  Do you have an opinion?
9     A    I've testified as to what the calculation was.
10    Q    Yeah, I'm not -- I'm not asking that though.
11 I'm asking do you know what JD Kinsey means in this
12 email?
13         MR. STUKENBERG:  Objection.  The email
14 says what it is.
15    Q    (By Mr. Moulton) Do you know what JD Kinsey
16 means?
17    A    The email speaks for itself.
18    Q    Okay.  So the email does speak for itself.
19 Apart from what's written in the email, you don't know
20 anything else about what JD Kinsey's talking about here?
21    A    That completely mischaracterizes my testimony
22 about the analysis that Mr. Kinsey put together.  So to
23 say that I don't know anything --
24    Q    And, yeah, I --
25    A    -- it splits my testimony --

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

**MARK LAYTON - April 15, 2022**

Page 114

1   Q   Fair enough.
2   A   -- up and is --
3   Q   I'll reask the question.
4       You don't -- you don't know -- I mean,
5   and just -- let's -- maybe we'll just do it like this.
6   You've never talked to JD Kinsey at all about making
7   adjustments?
8   A   Regards to my approval of any discretionary
9   amounts, no.  I -- I was not involved in the day-to-day
10  approval.  I'm not the --
11  Q   No.
12  A   -- supervisor for anybody on the island.  That
13  would have been handled by their employers --
14  Q   That's just --
15  A   -- in regards to --
16  Q   That's just not my --
17  A   -- payroll.
18  Q   -- question.
19      MR. MOULTON:  Objection, nonresponsive.
20  Q   (By Mr. Moulton) I just want to know if you
21  ever talked to JD Kinsey about making adjustments.  Yes
22  or no?
23  A   And I just want to finish a couple of
24  questions where I can answer them without you talking
25  over me, out of respect for the court reporter.

Page 115

1   Q   Okay.  Look, this -- we could probably -- you
2   know, we -- we could be done in maybe 30 minutes or an
3   hour if you'll just answer the questions, okay?
4       Did you talk -- just focus on my
5   question:  Have you ever talked to JD Kinsey about
6   making adjustments?  Yes or no?
7   A   I don't recall any discussions between myself
8   and JD Kinsey regarding any payroll processing matters.
9   Q   As part of discovery in this case, did you --
10  were you asked to -- to look for any relevant emails
11  that you may have?
12  A   My relevant emails were pulled via search
13  criteria.
14  Q   Okay.  And who performed that search?
15  A   That would have been directed by counsel.
16  Q   So did you do the search, or did counsel do
17  the search?
18  A   That would have been performed at the
19  discussion of -- between counsel and our IT department.
20  I don't perform those searches myself.
21  Q   Can you explain why we don't have any emails
22  from you?
23      MR. STUKENBERG:  Objection,
24  mischaracterizes the evidence.
25      And I just want to go ahead and get it

Page 116

1   out there:  To the extent that those discussions involve
2   privileged matters, I'm going to ask you not to answer.
3       I assume you don't want to know about
4   privileged discussions.
5       MR. MOULTON:  No.
6   Q   (By Mr. Moulton) I want to know are you aware
7   no emails have been produced from your account regarding
8   the wages and hours and the thought processes into your
9   pay plan?
10      MR. STUKENBERG:  Objection,
11  mischaracterizes the documents that have been produced.
12  Q   (By Mr. Moulton) Do you know if any have been
13  produced from your account?  Do you -- do you have
14  personal knowledge of that?
15  A   Yes, I do.
16  Q   Okay.  So your testimony is that you have
17  produced these documents?
18  A   My testimony is that the documents out of my
19  email account have been produced and those documents do
20  exist.
21  Q   Okay.
22      MR. MOULTON:  What was my last exhibit
23  number?
24      MR. STAMEY:  169.
25      MR. MOULTON:  It was 169?

Page 117

1       THE REPORTER:  Yes.
2       MR. MOULTON:  Okay.
3       MR. STAMEY:  Don't ever say I'm not
4   helpful.
5       MR. MOULTON:  In more ways than one.
6   Q   (By Mr. Moulton) All right.  Mr. Layton,
7   let's -- I want to go through some payroll examples with
8   you if that's all right with you.  Let's see how this
9   exhibit does with screen share.
10      MR. STUKENBERG:  What software are you
11  using?
12      MR. MOULTON:  I use -- well, we'll go --
13  we can talk about that off the record, but I'm happy to
14  talk about it.
15  Q   (By Mr. Moulton) Before we get -- while we're
16  waiting for this to load, do -- do you recall whether --
17  now pay attention to my question here because I have a
18  very specific question.  We don't have to be here all
19  day, okay?
20      Do you recall whether or not
21  Mr. Broussard actually reviewed actual payroll
22  documents, like the pay stubs or time sheets, that were
23  going out to employees; or was his analysis with you
24  guys prospective, looking at helping you guys decide
25  what you were going to do?

## MARK LAYTON - April 15, 2022

Page 118

1  A   Mr. Broussard's analysis was to give us the
2  option between compliant pay plans.
3  Q   Okay.  So I believe he testified yesterday
4  that he did not get involved in analyzing the actual
5  payroll that went out to see if it complied with the law
6  or his advice.
7  A   I believe that somewhat mischaracterizes it.
8  So in regards to reviewing specific pay stubs, I don't
9  believe that to be the case, that Mr. Broussard
10 reviewed.  Mr. Broussard did, however, review the hourly
11 pay practice and the application of regular and overtime
12 rates.
13 Q   But he didn't actually review pay stubs is
14 what you're saying?
15 A   I don't believe Mr. Broussard actually
16 reviewed pay stubs --
17 Q   Okay.
18 A   -- no.
19       (Plaintiffs' Exhibit 170 marked.)
20 Q   (By Mr. Moulton) All right.  So we're going to
21 look at a series of pay stubs and time sheets that have
22 been produced in this matter, and it's Plaintiff's
23 Exhibit 170.  For example, we have one here on your
24 screen -- you should be able to see -- for Justin
25 Washburn.

Page 119

1        Now, before we get into it, I mean,
2  you've probably looked at even more of these than I
3  have.  I'm pretty sure I've looked at thousands of
4  payroll records at this point.  Would you agree that you
5  have looked at thousands of payroll records at this
6  point?
7  A   I've looked at many payroll records, yes.
8  Q   Okay.  When you look at Justin Washburn's
9  payroll record, do you know what target rate that 37.84
10 rate corresponds to?
11 A   Mr. Washburn's pay rate is 37.84 per hour as
12 an hourly employee.
13 Q   And what would the target rate be for him?
14 A   If Mr. Washburn were to work seven days a week
15 at 16 hours per day, back of the envelope math, I think
16 Mr. Washburn would earn close to but not exactly $800
17 per day if you -- if you reverse calculated that amount
18 for a pay period.
19 Q   Right.  And we can actually -- we can actually
20 know that just looking at his pay stub because we know
21 that 37.84 rate, back on 151, corresponds to the target
22 or "PR Storm - Per Day" rate of $800, correct?
23 A   800 is the target if the employee works seven
24 days a week at 16 hours per day.  I think if you go back
25 to his pay stub and try to divide $24,801.28 by 800, I

Page 120

1  don't think you're going to get an exact number of days.
2  Q   Oh -- oh, that's not the column we'd be
3  looking at.  That's the year to date.  Let's look at the
4  current period.  For this pay period is all -- is what
5  we're talking about.
6        So do you see how his current period, he
7  gets paid $1600?
8  A   For the current period, his gross earnings are
9  $1600.  For the year to date, that's not divisible by
10 any round number.
11 Q   Right.  And -- and I'm not going to ask you
12 about year to date numbers.  I just don't care because
13 that could be anything.
14 A   Well, because the statistics aren't in your
15 favor.
16 Q   Well, it -- also it's because it could have
17 included pay rates that weren't Puerto Rico rates
18 because we're already into June, correct?
19 A   No.  It's just that the statistics aren't in
20 your favor.
21 Q   Do you know when Mr. Washburn started?
22 A   I can't tell that based on this particular pay
23 record.
24 Q   So you don't know what he was earning before
25 or not, do you?

Page 121

1  A   I do know based on my data that the statistics
2  are not in your favor, which is why you're not bringing
3  them up.
4  Q   And I'm not -- yeah, okay.  Well, either way,
5  I'm not -- we're -- we're not going to -- I'm not going
6  to ask about year to date right now, okay?  And so if
7  I'm not asking about it, I'm not asking you to talk
8  about it.  And I'll -- if I change that, I'll tell you
9  because you're just wasting time and being nonresponsive
10 if you do.
11 A   You're wasting my time with something that the
12 statistics don't -- don't support, but I'm happy and I'm
13 here for -- for this amount of time.
14 Q   You would -- you understand that folks
15 before -- if they were working for Higher Power before
16 the island, that they could have had any number of rates
17 and actually had hours that were not divisible by 16 --
18       MR. STUKENBERG:  Do you --
19 Q   (By Mr. Moulton) -- correct?
20       MR. STUKENBERG:  -- know if he did work
21 before?
22       MR. MOULTON:  I don't know.  I don't even
23 know why he's doing this.
24 Q   (By Mr. Moulton) Why are you doing this?
25 A   I don't know.  Why are you doing this?

## MARK LAYTON - April 15, 2022

Page 122

1 Because -- because the statistics don't support you.  So
2 you've got a two-day period that gets to a round number
3 and then you've got a much larger period that doesn't,
4 but you want to focus on these two days.
5     Q     And that --
6     A     So that's fine.
7     Q     That's exactly what I want to do, and that's
8 all we're doing.  We're looking at this pay stub in this
9 period.  That's what I'm doing with you, okay?  When
10 your lawyer wants to ask you questions at trial, you
11 can -- y'all can do whatever you want as long as it's
12 within the rules, okay?  That's not what I'm doing.  I'm
13 asking you about the current period and the hours on
14 Justin Washburn's pay stub here, okay?  Are we clear on
15 that?
16    A     Sure.
17    Q     Okay.
18           All right.  Looking at his pay stub, can
19 you tell me how many days he worked?
20    A     It appears that Mr. Washburn worked two days
21 during this pay period.
22    Q     And at $800 per day, he would get 1600; and
23 that's what he was paid, correct?
24    A     Mr. Washburn was paid for 16 hours at 37.84
25 and appears to have been paid for 16 hours at 56.76.

Page 123

1     Q     But that's not all he was paid?
2     A     Appears to have $86.40 under a day rate pay
3 code.
4     Q     Okay.  So that 86.40 is exactly the amount
5 needed to bring his hourly pay up to the Puerto Rico
6 storm day rate, correct?
7           MR. STUKENBERG:  Objection, form.
8     A     The rates are the hourly rates that are
9 reflected here.  The 86.40 appears to be a discretionary
10 amount that was approved for Mr. Washburn.
11    Q     (By Mr. Moulton) All right.  Let's go to
12 the -- in the same Exhibit 170, we're going to go to the
13 next pay stub, which is on Mammoth 7080.  And
14 Mr. Washburn, in his pay period of May 14th/May 27, was
15 paid, under a day-rate category, $800.
16           Do you see that?
17    A     Yes, I do.
18    Q     Okay.  Do you know why it doesn't show hours
19 and rates here?
20    A     That would appear to be a payroll input error
21 in regards to Mr. Washburn given that he is an hourly
22 employee.
23    Q     Okay.  Do you know how many hours he worked
24 this day?
25    A     I do not.

Page 124

1     Q     Do you know how many days he worked?
2     A     Not based on this particular record.
3     Q     If his target rate is $800 per day, does that
4 inform you how many days he worked?
5     A     That informs me what his target earnings would
6 be if he works for seven days and is available to work
7 or works for seven days at 16 hours per day.  Over a
8 period of -- of a payroll period, he would earn
9 approximately $800 per day if you reverse solve that but
10 not exactly; and we've gone through that math.
11    Q     So on Page 7,081 in this same exhibit, we can
12 see the corresponding time detail report.  And do you
13 see how it says "Fixed: (DYR)" and $800?  Do you see
14 that?
15    A     Well, DYR would be --
16    Q     I'm asking you do you see that.
17    A     Yes, I do.
18    Q     Okay.  Does DYR mean day rate?
19    A     DYR is a pay code.  In this -- in this
20 instance that would be an inappropriate pay code for
21 this employee, and -- and I would characterize that as
22 an error.
23           MR. MOULTON:  And objection,
24 nonresponsive.
25    Q     (By Mr. Moulton) My question is:  Does DYR

Page 125

1 mean day rate?
2     A     It's a pay code.
3     Q     Right.  What does -- what does it mean?
4     A     It is a day rate pay code that is an error in
5 this particular instance.
6     Q     Okay.  Let me ask you this:  The DYR code in
7 the Time Detail Report, how does that map out into the
8 paycheck?
9     A     DYR as the pay code --
10    Q     Right.
11    A     -- would map to the day rate line item on the
12 pay stub.
13    Q     Okay.  So normal people would say DYR means
14 day rate?
15           MR. STUKENBERG:  Objection, form.
16    A     That's not at all what I said.  It's a pay
17 code, and it's an error.
18    Q     (By Mr. Moulton) So it doesn't mean day rate?
19    A     I said the DYR pay code maps to the day rate
20 line.
21    Q     Okay.  Moving right along in these examples
22 for Tyler Halford, on Bates No. 533, we have a pay
23 period March 5th/March 18th.  Do you see that?
24    A     Yes, I do.
25    Q     Okay.  Do you -- now, you probably recall that

# MARK LAYTON  -  April 15, 2022

1 37.84 is the rate that is associated with a target rate
2 of $800 per day, correct?
3      A    I don't recall where 37.84 maps to.  Appears
4 to be correct, yes.
5      Q    All right.  If we go back to Exhibit 151, we
6 see the "PR Storm - Per Hour" rate of 37.84 is right
7 next to the "PR Storm - Per Day" of $800; and you call
8 that a target rate, right?
9      A    $800 is a target rate, yes.
10     Q    Okay.  So looking at this pay stub for Tyler
11 Halford back in Exhibit 170, by looking at this pay
12 stub, can you tell me how many days he worked in -- for
13 this pay period?
14     A    He appears to likely have worked for ten days.
15     Q    Okay.  And why do you say that?
16     A    16 hours per day --
17     Q    Times 10 equals 160, right?
18     A    Yep.
19     Q    Okay.  Now, a -- a guy whose target rate is
20 $800 per day, if he works ten days, his target pay would
21 be $8,000, right?
22     A    If he works ten days, then his pay would be
23 whatever it calculates to be.  It would not be $800 to
24 the penny.  It would calculate whatever the math is.
25     Q    Okay.  So you're saying that his -- that his

1 target would have been 3,027.2 plus 4540.8?
2      A    That's what he would have earned during that
3 pay period.
4      Q    Okay.  And this additional -- this day rate
5 boost of 432 that brings him to exactly his target rate
6 is an error?
7           MR. STUKENBERG:  Objection, form.
8      A    It's not a day rate boost.  I've not
9 characterized anything as a, quote, unquote, day rate
10 boost.  I have testified that there were instances in
11 which we made discretionary bonuses to employees.  There
12 were other instances in which we did not.
13     Q    (By Mr. Moulton) So the --
14     A    In this particular case, the characterization
15 of that discretionary bonus under the day rate pay code
16 was an error in selection of pay code.
17     Q    So it should have been bonus?
18     A    Yes, sir.
19     Q    Okay.  How come no one ever fixed this?
20     A    It's an error of pay code; and statistically,
21 if you look at this error, this error occurred less than
22 2 percent of the time.
23     Q    So it wasn't worth fixing?  Is that what
24 you're saying?
25     A    That's not what I said.  I said statistically

1 this error is a minute portion of the overall population
2 for hourly employees.
3      Q    And that's the reason you're giving for why it
4 wasn't fixed?
5      A    It was an error in selection of pay code.
6      Q    Okay.  No one ever noticed and caught this
7 error and fixed it?
8      A    It's a discretionary amount that was paid to
9 the employees.  The selection of the pay code was an
10 error.  It's a minute percentage of the overall
11 population both in terms of dollar amount as well as
12 occurrence.
13     Q    So the $432 is a discretionary amount
14 determined by who?
15     A    That would be a discretionary amount that
16 would have been approved by the employee's supervisor.
17     Q    Okay.  How do you guys track that?
18     A    It's tracked -- it was input under an
19 inappropriate code here.
20     Q    No.  I'm not asking that.  You're -- you're
21 saying the employee's supervisor approved specifically a
22 432 adjustment for Tyler Halford, correct?
23     A    My testimony was that Mr. Halford received a
24 discretionary amount of $432 in this particular pay
25 period.

1      Q    And you're saying that his supervisor had to
2 specifically approve it for it to go through, right?
3      A    That's correct.
4      Q    Okay.  What documents would reflect these
5 approvals?
6      A    The approval process would be contained inside
7 of the HR/IS system in regards to the payroll processing
8 procedures.
9      Q    What are those documents called?
10     A    Those are electronic approvals the majority of
11 the time.  In some instances, those approvals could have
12 been either verbal or in writing via paper or email.
13     Q    Okay.  So what's the form called to get your
14 discretionary amount added if you're Tyler Halford?
15 What do you do?
16     A    If you're Tyler Halford, you have no input in
17 that process.  That's at the discretion of the
18 supervisor, not at Mr. Halford.
19     Q    So on every single payroll that doesn't have a
20 full week, the supervisor is going to review it and
21 decide whether or not he's going to apply the
22 discretionary amount?
23     A    Supervisors have discretion in regards to the
24 payment of any discretionary bonuses.
25     Q    Okay.  What's the form called for doing this?

**MARK LAYTON - April 15, 2022**

Page 130

1    A    There is no form name, and there is no single
2 form.  I mentioned four or five different ways that a
3 discretionary bonus may be approved by a supervisor.
4    Q    If I'm Tyler Halford's supervisor, what do I
5 do to get him this discretionary amount added?
6    A    Tyler Halford's supervisor has the
7 discretion --
8    Q    No.  I want to know what he has to do.
9    A    And I want to answer --
10    Q    Yeah.
11    A    -- without you interrupting me again and again
12 and again and again.
13    Q    Okay.  Tell me what he does.
14    A    Mr. Halford's supervisor would submit an
15 amount of a discretionary bonus to the payroll
16 processing team and approve that bonus via either
17 writing in the form of email, verbally, or inside of
18 electronic approval of the payroll.
19    Q    Okay.  So there should be documents that would
20 document this?
21    A    I've mentioned there may or may not be
22 documents.  I mentioned some of the approvals may be
23 verbal.
24    Q    Sure.
25    A    The approval and processing of these amounts

Page 131

1 is contained inside of the HR/IS system in regards to
2 the amounts that were ultimately approved and paid, but
3 the requesting an approval may or may not be in writing.
4    Q    So if I want to ask your lawyers for copies or
5 examples of these, what am I asking for?
6    A    You have a mountain of documents that have
7 been produced that contain discretionary calculations.
8 Some were paid.  Some were not.  And you have even more
9 documents in regards to payroll records in regards to
10 how employees were paid.
11    Q    Can you show me a time when it was ever
12 denied?
13    A    Yes, there were times when it was denied.
14    Q    Can you show it to me on paper?
15    A    There are pay stubs in which discretionary
16 bonuses for periods of time in which an employee worked
17 less than their full seven-day workweek --
18    Q    I have not --
19    A    -- and they were not paid any discretionary
20 amount.
21    Q    You have not produced a single document
22 that -- between supervisors and people in payroll about
23 discretionary amounts ever.  So if you're telling me
24 that's true, that's a lie.
25    A    And if you want to call me a liar, then that,

Page 132

1 I take offense to.
2    Q    Okay.  Can you --
3    A    That's unprofessional, and I don't appreciate
4 the connotation that I'm a liar.
5    Q    I -- I hear you.
6    A    No.
7    Q    No, I hear you.  It's --
8    A    It's true.  You're unprofessional --
9    Q    It's not cool getting call --
10    A    -- and don't badger me and call me a liar.
11 Don't ever call me a liar again.
12    Q    How about this:  If what you're saying is
13 true --
14    A    What I'm saying is true; and to the extent you
15 keep going down this path and calling me a liar, it
16 doesn't end well because I'm not a liar.  I've testified
17 truthfully.  I'm under oath, and I'm not a liar.  So
18 quit calling me a liar.
19    Q    How about this:  Give me the search term that
20 I would need to find even one of these supposed
21 approvals that you're talking about.
22    A    You've got a mountain of documents.
23    Q    No.  I --
24    A    If you can't find it, it's not my problem.
25 They're in there.  I've testified that they're in there.

