**DONALD KEITH ELLISON  -  May 04, 2022**

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DIVISION OF TEXAS


FRANCISCO CANTU, et al.,

                    Plaintiffs,

versus                          Civil Action No. 5:19-CV-00615


MAMMOTH ENERGY SERVICES, INC., et al.

                    Defendants.
..............................


            Transcript of the videotape deposition of

Donald Keith Ellison, taken before me on May 4, 2022, at

about 9:25 a.m. Mountain Time.


APPEARANCES:

DAVID I. MOULTON, ESQ.
Bruckner Burch, PLLC
8 E. Greenway Plaza
Suite 1500
Houston, Texas   77046

        On behalf of the Plaintiffs

BILL LEONE, ESQ.
HARRIS STAMEY, ESQ.
Norton Rose Fulbright
1225 17th Street, Suite 3050
Denver, Colorado  80202

        On behalf of the witness and Defendants.


VIDEOGRAPHER:  Walt Mathorn


APPEARANCES continued on next page.
```

**DONALD KEITH ELLISON  -  May 04, 2022**

Page 2

1  APPEARANCES, continued

2

3

   JAKLYN GARRETT, ESQ.

4

        On behalf of the witness.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1  EXHIBITS, continued

2

3

              E X H I B I T S

4

5

6  Plaintiffs'

   No.      Identification        Marked   Admitted

7

8  139      Higher Power pay scale    66

9  224      E-mail of October 8       68

10 225      Copy of contract with     69
            Cobra and PREPA

11

   226      Fourth Amendment to       73

12          contract

13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X

2

3  WITNESSES                        PAGE

4

   DONALD KEITH ELLISON

5

6  Examination by Mr. Moulton          5
   Examination by Mr. Leone           76

7

8

              E X H I B I T S

9

10 Plaintiffs'

   No.      Identification      Marked  Admitted

11

   222      Keith Ellison's         22
12          LinkedIn profile

13 136      Cobra Executive Team    28
            Organizational chart

14

   131      E-mail chain            30

15

   52       Example of offer letter 38

16

   143      E-mail from Jeff Beagle 41

17

   187      PR storm rate           42

18

   151      PR storm per-day rates  47

19

   140      E-mail chain            57

20

   209      November 20 e-mail chain 61

21

   223      E-mail from Ken Kinsey  62
22          dated Monday, November 27
            Bates No. 3305

23

   137      Pay scale for Puerto Rico 65

24

   165      E-mail from J.D. Kinzie  66
25          with attachment called SLSX

Page 5

1          Wednesday, May 4, 2022

2          About 9:25 a.m. MTD

3            - - -

4          THE VIDEOGRAPHER:  Good morning.  We are on the

5  record.  The time now is 9:18.  Today is May 4th, 2022.

6  We are located at 1225 17th Street, Denver, Colorado.

7  We're here for the videotape deposition of Keith Ellison

8  in the matter of Francisco Cantu, et al v Mammoth Energy

9  Services, Inc., et al, filed in the United States

10 District Court for the Western District of Texas, civil

11 action number 5:19-CV-00615.

12         The videographer is Walt Mathorn.  The court

13 reporter is Jackie Sullivan.

14         Will counsel please state their appearance,

15 beginning with the plaintiff's counsel?

16         MR. MOULTON:  Good morning.  This is David

17 Moulton, counsel for the plaintiffs.

18         MR. STAMPEY:  Good morning.  This is Harris

19 Stampey.  We're counsel for the defendants and for Mr.

20 Ellison.

21         MR. LEONE:  Bill Leone, Norton, Rose,

22 Fulbright, counsel for the defendant -- excuse me -- for

23 the witness.

24         MS. GARRETT:  Jaklyn Garrett, also counsel for

25 the witness.

## DONALD KEITH ELLISON  -  May 04, 2022

Page 6

1    MR. MOULTON:  Her name is Jacqueline too.
2    (Counsel could not hear the court reporter.)
3    MR. STAMPEY:  Do you want to just go off the
4 record to give time for Jackie to figure it out?
5    (There was a pause in the proceedings.)
6    THE VIDEOGRAPHER:  The time now is 9:25.  We're
7 back on the record.
8        DONALD KEITH ELLISON,
9 was called as a witness herein, and after having been
10 first duly sworn to tell the truth, the whole truth, and
11 nothing but the truth, was examined and testified as
12 follows:
13        DIRECT EXAMINATION
14 BY MR. MOULTON:
15    Q.   Good morning, Mr. Ellison.  My name is Dave
16 Moulton.  I represent some folks that are suing Mammoth
17 and Cobra and Higher Power for unpaid overtime for work
18 they did in Puerto Rico.  I'm sure you're familiar with
19 that.  There's about 150 guys that we represent.
20        For the record, would you please say your full
21 name?
22    A.   Donald Keith Ellison.
23    Q.   Have you ever gone by any other names?
24    A.   No, sir.
25    Q.   Are you more commonly referred to as Keith

Page 7

1 Ellison?
2    A.   That is correct.
3    Q.   You don't go by "Don"?
4    A.   No.
5    Q.   So Donald Keith Ellison, and you usually go by
6 Keith Ellison, correct?
7    A.   That is correct.
8    Q.   What is your date of birth, sir?
9    A.   12/20/75.
10    Q.   And what is your current residential address?
11    A.   295 Ferrell Tatum Road, LaGrange, Georgia
12 30240.
13    Q.   And I didn't -- did you get the ZIP code in
14 there?  I didn't quite hear you.
15    A.   30240.
16    Q.   Okay.  How long have you lived there, sir?
17    A.   Almost three years now.
18    Q.   And you're married, correct?
19    A.   That is correct.
20    Q.   What is your wife's name?
21    A.   Jaklyn Garrett.
22    Q.   How do you spell "Jaklyn"?
23    A.   J-a-k-l-y-n.
24    Q.   How long y'all been married?
25    A.   Three years.

Page 8

1    Q.   She's a lawyer, correct?
2    A.   That is correct.
3    Q.   What firm does she work at?
4    A.   She works for herself.
5    Q.   Okay.  Does she work there out of the house?
6    A.   That is correct.
7    Q.   Okay.  And what is your -- what is your cell
8 phone number?
9        MR. LEONE:  We're not going to give you the
10 cell phone number.  That's personal.  There's no reason
11 for you to have it.  If you need to contact him, call me.
12        MR. MOULTON:  Yeah, I think we do need his cell
13 phone number.  As you know, Mr. Leone, we don't know
14 where Mr. Ellis is going to be by the time trial rolls
15 around.  We might have trouble finding him.
16        MR. LEONE:  We're not going to give you his
17 cell phone number.
18        MR. MOULTON:  We also need it because in
19 documents when there's cell phone numbers we know whose
20 it is, so...
21        MR. LEONE:  You give me a document, you have a
22 phone record or something, if you need identification of
23 it let me know.
24        MR. MOULTON:  Sir, there is not a reason to not
25 give me -- for you to have your client not answer this

Page 9

1 question.
2        MR. LEONE:  I'll take it under advisement.  For
3 now he's not going to answer the question.
4 BY MR. MOULTON:
5    Q.   Are you going to take the advice of your
6 counsel, Mr. Ellison, in not presenting the cell phone
7 number?
8    A.   I am.
9        MR. MOULTON:  We're going to certify this
10 question for the Court.
11 BY MR. MOULTON:
12    Q.   Besides your cell phone, what other phones do
13 you use?
14    A.   That's it.
15    Q.   You don't have a home phone?
16    A.   No, sir.
17    Q.   How many cell phones do you have?
18    A.   I think one.
19    Q.   What's the carrier?
20    A.   Verizon.
21    Q.   How long have you been with Verizon?
22    A.   I don't remember.  Ten years.
23    Q.   What's your Social Security number?
24    A.   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.
25    Q.   Have you been convicted of any crime, sir?

## DONALD KEITH ELLISON - May 04, 2022

Page 10

1   A.   No, sir.

2   Q.   Do you have any criminal charges pending

3 against you?

4   A.   Yes, sir.

5   Q.   I'm aware of one in Puerto Rico for alleged

6 fraud and obtaining a contract with PREPA.

7         MR. LEONE:  That is not what the case is about.

8 He doesn't have any criminal case pending in Puerto Rico.

9         MR. MOULTON:  I don't mean to get --

10 BY MR. MOULTON:

11   Q.   How would you characterize that criminal

12 matter, sir?

13   A.   It's a pending case regarding multiple accounts

14 that are incorrect.

15   Q.   Okay.  And I understand that you believe

16 they're incorrect, but what's the gist of the accounts,

17 what are you being accused of?

18   A.   Bribery, conspiracy, FASFA fraud, false

19 statement.

20   Q.   Besides that criminal matter, are there any

21 other criminal matters pending against you that you know

22 about?

23   A.   No, sir.

24   Q.   Have you testified under oath before?

25   A.   Yes, sir.

Page 11

1   Q.   In what cases have you testified under oath

2 before?

3   A.   Several.  They're civil cases regarding

4 previous employers; vehicle accidents.  I don't remember

5 the numbers of them.

6   Q.   Okay.  Have you testified in regards to any

7 cases where the allegation was regarding the payment of

8 overtime pay or hours worked, wage-and-hour issues?

9   A.   No, sir.

10   Q.   Was any prior companies that you've been

11 affiliated with besides Mammoth and Cobra -- besides

12 what's related to this lawsuit, have you ever -- have you

13 ever been part of any sort of Department of Labor

14 investigation about wage-and-hour issues or any lawsuits

15 about wage-and-hour issues?

16   A.   Not to my knowledge.

17   Q.   What did you do to prepare for this deposition?

18   A.   I met with my counsel, I met with the counsel

19 of Mammoth, looked over a few exhibits.  That was it.

20   Q.   When did y'all prepare or meet?

21   A.   Last Friday and yesterday.

22   Q.   And for how long did you meet?

23   A.   Hour-and-a-half on last Friday and thirty

24 minutes yesterday.

25   Q.   Okay.  So the lawyer from Mammoth that you

Page 12

1 would have met with was Mr. Stampey?

2   A.   Yes.

3   Q.   Any other lawyers from Mammoth that you met

4 with?

5   A.   I believe there was a gentleman on the phone

6 call.  I don't recall his name.

7   Q.   Do you remember his name?

8         MR. LEONE:  Will Stuckenberg.

9         MR. MOULTON:  I'm sorry?

10         MR. LEONI:  Will Stuckenberg.

11 BY MR. MOULTON:

12   Q.   When was the last time you've spoken with any

13 of the folks besides the lawyers at Mammoth or its

14 affiliate?

15   A.   Currently it's been several weeks since I've

16 spoken with any of the current employees.

17   Q.   Who did you speak with?

18   A.   I've spoken with Scott Whitsell, Bill

19 Lancaster.

20   Q.   Anyone else?

21   A.   No, sir.

22   Q.   And what did you and Scott Whitsell talk about?

