UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| FRANCISCO CANTU, et al, | § | Case No. 5:19-cv-00615 |
| | § | |
| vs. | § | Jury Trial Demanded |
| | § | |
| MAMMOTH ENERGY SERVICES, | § | |
| INC., et al. | § | Class/Collective Action |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO-TAPED DEPOSITION OF

STEVEN ANTHONY BROUSSARD

April 14, 2022

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEO-TAPED DEPOSITION OF STEVEN ANTHONY BROUSSARD, produced as a witness at the instance of the Plaintiffs, and duly sworn, was taken in the above-styled and numbered cause on the 14th day of April, 2022, from 9:41 a.m. to 10:34 a.m., before Judy H. Gallo, CSR in and for the State of Texas, reported by machine shorthand, and the witness was located at Porter Hedges, LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached hereto.

Page 2

1              APPEARANCES
2
3 FOR THE PLAINTIFFS FRANCISCO CANTU, ET AL:
4 Mr. David I. Moulton
  Bruckner Burch PLLC
5 8 Greenway Plaza, Suite 1500
  Houston, Texas 77046
6 Telephone: 713.877.8788
  Telecopier: 713.877.8065
7 Dmoulton@brucknerburch.com
8
  FOR THE DEFENDANTS MAMMOTH ENERGY SERVICES, INC., ET AL:
9
  Mr. William R. Stukenberg
10 Mr. Harris M. Stamey
   Porter Hedges LLP
11 1000 Main Street, 36th Floor
   Houston, Texas 77002
12 713.226.6000
   E-mail:    WStukenberg@porterhedges.com
13            HStamey@porterhedges.com
14
15 ALSO PRESENT:
16 Mr. Mark Layton, corporate representative
   Mr. Nigel Clarke, videographer

Page 3

1              I N D E X
2 Appearances.................................... 2
  STEVEN ANTHONY BROUSSARD
3 Examination By Mr. David I. Moulton............ 4
  Examination By Mr. William R. Stukenberg....... 35
4 Examination By Mr. David I. Moulton............ 39
  Signature Requested............................ 42
5 Reporter's Certificate......................... 43
6
7 EXHIBITS MARKED FOR IDENTIFICATION
  Plaintiff's Exhibit 130 - LinkedIn............. 4
8 Plaintiff's Exhibit 131 - 10-20-17 e-mail chain
  PR Storm Restoration........................... 4
9 Plaintiff's Exhibit 132 - 11-26-17 and 11-21-17
  E-mail chain - terminated staff................ 4
10 Plaintiff's Exhibit 133 - 5 Start Offer of
  Employment..................................... 4
11 Plaintiff's Exhibit 134 - E-mail 10-23-17 Pay
  Rates.......................................... 4
12 Plaintiff's Exhibit 135 - from Jeff Beagle -
  Spreadsheet.................................... 4

Page 4

1         (Premarked Plaintiff's Exhibits 130-135.)
2         THE VIDEOGRAPHER: All right. Today is
3 Thursday, April 14th, 2022. We are on the record at
4 9:41 a.m.
5         STEVEN ANTHONY BROUSSARD,
6 Having been first duly sworn, testified as follows:
7              EXAMINATION
8    Q. (By Mr. Moulton) Good morning, Mr. Broussard.
9 Before -- my name's Dave Moulton. I'm the lawyer that
10 represents Plaintiffs in this case.
11        MR. MOULTON: Before we get started, just
12 for the record, can we take an attendance role? So
13 starting with Mr. Stukenberg.
14        MR. STUKENBERG: Sure. Will Stukenberg
15 with Porter Hedges. Counsel for the Defendants.
16        MR. STAMEY: Harris Stamey with Porter
17 Hedges, counsel for the Defendants.
18        MR. LAYTON: Mark Layton, corporate
19 representative for the Defendants.
20        MR. MOULTON: Thank you.
21    Q. (By Mr. Broussard) Mr. Broussard, would you
22 please state your full name, for the record?
23    A. Steven Anthony Broussard.
24    Q. And what is your current address?
25    A. 3124 North Wild Mountain Road, Tulsa, Oklahoma.

Page 5

1    Q. And how long have you lived there?
2    A. That's a good question. 26 years.
3    Q. And what is your date of birth?
4    A. 6-20, 1962.
5    Q. What is your profession?
6    A. I'm an attorney.
7    Q. As an attorney, have you -- have you worked
8 with Mammoth Energy and the -- and the other Defendants
9 in this matter?
10    A. I have represented them in the past.
11    Q. As -- as -- as a representative, have you been
12 involved with any litigation with them? In other words,
13 are you a litigation attorney, or primarily an advising
14 attorney?
15    A. I do litigation, and also advise clients.
16    Q. Okay. For Mammoth Energy, have you ever
17 testified for Mammoth Energy or its subsidiaries before?
18    A. I have -- this is the second time I've given a
19 deposition, and the first time was not involving any
20 entity related to Mammoth.
21    Q. Okay. So the answer to that would -- I'm
22 assuming is "no," --
23    A. Yes.
24    Q. -- right?
25    A. That's correct.

Page 6

1  Q. Okay. How long ago was it that you gave a
2 deposition?
3  A. Um, maybe about 16 years ago.
4  Q. Okay. Was it in regards to a wage and hour
5 matter?
6  A. No.
7  Q. Okay. Could you briefly describe for us your
8 experience with wage and hour law?
9  A. Yes. So I practice in the area of employment
10 law. Um, I advise management on employment issues,
11 which include wage and hour issues, discrimination
12 issues, contract issues, policies. Um, I also represent
13 companies in litigation involving employment matters,
14 and I've done that for about 30 years.
15  Q. Okay. Sir, we're going to show you a document
16 that I've marked as Plaintiff's Exhibit 130. We're
17 doing sequential exhibits. And I know Will is panicking
18 right now. He's afraid I'm going to have this huge
19 exhibit, but this is one page. And I just wondered if
20 you -- wanted to know, Mr. Broussard, can you verify for
21 me that his is information from your LinkedIn page?
22       MR. STUKENBERG: Has this been produced?
23       MR. MOULTON: It's on the internet.
24       MR. STUKENBERG: I just asked, has it been
25 produced?

