```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF TEXAS
                  SAN ANTONIO DIVISION


FRANCISCO CANTU and        )CIV A. NO.:5:19-CV-00615
NORBERTO ELIZONDO,         )
individually and           )JURY TRIAL DEMANDED
on behalf of all others    )
similarly situated,        )CLASS/COLLECTIVE ACTION
                           )PURSUANT TO 29 USC
          Plaintiffs,      )SECTION 216(b)/FED R.
                           )CIV. R. CIV. P. 23
                           )
vs.                        )
                           )
MAMMOTH ENERGY SERVICES,   )
INC., d/b/a COBRA ENERGY   )
and HIGHER POWER           )
ELECTRICAL, LLC,           )
                           )
          Defendants.      )



     VIDEOTAPED DEPOSITION OF JEFFREY ATLEE BEAGLE

        TAKEN ON BEHALF OF THE PLAINTIFFS

          IN OKLAHOMA CITY, OKLAHOMA

             ON APRIL 18, 2022



        REPORTED BY:  KAREN B. JOHNSON, CSR
```

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 2

```
1              A P P E A R A N C E S
2
3 For the Plaintiffs:
    (attended remotely)
4
                  David I. Moulton
5                 Bruckner Burch, PLLC
                  8 E. Greenway Plaza, Suite 1500
6                 Houston, Texas 77046
                  dmoulton@brucknerburch.com
7
8
   For the Defendants:
9
                  William Stukenberg
10                Porter Hedges, LLP
                  1000 Main Street, 36th Floor
11                Houston, Texas 77002
                  (713)226-6626
12                wstukenberg@porterhedges.com
13
14 (attended remotely) Anthony Arteaga
                  Porter Hedges, LLP
15                1000 Main Street, 36th Floor
                  Houston, Texas 77002
16                (713)226-6626
                  aarteaga@porterhedges.com
17
18
19 Also Present:
20                Johnny Blanco, Videographer
21
22
23
24
25
```

Page 4

```
1 Exhibit Number 148  E-mails                      48
2 Exhibit Number 149  E-mails                      50
3 Exhibit Number 179  E-mails                      54
4 Exhibit Number 180  E-mails                      57
5 Exhibit Number 181  E-mails                      59
6 Exhibit Number 182  E-mails                      60
7 Exhibit Number 183  E-mails                      61
8 Exhibit Number 184  Excel Spreadsheet           62
9 Exhibit Number 185  E-mails                      63
10 Exhibit Number 170  Earnings Statements         66
11 Exhibit Number 156  E-mails                      83
12
13              DEFENDANT'S EXHIBITS
14                                           Page
15 Exhibit Number 134  E-mails                      90
16 Exhibit Number 142  E-mails                      91
17
18
19
20
21
22
23
24
25
```

Page 3

CONTENTS

```
1              CONTENTS
2                                           Page
3 Direct Examination by Mr. Moulton              6
4 Cross-Examination by Mr. Stukenberg           87
5 Redirect Examination by Mr. Moulton           97
6
7              PLAINTIFF'S EXHIBITS
8                                           Page
9 Exhibit Number 175  LinkedIn Page              9
10 Exhibit Number 131  E-mails                    16
11 Exhibit Number 140  E-mails                    18
12 Exhibit Number 137  Pay Rate Scale            20
13 Exhibit Number 139  Higher Power Offer Letter 21
14 Exhibit Number 138  5 Star Pay Scale          22
15 Exhibit Number 166  E-mails                    23
16 Exhibit Number 176  E-mails
17 Exhibit Number 167  Excel Spreadsheet         26
18 Exhibit Number 174  Excel Spreadsheet         30
19 Exhibit Number 177  E-mails                    32
20 Exhibit Number 151  Cobra Pay Scale           34
21 Exhibit Number 143  E-mails                    36
22 Exhibit Number 52   Tanner Offer Letter       41
23 Exhibit Number 146  Fair Offer Letter         44
24 Exhibit Number 1    Benavides Offer Letter    44
25 Exhibit Number 61   Personnel Action Form     45
```

Page 5

```
1              S T I P U L A T I O N S
2
3         IT IS HEREBY STIPULATED AND AGREED by and
4 among the attorneys for the respective parties
5 hereto that the deposition of JEFFREY ATLEE BEAGLE
6 may be taken on behalf of the Plaintiffs on the 18th
7 of APRIL, 2022, in OKLAHOMA CITY, OKLAHOMA, by Karen
8 Johnson, Certified Shorthand Reporter for the State
9 of Oklahoma, taken pursuant to Federal Rules of
10 Civil Procedure.
11
12              * * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 6

1        THE VIDEOGRAPHER:  Good morning.  We are
2   on the record.  Would the court reporter please
3   swear the witness.
4            JEFFREY ATLEE BEAGLE,
5   after having been first duly sworn at 12:00 p.m.
6   deposes and says in reply to the questions
7   propounded as follows, to wit:
8        MR. MOULTON:  All right.  Before we get
9   started, can we just have everyone who's attending
10   this deposition today please announce themselves
11   for the record.  I'm David Moulton, I represent
12   the plaintiffs in this matter.
13        MR. STUKENBERG:  Will Stukenberg on behalf
14   of the defendants and Mr. Beagle.
15        THE WITNESS:  Jeff Beagle.
16        MR. MOULTON:  Do we have anybody on
17   your -- on Anthony Arteaga line?
18        MR. STUKENBERG:  Yes.
19        MR. ARTEAGA:  Yes, sir.  Anthony Arteaga
20   on behalf of defendants.
21        MR. MOULTON:  And, Anthony, do you have
22   anybody watching or listening with you?
23        MR. ARTEAGA:  No, sir, it's just me.
24        MR. STUKENBERG:  He does my exhibits for
25   me, Dave.

Page 7

1        MR. MOULTON:  I'm sorry, what?
2        MR. STUKENBERG:  He does my exhibits for
3   me.
4        MR. MOULTON:  Okay.  Perfect.
5        Mr. Beagle, is there anyone else in the
6   room with you besides Mr. Stukenberg, the court
7   reporter, and the -- and the videographer?
8        THE WITNESS:  There is not.
9            DIRECT EXAMINATION
10   BY MR. MOULTON:
11        Q    Mr. Beagle, for the record, can you state
12   your full name, please?
13        A    Jeffrey Atlee Beagle.
14        Q    How do you spell Atlee?
15        A    A-T-L-E-E.
16        Q    And how do you spell Beagle?
17        A    B-E-A-G-L-E.
18        Q    What is your home address, sir?
19        A    1901 Interurban Way, Edmond, Oklahoma,
20   73034.
21        Q    How long have you lived at that address?
22        A    Six years.
23        Q    What's your date of birth?
24        A    July 12th, 1985.
25        Q    What is your current employer?

Page 8

1        A    Insurica.
2        Q    To get ready for your deposition today,
3   did you talk with anyone or review any materials?
4        A    Yes.
5        Q    Who did you meet with?
6        A    Will.
7        Q    Did you meet with Mr. Layton?
8        A    No.
9        Q    Have you talked to Mr. Layton about this
10   deposition?
11        A    No.
12        Q    Have you talked with anyone besides
13   Mr. Stukenberg that's affiliated with the
14   defendants in any way?
15        A    No.
16        Q    When is the last time you talked with
17   any -- any other workers or employees of Mammoth
18   or its affiliates?
19        A    I have one friend that still works there
20   that I talk to somewhat regularly at one of the
21   affiliates.
22        Q    Okay.  And who is that?
23        A    Chris Scott.
24        Q    What company is he with?
25        A    Stingray.

Page 9

1        Q    And when -- and how long ago was it that
2   you and Mr. Scott spoke last?
3        A    Within the last month.
4        Q    Have you all discussed the -- the lawsuit
5   at all?
6        A    No.
7        Q    Besides Mr. Scott, do you have any
8   friends, family members or anyone that you're
9   close to that still works for Mammoth or any of
10   its affiliates?
11        A    No.
12        Q    How did your employment with Mammoth end?
13        A    I resigned.
14        Q    Okay.  And which -- which entity were you
15   technically employed by?
16        A    Mammoth Energy, Inc.
17        Q    Were you employed by any others?
18        A    I believe when I started, I was employed
19   by Stingray.
20        Q    Okay.  So you're -- so while -- while you
21   were there, you were with Stingray at first and
22   then you were with Mammoth Energy, Inc.?
23        A    Correct.
24        Q    And you said you resigned, can you tell us
25   why you resigned?

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 10

1    A    Just found a new opportunity at my new
2  employer, and it was a really good opportunity and
3  decided to make a change.
4    Q    Okay.  Was there anything that you didn't
5  like about your job that factored into leaving
6  Mammoth?
7    A    No, it was busy, but --
8    Q    Okay.  When you were with Mammoth Energy,
9  Inc., who did you report to?
10   A    Mark Layton.
11   Q    And he was the CFO; correct?
12   A    Correct.
13   Q    Did you report to anyone else?
14   A    No.
15   Q    And who were your direct reports?
16   A    Alex Kalman, Michelle Hernandez, Debbie
17  Mary, there may be -- those are the ones that come
18  to mind, I may be missing somebody.
19   Q    You were the director of HR; correct?
20   A    Correct.
21   Q    Mr. Beagle, I want to show you a document
22  here, we're going to discuss it real quick, we've
23  marked it as Exhibit 175.
24        (Plaintiff's Exhibit Number 175 marked for
25        identification and made part of the

Page 11

1        record)
2    Q    (By Mr. Moulton) And this is the --
3  basically the resume' version of your LinkedIn
4  page that I downloaded.  And I just wanted to see
5  if you can review this to see if this is an
6  accurate summary for you?
7        MR. STUKENBERG:  And I'm going to go ahead
8  and object to any documents that weren't produced
9  in advance of the deposition.
10        THE WITNESS:  Yeah, that looks like what I
11  have on my LinkedIn page for my current role.
12   Q    (By Mr. Moulton) Okay.  And I want to
13  scroll down to the experience section, if you
14  could just kind of verify these, your experience
15  section, so under -- for Insurica, I have you down
16  as vice-president, director human resources from
17  December 2018 to the present; is that right?
18   A    Yeah, I started as director,
19  vice-president was added more recently, but the
20  role was essentially the same.
21   Q    Okay.  And then with Mammoth Energy
22  Services, you were the human resources director?
23   A    Yeah.
24   Q    From March 2015 through December 2018;
25  correct?

Page 12

1    A    I think that's correct, yeah.
2    Q    Okay.  In that first part here, it
3  mentions 2200 employees company-wide throughout
4  the U.S. and Puerto Rico, do you have a sense for
5  during the time that Mammoth had work in Puerto
6  Rico, can you tell me about -- of those -- of
7  those 2,200 employees, how many were actually
8  Puerto Rican workers or workers that were working
9  in Puerto Rico?
10   A    I don't recall.
11   Q    Okay.  And so the -- the duties you listed
12  here for Mammoth Energy Services, are they
13  accurate?
14   A    Yes.
15   Q    Okay.  And then under Stingray Energy, you
16  worked there for -- it says three years, eleven
17  months from October 2014 to October 2016; is
18  that -- is that correct?
19   A    I think that's right.
20   Q    Okay.  And you were the director of human
21  resources there?
22   A    Yes.
23   Q    And Stingray is one of the affiliates in
24  Mammoth; right?
25   A    Correct.

Page 13

1    Q    When you were working at Stingray, did you
2  work with Mr. Layton?
3    A    I honestly can't remember when he joined
4  the organization.
5    Q    Were you there before him?
6    A    I believe so.
7    Q    Okay.  How closely have you worked with
8  Mr. Layton during the time that you were at -- you
9  were affiliated with Mammoth?
10        MR. STUKENBERG:  Objection; form.
11        THE WITNESS:  Standard supervisor-employee
12  relationship, I don't know how to answer that.
13   Q    (By Mr. Moulton) Did you -- yeah, sorry.
14  Did you get to know him pretty well?
15   A    Professionally, I guess, yeah.
16   Q    Okay.  Do you have an opinion about
17  whether or not he's honest or dishonest?
18        MR. STUKENBERG:  Objection; form.
19        THE WITNESS:  I would say he's honest.
20   Q    (By Mr. Moulton) Okay.  You're not aware
21  of any times where he was dishonest with you?
22   A    No.
23   Q    Okay.
24   A    Excuse me.
25   Q    You mentioned you met with Mr. Stukenberg

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 14

1  today, without asking you what you guys talked
2  about, I just kind of wanted to know, what time
3  did you -- did y'all meet?
4      A    Today?
5      Q    Yeah.
6      A    I think I got here about 11:15.
7      Q    Okay.  Did you -- did you meet with him
8  about this deposition at any other time?
9      A    Yes.
10     Q    When was that?
11     A    Last week.
12     Q    Okay.  And how did y'all meet, in person
13 or over Zoom or phone?
14     A    Zoom or Teams.
15     Q    Okay.  And approximately how long did you
16 y'all talk or meet?
