IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| FRANCISCO CANTU, ET AL., | ) | |
| | ) | |
| PLAINTIFFS, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 5:19-CV-00615 |
| MAMMOTH ENERGY SERVICES, | ) | |
| INC., ET AL., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

*********************************

VIDEOTAPED ORAL DEPOSITION OF

JAMES D. KINSEY

APRIL 22, 2022

*********************************

     VIDEOTAPED ORAL DEPOSITION OF JAMES D. KINSEY,
produced as a witness at the instance of the Plaintiffs,
and duly sworn, was taken in the above-styled and
numbered cause on the 22nd day of April 2022, from 9:43
a.m. to 3:42 p.m., before Jill Allen, CSR, in and for
the State of Texas, reported by computerized machine
shorthand, at the offices of Court Reporters
Clearinghouse - Executive Workspace, 777 Main Street,
Suite 600, in the City of Fort Worth, County of Tarrant,
pursuant to Notice and the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## JAMES D. KINSEY  -  April 22, 2022

---

Page 2

```
 1            A P P E A R A N C E S
 2 (All parties appeared remotely via Zoom)
 3 FOR THE PLAINTIFFS:
 4     MR. DAVID I. MOULTON
       BRUCKNER & BURCH, LLC
 5     11 Greenway Plaza, Suite 3025
       Houston, Texas  77046
 6     713.877.8788
       713.877.8065  FAX
 7     Email:  dmoulton@brucknerburch.com
 8 FOR THE DEFENDANTS, MAMMOTH ENERGY SERVICES, INC. and
   HIGHER POWER ELECTRICAL, LLC:
 9
       MR. WILLIAM R. STUKENBERG
10     MR. M. HARRIS STAMEY
       PORTER HEDGES
11     1000 Main Street, 36th Floor
       Houston, Texas  77002
12     713.226.6000
       713.228.1331  FAX
13     Email:  wstukenberg@porterhedges.com
14 FOR THE WITNESS, JAMES D. KINSEY:
15     MR. MICHAEL J. LOMBARDINO
       REED SMITH
16     811 Main Street, Suite 1700
       Houston, Texas  77002
17     713.469.3800
       713.469.3800  FAX
18     Email:  mlombardino@reedsmith.com
19
20 ALSO PRESENT: Sonja Pendergast, Videographer (in-person)
             Anthony Argeaga (via Zoom)
21
22
23
24
25
```

---

Page 3

```
 1               INDEX
 2                                          PAGE
   Appearances....................................2
 3
   WITNESS:  JAMES D. KINSEY
 4
   Examination by Mr. Moulton.............6, 155, 167
 5 Examination by Mr. Lombardino....................125
   Examination by Mr. Stukenberg..............127, 161
 6
 7 Signature and Changes..........................171
 8 Reporter's Certificate.........................173
 9
              EXHIBITS
10
   NUMBER      DESCRIPTION                    PAGE
11
12 EXHIBIT 207 - Mr. Kinsey's LinkedIn profile....12
   EXHIBIT 208 - Email string between Ken Kinsey,
13            Alex Kalman, Steve Wolfe, JD Kinsey,
              Jeff Beagle, 10/24/2017............24
14 EXHIBIT 209 - Email string between Ken Kinsey, Scott
              Whitsell, Robert Malcolm, Keith Ellison,
15            JD Kinsey, Jeff Beagle, Alex Kalman,
              11-19/20-2017......................27
16 EXHIBIT 210 - Work hours calculation example....33
   EXHIBIT 211 - Email string between Ken Kinsey, Mark
17            Logan, Jeff Beagle, Alex Kalman,
              and JD Kinsey, 11/17/2017..........49
18 EXHIBIT 212 - Email string between JD Kinsey and
              Bethany Stone, 11/29/2017..........67
19 EXHIBIT 213 - Email to Bethany Stone from JD Kinsey,
              7/5/2018...........................83
20 EXHIBIT 214 - Email string between JD Kinsey, Missy
              Davis and Alex Kalman, 12/25/2017....103
21 EXHIBIT 215 - Email string between JD Kinsey and
              Alex Kalman, 12/26/2017............106
22 EXHIBIT 216 - Email to JD Kinsey from Missy Davis,
              12/19/2017.........................107
23 EXHIBIT 217 - Email string between JD Kinsey and
              Alex Kalman, 12/26-27/2017.........108
24 EXHIBIT 218 - Email string between Missy Davis and
              JD Kinsey, 6/11/2018...............114
25
```

---

Page 4

```
 1            EXHIBIT INDEX CON'T.
 2 NUMBER      DESCRIPTION                    PAGE
 3 EXHIBIT 219 - Earnings statements.............115
   EXHIBIT 220 - Email to Missy Davis from Gerry Morgan,
 4            5/25/2018..........................122
   EXHIBIT 221 - Earnings Statement for Patrick
 5            Chappell...........................144
 6        *****PREVIOUSLY MARKED EXHIBITS
 7 EXHIBIT 137 - Pay class/pay scale for workers Excel
 8            spreadsheet........................29
 9 EXHIBIT 138 - 5 Star orientation letter.........31
   EXHIBIT 139 - Higher Power welcome letter with
10            attached wage scale................31
   EXHIBIT 151 - Cobra Energy Services crew wage scale
11            for 2017...........................38
   EXHIBIT 165 - Email string between JD Kinsey, Jeff
12            Beagle, Ken Kinsey and Alex Kalman,
              11/21/2017.........................28
13 EXHIBIT 167 - Excel spreadsheet (CONFIDENTIAL)....38
   EXHIBIT 169 - Email string between JD Kinsey, Alex
14            Kalman and Missy Davis, 1/9/2018....64
   EXHIBIT 170 - Example pay stubs.................93
15 EXHIBIT 172 - Email string between Jeff Beagle,
              JD Kinsey, Missy Davis, Ken Kinsey,
16            And Shelly Wheeler, 1/21-22/2018....78
   EXHIBIT 173 - Excel spreadsheet (CONFIDENTIAL)....78
17 EXHIBIT 176 - Email string between JD Kinsey and
              Jeff Beagle, 11/18/2017............32
18 EXHIBIT 183 - Email string between JD Kinsey, Alex
              Kalman, Bethany Stone, Michelle Poling
19            and Missy Davis, 1/21-22/2018......70
   EXHIBIT 184 - Excel spreadsheet (CONFIDENTIAL)....73
20 EXHIBIT 190 - Email string between Missy Davis and
              JD Kinsey, 7/3/2018................91
21 EXHIBIT 202 - Email string between Jeff Beagle, JD
              Kinsey, Missy Davis and Ken Kinsey,
22            11/17/2017.........................61
   EXHIBIT 204 - Email string between Missy Davis,
23            JD Kinsey and Alex Kalman, 1/12/2018...110
24
25
```

---

Page 5

```
 1            P R O C E E D I N G S
 2        VIDEOGRAPHER:  We're on the record at
 3 9:43 a.m.  Today is April 22nd, 2022.  This is the
 4 videotaped oral deposition of James D. Kinsey.  This is
 5 the beginning of the video deposition taken in the
 6 matter styled Francisco Cantu, et al. versus Mammoth
 7 Energy Services, et al. filed in the United States
 8 District Court, Western District of Texas.  These
 9 proceedings are being held at Executive Workspace,
10 located at 777 Main Street, Suite 600, Fort Worth,
11 Texas, 76102.  My name is Sonja E. Pendergast, here with
12 our court reporter, Jill Allen.
13        Will counsel please state their
14 appearances and agreements for the record.
15        MR. MOULTON:  Good morning.  This is David
16 Moulton for the plaintiffs.
17        MR. STUKENBERG:  Will Stukenberg for the
18 defendants.
19        MR. LOMBARDINO:  And Michael Lombardino
20 for the witness.
21        VIDEOGRAPHER:  Will the court reporter
22 please swear in the witness.
23        THE REPORTER:  Go ahead.
24        MR. STUKENBERG:  Also for defendants is
25 Harris Stamey, counsel, and then Anthony Arteaga, who is
```

---

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

## JAMES D. KINSEY  -  April 22, 2022

Page 6

1 with my office and a paralegal helping on the case.
2          JAMES D. KINSEY,
3 having been first duly sworn, testified as follows:
4          MR. LOMBARDINO:  And, Dave, before we get
5 started, I just want to say the witness reserves the
6 right to read and sign.
7          MR. MOULTON:  Absolutely.  Okay.
8          EXAMINATION
9 BY MR. MOULTON:
10    Q.   Okay.  Good morning, Mr. Kinsey.  My name is
11 David Moulton.  I represent about 150 guys who have made
12 a claim against Mammoth, Cobra and Higher Power for
13 overtime pay for work that they did in Puerto Rico.  How
14 are you doing this morning, sir?
15    A.   I am doing well.
16    Q.   Great.  I understand when we were scheduling
17 this deposition, that you had had a car wreck recently.
18 How are things going with that?
19    A.   I did not have a car wreck, but I did have
20 surgery to repair a deviated septum, and fortunately, it
21 is going well.
22    Q.   Okay.  Great.  So you are perfectly fine and
23 well today to testify, not groggy or taking medications
24 that might mess with your memory or anything like that?
25    A.   Yes, sir.

Page 7

1    Q.   Great.
2         Sir, have you ever given a deposition before?
3    A.   I have not.
4    Q.   If you can't already tell, there's a lot of
5 people on the line, and there's a person, Ms. Woodruff,
6 who's there with you in the room.  She's the court
7 reporter.
8         MR. MOULTON:  And you're there, right,
9 Ms. Woodruff?  Are you --
10         THE REPORTER:  Yeah.
11         MR. MOULTON:  -- remote?
12         THE REPORTER:   I'm here in the room with
13 him, yes.
14         MR. MOULTON:  Okay.  Great.
15    Q.   But the point is, is that it's her job to
16 write down everything that's being said, and so I will
17 promise to you that I will make my best effort to not
18 talk over you or interrupt, and I'll ask that you wait
19 for the question to be -- to wait till we finish the
20 question before you start answering, and that way we
21 don't have folks talking over each other and making life
22 difficult for Ms. Woodruff.  Does that make sense?
23    A.   Yes, sir.
24    Q.   And you understand today that the testimony
25 you're giving is just like you're in court.  It's no

Page 8

1 different except that, you know, we're not in a
2 courtroom right now, but you're under the same oath that
3 could subject you to criminal penalties if you lie.  You
4 understand that?
5    A.   Yes, sir.
6    Q.   Now, Mr. Kinsey, what is your full name for
7 the record?
8    A.   James Daniel Kinsey.
9    Q.   Do you go by any other names?
10    A.   Yes, sir.  I go by J.D., my initials.
11    Q.   Okay.  Are there any other variations that you
12 use?
13    A.   No, sir.
14    Q.   Have you ever been arrested or convicted of
15 any crimes?
16    A.   No, sir.
17    Q.   What did you do to prepare for your deposition
18 today?
19    A.   Prayed.
20    Q.   Okay.  You seem a little nervous.  Everyone
21 is.  Please relax.  We're just here to find out, you
22 know, the truth, and we're going to have some specific
23 questions for you today.  Okay?
24    A.   Yes, sir.
25    Q.   Did you meet with any attorneys to prepare for

Page 9

1 your deposition today?
2    A.   I discussed with my representative, Michael.
3    Q.   And when was that?
4    A.   We talked earlier this week.
5    Q.   And for about how long did y'all speak?
6    A.   Total, possibly two hours.
7    Q.   Okay.  Besides speaking with your lawyer --
8 and I don't want to know what y'all talked about -- did
9 you talk to anyone else about this deposition?
10    A.   No, sir.
11    Q.   Okay.  Have you been contacted by anyone at
12 Mammoth or Higher Power or 5 Star about this case?
13    A.   Only to be informed of its existence.
14    Q.   Okay.  And who did you speak with?
15    A.   I do not remember.
16    Q.   What did y'all -- about how long ago was it?
17    A.   Couple weeks.
18    Q.   Okay.  Was it Mr. Layton that reached out to
19 you?
20    A.   No, sir.
21    Q.   Can you tell me who it was?
22    A.   I don't remember.  It's been a couple weeks.
23    Q.   How long did y'all speak for?
24    A.   Just a few minutes.  Just enough to make sure
25 that I was aware of what was taking place.

## JAMES D. KINSEY  -  April 22, 2022

Page 10

```
 1    Q.    Oh, I see.
 2          Did you speak about this case at all with your
 3  father?
 4    A.    Only to let him know that it was taking place.
 5    Q.    Okay.  And who is your father?
 6    A.    His name is Kenneth Kinsey.
 7    Q.    He also worked for one of the Mammoth
 8  affiliates during the Puerto Rico time, correct?
 9    A.    Yes, sir.
10    Q.    Which company did he work for?
11    A.    He was employed by Cobra Energy.
12    Q.    Did he work for any other companies that were
13  affiliated with Mammoth or Cobra?
14    A.    No, sir.
15    Q.    During the time the workers in this case were
16  working in Puerto Rico, which started around October
17  2017 and went on for a couple of years, you were also
18  working for one of the Mammoth companies, correct?
19    A.    Yes, sir.
20    Q.    Which one were you working for?
21    A.    Cobra Energy.
22    Q.    And do you recall when it was that you got
23  hired?
24    A.    I do not remember the specific date.
25    Q.    Okay.  Where do you work now?
```

Page 11

```
 1    A.    I work for a company called True Construction,
 2  doing remodel and new construction services.
 3    Q.    Is that your own company?
 4    A.    It is not.
 5    Q.    How long have you worked for True
 6  Construction?
 7    A.    Roughly three years now.
 8    Q.    Okay.  Is this the job that you had after
 9  working for Cobra?
10    A.    Immediately after Cobra, I did not have
11  employment, and then the following year is when I was
12  hired by True Construction.
13    Q.    Okay.  I want to show you an exhibit that we
14  have marked as Exhibit 207.  Does this look like --
15          MR. LOMBARDINO:  Real quick before you
16  begin, the exhibits, are you going to let the witness
17  have control of the document, or are you going to keep
18  it -- one thing -- not to reveal attorney-client
19  privilege?  But I can tell him, you know, review the
20  whole document, if you're going to give him an
21  opportunity to scroll through it or --
22          MR. MOULTON:  I don't know if I can do it,
23  but if he wants to scroll through this, I'll be happy to
24  do that.
25    Q.    Mr. Kinsey, for any exhibits I show you today,
```

Page 12

```
 1  for most of them, we're going to be doing this anyway.
 2  Just on this one I wasn't.  But I'll take
 3  Mr. Lombardino's advice here, is that we can start at
 4  the bottom of this exhibit and kind of scroll up and get
 5  you familiar with it before we start asking questions
 6  about it.  Is that fair?
 7    A.    Yes, sir.
 8    Q.    And can you see clearly on the screen this
 9  exhibit I'm showing which is Exhibit 207?
10    A.    Yes, sir.
11    Q.    So we're at the bottom of this.  I'll scroll
12  up when you tell me you're ready.  How's that?
13    A.    I'm ready, yes, sir.  Yes, sir, I'm ready.
14  Yes, sir.
15    Q.    So you've had a chance to review Exhibit 207
16  now?
17    A.    Yes, sir.
18    Q.    Is Exhibit 207 your LinkedIn profile?
19    A.    It appears to be, yes, sir.
20    Q.    And when you review this, is it your
21  understanding that this is accurate as far as employers
22  and dates and your positions?
23    A.    To the best extent that I can remember, yes,
24  sir.
25    Q.    Okay.  When you went to work at Cobra, do you
```

Page 13

```
 1  remember how it was you got your job?
 2    A.    I was approached by Ken Kinsey and was
 3  informed that Cobra needed someone to do data entry for
 4  them and asked if it was something that I would be
 5  interested in.  And after thinking about it, praying
 6  about it, my wife and I agreed that it would be a good
 7  opportunity.
 8    Q.    Okay.  So this is an opportunity that was
 9  available to you through your father, correct?
10    A.    Yes, sir.
11    Q.    Okay.  And for data entry, what type of data
12  entry were you going to be working with?
13    A.    There was not -- initially, there was not a
14  specific category.  It was just whenever the office
15  staff needed, I would help with.
16    Q.    I see.  Let's go ahead and look at 207, and
17  let's look at your entry here for Cobra Energy where you
18  were the -- it says you're a compliance coordinator.  Do
19  you see where I'm looking at?
20    A.    Yes, sir.
21    Q.    So you were the compliance coordinator with
22  Cobra Energy from October 2017 to August 2018, correct?
23    A.    The compliance coordinator position was
24  something I only actually held from, I believe, July --
25  June through August.  It was a position that they
```

## JAMES D. KINSEY  -  April 22, 2022

Page 14

1 transferred -- transitioned me into.

2    Q.   What was your position before they transferred
3 you into compliance coordinator?

4    A.   I was considered kind of a payroll manager.

5    Q.   So let's take a look here.  You have some, I
6 would say, bullet points, but they look like hashtag
7 points.  I don't think it matters.  But here under Cobra
8 Energy, can you see where you've listed your
9 responsibilities at Cobra Energy, and can you verify
10 they're accurate.

11    A.   Yes, sir.

12    Q.   Okay.  And then looking back at your time --
13 your jobs before Cobra Energy, my initial review -- and
14 correct me if I'm wrong.  It looks like Cobra Energy was
15 your first position working in a position responsible
16 for processing payroll.

17    A.   Yes, sir.

18    Q.   Okay.  And so this had a lot of new things for
19 you?

20    A.   Yes, sir.

21    Q.   Because you had never performed the jobs
22 before that are listed here that you have here for
23 Cobra Energy, right?

24    A.   Not all of them.  Some of them were new.  Some
25 of them I had experience in previous employment.

Page 15

1    Q.   Okay.  Which one of these did you have prior
2 experience with?

3    A.   Communicating with leadership teams, managing
4 transportation, reviewing policies.  Those are some of
5 the highlights.

6    Q.   Okay.  So you feel like that the job that you
7 had before Cobra Energy prepared you well enough to be
8 able to step into this role --

9    A.   Yes, sir.

10    Q.   -- with normal -- I mean, you did have to get
11 trained, though, right?

12    A.   Yes, sir.  Yeah.  Upon initiation, I felt
13 comfortable in that position, and then throughout the
14 role, through training and other processes, I learned
15 the skills that I needed.

16    Q.   Okay.  Can you tell me why your employment
17 with Cobra Energy ended.

18    A.   I don't remember the particulars that they
19 used on the termination other than they terminated me.

20    Q.   Okay.  So you were terminated --

21    A.   Yes, sir.

22    Q.   -- is that right?  Okay.

23         Were you terminated because of a reduction in
24 force or were you terminated because of a specific
25 reason?

Page 16

1         MR. LOMBARDINO:  Objection.

2    A.   I know there is a reason that Cobra terminated
3 me, but I don't remember what that reason was.

4    Q.   Who was it that terminated you?

5         MR. LOMBARDINO:  Objection, calls for
6 speculation.

7    A.   Michelle -- her maiden name was Poling.  I
8 can't remember what her married last name was.  She was
9 my supervisor.

10    Q.   What company did she work for?

11    A.   Cobra Energy.

12    Q.   What was her position?

13    A.   She was the HR director for Cobra Energy.

14    Q.   Were you given any kind of documents when you
15 were terminated, like a termination slip that had
16 information on it about your termination?

17    A.   At the time of termination, I don't remember
18 receiving one.

19    Q.   How were you informed you were terminated?

20    A.   She asked me to meet with her after work one
21 day and effectively told me I was terminated.

22    Q.   And were you terminated right then and there?
23 Were you allowed to come back the next day, or did you
24 have a phase-out?  What happened after that?

25    A.   It was effective immediately.

Page 17

1    Q.   Where were you when she terminated you?

2    A.   I don't remember the location.  I just
3 remember it being outside of the work location.

4    Q.   And what work location are you talking about?

5    A.   There was an office that was being set up in
6 Arlington, Texas, and at the time, it was still being
7 set up, and so we were working from home predominantly,
8 and so she had me meet her in Arlington to go over the
9 reasons why she terminated me.

10    Q.   Besides Ms. Poling communicating to you that
11 you were terminated, was there anyone else in management
12 that you're aware of that participated in that process?

13         MR. LOMBARDINO:  Objection, calls for
14 speculation.

15    A.   The only other person that I am aware of was
16 the president, Keith Ellison, and I know that because I
17 appealed the termination to him.

18    Q.   I'm sorry.  I didn't catch the last part.  You
19 did what?

20    A.   The only reason I know that he was involved
21 was because I appealed my termination to him.

22    Q.   Oh, okay.  How did you appeal your termination
23 to Keith Ellison?

24    A.   I called him and told him that I didn't think
25 it was fair and asked him to review the evidence.

**JAMES D. KINSEY  -  April 22, 2022**

Page 18

1    Q.    And what did he say?

2    A.    He came back and said that he agreed with her
3 decision.

4    Q.    Okay.  Now, with Mr. Ellison, when you told
5 him you didn't think it was fair, what about your
6 termination wasn't fair, if you can recall?

7    A.    I remember parts of the conversation, and I
8 know it had to do with payroll, but beyond that, I don't
9 remember.

10   Q.    Okay.  Is there anything else about that
11 conversation that you can remember now?

12   A.    Other than I was very upset, no, sir.

13   Q.    Do you bear any ill will towards Cobra or
14 Mammoth, Higher Power, any of the defendants in this
15 matter over your termination?

16   A.    No, sir.

17   Q.    So even though you were terminated, you feel
18 confident that you can testify impartially and
19 truthfully today?

20         MR. LOMBARDINO:  Objection, asked and
21 answered.

22         THE WITNESS:  I didn't hear you, Michael.

23         MR. LOMBARDINO:  I said, Objection, asked
24 and answered.  He was asking you the same question a
25 different way.  But if you remember the question, you

Page 19

1 can answer it, and if you need to repeat the question,
2 the court reporter can read it back to you.

3    A.    Can you repeat the question, David?

4    Q.    Yes, sir.  I'm just trying to verify that even
5 though you were terminated, that your testimony today,
6 in your opinion, can be truthful and accurate.

7    A.    Yes, sir, it can be.  Mammoth always treated
8 me fairly.

9    Q.    And you understand that your obligation to
10 speak under oath comes before any feelings you may have
11 in regard to your termination, correct?

12   A.    Yes, sir.

13   Q.    When you were working for Cobra Energy, which
14 locations were you working out of?

15   A.    Predominantly out of the San Juan office in
16 Puerto Rico.

17   Q.    When you say predominantly, why do you say
18 predominantly and not always?

19   A.    Sometimes I worked from my house in Puerto
20 Rico.  At times I was in plain view working.  Majority
21 of the time spent was within the office in San Juan, but
22 I did work from other locations at times.

23   Q.    Okay.  But for that period you were with
24 Cobra Energy, it was almost always in Puerto Rico,
25 correct?

Page 20

1    A.    Oh, yes, sir.

2    Q.    When you worked for Cobra Energy, I think you
3 mentioned that your supervisor, your direct supervisor,
4 was Michelle Poling, right?

5    A.    She was, yes, sir.

6    Q.    Was there anyone else that you would report to
7 with Cobra Energy?

8    A.    Initially, my reporting manager was Jason, and
9 I can't remember Jason's last name.  He was the
10 logistics director.  So I reported to him, and then once
11 Michelle was hired, I reported to her.

