**EXHIBIT M**

ALEXANDER NEIL KALMAN  -  April 21, 2022

```
               IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF TEXAS
                      SAN ANTONIO DIVISION

FRANCISCO CANTU and NORBERTO  §   CIV A. NO:  5:19-cv-00615
ELIZONDO, individually and on §
behalf of all others          §   JURY TRIAL DEMANDED
similarly situated,           §
                              §   CLASS/COLLECTIVE ACTION
              Plaintiffs,     §   PURSUANT TO 29 U.S.C. § 216(b)/
                              §   FED. R. CIV. P.23
-vs-                          §
                              §
MAMMOTH ENERGY SERVICES, INC. §
d/b/a, COBRA ENERGY and       §
HIGHER POWER ELECTRICAL, LLC, §
                              §
              Defendants.     §


                      ORAL DEPOSITION
                   ALEXANDER NEIL KALMAN
                      APRIL 21, 2022
```

          ORAL VIDEOTAPED DEPOSITION OF ALEXANDER NEIL KALMAN,

produced as a witness at the instance of the Plaintiffs and duly

sworn, was taken in the above-styled and numbered cause on April

21, 2022, from 9:32 a.m. to 1:13 p.m., before Trena K. Bloye,

Certified Shorthand Reporter in and for the State of Oklahoma,

reported by computerized stenotype machine at the offices of D&R

Reporting & Video, Inc., 400 N. Walker Ave., Ste. 160, Oklahoma

City, Oklahoma 73102, pursuant to the Federal Rules of Civil

Procedure and under the following agreement of counsel for the

respective parties that:

          The deposition may be signed by the witness before any

notary public or officer authorized to administer oath.

ALEXANDER NEIL KALMAN  -  April 21, 2022

```
 1              A P P E A R A N C E S

 2

 3

 4    For the Plaintiffs:

 5           DAVID L. MOULTON
             BRUCKNER BURCH PLLC
 6           11 Greenway Plaza
             Suite 3025
 7           Houston, Texas 77046
             dmoulton@brucknerburch.com
 8

 9    For the Defendants:

10           ERIN C. VILLASEÑOR
             M. HARRIS STAMEY
11           PORTER HEDGES, LLP
             1000 Main Street
12           36th Floor
             Houston, Texas 77002
13           713-226-6619
             evillasenor@porterhedges.com
14

15    Videographer:

16           Johnny Blanco

17

18

19

20

21

22

23

24

25
```

ALEXANDER NEIL KALMAN  -  April 21, 2022

1                    C O N T E N T S

2

3                                              Page

4    Examination by Mr. Moulton                  6

5    Examination by Ms. Villaseñor              88

6    Re-Examination by Mr. Moulton             107

7    Re-Examination by Ms. Villaseñor          110

8    Further Re-Examination by Mr. Moulton     111

9    Reporter's Certification                  114

10   Further Certification                     116

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ALEXANDER NEIL KALMAN - April 21, 2022

```
1              INDEX OF PREVIOUSLY MARKED EXHIBITS

2

3    Exhibit              Description            Page

4       131    Email chain                        27

5       137    Employee Base Pay Rate Sheet       34

6       138    Pay scale for Five Star            36

7       139    pay scale for Higher Power         36

8       140    Email chain                        31

9       147    Email, Mammoth 3296                70

10      151    Cobra rates spreadsheet            44

11      166    Email chain, Mammoth 3290-3291     36

12      167    Mammoth 3292 Confidential          39

13      169    Email chain                        54

14      170    Employee Earnings statements       76

15      172    Email chain                        60

16      173    Excel spreadsheet, Mammoth 3149    61

17      174    Mammoth 3292 Confidential-EX174    40

18      178    Email chain                        51

19      180    Email chain                        52

20      181    Email chain                        52

21      183    Email chain referencing 1/26/18 report  63

22     184    Excel spreadsheet, Mammoth 3145    63

23      185    Email chain, Mammoth 3150          70

24

25
```

**ALEXANDER NEIL KALMAN - April 21, 2022**

```
 1              INDEX OF NEWLY MARKED EXHIBITS

 2

 3    Exhibit           Description              Page

 4    199      LinkedIn printout                  20

 5    200      Email chain                        33

 6    201      Email chain                        48

 7    202      Email chain, Mammoth 3208-3210     65

 8    203      Email, Mammoth 3735                68

 9    204      Email chain, Mammoth 3169-3171     71

10    205      Email chain, Mammoth 3182-3183     86

11    206      Email chain, Mammoth 3593         101

12

13

14                    *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25
```

ALEXANDER NEIL KALMAN - April 21, 2022

| | |
|---|---|
| 1 | VIDEO OPERATOR:  Good morning.  We are on |
| 2 | the record.  Will the  court reporter please swear in |
| 3 | the witness. |
| 4 | (The witness was sworn.) |
| 5 | COURT REPORTER:  And, Counsel, would you |
| 6 | please introduce yourselves for the record. |
| 7 | MR. MOULTON:  Good morning, this is David |
| 8 | Moulton for the Plaintiffs. |
| 9 | MS. VILLASEÑOR:  And Erin Villaseñor for |
| 10 | the firm of Porter Hedges for Defendant. |
| 11 | COURT REPORTER:  All right.  Go ahead, |
| 12 | Mr. Moulton. |
| 13 | MR. MOULTON:  Can we -- I'm sorry.  Did |
| 14 | you swear in the witness already? |
| 15 | COURT REPORTER:  I did, yes. |
| 16 | MR. MOULTON:  Okay.  Thank you. |
| 17 | ALEXANDER NEIL KALMAN, |
| 18 | after having been first duly sworn at 9:32 p.m., deposes |
| 19 | and says in reply to the questions propounded as |
| 20 | follows, to wit: |
| 21 | EXAMINATION |
| 22 | BY MR. MOULTON: |
| 23 | Q   All right.  Mr. -- is it Kalman or Kalman?  I'm |
| 24 | sorry. |
| 25 | A   Kalman. |

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1    Q    Kalman.  Okay.  Mr. Kalman, my name is David
 2 Moulton.  I represent about 150 linemen and mechanics
 3 who are claiming overtime pay against Mammoth d/b/a
 4 Cobra and Higher Power.
 5         Have you ever -- have you and me ever talked
 6 before?  Do you know me?
 7    A    I have talked with somebody who did the
 8 subpoena.  I am not sure if it was you directly or
 9 another lawyer.
10    Q    Okay.  So you spoke with someone about coming
11 here today to schedule your deposition?
12    A    Yes.
13    Q    Did you have any conversations with me or
14 anyone at my firm about the details or facts of this
15 case?
16    A    Just that it had to do with the PREPA Puerto
17 Rico situation.
18    Q    Okay.  Now, could you -- for the record, could
19 state your full name for the record, please?
20    A    Yes.  Alexander Neil Kalman.
21    Q    And what is your date of birth, sir.
22    A    August 18th, 1987.
23    Q    And what is your current address?
24    A    Current address is 7704 Northgate Avenue,
25 Oklahoma City, Oklahoma, 73162.
```

ALEXANDER NEIL KALMAN - April 21, 2022

1      Q    And for how long have you lived at that
2   address?
3      A    It has been since, I believe September of 2020.
4      Q    Okay.  And where do you currently work right
5   now?
6      A    I currently work for OMES with the State of
7   Oklahoma.
8      Q    And where is your work address?
9      A    It is the data center on Lincoln.  I don't have
10  the exact address in my memory.  I can get that for you
11  if you need it.
12     Q    That's okay.  So what's the street name?
13     A    Lincoln.
14     Q    Lincoln.  It's the data center on Lincoln in
15  Oklahoma City?
16     A    Yes.
17     Q    Okay.  What's your cellphone number?
18     A    Cellphone number is 405-863-6108.
19     Q    Do you use any other phone -- other cell
20  numbers?
21     A    I have one for the state.  I only use it for
22  state business, nothing personal.
23     Q    Okay.  Can we get that number?
24     A    Yes.  I do not have it on me.  I leave that
25  cellphone at work.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    Oh, okay.  All right.  That's fine.  And you
2    use -- you'll only use that phone for state business?
3    You don't use it for personal reasons or for other
4    reasons?
5    A    Correct.  I have a personal phone and then I
6    have a work phone that I leave at the office, but it is
7    technically a cell.
8    Q    Do you happen to know your office phone number?
9    A    I do not have an office phone other than that
10   cellphone.
11   Q    Got it.  Have you, within the last year or so,
12   have you spoken with anyone that was affiliated with
13   Mammoth or Cobra or Higher Power about this case at all?
14   A    Mark Layton has called me twice in the leadup
15   to this deposition.  But, otherwise, no, I am under a
16   cease and desist not to contact any Mammoth employees.
17   Q    Okay.  Let's kind of unpack that.  Mr. Layton,
18   that's Mark Layton; correct?
19   A    Yes.
20   Q    He's called you twice?
21   A    Yes.
22   Q    Did he just try to talk to you or did you all
23   actually talk?
24   A    He called to offer me representation by Mammoth
25   legal counsel twice.  And during the first call he also

ALEXANDER NEIL KALMAN - April 21, 2022

1  asked if I would be willing to talk with legal
2  representation on the phone.
3      Q    Okay.  And what did you say?
4      A    No.
5      Q    Other than offering legal representation to you
6  and asking you to speak with the lawyers for Mammoth on
7  the phone, did you all speak about anything else?
8      A    I reminded him of the nature of my termination
9  with Mammoth; but, no, nothing else.
10      Q    Okay.  And so what was the nature of your
11  termination with Mammoth?
12      A    I was laid off after site closures and then my
13  severance was denied.
14      Q    Why was your severance denied?
15      A    They claimed that I destroyed inappropriate
16  documentation.  They did not give me specifics.
17      Q    Okay.  And when you say "they," who was it who
18  told you that the reason for your severance being denied
19  was because of document destruction?
20      A    Mammoth legal counsel.
21      Q    Do you know who it was at Mammoth that said
22  that?
23      A    I do not have the specific lawyer's name.  It
24  was a lawyer from Tulsa.
25      Q    Were there -- was there any information given

ALEXANDER NEIL KALMAN - April 21, 2022

1  to you about what documents they were talking about?

2      A    No.

3      Q    Do you know what documents they were talking

4  about or suspect?

5      A    My only guess is that there were W-2s that

6  didn't have appropriate documentation on the EIN that

7  Paycom printed for the 2019 tax -- or 2018 tax year that

8  I did have to destroy after requesting new copies.

9  Those were issued out to the employees once they were

10 verified correct.

11     Q    Okay.  So you said that they had to be

12 destroyed.  What do you mean by that?

13     A    So they did not have the company's FEIN listed

14 on them, they were incorrect documents, and the

15 employees would not be able to file their tax returns

16 with them.

17     Q    Okay.  So when you say they had to be

18 destroyed, are you saying they had to be destroyed by

19 law or because you thought they needed to be destroyed?

20     A    I destroyed them per my instructions based on,

21 like, legal present that I am aware of within HR.  You

22 do not want to have extra W-2s hanging around.  And

23 since we got new W-2s issued out to the employees, as

24 well as online copies, these were no longer necessary.

25     Q    Okay.  Before you destroyed these -- these

ALEXANDER NEIL KALMAN - April 21, 2022

