UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

CASE NO. 5:19-CV-00615

FRANCISCO CANTU, ET AL.,

Plaintiffs

V.

MAMMOTH ENERGY SERVICES, INC., ET AL.,

Defendants

DEPONENT:  MISSY DAVIS

DATE:      APRIL 19, 2022

REPORTER:  SOPHIE JONES

**MISSY DAVIS - April 19, 2022**

Page 2

1                      APPEARANCES
2
3 ON BEHALF OF THE PLAINTIFFS, FRANCISCO CANTU, ET AL.:
4 David Moulton, Esquire
5 Bruckner Burch PLLC
6 11 Greenway Plaza
7 Suite 3025
8 Houston, Texas 77046
9 Telephone No.: (713) 877-8788
10 E-mail: dmoulton@brucknerburch.com
11 (Appeared via videoconference)
12
13 ON BEHALF OF THE DEFENDANTS, MAMMOTH ENERGY SERVICES,
14 INC., ET AL. AND MISSY DAVIS:
15 M. Harris Stamey, Esquire
16 Porter Hedges
17 1000 Main Street
18 36th Floor
19 Houston, Texas 77002
20 Telephone No.: (713) 226-6619
21 E-mail: hstamey@porterhedges.com
22
23 Also Present: Esther Heath, Videographer; Anthony
24 Arteaga, Paralegal at Porter Hedges (Appeared via
25 videoconference)

Page 4

1              EXHIBITS (CONTINUED)
2
3 191 - Email Chain - MAMMOTH003265-66        75
4 192 - Email Chain - MAMMOTH003492-3506      82
5 193 - Email Chain - MAMMOTH003394-3409      84
6 194 - Email Chain - MAMMOTH003761-66        88
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1                       INDEX
2                                          Page
3 PROCEEDINGS                               6
4 DIRECT EXAMINATION BY MR. MOULTON         7
5 CROSS EXAMINATION BY MR. STAMEY          79
6
7                     EXHIBITS
8 Exhibit                                  Page
9 186 - Recruiting Emails                   23
10 138 - 5 Star Orientation Handout         37
11 187 - 5 Star Offer of Employment Letter  41
12 151 - Crew Wage Scale for 2017 Puerto Rico
13     Storm Rates and Stand By Rates for Cobra
14     Energy and Subsidiaries              42
15 166 - Email Chain - MAMMOTH003290-91     47
16 188 - Email Chain - MAMMOTH003297-99     52
17 189 - Email Chain - MAMMOTH003287-89     55
18 179 - Email Chain - MAMMOTH003300-02     56
19 180 - Email Chain - MAMMOTH003445-46     57
20 169 - Email Chain - MAMMOTH003154-60     57
21 183 - Email Chain - MAMMOTH003143-44     65
22 184 - Excel Spreadsheet - MAMMOTH003145  65
23 190 - Email Chain - MAMMOTH003255-56     70
24 162 - Email Chain - MAMMOTH003468-69     72
25

Page 5

1                     STIPULATION
2
3 The video deposition of MISSY DAVIS was taken at HOLIDAY
4 INN EXPRESS & SUITES, 234 MIDTOWN BOULEVARD,
5 MADISONVILLE, KENTUCKY 42431 on TUESDAY the 19TH day of
6 APRIL 2022 at approximately 9:30 a.m. CST; said video
7 deposition was taken pursuant to the FEDERAL Rules of
8 Civil Procedure.
9
10 It is agreed that SOPHIE JONES, being a Notary Public
11 and Court Reporter, may swear the witness and that
12 the reading and signing of the completed transcript
13 by the witness is not waived.
14
15
16
17
18
19
20
21
22
23
24
25

**MISSY DAVIS - April 19, 2022**

|  | Page 6 |
|---|---|

PROCEEDINGS

3      VIDEOGRAPHER:  We're now on the record.
4  My name is Esther Heath.  I'm the videographer today
5  and Sophie Jones is the court reporter.  Today is
6  the 19th day of April 2022.  The time is 9:30 a.m..
7  We are at the Holiday Inn Express and Suites located
8  at 234 Midtown Boulevard, Madisonville, Kentucky to
9  take the deposition of Missy Davis in the matter of
10  Francisco Cantu, et al. versus Mammoth Energy
11  Services, Inc., et al.  Pending in the United States
12  District Court for the Western District of Texas.
13  Case number 519-CV-00615. Will counsel please
14  identify themselves for the record?
15      MR. STAMEY:  Harris -- go ahead, David.
16      MR. MOULTON:  This is David Moulton for the
17  plaintiffs.  Good morning.
18      MR. STAMEY:  And this is Harris Stamey, and I'm
19  here with witness Missy Davis, or Melissa Davis.
20      VIDEOGRAPHER:  Okay.  Thank you.  Ms. Davis,
21  will you please raise your right hand for the
22  reporter?
23      COURT REPORTER:  Do you solemnly swear or
24  affirm that the testimony you're about to give will
25  be the truth, the whole truth, and nothing but the

|  | Page 7 |
|---|---|

1  truth?
2      THE WITNESS:  I do.
3      COURT REPORTER:  Counsel, you may proceed.
4      DIRECT EXAMINATION
5  BY MR. MOULTON:
6      Q    Good morning, Ms. Davis.  Thank you for coming
7  in to provide testimony today in this case.  Before we
8  get started, can you please state your full name for the
9  record?
10      A    It's Melissa Lynn Davis, and most people refer
11  to me as Missy.
12      Q    And for the record, also, Ms. Davis, can you
13  identify everyone that's in there in the room with you?
14      A    I hope.  There is Harris --
15      Q    Okay.
16      A    -- Jamie, and I'm sorry, I'm terrible with
17  names, but we do have a videographer and a court
18  reporter.
19      Q    Okay.  Is there anyone else in the room?
20      A    No.
21      Q    Okay.  Are you -- and then just to -- just for
22  the record to make sure, I'll ask that you, during this
23  deposition, not communicate, you know, other than what
24  we're doing on this video right here, in other words, no
25  texting, no e-mailing with other folks during the

|  | Page 8 |
|---|---|

1  deposition; is that fair?
2      A    Yes.  Let me -- I'm turning my phone off right
3  now.  Sorry.
4      Q    Yeah.  That's fine.
5      A    Okay.
6      Q    Okay.  Now, Ms. Davis, could you tell me what
7  your current address is?
8      A    Yes, it's 925 Dockery Road, and that's in
9  Dawson Springs, Kentucky, 42408.
10      Q    And what is your date of birth, please?
11      A    3-11-77.
12      Q    And what -- who is your current employer?
13      A    Groves Electrical Services.
14      Q    And can you give me their address?
15      A    3135 Grapevine Road, and that's in
16  Madisonville, Kentucky, 42431.
17      Q    What is your cell phone number?
18      A    270-871-3519.
19      Q    Do you use any other cell phones?
20      A    Yes, I do have a work cell phone for Groves.
21      Q    Okay.  Can I get that number, as well?
22      A    Yeah, I have to look it up.  I don't know what
23  it is.  I haven't been there very long.
24  It is 270-584-2941.
25      Q    Do you have an all office phone with Groves?

|  | Page 9 |
|---|---|

1      A    Yes.  270-825-1437, and my extension is 165.
2      Q    How long had you been working for Groves?
3      A    Started there February 8 of this year.
4      Q    Okay.  And where were you working at
5  immediately prior to Groves?
6      A    The City of Madisonville.
7      Q    Okay.  How long have you worked for them?
8      A    Started in May 2021 when I left Five Star and
9  went to the City and worked until February 7 of this
10  year.
11      Q    With Groves, what is your current position?
12      A    I'm the accounts receivable manager.
13      Q    With the City of Madisonville, what was your
14  position?
15      A    Human Resources Manager.
16      Q    With Five Star, what was your position?
17      A    Human Resource Manager.
18      Q    And how many -- can you give me your dates of
19  employment approximately with Five Star?
20      A    I believe I started with them in August 2016
21  and went until May 2021.
22      Q    Okay.  And do you recall how you got your job
23  at Five Star?
24      A    I do.  I was contacted via -- I think it was
25  Facebook or text message by Samantha Nall.  She told me

**MISSY DAVIS - April 19, 2022**

Page 10

1 that there was an opening for a HR manager with Five
2 Star and asked if I'd be interesting -- interested in
3 applying for the position.
4     Q     Okay.  So did you already know Ms. Nall from
5 before?
6     A     I did.
7     Q     Okay.  How are you-all acquainted?
8     A     We worked together at Hendricks Electric and
9 T&D Solutions.
10    Q     Okay.
11    A     Several years ago.
12    Q     Right.  Okay.  And so, you know, of course you
13 worked with Mr. Scott Whitsell; is that right?
14    A     I did.
15    Q     Okay.  And for how long were you working for
16 Mr. Whitsell?
17    A     At Five Star?
18    Q     Yeah.
19    A     Well, from 2016 to 2021 I worked at Five Star.
20    Q     Okay.  So the entire time, Mr. Whitsell
21 would've -- I think probably would've been one of your -
22 - one of the people you would report to?
23    A     Correct.
24    Q     Okay.  When you were working at Five Star,
25 particularly during the Puerto Rico time, who all did

Page 11

1 you report to?
2     A     During the entire time of Puerto Rico or just
3 during a certain time period?
4     Q     If it changed --
5     A     Yeah, it did.
6     Q     -- let's -- it did?  Okay.  Let's kind of walk
7 through that process, then.  Like at the beginning of
8 the Puerto Rico project, who were you reporting to?
9     A     I felt like my immediate supervisor would've
10 been Samantha Nall, the way that it was set up, and --
11 for anything administrative, basically.  And then
12 anything operational would've been Scott Whitsell.
13 As time went on, it did sort of change as Puerto Rico
14 evolved.  So at one point they changed who I reported
15 to, moreso to the -- Michelle Poling as -- once she came
16 on board.  She was hired by Cobra Energy as a Director
17 of Administration and HR was her title, and it sort of
18 switched to answering over to her.  Anything human
19 resource related, or payroll related in the beginning,
20 I would've referred to Alex Kalman or Jeff Beagle.
21    Q     Okay.  So to kind of go through some of these
22 names.  I think -- did -- was it your understanding that
23 Samantha Nall was an employee of Five Star, or was she
24 employed by Cobra?  Or is she a Mammoth person?
25    A     She was Five Star Electric.

Page 12

1     Q     Okay.  And Michelle Poling, what -- who did
2 you understand her employer to be?
3     A     Cobra Energy.  I'm not sure which Cobra entity
4 she was technically worked for.  I just know it was
5 Cobra.
6     Q     Okay.  Do you know who she would report to?
7     A     Keith Ellison.
8     Q     And he was the president of Cobra?
9     A     Yes.
10    Q     Alex Kalman, which company was he with?
11    A     Mammoth Energy.
12    Q     Okay.  And also -- and Jeff Beagle also
13 would've been with Mammoth, as well?
14    A     I believe so.
15    Q     Okay.  Are you related to anyone that's
16 currently in -- working with Mammoth or its
17 subsidiaries?
18    A     I don't believe so.  Well -- oh, let me take
19 that back.  My husband is still a current employee of
20 Five Star Electric.
21    Q     Oh, okay.  What is his name?
22    A     Charles Jason Davis.
23    Q     And what does he do for Five Star?
24    A     He's a lineman.
25    Q     Okay.  Any other relatives that work with

Page 13

1 Mammoth or its subsidiaries?
2     A     I don't think so.  I can't think of anyone.
3     Q     Do you still talk with anyone at Mammoth and
4 its subsidiaries other than your husband?
5     A     Oh, sure.
6         MR. STAMEY:  Objection to form.
7     Q     Yeah.  I'm sorry?  I didn't hear your answer,
8 Ms. Davis.
9         MR. STAMEY:  You can answer it even though I
10 object.
11    A     Okay.  I do still communicate --
12    Q     Okay.
13    A     -- with friends that I have.
14    Q     Right.  Can we -- can you name some of --
15 well, can you name the friends that you have that you
16 still communicate with at Mammoth?
17    A     Mammoth or Five Star?  It's different.
18    Q     Both.
19    A     Okay.  The only person I've communicated with
20 recently at Mammoth would've been Marty Whimmer over my
21 husband's short-term disability claims, but nothing
22 personal.  I talk to Samantha Nall at Five Star
23 electric.  I talked to Scott Whitsell at Five Star
24 Electric.  My neighbor works for Five Star Electric.
25 So I mean -- who else?  I occasionally talk with Jerrell

**MISSY DAVIS - April 19, 2022**

Page 14

1 Rich who took my place at Five Star Electric. I've been
2 and had lunch with friends at Five Star Electric, not
3 recently, but since I left Five Star. So it -- those
4 are the main ones that I talk to.
5       Q    Okay. And what I wanted to know particularly,
6 I don't necessarily want to know about you and your
7 neighbors' backyard barbecue plans, but what I do want
8 to know about is whether with any of the folks you just
9 mentioned that still work at Five Star that you still
10 communicate with, in regards to this case, what have
11 you-all spoken about?
12      A    Just that there is a case with -- I've talked
13 to Sam and Scott Whitsell just to tell them that I was
14 being subpoenaed.
15      Q    Okay. And what did -- what else did you-all
16 talk about? You said you were getting subpoenaed.
17 What did they say?
18      A    "That sucks."
19      Q    It's true. Right? Okay. Right? Okay.
20 Did Mr. Whitsell talk about his deposition at all?
21      A    No. I mean, I know he went. He did tell me
22 he was going, but I didn't -- we didn't discuss what
23 occurred at the deposition.
24      Q    Okay. And how long ago did you talk to
25 Ms. Nall and Mr. Whitsell that you had been subpoenaed?