Page 133

1    Q    If I wanted to find it, what would I search
2 for?
3    A    I would start by looking at the documents and
4 doing your job.
5    Q    I have done that.  I'm --
6    A    Obviously you've not done it well because I've
7 seen them.
8    Q    Are they emails?
9    A    The documents are in there.
10    Q    Are they emails?
11    A    Not my job to do your job.
12    Q    Are they emails?  The ones you're talking
13 about that you've seen, are they emails?
14    A    In regards to emails of what?
15    Q    These discretionary amounts added that you
16 keep talking about.  You said you've seen documents that
17 talk about these discretionary amounts.
18    A    There are documents that have been produced in
19 which there are calculations such that there is an
20 opportunity for supervisors to either approve or not
21 approve a discretionary amount.  They are in the form of
22 spreadsheets, and you can shake your head, because you
23 haven't done your job, all you want.
24    Q    Okay.
25    A    The facts are that the documents are in there.

## MARK LAYTON - April 15, 2022

Page 134

1    Q    We've seen spreadsheets of, like, Missy Davis,
2 like, when she's actually processing them, okay?  But
3 I'm talk -- I want to know -- what I'm asking about are
4 the documents where supervisors are submitting the
5 request for the -- the discretionary amount.  You're
6 saying those exist somewhere.
7    A    That's not at all what I said.
8    Q    So they don't exist?
9    A    That's not at all what I said.
10   Q    So what's the answer?
11   A    I'll reincorporate all my previous testimony.
12   Q    What's the answer?  Do those documents --
13   A    I've given you the answer.
14   Q    Have you seen those documents in this
15 production?
16        MR. STUKENBERG:  What documents are you
17 asking for, Dave?
18        MR. MOULTON:  He -- okay.  He's saying
19 that the amounts like 432 are discretionary amounts that
20 come through when supervisors request them and that the
21 company can decide whether or not to add them or not.
22        THE WITNESS:  That's not what I said.
23        MR. STUKENBERG:  I didn't understand that
24 to be his testimony --
25        MR. MOULTON:  Okay.

Page 135

1    Q    (By Mr. Moulton) So what --
2        MR. STUKENBERG:  -- but I'm not going to
3 testify for him.
4    Q    (By Mr. Moulton) What about that process is
5 wrong?
6    A    I'll speak real slowly for you.
7    Q    Yeah.  Go ahead.
8    A    I reincorporate all of my previous testimony
9 in which I've told you the documents -- some of which
10 are documents, some of which are verbal -- in which
11 supervisors have the opportunity to either approve or
12 not approve any discretionary amount.
13   Q    Okay.  And obviously if I'm talking about the
14 documents, I'm not talking about the verbal ones.  What
15 I want to know is have you produced documents that show
16 the request from supervisors for any discretionary
17 amounts?
18   A    Whether there were -- the -- the requests from
19 supervisors is a -- is a misconnotation of my testimony.
20   Q    Okay.  So you're saying that they have an
21 opportunity to approve or reject?
22   A    Supervisors have the opportunity to approve or
23 reject any discretionary amount paid.
24   Q    So who sends them the approval or rejection
25 communication?

Page 136

1    A    The communication could come from a number of
2 areas.  The supervisor --
3    Q    Who --
4    A    -- could --
5    Q    Who sends it?
6    A    Can I answer --
7    Q    Yes.
8    A    -- or are you just going to interrupt me all
9 day?  It's very rude --
10   Q    Who --
11   A    -- and to the extent that --
12   Q    Who sends it?
13   A    -- you want to continue your rudeness, it's
14 really not productive.  I'm trying to answer your
15 questions, and you keep talking over me.
16   Q    Who sends it?
17   A    The supervisor can send, either in writing or
18 via verbal direction, for the discretionary amount to be
19 paid.  In the alternative, a discretionary proposal may
20 be submitted from any one of a number of clerks to the
21 supervisor for approval in email or through the approval
22 of a payroll processing function.
23   Q    Safe to say for Tyler Halford's $432 you can't
24 tell me who approved it?
25   A    Not on the face of this document.  Nor would

Page 137

1 you be able to see any type of approval process on any
2 pay stub for any employee at any one time.
3    Q    Can we see it on the Time Detail Report?
4    A    This is a time entry report and not a payroll
5 approval report.  So you can see who keyed amounts into
6 the system.  It doesn't -- this report doesn't reflect
7 who approved payroll or payroll amounts or bonuses.
8 It -- it only captures the input side.
9    Q    Okay.  So if we go down to Page 549 in this
10 exhibit, 170, we can see that 432 was keyed in; and
11 you're saying that that would have been keyed in based
12 on these reports you're talking about?
13   A    I don't think I testified as to any reports.
14 I gave testimony a couple of times now on various ways
15 that a discretionary bonus could be paid.
16   Q    So someone had to put 432 in this spreadsheet.
17 Who did it?
18   A    Based on this report, you can't tell who input
19 the $432.
20   Q    Is that something that JD Kinsey would do?
21   A    It's possible that Mr. Kinsey input it.  Based
22 on this particular report, I can't see that Mr. Kinsey
23 input this 432; but I've seen a number of instances in
24 which Mr. Kinsey did input inappropriate day codes such
25 as this $432 under a day rate pay code.

**MARK LAYTON - April 15, 2022**

Page 138

1    Q    Who else besides Mr. Kinsey would -- for the
2  time in Puerto Rico for these discretionary amounts as
3  you call them, who would be entering them besides
4  Mr. Kinsey into the Time Detail Reports?
5    A    Based on my review of the data, the
6  overwhelming majority of the time for which this
7  particular pay code was inappropriately selected was
8  performed by JD Kinsey.
9    Q    Who else would have done it though?  Anyone
10  else?
11    A    There may have been some payroll clerks that
12  utilized this inappropriate day code as well.  I would
13  characterize other employees as utilizing this
14  inappropriate pay code as a relatively minute percentage
15  of the population.  In other words, Mr. Kinsey, based on
16  my review, appears to have been the individual that
17  utilized this day code about 90-plus percent of the
18  time.
19    Q    Okay.  And I'm -- I'm sorry.  I just -- I
20  think we're just talking about two different things, all
21  right?  I feel like you're not answering my question.
22  If I want to talk to other people that potentially may
23  have been entering in these -- these rates or these --
24  these discretionary amounts as you call them, we know
25  Mr. Kinsey would enter them.  Who else, if anyone, would

Page 139

1  enter them into the Time Detail Report?
2        MR. STUKENBERG:  If you know.
3    A    Mr. Kalman may have done some payroll entry as
4  it relates to -- to Puerto Rico.  I don't recall any
5  other clerks off the top of my head.
6    Q    (By Mr. Moulton) Would Missy Davis also enter
7  in payroll?
8    A    I don't recall instances in which Missy Davis
9  input payroll for Puerto Rico related wages.  She
10  certainly would have had inquiry access and visibility
11  on Puerto Rico wages and -- and may have input some
12  small percentage of the population as it relates to
13  Puerto Rico entry.  But in large part, it was Mr. JD
14  Kinsey that input Puerto Rico hourly -- hours and wages.
15    Q    All right.  Moving along with Mr. Tyler
16  Halford.  Looking at the pay period February 5th to
17  February 18th, which is Bates No. Mammoth 535 inside
18  Exhibit 170.
19        Looking at this pay stub, can you tell me
20  how many days he worked?
21    A    Appears to have worked 80 hours, which would
22  be approximately five days.
23    Q    Approximately or exactly?
24    A    I would assume that on the face of this it was
25  probably exactly five days, but I'd have to look at the

Page 140

1  Time Detail Report to confirm that.
2    Q    Which we can do, should be able to do.
3  February 5th, February 18th -- so in that first week of
4  February 5th, I'm counting five days?
5    A    Looks like five days over a two-week period.
6    Q    Well, actually -- yeah, five over a two-week
7  because that 518.72 is a double entry for Monday.  So
8  that's actually four in the first week and one on the
9  second week, correct?
10        Do you agree with that?
11    A    Based on the -- the hours, it looks like there
12  were five days worked over a two-week period.
13    Q    Okay.  And -- and so, again, he was paid
14  $518.72 under the day rate pay code, which brings up his
15  hourly pay calculation up to $4,000, correct?
16    A    It brings up his gross for the pay period to
17  $4,000.
18    Q    Yes, which is exactly what 800 times 5 would
19  be, right?
20    A    800 times 5 is 4,000, yes.
21    Q    Moving right along with Robby Alvear.  In
22  Robby Alvear here, we have an example of him being paid
23  a flat $6,400 for the pay period April 30th to May 13th.
24        Do you see this?
25    A    Yes, I do.

Page 141

1    Q    Okay.  Do you happen to know how many days or
2  hours he worked?
3    A    I can't tell that based on the data on this
4  earning statement.
5    Q    So April 30th to May 13th.  That's going to be
6  this first one here in this Time Detail Report.  If we
7  want to know how many days he worked, how would we
8  figure that out?
9    A    It appears he has entries on eight days.
10    Q    Right.  He has an $800 entered for eight days
11  for this pay period, correct?
12        MR. STUKENBERG:  You're talking about the
13  two-week pay period?
14        MR. MOULTON:  Yes.
15    A    That's correct.  There are eight days at day
16  rate pay code of $800 per day.
17    Q    (By Mr. Moulton) So for every day in this pay
18  period that Mr. Alvear worked, he was paid $800 for each
19  one of those days?
20    A    That appears to be what was input, yes.  That
21  was -- that was a payroll input error by Mr. Kinsey.
22    Q    Another error?
23    A    And Mr. Kinsey was counseled for those errors
24  and ultimately terminated for -- for those errors.
25    Q    Sure.  It's all mistakes?

**MARK LAYTON - April 15, 2022**

---

Page 142

1      A    A minute percentage of the overall population,
2  less than 2 percent; but I understand that you want to
3  throw the statistics out the window.
4           MR. STUKENBERG:  Dave, what are you
5  thinking for lunch?
6           MR. MOULTON:  I don't know.  Do, like, 30
7  minutes?
8           MR. STUKENBERG:  Do you think you want to
9  break soon?  I don't know whether you're at a stopping
10 point.
11          MR. MOULTON:  I'm going to have more
12 stuff to cover.  So if -- if y'all want to take a break,
13 we can do it now.
14          MR. STUKENBERG:  I mean, I'm not
15 starving.  I just wanted to raise the issue.
16          MR. MOULTON:  Yeah.
17          MR. STUKENBERG:  Put it on your radar
18 when you get to a stopping point.
19          MR. MOULTON:  Yeah.  So we'll do a few
20 more.  I think, you know, I want to do enough where we
21 can at least see all the iterations of it, you know.
22          MR. STUKENBERG:  Sure.
23      Q    (By Mr. Moulton) All right.  Mr. Layton, for
24 Mr. Ballesteros, on Mammoth 154, Exhibit 170, again, we
25 have that 37.84 rate, which corresponds to the

---

Page 143

1  800-dollar per day storm rate in Puerto Rico according
2  to Exhibit 151, correct?
3      A    What was the question again?
4      Q    Yes.  Mr. David Ballesteros' rate on this pay
5  stub is 37.84, which corresponds with the 800-dollar PR
6  storm per day rate according to document -- or
7  Exhibit 151, correct?
8      A    Corresponds with the hourly rate, that's
9  correct.
10     Q    And so here, again, we see yet another example
11 where someone who works, what, that's six days?  You
12 agree that's six days?
13     A    Appears to be six days at 16 hours a day, yes.
14     Q    All right.  And at $800 a day gets $4800.  Do
15 you see that?
16     A    He worked six days, which is 96 hours.  40 of
17 which paid at regular, 56 at overtime.
18     Q    Okay.  And he gets a $107.84 boost up to
19 $4,800, right?
20          MR. STUKENBERG:  Objection, form.
21     A    It's a hundred-and-seven-dollar and
22 eighty-four-cent discretionary bonus that was paid under
23 an inaccurate line item or pay code.
24     Q    (By Mr. Moulton) How did Mr. Ballesteros get
25 this 107.84 on his paycheck?

---

Page 144

1      A    We've covered the mechanics behind that.
2      Q    I want to know how Mr. Ballesteros got it on
3  this one.
4      A    And I'll reincorporate all my previous
5  testimony on how that occurs.
6      Q    I want to know for this one though.
7           MR. STUKENBERG:  I'm just -- just so I'm
8  clear, Dave.  Are you asking him the background on the
9  rationale and approval and all of that for this payment
10 of $107?
11          MR. MOULTON:  I want to know how that
12 107.84 got on this paycheck.
13          MR. STUKENBERG:  Okay.
14          MR. MOULTON:  Does he -- does he know
15 that?
16     A    That $107.84 was input into the payroll
17 processing function.
18     Q    (By Mr. Moulton) You don't know who did it?
19     A    I can't tell when you keep jumping back and
20 forth and don't show me the detail.
21     Q    No.  I just want to know this before we look
22 at it.  Like, do you happen to know?
23     A    If you'll show me the detail, I'm happy to
24 look at it.
25     Q    Okay.

---

Page 145

1      A    If you're asking me from memory on over a
2  hundred thousand payroll transactions on who input
3  this --
4      Q    All right.
5      A    -- no.
6      Q    So safe to -- safe to -- safe to assume you
7  have no independent memory of this; is that correct?
8  You have -- you could only -- you're just as good as us
9  at looking at the payroll records, right?
10          Is that right?
11          MR. STUKENBERG:  Objection, form.
12     Q    (By Mr. Moulton) You're not -- okay.  So
13 your -- but your answer isn't going to be informed by
14 any particular memory on this particular transaction,
15 right?
16          MR. STUKENBERG:  On this particular
17 transaction, not the process in general.
18          MR. MOULTON:  Right.
19     A    On this particular transaction, I have no
20 specific knowledge in regards to inputted -- who input
21 the amount on this.  One, this period of time that you
22 keep flipping back and forth --
23     Q    (By Mr. Moulton) Yeah, I'm trying to find it.
24 I finally -- I think I finally found the right period.
25 This -- he has so many payroll records so -- that are

---

Page 146

1 blank.  I'm -- I'm trying to find it for you,
2 Mr. Layton.  I'm -- I'm getting there.
3             I think we're in March, right?
4 March 19th to April 1st?
5             Okay.  March 19th to April 1st --
6    A    JD Kinsey input the $107.84 as well as the
7 hours for each one of the days inside of this particular
8 pay period that's reflected on the pay stub.
9    Q    Okay.  So and -- and just -- so this agrees
10 with what we were -- what me and -- me and you both were
11 thinking.  96 is going to be six days; and it's going to
12 have this $107.84 added because there was some sort of
13 approval process that went through payroll to put it on
14 there, right?
15    A    I believe that mischaracterizes my previous
16 testimony, all of which I'll reincorporate.
17    Q    Who in payroll is -- is dealing with the --
18 the approval process?
19    A    I don't know that I understand the -- the
20 question.  Payroll is responsible for inputting data.
21    Q    Uh-huh.
22    A    That process goes through -- once input,
23 through an approval process of -- of supervisors, many
24 of which are -- are outside of quote, unquote, payroll.
25    Q    Okay.  Well -- so I'm just having a hard time

Page 147

1 understanding the process because I know J Kinsey inputs
2 them or at least is a person that -- and Mr. Kalman
3 could be inputting them actually into the payroll
4 system, correct?
5             You agree with that?
6    A    Among others, yes.
7    Q    Okay.  And -- but you -- I asked you over and
8 over and over and you couldn't think of anyone else.
9    A    I -- I named two names and said there were
10 likely others.
11    Q    Okay.  But you can't -- sitting here today,
12 you're not able to tell me the names of any others?
13             MR. STUKENBERG:  I thought he said Missy
14 Davis.
15             MR. MOULTON:  He said no.
16             MR. STUKENBERG:  Okay.
17    A    I did say Missy Davis may -- may have input
18 some small population of -- of payroll amounts.
19    Q    (By Mr. Moulton) Okay.  I thought you said no
20 on that.  So we've got Kinsey, Kalman, Davis.  Anyone
21 else that you can remember?
22    A    Shelly Wheeler may have had some nominal input
23 from time to time.
24    Q    Anyone else?
25    A    It's possible that Beth Stone may have done

Page 148

1 some input from time to time.
2    Q    Who does she work for, Beth Stone?
3    A    Beth Stone would have been a Mammoth Energy,
4 Inc., employee.
5    Q    What about Wheeler?
6    A    Wheeler was employed by Higher Power.
7    Q    So -- and if I understand right, you said
8 Kinsey is just a clerk.  He's not one who gets to make
9 decisions about how people get paid or what they get
10 paid?
11    A    That's correct.  Mr. Kinsey is just a payroll
12 clerk.
13    Q    Okay.  So for Mr. Kinsey, for example, to
14 enter in one of these day rate adjustments, he is going
15 to be doing it based on an approval made by someone
16 else?
17    A    He would have been doing it based on the
18 direction of someone.  Any input that Mr. Kinsey made in
19 regards to a discretionary bonus would have had to have
20 been supervisor-approved based on either the direction
21 of that payment or after Mr. Kinsey input that amount in
22 order for payroll to be processed.
23    Q    Okay.  So on the island during the time period
24 that these guys were out there working, who -- who are
25 the supervisors that would do this approval?

Page 149

1    A    There would be any number of -- of
2 supervisors that -- that would have been capable of
3 approving a discretionary bonus.
4    Q    By -- okay.  So you're saying it's probably
5 too many names to -- to remember?
6    A    That would have been a -- a massive population
7 over a multimonth period.
8    Q    Okay.  Can you tell me what level of -- of
9 position would have that authority to make these
10 adjustments under the day rate here in the pay stubs?
11    A    Regards to specific levels, could have been
12 approved by president, vice president, COO.  There could
13 have been probably some other administrative managers in
14 Puerto Rico that -- that could have approved
15 discretionary bonuses as well.
16    Q    I think for the guys that worked on
17 December 23rd there was, like, a "HOL" code in the
18 payroll.  Do you remember that?
19    A    Holiday is -- is a pay code that -- that
20 exists.
21    Q    Okay.  Who would approve the holiday pay code?
22    A    Holiday pay codes --
23    Q    And I -- you know, I don't mean the code.  I
24 mean the amounts that would come out for holiday pay.
25    A    The -- the amounts for -- for holiday pay

**MARK LAYTON - April 15, 2022**

Page 150

1 would have been no different than any other payroll
2 processing in regards to formal approval of payroll.
3     Q    Okay.  Now, from my review, it looks like
4 people that were there on December 23rd, or thereabouts,
5 of 2017 got $1,111.11 added to their payroll; is that
6 right?
7     A    That didn't have anything to do with whether
8 they were in Puerto Rico or whether they were in the
9 lower 48.  That was a discretionary holiday payment --
10    Q    Uh-huh.
11    A    -- that was paid to all employees of Higher
12 Power, 5 Star, and Cobra Energy that were employed as of
13 that date regardless of whether they were in the lower
14 48 or Puerto Rico.
15    Q    And who approved that -- that particular
16 holiday bonus?
17    A    That particular holiday bonus was approved for
18 each of those entities by myself and by Mr. Straehla in
19 our capacity at each one of those entities.
20    Q    Okay.  Now, you guys weren't doing the
21 approvals back to these day rate adjustments, right?
22    A    No, sir.
23    Q    Okay.  So that's going to be president --
24 presidents, vice presidents, COOs, and administrative
25 managers is what you said.  Anyone else?

Page 151

1     A    There may be other mid-level managers that --
2 that would have been able to -- to approve it.  Those
3 would have been the -- the primary approvers.
4     Q    Okay.  So for Higher Power that would have
5 been Robert Malcom?
6     A    Yes, Mr. Malcom was -- was the president.
7     Q    Okay.  Who was his vice president?
8     A    I don't recall the -- the name of -- of his
9 vice president.
10    Q    Who was -- who was the COO of Higher Power?
11    A    I don't believe Higher Power had a -- a COO.
12    Q    Okay.  And what admin or manager or managers
13 with Higher Power would have been qualified to approve
14 the day rate adjustments?
15    A    The discretionary bonuses paid under this day
16 rate item?  There could have been -- Mr. Malcom, any one
17 of his direct reports.  I don't recall their -- their
18 specific names.
19    Q    Okay.  Well, which positions would report to
20 Robert Malcom?
21    A    Mr. Malcom would have safety report to him,
22 DOT report to him.  He would have had some clerical
23 staff that -- that would report to him, and then he
24 would have a operational foreman and general foreman
25 that -- that would report to him.