23   A.   Basketball.

24   Q.   Okay.

25   A.   Potential acquisitions, operational things for

Page 13

1 the company, friendship.

2   Q.   Are you still employed by any entity affiliated

3 with Mammoth or Cobra?

4   A.   No, sir, I am not.

5   Q.   Okay.  Have you talked to Mr. Layton -- or tell

6 me when's the last time you've spoken with Mr. Layton,

7 Mark Layton?

8   A.   Three years ago.

9   Q.   What about Mr. Whitsell, when's the last time

10 you spoke with him?

11   A.   Prior to leaving the company, so it's probably

12 six months to a year before I went on leave.

13   Q.   Did you speak about any of those hours you

14 related to this case with Mr. Whitsell?

15   A.   No.

16   Q.   What about Mr. Kalman, have you spoken with

17 him?

18   A.   Who?

19   Q.   Mr. Alexander Kalman.

20   A.   No, sir, I have not.

21   Q.   What about J.D. Kinzie, have you spoken with

22 him?

23   A.   No, sir, I have not.

24   Q.   Missy Davis?

25   A.   No, sir.

## DONALD KEITH ELLISON - May 04, 2022

Page 14

1    Q.    Okay.  So besides Mr. Whitsell and I think you
2 said Jill Lancaster, anyone else you've spoken with --
3 oh, you also said Mr. Whitsell.  Besides those three, are
4 there any other folks that are still at Mammoth or Cobra
5 that you've spoken to within the last year?
6    A.    Chad Minickey (ph).
7    Q.    Chad Minickey?
8    A.    Yes.
9    Q.    Okay.  Anyone else?
10    A.    That would be it.
11    Q.    Ms. Lancaster, Ms. Jill Lancaster, what is her
12 position?
13    A.    Not Jill Lancaster.  It is Phil.
14    Q.    I'm sorry.  Phil Lancaster, what does Phil
15 Lancaster do?
16    A.    Phil is a corporate development employee for
17 Mammoth.
18    Q.    All right.  And what does Chad do?
19    A.    Chad is a chief pilot and a member of Bremma
20 Aviation, which Mammoth owns a very small percentage of.
21    Q.    Can you recall any wage-and-hour issues with
22 Phil or Chad?
23    A.    No, sir, I have not.
24    Q.    Do you have any family members or friends other
25 than the ones you mentioned that still work for Mammoth

Page 15

1 or Cobra?
2    A.    Not to my knowledge.
3    Q.    How did your employment end with Cobra?
4    A.    Termination.
5    Q.    Who terminated you?
6    A.    Art Straehla.
7    Q.    You're talking about the Art Straehla -- you're
8 talking about he's the CEO of Mammoth, correct?
9            MR. LEONE:  Objection; form.
10 BY MR. MOULTON:
11    Q.    Was he also the CEO of Cobra Acquisitions?
12    A.    I'm uncertain of how they had the LLCs drawn
13 up.  Of course he was above me.
14    Q.    Well, was he an employee of Cobra Energy?
15    A.    I don't know how they had it structured.
16    Q.    Okay.  You were the president of Cobra Energy,
17 correct?
18    A.    That is correct, sir.
19    Q.    Okay.  Did you have any position or title with
20 Cobra Acquisitions?
21    A.    Yes, sir.  I was president of all of the Cobra
22 Energies.
23    Q.    And which entities were they?
24    A.    Cobra Energy, Cobra Acquisitions, Cobra
25 Logistics, Cobra Aviation, High Power; between the loads,

Page 16

1 Cobra Acquisition.
2    Q.    Okay.  You were president of all those
3 companies?
4    A.    Yes, sir.
5    Q.    Did you ever have any position with an entity
6 that had "Mammoth" in its name?
7    A.    In January of '17 when I was first hired prior
8 to getting all of the Cobra Acquisition or Cobra Energy
9 documents associated, I held positions inside of Mammoth,
10 one of the Mammoth entities, for about a month until we
11 got the paperwork done.
12    Q.    Does that explain why your e-mail was a Mammoth
13 Energy e-mail?
14    A.    Yes, sir.
15    Q.    During the time period that's relevant to this
16 case, which is basically October 2017 when the work on
17 the island started till it stopped, in what areas or what
18 locations were you working?
19            MR. LEONE:  Objection; form.
20            THE WITNESS:  I was in Puerto Rico.  We had a
21 tremendous amount of work in North America as well
22 continuing to form and continuing to grow.  The first few
23 months of the Puerto Rican contract I was primarily there
24 in Puerto Rico and moving it forward, making sure, you
25 know, the team that was there had what they needed to

Page 17

1 perform their task.  I would say March of '18 I began
2 focusing 50/50 of my time between Puerto Rico and North
3 America.  By June of '18 I was just in North America.
4    Q.    When you say you were focused, do you mean
5 mental focus or do you also mean location where you were
6 working?
7    A.    Mental and location.
8    Q.    Okay.  So when you were working in Puerto Rico
9 were you basically in San Juan?
10    A.    That is correct.
11    Q.    When you started transitioning in March of 2018
12 to 50/50 Puerto Rico and North America, what location in
13 North America were you working in?
14    A.    Oklahoma City.  Constantly traveling meeting
15 with various clients, usually partners in New York,
16 Kentucky, Texas, meet with the actual line operations
17 unit for Power.
18    Q.    Were Cobra offices in the same building as
19 Mammoth?
20    A.    Yes, sir.
21    Q.    I'm sorry?
22    A.    Some were.
23    Q.    So in Oklahoma City, is that where the shared
24 offices were?
25    A.    There were some, yes.  Oklahoma City Mammoth

## DONALD KEITH ELLISON  -  May 04, 2022

Page 18

1 building.

2     Q.    What offices did Cobra have in that building?

3     A.    **For myself there was -- I had an office, Mr.**
4 **Kinsey had an office, Steve Wolfe had an office, the**
5 **accounting group; Melissa.  There were a number of people**
6 **that had offices there.**

7     Q.    Did Mammoth own the building?

8     A.    **I don't know that they owned it or...**

9     Q.    But basically they were taking up the entire
10 floor of this building or the whole building?

11     A.    **I believe there were other companies that**
12 **operated in the same building.**

13     Q.    So was Cobra -- were Cobra and Mammoth sharing
14 the same office suite?

15     A.    **We shared the same floors, yes, sir.**

16     Q.    Okay.  Did you have like separate entries with
17 your separate company -- separate company names for each
18 office, or was it one office suite where everybody was
19 together?

20     A.    **I don't -- I mean, as far as the keycards went,**
21 **I have no idea how they had that established.  There was**
22 **one elevator and four different sets of stairs to get up**
23 **and down.**

24     Q.    So where was Mark Layton's office in relation
25 to yours?

Page 19

1     A.    **Across the building.**

2     Q.    Across the building?

3     A.    **Yes, sir.**

4     Q.    Okay.  Same floor?

5     A.    **Yes, sir.**

6     Q.    So you could get to his office without passing
7 through a common area, like a normal common area of the
8 building?

9     A.    **I mean, I walked passed the common area to get**
10 **to it, yes.**

11     Q.    But did you have to?

12     A.    **I did have to.**

13     Q.    Okay.  And where was Mr. Beagle's office in
14 relation to yours?

15     A.    **On the same floor, opposite side of the**
16 **building as well.**

17     Q.    Okay.  And did that require -- you know, could
18 you get through that through Cobra's office or did you
19 have to go like outside of Cobra's office and then into
20 Mammoth's office?

21     A.    **You had to go outside my office to get to their**
22 **office, yes, sir.**

23     Q.    And I mean the suite.  Like so did you have to
24 leave the Cobra suite to go into the Mammoth suite or was
25 it a shared suite?

Page 20

1     A.    **Each person there had their own offices.  I**
2 **don't understand -- I don't understand the question.**

3     Q.    Okay.  So you understand like on a floor of a
4 building like there could be two dentist offices.  There
5 could be, you know, Dentist Moulton and Dentist Ellison
6 and it would be two totally different companies on the
7 same floor and there's not going to be a door between
8 them to go like go back and forth, they're not going to
9 have a shared space.  That's what I'm asking about.
10 Between Mammoth and Cobra was it a shared suite?  In
11 other words, could you move between the suites without
12 having to go out to like a lobby area and then come get
13 through their main door?

14     A.    **Yes.**

15     Q.    So it was a shared suite?

16     A.    **Yes, sir.**

17     Q.    So Mammoth and Cobra in Oklahoma City have a
18 shared suite that you shared with Mark Layton and Jeff
19 Beagle?

20     A.    **That is correct.**

21     Q.    Who did you report strictly to?

22     A.    **Art Straehla.**

23     Q.    And who reported to you?

24     A.    **Everyone in the Cobra organization.**

25     Q.    And who specifically were your direct reports?

Page 21

1 I don't mean like the whole company.  I mean like who
2 were the guys directly underneath you?

3     A.    **Ken Kennedy, Mark Guise, Scott Whitsell, Robert**
4 **Malcolm.  That was who I dealt with directly.**

5     Q.    Okay.  So Robert Malcolm was a Higher Power
6 guy, right?

7     A.    **That is correct.**

8     Q.    Okay.  And what was his position in Higher
9 Power?

10     A.    **He was -- he was the previous owner of Higher**
11 **Power and we acquired the company from him and he stayed**
12 **on to serve as executive vice president or operations**
13 **director for Higher Power.**

14     Q.    And Scott Whitsell, he was a 5 Star person,
15 correct?

16     A.    **That is correct.**

17     Q.    And what was his role with 5 Star?

18     A.    **Similar situation:  He and another gentleman**
19 **had formed 5 Star prior to our acquisition of the office.**
20 **He stayed on to manage the operations.**

21     Q.    Now, I understand that Cobra Energy was formed
22 I think it was January 28th of 2017.  Does that sound
23 right to you?

24     A.    **I don't remember that date.**

25     Q.    Do you think it was in January of 2017?

## DONALD KEITH ELLISON  -  May 04, 2022

Page 22

1    A.    I believe so.

2    Q.    And Cobra Acquisitions, it wasn't formed until

3 October of 2017; is that right?

4    A.    I don't believe that's correct.

5    Q.    Okay.  Do you know when Acquisition was formed?

6    A.    No, sir, I do not.

7    Q.    So while you were employed by Mammoth getting

8 Cobra set up, which entity in Mammoth paid you?

9    A.    I don't remember.

10    Q.    Okay.  You don't know if it was Mammoth Energy

11 Services or Mammoth Energy Partners, for instance?