Page 7

1       MR. MOULTON: I don't think so. I --
2       MR. STUKENBERG: All right. We're going to
3 go ahead and object to using documents that haven't been
4 produced in the course of this litigation given the
5 amount of discovery disputes we've had about producing
6 documents in advance of depositions. You can go ahead
7 and answer. I'm just lodging my objection.
8  A. Sure. It might be. I haven't been on my
9 Linked page in years. I don't -- and I don't know -- I
10 don't know who set this up.
11  Q. No.
12  A. So I don't know what this is quite frankly.
13  Q. That's fine.
14  A. Yeah.
15  Q. And so, I guess, can we -- I guess I'm more
16 interested in the information. I was trying to save
17 some time rather than go through --
18  A. Sure.
19  Q. -- your entire -- entire, you know, life
20 history since you were in 5th grade. I don't want to do
21 that.
22  A. Uh-huh.
23  Q. But I'm showing here that you have been an
24 attorney with Hall Estill since May 1988; is that
25 correct?

Page 8

1  A. That's correct.
2  Q. And that you graduated from the University of
3 Tulsa College of Law in 1988?
4  A. That's correct.
5  Q. And you went -- attended Vander -- well, you
6 graduated from Vanderbilt University with a Bachelor's
7 in Economics in 1984?
8  A. That's correct.
9  Q. Okay. So during -- so during your --your
10 career, you've been with Hall Estill?
11  A. The entire time.
12  Q. Okay.
13  A. Yes. My -- my -- as far as my legal career as
14 a lawyer.
15  Q. All right. Well, we kind of have something in
16 common, other than the number of years I've been with my
17 current firm.
18  A. Uh-huh.
19  Q. But I might actually catch up with you, but
20 we'll see.
21       So, uh -- all right. So, um, now as part
22 of -- well, as it relates to Mammoth Energy. You gave
23 them advice about a number of things, correct?
24       MR. STUKENBERG: And -- and can we go ahead
25 and be specific who you're referring to as Mammoth

Page 9

1 Energy?
2  Q. (By Mr. Mouton) Yeah. Mammoth Energy Services,
3 Inc.
4  A. I have advised them in the past. Yes.
5  Q. Okay. And my understanding that you gave
6 advice to Mammoth Energy Services, Inc., in regards to a
7 pay plan that they implemented in Puerto Rico after the
8 storm there for the workers that went to repair the
9 electrical connections there?
10  A. Are you referring to October of 2017?
11  Q. Yes.
12  A. Yes.
13  Q. Okay.
14  A. I gave some advice in terms of -- of payments.
15 Yes.
16  Q. Okay. And I also understand that you also
17 helped them with their offer letters?
18  A. I don't know if Mammoth had any offers letters.
19 I'm not aware of that.
20  Q. Or -- or their subsidiaries?
21  A. I did review offer letters for, I think, maybe
22 one or two, maybe three subsidiaries, or affiliated
23 companies.
24  Q. Okay. Well, let's -- let's pull up Exhibit
25 131, and this is an e-mail chain. And I'm just going to

Page 10

1 kind of scroll down slowly to the bottom.  Kind of get
2 you familiar with this document.
3       A.   Sure.
4       Q.   So we start out -- and -- and I'm not asking
5 you to verify.  I'm just going to summarize this a
6 little bit.  Okay?
7            So we start out with an e-mail that you're
8 not on yet from Keith Ellison about -- it says, we are
9 paying the following.  It has a list.  And we go up, and
10 they're talking about, you know, getting this project
11 started.  And then Jeff Beagle e-mails you on October
12 20th, 2017.  Do you see that?
13      A.   Yes.
14      Q.   Okay.  And you respond to him on October -- on
15 the same day.  October 20th at 4:00 o'clock.  Do you see
16 that e-mail?
17      A.   Yes.
18      Q.   Okay.  And it looks to me that you provided
19 advice to Mr. Beagle and copied Ken Kinsey and Alexander
20 Kalman about a couple of things in this e-mail, correct?
21      A.   Yes.
22      Q.   Okay.  So the -- the first part, it looks like
23 you are letting them know that if the offer letters say
24 that the work will be governed by another State's laws,
25 that they won't be covered by the Puerto Rican

Page 11

1 employment laws; is that correct?
2       A.   Well, they were -- there's an exception as to
3 certain laws under Puerto Rico.  Under the Labor
4 Transformation and Flexibility Act, the laws -- there
5 are certain law that would not apply to workers who are
6 outside of Puerto Rico.
7       Q.   Right.  And, but for that to work, I believe
8 you advised them that they would have to have offer
9 letters or agreements with their workers that
10 specifically said that some other State's law would
11 apply?
12           MR. STUKENBERG:  Objection.  The document
13 speaks for itself.
14      Q.   (By Mr. Moulton) Is that -- is that an adequate
15 -- is that an accurate summary?
16      A.   Yes.  It's what I -- what I said in the e-mail
17 is what I said.  Yes.
18      Q.   Right.  Okay.  But that -- is that -- is that
19 true?  Is that -- that's the advice basically that you
20 gave them?  Is that -- for example, if you have the
21 employees get offer letters that say Oklahoma Law
22 applies, that the Puerto Rican employment laws won't
23 apply?
24      A.   If -- if you're talking about in terms of this
25 particular exhibit.