17     A    Hour, hour and a half.
18     Q    All right.  So, Mr. Beagle, I'm going to
19 go through several documents to kind of go through
20 sort of the history of -- of sort of the
21 development of how pay was determined at -- at
22 Mammoth while the worker -- well, actually, before
23 and then during while the workers were in Puerto
24 Rico.  And I'm going to start kind of where I --
25 what I view as the beginning of this, and so I'd

Page 15

1  ask that you pay close attention to my questions
2  and stay on -- if we can stay on the topic of my
3  questions, trust me, I think we'll get through it
4  all and I think we'll get through it rather
5  quickly.  But the trick in a deposition sometimes
6  is -- is to focus on the question that's being
7  asked, and I'd ask that you do that.  I'd also ask
8  that -- that you wait for the question to be
9  finished before you start talking, and I'll do my
10 best to not talk over you because the court
11 reporter has to write everything down.  Is that
12 understood?
13     A    Understood.
14     Q    Great.  Now, before we get going on that,
15 actually, Mr. Beagle, have you ever testified
16 before under oath?
17     A    Yes.
18     Q    Okay.  Approximately how many times are we
19 talking about?
20     A    Once, maybe twice.
21     Q    Have you testified under oath in regards
22 to any issues involving Mammoth or its
23 subsidiaries?
24     A    Yes.
25     Q    Okay.  Can you tell me about that?

Page 16

1      A    It was a -- one of the subsidiaries on a
2  classification case.
3      Q    Was it Stingray?
4      A    Yes.
5      Q    Okay.  Was it -- it may have been one of
6  the overtime cases dealing with a
7  misclassification of workers?
8      A    Yeah, it was over the classification of
9  exempt verse non-exempt.
10     Q    Okay.  Do you remember where you were when
11 you gave that deposition?
12     A    I want to say Cleveland.
13     Q    Ohio?
14     A    Yes.
15     Q    Okay.  And approximately when was that?
16     A    I don't recall, best guess would be 2014,
17 2015, somewhere around there.
18     Q    Okay.  Do you remember what position of
19 workers it was?
20     A    I think it was equipment operators.
21     Q    And do you remember if they were paid
22 salary, hourly, day rate, piece rate?
23     A    I think it had to do with salary verse
24 hourly.
25     Q    Okay.  And do you think it was a white

Page 17

1  color exemption case or a misclassification of
2  employee case?
3          MR. STUKENBERG:  Objection; form.
4          THE WITNESS:  I'm not -- I don't recall.
5      Q    (By Mr. Moulton) That's fine.  Okay.
6  We're going to go looking at some documents here,
7  I'm going to show you what's been previously
8  labeled as Plaintiff's Exhibit 131.  Show it there
9  on your screen.
10         (Plaintiff's Exhibit Number 131 previously
11         marked for identification and made part of
12         the record)
13     Q    (By Mr. Moulton) This is an e-mail chain
14 and with e-mail chains, they usually start, at
15 least in this case, they're starting at the
16 bottom, it's going to be the oldest e-mails, and
17 as we go through the chain, we'll scroll up and
18 get more recent.  Does that make sense?
19     A    Yes.
20     Q    Okay.  So this is -- we're going to look
21 Exhibit 131 at the bottom of Page 3579, I want to
22 direct your attention to an e-mail from Keith
23 Ellison on Thursday, October 19th at 1:02, do you
24 see this e-mail?
25     A    Yes.

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 18

1    Q    Okay.  And you see that you are copied on
2  it; correct?
3         MR. STUKENBERG:  No, he's not.
4         THE WITNESS:  I don't see it, I don't see
5  my name.
6    Q    (By Mr. Moulton) Yeah, I guess you're
7  copied like at 9:34 the next day.
8    A    Okay.
9    Q    Do you see that?
10   A    Yeah.
11   Q    Okay.  So you received this e-mail from
12 Keith Ellison where he's saying that they've got
13 the contract and they're paying the following day
14 rates, do you see that?
15        MR. STUKENBERG:  Objection; form.  He's
16 not copied on the e-mail, Dave.
17        THE WITNESS:  Yes, I see that.
18   Q    (By Mr. Moulton) Okay.  And you were
19 copied the next day on October 20th, correct, it
20 was forwarded to you?
21   A    Yes, I see that.
22   Q    Okay.  And you -- you, being the director
23 of HR, it looks like you're getting involved
24 pretty immediately, you're writing Ken about that
25 you're going to try to mirror these rates, can you

Page 19

1  explain to us what you meant by that?
2    A    Yeah, I think we looked at a couple
3  different options when we were, I guess, trying to
4  figure out how to make everything work, be that,
5  obviously our initial e-mail had a day rate, it
6  looks like I'm e-mailing Steve Broussard there, so
7  if we assumed those are numbers we're trying to
8  budget towards, you know, how can we do that in a
9  compliant manner under the FLSA.
10   Q    Right.  Okay.  And so you wrote Broussard
11 about that and he -- he wrote to you about a
12 couple things, but -- but hearing what you're
13 saying is, you -- you understood that those day
14 rates were budgets that you were going to try to
15 then work out a compliance system, is that what
16 you're saying?
17   A    Yeah, I think we looked at, I guess, day
18 rates, hourly rates, and reached out to Steve, as
19 our counsel, to try to get guidance from him on
20 how best to move forward.
21        (Plaintiff's Exhibit Number 140 previously
22        marked for identification and made part of
23        the record)
24   Q    (By Mr. Moulton) Okay.  Going to show you
25 what's been previously labeled as Exhibit 140,

Page 20

1  starting at the bottom here, there are some
2  e-mails from Alexander Kalman, he has some
3  questions about the pay plan, do you see that on
4  November 6th at the bottom at Page 3153?
5    A    Yes.
6    Q    Okay.  And Alex asks for follow up a
7  couple times, but I'm going to scroll up to the
8  part where the action is.  If you can look at two
9  e-mails for me inside Exhibit 140, it's Mammoth
10 3151 and Mammoth 3152.  We have an e-mail from Ken
11 Kinsey that you're copied on that says he's
12 "visited with Keith, see below.  The answers are
13 in red to your questions.  If the answers below
14 are not clear, please call me," do you see that?
15   A    Yes.
16   Q    Okay.  So we're going to go below to see
17 the -- the answers from -- that Ken said Keith
18 said in Number 2, do you see what I'm talking
19 about?
20   A    Yes.
21        MR. STUKENBERG:  Objection; form.
22   Q    (By Mr. Moulton) Okay.  So let's look at
23 this.  "In the same vein, can we confirm that
24 hourly employees should only receive their day
25 rate and not their hourly rate in addition to

Page 21

1  their day rate; correct?"  Did I read that
2  question right?
3    A    Yeah, that's how it's written there.
4    Q    Okay.  And the response, as you can see,
5  it's a slightly different color says, "All hourly
6  employees will get their PR rate only," do you see
7  that?
8    A    I do.
9    Q    Do you know what Keith meant by that?
10   A    If I recall, they had a Puerto Rico hourly
11 rate and then a standby hourly rate while they
12 were stateside before they deployed to Puerto
13 Rico.  So I think he would be referring they
14 should get their hourly rate for being on island,
15 the Puerto Rico rate only.
16   Q    Okay.  Do you know if he was referring to
17 the day rates that he had written about in -- in
18 Exhibit 131?
19   A    I -- I don't know.
20        (Plaintiff's Exhibit Number 137 previously
21        marked for identification and made part of
22        the record)
23   Q    (By Mr. Moulton) I'm going to -- the next
24 document I'm going to show you is Plaintiff's
25 Exhibit 137.  This looks a -- looks like it's a

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 22

1 pay rate scale for the workers that are -- that
2 are going to be going to Puerto Rico, do you agree
3 with this?
4      MR. STUKENBERG: Objection; form.
5      THE WITNESS: Looks like that, yeah.
6   Q   (By Mr. Moulton) Okay.  And can you -- do
7 you notice that these rates here from general
8 foreman on down are the rates that match with
9 Mr. Ellison's original e-mail that we looked at;
10 right?
11   **A   I'll take -- I didn't memorize them, but**
12 **I'll take your word for it that they match with**
13 **the original e-mail.**
14      (Plaintiff's Exhibit Number 139 previously
15      marked for identification and made part of
16      the record)
17   Q   (By Mr. Moulton) And these are the same
18 rates that we'll see in Exhibit 139, that Higher
19 Power put in their offer letter; correct?
20      MR. STUKENBERG: Objection; form.
21      THE WITNESS: Yeah, I guess you've got --
22 you've got the hourly rate there as well.
23   Q   (By Mr. Moulton) Right.  That's -- so this
24 is Exhibit 139.  The -- the hourly rates here,
25 though, aren't these hourly rates for the rates

Page 23

1 that they were receiving before they went to the
2 island?
3   **A   I'm not sure.**
4   Q   Okay.  But these Puerto Rico storm per day
5 rates mirror or are the same as the rates that
6 Mr. Ellison originally wrote; correct?
7   **A   Again, I -- I can't see them both, but**
8 **they look similar, yes.**
9   Q   If you want, we can go back to 131 and you
10 can review 131 again, just verify.
11   **A   Okay.  Can you go back?**
12   Q   Right.  So back in Exhibit 139, can you
13 verify they're the same rates?
14   **A   Yes, they look the same.**
15      (Plaintiff's Exhibit Number 138 previously
16      marked for identification and made part of
17      the record)
18   Q   (By Mr. Moulton) And in Exhibit 138, we
19 have a 5 Star pay scale, which has the same rates,
20 I wonder if you can verify that for me?
21      MR. STUKENBERG: What did you characterize
22 this document as, Dave?
23      MR. MOULTON: Exhibit 138.
24      THE WITNESS: Yes, those look the same.
25   Q   (By Mr. Moulton) Was trying to zoom it for

Page 24

1 you, but that messed up.
2   **A   Nah, you're good.**
3   Q   You got it, okay.
4      (Plaintiff's Exhibit Number 166 previously
5      marked for identification and made part of
6      the record)
7   Q   (By Mr. Moulton) Now, eventually -- in
8 Exhibit 166, we have some e-mails starting to talk
9 about how you guys are going to calculate on what
10 the hourly rates would be for those day rates;
11 correct?
12   **A   Right.**
13   Q   Okay.  And so let's just kind of review
14 this.  In the -- the bottom e-mail in Exhibit 166
15 is Mammoth 3291, and we have e-mail from Missy
16 Davis to you and Alex, Alex Kalman, and it says,
17 "Can you guys give me a mathematical explanation
18 on the PR pay rates and how we're processing that?
19 Not because I don't trust you, but because the men
20 are asking me and I don't know how to tell them or
21 explain it to them," do you see that?
22   **A   I do.**
23   Q   Okay.  And we have your response right
24 here on -- on November 13th, 2017 on Mammoth 3290
25 in Exhibit 166, and it says, "Missy, sorry for the

Page 25

1 late response.  Please find attached Excel file in
2 Sheet 1.  If you take the 16-hour shifts over a
3 seven-day workweek with the applicable overtime of
4 one and a half times for anything over 40, you'll
5 see that it nets out to the day rate over a week
6 period.  Take that total, then divide by the seven
7 days.  Let me know if that does not make sense.
8 Thanks."  Do you remember sending that e-mail?
9   **A   No, but I can read it, yeah.**
10   Q   Right.  Okay.  This is an e-mail you sent
11 to Missy?
12   **A   Yes.**
13   Q   Okay.  And here you're explaining to her
14 how you guys are going to come up with the hourly
15 rates that you'll use, if someone works the whole
16 week, they will end up getting the equivalent of
17 their day rate; correct?
18   **A   Yeah, I -- I think it was a budgeted**
19 **amount that we were trying to be compliant with,**
20 **so we were coming up with the hourly rate that**
21 **would hit that kind of targeted budgeted amount.**
22   Q   Sorry, I didn't mean to turn it off.
23   **A   I can see it.**
24   Q   Yeah.  I'm just closing some of these
25 windows before my computer starts hanging up.

## JEFFREY ATLEE BEAGLE - April 18, 2022

Page 26

1    A    Okay.
2    Q    And you provided another explanation in
3  this process in Exhibit 176 to Mr. Kinsey, so
4  let's look at this.
5         (Plaintiff's Exhibit Number 176 marked for
6         identification and made part of the
7         record)
8    Q    (By Mr. Moulton) Exhibit 176, Mammoth
9  3515, we got J.D. Kinsey writing to Alex and
10 you're going to be answering the question up here.
11 Let's look at this.  "Hey, Alex, I was doing some
12 math based on a breakdown that you've given me, it
13 was the breakdown of what the guys are supposed to
14 make per day and the breakdown per hour.  If the
15 breakdown per hour is correct, it doesn't match up
16 to the day rate.  I was just hoping that you could
17 help me to better understand the math part.  I'm
18 attaching the file that I was looking at."
19        And then you ask if he's accounting for
20 over 40, you clear it up that it's supposed to be
21 over 40, but not eight and eight.  But the part
22 that I want to ask you about is on the top here,
23 your answer to Mr. Kinsey about how to calculate
24 the rates, and let's look at this.
25        "If you take the 16-hour days with seven

Page 27

1  days in a workweek, you'll get 112 hours.
2  Anything over 40 in a workweek is time and a half.
3  So if you take for the week 40 hours times the
4  base, then 72 hours times the base times one and a
5  half, you'll get the equivalent of the day rate
6  times seven."  Is that how y'all figured out what
7  the rates should be?
8    A    Yeah, like I said, I think we consulted
9  with Steve Broussard that there was this
10 expectation from -- from Keith of kind of what the
11 positions would pay from a budgeted standpoint or
12 what they would be expected to make in the field,
13 and then we tried to work with Steve to come up
14 with the correct approach to hit that target.