12   Q.    Okay.  Was there anyone at Mammoth that you'd
13 would report to?

14   A.    I didn't report to them, but I communicated
15 with individuals such as Alex Kalman and Jeff Beagle.

16   Q.    Did you have any people that reported to you?

17   A.    No, sir.

18   Q.    Back to Exhibit 207 which I still have up on
19 your screen.  When you say you wrote and reviewed
20 policies and procedures at Cobra Energy, what do you
21 mean by that?

22   A.    Policies such as our transportation, the
23 rotation policy for individuals as they were
24 transitioning to the island and back home to continue
25 working, or if they were just going on a rotation,

Page 21

1 things of that nature.

2    Q.    Did you have any duties associated with
3 writing or reviewing Cobra's policies about how they
4 would pay overtime pay?

5    A.    I did not.

6    Q.    Did you have any conversations with an
7 attorney named Mr. Broussard about overtime pay?

8    A.    I don't recognize that name.

9    Q.    Were you part of any decision-making about how
10 overtime pay would be calculated for the workers in
11 Puerto Rico?

12   A.    No, sir.

13         MR. STUKENBERG:  Objection, asked and
14 answered.

15   Q.    I didn't hear your response, sir.

16   A.    I did not have any responsibilities in that.

17   Q.    When you worked for Cobra Energy, were you
18 able to attend any orientations for folks coming out to
19 work at Puerto Rico, like with 5 Star or Higher Power?

20   A.    I attended some in Puerto Rico, yes, sir.

21   Q.    Okay.  Which orientations did you attend?

22   A.    All of them that took place in Puerto Rico or
23 the majority of them.  I don't know that I was there for
24 all of them.

25   Q.    So let's try and get what you remember.  I

**JAMES D. KINSEY  -  April 22, 2022**

Page 22

1 mean, are we talking like one or two, are we talking
2 ten?  Do you have a sense for about how many it was?
3      A.   I don't remember the specific number, but it
4 was quite a few.
5      Q.   Okay.  Did you attend them for Higher Power
6 and 5 Star or just one or the other?
7      A.   We hired people into all three entities, and
8 so I handled -- I was part of orientation for all three.
9      Q.   Oh, these were orientations that had -- this
10 was orientations for multiple companies all at once?
11     A.   At times, yes, sir.
12     Q.   Okay.  So you attended orientations that had
13 5 Star and Higher Power in the same orientation?
14     A.   I don't remember if -- I don't remember if we
15 actually did multiple entities in the same orientation
16 or not.  I don't believe so, but I don't remember.
17     Q.   Do you recall any materials that would have
18 been shared with the linemen about their pay in these
19 orientations?
20     A.   We provided --
21          MR. LOMBARDINO:  Objection, vague and
22 ambiguous.
23          THE WITNESS:  Do what?
24          MR. LOMBARDINO:  I said, Objection, vague
25 and ambiguous.  But you can answer the question if you

Page 23

1 understand it.
2          MR. MOULTON:  Hey, Mike, I guess before we
3 get -- before you answer that question.  Mr. Lombardino,
4 I'd just like to remind you that in the Western District
5 of Texas, the objections are form, and that's pretty
6 much it.
7          MR. STUKENBERG:  Dave, if you don't like
8 our objections, you can take them up with the court.  I
9 don't need you reminding me of what the rules are.
10          MR. MOULTON:  I was reminding
11 Mr. Lombardino, but yes.  Okay.
12     Q.   Sir, do you recall any materials about how the
13 linemen would be paid at these orientations?
14          MR. LOMBARDINO:  Same objection.
15     A.   We would provide an offer letter to the
16 individuals with their expected compensation and
17 benefits and inherent work expectations.
18     Q.   On the offer letters that were given to the
19 workers in these orientations, how was the pay
20 expressed, according to your memory?
21     A.   The pay was an hourly rate calculated over
22 16 hours a day over the 14-day pay period.
23     Q.   With the hourly rate for 16 hours a day over a
24 14-day pay period, was there any sort of target that the
25 company was trying to reach with that pay?

Page 24

1      A.   Yes, sir.
2      Q.   What was that target?
3      A.   It varied from individual to individual.
4      Q.   Okay.  Did it vary by position?
5      A.   Yes, sir.
6      Q.   Did you guys refer to that target as a day
7 rate?
8      A.   In the vernacular while we were down there,
9 yes, sir.
10     Q.   And you guys did that so the linemen would
11 know what they could expect to be paid when they worked
12 a full seven days per week, right?
13     A.   Yes, sir.
14     Q.   Did you speak with your father about how the
15 workers would be paid before you started working in
16 Puerto Rico?
17     A.   Only about my compensation.
18     Q.   After you started working in Puerto Rico, did
19 he ever talk to you about how the workers would be paid?
20     A.   We would discuss it, amongst other things.
21     Q.   Okay.  And did he refer to their pay as a day
22 rate?
23     A.   The vernacular at that time, yes, sir.
24     Q.   Sir, we're going to look at some emails that
25 have been labeled as Plaintiff's Exhibit 208, and we'll

Page 25

1 start sort of down at the bottom and let you get
2 acquainted with this, and I'll have some questions about
3 it for you.  If you can just let me know when you're
4 ready to scroll up.
5      A.   Yes, sir.  Well, I'm not ready.  I was just
6 letting you know that I'll let you know.
7      Q.   Okay.
8      A.   I'm ready.  I'm ready.  Can you scroll down
9 slightly.  I'm ready.  Okay.
10     Q.   Okay.  So after having reviewed this email,
11 can you give me a better sense of when it was you
12 started working in Puerto Rico.
13     A.   Started working in Puerto Rico was October
14 31st.
15     Q.   Okay.
16          MR. LOMBARDINO:  Of what year, just for
17 the record.
18          THE WITNESS:  2017.
19     Q.   In this email here on October 24th from
20 Mr. Ken Kinsey, do you know why his signature says
21 Mammoth Energy on it?
22          MR. STUKENBERG:  Objection, speculation.
23     A.   I don't know.
24     Q.   Do you know why his -- later on it says he's
25 vice president of operations at Cobra?

### JAMES D. KINSEY - April 22, 2022

Page 26

1           MR. STUKENBERG:  Same objection.
2      A.   That was his position, from what I was aware
3 of.
4      Q.   You were never aware of him having a position
5 in Mammoth Energy?
6      A.   No, sir.
7      Q.   You don't know why he would have a Mammoth
8 Energy email?
9           MR. LOMBARDINO:  Objection, calls for
10 speculation.
11      A.   I think it had to do that Cobra was still
12 getting things established, but I can't say that for
13 certain.
14      Q.   Okay.  Cobra is an entity that Mammoth
15 created, correct?
16      A.   Yes, sir.
17      Q.   Did Mr. Ellison ever tell you that the workers
18 in Puerto Rico would be paid a day rate?
19      A.   That was the vernacular that we were using.
20      Q.   Okay.  Do you not think that he meant day rate
21 when he said day rate?
22      A.   I don't know what he thought, honestly.  I
23 didn't have a lot of interaction with him.
24      Q.   Okay.  Well, if someone tells you at that time
25 that the workers are getting a day rate, what did you

Page 27

1 understand that to mean?
2           MR. STUKENBERG:  Objection, speculation.
3      A.   At the time I thought when they said day rate,
4 it meant that they were going to receive a certain
5 amount per day.
6      Q.   In Exhibit 209, I want you to review these
7 emails for me, and I'll scroll up whenever you're ready.
8      A.   I'm ready to scroll up.  I'm ready.  Okay.
9 I'm ready.
10      Q.   So in Exhibit 209, we have some emails about
11 how the workers would be paid, and you were copied on
12 it, right?
13      A.   Yes, sir.
14      Q.   And here on November 20th, 2017, we have the
15 message from Keith Ellison about how the linemen are
16 going to be paid, right?
17      A.   Yes, sir.
18      Q.   And he said, All GF's and below are to be
19 purely the day rate while on island.
20           Do you see that?
21      A.   I do, yes, sir.
22      Q.   So at this time you understood that to mean
23 they'd be paid a flat amount per day, correct?
24      A.   Yes, sir.
25      Q.   Now, you said you hardly interacted personally

Page 28

1 with Mr. Ellison?
2      A.   Yes, sir.
3      Q.   Were you around him enough to have an opinion
4 about whether or not he's an honest person or not?
5      A.   Yes.  And he is from my interactions with him.
6      Q.   Okay.  So if he were to write something in an
7 email like this, we can trust that what he's saying is
8 true?
9           MR. STUKENBERG:  Objection --
10           MR. LOMBARDINO:  Objection, calls for
11 speculation.
12      Q.   In your opinion.
13      A.   In my opinion, I believe that's the way he
14 understood that to be taking place.
15      Q.   Okay.  And you understood it the same way?
16      A.   At that time, yes, sir.
17      Q.   Exhibit 165 is an exhibit we've used
18 previously, and it's another email chain.  Go ahead and
19 take a look at this.
20      A.   I'm ready to move forward.  I'm ready.  Okay.
21      Q.   So Exhibit 165 are emails exchanged, that
22 include you, about how the workers in Puerto Rico would
23 be paid, correct?
24           MR. STUKENBERG:  Objection.
25      A.   Yes, sir.

Page 29

1      Q.   When you say -- in the start of this email
2 chain when you say, All employees will receive a day
3 rate only while in Puerto Rico on November 21st, you're
4 using the same understanding as you had received from
5 Mr. Ellison the day before, correct?
6      A.   Yes, sir.
7      Q.   And that understanding was that they would get
8 their day rate for every day that they worked, correct?
9      A.   While in Puerto Rico, yes.
10      Q.   And if you also notice here, there's an
11 attachment to this email called pay class Excel
12 spreadsheet, right?
13      A.   Yes, sir.
14      Q.   We're going to take a look at that
15 spreadsheet.  It's Exhibit 137 which we've used
16 previously.  Go ahead and take a look at this, if you
17 would.  Let me know when you're ready to talk about it.
18      A.   Yes, sir, I'm ready.
19      Q.   Okay.  So on Plaintiff's Exhibit 137, we have
20 the pay scale for the workers in Puerto Rico, right?
21      A.   Yes, sir.
22      Q.   And we even have your pay on here, I believe.
23 Payroll/HR manager, J.D. Kinsey; is that right?
24      A.   Yes.
25      Q.   And it has your base pay and your day rate.

**JAMES D. KINSEY  -  April 22, 2022**

Page 30

1 Are those amounts correct?

2    A.   **At the time of that email, yes, sir.**

3    Q.   Your pay may have changed over time is what

4 you're saying?

5    A.   **Yes, sir.**

6    Q.   And it has your father's pay up here as well,

7 right?

8    A.   **Yes, sir.**

9    Q.   Do you happen to know if that's correct?

10    A.   **At that time, it was.**

11    Q.   And the pay information here for general

12 foreman on down is also correct?

13          MR. STUKENBERG:  Objection, form.

14    A.   **Yes, sir.**

15    Q.   Same goes for the mechanics and the safety

16 guys?

17          MR. STUKENBERG:  Objection, form.

18    A.   **Yes, sir.**

19    Q.   So looking at Exhibit 137, you're not aware of

20 any inaccuracies about the pay rates here?

21          MR. STUKENBERG:  Same objection.

22          MR. LOMBARDINO:  Objection, misleading.

23    A.   **At the time of that email, that was the way I**

24 **understood it.**

25    Q.   When you attended orientations for 5 Star and

Page 31

1 Higher Power, you would have seen their pay scales as

2 well, correct?

3    A.   **Only the linemen.**

4    Q.   Okay.  In Exhibit 138, one we've used

5 previously, we have an orientation letter for the 5 Star

6 guys.  Do you see this?

7    A.   **Yes, sir.**

8          MR. STUKENBERG:  Objection, form;

9 misleading.  That's not what it is.

10    Q.   Do you understand this to be a letter to

11 attend orientation for the 5 Star guys?

12    A.   **Yes, sir.**

13    Q.   And you can see that it's scheduled for April

14 5th, 2018?

15    A.   **Yes, sir.**

16    Q.   And you also notice here that they have a pay

17 scale which matches the pay scale we've already seen in

18 the previous exhibit, correct?

19    A.   **Yes, sir.**

20    Q.   We see this same pay scale in Exhibit 139,

21 which I'm showing you, from Higher Power.  Can you

22 verify to me that this is the same pay scale?

23    A.   **Yes, sir.**

24    Q.   Now, at some point the decision was made to

25 put hourly rates into the system that would come out to

Page 32

1 the day rates, right?

2    A.   **Yes, sir.**

3    Q.   And you -- I think you were aware of that

4 happening.  Let's look at some emails about that, if we

5 can.

6          If you'll look at Exhibit 176 which we have

7 used previously.  It's just one page.  Why don't you

8 review this for me and then we'll talk about it.

9          MR. STUKENBERG:  It's not on the screen.

10          MR. MOULTON:  I'm sorry.

11    Q.   Do you see Exhibit 176 now, sir?

12    A.   **Yes, sir.  Okay.**

13    Q.   Okay.  So in Exhibit 176, you're talking about

14 how you had seen how the day rates had been broken down

15 into hourly rates, correct?

16    A.   **Yes, sir.**

17    Q.   And you had started to do some math to try to

18 figure out how the hourly rates would match up to the

19 day rates, correct?

20    A.   **Yes, sir.**

21    Q.   And so you were letting -- you had a question

22 for Mr. Beagle, because the way you were doing your math

23 when you did the hourly calculation, it was coming up

24 short of the day rate calculation, correct?

25    A.   **Per the email, yes, sir.**

Page 33

1    Q.   Right.  And is that your memory?

2    A.   **That's from what I remember, yes, sir.**

3    Q.   Okay.  So Mr. Beagle then kind of gave you

4 some instruction.  It looks like you were using the

5 wrong hours.  You were looking at everything over eight

6 in a day being overtime, right?

7    A.   **I'm not sure what math I was using.  I'd just**

8 **say I was doing eight hours of regular time plus eight**

9 **hours of overtime, which is the same thing as what he**

10 **expressed.**

11    Q.   Okay.  So he -- but he gave you -- at the top

12 of this email, he's telling you the correct formula to

13 use to analyze how these rates match up, right?

14    A.   **Yes, sir.**

15    Q.   And so basically he's saying that if you take

16 the hourly rates and the overtime with -- counting

17 everything over 40 as overtime for seven days of

18 16 hours, the worker will get the equivalent of their

19 day rate, correct?

20    A.   **Yes, that was the expected compensation for**

21 **the day.**

22    Q.   All right.  I'm going to show you Exhibit 210.

23 We're going to kind of walk through one of these

24 calculations and see if it rings a bell for you.

25          You've seen a calculation like this as

## JAMES D. KINSEY  -  April 22, 2022

Page 34

1 probably what you were doing that night, where you have
2 a person who's paid $600 per day to come out to what
3 their rate would be, correct?
4          MR. STUKENBERG:  Dave, has this been
5 produced?
6          MR. MOULTON:  Oh, you know -- actually,
7 no.  It's just like a demonstrative we're walking
8 through.  Like instead of me typing it all out on the
9 screen, this is what we're going to do.
10          MR. STUKENBERG:  So is this something that
11 you just mocked up yourself?
12          MR. MOULTON:  Yes.
13          MR. STUKENBERG:  Okay.  I'm going to go
14 ahead and object to any questions about a document
15 created by a lawyer that's not actually reflective of
16 the pay practice.
17     Q.    So, Mr. Kinsey, I want to kind of go through
18 with you on this and see if this is what you remember as
19 the math being for how to come up with the difference --
20 to come up with the hourly rates and then the daily pay,
21 like the math that you were talking about with
22 Mr. Beagle.  Okay?
23     A.    That doesn't look like the math that I
24 remember.  I don't understand the 108 and 148 hours.
25     Q.    Okay.  Well, let's go through it and see if it

Page 35

1 will make sense to you, see if you can agree with it.
2 Okay?
3     A.    Okay.
4     Q.    So on the island, the guys are being
5 considered to have worked 16 hours a day for seven days
6 in a week, which comes out to 112 hours.  Is that your
7 understanding?
8     A.    Yes, sir.
9     Q.    So when you do 112 per week, you have 40
10 regular and 72 overtime hours.  Does that make sense?
11     A.    Yes, sir.
12     Q.    For 72 hours, if you're going to pay those at
13 time and a half, that's the same thing as 108 hours,
14 right?
15     A.    That makes sense.
16     Q.    Okay.  So if you take the 108 of the overtime,
17 plus the 40, you come out to -- it's equivalent of 148
18 hours, right?
19     A.    Okay.
20     Q.    Then if you take what they would earn for the
21 week at a day rate, which is 600 times seven, you get
22 $4,200, right?
23     A.    Yes, sir.
24          MR. LOMBARDINO:  Objection, assumes facts
25 not in evidence.

Page 36

1     Q.    So if we take that weekly pay that they can
2 expect if they work the whole week, divided by 148, we
3 come out with the hourly rate for a person at $600 per
4 day, right?
5     A.    Okay.
6          MR. STUKENBERG:  Objection, form.
7     Q.    Does that make sense to you?
8     A.    Yes.
9     Q.    Now, if we go back and we run this through
10 again, if you get paid $28.38 with the total time for
11 the week, this is what you're actually going to see on a
12 paycheck when you work seven days, $4,200 --
13          MR. STUKENBERG:  Objection.  We've never
14 seen a pay stub with 148 hours in a week.  And if you
15 just want to ask him to confirm that the math reflected
16 on this sheet is accurate, then we're just wasting time
17 here.  There's no pay stub that says it's 148 hours.
18          MR. MOULTON:  Objection duly noted.
19     Q.    Mr. Kinsey, you understand this math, correct?
20 Is there anything about this that's confusing you?
21     A.    Other than it's not what I was doing at the
22 time nor is it what's on the pay stubs, yes.
23     Q.    Sure.  We'll get into that.  But this is --
24 you reviewed spreadsheets prepared by Mr. Beagle that
25 did this math.

Page 37

1     A.    Not that way, but the end result, yes.
2     Q.    Okay.  But the end result is that for folks
3 that were making $600 per day on the pay stubs, it's
4 going to be $28.38 per hour, right?
5          MR. STUKENBERG:  Objection, form, the $600
6 per day.
7          MR. LOMBARDINO:  Objection, calls for
8 speculation.
9     A.    That was my understanding at the time.
10     Q.    And when the math is done on the paychecks at
11 $28.38 per hour when they work an entire week, are they
12 going to get exactly $4,200 or are they going to get
13 $4,200.24?
14          MR. LOMBARDINO:  Objection, calls for
15 speculation.  It's a hypothetical, as it's not -- it's a
16 document prepared by counsel.  But if you understand the
17 question, you can answer it.
18     A.    Other than I don't like the way that you did
19 the math, that would have been an approximate amount
20 they would have gotten paid.  I don't know that it would
21 have been that same amount based on the way the math is
22 doing.
23          MR. STUKENBERG:  And I'll just go ahead
24 and object.  This reflects no overtime or no overtime
25 rate.

**JAMES D. KINSEY  -  April 22, 2022**

Page 38

1    Q.   Sir, I'm going to show you a spreadsheet
2 that's been produced in this case as Exhibit 167 that
3 was prepared by Mr. Beagle.
4         MR. STUKENBERG:  Objection.  How do you
5 know it was prepared by Mr. Beagle?
6         MR. MOULTON:  Because he testified to it,
7 Will.
8         MR. STUKENBERG:  I don't remember that.
9    Q.   Mr. Kinsey, I want you to take a look at this
10 spreadsheet, which is --
11        MR. MOULTON:  For the court reporter, this
12 is Mammoth 3292.  It's an Excel spreadsheet.  It doesn't
13 have a sticker on it, but it is Exhibit 167.
14    Q.   Mr. Kinsey, looking at this spreadsheet, take
15 a minute to look at it and let me know what you think --
16 or let me know when you're ready.
17    **A.   Okay.**
18    Q.   Have you seen this spreadsheet before?
19    **A.   I have not.**
20    Q.   I'm going to look at Exhibit 151 which we used
21 previously.  Go ahead and take a look at this and let me
22 know when you're ready.
23    **A.   Yes, sir.**
24    Q.   Okay.  Is this the pay scale that was
25 developed for Cobra Energy?

Page 39

1    **A.   For the linemen, yes, sir.**
2    Q.   This is the pay scale that would have applied
3 to folks at Higher Power and 5 Star that were linemen?
4    **A.   Yes, sir.**
5    Q.   And mechanics, too, right?
6    **A.   Yes, sir.  If you were working for Higher**
7 **Power and 5 Star, they were equal pay structures.**
8    Q.   If you notice here at that $600 rate we were
9 just looking at, you come out to be the rate we were
10 just calculating.  Do you understand that?
11    **A.   Yes, sir.**
12    Q.   Looking at these rates, do you recognize these
13 rates?
14    **A.   I do, yes, sir.**
15    Q.   You're very familiar with them, right?
16    **A.   Yes, sir.**
17    Q.   In fact, you probably know them so well, that
18 you know that $37.84 is associated with $800 per day,
19 right?
20        MR. LOMBARDINO:  Objection, calls for
21 speculation.
22    **A.   It has been several years, so I wouldn't have**
23 **remembered that off the cuff, but at the time that I was**
24 **working there, yes, I could have looked at a**
25 **classification or a pay scale and known both.**

Page 40

1    Q.   Right.  So, for example, if you were looking
2 at a pay stub back then that had $37.84, you already
3 know this guy is an $800 target guy?
4         MR. LOMBARDINO:  Objection, calls for
5 speculation.
6    **A.   Yes, sir.**
7    Q.   I didn't hear your answer, sir.
8    **A.   Yes, sir.  I would have known simply because I**
9 **would review pay stubs to make sure individuals were**
10 **paid correctly and the pay stubs that I could see showed**
11 **their classification and their hourly rate.**
12    Q.   Okay.
13        MR. STUKENBERG:  Hey, Dave, just whenever
14 you get to a point to take a quick break.  No rush.  I
15 was just going to grab some coffee.  If you have more
16 questions, go ahead.  Just put it on your radar.
17        MR. MOULTON:  I think we can finish up
18 with this document here in a minute.  I just have a
19 couple more questions.
20        MR. STUKENBERG:  Sure.
21    Q.   So, Mr. Kinsey, did you notice when you worked
22 in Puerto Rico, that because these rates were -- would
23 only get the worker to the full amount of day rate pay
24 for a full week, that when they worked less than a full
25 week, they weren't going to get the same amount as their

Page 41

1 day rate?  Does that make sense?
2    **A.   Yes, sir.  If an employee did not work the**
3 **full seven days, then the target compensation was not**
4 **met.**
5    Q.   Right.  And so if we -- I want to share a
6 calculator with you so we can kind of see an example.
7 Okay?  So you can see my calculator on the screen,
8 right?
9    **A.   Yes, sir.**
10    Q.   So let's take, for example, this thousand
11 dollar rate which is associated with a $47.30 hourly
12 rate.  Do you see that on the chart?
13    **A.   It's not on the screen, but I know what you're**
14 **referencing.**
15    Q.   Bear with me, because I can't show both at the
16 same time.
17        So we do $47.30 which is the rate for a
18 thousand.  We multiply that by 16, like if they only
19 worked one day in a pay period, and that amount, as you
20 can see on my screen, comes out to $756.80, correct?
21    **A.   Yes, sir.**
22    Q.   So if the worker was expecting a day rate, he
23 would be shorted, if he was only paid by the hour, by
24 $243.20, correct?
25    **A.   Yes, sir.**

**JAMES D. KINSEY - April 22, 2022**

Page 42

1          MR. STUKENBERG:  Objection, form.

2     Q.   With this pay plan, these sort of concerns or

3 complaints came up from the linemen, right?