```
1    inaccurate W-2s did you check with anyone about whether
2    or not that was okay?
3        A    I checked in with my director, yes.
4        Q    Okay.  And who was that?
5        A    Michelle Martinez, I believe.  I forget her
6    name if I'm honest.
7        Q    And what was her position?
8        A    I believe it was HR director.
9        Q    So she was aware that you were going to destroy
10   the inaccurate W-2s?
11       A    Um-hum.
12       Q    I'm sorry?
13       A    Yes.
14       Q    Yes?  And, you know, we didn't cover this
15   already, but for a deposition because the court reporter
16   has to write down everything, please keep your responses
17   verbal.  I know in normal conversation we will say
18   uh-huh, nuh-uh, and that's fine.  But for a deposition I
19   do need to have a verbal response.  Is that all right?
20       A    Absolutely.
21       Q    And you're doing very good about interrupting
22   or talking over me, and I really appreciate that.  And
23   I'll make -- I'll promise you that I will do my best to
24   let you finish your responses before I answer (sic.),
25   but also that's something that's important for the court
```

ALEXANDER NEIL KALMAN - April 21, 2022

1   reporter to take everything down.  Understood?

2       A    Yes, sir.

3       Q    Great.  Okay.  So did Michelle Martinez

4   authorize the destruction of the inaccurate W-2s?

5       A    I don't remember the exact conversation we had.

6   My understanding was yes.

7       Q    Oh, I'm sorry.  What did you say at the end?

8       A    My understanding was yes.

9       Q    Okay.  But for sure you talked about it and she

10  didn't say not to?

11      A    Correct.

12      Q    And you don't recall she specifically said,

13  Yes, Mr. Kalman, it's fine, you can destroy them.  You

14  don't remember that?

15      A    No.  That is not the nature of communication at

16  the time.

17      Q    Okay.  Can you give us a little more specifics

18  on that, like what exactly you asked her and what

19  exactly she said?

20      A    I mean, I don't remember.  It's been three

21  years at least.  I'm sorry.

22      Q    Okay.  And so those are the only documents you

23  think they could be talking about when they accuse you

24  of destroying documents?

25      A    Correct.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    And just to be sure, you're not aware at any
2  point that you ever destroyed any payroll or hour
3  records that relate to the wages and hours of workers
4  that worked in Puerto Rico for Mammoth and Cobra and
5  Higher Power; right?
6    A    Absolutely not.
7    Q    When you reminded Mr. Layton of the
8  circumstances of your termination what did he say?
9    A    I asked him if he was aware of the nature of my
10 separation with Mammoth and he said yes.
11   Q    Okay.  And did you -- did you all talk about
12 anything else?
13   A    No.
14   Q    Have you ever been convicted of any crimes?
15   A    No.
16   Q    Have you ever been arrested?
17   A    No.
18   Q    So other than talking to Mr. Layton in the last
19 year or so is there.  Anyone else at Mammoth or Cobra or
20 Higher Power that you have spoken to?
21   A    No.
22   Q    When you worked for Mammoth what was your
23 position?  And we're talking -- let's talk about the
24 period from about the Puerto Rico time, which started in
25 October 2017 and went on for a few years.  Can you tell

ALEXANDER NEIL KALMAN - April 21, 2022

1  me what your position was during that timeframe?
2      A    In 2017 I was an HR generalist.  I think it was
3  2018 when I became an HR manager.
4      Q    What's the difference between an HR generalist
5  and the HR manager position?
6      A    An acknowledgement of the tasks I was already
7  accomplishing and a pay increase.
8      Q    Okay.  During 2017 and 2018 when you were
9  working for Mammoth, what physical location were you
10  working out of?
11      A    I was working out of the 14201 North building.
12  I forget the exact address.  But it's the one off of
13  Memorial in Oklahoma City.
14      Q    During that timeframe did you ever work in
15  Puerto Rico?
16      A    No.
17      Q    When you worked for Mammoth during the
18  2017-2018 timeframe, do you remember which Mammoth
19  entity was on your W-2s that's paying you?
20      A    Yes.  It was Mammoth Energy.
21      Q    And just to be a little more specific on that,
22  do you know if it was Mammoth Energy Partners, Mammoth
23  Energy, Inc.,  Mammoth Energy Services, Inc. or some
24  other one?
25      A    I do not recall.  I know they changed their

ALEXANDER NEIL KALMAN - April 21, 2022

1  names at a certain point and I'm not sure when in my
2  tenure they did that.
3       Q    Okay.  Do you recall what the name -- what the
4  different names were?
5       A    I believe there was Mammoth Energy Services LLC
6  and Mammoth Energy Partners.  But that's the best I know
7  and I'm not sure the legal descriptions of those
8  entities.
9       Q    Okay.  At that 14201 North building off of
10  Memorial, that location you were working at, what other
11  companies, if any, besides the Mammoth Energy Services,
12  Mammoth Energy Partners are addressed there?
13       A    I know that there are many employees who do
14  work for other Mammoth entities, but I am not aware if
15  they are considered Mammoth employees or directly
16  working for those other Mammoth entities.  So it would
17  be hard for me to give a clear answer on that.
18       Q    Okay.  About how many people worked at that
19  office building, or that office location?
20       A    I believe about a hundred.
21       Q    Okay.  And just to clarify, I didn't mean the
22  whole building.  I mean the folks working for Mammoth at
23  that location.  You're saying it's about a hundred?
24       A    I'm not sure.  A hundred is probably my best
25  bet, but it could easily be 50.  I'm not sure.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    Okay.  So your educated guess is 50 to 100?

2    A    Correct.

3    Q    Okay.  Were there Cobra employees that worked

4  at that same address?

5    A    I don't know if they were officially Cobra

6  employees, but I do know they worked on Cobra

7  accounting, yes.

8    Q    Were there any Higher Power folks that worked

9  at that office.

10    A    Again, I don't know if they were official

11  Higher Power employees, but I do know they worked on the

12  accounting for Higher Power.

13    Q    Okay.  And who were the -- do you remember the

14  names of the folks that worked on the accounting for

15  Higher Power at that address?

16    A    I do not.

17    Q    Do you remember the names of the folks that

18  worked on the Cobra accounting at that address?

19    A    I do not.

20    Q    During that 2017-2018 timeframe you worked for

21  Mammoth, who was -- who directly did you report to?

22    A    I forget when Jeff Beagle left Mammoth Energy

23  Services.  I worked directly for Jeff Beagle up until

24  his departure, and then after that point Michelle was

25  appointed the new HR director so I worked directly under

ALEXANDER NEIL KALMAN - April 21, 2022

1  her.

2      Q    Is that Michelle Pulling?

3      A    No.  That was -- I was a contemporary with her.

4  She reported to Jeff like I did.

5      Q    Okay.  Do you remember the Michelle that

6  replaced Jeff, do you remember her last name?

7      A    Again, I believe it was Hernandez, but I could

8  be mistaken.

9      Q    Okay.  I'm sorry.  I didn't hear that the first

10  time.  Okay.

11      A    It's okay.

12      Q    Okay.  So your direct report was Jeff Beagle.

13      A    Correct.

14      Q    Until he was replaced by Michelle?

15      A    Correct.

16      Q    And who were the folks reporting to you during

17  that timeframe of 2017-2018, during the Puerto Rico

18  time?

19      A    I believe it was Beth -- Beth Stone was my

20  direct report at that time.

21      Q    Okay.  And who did Beth Stone work for?

22      A    She worked for Mammoth Energy.

23      Q    In regards to you, who was JD Kinsey?

24      A    I am unaware of that name.  Yeah.

25      Q    You're not aware of a gentleman that would work

ALEXANDER NEIL KALMAN - April 21, 2022

1  doing, like, basically payroll for Higher Power that was

2  named JD Kinsey?

3      A    No, no.

4      Q    Okay.  You have never heard of JD Kinsey?

5      A    If I have I am not -- I did not work with him.

6      Q    Oh, okay.  Would you correspond with him?

7      A    I mean, it is entirely possible.  I dealt with

8  a lot of payroll questions and issues.  But I was never

9  directly over him and I wouldn't have directly, like --

10  on a day-to-day basis work with him.

11      Q    Okay.  Okay.  I mean, he didn't work in your

12  office?

13      A    Correct.

14      Q    Do you recall emailing, exchanging, calling,

15  talking with him?

16      A    I do not remember calling or emailing or

17  talking with him.

18      Q    Okay.  What about Missy Davis, do you remember

19  her?

20      A    Yes.

21      Q    Okay.  Who was Missy Davis in regards to you?

22      A    Missy Davis was a -- she was the HR generalist

23  or HR manager, I'm not sure of the exact title, for Five

24  Star Energy.  And as I understood it, she was a

25  contemporary.  She would ask me questions on

ALEXANDER NEIL KALMAN - April 21, 2022

1   administrative questions she had, but that was about it.

2        Q    Okay.  For Higher Power who was the person that

3   you would have dealt with, if anyone, that would have

4   been like their Missy Davis?

5        A    There was a person who was working there when

6   it first started, and I do not recall her name.  She

7   left within, I want to say, six months of acquisition.

8   And she was the most contemporary person for that

9   company.

10       Q    Okay.  Could that have been Shelly Wheeler?

11       A    The name sounds familiar, but I couldn't say

12   for certain.

13       Q    Okay.  All right.  I'm going to show you an

14   exhibit here that we're marking as Exhibit 199.

15       A    Okay.

16                  (Exhibit 199 was marked for

17                   identification and made a part of the

18                   record.)

19       Q    Can you see my screen where we have, basically,

20   it's like a summary from your LinkedIn.  Do you see

21   this?

22       A    Correct.

23       Q    Okay.  Can you just take a look at this Exhibit

24   199 and let me know if that is, in fact, information

25   from your LinkedIn and if it's accurate?

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    Yes.   That is from me and looks to be accurate,
2    correct.
3    Q    Okay.   So you worked at Paycom before Mammoth?
4    A    Correct.
5    Q    Did your work at Paycom have anything to do
6    with you getting hired at Mammoth?
7    A    Correct.
8    Q    Okay.   So what happened?   How did you go from
9    Paycom to Mammoth?
10   A    Yeah.   I was looking for a new job.   I was no
11   longer interested in staying with Paycom.   And at that
12   point a friend of mine heard that -- he got a call from
13   a recruiter.   He had a network of recruiters that he
14   worked with and one of them was looking for a payroll
15   person who had experience with Paycom and he was, like,
16   here, here is Alex, here is his number.   I met with her,
17   had lunch, and then from there had an interview with
18   Mammoth to be their payroll person.
19   Q    Okay.   And I noticed at the top that you
20   advertise yourself as having eight years of Paycom HRIS
21   experience.   First of all, can you tell me what HRIS?
22   A    Yeah, it's human resources information system.
23   HRIS is a colloquial term that is used in the
24   third-party payroll milieu.   And it allows for not just
25   payroll, but many other HR functions, including

ALEXANDER NEIL KALMAN - April 21, 2022

1  applicant tracking, time management, auditing,

2  reporting, things like that.

3      Q   Okay.  And so -- and forgive me for any

4  ignorance.  If that's your first line on your resume,

5  this is obviously very important to you.  I mean, isn't

6  that right?  Eight years of Paycom HRIS experience, that

7  is extremely important to you as you advertise yourself

8  to employers?

9      A   Yes.

10      Q   Okay.  And can you explain to me why it's

11  important to you?  Why is that valuable?

12      A   I mean, it's valuable to me because it is a

13  skill that I can show that will allow me to get jobs

14  that require experience.  I am no longer in the payroll

15  and HR field, though, and I have no desire to go back to

16  it.

17      Q   Okay.

18      A   So I will be taking this down.

19      Q   All right.  Is there something about Paycom

20  that was -- I mean, because you advertise specifically

21  for Paycom.  Is there something about Paycom that, by

22  advertising that, that made you more valuable?

23      A   Yes.  Specifically whenever somebody is looking

24  for a new payroll representative they generally ask for

25  a certain amount of experience with whatever system they

ALEXANDER NEIL KALMAN - April 21, 2022

1  are currently using, be it Paycom, ADP, Paylocity,
2  UltiPro.  And so putting out the experience that you
3  have with certain systems is advantageous for hiring.
4      Q   Okay.  And so knowing Paycom was a big part of
5  you getting hired at Mammoth?
6      A   Correct.
7      Q   After Mammoth you worked for Yakima Valley Farm
8  Workers Clinic?
9      A   Yes, Yakima Valley Farm Workers Clinic.
10     Q   Okay.  Can you tell me what that work was
11  about?
12     A   I was a benefit leave analyst.  I worked on
13  rolling out the employer portion of the Washington Paid
14  Family Medical Leave Act that went out in 2020.  I
15  helped with their leave programs and managed their FMLA.
16     Q   During the time you worked for Mammoth during
17  that Puerto Rico time of 2017 to 2018, you already had
18  your bachelor in business administration; correct?
19     A   Correct.
20     Q   And also business administration and management
21  like it says here?
22     A   I have a Bachelor's of Science in Business
23  Administration; right.
24     Q   And that was a degree you already had before
25  you went to Mammoth?

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1      A    Correct.
 2      Q    Okay.  Did you have any certifications, look
 3  you HR relevant certifications before you went to
 4  Mammoth or during the time you worked there?
 5      A    No.
 6      Q    Okay.  Can you explain to me any training
 7  you've had, if any, about the Fair Labor Standards Act?
 8      A    Only that I looked at myself and when I was
 9  being advised by legal representatives.
10      Q    Okay.  What legal representatives?
11      A    There were -- I was not directed -- I was not
12  represented directly.  I apologize.  I was on the
13  peripheries of other cases that Mammoth and subsidiaries
14  had that I had to --
15           MS. VILLASEÑOR:  I'm going to interrupt
16  here to counsel you to remember that you have a
17  privilege that relates back to any communications you
18  had with legal counsel while you were at Mammoth to the
19  extent that they have not been limited waived.  And I
20  will just instruct you on that.
21      Q    (By Mr. Moulton)  So, Mr. Kalman, just if I
22  may, I don't mean to get into details of conversations
23  with any lawyers or any -- you know, communications that
24  you may have been privy to, because, as Ms. Villaseñor
25  has asserted, there is a attorney-client privilege that
```

ALEXANDER NEIL KALMAN - April 21, 2022

1    Mammoth has on that.

2          What I'm trying to get is kind of your

3    background on whether -- you know, what you know

4    about -- just generally how you know about the FLSA and

5    basic information about that.

6          So it sounds like Mammoth had had some wage and

7    hour cases and you had maybe kind of helped out with

8    some of those cases and so you learned a little bit

9    about the FLSA through that.  Is that accurate?

10        A    Correct.

11        Q    Okay.  Now, did you have any specific training

12   as part of your degree about the Fair Labor Standards

13   Act?

14        A    No.

15        Q    And have you attended any HR seminars where you

16   would learn about the Fair Labor Standards Act?

17        A    No.

18        Q    Okay.  Now, you have done some of your own

19   research?

20        A    Correct.

21        Q    In general is it your understanding that the

22   Fair Labor Standards Act has rules about when and how to

23   pay overtime pay?

24        A    Correct, yes.

25        Q    In regards to payment of day rates, what is

ALEXANDER NEIL KALMAN - April 21, 2022

1  your understanding what the Fair Labor Standards Act
2  would require?
3      A   As far as I am aware you cannot pay day rates.
4      Q   Okay.  If you do pay a day rate does Fair Labor
5  Standards Act provide how it can be done or are you just
6  saying you just can't?
7      A   I am not aware that you can.
8      Q   Okay.  Now, Mr. -- is it -- I'm sorry.  I might
9  say your name still wrong.  Is it Kalman?
10     A   Kalman.
11     Q   I forget if it's Kalman or Kalman?
12     A   It's Kalman.
13     Q   Kalman.  I'm sorry.  I'm struggling with that
14  one.  Mr. Kalman, there has been a limited waiver of
15  attorney-client privilege in this case and I'm going to
16  ask you some specific questions to see if you have any
17  knowledge about those issues that have been waived.
18  Obviously, Ms. Villaseñor will assert any privilege.
19  And if she asserts an attorney-client privilege, I don't
20  want you to answer it.
21          But I want to know if you ever had any
22  conversations or communications with an attorney named
23  Steven Broussard about overtime or payment as to the
24  workers in Puerto Rico that were restoring electrical
25  work?

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    I do not know if I spoke with Steven Broussard
2  specifically about this.
3    Q    Okay.  And we'll talk about some emails that he
4  was -- that I think you're on --
5    A    Okay.
6    Q    -- in regards to that.  So but -- but before we
7  get there, it sounds like you don't actually remember
8  talking to him or being in a meeting with him?
9    A    Not to my knowledge, no.
10    Q    Okay.  I want to show you an email chain that's
11  Exhibit 131, which has been introduced previously.  And
12  we're going to be reviewing several emails today,
13  Mr. Kalman.  And I think the most efficient way to do
14  this is you can see here on the screen, you can see it
15  starts at the bottom and moves up.
16         What I think we should do is I'm going to go
17  down to the bottom of this exhibit and let you read it,
18  get a chance, get familiar with it.  When you're ready
19  would you ask me to scroll up so you can continue
20  reviewing it, and when you're ready let's talk about it.
21  Fair enough?
22    A    Okay.
23    Q    And if you need me to Zoom, I can Zoom.
24    A    Okay.  I'm good to go up.
25    Q    Okay.