Page 15

1       A    I'm not sure, like -- I'd have to look on my
2 phone to tell you the last time I talked to him.
3       Q    Okay. Just approximately. Are we talking
4 about like last week, a month ago, two months ago?
5       A    Probably in the last week.
6       Q    Okay. To prepare for your deposition today,
7 can you describe to me anything that you did to get
8 ready?
9            MR. STAMEY: With the exception of discussions
10   with counsel.
11      Q    And I'm not going to ask you what you-all
12 talked about because that would obviously be privileged.
13 But I can ask you, for example, if you did meet with a
14 lawyer and how long you met, things like that, which we
15 will ask you. But the general question is what did you
16 do to prepare?
17      A    I met with Harris for a couple of hours.
18      Q    Okay. When did you-all meet?
19      A    Yesterday afternoon.
20      Q    Did you-all meet in person?
21      A    We did.
22      Q    Did you guys discuss the testimony of other
23 folks in this case?
24      A    No.
25      Q    Did you-all review documents?

Page 16

1       A    We did.
2       Q    Okay. What documents did you review?
3       A    Various e-mails.
4       Q    Okay. Do you remember the subjects of those
5 e-mails?
6       A    Puerto Rico pay scales, pay plans, different
7 things like that.
8       Q    Okay. Any other documents that you can
9 recall?
10      A    Maybe a couple of spreadsheets, but -- that
11 had explanation as to the pay plan and that sort of
12 thing. But I don't -- can't think of anything else
13 really.
14      Q    Okay. How many times have you ever given a
15 deposition?
16      A    This is my first.
17      Q    You know what? And you're doing so well.
18 You haven't -- I was thinking you were going to say 10
19 because you're not talking over me and like not
20 interrupting, not arguing. That's -- see, that's what
21 -- the court reporter has to write everything down so
22 it's good if we -- if you wait for me to finish my
23 question, I'll try to wait for you to answer, that way
24 she can get it all down; is that understood?
25      A    Yes.

Page 17

1       Q    Okay. Thank you, Ms. Davis. So I'm going to
2 have -- I want to get everyone out of here at a
3 reasonable time today, and I have some very specific
4 questions that we're going to go through. I want -- I
5 kind of go through things in chronological order.
6 And I realize that at some point in my questions, you
7 may want to be talking about things that happen later,
8 and rest assured, we'll get to that. And if there's
9 something I'm missing, I'm sure Mr. Harris will get to
10 it. But I would ask that you focus on the question I'm
11 asking and that way we can get through this in a
12 reasonable and efficient manner; does that make sense?
13      A    Sure.
14      Q    Okay. So I want to talk to you about the
15 beginning when Puerto Rico -- when the Puerto Rico work
16 was starting up, that would've been about October 2017.
17 Do you recall that?
18      A    Oh, yes.
19      Q    Okay. And based on what Mr. Whitsell had
20 testified to, it sounded like you were working with him
21 to basically recruit workers to go to Puerto Rico for
22 the restoration project; is that right?
23      A    That's correct.
24      Q    All right. And when you-all were doing the
25 recruiting, you kind of put the word out through

**MISSY DAVIS - April 19, 2022**

Page 18

1 different channels, correct?

2    **A    Yes.**

3    Q    All right.  And so, one of those channels,

4 would've been the company's Facebook page?

5    **A    That's right.**

6    Q    All right.  And another channel would've been

7 Linejunk on Facebook.

8    **A    Possibly.**

9    Q    Yeah.  Okay.  And do you recall getting

10 e-mails from folks saying that they'd seen the posting

11 for work on Linejunk?

12    **A    Absolutely.  I -- well, I don't know about**

13 **Linejunk specifically, but on Facebook, yes.**

14    Q    Oh, okay.  All right.  When you would recruit,

15 would you use Linejunk?

16    **A    You know, I don't remember.**

17    Q    Okay.

18    **A    It's possible, but I don't remember.**

19    Q    All right.  Do you know what Linejunk is?

20    **A    I do.**

21    Q    Okay.  What is Linejunk?

22    **A    It's just -- I believe it's just a Facebook**

23 **page that's ran by an individual.  I don't know.**

24    Q    Right.  Is it sort of a place that a lineman

25 can go on Facebook for info and news and jobs and things

Page 19

1 like that?

2    **A    I assume so.  They also sell stuff, you know,**

3 **T-shirts and that sort of thing.**

4    Q    Sure.  Does your husband use Linejunk?

5    **A    I have no idea.  I know he's a -- at one point**

6 **he was like a -- not a member or whatever, but you like**

7 **the page so that you can see the posts or whatever.**

8    Q    Right.  It -- and just for -- how do I -- I

9 want to show you just my screen here.  We're not going

10 to enter this as an  exhibit.  I just want to know if

11 you can identify this as Linejunk's Facebook.  Do you

12 see my screen here, where it says, "Lineman appreciation

13 on this and every day," and it says,

14 "Linejunk@Linejunk"?

15    **A    I can see that, yes.**

16    Q    Yeah.  Is that the Linejunk that we're talking

17 about?

18    **A    I can't say for sure.  I assume so.**

19    Q    Okay.  Do you recall recruiting on this page?

20    **A    I don't recall.**

21    Q    Okay.  Who would've handled the recruiting at

22 Five Star?

23    **A    Myself.  As far as the posts themselves, it**

24 **would've been me.**

25    Q    Okay.  All right.  Is there -- other than this

Page 20

1 Linejunk, is there another Linejunk Facebook page that

2 you would've been posting to?

3    **A    Not that I know of.  I mean, they had -- there**

4 **are several pages that linemen use, but I don't know all**

5 **of them for sure.**

6    Q    Okay.  So were you advertising on -- or were

7 you recruiting on Linejunk or not -- or was it others,

8 or not sure?

9        MR. STAMEY:  Objection, form.  She's answered

10    this question like four times, David.

11    **A    I mean, it's possible, but I don't remember**

12 **specifically.**

13    Q    Okay.  Do you remember any other pages besides

14 the company webpage that you would've been recruiting

15 on?

16    **A    I do not recall.**

17    Q    Okay.  You can see that Linejunk has 494,000

18 followers.  Do you see that there?

19    **A    Yes.**

20    Q    Right.  So this would be a great page to

21 recruit on if you were trying to reach out to linemen,

22 correct?

23        MR. STAMEY:  Objection to form.

24    **A    I would assume.  Yes.**

25    Q    All right.  So we're going to -- so after you

Page 21

1 kind of -- you were advertising for linemen to come work

2 in Puerto Rico or recruiting.  I imagine you would've

3 had hundreds, if not thousands, of linemen contacting

4 you, calling, texting, e-mailing, that sort of thing; is

5 that correct?

6        MR. STAMEY:  Objection to form.

7    **A    It does seem to have been several, yes.**

8    Q    Right.  I mean, I would think that it would've

9 been overwhelming because I think you were the one

10 primarily who had to respond to them.  Do you recall

11 that?

12        MR. STAMEY:  Objection to form.

13    **A    I think I was probably the one that would've**

14 **replied to Facebook posts or messages.  I believe it**

15 **listed my phone number and Jeremy Lovens' phone number.**

16 **And we both -- we all fielded calls and e-mails.**

17    Q    Okay.  But safe to say, you would've -- you

18 and the -- your team of folks dealing with the

19 recruiting would've had to answer thousands of responses

20 either on Facebook or texts, calls, or e-mails, correct?

21        MR. STAMEY:  Objection to form.

22    **A    There were a lot.  I don't know how many.**

23    Q    Okay.  And I just wanted to get a sense for is

24 it thousands or hundreds?  Do you have a sense?

25    **A    No idea.**

**MISSY DAVIS - April 19, 2022**

Page 22

1    Q    Okay.  And some of the guys that would contact
2 you back wouldn't be just calling for themselves, they'd
3 be calling or contacting you on behalf of the crews that
4 they were with, correct?
5    A    **Sometimes.  Yes.**
6    Q    All right.  So sometimes even though you're
7 talking to one person you're really talking to their
8 entire crew, because they're going be passing that
9 information off to their crews, correct?
10        MR. STAMEY:  Objection to form.
11   A    **That was my understanding at the time.**
12   Q    Right.  Okay.  We're going to take a look at
13 some of the e-mails that you would've responded -- that
14 you were sending out to these folks that you're
15 recruiting on behalf of Five Star, right?  I mean --
16 well, before we do that, when you're doing this
17 recruiting, who had you do the recruiting?  Like who was
18 the person that gave you that responsibility?
19   A    **Scott Whitsell.**
20   Q    Okay.  So when you're recruiting, you're
21 recruiting on behalf of Five Star, correct?
22   A    **Yes, that's correct.  Okay.**
23   Q    Did you understand you would also be
24 recruiting on behalf of Cobra?
25   A    **I don't understand what you mean.**

Page 23

1    Q    Yeah.  I mean, so you're recruiting on behalf
2 of Five Star, but I wanted to know if you understood if
3 part of your responsibilities was to actually be
4 staffing for Cobra rather than just Five Star?
5        MR. STAMEY:  Objection to form.
6    A    **That was not my understanding.  I didn't even
7 have access to Cobra companies in the payroll system --
8 or the HR system.**
9    Q    Okay.  Okay.  All right.  That's fine.  So
10 let's go ahead and look at some of these e-mails if we
11 can.
12   A    **Wow.  That's really small.**
13   Q    I'll make it bigger for you.
14   A    **Okay.  Thank you.**
15   Q    Yeah.  Yeah.  Is that readable?
16   A    **Yes.  Much better.  Thank you.**
17   Q    All right.  I'm going to use some bookmarks on
18 the side here to kind of help us navigate it.  So I put
19 together several of these to -- I just want to discuss
20 with you the information that was relayed to these
21 workers that you're recruiting on behalf of Five Star.
22 Okay?  So this is plaintiff's  Exhibit 186, and we have
23 here an e-mail chain between you and RBrothers89.  Do
24 you remember this person's real name?
25        (EXHIBIT 186 MARKED FOR IDENTIFICATION)

Page 24

1    A    **Russell Brothers.**
2    Q    Okay.  Is he someone that ended up working for
3 Five Star?
4    A    **He did.**
5    Q    Okay.  And so, I have boxed in red kind of the
6 things that I wanted to focus on in here, it looks like
7 you were telling Mr. Brothers that all expenses will be
8 paid.  Do you see that?
9    A    **I see that.**
10   Q    Okay.  And you told him "The pay scale I have
11 now is a daily one," correct?
12   A    **I did tell him that.**
13   Q    And that the groundman is $600 a day and hot
14 apprentice is $700 a day, correct?
15   A    **That's correct.**
16   Q    And with John Shepard, he's another person
17 that responded, and your e-mail with him says
18 "apprentice and groundman is $600 a day, hot apprentice
19 is $700 day -- $700 a day, and class B lineman is $800 a
20 day," correct?
21   A    **Correct.**
22   Q    And you told him that "pay is the same
23 regardless of hours," correct?
24   A    **That was stated in the e-mail, yes.**
25   Q    And with Kyle, I don't see Kyle's last name in

Page 25

1 here, but his e-mail is KyleTPO2.  Do you know who that
2 is?
3    A    **I do not.**
4    Q    Okay.  But he was a person that was responding
5 in -- to an ad, and you told him this pay scale right
6 here.  "The foreman is $1,250 per day, journeyman,
7 lineman, $1,000 per day, A class, $900, B class, $800,
8 hot apprentice, $700, and apprentice groundman is $600,"
9 correct?
10   A    **Yes.  That's what was given to us initially.**
11   Q    Right.  And Kyle -- it looks like Kyle was
12 also submitting an application for another person, a
13 person named Wesley Amato, correct?
14   A    **Possibly.**
15   Q    Okay.  And that's something that would happen.
16 Like sometimes the person you're talking to is actually
17 kind of helping to get other folks on, as well, correct?
18   A    **Yes, that's right.**
19   Q    Did Tristian Stewart end up working for Five
20 Star?
21   A    **You know, I don't know.  I don't recall that
22 name.  There were a lot of folks at that time, so I'm
23 not sure.**
24   Q    Okay.  But here's another -- you got another
25 e-mail where you told him what the pay would be at

**MISSY DAVIS - April 19, 2022**

1 foreman, $1,250 per day, journeyman, $1,000 per day,
2 A class, $900, B class, $800, hot apprentice, $700,
3 apprentice, $600, correct?
4    A    Correct.
5    Q    And that's -- that was your response after he
6 asked you if the pay scale had been finalized.  You see
7 that?
8    A    I do.
9    Q    Okay.  And with Mr. Stewart, you also told him
10 like you've said to others, that "All expenses will be
11 paid," correct?
12    A    Yes.  That was my understanding.  Their room,
13 board, food would be paid.
14    Q    And you also know that from Mr. Stewart that
15 he was responding to a Facebook post, correct?
16    A    Yes, I believe so.
17    Q    And here are some e-mails with Mr. Shaun
18 Merrell.  Do you remember him?
19    A    I do not.
20    Q    Okay.  You don't know if he ended up working
21 for Five Star?
22    A    I do not know.
23    Q    Okay.  This is sort of a longer chain.  Let's
24 start at the bottom.  So why don't you go ahead -- if
25 you don't mind, can you start from the bottom here and