Page 152

1     Q    Okay.  Of those folks, which ones could
2 authorize the day rate adjustment?
3     A    Of those senior-level individuals, any of
4 which likely could have approved discretionary bonuses
5 inside of the -- the payroll processing function.
6     Q    Okay.  Do you remember any names?
7     A    I don't recall specific names of his direct
8 reports.
9     Q    I mean, specific --
10    A    I gave you --
11    Q    Yeah.  I mean --
12    A    -- positions.
13    Q    Yeah.
14    A    If you're asking me for a roll call on
15 names --
16    Q    No, I'm not.  I'm just asking specifically.  I
17 just want to make sure because sometimes people have
18 come up with all sorts of things they couldn't remember
19 in their deposition by the time we get to trial.  So I
20 want to make sure today.
21         You don't recall any names of anyone in
22 particular at Higher Power besides Robert Malcom that
23 could approve a day rate adjustment?
24    A    I referenced Mrs. Wheeler earlier in regards
25 to -- to her capacity at Higher Power.  I've referenced

Page 153

1 several positions.
2     Q    But I'm asking about names.
3     A    Names, the only name I can think of offhand
4 could be Ken Godwin would be a senior-level guy that --
5 that could have possibly approved some discretionary
6 approved or recommended some discretionary payments.
7 Ms. Wheeler is another possibly, and then I gave you
8 several different positions.
9     Q    Do you know the criteria that folks like Ken
10 Godwin and Robert Malcom or Ms. Wheeler would use to
11 determine whether or not a day rate adjustment would be
12 made?
13         MR. STUKENBERG:  Objection, form.
14    A    The process in place for --
15    Q    (By Mr. Moulton) No, I want to know criteria,
16 not the process.  We've covered that.  I want to know if
17 there's any criteria; and if you know what the criteria
18 are, what are they?
19    A    The criteria, which also leans on the
20 process --
21    Q    Okay.
22    A    -- is that supervisors have the ability to
23 recommend discretionary bonuses.  The input in these
24 particular instances that you brought up was via an
25 incorrect pay code in relation to these discretionary

**MARK LAYTON  -  April 15, 2022**

Page 154

1 bonuses, but any of these positions or personnel that
2 I've mentioned have the ability to -- to recommend a
3 discretionary bonus.
4      Q    Now, was -- were these -- these discretionary
5 bonuses, were they made or the -- the decision-making,
6 did it happen paycheck to paycheck; or did it happen,
7 like, overall for, "Hey, this particular employee we're
8 going to do it, this one we're not"?  In general, how
9 did -- how did that work?
10     A    Well, by its nature discretionary bonuses have
11 discretion.  So sometimes they're made.  Sometimes
12 they're not.  The -- the process to identify when and --
13 and how much is a -- very much a subjective process
14 based on what that manager determines, you know, quality
15 of -- of work performed by the employee, nature of the
16 work performed by the employee, conditions, things of
17 that nature among others may influence whether or not
18 any discretionary bonus is paid and what that amount may
19 or may not be.
20     Q    Okay.  So you're -- sitting here today, you
21 don't know exactly what criteria Mr. Godwin or
22 Ms. Wheeler or Mr. Malcom would have used?
23     A    I just gave you a number of criteria in
24 regards to baseline criteria as well as -- as other
25 criteria that they would utilize from time to time.

Page 155

1      Q    Okay.  And how do you know what criteria
2 Ms. Godwin used -- or Mr. Godwin or Ms. Wheeler or
3 Mr. Malcom used?
4      A    Based on my position at Higher Power and
5 conversations with senior management, I'm aware of -- of
6 criteria that they utilize from time to time in regards
7 to any discretionary amounts that may be paid or not
8 paid, including conditions, job performance, safety, you
9 know, incidents, hours, a number of items.
10     Q    What's your position at Higher Power?
11     A    I'm the chief financial officer of Higher
12 Power.
13     Q    Do you have any documents that would show what
14 criteria Ms. Wheeler or Mr. Malcom or Mr. Godwin were
15 using to approve or disapprove these supposed
16 discretionary additions to the payroll?
17     A    I believe we covered potential documents that
18 may exist earlier.
19     Q    Yeah, but that was something else.
20     A    No, it wasn't something else --
21     Q    It was.
22     A    -- and you continue to mischaracterize my
23 testimony.
24     Q    I am asking are you aware of any documents
25 that demonstrate the criteria they used.  Before I was

Page 156

1 asking about the documents, if any, that exist that
2 actually are the, you know, "send this to him" kind of
3 documents.  So we're talking about something else.  Just
4 listen to my question.
5           Do you know or do you -- do you -- do you
6 have any documents that would show the criteria that
7 Mr. Godwin or Mr. Malcom or Ms. Wheeler would use to
8 determine whether or not a particular day rate
9 adjustment should be made?
10     A    As I mentioned earlier, this quote, unquote,
11 day rate adjustment that you've characterized is a pay
12 code that's an error in selection of pay code.  In
13 regards to the criteria that any of these employees may
14 utilize, there may be some correspondence in their
15 emails, of which you have thousands, that -- that may go
16 into criteria of safety, job conditions, hours, things
17 of that nature.
18     Q    Okay.  So other than that, you're not aware of
19 any specifically?
20     A    If you're asking me to pull one document out
21 of the thousands of documents that have been produced,
22 I -- I can't point you to a single Bates stamped
23 document.
24     Q    There's no -- what I'm getting at is that
25 you're not aware of a document that says, you know, day

Page 157

1 rate adjustment or discretionary bonus, whatever you
2 want to call it, criteria sheet that someone like Ken
3 Godwin or Robert Malcom or Ms. Wheeler would use.
4 That's what I'm asking.
5           Are you aware of that?
6      A    Of a form called criteria sheet?  No.  I've
7 not seen a criteria sheet form with boxes checked of,
8 you know, one, two, three four, five.
9      Q    Or anything like that?
10     A    That's not what I testified to.
11     Q    No.  I'm asking are you -- because you want to
12 make my question to be something you want to say no to.
13 So I'm going to expand my question to be:  Did you see
14 any documents that are like that?
15          MR. STUKENBERG:  Objection, form.
16     A    What I've said is there may be correspondence
17 that's produced that incorporates those items.  If
18 you're asking whether or not there is a specified form
19 that I've seen --
20     Q    (By Mr. Moulton) Uh-huh.
21     A    -- that checks -- check boxes those items,
22 I've not seen that.
23     Q    Or even a report where they could, like, write
24 up a report about why they're giving a discretionary
25 amount?  Have you seen anything like that?

## MARK LAYTON - April 15, 2022

Page 158

1    A    As I mentioned, there may be emails that have
2 been produced.
3    Q    Besides those emails that you've mentioned, is
4 there any -- are you aware of any, like, documents
5 besides emails where they would do, like, a write-up
6 about why they would be approving or not approving a day
7 rate adjustment?
8    A    In regards to discretionary bonuses --
9    Q    Uh-huh.
10    A    -- which is what we're really talking about --
11    Q    Uh-huh.
12    A    -- I've seen a number of recommendations via,
13 you know -- in my capacity as the CFO of Higher Power,
14 in my experience, I've been recommendations from
15 managers in regards to discretionary bonuses in the form
16 of both email as well as, on rare occasion, a PAF that
17 may direct a discretionary bonus.
18    Q    All right.  Moving right along with
19 Mr. Ballesteros.  Pay period March 5th to March 18th,
20 got a hundred seventy-six hours worked.  We've got some
21 rates, hourly rates and some overtime here.  And under
22 "day rate" there is an adjustment of $323.84.
23            Do you agree with that?
24    A    There's an amount in the day rate line, yes --
25    Q    Yep.

Page 159

1    A    -- of 323.84.
2    Q    And looking at this, can you tell me how many
3 days he worked in this pay period?
4    A    A hundred seventy-six divided by 16 would
5 appear to be 11 days.
6    Q    All right.  And so for 11 days, if you were
7 going to get his target rate, you would get 8,800,
8 correct?
9    A    For 11 days, he would be paid, in this case,
10 80 hours at 37.84 and 96 at 56.76 getting to the
11 extended amounts of almost $8500.
12    Q    So is the target rate the hourly, or is the
13 target rate the day rate?
14    A    They're paid an hourly rate and --
15    Q    I want to know --
16    A    -- if --
17    Q    -- what the target is.
18    A    If an employee --
19    Q    Uh-huh --
20    A    -- works a full week or is available to work
21 each day at 16 hours a day, they will get very close to
22 the targeted earnings.  In no event does that ever
23 equal, in this case, $800 to the penny.  It's $800 and
24 whatever per day on an average if an employee works a
25 full week or is available to work the full week at 16

Page 160

1 hours a day for seven days.
2    Q    And he can still get a target rate when he
3 works less than a full week?
4    A    No.  If -- if an employee works less than a
5 full week, then they get their hourly and overtime rate
6 and it calculates to whatever the mechanics calculate.
7    Q    Well, we've just been through, I don't know,
8 five or six examples so far of where they got exactly
9 the target rate even though they didn't work a full
10 week, correct?
11    A    What they got were discretionary bonuses and
12 the -- the decision, as it relates to employee goodwill,
13 that gets these employees to what they perceive as -- as
14 target rates had they worked the full amount of hours
15 and days required.  The amounts were paid appropriately
16 for the days they worked; and in this case, a
17 discretionary payment was made, as I mentioned, for
18 employee goodwill to -- to give this employee a
19 discretionary bonus.
20    Q    So -- well, we have another paycheck, which is
21 exactly the same thing; but it's a different pay period.
22 January 22nd to February 4th, yet again, for
23 Mr. Ballesteros.  You're saying this $323.84 here that's
24 added under day rate is both incorrectly marked on here
25 and is really a discretionary bonus?  That's your

Page 161

1 testimony?
2    A    That's correct, and there are numerous
3 examples where a discretionary payment such --
4            MR. MOULTON:  Objection, nonresponsive.
5    A    -- as this were not paid, but I understand you
6 don't want to talk about those.
7            MR. MOULTON:  Objection, nonresponsive.
8 That wasn't my question.
9    Q    (By Mr. Moulton)  Okay.  January 8th to
10 January 21st, David Ballesteros, can you tell me how
11 many days he worked this pay period?
12    A    I would guess that -- 208 divided by 16.
13    Q    We can make it easy --
14    A    Thirteen days, say.
15    Q    There you go.  I knew you were a math genius.
16    A    And if you insult me one more time, we're
17 going to call a quick end to this because I've had about
18 enough of your unprofessionalism.
19    Q    I -- look, Man, I --
20    A    You call me a math genius --
21    Q    And you are a --
22    A    -- I'll call you a law genius and a --
23    Q    You are a math --
24    A    -- this is the only -- this is the only format
25 where you're going to be this unprofessional with me.

**MARK LAYTON - April 15, 2022**

Page 162

1          MR. STUKENBERG:  Yeah.  Dave, let's try
2  to keep it professional.  Come on.
3      Q     (By Mr. Moulton) Well, no.  I -- I got it.
4  I -- I'm -- I consider myself to be a fellow math nerd.
5  So I was kind of like -- I'm happy to talk to one.  So
6  sorry.  I don't mean to be disrespectful.
7          All right.  Mr. Ballesteros, we have yet
8  another example of where -- 13 days worked and his PR
9  storm day rate is 800.  So 13 times 800 would be 10,400,
10 which is what he was paid, correct?
11     A     That was his gross earnings.
12     Q     Yes.  And y'all got there -- you got him to
13 that 10,400 by giving him the $107.52, correct?
14     A     We paid a discretionary amount of 107.52.
15 That's correct.
16     Q     Oh, and so the next one here in Mammoth 170
17 inside Exhibit 170, we have a Christmas pay stub, like
18 we were talking about earlier, where we see the holiday
19 bonus of 1111.11.
20          Do you see that?
21     A     I see that.
22     Q     And that's the bonus you were talking about
23 earlier?
24     A     Yes, sir.
25     Q     Okay.  If we back that out, we're going to

Page 163

1  have -- 8800 is what his pay would be without that
2  holiday bonus; is that right?
3      A     Yes.
4      Q     Okay.  And 8800 comes out to be 800 -- or is
5  equal to 800 times 11, right?
6      A     That would be the math, yeah.
7      Q     And that would also correspond to 16 hours
8  times 11, which is 176 as we show here, right?
9      A     There were 176 hours worked, yes.
10     Q     Actually I think I got that -- so that's 11
11 days, right?  Yeah.
12     A     Yeah.
13     Q     Let's back that up.  11 days because 11 days
14 worked would be 176 hours, right?
15     A     That's correct.
16     Q     Okay.  And 11 times 800 would be your 8800,
17 correct?
18     A     11 times 800 is 8800.
19     Q     Yes.  So we got that corrected.
20          Okay.  Now, let's go down to the next
21 page -- I mean, up to this point he's been $800 a day,
22 but this one looks like it's a little different.  Can
23 you -- can you explain the 1400 as a -- as a day rate
24 here?
25     A     I can't explain what's in that pay code.  I

Page 164

1  can explain that this is an hourly employee.  So day
2  rate would not be an appropriate selection for pay code.
3      Q     Okay.  So this is a mistake?
4      A     That is an error, yes.
5          MR. STUKENBERG:  You want to take a
6  lunch, Dave?
7          MR. MOULTON:  Yeah, we can do a quick
8  lunch.  Want to do, like, 30 minutes like we did
9  yesterday?
10         MR. STUKENBERG:  Yeah.
11         THE VIDEOGRAPHER:  All right.  We are off
12 the record at 12:35.
13         (Recess from 12:35 p.m. to 1:26 p.m.)
14         THE VIDEOGRAPHER:  All right.  We are
15 back on the record at 1:26 p.m.
16     Q     (By Mr. Moulton) All right.  Mr. Layton, we're
17 going to be talking more about some of these payroll
18 records here in a minute; but I also want to cover some
19 other things and make sure we don't run out of time.
20         (Plaintiffs' Exhibit 171 marked.)
21     Q     (By Mr. Moulton) I want to show you what's
22 been marked as Plaintiff's Exhibit 171.  Let's try that
23 again.  You should be able to see on your screen a copy
24 of a Form 10-K for Mammoth Energy Services, Inc.
25     A     Yeah.  It's largely illegible, but that's --

Page 165

1  that's what the document appears to be.
2      Q     Okay.  As CFO are you involved in preparing
3  this document?
4      A     Yes.
5      Q     So you're very familiar with the 2017 10-K?
6      A     Yes, sir.
7      Q     Okay.
8          All right.  This is a very long document,
9  but there's only a certain section that I want to focus
10 on.  Let's try this.  Still blurry for you?
11     A     Yes.
12     Q     Okay.  Is that clearer?
13     A     It's better, yes.
14     Q     Okay.  So on Page Mammoth 4,079 in this
15 exhibit, there's a listing of lawsuits on Mammoth Energy
16 Services, Inc.'s, Form 10-K, correct?
17     A     Yes, sir.
18     Q     Okay.  And several of them are overtime
19 lawsuits, as you can see highlighted on my screen,
20 right -- or your screen?
21     A     I see three -- yeah.
22     Q     I see five.
23     A     Yeah.  I can't count when it's moving around,
24 but we'll -- we'll go with five.
25     Q     Okay.  So the first one, the June 3rd, 2015,

Page 166

1 action involves, it says, William Crigler versus
2 Stingray Pressure Pumping.
3        Do you see that?
4    A    I do.
5    Q    Okay.  Did you provide any testimony in that
6 case?
7    A    I don't believe I've provided any testimony in
8 that case, no, sir.
9    Q    Okay.  Do you know what the allegations were
10 in that case?
11    A    As stated in here.
12    Q    Other than --
13    A    You want me to read it to you or --
14    Q    No.  I'm asking -- obviously we can read the
15 document.  I want to know if you have personal knowledge
16 of what the allegations were in that case other than
17 what's written in this document.
18    A    This -- this document is self-explanatory.
19    Q    Do you know what kind of violation was at
20 stake?
21    A    In regards to this June 3rd, 2015, item?
22    Q    Yes.
23    A    That was a wage-an-hour item.
24    Q    Okay.  And I'm -- what I'm getting at, do you
25 know if it involved day rates?

Page 167

1    A    I don't recall the specifics inside of that
2 matter.
3    Q    Okay.
4    A    -- or the -- any allegations asserted by
5 plaintiffs in detail.
6    Q    Okay.  So you -- you don't know what kind of
7 overtime allegation it was.  You just know it was an
8 overtime case?
9    A    Generally speaking, yes.
10    Q    Okay.  What -- what -- so actually, before I
11 get there, let's go to the next one.  On December 2nd,
12 2015, there's another case here referenced, Bison versus
13 Field Services, LLC.
14        Do you see that?
15    A    I don't see a Bison verses Field Services.  I
16 see Bison Drilling and Field Services.
17    Q    Oh, I'm sorry.  It's John Talamantez versus
18 Bison and -- Bison Drilling and Field Services, LLC.
19        Do you see that there?
20    A    Yes, sir.
21    Q    Which of those entities is a -- is part of the
22 Mammoth umbrella?
23    A    Bison Drilling and Field Services is part of
24 the Mammoth umbrella.
25    Q    Okay.  And what were the -- what was the type

Page 168

1 of overtime allegation in that case?
2    A    I don't recall the -- the specific details
3 inside of -- of this particular item.
4    Q    Okay.  On the next one that's highlighted,
5 August 1st, 2016, we have the Caffey versus Redback
6 Energy Services, LLC?
7    A    Yes, sir.
8    Q    Okay.  Do you recall what the allegations were
9 in that case?
10    A    As stated, has to do with worker's overtime.
11    Q    What kind of overtime case?  Do you know?
12    A    It's a worker's overtime case in compliance
13 with the FLSA, as it -- as it says here.
14    Q    Do you know if it was misclassification or
15 a -- paying a day rate, straight time for overtime?  Do
16 you remember anything about the claims?
17    A    I don't recall the specificity of the -- the
18 allegations inside of that; but as referenced here,
19 it -- it's an overtime matter.
20    Q    Okay.  The next one, September 27, 2016, we
21 have another one Drake versus Redback.  It's also an
22 overtime case, it appears; and do you know what type of
23 overtime case it was?
24    A    I think in the Drake matter, as I -- as I
25 recall, that matter did -- did contain some day rate

Page 169

1 assertions by plaintiffs, among other items.
2    Q    On the next one, January 26th, 2017, Crosby
3 versus Stingray Pressure Pumping also an overtime case,
4 correct?
5    A    Yes, sir.
6    Q    Okay.  Did it involve day rates, or do you
7 remember the kind of allegation it was?
8    A    I don't recall any assertions of -- of day
9 rates inside of -- of that particular matter.
10    Q    Okay.  Do you recall anything else about that
11 claim?
12    A    Just as stated here.
13    Q    Okay.  You don't -- so you don't know if it
14 was, like, a misclass case or straight time for
15 overtime?
16    A    I don't believe that based on my recollection
17 that this was a misclassification case.
18    Q    Okay.  So with the companies that are
19 mentioned in these lawsuits -- so we've got Stingray
20 Pressure Pumping, Bison Drilling and Field Services,
21 Redback Energy, and Redback Coil Tubing, and Stingray
22 Pressure Pumping, with these entities, do you have any
23 role that's related to them?
24    A    I'm the -- currently the chief financial
25 officer of -- of each of those entities.