12    A.    I do not.

13    Q.    I'm going to share my screen with you and show

14 you an exhibit.

15    A.    Can you blow that up?  I can barely see it.

16    Q.    Yeah.  Actually I have it paused for now, I

17 think.  Because I wasn't sure if I'm sharing the right

18 thing.  Let me try this again.

19          Can you see Plaintiff's Exhibit 222 on your

20 screen?

21    A.    Yes.

22    Q.    This is your LinkedIn profile, correct?

23    A.    I believe so.

24    Q.    I'm not too concerned about all the history

25 here.  What I'm concerned mostly about is this Cobra

Page 23

1 Energy here.  Is this information correct where you have

2 your job -- where you described your position at Cobra

3 Energy?

4          (Witness reviews document.)

5    A.    Yes, sir.

6    Q.    And to be exactly correct, you would have to

7 put Mammoth on your profile because you were employed

8 directly by Mammoth for at least a little while, correct?

9          MR. LEONE:  Objection; form.

10          THE WITNESS:  Sure.

11 BY MR. MOULTON:

12    Q.    Okay.

13          MR. LEONE:  Anybody would have to put it on

14 there.  You have to put everything on LinkedIn.

15          MR. MOULTON:  Bill, so for this deposition

16 we're in the Western District of Texas and you get to say

17 "objection; form" or "leading," but that's about it.

18 Like this isn't the time for you to do free-for-all

19 and --

20          MR. LEONE:  Just ask a question.

21          I will if I have to.

22          MR. MOULTON:  If you would actually use the

23 question I did use, that it says -- it's very clear in my

24 question, and he answered it, and we're going to move on.

25          MR. LEONE:  I appreciate your lecture, but I

Page 24

1 think --

2          MR. MOULTON:  This is my deposition, sir.  It's

3 my time.  For Mr. Leone just to start pounding questions

4 about how he likes or doesn't like my question.  He can

5 say "objection; form" or he can say "objection; leading"

6 and that's -- he can assert a privilege, but that's it.

7          MR. LEONE:  If you yell one more time or

8 lecture like that we'll terminate this deposition.  You

9 can ask your next question.

10          MR. MOULTON:  I will.

11          MR. LEONE:  And control yourself, please.

12          MR. MOULTON:  I will be just fine, sir, if you

13 will abide by the Rules of Deposition.

14          MR. LEONE:  I understand the Rules of

15 Depositions in federal court.

16          MR. MOULTON:  Apparently you do not.

17 BY MR. MOULTON:

18    Q.    So Mr. Ellison, here under the Cobra Energy

19 when you say you "Managed all aspects of the business,"

20 what do you mean by that?

21    A.    For me it was operational.

22    Q.    Okay.  With Mammoth.  I'm sorry.  Go ahead.

23    A.    No, sir, you go right ahead.

24    Q.    Okay.  Would you include in managing all

25 aspects of the business as including compensation of

Page 25

1 employees?

2    A.    No, sir.

3    Q.    Okay.  So you had -- you did not manage the

4 compensation of the employees?

5    A.    No, sir.  We had a payroll department/HR that

6 would handle that.

7    Q.    Okay.  So for the Higher Power and 5 Star

8 employees, who would manage the compensation of those

9 workers?

10          MR. LEONE:  Objection; form.

11          THE WITNESS:  There would have been HR

12 personnel and payroll personnel.

13 BY MR. MOULTON:

14    Q.    Were there any other folks involved in

15 determining how those folks were paid other than the

16 folks at Higher Power and 5 Star?

17          MR. LEONE:  Objection; form.

18          THE WITNESS:  Not to my knowledge.

19 BY MR. MOULTON:

20    Q.    Okay.  So you had nothing to do with setting

21 their pay policies?

22          MR. LEONE:  Objection; form.

23          THE WITNESS:  It was driven through HR and

24 payroll.

25 BY MR. MOULTON:

## DONALD KEITH ELLISON - May 04, 2022

Page 26

1    Q.   I'm sorry.  So you had nothing to do with it?
2  Your answer is nonresponsive.  I want to know if you have
3  had anything to do with setting the payroll policies for
4  the folks at 5 Star and Higher Power.
5         MR. LEONE:  Objection; form.
6         THE WITNESS:  No, sir.
7  BY MR. MOULTON:
8    Q.   Did Jeff Beagle have anything to do with
9  setting the pay policies for the folks at 5 Star or
10 Higher Power?
11        MR. LEONE:  Objection; form.  What is the time
12 period we're talking about?
13        MR. MOULTON:  We're talking about -- if that's
14 your "form" problem then I'll clarify, sir.  We can pull
15 back up.
16 BY MR. MOULTON:
17   Q.   For the questions I'm asking I'm talking about
18 during the time period of the work -- I'm talking about
19 the workers in Puerto Rico during the time period of when
20 they started working to restore power under Cobra until
21 that project ended, so we're talking about October 2017
22 in Puerto Rico until that work ended, okay?  So I'm
23 asking you, did you have anything to do with setting the
24 pay policies that concerned the folks that were working
25 on that project in Puerto Rico to restore power?

Page 27

1    A.   No, sir.
2    Q.   Okay.  Did Mr. Beagle have anything to do with
3  setting their pay?
4    A.   I believe Mr. Beagle would have been
5  responsible for making sure payroll was processed by the
6  HR.
7    Q.   Did he have any role in determining what pay
8  plan would apply to those workers?
9    A.   I'm uncertain.  I believe he would have and
10 outside counsel would determine what was fair and right.
11   Q.   So Mr. Beagle did have a role in
12 consulting with counsel trying to make sure that the
13 employees were paid properly under Cobra?
14   A.   I'm sorry.  Could you rephrase the question or
15 reask the question?
16   Q.   So Mr. Beagle had a role in making sure that
17 the employees under Cobra were paid properly?
18   A.   Yes.
19   Q.   And you had no role -- you had no part of that?
20        MR. LEONE:  Objection; form.
21        THE WITNESS:  No.
22 BY MR. MOULTON:
23   Q.   Were you involved in setting the rates of pay
24 for the workers in Puerto Rico?
25   A.   Yes.

Page 28

1    Q.   And what was your role in setting their rates
2  of pay?
3    A.   Myself and the operations team determined per
4  classification of employee what the maximum pay status
5  would be for each position.
6    Q.   Okay.  Were you also part of setting the
7  holiday pay policy?
8    A.   Not to my knowledge.
9    Q.   What about the time-keeping policy of the
10 workers in Puerto Rico, what was their role with that, if
11 any?
12   A.   No, sir, I don't believe I would have had any
13 involvement in that.
14   Q.   Mr. Ellison, we're going to show you Exhibit
15 136 and in this exhibit we're going to go to the page
16 that's Bates numbered Mammoth 3816.  It has the
17 organizational chart with Cobra executive team.  Can you
18 see that on your screen, sir?
19   A.   I believe so.
20   Q.   Okay.  So here it shows you as president.  Are
21 the folks that are shown as your direct reports here, is
22 this correct?
23   A.   Yes, sir, with the exception of the outside
24 counsel.
25   Q.   You mean general counsel?

Page 29

1    A.   No, the outside counsel.
2    Q.   I'm not seeing it.  I don't see outside counsel
3  on the chart, do you?
4         Oh, I'm sorry.  External counsel.
5    A.   Yeah.
6    Q.   So they didn't report to you?
7    A.   No, sir.
8    Q.   But the rest of this page is correct?
9    A.   As far as the business position, yes.  The
10 general counsel would have been through the Mammoth
11 corporation of Mammoth.
12   Q.   On the next page with 3817, this is Exhibit
13 136, it continues down the chart.  Can you verify for me
14 that this is also correct?
15   A.   Can you blow this up?  I can barely see it.
16   Q.   Yes, sir.
17   A.   Yes, sir.
18   Q.   And on the next page in Exhibit 136, which is
19 Bates labeled Mammoth 3818, can you verify for me that
20 this chart is also correct?
21   A.   Yes, sir.
22   Q.   Okay.  So Aaron Blackaby reports to Ken Kinsey?
23   A.   That would have been correct.
24   Q.   Is that correct?
25   A.   Yes.

**DONALD KEITH ELLISON - May 04, 2022**

Page 30

1   Q.   Okay.  And in fact, on Mammoth 3817 Mr. Malcolm
2 and Mr. Whitsell both report to Mark Layton.  That's
3 correct, right?
4   **A.   Yes, sir, in construction.**
5   Q.   I'm sorry?
6   **A.   By the time this was put together that was the**
7 **intent, yes, sir.**
8   Q.   Did it not work like that in practice?
9   **A.   It never got fully utilized.**
10   Q.   Okay.  So Robert Malcolm and Scott Whitsell,
11 did they just report directly to you?
12   **A.   No, sir.  They're reporting to Mark.**
13   Q.   Okay.  And then Mark reported to you?
14   **A.   That is correct.**
15   Q.   Okay.  We're going to look at Exhibit 131,
16 which is a series of e-mails, and you're not on all of
17 them.  I'm going to focus on the one that's from you, and
18 you're free, if you want to read the whole thing before
19 you talk about it that's fine, you just tell me where you
20 want to scroll and how much you want to zoom and we'll
21 talk about it, okay?  But I'm only going to ask about
22 this first one.
23   **A.   Can you go ahead and zoom in on this one a**
24 **little?**
25   **Never mind.  I actually...**

Page 31

1   **All right.  What is your question about this**
2 **specific e-mail?**
3   Q.   Sure.  So this e-mail that's dated October 19th
4 from you, is this on the same day that you obtained the
5 contract from PREPA, correct?
6   **A.   Yes, sir.**
7   Q.   So your first communication about the pay scale
8 in Puerto Rico is in this e-mail, correct?
9   MR. LEONE:  Objection; form.
10   THE WITNESS:  Yes, sir.
11 BY MR. MOULTON:
12   Q.   Okay.  And you told Mr. Whitsell and Mr. Ken
13 Kinsey, Robert Malcolm, and other folks listed on this
14 e-mail that Cobra will be paying for the following day
15 rates that are listed here?
16   MR. LEONE:  Objection; form.
17   THE WITNESS:  I'm sorry.  Based on what I see
18 here it just says it's the rate that they're willing to
19 pay.
20 BY MR. MOULTON:
21   Q.   Okay.  So, for example, Cobra is willing -- I
22 mean, it actually says "paying," but I hear you.  So it
23 says Cobra will be paying or Cobra is paying, for
24 example, general foremen $1,400 per day, correct?
25   MR. LEONE:  The word "Cobra" is not in the

Page 32

1 e-mail.
2 BY MR. MOULTON:
3   Q.   Let me ask you that then.  Who are you speaking
4 for when you said this?  Were you speaking for Mammoth?