Page 12

1       Q.   Uh-huh.
2       A.   And if you meet the terms as -- as I've
3 outlined in this exhibit, I suspect so.  But, yes.  It's
4 more than just -- just that.
5       Q.   Okay.  And so what did I say that was wrong?
6       A.   What I'm saying is, is you left some of the
7 things out.  For example, they cannot exceed three
8 consecutive years of employment in Puerto Rico.  We talk
9 about individuals who are not -- don't live or reside in
10 Puerto Rico.  And that's why I said that the e-mail
11 speaks for itself, and in terms of what exactly the
12 requirements were with regard to that.
13      Q.   Okay.  All right.  But -- and so I'm not
14 in that -- and -- and that's fair.  I'm not really
15 trying to get into all the details.
16      A.   Yeah.
17      Q.   My point is, is that this is advice that you
18 gave to Mammoth Energy and its subsidiaries?
19      A.   I gave this to Mammoth and not all of its
20 subsidiaries.
21      Q.   Okay.  So who -- who are you advising at this
22 point?
23      A.   Well, I gave this to Jeff Beagle.
24      Q.   Okay.
25      A.   Who I understood at that time was with Mammoth,

Page 13

1 who was also working on offer letters related to, um,
2 companies that were affiliated with Mammoth that would
3 then present these offer letters to individuals who
4 might be wanting to work in Puerto Rico.
5       Q.   Okay.  So you --
6       A.   But I'm just -- I'm simply saying that I --
7 this is not something that was not to every affiliate
8 for Mammoth as far as I know.
9       Q.   Right.  But you understood that Mammoth would
10 potentially be using it with their subsidiaries?
11      A.   I understood that was a potential.
12      Q.   Yeah.  So as -- as part of your advisory role
13 here.  Did you also take on any sort of operational kind
14 of things?  Like -- and what I mean by that is, did you
15 actually have any role in verifying whether or not
16 Mammoth or its subsidiaries actually secured agreements
17 or got offer letters out to its workers?
18      A.   No.
19      Q.   Okay.  And you -- and you had no role in
20 verifying that they collected them back and -- and
21 actually had this policy actually operating?
22      A.   That's true.  I wasn't involved in that.
23      Q.   All right.  So your role as far as the -- the
24 advice about the Puerto Rican law was strictly saying,
25 hey, guys, this is what you want to have in your offer

Page 14

1 letters, and then you -- you didn't actually verify to
2 see that the company was actually implementing that
3 policy?
4    A.  Yeah.  Whatever I said in that e-mail is what I
5 advised them with regard to Puerto Rican law.
6    Q.  Right.  And I just want to be real clear that
7 you -- you took on no role to make sure they're actually
8 implementing these offer letters?
9    A.  I did not.
10   Q.  Now, also in your role in advising Mammoth --
11 I'm going to show you Exhibit 132.  It looks like you
12 were also asked to -- and I might ask you about what
13 this matter is about in Exhibit 132.
14   A.  Uh-huh.
15   Q.  I mean, all of it's redacted pretty much, but
16 the -- the key point, which if the part that's not
17 reacted -- redacted --
18   A.  Uh-huh.
19   Q.  -- is that you asked at some point with respect
20 to some other matter that I'm not asking about, that you
21 wanted to see the offer letter signed by that employee,
22 correct?  Do you see that --
23   A.  That's correct.
24   Q.  -- in Exhibit 132?  Okay.
25        And so I happen to have a copy of that, and

Page 15

1 I wanted to review that with you.
2    A.  Okay.
3    Q.  So Exhibit 133.  Is -- is this the -- the offer
4 letter that you reviewed as part of -- that -- that was
5 mentioned in the -- in the e-mail that's Exhibit 132?
6    A.  I believe it is the sample you mentioned.
7    Q.  Okay.  And -- and so if -- if you look there.
8 It says Puerto Rico Storm Rate?
9    A.  Yes.
10   Q.  It says -- you see where it says $900.00 per
11 day that would be broken down hourly over 16 hours
12 daily?
13   A.  Yes.
14   Q.  Okay.  As part of your advisory role to Mammoth
15 Energy, did you give them advice about instead of paying
16 a day rate of actually taking what they intended to pay
17 over a week and breaking it down into an hourly system?
18   A.  We talked about different methods or possible
19 methods of payment.  One was a day rate.  And I think we
20 also talked about paying by the hour.  They had -- they
21 were different options they could go by.  So, for
22 example, if they decided to go by a day rate, then they
23 would to do a certain calculation in order to comply
24 with the Fair Labor Standards Act.
25        My understanding at that time was with this

Page 16

1 particular project that the individuals who would be
2 working for the subcontractors or the contractor in
3 Puerto Rico would be working seven days a week, and they
4 would be working in excess of eight hours a day.
5        My understanding was also that the -- they
6 were working in terms of trying to figure out, you know,
7 what was -- what was the best plan in terms of going
8 forward within the confines of the Fair Labor Standards
9 Act.
10       So I don't know exactly where they ended
11 up.  We had several conversations about, you know, what
12 do we do in terms of -- of pay.  I don't even know if
13 they -- what they settled upon doing in terms of how
14 they would do it.  I just remember having those
15 conversations, and my conversations about that were with
16 Jeff Beagle.
17   Q.  Okay.  Now, if can go back to the e-mail where
18 you were advising about the Puerto Rico law.
19   A.  Yes, sir.
20   Q.  Which is Exhibit 131.
21   A.  Uh-huh.
22   Q.  I want to go back to that e-mail because you
23 reminded me that -- there's a paragraph here.  Maybe the
24 best way to not get caught up on details is just to --
25 to read it.