15   Q    And I believe that you actually prepared a
16 spreadsheet that would show how these calculations
17 were made; correct?
18   A    Probably, yes, yeah.
19   Q    All right.  Let's -- let's look at it,
20 let's look at it here, and just for -- what I'm
21 going to show you is a native Excel file.
22   A    Okay.
23        (Plaintiff's Exhibit Number 167 previously
24        marked for identification and made part of
25        the record)

Page 28

1    Q    (By Mr. Moulton) For the court reporter,
2  this is Exhibit 167, it's Mammoth 3292 in Excel.
3  I don't have an exhibit sticker on it because
4  we're going to look at the formulas.
5         So looking at this spreadsheet, are you
6  familiar with it?  Should we walk through it a
7  little bit?
8    A    It does look familiar.
9    Q    Okay.  So the way I understand it is that
10 you've come up with a total adjusted hours by
11 taking the regular hours and then plus one and a
12 half, the overtime hours, and come up with an
13 adjusted hours of 148, do you see that?
14   A    Okay.
15   Q    In Column H, okay.  Then you have your
16 budgeted day rates in Column I, and then if you
17 were to get your -- if a person, if one of the
18 workers was getting their day rate for the whole
19 week, and Column J has amounts due and earned for
20 the whole week; correct?
21   A    Right.
22   Q    Then in K we get like what the hourly
23 rates you would need to get to -- to you so that
24 if they work the whole week with 16 hours per day
25 times seven, with the regular and the overtime,

Page 29

1  that's the amount of pay, that's the hourly rate
2  that would need -- that they would need to get for
3  that to work in Column K; correct?
4    A    Correct.
5    Q    Okay.  And here you're checking your math,
6  make sure it works in the Column L?  And I'm
7  asking you, is that what you're --
8    A    Yes, yes.
9    Q    And in Columns N through Q, it looks like
10 there's a calculation here of how much the
11 overtime would be owed if a day rate were being
12 paid, do you agree with that?
13   A    Say that again.
14   Q    In Columns N through Q, it looks like
15 you're calculating how much overtime would be owed
16 if the workers were paid a day rate?
17        MR. STUKENBERG:  Objection; form.
18        THE WITNESS:  I don't know what that
19 means.
20   Q    (By Mr. Moulton) Okay.  So Column N, I
21 see -- let's see if we can kind of work through
22 it, may just be a lot to take in.  So if you take
23 the L2 divided by D2, that figure in Column N, to
24 me that looks like a calculation of what a regular
25 rate would be for a person if they had been paid a

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 30

1  day rate; correct?
2  **A   So you're taking the overall figure**
3  **divided by total hours worked, okay.**
4  Q   And to clarify, this is a -- this is a
5  spreadsheet that you created?
6  **A   Right.**
7  Q   Okay.  So you're -- you're taking the
8  total rates divided by the 112; correct?
9  **A   Correct.**
10  Q   And that comes out to 78.13, which would
11  be the regular rate for someone paid a day rate;
12  right?
13  MR. STUKENBERG:  Of that amount.
14  THE WITNESS:  Yes.
15  Q   (By Mr. Moulton) Okay.  And Column O is
16  half of that, which would be the overtime rate for
17  a day rate; right?
18  **A   Yes.**
19  Q   And then you're multiplying that figure,
20  that overtime, half-time rate times the number of
21  overtime hours to calculate how much overtime
22  would be due if the person were paid a day rate;
23  right?
24  **A   Okay.  Yeah.**
25  Q   And that's Column P?

Page 31

1  **A   It looks that way, yes.**
2  Q   Yeah.  And then you add it all together to
3  see what the total pay would be if a day rate
4  worker were paid -- if you had a day rate worker
5  and you added on the overtime that would be owed,
6  Q shows the total amount of the check; correct?
7  **A   Yes, that's the calculation.**
8  Q   Right.  I don't know if you noticed in
9  your sheet, and this is -- maybe this is a little
10  nerdy, but in K, the hourly rates here don't show
11  everything that's in there, like you know how
12  Excel only shows the number of figures you want it
13  to see, so if we expand it out -- or actually, no,
14  if you expand it out, you start seeing there's
15  more digits there in K, in other words, it wasn't
16  rounded?
17  **A   Right.**
18  (Plaintiff's Exhibit Number 174 previously
19  marked for identification and made part of
20  the record)
21  Q   (By Mr. Moulton) Okay.  All right.  I'm
22  going to show you another native spreadsheet that
23  is also not labeled, but it is Exhibit 174.
24  MR. STUKENBERG:  What exhibit was that,
25  Dave?

Page 32

1  MR. MOULTON:  That was 167.  So this 174
2  is also Mammoth 3292-Exhibit 174, we're just
3  making -- that's in the file name.
4  Q   (By Mr. Moulton) What I've done to your
5  spreadsheet, Mr. Beagle, is in Column K where they
6  have the rates that we were just looking at, I
7  just rounded them to two digits to make them to be
8  the rates that we actually see on the -- on the
9  rate sheets that you guys made.  So, for example,
10  instead of 59.12, you know, go on forever
11  decimals, we just have it 59.12, which would be
12  what you would put into the payroll system; right?
13  **A   Right.**
14  Q   Okay.  And if we do that, we can see
15  what -- in Column L, we'll see what the actual
16  amount would be for a worker paid at 59.12, 16
17  hours a day, seven days a week.  So do you see
18  that on Column L, we see that there's a slight
19  difference, like there's a 24 cent difference
20  between what the day rate amount would be and then
21  what the actual amount would be, do you see that?
22  **A   I see that.**
23  Q   All right.  And so -- and then on the next
24  one, they're off -- for the workers that are paid
25  $1,000 per day or 47.30, the difference is 40

Page 33

1  cents?
2  **A   Yes.**
3  Q   And then for the workers that are paid
4  900, a difference is 36 cents?
5  **A   Yes.**
6  Q   And for the workers that are paid 800 or
7  37.84, we get a difference of 32 cents?
8  **A   Yes.**
9  Q   And for the workers that are at 700 or
10  33.11, it's a 28 cent difference?
11  **A   Uh-huh.**
12  Q   Sorry, you got to say yes or no for the
13  court reporter.
14  **A   Yes.**
15  Q   And at 600, we have a difference of 24
16  cents, do you see that?
17  **A   Yes.**
18  Q   Right.  Okay.  So when someone works a
19  full week in Puerto Rico under the system that you
20  guys came up with, the figures in L would be the
21  amounts that will really show on their paycheck;
22  right?
23  **A   Yes, that's correct, because that's based**
24  **off the actual hourly rate they were paid.**
25  (Plaintiff's Exhibit Number 177 marked for

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 34

1    identification and made part of the
2    record)
3    Q    (By Mr. Moulton) All right.  So we'll go
4    to Exhibit 177, and this is an e-mail where
5    Mr. Layton asked you, "What is the deal that is in
6    place with our employees that are in Puerto Rico,
7    are we paying them their base salary plus a day
8    rate?"  Did I read that right?
9    A    Yes.
10   Q    Okay.  Then you answer his question,
11   you're talking about how they get the effective
12   hourly rate at a 16-hour shift, basically that
13   calculation we just went through; right?
14   A    Correct.  Yeah, they're on call for the 16
15   hours and they get the hourly rate.
16   Q    Uh-huh.  What -- what employees are you
17   guys talking about in this e-mail?
18   A    What do you mean?
19   Q    Well, he's saying, what is the deal that
20   is in place with our employees that are in Puerto
21   Rico, and then you answer him for the hourly
22   employees, my question is, which employees are you
23   guys talking about, what does it apply to?
24   A    I guess I don't understand the question.
25   Who are we -- I mean, we're talking about the

Page 35

1    hourly and then I talk about the salaried
2    employees after that.
3    Q    Right.  And I'm -- I'm not asking about
4    the salaried for now, I don't think I will.
5    A    Okay.
6    Q    My only question is you guys -- it's not
7    like I have a list of people that you're talking
8    about, you guys are using the term "our employees"
9    and for the hourly employees is your response,
10   you're talking about some employees, I was
11   wondering if you can enlighten us about employees
12   of which companies you're talking about?
13   A    I would assume we were talking about
14   employees of either 5 Star or Higher Power.
15   Q    Okay.  Would this also apply to employees
16   of Cobra?
17   A    I -- I don't think Cobra had employees
18   there.
19   Q    Okay.
20   A    From my recollection, but --
21        (Plaintiff's Exhibit Number 151 previously
22        marked for identification and made part of
23        the record)
24   Q    (By Mr. Moulton) The next exhibit I want
25   to show you is what's been previously marked as

Page 36

1    Exhibit 151, and to me, Exhibit 151, let's see if
2    you agree with this, looks like a summary of the
3    different versions of the scale that we've seen so
4    far.  Would you agree with that?
5    A    Yes.
6    Q    So this one has it all together, we have
7    the storm per day rates, we have the per hour
8    rates that you calculated and we had the -- the
9    stateside, non-Puerto Rico wages right next to it,
10   correct, or next to it; right?
11   A    Correct.
12   Q    So this is a pay scale for Cobra Energy?
13   A    Well, I -- I think that was a pay scale
14   that applied to Higher Power and 5 Star Electric
15   and probably just it was simpler to put Cobra on
16   there to kind of encompass those two entities.
17   Q    Okay.  So this -- where it says, "The crew
18   wage scale for 2017 Puerto Rico storm rates and
19   standby rates for Cobra Energy and subsidiaries,"
20   you're -- you're telling us that you think it's
21   just for the subsidiaries?
22   A    I -- I can't recall if Cobra had employees
23   or not is what I'm saying.
24   Q    Oh, okay.  But if they did, this would
25   also apply to them?

Page 37

1    A    I would assume so.
2    Q    Okay.  And do you -- are you sure on that,
3    are you kind of guessing?
4    A    I'm kind of guessing.
5    Q    Oh, that's fine.  I want to talk to you
6    about the offer letters and how the language for
7    the offer letters was determined.  We're going to
8    look at an exhibit that's been previously marked
9    as Exhibit 143.
10        (Plaintiff's Exhibit Number 143 previously
11        marked for identification and made part of
12        the record)
13   Q    (By Mr. Moulton) Do you remember a Scott
14   Whitsell?
15   A    A little bit.
16   Q    Okay.  Do you remember having -- being
17   part of an e-mail chain with him where you had
18   some concerns about what the offer letters would
19   say?
20   A    Yes.
21   Q    Okay.  So that's -- that's what this is in
22   Plaintiff's Exhibit 143, let's take a look.  So at
23   the bottom, at 3614, looks like there's some
24   example offer letters from Alex to Missy, Missy is
25   asking Scott if that's what we're using, and Scott

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 38

1   has a concern that you're -- you end up getting
2   copied on, and let's just sort of review this.
3   He's -- he's basically concerned that the offer
4   letters don't reflect what the workers were being
5   told about what they would be paid, would you
6   agree with that?
7       A   Yeah, that's what he said, yeah.
8       Q   Right.  And then you -- you come in and
9   you're -- it looks like to me in Mammoth 3612 on
10  Tuesday, October 24, that you're working to help
11  resolve the concerns.  And it says, are you -- you
12  ask Scott, "Are you looking at these versions
13  where it added in the day rate and the language
14  regarding that we will attempt to place them in
15  the non-project work?"
16      A   Yes, I see that.
17      Q   All right.  And so Scott's concern was
18  about the offer letters not including the day
19  rate?
20          MR. STUKENBERG:  Objection; form, calls
21  for speculation.  You just want him to read an
22  e-mail, just tell him to read the e-mail.  If you
23  want to ask him what somebody else was thinking,
24  we're going to object to speculation.
25          MR. MOULTON:  Well, Mr. -- Mr. --

Page 39

1   that's -- I appreciate the sidebar, actually, I
2   don't, Will, because I'm sure Mr. Beagle may have
3   some memory about this that's not in the e-mail
4   and that's why we're talking to him about it.
5       Q   (By Mr. Moulton) Do you recall
6   specifically what Mr. Whitsell's complaint was
7   about the offer letters?
8       A   No, other than what it says there about
9   how it will come across.
10      Q   Okay.  Maybe this will refresh the memory,
11  can you -- let's look at this e-mail from Scott
12  that included you where he says, "I understand 100
13  percent.  Any chance of taking the hourly rate out
14  in the letter and stating the per day rate will
15  show up hourly?"  Do you see that?
16      A   I do.
17      Q   Okay.  So it sounds like his concern is
18  that folks have been told that they can earn a
19  certain amount based on a day rate in the original
20  offer letter of work including that; would you
21  agree?
22          MR. STUKENBERG:  Objection; form.  The
23  document speaks for itself.
24          THE WITNESS:  Yeah, it -- can you -- can
25  you repeat the question?

Page 40

1       Q   (By Mr. Moulton) Yeah.  Do you recall
2   Scott being concerned that the -- that the offer
3   letters did not include the day rate?
4           MR. STUKENBERG:  Objection.
5           THE WITNESS:  I mean, not outside of
6   what's already in this e-mail.
7       Q   (By Mr. Moulton) Okay.  So you would just
8   rely on the e-mails for your memory?
9       A   Yeah, yeah.
10      Q   Okay.  And you can see where he's asking
11  to have the hourly rate taken out; right?