4     A.   Yes.

5     Q.   Where they would complain that they weren't

6 getting their full day rate?

7     A.   Yes, sir.

8          MR. MOULTON:  All right, Will.  You can go

9 ahead and -- we can take a quick coffee break if you'd

10 like.

11          MR. STUKENBERG:  Thanks everyone.

12          VIDEOGRAPHER:  Off the record at 10:42.

13          (Recess taken 10:42-11:01.)

14          VIDEOGRAPHER:  Back on the record at

15 11:01.

16     Q.   (BY MR. MOULTON) All right, Mr. Kinsey.  You

17 understand we're back on the record and that you're

18 under oath, correct?

19     A.   Yes, sir.

20     Q.   So one of the things I forgot to ask you about

21 earlier was if your father, Mr. Ken Kinsey, does he

22 still work with Mammoth or Cobra or any other affiliated

23 companies?

24     A.   He does not.

25     Q.   How long ago did he stop working for Cobra?

Page 43

1     A.   In the fall of -- or winter of 2018.  It was

2 shortly after my termination.

3     Q.   Okay.  And do you know the circumstances of

4 the -- how his employment ended?

5     A.   I just know he was terminated.  I don't know

6 the cause.

7     Q.   Do you know who it was that terminated him?

8     A.   It would have been Keith Ellison, because he

9 was the only one that had the authority.

10     Q.   And what does your father do now?

11     A.   He works for an engineering consulting company

12 out of Tyler, Texas.

13     Q.   Okay.  Can we get his phone number?

14     A.   Yeah.  I mean, I can tell it to you.

15     Q.   Go ahead.

16     A.   It is area code (432) 254-5783.

17     Q.   Thank you.

18          All right.  Before the break we were talking

19 about the -- what would happen when folks who were paid

20 at Cobra worked less than a full week and how, with the

21 hourly pay in the system, it would be less than what

22 their day rate pay would be.  Do you recall that?

23          MR. STUKENBERG:  Objection, form.

24     A.   That was the conversation we were having.

25     Q.   And you would say that you recall that there

Page 44

1 were sometimes complaints when folks would object and

2 they didn't have the full day rate on their check,

3 correct?

4          MR. STUKENBERG:  Objection, form.

5     A.   I would receive phone calls from employees who

6 had not received their expected compensation.

7     Q.   Right.  And what they were expecting was to

8 get the day rate amount that they had been promised,

9 correct?

10          MR. STUKENBERG:  Objection, form.

11     A.   They were expected to get their expected

12 compensation.  I mean, we -- when I did orientations, I

13 informed the individuals that there was an expected

14 daily compensation, but it was going to be paid over an

15 hourly overtime rate, and so if there was issues, then

16 they needed to let me know and I would adjust as

17 necessary.

18     Q.   Okay.  An example of that would be the example

19 we worked through on a calculator where if someone is at

20 $47.30 per hour under an hourly system, for, like, one

21 day's pay, they ended up getting shorted, like, $243.20.

22 Do you remember that?

23     A.   Yes, sir.

24     Q.   All right.  So you would receive complaints

25 from guys that'd be like, oh, hey, I need to get grossed

Page 45

1 up to my day rate, right?

2          MR. STUKENBERG:  Objection, form.

3     A.   They would call and go, hey, my paycheck's not

4 as much as what it's supposed to be, and then I would

5 explain to them why, and I would make the adjustments to

6 get them to that expected compensation.

7     Q.   So the amount that they were expecting was the

8 amount of the day rate pay that we saw on the prior

9 exhibits, right?

10          MR. STUKENBERG:  Objection, form.

11     A.   That was the total amount of expected

12 compensation, yes.

13     Q.   Right.  So they were complaining because

14 they weren't -- there was something wrong with their

15 paycheck, they didn't get that, right?

16     A.   That they didn't get the expected

17 compensation, yes, sir.

18     Q.   Right.  And so you would walk through it and

19 check it out for them, right?

20     A.   Yes, sir.

21     Q.   So you would look at their hourly rate --

22          VIDEOGRAPHER:  Excuse me.  I'm the

23 videographer, and I'm getting a lot of background noise

24 to the point that I can barely understand your

25 questions.

**JAMES D. KINSEY  -  April 22, 2022**

Page 46

1          THE REPORTER:  Yeah, I'm having trouble
2 hearing the questions.
3          VIDEOGRAPHER:  I don't know where it's
4 coming from.
5          MR. MOULTON:  I hear all these voices in
6 the background.
7          VIDEOGRAPHER:  Yes.
8          MR. MOULTON:  I think it might be Will's
9 house.
10         MR. STUKENBERG:  Let me see.
11         MR. MOULTON:  Is that better?
12         VIDEOGRAPHER:  It is at the moment, yes.
13 Thank you.  My apologies.
14         MR. MOULTON:  No problem.
15     A.  Can you repeat the question, Dave?
16     Q.  Yeah.  I don't recall exactly what the
17 question was, but let's see if we can just get back on
18 track with it.
19         I'm just trying to understand how you
20 understood the complaints to be, right, and then we'll
21 walk through how you addressed them.  So what I
22 understand is, when folks didn't work a full week, their
23 hourly pay would be short of what they were expecting
24 for their day rate pay, and they would contact you about
25 it, right?

Page 47

1     A.  Yes.  If there was an issue with their
2 paychecks, then I was the point of contact, and they
3 would reach out to me and then we would go from there.
4     Q.  Right.  And so you would look at their pay.
5 You would look at, for example, their rate to make sure
6 it was right, right?
7     A.  Yes, sir.
8     Q.  And you'd also look at the number of hours
9 that were inputted to make sure that that was right,
10 right?
11     A.  Correct.
12     Q.  And if there was a shortage to the day rate,
13 you would look to see if there was a gross-up that was
14 paid, correct?
15         MR. STUKENBERG:  Objection, form.
16     A.  If there was -- if an individual did not work
17 the full seven days, then yes, I would have to do an
18 adjustment to meet their expected compensation.
19     Q.  Okay.  In the emails and conversations with
20 folks at Cobra and Mammoth, you would refer to that
21 process as a gross-up, correct?
22     A.  Yes, sir.
23     Q.  So when we talk about gross-up, we're talking
24 about paying that difference between how the pay came
25 out under the hourly system -- that pay versus the

Page 48

1 amount the day rate would be, right?
2         MR. STUKENBERG:  Objection, form.
3     A.  Yes.  I mean, that was their -- that was what
4 the gross-up was, to adjust the compensation to make
5 sure that they received what they were expecting.
6     Q.  All right.  We're going to look at Exhibit
7 211.  We have some emails here.  It's just one page.
8 Why don't you take a look at this for me and we'll talk
9 about it.
10     A.  I do want to say this, David.  Whenever we
11 first got to --
12     Q.  Hold on.  Hold on.  Technically, the witness
13 is supposed to -- I'm supposed to ask a question and you
14 answer.
15     A.  Okay.
16     Q.  Are you answering the question I just asked,
17 though?  Before you say what you're going to say, what
18 are you doing?
19     A.  I want to provide some context, because
20 this was sent in early November --
21     Q.  Hold on.  Before you do this, are you giving
22 context to the emails I'm about to ask you about?
23     A.  Based on what I just read, yes, sir.
24     Q.  Let's go through the email first, and then in
25 your responses, as we talk about this, go ahead -- you

Page 49

1 can talk about that if it's responsive to my question.
2 Does that make sense?
3     A.  Yes, sir.
4     Q.  I mean, it's just depositions are sort of
5 formal like that.  Okay?
6     A.  Understood.
7         MR. LOMBARDINO:  He can provide whatever
8 context he wants.
9         MR. MOULTON:  Sure he can in response to a
10 question.  That's the way court works.  It's question
11 and answer.
12     Q.  All right.  Mr. Kinsey, in Exhibit 211, we
13 have some emails between you and Mr. Kinsey -- Ken
14 Kinsey about -- some complaints about guys not getting
15 their expected compensation, correct?
16     A.  Well, it was a communication between me and
17 the superintendents since he was the VP of operations.
18 I just carbon copied him on the email.
19     Q.  Oh, I see.  Okay.  So you're talking to the
20 superintendents, letting them know that there's --
21 you're already having issues.  This is early in the
22 process, right?
23     A.  Yes, sir.  And that's why I want to quantify,
24 because early in the process, it was a mess because
25 there was a lot of paper -- what was communicated in one

## JAMES D. KINSEY - April 22, 2022

Page 50

1 location was not the same in another, and so trying to
2 get all three entities on the same page took a few
3 weeks, and so that's where a lot of the pay issues
4 originated from, as well as, as employees were
5 transitioned from stateside work to Puerto Rico work,
6 pay rates did not get adjusted correctly, and that
7 created a lot of challenges as well.
8     Q.  So some of these complaints would have been
9 for folks calling about the adjustment, because maybe
10 they had transferred on the island midweek and they
11 didn't have the correct amount of gross-up or not of
12 gross-up on their check, correct?
13         MR. STUKENBERG:  Objection, speculation.
14 The email does not reflect that that was the pay concern
15 at all anywhere.
16     A.  At this particular point, based on the date, a
17 lot of these issues had to deal with the rates
18 inherently not being accurate and issues with standby as
19 they transitioned to the island.  The early weeks of the
20 power restoration, we transported hundreds of employees
21 to the island, and so there was a lot of just standby
22 time.
23         I mean, a lot of time guys waited to be able
24 to fly, because trying to get flights for hundreds of
25 people is not always easy.  So at the time of this

Page 51

1 email, that was the situation we were experiencing.
2     Q.  But you'd agree with me that as folks came
3 onto the island, if they came on at any point midweek
4 and they didn't have a full seven days, that their
5 hourly pay was going to need a gross-up to get them to
6 that day rate pay, right?
7         MR. STUKENBERG:  Objection, form; asked
8 and answered.
9     A.  Because of the inherent payroll issues
10 associated with the chaos, I mean, everyone -- for the
11 most part, a lot of employees had to get some type of
12 adjustment.
13     Q.  Okay.  And some of those adjustments would
14 have included the gross-up that we've been discussing,
15 correct?
16         MR. STUKENBERG:  Objection --
17         (Crosstalk/audio distortion.)
18     A.  That's possible.
19     Q.  So it was part of your job to track down these
20 issues and to address them, correct?
21     A.  Yes, sir.
22     Q.  Do you recall whose idea it was to pay these
23 gross-ups on top of the hourly pay?
24         MR. LOMBARDINO:  Objection, calls for
25 speculation.

Page 52

1     A.  I don't know.
2     Q.  As part of your job in payroll, it was your
3 job to process these gross-ups, correct?
4     A.  To make the adjustments, yes, sir.  I didn't
5 actually process the payroll.  That took place by
6 Mammoth.
7     Q.  Okay.  So when you make the adjustments,
8 specifically the gross-ups, how did you do it?
9     A.  I would look at what their hourly compensation
10 equated to compared to what the expected compensation
11 was, and then I would add that variance to the
12 timesheets, so that whenever payroll was processed, the
13 end result was what they were expecting to get paid.
14     Q.  So you would add the difference into Paycom?
15     A.  Yes, sir.
16     Q.  Would you calculate the difference yourself,
17 or was there like a chart you could look up and put the
18 number in?
19     A.  It was something that I had to calculate
20 manually.
21     Q.  So the process you would do that, was that
22 similar like what we did before with the thousand dollar
23 and $47.30 rate that we did on the calculator?  Was it
24 like that?
25         MR. LOMBARDINO:  Objection, vague and

Page 53

1 ambiguous, lacks foundation.
2     A.  It was a similar process.
3     Q.  Okay.  Can you describe to me how you would do
4 it?
5     A.  How specific do you want me to get?  Because I
6 don't remember super specifics.
7     Q.  Tell me what you do remember as specifically
8 as possible.
9     A.  I just remember as I entered time, I would
10 look at the total hours inputted, and then I would look
11 at what Paycom preloaded as the expected compensation.
12 And then I had created a spreadsheet that kind of helped
13 me track a lot of different information, and so through
14 Excel, I would figure out what that variance was and
15 then I would add that into Paycom.
16     Q.  Okay.  So when you're entering the hours --
17 and to be clear, the way you would do it is, for linemen
18 on the island, for every day that they're working, you
19 would input 16 hours into the Paycom system for that
20 day, right?
21     A.  That is correct.
22     Q.  Okay.  So when you would load that into
23 Paycom, you're saying that Paycom would tell you what
24 the hourly pay would be based on those hours you'd
25 enter?

## JAMES D. KINSEY - April 22, 2022

Page 54

1     A.   Yes, sir.

2     Q.   And based on the spreadsheet you kept of what
3  the -- let me ask you this:  Did Paycom also tell you
4  what the expected pay would be?

5     A.   No, sir.

6     Q.   Okay.  You had a spreadsheet that would tell
7  you what the expected pay would be?

8     A.   Yes, sir.  It was in reference to one of the
9  previous documents where there was the hourly rate of
10  what the individual received and then what that rate
11  should have equated to for total compensation.  And then
12  based on that, if I would know that individual only
13  worked the one day per the previous example, then I
14  would know, okay, that person should have been paid
15  roughly equal to this, and then I would add that
16  variance into Paycom.  So for that particular day or
17  that particular week, the end result would be what they
18  were expecting, or at least that was the goal.

19     Q.   Okay.  So it sounds like to me that maybe what
20  you're talking about as far as referring back like on a
21  chart would have been something like Exhibit 151 where
22  you could see the day rate or expected pay and the
23  hourly rates by each other?

24     A.   Yes, sir.  So, for example, the $47.30 that
25  you mentioned earlier, I would look at -- I would know,

Page 55

1  hey, that $47.30 and then however many hours they
2  worked, if it was 16 or 32, et cetera.  Knowing that the
3  expected compensation would have been close to that
4  thousand per day, then I would input an adjustment equal
5  to that.

6     Q.   Right.  So you would -- it was just like the
7  example we did, right?  You can take $47.30 times 16 and
8  see what that is, subtract it from a thousand, and that
9  would be your gross-up?

10     A.   Yes, sir.

11     Q.   Same thing.  I mean, 32, whatever, you would
12  just do that calculation difference and then you would
13  enter that gross-up into Paycom?

14     A.   Yes, sir.

15     Q.   Okay.  Now, that process, that gross-up
16  process, if you're -- under that calculation that you're
17  doing, was that your idea to start doing that on your
18  own, or was that something that you were instructed to
19  do?

20          MR. LOMBARDINO:  Vague and ambiguous.

21     A.   At the time all that was taking place, I
22  wasn't making any decisions on my own without
23  collaborating with somebody, just because I knew how
24  serious pay was.  Now, who informed me or verified that
25  what I was doing was accurate, I couldn't tell you who

Page 56

1  that person was.

2     Q.   Okay.  So there's two things there.  There's
3  one -- based on your answer, we could be talking about
4  two different things.  My question is not about who
5  would review your work to make sure you were right.
6  We'll talk about that later.

7          What I was wondering is this process, this
8  gross-up process.  Do you remember how it was that it
9  started that you would do it this way?

10          MR. LOMBARDINO:  Objection, asked and
11  answered.

12     A.   I don't remember what the process was.  I just
13  remember that when we started on the island, there was
14  the terminology day rate, but I know very quickly
15  Mammoth, Cobra came down and said that, hey, we can't
16  issue a day rate because of reasons that I wasn't privy
17  to, and we needed to be paying employees an hourly rate
18  so that we could pay them overtime.

19          And at that time, kind of per that one email
20  with Jeff Beagle trying to understand how the math
21  worked to make sure that I could express that to the
22  employees, then I would do a -- I would create a
23  spreadsheet of what the expected -- or what the actual
24  pay was, what the expected pay was, and then what the
25  adjustment needed to be.

Page 57

1          And in the beginning, I would send that
2  information to Mammoth payroll, HR, and they would
3  actually input that into Paycom.  Then it got to the
4  point where we had so many people on the island, that
5  the individuals within Oklahoma City, where Mammoth was
6  located, couldn't maintain their normal responsibilities
7  plus these, and then -- so at that point I was
8  instructed to make the adjustments in Puerto Rico.

9     Q.   Okay.  Let's kind of backpedal.  There's a lot
10  there I want to ask you about.

11          When you're entering the 16 hours each day for
12  the linemen, how do you know which days to enter 16 for
13  and which ones you weren't?

14     A.   That was communicated to me via the -- I don't
15  remember what we even called them at that point.  The
16  general foremen were responsible for communicating who
17  was active working under them, and that information
18  would get sent into the Puerto Rican main office in the
19  form of a roster, and then based on that roster, I
20  would -- based on that roster is how I entered my time.

21          While entering the time if I noticed a
22  variance, if somebody wasn't present or all of a sudden
23  they showed up present, then I would communicate with
24  the general foremen to quality control that roster.
25  That was how it was communicated to me.

## JAMES D. KINSEY  -  April 22, 2022

Page 58

1    Q.   Who would compile the roster, or was that you?
2    A.   There was a lot of people involved.
3    Q.   Okay.  So you have these general foremen
4 generally reporting -- and I understand there wasn't
5 electricity at times or good cell phone service, so you
6 probably had general foremen communicating the
7 attendance by telephone or verbally?
8    A.   A lot of different mediums.  I mean, some had
9 to be hand-delivered because of reasons you just
10 expressed.  Some we could -- they could get to a
11 restored area, for lack of a better description, that
12 had internet, and they would email them.  Those were the
13 two main forms that it was communicated.
14    Q.   So who in the Puerto Rico office was primarily
15 responsible for gathering all that information into what
16 I gather is one document called a roster?
17    A.   There was a company that Cobra subcontracted
18 called Texserve, and Texserve was kind of a liaison.
19 They would compile and gather a lot of information,
20 including attendance, and then they would take that
21 attendance and then they would submit that to -- we had
22 a couple different people in the office that that
23 information would go to.  Once they did their quality
24 check on it, then it was presented to me to do my
25 quality check.

Page 59

1    Q.   Okay.  So the quality checks were to make sure
2 that the -- that no one was missed or that the
3 attendance basically was accurate, correct?
4    A.   That was part of it.
5    Q.   What else were they looking for?
6    A.   The rosters were also used for billing
7 purposes.  And I never saw the full document that
8 Texserve presented to our office -- the main office.  I
9 just know there was a lot of information, and the
10 attendance was just a part of that.
11    Q.   Okay.  But safe to say -- and the only part I
12 really -- I just want to know about the parts you know
13 about.  So it sounds like the only parts you really know
14 about are the attendance part of this roster, right?
15    A.   Correct.
16    Q.   So the attendance roster is delivered to you.
17 You do your own quality check on it.  For your quality
18 check, you are verifying that the folks that it says
19 worked that day actually did and to make sure people
20 aren't left off; is that right?
21    A.   Yes.  I would compare that to the previous
22 day's attendance to make sure that I was keeping track
23 of who was there and who wasn't.
24    Q.   Okay.  You don't want to be accidentally
25 paying somebody who had, for example, already left the

Page 60

1 island?
2    A.   Yes, sir, because we -- again, hundreds of
3 employees, and sometimes one individual -- hey, they're
4 present, and they weren't.  Well, we weren't going to
5 pay them if they weren't present or vice versa.
6 Hundreds of employees, that guy didn't check in that
7 morning, he was not present.  Well, I can't pay you if
8 you're not present.  And I would do what I could to make
9 sure that people were paid correctly.
10    Q.   Okay.  So you get the roster, and then are you
11 able to just upload that roster into Paycom and Paycom
12 puts 16's for everybody that's working that day, or do
13 you have to manually enter that in?
14    A.   In the beginning, I had to manually enter it.
15 Towards the end, we could use a format that we could
16 import into Paycom to automatically do it.
17    Q.   For the gross-ups, would you manually enter in
18 the gross-ups?
19    A.   Yes, I would have to manually enter those.
20    Q.   So Paycom didn't automatically calculate the
21 gross-up for you?
22    A.   No, sir.
23    Q.   Before you could enter in a gross-up, did you
24 have to get permission from anyone?
25    A.   In the beginning, yes.

Page 61

1    Q.   How would that work?
2    A.   I would compile the list of all of the
3 grievances that I received, what they received, what
4 they expected and what the variance was, and then I
5 would send that to Oklahoma, and then they would take
6 care of importing it in their office.
7    Q.   Were you ever aware of anyone, after you had
8 put in the gross-ups into Paycom, ever coming back and
9 saying we're not paying that gross-up this time?
10    A.   I am not aware of that ever happening.
11    Q.   Never heard of that?
12    A.   No, sir.
13    Q.   I'm going to show you Exhibit 202.  I'll start
14 at the bottom here and we'll kind of scroll up and
15 see -- and we'll talk about it.
16    A.   Can you scroll slightly down.
17    Q.   Yes, sir.
18    A.   Thank you.  Okay.  Okay.  Okay.  I'm finished.
19    Q.   So I want to direct your attention to the
20 email from Mr. Beagle on November 17th which is inside
21 this Exhibit 202.  We're on Bates number 3209, Mammoth
22 3209.
23         MR. LOMBARDINO:  Real quick, just for the
24 record, November 17th, 2017.
25         MR. MOULTON:  Yes, 2017.  Yeah.

## JAMES D. KINSEY  -  April 22, 2022

Page 62

1    Q.    So, Mr. Kinsey, is Mr. Beagle here in this
2 email talking about what we've been talking about, about
3 this process of grossing up the pay up to the day rate
4 amount?
5    A.    He is discussing grossing up to the expected
6 compensation.  At this point -- it was around this point
7 is whenever we were -- we had notified the employees
8 that it wasn't going to be a true day rate because of,
9 again, things -- reasons that were not made privy to me,
10 but that we were still going to try to honor that
11 compensation, but it wouldn't be a day rate.  And so
12 that's what he's discussing, is making sure that we get
13 things adjusted accordingly.
14    Q.    Okay.  So he's saying here that since they're
15 paying 16 hours per day to get to the daily rate, that
16 that's -- that's what you're saying, right, is that when
17 they're shorted -- when they're working less than a full
18 week, that there's going to be that adjustment to still
19 get them to the expected pay even though the system is
20 still doing it hourly, right?
21         MR. STUKENBERG:  Objection, form.
22         MR. LOMBARDINO:  Objection, misstates
23 prior testimony, and objection, misleading.
24         MR. STUKENBERG:  And I'll go ahead and
25 object.  We're just reading documents again, Dave.