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1      A    Okay.  All right.  I am good to scroll up.
 2                 COURT REPORTER:  Mr. Moulton, are you
 3   still there?
 4                 THE WITNESS:  No.
 5                 (No response.)
 6                 COURT REPORTER:  Ms. Villaseñor, will you
 7   let us go off the record, please?
 8                 MS. VILLASEÑOR:  Yes.  Let's go off the
 9   record.
10                 VIDEO OPERATOR:  Off the record.
11                 (A break was had from 10:06 to 10:15
12                  a.m.)
13                 VIDEO OPERATOR:  Back on.
14      Q    (By Mr. Moulton) All right.  Mr. Kalman, we
15   were reviewing an email before we got interrupted there.
16                 MS. VILLASEÑOR:  Dave, I'm sorry.  You're
17   on Exhibit 133; correct?
18                 MR. MOULTON:  131.
19                 MS. VILLASEÑOR:  Oh, you were on 133 or
20   were you on 131?
21                 MR. MOULTON:  I was on 131.
22                 MS. VILLASEÑOR:  Okay.  Thank you.
23                 MR. MOULTON:  Yeah, no problem.
24      Q    (By Mr. Moulton)  So, Mr. Kalman, you have had
25   a chance to review Exhibit 131; correct?
```

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    I read up until the Steve Broussard message

2  regarding the FLSA.  I did not read above that.  So I'm

3  not sure if there was more to it.

4    Q    Okay.  All right.  So I think you need to

5  review, then, the top page.

6    A    Okay.

7    Q    That way -- okay.  So go ahead and review that.

8    A    All right.  Is that something you will bring up

9  or is that something I need to find somewhere?

10    Q    Oh, you still don't see it yet.  Okay.  I got

11  knocked off.  I haven't shared my screen yet.  I'm

12  sorry.

13              (The witness reviewed the document.)

14    A    Okay.  I have reviewed that.

15    Q    Okay.  So I want to ask you a few questions

16  about it.  Back here, if you will notice you were

17  forwarded an email from Keith Ellison about what they

18  were going to pay the folks working in Puerto Rico.  Do

19  you see that?

20    A    Yes.

21    Q    What did you understand from Mr. Ellison's

22  email?

23    A    That those were the day rates that he wanted to

24  pay his employees.

25    Q    Were you part of the process to come up with

ALEXANDER NEIL KALMAN - April 21, 2022

1  what language would be used in the offer letters?

2     A   No, I was not part of the offer letter

3  languaging.

4     Q   Now, in your -- in your position in HR with

5  Mammoth Energy, were you aware of any efforts made by

6  the subsidiaries like Cobra and Higher Power and Five

7  Star to recruit workers?

8     A   Yes.  I know they had to do a lot of hiring for

9  this job.

10     Q   Okay.  Do you know when the hiring or the

11  recruiting started?

12     A   I am not sure.  I think it was after we signed

13  the contract with PREPA.

14     Q   Okay.  At this point as of October 19th when

15  Mr. Ellison announced these day rates, at this point

16  there still wasn't a more detailed or more firm, if you

17  will, payment plan set up; right?

18     A   Correct.

19     Q   Okay.  It was several days later when there was

20  a plan to come up with having hourly rates that would

21  target these day rates; correct?

22     A   Absolutely.

23          MS. VILLASEÑOR:  Objection; form.

24     Q   (By Mr. Moulton) Is that your understanding?

25     A   Yes.

ALEXANDER NEIL KALMAN - April 21, 2022

1      Q    Okay.  Were you ever consulted about the
2  recruiting efforts?  Were you ever asked about it?
3      A    No, I was not a part of the recruiting efforts.
4      Q    Okay.  That was the job of folks at Higher
5  Power and Five Star?
6      A    Correct.
7      Q    Let me show you a document we've used
8  previously as Exhibit 140.  And just to confirm with me,
9  the window you are seeing, do you see -- you just see
10  the window that has the document; right?  The 140.  Are
11  you seeing anything else?
12      A    I am only seeing 140 at this time.
13      Q    Okay.  So let's do the same thing with 140.  Go
14  ahead and review up from the bottom of this document
15  where the email chain starts and scroll up.  Let me know
16  when you need to scroll.
17      A    Okay.  Okay.  All right.  Okay.
18      Q    Okay.  After having reviewed these emails, do
19  you recall these emails?
20      A    Yes.
21      Q    Okay.  And so starting back down at the bottom
22  it looks like you're starting this email chain with some
23  questions about how the folks in PR are going to be
24  paid; correct?
25      A    Correct.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q   Okay.  In regards to No. 2, can you tell us
2  what you were trying to find out?
3    A   Yes.  So the management team liked the term
4  "day rate" for the Puerto Rico hourly rate of pay.  It
5  was a quick shorthand for them at the time.  And so
6  that's what I was going for with that was if the
7  employees were going to be receiving their normal hourly
8  rate of pay that they received in-state as well as in
9  Puerto Rico.
10   Q   Okay.  And in number 8 -- I'm sorry -- on
11  November 8 you have a follow-up question about the
12  current policy to pay employees holiday time for all
13  holidays.  In this email which employees are you talking
14  about?
15   A   Specifically the employees that were going to
16  be in Puerto Rico, as they had different holidays.
17   Q   Okay.  And so was it the same policy for
18  holidays for the workers in Puerto Rico regardless if
19  they were Five Star or Higher Power?
20   A   As far as I'm aware the policies should have
21  been uniform.  I know that there was a lot of issue with
22  that.
23   Q   Okay.  So was the pay policy uniform between
24  Cobra, Mammoth, and Higher Power on the island?
25   A   Correct.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    And on No. 2, as you can see from the emails
2   above, the answer to your question from Ken and Keith is
3   here in No. 2.  Do you see that?
4    A    Correct.
5    Q    Okay.  And can you enlighten us what you
6   understood the -- what you understood by their answer?
7    A    That the employees would not be getting paid
8   their in-state hourly rate on top of their Puerto Rico
9   hourly rate, but would only be receiving the rate they
10   got while in Puerto Rico.
11    Q    Okay.  And can you describe to us what the rate
12   was in Puerto Rico?
13    A    I do not know off the top of my head.  It was
14   based off of the day rates in the original email by
15   Keith that were calculated based on hours worked.
16    Q    Okay.  Let's -- we're going to look at an email
17   from that same day as 140 I think.  Let's -- let's
18   confirm.  So the answer you got -- back on 140.  The
19   answer you got from Ken and Keith when he write his
20   answers down below, it was on Thursday, November 9th at
21   2:01 p.m.  Do you see that?
22    A    Correct.
23    Q    Okay.  So let's go over to 2 -- number 200 now,
24   Exhibit 200.  And let's take a look at this email chain.
25   And if you would just take a look at it and just let me

ALEXANDER NEIL KALMAN - April 21, 2022

1  know when you need to scroll up.

2      A    All right.

3      Q    All right, Mr. Kalman.  There, the email that's

4  dated November 9th, 2017, 2:13 p.m., in Exhibit 200, did

5  you tell Ms. Wheeler that the workers in PR that

6  normally receive an hourly rate -- an hourly rate will

7  only receive their day rate for the time they are in

8  Puerto Rico to include the general foreman?

9      A    Yes.  To clarify, though, the day rate that we

10  discussed was, again, that shorthand that the executives

11  liked, meaning it was a day rate that was broken down to

12  an hourly rate that the general foremans were going to

13  receiving instead of their normal salary, since they

14  were salaried employees in-state.

15      Q    Okay.  And the understanding you had here is

16  the same understanding you had for Exhibit 140, which

17  was just 12 minutes before; correct?

18      A    Right.  It should have been, like, the day rate

19  broken down into the hourly rate that we did those

20  conversions.

21      Q    Okay.  And we're going to talk about that in a

22  minute.

23      A    Um-hum.

24      Q    I will show you Exhibit 137.

25      A    Okay.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q   We used this one previously.  Can you tell us
2  what Exhibit 137 is?
3    A   From everything it looks like it should be the
4  base rate -- base pay plus day rate for certain
5  employees as well as certain classes of employees.
6    Q   Okay.  So the first part, the ones that are --
7  well, I guess I can't even say that.  But it looks like
8  there is some people that have base rates plus day
9  rates, and there is some people who only have day rates.
10  Can you explain why that was?
11    A   I mean, the only explanation I ever received
12  was that they negotiated a higher base pay.
13    Q   Were there some folks on the island, like, that
14  were in management that got a base salary plus a day
15  rate?
16    A   Correct.
17    Q   So under the base pay there, is that reflecting
18  those base salaries?
19    A   So the base pay, as far as I'm aware, should be
20  their normal salary, and then the day rate should be
21  what they receive in addition.
22    Q   Okay.  And we can see here that for the
23  mechanics, the safety guys, and then general foremen on
24  down that there is not a base pay listed; correct?
25    A   Correct.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    And for them it's just a day rate?

2    A    Correct.

3    Q    Let me show you what's been previously used as

4   Exhibit 139.  It's a two pager.  Why don't you just take

5   a look there at the bottom page of the document and then

6   look at the top page.  And I'm not going to ask any

7   details about top page.  Do you recognize this as the

8   pay scale for Higher Power in Puerto Rico?

9    A    Yes.

10    Q    And these are the same rates that Mr. Ellis set

11   forth in his original email; correct?

12    A    Without looking at the email I couldn't say for

13   certain, but I believe so.

14    Q    And in Exhibit 138 for Five Star we have the

15   same rate system; correct?

16    A    It should be, yes.

17    Q    On Exhibit 166 we have an email chain you're

18   copied on.  And I want you just to -- let's go ahead and

19   just review this and let me know when you want to scroll

20   up and I'll ask you about it.

21    A    Okay.  I've reviewed.

22    Q    Okay.

23    A    Okay.

24    Q    All right.  So with -- so you saw the question

25   from -- you were copied on this question from Missy and

ALEXANDER NEIL KALMAN - April 21, 2022

1  also copied with Mr. Beagle's response.  Can you
2  summarize for us what the issue was and how you were
3  handling it?
4      A   Yeah.  Employees were having questions about
5  their pay.  Employees were wanting to understand an
6  explanation of the day rate.  They found it very
7  complicated breaking the day rate down into an hourly
8  rate.  And so I believe Jeff created an Excel
9  spreadsheet to help them with that, and that's what he
10 attached.
11     Q   Okay.  So the way I understand it, and you
12 correct me if I am wrong, but Mr. Beagle took those day
13 rates and worked out an hourly rate that, if the worker
14 worked the entire week, would end up getting their day
15 rate; correct?
16     A   Correct.
17     Q   Okay.  And do you understand how he did that?
18     A   I mean, I -- I could come to an understanding.
19 I don't have an understanding currently because I
20 haven't done the math myself.
21     Q   Okay.  It's been a few years?
22     A   Yes.
23     Q   Okay.  But, you know, we're going to be -- I'll
24 ask you more in detail about that.  But before I get
25 there, did Missy Davis, did she ever express any

ALEXANDER NEIL KALMAN - April 21, 2022

1  displeasure to you about the -- this pay plan?

2      A   Yes.

3      Q   What did she say?

4      A   As far as I understand, she was just expressing

5  frustration in general.

6      Q   Okay.  So we see here that she was venting to

7  Ms. Samantha Nall.  But did she bring it up to you

8  privately at all?

9      A   I mean I would hear a lot of frustrations from

10  a lot of people, yes.  So Missy did communicate that she

11  was frustrated with the system.

12      Q   And what was her frustration?  Can you describe

13  to us what she was frustrated about specifically?

14      A   That the guys couldn't understand it.

15      Q   Okay.  And who -- did anyone else express that

16  frustration?

17      A   I mean, other than the men themselves, not to

18  my knowledge.

19      Q   Okay.  So would the men, the actual workers, be

20  expressing this frustration to you specifically or

21  directly.

22      A   No.  From what I understood they would express

23  it to Missy when she would get a call from them.

24      Q   Okay.  And did -- besides Missy was there

25  anyone else that was mirroring the frustrations towards

ALEXANDER NEIL KALMAN - April 21, 2022

1  you?

2      A   Shelly might have, but I don't know.

3      Q   Okay.  And in Exhibit 166 you can tell there is

4  an attachment here, a copy of hourly rate conversations,

5  V2, Excel spreadsheet.  Do you see that?

6      A   I see that there is an attachment.  I do not

7  see the attachment itself.

8      Q   Right.  Okay.  And so we're going to review

9  that, which was an Excel spreadsheet that you would have

10  seen or reviewed when you worked for Mammoth; correct?

11      A   I would have seen it, yes.

12          MR. MOULTON:  Okay.  This is Exhibit 167,

13  which is a native Excel file.  It's unmarked, but it is

14  Exhibit 167.  This is for the court reporter.  The file

15  name is Mammoth 3292 Confidential.

16      Q   (By Mr. Moulton) All right.  Mr. Kalman or

17  Kalman let look at this spreadsheet together.  I'm

18  assuming with your background in information systems you

19  are pretty competent with an Excel spreadsheet.

20      A   In general, yes.

21      Q   Okay.  So here in this spreadsheet we can see

22  how Mr. Beagle calculated the hourly rates that would

23  match the day rates the workers had been told; correct?

24      A   Yes.

25      Q   And so the way this was done is assuming a

ALEXANDER NEIL KALMAN - April 21, 2022

1   seven days worked in a work week with 16 hours per day,

2   you would essentially, at the -- for example, at the

3   1,250 per day level need to get 5912 as the regular

4   rate.  So over that entire week you would get the

5   equivalent of the day rate, which was 8,750; correct?

6       A   Correct.

7       Q   And so in column K here we can see exactly what

8   that rate would have to be to match these day rates that

9   have been set by Mr. Ellison and had been promised to

10  workers; right?

11      A   Yes.

12      Q   Now, I don't know if you've ever noticed with

13  this spreadsheet, but, like, if you increase the decimal

14  places, the number of decimal places you can see that

15  rate, for example, keeps on going.  Do you see that?

16      A   I do see that.

17      Q   Okay.  So, in other words, that's not a rounded

18  rate in this spreadsheet, it keeps going.  Does that

19  make sense?

20      A   Yes.

21      Q   Okay.  So I took this same spreadsheet in a

22  prior deposition, we're calling it 174 and we're -- the

23  file name is Mammoth 3292 Confidential-EX174.  If we

24  take -- this is the same spreadsheet.  If we round those

25  numbers like it would in payroll -- right?  If you're

ALEXANDER NEIL KALMAN - April 21, 2022

1  going to put hourly rates in payroll you don't put

2  59.1212 going on.  You would put 59.12; right?

3           MS. VILLASEÑOR:  Objection; form.

4      Q   (By Mr. Moulton)  You can answer, sir.

5      A   Um, it, uh -- the hourly pay rate goes in as a

6  set number so long as the employee is hourly.  If it is

7  salary you are supposed to put in the bi-weekly or

8  whatever frequency payroll that the employee will

9  receive directly and then the system calculates out the

10 actual salary.

11     Q   Okay.  And I guess maybe we're not talking

12 about the same things.  My question was is that when you

13 actually are going to go into payroll system and

14 calculate what the pay would be for these hourly

15 workers, the rate you would use would be rounded to the

16 nearest penny; correct?

17     A   As far as I am aware, yes.  I don't have that

18 knowledge about Paycom's internal systems.  We would put

19 it into two decimal points.

20     Q   Okay.  So you would put in this as two decimal

21 points.

22     A   Correct.

23     Q   Okay.  So when we do the same math in a

24 spreadsheet at two decimal points to calculate what the

25 actual pay would be for a week at these hour rates, we

ALEXANDER NEIL KALMAN - April 21, 2022

1  get this column over here in L.  Did you ever notice
2  that the numbers would be a little bit different than
3  exactly the day rate?
4      A   We were made aware of this issue, yes.
5      Q   Okay.  And so you can see from, you know, in
6  column M the differences between what it would be with
7  the rounded rate versus the promised rate; right?
8      A   Correct.
9      Q   Okay.  So, for example, at the $1,250 level,
10 it's over a week, the different will be 24 cents?
11     A   Yes, that appears accurate.
12     Q   Right.  And, you know, just another example,
13 this one is easier.  At the thousand dollar level the
14 difference would be 40 cents.
15     A   Correct.
16     Q   Okay.  And so we can see, then, that the hourly
17 rates that were actually used to target the day rates,
18 when applied over an entire week, would actually get the
19 worker to within less than a dollar of what their day
20 rate was promised; right?
21     A   Correct.
22         MS. VILLASEÑOR:  Objection; form.
23     Q   (By Mr. Moulton) Now, Mr. Kalman, did you ever
24 see a spreadsheet like this calculated for a different
25 number of hours per day, like maybe 11?

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    The -- I forget the number of hours that were
2  initially discussed.  I had thought it was 12, but
3  clearly I'm mistaken, since this spreadsheet says 16.
4  I'm not aware of any spreadsheets other than this one.
5    Q    I will pull up my next exhibit.  Mr. Kalman,
6  are you seeing my screen right now?
7    A    I see the Excel document that we were looking
8  at prior.
9              MR. MOULTON:  Okay.  Is Ms. Villaseñor
10  still on?
11              COURT REPORTER:  Yeah, she is.
12              MR. MOULTON:  All right.  She's just
13  muted.  Okay.
14              MS. VILLASEÑOR:  Yes.
15              MR. MOULTON:  All right.  We're ready to
16  go.
17              MS. VILLASEÑOR:  Are you trying to get a
18  new exhibit?
19              MR. MOULTON:  Yeah.  It's -- something is
20  wrong with Zoom.  It's not showing me what I'm showing.
21  So let me just try this.  It won't let me stop sharing.
22  I do this all the time.  I've never had this problem.
23              MS. VILLASEÑOR:  Maybe you have too many
24  tabs.
25              MR. MOULTON:  Maybe.  I mean, it's

ALEXANDER NEIL KALMAN - April 21, 2022