1 kind of get yourself familiar with this e-mail chain?
2    A    Sure.
3    Q    And just tell me when you want to scroll up.
4    A    Okay.  Yeah.  Would you scroll up for me?
5 Thank you.  Okay.  Okay.  Okay.
6    Q    All right.  So again, with Mr. Merrill, you
7 informed him that all expenses will be paid, correct?
8    A    That's correct.
9    Q    And you informed him of the same day-rate pay
10 scale that we've been going through, correct?
11    A    That's right.
12    Q    And you told him his daily pay is the same no
13 matter what the hours are, correct?
14    A    Correct.  That whether they worked 16, 12, 10
15 --
16    Q    And all expenses, meals, and lodging are
17 covered, correct?
18    A    Correct.
19    Q    And he asked you "Is the day-rate paid seven
20 days or just days worked"?  And your answer was "Storm
21 is seven days a week for 12-hour days."  And that's what
22 you told him, right?
23    A    That's what I said in -- that's what the
24 information we'd been given initially is.
25    Q    All right.  Let's go to the e-mails with Roy

1 Varnell.  Okay.  We can kind of scroll up through this
2 one.
3    A    I think I did some copying and pasting on
4 these e-mails after a while.
5    Q    Sure.  Makes sense.  So in this one,
6 Mr. Varnell, you're telling him to "see the pay scale
7 below."  And if we kind of go down to the bottom, it
8 says "Your daily pay is the same no matter what the
9 hours are and all expenses, meals, and lodging are
10 covered."  So that's what you told him, right?
11    A    That is what we said.  Yes.
12    Q    Okay.  And then you told him the same day-rate
13 pay scale, correct?
14    A    Correct.
15    Q    Then Roy is talking about, "Jeremy mentioned
16 the pay scale and if I bring my own men in equipment,"
17 do you know what he's talking about?
18    A    I would assume he had talked to Jeremy Lovans
19 and --
20    Q    Who's that?  I'm sorry.
21    A    He -- at the time, I believe he was the VP of
22 Operations for Five Star Electric.
23    Q    Okay.  Roy Varnell sounds like one of these
24 folks who may be coming with people, it's not just him.
25        MS. STAMEY:  Objection, form.

1    A    I don't remember Roy.
2    Q    Fair enough.  All right, here we have an
3 e-mail with Mr. David Rendon.  Do you remember him?
4    A    I do.
5    Q    Okay.  Did he end up working for Five Star?
6    A    He did.
7    Q    Okay.  Here as well you told him the day-rate
8 pay scale and that his daily pay saying "No matter what
9 the hours are, all expenses, meal, lodging are covered,"
10 correct?
11    A    That's correct.
12    Q    Here we have some e-mails with Josh Morgan.
13 Do you remember him?
14    A    Yeah, I believe so.  I do.
15    Q    Do you think he worked for Five Star?
16    A    I think so.
17    Q    Okay.  This is a little longer chain.
18 I'm going to scroll down the bottom --
19    A    Okay.
20    Q    -- and we'll do the scroll up trick until you
21 tell me when you're ready.  I think it starts right
22 here, October 23, on class B lineman.  Go ahead and
23 start reviewing there.
24    A    Okay.
25    Q    We'll just scroll up as you need.

## MISSY DAVIS - April 19, 2022

Page 30

1    A    Okay.  You can scroll up.  Okay.  Dave Pruitt.
2 Okay.  Okay.  Okay.  Okay.  All right.
3    Q    All right.  Let's kind of go through this.
4 The first part of this is just what we've seen earlier.
5 You told them "The daily pay is the same no matter what
6 the hours are, all expenses, meal, lodging are covered,"
7 correct?
8    A    That's correct.
9    Q    You also gave him the same day-rate pay scale,
10 correct?
11    A    Correct.
12    Q    Mr. Morgan was coming with this group of folks
13 here listed with their names and numbers, correct?
14        MS. STAMEY:  Objection, form.
15    A    I assume.
16    Q    Okay.  You actually spoke to one of these
17 guys, Dave Prewitt, correct?
18    A    Yes.
19    Q    He starts asking to see if -- it looks like he
20 wants to have confirmation that he is going to be able
21 to work for you guys in Puerto Rico, correct?
22        MS. STAMEY:  Objection, form.
23    A    I've told him that I was working to get
24 everyone processed and --
25    Q    Well, down here -- look, before we get there,

Page 31

1 my question is about this e-mail right here.  He was
2 asking you to confirm if they got the job and the next
3 steps, right?
4    A    That's what he's asking, yes.
5    Q    Right.  You say, "Yes, you are in," that means
6 that "you've got the job," right?
7        MS. STAMEY:  Objection, form
8    A    Con -- later in the e-mail I made sure he
9 understood it was contingent upon his drug screen and
10 background check as well.
11    Q    Of course.  Right.  Obviously.  Right.  But
12 what -- then you also knew that he was giving his notice
13 at his current employer, right?
14    A    That's correct.
15    Q    You knew he was relying on your representation
16 about what the work would be like and the pay and that
17 he was hired --
18        MS. STAMEY:  Objection --
19    Q    -- subject to the background check, correct?
20        MS. STAMEY:  Objection, form.
21    A    That's correct.
22    Q    The last one, it's not addressed to anyone in
23 particular.  I don't see who it is to, but it's the same
24 information, right?  "Your daily pay is the same no
25 matter what the hours are, all expenses, meal and

Page 32

1 lodging are covered," right?
2    A    Okay.
3    Q    Yeah.  I mean, this is what --
4        MS. STAMEY:  Dave, is there a Bates label on
5    this document?
6    Q    Yes 645.  This is the information that you
7 were copying and pasting and sending to people?
8    A    I believe so.
9    Q    Right.  Also, the same day-rate pay scale,
10 correct?
11    A    Correct.
12        MS. STAMEY:  Hey, Dave, I'm just going to give
13    you a heads up that I need you to e-mail me a copy
14    of that exhibit so that I can use it in redirect.
15        MR. MOULTON:  Yeah, okay.  No problem.  I want
16    to take a quick break because there's something --
17    there's a document I need to pull up that I didn't
18    think I would need, but we're going to look at it,
19    okay?  Go ahead and take five and we'll be right
20    back.
21        VIDEOGRAPHER:  Going off the record at 10:07
22    a.m.
23        (OFF THE RECORD)
24        VIDEOGRAPHER:  Back on the record at 10:17 a.m.
25 BY MR. MOULTON:

Page 33

1    Q    All right.  Ms. Davis, you understand you're
2 still under oath, correct?
3    A    Yes, I do.
4    Q    All right.  I want to just finish up with this
5 Exhibit 186 that we were talking about with these
6 recruiting e-mails, and I just want to direct you to the
7 last one I have here.  I'm going to show you on the
8 screen.  This last one is with someone named Tevin
9 Slaughter.  Do you remember him?
10    A    I do not.
11    Q    Okay.  On October 20, he wrote you that he had
12 seen the ad on Linejunk and was interested in going to
13 Puerto Rico for storm work.  Do you see him asking you
14 that?
15    A    I do see that.
16    Q    Okay.  Does that refresh your memory that you
17 were advertising or recruiting Linejunk?
18        MS. STAMEY:  Objection, form.
19    A    No, it does not.  I'm not saying I did or
20 didn't.  I do not remember doing it.
21    Q    Okay.  Do you know why Tevin would be reaching
22 out to you about an ad on LineJunk if you-all hadn't
23 recruited on Linejunk?
24        MS. STAMEY:  Objection, form.
25    A    I don't know why, no.

**MISSY DAVIS - April 19, 2022**

Page 34

1   Q    I'm sorry?
2   A    I don't -- I mean, I don't know what his
3 reasoning would be or what he saw.  I have no way of
4 knowing that.
5   Q    Okay.  You do know for sure that you were
6 recruiting on Facebook, but other than the company
7 website, you don't recall this page on Facebook that you
8 were recruiting on?
9   A    That's correct.  I do not recall.
10  Q    Do you have a sense for how many pages you
11 were recruiting on?
12  A    I do not.
13  Q    Okay.  Is it more than 10, more than five?
14 Can you give me any sort of general estimate?
15  A    I have no idea.  It was five years ago.
16  Q    Okay.  When you -- this wasn't the only
17 project you would've recruited workers for, right?
18  A    During that time period or ever?
19  Q    When you worked for Five Star.
20  A    At any point when I worked for Five Star, are
21 you asking?
22  Q    Right.
23  A    Okay.
24  Q    Yeah.  Well, I mean, you don't remember that
25 one five years ago, but what I'm asking is that there's

Page 35

1 probably other recruiting events that you may have done
2 more recently for Five Star that you may remember.
3   A    Okay.  Yeah, we've set up booths at recruiting
4 job fairs and various things like that.  We may have
5 even posted on Indeed recently, I don't know, before I
6 left.
7   Q    Okay.  When it's a storm situation like this
8 and you need to get people quickly, what were the normal
9 channels for recruiting folks?
10  A    We actually -- I don't remember ever
11 recruiting specifically for a storm other than Puerto
12 Rico.
13  Q    Okay.  It's -- for your work at Five Star,
14 that was sort of the unique thing?
15  A    For -- recruiting for just a particular event,
16 that was unique, yes.
17  Q    Okay.  For the work in Puerto Rico, did you
18 post on Indeed?
19  A    I don't even think Indeed was around then.
20  Q    Okay.
21  A    I don't remember doing so.
22  Q    Okay.  Did you-all do any booths or fairs for
23 Puerto Rico work?
24  A    No, I didn't have time.
25  Q    Okay.  After workers were recruited through to

Page 36

1 some of these e-mails and these communications we've
2 been talking about, one of the first things that they
3 would do would be to go to an orientation, correct?
4   A    Yes.  Once -- I'm sorry, can you say that for
5 me one more time?
6   Q    Yeah.  After you've talked with these guys,
7 after you've recruited them essentially through these
8 e-mails and texts, phone calls, all this, one of the
9 first things that they would do when they are coming on
10 with Five Star is to go to an orientation, right?
11  A    That's right.
12  Q    Okay.  Where did you-all conduct orientations?
13  A    It varied during this process.  The very first
14 orientation we had was at the Ballard Center here in
15 Madisonville, Kentucky.  We also used the Ramada Inn in
16 Henderson at times.  We used the Ballard Center more
17 than once, the Ramada Inn more than once.  Beyond that,
18 I'm not -- I can't remember for sure at that point.
19  Q    Okay.  Did you perform the orientations or was
20 that somebody else?
21  A    Well, it was a joint effort.  I would do the
22 HR portion of the orientations.  Of course, the Safety
23 Director manager, he did the safety portion.  Or one of
24 the safety specialists would do the safety portion of
25 the orientation.  There would always be usually one

Page 37

1 member at least of management present.  But we were all
2 -- but I would do most of the HR portion.
3   Q    Okay.  Who was the safety person that would be
4 there?
5   A    Usually it was Brian Baldwin or Daniel
6 Baldwin.  I can remember Andrew Henry and John Hayes
7 being there.  I don't remember which orientations were
8 -- you know, which guys were where.
9   Q    Okay.  Right.  It would probably vary, but
10 there's sort of the general --
11  A    Right.
12  Q    That's generally who was present?
13  A    Yes.
14  Q    Would anybody -- as far as you can recall, was
15 anybody from Cobra or Mammoth ever in attendance at
16 these orientations?
17  A    Steve Wolfe might have been at that first one,
18 but I don't remember if he was --
19  Q    Who was he?
20  A    He was -- I really don't know what his job
21 title was.  Business development or something for Cobra
22 Energy, I think.  But I'm not -- I can't be sure.  He
23 was not a Five Star employee.
24  Q    Okay.  We're going to look at an exhibit
25 that's been previously marked as  Exhibit 138.  Bear

**MISSY DAVIS  -  April 19, 2022**

Page 38

1 with me, I've got to get on the right screen.

2    **A    Okay.**

3    Q    Okay.  This is Exhibit 138.  Do you recognize

4 this as an orientation handout for Five Star?

5         (EXHIBIT 138 MARKED FOR IDENTIFICATION)

6    **A    Can you make that a little larger?**

7    Q    Absolutely.

8    **A    Yes.  That looks like a letter that I would**

9 **send to applicants or recruits giving them the**

10 **information of orientation, where to be, when, what to**

11 **bring with them, how to pack, what documents will be**

12 **needed, yes.**

13    Q    This is a document that would be sent to them

14 in advance of orientation or the document that they

15 would receive at orientation?

16    **A    No, it was something that would be sent to**

17 **them prior to orientation, letting them know when**

18 **orientation is, where it is, what airport to use, that**

19 **sort of thing.**

20    Q    Okay.  I see this one is set for Thursday

21 April 5, 2018.  Would you guys typically include the

22 date of the orientation that they're going to be

23 attending?

24    **A    That was usually the intention of the letter**

25 **was to let them know the date and time and that sort of**

Page 39

1 thing, yes.

2    Q    Okay.  We also -- again, we see the same pay

3 scale that we've been looking at in the recruiting

4 e-mails, correct?

5    **A    That's correct, and it states that "You'll**

6 **have an offer letter in your new hire packet that you**

7 **receive at orientation.  The pay scale is below.  The**

8 **tax situation and benefits will be explained during**

9 **orientation and please bring the following with you to**

10 **orientation," letting them know what documents we would**

11 **need to process them.**

12    Q    Okay.  A new recruit at this point, by the

13 time he's getting this letter and he's about to

14 potentially fly to Kentucky and then go to Puerto Rico,

15 is pretty well committed to this job at this point.