**MARK LAYTON  -  April 15, 2022**

Page 170

1    Q    Okay.  Back in 2017 when this was -- when this
2  report was made, were you the CFO for these companies
3  back then as well?
4    A    Yes, sir, I was.
5    Q    Okay.  Did you participate as far as -- let me
6  ask you this:  What -- what role did you play at all --
7  if at all with these cases that are mentioned here?
8    A    I would have been casually aware of these
9  cases.  In regards to depositions or testimony in these
10  cases, I don't believe I offered any depositions or
11  testimony in -- in any of these matters.
12    Q    Okay.  Did you attend depositions?  Not -- not
13  to testify, but to actually observe?
14    A    I don't recall any depositions on -- on these
15  particular matters.
16    Q    Are you aware of any Department of Labor
17  audits into Mammoth Energy Services, Inc., or any of the
18  companies in its umbrella?
19    A    DOL audits?
20    Q    Yeah, like, Department of Labor complaints,
21  audits?
22    A    I'm sure there -- there may have been some DOL
23  complaints from time to time lodged against various
24  entities inside the broader Mammoth portfolio.  I'm not
25  aware of any DOL audits, so to speak; but there were --

Page 171

1  there may have been some complaints and were from time
2  to time.
3    Q    Can you -- do you recall the name of any of
4  the entities involved in any DOL complaints or audits?
5    A    The only DOL complaints that I recall off the
6  top of my head related to Higher Power, Ivory Freight,
7  and potentially Silverback.
8    Q    Do you remember the outcome of any of those?
9    A    I believe in those instances, those complaints
10  were dismissed.
11    Q    Okay.  Have you ever had to meet with the
12  Department of Labor as part of any of these -- any
13  complaints or audits?
14    A    Are you asking me whether or not I've had to
15  offer testimony to the DOL?
16    Q    No, because, like, they probably wouldn't --
17  they wouldn't really take you -- they wouldn't call you
18  into a deposition unless they had gotten to the
19  litigation stage obviously.  What they typically do when
20  they're doing -- investigating a complaint or audit,
21  they may visit and you may be required or asked to
22  provide information to them not in a -- not in a
23  deposition setting.
24          Does that ring a bell to you?  Has that
25  ever happened to you?

Page 172

1    A    In regards to me individually having to
2  provide information, no, I don't think I individually
3  have provided information.  We have, through these legal
4  entities that I mentioned earlier, provided information
5  to counsel, which would have then been provided to the
6  DOL.
7    Q    Okay.  So not personally.  You weren't -- you
8  weren't directly involved -- you weren't directly
9  talking to DOL offices or agents; is that fair?
10    A    That's fair.
11          (Plaintiffs' Exhibit 172 marked.)
12    Q    (By Mr. Moulton) All right.  I'm going to show
13  you what's been marked as Plaintiff's Exhibit 172.
14  Looks like I stuck the exhibit sticker in the middle of
15  the page; but it'll work.
16          MR. STUKENBERG:  172?
17          MR. MOULTON:  Yes, sir.  I think -- we're
18  going in order, right?  We good?
19          THE REPORTER:  (Nods head).
20          MR. MOULTON:  Yeah, 172.
21    Q    (By Mr. Moulton) And back to our earlier
22  discussion about trying to find any documentation
23  about -- about what you call are these discretionary
24  payments that are -- that we've seen on the pay stubs.
25  I'm trying to find documents about it, and I want to ask

Page 173

1  you is -- is this an example of what you were talking
2  about, emails that would deal with that?
3    A    This would be -- appears to be an example of a
4  proposal for some discretionary amounts.  Yes, this
5  would be an example in that context.
6    Q    Okay.  Is it -- would you call this, like, a
7  typical example of that?
8          MR. STUKENBERG:  Objection, form.
9    A    This is -- this is an example of discretionary
10  bonus amounts.  In regards to what is typical or not
11  typical, I don't know what that connotation is; but this
12  is a specific example.
13    Q    (By Mr. Moulton) Okay.  Is this one of the
14  ones that you were thinking about when we were talking
15  earlier?
16    A    Not specifically, but this is an example.
17    Q    Okay.  So it looks like it involves Shelly
18  Wheeler, Alexander Kalman, Missy Davis, JD Kinsey,
19  Bethany Stone, and Michelle Poling.  Are you able to
20  tell me which of those folks would have been the ones to
21  actually approve the -- the payroll adjustment?
22    A    So in this particular matter, Shelly Wheeler,
23  I think, is one of the individuals that I mentioned
24  earlier that may receive input or direction from
25  operational managers in regards to payroll processing

**MARK LAYTON - April 15, 2022**

Page 174

1 mechanisms.  In the ground in Puerto Rico, JD Kinsey
2 generally input a bunch of that information, may have
3 then been subsequently approved by any combination of
4 Michelle Poling, Beth Stone, Alex Kalman on -- on one
5 step.  And then ultimately finally approved, in regards
6 to overall payroll, by Mr. Beagle.
7      Q    Okay.  So in that chain you just said -- and I
8 don't recall you saying this earlier.  So I'm -- I need
9 to ask you about it now.  Your -- you mentioned some
10 operational people maybe giving input to Ms. Wheeler
11 about the -- the adjustments?  Is that a fair
12 characterization of what you just said?
13      A    I believe earlier we referenced some
14 communication between Mr. Malcom as well as some of
15 Mr. Malcom's direct reports and what those positions
16 looked like and Ms. Wheeler, as it relates to Higher
17 Power.
18      Q    Okay.  So when you said "operations" now,
19 you're referring to what we talked about earlier with
20 those folks?
21      A    In regards to operational approval, yeah, we
22 discussed some of that input approval dialogue earlier.
23      Q    Okay.  Does this -- do the -- does the
24 approval process extend down to a foreman?
25      A    A foreman may be able to provide some input in

Page 175

1 regards to some of the processing approval.  It's
2 possible that an -- that a foreman could have been
3 involved in that.  I think it's -- it's unlikely,
4 probably didn't occur with regularity; but it's
5 certainly possible.
6      Q    What about a general foreman?
7      A    A general foreman, again, would have had some
8 connection to approval process and recommendation in
9 regards to the processing of the payrolls inside of this
10 time period.  He may or may not see an electronic stamp
11 or approval because to put this in context, during a
12 large part of this time period, Puerto Rico had no
13 power.  So for a lot of the supervisors in Puerto Rico,
14 there was no ability to connect electronically to be
15 able to approve some of these items because the entire
16 island was functionally without power.  Their only
17 communication while they were in many of the areas in
18 Puerto Rico was via sat phone.
19      Q    Okay.  So who -- in -- you -- you reminded me
20 of another topic of -- of the operational difficulties
21 in Puerto Rico during this time.  How was the workers'
22 time tracked, if it was?  You under -- you understand?
23             Was there -- was there a, like, actual
24 "you worked this many hours per day exactly" kind of
25 tracking, like, punch clock system in Puerto Rico?

Page 176

1      A    Well, punch in/punch out was functionally
2 unavailable because the island didn't have power.  So
3 that ability was impaired at best.  What we did have was
4 a show-up time at a prescribed location for the crews
5 for which they would generally have a safety meeting.
6 That show-up time was generally, say, 6:00 a.m.; and
7 those employees would meet.  Supervisors would talk
8 about safety, take roll as far as who was there or not
9 there.  That would be the genesis for whether or not an
10 employee showed up and/or was available to work.
11             Those supervisors were also aware of when
12 employees came back, what they were dispatched to do
13 during the day, and fully aware of some of the DOT
14 guidelines in regards to safety standards and when we
15 reset hours for these employees that may be driving
16 commercial vehicles at 16 hours.
17             So we had processes in place for those
18 supervisors to be able to both capture and communicate
19 any hours worked in excess of 16 so that, one, we could
20 make sure that the employees got enough rest to safely
21 recess and, two, so that we captured and reported those
22 hours in excess of 16 to payroll such that the employees
23 could be compensated for any hours in excess of 16 that
24 they worked.
25             MR. MOULTON:  All right.  I'm going to

Page 177

1 object to almost all of that as nonresponsive.
2      Q    (By Mr. Moulton) So the -- there's a
3 supervisor -- there's somebody that's on site at the
4 safety meeting that takes roll.  Who typically would --
5 what position would usually be taking roll?
6      A    The foreman or general foreman would have
7 knowledge as to whether or not their crews reported.
8      Q    Okay.  So they're -- they're taking roll.  How
9 are they -- how are they recording, if they are, of
10 who's physically there that day?
11      A    As I mentioned, the foreman and general
12 foreman are responsible for their crews.  They're aware
13 of who reports to work.  That's reported to the payroll
14 department, being, in many cases, JD Kinsey, who was
15 responsible for inputting their hours.  The hours either
16 worked or on call were 16 hours per day, and the foreman
17 and general foreman had processes in place to monitor in
18 the event that any employees exceeded 16 hours.
19      Q    What documents would these supervisors use to
20 document who was there each day?
21      A    In regards to --
22      Q    For the attendance.
23      A    -- physical documents?
24      Q    Yes.
25      A    From time to time, there were sign-in sheets

**MARK LAYTON - April 15, 2022**

Page 178

1 at the safety meetings.  Sometimes that was the case.
2 Sometimes that was not the case on the sign-in sheets.
3 Again, you're operating in an environment in which,
4 functionally, a hundred percent of the island didn't
5 have electricity.  So in regards to electronic capturing
6 or punch in/punch out that was physically impossible.
7      Q    Okay.  But there is definitely a -- everyday
8 there is a supervisor who is making sure -- he's
9 responsible for his crew to make sure that the -- the
10 folks who are showing up that day are going to get paid?
11     A    The supervisors are responsible for their
12 crews --
13     Q    Uh-huh.
14     A    -- and for reporting to the payroll department
15 as to who is present and who is not.
16     Q    Okay.
17     A    Regards to how they get paid, that's a
18 mechanical function for which the supervisors are not
19 involved in those calculations.  In regards to showing
20 up or not showing up, they are responsible for -- for
21 taking that roll and for capturing and reporting any
22 hours in excess of 16 or for recommending any
23 discretionary bonus from time to time.
24     Q    So you would agree with me that at least at --
25 at least for some of the time there were times where the

Page 179

1 attendance each morning was written down on paper?
2      A    That occurred sometimes, yes --
3      Q    Okay.
4      A    -- in regards to sign-in sheets for safety
5 meetings.
6      Q    And it could also have occurred on a -- like,
7 a iPad?
8      A    It's possible; however, to the extent there
9 was no cell phone service or electricity, it was really
10 tough in regards to -- to data capture.
11     Q    Right.  But regardless of whether or not
12 there's electricity or cell phone service, you could
13 still record it on an iPad and then when you got back to
14 a hotel or somewhere that had service, it could be
15 turned in, correct?
16     A    For a large percentage of this time frame,
17 there was no cellular service on the island.  So you had
18 to use sat phones to communicate data.
19     Q    Okay.
20     A    There were isolated pockets where there were
21 places that had generators and may have had some
22 communication ability; but in large part, particularly
23 in this January time frame that you've got on this
24 email, the island was functionally without power or
25 without cell phone communication.

Page 180

1      Q    All right.  We've -- we've heard testimony of
2 one of the guys who actually did that before -- you
3 know, actually taken the roll.  And what he would say is
4 that he would take the attendance on his iPad at the
5 meeting and later at the hotel, he would just print it
6 and hand it to -- to his -- the guy he reported to.
7           Would you -- is -- is that a way that
8 it -- that you understood that it could been -- it could
9 have been done?
10     A    It's certainly a possible way for some of the
11 supervisors, yes.  Would it have been possible for all
12 of them?  Likely not.
13     Q    But safe to say it wasn't the practice for
14 the -- for Higher Power to -- recording exact times of
15 start, stop work each day?
16     A    The time at which the employees started was
17 captured.  There were procedures in place to monitor the
18 hours worked as well as report any hours in excess of
19 16.
20     Q    Okay.  That's -- and that's not my question.
21           There -- the company wasn't tracking
22 exact hours actually worked; is that right?
23     A    Which company are you referring to?
24     Q    Higher Power.
25     A    Higher Power did track 16 hours for the

Page 181

1 employees that showed up and were on call for each day
2 that they showed up and worked and/or were on call.  So
3 those hours were tracked inside of the records.
4      Q    Okay.  And that -- so that's what we see over
5 and over is this 16.00.  That's what you're talking
6 about, right?
7      A    You see 16 a lot of times.  That was the shift
8 for which employees were required to work and/or be
9 available to work.
10     Q    Okay.  So -- so there wasn't -- there wasn't a
11 system in Higher Power to even, like, record on paper,
12 like, "Hey, today we're starting at 6:05 and then we're
13 ending at 5:53."  That -- that wasn't happening?
14     A    The safety meeting sheets in some instances
15 may have recorded the time of that safety meeting and
16 that kickoff time or -- or meeting point at -- at the
17 prescribed location.  In regards to end time, the
18 supervisors in this matter had the capability and
19 knowledge to -- to track any hours in excess of 16.
20     Q    So let me ask you this:  If there were -- at
21 least at some point -- at sometimes at least, paper, or
22 electronic documents that showed at least the start
23 times for these workers, how come we don't have them?
24     A    In regards to sign-in sheets?
25     Q    Sign-in sheets or anything they would have

**MARK LAYTON - April 15, 2022**

Page 182

1 used to record a start time.

2     A     I don't believe that there is a sign-in sheet
3 record retention policy in place that would require us
4 to keep those.

5     Q     Okay.  So you're saying that -- that there may
6 have been records that would show -- like, a sign-in
7 sheet that would show when they started work that day,
8 but those records were not kept?

9     A     That's -- I said I'm not aware of a record
10 retention policy relative to the sign-in sheets in -- in
11 regards to -- the production of those items.

12     Q     All right.  And I'm not even asking you about
13 your record retention policy.  I don't even know why
14 you're talking about it.  What I'm talking about is --
15 what I'm asking you about is:  Those documents existed
16 at some point.  Why don't we have them?

17     A     And I referenced the record retention policy
18 not --

19          MR. STUKENBERG:  Yeah.

20     A     -- requiring us to maintain those.  So --

21          MR. STUKENBERG:  And, Dave, if you want
22 to talk about what documents have been produced or not
23 produced, you can talk to me about it.

24          MR. MOULTON:  No.  I want to know -- it's
25 not about that.  I want to know -- it's not about that.

Page 183

1     Q     (By Mr. Moulton)  Okay.  So you're saying that
2 you didn't have to keep the -- the records that would
3 show the time they started each day because it wasn't
4 part of your record retention policy?  Is that what
5 you're saying?

6     A     I don't believe that was my testimony.

7     Q     Okay.  So I don't know why, when I ask you how
8 come we don't have these documents, you say it's not
9 part of our record retention policy.  So what?  Why does
10 that matter?

11     A     You asked why they weren't produced.  I said
12 I'm not aware of a record retention policy as it relates
13 to sign-in sheets.

14     Q     Okay.  So what happened to the time-in
15 sheets -- the sign-in sheets?

16     A     Again, we don't have a record retention
17 policy.  So I have no knowledge of -- of what happened
18 to these particular sign-in sheets.

19     Q     Okay.  So you don't know?

20     A     I don't know why they weren't produced.  I
21 don't -- I know that we don't have a record --

22     Q     I'm not --

23     A     -- retention policy.

24     Q     I'm not talking about production, okay, right
25 now.  I'm talking about how come -- how come you don't

Page 184

1 have them?  How come Mammoth or Higher Power, how come
2 they don't have these sign-in sheets?

3     A     Mammoth Energy Services, Inc., doesn't have
4 anything to do with anything that happened in Puerto
5 Rico.  So that's why they don't have the sign-in sheets.

6     Q     How come Higher Power doesn't have it?

7     A     There's no record retention policy as it
8 relates to the sign-in sheets, but the detailed pay
9 records captured the hours for each one of the
10 employees.

11     Q     Okay.  So the best available information that
12 we have about hours worked is going to be what's in the
13 Time Detail Reports?

14     A     You have time detailed reports as one
15 indicator of hours worked for each of the employees,
16 yes.

17     Q     All right.  Back to exhibit -- oh, hold on.
18 That was just one.  What's the -- what -- what others
19 are there?  What other documents show the hours they
20 worked?

21     A     I said that the detailed pay records capture
22 hours worked.  There may or may not be Excel files that
23 capture hours worked.

24     Q     Okay.  So you're aware of Excel files that
25 show exact hours worked for these guys; or is it just,

Page 185

1 like, the 16s that we've been talking about?

2     A     I said there may or may not be.

3     Q     Okay.

4     A     I've not --

5     Q     You don't know?

6     A     -- put my eyes on payroll input records as it
7 relates to employees.  I have seen the -- the detailed
8 hours in -- in many of the employee files in regards to
9 hours worked.

10     Q     Okay.  And so those are the same records that
11 you've produced?

12     A     Yes, sir.

13     Q     Okay.  Back to 172 now, you see how it has
14 a -- an attachment, "HPE Payroll Corrections - PR.xlsx."
15          Do you see that?

16     A     I see that.

17     Q     Okay.  And we talked about it earlier.  This
18 email is about doing the discretionary add-ons to the --
19 to the pay that we were talking about earlier, correct?

20     A     It appears to contain that subject, yes.

21     Q     Okay.  Any -- any -- do you happen to know why
22 they call it a correction rather than bonus sheet, for
23 example?

24     A     These are, in large part, administrative
25 clerks.  So why they choose their terminology, I don't

## MARK LAYTON - April 15, 2022

1 know.  I know that it has no legal context, if that's
2 what you're asking.
3     Q    Okay.  So you -- the answer to my question is
4 you don't know why they said that?
5           MR. STUKENBERG:  Objection.  He just gave
6 you his answer.
7     Q    (By Mr. Moulton) You don't know?
8     A    I'll reincorporate my previous answer.
9     Q    Okay.
10    A    I answered your question.
11    Q    Yeah, it's just you don't know?
12    A    That's not what I said.
13    Q    Okay.  That's what I heard.
14          MR. STUKENBERG:  That's fine.  You asked
15 him to answer.  Let's move on.
16          (Plaintiffs' Exhibit 173 marked.)
17    Q    (By Mr. Moulton) All right.  So let's look at
18 this spreadsheet.  This is going to be another Excel
19 spreadsheet that is going to be Plaintiff's Exhibit 173
20 and it's not going to have a sticker on it, but we're
21 going to designate it that.  It's -- it's Mammoth --
22 Bates No. Mammoth 3149, and it's a native Excel file
23 that we're going to be looking at here.
24          So we've got some tabs in this
25 spreadsheet, Mr. Layton.  Do you see this on your

1 screen?
2     A    Yes, sir.
3     Q    Okay.  So it looks like we have "Corrections
4 for January 22nd, 2018," on this first tab?
5     A    Yes, sir.
6     Q    And we have some names of folks and the
7 company they're with.  They're with HP, which is Higher
8 Power, correct?
9     A    That's correct.
10    Q    Okay.  And we have a "description of the
11 issue" here?
12    A    Yes, sir.
13    Q    Are those the reasons for the payroll
14 corrections?
15    A    This appears to be a list of various rate
16 changes.  I don't know what the connotation of
17 "corrections" is or isn't.
18    Q    Okay.  Is this about making those additional
19 payments under day rate on the pay stubs?
20    A    This appears to be hourly rate changes in
21 large part.  There's one employee at the bottom that
22 appears to be adding benefits.  So it appears to be a
23 little bit of a mixed bag in regards to changes.
24    Q    Okay.  Let's go on to the next tab.  Is -- on
25 this January 12th, '18, corrections needed tab, is this

1 one that involves adding in the additional pay on the
2 pay stub under day rate?
3     A    This one -- the highlighted in yellow appears
4 to be plugging in a day rate pay code and amount.
5     Q    Okay.  It looks like for 16 hours, correct?
6     A    That's correct.
7     Q    And it looks like that there's going to be an
8 addition of $1600?
9     A    Appears to be $1600 in there.  I'm not sure
10 what the -- what impact, if any, the -- the 200-dollar
11 federal withholding may or may not have on the overall
12 adjustment.
13    Q    Okay.  And so -- and we can take this at face
14 value, right, for the description of the issue?  The
15 employee is missing two days of standby, missing two
16 days in PR, employee taxes incorrect.
17          Do you disagree with that?
18    A    It says what it says.
19    Q    Okay.  And this is an example of a payroll
20 correction?
21    A    This is an example of a payroll item that's
22 identified in the -- in the processing of payroll.
23    Q    All right.  One -- specifically one of the
24 ones referenced in the email that's about adding in
25 these discretionary amounts to the pay?