5   **A.   I'm speaking for Cobra Acquisitions because it**
6 **had the contract.**
7   Q.   Okay.  So when you say "we are paying," who is
8 "we"?
9   **A.   Cobra Acquisitions.**
10   Q.   Okay.  So Cobra Acquisitions is paying the
11 following pay rates, correct?
12   MR. LEONE:  Objection; form.
13   THE WITNESS:  What I'm saying here, if it says
14 $1,400, based on a sixteen-hour workday.
15 BY MR. MOULTON:
16   Q.   So if they worked the full sixteen hours in the
17 day they're going to get $1,400?
18   **A.   We were going to pay that sixteen -- the**
19 **concept is we were going to pay them sixteen hours**
20 **whether they worked it or didn't work it.**
21   Q.   Okay.  So as long as they showed up for work
22 that day they were going to get the $1,400?
23   **A.   That is correct, sir.**
24   Q.   And that's applied for the rest of the folks
25 that are listed on this list here, not just general

Page 33

1 foremen, but on down through apprentice, correct?
2   **A.   Yes, sir.**
3   Q.   Now, Mr. Whitsell and Mr. Ken Kinsey were the
4 folks who would be responsible for recruiting the workers
5 at 5 Star and Higher Power for the work, correct?
6   **A.   No, sir, not completely responsible for it.**
7   Q.   Okay.  Who else is responsible besides Ken
8 Kinsey and Scott Whitsell for recruiting the 5 Star and
9 Higher Power workers?
10   **A.   Robert Malcolm, Steve Wolfe, Ken Cochran.**
11   Q.   So everyone on the "To" line here is involved
12 in recruiting?
13   **A.   Yes, sir.  There were far more that were**
14 **involved in it.**
15   Q.   Okay.  But everyone on the "To" line are
16 definitely folks involved in recruiting, correct?
17   **A.   Correct, sir.**
18   Q.   Okay.  And that's the reason why you told them
19 this, so they could get started on recruiting folks,
20 correct?
21   **A.   Correct, sir.**
22   Q.   There's nothing in this e-mail that says that
23 you're actually going to be paying them by the hour?
24   **A.   Not that I see, sir.**
25   Q.   Okay.  So the recruiter's first message is day

**DONALD KEITH ELLISON - May 04, 2022**

Page 34

1 rate, correct?
2          MR. LEONE:  Objection to form.
3          THE WITNESS:  I don't know what their first
4 message to the people were.
5 BY MR. MOULTON:
6     Q.   No.  I'm asking what your first message to the
7 recruiters is.  It's day rate?
8          MR. LEONE:  Objection; form.
9          THE WITNESS:  To me this is the maximum we were
10 going to be able to pay per employee.
11 BY MR. MOULTON:
12    Q.   Okay.  It doesn't say that anywhere on this
13 e-mail, right?
14    **A.   I don't see that, no, sir.**
15         MR. LEONE:  Does this document have an exhibit
16 number?
17         MR. MOULTON:  Yes; 131.
18 BY MR. MOULTON:
19    Q.   Now, you were involved in the process to come
20 up with the offer letters to the workers that would be
21 working in Puerto Rico, correct?
22    **A.   No.**
23    Q.   You were involved in the process of exchanging
24 drafts of offer letters and weighing in on them, correct?
25    **A.   At the drafts.**

Page 35

1     Q.   Okay.  Let's look at Exhibit 142, and this is
2 an e-mail chain.  I'll start at the bottom and I'll zoom
3 in a little bit for you.  You probably need a little
4 more.  Why don't you go ahead and review this chain for
5 me because I'll have some questions about it, and just
6 let me know when you're ready to scroll up.
7     **A.   Scroll down.  There you go.**
8          (Witness reviews document.)
9          Can you scroll?  Can you scroll some more?
10    Q.   Yes, sir.
11    **A.   Okay.  Okay.  All right.**
12    Q.   Okay.  So in this -- in this series of e-mails
13 here in Exhibit 142, you were -- you were copied on
14 several communications and participated regarding what
15 the offer letters should be saying, correct?
16         MR. LEONE:  Object to form.
17         THE WITNESS:  It appears so.
18 BY MR. MOULTON:
19    Q.   And in fact, this e-mail chain primarily is
20 concerning Mr. Whitsell's concerns about the offer
21 letters, correct?
22    **A.   It looks to me that way.**
23    Q.   All right.  And Mr. Whitsell's primary concern
24 is that the offer letters don't reflect what the workers
25 were being told, correct?

Page 36

1          MR. LEONE:  Objection; form.
2          THE WITNESS:  That's what he stated in the
3 letter -- in the e-mail.
4 BY MR. MOULTON:
5     Q.   Right.  And Mr. Whitsell, as you can see, and
6 you're copied on it, on October 24th, on Plaintiff's
7 Exhibit 142, Bates number 3596, he's asking if there's
8 any chance of taking the hourly rate out in the letter
9 and stating the per-day rate will show up hourly.  Do you
10 recall that?
11    **A.   I don't recall this, but I'm seeing it in front**
12 **of me now.**
13    Q.   All right.  And you did not tell him that you
14 could just leave the hourly, for example, and not say
15 anything about the day rate?
16         MR. LEONE:  Objection; form.
17         THE WITNESS:  I don't recall.
18 BY MR. MOULTON:
19    Q.   So you know that recruiters like Mr. Whitsell
20 were telling the workers the day rate, correct?
21         MR. LEONE:  Objection; form.
22         THE WITNESS:  No, sir.  I honestly don't know
23 what the recruiters were saying to the actual
24 individuals.
25 BY MR. MOULTON:

Page 37

1     Q.   Let's look at Exhibit 143.  And let's just --
2 it's another chain, but I want to focus on this one
3 e-mail here and see if you can agree with this before --
4 if you need to review it let me know, but let's see if
5 you can agree to this:
6          On October 24th in Plaintiff's Exhibit 143,
7 Bates number Mammoth 3611, we have an e-mail from you
8 saying "I am very good with it."  Do you agree there that
9 you are approving the offer letters?
10    **A.   Without seeing the actual attachment -- do you**
11 **have the attachments?**
12    Q.   I do have the attachment and we'll look at that
13 in a second.  My question is simpler though.  First of
14 all we're going to say, you know, see if you agree that
15 you approved the offer letters with this e-mail and then
16 we'll look at the offer letter that you approved, so my
17 question is:  Did you approve the offer letters?
18         MR. LEONE:  Objection; form.
19         THE WITNESS:  Based on this e-mail I'd say I'm
20 very good with it.  I don't know if that's an approval or
21 not.
22 BY MR. MOULTON:
23    Q.   Okay.  It's certainly not disapproval?
24    **A.   Is that a question?**
25    Q.   It is.  You're certainly not disapproving, are

**DONALD KEITH ELLISON - May 04, 2022**

Page 38

1 you?

2    A.    I don't believe that I'm the person to do that,
3 who had the authority to make a decision as to what HR
4 policy or payroll policy was so I couldn't approve it
5 from my perspective.

6    Q.    Well, you're the president of Cobra?

7    A.    Yes, sir.

8    Q.    And you're also the president of 5 Star and
9 Higher Power?

10    A.    Yes, sir.

11          MR. LEONE:  Objection; form.

12 BY MR. MOULTON:

13    Q.    I mean, the only person above you in this
14 process would be Jeff Beagle, who says I'm good,
15 according to what you just said, isn't that right?

16          MR. LEONE:  Objection; form.

17          THE WITNESS:  Yes, sir.

18 BY MR. MOULTON:

19    Q.    So I'm going to ask you on this next one,
20 Exhibit 1 -- actually no.  Exhibit 52.  I'm going to ask
21 you if this is an example of an offer letter that was
22 approved.

23          (Witness reviews document.)

24    A.    I can't imagine it was.

25    Q.    Why not?

Page 39

1    A.    Well, right off the bat it refers to twelve
2 hours a day looking at the date of this.  In the e-mail
3 chain that you showed before we were referring to sixteen
4 hours a day.

5    Q.    Right.  Except this -- but this does say what
6 you said in the e-mail, right, that you were expecting it
7 to be twelve but it could be --

8    A.    I didn't say that.

9    Q.    Pardon me?

10    A.    I did not say that.

11    Q.    No.  Hold on.

12          So how, back to that e-mail we were just
13 looking at, it said that the workers could be expected to
14 work sixteen but that wouldn't necessarily be the case,
15 correct?

16    A.    I don't believe I was the one who wrote that
17 e-mail.

18    Q.    Okay.  And I'm not trying to get into that with
19 you.  I'm trying to understand why you think Exhibit 52
20 is not the one that you approved.

21          MR. LEONE:  Objection; form.

22          THE WITNESS:  Can you show me the -- you said
23 you had the attachment.  Show me the actual offer letter
24 so that I can compare it to what you just put up.

25 BY MR. MOULTON:

Page 40

1    Q.    It's the same one except this one's signed by
2 James Banner?

3          MR. LEONE:  Objection; form.

4          THE WITNESS:  Okay.  Without actually seeing
5 it, I don't know that this is one.

6 BY MR. MOULTON:

7    Q.    Why don't we take a quick five-minute break and
8 I'll pull up that attachment for you.  How's that?

9    A.    Understood.

10          THE VIDEOGRAPHER:  The time now is 10:16.
11 We're off the record.

12          (Break taken at about 10:16 a.m. MTD.)

13          MR. LEONE:  Mr. Moulton, did you want to leave
14 that exhibit up?

15          MR. MOULTON:  Is it up right now?

16          MR. LEONE:  It is.  You're still sharing it.

17          MR. MOULTON:  I hit "pause" on my end.

18          MR. LEONE:  Yes, that means whatever you're
19 showing just sits there.  If you were going to grab
20 another exhibit then you would click on it and undue the
21 pause and it shows a new one.

22          MR. MOULTON:  That's good to know.  Thank you.

23          THE VIDEOGRAPHER:  The time now is 10:27.
24 We're back on the record.

25 BY MR. MOULTON:

Page 41

1    Q.    All right.  Mr. Ellison, you understand you're
2 still under oath, correct?

3    A.    I do.

4    Q.    So I want to go back to Plaintiff's or Exhibit
5 143.

6          MR. LEONE:  Okay.  Wait a minute.

7          Before you do that, David, we were able to
8 determine that he had the same cell phone number back in
9 2017/2018 that was used for business, so I don't mind if
10 he gives that cell phone number.

11 BY MR. MOULTON:

12    Q.    Mr. Ellison, will you please give us your cell
13 phone number?

14    A.    (736) 302-6860.

15    Q.    Thank you very much.

16          Okay.  So back at Exhibit 143, we were looking
17 at the offer letters after this before the break.  You
18 seem to be -- you seem to be concerned whether or not
19 that offer letter was the one that was approved or not,