Page 17

1        So you -- in the -- do you see the
2 paragraph -- two paragraphs above the example offer
3 letter above "Dear."
4    A.  The one that starts off "If the contract does
5 call for the application of the law of a jurisdiction
6 other than Puerto Rico?"
7    Q.  Yes.
8    A.  Yes, sir.
9    Q.  That's the one I want to draw your attention --
10 attention to.  And in the second sentence, it says, "In
11 any state in the United States, that would, at a
12 minimum, require payment of overtime in accordance with
13 the Fair Labor Standards Act.  Calculating overtime
14 under the FLSA, based on a day rate, would be done as
15 follows:"  And then you walk them through the
16 calculation, correct?
17   A.  That calculation's not correct.
18   Q.  Fair enough.  And I think I know what you're --
19 what you're going to say the -- what was wrong with it,
20 but --
21   A.  Yeah.
22   Q.  But -- and I don't want to get into that.  But
23 the -- but my point is that you gave advice to Mammoth
24 that basically in affect was:  If you're going to pay a
25 day rate, you're going to have to pay overtime, and

Page 18

1 there's going to be a formula for it?
2   A.  Uh, yes.  Right.
3   Q.  Now, can you tell us what -- if you were to
4 go -- if you could correct this e-mail now, what -- as
5 far as the calculation, what would you say?
6   A.  The last sentence should be half time the
7 amount for each hour in excess of 40.
8   Q.  Right.
9   A.  Yeah.
10   Q.  For day rates, they only get the extra --
11   A.  Right.
12   Q.  -- half time?
13   A.  That's right.  Yeah.  That was a mistake on my
14 part.
15   Q.  Yeah.  Sir, I want to show you now what's
16 Exhibit 134, and this is just a --it looks like an
17 e-mail that's just transmitting a document to you from
18 -- it's from Jeff Beagle on October 23rd.  Do you see
19 this e-mail?
20   A.  I do.
21   Q.  Okay.  And it references an attachment called
22 Hourly -- Hourly Rate Conversions Excel Spreadsheet.  Do
23 you see that?
24   A.  I see that.
25   Q.  Okay.  Does that jog your memory at all about

Page 19

1 what that might be?
2   A.  At one point when I sent a -- it may have been
3 in response to my -- the earlier e-mail that we saw when
4 I was talking about the day rate and the calculation.
5 Someone sent Jeff an e-mail saying, hey, make sure we
6 line him up with the -- I think it was the job
7 categories or positions.  And in response, I think I got
8 this.
9   Q.  Okay.  And so this is something you were asked
10 to review?
11   A.  Well, I received it, and I looked at it.  But I
12 think the -- when I got it, the question was not so much
13 -- I -- I think it -- when you say review.  What it was,
14 was a response, I think Jeff was making in response to
15 this other person, say make sure your jobs line up with
16 the classifications.  So they sent that.  So Jeff sent
17 that to me in response to that particular e-mail, and
18 did I review this.
19   Q.  Okay.  And so I have a copy of that
20 spreadsheet.
21   A.  Uh-huh.
22   Q.  It's Exhibit 135.
23   A.  Okay.
24   Q.  Do you recognize this as the spreadsheet that
25 you received from Mr. Beagle in Exhibit 134?

Page 20

1   A.  Yes.
2   Q.  Okay.  And so it looks like to me this is a
3 method of saying, let's take the -- the -- what someone
4 would receive as a day rate over a week, and let's
5 figure out what the hourly rates would be.  So if they
6 work the entire week like we're expecting, they would
7 end up getting their day rates for the week.  Does that
8 make sense?
9   A.  I don't know.
10   Q.  Okay.
11   A.  Well, I will -- I will tell you this.
12   Q.  Okay.
13   A.  When I got this particular document, it was --
14 I was focused on the titles.  I also looked at the
15 budgeted day rate, um, and I looked at the hours.  I was
16 trying to get a sense if there was a minimum -- if the
17 minimum wage would be met.  And as I looked at this
18 particular document, this looked to me as a -- maybe a
19 budgeting document.  I don't think they had settled on,
20 are we going to do a day rate?  Are we going to do an
21 hourly rate?  At this point in time, I think they were
22 still discussions about that.  And so they do have like
23 an implied hourly rate, a gross weekly, a day rate,
24 budget day rate.  They have got various figures out
25 there, and I think at -- you know, from what I could

Page 21

1 tell looking at this, is they were still trying to
2 decide what to do.
3   Q.  Okay.  Did you -- did you ever -- were you ever
4 privy to -- privy to what they ended up doing?
5   A.  I don't think I ever got a final, um,
6 determination.  I talked to Jeff Beagle.  Jeff was the
7 person, my primary contact.  And we talked about a day
8 rate.  We talked about -- we may have even talked about
9 a fluctuating work week, which wouldn't work in this
10 situation, and hourly.  And I -- and I don't know
11 exactly where they ended up.  But from my perspective,
12 they could have gone with a day rate.  They could have
13 gone with an hourly rate.  Um, but I don't know what
14 happened, and -- because I know there was some
15 discussion going back and forth trying to figure out.
16 At least that was my impression.
17   Q.  Okay.  All right.  So it sounds like to me --
18 and I don't mean to put words in your mouth.  So
19 don't -- I don't -- I don't want to upset you or
20 anything.  I just want to try to kind of clarify this.
21 It sounds like to me that they didn't present to you a
22 specific plan about how they were going to pay and ask
23 for your blessing, if you will, on it.  I -- I withdraw.
24         MR. STUKENBERG:  Objection.
25 Mischaracterizes the evidence.