12      A   Right.
13      Q   And it looks like you made some edits
14  potentially and sent it to him, because you're
15  asking if this would be more palatable?
16      A   Right.
17      Q   Then Scott comes back with another version
18  and Keith approves it; right?
19      A   I -- I can't tell from that if he comes
20  back with another version or is just following up
21  with the version that I -- sent, it looks like I
22  sent something.
23      Q   All right.  And just so you know, I did
24  depose Scott Whitsell and he made it clear that he
25  did, that he did come back with one --

Page 41

1       A   Okay.
2       Q   -- and this is one that Keith approved.
3       A   Okay.
4       Q   Would you -- would you disagree with that?
5       A   I don't remember that specifically, so
6   I -- I couldn't agree or disagree, I guess.
7       Q   Sure.  Fair enough.  It's been a little
8   while.  And then you said, "We will update," is
9   that -- is that a decision that you get to make in
10  your position?
11      A   I would believe that we would have gone
12  back to Steve Broussard and confirmed the language
13  we were putting in the offer letters is my
14  recollection.
15      Q   I see.  But based on -- based on his
16  input, at the end of the day, that would have been
17  a decision that would have been your call as HR
18  director?
19      A   Yeah, with influence or feedback from
20  the -- the management, obviously.
21      Q   Okay.  Who else would you have gotten
22  feedback from?
23      A   I'm just saying the people in this e-mail,
24  sorry.
25      Q   Oh, gotcha, okay.  It sounds like that

Page 42

1  happened, I mean, Keith, he's the president of
2  Cobra; right?
3      A   Yes, I believe he was, yeah.
4          (Plaintiff's Exhibit Number 52 previously
5          marked for identification and made part of
6          the record)
7      Q   (By Mr. Moulton) Okay.  We're going to
8  look at a document that's been previously marked
9  as Exhibit 52.  This is an offer letter for James
10 Tanner dated on -- the second page has a date, May
11 2nd, 2018, do you agree with that?
12     A   Yeah.
13     Q   Okay.  And we have here language about the
14 rate that you guys were discussing in the prior
15 exhibit, let's see if I can zoom in for you.  I
16 want to see if you agree with that, that that's
17 the -- this is -- this is the language that you
18 guys approved, which was $800 per day that will be
19 broken down hourly over 16 hours daily; is that
20 right?
21         MR. STUKENBERG:  Objection.
22         THE WITNESS:  I don't remember if this is
23 the version we approved or not.  But that's
24 definitely what it says on the document.
25     Q   (By Mr. Moulton) Okay.  Let's look at

Page 43

1  another one of these offer letters for Daniel
2  Wood.  The first couple pages aren't signed, so I
3  want to go down to the one that's signed, we have
4  an offer letter for Daniel Wood, mechanic's
5  helper, July 8, '18, it's agreed to him on July
6  10, 2018.  Is that what you understand this to be
7  is an offer letter for Daniel Wood?
8      A   Yes.
9      Q   Okay.  Now, this is way after those
10 initial conversations about what the offer letter
11 should say, correct, I mean, this is eight months
12 later, it looks like?
13     A   Based off those e-mails, yeah, that's
14 correct.
15     Q   Right.  And so it says for his storm rate
16 42.57 at 16 hours per day is $900 per day, is that
17 how you read that?
18     A   Yes, that's what it says.
19     Q   Okay.  Were -- were you ever in a position
20 during this time that you would be reviewing or
21 providing input, further input about what these
22 offer letters should be saying?
23     A   I don't believe so, it looks like that's
24 handwritten, was there something typed on the
25 earlier versions you had?

Page 44

1      Q   I think -- I think it was typed, but
2  it's -- I think it's just a different rate, but
3  the same -- the same idea.
4      A   Gotcha.  But, no, I was not reviewing
5  individual offer letters.
6      Q   Okay.  Now, after reviewing this method
7  of -- of showing the rate, do you believe this is
8  the rate that you -- you guys approved or do you
9  think it was more like the one that we already saw
10 in James Tanner's?
11     A   What do you mean?
12     Q   Well, it seemed like you weren't real
13 clear, you couldn't quite remember if like in
14 Exhibit 52, if the rate you -- you guys -- the
15 language that you approved was $800 per day that
16 we've broken down hourly over 16, because there's
17 that method, and you said you weren't sure if
18 that's the one that was eventually agreed to or
19 not; right?
20     A   Right.
21     Q   Okay.  So I'm showing you another example
22 for Daniel Wood, I'm wondering if this is the one
23 that you would have approved?
24     A   I don't specifically remember.  I think at
25 the end of the day, again, we were trying to

Page 45

1  ensure the hourly rate was understood, and if it
2  helped, to have a target amount that they would
3  earn each day in the offer letter, and that was
4  included as well.
5          (Plaintiff's Exhibit Number 146 previously
6          marked for identification and made part of
7          the record)
8      Q   (By Mr. Moulton) Okay.  And then we have
9  another example, which is Exhibit -- for Michael
10 Fair, which is 146.
11     A   Can you zoom in on that one a little bit,
12 it's pretty tiny.
13     Q   Yeah.  This one's expressed slightly
14 differently, it says 1,250 per day at 59.12 per
15 hour, do you see that?
16     A   I do.
17     Q   Okay.  And do you recall if this was the
18 version that you would have approved?
19     A   I don't -- I don't recall.  Again, I -- I
20 think it -- a different way of saying the same
21 thing, that you'll be compensated on an hourly
22 rate with a target earning amount of 1,250.  It
23 doesn't look like it's -- yeah.
24         (Plaintiff's Exhibit Number 1 previously
25         marked for identification and made part of

## JEFFREY ATLEE BEAGLE - April 18, 2022

Page 46

1    the record)
2    Q    (By Mr. Moulton) And in Exhibit -- what's
3    been previously marked as Exhibit 1, we have yet
4    another example for Carlos Benavides, and this one
5    says 800 per day at 37.84 per hour.  Do you recall
6    if this is the one that you would have approved?
7    A    Again, I -- I don't recall the specific
8    language we approved, but they all seem similar.
9        (Plaintiff's Exhibit Number 61 previously
10       marked for identification and made part of
11       the record)
12   Q    (By Mr. Moulton) Okay.  In Exhibit 61,
13   what's been previously marked as Exhibit 61, we
14   have a personnel action form, could -- could you
15   describe to us what personal action forms are for?
16   A    I believe they would have been used for,
17   excuse me, capturing certain information for new
18   hires, changes of position during employment, or
19   separation, so kind of just documentation --
20   Q    Okay.
21   A    -- of changes in the employee life cycle.
22   Q    So in Exhibit 61, we have a personnel
23   action form for -- for Alan Pierson that's dated
24   on his hire date, which is July 20th, 2017;
25   correct?

Page 47

1    A    Yeah.  Well, it looks like that's when --
2    yeah, his hire date and that's when whoever signed
3    that as a supervisor signed it.
4    Q    Looks like Scott Lynch maybe?
5    A    Maybe.
6    Q    Yeah.  And so this -- this is before
7    Puerto Rico because it's July 2017; correct?
8    A    Yes, that's correct.
9    Q    So Puerto Rico would have started about
10   October, actually kind of late October, October
11   20th or so?
12   A    Yeah, based off those e-mails you showed
13   earlier, that -- that seems right.
14   Q    Okay.  And so Alan Pierson, before he goes
15   to Puerto Rico, his base pay is $22 per hour;
16   right?
17   A    Yeah.  Well, that's what it says, yeah.
18   Q    All right.  We can count on -- on these
19   forms, right, I mean, they're not -- no one's
20   trying to put the wrong rates on these forms;
21   right?
22   A    I would assume not, no.
23   Q    Right.  Okay.  And then on the next page
24   in this Exhibit 61, we have another personal
25   action form, it's still for Alan Pierson, that's

Page 48

1    dated on October 24, 2017, do you see that?
2    A    I do.
3    Q    Okay.  And looks like that's signed by
4    Robert Malcolm?
5    A    That looks right.
6    Q    And he was the president of Higher Power?
7    A    Correct.
8    Q    And it has -- it says here it's authorized
9    by you, but that -- I mean, to be fair to you, it
10   looks like it's just preprinted on this form, but
11   do you know what that means?
12   A    I can't, the -- our faces are covering the
13   bottom of the form, if you can scroll down a
14   little bit.
15   Q    Oh, oh, I'd be happy to do that.  So we're
16   on Page Mammoth 1650 in Exhibit 61, it says on the
17   bottom, "Authorized by Jeff Beagle."
18   A    Yeah, I think that's just -- I'm sorry, I
19   didn't let you finish.
20   Q    I was wondering -- I have to get a
21   question, otherwise Will will just say I'm not
22   asking a question, which he's going to say right
23   now.  The question is, the question is, is what
24   does it mean when it says "authorized by Jeff
25   Beagle" on all these personal action forms?

Page 49

1    A    So that is just authorizing that version
2    of the form itself, not the information on the
3    form.
4    Q    Okay.  Gotcha.
5    A    So it was, you know, revised in September
6    of 2016 by me.
7    Q    Document management?
8    A    Right.
9    Q    Okay.  So you're not actually saying on
10   this form that you're -- that you're authorizing
11   his rate at PR $800 per day, is that what you're
12   saying?
13   A    Correct.
14   Q    If anyone was authorizing it, it would be
15   Robert Malcolm, who signed it?
16   A    Yeah, that he would be the approver, but
17   again, in practice, it would have been an hourly
18   rate.
19       (Plaintiff's Exhibit Number 148 previously
20       marked for identification and made part of
21       the record)
22   Q    (By Mr. Moulton) We'll look at some
23   e-mails that we've labeled as -- we've marked as
24   exhibits, Exhibit 148.  It looks a little cloudy.
25   A    Yeah.  Looks like it's not loading or

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 50

1  something.
2      Q     Let me try that again.  All right.
3  Exhibit 148, can you see it on your screen?
4      A     Yes.
5      Q     And because it's an e-mail, e-mail chain,
6  let's make sure we're looking at the whole thing,
7  okay.  So Mammoth 3316, Plaintiff's Exhibit 148,
8  let's see what we got here.  It looks like you're
9  writing to Missy and Scott about Trace Gunn with
10  the job title electrician apprentice in the Puerto
11  Rico department, and you're asking to confirm what
12  his day rate should be, you have $800 per day in
13  your system, but he's $700 day rate, so you want
14  to know which one's correct; is that right?
15     A     Yes, that's what it says, yep.
16     Q     And it looks like Scott Whitsell told you,
17  hey, Missy's going to know the answer?
18     A     Okay.
19        MR. STUKENBERG:  We just reading documents
20  here, Dave, or do you have questions?
21     Q     (By Mr. Moulton) Yeah.  So did you get
22  a -- did you -- do you recall, other than this
23  e-mail, getting a response from Missy?
24     A     I -- I do not, I mean, I think I used the
25  term "day rate" to -- that's what they were used

Page 51

1  to speaking about, to try to arrive at the correct
2  target amount, his budgeted amount for the hourly
3  rate.
4        MR. MOULTON:  Objection; non-responsive.
5        (Plaintiff's Exhibit Number 149 previously
6        marked for identification and made part of
7        the record)
8      Q     (By Mr. Moulton) We're going to go to
9  Exhibit 149, which is another e-mail chain.  I
10  want to focus on Page 3318.  It will give us
11  context.
12        MR. MOULTON:  We are going to have to read
13  the e-mails, Will.
14        MR. STUKENBERG:  Then have him read them
15  and then ask him a question, we don't need you to
16  read them to us.
17        MR. MOULTON:  That's -- that's fair.
18     Q     (By Mr. Moulton) We can start here at the
19  bottom.  Do you want to just kind of peruse this,
20  yeah, we look at Page 3323 together and why don't
21  you just look at that, Mr. Beagle, and tell me
22  when you want to scroll up to kind of get some
23  context of this.
24        (Witness reviews document)
25        THE WITNESS:  Okay.  You can scroll up.

Page 52

1        (Witness reviews document)
2        THE WITNESS:  Okay.
3        (Witness reviews document)
4        THE WITNESS:  Okay.
5        (Witness reviews document)
6        THE WITNESS:  Okay.
7        (Witness reviews document)
8        THE WITNESS:  Okay.
9        (Witness reviews document)
10        THE WITNESS:  All right.
11        (Witness reviews document)
12        THE WITNESS:  Okay.
13        (Witness reviews document)
14        THE WITNESS:  Got it.
15     Q     (By Mr. Moulton) Okay.  So on this e-mail
16  chain we saw several e-mails here where you guys
17  refer to the rates of pay for the employees in
18  terms of day rates; correct?
19     A     Yes.
20     Q     And if you could explain in November, on
21  this e-mail on November 29th, 2017, you said,
22  "This will make our" --
23        MR. STUKENBERG:  Dave, we read the
24  e-mails, what's the question?
25        MR. MOULTON:  I'm going -- I want to make

Page 53

1  sure we're talking about the same thing, Will, so
2  just bear with me.  I appreciate --
3        MR. STUKENBERG:  I mean, we're just saying
4  can you read this e-mail.  I mean --
5        MR. MOULTON:  I'm not doing that.  I'm
6  going to ask him about this e-mail, but we're
7  going to focus on the part that I want to focus on
8  to make sure it's clear that we're talking about
9  the same thing.