Page 63

1    Q.    Go ahead, sir.
2    A.    From what I understand on reading the email
3 and from what I do remember, that's what he is
4 discussing, is adjusting the pay to make sure that
5 employees were paid what they were expecting.
6    Q.    Other than Mr. Beagle talking about how this
7 will be done in this gross-up system, is there anyone
8 else that told you that this is what y'all would be
9 doing?
10    A.    I don't remember who all I would have heard it
11 from.  Jeff was the HR director for Mammoth, but I know
12 there was other people involved.  I just don't remember
13 who all was involved.
14    Q.    Did Mr. Beagle ever talk to you about whether
15 or not he had got this approved, this day rate system,
16 and whether the gross-up ever got approved by like an
17 attorney or anyone?
18    A.    I know that there was conversations with
19 attorneys.  Beyond that, I do not know.
20    Q.    So you don't know what those conversations
21 were and whether or not the attorney approved this or
22 not?
23    A.    I do not.  I was not privy to those
24 conversations.
25    Q.    So in the top email, Mr. Beagle is saying to

Page 64

1 keep track of these gross-ups into a spreadsheet?
2         MR. STUKENBERG:  Objection, form.  That's
3 not what the document says.
4    A.    From what I read or from what I understand
5 from the email, he wanted us to keep track of any
6 adjustments that needed to be made so that those could
7 be submitted for a special payroll.
8    Q.    Okay.  Do you know what DD corrected means?
9    A.    Direct deposit.
10    Q.    Oh, okay.  And that's where -- is that the
11 column that you're supposed to put the gross-ups in?
12    A.    I honestly don't remember.  I'm not even sure
13 that I ever saw the spreadsheets from Shelly or Missy.
14 I think I only ever saw my own.  And at that time I had
15 limited access within Paycom, so I couldn't make direct
16 deposit corrections.
17    Q.    I'm showing you Exhibit 169.  We have an email
18 chain here.
19    A.    Okay.
20    Q.    All right.  So in Exhibit 169, we have an
21 email chain between -- that includes you and Missy Davis
22 and Mr. Kalman, correct?
23    A.    As well as a few other individuals, but yes,
24 sir.
25    Q.    Right.  And in these emails, you guys are

Page 65

1 sending spreadsheets back and forth with adjustments to
2 payroll, correct?
3    A.    We're submitting them to Alex to take care of
4 in Oklahoma City, yes, sir.
5    Q.    So in 31 -- in this exhibit, we have Bates
6 numbers, right, Bates number 3158, and it spills onto
7 3159.  We have an email from you on January 9th.  Do you
8 see this email?
9    A.    Yes, sir.
10    Q.    So in this email, this is an example of where
11 you are keeping track of the gross-ups in the
12 spreadsheet and entering them, correct?
13    A.    From what I'm gathering, yes, sir.
14    Q.    And this is generally how it was done.  You
15 would keep track of the gross-ups in the spreadsheet.
16 You would share them with the folks that are listed on
17 these emails and submit them to Mr. Kalman?
18    A.    Yes, sir.  At that point in time, yes, sir.
19    Q.    And did this process ever change?
20    A.    It did get to the point where I was handling
21 inputting the adjustments myself instead of having to
22 send them -- I think I still sent them, just a
23 spreadsheet, to Alex and others, but I think at some
24 point in the process, they told me just to enter it
25 myself.

## JAMES D. KINSEY  -  April 22, 2022

Page 66

1    Q.    And by enter it yourself, you mean just put it
2  in the Paycom directly?
3    A.    Yes, sir.
4    Q.    Okay.  After that process started where you
5  just entered it into Paycom directly, are you aware of
6  any further review process after you, or was that what
7  was going out on a check?
8    A.    From what I understand, it was still being
9  reviewed by -- at this point Michelle Poling had been
10  hired as the HR director for Puerto Rico, and so I think
11  she and Alex and others still like spot-checked it or
12  QC'd it just to make sure that everything was still
13  correct.
14    Q.    And in the response, you said "at this time."
15  Are you talking about the time that I was asking about
16  when you would enter them directly, or are you talking
17  about when you're exchanging the spreadsheets?
18    A.    Whenever I would enter them directly.
19    Q.    All right.  So when you're -- during the time
20  you're exchanging the spreadsheets and weren't entering
21  them indirectly, how would that process work?
22    A.    I would create the spreadsheets and then send
23  those up to Oklahoma, and once it got to Oklahoma, I
24  don't know the specifics.
25    Q.    So you would submit it -- specifically for

Page 67

1  you, you would submit them to Kalman?
2    A.    Alex was my main point of contact in Oklahoma.
3  Bethany was another individual in Oklahoma, but I don't
4  remember what her job title was.
5    Q.    So you would submit them to Alex Kalman and
6  Bethany, correct?
7    A.    Yes, sir.
8    Q.    Let's look at Exhibit 212.
9    A.    Okay.
10    Q.    So on this exhibit here, you guys are
11  discussing how you enter the time in for the linemen,
12  correct?
13    A.    I think we're more specifically talking about
14  the ones that aren't linemen, but yes.
15    Q.    Okay.  But with respect to the linemen, you're
16  putting in 16 hours for every day that they're on the
17  roster, correct?
18    A.    Correct.
19    Q.    And for the folks that are paid -- there was
20  some salaried folks on the island, right?
21    A.    Yes, sir.
22    Q.    And you're also talking about them in this
23  email?
24    A.    Yes, sir.
25    Q.    So for the salaried folks, they would get a

Page 68

1  base salary plus a day rate, correct?
2    A.    Yes, sir.
3    Q.    And in Paycom, for the salaried people, you
4  would put a direct day rate amount for the day rates
5  that they were earning, in addition to their salaries,
6  correct?
7    A.    For the salaried positions, I believe that I
8  was entering a day rate, yes.  I don't remember how I
9  was coding it, but it would have been a dollar amount
10  for each day.
11    Q.    And you were asking about whether or not you
12  should do that same process for the linemen or if you
13  should still be entering in the 16 hours, correct?
14    A.    No.  In the context of this email, I'm asking
15  if I should be entering 16 hours a day for the salaried
16  positions or if I should be entering a day rate for the
17  salaried positions.  At this particular time, all
18  linemen non-salaried positions were supposed to receive
19  16 hours a day.
20    Q.    Okay.  But so -- I mean, aren't you asking --
21  aren't you also asking whether or not you should put day
22  rate, like dollar amounts, for linemen, or no?  Are you
23  not asking that?
24         MR. LOMBARDINO:  Objection, asked and
25  answered, argumentative and misleading.  He just told

Page 69

1  you the answer to that question.
2    Q.    You don't understand -- because it looks like
3  Mr. Kalman might have interpreted it that way.  Do you
4  see that?
5         MR. LOMBARDINO:  Objection, calls for
6  speculation.
7    A.    At the time of this email, it had been made
8  clear to me that if you were not salaried, you received
9  16 hours.  If you were salaried, there was still some
10  confusion as to how that needed to be entered.  And
11  that's what Alex and I are discoursing at this point, is
12  how to handle those individuals.
13    Q.    Okay.  And then he's also saying that now with
14  Paycom being set up the way it is, once you put in the
15  16 hours for the linemen, it should already be
16  automatically kicking out what the hourly pay would be,
17  right?
18    A.    At this point the non-salaried positions
19  should have received the 16 hours a day in Paycom.  If
20  you worked a 14-hour shift, then Paycom was
21  automatically going to calculate it to the expected
22  compensation.
23    Q.    A 14-hour shift or 14 days?
24    A.    14 days.  I'm sorry.  14 days.
25    Q.    Oh, I see.  Okay.

**JAMES D. KINSEY - April 22, 2022**

Page 70

1    A.    We were a biweekly pay, so the pay structure
2  was 14 days.
3    Q.    Right.  Right.
4          Let's look at Exhibit 183.
5    A.    Can you scroll back down?
6    Q.    Yes, sir.  I'm sorry.
7          MR. LOMBARDINO:  Dave, while he's reading
8  that, are we going to break for lunch?  Do you think
9  we're going to go into mid afternoon, or if you need
10 like only an hour, we can keep going and take a
11 five-minute break.
12         MR. MOULTON:  We might need to do a break.
13         MR. LOMBARDINO:  For lunch?
14         MR. MOULTON:  Yeah.
15         MR. LOMBARDINO:  Okay.
16   A.    Okay.
17   Q.    All right.  So in Exhibit 183, we have you on
18 an email chain going back and forth with Missy Davis and
19 Mr. Kalman about adjustments that need to be made to
20 payroll, correct?
21   A.    Yes, sir.
22   Q.    And it looks like you're attaching this weekly
23 update for January 26th.  Do you see that?
24   A.    Yes, sir.
25   Q.    So this is a spreadsheet that you would have

Page 71

1  been involved with, correct?
2    A.    Considering that's the header for Missy, I
3  would have received it.  I don't know that I would have
4  really reviewed it since that was her business, but I'm
5  sure I would have sent my own.
6    Q.    Okay.  When you're compiling the gross-ups
7  into a spreadsheet, are you doing it for Cobra and
8  Higher Power?  I'm sorry.  Are you doing it -- when
9  you're compiling the gross-ups into a spreadsheet, do
10 you do it for 5 Star and Higher Power?
11   A.    The spreadsheets that I compiled were for
12 anybody that was on the island, so that could have
13 included 5 Star, that could have included Higher Power
14 or Cobra.
15   Q.    Okay.  Would Missy Davis also do those
16 spreadsheets?
17   A.    She would only be responsible for 5 Star
18 employees that were not in Puerto Rico.
19   Q.    Okay.
20   A.    We also had a lady in Higher Power in
21 Plainview, Texas doing the same thing, and she was only
22 responsible for issues pertaining to non-Puerto Rico
23 based Higher Power employees.
24   Q.    Okay.  So if this spreadsheet here is being
25 shared with you in Puerto Rico, it's about Puerto Rican

Page 72

1  employees, right, or the ones working in Puerto Rico?
2    A.    I don't know what was on her spreadsheet.
3  It's certainly possible that there were individuals in
4  Puerto Rico that she was making notes about, but by and
5  large, the only ones she should have been would have
6  been ones that were transitioning to Puerto Rico, to
7  make sure that they had like standby time or things of
8  that nature, per diems entered.
9          Once they were in Puerto Rico, I'm not saying
10 she didn't help me, but that was my primary
11 responsibility, was to take care of Puerto Rico.  Hers
12 was to take care of non-Puerto Rico 5 Star employees.
13   Q.    Okay.  So during the transition weeks, your
14 jobs would kind of overlap because she would also -- you
15 would both have responsibilities for those transition
16 weeks?
17   A.    Yes, sir.  For instance, if an individual flew
18 out on a Monday, then they would -- but maybe they had
19 orientation on Sunday, well, I may not know about
20 orientation and they may not have my contact
21 information.  So in that situation where they got missed
22 on a roster, then she would advise me, hey, these people
23 need to be adjusted, FYI, and then at that point moving
24 forward, then it would be my responsibility to take care
25 of them.

Page 73

1    Q.    Okay.  So you would definitely receive reports
2  from Missy Davis, particularly for these transition
3  points where she was letting you know, hey, these guys
4  are coming on island, we need these adjustments, and
5  then it would become your responsibility to cake care of
6  it after that, right?
7    A.    Yes, sir.
8          MR. LOMBARDINO:  Objection, vague and
9  ambiguous.
10   Q.    We're going to look at the spreadsheet that's
11 attached to this email.  This is Exhibit 184.  It's
12 unmarked, but it's a native Excel spreadsheet called
13 Mammoth 3145_Confidential.
14         So go ahead and take a look at this first tab
15 here, Mr. Kinsey, the corrections needed for January 26,
16 2018.  Do you see that on your screen?
17   A.    Yes, sir.
18   Q.    Okay.  Go ahead and take a look and let me
19 know when you're ready.
20   A.    I'm ready.
21   Q.    Okay.  Is this a spreadsheet that you recall
22 seeing?
23   A.    I don't recall seeing it, but that doesn't
24 mean that I didn't see it.
25   Q.    Okay.

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

**JAMES D. KINSEY - April 22, 2022**

Page 74

1    A.    I mean, at this point these were individuals
2  responsible for Puerto Rico, and so I should have
3  reviewed it.
4    Q.    You said you should or shouldn't?
5    A.    I should have.
6    Q.    Oh, okay.  And so this is an example of a
7  spreadsheet where the gross-ups would be tracked, right?
8    A.    Yes, sir.
9    Q.    This is similar to the spreadsheets that you
10  would have prepared, correct?
11    A.    Yes, sir.
12    Q.    In fact, you probably used the same form,
13  right?
14          MR. LOMBARDINO:  Objection, calls for
15  speculation.
16    A.    In this case, it would have been the same form
17  because this was a template for Paycom.
18    Q.    Right.  Okay.  And so we can see on this
19  spreadsheet here that under the day rate adjustment
20  amount, we have the amounts listed that need to be --
21  the adjustments that need to be made for gross-ups?
22    A.    That is correct.  Those are the adjustments
23  that would need to be made.  The headers specifically
24  were subjective.
25    Q.    I get you.  It's fair.

Page 75

1         But we can see that this is the -- on the days
2  worked, though, where it shows the number of days here,
3  those numbers aren't subjective.  That's the number of
4  days they worked, right?
5    A.    Correct.
6    Q.    And for these guys listed as 12's there,
7  they're only working 12 days in a 14-day pay period,
8  right?
9    A.    Yes.
10    Q.    And so for these guys -- you know, if you work
11  less than the full 14, the hourly pay is going to be
12  less than what their full day rate would be, right?
13    A.    If you didn't work a full 14 days, then yes,
14  your expected compensation would have been short.
15    Q.    So in column I, those are the calculations
16  that would have been entered in to make up that
17  difference?
18          MR. LOMBARDINO:  Objection, calls for
19  speculation, since he didn't create this document.
20    A.    That's what they should have been, yes.
21    Q.    Okay.  When you were doing it, you did it like
22  that?
23    A.    I won't say that I did because I don't
24  remember, but there is the possibility.
25    Q.    Okay.

Page 76

1    A.    I mean, I did a lot of stuff differently down
2  there just out of sheer necessity, but I feel like I
3  probably would have sent something akin to this to
4  Oklahoma.
5    Q.    Okay.  And you would have done that for all
6  the linemen on the island, including the Higher Power
7  ones and the 5 Star ones, right?
8    A.    Yes, sir.
9          MR. MOULTON:  Mr. Lombardino, you
10  mentioned lunch.  I think now is the time to do a quick
11  lunch if you want to do it.  I think I've probably got a
12  couple more hours.
13          MR. LOMBARDINO:  So what time do you
14  want --
15          MR. MOULTON:  We can do like 30 minutes,
16  whatever works for you.
17          MR. LOMBARDINO:  Okay.  I don't know what
18  building you're in.  Is there like a place down there
19  that you can go grab -- is 30 minutes enough time for
20  you?  Because we don't want you rushed.  I mean, you're
21  going to have to use the rest room and call your wife
22  and all that stuff.
23          THE WITNESS:  Honestly, I don't have an
24  appetite right now.
25          MR. LOMBARDINO:  Okay.  Then let's do

Page 77

1  30 minutes.  We'll restart at 12:30?
2          MR. MOULTON:  Sounds great.
3          MR. STUKENBERG:  Hey, Dave.
4          MR. MOULTON:  Yeah.
5          MR. STUKENBERG:  So I'm going to go ahead
6  and cancel my tennis.  It looks like that's not going to
7  happen.
8          MR. MOULTON:  Make Harris do it.
9          MR. STUKENBERG:  Do what?
10          MR. MOULTON:  Make Harris attend.  Make
11  Aaron, make Priya.
12          MR. STUKENBERG:  Yeah, okay.  I'm going to
13  schedule -- I do need to schedule a call, though.  Is it
14  cool if, say, 2 o'clock, we do like a 20-minute break so
15  I can do this call I need to make?
16          MR. MOULTON:  Can you push it to 3:00?
17          MR. STUKENBERG:  That would be difficult,
18  because there's a lot of people that all want to be
19  coordinated to make that happen.
20          MR. MOULTON:  All right.  We'll break
21  again at 2:00.
22          MR. STUKENBERG:  Okay.  I'll see you guys
23  about 12:30.
24          VIDEOGRAPHER:  Off the record at 11:57.
25          (Lunch recess taken 11:57-12:39.)

**GOOD TO GO PROCESS SERVICE**
**713-351-7061**

## JAMES D. KINSEY - April 22, 2022

Page 78

1        VIDEOGRAPHER:  Back on the record at
2 12:39.
3    Q.   (BY MR. MOULTON)  All right.  Mr. Kinsey,
4 let's continue on.  Let's look at Exhibit 172.  And I
5 don't really have substantive questions about this.  I
6 just want to get you familiar that this is an email
7 exchange where y'all are talking about corrections to
8 payroll.  If you could just verify that for me.
9    A.   Could you scroll to the bottom, please.
10   Q.   Yes.
11   A.   Okay.  So this is just almost the same email,
12 I think, from Shelly's perspective instead of Missy's.
13 Could you scroll up, please.
14   Q.   Yes.
15   A.   Okay.  So yeah, it's pretty much the same.
16 Okay.  I'm ready.
17   Q.   So this is an email chain where you're working
18 with the folks in this email about the corrections to
19 payroll for this pay period that it says in the subject
20 line, right?
21   A.   That's what it appears to be, is payroll
22 corrections.
23   Q.   And so let's go ahead and look at this
24 spreadsheet, which is another native Excel spreadsheet.
25 It's Exhibit 173 for the record.  It's Bates numbered

Page 79

1 Mammoth 3149_Confidential.
2        And we're going to look at the January 15th
3 tab.  And I'm just going to have you look at this,
4 Mr. Kinsey, and ask you if you know what's going on with
5 this spreadsheet, if you could explain what it is.
6    A.   I'm not real sure.
7    Q.   Okay.  So on column F is -- you know, draws
8 the eye where it says Hours #, 448, 440 and then 8.  Do
9 you know -- can you explain what's going on?
10        MR. LOMBARDINO:  Objection, asked and
11 answered.  You're asking about a document he didn't
12 create.
13   A.   I have no clue what's going on.
14   Q.   Okay.  Are you familiar with the description
15 of the issue that says rate conversion not accurate to
16 $1200 per day?
17   A.   I'm assuming that it's because their pay scale
18 in Paycom was not accurate.  Beyond that, I don't know.
19   Q.   Okay.  You don't remember if it was you that
20 prepared this sheet or not?
21   A.   Considering that was sent to the group from
22 Shelly Wheeler, I'm fairly confident I didn't prepare
23 it.
24   Q.   Back on the email chain, can you tell me where
25 you think it was that Ms. Shelly Wheeler was sending it?

Page 80

1    A.   At the very top where it says from Shelly
2 Wheeler.
3    Q.   Okay.  Oh, that's the attachment you're
4 talking about.  Okay.
5        So according to you, Shelly Wheeler would have
6 been the one preparing that spreadsheet?
7    A.   From what I --
8        MR. LOMBARDINO:  He said he doesn't know.
9    A.   I'm assuming, but take that with a grain of
10 salt.
11   Q.   Right.  But is that -- she's with Higher
12 Power, right?
13   A.   Right.  But there could have been somebody
14 else within her office that prepared it and presented it
15 to her and then she sent it to us.  I don't know who
16 created that one.
17   Q.   Fair enough.
18   A.   I mean, Shelly, Missy and I were the points of
19 contact, but they had other people within their offices
20 that helped them do a plethora of things.
21   Q.   Now, if I understand your testimony from
22 earlier, at least with regards to the spreadsheets that
23 you would receive from Ms. Davis, you guys would have
24 been working together on spreadsheets that were for
25 folks that were transitioning to the island.  Do you

Page 81

1 recall that testimony?
2    A.   Yes, sir.  And that would have been the same
3 thing with Shelly.
4    Q.   Right.  So if you were involved at this point
5 on spreadsheets like this or copied, it was because it
6 was folks that were transitioning over to Puerto Rico?
7        MR. STUKENBERG:  Objection, form.  It
8 could have been any number of payroll issues.
9    A.   Given some of the texts within the
10 spreadsheet, I feel like it's referencing Puerto Rico
11 pay.  What the hourly hours represents, I don't
12 understand.
13   Q.   And I'm not asking you about that.  I'm not
14 even asking you specifically about spreadsheets.
15        Let me ask it a different way.  Ms. Wheeler
16 wouldn't have sent you spreadsheets that would have
17 dealt only with Higher Power people off in Puerto Rico,
18 right?
19   A.   Normally she would not have.
20        MR. LOMBARDINO:  Objection, speculation.
21 He doesn't know what's in her head.
22   Q.   So normally what would happen, if you're
23 involved, it's because we're talking about workers that
24 are either transitioning or who are in Puerto Rico?
25   A.   Transitioning to or transitioning from, yes,

## JAMES D. KINSEY  -  April 22, 2022

Page 82

1 sir.

2     Q.   Right.  Per these spreadsheets at least?

3     A.   Yes, sir.

4     Q.   And just to be clear, you were in charge of
5 doing -- entering the time and doing the gross-ups for
6 guys in Puerto Rico, not for ones that are working
7 stateside, right?

8          MR. LOMBARDINO:  Objection, form.

9     A.   In general, if they had nothing to do with
10 Puerto Rico, I had nothing to do with payroll entry.
11 There were times where standbys or per diems that took
12 place in the states, they might enter that information
13 and then I would take over once they arrived, and at
14 times I might have entered that standby or per diem
15 information.  But if there was no relationship to
16 Puerto Rico, then I should not have had anything to do
17 with it.

18     Q.   Do you recall any changes to the payroll
19 practice in July 2018?

20          MR. LOMBARDINO:  Objection, vague and
21 ambiguous.

22     A.   I mean, could you provide context?  I mean, I
23 know that there was changes made, but I don't know
24 anything specific in July.

25     Q.   Okay.  Are you aware of any -- so the question

Page 83

1 is just straight up, are you aware of -- can you recall
2 any changes that were made as far as the payroll
3 practice for the guys in Puerto Rico starting in July
4 2018, like July 23rd to be specific?

5     A.   I know there was changes that took place
6 around that time, yes, sir.

7     Q.   Okay.  Can you describe to us the changes you
8 do remember.

9     A.   I just know that we were transitioning from an
10 expected daily compensation to non-daily expected
11 compensation, is really all I remember, because I know
12 that we also went from providing housing and food and
13 all the other stuff to paying out of per diem to cover
14 cost of food and housing and transportation.

15     Q.   Let's look at Exhibit 213.  Go ahead and
16 review this.

17     A.   Okay.  So that would have been on July 5th,
18 2018.

19     Q.   Right.  So this would have been right before
20 the changes you were talking about, right?

21     A.   Yes, sir.

22     Q.   So here with Beth, why were you talking to her
23 about transitioning from a day rate to an hourly rate?

24     A.   Day rate was just a vernacular that we used
25 versus the mouthful that is daily expected compensation.

Page 84

1 I mean, the beginning days of the power restoration,
2 that was what the company thought we were going to be
3 paying, was a day rate, and the moniker just stuck even
4 though we weren't paying out a true day rate.  So just
5 everybody knew that when we said day rate, it referenced
6 that daily expected compensation versus saying all that.

7     Q.   Okay.  And so other than transitioning to the
8 hourly rate system in July, what other changes do you
9 recall that were going to happen as far as pay and
10 keeping records of hours?

11          MR. LOMBARDINO:  Objection, misstates
12 prior testimony and misleading.

13     A.   The only thing I remember is kind of what I
14 stated earlier, that prior to this transition -- prior
15 to the transition, it was kind of an all-inclusive -- I
16 mean, we were providing housing, transportation, food.
17 It was a big group.  Employees didn't have to worry
18 about clocking in.  That's what this email is
19 specifically referencing, is instead of now those in the
20 office having to keep track of how many hours the guys
21 did and did not work, it would now be the responsibility
22 of the individual employees to keep track of how many
23 hours they did and did not work.  They were no longer
24 expected to rely on us.  They were going to have to have
25 some ownership in that.

Page 85

1     Q.   This is really close to the same time that
2 your employment was terminated, I think; is that right?

3     A.   My termination took place sometime in the
4 beginning of August.

5     Q.   Okay.  So you really didn't experience much
6 of -- much of the changed system?

7     A.   At that particular time, we'd actually hired a
8 new lady.  I don't remember her name.  And she was going
9 to be responsible for taking care of payroll within
10 Puerto Rico because she was a Puerto Rican resident, and
11 that was about the time frame that I transitioned from
12 managing payroll to this compliance coordinator
13 position, and I was going to be based within the states.
14 So a lot of the conversations, a lot of the
15 expectations, I wasn't privy to.