```
1   possible.  Do you see Exhibit 151 now?
2                   THE WITNESS:  I'm still seeing the same
3   Excel document.
4                   MR. MOULTON:  Okay.  So the screen share
5   is frozen on my end.  Can you all just do a five-minute?
6   Let me just reset this.  Is that all right?
7                   MS. VILLASEÑOR:  All right.
8                   MR. MOULTON:  All right.  Thanks.
9                   VIDEO OPERATOR:  Off the record.
10                  (A break was had from 10:48 to 10:52
11                   a.m.)
12                  VIDEO OPERATOR:  Back on.
13      Q    (By Mr. Moulton) All right.  So, Mr. Kalman,
14   can you see Exhibit 151 on your screen now?
15      A    Correct, yes.
16      Q    Okay.  So after looking at the math we did,
17   that we looked at in the spreadsheets, can you verify
18   for us that these Cobra rates are the rates that were
19   figured out by Mr. Beagle in the spreadsheet?
20      A    Yes.
21      Q    Okay.  And can you explain to us what these
22   different rates are?
23      A    There is the Puerto Rico storm per day.  So
24   that is a brief outline of how much the employees can
25   expect to make on a given day given a certain number of
```

ALEXANDER NEIL KALMAN - April 21, 2022

1  hours worked.  The PR storm per hour is the hourly rate
2  that they would be receiving paid in Puerto Rico where
3  they were working.  And the non-Puerto Rico wage would
4  be whatever they would be making back state side during
5  normal business operations.
6      Q   Okay.  So these -- if I understand these rates
7  right, these rates are figured to be, like -- like let's
8  take this mechanic rate.  This 4257 is the rate where,
9  if you work a full week and if it's 16 hours per day
10  full week, with the 4257 regular rate plus the overtime
11  on that, it's going to come out to be 900 times 7 for
12  the week; right?
13     A   Correct.
14     Q   And so there -- there's a problem with this pay
15  system for when people work a -- less than a complete
16  week; right?
17             MS. VILLASEÑOR:  Objection; form.
18     A   We did notice a pay discrepancy when they are
19  working less than a full seven days.
20     Q   (By Mr. Moulton) Okay.  Can you describe to us
21  what the pay discrepancy was when you work less than a
22  full seven days?
23     A   Based on -- you basically had to redo the
24  calculations to find a new appropriate hourly rate to
25  make it out so that the daily rate came out to be

ALEXANDER NEIL KALMAN - April 21, 2022

1   accurate.

2       Q    Okay.  So would you -- would you actually

3   calculate a new regular rate or would you just pay the

4   difference between what it would be hourly and what the

5   day rate was?

6       A    I believe once we noticed that there was this

7   discrepancy and we figured out -- I believe that we went

8   ahead and paid a true up amount based off of the number

9   of days worked.

10      Q    Okay.  Now, on island there wasn't a system

11  like you would normally have where folks -- where hours

12  were recorded exactly, like, you know, sign in at 5:50

13  a.m. and sign out at 6:30 p.m.; correct?

14      A    Correct.

15      Q    How were the hours tracked on the island for

16  the workers if at all?

17      A    To my understanding it was done that the

18  managers would record the number of guys that were going

19  out, made sure that they worked a full day, which was

20  the number of hours that we did the date rate off of,

21  the 16, and then would come back and would report that

22  information to the administration and they would put

23  those hours in.

24      Q    Were you ever aware or not whether or not

25  managers actually recorded actual time worked or made

ALEXANDER NEIL KALMAN - April 21, 2022

1 sure they actually worked 16, or was it more of an
2 attendance-based system?
3      A   I am not aware.
4      Q   Okay.  But safe to say that when you are
5 calculating how much the true ups would be, you would
6 assume 16-hour days; correct?
7      A   Correct.
8      Q   Okay.  And if we could I'd like to do an
9 example based on 151 like at the journeyman lineman rate
10 of $1,000 per day and 47.30 per hour.  If you take, as
11 an example, if you have a journeyman lineman who works
12 one day in that -- in the work week, and if his hourly
13 rate is 47.3 -- 47.30 in the system for one days work,
14 the system would calculate 47.30 times 16; correct?
15      A   Correct.
16      Q   That comes out to 756.80; right?
17      A   Yes.
18      Q   I have the calculator up.  And so when you talk
19 about the true up, you're talking about paying the
20 difference between the day rate of a thousand and that
21 $756.80 figure for example; right?
22      A   Correct.
23      Q   So this was -- so this true up system is the
24 way you can make sure you're still paying the folks on
25 island what they were expecting to be paid even if they

ALEXANDER NEIL KALMAN - April 21, 2022

1  don't work a full week; right?

2      A   Correct.

3      Q   We're going to look at an exhibit which has

4  been previously used an Exhibit 201.  Again, it's an

5  email so it's not very long.  But go ahead and look,

6  scroll through this, let me know when you want to scroll

7  up and we'll talk about it.

8      A   Okay.  Okay.

9      Q   All right.  Some in Exhibit 201 you and

10 Mr. Beagle, who is your boss, correct, are discussing

11 how to implement this true up system; right?

12     A   Correct.

13     Q   Okay.  And so why -- what is Mr. Beagle asking

14 you and why?

15     A   Because I have assisted with complicated

16 calculations in the past and I have worked on getting

17 those numbers into the Paycom system to report

18 accurately.

19     Q   You're the Paycom expert?

20     A   Correct.

21     Q   In your email back to Mr. Beagle what do you

22 mean about now you're unsure if you go with the day

23 rate, if you're required to pay the half OT premium of

24 full one-and-a-half.  What are you asking?

25     A   So let me reread this.  It's complicated.

ALEXANDER NEIL KALMAN - April 21, 2022

1   Q    Um-hum.

2             (The witness reviewed the document.)

3   A    So the best understanding I have is there are

4 questions on whether or not pay would need to be done at

5 a premium in addition to what we had paid out or if the

6 overtime and the true up was enough.

7   Q    Okay.  So you were expressing to Mr. Beagle

8 your uncertainty about whether or not additional

9 overtime would be owed?

10   A    If it needed to be calculate based on the true

11 up.

12   Q    Oh, I see.  So -- and I think -- so on this

13 middle email here of 3/13 it looks like you all are

14 talking about this idea where you -- that's what you --

15 this is the true up, right, where you say, You have a

16 day rate fixed earning you add to each day.  Are you

17 talking about the true up there?

18   A    Correct.

19   Q    Okay.  So in the next email you're discussing

20 with Mr. Beagle whether or not overtime would need to be

21 paid based on the true up?

22   A    Right.  If we would have to calculate their

23 hourly rate based on that true up amount.

24   Q    Okay.  So recalculate the hourly rate and then

25 figure out if overtime would be owed on that?

ALEXANDER NEIL KALMAN - April 21, 2022

1      A    Correct.

2      Q    Okay.  Do you remember if Mr. Beagle ever

3   answered that?

4      A    I am not aware.

5      Q    Were you aware of whether -- well, I mean, we

6   looked at a prior email where -- that you read -- you

7   may recall this, in Exhibit 131, where they were

8   discussing the pay plan with Mr. Broussard.  Do you

9   remember that?

10     A    Yes.

11     Q    Let's go ahead and just pull that up again, the

12  131 exhibit.  Do you see where -- there is these emails

13  going back and forth between Jeff Beagle and

14  Mr. Broussard where it looks like the last one on this

15  chain is October 22nd; right?

16     A    Correct.

17     Q    Okay.  So that was just the day before the

18  emails in 201; right?

19     A    Correct.

20     Q    Okay.  So there is a question that came up from

21  you, at least, the question about how to calculate

22  overtime the day after a conversation with their lawyer

23  about how to pay overtime; correct?

24     A    Correct.

25     Q    Are you aware whether Mr. Beagle followed up

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1  with Mr. Broussard about this -- about the true-up plan?
 2      A   I am not aware.
 3              MR. MOULTON:  Ms. Court Reporter?
 4  Ms. Bloye?
 5              COURT REPORTER:  Yes, sir.
 6              MR. MOULTON:  Have I used Exhibit 178
 7  yet?
 8              COURT REPORTER:  Let me go back and look.
 9  Hold on.  You have not mentioned 178.
10      Q   (By Mr. Moulton) All right.  Mr. Kalman, let's
11  look at Exhibit 178.  This is the same email chain we've
12  been looking at, a different branch of it, if you will.
13  Go ahead and take a look at this.
14      A   Okay.
15      Q   I'll scroll when you're ready.  Okay?
16      A   Okay.
17      Q   Okay.  What is Mr. Beagle asking you on
18  September 23rd at 3:15?
19      A   He is asking about a variable OT rate depending
20  on the number of hours they worked to better --
21      Q   Okay.
22      A   -- match up with the day rates.
23      Q   Okay.  Do you know if he checked with
24  Mr. Broussard about this?
25      A   I am not sure.
```

ALEXANDER NEIL KALMAN - April 21, 2022

1     Q    Let's look at Exhibit 180.  Some emails that
2  you're copied on.  Let's go ahead and do the same,
3  scroll up.  Let me know when you're ready.
4     A    Okay.  I'm good to go up.
5     Q    Okay.
6     A    Okay.
7     Q    Okay.  Now, with the Paycom system you're one
8  of the people that's going to have to be administering
9  the policies, the payroll policies to make sure the pay
10  is correct; right?
11     A    I did training for Higher Power and Five Star
12  to enter the time in, correct.
13     Q    Okay.  So in Mr. Beagle's email to you and
14  Ms. Davis, what is Mr. Beagle saying about how the true
15  ups are going to be handled?
16     A    That after each bi-weekly pay period is my
17  understanding, if the employee had not received an
18  amount equal to the number of days worked in Puerto Rico
19  they would receive that amount in a gross up.
20     Q    Let's look at Exhibit 181.  These are some
21  emails that you are also a part of.  Can you review
22  these for me?  Let me know when you are ready.
23     A    Okay.  I am good to go up.
24          Okay.  I am good to go up.  Okay.
25     Q    Okay.  What is Missy Davis asking for in this

ALEXANDER NEIL KALMAN - April 21, 2022

1   email chain?

2       A   So Missy was using the same email chain several

3   different times, it looks like.  And so I was following

4   up saying that we were going to be checking in with the

5   management team on how to handle the true up, and then

6   Jeff was responding.

7       Q   Okay.  And so Mr. Beagle asked your opinion on

8   the -- the true up policy; correct?

9       A   Correct.

10      Q   And -- and so what did you think about it?

11              MS. VILLASEÑOR:  Objection; form.

12      A   I said that it sounded fine by me.

13      Q   (By Mr. Moulton)  Okay.  And what did you mean

14  by that?

15      A   I mean, all I can say is what's on the email.

16  I mean, based on what it says, it sounds like I was okay

17  with that.

18      Q   Okay.  And to kind of clarify.

19      A   Yeah.

20      Q   Do you think your role in this was the person

21  that would determine, you know, that the gross ups would

22  be done or you were the person who was helping everyone

23  to implement that?

24      A   I offered options to my executive team and to

25  my director as to ways we could make payroll happen.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q   Okay.  So do you think you were part of the
2    decisionmaking process about what the policy would be or
3    more on the implementation side or both?
4    A   I would say probably both.
5    Q   Okay.  And with Mr. -- I'm sorry?  Somebody
6    said something.
7           COURT REPORTER:  It was just an audio
8    interruption.  But we have five minutes left.
9           MR. MOULTON:  Oh, okay.  For the video?
10          COURT REPORTER:  Yes, sir.
11   Q   (By Mr. Moulton) Okay.  So, Mr. Beagle -- I'm
12   sorry.  Mr. Kalman, did you ever hear anything about
13   whether or not Mr. Beagle, you know, discussed or
14   verified whether or not this policy would be compliant
15   with the FLSA with any lawyers?
16   A   I am not aware if he had that discussion.
17          MR. MOULTON:  Okay.  All right.  We can
18   go ahead and take a break for the video.
19          VIDEO OPERATOR:  Off the record.
20          (A break was had from 11:10 to 11:17
21           a.m.)
22          VIDEO OPERATOR:  Back on.
23   Q   (By Mr. Moulton)  So, Mr. Kalman, we are going
24   to look at another exhibit, Exhibit 169.  I have an
25   email chain that I want you to review if you would.

1  It's a little bit longer.  Maybe we don't have to do the
2  whole thing.  Let's kind of focus in on a few things.
3          If you notice, these are emails that have a
4  subject line of a Weekly Report Update.  Does that sound
5  familiar to you?
6      A   I believe that that's what they used to enter
7  time for the employees.
8      Q   Okay.  Are those also the same spreadsheets
9  that would have been used to apply the true ups or gross
10 up amounts?
11     A   I don't know if it would be the same
12 spreadsheet or a separate spreadsheet.
13     Q   Okay.  But that is how the true ups or gross
14 ups were communicated from the subsidiaries on up was on
15 a spreadsheet that you would have been included on;
16 right?
17     A   Correct.
18     Q   Okay.  So this is a -- so there is several
19 emails here about -- about the adjustments that you all
20 were making.  I want to go to 31 -- page 3155.  And if
21 you need more context to what we're going to talk about,
22 I can scroll up to where you want, but I'm trying to
23 save time here.
24         But on 3155 in this exhibit you mention adding
25 some adjustments that you're making.  Can you tell us

ALEXANDER NEIL KALMAN - April 21, 2022

1   what you're talking about?

2       A   That would have been things that she attached

3   to the spreadsheet, probably pay rate changes.  That's

4   my best understanding.  I believe that there were

5   employees that had been misclassified based on their

6   position.

7       Q   Do you see this email in the same chain from JD

8   Kinsey?

9       A   Yes.  Reviewing now.

10      Q   Does that ring a bell who that is, do you

11  remember him now?

12      A   Yes.  I do remember JD Kinsey now.  I believe

13  he is a -- related to Ken Kinsey.

14      Q   Right.  And what was -- what was he doing in

15  this -- as regards to payroll?

16      A   So JD Kinsey was the payroll person.  I forget

17  when he left.  And that's my misunderstanding.

18      Q   Okay.  And who did he do payroll for?

19      A   He, as far as I was aware, was the main payroll

20  person in Puerto Rico.  And so he would send -- he would

21  track the hours and then he would send those hours to

22  Five Star and Higher Power.

23      Q   Okay.  And then what would happen with those

24  reports after Five Star and Higher Power?

25      A   I believe that they would do the reviews to see

ALEXANDER NEIL KALMAN - April 21, 2022

1  if anybody was not paid and needed a true up and if

2  there are any employees that had been misapplied the

3  position and if they needed to have their position

4  changed in the system and a rate change with that.

5      Q   Okay.  So looking at this email now from JD

6  Kinsey on January 9th that spans Bates number 3157 and

7  3158, do you see that he's asking here about how to

8  adjust the pay for folks if they miss even one day

9  because their rates are going to be off?  Do you see

10 that?

11     A   Yes.

12     Q   Okay.  Does that refresh your memory that this

13 email chain is also dealing with these true ups for guys

14 that don't work a full week?

15     A   Correct.

16     Q   So at the top of this 3154, we have an email

17 from you.  Would you review this, please?

18     A   Okay.

19     Q   When you mention that you're working through

20 the changes to get the actual amount owed for each

21 employee, what do you mean?

22     A   So this is in January, and year change happens

23 last week of December, first week of January.  I believe

24 we had a payroll that straddled the years.  And so we

25 had to process a payroll for 2017 that was actually paid

Case 5:21-cv-00085-OLG   Document 41-13   Filed 08/02/24   Page 58 of 116

Page 58

ALEXANDER NEIL KALMAN - April 21, 2022

1    out in 2018.  And so we had to be very careful about

2    where the pay was attributed so it would be attached to

3    the appropriate W-2.

4        Q   Oh, I see.  Okay.  In regards to the true ups,

5    did you guys consider that the true up was an amount

6    that was owed?

7                MS. VILLASEÑOR:  Objection; form.  What

8    do you mean by "owed"?

9        Q   (By Mr. Moulton) Go ahead, sir.

10       A   Okay.  I believe that this was what they were

11   required to have to get to their normal day rate.

12       Q   Okay.  Well, was it your understanding that the

13   day rate was owed?

14       A   It's my understanding that that's what the

15   employees agreed to be paid and so that's what we need

16   to pay them.

17       Q   And so why do you think that?  What's the basis

18   of your understanding?

19       A   Instructions given to me by the executive team.

20       Q   Okay.  And who would have been involved with

21   that?

22       A   I mean, Keith Ellison was the one who dictated

23   the day rate.

24       Q   Okay.  Who else?

25       A   I believe it was Keith was the one who dictated

ALEXANDER NEIL KALMAN - April 21, 2022

1  that and leadership didn't question that.

2      Q   Okay.  And besides the emails and what we've

3  already talked about with Mr. Beagle setting that policy

4  of the gross ups, was there anyone else in management

5  that was involved in setting that policy that you know

6  of?

7      A   Not that I'm aware of.

8      Q   Did you ever hear -- did you ever hear anything

9  about whether or not the true ups were really just

10 discretionary bonuses that would be added to the pay

11 rather than something that was owed?  Did you hear

12 anything about discretionary bonuses that would be added

13 to the true ups?

14     A   Not I recall, no.

15     Q   That was never a part of the conversation?

16     A   Not that I recall, no.

17     Q   Okay.  So as far as you understood the true ups

18 were to get the employees up to what they had been

19 promised and what they were owed?