16         MS. STAMEY:  Objection, form.

17    **A    I would assume that they would be.**

18    Q    All right.  If they were already working,

19 they probably would've already given notice or left that

20 job, like we saw in one of the recruiting e-mails,

21 correct?

22         MS. STAMEY:  Objection, form.

23    **A    Some of them just went on leave, to be honest,**

24 **on their current jobs and then with intent of going back**

25 **to their job, but yes.**

Page 40

1    Q    Okay.  Either way, they're committing to go to

2 a Five Star based on information they've received and

3 the recruiting e-mails and also this letter, right?

4         MS. STAMEY:  Objection, form.

5    **A    I would assume.**

6    Q    All right.  We're going to look at  exhibit -

7         MS. STAMEY:  Dave, I don't think you mean to do

8 this, but your outline is on the screen.

9         MR. MOULTON:  Sorry.  Yeah, that's

10 embarrassing.  Did you already screenshot it?

11         MS. STAMEY:  I did not screenshot.

12         MR. MOULTON:  Okay.  Thank you.  I hope Anthony

13 didn't either.  I wouldn't do it to you, Harris.

14         MS. STAMEY:  I don't know about that.  You've

15 sent screenshots of me to Rick several times.

16         MR. MOULTON:  Well, that's just you, not your

17 notes.  That's different.  But, you know, we like

18 your outfits.  You get creative sometimes.

19         MS. STAMEY:  I thought about wearing a vest for

20 you today, but.

21         THE WITNESS:  Do I need to leave the room so

22 you-all can work this out?  Sorry.

23         MR. MOULTON:  That's funny.

24         MS. STAMEY:  You're absolutely right, Missy.

25         MR. MOULTON:  All right, let's try this again.

Page 41

1    Okay.  That's just a webpage, right?

2         MS. STAMEY:  Yes.

3 BY MR. MOULTON:

4    Q    Okay.  You can see  Exhibit 187 now, Ms.

5 Davis?

6         (EXHIBIT 187 MARKED FOR IDENTIFICATION)

7    **A    I can.**

8    Q    Okay.  Is this an example form offer letter

9 that Five Star used?

10    **A    I believe so.  There were several versions of**

11 **this that floated around.  I'm not sure which one this**

12 **is.  But I'm thinking this may have been -- but I can't**

13 **say for certain, the final draft, I guess, is what I'm**

14 **getting at.  I don't know exactly which one this one is,**

15 **but --**

16    Q    Okay.  But it's safe to say that you saw

17 several versions?

18    **A    Yes.**

19    Q    Okay.  This is definitely one of the ones that

20 you-all were using, correct?

21    **A    I believe so.  But, again, I don't know which**

22 **version was the final version.  Like I said, it's been a**

23 **while.**

24    Q    Okay.  Now, do you know -- well, who was it

25 that was the person that would've been responsible for

**MISSY DAVIS - April 19, 2022**

Page 42

1 getting offer letters out and getting them signed and
2 collected and all that?
3     A    That would've been me.
4     Q    Okay.  Do you know if everyone got an offer
5 letter and if it was signed and collected?
6     A    To my knowledge, new employees were provided
7 offer letters.  If they -- if we did not collect one, it
8 was an error.  But, I mean, I can't say for sure.  But
9 it was our intent for every new hire to receive one.
10    Q    I'm going to show you  Exhibit 151.  What do
11 you understand this document to be?
12         (EXHIBIT 151 MARKED FOR IDENTIFICATION)
13    A    Once we heard from our corporate HR team that
14 they had met with the lawyers and the plan was to pay
15 the storm on an hourly rate plus overtime.  Someone, I
16 guess, developed this form that kind of broke it down
17 for us, and also to help differentiate the fact that if
18 someone worked for us state-side, came back to the
19 States and worked for us at home, they would have a
20 different hourly rate as well.
21    Q    Okay.  On Exhibit 151, that last rate you're
22 talking about, the state-side rate if they left Puerto
23 Rico, that's a non-Puerto Rico wage column, correct?
24    A    That's right.
25    Q    Okay.  In the first column, we have the

Page 43

1 different positions that we've been seeing in the
2 recruiting e-mails, and also in the orientation letter,
3 correct?
4     A    I believe so.
5     Q    Right.  Then we also see -- under the
6 "PR Storm Per Day," we see the same rates that were
7 discussed in -- in the recruitment e-mails, and also the
8 orientation letter, correct?
9     A    I believe so.
10    Q    All right.  The new one here is the "PR Storm
11 Per Hour," right?
12    A    That's right.
13    Q    That's something that we haven't seen on the
14 previous documents yet, correct?
15    A    That's correct.
16         MS. STAMEY:  Objection form.
17    Q    Now, Ms. Davis, do you know who came up with
18 the PR storm per hour rates?
19    A    Specifically, no.
20    Q    Okay.  Did you ever consider what happens when
21 someone, say, doesn't work a full week?
22    A    We did.
23    Q    Okay.  Can you explain to me what the issue
24 was?
25    A    We realized early on that if someone did not

Page 44

1 work the full seven days a week, 16-hour days, seven
2 days a week, that the per hour calculations for overtime
3 and straight time wouldn't necessarily meet the per day
4 rate that we had given to the employees.  We would have
5 to make -- I don't know if you'd call it gross up or
6 adjustments -- or some kind of adjustment to the
7 employee's paychecks to help bring them up to their
8 day-rate amounts that we had advertised.
9     Q    Okay.  Just to kind of give a simple example
10 on this Exhibit 151 -- I mean, I just love math, so I
11 can't help myself.  But let's take that $1,000 day rate
12 that's associated with the 47.30 hourly rate.  Do you
13 see that?
14    A    Uh-huh.
15    Q    To kind of give an example of what I think
16 you're talking about, if you had a guy, for example, who
17 worked one day that he would get paid hourly at 16 hours
18 would be 47.3 times 16, right?
19    A    If that was his only day worked that week,
20 correct.
21    Q    Right.  I'll represent to you because I just
22 did the math on my calculator, that figure is $756.80
23 cents, correct?
24         MS. STAMEY:  Objection, form.
25    A    I have to take your word for it.  I don't have

Page 45

1 a calculator.
2     Q    Okay.  What you're saying is that for folks
3 like that that have been told that he could expect
4 $1,000 a day, he would get a gross up of the difference
5 between $1,000 and what 47.3 times 16 is?
6         MS. STAMEY:  Objection, form.
7     A    Yes, I believe that's correct.
8     Q    Okay.  What do you think about this pay plan?
9         MS. STAMEY:  Objection, form.
10    A    Specifically -- can you narrow it down?
11    Q    Yeah.  Did you an opinion?  Do you recall ever
12 having an opinion about it either way, if you liked it
13 didn't like it?
14    A    Well, I was relieved to see that we were doing
15 hourly rates plus overtime.
16    Q    Okay.  You were worried about the day-rate
17 situation?
18    A    I was.
19    Q    Why?
20    A    Because legally that was not something that I
21 thought we should be doing as a payroll HR professional.
22    Q    Okay.  Why not?
23    A    It was against, I can never say it right,
24 FLSA or FSLA laws.  The --
25    Q    What was your understanding -- in your

**MISSY DAVIS  -  April 19, 2022**

Page 46

1  understanding, what would be the violation with a
2  day-rate?
3      A    I don't know.  I just know that -- I don't
4  know specifically.  But --
5      Q    Well, was it your understanding that if you
6  pay workers a day-rate, that an additional amount for
7  overtime would have to be paid?
8      A    I do not know.  I don't understand.
9      Q    That's fine.  Okay.  You don't understand the
10 question, or you don't understand what the problem would
11 be?
12     A    Kind of both.
13     Q    Okay.  My understanding is that -- I'm not
14 trying to put words in your mouth, I'm just trying to
15 understand.  Forgive me if I'm not saying it right.  You
16 can correct me.  I understand that you were
17 uncomfortable with a pure day-rate situation because
18 there's something about it that you didn't think was
19 right; is that right?
20          MS. STAMEY:  Objection, form.
21     A    I did have reservations about paying only a
22 day-rate and not an hourly rate.  I was relieved when I
23 heard that we would be moving to an hourly rate in order
24 to get to the day-rate.
25     Q    Okay.  My question is about the concerns that

Page 47

1  you had in a day-rate.  You mentioned that you thought
2  it might not have been in compliance with the Fair Labor
3  Standards Act, correct?
4      A    Correct.
5      Q    I was asking you if you understood in what way
6  would it not be in compliance with the Fair Labor
7  Standards Act, in your opinion.
8          MS. STAMEY:  Objection, form.  Asked and
9  answered.
10     A    I can't quote for you verbatim FLSA laws, I
11 just don't know.  But I do know that overtime rates must
12 be paid.  To tell you exactly what the problem is with
13 it, I don't know that I can do that because one, I'm not
14 a lawyer.  And two, I'm not that familiar with the
15 verbiage on the actual law.
16     Q    That's fine.  That's fair.  Okay.  I'm going
17 to show a document that's been previously marked as
18 Exhibit 166.  This is an e-mail chain.  I'm going to
19 scroll down to the bottom, give you a chance to get
20 familiar with this document.  Can you -- do you need me
21 to zoom?  Can you see it?
22     A    No, I can see it.
23     Q    Okay.  Go ahead and just review that and tell
24 me when you want to scroll up.
25          (EXHIBIT 166 MARKED FOR IDENTIFICATION)

Page 48

1      A    You can -- okay.
2      Q    Okay.  Can you describe to us what was going
3  on with this e-mail chain, starting at the bottom?
4      A    Well, based on the date there, I would assume
5  I was getting a lot of questions from the employees
6  about how their pay rates were being calculated and how
7  the math would work.  And I had seen various documents.
8  I was just asking corporate HR for some clarification on
9  the mathematical explanation for how they had come up
10 with the hourly and overtime rates.
11     Q    Okay.  So the person at corporate HR you were
12 talking with would have been Jeff Beagle, correct?
13     A    Jeff Beagle and Alex Kalman, yes.
14     Q    And it looks like Jeff Beagle sent you an
15 excel file that kind of walked through how they came up
16 with the rates we were just looking at, correct?
17     A    Correct.
18     Q    And he's explaining that if the person works a
19 full week, like you'd said earlier, they will get the
20 equivalent of their day-rate times seven?
21     A    Correct.
22     Q    So can you explain to us what you meant when
23 you wrote "Samantha saying this is stupid," so stupid"?
24     A    Because I knew that it was going to be a lot
25 of manual work on our part to make this all happen in

Page 49

1  Paycom.
2      Q    Right.  Okay.  And I've seen thousands of
3  e-mails and many of them with you on it, and I can
4  appreciate the pain, I think, because -- let me see if I
5  can kind of describe it.  It sounds like to me that to
6  do this payroll you're having to enter rates and hours,
7  and also having to do the gross ups.  So it's sort of a
8  burdensome process, right?
9          MR. STAMEY:  Objection to form.
10     A    It was a burdensome process.
11     Q    And is that what you're talking about when you
12 say, "this is stupid"?
13     A    It was.
14     Q    Was it also stupid because it wasn't exactly
15 what the guys had been promised?
16          MR. STAMEY:  Objection to form.
17     A    It was exactly what they'd been promised, we
18 just had to explain the calculations.
19     Q    Oh, okay.
20     A    And that caused extra time and extra work,
21 I guess you could say.
22     Q    Right.  And I know from our end of things and
23 also from reading the e-mails, you were having to deal
24 with a lot of folks who are saying, "Hey, I didn't get
25 my day-rate.  I need to get the gross up on the next

**MISSY DAVIS - April 19, 2022**

Page 50

1 check." That extra level of administrative work was
2 part of the reason why this was stupid?
3          MR. STAMEY: Objection to form. Dave, if
4    you're going to make statements about what documents
5    say like that, you need to bring them up on the
6    screen.
7    A    I'm sorry, can you ask your question again?
8    Q    Yeah. I'm trying to find out -- it sounds
9 like to me that part of the reason why this is stupid
10 and kind of what you're hinting at, is that you have to
11 deal with all the folks that would call in and say,
12 "Hey, I didn't get my day-rate. I need my gross up."
13 So you'd have to reprocess checks or make sure it got on
14 the next one, things like that, correct?
15         MR. STAMEY: Objection to form.
16   A    I don't believe that at November 13 that that
17 had happened at that time yet.
18   Q    Okay. But that is something that did happen,
19 right?
20         MR. STAMEY: Objection to form.
21   Q    Later on?
22         MR. STAMEY: Objection to form.
23   A    I'm not sure that people would actually call
24 and say, "I need a gross up," they don't know what that
25 is. So I would have a lot of questions about "Can you

Page 51

1 explain my paycheck. I don't understand."
2    Q    Okay. I mean, I realize they may not have
3 used the words "gross up," but did you all get
4 complaints from workers saying, "Hey, I didn't get what
5 I'm supposed to get on this paycheck"? Like "I was
6 supposed to get more because when I worked less than a
7 full week, I'm not getting my day-rate." Do you
8 remember complaints or calls like that?
9    A    There were constant calls of various reasons
10 for payroll. They didn't understand taxes, they didn't
11 understand hours. "Can you tell me," you know, "how
12 many" -- I mean, they would've said different things.
13 But there was a lot of explanation that went into a lot
14 of different things on the pay stubs because they didn't
15 understand.
16   Q    Okay.
17   A    Whether it was because there was a day missing
18 or because they just -- it was a crazy situation and
19 maybe hours got missed being put in and we just had to
20 give them more hours. It just depends on what the
21 situation was.
22   Q    All right. And I could appreciate you
23 probably had to answer questions just about probably
24 everything having to do with payroll, but my question is
25 specifically about, were you aware of calls or