1     A    No, I don't believe this references a
2 discretionary amount of pay.  This appears to be for two
3 days of work.  I don't see a discretionary amount of pay
4 described in the email.
5     Q    Okay.  Let's try January 15th, 2018.  That's
6 the next tab.  We have some workers here; company, HP;
7 hours type.  We got hours number.
8          Do you know what's going on with this?
9     A    No.  Those hours don't -- don't make a whole
10 lot of sense to me.
11    Q    Right.  It's -- it's -- it sure looks like to
12 me that that's probably meant to be a 448 additional
13 pay.  Can you verify either way?
14    A    I don't believe that's meant to be --
15    Q    Well, what else could be it be?
16    A    Well, it's under an hours column.  So --
17    Q    Right.
18    A    -- if it's an hourly input, then that would --
19 to the extent it results in a pay calculation, it would
20 be an hourly input times an hourly rate.  So I don't
21 draw the conclusion that -- that you make.
22    Q    Okay.  So you don't -- so looking at these,
23 you don't -- you don't know what -- what's going on with
24 this spreadsheet on January 15th, '18; is that correct?
25    A    Well, 448, you know, would presumably be a

## MARK LAYTON - April 15, 2022

Page 190

1 month's worth of hours if you backward calculate that, I
2 think.  In regards to how that drives --
3       Q    Right.
4       A    -- you know, a calculation, I don't know; but
5 any hourly calculation is based on an hourly rate.  In
6 other words, you can't hard code a payroll amount into
7 a -- an hours number.  It requires an hourly rate.
8       Q    Okay.  So can you point to me -- even after
9 you've had a break now, can you point to me any examples
10 of documents, specific documents, that would deal with
11 a -- a day rate adjustment?
12              MR. STUKENBERG:  Objection, form.  Didn't
13 you guys just go over one?
14              MR. MOULTON:  I mean -- I mean, the --
15 what -- what he calls the discretionary ones.
16       Q    (By Mr. Moulton) You know, your -- the ones
17 that you called the discretionary adjustments to the
18 pay.  We just looked at a ton of examples of them before
19 the break.  I want to know if even after the break --
20 presumably, you've had a chance to talk to your
21 lawyers -- if you -- without telling me what y'all
22 talked about, are you able to identify any paper
23 examples of -- that are associated with that approval
24 process?
25              MR. STUKENBERG:  So I'm going to go ahead

Page 191

1 and object to all the characterizations as though we
2 coached the witness during a break and --
3              MR. MOULTON:  Oh, I don't mean that.
4              MR. STUKENBERG:  -- the other thing I'll
5 tell you, Dave, is that we didn't go look for any
6 documents either.  To the extent you want -- to answer
7 your question, whatever documents exist, you have.
8              MR. MOULTON:  Right.
9              MR. STUKENBERG:  They've been produced.
10              MR. MOULTON:  And I -- I hear you, and
11 I'm not mean to mean -- I don't mean to be asking about
12 coaching the witnesses.
13       Q    (By Mr. Moulton) Sometimes your memory can get
14 refreshed after a break, and I'm asking you:  Sitting
15 here now, are you aware of any documents or any specific
16 examples that you can point me to that would show
17 documents that are associated with the approval process
18 for the discretionary amounts that are added on to the
19 plaintiff's pay?
20              MR. STUKENBERG:  Same objection.
21       A    You've got all the documents that have been
22 produced.  So if you want to comb through those
23 documents, you've got them.
24       Q    (By Mr. Moulton) And -- and that's not my
25 question.  I mean, you can say, "Dave" -- what you're

Page 192

1 saying, you go, "Dave, figure it out yourself."  And I
2 am.  I -- I hear you on that, but I want to know if you
3 know of any one particularly right now, any particular
4 document that you can point me to?
5              MR. STUKENBERG:  Does any of the
6 documents from what have been produced come to mind in
7 particular?
8              MR. MOULTON:  Thank you, Will.
9       A    I don't recall any Bates numbered documents
10 with specific Bates numbers that answer your question.
11       Q    (By Mr. Moulton) Okay.  And that's not what
12 I'm asking.  I'm wondering if you can even describe one.
13       A    I believe my previous testimony has described
14 some of those calculations in Excel and then I further
15 described what the mechanical payroll approval process
16 may look like and I'll reincorporate all of that
17 testimony.
18       Q    I want to talk a little bit more about the
19 treasury shared resource that we were talking about
20 earlier.  Do you recall testimony about that?
21       A    Yes, I do.
22       Q    Okay.  One aspect of that I didn't cover was
23 if -- if one of the subsidiaries is having a loss, like,
24 they're just -- something's happened and they're kind of
25 in the red, how would the treasury service step in or

Page 193

1 work in those sort of situations?
2       A    I don't necessarily understand what a loss has
3 to do with anything or doesn't have to do with a
4 treasury service.
5       Q    Okay.  Why not?
6       A    Treasury service has to do with requesting
7 funds and the shared service either pushing those funds
8 down or not pushing those funds down.  So a loss doesn't
9 have anything to do with those mechanics or the
10 recording of those transactions.
11       Q    Okay.  So if -- if Higher Power, for example,
12 was ever in a situation where it was either sort of a
13 negative balance or was going to have a transaction that
14 would cause it to go to a negative balance, is that a
15 situation where money could be swept to Higher Power to
16 either prevent the negative amount or to bring it back?
17       A    I don't know what a negative amount is.  So
18 you're going to have to describe that.  Higher Power can
19 request an influx of cash, and that can either be
20 allocated or not allocated.  In the context of a
21 negative balance, that has no financial meaning.
22       Q    Okay.  So I'm -- I'm trying to -- I'm having a
23 hard time wrapping my head around that.  If an account
24 balance, like a bank account balance, is below zero, I
25 would consider that to be a negative balance.

**MARK LAYTON - April 15, 2022**

Page 194

```
1              Does that make sense to you?
2      A    I would -- that would -- you're asking if
3  Higher Power --
4      Q    No, no --
5      A    -- or --
6      Q    No, no, no.  We seem to be having a
7  communication problem.  So I'm trying to get back on
8  track with us, me and you, okay?  You said you don't
9  understand what a negative balance means, like, you said
10 it doesn't even exist.  And so I'm like -- that doesn't
11 make sense to me.  So I'm trying to see if there -- we
12 can come up with a scenario that makes sense to both of
13 us.
14              Negative bank account balance is that a
15 negative balance, or no?
16     A    I would characterize that as an overdraft or
17 overdrawn balance.
18     Q    Okay.  All right.  Overdraft or overdrawn.
19              You could also have a situation where
20 you're just looking at things that are owed and things
21 coming in and that could actually end up being less than
22 zero.  That would also be a -- a negative situation,
23 correct?
24              MR. STUKENBERG:  Objection --
25     A    That would --
```

Page 195

```
1              MR. STUKENBERG:  -- form.
2      A    -- not result in a negative bank balance.
3  You're --
4      Q    (By Mr. Moulton)  Okay.
5      A    You're conflating a working capital issue --
6      Q    Uh-huh.
7      A    -- with a cash or bank balance issue, and
8  that's holistically inappropriate.
9      Q    All right.  And -- and I'm not actually
10 conflating them.  I'm just talking about two different
11 things, but that's fine.  So we have the -- we have the
12 negative bank balance scenario.  If that were to happen,
13 treasury services could make sure that Higher Power, for
14 example, gets back into positive, correct?
15     A    In this made up example, yes.
16     Q    Okay.
17     A    If --
18     Q    Now, if --
19     A    Can I finish?
20     Q    Well, I mean, the answer is "yes."  So if -- I
21 mean, we can be here all day; but, I mean, if the answer
22 is "yes," that's all I care about.
23     A    Do you want to sit here and offer testimony,
24 or do I get to answer any of these questions?
25     Q    You answered it.  You answered "yes."
```

Page 196

```
1              So, now, in a working capital situation,
2  where the working -- we've -- the -- we talked about a
3  working capital situation where it could be negative.
4  Is that something where the treasury services could step
5  in and prevent or cure?
6      A    There's not a prevention or a, quote, unquote,
7  cure.
8      Q    Okay.
9      A    The treasury management function is that the
10 subsidiaries can either receive or push funds to Mammoth
11 Energy Partners and the individuals at Mammoth Energy,
12 Inc., aid in that approval and processing.  All of those
13 transactions are recorded on both sides as far as cash
14 going up and down, and those decisions are made
15 generally on a -- a daily basis.
16     Q    Mammoth Energy Partners can sweep the money in
17 though, right?
18     A    That's not a -- Mammoth Energy, Inc., and its
19 shared services --
20     Q    I said "partners," but, yeah.
21     A    -- can either push money up from the
22 subsidiary to Mammoth Energy Partners or push money down
23 from Mammoth Energy Partners.
24     Q    Okay.  Now, so what happens with Higher Power
25 when -- let's say Higher Power has paid everything that
```

Page 197

```
1  it owes and has bought everything it wants and it's
2  sitting with excess money in its account.  How is that
3  treated or what -- what happens with that money?
4      A    There's nothing magical that happens with that
5  money.  There are treasury decisions made on a daily
6  basis to push money up or down from a subsidiary to
7  Mammoth Energy Partners.
8      Q    Is there any -- go ahead.
9      A    We've already talked about, and I've already
10 testified to, the -- the shared services treasury
11 function to both invest cash and to minimize borrowing
12 costs.
13     Q    All right.  So -- so with the profits, if you
14 will, from Higher Power, that can be pushed up to
15 Mammoth Energy, Inc.?
16     A    We didn't talk about profits.  We talked about
17 cash in a treasury function.  So --
18     Q    And I'm asking you a new --
19     A    -- again --
20     Q    -- question now.  Let's move on, okay?  I'm
21 asking you a new question.  The new question, answer
22 that.
23     A    So cash --
24     Q    No.
25     A    -- can be --
```

**MARK LAYTON  -  April 15, 2022**

Page 198

1    Q    No.  I want to know specifically about
2  profits.
3    A    Profits is different.
4    Q    Okay.  How are -- how are Higher Power's
5  profits dealt with at the Mammoth Energy level?
6    A    Mammoth Energy what?
7    Q    Mammoth Energy, Inc.  Let's start with that
8  one.
9    A    Mammoth Energy, Inc., does not hold any equity
10  interest in any entity.  So Mammoth Energy, Inc., does
11  not record the profit or loss of any legal entity.
12    Q    And I'm talking about the -- the sweeping
13  process, okay?  So if Higher Power has profit in its
14  account, how is that pushed up or down?  What -- what
15  happens?  How does that work?
16    A    There is no bank balance that has profit.
17  Bank balance has cash.
18    Q    Okay.
19    A    Profit is something different.  So maybe we'll
20  have a little accounting exercise where we talk about
21  cash and what profit is.
22    Q    That's okay.  We'll --
23    A    Cash is --
24    Q    We'll go with cash.  Talk about cash.  And
25  we -- have you already covered cash?

Page 199

1    A    We've covered cash.
2    Q    Okay.  All right.  And cash would -- could
3  include profits?
4    A    Cash is cash.  Profits is a PNL term that's
5  treated differently.
6    Q    Okay.  That's just, like, on other documents;
7  but the actual -- the actual money in a bank account can
8  be all sorts of things.  It can be profit.  It can
9  just -- it can be operating capital.  It can be any
10  number of things, is what you're saying, I think?
11    A    Cash is cash, and you're trying to butcher
12  accounting.  So if you want to talk about cash and
13  treasury, we can talk about that.  If you're going to
14  butcher accounting, then we're going to be here for a
15  while because you're completely butchering it.
16    Q    Okay.  So if -- if money is swept up to
17  Mammoth Energy, Inc., how does money get to Mammoth
18  Energy Services, Inc.?
19    A    I've never testified at any point in this
20  arduous process about cash going to Mammoth Energy,
21  Inc., not one time.
22    Q    And I --
23    A    If you need to take a minute and go reread it
24  so you understand what I've testified to, then maybe you
25  should do that.

Page 200

1    Q    Okay, sir.  I did not say you said that; and
2  I'm not insinuating you did, okay?  So this is
3  ridiculous from you, okay?
4    A    If you ask me a bad question, you're
5  probably --
6    Q    No, it's not a --
7    A    -- going to get a bad answer.
8    Q    -- bad question.
9    A    And if you don't like that, then stop asking
10  bad --
11    Q    No.
12    A    -- questions.
13    Q    Okay.  So are you saying that no money from
14  Mammoth Energy, Inc., goes to Mammoth Energy Services,
15  Inc.?
16    A    Mammoth Energy, Inc., is not sweeping cash up
17  or down to Mammoth Energy Services, Inc.  We've talked
18  about it ad nauseam that the subsidiaries push cash up
19  and down to Mammoth Energy Partners.  Not one time have
20  we said Mammoth Energy Services, Inc.
21    Q    And I realize that, but I'm asking a different
22  thing now.  And I know you want to keep talking about
23  what you --
24         MR. STUKENBERG:  So what's --
25    Q    (By Mr. Moulton) -- already talked about --

Page 201

1         MR. STUKENBERG:  What's the new question?
2    A    What's the new wrinkle?
3    Q    (By Mr. Moulton) The new question is:  How
4  does money get from the subsidiary, for example, Mammoth
5  Energy, Inc., to Mammoth Energy Services, Inc.?
6         MR. STUKENBERG:  I believe he just
7  testified that Mammoth Energy, Inc., does not have
8  money.
9    A    Mammoth Energy, Inc., just like all the other
10  subsidiaries --
11    Q    (By Mr. Moulton) Uh-huh.
12    A    -- pushes money up and down to Mammoth Energy
13  Partners.
14    Q    Okay.  So -- so I've also asked this other
15  question; but let me ask it again, okay?  How does
16  Mammoth Energy Services, Inc., get money from
17  subsidiaries?
18    A    You're -- you're trying to skip this legal
19  structure.  Mammoth Energy Services, Inc., owns Mammoth
20  Energy Partners, LLC.
21    Q    Yes.
22    A    So all of the subsidiaries are owned either
23  directly or indirectly by Mammoth Energy Partners, LLC.
24    Q    Okay.  So Mammoth Energy Services, Inc., is
25  under the umbrella of Mammoth Energy Partners?

## MARK LAYTON - April 15, 2022

Page 202

1    A    That's not what I just said.  Let me speak
2 real slowly for you.
3    Q    Well, no.  Let me --
4    A    Mammoth --
5    Q    Let me try --
6    A    -- Energy Services, Inc., is the ultimate
7 parent.
8    Q    Yes.
9    A    It owns Mammoth Energy Partners --
10    Q    Uh-huh.
11    A    -- LLC.
12    Q    So --
13    A    Mammoth Energy Partners, LLC, either directly
14 or indirectly owns all of the subsidiaries.
15    Q    And I understand that.  So does Mammoth Energy
16 Services, Inc., have revenues?
17    A    Mammoth Energy Services, Inc., does not
18 perform any services.  It does not record any revenues.
19 It is a publically traded entity that has a publically
20 traded currency.  It has a loan agreement, and it owns
21 the membership interest of Mammoth Energy Partners, LLC.
22 It has no revenues.  It has no customers.  It only has
23 ownership interest in the direct or indirect
24 subsidiaries.
25    Q    So it's a publically traded company.  So it

Page 203

1 has shareholders?
2    A    Mammoth Energy Services, Inc., has
3 shareholders, yes.
4    Q    How do the shareholders get paid?
5    A    The shareholders own shares.
6    Q    Uh-huh.  And where did the money come to pay
7 for those shares?
8    A    Just like trading any equity, an investor can
9 buy shares in whatever stock they want.  I don't know
10 where they get their money.
11    Q    Okay.  But does Mammoth Energy -- well,
12 Mammoth Energy Services, do they pay a dividend?
13    A    Not currently.  Mammoth Energy Services
14 historically has paid some dividends, but that's not
15 currently in place.
16    Q    Where does the money come for that?
17    A    The money for any dividends paid by Mammoth
18 Energy Services would come from Mammoth Energy Partners,
19 which would receive its money through pulling cash up or
20 down or through equity earnings from its, either
21 directly or indirectly owned, subsidiaries.
22    Q    Thank you.
23         In the shared function of -- when regards
24 to the -- the HR department in Mammoth Energy,
25 Incorporated --

Page 204

1    A    Inc., yes.
2    Q    Yes.  Mammoth Energy, Inc., there -- you
3 mentioned that there's a HR department that's a shared
4 service for companies that would include Higher Power,
5 Cobra, for example, right?
6    A    I believe I mentioned Higher Power, 5 Star,
7 Cobra Energy, among other Cobra entities.
8    Q    Yes.  And the point of my question wasn't to
9 give an exhaustive list; but the point is that there is
10 a group at Mammoth Energy, Inc., that provides shared
11 human resources for other entities underneath the -- in
12 this Mammoth umbrella, correct?
13    A    That's correct.
14    Q    Okay.  Now, as part of that shared resource in
15 Mammoth Energy, Inc., those HR representatives have
16 access to -- do they have access to the -- to, like, the
17 employee files and employment records of the employees
18 of the subsidiaries?
19    A    It would depend on job function and role.
20 They may have access, depending on job function and
21 role, to none, some, or all of the legal entities for
22 which Mammoth Energy, Inc., provides shared services.
23    Q    Did Mammoth Energy, Inc., have access to the
24 payroll records and employment records of the plaintiffs
25 in this matter that worked for Higher Power?

Page 205

1    A    Depending on role, same answer.  They may have
2 had some, none, or all access to -- to Higher Power
3 records.
4    Q    Okay.  So -- I mean, some or all or none
5 isn't, to -- to me, an acceptable answer.  Like, it
6 sounds like you don't know.
7    A    I gave you an answer.  If you don't like it,
8 then ask a different question.
9    Q    Okay.  I'll try it.
10         For the plaintiffs that provide the
11 electrical services in Puerto Rico, you know, like your
12 linemen, mechanics, the guys that were working in Puerto
13 Rico, did Mammoth Energy, Inc., have access to their
14 employment records?
15    A    The HR employees at Mammoth Energy, Inc.,
16 depending on role, may have had some access to, let's
17 say, Higher Power Electrical payroll and HR records.
18 However, not all of the HR employees at Mammoth Energy,
19 Inc. -- they may or may not have had access.  So your
20 question initially was whether or not Mammoth Energy,
21 Inc., had access to all of the legal entities; and I
22 think that that is an inaccurate characterization.
23    Q    All right.  But at least with Higher Power,
24 there's at least some employees at -- at Mammoth Energy,
25 Inc., that would have access to the employment files?

**MARK LAYTON - April 15, 2022**

Page 206

1    A    Depending on role, yes.

2    Q    Depending on whose role?

3         MR. STUKENBERG:  The role of the

4  employees, Dave.

5         MR. MOULTON:  The ones --

6         MR. STUKENBERG:  The director of HR is

7  going to have a different level of access than the

8  payroll coordinator.

9         MR. MOULTON:  Right.

10   Q    (By Mr. Moulton) You're talking about that --

11  you're talking about the level of access at the -- at

12  the Mammoth Energy level not -- not depending on who it

13  was working at Higher Power; is that right?

14   A    Yes.  Your question was about who at Mammoth

15  Energy and that's --

16   Q    Yes.

17   A    -- what I answered.

18   Q    Yes, but -- yeah.  Okay.

19        Were the -- were the offer letters for

20  the plaintiffs in this case part of any document

21  retention policy?

22        MR. STUKENBERG:  Objection, form.

23   A    Can you ask that again?

24   Q    (By Mr. Moulton) Yeah.  We've looked at some

25  offer letters today?

Page 207

1    A    Uh-huh.

2    Q    You've seen several examples.  You know what I

3  mean by offer letters, correct?

4    A    Yes.

5    Q    Okay.  Were they subject to any document

6  retention policy that you know of?

7         MR. STUKENBERG:  And I just want to make

8  sure we're clear here.  Are you talking about, like, an

9  internal company policy to retain documents in the

10  ordinary course of business; or are you talking about in

11  the -- in -- as it relates to litigation?

12        MR. MOULTON:  Ordinary course of

13  business.

14        MR. STUKENBERG:  Got it.  Just wanted to

15  make that clarification.

16        MR. MOULTON:  Yeah.

17   A    In the ordinary course of business, I'm not

18  aware of a specific document retention policy as it

19  relates to any of the defendants in this matter.

20   Q    (By Mr. Moulton) Okay.  Do you happen to know

21  whether or not any of the defendants in this matter have

22  offer letters for every plaintiff in this case?