20 and in particular you were focusing on whether it was
21 sixteen hours or twelve hours.  I just wanted to kind of
22 direct your attention to this e-mail from Jeff Beagle
23 that you're copied on inside Exhibit 143, and can you see
24 on your screen where they're talking about sixteen-hour
25 shifts would be the maximum anyone would work, was the

## DONALD KEITH ELLISON - May 04, 2022

Page 42

1 idea.  Do you see that on your screen?  So we're all on
2 the same page, right?
3     A.    Yes.
4     Q.    Okay.  So is that your understanding of how
5 this was going to work in Puerto Rico, it's like a
6 maximum day would typically be sixteen but you didn't
7 think people were really going to be working that much,
8 probably about twelve; is that right?
9     A.    Can you hear me, sir?
10     Q.    I can hear you now.  Go ahead.
11     A.    As far as I was concerned, sixteen hours was
12 sixteen hours, and honestly that's what I expected the
13 person to do based on weather and the amount of daylight
14 they had.  I never expected it would be twelve hours or
15 thirteen.  Actually it would be a maximum of sixteen.
16     Q.    Okay.  But you don't know if the recruiters
17 were telling the guys twelve or sixteen?
18     A.    I do not.
19     Q.    I'm going to show you Exhibit 187, which,
20 according to my interpretation of what -- let me put it
21 this way:  We got a huge stack of documents from your
22 lawyers for Mammoth, right, thousands of pages?  As far
23 as I can tell, this is the attachment that we're talking
24 about that you wrote as far as the offer letter.  I don't
25 know if that's correct.  Why don't you review it and see

Page 43

1 if you created it?
2            MR. LEONE:  Can you blow that up?
3            MR. MOULTON:  Yes, sir.
4            THE WITNESS:  Do you have the e-mail
5 immediately preceding this, and Bates number?
6 BY MR. MOULTON:
7     Q.    There's multiple copies.  I can't tell which
8 one is the latest or not.  It's just a bunch of e-mails,
9 so I can't answer that question.  I don't know.  If you
10 know that would be very helpful to know and not have to
11 be wasting time on this.
12            (Witness reviews document.)
13            MR. LEONE:  I have one to this deposition.  We
14 all have the documents.  It's going to be hard for him to
15 identify a letter from memory from that long ago.  If
16 there's anything you guys can do to kind of agree what
17 the attachments to that e-mail was it would be helpful to
18 him.
19            THE WITNESS:  I can't tell that this was the
20 exact letter that I said I was good with.
21 BY MR. MOULTON:
22     Q.    Okay.  Fair enough.
23            Let me ask you a different question and see if
24 you can do this:  On the Puerto Rico storm rate on
25 Exhibit 187 where it says $900 per day, that would be

Page 44

1 broken down hourly over sixteen hours daily, is that what
2 was on the offer letters, that sort of language, the day
3 rate would be broken down hourly?
4     A.    Honestly, I don't remember.
5     Q.    Okay.
6     A.    I see it written here.
7     Q.    So on Exhibit 187 you just don't remember
8 either way?
9     A.    That's correct.
10     Q.    Looking at Exhibit 52 we have an example
11 actually signed by a Higher Power guy, James Tanner, in
12 May of 2018.  Do you see that?
13     A.    Yes, I see that.
14     Q.    Okay.  Does it surprise you that this is the
15 same wording, a day rate broken down hourly over sixteen
16 hours a day?
17            MR. LEONE:  Objection to form.
18            THE WITNESS:  I don't know that.  I mean, it
19 does not surprise me.
20 BY MR. MOULTON:
21     Q.    Okay.  Is that the type of language that you
22 expected to see on the offer letters?
23     A.    Honestly I didn't know.  You know, I didn't
24 have a dog in that fight.
25     Q.    I'm sorry, I didn't hear your answer, sir.

Page 45

1     A.    I said I didn't have a dog in that fight.
2     Q.    In the hunt?
3     A.    In the hunt, period.  We weren't fighting.
4 BY MR. MOULTON:
5     Q.    On Exhibit 143 you clearly do because you, as
6 president of Cobra, say I'm very good with it?
7            MR. LEONI:  Objection to form; and it's
8 argumentative.
9            THE WITNESS:  Yes, sir, I said that.
10 BY MR. MOULTON:
11     Q.    So sitting here today, you're not able to
12 recall what version of the offer letter you approved or
13 disapproved?
14     A.    Not unless you show me the one that was
15 attached to this e-mail thread.
16     Q.    I can't tell.  What the production I got from
17 the defendants, I don't know which one it was.  I thought
18 I had the right one just because it's the one that seems
19 to match, but I can get the e-mail you did.
20            MR. LEONE:  Objection to form.  This was four
21 years ago.
22 BY MR. MOULTON:
23     Q.    All right.  So eventually you were aware that
24 Mr. Beagle and a few others at Mammoth spoke with a
25 lawyer named Mr. Brusard (ph) about pay.  Did you know

## DONALD KEITH ELLISON  -  May 04, 2022

1 about that?

2     A.    I knew that Mr. Beagle was going to seek
3 outside counsel's advice to ensure that what the company
4 was doing was legal and proper.

5     Q.    Okay.  But you weren't up -- you weren't a part
6 of the discussions with counsel about that?

7     A.    No, sir.

8     Q.    So you don't know what was said or not said in
9 the meetings with lawyers?

10    A.    No, sir.

11    Q.    Were you shown any e-mails about what the
12 outside counsel said about how to pay the workers or not
13 pay the workers?

14    A.    Not to my knowledge.

15    Q.    Is it your understanding that Mr. Beagle worked
16 out some hourly rates that if the worker worked the
17 entire week would get the equivalent of their day rate
18 times seven?

19    A.    Not to my knowledge.

20    Q.    You weren't aware of that?

21    A.    No, sir.

22    Q.    Okay.  So in your opinion how were the workers
23 being paid?

24    A.    I didn't know.

25    Q.    You didn't know how they were paid?

1     A.    No, sir.

2     Q.    Okay.  So you've never seen Cobra's pay scale?

3     A.    The pay scale that was originally suggested as
4 to what the maximum was per classification?

5     Q.    So you know about that one.  Did you ever see
6 one -- were you ever aware of a pay scale that had those
7 amounts broken into hours?

8     A.    I don't recall.

9     Q.    Look at Exhibit 151.  Do you recognize Exhibit
10 151?

11    A.    I see it but, I mean, I don't recall having
12 reviewed it.

13    Q.    Okay.  So this is the first time you've ever
14 seen this document?

15    A.    I can't say it's the first time, but based on a
16 lot that has transpired over the last four years I don't
17 remember.

18    Q.    All right.  Will you agree with me on Exhibit
19 151 that the PR storm per-day rates are the rates that
20 you set forth in your October 19th e-mail, right?

21    A.    I agree that that's the proposed rate.

22    Q.    Were you ever aware that the company decides to
23 start grossing up the worker's pay to a day rate, does
24 that sound familiar to you at all?

25    A.    Can you rephrase the question?

1     Q.    Yes.

2           Were you aware that the company grossed up the
3 worker's pay up to the day rate amount when they worked
4 less than a full week?

5     A.    No, sir, I wasn't aware that that was taking
6 place at the time.

7     Q.    Okay.  So as far as you knew they were just
8 being paid their day rate?

9           MR. LEONE:  Objection; form.

10          THE WITNESS:  As far as I knew they were being
11 paid whatever -- whatever was worked out between them and
12 HR and payroll when they came on for the days that they
13 worked.

14 BY MR. MOULTON:

15    Q.    So you don't know how the workers were paid, is
16 that what you're saying?

17    A.    That is correct.

18    Q.    Okay.  So you never had any discussions with
19 Jeff Beagle about the policy to gross up the day rates,
20 or I'm sorry, to gross up the hourly pay up to the day
21 rate?

22    A.    Not that I recall.

23    Q.    He never talked to you about it?

24    A.    Not that I recall.

25    Q.    Do you recall any conversations about grossing

1 up the pay with anyone besides Mr. Beagle or anyone?

2     A.    No, sir, not that I recall.

3     Q.    Were you ever part of any process to decide
4 whether or not any particular gross-up would be paid or
5 not for a worker?

6     A.    A worker?

7     Q.    Any worker.  Were the workers in Puerto Rico
8 working on restoring power after Hurricane Maria from
9 October 17th on?

10    A.    Sure.  If they were salaried employees part of
11 our management team, you know, we had the discretionary
12 ability to provide notices.

13    Q.    What about specifically the gross-up that would
14 bring up the workers' pay from the hourly amount to the
15 day rate amount, did you ever -- were you involved in
16 those approvals?

17    A.    For the hourly employees?

18    Q.    Yes, sir.

19    A.    No, sir.  That was not my typical focus.

20    Q.    So you would have been involved with bonuses
21 for salaried exempt folks?

22    A.    Yes.

23    Q.    I'm sorry?

24          MR. LEONE:  Objection; form.

25          MR. MOULTON:  I'm asking the witness.  I can't

**DONALD KEITH ELLISON - May 04, 2022**

Page 50

1 hear his answer. We heard your objection there so you
2 can keep it --
3        THE WITNESS: Yes, for the salaried employees
4 technically that --
5 BY MR. MOULTON:
6    Q.  So when you were reviewing bonuses for salaried
7 folks what are you talking about?
8    A.  Those that I deemed deserved a bonus.
9    Q.  Okay. And so are these like Christmas bonuses
10 or like good-job bonuses or what is it?
11   A.  It would have been based on the performance.
12 Good-job bonuses.
13   Q.  What positions do you consider to be the
14 management position that you would have been involved
15 with approving bonuses?
16   A.  It would have been the executive leadership
17 management project managers. I would have asked the
18 operations directors for each of the companies to submit
19 a list of general foremen in Puerto Rico.
20   Q.  General foremen in Puerto Rico were not paid a
21 base salary though, right?
22   A.  I don't believe so.
23   Q.  Okay. So if they weren't paid a base salary
24 you wouldn't have been approving their bonuses, correct?
25        MR. LEONE: Objection; form.

Page 51

1        THE WITNESS: I know for a fact there was at
2 least one general foreman in Puerto Rico that I knew I
3 made a discretionary bonus to him.
4 BY MR. MOULTON:
5    Q.  Okay. One time?
6    A.  I believe maybe twice.
7    Q.  Twice for one guy?
8    A.  To the best of my knowledge. Patrick Walker
9 was one.
10   Q.  Patrick Walker. Anyone else?
11   A.  There may have been more. We had so many
12 employees down there I had no idea who was where at that
13 time.
14   Q.  So let me ask you this then. So when you said
15 you didn't approve any bonuses for the hourly folks who
16 does that mean?
17   A.  Typically that was foremen and below.
18   Q.  Foremen and below; is that right?
19   A.  Yes, sir.
20   Q.  When you would approve a bonus for a worker how
21 would that show up on their paycheck?
22   A.  I have no idea.
23   Q.  Do you think it would have been called a bonus?
24   A.  Do what?
25        I have no idea. No, sir.

Page 52

1    Q.  Do you think it would have been called a day
2 rate?
3        MR. LEONE: Objection; form.
4        THE WITNESS: Again, I have no idea.
5 BY MR. MOULTON:
6    Q.  So you're not aware of any bonuses being paid
7 as day rates on paychecks?
8        MR. LEONE: Objection; form.
9        THE WITNESS: I have no idea.
10 BY MR. MOULTON:
11   Q.  So you just don't know, it could have been, but
12 you just don't know?
13        MR. LEONE: Object to form.
14        THE WITNESS: Again, I have no idea.
15 BY MR. MOULTON:
16   Q.  Now, back on Exhibit 151, now I think you're
17 telling me that you have never seen this chart of PR
18 storm per-hours rates?
19        MR. LEONE: Objection to form. That's not what
20 he said.
21        THE WITNESS: No, sir, I'm not telling you I've
22 never seen it. I'm telling you I don't remember it.
23 BY MR. MOULTON:
24   Q.  Okay. So you were aware that there were rates
25 that were tied to sixteen hours per day that were set for

Page 53

1 the workers that are listed in Exhibit 151?
2    A.  Yes, sir.
3    Q.  Okay. Did it ever occur to you that if you
4 work less than a full week at the PR storm per-hour rate,
5 that you don't get your day rate?
6    A.  It's in that.
7    Q.  That never occurred to you?
8    A.  No, sir.
9    Q.  And so you weren't aware at any time that folks
10 were being, like if they only worked one day, for
11 example, let's take the thousand-dollar rate here for a
12 journeyman lineman. Did it ever occur to you to see what
13 that 47.30 times 16 was?
14   A.  No, sir.
15   Q.  Okay. Well, it's $756.80, so it's less than
16 the thousand dollars that they were told. Do you
17 understand that?
18   A.  I do.
19   Q.  Okay. All right. So you never heard of any
20 policy of anyone paying the difference between what the
21 hourly rate would be and what the per-day amount would
22 be?
23        MR. LEONE: Objection; form.
24        THE WITNESS: I'm sorry. Can you rephrase?
25 Not rephrase but reask the question?

## DONALD KEITH ELLISON - May 04, 2022

Page 54

1 BY MR. MOULTON:

2    Q.   Yes.

3         So you never heard anything about the workers
4 being paid the difference between what their hourly rate
5 was and their day rate was?

6         MR. LEONE:  Objection to form.

7         THE WITNESS:  I never heard one person ever
8 issue a complaint or ask me anything about that, that I'm
9 aware of.

10 BY MR. MOULTON:

11   Q.   Okay.  And that's not my question.  My question
12 is:  You have no knowledge of this ever happening, of the
13 difference between what the hourly rate is per day, what
14 the hourly pay is, and what the day rate pay would be?

15   A.   I honestly don't understand what you're getting
16 at.

17   Q.   Okay.  I think -- I'm going to show you my
18 calculator.  My question is this:  Do you see my
19 calculator on the screen?

20   A.   I sure do.

21   Q.   Okay.  So a guy who is on the pay scale at a
22 thousand dollars per day, or 47.30 per hour, if he works
23 one day in Puerto Rico under the hourly system would get
24 $756.80.  Do you see that?

25   A.   I see that.

Page 55

1    Q.   Are you aware of at any point a worker like
2 that being paid extra to get him to the thousand?

3    A.   No, sir, I'm not personally aware, nor was I
4 involved in the decision-making of that.  However, there
5 would have been management personnel on site that could
6 have the discretion of making the decision to gross
7 someone up or bonus him.  I also understand as an
8 employee for the work that a half a day was terminated
9 for a safety issue and we may not have had the same
10 reason to do so.

11   Q.   Okay.  So who are the folks at 5 Star and
12 Higher -- at 5 Star -- I'm sorry, not 5 Star.  Back up.

13        Who were the folks at Higher Power who would
14 have had the authority to obtain the gross-up or not?

15   A.   I honestly, during this time that you're
16 speaking of, if we're still speaking of the October 2017
17 through July/August of 2018, I have no clue who was
18 handling payroll at Higher Power or 5 Star.

19   Q.   Okay.  But it would have been the payroll
20 person?

21   A.   It would have been their -- particularly it
22 would have been the operations manager for whatever
23 division they were in.  In Puerto Rico it more than
24 likely would have been Cory Mahan or Don Edwards.

25   Q.   On what documents would it have been recorded

Page 56

1 whether or not they're approving a gross-up or not?

2    A.   (No verbal response.)

3    Q.   I'm sorry?

4    A.   I have no clue.

5    Q.   Okay.  So you've never seen any documents that
6 would -- that has this approving process document?

7    A.   No, sir, not to my knowledge.

8    Q.   Okay.  There's hundreds of workers out there,
9 right?

10   A.   There are.  There were thousands of workers out
11 there.

12   Q.   Okay, thousands.  You would agree with me then
13 it would be impossible for any one person to keep track
14 of which gross-up to pay and which ones weren't if they
15 were really approving them?

16        MR. LEONE:  Objection; form.

17        THE WITNESS:  I don't know that it would be
18 impossible.

19 BY MR. MOULTON:

20   Q.   So it's possible for one person to keep track
21 of thousands of workers of whether or not they get a
22 gross-up for that pay period or not?

23        MR. LEONE:  Objection; form.

24        THE WITNESS:  Honestly I don't know that it was
25 one specific person that was asked to perform this.

Page 57

1 BY MR. MOULTON:

2    Q.   So lots of people had to do it?

3    A.   I don't know that.

4    Q.   Okay.  So you don't know about any documents,
5 you don't know who did it, you don't know how many?

6        MR. LEONE:  Are you going to repeat the whole
7 deposition or just part of it?

8 BY MR. MOULTON:

9    Q.   Tell me how this approval process worked, Mr.
10 Ellison.

11   A.   I honestly don't know.

12   Q.   Okay.  So you don't know anything -- you don't
13 even know if there was an approval process about
14 gross-ups or not?

15   A.   I do not.

16   Q.   Okay.  All right.  Sir, can you see Exhibit 140
17 on your screen here?

18   A.   Can you blow it up?

19        MR. LEONE:  Can you blow it up, please?

20        MR. MOULTON:  Yes, sir.

21 BY MR. MOULTON:

22   Q.   Actually I'm going to scroll down and let you
23 look at it.  Tell me when you're ready to scroll up.

24   A.   Scroll up, please.

25        Scroll up again.  And scroll up.  Can you

## DONALD KEITH ELLISON - May 04, 2022

1 scroll down a little bit?  I think I got cut off, that
2 part I -- there you go.  Scroll up, please.  Further.
3          (Witness reviews document.)
4          THE WITNESS:  Okay.
5 BY MR. MOULTON:
6      Q.   Okay.
7      A.   All right.
8      Q.   Okay.  After reviewing Exhibit 140 do you
9 recall this e-mail chain?
10     A.   No, sir, I do not.
11     Q.   You don't remember speaking with Mr. Ken Kinsey
12 about the issues addressed here?
13     A.   No, sir.
14     Q.   Okay.  In the e-mail from Alexander Kalman
15 where there's some answers to his questions, in number
16 two, do you disagree with what number two says?
17          MR. LEONE:  The question or the answer, Dave?
18          MR. MOULTON:  Both.
19          MR. LEONE:  Object to form.
20          THE WITNESS:  I believe two and three are the
21 same thing as far as I'm concerned.
22 BY MR. MOULTON:
23     Q.   I'm just asking you about number two.  Do you
24 agree that -- do you disagree with the answer on number
25 two that all hourly employees will get their PR rate

1 only, do you disagree with that?
2      A.   No, sir, I do not.
3      Q.   Now, on number three you said it's the same
4 thing.  What do you mean by that?
5      A.   The purpose of the contract in the first place,
6 you know, I understand there may have been employees
7 hired that were working North American work so we could
8 pay them the same wage and hourly to perform work that
9 was underpaid for unreported or for ADP Texas while they
10 were waiting to rotate over.
11     Q.   Oh, so they would get standby pay?
12     A.   If they were working on a utility partner's
13 system they would have gotten paid their normal North
14 American wage rate.
15     Q.   You're saying that the workers in the Puerto
16 Rico project would have not gotten paid the PR rate?
17     A.   I'm saying that if there was someone hired --
18     Q.   Um-hmm.
19     A.   -- to -- for the Puerto Rican project, they
20 were waiting for their rotation to go to Puerto Rico,
21 they would not receive their Puerto Rican hourly pay rate
22 or their Puerto Rican rate until they put boots on the
23 ground in Puerto Rico and began work.
24     Q.   That makes sense.
25          So you're clarifying that the PR rate only

1 applied to the workers actually working in Puerto Rico?
2      A.   That were physically working in Puerto Rico.
3      Q.   Okay.  And by the "PR rate," we're talking
4 about those rates we saw in Exhibit 151, correct?
5      A.   I believe -- well, 151, could you show me that
6 one again?
7      Q.   Yes, sir.  I think I still have it up.
8      A.   Can you pull it up for me?
9      Q.   So let me actually ask the questions, ask you
10 this:  In Exhibit 151 we have the PR rates that you're
11 talking about, right?  The first two columns, not the
12 non-Puerto Rico wage obviously.
13     A.   That is correct.
14     Q.   So -- were you aware of when it was that the
15 company was consulting with Mr. Brusard (ph) about the
16 pay?
17     A.   No, sir.
18     Q.   So you don't -- do you know if that was, you
19 know, like in 2018 or was it in the beginning of the
20 process or somewhere in between?
21          MR. LEONE:  Objection; form.
22          THE WITNESS:  That would be the assumption.
23 BY MR. MOULTON:
24     Q.   Okay.  You just don't know?