Page 22

1  A.  Yeah.  I would say this.  I would say what they
2  did was they presented -- I presented two different
3  options from a legal perspective, how to comply with the
4  Fair Labor Standards Act.  I was fairly certain they
5  would go with either of those options.  Okay.  And if
6  they -- and if they went with one of those options in
7  the way we discussed, they would be in compliance in my
8  mind with the Fair Labor Standards Act.  So that's
9  really where it was.  It wasn't a matter of -- I mean, I
10  guess you could say there were two plans --
11  Q.  Uh-huh.
12  A.  -- affectively that they were considering.  Now
13  which one they chose, I don't know.  But I know there
14  were two different plans that they were talk -- we --
15  that it came down to at that point in time.
16  Q.  Okay.  And then just to clarify.  What -- what
17  were the two plans?
18  A.  One was to pay -- pay on an hourly basis, which
19  would mean then the regular rate for overtime purposes
20  would be the hourly rate, and the other one was
21  potentially a day rate plan.
22  Q.  Okay.  Um, and then so going forward, and
23  just -- just to -- to confirm.  You didn't review actual
24  payroll records at any point to determine whether or not
25  those records and that payment plan was -- was in

Page 23

1  compliance?
2  A.  No.
3  Q.  Okay.  And so you -- you -- what you did is --
4  y'all -- y'all discussed two different options.  The day
5  rate plan and the hourly plan, and talked with them
6  about either one of -- that either one could comply with
7  the FLSA?
8  A.  Right.
9  Q.  Okay.  And with it -- and if it was a day rate,
10  they would have to pay an additional half time for hours
11  worked over 40, correct?
12  A.  That's correct.
13  Q.  And if they are going with the hourly system.
14  The hourly system would have the overtime because you'd
15  do an hourly rate plus -- or, you know, and a time and a
16  half for after 40, correct?
17  A.  Right.
18  Q.  Okay.  So either one of those would comply?
19  A.  Right.
20  Q.  Okay.  Did you give any -- did -- did you give
21  any advice to them about whether or not a day rate
22  includes overtime pay?
23  A.  Um, no -- other than what the calculations that
24  -- as I laid out, we've talked about.  No.  I didn't say
25  anything about including necessarily.  Now the day rate

Page 24

1  -- and, you know, as I pointed out in the e-mail.  I
2  mean, the -- the regular rate is going to fluctuate
3  depending on the number of hours that they worked, of
4  course.  But there wasn't any -- any discussion beyond,
5  um, what's laid out in e -- e-mails in terms of the day
6  rate.  Other than, of course, correcting the -- instead
7  of one and a half, it's half time above 40 hours a week.
8  Q.  So I -- I have a couple of more questions about
9  your -- your role with -- with Mammoth and advising
10  them.
11  Did you -- with respect to the Plaintiffs
12  in this case, did you give Mammoth any advice about the
13  Motor Carrier Act Exemption in Puerto Rico?
14  A.  No.
15  Q.  Okay.  Did you give ad -- advice to Mammoth or
16  any of its subsidiaries with respect to the Plaintiffs
17  in this matter about the application of the Motor
18  Carrier Act in Puerto Rico?
19  A.  No.
20  Q.  Okay.  Are you familiar with the term
21  white-collar exemptions?
22  A.  Yes.
23  Q.  Okay.  And to -- to make sure there's no
24  ambiguity about this.  What I mean by white-collar
25  exemptions can be your professional, executive,

Page 25

1  administrative.  Um, al --
2      MR. STUKENBERG:  Computer.
3      MR. MOULTON:  Well, I mean, I guess, but we
4  don't have computer guys in this case.  I mean, okay.
5  Q.  (By Mr. Moulton) All right.  Professional,
6  executive, administrative, computer ex -- exemptions,
7  and a highly compensated exemption.
8      With respect to those exemptions, did you
9  give advice to Mammoth or its subsidiaries with respect
10  to the Plaintiffs in this matter about the applicability
11  of those exemptions?
12  A.  No.
13  Q.  So safe to say, it wouldn't make any sense for
14  Mammoth to say that they relied on advice from you about
15  the applicability of Motor Carrier Act or white-collar
16  exemptions as applied to the Plaintiff in this matter?
17  A.  The only thing I can think of -- I don't
18  remember any discussion about the Motor Carrier Act.
19  It's possible in a conversation with Jeff, just talking
20  in general terms about the Fair Labor Standards Act and
21  the requirements, pointing out that there are certain
22  exemptions, depending on the job duties associated with
23  a certain position.  That's very possible that happened.
24  So Jeff would have known that.
25      Now in terms of going into detail with the

Page 26

1 Motor Carrier's Act.  I don't remember that.  I don't
2 recall that.
3    Q.  Okay.  Now -- now, do -- do you recall
4 conver -- do you recall any more detailed conversations
5 with Jeff Beagle about the applicability of any
6 white-collar exemptions to the Plaintiffs in this
7 matter?
8    A.  Um, and -- and I don't know the Plaintiffs in
9 this matter.  All I know is -- is my advice related to
10 what, at the time, I believe we thought were non-exempt
11 positions under that Fair Labor Standards Act.  And if
12 that's where the -- where the Plaintiffs are, I guess
13 so.
14    Q.  Okay.  So did you -- do you recall letting Jeff
15 Beagle know that any of the Plaintiffs could be exempt?
16    A.  I don't recall that.  No.
17    Q.  Did you -- did you discuss with Mr. Beagle
18 whether or not the application of a -- did you discuss
19 with him the -- the -- wait.  Let me rephrase it.  Did
20 you discuss with Mr. Beagle whether or not a day rate
21 would either invoke or not invoke any exemptions?
22 Particularly white-collar exemptions?
23        MR. STUKENBERG:  Can you repeat that?  I am
24 sorry.  I missed it.
25    Q.  (By Mr. Moulton)  Yeah.  Did you -- did you