10     Q     (By Mr. Moulton) I want to focus on this,
11  where it says, "This will make our review process
12  easier when confirming timecards net out to day
13  rates for all employees."  Can you explain to us
14  what it means when -- in your review process when
15  you're confirming the timecards net out to day
16  rates, what does that mean?
17     A     Well, I mean, I think it means, again, we
18  had a targeted amount that colleagues were
19  expecting to make, I think we talked about it here
20  in the terms of a day rate because that was the --
21  what -- kind of what's used, just as the shorthand
22  versus, you know, weekly targeted amount of
23  compensation.  And so when we had a -- it sounds
24  like when we had a position, we wanted to make
25  sure that we had them classified correctly

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 54

1  based -- for their compensation.
2      Q    Do you recall when -- when folks didn't
3  work a full week and they had been told they would
4  be paid pay rates -- or day rates, that there
5  would be a process of adjusting the pay up to what
6  the day rate would be?
7      A    Well, but -- told they would be paid day
8  rates by whom?
9      Q    Well, I mean, we know that Scott Whitsell
10  was recruiting folks based on that initial e-mail,
11  so I mean, that's not -- I mean, that's not a part
12  of the question that I'm -- that matters.  Do you
13  recall a process where you would basically -- for
14  folks that didn't work a full week, that their pay
15  would be adjusted to be what the day rate would
16  be?
17          MR. STUKENBERG:  Objection; form.
18          THE WITNESS:  Yes, I -- I do recall
19  instances where, for some reason, they may have
20  not worked a full week and then the managers could
21  determine to pay additional amount of bonus to the
22  colleagues for, I guess, if nothing more than
23  morale reasons.
24      Q    (By Mr. Moulton) And in Exhibit 149, when
25  you're confirming the timecards net out to day

Page 55

1  rates, is that the process you're talking about?
2      A    I don't recall sending that e-mail, but
3  there's a chance that, again, kind of shorthand
4  for those additional payments, yeah.
5      Q    Okay.
6          MR. STUKENBERG:  Dave, when you get to a
7  stopping point, let's take a break, doesn't need
8  to be now, but just --
9          MR. MOULTON:  That's fine.  We can cover
10  this e-mail, then we can have a break.
11          (Plaintiff's Exhibit Number 179 marked for
12          identification and made part of the
13          record)
14      Q    (By Mr. Moulton) All right.  This one
15  isn't very long, this one should go a little
16  faster.  This is Exhibit 179, and let's start at
17  the bottom, if you want to take a look at it.
18      A    Okay.
19      Q    From the bottom, kind of scroll up, just
20  tell me when you're ready.
21          (Witness reviews document)
22          THE WITNESS:  Okay.
23          (Witness reviews document)
24          THE WITNESS:  Okay.
25          (Witness reviews document)

Page 56

1          THE WITNESS:  Okay.
2          (Witness reviews document)
3          THE WITNESS:  Okay.
4      Q    (By Mr. Moulton) Okay.  So you've had a
5  chance to review the e-mails in Exhibit 179;
6  correct?
7      A    Correct.
8      Q    Okay.  So it sounds like this is basically
9  about workers who need adjustments to their pay;
10  correct?
11      A    Yeah.  Looks like the initial -- it
12  started maybe account numbers and incorrect pay
13  rates or titles, yeah, some sort of adjustments
14  needed.
15      Q    Right.  There was also adjustments needed
16  because when -- when folks don't work a full week,
17  what the -- if you call it a -- the day rate pay
18  is, is a higher than what the actual pay comes out
19  for their -- their hourly pay; correct?
20          MR. STUKENBERG:  Objection; form.
21          THE WITNESS:  Can you repeat that?
22      Q    (By Mr. Moulton) Yeah.  So I just wanted
23  to confirm with you that under the system that
24  Mammoth was using, when workers don't work a full
25  week, the hourly pay that they would get is less

Page 57

1  than the amount they would get if they were paid a
2  day rate; right?
3      A    Correct.
4      Q    All right.  And so Missy's asking about
5  how do we adjust for folks who don't work the full
6  week; correct?
7          MR. STUKENBERG:  Objection; form.  The
8  document speaks for itself.
9          THE WITNESS:  Correct.
10      Q    (By Mr. Moulton) All right.  And so you --
11  you talk about this, right, and on your e-mail,
12  November 17, that's what you're talking about,
13  you're talking about grossing up the pay to equal
14  what the day rate pay would be for those folks who
15  worked less than a full week; correct?
16          MR. STUKENBERG:  Objection; form.  The
17  bottom of the document explains what they're
18  correcting.
19          THE WITNESS:  Correct.
20          MR. MOULTON:  Did you want to do your
21  break now, Will, or you want to keep going?
22          MR. STUKENBERG:  No, we can do a break.
23          THE VIDEOGRAPHER:  Off the record.
24          (Break taken from 1:06 to 1:16)
25          THE VIDEOGRAPHER:  Back on.

## JEFFREY ATLEE BEAGLE - April 18, 2022

Page 58

1    Q    (By Mr. Moulton) Mr. Beagle, you
2  understand you're still under oath; right?
3    A    Yes.
4        (Plaintiff's Exhibit Number 180 marked for
5        identification and made part of the
6        record)
7    Q    (By Mr. Moulton) Okay.  Let's continue our
8  discussion about the grossing up the page up to
9  the day rate amounts.  Going to show you what
10  we've labeled or marked, I should say, as Exhibit
11  180, and this is another e-mail chain, I want to
12  let you get familiar with this starting at Mammoth
13  3446.  Go ahead and take a look at that and I'll
14  scroll up when you're ready.
15        (Witness reviews document)
16        THE WITNESS:  Okay.
17        (Witness reviews document)
18        THE WITNESS:  Okay.  You can scroll up.
19        (Witness reviews document)
20        THE WITNESS:  Okay.
21        (Witness reviews document)
22        THE WITNESS:  I'm done.
23    Q    (By Mr. Moulton) Okay.  So this is another
24  e-mail describing this process where if a worker
25  works less than the full week and the hourly pay

Page 59

1  isn't going to come out to be what the day rate
2  pay would be and that you guys are saying that
3  you're just going to gross it up to that day rate
4  amount; correct?
5        MR. STUKENBERG:  Objection; form.  Reading
6  documents to him.
7        THE WITNESS:  Yes, that's what it says.
8    Q    (By Mr. Moulton) And that's the process
9  that -- that you guys started to do; correct?
10    A    Correct, with, again, I think there was a
11  targeted amount or expectations from the
12  colleagues in those instances where it didn't meet
13  expectations, the managers wanted to bonus them
14  out to, you know, goodwill, morale, whatever we
15  want to call it, hard work occurring on the
16  island, retention.
17    Q    Okay.  It's curious that you mentioned
18  bonus for the first time after having a break and
19  speaking with your lawyer.
20        MR. STUKENBERG:  I'll go ahead and object
21  to the sidebar insinuation.  In addition, Dave, if
22  you look at the transcript, you'll see he said
23  bonus several times before the break.  But you can
24  go ahead and ask a question if you want to.
25    Q    (By Mr. Moulton) Do you recall ever

Page 60

1  referring to these grossed up amounts as bonuses
2  ever in e-mails?
3    A    I don't recall all the e-mails, no.
4        (Plaintiff's Exhibit Number 181 marked for
5        identification and made part of the
6        record)
7    Q    (By Mr. Moulton) Let's look at Exhibit
8  181, which is another e-mail chain here, it's
9  actually part of the same chain.
10    A    Okay.
11    Q    Scroll down to the bottom.  Tell me when
12  you're ready to scroll up.
13    A    Yeah, you can go back up.
14    Q    Okay.
15        (Witness reviews document)
16        THE WITNESS:  Okay.  You can go up.
17    Q    (By Mr. Moulton) Okay.  So in Exhibit 181
18  we have yet another explanation of how when the
19  hourly pay is -- doesn't -- or is short for a
20  person who's working less than a full week, that
21  the solution will be just to -- to gross their --
22  their pay up to that -- that day rate amount;
23  correct?
24        MR. STUKENBERG:  Are you asking about what
25  the e-mail says, what the practice is?

Page 61

1    Q    (By Mr. Moulton) This e-mail is about that
2  practice; right?
3    A    Yes, that's what the e-mail says.
4    Q    Let's take a look at Exhibit 182.
5        (Plaintiff's Exhibit Number 182 marked for
6        identification and made part of the
7        record)
8    Q    (By Mr. Moulton) Go ahead.  Get yourself
9  familiar with this, tell me when you want to
10  scroll up.
11    A    Can you scroll down a little bit, it's cut
12  off by the -- perfect.
13    Q    Okay.
14    A    You can go up, right there is good.
15        (Witness reviews document)
16        THE WITNESS:  Okay.  You can scroll up.
17    Q    (By Mr. Moulton) Okay.  Go ahead.  I'm
18  sorry.
19        (Witness reviews document)
20        THE WITNESS:  Okay.
21        (Witness reviews document)
22        THE WITNESS:  Okay.
23        (Witness reviews document)
24        THE WITNESS:  Okay.
25    Q    (By Mr. Moulton) Okay.  So first question

**JEFFREY ATLEE BEAGLE - April 18, 2022**

Page 62

1  I want to ask you is about Page 3546 in Exhibit
2  182 here.  I'm sorry, going to be on Page 3547.
3      A   Okay.
4      Q   So your e-mail on November 3rd, 2017 is
5  letting Mr. Estes know -- is it Ms. or Mr.?
6      A   I believe it was a Ms.
7      Q   Okay.  Ms. Estes.  Okay.  So you're
8  writing Ms. Estes, you're telling her that you
9  guys will be able to process basically the
10 corrections to get these workers on that list up
11 to their day rate; right?
12         MR. STUKENBERG:  Objection; form.  The
13 document speaks for itself.
14         THE WITNESS:  I didn't see anything
15 about -- okay, yes, I see that.
16     Q   (By Mr. Moulton)  Is that true?
17     A   Yeah, looks like they didn't get paid as
18 expected.
19     Q   And so that difference will get out to
20 them for the Monday payment; right?
21     A   Correct.
22         (Plaintiff's Exhibit Number 183 marked for
23         identification and made part of the
24         record)
25     Q   (By Mr. Moulton) So Exhibit 183, I want

Page 63

1  you to review this real quick.
2          (Witness reviews document)
3          THE WITNESS:  Okay.  You can scroll up a
4  little bit.
5      Q   (By Mr. Moulton) Okay.
6          (Witness reviews document)
7          THE WITNESS:  Okay.
8          (Witness reviews document)
9          THE WITNESS:  Okay.
10         (Witness reviews document)
11     Q   (By Mr. Moulton) Okay.  So did you
12 understand that the folks doing payroll would keep
13 track of what adjustments need to be made on a
14 spreadsheet?
15     A   Yes, I believe J.D. would.
16     Q   And Exhibit 183 is talking about one of
17 those spreadsheets; right?
18     A   It appears, yes.
19         (Plaintiff's Exhibit Number 184 marked for
20         identification and made part of the
21         record)
22     Q   (By Mr. Moulton) Okay.  We're going to
23 look at that spreadsheet in its native form, it's
24 going to be Exhibit 184.  We're not going to have
25 a sticker on it because it's a native Excel

Page 64

1  spreadsheet, but I wanted to discuss this with
2  you, Mr. Beagle.  Do you see an Excel spreadsheet
3  in front of you right now?
4      A   I do.
5      Q   Okay.  Have you seen rate adjustment
6  sheets like this?
7      A   Not that I recall, no.
8      Q   Okay.  This is not something that you
9  would review?
10     A   No.
11     Q   Okay.  Now, I realize you said you have
12 never reviewed sheets like this, do you -- do you
13 understand what this is?
14     A   I mean, it appears they're recommending in
15 Column I an adjustment to compensation, an
16 increase to compensation, and then the comments
17 there say because they did not work entire
18 two-week period.
19     Q   Right.  So that sounds like the gross-ups
20 that you were talking about in the earlier
21 e-mails; right?
22     A   Correct.
23     Q   Let's look at Exhibit 185.
24         (Plaintiff's Exhibit Number 185 marked for
25         identification and made part of the

Page 65

1          record)
2      Q   (By Mr. Moulton) It's just one page, go
3  ahead and review these e-mails.
4      A   Okay.
5          (Witness reviews document)
6          THE WITNESS:  Okay.
7      Q   (By Mr. Moulton) Okay.  I want to focus on
8  J.D. Kinsey's e-mail that was also sent to you
9  about entering in the 16-hour pay.
10     A   Okay.
11     Q   So is it true for Puerto Rico that when
12 the workers worked on the island, basically every
13 day that they showed up for work in the payroll
14 system, there would be a 16 hours entered for
15 them?
16     A   That is correct.  That was their on --
17 essentially on-call time, the max amount they
18 would ever be asked to work in a day.
19     Q   So I want to talk to you about the process
20 that was in place, if you know, do you -- do you
21 understand how -- how attendance or time was
22 recorded and then how that got into the payroll
23 system and then how it ended up in pay, do you
24 understand what I'm asking, that process?
25     A   Yeah, if I recall, I think the -- the

**JEFFREY ATLEE BEAGLE - April 18, 2022**

Page 66

1  foreman or crew leader would take attendance each
2  day, report that in to J.D. Kinsey, and he would
3  enter that information into the payroll system.
4      Q    And how would the foreman typically record
5  who was there that day?