16     Q.   Okay.  And so can you say either way whether
17 or not you know after July 23rd, 2018 if the workers in
18 Puerto Rico were actually expected to keep track of
19 their hours worked or not?

20     A.   That was the intention, but I do not know what
21 actually took place.  From what I do remember, the time
22 that I did leave Puerto Rico, we were still within the
23 restoration effort, and as long as we were within the
24 restoration effort, employees were still getting paid
25 16 hours a day.  And I think once I left the island

Page 86

1 within the month of August, I believe is when they
2 transitioned to reconstruction, which was the whole new
3 billing, pay rates, all new everything.
4      Q.    Okay.  And so --
5      A.    And after reviewing some of these emails, I do
6 want to clarify a question kind of in the beginning.
7 You asked about the circumstances of my termination.  It
8 was in part to this, because employees were being paid a
9 per diem, and they were expected to provide their own
10 housing.  And at least for a pay period, I was a part of
11 that process because I issued pay to employees that
12 weren't on the island for the per diem -- not their
13 hourly rate, but their per diem.
14          And that was what I was terminated for, is it
15 was determined that we were not supposed to pay
16 employees per diem while off the island, and because I
17 did, they said I violated company policy and terminated
18 me.
19      Q.    Okay.  So when I -- let's talk about that.
20 When I asked you about that -- I asked you several
21 questions, and you weren't able to remember any details
22 about why you were terminated.  Did you do anything to
23 refresh your memory to now remember?
24      A.    No.  I just --
25          MR. LOMBARDINO:  Objection, misstates

Page 87

1 prior testimony.
2      A.    No, I didn't do anything to refresh my memory.
3 Just through the course of our conversation and reading
4 some of these emails, information just came back to me.
5      Q.    So remembering more about that conversation
6 with Ms. Poling about why you were terminated?
7      A.    Yes, sir.
8      Q.    So it's your testimony -- let me make sure I
9 understand.  You were terminated because you were paying
10 per diem to workers even though they weren't on the
11 island, which you weren't supposed to be doing?
12      A.    That was -- from what I remember, that was the
13 reason she gave me.  I paid them the per diem while they
14 were off the island because that's what I was -- I felt
15 like I was supposed to be doing.
16      Q.    Okay.  Why did you feel like you were supposed
17 to be doing that?
18      A.    Through the course of conversations that took
19 place, and then we were expecting employees to maintain
20 their own housing while -- whether they were on the
21 island or off the island.  And based on the
22 conversations we were having within the office, it
23 was -- I was under the impression that we should have
24 been paying them that per diem, and apparently a policy
25 had been written, without my knowledge, that said that

Page 88

1 we weren't supposed to do that.
2      Q.    Okay.  So with the -- with these per diems
3 that you were paying, I'm a little confused, because I
4 thought that your role with payroll was to basically get
5 it ready, then someone else would review and then decide
6 what to pay and what not to pay.
7      A.    Well, I would enter the data and then they
8 would verify it and they would send it off to the bank,
9 so I was still expected to enter in necessary
10 information for them to be able to process it.
11      Q.    So who was the person that would be reviewing
12 your work before they would pay it?
13          MR. LOMBARDINO:  Objection, speculation.
14      A.    I don't know.  Someone in Oklahoma.
15      Q.    And to be clear, what I understand is that you
16 would -- at least from your point of view, you were
17 sending it to Mr. Kalman, right?
18      A.    I think he was still employed at that point.
19      Q.    Right.  Mr. Kalman.  And then there was one
20 other person.  I forget their name.  But who else would
21 you send it to besides Mr. Kalman?
22      A.    I didn't really send it to anyone.  It was --
23 once I got done processing my information, then they had
24 a chance to review it and submit it to -- actually hit
25 the submit button, I mean, because we were a two-week

Page 89

1 behind process.  So there was a time frame from when I
2 said, hey, I'm done, to the time that it actually got
3 submitted.  And somebody in Oklahoma reviewed it.  Who
4 that was, I don't know.
5      Q.    Do you know who had access to it in Oklahoma?
6          MR. LOMBARDINO:  Objection, calls for
7 speculation, lacks foundation.
8      A.    Anybody that had administrative payroll access
9 to Paycom.
10      Q.    I'm asking you, did you know who the people
11 were that had administrative payroll access?
12      A.    I --
13          MR. LOMBARDINO:  Objection, asked
14 answered.
15      Q.    I'm sorry?
16      A.    I do not know.
17      Q.    And to be clear, I'm not asking if you know
18 every single person.  Do you know anyone that did?
19      A.    I know that Alex had the ability.  Whether or
20 not he did, I do not know.
21      Q.    So just to be clear, what ability did Alex
22 have, according to your knowledge?
23      A.    He was the primary payroll individual for
24 several of the Mammoth companies.
25      Q.    Okay.

## JAMES D. KINSEY - April 22, 2022

1    A.    I mean, I don't know what his specific

2 responsibilities were.

3    Q.    And just to be clear, you know, because you're

4 the one that took us back to the termination issue, was

5 there anything about your termination that had to do

6 with entering in dollar amounts into Paycom?

7    A.    From what I remember, it was specific to the

8 per diems, and per diems were issued in dollar amounts.

9    Q.    Do you also recall in Paycom entering in

10 dollar amounts that were equivalent to day rates, like

11 under a Code DYR?

12    A.    Only for salary position people, never for --

13 I wasn't supposed to do it for non-salary people.

14    Q.    Right.  So I'm asking you, even though you

15 weren't supposed to, do you ever recall doing that?

16    A.    I don't remember doing it.

17    Q.    Okay.  Did you ever get in trouble for doing

18 that?

19    A.    No, sir.

20    Q.    That you can recall?

21    A.    That I can recall, correct.

22    Q.    Just to be clear, entering in dollar amounts

23 like day rate amounts for linemen, like if they missed a

24 day or to correct their pay, had nothing to do with your

25 termination?

1    A.    Correct.

2          MR. LOMBARDINO:  Objection, misleading.

3    Q.    I want to go back to talk more about this

4 transition time around July 23rd of 2018, between the

5 day rate or expected compensation, as you would put it,

6 and the new system after that time.  So I'm going to

7 show you what's been labeled as Exhibit 190.  Go ahead

8 and review this for me.

9    A.    Is that the bottom of the email?

10    Q.    It is.  I'll scroll down so you can verify.

11    A.    Okay.

12    Q.    What's going on with this email chain?  Can

13 you explain it?

14    A.    That was part of the reason why I asked if

15 that was all of it, because it seems like there's some

16 context missing.

17          Based on what I'm reading, it sounds like we

18 were just trying to transition from having to enter

19 16 hours a day and then doing the adjustments to just

20 the standard hourly rate with no adjustments.

21    Q.    And transitioning to a standard hourly rate

22 with no adjustments would be a lot easier, right?

23    A.    It would, because we no longer had to do

24 adjustments.

25    Q.    Right.  And when you mention that you're

1 trying to limit the number of day rate entries you put

2 into the system, what are you talking about there?

3    A.    It would be the 16 hours per day.

4    Q.    Why would you be trying to limit the number of

5 16's you would put?  Wouldn't you just put in what was

6 on the roster?

7    A.    Well, that's what was on the -- I mean, if you

8 were present on the roster during the restoration

9 effort, then you got 16 hours.

10    Q.    Right.

11    A.    And I was looking forward to the time when

12 I -- the employees could clock in and out and it would

13 make doing payroll on my end less stressful.

14    Q.    So let's make sure we're looking at the same

15 thing, because it seems like we're talking about two

16 different things.  I may be wrong.  Let's just look at

17 your email here.

18          I'll do what I can this round to try and limit

19 the number of day rate entries I put into the system.

20          What's a day rate entry?

21          MR. LOMBARDINO:  Objection, asked

22 answered.  He just told you what he meant by this email.

23    A.    I mean, the day rate was the vernacular that

24 we used, and it would have been having to go through and

25 make sure that the 16 hours per day and the adjustments

1 were taken care of.

2    Q.    Okay.  So the day rate entry is the 16?

3    A.    Yes.

4    Q.    Let's look at some example pay stubs.  It's

5 going to be Exhibit 170.

6          MR. MOULTON:  Ms. Court Reporter, before

7 we move on, on that last exhibit, did I mention it was

8 190?

9          THE REPORTER:  One second.  Let me look.

10 Yes, you did say "show you what's been marked Exhibit

11 190," yes.

12          MR. MOULTON:  Thank you so much.  Wanted

13 to make sure.

14    Q.    All right, sir.  I'm going to show you Exhibit

15 170.  Actually, to make this easier, I'm going to open

16 it up a little bit differently while we get started.  In

17 Exhibit 170, we have a pay stub for Mr. Justin Washburn,

18 correct?

19    A.    Okay.

20    Q.    And can you verify for me on this pay stub --

21 when you see -- you can see this is an hourly in

22 Puerto Rico, correct?

23    A.    Yes, sir.

24    Q.    So this means it's not a salaried worker?

25    A.    Correct.

## JAMES D. KINSEY  -  April 22, 2022

Page 94

1    Q.    And it's a Puerto Rican -- it's assigned to
2 the Puerto Rico Department, which would have been a
3 department you were working with during this time,
4 correct?
5    A.    Yes, sir.
6    Q.    In looking at this paycheck, when we see 32,
7 that corresponds to two days worked, right?
8    A.    Yes, sir.
9    Q.    And so we can see here it's $37.84 rate.  To
10 refresh your memory, we can go look at Exhibit 151,
11 which I'll just pull up for you, unless you already
12 know.  Do you remember what that $37.84 rate corresponds
13 to in terms of expected pay?
14    A.    I don't remember.
15    Q.    All right.  If we look on 151, we can tell.
16 After looking at 151, can you tell me which day rate the
17 $37.84 is associated with?
18    A.    The $37.84 would have been associated with a
19 Class B lineman.
20    Q.    Right.  Which is $800 per day in the chart?
21    A.    That's what they would have expected to
22 receive, compensation, yes.
23    Q.    So back to Exhibit 170, we can see with two
24 days at the $800 dollar level, which corresponds to
25 $37.84 per hour, he got paid $1600, which is two times

Page 95

1 $800, correct?  Do you see that?
2    A.    Yes, sir.
3    Q.    And what I wanted to ask you about is
4 specifically under the Day Rate column -- or the
5 Day Rate line, if you will, you see there's an $86.40
6 added to his regular and overtime earnings?
7    A.    Okay.
8    Q.    This is an example of one of the gross-ups,
9 right?
10    A.    Yes, sir.
11    Q.    So when you were doing gross-ups for workers,
12 this is the process you would have done.  You would have
13 gone to see what the expected pay was.  You would have
14 seen what the hourly and overtime was and then added the
15 difference, like in this case, $86.40, correct?
16    A.    Yes, sir.
17    Q.    If we look at the next pay stub for
18 Mr. Washburn in Exhibit 170, which is Bates numbered
19 Mammoth 7080, we see a pay period for May 14 to May 27
20 for Mr. Washburn.  Do you see that?
21    A.    Uh-huh.  Yes, sir.
22    Q.    Under the Day Rate column, we have just an
23 $800 entered in.  Can you explain that?
24    A.    Other than I did it, no, sir.
25    Q.    And to be fair, let's look at the Time Detail

Page 96

1 Report for him.  Can you see that this is a -- I just
2 jumped down in this document to the Time Detail Report
3 for Mr. Washburn.
4    A.    It's really hard to read, but --
5    Q.    Let me just scroll --
6          MR. LOMBARDINO:  For the record, do you
7 want to use a Bates number or -- because when you're
8 reading back, the record will just say this document,
9 that document.
10          MR. MOULTON:  So we're in Exhibit 170
11 still, but we've just jumped down to Mammoth 7081 in
12 that document.  Thank you.
13    Q.    So we're going to the pay period we were just
14 looking at, the one ending May 27.  Can you see it now?
15    A.    Yes, sir.
16    Q.    Do you see where it says Fixed (DYR) and
17 there's $800 under the Missing -- I'm sorry, under the
18 Dollars column?
19    A.    Yes, sir.
20    Q.    And then it has the Supervisor Approval is
21 jkinsey.  Do you see that?
22    A.    Yes, sir.
23    Q.    What does it mean when it says Supervisor
24 Approval, jkinsey, on this document?
25    A.    That I would have been the one that clicked

Page 97

1 approve on it.
2    Q.    Okay.
3    A.    Which was normal for all employees on the
4 island.
5    Q.    I mean, I've seen your name literally on
6 thousands of pieces of paper just like this.  That's how
7 it worked, right?  You were the one putting this in and
8 it would show you as approving it?
9    A.    That I would approve it and then it would get
10 sent to Oklahoma for final processing.
11    Q.    As far as you're aware, is there anything in
12 Paycom we could look at to see if there was further
13 approvals done after you?
14    A.    Not that I'm aware of, because they could have
15 approved of it and not changed it, or they could have
16 sent it back to me for an adjustment.  I don't remember.
17    Q.    Okay.  But here it says jkinsey, May 27, 2018,
18 which is the same day as the entry, right?
19    A.    Yes, sir.
20    Q.    So the way Paycom works, if someone else had
21 come in after you and changed your approval, would it
22 record it?
23    A.    It should --
24          MR. LOMBARDINO:  Objection, calls for
25 speculation, lacks foundation, calls for speculation.

## JAMES D. KINSEY  -  April 22, 2022

Page 98

1    A.    It should have -- if somebody changed
2  anything, they would have had to have unapproved it and
3  then reapproved it.
4    Q.    Okay.  And could they unapprove and reapprove
5  as you?
6    A.    No.
7    Q.    You had your own login?
8    A.    Yes, sir.
9    Q.    And you didn't share that login?
10   A.    I did not.
11   Q.    So back to the dollar amount entered here, can
12 you tell us why for an hourly worker you put in this
13 dollar amount of $800 and not the 16?
14   A.    I don't know why I would have done that.
15   Q.    Okay.  We're going to look at another pay stub
16 we have in this Exhibit 170.  Let's go to 14 -- Tyler
17 Halford, which is Mammoth 533 Bates number, and the pay
18 period we're looking at is March 5th to March 18th.  Do
19 you see this on your screen?
20   A.    Yes, sir.
21   Q.    Can you read it?
22   A.    Yes, sir.
23   Q.    So, again, we have another person here who is
24 at that $37.84 or $800 per day rate.  Do you see that?
25   A.    Yes, sir.

Page 99

1    Q.    Okay.  And so 160 hours on his paycheck
2  corresponds to ten days work, right?
3    A.    Yes, sir.
4    Q.    And so at that $800 level, his pay -- his
5  expected pay is $8,000, and that's what he got?
6    A.    I didn't know if you were asking me or telling
7  me.
8    Q.    I'm asking.
9    A.    I mean, he was at $37.84 and he worked for ten
10 days, and his expected compensation should have been
11 around that $8,000 mark.
12   Q.    Right.  And, in fact, because the hourly pay
13 and the overtime didn't get him there, he has a gross-up
14 that puts it exactly to that expected pay of $8,000,
15 right?
16   A.    Well, the expected pay wasn't exactly $8,000
17 and zero cents.  I mean, $800, at that rate, it was
18 slightly different than that.  But that was just what we
19 adjusted it to when we had to do adjustments.
20   Q.    So back on Exhibit 151, is it your testimony
21 that when it says for a person who's $800 per day,
22 Puerto Rico storm, that that's not what they can expect?
23         MR. LOMBARDINO:  Objection, asked and
24 answered.
25   A.    Over the course of 14 days, based on 16 hours

Page 100

1  a day, it would not have been exactly an even number.
2    Q.    Right.  There would have been some rounding.
3  It would have been off by less than a dollar?
4    A.    Correct.
5    Q.    Right.  But on this paycheck, we have one
6  that's not the full week like we've talked about.  When
7  it wasn't the full week, this $432 is the gross-up to
8  get him to his expected earnings, correct?
9    A.    To get him close to it, yes.
10   Q.    Is $8,000 close to it or is it exactly?
11   A.    It was close --
12         MR. LOMBARDINO:  Objection, asked
13 answered.
14   A.    I mean, it would have been close, because, I
15 mean, there would have been some cents associated with
16 that.
17   Q.    Okay.  So you're saying for all practical
18 reasons, it's the expected pay?
19         MR. LOMBARDINO:  Objection, asked and
20 answered.
21   A.    I would say for all intents and purposes, he
22 worked ten days and he was expecting around $8,000, and
23 that's what we adjusted it to.
24   Q.    On Mammoth 535 inside of Exhibit 170, pay
25 period for Tyler Halford, February 5th to February 18th,

Page 101

1  again, we have him at the $800 or $37.84 hourly rate,
2  and he worked five days in this one, correct?
3    A.    I guess.  If it's 16 times five, yeah, would
4  make sense.
5    Q.    Right.  And $800 times five is $4,000, which
6  is exactly his expected pay.
7    A.    Well, $4,000 is close to what the expected pay
8  would have been.
9    Q.    And this day rate of $518.72 is exactly the
10 amount needed to get him to $4,000 above his hourly pay,
11 correct?
12   A.    The $500 is what would have gotten us close to
13 the expected rate.
14   Q.    Okay.  And it's not $500.  It's $518.72,
15 correct?
16   A.    Yes, sir.
17   Q.    Inside Exhibit 170, we're going to scroll down
18 to page Mammoth 23.  That's the Bates number.  Pay
19 period is April 30th to May 13th, and it's for Robby
20 Alvear.  Do you see this document, sir?
21   A.    Yes, sir.
22   Q.    Okay.  Under Day Rate, we just have $6,400
23 entered as -- looks like to be one of these dollar
24 amount ones.  Would you agree with that?
25   A.    Yeah, that's what it looks like.

## JAMES D. KINSEY - April 22, 2022

Page 102

1    Q.   Okay.  And we can verify if we go to his
2 pay -- or his time records, the Time Detail Report,
3 which is Mammoth 24.  We can see here that he has $800
4 entered in as a Fixed (DYR) code by jkinsey for eight
5 days, correct?
6    A.   That's what it shows.
7    Q.   Right.  Can you explain why you were entering
8 in dollar amounts under the Day Rate code?
9    A.   I cannot explain it.  I don't know why I would
10 have done it.
11    Q.   Now, if you had put in his -- if you would
12 have put in his 16 hours per day, he still would have
13 got paid the same amount with the gross-up, right?
14    A.   It would --
15        MR. LOMBARDINO:  Objection, misleading.
16    Q.   Pardon?
17    A.   Somebody else started talking.
18        If I would have entered 16 hours per day with
19 the adjustment, it would have been close to the $6,400.
20    Q.   Okay.  It would have been off by a few
21 pennies?
22    A.   Yes, sir.
23    Q.   Now, after reviewing these documents of you
24 entering in dollar amounts per day, do you recall ever
25 anyone complaining at you because of that or raising an

Page 103

1 issue with you or writing you up or anything negative
2 about it?
3    A.   I don't recall anything.
4    Q.   So for these Paycom entries where you would
5 have put in the dollar amounts under Day Rate like we
6 just looked at, those would have been reviewed by other
7 people, right?
8    A.   Should have been.
9        Should have been.  Okay.
10        So it should have been reviewed by folks like
11 Mr. Kalman that you were submitting them to, right?
12    A.   I would think so.
13    Q.   Okay.  And you don't recall Mr. Kalman ever
14 telling you, hey, we're not supposed to do it that way?
15    A.   I don't remember him ever telling me that.
16    Q.   So as far as you knew, it was okay to do that?
17    A.   As far as I knew, that was an acceptable
18 practice.
19    Q.   And so you were -- as far as you're concerned,
20 Cobra and Mammoth were totally fine with that?
21    A.   Yes.
22    Q.   Let's look at Exhibit 214.  Go ahead and take
23 a look at that and let me know when you're ready to talk
24 about it.
25    A.   Okay.

Page 104

1    Q.   Can you explain to me what's going on with
2 this email, Exhibit 214.
3    A.   Looks like somebody transitioned to the island
4 and I was making sure that we were getting him paid
5 correctly.
6    Q.   Okay.  Are you familiar with the payroll code
7 called Day Rate?
8    A.   Yes, sir.
9    Q.   What is the Day Rate payroll code used for?
10    A.   Initially it was used to do -- for us to be
11 able to enter dollars per day.  When I first started on
12 the island, I had regular OT and Day Rate as my entry
13 options.
14    Q.   Okay.  So on the payroll records we were just
15 looking at, on the pay stubs, when it has a line,
16 Day Rate, that corresponds to the payroll code of
17 Day Rate?
18    A.   Yes.  The DYR on the timesheets would be
19 Day Rate.
20    Q.   Okay.  So the DYR is the code for the Day Rate
21 line in the pay stubs?
22    A.   Correct.  And we were using it to make the
23 adjustments.
24    Q.   To be able to access these codes like
25 Day Rate, did you need permission?

Page 105

1    A.   Yes.  Effectively, an administrator had to set
2 up your permissions for you to be able to access or
3 input anything.
4    Q.   Okay.  So this make sense then, that Missy
5 Davis, for example, to be able to use the Day Rate code,
6 would have to get authorization from someone who had it,
7 like Mr. Kalman?
8    A.   Yes.
9        MR. LOMBARDINO:  Objection, speculation.
10    Q.   Do you recall if Mr. Kalman ever -- do you
11 remember how you got your access to the Day Rate code?
12    A.   That was the way it was when I started.
13    Q.   So you actually had to get -- be given access
14 to the Day Rate code to be able to enter in Day Rate --
15 or dollar amounts under Day Rate?
16    A.   Yes, sir, because in the beginning days of the
17 restoration effort, that was what we thought we were
18 going to do, was pay people a straight day rate.  And
19 then as conversations were taking place with legal, it
20 was determined we couldn't issue a straight day rate for
21 reasons.  But that was the access that I had, so that's
22 what I had been told to use to make the adjustments.
23    Q.   And by the adjustments, we're talking about
24 the gross-ups we talked about earlier, right?
25    A.   Yes, sir.

## JAMES D. KINSEY  -  April 22, 2022

Page 106

1    Q.    Let's look at Exhibit 215.  Go ahead and take
2  a look at this and let me know when you're ready.
3    A.    Okay.
4    Q.    So were you asking Mr. Kalman if you could
5  just enter in dollar amounts for days worked under the
6  Day Rate code?
7    A.    That's what it appears to say.
8    Q.    Okay.  And that would have been like what we
9  were just looking at in the payroll records where we saw
10  like an entry of $800 for a worker.  Do you recall that?
11    A.    Yes, sir.
12    Q.    And what did you understand that Mr. Kalman's
13  response to be, that you were supposed to do it that way
14  or not?
15    A.    Based on this email, I should not have been
16  doing that.
17    Q.    Do you recall getting this email?
18    A.    I got a lot of emails.  I was in Puerto Rico,
19  and this was the day after Christmas.
20    Q.    Fair enough.
21    A.    No, I don't recall receiving this one.
22          MR. STUKENBERG:  What's the exhibit
23  number, Dave?
24          MR. MOULTON:  215.
25          MR. STUKENBERG:  Thanks.