20     A   Correct, yes.

21     Q   Actually, we're going to skip this one.

22             (Referring to a document on screen

23              share.)

24     Q   All right.  So this process for making these

25 adjustments, the true ups up to the day rate, that --

ALEXANDER NEIL KALMAN - April 21, 2022

1   did the process for handling them was the same for Cobra
2   and Higher Power; correct?
3       A    Correct.
4       Q    And the same for Five Star; correct?
5       A    Correct.
6       Q    In Exhibit 172 we have an email chain that is
7   talking about the weekly update for January 26 with HPE
8   payroll corrections PR; right?
9                MS. VILLASEÑOR:  What are you showing,
10  Dave?
11               MR. MOULTON:  Oh, I'm sorry.  Let's try
12  that again.
13      Q    (By Mr. Moulton)   Exhibit 172, Mr. Kalman, we
14  have an email chain about the weekly update report for
15  January 26.  Do you see that?
16      A    Yes.
17      Q    Okay.  So it was part of your job to review
18  these weekly update reports; right?
19      A    I believe that I -- I received them and I
20  inputted the adjustments into Paycom.
21      Q    Oh, okay.  So you -- you were the one actually
22  putting in the gross ups into Paycom?
23      A    No.  That was the rate changes that I was
24  making the adjustments to.  The gross ups should have
25  been imported by Beth Stone.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    Okay.  Who is Beth Stone?

2    A    She was the payroll manager.

3    Q    And what company was she with?

4    A    She was with Mammoth.

5    Q    Okay.  So she worked in the same office as you?

6    A    Yeah.  She was my direct report.

7    Q    Okay.  So let's take a look at the spreadsheet

8    that's referenced in 172.  So we see some -- can you

9    tell us what we're looking at on this January 2nd tab?

10            MR. MOULTON:  Oh, and by the way, for the

11   court reporter, this is Exhibit 173.  It's a native

12   Excel spreadsheet, it's Mammoth 3149.

13   Q    (By Mr. Moulton)  All right, sir.  So on this

14   Exhibit 173 tab, Corrections for January 22nd, do you

15   recognize this?  Do you know what's going on here?

16   A    Yes.  So it looks like there are many changes

17   to employees who had incorrect rates previously due to

18   incorrect positions and those have been updated.  And

19   then there was standby time that was paid, and then

20   adding an employee to Blue Cross/Blue Shield.

21   Q    Okay.  But this is an example of the types of

22   spreadsheets where you guys would handle any corrections

23   that would need to be made.  And this one doesn't look

24   like it has any true ups, but it would be the same sort

25   of spreadsheet where you would put the true ups on here;