Page 52

1 complaints by folks asking about them not getting paid
2 their day rate, or the amount that would be their full
3 day-rate for their paychecks?
4          MR. STAMEY: Objection to form.
5    A    I'm not trying to be evasive here, but I
6 really don't remember exact phone calls. So I'm sure I
7 probably did talk to some people about concerns of not
8 getting their day-rates exactly. But I can't tell you
9 who. I can't tell you when. I can't tell you
10 specifics.
11   Q    Now we're going to look at Exhibit 188. And
12 I want to start at the bottom again here. Why don't you
13 go ahead and get yourself familiar with these e-mails
14 and when you're ready let me know and I'll scroll up for
15 you.
16         (EXHIBIT 188 MARKED FOR IDENTIFICATION)
17   A    Okay. You can because that was part of the
18 previous e-mail. Okay. Okay. Okay.
19   Q    All right. Can you explain what's going on
20 with this e-mail chain?
21   A    So once Jeff sent me the spreadsheet, it
22 appears that I went back to him with a question of what
23 are we going to do when someone misses a day during the
24 week? How are we going to make those adjustments? And
25 he replied back about running a report of wages earned

Page 53

1 versus days worked. If there was a negative balance or
2 it does not equal, it'll be grossed up on their next
3 payout once their hitch is done.
4    Q    Okay.
5    A    And then I forwarded it to Samantha.
6    Q    All right. What were your thoughts about this
7 approach?
8    A    For one, I didn't know what report he was
9 referring to in Paycom. I didn't how he -- he didn't
10 give me any specifics on what report to run or how we
11 would actually make that happen in Paycom. And I was
12 pretty certain it wasn't like an automatic process that
13 Paycom could just magically do and that I would end up
14 having to make a lot of manual entries and a lot of
15 extra work to make it all happen and hoped that no one
16 got missed. There were a lot of aspects of the question
17 that I don't believe he really realized or addressed in
18 my question.
19   Q    Okay. So typical boss coming up with a plan
20 and really no clue about all the work that's going to
21 have to go into it?
22         MR. STAMEY: Objection to form.
23   A    Well, I can't say what he did have a clue or
24 didn't have a clue about, but I know it didn't appear
25 that he had a specific explanation.

**MISSY DAVIS - April 19, 2022**

Page 54

1    Q    Okay.  Well, what is clear, it does look like
2  that Mr. Beagle is going to be asking for this report to
3  show these differences so their pay can be grossed up
4  when they don't work a full week, correct?
5         MR. STAMEY:  Objection to form.
6    A    I don't know what you mean by "asking for."
7    Q    Yeah.  What I mean is, I don't view this as
8  looking at it like your idea that you're going to be
9  doing the gross ups.  It looks like to me that Jeff
10  Beagle is asking for that information so that can be
11  done, correct?
12         MR. STAMEY:  Objection to form.  It is not what
13     the e-mail states, Dave.
14    A    I don't know.  He's just talking about running
15  a report out of Paycom to get the information needed.
16    Q    Right.  But he's telling you how it's going to
17  be handled, right?  In November 14, "If there is a
18  negative balance that does not equal up to the day rate,
19  it will be grossed up on their next payroll once their
20  hitch is done," right?
21    A    That's what he stated.
22    Q    Right.  And so, this is coming from Jeff
23  Beagle, this practice or policy if you will.  It's not
24  coming from you.
25    A    Correct.

Page 55

1    Q    Let's look at Exhibit 189.  Go ahead and get
2  yourself familiar with this document, it's got an e-mail
3  chain again.  Just tell me when you want to scroll up.
4         (EXHIBIT 189 MARKED FOR IDENTIFICATION)
5    A    Okay.  Go ahead -- okay.
6    Q    Remember this e-mail?
7    A    No, I don't.  But I do now.
8    Q    Okay, all right.  What's going on here?  To me
9  -- I mean, I don't want to put words in your mouth.  But
10  it looks like when you see the few e-mails here, where
11  you're not happy.  Looks like you're kind of upset.  Can
12  you explain what's going on?
13    A    To me, I think I felt like I was asking a lot
14  of very specific questions on how to make this work, and
15  I was getting a lot of vague answers.  Because I didn't
16  feel like -- either they didn't understand the
17  questions, or they didn't know the answers, or they were
18  still working on the solution.  I didn't really know why
19  or what was going on at the time.  But apparently, I had
20  been asking a lot of questions, and not getting a lot of
21  specific answers about how to make things work the way
22  they needed to.
23    Q    Okay.  So that's sort of the frustration here
24  that you're -- I mean, it looks like you're venting a
25  little bit to one of your co-workers, Ms. Nall, correct?

Page 56

1    A    Yes.
2    Q    I didn't hear you.
3    A    Yes.  I'm sorry.
4    Q    Okay.  Look at Exhibit 179, it's been
5  previously marked.  So we have another e-mail chain.
6  Same process, why don't you just review this and let me
7  know when you're ready to scroll up.
8         (EXHIBIT 179 MARKED FOR IDENTIFICATION)
9    A    Okay.
10         MR. STAMEY:  What number is this, Dave?
11         MR. MOULTON:  It's 179.  We've used it before,
12     that's why we're going back in numbering.
13    A    Okay.  Okay.  Oh, hang on.  Okay.  Okay.  Okay.
14    Q    Okay.  So is this where Mr. Beagle has
15  provided you now more information about how this is
16  going to work as far as collecting the information you
17  need to deal with any gross up issues?
18    A    I believe so.
19    Q    And if we could kind of focus on his e-mail to
20  you on November 17, not just to you, but you're on the
21  "To" line at 8:50 a.m.  Can you see here where he is
22  instructing you on how the gross ups are going to be
23  handled?
24    A    Give me just a second.  Okay.
25    Q    So it's -- Mr. Beagle is describing to you how

Page 57

1  this policy is going to work, right?
2    A    He was explaining to me how we were going to
3  fix that particular payroll, yes.
4    Q    All right, okay.  We're going to look at
5  Exhibit 180.  It's one we've also used before.  Just
6  like the other e-mails, why don't we just go ahead and
7  start at the bottom, and we'll scroll up and let me know
8  when you're ready.
9    A    Okay.  Okay.
10    Q    You know, I think we've already covered this,
11  right?
12    A    Right.
13    Q    You know what?  I'm not going to have any
14  questions for you on 180, we've already covered it in
15  another exhibit.  So let's look at Exhibit 169, again
16  the e-mails.  Sorry, this one is a little long.  Why
17  don't you start at the bottom and kind of just get
18  familiar with it and I'll scroll up again, you let me
19  know when you're ready.
20         (EXHIBIT 180 MARKED FOR IDENTIFICATION)
21         (EXHIBIT 169 MARKED FOR IDENTIFICATION)
22    A    Okay.  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.
23  Okay.  Okay.  All right.  Okay.
24    Q    Okay.  So sort of a high level summary.  These
25  are e-mails back and forth about sort of the details of

## MISSY DAVIS  -  April 19, 2022

Page 58

1 dealing with these gross ups that we've been talking
2 about, right?
3
4          MR. STAMEY:  Objection to form.
5     A    Well, I think there were issues with the gross
6 ups, whatever you want to call it, day-rate adjustments,
7 however you want to word it.  But there was questions
8 about whether we were paying guys who were off sick,
9 that sort of thing.
10    Q    Right.  And if you notice -- as you scroll
11 through here, did you notice that there's a subject line
12 or weekly report that you all are discussing?  And that
13 number changes over time, you start with a four at the
14 top and it comes down to three?
15    A    No.
16    Q    Those weekly reports and down here it's a two.
17 And then originally, it's just weekly report.  Do you
18 see that in the subject line?
19    A    I do see that.
20    Q    Okay.  Is that referring to spreadsheets that
21 you guys would work in where you would keep track of who
22 needed a gross up or a day-rate adjustment and the
23 reasons?
24    A    I think so.
25    Q    Okay.  At some point there's a question.

Page 59

1 You're asking JD Kinsey a question here about how to
2 handle sick days, right?
3     A    Yes.
4     Q    Which on page 3158; is that correct?
5     A    That's correct.
6     Q    Okay.  JD Kinsey, I think you said this
7 earlier, but maybe I'm remembering from someone else's
8 depo.  I think he was with Cobra.
9     A    I don't know what entity he worked for.
10 I know he wasn't on the Five Star payroll.
11    Q    Okay.  You see his e-mail -- on page 3158, his
12 e-mail address is with @cobratd.com.  Does that mean
13 he's with Cobra?
14         MR. STAMEY:  Objection to form.
15    A    I believe we all had cobratd e-mails at one
16 point, I'm not sure.
17    Q    Okay.  Michelle Poling's also had a cobratd,
18 right?
19    A    She had a cobratd e-mail as well, yes.
20    Q    I think you said that she was a Five Star
21 person, right?
22         MR. STAMEY:  Objection to form.
23    A    No, Michelle was not a Five Star employee.
24    Q    Okay.  So she wasn't -- it was Samantha Nall,
25 she's Five Star, right?

Page 60

1     A    Correct.
2     Q    Shelly Wheeler is also copied on these, with
3 HP Services.  That's Higher Power, correct?
4     A    Yes.
5     Q    Why was Shelly Wheeler included on these
6 e-mails?
7     A    I'm not sure.  I didn't start the chain so --
8     Q    Okay.  When you're doing the calculations for
9 gross ups or pay rate adjustments, is this something
10 that you all would coordinate with Higher Power to get
11 their report in on the same report?
12    A    You know I remember somebody doing a report
13 for them.  I don't know if it was Shelly or JD, and I
14 don't know if it was on the same spreadsheet that we
15 use.  But I believe the template for the spreadsheet was
16 the same as far as I know.
17    Q    Okay.  Back to the e-mails, it looks like on
18 3157 in this exhibit, which is the page number, and
19 3158, we have an answer from JD Kinsey letting you know
20 how they've been doing -- or how Cobra is doing it,
21 correct?
22         MR. STAMEY:  Objection to form.
23    A    As far as I know, when he says, "We've been
24 doing -- what we've been doing," he's talking about in
25 general, everyone.

Page 61

1     Q    And it sounds like he's basically saying the
2 same thing Jeff Beagle was saying.  When someone has a
3 day missing, or if they're one day off, their pay has to
4 be adjusted, correct?
5         MR. STAMEY:  Objection to form.
6     A    That's what he's saying.
7     Q    And he talks about two different ways to make
8 that adjustment.  He talks about adjusting the time --
9 I'm sorry, that's not -- scratch that.  Let's look at
10 what he says.  "When someone has even one day off, it
11 affects the overall rate, and so their time needs to be
12 adjusted or a day-rate entered to adjust for the missing
13 amount."  Do you understand that those are two ways of
14 making the adjustment?
15    A    I'm not sure what he's meaning by "Their time
16 needs to be adjusted."
17    Q    Okay.
18    A    I don't know what that means.
19    Q    Okay.  Do you know what it means to enter a
20 day to adjust for the missing amount.
21    A    There was an option in Paycom, I guess, to
22 enter a day-rate adjustment for that missing amount.
23    Q    Okay.  So in Paycom, if someone was shorted a
24 day or something, or you needed to make an adjustment,
25 you could just put in their day-rate right in the pay

**MISSY DAVIS - April 19, 2022**

Page 62

1 column directly, correct?

2        MR. STAMEY:  Objection to form.

3    A    I believe JD did do that --

4    Q    Okay.

5    A    -- at times.

6    Q    Right.  Is that something you were aware of at

7 the time?

8    A    What do you mean?

9    Q    Like is this something you became aware of

10 after?  Or when this was happening were you aware that

11 J.D. would do that?

12    A    Yes, I was aware.

13    Q    Do you know who else knew he was doing that?

14    A    I believe Alex may have known.  I believe

15 Michelle knew, Michelle Poling.  I don't know otherwise.

16    Q    Were you ever aware of anyone ever saying

17 that's not the way it should be done, that was

18 incorrect?

19    A    Yes.

20    Q    Who said that?

21    A    Well, I know I did on a few occasions.  I gave

22 him various reasons why that didn't work.  It affected

23 the way we tracked hours for OSHA.  It also affected

24 ability to do employment verifications for guys when

25 they were purchasing, buying homes and for the banks to

Page 63

1 send employment verifications.  There were a lot of

2 reasons that that was not the ideal way of entering

3 hours.

4    Q    Okay.  So you had definitely told him that in

5 your opinion that wasn't the correct way to do it.  Did

6 he have a response?

7    A    I don't remember a specific response other

8 than I got the feeling he just thought it was easier.

9    Q    Okay.  And to be fair, it's not like you could

10 order him around because he doesn't work for you, right?

11    A    That's correct.

12    Q    In fact, I think Five Star is considered to be

13 like a contractor of Cobra at this point; is that right?

14    A    I haven't --

15    Q    You don't know?

16    A    No.  I mean, we were, I assume, a subsidiary

17 or owned by Cobra Energy.  One of the Cobra entities.

18    Q    Okay.  From your perspective, would JD Kinsey

19 be a superior in the chain of command?

20    A    No.

21    Q    Okay.  How would you view him in the chain of

22 command?

23    A    I don't know that I did really.  He was

24 basically hired to do payroll for Puerto Rico hours.