23        MR. STUKENBERG:  Objection, form.

24   A    As I just said, I'm not aware of any document

25  retention policy.  I believe to the extent that we have

Page 208

1  been able to locate offer letters, those have all been

2  produced.

3    Q    (By Mr. Moulton) Okay.  Let me ask you -- I

4  know you may think this is the same thing, but I'm going

5  to ask you something else.

6         How -- are there any records we could

7  look at to determine whether or not every single worker

8  actually got an offer letter and if they did, which

9  version?

10        MR. STUKENBERG:  Objection, form.

11   A    You've got all the offer letters that -- that

12  the defendants have.  They've all been produced in this

13  matter.

14   Q    (By Mr. Moulton) Okay.  And -- and I

15  appreciate that.  I'm asking about something else.

16  Sometimes there are HR documents, for example, that

17  might track, like, okay, this employee got an offer

18  letter and it was Version 2627, for example.  And so we

19  would -- there would be some evidence that they actually

20  got one even without having the document.

21        So I'm asking you:  Is there any evidence

22  that you're aware of that would point to whether or not

23  any plaintiff in this case actually got an offer letter

24  with respect to the work in Puerto Rico?

25   A    If you're asking whether or not there's an

Page 209

1  electronic record, a version control, and whether or not

2  each employee received an offer letter, I'm not aware of

3  that field inside of the HR/IS system.

4    Q    Okay.  And, again, that's not exactly the

5  question I asked.  I'm asking if there's any record you

6  know of that could be used to determine whether or not

7  any particular plaintiff in this case got an offer

8  letter; and if so, which version?

9    A    I don't believe there's anything that captures

10  that -- that specific data.

11   Q    Okay.  Now, you -- are you personally aware of

12  whether or not every plaintiff got an offer letter or

13  not?

14   A    No, I'm not personally aware of whether every

15  plaintiff got an offer letter or not.

16   Q    Okay.  Are you aware of whether or not the

17  general practice was to make sure every single one got

18  an offer letter?

19   A    The general practice was that potential

20  employees receive an offer letter, yes.

21   Q    Okay.  That was a general practice, but you

22  don't know how well that was complied with; is that

23  right?

24   A    I've stated that I'm not aware of whether or

25  not every single employee received an offer letter.  I'm

**MARK LAYTON - April 15, 2022**

Page 210

1 not aware of any field or other report that would
2 capture whether or not every single employee would
3 receive an offer letter.  Every offer letter that's
4 responsive to the document request has been produced.
5      Q    Do you believe Mr. Broussard ever approved the
6 payments of -- of these additional amounts that we were
7 talking about before that you claim are discretionary
8 into the payroll?
9           MR. STUKENBERG:  Objection, form.
10     A    If you're asking whether or not Mr. Broussard
11 is part of our payroll approval process --
12     Q    (By Mr. Moulton) No, I'm not --
13     A    -- he's not.
14     Q    I'm not asking that, okay?  I'm asking whether
15 or not he approved that payroll policy of adding in
16 these extra amounts.
17           MR. STUKENBERG:  Objection, form.
18     A    If you're asking whether or not
19 Mr. Broussard --
20     Q    (By Mr. Moulton) Answer my question.  Don't --
21 you don't get to say, "If you are asking."  That's not
22 my question, okay?
23     A    And you don't even know what my answer is
24 because you won't let me speak.
25     Q    No --

Page 211

1     A    So shut up --
2     Q    -- hold on.
3     A    -- for a second.
4     Q    No.
5           MR. STUKENBERG:  The question is --
6           MR. MOULTON:  No --
7           MR. STUKENBERG:  -- vague --
8           MR. MOULTON:  -- it's not fair for him to
9 keep --
10           MR. STUKENBERG:  It's vague.  It's vague.
11     Q    (By Mr. Moulton) Okay.  We already talked
12 about what Mr. Broussard did with the -- you know, he --
13 he gave you advice on two ways to comply.  You could
14 either do a -- a day rate with overtime; or you could do
15 hourly with an overtime, correct?
16     A    Mr. Broussard offered two compliant policies
17 for us to evaluate, yes.
18     Q    Okay.  Now, as part of that process, I want to
19 know if you sought advice from him and if he approved
20 about these additional amounts that we've talked about
21 today that get paid on in a discretionary fashion that
22 you've talked about?
23           MR. STUKENBERG:  Objection, form.
24     A    If you're asking about whether or not we
25 consulted Mr. Broussard on discretionary bonuses, then

Page 212

1 we did not consult Mr. Broussard on -- on discretionary
2 bonuses.
3           MR. STUKENBERG:  As it relates to these
4 discretionary bonuses.
5           THE WITNESS:  Correct.
6     Q    (By Mr. Moulton) In this case, yeah.  I
7 wouldn't be asking about Stingray, at least not right
8 now.
9           Okay.
10           MR. STUKENBERG:  You done, Dave?
11           MR. MOULTON:  No, I'm not done.  I'm
12 trying to.
13     Q    (By Mr. Moulton) You would agree with me that
14 the defendants in this matter would be -- knew that
15 the -- that the workers would be working over 40 hours
16 in Puerto Rico per week?
17           MR. STUKENBERG:  I'm sorry.  Can you
18 repeat the question?
19           MR. MOULTON:  Yeah.
20     Q    (By Mr. Moulton) The defendants in this matter
21 knew that the plaintiffs would be working over 40 hours
22 per week maybe not every week, but very often in Puerto
23 Rico?
24           MR. STUKENBERG:  The defendants?
25           MR. MOULTON:  Yes.

Page 213

1           MR. STUKENBERG:  Okay.  All the
2 defendants?
3           MR. MOULTON:  Yes.
4     A    So in regards to the employers Higher Power
5 Electrical and 5 Star, they certainly knew that it would
6 be likely, based on the work demands, that their
7 employees would work more than 40 hours a week.  Mammoth
8 Energy Services has no employees, never did anything on
9 the island of Puerto Rico, has no customers or revenues.
10 So they -- they had no knowledge one way or the other
11 and had no employees.
12     Q    (By Mr. Moulton) Did Mr. Broussard give any
13 advice to the defendants in this matter about whether or
14 not the plaintiffs were exempt under any exemption?
15           MR. STUKENBERG:  And --
16     Q    (By Mr. Moulton) About -- relating to the
17 plaintiffs in this case?
18     A    As it relates to the plaintiffs in this case,
19 there may have been some dialogue during the -- the
20 iterative discussion with Mr. Broussard related to
21 white-collar employees as well as for employees driving
22 heavy vehicles.
23     Q    At any point did anyone that you're aware of
24 conduct any sort of investigation as to what were the
25 primary job duties of any of the plaintiffs in this

**MARK LAYTON  -  April 15, 2022**

Page 214

1 case?

2     A     In regards to a quote, unquote, investigation,
3 that has a context that I don't believe is -- is
4 applicable.  In regards to these employees and the work
5 that -- that they do, there are certainly job
6 descriptions; but to the extent you characterize that as
7 an investigation, there is no, quote, unquote,
8 investigation.

9     Q     Okay.  So you're not -- are you aware of
10 anyone trying to determine whether or not any of the job
11 classifications of the plaintiffs in this case were --
12 would qualify as white-collar exemptions?

13           MR. STUKENBERG:  Prior to any litigation?

14           MR. MOULTON:  Yes.

15     Q     (By Mr. Moulton) That's for you, Mr. Layton.
16 What's the answer?

17     A     Prior to litigation, I'm not aware as it
18 relates to -- to white-collar.

19     Q     Okay.

20     A     And, you know, as I mentioned earlier, we
21 likely discussed, as I recall, white-collar and -- and
22 heavy vehicle with Mr. Broussard during the pay practice
23 discussion.

24     Q     Are you relying on Mr. -- anything
25 Mr. Broussard said about the white-collar exemptions for

Page 215

1 a -- any affirmative defense in this case?

2           MR. STUKENBERG:  Related to white-collar?

3           MR. MOULTON:  Yeah.

4     A     Regards to white-collar defense in this case?

5     Q     (By Mr. Moulton) Uh-huh.

6     A     No.

7     Q     Or a good-faith defense?

8     A     Certainly relying on Mr. Broussard's counsel
9 that he provided in relation to -- to good faith, yes.

10     Q     Okay.  So what -- what about Mr. Broussard's
11 conversations led any of the defendants in this matter
12 to believe that any of the plaintiffs could be exempt as
13 white-collar -- white-collar employees?

14           MR. STUKENBERG:  Objection,
15 mischaracterizes the testimony.

16     A     That's not what I said about white-collar.

17     Q     (By Mr. Moulton) And -- and I'm not -- I'm not
18 saying you did.  I'm saying is there anything that
19 Mr. Broussard said that you're aware of that the
20 defendants are relying upon for their good-faith defense
21 that plaintiffs might be white-collar workers?

22     A     And I think my testimony speaks for itself in
23 regards to the discussion with Mr. Broussard on
24 white-collar workers.

25     Q     So y'all didn't have any discussions about

Page 216

1 white-collar workers?

2     A     That's not at all what I testified about.

3     Q     Okay.  Well --

4     A     I said that came up during the iterative
5 dialogue with Mr. Broussard as well as heavy vehicles.

6     Q     Okay.  So what did Mr. Broussard say that led
7 you to believe, if you did, that any of the plaintiffs
8 in this matter were exempt as white-collar --
9 white-collar employees?

10     A     Are you asking me whether or not we're relying
11 on Mr. Broussard's advice prior to hiring these
12 employees in relation to the defense of this matter?

13     Q     I'll take that question, except move it up
14 from not prior to -- to hiring them but during the time
15 they're also working there.

16           MR. STUKENBERG:  We're not asserting any
17 white-collar --

18           MR. MOULTON:  Yeah, you are.

19           MR. STUKENBERG:  Okay.

20           MR. MOULTON:  You put it in your
21 discovery responses.

22           Okay.  Are -- so are you not -- are you
23 not?

24           MR. STUKENBERG:  Go ahead.  You can
25 answer.  Whatever you talked about with Mr. Broussard

Page 217

1 about white-collar exemptions.

2     A     So we -- we certainly discussed during the
3 iterative analysis whether or not there may be a
4 white-collar exemption or whether or not there may be a
5 heavy-vehicle exemption for certain employees.

6     Q     (By Mr. Moulton) And I -- I hear you on heavy
7 vehicle.  We're going to get to that in a minute once we
8 can finish up on white-collar.  Did he give an opinion
9 to you guys that any of the plaintiffs in this case
10 would be exempt as white-collar workers?

11     A     Regards to white-collar workers, Mr. Broussard
12 had some discussion with Mr. Beagle, among others, about
13 employee classification and whether or not some may fall
14 under white-collar.  I don't believe, for the majority
15 of the plaintiffs in this case, that -- that we've
16 asserted a white-collar defense.

17     Q     Okay.  Do you know of any in particular that
18 you are asserting a white-collar defense for?

19     A     Our responses speak for themselves.

20           MR. STUKENBERG:  Yeah, I mean, that's --
21 go ahead.

22     Q     (By Mr. Moulton) All right.  And let's talk
23 about the heavy vehicle.  Did Mr. Broussard tell the --
24 any of the defendants in this matter that the plaintiffs
25 would be exempt under the Motor Carrier Act?

**MARK LAYTON  -  April 15, 2022**

Page 218

1      A      There was certainly some dialogue with
2  Mr. Broussard and the Motor Carrier Act and, you know,
3  certainly some -- some natural tie-in with that 16-hour
4  monitoring that I've mentioned several times by our
5  supervisors.
6      Q      Okay.  And what did he say about the
7  applicability of the Motor Carrier Act to any of the
8  plaintiffs in this case?
9      A      The general discussion was what -- there could
10  be some applicability of the Motor Carrier Act.
11      Q      Okay.  So other than him saying that it might
12  apply, he didn't say anything else?
13      A      I said the general discussion.
14      Q      Uh-huh.
15      A      It's, you know, a factual analysis.
16      Q      Okay.  So who did he say could be -- who
17  might -- who did he say might be exempt under the Motor
18  Carrier Act, pray tell?
19      A      It would depend on job classification and
20  whether or not they were driving DOT regulated vehicles.
21      Q      Okay.  Did he talk to you about small truck
22  and SAFETEA-LU exceptions?
23              MR. STUKENBERG:  Did you say SAFETEA --
24              MR. MOULTON:  SAFETEA-LU.
25              MR. STUKENBERG:  Loop?

Page 219

1              MR. MOULTON:  LU, right?  Isn't it
2  SAFETEA, L-U?
3      Q      (By Mr. Moulton) Did he talk to you --
4              MR. STUKENBERG:  SAFETEA-LU?  Object to
5  form.
6      Q      (By Mr. Moulton) Yeah.  Did you -- did he talk
7  to you about drivers who also drive small vehicles, like
8  under 10,000 pounds?
9              MR. STUKENBERG:  Objection, form.
10      A      There may have been some dialogue about,
11  quote, unquote, smaller vehicles; but there's a -- you
12  know, a technical analysis that goes into that -- that
13  10,000-pound rule and whether or not they're pulling
14  trailers.  So I think that's -- that's a pretty deep
15  rabbit hole.
16      Q      (By Mr. Moulton) So did the -- did any of the
17  defendants in this matter decide prior to the end of
18  the -- the work being done in -- in Puerto Rico that any
19  of the plaintiffs were exempt under the Motor Carrier
20  Act?
21              MR. STUKENBERG:  I'm sorry.  Can you
22  repeat the question?
23              MR. MOULTON:  Yeah.
24              MR. STUKENBERG:  I missed it.
25      Q      (By Mr. Moulton) Did any of the defendants in

Page 220

1  this matter decide that any of the plaintiffs were
2  exempt under the Motor Carrier Act before their work in
3  Puerto Rico ended?
4              MR. STUKENBERG:  Decide?
5              MR. MOULTON:  Yeah.  Yeah.
6      Q      (By Mr. Moulton) Did you make a determination?
7              MR. STUKENBERG:  I'll go ahead and object
8  to form.
9              You can answer.
10      A      I'm not aware of a determination and to the
11  extent there -- if there would have been conversations
12  about that, they would have been privileged.
13      Q      (By Mr. Moulton) Not if you're relying on it
14  for either a good-faith defense or other defenses in
15  this matter.  So I'll ask that again.  If you're going
16  to rely on it, you've got to disclose it.  So please
17  answer.
18      A      And our responses in the matter speak for
19  themselves in regards to motor carrier exemptions.
20      Q      Have -- have the defendants produced all the
21  documents related to necessary recordkeeping that would
22  be required under, say, DOT rules that would apply under
23  the Motor Carrier Act?
24      A      The defendants have produced all documents
25  required to be produced in this matter.

Page 221

1              MR. STUKENBERG:  No rush, Dave; but
2  whenever you get a --
3              MR. MOULTON:  Yeah.  No, I'm getting
4  close to --
5              MR. STUKENBERG:  -- for a break, just let
6  me know.
7              MR. MOULTON:  Oh, yeah.  Okay.  If y'all
8  want to do a quick break, let's do it; and then I'll --
9  I'll take up a couple things and we'll be done.
10              MR. STUKENBERG:  Great.
11              THE VIDEOGRAPHER:  All right.  We're off
12  the record at 2:42.
13              (Recess from 2:42 p.m. to 2:56 p.m.)
14              THE VIDEOGRAPHER:  All right.  We're back
15  on the record at 2:56 p.m.
16      Q      (By Mr. Moulton) All right.  Mr. Layton, I
17  want to cover just a couple more things about these
18  payroll records.  Back to this Justin Washburn pay stub
19  that we looked at earlier in Plaintiff's Exhibit 170, do
20  you know why 16 was regular and 16 was counted as
21  overtime for this pay stub?
22      A      I don't.
23              MR. STUKENBERG:  What exhibit is this?
24              MR. MOULTON:  170.
25      A      It would seem odd at a high-level glance

**MARK LAYTON  -  April 15, 2022**

Page 222

1 given -- given the hours; but based on the -- the
2 earning statement, I don't know why it was coded that
3 way.
4     Q    (By Mr. Moulton) It would seem to me -- we've
5 already established this guy worked two days.  It seemed
6 like to me that it would be -- the calculation would
7 make more sense if it was a rate of 37.84 with 32 hour
8 units.  Would you agree?
9     A    That would make more sense, yes.
10    Q    That's -- and I mean, like, 32 regular units,
11 right?
12    A    Yes.
13    Q    Okay.  But if it was that way, would he have
14 still got the same day rate?
15    A    Well, there's a day rate code for which we,
16 appears, selected an inappropriate pay code.  He got a
17 discretionary bonus of 86.40.
18    Q    All right.  And so my question is:  If you
19 have them where it shows all regular, the discretionary
20 bonus would have to be bigger, right, to get it to 1600?
21         MR. STUKENBERG:  Objection, form.
22    A    Well, discretionary bonus is discretionary.
23 So as the employer, we can make that whatever we want.
24 In this particular case Mr. Washburn received a
25 discretionary amount of $86.40.

Page 223

1     Q    (By Mr. Moulton) So the discretionary amount
2 is -- doesn't have any particular target in mind.  It's
3 totally just whatever the defendants want to do?
4     A    I don't believe that's been my testimony.
5 Discretionary, by its nature, is discretionary based on
6 timing, amount, and whether or not it's paid.
7     Q    Okay.  So let me just make sure:  With the
8 discretionary amounts that you're -- that you've been
9 talking about, were they ever meant to bring the workers
10 up to any particular target?
11    A    There were certainly discretionary amounts
12 that -- discretionary payments that were made in order
13 to get employees closer to what their targeted earnings
14 amount would be approximately if they worked seven days
15 of 16 hours a day.  Again, if you run out the hours,
16 they never got exactly to their targeted amounts.  They
17 were usually a few pennies or a few dollars over those
18 targeted amounts just due to the mechanics behind it.
19    Q    Okay.  I -- I think what you're really trying
20 to say is yes, but you're just so caught up on details?
21         MR. STUKENBERG:  Objection.  His answer
22 is his answer.
23    Q    (By Mr. Moulton) So there are times where
24 the -- quote, the discretionary amount is meant to bring
25 up the worker to the targeted amount that they're --

Page 224

1 that you would be targeting?
2         MR. STUKENBERG:  Objection, form.
3     A    That mischaracterizes my testimony as it
4 relates to discretionary bonuses and getting the -- the
5 employee an employee goodwill closer to their targeted
6 earnings amount in the event they had to work seven days
7 and 16 hours a day.
8     Q    (By Mr. Moulton) Okay.  So you agree that it
9 can be used to get them closer, and my question is:  Can
10 it be used to get them to the targeted amount?
11    A    Their targeted amounts were never, in this
12 case, $800 per day because if you worked the 224 hours
13 for over a period of 14 days, it would not be divisible
14 by 800.
15    Q    So --
16    A    And I understand you don't want to talk about
17 those, but that's the case 98-plus percent of the time.
18    Q    So you're saying 98 percent of the time the
19 mechanics of the hourly rate and the overtime comes out
20 to a number that's pennies off of the targeted rate,
21 right?
22    A    The hourly employees, if you run through the
23 mechanics for their hours worked, do not equal these per
24 day columnar amounts.
25    Q    Right.  It's off by pennies, correct?