25     A.   I do not.

1      Q.   Let's look at Exhibit 209.  It's a chain.  Why
2 don't you go ahead and look at it and I'll scroll up?
3      A.   Can you zoom this up?
4      Q.   Oh, I'm sorry.  Yes.
5      A.   Scroll up.
6          (Witness reviews document.)
7          Scroll up.
8          (Witness reviews document.)
9          Scroll up.
10          (Witness reviews document.)
11          Okay.
12     Q.   Okay?
13     A.   Yes, sir.
14     Q.   Okay.  So Exhibit 209 we have an e-mail chain.
15 It looks like the date on it of the e-mails are November
16 20th, correct?
17     A.   Yes, sir.
18     Q.   So that's like a month after the work in Puerto
19 Rico started, right?
20     A.   Yes, that's close.
21     Q.   And it's a little over a month from that first
22 e-mail of October 19th where you set the day rates,
23 correct?
24     A.   Technically it's two weeks after the work was
25 started.

## DONALD KEITH ELLISON - May 04, 2022

Page 62

1    Q.    Two weeks after the work started?

2    A.    Yes, sir.

3    Q.    Okay.  So you're saying that the work didn't

4 actually get going until late October/early November?

5    A.    It would have been early November when the

6 advanced party arrived.

7    Q.    Okay.  On November 20th -- in Plaintiff's

8 Exhibit 209 we got an e-mail from you that spans Mammoth

9 pages 3215 and 3216.  And just so we're on the same page,

10 what I'm reading here is:  Only management was to ever

11 receive base plus a day rate.  All GFs and below are to

12 be purely the day rate while on island.  Do you recall

13 this e-mail?

14    A.    I don't recall it but it's in front of me, yes,

15 sir.

16    Q.    Okay.  "GF" means general foreman, correct?

17    A.    Yes, sir.

18    Q.    Okay.  And so when you said that all GFs and

19 below are purely the day rate while on the island, that's

20 what you meant, right?

21        MR. LEONE:  Objection; form.

22        THE WITNESS:  That's what I meant.  That's what

23 I wrote.  Did it happen that way?  I don't know.

24 BY MR. MOULTON:

25    Q.    All right.  And in Exhibit 223, let's try to

Page 63

1 answer this question without having to take the time to

2 review the whole thing.  I don't think it requires the

3 whole thing.

4        MR. LEONE:  Blow it up.

5        MR. MOULTON:  Yes.

6 BY MR. MOULTON:

7    Q.    If you need it just let me know.

8        So in Exhibit 223, I'm going to blow it up and

9 focus on this e-mail from Ken Kinsey, Monday, November

10 27th, which is on Bates number Mammoth 3305.  Can you

11 look at that for me?

12        (Witness reviews document.)

13    A.    I see it.

14    Q.    Okay.  Who is Ken Kinsey?

15    A.    At the time, a VP of operations.

16    Q.    So he's under you?

17    A.    That is correct.

18    Q.    And his son is also on here, J.D. Kinzie,

19 correct?

20    A.    Yes, sir.

21    Q.    And J.D. Kinzie was the payroll manager for

22 Cobra?

23    A.    I have no idea what J.D.'s position was.

24    Q.    What did he do?

25    A.    I have no idea.  Other than piss people off, I

Page 64

1 don't know.

2    Q.    Okay.  All right.  Is this a correct statement

3 in this e-mail about how this day rate and holiday pay

4 interact?

5    A.    I don't know that this is correct or not.

6    Q.    Okay.  You just don't know either way?

7    A.    I don't know if it was in line with the HR

8 policies or not.

9    Q.    Do you think Ken Kinsey would say this if it

10 didn't?

11        MR. LEONE:  Objection; form.

12        THE WITNESS:  I don't know why Ken would have

13 stated one way or the other, but I see that this is

14 communication back and forth between DMV North and Mr.

15 Kalman.  It would have been the three of them to make

16 that decision together.

17 BY MR. MOULTON:

18    Q.    Well, is it safe to say you didn't jump in and

19 correct it?

20    A.    I don't believe so, not unless you scroll up

21 and down and show me whether I did or didn't.

22    Q.    I mean, I can scroll up for you, but you

23 didn't; do you agree with that?

24    A.    If I didn't respond I didn't respond.

25    Q.    I'm going to look at Exhibit 165.  Go ahead and

Page 65

1 take a look at this, if you will.

2    A.    Blow it up again.

3    Q.    Yeah, I'm sorry.  I keep forgetting.  I'm not

4 going to even ask you about all this back-and-forth on

5 here.  I just want to focus on the fact that this e-mail,

6 as you can see, from J.D. Kinzie, which includes you on

7 it, has an attachment called SLSX.  Do you see that?

8    A.    I see that.

9    Q.    And you can see that the date on this is

10 basically a day after that e-mail chain we were just

11 looking at where if there was a pure day rate on November

12 20th and now we have an updated pay structure being

13 exchanged.  Do you see this?

14        MR. LEONE:  Objection; form.

15        THE WITNESS:  I see that there was an

16 attachment.

17 BY MR. MOULTON:

18    Q.    So let's look at that attachment, which is

19 Exhibit 137.  This Exhibit 137 is the pay scale for

20 Puerto Rico, correct?

21        MR. LEONE:  Objection; form.

22        THE WITNESS:  I don't recall.

23 BY MR. MOULTON:

24    Q.    Okay.  Do you see where like general foreman on

25 down where it has their pay rates that matches your

## DONALD KEITH ELLISON - May 04, 2022

Page 66

1 original October 19th e-mail?

2   **A.   Yes, sir.**

3   Q.   Okay.  And it also has mechanics and safety

4 guys that were not on your original e-mail but has day

5 rates for them as well?

6   **A.   Yes, sir, I see that.**

7   Q.   Okay.  And in Exhibit 139 we have the Higher

8 Power pay scale.  Is that what you understand this to be?

9       MR. LEONE:  You got to let him read it, Dave.

10 You went straight to the first page.

11      MR. MOULTON:  Yeah.  Well, the first page is --

12 we're not asking about that.  That's just general

13 information for the Higher Power folks.

14 BY MR. MOULTON:

15   Q.   Exhibit 139, we're going to page 665.  It's the

16 second page in the exhibit where it has the list of

17 rates.  Do you understand this to be the Higher Power pay

18 scale?

19   **A.   Yes, sir.  I see it says wage scale for Puerto**

20 **Rico and normal wage scale.**

21   Q.   So the per-day rates match the day rates that

22 you set forth in your original October 19th e-mail,

23 correct?

24       (Witness reviews document.)

25   **A.   I see that.**

Page 67

1   Q.   In Exhibit 138 we have the orientation letter

2 for 5 Star?

3   **A.   Can you blow it up?**

4   Q.   Yes, sir.

5       Exhibit 138 is an orientation letter from 5

6 Star for an orientation scheduled for April 5th, 2018,

7 right?

8   **A.   Yes, sir.**

9   Q.   And it has a pay scale for 5 Star which matches

10 the same rates you set forth in your original October

11 19th e-mail, correct?

12      MR. LEONE:  Was this the non- -- this feels

13 like it's all information that you have and that you got

14 from other witnesses.  Why are we adding this witness?

15 Typically those are documents you've already gone through

16 with others.  He's a nonparty.

17      THE WITNESS:  Those kind of performed, I don't

18 know.

19      MR. LEONE:  Objection; form.

20 BY MR. MOULTON:

21   Q.   Sir, these are the same rates that you set

22 forth in your October 19th e-mail, correct?

23   **A.   They appear to be.**

24   Q.   Did you ever review pay stubs for any workers?

25   **A.   No, sir, not that I recall.**

Page 68

1   Q.   Okay.  I'm going to show you Exhibit 170.

2 We're going to look at a pay stub for Justin Washburn.

3 He just rings a bell.  Did you ever see pay stubs like

4 this?

5   **A.   No, sir, not that I recall.**

6   Q.   Did you review pay information for any of the

7 Puerto Rico hourly guys in Paycom?

8   **A.   No, sir, not that I recall.**

9   Q.   Exhibit 224, we have an e-mail of October 8th

10 that wasn't in your original October 19th e-mail.  Can

11 you confirm whether or not these are right?

12   **A.   Yeah.**

13   Q.   Go ahead and take a look at Exhibit 224 and

14 I'll ask about it.

15       (Witness reviews document.)

16   **A.   Scroll up, please.**

17       (Witness reviews document.)

18       Scroll up.

19       (Witness reviews document.)

20       Okay.  What's the question?

21 BY MR. MOULTON:

22   Q.   So your e-mail in Exhibit 224 on May 5th about

23 these rates here, when you say that this is not what you

24 had in mind what are you talking about?

25   **A.   Honestly at this point I don't remember.**

Page 69

1   Q.   Okay.  Well, based on the e-mails you just

2 read, you're talking about these rates that are listed in

3 the May 4th e-mail, right?

4   **A.   I assume that's what this is referring to.**

5   Q.   Okay.  Was it your concern that these rates

6 were -- that the proposed rates were too high?

7   **A.   I honestly don't remember increasing or trying**

8 **to decrease rates.**

9   Q.   Okay.  So you're not able to say anything about

10 this e-mail?  You don't remember it at all?

11   **A.   I do not.  There's quite a bit that's taken**

12 **place between then and now.**

13   Q.   Sure.  But you don't disagree that this is an

14 e-mail saying that -- this is an e-mail that you wrote on

15 this chain, right?

16   **A.   No, sir, I don't disagree that there's an**

17 **e-mail there.  I don't disagree that this is saying this**

18 **is not what I had in mind.  But I don't know what I'm**

19 **referring to one way or the other in this.**

20   Q.   Fair enough.

21       You were involved in negotiating the contract

22 with Cobra, correct?

23   **A.   That is correct.**

24   Q.   Let's look at Exhibit 225.  As you can see in

25 Exhibit 225 -- well, actually, no, you can't see it yet.

**DONALD KEITH ELLISON  -  May 04, 2022**

Page 70

1 This is a copy of the contract with Cobra and PREPA,
2 correct?
3    **A.   Can you blow this up?**
4    Q.   Yes.
5    **A.   Can you scroll down and make sure it was**
6 **executed?**
7    Q.   This is one signed by Arty.  Let me pull up
8 that signature page for you.  We're not going to go
9 through the whole contract obviously, but yeah, do you
10 see that where it's signed by Arty?
11   **A.   I don't see any signature on there.**
12   Q.   An electronic signature?
13   **A.   I don't know, no.**
14   Q.   You don't see that "/s/Arty"?
15   **A.   Yeah, I see what you're saying there, but**
16 **everything was done in Web Signatures.**
17   Q.   Okay.  So you're not --
18   **A.   Not --**