Page 27

1 discuss with Mr. Beagle whether or not payment of a day
2 rate would either invoke or not invoke any exemptions,
3 particularly white-collar exemptions?
4    A.  I don't recall that.
5    Q.  Okay.  Did you discuss with Mr. Beagle whether
6 or not blue-collar workers would be exempt or not
7 exempt?
8    A.  If -- if you mean -- well, I guess it depends
9 on what your definition of blue collar is.  So, I mean,
10 I don't know.  What's your definition of that?
11    Q.  Oh, okay.  Um, I'm just -- I'm not actually
12 putting a definition.  I just want to know if y'all had
13 that discussion?  Like did you -- did the -- did the
14 phrase blue-collar work and exemptions come up in
15 y'all's discussions about the applicability of
16 white-collar exemptions to the employ -- to the
17 Plaintiffs in this matter?
18    A.  Um, I -- I don't remember.  I don't know if it
19 did or not.
20    Q.  Okay.  Did y'all -- did you talk with him --
21 did you talk with him about the -- about like electrical
22 linemen?  Whether or not they would be blue collar or
23 not?
24    A.  I don't recall that conversation.
25    Q.  Okay.  Did you talk with him about whether or

Page 28

1 not mechanics would be blue collar or not?
2    A.  I don't recall that.  And it's possible that we
3 would have had a conversation again that was somewhat
4 general terms, but I don't recall it in specific.
5    Q.  Okay.  Now back to the two options that we were
6 talking about earlier as far as the pay plan.  The two
7 options were either that -- that Mammoth was considering
8 was either at day rate system or an hourly system.  Do
9 you recall that testimony?
10    A.  Yes.
11    Q.  Okay.  Was there ever a third option that came
12 up where it would be hourly, but say boosted to the day
13 rate?
14    A.  I don't recall any conversation like that.
15    Q.  Okay.  Did you ever discuss any sort of
16 situation where that even though -- that even if they
17 adopt a -- an hourly system, that they would also pay,
18 in addition to the hourly system day rates?
19    A.  No.
20    Q.  No. So that -- that's not something that -- so
21 those -- those other scenarios that I just mentioned are
22 not plans that you advised them on?
23    A.  No.  I didn't advise them on that.
24        MR. MOULTON:  Okay.  I think I'm almost
25 going to be done.  I just want to review a couple of

Page 29

1 things.
2        MR. STUKENBERG:  Sure.
3        MR. MOULTON:  And we can take five -- y'all
4 -- we can take a break or we can sit here.  Either way.
5 But I'm thinking like five minutes.  So I'm probably --
6 probably going to be done, but we'll se.
7        MR. STUKENBERG:  Yeah.  Why don't we take
8 five.
9        MR. MOULTON:  Okay.
10        THE VIDEOGRAPHER:  We are off the record at
11 10:11.
12        (Recess taken at 10:11 until 10:21.)
13        THE VIDEOGRAPHER:  All right.  We are back
14 on the record at 10:21 a.m.
15    Q.  (By Mr. Moulton) All right.  Mr. Broussard, I
16 just had a -- a couple of follow-up questions.
17    A.  Before -- before we.
18    Q.  Oh, yeah.  Go ahead.
19    A.  Let me just -- there's one thing I want to make
20 sure it is clear.  I think we've been -- and I've been
21 guilty of this -- using the term Mammoth rather loosely
22 here.  When going back to the discussions that I was
23 having back in 2017 we've been talking about.  When I
24 refer to Mammoth, I'm talking about the affiliates, as
25 well, that were -- that were involved in that -- that

Page 30

particular situation that we're going to be working as -- as I understood to be contractors down there in Puerto Rico. So I just wanted to make sure that was clear because I didn't want to give the impression that I'm only talking about one particular entity.

Q. Right. And so -- and to be -- and to further clarify. When -- when you were talk -- so you're saying when you were talking about Mammoth before. You meant Mammoth Energy Services, Inc.? You mean 5 Star? You mean Higher Power? Does that -- did you include those?

A. If those were the ones that were involved at that time. Because it really was kind of a -- the focus on who was going to Puerto Rico. Who was going to be providing services in Puerto Rico. And as I understood at that time, these contractors were hired by another entity to go and work in Puerto Rico.

Q. Okay. Was that Cobra, or do you not know?

A. I can't remember.

Q. Okay. Um, and since you've mentioned it now. Did you -- did you give any advice to Mammoth or its -- or its subsidiaries about whether or not the -- the companies and the workers going to Puerto Rico were, in fact, independent contractors?

A. No.

Q. Okay. Did you advise them whether or not they

Page 31

were employees or not of Mammoth?

A. I -- I would say this. In terms of the Mammoth legal entity they were doing. I know they weren't employees of Mammoth, the legal entity. The individuals were going to get offers from -- as I understood -- different companies that were affiliated with Mammoth. And that because of that, then if they accepted, of course, they would be employees of those companies.

Q. And -- and I -- and I appreciate all that. I don't -- I don't think that was exactly responsive to my question. Um, I want to know if you actually gave advice to Mammoth or its affiliates about who would be an employee or not in Puerto Rico?

A. I was not involved in the selection of employees.

Q. Okay. And were you -- and so is it safe to say that you weren't involved with providing advice about classifying the workers as employees or not of any particular entity?

A. I wouldn't have been in -- I'm -- I'm trying to -- if I understand your que -- are you saying -- I don't know if I understand the question.