6      A    I don't know the answer to that.
7      Q    Okay.  So you wouldn't be able to say if
8  he used like a paper form or iPad or called it in?
9      A    No, I don't know.
10     Q    Okay.  But you -- the way you understand
11  it, though, that they would be reporting it
12  directly to J.D. Kinsey?
13     A    I believe so, yes.
14     Q    Okay.  Do you know what J.D. stands for?
15     A    I do not.
16     Q    Okay.  Was he related to Ken Kinsey?
17     A    Yes, I believe it was his son.
18     Q    Okay.  And who was Ken Kinsey?
19     A    I don't remember his exact title, but he
20  was one of the management personnel in Puerto
21  Rico.
22     Q    Okay.  Did Mammoth not have an
23  antinepotism policy?
24     A    I don't remember what the nepotism policy
25  was.

Page 67

1      Q    All right.  We're going to look at some
2  payroll records.
3      A    Okay.
4          MR. MOULTON:  And by the way, Will, I
5  don't think we're going to be a whole lot longer.
6          MR. STUKENBERG:  Great.
7          MR. MOULTON:  Just so you know for your
8  flights and stuff.
9          MR. STUKENBERG:  Great.
10     Q    (By Mr. Moulton) Just bear with me a
11  second, going to get these opened up so we can
12  work with them.  I'm not like Will and hand you
13  3,000 pieces of paper and you have to sort through
14  it all in your depo, I'm going to make it easy.
15          It's still loading, just so you know.
16     A    No, you're good.
17     Q    Where did you go?  I can't find you.  Here
18  we go.
19     A    I'm here.
20     Q    Yeah, I know, apparently -- talking about
21  on my desktop.  Okay.  All right.
22          (Plaintiff's Exhibit Number 170 previously
23          marked for identification and made part of
24          the record)
25     Q    (By Mr. Moulton) Plaintiff's Exhibit 170,

Page 68

1  we got some example paystubs that I wanted to
2  discuss with you.
3      A    Okay.
4      Q    I'm going to put it on two screens so we
5  can flip back and forth to -- to time sheets if we
6  need to, okay.  So if you ever need to see a time
7  sheet for any one of them, we can just jump right
8  to it.  All right.
9          So the first one we have, we have a
10  paystub for Justin Washburn, looks like it's for
11  the pay period June 25th to July 8th, do you see
12  that?
13     A    I do.
14     Q    And that I'm assuming that you're probably
15  familiar enough with these to know that because
16  every day worked on the island essentially was
17  logged as 16 hours, that this is a paystub for a
18  two day -- or two days' work, would you agree with
19  that?
20     A    Yes.
21     Q    Okay.  And we know also because of -- if
22  you want to refresh your memory, we can -- hold
23  on, let's do this.  We can also reconfirm when we
24  see rates on these paystubs, we can go back to the
25  pay scale, like in Plaintiff's Exhibit 151, and

Page 69

1  see what the target day rate pay was; right?
2      A    Okay.
3      Q    So for a 37.84 rate like we were just
4  looking at, that corresponds to $800 a day;
5  correct?
6      A    Correct, yeah, that would be the target.
7      Q    Right.  And so we see here, this is an
8  example of the gross-ups that we were talking
9  about earlier, right, because with only two days
10  worked, Mr. Washburn is basically $86.40 short of
11  what his day rate would be; right?
12     A    Right.  To get to the target of 1,600.
13     Q    Right.  So this is -- so for Mr. Washburn
14  then, his pay, in effect, ends up being $800 a day
15  for two days; correct?
16          MR. STUKENBERG:  Objection; form.
17          THE WITNESS:  Correct.  Yeah, that's the
18  math, yeah.
19     Q    (By Mr. Moulton) Right.  And so then, you
20  know, there's -- that's one example, and let's go
21  to his next pay stub in this -- in this set.  And
22  just, you know, we're not -- I'm not going to go
23  through every single one of his, I have some that
24  where I have specific questions about and so just
25  so you know, this is not -- these won't

**JEFFREY ATLEE BEAGLE - April 18, 2022**

Page 70

1  necessarily be consecutive.
2      This one's on May 14th, May 27th, and this
3  one just shows just day rate $800, and do you know
4  why it was entered in like this?
5      A   It shouldn't have been, I mean, that
6  wasn't the -- that wasn't the way it worked.
7      Q   Okay.
8      A   I don't know why it would have been.
9      Q   Okay.  That's -- but, you know, even if
10  you had done it as 16, there still would have been
11  a gross-up and it still would have come out to
12  800; right?
13      MR. STUKENBERG:  Objection; speculation.
14      THE WITNESS:  If management wanted to do a
15  gross-up, yes.
16      Q   (By Mr. Moulton) Okay.  And just to
17  confirm, we can actually look at that paycheck,
18  May 14th to May 27th, we look at his time detail
19  reports, and for that two-week period, as you can
20  see on Mammoth 7081, on Sunday, there's an entry
21  there for $800, do you see that?
22      A   Yes.
23      Q   Okay.  So that $800 under the pay code DYR
24  corresponds to his pay stub just showing a day
25  rate of 800; correct?

Page 71

1      A   It appears, yes.
2      Q   If we look at Tyler Halford's paystub
3  starting on same exhibit, Exhibit 170, Mammoth
4  533, with 160 shown in the days or in the hours
5  worked, that corresponds to ten days; right?
6      A   Correct.
7      Q   Okay.  And with a 37.84 rate, we know
8  that's targeting $800 a day; right?
9      A   Correct.
10      Q   And so he actually gets paid what is equal
11  to 800 times ten on his paycheck; correct?
12      A   Correct.
13      Q   And to get there, there was a gross-up of
14  $432 to make that happen?
15      MR. STUKENBERG:  Objection; form.
16      THE WITNESS:  Correct.
17      Q   (By Mr. Moulton) And for Mr. Halford in
18  the same exhibit on Page 535, we have another
19  example where he's worked five days, which would
20  correspond to 80 hours and $4,000 is his pay;
21  right?
22      A   Correct.
23      Q   So for this one to work, he had to get a
24  day rate adjustment of $518.72 to get him to his
25  day rate pay; correct?

Page 72

1      MR. STUKENBERG:  Objection; form.
2      THE WITNESS:  Yes, there was an adjustment
3  of 518.72.
4      Q   (By Mr. Moulton) Right.  Let's look at an
5  example for Robby Alvear or Alviar, it's Mammoth
6  23 inside Exhibit 170, pay period April 30th to
7  May 13th, do you see where it says "day rate
8  6,400"?
9      A   Yes.
10      Q   On this one, it doesn't show an hourly
11  rate; right?
12      A   Correct.
13      Q   Okay.  But if we look at his time sheets,
14  we should be able to tell how many days he worked,
15  so let's do that, let's make sure we're in the
16  right time.  April 30th, May 13th, so it looks --
17  with his time detail report, we have eight days
18  worked from Sunday, May 6th through Sunday, May
19  13th, I know that sounds like seven, but when you
20  count Sunday both times, it's eight days; right?
21  Do you see that as eight days?
22      A   Yes.
23      Q   All right.  And so and for each of these
24  days, it shows that he's getting $800 each day;
25  right?

Page 73

1      A   Yes.
2      Q   Okay.  And again, those are entered in
3  under DYR code, which comes out in his paystub as
4  the day rate; right?
5      A   Yes.
6      Q   So he was paid $800 for every day he
7  worked in this pay period; right?
8      A   Yes.  Again, that's not how the practice
9  was supposed to have been set up, but that appears
10  to be what J.D. did.
11      Q   Okay.  Was J.D. ever in trouble for doing
12  it that way?
13      A   I don't recall.
14      Q   Okay.  You don't know if he was fired
15  because of that?
16      A   I do not remember.
17      Q   Okay.  In your opinion, this is the second
18  time where you said that a pay entered as day rate
19  was -- was improperly done, can you tell us what
20  you think should have been done the right way?
21      A   Should have been how we structured it,
22  which was 16 hours per on-call shift, and then,
23  again, when there was a shortage, obviously, the
24  colleagues were upset by that, and in many
25  instances, management decided to make that

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 74

1  additional payment to them, the gross-up or
2  whatever we called it.  But in my mind, those are
3  separate from the hourly rate, which is what they
4  were offered in their offer letter.
5      Q    All right.  Let's look at someone with a
6  different rate.  Let's try Wilburn Durrance.
7  Wilburn Durrance has a rate of 59.12 on his
8  paycheck that's dated March 5th, March 18th, let's
9  see if I can see the Bates number, yeah, Bates
10 Number 361, do you see that?
11     A    Uh-huh.
12     Q    You strike me as a guy who's really good
13 at math, we probably don't need to go look at the
14 rate sheet, we probably figure it out.  So it
15 looks like --
16     A    I don't know about that.
17     Q    Yeah.  Someone got mad that I called them
18 a math genius, but I thought that would be a
19 compliment, but I'll spare you, okay.  So 160
20 hours on this paycheck comes out to ten days;
21 right?
22     A    Right.
23     Q    Okay.  And if you got 12,500, then that
24 target rate would be 1,250; right?
25     A    Right.

Page 75

1      Q    And we can verify this 59.12 rate back in
2  Exhibit 151 where it shows 59.12 is targeting
3  1,250 per day; right?
4      A    Correct.
5      Q    Okay.  So we can see on this paycheck then
6  for him to get his target rate, that his day rate
7  gross-up was paid in an amount of $203.04; right?
8      A    Correct.
9      Q    For Richard Loveless in Exhibit 170 on
10 Mammoth 746, we have another example with a
11 different rate.  This one, again, is 160 hours,
12 comes out to be ten days worked; right?
13     A    Right.
14     Q    And if you got paid $10,000 for the ten
15 days, we know his target was $1,000 per day;
16 right?
17     A    Correct.
18     Q    And with this rate, you have or the
19 company has here for him at 47.30 back on Exhibit
20 151, we can verify that that rate corresponds
21 into, in fact, $1,000 per day; right?
22     A    Right.
23     Q    And so for this payroll to work, because
24 his hourly pay was short, there had to be a
25 gross-up of $540; correct?

Page 76

1      A    Correct.
2      Q    Now, with Alan Pierson in Exhibit 170,
3  Page Mammoth 889, we have yet another example of
4  this, we have 192 hours, which would correspond to
5  13 days; correct?
6      A    I believe that's right.
7      Q    In fact, I'm going to pull up my
8  calculator, if you'll bear with me, just to make
9  sure.  So we take 192, if we divide that by 16,
10 we'll come out to -- oh, I'm sorry, it's 12 days
11 worked.
12     A    Oh.
13     Q    12, I know, I'm so disappointed.
14     A    You shouldn't have relied on my math.
15     Q    Right.  Okay.  So 12 days worked, you may
16 remember that his rate of 37.84 corresponds to
17 $800 per day?
18     A    Yes.
19     Q    Okay.  And so 12 days worked at 800, his
20 pay comes out to be 9,600; correct?
21     A    Correct.
22     Q    And for that to work, he had to get a
23 gross-up of $215.68; right?
24     A    Correct.
25     Q    Let's do -- let's do another rate here for

Page 77

1  Jonathan Baker.
2          MR. STUKENBERG:  Objection.
3      Q    (By Mr. Moulton) In Exhibit 170, Mammoth
4  2089.
5          MR. MOULTON:  We're almost done, Will
6          MR. STUKENBERG:  Objection; cumulative and
7  boring.
8          MR. MOULTON:  What?
9          MR. STUKENBERG:  Cumulative and boring.
10         MR. MOULTON:  I can barely hear you, but I
11 think you're complaining that it's boring, but you
12 should not complain because I'm getting you out of
13 here at a reasonable time today.  I can change all
14 that.
15         MR. STUKENBERG:  Let's get through it.
16         MR. MOULTON:  Okay.
17     Q    (By Mr. Moulton) So for Jonathan Baker,
18 the rate here that shows a 28.38, which we know
19 back on Exhibit 151 corresponds to a $600 day
20 rate; right?
21     A    Yeah, target -- target amount, yeah.
22     Q    Yeah.  And so 80 hours really is still 16
23 times 5, so that's 5 days worked; right?
24     A    Right.
25     Q    Okay.  And so at the rate of 600, 5 times

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 78

1  600 equals his pay -- his pay of $3,000; right?
2    **A    Correct.**
3    Q    And for that to work, because the hourly
4  pay was short, he had to get a day rate gross-up
5  of $162; right?
6    **A    Yeah.  Had to, but -- I wouldn't say had**
7  **to, but did get, yes.**
8    Q    Okay.  Right.  You -- in your opinion,
9  these were -- these amounts were a bonus, they
10  weren't something that the company had to do?
11    **A    Yeah, we set forth an hourly rate and did**
12  **not have to tie to that target amount, but chose**
13  **to in most cases.**
14    Q    Who exactly were the folks that would
15  approve whether or not the company was going to
16  pay the gross-ups?
17    **A    It would have been funneling through the**
18  **island, so management on the island.**
19    Q    Okay.  Do you happen to remember any
20  names?
21    **A    I don't remember specifics, no.**
22    Q    Okay.  Would that -- would you have been a
23  person that was approving the -- the gross-ups or
24  no?
25    **A    No.**

Page 79

1    Q    Okay.  So we're probably talking about
2  like is that something that J.D. Kinsey would do
3  on his own?