Page 107

1    Q.    And so sitting here today, even after
2  reviewing some of these emails, you don't recall ever
3  being told not to enter in dollar amounts under the
4  Day Rate code?
5    A.    Other than this specific instance, I don't
6  remember any other instances, but if one happened, it's
7  certainly possible it could have happened other times.
8    Q.    Okay.  We're going to look at Exhibit 216.
9    A.    Okay.
10    Q.    So this is an email from Missy Davis to you,
11  correct?
12    A.    Yes, sir.
13    Q.    And she's talking about moving workers inside
14  the -- into the pay -- I'm sorry, into the Puerto Rico
15  department in Paycom and out of the Puerto Rico
16  department in Paycom, correct?
17    A.    Yes, sir.
18          MR. STUKENBERG:  Objection.  The document
19  says what it says, Dave.  If you want to ask him a
20  question, ask him a question.  Don't just ask does the
21  document say this.
22    Q.    I'm sorry, sir.  What was your answer?
23    A.    That's what it appears to say.
24    Q.    Right.  What is the significance of that,
25  moving folks in and out of the Puerto Rico department?

Page 108

1  What does that mean as far as access?
2          MR. LOMBARDINO:  Objection, calls for
3  speculation.
4    A.    I only had -- at that particular time, I only
5  had the ability to see the Puerto Rico department, which
6  meant I could only make -- enter hours if they were in
7  Puerto Rico department.  So what Missy is saying is, if
8  she -- before the guys transitioned, I wouldn't be able
9  to enter any time for them.  Once they returned back to
10  the states, I wouldn't be able to enter any time for
11  them.  And so she's just clarifying that during those
12  times, she would be taking care of their time entry.
13  Once they were in Puerto Rico, I would be taking care of
14  their time entry.
15    Q.    So in Exhibit 217, take a look at this one and
16  let me know when you're ready.
17          MR. LOMBARDINO:  We've been almost going
18  for an hour, so if we have a good break time.  I
19  generally like to take a break every hour.  I don't want
20  to interrupt your flow, Dave.  So when you get to -- at
21  the end of this exhibit or whatever, you know, we can
22  take a five-minute break, stretch our legs.
23    A.    Dave, can you scroll back to the bottom.  I
24  wasn't done reading it.
25    Q.    Yeah.  Sure.

Page 109

1    A.    Okay.  I'm ready.  Okay.
2    Q.    All right.  So you notice that the dates on
3  these emails are right around Christmas, right, December
4  27th, 2017?
5    A.    Yes, sir.
6    Q.    Do you recall a holiday bonus that was paid
7  companywide?
8    A.    I know that there was one paid, yes, sir.
9    Q.    Right.  And do you recall if the amount was
10  $1,111.11 for everyone?
11    A.    I think that's accurate.
12    Q.    And this email down here on December 26th,
13  when you mention that they're no longer in the system to
14  receive the bonus, you're talking about Christmas bonus,
15  correct?
16    A.    I don't necessarily think it was specific to
17  the fact that it was Christmastime.  It was just a bonus
18  that the senior management decided to pay out.
19    Q.    Oh, okay.  So not necessarily Christmas, but
20  it was one that everyone got in the company?
21    A.    It was the Puerto Rico employees, so not
22  everybody in the company got it.  But I remember the
23  significance of the $1,111, because that was
24  management's way of saying that we were the best, that
25  we were number one.

**JAMES D. KINSEY  -  April 22, 2022**

Page 110

1    Q.    Got it.  Okay.  So this email is talking about
2  that bonus, that $1,111, you're the best bonus to the
3  guys in Puerto Rico, correct?
4    **A.    That is part of this email chain, yes, sir.**
5    Q.    And then the other part is about -- again, we
6  have -- there's some information here where you're
7  talking about Missy moving names back into her group,
8  and once she does that, they're no longer visible to
9  you; is that right?
10   **A.    Correct.**
11        MR. MOULTON:  All right.  Because
12  Mr. Lombardino needs a break every hour, we will take a
13  short five-minute break.
14        VIDEOGRAPHER:  Off the record at 1:30.
15        (Recess taken 1:30-1:42.)
16        VIDEOGRAPHER:  Back on the record at 1:42.
17   Q.    (BY MR. MOULTON)  Mr. Kinsey, I promise this
18  is starting to get -- we're starting to see the light at
19  the end of the tunnel.  You won't be here hopefully too
20  much longer.
21        I want to show you Exhibit 204.  It's an
22  email.  I'll scroll down to the bottom and let you
23  review them, if you will.
24   **A.    Okay.  I'm good.**
25   Q.    In this email chain, you mention some

Page 111

1  complaints that you had heard from the workers.  Can you
2  tell us what the complaints were about.
3    **A.    I don't recall.  I mean, I can make an**
4  **assumption if you want me to.**
5    Q.    Well, let me -- looking at exhibit -- looking
6  at this Exhibit 204 -- and it's Bates number 3170.  Your
7  email on January 12th, can you tell us based on that
8  what the complaints were?
9    **A.    I'm assuming it had to do with pay not being**
10  **correct.**
11   Q.    So it looks like there had been some
12  adjustments, some gross-ups, that were supposed to have
13  been included but for some reason didn't get on the
14  check.  Is that what you understand happened?
15        MR. STUKENBERG:  Objection.  He already
16  testified he doesn't know what's going on in this email.
17  If you just want to say what the email says, we can all
18  read the email.
19   **A.    That's the way I understand it, that guys**
20  **should have gotten something and didn't receive it.**
21  **Beyond that, I don't know.**
22   Q.    Okay.  And so you and Missy started working on
23  getting that fixed, right?
24   **A.    That's --**
25        MR. LOMBARDINO:  Vague and ambiguous.  I

Page 112

1  don't know what "that" means.
2    Q.    You worked on getting the gross-ups fixed for
3  the next check?
4        MR. LOMBARDINO:  Objection, misstates
5  prior testimony.
6    **A.    Based on the text, that's what it appears to**
7  **be.**
8    Q.    Okay.  Do you recall what actually happened?
9  Did they get their gross-ups paid eventually?
10   **A.    They should have.  I mean, I can't say with**
11  **certainty that they did, but they should have.**
12   Q.    Okay.  And why do you say that they should
13  have got paid their gross-ups?
14   **A.    Because they were -- I mean, we had said that**
15  **we were going to provide a certain pay rate for the**
16  **guys, and if they were working on the island, then they**
17  **should have received that pay rate.**
18   Q.    Now, is it fair to say that you were
19  processing payroll for -- at least at some point for
20  hundreds of guys working on the island?
21   **A.    That's accurate.**
22   Q.    And it can get really busy with people coming
23  on and off and the adjustments that have to be made,
24  correct?
25   **A.    That is correct.**

Page 113

1    Q.    And from what I understand you testified
2  earlier, is that at least for the gross-ups, you're
3  going to have to enter those in manually, correct?
4    **A.    That is correct.**
5    Q.    And it would have been based on a calculation
6  that you would have done basically by hand?
7    **A.    Effectively.**
8    Q.    And so can you say one way or another whether
9  or not you were 100 percent perfect every single time
10  getting the correct gross amount or not?
11   **A.    I was not 100 percent perfect.**
12   Q.    Right.  You're a normal human being that makes
13  mistakes from time to time, correct?
14   **A.    Yes, sir.**
15   Q.    I can just tell from talking to you, though,
16  that you do your best to do your job correctly.  Would
17  you agree with that?
18   **A.    I try to do my best.**
19   Q.    You also -- it sounds like there's also a
20  system in place to verify that the amounts that you were
21  putting in were correct.  In other words, there was
22  other people reviewing your work, correct?
23   **A.    There was supposed to be.**
24   Q.    So if you were to make a mistake, for it to go
25  through to payroll, it would have to get past other

## JAMES D. KINSEY - April 22, 2022

Page 114

1 people?

2    **A.**   **Yes, sir.**

3    Q.   If they were doing their job?

4    **A.**   **That would be an accurate assumption.**

5    Q.   Right.

6          MR. STUKENBERG:   What exhibit were you

7 just on, Dave?

8          MR. MOULTON:   It may have been 204.   I'm

9 not sure.

10    Q.   Mr. Kinsey, I want to talk with you about

11 Exhibit 218.

12    **A.**   **Okay.**

13    Q.   Can you tell us what's going on in this

14 Exhibit 218.

15    **A.**   **It looks like I didn't enter time in correctly**

16 **and had to go back and fix it.**

17    Q.   And it looks like you had been out late and

18 just made a mistake?

19    **A.**   **Considering that was my anniversary, I think I**

20 **had -- was probably the first day off I had taken in**

21 **months.**

22    Q.   Okay.   Were you still on island?

23    **A.**   **Yes.**

24    Q.   Okay.   You're aware of the no alcohol policy

25 on the island?

Page 115

1    **A.**   **That is correct.**

2    Q.   Is that a policy that you abided by

3 100 percent?

4    **A.**   **100 percent.**

5    Q.   So even on an anniversary, you didn't drink?

6    **A.**   **I don't drink, period.**

7    Q.   Oh, okay.   Good for you.   Neither do I.

8    So for any mistakes that may have been in

9 payroll would have just been normal mistakes.   It

10 wouldn't have been compounded by, say, alcohol?

11    **A.**   **That is correct.**

12    Q.   And it's safe to say you're not a drug user?

13    **A.**   **That is correct.**

14    Q.   So we're not talking about a situation where

15 there could have been massive errors in the payroll

16 based on someone who was drinking too much or doing

17 drugs?

18    **A.**   **Correct.**

19    Q.   Okay.   Let's look at Exhibit 219.   So in

20 Exhibit 219, on the first page we have an earnings

21 statement for Dakota Bunch for the pay period July 9th

22 to July 22nd.   Do you see that?

23    **A.**   **Yes, sir.**

24    Q.   And on this one we can see we have this $47.30

25 rate, which, according to trusty Exhibit 151 which I'm

Page 116

1 showing you right now, it corresponds to the thousand

2 dollar rate for a journeyman lineman, right?

3    **A.**   **Okay.**

4    Q.   So back at the pay stub, we can see with 208

5 hours reflected on the pay stub, that would correspond

6 with 13 days work, correct?

7    **A.**   **Sure.**

8    Q.   And that 13 days work, you get $13,000 at that

9 rate when you get your gross-up, right?

10    **A.**   **It would have been that ballpark, yes, sir.**

11    Q.   And these gross-ups, you would have calculated

12 it like that.   You would have taken the $13,000 minus

13 what this hourly and overtime was, right?

14          MR. LOMBARDINO:   Objection, asked and

15 answered on prior exhibits.

16    **A.**   **Yes, that's what I would have done.**

17    Q.   Okay.   So at this $47.30 rate, the 13 days, we

18 know the gross-up is $134.40, right?

19    **A.**   **Okay.**

20    Q.   And we have an identical pay stub for

21 Mr. Bunch for a different pay period, June 25th to July

22 8th, where again we see 13 days, $13,000.   The gross-up

23 is $134.40.   Do you see that?

24    **A.**   **Yes, sir.**

25    Q.   So $134.40 is the right gross-up for a person

Page 117

1 who is at this $47.30 per hour rate when they work

2 13 days, correct?

3    **A.**   **That appears to be accurate.**

4    Q.   Dakota's pay stubs go on -- timesheets go on

5 forever.

6    The next one for Justin Norman, we're looking

7 in this same exhibit which is Exhibit 219.   We're going

8 to Bates number Mammoth 7941 where we have an earnings

9 statement for Justin Norman for the pay period April

10 30th to May 13th.   Do you see this one?

11    **A.**   **Yes, sir.**

12    Q.   Okay.   So this $47.30 rate corresponds to that

13 rate we just saw in Exhibit 151, correct?   It comes out

14 to $1,000 a day -- is the expected pay, right?

15    **A.**   **That would be, yes.**

16    Q.   As you can see on this pay stub for Justin

17 Norman back in Exhibit 219, he only got paid $946.   I

18 was wondering if you could explain that.

19    **A.**   **Yeah.   I missed it.**

20    Q.   Okay.   Do you know why you would have put the

21 hours in as eight regular and eight overtime for 16

22 instead of just putting 16?

23    **A.**   **No.   I mean, I would have -- should have just**

24 **put 16 in.**

25    Q.   So this is an example of a pay stub that

JAMES D. KINSEY - April 22, 2022

Page 118

1 appears, in your opinion, to have a mistake on it?

2   A.   Yes, sir.

3        MR. LOMBARDINO:  Objection, calls for

4 speculation.

5   Q.   This is not the way that you were -- that you

6 thought you were supposed to do it?

7   A.   I would say yes.  I mean, he didn't receive

8 the expected compensation.

9   Q.   And it wasn't entered exactly right either,

10 because it should have just been 16, right?

11  A.   That could just be a Paycom -- where Paycom

12 automatically adjusted it to eight hours of overtime and

13 eight hours of regular over a single day.

14  Q.   Okay.

15       MR. STUKENBERG:  What exhibit is that,

16 Dave?

17       MR. MOULTON:  It's one I compiled for

18 today.  It's Exhibit 219.

19  Q.   And, Mr. Kinsey, we're going to go -- if we

20 just jump down real quick, a few pages down to like,

21 say, Mammoth 7944 on this exhibit.  And I'm going to

22 zoom in for you.  I know you're looking close.

23  A.   Yeah, it's super blurry.

24  Q.   Oh, is it?

25  A.   Yeah.

Page 119

1   Q.   If I scroll in more, let's see if you can see

2 it better.

3   A.   Yeah, I can understand that now.

4   Q.   Okay.  It looks like on Bates number 7944,

5 that there is a portion of the pay where it is broken up

6 into eights like you were talking about.

7   A.   So on that particular day, there's only eight

8 hours entered, and there's a per diem entered which

9 means he was not on the island at that day.

10  Q.   Okay.  Oh, I see.  I see.  So maybe that

11 paycheck isn't wrong because it was -- he wasn't quite

12 on the island yet.

13  A.   Well, but that paycheck only showed eight

14 hours of regular and eight hours of overtime, and

15 according to this, there still should have been 64 hours

16 total, so I don't know what -- I can't speculate.

17  Q.   Okay.

18  A.   But the only time an individual received a

19 per diem was if they were transitioning to the island.

20 That would have covered basically the cost of food,

21 because the housing would have been paid for during

22 orientation and travel.

23  Q.   And just to be clear, let's -- let's look at

24 this again, because for the one we're talking about

25 where he was paid $946, this is the pay period April

Page 120

1 30th to May 13th.  Do you see that?

2   A.   Yeah, 4/30 to 5/13.

3   Q.   Yeah.  We were actually looking in the wrong

4 section.  Let's try that again.

5        So April 30th to May 13th, if you look down

6 here, you see that it is just the one day, right?

7   A.   Yes, sir.  So at that point -- I'm

8 speculating, but I'm assuming Paycom just corrected it

9 to eight hours of regular and eight hours of overtime

10 for that day, but that's a Paycom thing.

11  Q.   Okay.  Now, if we look in his pay period for

12 April 16th to April 29th inside of Exhibit 219, which is

13 Mammoth 7942 -- if we look here, this is just like the

14 pay stubs we saw for Dakota Johnson.  Was it Johnson?

15 Dakota Bunch.

16       Dakota Bunch, Exhibit 219, first page, Mammoth

17 4774, when you have a guy at this level, at $47.30 at

18 13 days, the gross-up is supposed to be $134.40.  We

19 established that.  Do you recall that?

20  A.   That's what we talked about, yes, sir.

21  Q.   So let's -- I just want to show you what we

22 have down here for the next guy, Justin Norman.  So on

23 Justin Norman -- and we're now on Mammoth 7942 in

24 Exhibit 219.  It's basically the same thing.  It's

25 $47.30.  It's 208 in just 13 days, right?

Page 121

1   A.   Uh-huh.

2   Q.   But his gross stub is $134.34.  Do you see

3 that?

4   A.   Yes, sir.

5   Q.   And so this is the -- this isn't quite right.

6 It's supposed to be $134.40, right?

7   A.   It should have been close to that, yes.

8   Q.   Okay.  Well, I mean, Justin Norman's at the

9 exact same pay scale as Dakota Bunch, right?

10  A.   Right.  I would have thought that I would have

11 entered the same for Dakota as I would have Justin.  I

12 don't have an explanation as to why I didn't.

13  Q.   Right.  I mean, but, you know, look, you're

14 typing them in manually and -- I mean, I don't know what

15 you did, but it looks to me you could have easily typed

16 in 34 again instead of putting in 40, because that

17 number had a 34 in it, right?

18       MR. LOMBARDINO:  Objection, asked and

19 answered, argumentative.  He's already answered he

20 didn't recall why the numbers are the way they are.

21 Also, I think Dakota might be a female, not a male.

22       MR. MOULTON:  Okay.

23  Q.   Do you know, Mr. Kinsey?  Do you remember

24 Dakota?

25  A.   I don't remember any female linemen.

**JAMES D. KINSEY  -  April 22, 2022**

Page 122

1    Q.   Okay.
2    A.   The only females I remember working for us
3 were located within our office.  Pretty sure it was a
4 gentleman.
5    Q.   Well, looking back at --
6              MR. STUKENBERG:  Hey, Dave.  I've got that
7 call at 2:00.
8              MR. MOULTON:  Oh, okay.
9              MR. STUKENBERG:  Shouldn't take more than
10 about ten minutes.
11             MR. MOULTON:  All right.  Well, hurry up.
12             VIDEOGRAPHER:  Off the record at 2:00 p.m.
13             (Recess taken 2:00-2:32.)
14             VIDEOGRAPHER:  Back on the record at 2:32.
15    Q.   (BY MR. MOULTON)  Mr. Kinsey, we're just about
16 ready to finish up here.  I just had a few more
17 questions for you.  I want to show you what's been
18 marked as Plaintiff's Exhibit 220, and it's a short
19 email here I want you to review.
20    A.   Okay.
21    Q.   Do you know who Gerry Morgan is?
22    A.   I don't remember.  I was just sitting here
23 thinking about that.
24    Q.   Well, were there some guys that came on the
25 island through like a recruiter?

Page 123

1    A.   No, not that I was aware of.
2    Q.   Okay.  Do you know why Gerry is writing Missy
3 and you about this new worker and he would get paid
4 $1,250, less his 10 percent?
5    A.   I'm speculating, but again, less than
6 10 percent would have been just a joke, because I don't
7 have any recollection of anybody being compensated for
8 recruiting.  I really don't know.  I mean, I know that
9 in certain circumstances if we were looking for specific
10 positions, someone might know a guy, and if we needed
11 somebody, then they would recommend and then we would
12 start trying to work on the process to get them hired so
13 that we could get them down there.  Beyond that, I
14 don't -- I don't remember Randall Palmer or Gerry
15 Morgan.  The name sounds familiar, but I can't place
16 them.
17    Q.   Okay.  And my question, I guess, is a little
18 more general.  You're not aware of anyone working in
19 Puerto Rico as a lineman that would have been paid less
20 because Cobra would have been paying like a headhunter
21 fee or a recruiter fee?
22    A.   Not that I'm aware of.  The only person I'm
23 aware of that was recruited was a senior VP of
24 operations.
25    Q.   Okay.  Who was that?

Page 124

1    A.   I don't remember his name.  I just remember he
2 was hired to help run things.
3    Q.   Okay.
4    A.   But no linemen.
5    Q.   Are you -- do you have any family members or
6 close acquaintances that still work for any of the
7 Mammoth entities or Cobra?
8    A.   No.  By and large, everyone that I worked with
9 at that time was terminated for various reasons.
10    Q.   Okay.  Was Missy Davis terminated?
11    A.   Not that I'm aware of.
12    Q.   When you say --
13    A.   Let me clarify that.  The people that I worked
14 with hand in hand in Puerto Rico, a lot of us were
15 terminated.
16    Q.   Okay.  Can you walk me through that list of
17 the people you're thinking about.
18    A.   I mean, I know some folks like Jason -- I
19 can't remember his -- Jason Russell.  I know he was
20 terminated.  I know Ken Kinsey was terminated.  I was
21 terminated.  I know Ken's assistant was terminated.  I
22 know there was a lot of people that were terminated
23 during that transition from restoration to
24 reconstruction.
25    Q.   Okay.  Sir, have you provided truthful

Page 125

1 testimony today?  Have you answered all my questions
2 truthfully?
3    A.   I have, yes, sir.
4    Q.   Sitting here today, is there -- and thinking
5 about your testimony today, are you aware of any
6 corrections or anything that you feel that you would
7 need to add for your record to be complete at this time?
8    A.   At this time, I believe I've answered
9 everything as truthfully as I can remember.
10             MR. MOULTON:  I appreciate your time
11 today, sir.  We very much appreciate you being willing
12 to come in and testify.  We know it's not an easy
13 experience, and we're grateful for your time in doing
14 this.  So with that, we'll go ahead and pass the
15 witness.  I'm assuming Will and/or Michael may have some
16 questions for you.
17             MR. STUKENBERG:  Michael, do you want to
18 go first?
19             MR. LOMBARDINO:  Sure.
20                   EXAMINATION
21 BY MR. LOMBARDINO:
22    Q.   I have a few questions.  I won't be near as
23 long as Mr. David, but I do want to ask you a few
24 questions to make sure your testimony is clear.
25             In your view as the payroll manager, were they

## JAMES D. KINSEY - April 22, 2022

Page 126

1 paid a strict day rate or were they paid an hourly rate
2 plus overtime?
3          MR. MOULTON:  Objection, form.
4     **A.   The way I understood it was an hourly rate**
5 **plus overtime.**
6     Q.   If they were paid a day rate, would there have
7 been cents on their paycheck or just dollars?
8          MR. MOULTON:  Objection, form.
9     **A.   It would have been just dollars.  There would**
10 **have been no need for hourlies.**
11     Q.   Now, as the payroll manager, were you the
12 highest person in the company who dealt with personnel
13 issues -- I'll withdraw that question.
14          Were the highest person in the company that
15 dealt with payroll -- with personnel issues, or were
16 there people above you?
17     **A.   There was people above me.**
18     Q.   And when you were entering hours into the
19 system, once you were finished entering hours, you don't
20 know what happened to the data after you finished
21 entering the hours, right?
22          MR. MOULTON:  Objection, form.
23     **A.   Correct.**
24     Q.   So you had no control over what the amount was
25 on the actual paycheck?