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1   correct?
 2            MS. VILLASEÑOR:  Object to the form.  If
 3   you want to show him one that you believe what you're
 4   talking about.  But this is not that.
 5       Q   (By Mr. Moulton) Sir, is this the type of
 6   spreadsheet that you guys would have tracked true ups
 7   on?
 8       A   As far as I am aware, yes.
 9       Q   Okay.  On the corrections needed for January
10   12th tab, can you tell us what this correction is about?
11       A   It looks like -- okay.  So looks like the
12   employee had requested certain taxes be not taxed, and
13   that was not done during the first payroll and so a
14   correction needed to be issued.
15       Q   Okay.  Is it -- is there also a correction here
16   for $1600 for missing two days of standby?
17       A   No.  That is a test.
18       Q   A test.  Oh, oh, I see.  Okay.  Thanks for
19   clarifying that.  That's just to -- that's a line just
20   to kind of keep you all organized, if you will?
21       A   Correct.
22       Q   On January 15th, 2018, this tab, can you
23   explain what's going on here?
24       A   Yes.  It appears that for a large minority of
25   the people the rate was not accurate and so we had to
```

ALEXANDER NEIL KALMAN - April 21, 2022

1  make an adjustment.  This, again, was probably done due
2  to the employees not being in the right position.  And
3  then it looks like for the final employee he was owed
4  overtime that was shorted to him on the given date and
5  that he needed to be paid at his updated rate.
6      Q   Okay.
7      A   He has two line items on there.  So, if you
8  see, there is the Higher Power -- there is one line item
9  where he needs to be changed to the higher rate and then
10  another one where he was shorted hours.
11     Q   Got it.  Let's look at 183.  So this is
12  referencing that January 26 report.  Do you see that?
13     A   Yes.
14         MR. MOULTON:  Okay.  We're going to take
15  a look at that January 26 report.  And can you see can
16  you see -- and for the court reporter, this is Mammoth
17  3145 native Excel spreadsheet.  It's Exhibit 184.  It's
18  not marked, but we wanted it attached.
19     Q   (By Mr. Moulton) All right.  Mr. Kalman, on
20  this tab here, Corrections Needed For January 26, can
21  you tell me what's happening here?
22     A   Yes.  This would be the true up amounts as
23  discussed previously.  Employees who did not work full
24  shifts, full 14 days on site, they would have to have
25  their pay adjusted to make sure they were paid

ALEXANDER NEIL KALMAN - April 21, 2022

 1  accurately.

 2      Q    Okay.  For these day rate adjustment amounts,

 3  do you recall who it was who would be entering this into

 4  the spreadsheet?

 5      A    Missy would enter that information --

 6      Q    Okay.

 7      A    -- or JD.

 8      Q    Go ahead.

 9      A    Sorry.  It was either Missy or JD.

10      Q    Okay.  I notice that this column I here, if you

11  look at the cells there is not a calculation there.

12  They are just amounts entered.  Do you see that?

13      A    Yes.

14      Q    Do you know how Missy and JD were putting these

15  numbers in?

16      A    I do not.

17      Q    You don't know if they had, like, maybe a sheet

18  they would reference to put those numbers in?

19      A    I mean, it's entirely possible.

20      Q    Okay.  But you're not aware of a sheet like

21  that?

22      A    Not to my knowledge.

23      Q    Okay.  So I'm on the January 19th sheet, is

24  that more of the same, the adjustments that need to be

25  made?

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    So some of them were -- some of them do appear
2 to be true up adjustments needed, but not all of them.
3 So, for example, the first one looks like it was an
4 inappropriate rate.
5    Q    Okay.  On the January 12th tab, got more
6 examples; correct?
7    A    Correct.
8    Q    All right.  So what -- I see that you're copied
9 on these reports.  What is your role in regards to these
10 correction reports?
11    A    Being aware of them, raising any questions that
12 I might have to my director, and to make sure that Beth
13 received them and got them imported into the payroll
14 system.
15    Q    We'll look at Exhibit 202.  This is a new one.
16              (Exhibit 202 was marked for
17                identification and made a part of the
18                record.)
19    Q    Go ahead and take a look at this and we'll
20 scroll up and talk about it.
21    A    Okay.  Okay.  Okay.  Okay.  Okay.
22    Q    All right.  Can you describe to us, what was
23 the problem that was happening that gave rise to this
24 email?
25    A    So we had several issues.  One of the major

ALEXANDER NEIL KALMAN - April 21, 2022

1  ones that was discussed was the routing and account

2  numbers not being accurate and there being issues with

3  direct deposits going through appropriately.  In

4  addition, there are email considerations of employees

5  being paid the wrong position day rate pay and us

6  needing to get that corrected.

7      Q   Okay.  And Mr. Beagle also brings up on

8  November 17th in the morning, 8:15, there is an issue

9  with -- about the true ups; right?

10     A   Correct.

11     Q   About calculating how much they should be trued

12 up because they may be shorted if they work less than a

13 full week.  Do you see that?

14     A   Yes.

15     Q   Okay.  Were you aware whether or not Mr. Beagle

16 had ever, you know, sat down and calculated what all

17 those gross up amounts should be for the workers?

18     A   Not off the top of my head.  I wasn't part of

19 that to my knowledge.

20     Q   Okay.  But you -- when he says that he's doing

21 that right here in the email, does that trigger any

22 memory for you?

23         MS. VILLASEÑOR:  Objection; asked and

24 answered.

25     A   I -- I see that he says that he's calculating

ALEXANDER NEIL KALMAN - April 21, 2022

1  the gross up now.  I may have assisted with that, but
2  I'm not aware that I did.
3      Q    (By Mr. Moulton) That's certainly a calculation
4  that you would know how to do; right?
5      A    I mean, if I sat down with it I could, yes.
6      Q    Right.  And what is Mr. Beagle saying to do in
7  this email, November 17th, as you understand it?
8      A    So in this he was talking about the routing and
9  account information being incorrect, and to put in the
10 spreadsheet DD corrected, so direct deposit corrected.
11 And then we would generate the employee's new direct
12 deposits that would be sent out to their banks.
13     Q    The offer letters, were you part of the
14 decisionmaking about what the offer letter should say?
15     A    No.
16     Q    Do you recall referencing offer letters?
17     A    I received offer letters that were signed and I
18 made sure to document them in the Paycom system.  But,
19 otherwise, I did not review them, no.
20     Q    Okay.  So when you reviewed signed offer
21 letters to document them in the Paycom system what were
22 you doing?
23     A    Making sure that they were entered into the
24 right employee's file.
25     Q    Okay.  Did you have to -- did you have to enter

ALEXANDER NEIL KALMAN - April 21, 2022

1  anything with regard to pay rates?

2      A    Yes.

3      Q    What would you enter?

4      A    What was listed on the offer letter.

5      Q    Okay.  So if the offer letter had a day rate,

6  would you enter the day rate?

7      A    We would enter in whatever the hourly rate for

8  that position was.

9      Q    So back on that exhibit like with the charts

10 and the rates, you would enter in the hourly rate that

11 corresponded with the particular day rate?

12     A    Correct.

13              (Exhibit 203 was marked for

14               identification and made a part of the

15               record.)

16     Q    Let's look at Exhibit 203.  So this is an email

17 from you to Shelly Wheeler, who is HR at Higher Power;

18 right?

19     A    I am not seeing anything currently.

20     Q    Oh, I'm having a rough day today, Alex -- or

21 Mr. Kalman.  I'm not sharing my screen when I need to be

22 sharing it.

23          Okay.  So No. 203.  And this is an email from

24 you to Shelly Wheeler, who is the HR person at Higher

25 Power; correct?

ALEXANDER NEIL KALMAN - April 21, 2022

1       A    Correct.

2       Q    Okay.  Can you tell me why you're sending her

3  all these documents?

4       A    Yes.  I was often asked to send documents on

5  Jeff's behalf when he was in meetings or otherwise

6  occupied.

7       Q    Okay.  So you were giving all these, basically,

8  new hire documents over to Ms. Wheeler so she could have

9  them for Higher Power; right?

10      A    Correct.

11      Q    So these are documents that would have been

12  developed through a process at the -- at your level and

13  then given or assigned to Higher Power; right?

14      A    It was not at my level.  It was the director

15  came up with the policy documents.

16      Q    And by "the director," you mean your boss?

17      A    Jeff Beagle.

18      Q    Right.  So this was -- the offer letters and

19  these documents you see here were developed at the

20  Mammoth Energy level and pushed down to Higher Power;

21  right?

22      A    Correct.

23      Q    Do you know if -- if offer letters were

24  collected from all employees?

25      A    To my knowledge, yes, that was part of our

ALEXANDER NEIL KALMAN - April 21, 2022

1    standard process.

2        Q    Okay.  On Exhibit 147 we have an email from you

3    to Missy Davis asking about some missing offer letters.

4    Do you see that?

5        A    Yes.

6        Q    Okay.  And what is Missy's response?

7        A    She said, "They were existing employees so I

8    didn't have them complete offer letters."

9        Q    Okay.

10       A    "Daniel Baldwin hasn't left yet."

11       Q    Right.  So can you say for certain whether or

12   not you had offer letters for every single person on the

13   island?

14       A    No, I can't say that for certain.

15       Q    In Exhibit 185 we have an email from JD Kinsey

16   to you about entering time.

17       A    I am reviewing the email.

18       Q    Okay.

19       A    Okay.  I see that.

20       Q    Okay.  So JD is asking about two different

21   kinds of employees.  He's asking about some employees

22   about how to enter their information into the Paycom and

23   then for other employees how to handle theirs; right?

24       A    Correct.

25       Q    And the difference would be there is some

ALEXANDER NEIL KALMAN - April 21, 2022

1  employees that are working on the island that have a

2  base salary plus a day rate and there is some other

3  folks who are working under this system we've been

4  talking about, it's hourly system plus the gross ups or

5  true ups; right?

6           MS. VILLASEÑOR:  Objection; Form.

7     A    So the -- I'm not sure on these specific

8  employees.  But it appears that they might be some of

9  the ones that did receive their salary pay in addition

10  to the day rate.  The day rate would still be -- so for

11  the salary employees I do believe there was just the day

12  rate entered in directly.

13     Q    (By Mr. Moulton) Okay.  And for the ones that

14  were on the -- on the hourly system plus true up,

15  they -- they're supposed to be entered just as 16 hours

16  per day worked; right?

17     A    Yes, that is my understanding.

18     Q    Okay.  And this is what you're confirming with

19  JD; right?

20     A    Correct.

21               (Exhibit 204 was marked for

22                identification and made a part of the

23                record.)

24     Q    I'm going to show you Exhibit 204.  Go ahead

25  and look at this.  We'll talk about it.

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    Okay.  So appears Missy was seeing some
2  adjustments that hadn't gone through.
3    Q    Okay.  And keep on reviewing here.  We'll talk
4  about it here in a second.
5    A    Okay.  I'm good to continue up.
6    Q    Okay.
7    A    All right.  It sounds like there were employees
8  who had pay issues that needed to be corrected and that
9  Missy and JD were working on those.
10   Q    Right.  Okay.  So I have a question about this.
11 They seem to have divided the labor between themselves.
12 Do you recall that?
13   A    Yes, the email states they were dividing labor.
14   Q    Right.  And so Missy is going to work on the
15 Five Star guys and JD is going to work on Higher Power
16 guys.
17   A    Yes.
18   Q    Once you had workers inside the PR department,
19 JD or Missy could have worked on them; right?
20           MS. VILLASEÑOR:  Objection; form.
21   A    I believe so.  I would have to review the
22 Paycom setup.  It's fairly complicated.
23   Q    (By Mr. Moulton)  Okay.  Well, you're my
24 best -- you're my best source of information on Paycom
25 so I'm going to ask some questions about it.  How does

ALEXANDER NEIL KALMAN - April 21, 2022

1  permission work on Paycom?

2      A   So admin levels, users can set up new users.

3  The only ones that had admin level to my knowledge were

4  myself, Beth Stone, and Jeff Beagle at the time.  There

5  were discussions about not giving us all admin access;

6  however, there was a limitation that would not allow

7  Paycom to let us do the things we needed to do to

8  complete our jobs without that admin access, so that's

9  where that security had to come from.

10         So I was responsible for setting up most of the

11  users.  I could dictate the access that managers had and

12  users had based on the type of product that they should

13  be able to see, whether it's payroll or just time off,

14  things like that, and then by specific either

15  departments' employees or other user access groups that

16  were already set up within Paycom.  And that's just why

17  I say that without reviewing specifics I couldn't give

18  you an exact list of who could and who couldn't make

19  those adjustments, but it should be fairly easy to

20  review within the Paycom system.

21      Q   Got it.  So does it make sense for you for

22  Missy to be splitting up the lists so they don't double

23  dip if she was only looking at Five Star?

24      A   From my understanding it looks like she only

25  took the Five Star employees and he took the Higher

ALEXANDER NEIL KALMAN - April 21, 2022

1   Power employees.  And since Missy was the HR person for
2   Five Star, I didn't see that as unusual.
3       Q    And I appreciate that.  I hear that, but I'm
4   asking kind of a little different question.
5       A    Okay.
6       Q    Do you know why she would ask -- why would she
7   need to split up a list if she didn't have access to it?
8            MS. VILLASEÑOR:  Objection; form.  He
9   can't speculate as to what she's thinking.
10      A    So with the -- I mean I think she was offering
11  to be kind, honestly, because she was wanting to do some
12  of the work because she was extremely dedicated.
13      Q    (By Mr. Moulton)  Okay.  So if she had wanted
14  to work on Higher Power guys that's definitely access
15  she could have been given?
16      A    Yes, she could have been given that access.
17      Q    And looking at this, at least, you're not able
18  to confirm either way whether she, in fact, had that
19  access at this time?
20      A    Not without access to the Paycom system.
21      Q    Okay.  What does the Puerto Rico department
22  mean inside the Paycom system?
23      A    Paycom has a lot of variable fields and
24  options.  They had full labor allocation suites, so you
25  could have as many departments and subdepartments as

ALEXANDER NEIL KALMAN - April 21, 2022

1  desired.  I believe that the Puerto Rico department that
2  was created -- or it may have been a subdepartment.  I
3  apologize, I don't remember the full structure.
4        But as far as I was aware it was men, they were
5  a Puerto Rico employee who was on site in Puerto Rico.
6     Q   All right.  I'm getting an exhibit loaded here.
7        So with that Puerto Rico department would
8  folks -- when guys would go work in Puerto Rico for the
9  workers, they would have to be added to the Puerto Rico
10 department in Paycom; right?
11    A   Yes.
12    Q   And why would they have to be added to the
13 Puerto Rico department in Paycom?
14    A   As I recall it had something to do with the
15 calculated rates calculating the hours based off of 40
16 per week instead of eight-hour days.
17    Q   Okay.  Did it mean anything as far as access
18 about who could see that information?
19    A   I mean, so the user access groups are primarily
20 driven off of departments and other labor allocations.
21 So, yes, certain user access groups certainly could be
22 set up specifically for Puerto Rico.
23    Q   Would you have been the person that would have
24 set up those user access groups?
25    A   Yes.

ALEXANDER NEIL KALMAN - April 21, 2022

1     Q    And for the Puerto Rico department can you

2  recall generally who would have had access to it?

3     A    I can't say.  I would have to look at it.

4     Q    Okay.  Where in Paycom would we see that?

5     A    So if you go to user options, user access

6  settings, there should be a list of users and their user

7  access group.  Paycom could gather that information.

8  But user access groups are separate and are set up

9  separately.  So you would have to know which user access

10  group they were on at the time.

11     Q    Okay.  Let me show you Exhibit 170.

12     A    Okay.

13     Q    So on this first page can you tell us what

14  we're looking at?

15     A    It looks to be a paycheck for Justin Washburn.

16     Q    Right.  And based on your prior testimony are

17  you able to see, based on looking at the hours that are

18  listed here, how many days he worked in this pay period?

19     A    So based off of this it looks like he only had

20  32 hours worked.

21     Q    Right.  And do you know how many days that

22  would corresponded to in Puerto Rico?

23     A    Two.

24     Q    Right.  And based on the rate scale that we

25  looked at earlier in 151, let me pull that up for you to

ALEXANDER NEIL KALMAN - April 21, 2022

1  refresh your memory.  We can see that the 37.84 rate
2  corresponds with the 800 a day rate; right?
3      A   Correct.
4      Q   So if we go back to the pay stub in 170, we can
5  see that 37.84 rate again; right?
6      A   Correct.
7      Q   And do you know why the 32 hours was split as
8  16 regular and 16 overtime?
9      A   Yes.  So the normal setup for Paycom is that
10  any hours over eight in day are calculated as overtime,
11  or at least that's how we had it set up.  So that's why
12  it would have listed like that.
13      Q   Why wouldn't it just put 32 regular?
14      A   Because of the setup.  So, again, different
15  states and different municipalities have different rules
16  requiring overtime.  Some have any hours over 40 within
17  a work week would be considered overtime, while some
18  places have any hours over eight in a day count as
19  overtime.
20          So in this case the time card was set up, at
21  least my assumption is the time card was set up that any
22  hours over eight in a day would count towards overtime.
23      Q   Okay.  Let's look at his actual time detail
24  report.
25      A   Okay.

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    I'm going to scroll down.  The pay period we're
2  looking at is June 25th, July 8.  So remember those
3  dates.  Let's look at them.
4        Go to June 25th.  Is there anything about
5  looking at the actual time detail report that refreshes
6  your memory about what you just talked about?
7    A    I mean, it looks like 16 hours of fixed regular
8  were added and then 16 hours of fixed overtime were
9  added.  I mean --
10   Q    If -- go ahead.  I'm sorry.
11   A    No, it's okay.  It looks like this information
12  was added.  It's strange that the change report doesn't
13  show who made those changes.  But that's the most
14  information I have out of this setup.
15   Q    Okay.  And the question I had is -- I mean, it
16  shows that fixed capital R means it's supposed to be
17  entered into the regular time in the pay tub; right?
18   A    Right.  So that should be regular hours.
19   Q    Okay.  And then this fixed DYR, that's the true
20  up or gross up we've been talking about today; right?
21   A    Yes.
22   Q    Okay.  So let's go back to the pay stub.  Does
23  it make sense to you now, looking at this, why some of
24  the hours, or these 16 hours were added in as overtime?
25   A    I mean, again, as far as I'm aware, like the

ALEXANDER NEIL KALMAN - April 21, 2022

1    only way that should have come through was if it was

2    added, and it looks like it was added.

3        Q    Okay.

4        A    So it looks like they must have added in a

5    variable rate overtime, I guess.

6        Q    All right.  Well, that 37.84 corresponds to the

7    $800 a day; right?

8        A    Correct.

9        Q    Right.  And he worked two days.  It says pay

10   comes out to be, with this true up here, the true up

11   gets him to that day rate level.

12       A    Correct.

13       Q    And this is an example of how true ups would

14   work in practice; right?

15              MS. VILLASEÑOR:  Objection.  Form.

16       A    I -- I mean, it must be how it worked at some

17   point.  I thought that it was a fixed dollar amount that

18   we were adding.  I forget when he must have made that

19   change.

20       Q    (By Mr. Moulton) Oh, you mean for, like,

21   specific days, like just put in a day rate amount?

22       A    Like a true up dollar amount.

23       Q    Oh, okay.  Well, isn't that what this 86.40 is?

24       A    So that's -- oh, yes, for the current period.

25   I apologize.  I thought that was year to date

ALEXANDER NEIL KALMAN - April 21, 2022

1   information.  So, yes, that is the day rate, that is the
2   true up.
3       Q    Okay.  So just -- so you were looking at
4   something else a second ago.  So just to confirm --
5       A    Correct.
6       Q    -- the 8640 for this pay period is the true up
7   that makes the -- that brings up this hourly pay, if you
8   will, up to the day rate amount; right?
9       A    Yes, correct.
10      Q    For this one here, the next pay stub for Justin
11  Washburn, which is May 14-May 27, you see a plain day
12  rate entered in $800.  Do you know what that was?
13      A    I can only hazard a guess, and my guess would
14  be that the employee missed a day that he was supposed
15  to be paid that wasn't entered on a time card or
16  something.  And rather than enter into a time card they
17  paid a straight $800.
18      Q    Okay.  We may be able to get some information
19  on that from the pay stub -- I mean, from the time
20  detail report; right?
21      A    I mean, we would need to know what the error --
22  what date the correction was being made for.  But in
23  theory, yes, it should list it there.
24      Q    Okay.  Let's go look.  May 14th to May 27.
25  Does that look like a missed day makeup kind of paycheck

ALEXANDER NEIL KALMAN - April 21, 2022

1    to you or does it look like a normal paycheck?

2              MS. VILLASEÑOR:  Objection; form.

3        A    It appears the user here has added a $800 as a

4    fixed dollar amount onto the time card.

5        Q    (By Mr. Moulton) Okay.  And you were aware that

6    this was being done during the time you're working --

7    that the guys were working in Puerto Rico; right?

8        A    I mean, I would not have approved of just

9    adding a fixed dollar amount unless they were the

10   salaried employees who also received a day rate.

11       Q    Right.  And that's consistent with an email we

12   saw earlier.

13       A    Correct.

14       Q    Right?  Do you recall that?

15       A    Yes.

16       Q    All right.  So looking at this -- at this time

17   detail report for Mr. Washburn, can you tell who it was

18   that was responsible for entering in the amounts that we

19   see here?

20       A    Yes.  The supervisor approval -- well, no.  I

21   take that back.  The supervisor approval is for JD

22   Kinsey.  We would actually need to look at the audit

23   history report to see who entered that information in.

24       Q    Okay.  So there's a separate report to see who

25   physically entered these numbers?

ALEXANDER NEIL KALMAN - April 21, 2022

1      A    Yes, versus who approved it.

2      Q    Okay.  So Mr. Kinsey's name here in the

3   supervisor approval, what does that mean?

4      A    That means that he reviewed the time card and

5   approved it.

6      Q    Okay.  And then for the allocation column, what

7   does that mean?

8      A    So that is the labor allocation and departments

9   that I was discussing earlier.  So we have -- all of our

10  breakouts should be in that allocation section.

11     Q    Okay.  And looking at this particular

12  allocation are you able to tell who would have had

13  access to this allocation or not?

14     A    No.  Using this allocation I would not be able

15  to tell which users had access to that.

16     Q    Do you know why it says "Hardware clocks" at

17  the top of this document?

18     A    So that is the time group.  The time group is a

19  field that is filled in for employees for what kind of

20  time cards and approvals they have.  And I believe that

21  the decision was made to put them on the hardware clocks

22  simply because I think there was a discussion about

23  maybe rolling out iPads back when we were first

24  initiated this Puerto Rico system.

25     Q    Okay.  But it's clear now that even though it

ALEXANDER NEIL KALMAN - April 21, 2022

1  may have been set up that way, there was never a

2  hardware clock -- an actual physical clock to track

3  exact hours worked in Puerto Rico; right?

4      A   Correct.  You would see in and out punches if

5  there was a hardware clock involved.

6      Q   Okay.  And so for Puerto Rico the process was

7  that supervisors would report who had, basically, shown

8  up for work that day?

9              MS. VILLASEÑOR:  Objection to the form.

10     A   Again, I knew that the managers were supposed

11  to track the information.  Whether or not they did that,

12  I don't know.

13     Q   (By Mr. Moulton)  Okay.  They weren't supposed

14  to be tracking -- or they weren't tracking exact hours

15  worked.  They were tracking who worked that day;

16  correct?

17     A   Correct.

18              MS. VILLASEÑOR:  Objection; form.

19     Q   (By Mr. Moulton) Okay.  Looking at the top of

20  this time detail report again there is some other

21  information here like about the department and home

22  allocation.  And just to be clear, are you able to tell

23  by looking at this screen who or which groups would have

24  had access to whose information in -- in Paycom?

25     A   No.  Again, I would have to have access to the

ALEXANDER NEIL KALMAN - April 21, 2022

1  specific user access groups, which are not shown on time

2  card information.

3      Q   Can you think of a reason why -- let's look --

4  before I do that, so in this Exhibit 170, I'm scrolling

5  down to Mammoth 23, that's the Bates number.  And it's a

6  pay stub for Robby Alvear from May -- I'm sorry.  April

7  30th to May 13 is the pay period.  Do you see that?

8      A   Yes.

9      Q   Okay.  We see here another instance where it's

10  just a straight day rate amount entered here.  Do you

11  see that?

12      A   Yes.

13      Q   Okay.  This is a different type.  It's not the

14  gross up or true up type of day rate adjustment.  This

15  is just plain day rates entered into the system;

16  correct?

17      A   Correct.

18      Q   Okay.  Let's take a look at the time detail

19  report.  So it's the pay period April 30th to May 13th,

20  so it looks like it's the first one.  April 30th to May

21  13th.  Can you see here that there are eight days

22  entered at $800 per day?

23      A   Yes.

24      Q   Okay.  And this was approved by JD Kinsey;

25  right?

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    That's Correct.

2    Q    Is JD Kinsey when he's entering this, is he

3  doing it wrong or is there something with Paycom that

4  made it difficult for him to be able to do it in, like,

5  with the 16th that we're seeing down here below?  Do you

6  know anything about this?

7    A    I do not recall anything with regards to this.

8  I would -- I would not have suggested using the 800 or

9  the fixed dollar amount.

10    Q    Why not?

11    A    Well, because then we're just paying them day

12  rates and that's against FSLA standards as far as I'm

13  aware.

14    Q    Oh, I see.  Okay.  Did you review -- with the

15  true ups that were done that we see, did you view that

16  as being a way of paying day rates or did you do it

17  differently?

18    A    Are you asking for my professional opinion?

19    Q    Yes.

20    A    My professional opinion is yes, they were

21  paying day rates and they were finding a way around it.

22    Q    Okay.  And why do you feel that way?

23    A    Because Keith said that this is what we were

24  paying them as day rates, and then we were required to

25  find a way around that.

ALEXANDER NEIL KALMAN - April 21, 2022

1     Q    Okay.  So by finding a way around, you're

2  talking about coming up with this hourly system plus

3  these true ups that end up paying them their day rates?

4     A    Yes.

5     Q    Okay.  I'm going to show you a document -- or

6  Exhibit 205.

7                    (Exhibit 205 was marked for

8                     identification and made a part of the

9                     record.)

10    Q    We've got an email chain here.  Go ahead and

11 review this and let's scroll up again.

12    A    Okay.  Okay.  Okay.

13    Q    So I want to ask you about Paycom.  I know I've

14 asked you several questions.

15    A    Okay.

16    Q    Can you tell me what is going on here?  It

17 looks like you made a change to change the access.  Do

18 you agree with that?

19    A    Yes.

20    Q    Okay.  What's going on?  Can you explain?

21    A    So it seems like there are some employees that

22 JD didn't have access to.  They may have been

23 transferred between departments.  And I do agree that

24 departments can be used as the user access groups.  So

25 it seems like that is what is appearing here and that we

ALEXANDER NEIL KALMAN - April 21, 2022

1  were making sure that during that transition from Puerto

2  Rico to not Puerto Rico that they still got all of the

3  hours that they were supposed to have in.

4       Q   Okay.  And just to be clear, when we're talking

5  about moving departments, we're talking about software

6  inside this Paycom; right?  We're not talking about

7  actually putting different people in a different part of

8  the company; correct?

9       A   Correct.  It was a way for us to represent when

10  the employee was on or off the island.

11       Q   Okay.  So it looks like Missy was able to move

12  some folks that had been in -- that had been visible to

13  JD Kinsey on into her Five Star group; right?

14       A   So she probably changed the labor allocation to

15  show that those employees were no longer in Puerto Rico.

16  And if we had set up that user access group for JD to

17  only see Puerto Rico employees, that would explain why

18  he was no longer able to see them.

19       Q   Okay.  So the next email when you moved -- you

20  moved them back into the PR department and he was able

21  to see them again?

22       A   Correct.

23       Q   So the PR department is accessible by JD Kinsey

24  and also Missy Davis?

25       A   Yes.  I mean, so, again, to clarify, we could

ALEXANDER NEIL KALMAN - April 21, 2022

1  filter it down to where Missy could only see Puerto Rico

2  employees in Five Star or only Puerto Rico employees.

3  So we can reduce the access by quite a bit.  So in

4  theory, yes.  But I can't say for certain without

5  looking at the user access groups.

6      Q   Okay.  But based on JD Kinsey's email, it sure

7  looks like Missy was able to take folks out of what used

8  to be visible to JD Kinsey and into only hers.

9      A   Correct.

10          MS. VILLASEÑOR:  Objection to form.

11     Q   (By Mr. Moulton)  Is that right?

12     A   It appears so, yes.

13          MR. MOULTON:  I will pass the witness.

14          MS. VILLASEÑOR:  All right.  Let me take

15  five minutes.  I need to use the restroom.

16          MR. MOULTON:  Okay.

17          MS. VILLASEÑOR:  All right.  Thank you.

18          VIDEO OPERATOR:  Off the record.

19          (A break was had from 12:17 to 12:36

20           p.m.)

21          VIDEO OPERATOR:  Back on.

22                    EXAMINATION

23  BY MS. VILLASEÑOR:

24     Q   Good afternoon, Mr. Kalman.  My name is Erin

25  Villaseñor.  And as I mentioned earlier, I represent the

ALEXANDER NEIL KALMAN - April 21, 2022

1  Defendants in this case, Mammoth and Higher Power.

2      A    Um-hum, yes.

3      Q    I want to go back to Exhibit 131.  And I'll

4  share my screen with you.  Mr. Moulton showed you a

5  little bit earlier.

6          Can you see what's on my screen, sir?

7      A    Yes.

8      Q    If you recall, Exhibit 131 is an email that you

9  are cc'ed on, an email chain that you are cc'ed on,

10  rather, regarding discussions with outside counsel

11  regarding the pay structure in Puerto Rico; is that

12  correct?

13      A    Correct.

14      Q    Okay.  And I believe you testified earlier when

15  Mr. Moulton, that you were not directly involved with

16  any conversations with outside counsel regarding the pay

17  structure; correct?

18      A    Correct.

19      Q    And your involvement, as we understand it, is

20  that Mr. Beagle -- who is your supervisor; correct?

21      A    Correct.

22      Q    -- from time to time would get your input on

23  things regarding the pay structure.  Is that fair?

24      A    Yes.

25      Q    Okay.  You didn't approve the final pay

ALEXANDER NEIL KALMAN - April 21, 2022

1  structure, did you?

2      A    No.

3      Q    And you testified earlier that you were not

4  part of the drafting of the offer letters.

5      A    Correct.

6      Q    You didn't attend orientation for Five Star or

7  for Higher Power for the Puerto Rico employees, did you?

8      A    Not for the Puerto Rico employees, no.

9      Q    And you to not know what was conveyed to them

10  regarding the way they would be paid at these

11  orientations, do you?

12      A    No.

13      Q    You don't even recall any of the details about

14  what was conveyed to them in each of their offer

15  letters, do you?

16              MR. MOULTON:   Objection; form.

17      A    No.

18      Q    (By Ms. Villaseñor)  You weren't part of the

19  decision to pay based on a 16-hour work day; correct?

20      A    Correct.

21      Q    You testified earlier that the hourly rates for

22  the employees in Puerto Rico were based on a day rate

23  set by Mr. Ellison; is that correct?

24      A    Correct.

25      Q    But you also testified that they were based on

ALEXANDER NEIL KALMAN - April 21, 2022

1   hours work; correct?

2       A    Correct.

3       Q    In your word, that management conveyed and the

4   employees knew that they were being paid hourly based on

5   hours work; correct?

6               MR. MOULTON:   Objection; form.

7       A    Correct.

8       Q    (By Ms. Villaseñor)  And you're aware that

9   management told them that these day rates that were set

10  by Mr. Ellison before the PREPA contract was signed,

11  those -- that was the type of pay that they could expect

12  to receive per day; correct?

13              MR. MOULTON:   Objection; form.

14      A    I am not aware of discussions that were had

15  between them.

16      Q    (By Ms. Villaseñor)  So you don't know one way

17  or the other whether employees were told these so-called

18  day rates was the amount that an employee could expect

19  to receive per day for 16 hours of work in Puerto Rico?

20              MR. MOULTON:   Objection; form.

21      A    Correct.  That is correct.

22      Q    (By Ms. Villaseñor) We saw earlier in some of

23  emails Mr. Moulton showed you that Mr. Beagle asked you

24  questions about how to set up what was referred to

25  earlier as a true up system.  Do you recall that?

ALEXANDER NEIL KALMAN - April 21, 2022

1    A   Yes.

2    Q   And you were assisting him because you are the

3  expert in Paycom.  Fair?

4    A   Yes.

5    Q   And so he wanted your input about how he could

6  actually enter the true ups.  Fair?

7         MR. MOULTON:  Objection; form.

8    A   Correct.  He asked the best way to get them

9  into the system.

10   Q   (By Ms. Villaseñor)  And in terms of how the

11 final calculations were done or when they were done or

12 why they were done, that would be a decision that

13 Mr. Beagle made; right?

14         MR. MOULTON:  Objection; form.

15   A   Correct.

16   Q   (By Ms. Villaseñor)  And you weren't part of

17 any discussions about the details of the so-called true

18 up payments; right?

19         MR. MOULTON:  Objection; form.

20   A   I helped with some of the processing of them.

21 I was part of those emails.  But I was not the one who

22 was dictating the amounts, no.

23   Q   (By Ms. Villaseñor)  And on the time detail

24 reports where we saw that there were some so-called

25 entries as day rates, but there wasn't even an

ALEXANDER NEIL KALMAN - April 21, 2022

1  indication of who actually entered them.  Is that fair?

2      A    Not on that form.  That information could be

3  found within the time card system.

4      Q    Okay.  But is it fair to say that things were

5  being done in Paycom that you didn't know about?

6              MR. MOULTON:  Objection; form.

7      A    Correct.  I am not aware of all the changes

8  that took place in the Paycom system.

9      Q    (By Ms. Villaseñor) And you weren't approving

10  the true up entries or the straight day rate entries.

11  Fair?

12      A    Correct, I was not.

13      Q    And you don't know the details of when or for

14  whom or why certain entries were done on certain days.

15  Fair?

16              MR. MOULTON:   Objection; form.

17      A    That is accurate.

18      Q    (By Ms. Villaseñor)  With regard to the true

19  ups, you testified earlier that you were probably part

20  of the implementation and in the decisionmaking process

21  regarding true ups.  But isn't it true that you were

22  really just part of implementing ways to get certain

23  entries into Paycom?

24              MR. MOULTON:  Objection; form.

25      A    I assisted Jeff to make sure that the

ALEXANDER NEIL KALMAN - April 21, 2022

1  calculations that were going seemed accurate to me.  I
2  verified them.  But he was the one that made those
3  calculations, yes.
4      Q   (By Ms. Villaseñor)  And sitting here today you
5  don't even know what the final calculations were or
6  under what circumstances they were calculated for;
7  correct?
8              MR. MOULTON:  Objection; form.
9      A   I am unsure the specifics of any given
10  employee's pay, correct.
11      Q   (By Ms. Villaseñor)  And for the gross up
12  spreadsheets, as Mr. Moulton calls them, the true up
13  spreadsheet, you the don't know one way or the other
14  whether each of those entries was actually entered into
15  Paycom; correct?
16      A   All of those entries should have been entered
17  into Paycom, as they were given to us by Higher Power,
18  Five Star, and those would have been entered by Beth
19  Stone.
20      Q   Okay.  And do you know one way or the other
21  whether Beth Stone entered all of those?
22      A   It's been three years.  I can't say for
23  certain.  But I know Beth Stone is a personal of
24  integrity and honor and would enter that information
25  accurately if she was asked to.

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1      Q    And for each of those spreadsheets, management
 2   had to sign off on whether to give a true up; is that
 3   correct?
 4                MR. MOULTON:  Objection; form.
 5      A    I am not sure.  By the time those came to me I
 6   would make sure Beth had them, that they got entered in,
 7   and that they signed off on the final payroll numbers.
 8      Q    (By Ms. Villaseñor)  Okay.  So there may have
 9   been some decisions or iterations of this spreadsheet
10   before it got to you?
11      A    Absolutely.
12      Q    Certainly, if Mr. Beagle, your boss, told you
13   not to enter into (sic.) one of these day rate entries
14   or these true up entries as Mr. Moulton refers to them,
15   you wouldn't have done it; right?
16                MR. MOULTON:  Objection; form.
17      A    Correct.
18      Q    (By Ms. Villaseñor)  Same for Mr. Kinsey, if he
19   told you not to enter into a certain true up or day rate
20   entry, you wouldn't have done it; correct?
21                MR. MOULTON:  Objection; form.
22      A    I would have verified with Jeff first.
23      Q    (By Ms. Villaseñor)  Right.  The buck stops --
24   the buck stops with Jeff; right?
25      A    Yes.  He was my direct supervisor.
```