25    Q    Do you know who Ken Kinsey is?

Page 64

1    A    I do.

2    Q    Who's Ken Kinsey?

3    A    JD father's and the VP of Cobra -- one of the

4 Cobra entities.

5    Q    Okay.  Was the fact that J.D. was the son of

6 one of the VPs a factor in maybe the inability to get

7 J.D. on board with entering the payroll correctly?

8        MR. STAMEY:  Objection to form.

9    A    I can't speak to what JD's problem was with

10 getting on board with that.  I have no idea.

11    Q    All right.  But even though he was the son of

12 a VP, that didn't sway you.  You told him that he wasn't

13 supposed to be doing it this way, right?

14    A    Correct.

15    Q    And he kept doing it?

16    A    Correct.

17    Q    Did you ever complain to anyone above JD that

18 could've put a stop to that practice?

19    A    I don't know who could've put a stop to it.

20 I do remember bringing in the point to Michelle Poling

21 and I don't know if I actually mentioned it to Alex or

22 not, but I do feel like Alex was aware.  I don't know

23 why I feel like that.  I don't know if there was a

24 specific e-mail or something, but I feel like Alex knew

25 and had tried to persuade him not to do that, but I

Page 65

1 can't tell you why I think that.

2    Q    Okay.  Let's look at Exhibit 183.  It's been

3 used before.  And this one's short.  Why don't you go

4 ahead and take a look at this one and let me know when

5 you want to scroll up.

6        (EXHIBIT 183 MARKED FOR IDENTIFICATION)

7    A    Okay.  Just a little, please.  Okay.  Okay.

8    Q    So do you understand this as being an e-mail

9 that essentially is a cover e-mail for a spreadsheet

10 that's attached for the weekly report update number six

11 for January 26?

12    A    It appears so.

13    Q    Right.  And so, we're going to be able to see

14 in this report some examples of the day-rate adjustments

15 or gross ups, right?

16    A    I assume.

17    Q    Let's go ahead and do that.  I'm going to show

18 you plaintiff's  Exhibit 184.  And for the court

19 reporter, this is a native spreadsheet that is not

20 marked, but it is Exhibit 184, the Bates number and also

21 the file name is Mammoth003145_confidential.  All right.

22 Ms. Davis, looking at this spreadsheet on the tab

23 "Corrections needed January 26,'18."  Do we see here

24 examples of the day-rate adjustments that we've been

25 talking about?

**MISSY DAVIS - April 19, 2022**

Page 66

1 (EXHIBIT 184 MARKED FOR IDENTIFICATION)
2   A   I believe so.
3   Q   Okay.  Can you see it clearly on your screen?
4   A   Yeah, it's a little small, but I can see it.
5   Q   Okay.  I was trying to be able to get it so
6 you can see the whole -- the whole sheet, but we can
7 zoom in a little bit.
8   A   Okay.
9   Q   So it looks like to me that you have several
10 guys listed here and it has the number of days that they
11 worked and what their day-rates were correct?
12   A   Uh-huh.  That's correct.  Sorry.
13   Q   Yeah, that's fine.  And it looks like this is
14 a situation where they didn't work the full 14 days in
15 the pay period, correct?
16   A   That's right.
17   Q   So for all of these, it's 12 days out of the
18 14-day period, except for line 19 for Steven Fellers.  He
19 worked 13, correct?
20   A   That's correct.
21   Q   And these amounts, the day-rate adjustment
22 amount, is going to be the amount that's going to be
23 added on to their hourly and overtime pay to get them up
24 to what their day-rate pay would be correct?
25   A   Correct.

Page 67

1   Q   And you also have a description of the issue
2 here, where it -- all of them say the same thing.  It
3 says, "Day-rate adjustment needed equals did not work
4 entire two week period in Puerto Rico."  Do you see
5 that?
6   A   I do.
7   Q   Okay.  Is that a -- that a true description
8 of the issue here?
9       MR. STAMEY:  Objection, form.
10   A   That was the terms that we used.  Yes.
11   Q   Okay.  So January 19, that's the week before.
12 It's also on here, right?
13   A   I believe so.
14   Q   Okay.  So the same thing, we have some
15 adjustments that need to be made.  And the description
16 of the issues in Colum L, correct?
17   A   I believe so.
18   Q   Okay.  Were you the one preparing these
19 reports or you working with other people on it?
20   A   I did a lot of it.  I'm not going to say that
21 J.D. did not contribute because he -- he may have.
22   Q   Okay.  Safe to say that you're not going to be
23 able to remember anyone's particular issue on any
24 particular check in detail, that we would have to rely
25 on these spreadsheets, for example?

Page 68

1       MR. STAMEY:  Objection, form.
2   A   Yeah, I would think so.
3   Q   All right.  Okay.  And looking at the tab for
4 January 19, are you aware of any inaccuracies on the
5 description of the issue?
6   A   I can't read the descriptions of the issues.
7   Q   Oh.
8   A   Sorry.  They're too small.
9   Q   Yeah.  Look, I can zoom in all day for you.
10   A   Okay.
11   Q   Tell me when you can --
12   A   A little bit more, please.
13   Q   Yeah.  I'm --
14   A   That's better.  Okay.  And what's your
15 question?
16   Q   Yeah.  The question was:  Are you aware of any
17 inaccuracies after reviewing the description of the
18 issue on this tab "Corrections needed January 19"?
19   A   Oh yeah.  I would have no way of knowing.
20   Q   Okay.  And the same one for January 12.
21 The same question on the description of the issue, are
22 you aware of any inaccuracies there?  And let me zoom.
23 I'll keep zooming in until you say stop.
24   A   I'm good.
25   Q   Okay.

Page 69

1   A   I'm not aware of any.  I mean, I wouldn't
2 know.
3   Q   Okay.  Now on this same spreadsheet, we have a
4 tab for "Higher Power terms, Puerto Rico."  Do you know
5 why this would be on the same spreadsheet as Five Star
6 Or it's in the same Excel workbook as Five Star's
7 information?
8   A   I do not know.
9   Q   Okay.  Let's take a look at it.  I realize you
10 may -- I don't know if you've seen it or not.  Do you --
11 do you recognize this as a document you've ever seen
12 before, this tab "Higher Power terms PR"?
13   A   I do not recognize it.
14   Q   Okay.  Who would -- if you know, do you know
15 who would be taking the information from Higher Power
16 and the information from Five Star and putting them into
17 the same Excel workbook?
18   A   Possibly JD?  I don't know for a fact.
19   Q   Okay.
20       On the tab "Five Star terms, Puerto Rico,"
21 can you -- can you tell us what this is, do you know?
22   A   I assume it was the termination for Jacob
23 Rendon.
24   Q   Oh.  Oh, okay.  I was thinking terms like
25 contracts or something.  But you -- these, these

**MISSY DAVIS  -  April 19, 2022**

1 spreadsheets "terms" is termination dates; is that
2 right?

3     A    That's correct.

4     Q    Okay.  Now earlier you testified that you --
5 no -- scratch that.  No.  I understood that you're
6 actually talking about something else.  All right. We're
7 going to look at another e-mail chain with the client.
8 This is labeled as  Exhibit 190 and let's go ahead and -
9 - it's not very long.  Let's scroll to the bottom and
10 let's have you review it, and we'll talk about it.
11 Okay?

12    A    Okay.  Okay.  Okay.  Okay.

13    Q    Okay.  Can you -- can you tell us what's going
14 on with these e-mails?

15         (EXHIBIT 190 MARKED FOR IDENTIFICATION)

16    A    It looks like I was trying to get JD once
17 again to stop entering day-rate -- solely just day-rate
18 entries into Paycom without entering the hours.

19    Q    Okay.

20    A    And he's talking about needing help with the
21 payroll process.

22    Q    Okay.  What did you mean by "looking forward
23 to strictly hourly rates as well" here on July 3 at
24 6:55?

25    A    I think that if I'm not mistaken, we were

1 transitioning to a different contract soon or something.
2 And the men would no longer be making that reference or
3 having that day-rate amount as something that they would
4 be looking for, needing, or expecting.

5     Q    Right.  And then from the perspective of -- of
6 -- from your perspective, that was going to be something
7 that'd be a lot easier to administer as -- from the HR
8 perspective, correct?

9     A    Well, I wouldn't have to worry about J.D.
10         entering it wrong all the time, for one.

11    Q    Okay.  And you wouldn't have to be doing all
12 these payroll correction sheets all the time?

13    A    Correct.  Well, even then, you know, hours got
14 missed.  Things -- there was still a correction sheet
15 that went, you know, people messed up their direct
16 deposit information and -- and you'd have to get a
17 correction.  There were any number of corrections still
18 needed, but not for that reason.

19    Q    Right.  But that's like every payroll.
20 I mean, that just goes with the territory.

21    A    Right.

22    Q    Okay.  Were you aware of Five Star not having
23 enough money to meet payroll when they -- when they are
24 first starting to work on the island?

25    A    I had a little bit of knowledge on that, but

1 Samantha was the main one that took care of the
2 financial end of things.

3     Q    Okay.

4     A    I knew it had something to do with the moving
5 of the money between the entities.

6     Q    Okay.  So where did the money come from for
7 Five Star to meet payroll?

8     A    I have no idea.  I would assume one of the
9 other entities.  I don't know what -- I don't -- I was
10 never involved in that.

11    Q    Okay.  I'm going to show you  Exhibit 162.
12 And go ahead and start at the bottom.  Let's scroll up
13 like we've been doing.  Let me know when you're ready.

14         (EXHIBIT 162 MARKED FOR IDENTIFICATION)

15    A    Okay.  Okay.

16    Q    All right.  So you've mentioned Samantha Nall.
17 Like you said, she was the one that would've been more
18 privy to the financial issue with Five Star.

19    A    Correct.

20    Q    Who's Bill Short?

21    A    I have no idea.

22    Q    Okay.  Do you remember these e-mails that
23 you're copied on about Five Star not having enough money
24 in its account to cover payroll?

25    A    I mean, I see that I was on there, but I don't

1 remember them specifically.

2     Q    Okay.  And I -- you know, I don't have
3 Samantha Hall right in front of me now, but you know,
4 Samantha -- sorry, Samantha Nall.  You know her well,
5 correct?

6     A    I do.

7     Q    All right.  And you know her well enough that
8 she wouldn't write an e-mail that would be intentionally
9 dishonest?

10         MR. STAMEY:  Objection, form.

11    A    Not to my knowledge.

12    Q    All right.  So we can trust what she writes in
13 e-mails, correct?

14    A    In my opinion, yes.

15    Q    Okay.  Did you have any conversations with the
16 Higher Power people about how they were going to meet
17 payroll?

18    A    Never that I remember.

19    Q    Okay.  Now, I talked to you -- we talked a lot
20 about these day-rate adjustments or gross-ups.  Can you
21 describe to me the process of how they would get entered
22 into those sheets and get -- and get applied to
23 paychecks?  How did that work?

24    A    Well, I know from my perspective.  I don't
25 know what JD did.  I don't know what they did at Mammoth

**MISSY DAVIS - April 19, 2022**

Page 74

1 once that information was sent.  I just know that I've
2 literally scrolled through every single timesheet in
3 Paycom to see who had worked the full 14 days and who
4 did not, looked for anything that looked odd or that
5 would stand out as being anything of an error or could
6 -- or whatever.  And especially if I knew someone
7 specifically was on island but was missing a day or
8 things like that, I would look for things like that.  And
9 so, it became too much to do and to get done prior to
10 payroll getting completed and submitted.  But that's --
11 I would do that and look for guys and make sure that
12 those had been added to the spreadsheets that J.D.
13       submitted.
14    Q    Okay.  So when you're -- when you're reviewing
15 Paycom for these -- for the times where they didn't work
16 the full week, things like that, which workers would you
17 have been doing that for?
18    A    Most likely I would have filtered for anyone
19 working in Puerto Rico that -- the only thing I had
20 access to in Paycom was Five Star Electric employees.
21 I -- I had no access to any other entity, their payroll,
22 their timesheets, nothing.  So I was just looking at
23 Five Star Electric employees who were stationed in
24 Puerto Rico.
25    Q    Okay.  Do you know who at Higher Power

Page 75

1 would've been doing the work that you were doing or
2 similar?
3    A    No, I don't.  As far as I know JD was the only
4 one doing that for Higher Power.  But I don't know that
5 to be a fact.
6    Q    Okay.  Do you remember how housing worked on
7 the island?
8    A    I remember that initially there were barges
9 that the employees stayed on.  And then at one point,
10 the barges went away, for whatever reason, and they had
11 transitioned people to resorts or hotels or rental cabin
12 -- I don't know.  Different -- they kind of scattered
13 and did different things at that point.
14    Q    Okay.  Oh, were you ever aware of who was
15 paying for the lodging?
16    A    No.  I had no direct knowledge of that.
17 I just knew it was paid for.
18    Q    Okay.  I'm going to show you  Exhibit 191.  And
19 I'll -- it's not very long.  We'll start at the bottom
20 here, if you want to review that and let me know when
21 you want to scroll up.
22       (EXHIBIT 191 MARKED FOR IDENTIFICATION)
23    A    Okay.  Okay.  Okay.  Okay.
24    Q    All right.  Can you describe to us what was
25 going on in these e-mails?