Page 225

1     A    It's off by pennies or dollars.  It's no
2 different than a salaried employee that is paid every
3 other week that -- they may be earning $60,000 a year.
4 They're paid salary.  At the end of the year, based on
5 payroll, it may be off, you know, a few pennies here,
6 there.  For an hourly employee that may work an extra
7 hour of overtime here or there, while you may have an
8 employee -- hourly employee that's -- that's targeted to
9 make $60,000 in a year, it may be plus or minus based on
10 actual hours, worked.
11    Q    Well, looking at Exhibit 151, we can reverse
12 the math that we talked about earlier to figure out
13 exactly the difference.  Specifically, you can take that
14 "PR Storm - Per Hour" number, for example, for that
15 foreman.  You see that 66.22 on Exhibit 151?
16         If we take that number, according to the
17 math we did earlier, and you multiply it by 148, you're
18 going to get what he would get in a full week, correct,
19 of working seven days?
20    A    At 148 for seven days?
21    Q    So --
22    A    That doesn't.
23    Q    Yeah.  So 66.22 times 148 would give us what
24 that employee work -- gets if he works the whole week
25 like you keep talking about.  And, for example --

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

## MARK LAYTON  -  April 15, 2022

Page 226

1 because I'll help you out here -- comes out to be
2 9800.56.  Isn't that the right that he would get --
3 isn't that the amount that he would get?
4    A    I haven't run through the -- the math on
5 regular and overtime at this rate.
6    Q    Okay.  So I have a calculator up; and, you
7 know, we can do the math together.  So 66.22 times 148
8 is $9,800.56.  That's what he's going to get for the
9 whole week when you go do your 66.22 times your 40 plus
10 112 times 66.22 times one and a half.  That's the same
11 thing, okay?  That's what he's going to get.  Does -- do
12 you -- do you not know that?
13    A    If you're asking me to track all your
14 calculations, I don't know what you're doing over there.
15    Q    Yeah.  Well, we're doing the same thing that
16 y'all -- we did in that spreadsheet earlier; but we're
17 doing it in reverse.
18    A    If you want to pull up the spreadsheet and
19 have me talk about it, I'm happy to do it.  But if
20 you're going to do math and ask me to follow you and do
21 it in my head, I'm not going to do that.  That's a waste
22 of my time.
23    Q    Okay.  So 9800.56 -- that's fair enough.
24 I'll -- I'll keep doing it, and I think get -- I think
25 you'll understand this.  9800.56, you divide it by 7.

Page 227

1 Comes out to the targeted rate of $1400.08.
2          Do you see that?
3    A    No, I can't see that.  I don't know what
4 you're doing over there.
5          MR. STUKENBERG:  Same objection.  If you
6 want to go through the formula with him, do it on the
7 spreadsheet with the document.
8          MR. MOULTON:  All right.  We can do that
9 again.  I just thought he would be with me.
10    Q    (By Mr. Moulton) So before -- back -- we'll go
11 to this exhibit, 167.  That's a native document.  We
12 talked about how if you take the budgeted day rate and
13 multiply it by 7 for the whole week and divide it by the
14 total adjusted hours of 148, we'd get to that hourly
15 rate.
16          Do you recall that?
17    A    Yes, sir.
18    Q    Okay.  So we can also do the reverse to see
19 what a person would actually get for the week.  59.12,
20 for example, in that first one, times 148 yields or
21 equals $8,749.76.  So do you see that math, how you can
22 just multiply the hourly rates times 148 to get what the
23 pay for the week would be?
24    A    All I see is a spreadsheet on my screen.  So
25 the mechanics, yeah, I follow you.  Like, all I see is a

Page 228

1 spreadsheet.  So if you're asking me to do this --
2          MR. STUKENBERG:  The numbers don't --
3 that you're barking out don't match the numbers in the
4 spreadsheet, which makes it (inaudible).
5          THE REPORTER:  Which makes it what?
6          MR. STUKENBERG:  Of limited utility.
7    Q    (By Mr. Moulton) All right.  You understand
8 spreadsheets, right?  If you take 59 point -- if you
9 take these numbers right here, equals that number times
10 148, we get the amounts, okay?  Which is actually what
11 that Column M is, right?
12          MR. STUKENBERG:  So what's the question?
13          MR. MOULTON:  So we're going to get
14 there.
15    Q    (By Mr. Moulton) The problem is that when, in
16 your payroll system, you have them rounded.  So let's
17 just see here.  Round that to -- let's use exactly
18 59.12, not 59.12 and going on forever.  We get the
19 amounts that would be paid for an entire week at these
20 rates.
21          Do you follow?  The exact amounts, that's
22 what's going to be in your payroll.
23    A    If the employee works seven days for 16 hours
24 per day or is available for those 16 hours per day.
25    Q    Yes, yes.

Page 229

1          Okay.  So now you understand.  We can
2 take the hourly rates and multiply them by 148 to get
3 what the total pay would be for the week?
4    A    If the employee either works or is available
5 to work the requisite hours.
6    Q    Yes, sir.
7          Okay.  So we were talking earlier about
8 how you're saying 98 percent of the time the -- the math
9 is going to come out to be a little different --
10          MR. STUKENBERG:  What's the question?
11    Q    (By Mr. Moulton) -- and we can see what those
12 differences are by just doing this math.  So, for
13 example, at the 59.12 rate, the difference is going to
14 be 24 cents.
15          Do you see that?
16    A    I see that, but I think your characterization
17 of the 98 percent is inappropriate.  That's not exactly
18 what my testimony was.
19    Q    For the J Lineman, the difference is going to
20 be 40 cents.  Do you see that?
21    A    I do.
22    Q    For the A Class, the difference will be 36
23 cents.  Do you see that?
24    A    I do.
25    Q    Okay.  For B Class, the difference will be 32

**MARK LAYTON - April 15, 2022**

Page 230

1 cents, correct?
2    A    Yes.
3    Q    And for Hot apprentice, the difference would
4 be 28 cents?
5    A    Yes.
6    Q    And for the Apprentice slash Groundsman, it
7 would be 24 cents?
8    A    That's correct.
9    Q    Okay.  And these same numbers would apply even
10 if they're a different position, but if they're -- you
11 know, if these -- at these hourly rates in Column K that
12 we've been talking about, correct?
13    A    To the extent that the hours are worked or
14 available to work, the calculation would be correct,
15 yes.
16    Q    Okay.  We're going to take these calculations
17 that me and you just worked through and make this a new
18 spreadsheet and we will label that as Plaintiff's
19 Exhibit 174.
20          (Plaintiffs' Exhibit 174 marked.)
21    Q    (By Mr. Moulton) All right.  Back to your
22 98 percent comment.  I'm trying to understand it.
23 You're saying that 98 percent of the payroll matches
24 your math of when someone works a full week, that the --
25 the amount doesn't equal exactly the targeted rate?

Page 231

1          MR. STUKENBERG:  Objection --
2    Q    (By Mr. Moulton) Is that what you're saying?
3          MR. STUKENBERG:  Objection, form.
4    A    That's not what my testimony was.
5    Q    (By Mr. Moulton) Okay.  Can you -- can you
6 explain what you were trying to say?
7    A    My testimony speaks for itself, and I'll
8 reincorporate it as it relates to the questions asked
9 and answered.
10    Q    You've got to answer this question, sir.  You
11 don't get to say -- unless your attorney says you're not
12 going to answer, you're not the one who gets to say, "I
13 don't answer a question."
14          Okay.  The 98 percent comment you've been
15 making, you've done some statistical analysis you've
16 also talked about, okay?  In your statistical analysis,
17 you referred to 98 percent of the payroll being what?
18 What is the fill in the blank?
19    A    98 percent, in excess of that amount, the
20 hours were entered and calculated based on regular and
21 overtime earnings.
22    Q    Meaning that you -- there wasn't any
23 additional amount added?  Is that what you mean?
24 Just -- it was just straight regular and overtime?
25    A    I'm saying it's the payroll records -- in

Page 232

1 excess of 98 percent of the time, the detailed records
2 for the hourly employees record regular and overtime
3 hours.
4    Q    Okay.  So -- and they -- they still may have
5 additional amounts added?  You're just saying that
6 98 percent of them have regular rates, overtime rates,
7 regular hours, overtime hours, correct?
8    A    98-plus percent of the population for the
9 hourly employees is paid based on regular and overtime
10 hours.
11    Q    Okay.  And that's not surprising because these
12 guys worked full seven days all the time?  I mean, the
13 vast majority of the time they worked is a full seven
14 days, correct?
15    A    There were various amounts of time that the
16 employees worked.
17    Q    Let me ask you this:  What percentage of the
18 time did they work a full seven days?
19    A    For the employee base, they worked the
20 full seven days, I'd say, the majority of the time.
21    Q    Okay.  Do you know the exact percentage?
22    A    No, I don't; but since you're a math genius,
23 you can probably figure it out.
24    Q    I am a math genius.  I love math.
25          All right.  So if 98 percent of the time

Page 233

1 they're working seven days anyways, then your 98 percent
2 figure that they were paid just their overtime and
3 regular wouldn't really mean much, would it?
4          MR. STUKENBERG:  Objection, form.
5    A    It means a lot.
6    Q    (By Mr. Moulton) Why?
7    A    So you can characterize it however you want.
8    Q    Why would it mean -- what does it mean to you
9 and why?
10    A    I've explained that, and I'll reincorporate
11 that testimony.
12    Q    Okay.  So it's -- are you saying, also, that
13 it's less than 2 percent of the time that there's a day
14 rate line item on a pay stub?
15    A    Yes.
16    Q    Okay.  But even though you did this 98 percent
17 analysis, you didn't bother to see what percent of the
18 time they actually worked the full seven days?  That's
19 not a calculation you did?
20    A    Does it matter?  They're paid hourly 98-plus
21 percent of the time.
22    Q    Okay.  No, answer my question.  Just "yes" or
23 "no."  Did you do it?
24    A    Did I go determine how many days each employee
25 worked?  No.

**MARK LAYTON - April 15, 2022**

Page 234

1    Q    No.
2    A    They were paid hourly --
3         MR. MOULTON:  Will, are you going to --
4    A    -- and overtime --
5         MR. MOULTON:  -- keep letting him do
6    this, keep not --
7    A    -- 98 percent of the time --
8         MR. MOULTON:  -- answering the question?
9         MR. STUKENBERG:  He answered your
10   question.
11        MR. MOULTON:  No, he didn't.  No.
12        MR. STUKENBERG:  And really, we're just
13   talking circles.
14        MR. MOULTON:  No, we're not.  We're not
15   talking in circles.
16   Q    (By Mr. Moulton) I want to know if you
17   determined what percent of the time the workers either
18   worked a full seven days or not.
19        MR. STUKENBERG:  And he said he didn't do
20   that.
21   Q    (By Mr. Moulton) You didn't do that?
22   A    No, I didn't do that.
23   Q    Okay.  What was Higher Power's policy with
24   regards to lunch breaks in Puerto Rico?
25   A    Generally the employees got breaks.  In a

Page 235

1    number of instances, the employees, depending on the
2    area of the island that they were working on, received
3    lunches from the barges on which the overwhelming
4    majority of the employees were -- were housed on.
5    Q    At any point did Higher Power or Cobra or
6    Mammoth Energy Services, did they ever track whether or
7    not people took breaks and how much time?
8    A    Mammoth --
9         MR. STUKENBERG:  Can you give us a time
10   period?
11        MR. MOULTON:  During the time that they
12   were working in Puerto Rico.
13        MR. STUKENBERG:  The totality of the time
14   they were working in Puerto Rico?
15        MR. MOULTON:  Yes.
16   A    Mammoth Energy Services never had a single
17   employee in Puerto Rico.  So there were no lunch breaks
18   to -- to --
19   Q    (By Mr. Moulton) No, that's not my question.
20   A    -- track.
21   Q    I'm asking tracking.
22   A    And I --
23   Q    Okay.  Hold on.
24   A    -- was answering about tracking and you can
25   make your faces and your --

Page 236

1    Q    No.
2    A    -- condescending remarks --
3    Q    No.
4    A    -- but it -- it's not additive to this
5    process.
6    Q    No.
7    A    It hasn't been all day long.
8    Q    No.  Okay.  You can keep telling me all day
9    long that because Mammoth Energy Services doesn't have
10   employees that it didn't track something, and I don't
11   care.  Like, I just want to know if they did regardless,
12   okay?  And you can -- if they didn't, just say no.
13   A    No.
14   Q    Did -- did any of the defendants in this
15   matter track whether or not any of the plaintiffs
16   took -- took lunch breaks and how long they were at any
17   point when they were working in Puerto Rico?  That's a
18   "yes" or "no" question.
19   A    Mammoth Energy Services, Inc., has never had
20   any employees.  So there is no lunch break to track.
21   Higher Power and 5 Star, I'm not aware of a tracking
22   mechanism for lunch breaks, but the employees were
23   provided those lunch breaks as well as lunches in many
24   cases for which they could take with them.
25   Q    Okay.  And, again, you keep on thinking I'm

Page 237

1    asking something else.
2         I want to know if any of the defendants
3    tracked any of the workers' lunches, not whether any of
4    the defendants tracked their own people's lunches.  I
5    want to know if any of the defendants tracked the
6    lunches of the plaintiffs in this case.  "Yes" or "no"?
7         MR. STUKENBERG:  I'd object.  The witness
8    has answered this question now, I think, four times.
9    A    I've answered it, and I'll reincorporate my
10   previous testimony.
11   Q    (By Mr. Moulton) Have any of the defendants in
12   this matter made any estimates about what the damages
13   could be if plaintiffs were correct?
14        MR. STUKENBERG:  Objection.  Instruct the
15   witness not to answer on the basis of privilege.
16   Q    (By Mr. Moulton) Okay.  So, first, I want to
17   know if that determination has ever been made without
18   asking what it was.  Has anybody conducted that
19   analysis?
20        MR. STUKENBERG:  Objection on the basis
21   of privilege.  I'm going to instruct the witness not to
22   answer to the extent that any of that has been done in
23   consultation with legal or with the assistance of legal.
24   Q    (By Mr. Moulton) Are you going to follow your
25   counsel's advice, Mr. Layton?

**MARK LAYTON - April 15, 2022**

Page 238

1  A   Yes, I am.

2  Q   Okay.  What was the name of the security

3 company that was used in Puerto Rico?

4  A   There were two different security companies,

5 as I recall, that were utilized in Puerto Rico as

6 subcontractors to Cobra Acquisitions.

7  Q   Okay.  What were the names of those security

8 companies?

9  A   I believe the names of -- of those security

10 companies were Alpha Lobo and Espada, E-s-p-a-d-a.

11  Q   So with Alpha Lobo, there's no "Inc."?

12 There's no "LLC"?  Do you know the exact name of that

13 entity?

14  A   No.

15  Q   Okay.  Are they a Mammoth -- are they part of

16 the Mammoth empire?

17  A   I don't know what an empire is, but neither

18 one of those entities is either directly or indirectly

19 owned in any way, shape, or form by any Mammoth Energy

20 Services company.

21  Q   Okay.  What about Espada?  Are they part of

22 the Mammoth empire?

23  A   Again, I don't know what an empire is.

24 Espada's not related to any subsidiary of Mammoth Energy

25 Services, Inc., or any of its direct or indirect

Page 239

1 subsidiaries.

2  Q   Are you aware of any overtime complaints,

3 lawsuits, arbitrations, complaint -- you know, any --

4 about overtime that dealt with any employee with -- of

5 Espada?

6  A   I'm aware of a matter between either Espada or

7 Alpha Lobo.  I don't recall which; but, yes, I'm -- I'm

8 aware.

9  Q   And what do you know about that?

10      MR. STUKENBERG:  Other than whatever's --

11 you're aware is privileged.  If you have nonprivileged

12 information, you can provide it.

13  A   I don't have any nonprivileged information

14 associated with -- with either of those entities.

15  Q   (By Mr. Moulton)  Okay.  So other than

16 discussions from your lawyers, you didn't have

17 independent knowledge that anyone -- any employee had

18 sued Espada, for example, for overtime regarding his

19 work in Puerto Rico?

20  A   I'm not aware of any nonprivileged

21 conversations.

22  Q   Okay.  And the same for Alpha Lobo?

23  A   That's correct.

24  Q   Okay.  I've heard the term from some of the

25 plaintiffs in this case that there was a -- basically a

Page 240

1 lodging boat that they informally called a Russian

2 prison ship.  I don't know if it actually was or not.

3 Do you know what that is?

4  A   There were two barges that were utilized to

5 house a number of employees of Cobra Acquisitions and

6 its subcontractors, which would include Higher Power and

7 5 Star.

8  Q   So which -- which of the entities would be

9 directly providing the -- the lodging for the workers in

10 Puerto Rico?

11  A   The lodging for the workers that were housed

12 on -- on those barges -- those two barges were chartered

13 by Tiger Shark Logistics.

14  Q   And who paid Tiger Shark?

15  A   Cobra Acquisitions subcontracted Tiger Shark

16 to provide those barges.

17  Q   Okay.  And as far as, like, the meals on the

18 island, who was providing those?

19  A   The meals in -- in large part were provided on

20 those barges for the employees that stayed on the

21 barges.

22  Q   Okay.  That answers where, but I'm asking who.

23  A   Again, Tiger Shark chartered those barges and

24 Tiger Shark would have had agreements in place with

25 caterers and -- and chefs to prepare meals on -- on

Page 241

1 board those two barges.

2  Q   Oh, it was a package deal, in other words?

3  A   In some cases it was package.  In regards to

4 some services, Tiger Shark had agreements in -- with

5 its own subcontractors in relation to chefs and

6 provisioning supplies and meals and various other

7 things.

8  Q   When lodging switched to a -- more of, like,

9 apartments and hotels, kind of -- in other words when

10 they weren't on the barges so much anymore, who was

11 providing the funds for that?

12  A   Regards to providing funds for that?

13  Q   Uh-huh.

14  A   I'm not sure I follow your question.

15  Q   Yeah, who paid the hotel bills?

16  A   So in the -- in the instances where Cobra

17 Acquisitions acquired blocks of rooms for

18 subcontractors, Cobra Acquisitions would have paid for

19 those blocks of rooms or for housing for its workers and

20 for the housing for certain subcontractors.

21  Q   Okay.  So like the other funds we've talked

22 about before, Cobra Acquisitions is part of the treasury

23 function -- or can participate in the treasury function

24 provided by Mammoth Energy Partners, correct?

25      MR. STUKENBERG:  Objection, form.

## MARK LAYTON - April 15, 2022

Page 242

1    A    I believe that mischaracterizes my testimony
2 as it relates to the treasury function.
3    Q    (By Mr. Moulton) Okay.  And I don't mean to be
4 mischaracterizing your testimony.  I'm just asking you
5 is it "yes" or "no"?
6         MR. STUKENBERG:  It's the wrong entity.
7    A    You asked about Mammoth Energy Partners, and
8 I've testified a number of times about Mammoth Energy,
9 Inc., employees providing treasury services.
10   Q    (By Mr. Moulton) Okay.  So the answer to my
11 question would be "yes" if I had said Mammoth Energy,
12 Inc.?
13   A    Mammoth Energy, Inc, yes, did supply treasury
14 services for Cobra Acquisitions.
15   Q    Okay.  And those funds could have -- would
16 have been used to pay for lodging or pretty much
17 anything that Cobra is buying out there, correct?
18   A    I don't understand the connotation of "funds."
19 To the extent Cobra Acquisitions had contracts with
20 subcontractors, Cobra Acquisitions would have paid those
21 subcontractors.
22   Q    Okay.  But they're part of the treasury sweep,
23 right?
24   A    Cobra Acquisitions participates in that
25 treasury management function.  Cobra Acquisitions would

Page 243

1 have made the disbursements to Cobra Acquisitions'
2 subcontractors out of Cobra Acquisitions' checking
3 account.
4    Q    So Cobra Acquisitions gets this contract
5 and -- indulge me for a minute -- like, how much was the
6 initial contract amount?  I want to say it was, like,
7 240 million or something.  What was it?
8    A    The initial contract that was awarded in
9 October of '17 was approximately 245-million.
10   Q    Okay.  So 245-million contract acquired, that
11 Cobra Acquisitions gets, did that money get deposited in
12 a Cobra Acquisitions account?
13   A    Any payments from PREPA, in regards to the
14 contract between Cobra Acquisitions and PREPA, would
15 have been deposited into Cobra Acquisitions' checking
16 account.
17   Q    Okay.  And then what happens to the money
18 after that?
19   A    Then Cobra Acquisitions either retains that
20 money and pays its subcontractors or participates in the
21 treasury management function for which money is pushed
22 up to Mammoth Energy Partners, LLC, and in many
23 instances was pushed back down to Cobra Acquisitions in
24 order for Cobra to pay its vendors or subcontractors.
25   Q    Okay.  Oh, do you have an opinion about what

Page 244

1 the average number of hours the workers on the island
2 were working per day during the period of approximately
3 October 2017 through July 22nd, 2018?
4    A    The employees were either working or available
5 to work for 16 hours a day.
6    Q    Okay.  Are you aware of what is meant by --
7 what's considered to be compensable time under the Fair
8 Labor Standards Act?
9         MR. STUKENBERG:  Objection, form.
10   A    If you're asking me for a legal opinion of
11 that particular section, I'm -- I'm not a lawyer.
12   Q    (By Mr. Moulton) Do you -- well -- and I'm not
13 asking for a legal opinion.  I'm just asking for your
14 general understanding.  It -- is it your position that
15 the -- that the plaintiffs were actually on average on
16 the clock 16 hours per day?
17        MR. STUKENBERG:  Objection, form.
18   A    I've testified as to what the hourly employees
19 were compensated for, for either working or being
20 available to work for 16 hours per day.
21   Q    (By Mr. Moulton) Okay.  Do you think that the
22 plaintiffs were actually working any number less than 16
23 hours per day on average?
24        MR. STUKENBERG:  Objection, form.
25   A    The hourly employees were required to either

Page 245

1 work or be available to work for 16 hours a day, and
2 that was clearly communicated to each of the hourly
3 employees.
4    Q    (By Mr. Moulton) All right.  And so what I'm
5 trying to find out is, you know, we get -- we get -- we
6 go to trial and you get up on the stand in trial and all
7 of a sudden you start -- you might try and start saying,
8 "Oh, well, no.  They were really only working 8 hours,"
9 or, "They were really only working 10 or 12," or any
10 other number.  I want to know right now.  Do you have an
11 opinion about the number -- any other number other than
12 16 hours per day?
13        MR. STUKENBERG:  Objection, form.  And I
14 think -- I think here's the clarification.
15        MR. MOULTON:  Yeah.
16        MR. STUKENBERG:  Are you asking about the
17 number of hours where they are in the field physically
18 performing service verses the number of hours that
19 they're on call?  Is that what you're trying to figure
20 out?
21        MR. MOULTON:  I want to know what his
22 opinions are because --
23        MR. STUKENBERG:  Well, because you're --
24 you're using legal terms of art.
25        MR. MOULTON:  No, I'm not.