19   Q.   You're just saying other than the signature
20 issue you're just not a hundred percent sure without
21 seeing what signature if this is a true copy of the
22 contract is what you're saying?
23   **A.   That's true.**
24   Q.   Okay.  So you probably would recognize this
25 slideshow that's attached as a slideshow prepared by you,

Page 71

1 correct?
2           MR. LEONE:  Objection; form.
3           THE WITNESS:  Correct.
4 BY MR. MOULTON:
5    Q.   Okay.  And we want to go to a certain page in
6 it.  Let's see.  3866.
7           MR. LEONE:  So this is part of the same exhibit
8 as the contract?
9           MR. MOULTON:  Yeah.  It was attached, Bill.
10 BY MR. MOULTON:
11   Q.   So let's focus on page 3866 in Exhibit 125.
12 Can you see that on here like a Cobra rate structure?
13   **A.   Yes.**
14   Q.   Does that look familiar to you?
15   **A.   Yeah.**
16   Q.   Is this something you prepared?
17   **A.   Yes.**
18   Q.   Okay.  So in the contract with PREPA, the
19 structure was always it would be -- that Cobra would get
20 paid on a day rate structure too, rate?
21   **A.   That is correct.**
22   Q.   So here we can see the amount that you're
23 billing per day for the various items in this chart?
24   **A.   Yes.**
25   Q.   Okay.  And on page 3888, a similar kind of

Page 72

1 deal.  You have the line item like the workers, for
2 example.  We have a blended rate, 250, and a billable
3 daily rate of $4,000, correct?
4    **A.   That is correct.**
5    Q.   So Cobra was billing on a day-rate basis?
6    **A.   That is correct.**
7    Q.   Now, in these two charts we're looking at, this
8 is a summary of what Cobra was providing to the project,
9 the workers, the sand camp, the security team, logistics
10 team, management team, for example, correct?
11   **A.   Correct.  With the exception of, you know, you**
12 **say the workers, but in that $4,000 per-man per-day rate**
13 **it also included all of the equipment required to perform**
14 **the task, from the bucket trucks, Deere trucks,**
15 **helicopters, string of equipment, cranes, which made up**
16 **the majority of that value.**
17   Q.   Okay.  Page 3870 we have a summary of the
18 equipment that they were to be providing, correct?
19   **A.   This is the original summary of the equipment**
20 **that we would provide.  We had to provide far more**
21 **equipment.**
22   Q.   Okay.  But if I wanted to get a sense at least
23 for, you know, about what -- what was invested by Cobra
24 in the project, it was at least what we can see here on
25 these charts and the contract, right?

Page 73

1    **A.   At a minimum.**
2    Q.   I'm sorry?
3    **A.   At a minimum.**
4    Q.   At a minimum?  Okay.
5         Did you ever hear anything about Higher Power
6 not having enough money towards payroll?
7    **A.   No, sir.**
8    Q.   On Exhibit 225 -- I'm sorry.  Actually that's
9 not it.
10        Exhibit 226, we have the fourth amendment to
11 the contract, correct?
12        MR. LEONE:  Can you blow that up?
13        THE WITNESS:  Okay.
14        THE WITNESS:  It says -- this looks like --
15        MR. LEONE:  Are these exhibits from an SEC
16 filing?
17        MR. MOULTON:  I don't know.  I just got them
18 from Mammoth.
19 BY MR. MOULTON:
20   Q.   I want to direct your attention, sir, to page
21 3885, Mammoth 3885, in Exhibit 226.
22   **A.   Okay.**
23   Q.   Do you see the contract's rate schedule there?
24   **A.   I do.**
25   Q.   Okay.  So here again we see that Cobra was

**DONALD KEITH ELLISON - May 04, 2022**

Page 74

1 billing on a day-rate system with PREPA?

2   **A.   Yes.**

3   Q.   And this chart shows what the proposal was,

4 what the contract was for like what Cobra would be

5 providing and how much they'd be paid?

6   **A.   Yes.**

7   Q.   Okay.  Now, on this amendment number four, was

8 it for the work going forward after July 23rd or was this

9 for some other period?

10   **A.   Can you scroll down?**

11   **Mammoth 4 I believe was executed in February.**

12 **Again, these are not Web Signatures, which would have**

13 **been dated.  This isn't the actual contract or amendment**

14 **that was executed.**

15   Q.   Well, regardless of that, do you

16 remember when -- you're saying that Exhibit -- that the

17 amendment number four, the Web Signature form would have

18 a date on it?

19   **A.   That's correct.**

20   Q.   And based on that date, you would --

21   **A.   This is executed January of '18.**

22   Q.   Right.

23   **A.   Not July of '18, as you mentioned.**

24   Q.   Right.  And I hadn't noticed the date yet.

25 That's why I was asking you.

Page 75

1   Okay.  Do you remember approximately when it

2 was the last contract was signed with PREPA?

3   **A.   May.**

4   Q.   May.  Okay.  Do you remember how many

5 amendments there were or how many contracts?

6   **A.   There was two contracts.  The first contract**

7 **contained a total of five amendments.  The second**

8 **contract was executed late May '18.**

9   Q.   Okay.  So the amounts that amendment number

10 four were additional equipment, additional investment, by

11 Cobra in the project, correct?

12   **A.   That is correct.**

13   Q.   Is that right?

14   Okay.

15   And just to kind of clean that up because it

16 was two questions, in amendment number four we see

17 additional investment by Cobra in the project, correct?

18   MR. LEONE:  Object to the form.

19   THE WITNESS:  We see that PREPA has requested

20 we increase our resource channel of equipment, yes.

21 BY MR. MOULTON:

22   Q.   Can you tell me how the treasury suite function

23 worked with Mammoth?

24   **A.   No, sir.  I wasn't in accounting.  I understood**

25 **that, you know, the our account swept all accounts daily.**

Page 76

1   Q.   When you say that the corporate accounting

2 swept all the accounts daily, what does that mean?

3   **A.   They swept any funds from payments that hadn't**

4 **come yet back to the parent corporate account.**

5   Q.   Okay.  And that's something that Mammoth could

6 do without asking you?

7   **A.   Yes, sir.**

8   Q.   And they did.  You didn't have anything to do

9 with it, right?

10   **A.   That's correct.**

11   Q.   So Mammoth could pull money in and out of the

12 Cobra account without authorization from you?

13   MR. LEONE:  Objection; form.

14   THE WITNESS:  I believe they could pull money

15 in and out from any of the accounts for all of it.

16 BY MR. MOULTON:

17   Q.   That would include Higher Power?

18   **A.   That would include Higher Power, 5 Star, any**

19 **account -- any of the businesses under the Mammoth suite.**

20   Q.   Okay.

21   MR. MOULTON:  I will pass the witness.

22   EXAMINATION

23 BY MR. LEONE:

24   Q.   Mr. Ellison, earlier we were talking about

25 people that were in charge at 5 Star and Higher Power

Page 77

1 during the time the work in Puerto Rico was going on.  I

2 believe that Mr. Moulton asked if you were president of

3 those companies.  Who was the president of 5 Star during

4 the time that 5 Star was providing workers for work in

5 Puerto Rico?

6   **A.   For 5 Star I believe that we had Scott Whitsell**

7 **as the president.**

8   Q.   And same question for Higher Power.

9   **A.   Robert Malcolm.**

10   Q.   Earlier in the deposition Mr. Moulton asked you

11 about what you know one of the workers of Puerto Rico had

12 to do in order to receive their pay for a day, and you

13 said that they had to show up for work.  What exactly did

14 a worker have to do in order to receive pay for the

15 entire day in Puerto Rico?

16   **A.   It seemed like a glossed-over answer.  I mean,**

17 **they had to show up, actually be prepared and available**

18 **for work for that day.**

19   Q.   So not only working, but available to work as

20 well, correct?

21   **A.   That is correct.  They had on the line pay and**

22 **then once they came back in and what did they work, eight**

23 **hours or fifteen hours, they may have to go back out.**

24   Q.   They were on the clock sixteen hours each day,

25 correct?

# DONALD KEITH ELLISON - May 04, 2022

Page 78

1    A.    That is correct.

2         MR. MOULTON:  Object to form.

3 BY MR. LEONE:

4    Q.    Earlier when Mr. Moulton was asking you about

5 the gross-ups for adjustments, who would have had

6 authority to make those adjustments?  You mentioned

7 operations personnel and ground.  Who do you recall would

8 have been somebody, operation person, on the ground in

9 Puerto Rico, that would have made a decision like that?

10        MR. MOULTON:  Leading, and form.

11        THE WITNESS:  Edwards, Cory Mahan, Ken Kennedy,

12 Chad Minickey.

13 BY MR. LEONE:

14   Q.    When we talk about, you know, discretion to

15 just pay, if somebody was fired in the middle of the

16 week, would those people that you just referred to, would

17 they have had the ability to determine whether or not

18 somebody should be paid for the rest of the week?

19        MR. MOULTON:  Leading, and form.

20        THE WITNESS:  Absolutely.

21        MR. LEONE:  I will pass the witness.  Pass.

22        Sir, it's your trial.

23        THE VIDEOGRAPHER:  The time now is now 11:29.

24        MR. LEONE:  David, will you guys handle review

25 for signature of the transcript?  Do you have a process

Page 79

1 for that or not?

2         MR. MOULTON:  On the record you're supposed to

3 request it.  I'll let you request it off if you want.  If

4 we're still on...

5         MR. LEONE:  Madame court reporter, we would

6 like to read and sign.

7         THE VIDEOGRAPHER:  The time is now 11:30.

8 We're off the record.  This concludes today's deposition.

9         (Deposition concluded at about 11:30 a.m. MTD.)

10                      - - -

11

12

13

14    _____

15              DONALD KEITH ELLISON

16

17

18

19

20

21

22

23

24

25

Page 80

1

2

3

4          CERTIFICATION OF TRANSCRIPT

5         This is to certify that the foregoing

6 transcript of the videotape deposition of Keith Ellison

7 on May 4, 2022 is a true and accurate transcript of the

8 proceedings taken by me and transcribed by me.  I further

9 certify that I am not related to any party or attorney,

10 nor do I have any interest whatsoever in the outcome of

11 the action.

12         This 16th day of May, 2022.

13

         _____

14    JACQUELINE M. SULLIVAN, RPR, CRR

      Good to Go Process Service

15    Firm Reg. No. 62

      1225 North Loop West, Suite 327

16    Houston, Texas 77008

      713-351-7061

17

18

19

20

21

22

23

24

25