Q. Yeah. What -- maybe if -- if I can -- maybe let -- let me give you what I'm really after. All right?

Page 32

A. Sure. That would be helpful.

Q. And I -- depositions are funny because sometimes you can't just say what you're really after. But I want to know if Mammoth or the subsidiaries that are involved in this case can say Steve Broussard told us that these workers were not employees of Mammoth or Cobra. Can they say that?

A. If they worked for another company, they could.

Q. I want to know if you told them, if you helped them make a classification decision about employee or non-employee status? That's what I'm asking.

A. So whether they were an employee or independent contractor?

Q. Yeah.

A. Okay. That's -- I can answer that question.

Q. Yeah.

A. No.

Q. Okay. That's what I want to know. You didn't provide them advice on it?

A. No. I did not provide advice to them regarding whether they should be employees or independent contractors.

Q. All right. And I -- and I realize today you've clearly expressed an opinion about it now. Back then, this was not part of the discussion? You did not advise

Page 33

them about who was an employee and who was not?

A. That conversation, as I understood at that time, involved employment, employees. And there was -- there wasn't a discussion about independent contractors.

Q. I hear you, and -- but I -- and -- and to -- just to be clear.

A. Let me put it this way. Other than the companies involved, other than independent contractors. The -- the -- they were going to be hired by another company to perform work in Puerto Rico. That was my understanding.

Q. Right. And -- and so -- and from what you just said earlier. What you -- what you mean to say is that you mean -- you mean that your advice would apply to employees and not independent contractors. The advice that we talked about like the pay plan and the Puerto Rico law issues, correct?

A. Correct.

Q. Okay. And then I just want to -- just, again, just to be -- just super clear about this. You weren't involved in giving them advice about how to classify workers as either employees or independent contractors, correct?

A. I don't remember that discussion.

Q. Okay. Are you -- okay. Now back to what I

Page 34

1 wanted to ask you about. Did -- did -- was there
2 anything else that you wanted -- because this was
3 something that you wanted to clarify --
4   **A. Right.**
5   Q. -- as you came back in.
6        Okay. Was there anything else that you
7 wanted to clarify before we move on?
8   **A. Not at this time.**
9   Q. Okay. Are you related to anyone at Mammoth or
10 its subsidiaries?
11  **A. Not that I'm aware of.**
12  Q. Okay.
13       MR. STUKENBERG: Do you mean like a
14 familial relation?
15       MR. MOULTON: Yeah. Familial relations.
16  **A. Not that I'm aware of.**
17  Q. (By Mr. Moulton) Like -- and so, do you have
18 a -- do you have any relationships with folks at Mammoth
19 or its subsidiaries that you know of that maybe not
20 family relationships but maybe any other kind of close
21 relationships? Like frat buddies or friends or anything
22 like that?
23       MR. STUKENBERG: Objection to the
24 characterization --
25       MR. MOULTON: If I don't --

Page 35

1        MR. STUKENBERG: -- friends, close
2 relationships. I mean, you can go ahead and answer.
3   **A. Thanks. I -- I don't have any -- I don't think**
4 **I have any close relationships. I think I was friendly**
5 **with the people I work with that were affiliated with,**
6 **um, um, a Mammoth en -- entity, I guess, but -- and when**
7 **I say that, I'm talking in general, using the term**
8 **Mammoth in a general sense, but I wouldn't say I had any**
9 **type of a close relationship with anyone there.**
10  Q. (By Mr. Moulton) Okay. So safe to say that
11 regardless of the outcome of this case. It's not going
12 to have any impact on you whether financially or family
13 or falling out with friends?
14  **A. Not that I'm aware of.**
15       MR. MOULTON: Okay. I'll pass the witness.
16       EXAMINATION
17  Q. (By Mr. Stukenberg) Mr. Broussard, you
18 mentioned that you spoke with Mr. Beagle in order to be
19 compliant with the Fair Labor Standards Act; is that
20 right?
21  **A. That's correct.**
22  Q. Did you speak with anybody else with a Mammoth
23 affiliated entity about FLSA compliance?
24  **A. There was a call that I had with, um, Jeff**
25 **Beagle and Mark Layton on a weekend, and we talked. I**

Page 36

1 **don't remember the specifics of it, but we did have a**
2 **conversation. It was related to, um, you know, the Fair**
3 **Labor Standards Act, wages, how to pay employees; that**
4 **sort of thing.**
5   Q. Okay. So you did speak with Mr. Layton about
6 the compensation plans and --
7   **A. I --**
8   Q. -- evaluation?
9   **A. I -- we had a conversation. I can't tell you**
10 **the specifics. I remember a conversation because it was**
11 **a weekend.**
12  Q. I've got it.
13       We looked at an offer letter earlier. You
14 did review the offer letters, the sample offer letters
15 that Mr. Beagle provided you?
16  **A. I reviewed, um -- I can't remember how many I**
17 **reviewed, but he did provide me offer letters, samples**
18 **that I did review.**
19  Q. What did you understand Mr. Beagle's intent to
20 be in seeking your advice related to these Puerto Rico
21 issues?
22  **A. Um, when -- in conversations with Jeff, the**
23 **idea was trying to get it right. Um, trying to make**
24 **sure that they were in compliance with the Fair Labor**
25 **Standards Act, um, and the applicable laws in Puerto**