4    **A    No, you're probably talking Ken Kinsey,**
5  **something like that.**
6    Q    Okay.  Ken Kinsey, what about like a
7  Robert Malcolm?
8    **A    I don't recall.**
9    Q    Okay.  Now, we -- just to kind of give you
10  some background before I get to my next round of
11  questions, Mr. Beagle, just to let you know, we --
12  we had Mr. Broussard in last Thursday in Houston
13  for a deposition, we talked to him about, you
14  know, coming up with offer letters, coming up
15  with, you know, when y'all are talking about two
16  different plans and things like that.  So I want
17  to kind of talk to you about some of the
18  conversations as you recall them with
19  Mr. Broussard, okay?
20        And just so you know, because he's a
21  lawyer, I'm not going to -- I don't want to ask
22  about things that are privileged, but because this
23  case involves advice that he may have given that
24  the company is relying on for certain defenses,
25  the way I understand it, Will can -- Will can

Page 80

1  correct me, that there has been a waiver on those
2  things.  Now, if I ask about something that the
3  waiver doesn't apply to, I'm sure Will's going to
4  object and tell you not to respond.  But I guess
5  what you may want to do for this part is to give
6  Will plenty of time to unmute himself and -- and
7  put the objections in, because I do not want to
8  get into privileged conversations, okay?
9    **A    Okay.**
10    Q    All right.  So the -- the way I understand
11  Mr. Broussard's testimony is that he was working
12  with you guys to come up with a pay plan that
13  would be compliant with targeting the amounts that
14  Mr. Ellison wanted to pay, like we -- you know,
15  from that original e-mail.  Is that -- is that
16  your understanding of what Mr. Broussard's role
17  was?
18    **A    Yes.**
19    Q    Okay.  And the way I understand it is that
20  his perception was that there was basically two
21  plans that were discussed, there was a plan that
22  was, you know, you could pay day rates, but you
23  would have to pay extra amounts on the day rate
24  because overtime would be required, or you could
25  use the day rates like a budget and come up with

Page 81

1  hourly rates to stay within the budget and pay
2  hourly plus overtime; correct?
3    **A    Correct.**
4    Q    And as I understand his testimony, he
5  wasn't sure about what exactly which plan y'all
6  went with, but I think, based on your testimony, I
7  can guess, but can you tell us which plan you went
8  with or the company went with, I should say?
9    **A    We went with hourly plus overtime.**
10    Q    Okay.  Now, the one thing I wanted to
11  clear up is that with -- with the gross-up
12  payments, was that something that was put to
13  Mr. Broussard for his opinion on?
14    **A    I don't recall.**
15    Q    Did you discuss with Mr. Broussard whether
16  or not the workers may be exempt in Puerto Rico?
17        MR. STUKENBERG:  And I'm just going to
18  object here, Dave, are you talking about the
19  plaintiffs in this case or any workers?
20        MR. MOULTON:  So I have a question -- so
21  let me kind of clear this up, Will.  I do want to
22  talk about the plaintiffs in the case, but
23  sometimes you may -- if you're trying to rely on
24  advice he may have given to other folks, but
25  you're still going to apply it to the plaintiffs

**JEFFREY ATLEE BEAGLE - April 18, 2022**

Page 82

1  in the case, I want to ask about that.  Does that
2  make sense?
3        MR. STUKENBERG:  Sure.  Go ahead.
4        MR. MOULTON:  If you're relying on advice
5  from him that applied to the plaintiffs, then I
6  want to know about that.  I don't want to know how
7  you told some other workers that had positions
8  that were totally different, had nothing to do
9  plaintiffs.
10       MR. STUKENBERG:  Okay.  Go ahead.
11       MR. MOULTON:  That make sense?
12       MR. STUKENBERG:  Yes.
13       MR. MOULTON:  Okay.  All right.
14   Q    (By Mr. Moulton) So I want to know if you
15  had discussions with Mr. Broussard about whether
16  any of the plaintiffs were exempt?
17   A    I guess I don't know who the plaintiffs
18  are, so I don't know how to answer that.
19   Q    Okay.  So let's -- let's describe them
20  generally, I'm not going to read you a list of 150
21  names, though I know Will wants me to, but -- so
22  the workers in this case are essentially the guys
23  who are restoring power in Puerto Rico, they're
24  like the rate -- you know, the different positions
25  we've seen on the rate sheets?

Page 83

1   A    Right.
2   Q    Like general foreman, foreman, lineman,
3  mechanics, electricians, those types people.
4   A    Gotcha.
5   Q    Yeah.  So I want to know if you had
6  discussions with Mr. Broussard about whether or
7  not those workers were exempt.
8   A    I do think we asked initially whether they
9  would be considered salary or hourly and then just
10  talked about the day rate or the hourly options,
11  day rate with overtime or hourly with overtime.
12   Q    Okay.  And why would you have asked them
13  whether or not they were hourly or salary?
14   A    To see if they were exempt or not.
15   Q    Right.  Because for the -- at least for
16  the white collar exemption, I guess is what you
17  would have been asking about, would have required
18  a salary payment; right?
19   A    Correct.
20   Q    So if the workers were paid on an hourly
21  system, they wouldn't be exempt; right?
22       MR. STUKENBERG:  Objection.  He's not a
23  lawyer, you can ask him what Mr. Broussard told
24  him.
25   Q    (By Mr. Moulton) Right.  Well, is that --

Page 84

1  is that your understanding, that if they were paid
2  by the hour, they wouldn't be exempt, based on
3  Mr. Broussard's conversations?
4   A    I don't recall the specifics of the
5  conversations we had.
6   Q    Okay.  Well, we have that original letter
7  and we can go back to it, but Mr. -- in that
8  letter, Mr. Broussard let you guys know that if
9  you're going to pay day rates, you're going to
10  have to pay them overtime, is that your
11  understanding?
12   A    Right.  From that e-mail, yes.
13   Q    Right.  Right.  Besides white collar
14  exemptions, were there any other exemptions that
15  were discussed with Mr. Broussard?
16   A    I don't recall.
17   Q    All right.  We have another exhibit I want
18  to show you, we're getting -- we're getting pretty
19  close to getting done.
20   A    Okay.
21       (Plaintiff's Exhibit Number 156 previously
22        marked for identification and made part of
23        the record)
24   Q    (By Mr. Moulton) Let me show you
25  Plaintiff's Exhibit 156.  In Exhibit 156, would

Page 85

1  you agree this is an e-mail that would go out to
2  workers about their benefits package?
3   A    Looks like it, yes.
4   Q    Okay.  So in this exhibit, Exhibit 156, is
5  it Mammoth Energy Services, Inc., is that the
6  entity that provides the employee benefits?
7   A    I think it was Mammoth Energy, Inc.
8   Q    Okay.  So do you know why this -- the
9  Mammoth Energy Services, Inc. logo was put on the
10  benefits guide?
11   A    I don't, maybe Energy, Inc., I don't even
12  know if they had a logo, I don't know.
13   Q    Okay.  Were you the one that put this
14  together?
15   A    I don't recall.
16   Q    Okay.  This --
17   A    It was actually probably our benefit
18  broker.
19   Q    Go ahead.
20   A    It may have been our benefit broker.
21   Q    Okay.  Who was the benefit broker?
22   A    Andreini & Company.
23   Q    So scrolling through this, can you just
24  kind of verify with me if this is a correct -- I
25  mean, if these benefits that are described here

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 86

1  are the benefits that were, in fact, offered to
2  the workers?
3      A   To the best of my recollection, it seems
4  right, yes.
5      Q   Okay.  Were you ever a part of any
6  discussions about whether or not either Higher
7  Power or 5 Star had enough money in their accounts
8  to cover payroll?
9      A   I -- I -- not that I specifically recall,
10  but it's possible that would have worked with
11  accounting or something like that.
12      Q   Okay.  And do you know how Mammoth would
13  handle finances as far as transferring to and from
14  its entities?
15      A   I don't recall now.
16      Q   Were you part of what they call the
17  treasury shared function?
18      A   I don't think so.  I did a little bit of
19  treasury when I first started with Stingray when
20  they were very small, but not with Mammoth, no.
21      Q   Okay.  So in your position as HR director
22  with Mammoth Energy, Inc., you're part of a shared
23  resource for all the entities of Mammoth; right?
24      A   Correct.
25      Q   Okay.  In your opinion, what does that

Page 87

1  mean when you're part of a shared resource,
2  what -- how does that -- how does your work affect
3  everyone else?
4      A   I think we're there to provide services
5  that maybe the subsidiary or related parties don't
6  have internally within their own kind of vertical,
7  that could be HR support, accounting support,
8  finance support, to kind of consult and guide them
9  in their business operations.
10      Q   Okay.  When -- when you guys were
11  consulting with Mr. Broussard about the pay plan,
12  which entities was that going to apply to?
13      A   It would have been Higher Power and 5 Star
14  and potentially Cobra, but I can't recall.
15      Q   Okay.  But -- and the way I understand it,
16  you weren't an employee of either of those
17  entities; right?
18      A   I was not.
19      Q   Or an employee, I mean.
20      A   Yeah, employee, correct.
21      Q   You were only employed by Mammoth Energy,
22  Inc.?
23      A   Yes, at that time, yes.
24          MR. MOULTON:  Will, I'm going to pass this
25  witness.

Page 88

1          MR. STUKENBERG:  Great.  Thank you, Dave.
2  I've got a couple of questions.  As it -- and,
3  Dave, if you can't hear me, let me know.
4                  CROSS-EXAMINATION
5  BY MR. STUKENBERG:
6      Q   As it relates to Mr. Kalman and
7  Mr. Kinsey, what role, if any, did they have in
8  establishing the pay structure?
9      A   Very little.  I think Alex was more of a
10  payroll coordinator, he actually joined us from
11  our payroll provider, so that kind of technical
12  knowledge on the system was why he was brought in.
13  And I don't think J.D. had any, I think he may
14  have even joined after the practice was kind of
15  already in the process or developed.
16      Q   Okay.  So their role was not to create the
17  payroll system?
18      A   Correct.
19      Q   Okay.  They were more execution processing
20  payroll?
21      A   Correct.
22      Q   And is that true for the bonus payments or
23  gross-ups that we've been talking about today?
24      A   Correct.
25      Q   Okay.  Why did you all consult

Page 89

1  Mr. Broussard?
2      A   We wanted to, I think, just -- simple
3  answer, we wanted to do it the right way.  We
4  wanted to do it in a compliant manner and just had
5  some questions on how to make sure we were doing
6  that.
7      Q   Okay.  And so the purpose was to make sure
8  that you all were in compliance with the Fair
9  Labor Standards Act?
10      A   Correct.
11      Q   And did you believe you were in compliance
12  with the Fair Labor Standards Act?
13      A   Yes.
14          MR. MOULTON:  Objection; form.
15      Q   (By Mr. Stukenberg) Were you at any point
16  given any indication that you were anything but in
17  compliance with the Fair Labor Standards Act?
18          MR. MOULTON:  Objection; form.
19          THE WITNESS:  No.
20      Q   (By Mr. Stukenberg) Mr. Broussard approved
21  the offer letters that ultimately went out in this
22  case as being compliant?
23      A   Yes.
24          MR. MOULTON:  Objection; form.
25      Q   (By Mr. Stukenberg) What was the original

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 90

1  target number of hours per day, do you recall?
2      A    I think it was either 10 or 12.
3      Q    Okay.  And then ultimately, that migrated
4  to 16?
5      A    Correct.
6      Q    Why was that increased to 16?
7      A    I think 16 was the maximum that anybody
8  would ever work, it was also the amount time that
9  they were expected to be on call and available
10 even if they'd returned to the company-provided
11 housing to go back out to the field, so 16 is what
12 we set it at to compensate for that on-call time.
13     Q    Okay.  Let's take a look at --
14          MR. STUKENBERG:  Anthony, it will be my 5,
15 but it will be something else.
16          MR. MOULTON:  Sorry?
17          MR. STUKENBERG:  I'm going to have Anthony
18 pull up a document for me.
19          MR. MOULTON:  Which one?
20          MR. STUKENBERG:  We have a different
21 numbering system, so he's going to pull it up.
22          MR. MOULTON:  No, you don't.  I have all
23 your exhibits, bro.
24          MR. STUKENBERG:  He's going to pull it up
25 as 5 and then he's going to tell you what number

Page 91

1  it is that's in your system.
2          MR. MOULTON:  Oh, okay.  Are you using the
3  same number you used before, Exhibit 5?
4          MR. STUKENBERG:  No.
5          MR. MOULTON:  Okay.
6          MR. STUKENBERG:  I'm not marking it as
7  Exhibit 5.
8          MR. MOULTON:  If you'll note, is it a new
9  one or what are you doing?
10         MR. STUKENBERG:  No, it's one we used, I
11 just don't know the number, the previous number.
12 Anthony may not be there.  Anthony, are you there?
13         MR. ARTEAGA:  I'm here, sir.  Can you guys
14 see it?
15         MR. STUKENBERG:  No.
16         MR. ARTEAGA:  No?  Okay.
17         THE WITNESS:  We can see it.
18         MR. ARTEAGA:  How about now?  Okay.
19         (Exhibit Number 134 previously marked for
20         identification and made part of the
21         record)
22     Q    (By Mr. Stukenberg) Do you recall this
23 e-mail?  And it may be helpful to see the
24 attachment that goes with it.