Page 127

1          MR. MOULTON:  Form and leading.
2     Q.   Did you have control over the amount of the
3 actual paycheck?
4          MR. MOULTON:  Form and leading.
5          MR. LOMBARDINO:  That's not leading.
6     **A.   Once I entered the hourly rate or the**
7 **adjustments, after that, I had no control over it.**
8     Q.   In your view, what would have happened if the
9 workers were not getting paid what they were hoping to
10 be paid?
11          MR. MOULTON:  Objection, form.
12     **A.   From what guys told me, if they didn't get**
13 **paid what they were expecting, then they were going to**
14 **quit.**
15          MR. LOMBARDINO:  What was your form
16 objection?
17          MR. MOULTON:  He's already answered that
18 question and also calls for speculation.  And I'm not
19 going to explain objections.  We're just going to go on.
20          MR. LOMBARDINO:  Okay.  If those were your
21 only two objections, then I won't ask it again.
22          I think that's all the questions I have
23 for you at the moment.  I'm going to pass the witness.
24                    EXAMINATION
25 BY MR. STUKENBERG:

Page 128

1     Q.   Mr. Kinsey, you indicated that the vernacular
2 you-all would use in Puerto Rico was day rate as
3 shorthand; is that accurate?
4     **A.   Yes, sir.**
5     Q.   And so you would call it a day rate in lieu of
6 using a phrase like daily expected compensation based on
7 a 16-hour day paid hourly with OT, or something to that
8 effect?
9          MR. MOULTON:  Objection, form.
10     **A.   Yes, sir.**
11     Q.   But when you said day rate, what did you
12 actually mean?
13          MR. MOULTON:  Objection, form.
14     **A.   I mean, when we talked about day rate, that**
15 **was -- it was what the guys expected to get paid for**
16 **their day of work.  I mean, it was -- everybody in the**
17 **office knew that we were -- that the linemen were**
18 **getting paid an hourly rate.  It was just how the**
19 **conversation started, was day rate, and we just carried**
20 **on with that.**
21     Q.   Okay.  And when you used the phrase day rate,
22 would you describe what the actual pay practice was that
23 you were referring to.
24     **A.   No.  It was just -- that was just the phrase**
25 **we used.**

Page 129

1     Q.   No, but can you explain to me what the pay
2 practice you were referring to was when you used the
3 phrase day rate.
4     **A.   Oh, I understand.  When we would talk about**
5 **day rate, we would talk about the 16 hours per day, the**
6 **total compensation.  So if an individual was supposed to**
7 **receive $1,000 per day, that was what they expected.**
8 **Then we would enter 16 hours per day and then make**
9 **whatever adjustments we needed to, to make sure they**
10 **were correctly compensated.**
11     Q.   Okay.  So you were referring to the 16 hours a
12 day with hourly pay plus overtime?
13     **A.   Yes, sir.**
14          MR. MOULTON:  Objection, form.
15     Q.   I'm sorry.  I didn't hear your answer.
16     **A.   Yes, sir.**
17          MR. MOULTON:  Same objection.
18     Q.   If you'd wait just a second before you answer
19 so Mr. Moulton can get his objection in, then we can
20 hear your answer.
21          Can you repeat your answer, please.
22     **A.   Yes, sir.**
23     Q.   Okay.  We saw a lot of emails about
24 adjustments and changes in compensation.  Were there a
25 lot of communications about adjustments to compensation

**JAMES D. KINSEY  -  April 22, 2022**

Page 130

1 other than the gross-ups that we've discussed today?

2    A.   Not that I'm aware of.

3    Q.   Okay.  You don't recall instances where like

4 somebody was entered at the wrong position so their

5 hourly rate was off, things like that?

6    A.   That did happen, yes, sir.

7    Q.   Okay.  And you would make adjustments when

8 that occurred?

9    A.   Yes, sir.  So, for instance, if somebody was a

10 journeyman lineman in the system but they were supposed

11 to be a foreman, obviously two different pay rates, and

12 so I would have to go in and make sure that that pay

13 rate was corrected so they would receive their correct

14 pay.

15    Q.   And we've seen some of that in the exhibits

16 reviewed today?

17    A.   I don't know that we saw that specific

18 example.

19    Q.   Okay.  Prior to working for Cobra, did you

20 have any payroll experience?

21    A.   I did not.

22    Q.   Did you have any experience with compliance

23 with the Fair Labor Standards Act?

24    A.   I did not.

25    Q.   Did you view it as your role to be responsible

Page 131

1 for compliance with the Fair Labor Standards Act?

2    A.   I did my best, but I trusted that my

3 supervisors were going to hold me accountable.

4    Q.   Is it your understanding that Mr. Beagle was

5 the one that created the pay practice at issue here?

6    A.   I was not aware who created it.

7    Q.   Okay.  But people above you within the human

8 resources department created the pay practice at issue?

9    A.   From what I understood, yes.  I knew Jeff was

10 the HR director for Mammoth, and I was under the

11 impression that he, amongst others, were responsible for

12 the pay structure.

13    Q.   Okay.  You were an execution person, not a

14 policy formulation person; is that fair?

15         MR. MOULTON:  Objection, form.

16    A.   That is correct.

17    Q.   Okay.  Did you have prior experience with

18 Paycom before joining the organization?

19    A.   I did not.

20    Q.   So you don't consider yourself like a Paycom

21 expert or anything?

22    A.   No, sir.

23    Q.   Okay.  You were instructed to enter hourly and

24 overtime for the non-exempt employees; is that accurate?

25    A.   That would be correct.

Page 132

1    Q.   And you were similarly instructed not to enter

2 day rates with flat amounts of pay for non-exempt

3 employees?

4    A.   Per the --

5         MR. MOULTON:  Objection, form.

6    A.   Some of the emails that we looked at earlier,

7 that's what I was instructed.

8    Q.   Now, for exempt employees, it's my

9 understanding that they received their base salary plus

10 an amount per day?

11    A.   That is correct.

12    Q.   And then the non-exempts received hourly with

13 overtime?

14         MR. MOULTON:  Objection, form.

15    A.   Yes, sir.

16    Q.   And so if the non-exempts were being paid a

17 day rate, you could have just keyed in a day rate in the

18 same way that you did for the exempt employees, correct?

19    A.   That is correct.

20    Q.   And you were instructed not to do that but

21 rather to enter hours so it would generate an hourly

22 with overtime pay structure?

23    A.   Yes, sir.

24    Q.   We heard some testimony earlier today about

25 gross-ups or day rate adjustments.  Do you recall that?

Page 133

1    A.   We've talked a lot about that.

2    Q.   Okay.  Do you want to refer to that as a

3 gross-up?  Is that a fair term to use?  I've seen that

4 in some of the emails.

5    A.   Yes.

6    Q.   Are you comfortable with that term?

7    A.   Yes, sir.

8    Q.   I heard you say earlier that for changes to

9 compensation -- again, you were not the one setting

10 policy, correct?

11         MR. MOULTON:  Objection, form.

12    A.   Correct.

13    Q.   And I believe you testified earlier that you

14 had to get approval for modifications for the

15 compensation practice, right?

16    A.   In the beginning, yes, I had to go through

17 someone in Oklahoma to get changes made.

18    Q.   Okay.  So for gross-ups, you would need to get

19 approval for that?

20    A.   In the beginning I would send those to

21 Oklahoma, and they would approve it, deny it, correct

22 it.

23    Q.   Okay.  And so you would get feedback from

24 people in Oklahoma or others to make modifications to

25 the gross-ups?

**JAMES D. KINSEY - April 22, 2022**

Page 134

1    A.    I didn't typically receive feedback.  They
2  would just do it and move on.
3    Q.    So they would actually make the changes
4  themselves?
5    A.    Uh-huh.
6    Q.    Got it.
7    A.    At least as much as I'm aware, yes.
8    Q.    Okay.  And so they would change it, delete it,
9  add it, whatever they wanted to do.  You weren't privy
10  to that?
11         MR. MOULTON:  Objection, form.
12    A.    That's correct.
13    Q.    Is it also correct that you don't know the
14  reasons why these other parties made these adjustments?
15    A.    Any adjustments made after I sent it off, I
16  have no clue what the reasons were.
17    Q.    Okay.  You can't say definitively one way or
18  the other whether you were ever instructed not to pay
19  somebody a gross-up?
20    A.    I would agree to that.
21    Q.    You just don't remember either way?
22    A.    I don't recall anybody telling me not to.
23    Q.    Okay.  So it's plausible that happened and you
24  just don't remember?
25    A.    It's possible.

Page 135

1    Q.    Once you entered information on Paycom, other
2  people would review it, correct?
3    A.    Yes, sir.
4    Q.    And they would make changes to it?
5         MR. MOULTON:  Objection, form.
6    Q.    They could make changes to it?
7         MR. MOULTON:  Objection, form.
8    A.    They could.
9    Q.    Do you recall instances where that happened?
10    A.    I do not recall any.
11    Q.    Okay.  But there were multiple people that had
12  authority and access to make those edits or revisions?
13         MR. MOULTON:  Objection, form.
14    A.    That is correct.
15    Q.    And within the Paycom time tracker system, how
16  knowledgeable are you of that system?
17         MR. MOULTON:  Objection, form.
18    A.    Novice level.
19    Q.    Novice level.
20         So earlier I think you testified that if a
21  modification were made, it would be reflected in the
22  reviewer column.
23         You don't actually know that to be accurate
24  one way or the other, do you?
25         MR. MOULTON:  Objection, form.

Page 136

1    A.    I don't know that for certain.
2    Q.    So it's plausible that somebody could have
3  made a modification on the time entry report and it
4  would still reflect you as the approver?
5         MR. MOULTON:  Objection, form.
6    A.    It's possible.  I don't know enough about the
7  system to know what particulars.
8    Q.    Okay.  So when you testified earlier today
9  that you showing as the reviewer means nobody else ever
10  made a modification, you don't know if that's true or
11  not?
12    A.    I felt that it was true, but I can't say with
13  certainty.
14    Q.    Okay.  And you tracked -- you were responsible
15  for tracking this payroll data, correct?
16    A.    Yes, sir.
17    Q.    But other people could access and make
18  modifications to it, right?
19         MR. MOULTON:  Objection, form.
20    A.    That is correct.
21    Q.    And we saw some emails earlier today where
22  Missy Davis or Alex Kalman or different individuals were
23  actually making modifications --
24         MR. MOULTON:  Objection, form.
25    Q.    -- to compensation.  Do you recall that?

Page 137

1    A.    Yes, sir.
2    Q.    You're aware that there were instances where
3  somebody worked a short workweek but did not receive a
4  gross-up.  You're aware that happened?
5    A.    I know that there were times I missed making
6  gross adjustments.
7    Q.    Okay.  And are you aware that there are times
8  where individuals did not receive a gross-up that was
9  not the result of your making an error?  Do you know one
10  way or the other?
11    A.    I don't.
12    Q.    Okay.  So if we see a pay stub where somebody
13  worked a short week and there was no gross-up, you can't
14  say one way or the other whether that was a mistake that
15  you made or perhaps an adjustment that somebody else
16  made?
17         MR. MOULTON:  Objection, form.
18    A.    I couldn't say one way or another.  I mean --
19    Q.    You don't --
20    A.    We looked at an example earlier where there
21  was no adjustment, and I don't know why.
22    Q.    Okay.  So you don't know if that was a mistake
23  or somebody intentionally didn't pay the gross-up and
24  made that decision.  You don't know either way?
25         MR. MOULTON:  Objection, form.

**JAMES D. KINSEY  -  April 22, 2022**

Page 138

1    A.   That's correct.
2    Q.   And is that true of any given pay stub where
3  somebody worked a short week and did not receive a
4  gross-up, you can't say why that didn't happen?
5         MR. MOULTON:  Objection, form.
6    A.   I would agree.  I mean, I don't know.
7    Q.   There's no way to tell just from the pay stub?
8    A.   Correct.
9    Q.   So you would gather information and assemble a
10 spreadsheet for those who had a short workweek and would
11 be eligible for gross-up, correct?
12        MR. MOULTON:  Objection, form.
13   A.   In a manner, yes.
14   Q.   And then once you assembled that information,
15 you would share it with other people within the
16 organization?
17   A.   In a manner, yes.
18   Q.   And then would other people have authority to
19 make changes to the information, the data you would
20 gather?
21        MR. MOULTON:  Objection, form.
22   A.   Yes, sir.
23   Q.   And so somebody like, for instance, Jeff
24 Beagle could elect not to pay a gross-up if he so chose?
25        MR. MOULTON:  Objection, form.

Page 139

1    A.   He had the authority to do that.
2    Q.   Okay.  So let's just kind of go through a
3  list.  There's Jeff Beagle, Alexander -- Alex Kalman,
4  Ken Kinsey, Keith Ellison.  If any of those people made
5  a decision not to pay a gross-up, you wouldn't have paid
6  it, right?
7         MR. MOULTON:  Objection, form.
8    A.   If they had told me not to pay someone, then I
9  wouldn't have paid them.
10   Q.   And they all had authority to make that call
11 one way or the other?
12        MR. MOULTON:  Objection, form.
13   A.   From what I understand, yes.
14   Q.   It wasn't your call to make?
15   A.   Correct.
16   Q.   It was -- somebody higher up was making those
17 decisions?
18   A.   Yes.
19   Q.   Okay.  And again, there were other people that
20 could have made those modifications in Paycom, had that
21 authority to do so?
22        MR. MOULTON:  Objection, form.
23   A.   Yes, sir.
24   Q.   Okay.  And had access.  I know Dave keeps
25 objecting, so just --

Page 140

1         MR. STUKENBERG:  Dave, if you can help me
2  out, because I want to get the question correct.
3    Q.   When I say access or authority, what I'm
4  trying to get at is, they actually had the credentials
5  to log into Paycom and make these changes.  That's the
6  question I'm asking.  Is that accurate?
7         MR. MOULTON:  Objection, form.
8    A.   There were many people, including Jeff Beagle,
9  Ken Kinsey, Keith Ellison, Alex Kalman, that had the
10 credentials to log into Paycom and make whatever changes
11 to the system that they wanted to.
12   Q.   And they could do that after you had gathered
13 the data and input?
14        MR. MOULTON:  Objection, form.
15   A.   They could do it whenever they wanted to.
16   Q.   Okay.  I know you testified earlier that there
17 were occasions where mistakes could have happened in
18 payroll, correct?
19   A.   Yes.
20   Q.   But there were also a lot of checks and
21 balances to make sure payroll was accurate, correct?
22   A.   Yes.
23   Q.   I mean, there were multiple people reviewing
24 each payroll cycle to verify that it was correct?
25   A.   Yes.

Page 141

1    Q.   So is it fair to say that the payroll was more
2  than likely accurate?
3    A.   It was as accurate as I could make it.
4    Q.   Okay.  Coupled with everybody else involved
5  reviewing and verifying its accuracy, correct?
6    A.   Yes.  And we did our absolute best so that
7  come payday, guys got paid correctly.  Pissed off
8  employees don't make for good employees.
9    Q.   Right.  And presumably if somebody was --
10 strike that.
11        MR. STUKENBERG:  Let's pull up -- Anthony,
12 if you can pull up -- well, Dave, this is actually your
13 exhibit.
14        MR. MOULTON:  Which one you want?
15        MR. STUKENBERG:  219.  And pull up 4796.
16 I wonder if I got the wrong exhibit.  I got Exhibit 19,
17 page 4796.
18        MR. MOULTON:  219, right?  I don't have a
19 19.
20        MR. STUKENBERG:  Yeah, yeah, 219.
21        MR. MOULTON:  And what page?
22        MR. STUKENBERG:  4796.  It's a document
23 you were asking about earlier today.
24        MR. MOULTON:  I don't see a 4796.
25        MR. LOMBARDINO:  Go back up.  You were at

## JAMES D. KINSEY - April 22, 2022

Page 142

1  4795.
2           MR. MOULTON:  Yeah.  I don't -- there's
3  not one after it.
4           MR. LOMBARDINO:  You skipped pages in that
5  exhibit?
6           MR. MOULTON:  This is just a compilation
7  of various payroll --
8           MR. STUKENBERG:  What is the page at the
9  bottom that's partial showing?
10          MR. MOULTON:  There's not a partial.
11 Oh --
12          MR. STUKENBERG:  Norman Johnson --
13          MR. MOULTON:  Yeah, 7941.
14          MR. STUKENBERG:  7941.  Sorry.  I read
15 that 4796 because I was looking at the page before.
16     Q.   So this is Exhibit 219, page --
17          MR. STUKENBERG:  What was it?  7941?
18     Q.   So, Mr. Kinsey, this is an example where
19 somebody worked a short week.  Do you see that?
20     A.   Yes, sir.
21     Q.   It looks like the person worked one day --
22     A.   Yes.
23     Q.   -- correct?
24          And there's no gross-up paid on that day; is
25 that accurate?

Page 143

1      A.   Per this pay stub, yes, sir.
2      Q.   And you have no idea why gross-up was not paid
3  that workweek, correct?
4      A.   I don't know.
5      Q.   And it's plausible that somebody made the
6  decision to not pay a gross-up in this instance?
7           MR. MOULTON:  Objection, form.
8      A.   It's possible.
9      Q.   You just don't know one way or the other?
10     A.   I do not.
11          MR. STUKENBERG:  Anthony, can you pull up
12 4885.
13          MR. ARTEAGA:  Give me a second.
14          MR. STUKENBERG:  Sure.
15     Q.   While he's doing that, Mr. Kinsey, you were
16 ultimately terminated for making what the company
17 believed were payroll errors.  That's what you were told
18 anyway?
19     A.   Yes, sir.
20     Q.   And do you know everyone that was involved in
21 the decision to terminate your employment?
22     A.   I believe it was just Michelle Poling and
23 Keith Ellison.  If others were involved, I'm not aware
24 of it.
25     Q.   Okay.  And you don't know if Michelle or

Page 144

1  Mr. Ellison had any conversations with anybody else
2  about your separation?
3      A.   I don't believe so, but I don't know.
4      Q.   And you don't know if there were reasons
5  beyond what you were told for your termination?
6      A.   There could be reasons beyond that, but I have
7  no clue.
8      Q.   Okay.  And you were, we saw in some emails
9  earlier today, counseled several times about not
10 hard-coding in day rates for non-exempt employees,
11 correct?
12     A.   That is what we saw in the emails.
13     Q.   And do you recall why you on occasion
14 hard-coded day rate flat amounts for non-exempt
15 employees?  Was that just an error?
16     A.   I really don't know.  I can't speak to why I
17 did it.
18     Q.   Okay.  Let's take a look at Mammoth 4855,
19 which we'll go ahead and mark as --
20          MR. STUKENBERG:  I think we're on
21 Exhibit 220?
22          MR. MOULTON:  221, I think.
23          MR. STUKENBERG:  221.  We'll mark this
24 221.  It's Mammoth 4855.
25     Q.   You can see in this instance the person has a

Page 145

1  regular rate of $59.12.  Do you see that?
2      A.   Yes, sir.
3      Q.   And this is actually the wrong document.
4           Do you know what hourly rate corresponds
5  to from a target compensation rate?
6      A.   I think it refers to the foreman level.
7      Q.   And their target compensation, I believe, was
8  $1,250 per day; is that right?
9      A.   That would -- I believe that's correct.
10          MR. STUKENBERG:  And, Anthony, would you
11 scroll to page 31 of that document.
12     Q.   Looking at this pay stub, you can see that
13 this person has a regular rate of $59.12 and an overtime
14 rate of -- what is that, $88.68; is that right?
15     A.   It's really small and blurry.  I can't say --
16 yeah, that is correct.
17     Q.   And so this is -- Mr. Chappell would have been
18 a foreman?
19     A.   I believe so.
20     Q.   And in this instance, he did not work a full
21 two-week period; is that correct?
22     A.   That's what it looks like.
23     Q.   He worked 144 hours; is that right?
24     A.   That's what it looks like.
25     Q.   And then that generates total compensation of

## JAMES D. KINSEY  -  April 22, 2022

Page 146

1 $7,567.36; is that correct?

2     A.    That's what the pay stub shows.

3     Q.    And there's no gross-up or adjustment made in

4 this instance, correct?

5     A.    Not on this earnings statement.

6     Q.    And you don't have any idea why no

7 adjustment -- the company elected to not make an

8 adjustment in this instance?

9     A.    Given the date of it, I'm pretty confident

10 that I made a mistake.

11    Q.    Okay.  But you don't know one way or the

12 other?

13    A.    I do not know one way or the other.

14    Q.    Okay.  Let's go --

15          MR. LOMBARDINO:  Real quick, Will.

16          MR. STUKENBERG:  Yeah.

17          MR. LOMBARDINO:  Do you want -- it's

18 unclear -- is this a different exhibit from the last

19 exhibit, or is this all the same exhibit, and do you

20 want to --

21          MR. STUKENBERG:  We'll submit the whole

22 thing as being Exhibit 221.

23          MR. LOMBARDINO:  Okay.  For the record, do

24 you want to put the Bates number of the document you're

25 looking at on the screen right now?  Because I don't

Page 147

1 think you mentioned the Bates number of this page.

2          MR. STUKENBERG:  Yeah.  It's -- what is

3 the Bates number there, 4885?  Is that what it says?

4          MR. LOMBARDINO:  Yeah.  And it's dated --

5 earnings statement dated November 17th, 2017.

6          MR. STUKENBERG:  Yeah.

7     Q.    So if we go to the first page of Exhibit 221,

8 which is Bates number 4855 -- and if we can zoom in a

9 little to see it a little better.  So scrolling up on

10 4855, back to where the compensation is, this is for the

11 pay date June 1st, 2018.  Do you see that?

12    A.    Yes, sir.

13    Q.    And this is another pay stub for Mr. Chappell,

14 who we understand to be a foreman; is that accurate?

15    A.    I believe so, yes, sir.

16    Q.    And so in this instance, it appears as though

17 he worked all 14 days in this pay period for 16 hours a

18 day.  Do you see that?

19    A.    Yes, sir.

20    Q.    And what's his total compensation?

21    A.    It reads $17,499.52.

22    Q.    Okay.  And if he were being paid a day rate,

23 wouldn't it be an even number?  It wouldn't have this

24 52 cents, correct?

25          MR. MOULTON:  Objection, form.

Page 148

1     A.    From my understanding, correct.

2     Q.    Do you know what $1,250 times 14 is?

3     A.    Off the top of my head, I think it's $17,500.

4     Q.    Okay.  And so if he were being paid $1,250 per

5 day, then his compensation should be $17,500, right?

6          MR. MOULTON:  Objection, form.

7     A.    I believe so.

8     Q.    But that's not what he was paid here, correct?

9     A.    According to this earnings statement, that is

10 correct.

11    Q.    Do you -- strike that.

12          Were you told that you needed to enter

13 16 hours in pay hourly with overtime because that's what

14 management and legal said you needed to do to be

15 compliant?

16          MR. MOULTON:  Objection, form.

17    Q.    Do you remember being told that at any point?

18    A.    I do --

19          MR. MOULTON:  Objection, form.

20    A.    I do remember being told that, but I couldn't

21 tell you which individual specifically.

22    Q.    But it was your understanding that you were

23 paying hourly with overtime in the manner that you were

24 because that's what was required to make the pay plan

25 legal?

Page 149

1          MR. MOULTON:  Objection, form.

2          MR. STUKENBERG:  Dave, you've objected to

3 every question I've asked.  At some point it's really

4 disruptive to the deposition.  Not every question I ask

5 is objectionable, so if you have --

6          MR. MOULTON:  It's based on his prior

7 testimony.  Look, we're not going to argue about it.  We

8 can deal with it in front of the court.

9          MR. STUKENBERG:  I would -- Dave, if

10 you're going to object to every question I ask, I

11 seriously will take it up with the court because it's

12 disruptive to the questioning.

13          MR. MOULTON:  I'm not trying to be

14 disruptive, and I don't think it is.  I'm saying it in a

15 non-argumentative manner, just like the rules say.  I

16 think there is an objection to that question.  I don't

17 know what will be on the next one, but just continue.

18          MR. STUKENBERG:  Can you read back my

19 question, please.

20          (Record read.)

21    A.    That is the way that I understood that.

22    Q.    Do you recall who told you that you needed to

23 pay the non-exempt employees hourly with overtime, as

24 well as gross-ups, in order to make it legal?

25    A.    I do not remember.

## JAMES D. KINSEY - April 22, 2022

Page 150

1                MR. MOULTON:  Objection, form.
2       Q.   You don't remember who told you that?
3       A.   I do not.
4       Q.   Okay.
5       A.   There was a lot of people involved at that
6  time.
7       Q.   Okay.  And the people that were making the
8  decisions regarding how the compensation would work were
9  higher up in the organization than you were?
10               MR. MOULTON:  Objection, form.
11      A.   They were executive level individuals making
12  that decision.
13      Q.   It was not within your scope of responsibility
14  to establish the pay practice at issue here?
15      A.   Correct, I did not have that authority.
16      Q.   Did you ever have any conversations with
17  linemen that their pay broke out hourly with overtime to
18  get them to a target level of compensation?
19      A.   I remember having many of those conversations.
20      Q.   So you often explained to linemen that they
21  were getting paid hourly with overtime to get to a
22  target rate?
23      A.   Yes, sir.
24      Q.   Was that something that was covered at the
25  orientations you attended, do you recall?