ALEXANDER NEIL KALMAN - April 21, 2022

1    Q    You said earlier that you would not have

2    approved a fixed dollar rate day entry.  Is that true?

3    A    For an hourly employee, correct.

4    Q    Do you know who would have approved that entry?

5    A    It must have been somebody in the executive

6    team.  On the specific time sheet it was JD Kinsey who

7    was the approver on the time card.

8    Q    But he would have had to have approval from

9    somebody on the executive team.  Is that what you're

10   saying?

11              MR. MOULTON:  Objection to form.

12   A    That is my understanding, yes.

13   Q    (By Ms. Villaseñor) And that would have been

14   perhaps an entry that was made at their discretion.

15   Fair?

16   A    Correct.

17              MR. MOULTON:  Objection; form.

18   Q    (By Ms. Villaseñor)  And you don't know all of

19   the reasons it would have been made at their discretion,

20   do you?

21   A    No.

22              MR. MOULTON:  Form.

23   Q    (By Ms. Villaseñor)  Earlier you testified that

24   it's your professional opinion that the earning

25   statements and the time detail report that Mr. Moulton

ALEXANDER NEIL KALMAN - April 21, 2022

1  showed you reflected that Higher Power was paying a day
2  rate.  Is that fair?
3          MR. MOULTON:  Objection; form.
4      A   Yes.  Yes.
5      Q   (By Ms. Villaseñor)  Okay.  But in all of your
6  discussions that we've seen in the emails today,
7  including your boss, Mr. Beagle, was asking you, you
8  know, how you would calculate overtime and how you would
9  come up with a true up if an employee didn't work the
10 full seven days, you never said anything about, Hey,
11 this looks like we're paying a day rate?
12         MR. MOULTON:  Objection; form.
13     A   We had many conversations in person and there
14 were a lot of discussions about the best way to make
15 sure that we limit our legal liability.  And there were
16 discussions that took place regarding that, yes.
17     Q   (By Ms. Villaseñor)  Okay.  And so was it your
18 understanding that Mr. Beagle had spoken with outside
19 counsel and gotten an opinion that the way the final
20 practice was implemented was legal.  That's your
21 understanding; right?
22         MR. MOULTON:  Objection; form.
23     A   My understanding was that the original process
24 that we had in place had been at least reviewed or
25 suggested by a lawyer.  I'm not sure on the details,

ALEXANDER NEIL KALMAN - April 21, 2022

1  though.

2      Q    (By Ms. Villaseñor)  And so correct me if I am

3  wrong, but as an HR generalist or HR supervisor, you

4  wouldn't have continued to stay in that role if you

5  thought that the way they were paying employees was

6  illegal; right?

7            MR. MOULTON:  Objection; form.

8      A    I wouldn't have stayed with a company that was

9  openly paying their employees illegally, no.

10     Q    (By Ms. Villaseñor)  Okay.  You have no legal

11 background; correct?

12     A    Correct.

13           MR. MOULTON:  Objection.

14     Q    (By Ms. Villaseñor) And you weren't even part

15 of the discussions with Mr. Beagle and Mr. Broussard of

16 the executive team about the legalities of the pay

17 structure or how it was implemented.  Fair?

18           MR. MOULTON:   Objection; form.

19     A    That is correct.

20     Q    (By Ms. Villaseñor) I believe the last exhibit

21 Mr. Moulton showed you, Exhibit 205, which I don't have,

22 but I believe you may recall this, a situation where

23 Missy had the ability in Paycom to allow JD certain

24 access.  Did she have that or were you the one approving

25 who had access in Paycom?

ALEXANDER NEIL KALMAN - April 21, 2022

1          MR. MOULTON:  Objection; form.
2     A    I do not believe that Missy had direct access
3  over the employees JD could or could not see.  I believe
4  that the user access group was driven off of the Puerto
5  Rico department field within the Paycom system and that
6  Missy had access to make changes to that field.
7     Q    (By Ms. Villaseñor) When Mr. Beagle consulted
8  you about the pay structure for the so-called true ups,
9  you testified that, you know, it wasn't your final
10  decision and -- is that true, it wasn't your final
11  decision?  He was just trying to see what you thought
12  about it?
13          MR. MOULTON:  Objection; form.
14     A    With regards to the true up or --
15     Q    (By Ms. Villaseñor)  We'll start with the true
16  ups.  You testified that while Mr. Beagle may have asked
17  you about, you know, how you could make it work in
18  Paycom, that wasn't really your call as to how it should
19  be done.  If Mr. Beagle told you to do it one way or the
20  other, you would have done it; correct?
21     A    Correct.  I proposed options and let him go
22  with the one that he decided on.
23     Q    Right.  And you certainly wouldn't have --
24  well, it sounds like you are a straight-up guy.  You
25  wouldn't have implemented something that was -- that you

ALEXANDER NEIL KALMAN - April 21, 2022

1   thought at the time was illegal.  Fair?
2                 MR. MOULTON:  Objection; form.
3       A    That is correct.
4       Q    (By Ms. Villaseñor)  When you emailed the offer
5   letters on behalf of Mr. Beagle, I believe you testified
6   earlier that you weren't involved in the offer letters,
7   but at that particular instance you were just sending
8   Mr. Beagle his time up.  Is that fair?
9       A    So the only way that I was off -- like in
10  process of the offer letters was in receiving them and
11  making sure they were filed away in documentation.  I
12  provided documents to Shelly, but they were already in
13  our database that Jeff had created.
14      Q    And when you sent them to Shelly you
15  specifically pointed out that these employees in Puerto
16  Rico were going to be paid hourly plus overtime; right?
17      A    Correct.
18                MR. MOULTON:  Objection; form.
19      A    Yes.
20      Q    (By Ms. Villaseñor)  And although -- you didn't
21  state this in your email, but although there are
22  sometimes would have been day rate entries or true ups,
23  those would have been issues decided by upper
24  management?
25                MR. MOULTON:  Objection; form.

ALEXANDER NEIL KALMAN - April 21, 2022

1      A   Uh, correct.

2      Q   (By Ms. Villaseñor) On a case-by-case basis;

3   correct?

4              MR. MOULTON:  Objection; form.

5      A   I mean, any payroll adjustments had to be

6   approved by management.

7      Q   (By Ms. Villaseñor)  Okay.

8              MS. VILLASEÑOR:  David, do you know what

9   exhibit we're on?

10             MR. MOULTON:  I finished with 205.  So

11  you will be on 206 if we're doing a new one.

12             (Exhibit 206 was marked for

13                identification and made a part of the

14                record.)

15     Q   (By Ms. Villaseñor) Okay.  I'm going to show

16  you what we'll mark as Exhibit 206.  And Exhibit 206

17  bears the beginning Bates label Mammoth 003593.

18             MR. MOULTON:  Oh, hey, before you do

19  that, I think we already used this one.  Can't we just

20  use the same one?

21             MS. VILLASEÑOR:  Did we -- did we use it?

22             MR. MOULTON:  Yeah, I'm pretty sure.

23  Hold on.  I used it today.

24             MS. VILLASEÑOR:  I think you used a

25  different version.

ALEXANDER NEIL KALMAN - April 21, 2022

1          MR. MOULTON:  Oh, really?  Okay.  Go
2  ahead.
3          MS. VILLASEÑOR:  If it's the same
4  version, oh well.  We'll have two.
5          MR. MOULTON:  Yeah, I'm pretty sure this
6  is exactly the same one.
7          MS. VILLASEÑOR:  Okay.
8     Q   (By Ms. Villaseñor)  Can you see Exhibit 206,
9  Mr. Kalman?
10    A   Yes.
11    Q   Okay.  And I'm not sure if this is the same one
12  we looked at earlier, but this is where you send offer
13  letters -- these are not attached here -- but to Shelly
14  Wheeler on October 24th, 2017.  Do you see that?
15    A   Correct, yes.
16    Q   Okay.  And then you specifically point out to
17  her that the rate of pay does not equal the day rate via
18  straight time, but factors in overtime rates and the
19  calculation per week; correct?
20    A   Correct.
21    Q   Okay.  And are those your words or
22  Mr. Beagle's?
23    A   Um, those are my words.
24    Q   You've heard -- well, let me back up.  Earlier
25  you testified that the so-called day rate in

ALEXANDER NEIL KALMAN - April 21, 2022

1  Mr. Ellison's very early email in October 2017 were the
2  day rates that were conveyed to the various employees in
3  Puerto Rico; correct?