Page 76

1    A    It looks like this was around the time we were
2 transitioning contracts.  And at one point we switched
3 to a per diem.  I guess when the contracts changed, we
4 changed over to paying the guys per diem, rather than
5 paying for the meals and lodging.  And this was just
6 kind of what -- me asking questions about that process
7 so that I could provide letters of employment for those
8 guys seeking rental property in San Juan or Puerto Rico
9 or somewhere.
10    Q    Okay.  And can you -- can you explain to us
11 why the only folks that you seem to be asking are Cobra
12 people, correct?
13    A    Can we scroll down to the first e-mail?
14    Q    Yeah.
15    A    Well, my -- it was initially to Michelle
16 Poling.  And she was my -- at that point, my HR contact
17 in Puerto Rico.  So she was my "To" person and Scott
18 Whitsell of course, was the president of Five Star.
19 And then Denise was at one point, I guess, the
20 operational manager for Puerto Rico down there for all -
21 - for everyone.  So that's who I included on the
22 e-mails.
23    Q    Right.  Okay.
24    A    Michelle brought others into the e-mail.
25 I don't -- I don't know.  I guess she thought they may

Page 77

1 have more knowledge of it.  I don't know.
2    Q    Okay.  But safe to say this is -- this is
3 something that would've required Cobra's input because
4 they were in charge of the housing, essentially?
5       MR. STAMEY:  Objection, form.
6    A    I mean, Cobra was the one in charge of the --
7 everything, I thought.  I mean -- you know what I mean?
8 Like the -- that didn't come out right.  They were the
9 ones with the contract, getting the information was
10 going to be telling us about the per diem and the
11 housing and the lodging.  So that's why I asked them.
12 Plus, Michelle was at that point, transitioned over into
13 my HR contact in Puerto Rico.  And to my knowledge, she
14 was a Cobra employee.
15    Q    Okay.  Hey, Harris, let's take a quick break.
16 I'm going to review some things, but I think I'm getting
17 close to getting done, if not done.
18       MR. STAMEY:  Okay.  While you're at it --
19       VIDEOGRAPHER:  Off the record at 11:32 a.m.
20       (OFF THE RECORD)
21       VIDEOGRAPHER:  We're back on record at 11:45
22 a.m.
23 BY MR. MOULTON:
24    Q    Okay.  Ms. Davis, I want to talk to you about
25 something I forgot to ask you about earlier, which is,

**MISSY DAVIS - April 19, 2022**

1 can you describe to us the reason why you left Five
2 Star?
3     A    I was offered a position as an HR manager for
4 the City of Madisonville, and I had a very good friend
5 who was Deputy City Administrator.  And I just felt like
6 it would be a -- a good career move.  There was less
7 stress.  There was less hours.  There were a lot of
8 better benefits, free health insurance, things like that
9 nature.
10     Q    Okay.  Have you answered all my questions
11 truthfully today?
12     A    I have.
13     Q    Sitting here now, is there anything that
14 you're aware of that you would like to clarify or amend
15 to any of the answers that you've given today?
16     A    I don't think so.
17     Q    Okay.  I'll pass the witness.
18         MR. STAMEY:  Dave, if you could bring up
19     Exhibit 186 and scroll all the way to the bottom,
20     I think you added the last guy's e-mails buried in
21     there.  You know what I'm talking about?
22         MR. MOULTON:  Yeah.  I know exactly what you're
23     talking about.  I just want to make sure I share the
24     right screen.  Okay.  So Kevin Slaughter?
25              CROSS EXAMINATION

1 BY MR. STAMEY:
2     Q    Yes, sir.  So Ms. Davis, tell us about how the
3 recruiting process went once you got the instructions
4 from Mr. Whitsell to start finding people to send to
5 Puerto Rico?
6     A    So we put a post on Facebook and told folks to
7 contact myself or Jeremy about going and gave them what
8 information we had at the time once they contacted us.
9 You know, I can remember Jeremy saying, "We'll probably
10 get five or 10 calls."  And there were a lot more than
11 that.  I don't know how many there were, but there was a
12 lot.  And we just started giving them the information
13 that we had and starting to try to build a base of folks
14 that we could pull from.
15     Q    And do you recall approximately what the
16 timeframe was when you started recruiting, versus when
17 you first learned about a pay plan being put in place
18 that was going to be moved with overtime?
19     A    I think it was around a -- a week or so.
20 I -- I don't know exactly, but it was several days in
21 before we actually knew a pay plan was going to be
22 structured.
23     Q    So you can see in Exhibit 186 on the -- you
24 see the bookmarks on the left.  You can see the dates of
25 all of these e-mails that Mr. Moulton has provided.

1 You see either 10-20, 10-22, 10-23?
2     A    Uh-huh.
3     Q    Are all of these e-mails and these
4 communications from these potential recruits -- were
5 these before or after you learned about the actual pay
6 plan that was going to be used for Puerto Rico?
7         MR. MOULTON:  Objection, form.
8     A    I'm sorry?
9         MR. MOULTON:  I just have an Objection to form.
10     Go ahead.
11     A    Okay.  I believe this was prior to receiving
12 the -- the final pay plan that gave us our hourly rates
13 that were equivalent to make the day-rates.
14     Q    Okay.  And so, in this -- this last e-mail,
15 we see Kevin Slaughter sends to you on October 20, 2017.
16 "Hello.  I seen your ad on Linejunk and was interested
17 in going to PR for storm work."  And you testified
18 earlier, you didn't recall anyone -- you didn't recall
19 placing an ad on Linejunk yourself, correct?
20     A    I do not recall that.  No.
21     Q    All right.  Was it possible for somebody else
22 to put an ad on Linejunk or to share a potential post on
23 Linejunk?
24     A    I would assume --
25         MR. MOULTON:  Objection to form.

1     A    -- I would assume so.
2     Q    And so when -- you actually posted something
3 on the Five Star web page, right?
4     A    Yes.  I do remember doing that.
5     Q    And are people able to share posts from the
6 Five Star web page on other web pages on Facebook like
7 Linejunk?
8         MR. MOULTON:  Objection to form.
9     A    Possibly.
10     Q    Okay.
11     A    I don't know.
12     Q    What was your response to Mr. Slaughter that
13 same day?  Can you read that for us?
14     A    I asked him what his classification skill
15 level was.  "We are finalizing pay scale now.  We have a
16 dollar amount per day per classification, but we are
17 trying to get clarification on an hourly rate, et
18 cetera.  Looking to do 45-day rotation.  But have a
19 guaranteed 120-day contract as of now.  Please send me
20 your phone number and class and I can call you with more
21 -- final info."
22     Q    So what do you remember about getting
23 clarification on an hourly rate at this timeframe?
24         MR. MOULTON:  Objection, form
25     A    Those first few days was really busy and just

**MISSY DAVIS - April 19, 2022**

Page 82

1  a lot of information coming and going.  And no one was
2  really sure what we were going to be doing and how we
3  were going to pay it out.  I know -- I mean, one of my
4  first initial things was to -- to Scott and Samantha was
5  "How can we pay a day-rate?  That's -- that's not really
6  legal."  So there was a lot of talk back and forth of
7  how that was actually going to happen in the end.  And
8  that was still -- I still felt like that was nothing
9  that had been decided at that point.
10     Q     And here you specifically mentioned to
11  Mr. Slaughter clarification on an hourly rate.  Do you
12  recall mentioning this issue with an hourly rate to
13  other recruits at this timeframe?
14     A     Could have --
15         MR. MOULTON:  Objection, form.
16     A     I don't know.
17         MR. STAMEY:  Anthony, can you bring up, let's
18  see -- exhibit -- or let's do Mammoth 3492.  Which --
19  - Dave, what was your last exhibit number?  Was it
20  191?
21         MR. MOULTON:  Yeah, 191 was my last number.
22         MR. STAMEY:  Okay.  So we'll mark this as
23  Exhibit 192.
24         MR. MOULTON:  Can you tell me the Bates number?
25         MR. STAMEY:  The Bates number will be Mammoth

Page 83

1  3492.
2         MR. MOULTON:  Okay.
3         MR. STAMEY:  And Dave, I think you've got to
4  stop sharing so Anthony can share.
5         MR. MOULTON:  I can't see it.
6         MR. STAMEY:  And can you zoom in, Anthony, so
7  we can read the e-mail?
8  BY MR. STAMEY:
9     A     Oh, that's much better.  Thank you.
10     Q     Okay.  And scroll up a little bit so we can
11  see who it's from, time, date, et cetera.  Ms. Davis,
12  we've got what's been marked as Exhibit 192.  This is an
13  e-mail from Alex Kalman to you on 10-24-2017, the
14  subject of which is "Offer Letters," and the attachments
15  -- there's a number of attachments there that are offer
16  letter templates.  Do you see that?
17         (EXHIBIT 192 MARKED FOR IDENTIFICATION)
18     A     I see that.
19     Q     And then in the e-mail, Mr. Kalman writes to
20  you, "Attached are the offer letters and the
21  immunization policy documents for the employees to sign.
22  Some things to note" -- item number one, can you read
23  that for us?
24     A     "The rate of pay does not equal the day rate
25  via straight time, but factors in overtime rates into

Page 84

1  the calculation per week."
2     Q     When was the first time that you'd heard about
3  the hourly and overtime rates being used for the pay
4  plan?
5     A     I'm not sure if Alex may have called me on the
6  phone prior to sending this e-mail.  It seems like he
7  and I had a phone conversation as well as him sending
8  the e-mail.  So I can't say for sure if it was -- if it
9  all happened right at the same time, or if this was the
10  first that I'd heard of it.  But I -- I mean, you all
11  have my e-mails, so you would have to kind of look at
12  that.  As far as whether or not I had had an e-mail
13  prior to this, I don't know what if I did.
14         MR. STAMEY:  And Anthony, if you could bring up
15     Mammoth 3394, which was tab six.  And we'll mark
16     that as Exhibit 193.  And so, you -- Anthony, if
17     you can zoom out a little bit, so we can see that
18     this is --
19  BY MR. STAMEY:
20     Q     So we see the e-mail that we saw on Exhibit
21  193 below, from Mr. Cowman.  And then you forward this
22  e-mail to Scott Whitsell that same day.  And you say,
23  "Are these -- so we are using these, correct"?  Do you
24  recall why you sent these offer letters to Scott?
25         (EXHIBIT 193 MARKED FOR IDENTIFICATION)

Page 85

1     A     I feel like Scott and I had discussed at
2  length the whole pay situation.  And so, when I saw
3  those, I -- they were different than what we had
4  previously discussed, so I wanted Scott to see them.
5  I always ran everything through him.  And so, I wanted
6  him to clarify that he -- this is what he wanted me to
7  use, and he knew this was the documents we would be
8  using.
9     Q     Okay.  And before you had -- actually Anthony,
10  why don't we bring up -- let's see, I believe it is
11  Exhibit 166.  Do you recall talking about Exhibit 166,
12  the e-mail where you said, "This is stupid.  Like I
13  said, stupid" earlier?
14     A     Right.
15     Q     And in this e-mail, Jeff Beagle gives you the
16  mathematical explanation of the pay plan.  Do you recall
17  that?
18     A     Uh-huh.  Yes.
19     Q     Now earlier you provided some testimony about
20  some concerns you'd had over the potential for paying a
21  day-rate relative to the FSLA.  Can you give us an
22  explanation of what that concern was, and then how that
23  concern was ultimately alleviated from your perspective?
24         MR. MOULTON:  Objection, form.  Go ahead.
25     A     I know initially -- I can remember my first

## MISSY DAVIS - April 19, 2022

Page 86

1 thought being, "God, how can we pay a day-rate? What --
2 nobody pays a day-rate. What's -- what's that mean"?
3 So those were some of the thoughts that went through my
4 head and that I -- concerns that I took to Scott
5 Whitsell. And so later, whenever I saw offer letters
6 coming out and the spreadsheet in Jeff's explanation,
7 I was relieved to know that there was an hourly rate,
8 overtime rate. And -- and the way I kind of looked at
9 it was, we had advertised a day-rate that was a minimum
10 amount that they would make on a day -- on a daily
11 basis, but that we would be paying them on an hourly,
12 plus overtime basis. So I felt relieved about that.
13 It was just a lot more work to explain to the men, and
14 to make sure that the men understood no one was trying
15 to short them or keep them from making the rates that
16 they were initially given.
17      Q   Once Mr. Beagle explained how the math was
18 going to work and that the men were going to be paid on
19 an hourly basis with an hourly rate and overtime rate,
20 did you continue to have any concerns with respect to
21 the legality?
22      A   No. Not at that time.
23      Q   Okay. Anthony, can you bring up Mammoth 3761,
24 which is the Scott Whitsell e-mail with the updated
25 offer letter?

Page 87

1           MR. ARTEAGA:  Is that a tab E notebook?
2           MR. STAMEY:  It's one of the documents we added
3 at the end.
4           MR. MOULTON:  Okay.
5           MR. STAMEY:  Anthony, also just -- you're
6 sharing your screen, I don't know if you're
7 intending to do that.
8           MR. ARTEAGA:  No, I was not intending to do
9 that. Give me a second.
10          MR. STAMEY:  Yeah. You probably want to share
11 an app versus your screen.
12          MR. ARTEAGA:  Right. Give me a second. I'm
13 going to pull up 3761.
14          MR. MOULTON:  Okay. While he is doing that,
15 Harris, are you marking a new exhibit, or is this an
16 old one?
17          MR. STAMEY:  I believe that this will be a new
18 one.
19          MR. MOULTON:  Okay.
20          MR. STAMEY:  I think -- was the next one -- was
21 it 193 or 4?
22          MR. ARTEAGA:  It's going to be 194.
23          MR. STAMEY:  194. That's it. And Anthony,
24 you have the attachment to this, right?
25          MR. ARTEAGA:  Yes.