**MARK LAYTON - April 15, 2022**

Page 246

1           MR. STUKENBERG: Well, you're like
2 compensable time. Okay. Well, are --
3           MR. MOULTON: I tried that.
4           MR. STUKENBERG:  -- you talking about
5 on-call --
6           MR. MOULTON: He doesn't --
7           MR. STUKENBERG:  -- time, or are you
8 talking about physical time in the --
9           MR. MOULTON: No.
10          MR. STUKENBERG:  -- field?
11          MR. MOULTON: I don't -- I don't want to
12 be dividing it up.
13      Q     (By Mr. Moulton) You ask -- I ask -- if I
14 asked my neighbor, "How many hours you work per week,"
15 and he tells me 10, we don't have to get into a -- or 10
16 hours per day or 60 or whatever, we don't have a legal
17 discussion about the number of hours.
18          MR. STUKENBERG: You would if it was in
19 the context of a lawsuit over hours worked, Dave.
20          MR. MOULTON: I hear you. What -- I just
21 want to know if -- okay. We can talk -- I want to know
22 if he has an opinion, first of all. Then we'll talk
23 about the different parts of it, but what I want to know
24 is: Does he have an opinion about the number of hours
25 he thinks these guys were working per day?

Page 247

1           MR. STUKENBERG: Okay. Well, I'm going
2 to object to all these questions being vague because
3 they simply don't distinguish between what is
4 compensable time and what is your actual on-call time --
5           MR. MOULTON: I will -- I can ask those,
6 too.
7      Q     (By Mr. Moulton) But before I get to that, I
8 want to know before I get to that: Do you have an
9 opinion about the number of hours you believe the
10 plaintiffs were working per day or per week, whatever
11 you want, in Puerto Rico between October 2017 to
12 July 22nd, 2018? "Yes" or "no"?
13     **A     The hourly employees were compensated for**
14 **hours for which they either worked or were available to**
15 **work, in this case, during the time period referenced,**
16 **being 16 hours per day.**
17     Q     Okay. I'm not asking you about what you
18 compensated them for because that involves a conclusion
19 about what you think you were paying them for. That's
20 not what I'm asking. I'm asking about work.
21          Do you have an opinion about the number
22 of hours they worked?
23          MR. STUKENBERG: Same objection.
24     Q     (By Mr. Moulton) "Yes" or "no"? That's a
25 "yes" or "no."

Page 248

1      **A     I reincorporate my same answer.**
2      Q     Okay. So you don't have an opinion?
3      **A     That's not what I've testified to.**
4      Q     Okay. Well, you don't get to not answer the
5 questions unless they tell you not to, and there's very
6 limited reasons for that.
7           Do you have an opinion about the number
8 of hours they actually worked, or no? "Yes" or "no"?
9           MR. STUKENBERG: Same objection.
10     **A     The employees were paid for the hours that**
11 **they either worked or were available to work.**
12     Q     (By Mr. Moulton) Okay. So you say that the
13 number of hours that they worked or were available to
14 work is 16?
15     **A     Yes, sir.**
16     Q     When you combine it?
17     **A     Yes, sir.**
18     Q     Okay. Do you have an opinion about the split
19 between what they worked and were available to work on
20 top of that?
21     **A     The split between the worked and available to**
22 **work?**
23     Q     Yes, sir.
24     **A     I would say in general, the available to work**
25 **piece of that equation was less than the worked piece.**

Page 249

1      Q     Okay. So on average, how many -- how many
2 hours per day were the plaintiffs in this case, during
3 this time period from October, '17, to July, '18, how
4 many hours were they working?
5           MR. STUKENBERG: Objection, form. You
6 mean working in the field?
7           MR. MOULTON: We just talked about -- he
8 has a -- he -- he did the split. I'm using his words.
9      Q     (By Mr. Moulton) You're saying that there's
10 some number that's less -- you're saying that -- that
11 they're available to work and working total 16, that the
12 number of hours that they are just available to work
13 versus working is less. So we're talking between 8 and
14 16 at this point. What is the split on average?
15          MR. STUKENBERG: Same objection.
16     **A     I gave you the answer on the split.**
17     Q     (By Mr. Moulton) On average, what is it?
18     **A     The amount of time that the employees worked**
19 **in the field versus what they were available to work**
20 **depended on a number of variables including where they**
21 **were working on the island, what the project was, what**
22 **the security situation in the area where they were**
23 **working was, how close they were to the completion of**
24 **the specific project.**
25          **So there are a number of variables that**

## MARK LAYTON - April 15, 2022

Page 250

1 influenced that amount of, quote, unquote, worked versus
2 available to work.
3     Q    Okay.  And I'm asking for the part that's
4 worked in the field; and even though it varied among
5 different people, different times, like you've talked
6 about, do you have an opinion on what the average number
7 would be?
8     A    On average --
9     Q    Yes.
10     A    -- we tried to keep the hours worked in the
11 field at or around 12 to 14 hours, which would squeeze
12 that available work time somewhere in the ZIP code of
13 two to four hours.
14     Q    Okay.
15     A    Just timewise, a reminder that I've got a
16 flight.
17     Q    No, I know.  I got you.  I'm -- I'm trying to
18 get you out of here.  Just that that -- you know, it
19 shouldn't have taken an hour to get that response, but,
20 you know.
21          Now, with that estimate you just came up
22 with on this average of about, I believe you said, 12
23 of -- of -- hours -- you said 12 to 14 hours worked in
24 the field and basically two to four, somewhere in there,
25 of hours just available to work, but the total is 16.

Page 251

1          How did you come up with that estimate?
2     A    That estimate is based on dialogue with
3 operational personnel and my understanding of the work
4 performed in Puerto Rico.
5     Q    Who did you talk to?
6     A    Throughout the -- this engagement?  I talked
7 to any number of individuals and visited Puerto Rico, I
8 believe, a couple of occasions during that particular
9 time frame.
10     Q    Fly around the Cobra helicopter?
11     A    No.
12     Q    You're not the guy that did that?  Who was the
13 guy flying around in the Cobra helicopter?
14     A    We employed a number of pilots that flew
15 helicopters for --
16     Q    No.  I mean there was, like, a higher-up that
17 would come down and fly around in the -- in the Cobra
18 helicopter.  Do you know who that was?
19     A    I don't know what you're talking about or what
20 the connotation of higher -- higher-up --
21     Q    Okay.  Never mind.
22          So back to the -- your estimate about
23 hours.  I want to know names of folks that you would
24 have used to inform or talked about to inform your
25 average, your estimate.

Page 252

1     A    I would have had a -- any number of
2 conversations with, you know, Mr. Ellison, Mr. Kinsey,
3 Mr. Beagle, probably would have spoken at various times
4 to Mr. Russell as well as various other operational and
5 HR personnel.
6     Q    In those discussions, did you find that
7 these -- that these discussions tended to be in
8 agreement with your estimate or were some -- do you
9 recall if anyone had a -- an estimate that was
10 significantly different from your own?
11     A    I don't recall a significantly different
12 estimate in regards to hours worked during the time
13 frame in question.
14     Q    Did -- did you guys ever look at, like, what
15 hours of daylight were available on the island to help
16 inform your -- your estimate of the hours worked?
17     A    In some cases daylight hours influenced the
18 number of hours that the teams would work, yes --
19     Q    Obviously, that's why I'm --
20     A    -- depending upon --
21     Q    That's not --
22     A    -- whether or not a crew was close to
23 finishing a project or where they were working -- and
24 you can roll your eyes and keep interrupting me.  You're
25 just --

Page 253

1     Q    This isn't the --
2     A    -- belaboring --
3     Q    -- question --
4     A    -- the process.
5     Q    -- I asked.
6          MR. STUKENBERG:  It is.
7     A    It is, and I answered it.
8          MR. STUKENBERG:  He's answering your
9 question.  Let him --
10          MR. MOULTON:  No, he's not.
11          MR. STUKENBERG:  -- finish.
12          MR. MOULTON:  That's not what I'm asking.
13          MR. STUKENBERG:  You asked did daylight
14 hours inform the number of hours they worked and he's --
15          MR. MOULTON:  No --
16          MR. STUKENBERG:  -- explaining how it
17 did.
18          MR. MOULTON:  -- I didn't.  I didn't ask
19 that question.  That's the question you think I asked.
20          MR. STUKENBERG:  Can you read the
21 question back?
22          THE REPORTER:  QUESTION:  "Did you guys
23 ever look at what hours of daylight were available on
24 the island to help inform your estimate of the hours
25 worked?"

**MARK LAYTON - April 15, 2022**

Page 254

1          MR. MOULTON:  To form your estimate,
2 not -- okay.  That's not what he's talking about.  He's
3 talking about how daylight's actually affect the hours,
4 not -- and I get that --
5          MR. STUKENBERG:  To inform your estimate,
6 right?
7          MR. MOULTON:  No --
8      **A**    **It's how it affects the estimate and the**
9 **hours.  I mean --**
10     Q    (By Mr. Moulton) No, they're two different
11 things.  Obviously -- no, no.  You guys maintain that,
12 like, folks -- okay.  Let me -- so --
13         MR. STUKENBERG:  We got 21 minutes left,
14 Dave.
15     Q    (By Mr. Moulton) We -- we --
16         MR. STUKENBERG:  I'd encourage you to use
17 it effectively.
18     Q    (By Mr. Moulton) We understand that at least
19 for -- for some portion of this, folks were generally
20 working during daylight hours and I get that and -- and
21 I think that's something that you would agree to, right?
22     **A**    **We targeted to try to work during daylight**
23 **hours realizing that the specificity of the project and**
24 **the necessity of the project, whether -- we may be**
25 **restoring power to a hospital or to a pharmaceutical**

Page 255

1 **company that may necessitate the crews to work longer**
2 **than 12 hours.**
3          **So daylight is certainly a data point**
4 **that I considered in my estimate, but I also have a**
5 **pretty good knowledge of exactly what was going on on**
6 **that island and gave you an educated estimate and the**
7 **reasons why that estimate was correct.**
8      Q    Right.  And so -- and that's what I wanted --
9 what I was getting at before is, like, you know, is --
10 what I was wondering is if you had ever sat down with,
11 like, maybe a chart of, like, sunrise/sunset for Puerto
12 Rico to help you make a -- to help you arrive at a
13 better estimate.
14          Did you ever do that?
15     **A**    **Again, I considered daylight in my estimate.**
16 **It's one data point of many.**
17     Q    Okay.  Helicopters.  Who paid for the
18 helicopters?
19     **A**    **At different points in time, Cobra Aviation**
20 **owned helicopters that performed services on the island**
21 **as it relates to Cobra Acquisitions as a subcontractor.**
22 **There were various other entities that owned helicopters**
23 **that provided services on the island as a subcontractor**
24 **to Cobra Acquisitions.**
25     Q    Were any of the helicopters owned by Higher

Page 256

1 Power?
2      **A**    **No.**
3      Q    Apart from what we've already talked about
4 today, is there -- is there anything that you know of
5 already that you wanted to correct or clarify for the
6 record that you -- that you're aware of now?
7          MR. STUKENBERG:  Can you repeat that
8 question?
9          MR. MOULTON:  Yeah.
10     Q    (By Mr. Moulton) Like, is there anything that
11 you wanted to clarify or correct now before I pass you
12 off to your lawyers?
13         MR. STUKENBERG:  Objection, form.
14     **A**    **You're asking whether I'd like to correct any**
15 **previous answers today?**
16     Q    (By Mr. Moulton) Yeah.
17     **A**    **Not that I'm aware of.**
18     Q    Okay.  Or anything to add?
19     **A**    **Not at this time.**
20     Q    Okay.
21         MR. MOULTON:  Pass the witness.
22              EXAMINATION
23 BY MR. STUKENBERG:
24     Q    Mr. Layton, what was Mr. Beagle's role, if
25 any, in -- in approving payroll, including discretionary

Page 257

1 bonuses as it relates to the Puerto Rico employees?
2      **A**    **Mr. Beagle, in his capacity, certainly would**
3 **have had the ability to offer final approval over a**
4 **payroll, which would include any discretionary bonuses.**
5      Q    So he could approve or disapprove
6 discretionary bonuses?
7      **A**    **Yes, sir.**
8      Q    That was within his scope of authority?
9      **A**    **Yes, sir.**
10     Q    Same for you?
11     **A**    **Yes, sir.**
12     Q    So if you wanted to, you could have eliminated
13 anybody's bonus you wanted to?
14     **A**    **That's correct.**
15     Q    And you could have paid anybody a bonus in any
16 amount that you wanted to?
17         MR. MOULTON:  Objection, leading.
18     **A**    **That's correct.**
19     Q    (By Mr. Stukenberg) Earlier we were talking
20 about a case against Redback called Drake.  Is Redback a
21 party to this case?
22     **A**    **No, sir.**
23     Q    Did -- does Redback have any relationship to
24 this case?
25     **A**    **No, sir.**

## MARK LAYTON - April 15, 2022

Page 258

```
1     Q     And you mentioned you thought Drake may have
2 been a case involving an alleged day rate pay practice.
3 Have you had a chance to revisit the -- the issues in
4 Drake?
5     A     Yes, sir.  I -- I looked at some of that court
6 documentation in one of the breaks.
7     Q     And what kind of case was Drake?
8     A     Drake was a misclassification case.
9     Q     Okay.  Have you ever -- are you aware of a
10 daily overtime compensation system?
11    A     Daily overtime such as some -- some states may
12 require a application of an overtime rate for any hours
13 in excess of a threshold.  So, yes, to that extent, I'm
14 aware of it.
15          MR. STUKENBERG:  I pass the witness.
16               FURTHER EXAMINATION
17 BY MR. MOULTON:
18    Q     Are you saying that there was any workers here
19 that were subject to any state laws that had a -- an
20 overtime requirement for -- a day overtime requirement?
21    A     Not that I've seen based on -- on my review of
22 the detail.
23    Q     Okay.  What kind of misclassification case was
24 Drake?
25          MR. STUKENBERG:  Misclassification.
```

Page 259

```
1     Q     (By Mr. Moulton) You said it was a
2 misclassification type of case, but, like, there's --
3 that's extremely broad.  Like, what kind was it?  Do you
4 know?
5     A     It was a misclassification --
6     Q     On --
7     A     -- case.
8     Q     On, like, an exemption or
9 employee/nonemployee?
10    A     It was a misclassification case.
11    Q     So you -- you're just going to keep repeating
12 that?  You don't know what kind of misclassification?
13    A     It was a misclassification of an employee.
14    Q     Okay.  In what way?
15    A     A misclassification.
16          MR. STUKENBERG:  You can pull up the
17 docket on pacer.
18    Q     (By Mr. Moulton) All right.  Do you know the
19 answer or no?
20    A     I just answered twice.
21    Q     No.  What kind of misclassification?
22          MR. STUKENBERG:  It's an exempt/nonexempt
23 case.
24          MR. MOULTON:  Okay.  All right.
25          MR. STUKENBERG:  It's got nothing to do
```

Page 260

```
1 with this case.
2     Q     (By Mr. Moulton) Is that true, Mr. Layton?
3 What your counsel said, is that true?
4     A     Pull up the docket and look at it.
5     Q     Is -- is what he said true?
6     A     It's a misclassification case.
7     Q     Okay.  So you don't know what kind it was?
8     A     It's an exempt/nonexempt misclassification
9 case.  Go pull it up.
10    Q     Okay.  Thanks for answering the question.
11    A     Thank you.
12    Q     Yeah.  You're welcome.
13          MR. MOULTON:  We'll pass.
14          MR. STUKENBERG:  Nothing on my end.
15          MR. MOULTON:  Okay.
16          THE VIDEOGRAPHER:  We're off the record
17 at 3:47.
18          (Proceedings concluded at 3:47 p.m.)
19
20
21
22
23
24
25
```

Page 261

```
1               CHANGES AND SIGNATURE
2 WITNESS NAME: MARK LAYTON
3 DATE OF DEPOSITION:  APRIL 15TH, 2022
4 PAGE LINE  CHANGE                   REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____
```

**MARK LAYTON - April 15, 2022**

Page 262

1    I, MARK LAYTON, have read the foregoing deposition
2  and hereby affix my signature that same is true and
3  correct, except as noted above.
4
5            _____
            MARK LAYTON
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10    Before me, _____, on this
11  day personally appeared MARK LAYTON, known to me or
12  proved to me on the oath of _____ or through
13  _____ (description of identity card
14  or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged
16  to me that he/she executed the same for the purpose and
17  consideration therein expressed.
18    Given under my hand and seal of office on this
19  _____ day of _____, _____.
20
21            _____
            NOTARY PUBLIC IN AND FOR
22            THE STATE OF _____
23  My Commission Expires: _____
24
25

Page 263

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF TEXAS
2              SAN ANTONIO DIVISION
3  FRANCISCO CANTU, et al.     )
                               )
4                              )
  vs.                         ) CASE NO. 5:19-cv-00615
5                              )
  MAMMOTH ENERGY SERVICES,     )
6  INC., et al.               )
7
8
9        REPORTER'S CERTIFICATION
      ORAL AND VIDEOTAPED DEPOSITION OF
10            MARK LAYTON
            APRIL 15TH, 2022
11
12
13    I, Robin Rios, Certified Shorthand Reporter in and
14  for the State of Texas, hereby certify to the following:
15    That the witness, Mark Layton, was duly sworn by
16  the officer and that the transcript of the oral and
17  videotaped deposition is a true record of the testimony
18  given by the witness;
19    That the deposition transcript was duly submitted
20  on May 2, 20222 to the witness or to the attorney
21  for the witness for examination, signature, and return
22  to me by June 2, 2022.
23    That pursuant to information given to the
24  deposition officer at the time said testimony was taken,
25  the following includes all parties of record and the

Page 264

1  amount of time used by each party at the time of the
2  deposition:
3    Mr. David Moulton - 05:34
          Attorney for Plaintiffs
4
    Mr. William Stukenberg - 00:02
5          Attorney for Defendants
6  Mr. Harris Stamey - 00:00
          Attorney for Defendants
7
8    I further certify that I am neither counsel for,
9  related to, nor employed by any of the parties in the
10  action in which this proceeding was taken, and further
11  that I am not financially or otherwise interested in the
12  outcome of this action.
13    Certified to by me on this 2nd day of May, 2022.
14
15
16            _____
            Robin Rios, Texas CSR #8910
17            Expiration:  2/28/2023
            Good to Go Process Service
18            Firm Registration No. 62
            1225 North Loop West, Suite 327
19            Houston, Texas 77008
            Phone No.: 713-351-7061
20
21
22
23
24
25