Page 37

1 **Rico. That was my understanding. We had several**
2 **conversations about various ways to do things. Um, and,**
3 **you know, how to structure a pay plan or pay system**
4 **that's going to be compliant with the Fair Labor**
5 **Standards Act. Um, you know, how to figure out, you**
6 **know, what the overtime pay should be. That sort of**
7 **thing.**
8   Q. Did anybody with any Mammoth related entities
9 ever express to you any interest, effort, or intent to
10 try to find a pay system that avoided paying overtime?
11  **A. No. No. Never. And, like I said, in fact, we**
12 **had, um, different conversations. Um, Jeff would --**
13 **would -- would reach out and say if you have a question**
14 **about this. Um, I think the intent was -- at least my**
15 **impression talking to him-- was they were trying to**
16 **figure out -- make sure they did it right. Make sure**
17 **they paid folks the way that they were supposed to be**
18 **paid. Um, at least that was my impression.**
19  Q. And you talked about there were several
20 different pay plans that were under evaluation.
21       MR. MOULTON: Objection, form.
22  **A. Well --**
23  Q. (By Mr. Stukenberg) Is that accurate?
24  **A. Well, there were -- there were -- as I**
25 **remember, we talked about different ways. We may have**

Page 38

1 talked about the fluctuating work week at one point.
2 That -- that went out the window because, as I
3 understood it, you know, it wasn't going to fluctuate.
4 These guys were going to be working long hours.  They
5 were going to be working every day.  Um, we talked about
6 a possible day rate plan under the Fair Labor Standards
7 Act, and we talked about an hourly plan.  Um, and so I
8 think we came down to -- as I remember, there were two
9 options.  And I remember in terms of the hourly, there
10 was some discussion about how do we -- you know, how do
11 we -- how do we settle upon an hourly rate, and what --
12 what would that be.  Um, and I -- and -- and -- because
13 they were working within a budget.  Um, but I don't
14 remember the specifics in terms of them deciding on a
15 particular rate, or how they were going to do it, but we
16 talked about that.  And I -- because I just can't
17 remember the details of it.
18      Q.   And on the hourly with overtime arrangement.
19 Are you of the opinion that taking a target level of
20 compensation associated with an assumed number of hours
21 to come to an hourly rate with overtime would be
22 compliant?
23      A.   I think so.  I mean, it -- it -- you know,
24 there's flex -- there's -- if you say I've got -- in my
25 budget, I've got X amount of dollars.  And if you say

Page 39

1 okay.  How do I -- you've -- you've got to plan for what
2 -- what you anticipate happening.  So I don't see an
3 issue with.  If you say, look, we're going to pay this
4 hourly rate.  And assuming I pay this hourly rate, and
5 assuming I have to pay overtime on this particular
6 hourly rate.  Am I still within my budget?  And I think
7 that's -- that's absolutely legal to do that.  Um, I
8 don't think the Fair Labor Standards Act or -- would
9 prohibit you from doing that.  So, um, yeah.  I -- I --
10 think that would be fine.
11      Q.   And based on what you know from the hourly with
12 overtime plan, that you and Mr. Beagle and Mr. Layton
13 discussed that -- was it your opinion that was compliant
14 with the Fair Labor Standards Act?
15      A.   Yes.
16           MR. STUKENBERG:  I'll pass the witness.
17                 EXAMINATION
18      Q.   (By Mr. Moulton) And just to -- to clarify
19 about that.  About those discussions you had with
20 Mr. Stukenberg right now.
21           Um, the -- the two pay plans that were at
22 issue here.  Were either a completely hourly system, or
23 a completely day rate system?  Not any mixed systems,
24 correct?
25      A.   I don't know if there was -- I don't know how

Page 40

1 -- how you could mix the -- unless it's different work
2 weeks.  I don't know.  But I -- I remember there being
3 an hourly and a daily, and they were separate.
4           MR. MOULTON:  Okay.  Pass the witness.
5           MR. STUKENBERG:  Nothing else for me.
6           THE VIDEOGRAPHER:  All right.  We're off
7 the record at 10:34.
8           (Deposition concluded at 10:34 a.m.)

Page 41

1 Changes/Signature to Deposition of:
2 STEVEN ANTHONY BROUSSARD
3 Deposition Date:  April 14, 2022
4 PAGE   LINE          CHANGE              REASON
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

```
                                                    Page 42
 1           I, STEVEN ANTHONY BROUSSARD, have read the
 2  foregoing deposition and hereby affix my signature that
 3  same is true and correct, except as noted above.
 4
 5           _____
 6                 STEVEN ANTHONY BROUSSARD
 7
 8
 9  THE STATE OF TEXAS)
10  COUNTY OF HARRIS  )
11
12           Before me, _____, on this day
13  personally appeared STEVEN ANTHONY BROUSSARD, known to
14  me (or proved to me under oath or through
15  _____) to be the person whose name is
16  subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
18  consideration therein expressed.
19           Given under my hand and seal of office this
20  _____ day of _____, _____.
21
22
                   _____
23                 Notary Public in and for
24                 The State of _____
25                 Commission Expires: _____
```

```
                                                    Page 43
 1               C E R T I F I C A T E
 2
 3  STATE OF TEXAS   )
 4  COUNTY OF HARRIS )
 5
 6
 7           I, Judy H. Gallo, Certified Shorthand Reporter
 8  in and for the State of Texas, duly commissioned and
 9  qualified, do hereby certify that the foregoing is a
10  true, correct, and complete transcript of the
11  proceedings in the foregoing captioned matter taken by
12  me and transcribed from my stenographic notes.
13           The original deposition and exhibits were
14  delivered to David I. Moulton, Custodial Attorney.
15           IN WITNESS WHEREOF, I have hereunto set my
16  hand and affixed my seal of office at Houston, Texas
17  this the 2nd day of May, 2022.
18
19                  [signature: Judy H. Gallo]
20                  _____
                    Judy H. Gallo
21                  Texas CSR No. 794
                    Expiration Date:  4-30-23
22
                    Good to Go Process Service
23                  Registration Number 62
                    1225 North Loop West, Suite 327
24                  Houston, Texas  77008
                    713-351-7061
25
```