25     A    Yes, I believe this is the e-mail that had

Page 92

1  the file we looked at earlier as well.
2      Q    And it's similar, it's just a different
3  iteration.
4      A    Okay.
5      Q    If you'll see here, the hours per day were
6  11?
7      A    Okay.
8      Q    Did you discuss this compensation system
9  with Mr. Broussard?
10     A    Yes.
11     Q    And what was Mr. Broussard's feedback
12 about the compensation system as structured here?
13     A    That it was compliant under the FLSA.
14         MR. STUKENBERG:  Let's also take a look
15 at, Anthony, what is my 12.  And let's scroll to
16 the third e-mail down.
17         (Exhibit Number 142 previously marked for
18         identification and made part of the
19         record)
20     Q    (By Mr. Stukenberg) Do you recall this
21 e-mail, Mr. Beagle?
22     A    Yes.
23     Q    Okay.  Let's go up to the first page.  Do
24 you see the e-mail from you to Mr. Whitsell on
25 October 24th at 1:23?

Page 93

1      A    Yes.
2      Q    Again, what was the significance of the
3  16-hour shift?
4          MR. MOULTON:  Object to form.
5          THE WITNESS:  Again, I think it was the
6  kind of maximum that a colleague would be asked to
7  work because there could be certain things that
8  are triggered over that 16-hour time frame in a
9  given day, DOT or OSHA, depending on kind of the
10 role they were in.  So that was the maximum we'd
11 ever ask them to work.  And then they were
12 essentially kind of on call that entire time and
13 so that's where we budgeted or kind of came up
14 with that 16-hour shift, because that's the amount
15 of time they would be on call, the maximum they'd
16 work and we wanted to compensate them fully for
17 that time.
18     Q    (By Mr. Stukenberg) And what would have
19 happened if they worked over 16 hours?
20     A    They would have been paid.
21     Q    So the practice was to pay them if they
22 worked over 16?
23     A    Yeah.
24     Q    Got it.  Let's talk a little bit about
25 these bonuses or gross-ups or payroll adjustments

**JEFFREY ATLEE BEAGLE - April 18, 2022**

Page 94

1  we've been talking about today.  Do you know what
2  I'm referring to?
3      A.   Yes.
4      Q.   What phrase would you like to use?
5  Doesn't really matter to me, whatever you want.
6      A.   Let's use gross-up, that's fine.
7      Q.   Okay.  Can you please describe what the
8  purpose of these gross-ups were?
9      A.   Yes, I think it was more than anything, it
10 was a decision by the organization, by management,
11 from a kind of morale standpoint that, you know,
12 we had these targeted day rates and situations
13 where they were not met, for employee retention
14 purposes, felt strongly that we should consider
15 paying those out in certain situations.  Again, I
16 don't think they were owed per se, because we
17 structured their compensation for an hourly rate,
18 but it was more of a retention and morale decision
19 than anything.
20     Q.   Were they generally paid?
21     A.   I believe in most cases they were, there
22 were certainly instances that I can recall where
23 they weren't always paid, but I think generally
24 they were, they were paid.
25     Q.   Can you tell us about some of the

Page 95

1  instances you recall where they weren't paid?
2      A.   I couldn't recall names, but I just
3  remember certain situations where maybe personal
4  situations arise, whatever it may have been,
5  somebody didn't work a full shift and management
6  on-site elected not to pay those additional
7  amounts.
8      Q.   Okay.  So you recall an instance anyway
9  where management elected not to pay a gross-up
10 when a person worked a short week because the
11 individual took personal time or something?
12     A.   Right.
13     Q.   Any other instances you recall where the
14 decision was made not to pay the gross-ups?
15     A.   Not specifically.
16     Q.   Okay.  Is it your recollection that it did
17 happen from time to time?
18     A.   Yes.
19     Q.   And that was a decision made at the Puerto
20 Rico management level?
21     A.   Correct.
22     Q.   Could you have elected to disapprove
23 anybody's gross-up if you wanted to?
24     A.   If I had a reason to, I could have.
25     Q.   What about Mark Layton's authority, if

Page 96

1  any, as it related to these gross-ups?
2      A.   Yeah, he could have decided not to pay
3  those as well.
4      Q.   So are you familiar with the requirement
5  or as to the requirement to pay overtime on
6  discretionary bonuses?
7      A.   Yes.
8          MR. MOULTON:  Objection to form.
9      Q.   (By Mr. Stukenberg) And what is your
10 general understanding?
11         MR. MOULTON:  Objection; form.
12         THE WITNESS:  Discretionary bonuses do not
13 have to be included in the regular rate of pay for
14 overtime calculations.
15     Q.   (By Mr. Stukenberg) And so why were these
16 gross-ups in Puerto Rico not included in the
17 overtime calculations?
18         MR. MOULTON:  Objection; form.
19         THE WITNESS:  Because we felt they were
20 discretionary.
21     Q.   (By Mr. Stukenberg) Okay.  We saw a couple
22 of paystubs where it had a DYR code and a flat
23 amount entered, it just said day rate, is that
24 consistent with what the pay practice was here?
25     A.   No.

Page 97

1      Q.   What, if anything, were those paystubs,
2  what do those reflect?
3      A.   Well, they were intended to reflect the
4  16-hour shifts that they would have been on call
5  for the days that they were available and ready
6  for work.  When it was entered like a day rate
7  like that, the only thing I can think of is either
8  got lazy or got in a hurry and didn't follow the
9  appropriate protocol.
10     Q.   Okay.  So somebody either got lazy or made
11 a mistake?
12     A.   Yeah.
13     Q.   Do you consider those to accurately
14 reflect the actual pay practice the company
15 embraced under the advice of Mr. Broussard?
16     A.   No.
17     Q.   Do you believe that the company was
18 obligated to pay gross-ups?
19     A.   No.
20         MR. MOULTON:  Objection; form.
21     Q.   (By Mr. Stukenberg) There were exempt
22 employees who were paid their base compensation,
23 plus a day rate, do you recall that?
24     A.   Yes.
25     Q.   And we've seen various e-mails where you

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 98

1  and others have used the term "day rate," what did
2  you mean when you used the term "day rate"?
3       MR. MOULTON:  Objection; form.
4       THE WITNESS:  I guess in those instances
5  where it was an exempt employee that also received
6  a day rate, probably more purely day rate.  In
7  most instances where I used it, it was a shorthand
8  because that's kind of what the managers on the
9  island understood, versus saying, you know,
10  targeted weekly earnings or -- or something like
11  that, it was just easier to say day rate.
12       Q    (By Mr. Stukenberg) So what you really
13  meant were targeted -- targeted weekly earnings --
14       A    Right.
15       Q    -- or daily earnings?
16       A    Right.
17       Q    Okay.  So you weren't using it as a legal
18  term of art?
19       A    Correct.
20       MR. STUKENBERG:  I'll pass the witness.
21            REDIRECT EXAMINATION
22  BY MR. MOULTON:
23       Q    You mentioned that the general practice
24  was to pay the gross-ups, can you -- are you able
25  to -- to remember how many times that the

Page 99

1  gross-ups weren't paid?
2       A    I don't, I don't recall, I just -- I
3  remember instances where they weren't paid, but I
4  can't remember specifics.
5       Q    Okay.  And I also want to just kind of
6  clarify something.  What I heard you say when you
7  answered about certain situations when they were
8  not paid, was when a -- when a worker didn't work
9  a full shift, but then Mr. Stukenberg asked you if
10  it was when they didn't work a full week, so I
11  wanted to clarify that.  Was it when -- like you
12  had a worker who had a personal issue who left
13  early and missed part of a shift is when it
14  wouldn't be paid or was -- or was it not paid when
15  they didn't work a full week?
16       A    I guess they wouldn't have to be mutually
17  exclusive, but I intended a full week is what I
18  meant to say versus a shift, not that they left in
19  the middle of the day, but they didn't finish
20  their full week.
21       Q    Okay.  Did it matter if they weren't
22  finishing it for a -- like whether it was a
23  personal issue or scheduled days off?
24       A    The ones I remember were kind of un --
25  that kind of -- that came to mind were kind of

Page 100

1  unexpected personal issues or things like that,
2  but again, I -- I can't remember every scenario.
3       Q    Okay.  So like somebody was having an
4  issue they needed to deal with back home and they
5  were taking off from the island early, those would
6  be situations where that you could recall they
7  weren't getting the gross-up?
8       A    Correct.
9       Q    You talked about how the 16 hours is
10  supposed to be a number, like a maximum amount
11  worked that includes the actual time worked, plus
12  their on-call time, as you would say, do you
13  recall that?
14       A    Yes.
15       Q    And so I have a question for you, do you
16  have an opinion about how many hours were actually
17  worked on average out of those 16 hours?
18       MR. STUKENBERG:  And I just want to object
19  because we've got into this back and forth before,
20  Dave, and I think we can clear it up if we just
21  get on the same page as what you're referring to.
22  Are you referring to how many hours are actively
23  worked in the field verse how many hours are on
24  call, but not actively being worked, is that the
25  distinction you're trying to draw?

Page 101

1       MR. MOULTON:  Yes, but -- but because we
2  can then keep on going down rabbit holes about
3  what active means, I don't really want to do that.
4  You've -- you've asked him questions that are
5  pretty technical about the FLSA, I take it this
6  guy understands the difference between hours that
7  are actual working and which ones aren't, and so I
8  think he understands that.  So my question is --
9       MR. STUKENBERG:  I just don't want to get
10  into some where it gets misconstrued later that he
11  says 11 hours worked and you're like, well, it was
12  16, you know, because he's not counting the
13  on-call time.
14       Q    (By Mr. Moulton) Well, let's do this then,
15  out of that 16 that was -- that was including
16  on-call time, how much of that on average do you
17  think was actual on-call time?
18       A    I -- I don't know the answer to that.  I
19  mean, based off the e-mails, I think it seemed
20  like we were originally targeting around a 12-hour
21  shift, so maybe that's the right answer, but I
22  wasn't there, probably didn't get into that level
23  of detail after we put the practice in place.
24       Q    Okay.  Okay.  So you wouldn't have visited
25  the island, for instance, to kind of -- to find

**JEFFREY ATLEE BEAGLE  -  April 18, 2022**

Page 102

1  out, talking to workers or observing how many
2  hours they were actually working?
3     A    Correct.
4     Q    And you wouldn't have had -- you didn't
5  have people do that for you and then report back
6  to you?
7     A    Correct.
8     Q    So when you say that you think it could
9  have been 12, that's just based on those early
10  conversations about what was sort of expected or
11  what they thought the days were really going to
12  go, it's not -- you're not saying that you have
13  any knowledge of how many hours they were actually
14  working?
15    A    Correct, yeah.  I believe I would have had
16  knowledge had it gone over the 16, but between
17  there, no, I don't know.
18    Q    Okay.
19       MR. MOULTON:  I think that's it.  Pass the
20  witness.
21       MR. STUKENBERG:  Nothing from me.  I'll
22  take an e-tran.  We'll read and sign.
23       THE VIDEOGRAPHER:  Off the record.
24       (Deposition adjourned at 2:16 p.m.)
25                    * * * * *

Page 103

1        J U R A T   P A G E
2
3        I, JEFFREY ATLEE BEAGLE, do hereby state
4  under oath that I have read the above and foregoing
5  deposition in its entirety and that the same is a
6  full, true and correct transcript of my testimony so
7  given at said time and place, except for the
8  corrections noted.
9
10       _____
11          JEFFREY ATLEE BEAGLE
12
13       Subscribed and sworn to before me, the
14  undersigned Notary Public in and for the State of
15  _____, by said witness
16  _____, on this the _____ day of
17  _____, 2022.
18
19       _____
20              Notary Public
21
22  My Commission Expires: _____
23
24                  KBJ
25

Page 104

1                Correction Sheet
2
   Witness:  JEFFREY ATLEE BEAGLE
3  Reporter:  KBJ
   Attorney: DAVID MOULTON, 8 GREENWAY PLAZA, STE.
4  1500, HOUSTON, TX. 77046      Date: 4-18-22
   OA: WILLIAM STUKENBERG
5
6  Case Style: CANTU, ET AL. v. MAMMOTH, ET
   AL;5:19-cv-00615
7
   Page Line  Correction        Reason for Correction
8
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25

Page 105

1              C E R T I F I C A T E
2
   STATE OF OKLAHOMA  )
3                     )  SS:
   COUNTY OF OKLAHOMA )
4
5        I, Karen B. Johnson, Certified Shorthand
6  Reporter, within and for the State of Oklahoma, do
7  hereby certify that JEFFREY ATLEE BEAGLE was by me
8  first duly sworn to testify the truth, the whole
9  truth, and nothing but the truth in the case
10 aforesaid; that the above and foregoing testimony
11 was by me taken in shorthand and thereafter
12 transcribed; that the same was taken on APRIL 18,
13 2022, that the testimony was taken in OKLAHOMA CITY,
14 State of Oklahoma; that I am not an attorney for nor
15 a relative of any said parties or otherwise
16 interested in the event of said action.
17       IN WITNESS WHEREOF, I have hereunto set my
18 hand and seal of office on this 27TH day of APRIL,
19 2022.
20
21
22       _____
23          Karen B. Johnson
            State of Oklahoma CSR #1376
24          Good to Go Process Service
            1225 North Loop West, Suite 327
25          Houston, Texas 77008

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**