Page 151

1       A.   The ones that I participated in, that was
2  covered, because I knew that that was going to be a
3  point of contention, and I wanted to try to head those
4  phone calls off from the beginning.
5       Q.   Do you recall who spoke to that issue at the
6  orientations?
7       A.   That would have been me.
8       Q.   Okay.  And then every orientation you
9  attended, you explained that this was going to be hourly
10  with overtime to get to this target level of
11  compensation?
12      A.   Yes, sir.  From what I remember, we would
13  provide offer letters to the individuals with their
14  classifications, their pay rates, their benefits package
15  that they would sign and agree to, and it was specified
16  an hourly rate.
17      Q.   And so you would explain to them that they
18  were going to get paid an hourly rate with overtime to
19  get to this target level of daily compensation?
20      A.   Yes, sir.
21      Q.   And I think you testified, correct me if I'm
22  wrong, that you attended every orientation in
23  Puerto Rico while you were on island?
24      A.   I believe I attended every one of them.  I'm
25  fairly confident of that, but don't make me swear to it.

Page 152

1       Q.   Sure.  And you were on the -- what dates were
2  you on the island again?
3       A.   I arrived in Puerto Rico October 31st of 2017,
4  and with the exception of a few days throughout the
5  year, I left in the beginning of August 2018.
6       Q.   So you were there -- did you say October 31st
7  of '17?
8       A.   Yes, sir.
9       Q.   Through at least July 23rd, 2018?
10      A.   Yes, sir.
11      Q.   Okay.  And that's the window of time that
12  you're referring to where you attended orientations and
13  advised the linemen that they would be paid hourly with
14  overtime?
15      A.   Yes, sir.
16      Q.   When people would call and complain about
17  their pay, did you explain to them that they were being
18  paid hourly with overtime?
19      A.   Yes, sir, because they would want to know how
20  their pay was calculated, and so --
21      Q.   Go ahead.  I'm sorry.
22      A.   If their pay did not equal what they were
23  expecting, then I would have to explain to them how to
24  get there.  And then majority of the time, once I
25  explained the process, I didn't typically get a phone

Page 153

1  call back unless they were missing pay, and then it was
2  usually, hey, my paycheck's wrong, can you look into it,
3  and then I would.
4       Q.   So when people would call and inquire about
5  compensation, you would explain to them that they were
6  being paid hourly plus overtime for 16 hours a day.
7       A.   Yes, sir.
8                MR. STUKENBERG:  Let's just take a second,
9  Dave.  I think I'm almost done.  Check my notes.
10               VIDEOGRAPHER:  Are we going off the
11  record?
12               MR. STUKENBERG:  Yeah, let's go off the
13  record, but not a long break.  Couple of minutes.
14               VIDEOGRAPHER:  Off the record at 3:16.
15               (Recess taken 3:16-3:22.)
16               VIDEOGRAPHER:  Back on the record at 3:22.
17      Q.   (BY MR. STUKENBERG)  Mr. Kinsey, nothing in
18  the offer letters that were distributed to the linemen
19  or mechanics said that they were guaranteed a gross-up
20  in a (audio distortion), for example?
21               THE REPORTER:  Could you repeat that last
22  part.
23               MR. STUKENBERG:  Sure.
24      Q.   There was nothing in the offer letters that
25  were given to the linemen or mechanics that stated that

## JAMES D. KINSEY  -  April 22, 2022

Page 154

1 they were guaranteed a gross-up in workweeks where they
2 did not work a full workweek?
3          MR. MOULTON:  Objection, form.
4     A.  I don't remember there being any terminology
5 like that.
6     Q.  Okay.  You wouldn't do something that you felt
7 was illegal, would you?
8     A.  If I felt like it was illegal, I would not be
9 doing it.
10     Q.  Okay.  And so you didn't have -- you didn't
11 believe that you were doing anything wrong or illegal as
12 it related to processing this payroll?
13     A.  I trusted my senior management and was
14 confident in what they were telling me.
15     Q.  And you mentioned you got some calls and
16 complaints from guys when their pay was wrong; is that
17 right?
18     A.  Yes, sir.
19     Q.  That's the nature of the complaints you got?
20     A.  Yes.
21     Q.  Okay.  You did not get calls with guys
22 complaining that their compensation was off by a couple
23 of pennies?
24     A.  No.
25     Q.  You did not get calls from guys complaining

Page 155

1 that they should have gotten paid more overtime?
2     A.  No.  I mean, typically it either had to do
3 with benefits not being entered correctly or the time,
4 the adjustments.  Those were the typical conversations I
5 fielded.
6     Q.  Okay.  But they weren't complaints that "I'm
7 being paid in an unlawful manner" or anything along
8 those lines?
9     A.  No, sir.
10          MR. STUKENBERG:  All right.  I'll pass the
11 witness.
12              FURTHER EXAMINATION
13 BY MR. MOULTON:
14     Q.  Mr. Kinsey, when you would get complaints from
15 linemen about their checks, would you have occasion to
16 explain to them the gross-up and how that worked?
17     A.  Yes.  I mean, that was typically the nature.
18 If they called and said, hey, I'm X dollars short or I
19 think I'm -- sometimes it would just be as simple as,
20 hey, my paycheck's short, would you look into it.  And
21 sometimes they would want to know why it was short, and
22 then -- or they may go, hey, I'm looking at my pay stub
23 and I'm confused, can you help me to understand it.  And
24 then I would walk them through the process of this is
25 your hourly rate, and this is why, and this is the

Page 156

1 adjustment to get you to your target compensation.
2     Q.  Okay.  At the orientations where you would --
3 where the compensation would be discussed with the
4 linemen that you attended, you guys would show them what
5 their target compensation would be.  For example, you
6 would show them that a general foreman is expected to be
7 at that $1,400 per day level, for example?
8     A.  Yes, sir.  The offer letters, I believe, had
9 the hourly rate plus the target compensation on them.
10     Q.  So the linemen, through the offer letters and
11 the materials and what was told to them at orientation,
12 knew what their expected compensation would be?
13     A.  They should have been aware.  We did
14 everything we could to make sure they understood the
15 process.
16     Q.  So they understood that when they worked a
17 full week, they're going to get that equivalent of
18 $1,400, or whatever it would be, a thousand times seven,
19 correct?
20          MR. STUKENBERG:  Objection, form.
21          MR. LOMBARDINO:  Objection, calls for
22 speculation.  He doesn't know what's in their head.
23     Q.  That was the intent, to make sure that they
24 would understand that?
25          MR. STUKENBERG:  Objection, form.

Page 157

1     A.  The intent was that they knew what the target
2 was and that we would do our best to get them there
3 based on this hourly rate.
4     Q.  Right.  And they also knew that if they didn't
5 work a full week, that the company intended to also do
6 the gross-ups for them?
7          MR. LOMBARDINO:  Objection, misstates
8 prior testimony, misleading.
9          MR. STUKENBERG:  I'll object as well,
10 form.
11     A.  The way I understood it is the employees
12 expected to have a target compensation and the company
13 was attempting to reach that.
14     Q.  Right.  And so my question is, at orientation,
15 did it ever come up what would happen if they didn't
16 work a full week?  Did you guys explain that?
17          MR. STUKENBERG:  Objection, form.
18          MR. LOMBARDINO:  Objection, calls for
19 speculation.
20     A.  I don't remember.  I would imagine that we
21 would have discussed, just to try to head those
22 conversations off at the onset.  I won't say I did it at
23 every one of them.
24     Q.  Okay.  So fair to say that when it did come up
25 or if it came up, you would have let them know about how

## JAMES D. KINSEY  -  April 22, 2022

Page 158

1 you guys do the gross-up?

2          MR. STUKENBERG:  Objection, form.  He just
3 said he doesn't remember if it happened or not.  You're
4 asking him what he would do if -- go ahead.

5     A.  I did my best to make sure they understood the
6 process.  That way, when payday came, they either
7 already had the answers to their questions or they would
8 at least have something to build off of when they called
9 me.

10    Q.  Earlier we were looking at a pay stub for
11 Mr. Chappell where there was -- it looked like a
12 gross-up had been missed, and you had mentioned that by
13 looking at that pay stub, you were pretty sure that it
14 had been one that you had missed.  Can you explain why
15 you said that.

16    A.  Because that pay period took place whenever we
17 first got to the island and there was a steep learning
18 curve.

19    Q.  Okay.  So there was a little chaos and it
20 could have been something got missed?

21    A.  We put roughly 300 people on the island in a
22 matter of about two to three weeks, so yeah, there was a
23 lot of chaos.

24    Q.  Okay.  Were you privy to any communications
25 that would have been sent to the linemen before

Page 159

1 orientation, like recruiting emails?  Did you ever see
2 those?

3     A.  At some point I did.  In the beginning I did
4 not.  In the beginning there was a lot of confusion as
5 to what was being communicated to the linemen per some
6 of the emails that we looked at earlier.  I think there
7 was one where Ken specifically said, I need to know what
8 y'all communicated so that we can be on the same page.

9     Q.  Okay.

10    A.  As time progressed, we had developed kind of a
11 consistent offer letter with company letterheads, so in
12 theory, all we had to do was change the letterhead and
13 the pertinent employee information, and that way
14 everything was consistent across the board.

15    Q.  So on some of those earlier communications
16 before it became standardized, were you aware of the
17 communications going out to linemen telling them that
18 they would be paid day rates?

19    A.  At the onset of the restoration effort, that
20 was the case.  It was communicated at the onset that
21 individuals were going to be paid a day rate.

22    Q.  Okay.

23    A.  Once things had started -- the process had
24 started and a lot more conversations were taking place,
25 that's when it was communicated to me that there was

Page 160

1 concerns with straight day rates and we had to pay
2 hourly rates.  And I don't know when in November that
3 took place.  I just know it took place.

4          And then from that point forward, I was not
5 supposed to enter just straight dollars per day.  It was
6 supposed to be hours per day.  But at the very
7 beginning, that was the communication, and that was why
8 that vernacular just kind of carried through, because
9 that way we weren't creating more confusion.

10    Q.  All right.  And so there were linemen in the
11 beginning who were hired before you had the standardized
12 offer letters, for instance, that spelled out what their
13 hourly rate would be.  In other words, you had guys that
14 got hired on just being told day rates?

15          MR. STUKENBERG:  Objection, form.

16    A.  I don't know specifically what the guys were
17 communicated.  I know a lot of guys were current,
18 existing employees that got sent to Puerto Rico to work,
19 and I don't know what they were -- how that was
20 communicated.

21          MR. MOULTON:  I will pass the witness.

22          MR. STUKENBERG:  I've got a couple more
23 questions unless, Mr. Lombardino, you'd like to go
24 first.

25          MR. LOMBARDINO:  No, I don't have any

Page 161

1 questions, so I will pass as well.

2          FURTHER EXAMINATION

3 BY MR. STUKENBERG:

4     Q.  You were just testifying about the
5 orientations you attended where you said you would
6 explain that there was a target rate for the guys to
7 receive for every day worked, but that you would explain
8 that it was hourly with overtime; is that correct?

9     A.  Yes.  I'm confident that on that offer sheet
10 that had their name, their classification, that there
11 was a line item that said hourly rate.

12    Q.  Is there any doubt in your mind that it was
13 communicated to these guys that they were being paid
14 hourly with overtime rather than a day rate?

15    A.  To the best extent of my understanding, they
16 were aware of an hourly rate.

17    Q.  Okay.  And you-all did everything you could to
18 explain that this was an hourly with overtime system to
19 get to a target compensation level?

20    A.  Yes, sir.

21    Q.  Mr. Moulton was asking you some questions
22 about if you explained the gross-up, and I believe your
23 testimony is you don't recall definitively one way or
24 the other if you explained the gross-up process at
25 orientation?

### JAMES D. KINSEY - April 22, 2022

Page 162

1          MR. MOULTON: Objection, form.
2     A.  I believe that I did, but I can't say I did
3 that at every orientation.  I did a lot of orientations.
4     Q.  You think you did, but you're not sure one way
5 or the other?
6     A.  Yes, sir.
7          MR. MOULTON: Objection, form.
8     Q.  Okay.  You were referring to the first payroll
9 cycle where a gross-up was not paid, and you said you --
10 you assumed it was a mistake just because you were
11 processing so many people, so many new hires at that
12 time; is that right?
13    A.  Yes, sir.  I mean, there was a lot of existing
14 employees transitioning, a lot of new employees being
15 hired.  It was a whirlwind chaos for the first month.
16    Q.  And you don't actually definitively know if
17 that was a mistake or somebody consciously elected not
18 to make an adjustment on that particular pay stub,
19 right?
20         MR. MOULTON: Objection, form.
21    A.  I would agree.  I don't know definitively.
22    Q.  Okay.  And there are instances well after the
23 initial few payroll cycles where gross-ups were not
24 paid, correct?
25         MR. MOULTON: Objection, form.

Page 163

1     A.  Per some of the earnings statements we looked
2 at, yes.
3     Q.  And for those earnings statements, you don't
4 know if that was an oversight on your part or somebody
5 exercising discretion not to pay a gross-up in that
6 instance, right?
7          MR. MOULTON: Objection, form.
8     A.  That is correct.
9     Q.  Okay.  Are you aware that there were
10 orientations held stateside before guys deployed?
11    A.  Yes.
12    Q.  You weren't at those orientations?
13    A.  I was not at any of them.
14    Q.  So you don't know what they were told at the
15 orientations to the compensation system?
16    A.  No, sir.
17    Q.  Mr. Moulton was asking you about guys being
18 told they were going to be paid day rates.  Are you
19 talking about they were told that as part of the
20 recruiting process before being deployed to Puerto Rico?
21    A.  I don't really know what the conversations
22 were like.  Like I said, there was a lot of existing
23 employees that were being asked to go to Puerto Rico to
24 work, and then there was a lot of employees that were
25 hired via reference, off the street.  I mean, there was

Page 164

1 a lot of moving parts at that time.
2          I do want to clarify the previous -- not the
3 most recent question, but the previous.  I did attend at
4 least one orientation with Higher Power sometime in the
5 summer of 2018, but that's the only one I can remember.
6     Q.  And that was an orientation stateside?
7     A.  Yes, sir.
8     Q.  And at that orientation, was it explained that
9 it was hourly with overtime?
10    A.  I don't remember.  I barely remembered that I
11 was there.
12    Q.  Okay.  Fair enough.
13         You said initially the intention was to
14 actually pay the non-exempt employees on a day rate
15 system, right?
16    A.  That was the way I understood it.
17    Q.  Okay.  And then at some point the decision was
18 made not to pay them day rates but rather to pay hourly
19 with overtime?
20         MR. MOULTON: Objection, form.
21    A.  The way that was explained to me, yes.
22    Q.  And do you know one way or the other if that
23 decision was made prior to any of the plaintiffs in this
24 case actually deploying to Puerto Rico?
25    A.  I don't know who all is listed in this case,

Page 165

1 so I don't know.
2     Q.  Do you know if the decision was made to pay
3 hourly with overtime prior to when any of the linemen
4 and mechanics deployed to Puerto Rico?
5     A.  I know we had employees on the island that got
6 there before I did that were under the impression it was
7 going to be a day rate, and then at whatever point in
8 time it was, it was determined that was not the
9 appropriate course of action, it was communicated to
10 them, hey, you're not going to get paid a day rate.
11 You're going to get paid an hourly rate, et cetera.
12    Q.  And that was the Advanced Team?
13    A.  Yes, sir.  We had employees on the island
14 middle of October before I was even hired.
15    Q.  Okay.  And so for any of those employees that
16 were on the day rate system, their pay stubs would
17 actually reflect a day rate?
18    A.  It should, but I don't remember.
19    Q.  It would not reflect hourly with overtime like
20 the pay stubs we've seen today?
21    A.  I don't believe it will.  I was not
22 responsible for those original timesheets, so I don't
23 know what those look like.
24    Q.  And for the individuals that deployed under
25 the prior compensation system, when the decision was

## JAMES D. KINSEY - April 22, 2022

Page 166

1 made to modify to hourly with overtime, was that
2 explained to them?
3     A.   It should have been.  I know I met with a
4 bunch of those individuals, because there was a lot of
5 issues between classifications and pay rates and
6 benefits.  So I know I met with them, but I can't
7 definitively say we talked about it.
8     Q.   Okay.
9     A.   At least at that point in time.
10    Q.   Okay.  And once the decision was made to pay
11 hourly with overtime, is it your understanding that
12 everybody would have been told it was an hourly with
13 overtime system to get to this target rate?
14              MR. MOULTON:  Objection, form.
15    A.   It was supposed to be communicated down
16 through the ranks.  I know the superintendents were
17 informed of that, and then the expectation is that they
18 would communicate that to their subsequent subordinates.
19    Q.   Okay.  And that would be covered at
20 orientation and in offer letters as well?
21    A.   Should have been, yes.  So for guys that were
22 on the island when that decision was made, they wouldn't
23 have gone through an additional orientation, but it was
24 expected that their direct supervisor would have
25 communicated that shift to them.

Page 167

1     Q.   Okay.  And we would probably be able to
2 differentiate that population from the hourly with
3 overtime population based on the hourly with overtime
4 population pay stubs reflecting hourly rates and
5 overtime rates, correct?
6              MR. MOULTON:  Objection, form.
7     A.   I believe so, but again, I wasn't privy to
8 those original timesheets, so I don't know.
9              MR. STUKENBERG:  I'll pass the witness.
10             FURTHER EXAMINATION
11 BY MR. MOULTON:
12    Q.   Mr. Kinsey, when these initial guys that were
13 on the island who were under that initial -- what you
14 call the initial pay rate or day rate system, you
15 mentioned to Mr. Stukenberg that at some point it was
16 communicated to them that their pay would be hourly plus
17 overtime, correct?
18    A.   Yes, sir.
19    Q.   It was also told to them about how their pay
20 would be grossed-up if they worked less than a full
21 week, correct?
22             MR. STUKENBERG:  Objection, form.
23             MR. LOMBARDINO:  Misstates prior
24 testimony, foundation.
25    A.   I don't remember all the conversation, other

Page 168

1 than I know that, hey, you're going to get paid and
2 we're going to take care of you.
3     Q.   Okay.  And what do you mean by we're going to
4 take care of you?
5     A.   There was a target compensation and expected
6 compensation, and that's what the company was seeking to
7 obtain, reach.  I mean, other than to say that they were
8 going to pay them what they thought they were going to
9 get paid, I don't know how else to say it.
10    Q.   I think you said it.
11             MR. MOULTON:  Thank you.  Pass the
12 witness.
13             MR. LOMBARDINO:  No questions.  Pass the
14 witness.
15             MR. MOULTON:  You're done.  Thank you very
16 much.  Again, we appreciate your time and --
17             MR. LOMBARDINO:  Actually, Will has an
18 opportunity.  You know, we go in a circle, so --
19             MR. MOULTON:  I thought he said pass.
20             MR. LOMBARDINO:  That was me.
21             MR. MOULTON:  Oh.
22             MR. LOMBARDINO:  And he might be done.  I
23 just want to --
24             MR. STUKENBERG:  I'll pass.
25             THE REPORTER:  Could I get everyone's

Page 169

1 order for the record.  Does anyone want a copy?
2             MR. STUKENBERG:  I'll take a copy and a
3 video, please.
4             MR. LOMBARDINO:  On behalf of the witness,
5 we -- obviously we'd like a copy for reading and signing
6 purposes, but no video needed.  And you can send it to
7 me at my office, my email.  If you don't have the
8 contact information, I can give it to you after --
9             THE REPORTER:  I'll find it.  I can get
10 it.  Do you also want an electronic copy in addition to
11 having him sign the original or just the original?
12             MR. LOMBARDINO:  So how do y'all do it
13 these days?  Do you actually mail an original like in
14 the old days?
15             THE REPORTER:  I think it's electronic.
16 They can just send the electronic original -- or I think
17 that's what they do, and if you need to do something
18 later, you can.
19             MR. LOMBARDINO:  That's fine.  Yeah, send
20 the electronic, and then we'll get it read and then --
21 actually, I need signature for you.
22             THE REPORTER:  Yes.  And real quick,
23 Anthony, that Exhibit 221, are you the one that will be
24 sending that to me?
25             MR. ARTEAGA:  Yes, ma'am, I will be

## JAMES D. KINSEY  -  April 22, 2022

Page 170

1 sending it to you.

2          THE REPORTER:  Did you see my email in the

3 chat?

4          MR. ARTEAGA:  Yes, ma'am, I did.

5          THE REPORTER:  Okay.  Thank you.  I think

6 that's all I have.

7          MR. LOMBARDINO:  Dave, did you want a

8 transcript?

9          MR. MOULTON:  Yes, of course.  We'll do

10 the standard electronic and we'll do video.  I'll email

11 you the exhibits we used.

12          THE REPORTER:  Yes.  Okay.

13          VIDEOGRAPHER:  End of deposition.  Off the

14 record at 3:42.

15          (Deposition concluded at 3:42 p.m.)

16

17

18

19

20

21

22

23

24

25

Page 172

1          I, JAMES D. KINSEY, have read the foregoing

deposition and hereby affix my signature that same is

2 true and correct, except as noted above.

3

4          _____

          JAMES D. KINSEY

5

6

7 THE STATE OF _____)

  COUNTY OF _____)

8

          Before me, _____, on

9 this day personally appeared JAMES D. KINSEY, known to

me or proved to me under oath or through

10 _____ (description of identity card or

other document) to be the person whose name is

11 subscribed to the foregoing instrument, and acknowledged

to me that they executed the same for the purposes and

12 consideration therein expressed.

          Given under my hand and seal of office this

13 _____ day of _____, 2022.

14

15

          _____

16          NOTARY PUBLIC IN AND FOR

          THE STATE OF _____

17          COMMISSION EXPIRES: _____

18

19

20

21

22

23

24

25

Page 171

1                CHANGES AND SIGNATURE

2 WITNESS:  JAMES D. KINSEY   DEPOSITION DATE:   4/22/2022

3 PAGE     LINE     CHANGE              REASON

4 _____

5 _____

6 _____

7 _____

8 _____

9 _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 _____

23 _____

24 _____

25 _____

Page 173

1 STATE OF TEXAS     )

2 COUNTY OF DALLAS   )

3          I, Jill Allen, a Certified Shorthand Reporter in and

4 for the State of Texas, County of Dallas, certify that

5 the foregoing deposition of JAMES D. KINSEY was reported

6 stenographically by me at the time and place indicated,

7 said witness having been placed under oath by me, and

8 that the deposition is a true record of the testimony

9 given by the witness.

10          Review was requested by the deponent or a party

11 before completion of the deposition.

12          I further certify that I am neither counsel for nor

13 related to any party in this cause and am not

14 financially interested in its outcome.

15          Given under my hand on this the 17th day of May,

16 2022.

17

18

19          _____

          Jill Allen, Texas CSR No. 3184

20          Certification Expires:  10/31/2023

21          Good to Go Process Service

          Firm Registration No. 62

22          1225 North Loop West, Suite 327

          Houston, Texas  77008

23          713.351.7061

24

25