4      A   Yes.  I believe that the day rates that Keith
5  listed in his email were what was communicated to
6  employees.

7      Q   But you know sitting here today that employees
8  were told in the offer letters that you sent around --
9  and you've also heard from your boss, Mr. Beagle, that
10  they were -- and as you previously conveyed in the email
11  we just looked at, that these were rates that employees
12  could expect to receive if they worked their full
13  16-hour shifts for seven days; right?

14              MR. MOULTON:  Objection; form.

15      A   It was my understanding that if they worked a
16  day they would receive that based on 16 hours.

17      Q   (By Ms. Villaseñor)  Okay.  But -- and you have
18  seen multiple instances where the employee receives more
19  than that amount; right?  So it's really just a target
20  rate; correct?

21              MR. MOULTON:  Objection; form.

22      A   I guess I don't see where they got paid more
23  than their day rate, other than like the variance of 40
24  cents.

25      Q   (By Ms. Villaseñor)  Right.  Variance of 40

ALEXANDER NEIL KALMAN - April 21, 2022

1  cents, I mean, it's still -- they are not being paid
2  that amount per day; correct?
3              MR. MOULTON:  Objection; form.
4      Q   (By Ms. Villaseñor) I mean, the 40 cents comes
5  from somewhere.
6              MR. MOULTON:  Objection; form.
7      A   That is accurate.
8      Q   (By Ms. Villaseñor)  So sitting here today
9  you'd agree with me that what Mr. Moulton calls
10 Mr. Ellison's day rates are really just target amounts
11 that employees could expect to be paid?
12             MR. MOULTON:  Objection; form.
13     A   Yes.
14     Q   (By Ms. Villaseñor)  Earlier you testified that
15 my firm -- or I'm sorry -- Mr. Layton had offered my
16 firm to represent you for the purposes of this
17 deposition.  Is that true?
18     A   He offered legal representation.  He did not
19 give specifics.
20     Q   Okay.  But you refused that; right?
21     A   Correct.
22     Q   And you've refused to really even speak with
23 Mr. Layton or the legal representation he offered;
24 right?
25             MR. MOULTON:  Objection; form.

ALEXANDER NEIL KALMAN - April 21, 2022

1      A    Yes.   I was concerned, since I had received a
2  cease and desist not to talk to Mammoth, that I
3  shouldn't talk to Mammoth.
4      Q    (By Ms. Villaseñor)  I understand that.  And
5  the reason why you received this cease and desist, as
6  understand it, is that you were terminated; correct?
7      A    Well, I was laid off and then I was later told
8  that I had violated the agreements of my severance.
9      Q    And in that letter you received in that cease
10  and desist letter, did Mammoth threaten to sue you?
11      A    No.   That came later after I had discussed
12  legal options with them, and they said that any suit
13  with absolutely follow with a countersuit.
14      Q    So is it fair to say that you don't really like
15  Mammoth?
16              MR. MOULTON:   Objection; form.
17      A    That is fair to say.
18      Q    (By Ms. Villaseñor)  And so in all the emails
19  that we've reviewed in this case, that you've reviewed
20  in this deposition, you never point out that anything is
21  wrong with the pay structure that you're in charge of
22  implementing in Paycom or that anything is wrong with
23  the pay structure as you've been asked to give your
24  input on, even though it wasn't your final decision, or
25  anything else about the way the pay structure may be an

ALEXANDER NEIL KALMAN - April 21, 2022

```
1   improper day rate, you never said anything about
2   anything being improper or illegal until sitting here
3   today.  Is that fair?
4              MR. MOULTON:  Objection; form.
5       A   It is correct I did not put any of that into an
6   email.
7       Q   (By Ms. Villaseñor)  And you never said
8   anything about it either, did you?
9              MR. MOULTON:  Object to form.
10      A   I voiced my concern with Jeff asking how we
11  were going to make this legal.
12      Q   (By Ms. Villaseñor)  And he told you, I spoke
13  with Mr. Broussard, our legal counsel; correct?
14             MR. MOULTON:  Objection; form.
15      A   Yes.
16      Q   (By Ms. Villaseñor)  And you trusted
17  Mr. Beagle; correct?
18      A   Yes.
19      Q   And you trusted he would -- he would do the
20  right thing and would do their best to do anything that
21  was the right thing; correct?
22      A   Correct.
23      Q   Okay.  So the first time that you've really
24  conveyed that anything was wrong is after Mammoth
25  threatened to sue you --
```

ALEXANDER NEIL KALMAN - April 21, 2022

```
1            MR. MOULTON:  Objection.
2       Q   (By Ms. Villaseñor)  -- and in this deposition;
3  correct?
4            MR. MOULTON:  Objection; form.
5       A   Correct.
6            MS. VILLASEÑOR:  Pass the witness.
7                  RE-EXAMINATION
8  BY MR. MOULTON:
9       Q   All right.  Mr. Kalman, I think you were saying
10 with Ms. Villaseñor that it was your understanding that
11 Mr. Beagle would be involved in a -- in approving
12 whether or not gross ups or true ups would be paid.  Is
13 that your understanding?
14      A   It is my understanding that management would be
15 involved in that approval process.
16      Q   And by "management," who do you mean?
17      A   I mean it would be someone of Jeff's level or
18 above.  So Jeff, Ken Kinsey, Keith.
19      Q   Okay.  Do you recall any specific instances
20 where a true up or a gross up wasn't paid?
21      A   Not to my knowledge.
22      Q   So you don't recall Mr. Beagle or Mr. Ellison
23 or Mr. -- Mr. Kinsey, any of the executives that you
24 mentioned a minute ago ever disapproving a gross up or a
25 true up?
```

ALEXANDER NEIL KALMAN - April 21, 2022

1    A    Not to my knowledge.
2              COURT REPORTER:  Mr. Moulton, five
3    minutes on the video.
4              MR. MOULTON:  Okay.  I think I can do
5    another question and be done.
6              (A document was displayed.)
7    Q    (By Mr. Moulton) Mr. Kalman, I kind of refresh
8    your memory here on Exhibit 201.
9    A    Yes.
10   Q    Okay.  So -- and I realize it's up to
11   Mr. Beagle to set the payroll policy; correct?
12   A    Correct.
13   Q    And he's setting the payroll policy that's been
14   applied to all the Cobra -- to Cobra and its
15   subsidiaries, including Higher Power and Five Star;
16   right?
17   A    Yes.
18   Q    And he asked for your opinion about the true up
19   system; right?
20   A    Correct.
21   Q    And you expressed to him that even -- and we
22   realize you're not an FLSA lawyer or a wage and hour
23   lawyer.  But you expressed to him that you had a concern
24   about how to calculate the overtime with that system;
25   right?

ALEXANDER NEIL KALMAN - April 21, 2022

```
1      A    Correct.
2      Q    Okay.  Did he -- did he ever tell you that
3 Mr. Broussard or any other lawyer had approved the gross
4 up system?
5      A    I think the most I can say that I ever heard
6 was that we have a plan that we're going to make work.
7      Q    Okay.
8      A    But I can't say --
9      Q    Go ahead.
10     A    I just -- I can't say specifically.  I do not
11 recall.
12     Q    All right.  So you're -- and based on what
13 Ms. Villaseñor asked you, I gather what you're saying is
14 after it was explained to you that the -- that the
15 company is going to be paying these hourly rates with
16 overtime, plus the gross up, you thought that that --
17 because there is overtime included in that, that that
18 could be right?
19     A    Yes.
20     Q    But because you're not an expert on legal
21 matters, you don't really know if that's okay or not; is
22 that right?
23     A    That is accurate.
24     Q    Okay.  So it is true, then, that you were given
25 a color -- an explanation that satisfied your concern
```

ALEXANDER NEIL KALMAN - April 21, 2022

1  that came from someone you trust, like Mr. Beagle;
2  right?
3      A   Yes.
4              MR. MOULTON:  I will pass the witness.
5                      RE-EXAMINATION
6  BY MS. VILLASEÑOR:
7      Q   Just a few more questions, Mr. Kalman.  Thank
8  you for your time today.
9          When Mr. Moulton was just asking you if you had
10  knowledge of anyone from the executive team, like
11  Mr. Broussard or Mr. Kinsey or Mr. Ellison disapproving
12  a true up --
13              MR. MOULTON:  Objection; form.
14              MS. VILLASEÑOR:  I'm not done with my
15  question.
16              MR. MOULTON:  Well, Mr. Ellison is not
17  part of the executive team.  I mean, there's already a
18  problem with it.  I'm sorry.  I don't mean to interrupt
19  you.
20              MS. VILLASEÑOR:  Okay.  I'll rephrase.
21              MR. MOULTON:  Go ahead.
22      Q   (By Ms. Villaseñor) When Mr. Moulton was asking
23  you if you were aware of anyone in a position above you,
24  like Mr. Beagle or Mr. Ellison or Mr. Kinsey
25  disapproving a true up or day rate entry, you said "not

ALEXANDER NEIL KALMAN - April 21, 2022

1  to my knowledge."  Is that fair?

2      A   Yes.

3      Q   Okay.  And is it not to your knowledge or you

4  just don't know whether they did or they didn't?

5      A   I have no knowledge of whether or not they had.

6  As has been discussed, the Excel spreadsheet changed

7  hands between people before it got to the Payroll

8  Department, and by the time it got to the Payroll

9  Department it was approved.

10     Q   Right.  And I believe you told me earlier that

11 in between these various iterations somebody like

12 Mr. Beagle or Mr. Kinsey or Mr. Ellison would have been

13 approving or disapproving these true ups or day rate

14 entries; correct?

15     A   Correct.

16             MR. MOULTON:  Objection; form.

17     A   Yes.

18             MS. VILLASEÑOR:  Thank you, sir.  Thank

19 you for your time today.  Pass the witness.

20                 FURTHER RE-EXAMINATION

21 BY MR. MOULTON:

22     Q   All right.  Mr. Kalman, with this exchange

23 happening before, the exchange you're talking about with

24 Ms. Villaseñor right now with these spreadsheets, you're

25 saying these were shuffled around before they ever got

ALEXANDER NEIL KALMAN - April 21, 2022

1  to you?

2      A    Right.  Like they would -- Missy and JD or

3  whomever was sending them would, as far as I understood,

4  get approval before sending them to Payroll.

5      Q    Okay.  So they would have sent -- are you

6  saying that you know they were sent to someone like

7  Mr. Beagle or Mr. Ellison before they got to you?

8      A    I mean, that was my understanding, yes.

9      Q    Okay.  All right.  So by the time it got to you

10  it was time just to pay it.

11      A    Correct.

12      Q    Okay.  But as far as your memory of any of

13  this, you were never aware specifically of any time

14  where any of these executives had disapproved a gross up

15  or a true up; is that right?

16      A    Not to my knowledge, no.

17      Q    Okay.  But you're saying that it could have

18  happened but you're just -- you wouldn't necessarily

19  know.

20      A    Right, I would not have been aware.

21          MR. MOULTON:  Okay.  Pass the witness.

22          MS. VILLASEÑOR:  No further questions.

23  We will reserve for trial.

24          MR. MOULTON:  All right.  Thank you,

25  Mr. Kalman, you are done today.

ALEXANDER NEIL KALMAN - April 21, 2022

```
1                    MS. VILLASEÑOR:  Thank you.
2                    VIDEO OPERATOR:  Off the record.
3                    COURT REPORTER:  All right.  Before you
4    disconnect would you like to state your transcript
5    orders on the record, please?
6                    VIDEO OPERATOR:  And/or video.
7                    COURT REPORTER:  And the video.
8                    MR. MOULTON:  Sure.  And before we go,
9    Mr. Kalman, because you are a witness you have the right
10   to review your own transcript.  And so I'm just letting
11   you know this, that you can tell the court reporter if
12   you would like a copy for yourself to review.  You are
13   certainly -- that is your right to do.  So if you want
14   to do that, you should let her know.
15                   THE WITNESS:  Okay.  Thank you.
16                   MR. MOULTON:  And, ma'am, Ms. Bloye, we
17   will order the standard, like electronic package.  For
18   video we'll do sync.
19                   COURT REPORTER:  Okay.  Thank you.
20                   MS. VILLASEÑOR:  And then for defendants
21   I think we've just got the standard order.  You can ask
22   Anthony Arteaga at my firm if you don't have it.
23                   COURT REPORTER:  All right.  Very good.
24                   (Deposition concluded at 1:13 p.m.)
25                   (Signature of the witness was waived.)
```

ALEXANDER NEIL KALMAN - April 21, 2022

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                   SAN ANTONIO DIVISION

 3  FRANCISCO CANTU and NORBERTO  §  CIV A. NO:  5:19-cv-00615
    ELIZONDO, individually and on §
 4  behalf of all others          §  JURY TRIAL DEMANDED
    similarly situated,           §
 5                                §  CLASS/COLLECTIVE ACTION
                    Plaintiffs,   §  PURSUANT TO 29 U.S.C. § 216(b)/
 6                                §  FED. R. CIV. P.23
    -vs-                          §
 7                                §
    MAMMOTH ENERGY SERVICES, INC. §
 8  d/b/a, COBRA ENERGY and       §
    HIGHER POWER ELECTRICAL, LLC, §
 9                                §
                    Defendants.   §
10

11
                    REPORTER'S CERTIFICATION
12            DEPOSITION OF ALEXANDER NEIL KALMAN
                        April 21, 2022
13

14       I, Trena K. Bloye, Certified Shorthand Reporter within and

15  for the State of Oklahoma, certify to the following:

16       That the witness, ALEXANDER NEIL KALMAN, was duly sworn by

17  the officer and that the transcript of the oral deposition is a

18  true record of the testimony given by the witness;

19       That the witness chose to waive his right to read and sign

20  the deposition;

21       That the amount of time used by each party at the deposition

22  is as follows:

23              DAVID I. MOULTON  2:32

24              ERIN VILLASEÑOR  0:27

25       That pursuant to information given to the deposition officer
```

ALEXANDER NEIL KALMAN - April 21, 2022

1    at the time said testimony was taken, the following

2    includes counsel for all parties of record:

3         DAVID I. MOULTON, Attorney for Plaintiffs

4         ERIN VILLASEÑOR, Attorney for Defendants

5      I further certify that I am neither counsel for,

6    related to, nor employed by any of the parties or

7    attorneys in the action in which this proceeding was

8    taken, and further that I am not financially or

9    otherwise interested in the outcome of the action.

10     Further certification requirements pursuant to Rule

11    203 of TRCP will be certified to after they have

12    occurred.

13     Certified to by me this 26th day of April, 2022.

14

15

16

17

18

19                    _____
                      Trena K. Bloye
20                    #1522 CSR for the State of Oklahoma
                      Good To Go Process Service
21                    Firm Registration No. 62
                      1225 North Loop West, Suite 327
22                    Houston, Texas 77008
                      713-351-7061

23

24

25

**ALEXANDER NEIL KALMAN - April 21, 2022**

```
1           FURTHER CERTIFICATION UNDER RULE 203 TRCP

2

3      The original deposition was/was not returned to the

4    deposition officer on _____;

5      If returned, the attached Changes and Signature page

6    contains any changes and the reasons therefor;

7      If returned, the original deposition was delivered to

8    DAVID I. MOULTON, Custodial Attorney;

9      That $_____ is the deposition officer's charges to

10   the Plaintiffs for preparing the original deposition

11   transcript and any copies of exhibits;

12     That the deposition was delivered in accordance with

13   Rule 203.3, and that a copy of this certificate was

14   served on all parties shown herein on and filed with the

15   Clerk.

16     Certified to by me this 26th day of April, 2022.

17

18

19

20

21

22                  _____

23                  Good To Go Process Service
                    Firm Registration No. 62
24                  1225 North Loop West, Suite 327
                    Houston, Texas 77008
25                  713-351-7061
```