Page 88

1           MR. STAMEY:  Okay.
2           MR. ARTEAGA:  I can pull it up.
3           MR. STAMEY:  All right. Let's go to the
4 beginning of the chain and let -- let Missy be able
5 to read through the chain so she can see the entire
6 e-mail.
7 BY MR. STAMEY:
8      Q   Missy, just let him know when you want to
9 scroll out, scroll in, and zoom or -- and scroll
10 through.
11     A   Okay. Yeah, scroll up just a little for me.
12 Okay, keep going. Okay. Okay. Okay. Okay. Okay.
13 Okay. Okay. Okay.
14     Q   So we see the last e-mail in the chain, Scott
15 Whitsell circulates a new version of the offer letter to
16 Jeff Beagle, Keith Ellison, and Ken Kinsey on October
17 24, 2017. Anthony, can you go to the attachment that he
18 sent?
19          ( EXHIBIT 194 MARKED FOR IDENTIFICATION)
20          MR. ARTEAGA:  Sure.
21          MR. STAMEY:  If you can zoom in a little bit so
22 that we can see the -- the wording that would be
23 great.
24          MR. ARTEAGA:  I got you.
25 BY MR. STAMEY:

Page 89

1      Q   So on the attachment, do you see it says, "Our
2 goal is to work 12 hours a day and not to work at night.
3 As many of you know and are accustomed to with storms,
4 certain situations may arise that could require longer
5 hours, but will not exceed 16 hours." Do you recall any
6 conversations with Mr. Whitsell about adding that
7 language to the letter?
8           MR. MOULTON:  Objection, form.
9      A   Seems like I do remember he and I discussing
10 that we knew it was very traditional for storm work to
11 be 16 hours. But I'm not sure exact -- I mean, I -- I
12 don't remember that exactly, but I do remember he and I
13 worked on it.
14     Q   What is your understanding of the idea of
15 working, or being available to work, in the context of
16 16 hours?
17          MR. MOULTON:  Objection, form.
18     A   Well, not only from working in the industry,
19 but also my husband works as a lineman. So it's my
20 understanding that they do not work just constant from
21 the whole 16 hours, even if they are on storm. So their
22 mealtimes are included, their break times are included,
23 they may even be sent back to the show-up areas, or be
24 waiting in their trucks, or different things on a
25 general, in general storm. So they are paid for the

**MISSY DAVIS - April 19, 2022**

Page 90

1 hours that they are available to work, which is
2 generally 16 hours, to comply with the OT regulation and
3 that sort of thing.
4     Q    And when this offer letter got finalized with
5 Mr. Whitsell, was this what you ultimately used at the
6 orientations with the guys?
7     MR. MOULTON:  Objection, form.
8     A    I believe so.
9     Q    Anthony, if you could scroll down so we can
10 see the section in the table.  "Your Puerto Rico storm
11 rate," it says "$900 per day that will be broken down
12 hourly over 16 hours daily."  What did you explain to
13 people at the orientation about how that pay was going
14 to work?
15     MR. MOULTON:  Objection, form.
16     A    To -- to my knowledge, what we would always
17 explain to them was, yes, here's how the math works.
18 We would even -- I think we even had maybe a dry erase
19 board in the orientations that we could do the math for
20 them on the board or show them how the math worked.
21 If you worked 16 hours a day -- or you were paid 16
22 hours a day, seven days a week, that it worked out to be
23 the 900, the 1,000, the 1250, whatever.  And then we
24 also -- if you notice there's a starting hourly rate
25 that's blank in this letter, we wanted them to know if

Page 91

1 they came back to work for us stateside, or if they had
2 standby pay before they left, or at any time that they
3 were here stateside, that it would be a different hourly
4 rate than their hourly rate for Puerto Rico.
5     Q    Anthony, can you bring up  Exhibit 52?
6 Actually, never mind scratch that, Anthony.  You talked
7 a little bit with Mr. Moulton about orientations and
8 presenting, and I believe you mentioned some people that
9 were at the orientations, I didn't hear Mr. Whitesell's
10 name.  Was Mr. Whitsell ever at the orientations?
11     A    Yes, initially he was at every orientation.
12 At some point it got to be -- we were having them so
13 often and he was very busy at that point.  So he would
14 send -- another member of the management team would
15 always be present with me during that time whether it
16 was Scott Shoulders, or himself, or another -- Jeremy,
17 any of those folks that were a part of the -- the
18 management team, if he was not there.  That first
19 orientation, it was an all hands-on deck, because it was
20 huge.
21     MR. STAMEY:  Anthony, if you could bring up
22 Exhibit 188.
23     MR. ARTEAGA:  Okay, 188.  I don't have 188.
24 That's a new exhibit.
25     MR. STAMEY:  Okay.  That would -- Anthony, that

Page 92

1 would be -- let me do --
2     MR. MOULTON:  "Stupid e-mail."  Yeah, I can
3 pull it up for you too, if you want.
4     MR. STAMEY:  Hold on, I think I've got another
5 -- it's on.  Look at --
6     MR. MOULTON:  I like how we labeled -- well, at
7 least I've started to label these e-mails based on -
8 - Ms. Davis' colorful -- color -- colorful
9 explanations.
10     MR. STAMEY:  Yeah.  Dave, if you can bring up
11 188?  I don't seem to have --
12     MR. MOULTON:  You want 188.  Okay.
13     MR. STAMEY:  Yes, please.
14     MR. MOULTON:  Just double checking to make sure
15 I share the right screen here for you.  Op, there we
16 go, 188.
17 BY MR. STAMEY:
18     Q    And so, Exhibit 188, do you recall discussing
19 this with Mr. Moulton earlier, right?
20     A    Yes.
21     Q    And this is where you -- you brought up the
22 issue regarding, you know, what happens if they -- they
23 don't work an entire week, correct?
24     A    I believe so.
25     Q    And you -- you brought this up with

Page 93

1 Mr. Beagle.  Why did you decide to bring it up with
2 Mr. Beagle, specifically?
3     A    Well, Mr. Beagle and Alex Kalman were the
4 Paycom experts on -- we had not been with Cobra and
5 Mammoth very long, so we were still fairly new to the
6 Paycom software.  And I was hoping beyond hope that
7 there was a way Paycom was going to be able to do all of
8 this for us automatically.
9     Q    And ultimately that's not what happened?
10    A    Not what happened.  No.
11    Q    We've talked a good amount about JD Kinsey.
12 What were your impressions generally about his ability
13 to do his job?
14    A    So JD was a nice guy, but to be honest, I felt
15 like he got the job because his dad was the VP.  And his
16 dad wanted him to make a ton of money in Puerto Rico, so
17 he sent him down there and he had had zero experience in
18 doing what we do.  He had zero experience in payroll and
19 HR, to my knowledge.  And while he's relatively
20 intelligent, he was fairly lazy, and wanted to do what
21 was the easiest for JD and didn't really want to conform
22 to the reasons that we -- he wasn't really concerned
23 about why we needed it a certain way.  It was more of
24 what -- what he can do.  And I think he bit off more
25 than he could chew, and he didn't want to let Daddy know

**MISSY DAVIS  -  April 19, 2022**

Page 94

1  that.  That was my opinion.

2  Q     So what are some of the mistakes that you can
3  recall that JD made regularly on the payroll process,
4  for people that were working in Puerto Rico?

5       MR. MOULTON:  Objection, form.

6  A     I know that during the correction process, he
7  would miss folks that had needed to be added due to not
8  working the full 14 days.  He was also doing a lot -- a
9  larger volume than I was because he was trying to do for
10  Higher Power and Five Star, so I give him that, for
11  sure.  He was doing a larger volume.  But I was just
12  double checking him to make sure that folks did not get
13  left off the corrections spreadsheet prior to payroll
14  being submitted.  You know, later on, I think there were
15  some other errors, but those were the ones early on that
16  I noticed.

17  Q     Now, the correction spreadsheets we were
18  talking about earlier that had the gross upper day rate
19  adjustments on them.  Once you had collected the names
20  for certain individuals where you had identified a
21  potential adjustment, where would you send that
22  information?

23  A     Ultimately it went to Alex Kalman.

24  Q     Okay.  And -- did you say something Dave?

25       MR. MOULTON:  No, I did not.

Page 95

1  Q     All right.  And who ultimately had approval
2  over the decision to actually make the adjustments on
3  the payroll?

4  A     I would assume Jeff or Alex was the last ones
5  to -- to handle it before submitting through Paycom.

6  Q     Okay.  But do you actually know one way or the
7  other?

8  A     I don't.

9  Q     Okay.  Once Mr. Beagle had discussed putting
10  in the process for the adjustments -- the adjust -- the
11  day-rate adjustments, did you ever have any concerns
12  about the legality of the pay plan at that point?

13  A     No, it wasn't anything to do with that.  It
14  was just the amount of work that it was going to be on
15  everyone to -- to process and make it all happen, was my
16  only concern.

17  Q     You were pretty familiar with most of the men
18  that Five Star sent over to Puerto Rico, right?

19  A     Initially, for sure.

20  Q     And did they communicate with you pretty
21  regularly about how things were going over there?

22       MR. MOULTON:  Objection, form.

23  A     I received 5:00 a.m. Sunday morning phone
24  calls.  I received constant phone calls from down there.

25  Q     Overall were the men who had gone over to

Page 96

1  Puerto Rico to work for Five Star, were they happy about
2  the work, unhappy?  What was your impression?

3       MR. MOULTON:  Objection, form.

4  A     Overall, I think everyone was okay.
5  I don't -- typical complaints as far as the tax
6  situations, the -- the housing, or having a room with
7  this one or that one, you know, typical cry baby type
8  stuff.  Is what I would call it.  Linemen are really big
9  babies, in case you all didn't know.  But as far as
10  legitimate safety or -- you know, legitimate concerns,
11  I can remember a few.  But nothing that had to do with
12  day-rates, or hourly rates, or per diem, or anything
13  like that,

14  Q     Were the guys excited to have to work of
15  Puerto Rico?

16  A     Oh, yes.  Yes, they really were.  For the most
17  part, you know, the orientations were a lot of fun.
18  Everyone was really excited, they were playing practical
19  jokes, and laughing and having a lot of fun in the
20  beginning.  Well, at every orientation, just about.  You
21  know, as -- at every orientation, we knew a little bit
22  more about what to tell them to expect.  You know, it
23  became a big joke about watching for the drivers over
24  there because I guess our biggest safety issues ended up
25  being driving, and -- and vehicle accidents, and things

Page 97

1  like that.  So those were always things that we had a
2  lot of fun with, you know, to -- to explain during an
3  orientation, to talk about.  And they were -- so they
4  seemed very eager and grateful.

5       MR. STAMEY:  Dave, I'll pass the witness.

6       MR. MOULTON:  We'll also pass.  Thank you very
7  much, Ms. Davis.  We appreciate you taking time out
8  for us today.

9       THE WITNESS:  Thank you.

10       COURT REPORTER:  All right.  And before we go
11  off the record, I'm going to get order information.
12  Mr. Moulton, how did you want your copy of the
13  transcript?

14       MR. MOULTON:  We'll do like the electronic
15  package.

16       COURT REPORTER:  Okay.  And did you want to
17  copy of the video?

18       MR. MOULTON:  Oh yeah.  Absolutely, video and
19  synced.

20       COURT REPORTER:  All right.  And Mr. Stamey,
21  how did you want your copy of the transcript?

22       MR. STAMEY:  So for the witness, she wants to
23  read and sign.

24       COURT REPORTER:  Okay.

25       MR. STAMEY:  And then for the defendants, we do

MISSY DAVIS  -  April 19, 2022

Page 98

1    want a copy -- electronic copy of the transcript.
2         COURT REPORTER:  All right.
3         MR. STAMEY:  And we would like the video, also
4    synced.
5         COURT REPORTER:  All right.  We can go off
6    record.
7         MR. MOULTON:  And before we end, can we -- did
8    we end on 194?  Is that --
9         COURT REPORTER:  Yes.
10        MR. MOULTON:  Is that right?
11        MR. STAMEY:  Yes.
12        MR. MOULTON:  Okay.  All right.  I'll send you
13   over all the exhibits that the plaintiffs used and
14   then I'm assuming, Parish, you'll be sending
15   y'all's?
16        MR. MOULTON:  Yes, we will.  Would it be okay
17   if I could have Sophie's e-mail address so I could
18   e-mail them -- the exhibits to her?
19        VIDEOGRAPHER:  This concludes the deposition of
20   Missy Davis.  Going off the record at 12:19 p.m.
21        (DEPOSITION CONCLUDED AT 12:19 P.M.)
22
23
24
25

Page 99

1              CERTIFICATE OF REPORTER
2
3
4    I do hereby certify that the witness in the foregoing
5    transcript was taken on the date, and at the time and
6    place set out on the Title page here of by me after
7    first being duly sworn to testify the truth, the whole
8    truth, and nothing but the truth; and that the said
9    matter was recorded digitally by me and then reduced to
10   type written form under my direction, and constitutes a
11   true record of the transcript as taken, all to the best
12   of my skill and ability. I certify that I am not a
13   relative or employee of either counsel, and that I am in
14   no way interested financially, directly or indirectly,
15   in this action.
16
17
18
19
20
21
22   SOPHIE JONES,
23   COURT REPORTER/NOTARY
24   MY COMMISSION EXPIRES ON: 10/04/2029
25   SUBMITTED ON: 05/09/2022