# Attachment 1

| | | |
|---|---|---|
| BASULTO et al., | § | |
| | § | |
| INDIVIDUAL CLAIMANTS, | § | ARBITRATOR: DENNIS A. CLIFFORD |
| | § | |
| V. | § | |
| | § | |
| MAMMOTH ENERGY SERVICES, INC., | § | |
| COBRA ACQUISITIONS, LLC, HIGHER | § | ARBITRATION NOS.: |
| POWER ELECTRICAL, LLC, and 5 STAR | § | |
| ELECTRIC, LLC, | § | 21:A-001 to 21:B-043 |
| | § | |
| RESPONDENTS. | § | |

## INTERIM AWARD WITH
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**I.      Findings of Fact and Conclusions of Law Regarding the Parties, Jurisdiction, and Governing Authorities**

1.      Claimants include 29 individuals: 1) Billy Cambron, 2) Dennis Conners, 3) Michael Drabant, 4) Anthony Eaton, 5) Billy Franks, 6) Luis Garcia, 7) Damian Gray, 8) Warren Houston, 9) Daniel Lozoya, 10) Kardeius McClendon, 11) Brandon McNatt, 12) Salvador Miranda, 13) Abel Miranda, 14) William Nix, 15) Steve Olivares, 16) Baltazar Oyervides, 17) Jordan Rodriguez, 18) Joel Salazar, 19) Saul Sanchez, 20) Enrique Sanchez, Jr., 21) Aaron Smith, 22) Kendal Smith, 23) Michael Springmeyer, 24) Terrence Summers, 25) James Thompson, 26) Jorge Torres, 27) Efrain Villastrigo, 28) Michael Wallace, and 29) Casey Waymire (collectively, "Claimants").

2.      Respondents include four companies: 1) Mammoth Energy Services, Inc. ("Mammoth Energy Services"), 2) Cobra Acquisitions, LLC ("Cobra Acquisitions"), 3) Higher Power Electrical, LLC ("Higher Power") and 4) 5 Star Electric, LLC ("5 Star").[1]  The Arbitrator

---

[1] The Parties dispute whether Mammoth Energy Services, Inc. and Cobra Acquisitions, LLC were Claimants' "employers," as that term applies under the FLSA.  The Arbitrator addresses this issue in a separate section of the Award.

refers to Claimants and Respondents as "the Parties."

3.     Claimants performed restoration work on Puerto Rico's power grid in the aftermath of Hurricanes Irma and Maria.   They assert claims for overtime compensation against Respondents, pursuant to the Fair Labor Standards Act ("the Claims").[2]   The Claims accrued at various times from February 5, 2018 to July 22, 2018 ("the Claims Period").[3]

4.     The Arbitrator has jurisdiction because the Parties agreed to arbitrate the Claims before the Arbitrator, as set forth in the 1) Arbitrator Retention Agreement, 2) the respective Dispute Resolution sections of the Employee Handbooks, and 3) the Employee Handbook Acknowledgment, Arbitration Agreement and Waiver of Jury Trial forms (collectively, "the Arbitration Agreement").

5.     The Arbitration Agreement provides, and the Arbitrator concludes, that the Federal Arbitration Act governs these proceedings.

6.     The Arbitration Agreement prohibits the Arbitrator from conducting class, collective, or representative proceedings and requires the Arbitrator to conduct individual arbitrations for each Claimant.   However, to promote efficiency, the Parties stipulated that the

---

[2] *See* 29 U.S.C. § 207 (a)(1).

[3] The specific Claims Period for each Claimant is set forth below:

February 5, 2018 – July 22, 2018: Billy Cambron, Michael Drabant, Anthony Eaton, Billy Franks, Luis Garcia, Damian Gray, Warren Houston, Kardeius McClendon, Brandon McNatt, Salvador Miranda, Abel Miranda, William Nix, Steve Olivares, Jordan Rodriguez, Aaron Smith, Kendal Smith, Michael Springmeyer, James Thompson, Jorge Torres, Efrain Villastrigo, Michael Wallace, and Casey Waymire.

February 5, 2018 – March 11, 2018 and July 2, 2018 – July 15, 2018: Terrence Summers

February 26, 2018 – July 22, 2018: Baltazar Oyervides

March 5, 2018 – July 22, 2018: Saul Sanchez

April 2, 2018 – July 22, 2018: Daniel Lozoya, Enrique Sanchez, Jr., and Joel Salazar.

April 9, 2018 – July 22, 2018: Dennis Conners

Arbitrator may resolve the 29 Claims in a single arbitration, on a collective basis, and that evidence pertaining to one Claim may be used for other Claims.

7.      Accordingly, Claimants submitted one post-hearing brief addressing all of their Claims, and Respondents submitted one post-hearing brief addressing all of their defenses.  The Parties also submitted responses to the opening briefs.  In addition, the Parties submitted briefs regarding alleged supplemental authority from the Sixth Circuit.[4]  The hearing took place over three separate sessions in March, May, and November of 2022.

## II.      Summary of Contentions

8.      Claimants contend that Respondents paid them on a day-rate basis and failed to pay the overtime compensation the FLSA requires for day-rate workers.  Respondents contend that Claimants were paid on an hourly basis and have already received the overtime compensation the FLSA requires for hourly workers.

9.      The threshold issues are (1) whether each Respondent was an employer, (2) whether Claimants were paid on a day-rate or hourly basis, and (3) whether Respondents paid overtime compensation in accordance with the FLSA.  If liability is established, additional issues to be decided are (4) what amounts of overtime compensation are owed, (5) whether Claimants established a willful violation, (6) whether Respondents established a good faith defense, and (7) whether Respondents established the highly-compensated employee exemption.

## III.     Findings of Fact and Conclusions of Law

### A.      Were Respondents Claimants' Employers?

#### a.      The Undisputed Employers

10.     Each Claimant signed a form confirming an "at-will employment" relationship with

---

[4] *See Walsh v. KDE Equine, LLC*, No. 21-5054, 2022 WL 17843720 (6th Cir. Dec. 22, 2022).

the Respondent that provided him with an "Employee Handbook," as reflected on the chart below.

Accordingly, the Arbitrator finds that each Respondent/Employer listed below was the employer

of the corresponding Claimant/Employee:

**Handbook and Acknowledgment Forms**

| Claimant/ Employee | Respondent/ Employer | Claimant/ Employee | Respondent/ Employer |
|---|---|---|---|
| Billy Cambron | 5 Star Electric, LLC | Michael Drabant | Higher Power Electrical, LLC |
| Dennis Conners | 5 Star Electric, LLC | Anthony Eaton | Higher Power Electrical, LLC |
| Billy Franks | 5 Star Electric, LLC | Damian Gray | Higher Power Electrical, LLC |
| Luis Garcia | 5 Star Electric, LLC | Warren Houston | Higher Power Electrical, LLC |
| Daniel Lozoya | 5 Star Electric, LLC | Brandon McNatt | Higher Power Electrical, LLC |
| Salvador Miranda | 5 Star Electric, LLC | William Nix | Higher Power Electrical, LLC |
| Abel Miranda | 5 Star Electric, LLC | Steve Olivares | Higher Power Electrical, LLC |
| Baltazar Oyervides | 5 Star Electric, LLC | Aaron Smith | Higher Power Electrical, LLC |
| Joel Salazar | 5 Star Electric, LLC | Kendall Smith | Higher Power Electrical, LLC |
| Saul Sanchez | 5 Star Electric, LLC | Terrence Summers | Higher Power Electrical, LLL |
| Enrique Sanchez, Jr. | 5 Star Electric, LLC | James Thompson | Higher Power Electrical, LLC |
| Michael Springmeyer | 5 Star Electric, LLC | Michael Wallace | Higher Power Electrical, LLC |
| Jorge Torres | 5 Star Electric, LLC | Casey Waymire | Higher Power Electrical, LLC |
| Efrain Villastrigo | 5 Star Electric, LLC | Jordan Rodriguez | Cobra Energy |
| Kardeius McClendon | 5 Star Electric, LLC[5] | | |

    **b.**     **The Disputed Employers: Mammoth Energy Services, Inc. and Cobra Acquisitions, LLC**

11.    Consistent with its broad, remedial purposes, the FLSA defines the term

"employer" expansively—the statute places no express limitation on the word's meaning, stating

only that it "includes any person acting directly or indirectly in the interest of an employer in

---

[5] McClendon signed an "Employee Handbook" acknowledgement form that does not refer to a specific company; the form refers to "the Company."  However, payroll records pertaining to McClendon show "5 Star Electric" as his "position family";  "5 Star"  in the field labeled "Labor Allocation Profile"; and "5 Star Electric LLC" in the field labeled "Payroll Profile."

relation to an employee."[6]   The FLSA defines the related terms "employee" and "employ" in similarly broad fashion.[7]   The breadth of these definitions brings some employment relationships within the FLSA's coverage when they may not qualify as such "under a strict application of traditional agency law principles" or under other federal or state statutes.[8]

12.    The Parties dispute whether Mammoth Energy Services, Inc. ("Mammoth Energy Services") and Cobra Acquisitions, LLC ("Cobra Acquisitions") were employers of Claimants.

13.    Mammoth Energy Services is a publicly traded entity.  Mark Layton testified that Mammoth Energy Services does not have any employees, but he acknowledged that it does have a slate of directors and officers.[9]   Layton testified that a different entity, Mammoth Energy, Inc. (which is a subsidiary of Mammoth Energy Partners LLC[10]), provided shared-services functions, including HR, accounting, and finance support, for a number of subsidiaries, including 5 Star and Higher Power.  Layton further testified Jeff Beagle was employed by, and received his paychecks from, Mammoth Energy, Inc.[11]   Yet Beagle is listed as the Director of Human Resources for Mammoth Energy Services on the Insider Trading paperwork that was provided to many Claimants, and his emails make no distinction between Mammoth Energy Services, Inc. and Mammoth Energy, Inc.  Based on the evidence submitted, the Arbitrator finds that Beagle functioned as the Director of Human Resources for numerous entities, including Mammoth Energy Services, before and during the Claims Periods.

---

[6] 29 U.S.C. § 203(d).

[7] *See id*. § 203(e)(1) (defining "employee" as "any individual employed by an employer"); *id*. § 203(g) (stating that the term "employ … includes to suffer or permit to work").

[8] *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

[9] Layton is the Chief Financial Officer of Mammoth Energy Services and multiple subsidiary companies.

[10] Mammoth Energy Partners LLC is a subsidiary of Mammoth Energy Services, Inc.

[11] Mammoth Energy, Inc. is not a party to this action.

14.     Cobra Acquisitions is a subsidiary of Mammoth Energy Partners LLC.  Cobra Acquisitions purchased Higher Power in April 2017 and it purchased 5 Star in July 2017.  Cobra Acquisitions then entered into a Master Service Agreement ("MSA") with Puerto Rico Electric Power Authority ("PREPA") in October 2017 to provide emergency repair services to Puerto Rico's power grid.  Layton testified that Cobra Acquisitions transferred its ownership interest in Higher Power and 5 Star to an entity that he referred to as "Cobra Energy," for operations purposes, at some point shortly after Cobra Acquisitions entered into the MSA with PREPA.  Respondents contend that Higher Power and 5 Star operated as subcontractors to Cobra Acquisitions at all times relevant to this dispute, including the Claims Periods.

15.     The Parties have cited cases suggesting a four-factor economic-realities test may be used to determine whether Mammoth Energy Services and Cobra Acquisitions were employers under the FLSA.  Courts sometimes use a five-factor test.  Regardless of which test is used, courts generally consider the totality of the circumstances.  No single factor alone is determinative, and not all factors must weigh in favor of employment status to establish an employment relationship under the FLSA.[12]

### 1.     The Power to Hire/Fire, and Maintenance of Employment Records

16.     Claimants did not provide sufficient evidence to establish that Mammoth Energy Services or Cobra Acquisitions had the power to hire or fire Claimants.  Higher Power and 5 Star sometimes used Disciplinary Action Forms with the name "Cobra Energy" on the document.  The forms list "Terminated" as one of the disciplinary options.  Even so, Cobra Acquisitions and Cobra Energy are distinct legal entities.  The Arbitrator finds an initial factor—the power to hire and

---

[12] *See Kibodeaux v. A&D Interests, Inc.*, No. 3:20-CV-00008, 2022 WL 980354 (S.D. Tex. Mar. 31, 2022).

fire—weighs against finding that Mammoth Energy Services and Cobra Acquisitions were Claimants' employers.

17.     The Arbitrator finds that a second factor—the maintenance of employment records—weighs slightly in favor of finding that Mammoth Energy Services was Claimants' employer.  The Benefits Enrollment/Change forms and the Insider Trading cover letter and policy both suggest that Mammoth Energy Services was an employer.  *See* Bates No. 887, Ex. 47; Bates No. 6316-22, Ex. 27.   In addition, many records generally reference "Mammoth Energy," including the Immunization forms, Paycom records (compensation summaries), and Time Detail Reports, without making any distinction between the Mammoth Energy entities.[13]

18.     The Arbitrator finds that the same factor—the maintenance of employment records—weighs against a finding that Cobra Acquisitions was Claimants' employer.  The name "Cobra Energy" appears on some records, including pay-change notice forms.  *See* Bates No. 7644, Ex. 89.  The name "Cobra Energy Services" appears on some records, including Disciplinary Action forms, Drug/Alcohol Test Consent forms, and Accident Investigation reports.  *See* Bates No. 7942, Ex. 223; Bates No. 8513, Ex. 70; Bates No. 8553, Ex. 68.  The name "Cobra Acquisitions," however, does not appear on any relevant records in this case, other than the MSA.

> **2.     Supervision/Control of Schedules and Conditions of Employment, and Determination of Pay Rate and Method of Payment**

19.     The alleged liability in this case largely stems from the payroll and timekeeping practices. Those issues are directly related to the following economic-realities factors: (1) the supervision and control of employee schedules or conditions of employment and (2) the

---

[13] The Arbitrator understands that a reference to "Mammoth Energy" on a document could pertain to one or more of many different "Mammoth Energy" entities.

determination of the rate of pay and method of payment.

20.     Beagle worked in several capacities during the timeframe in question.  One such capacity was Director of Human Resources for Mammoth Energy Services.  *See* Bates No. 135, Ex. 2.  Beagle communicated with Steve Broussard (outside legal counsel) regarding the work hours and compensation structure for Claimants on numerous occasions leading up to the implementation of the practices at issue in this matter.  *See* Bates No. 3519, Ex. 76.  Alex Kalman and Ken Kinsey are copied on many of these emails.  Kalman was employed in an HR/Payroll role by an entity listed in her email signature as "Mammoth Energy."  Ken Kinsey was employed as VP of Operations by an entity listed in his email signature as "Cobra Energy."

21.     Missy Davis was employed as an HR Manager for 5 Star.  Davis did not develop the timekeeping or compensation practices at issue in this case.  To the contrary, she wrote unprofessional emails concerning the practices, at times describing her dissatisfaction with them. Beagle gave instructions to Davis on how to apply the practices at issue in this case.  *See* Bates No. 3037, Ex. 90; Bates No. 2948, Ex. 98; Bates No. 3527, Ex. 106.

22.     JD Kinsey is Ken Kinsey's son.  JD Kinsey was employed as an HR/Payroll Manager by an entity listed in his email signature as "Cobra Energy."  He was responsible for entering time and gross-up payments (as explained below).  He did not develop the timekeeping or compensation practices at issue in this case.  JD Kinsey followed the timekeeping and compensation practices that Beagle developed and imposed on the workforce.  *See* Bates No. 3040-42, Ex. 123; Bates No. 2927, Ex. 95.

23.     The Arbitrator finds that Beagle, acting on behalf of Mammoth Energy Services, developed the schedules, conditions of employment, payroll practices, and timekeeping practices at issue in this case.  The Arbitrator further finds that Beagle, acting on behalf of Mammoth Energy

Services, imposed those conditions and practices upon employees of 5 Star and Higher Power, including Claimants in this action.  *See* Bates No. 3336, Ex. 2

24.     For the above reasons, the Arbitrator finds that Claimants have established that Mammoth Energy Services was their "employer," under the FLSA's liberal definition of that term, during the Claims Periods.  However, the Arbitrator finds that Claimants have not provided sufficient evidence to establish that Cobra Acquisitions was their employer during the Claims Periods.[14]

### B.     Did Respondents Pay Claimants on an Hourly or Day-Rate Basis?

#### a.     Legal Background

25.     The FLSA requires payment for each overtime hour, and the overtime payment must be calculated at 1.5 times the "regular rate" of pay.[15]  In this case, liability turns on whether Respondents paid Claimants on an hourly basis or a day-rate basis.  The answer to that question dictates how the overtime should have been calculated and paid under the FLSA.

26.     If an employer pays an employee strictly on an hourly basis, then the employee's hourly rate is his regular rate, and the FLSA requires the employer to pay 1.5 times that hourly rate for each overtime hour worked during the workweek.[16]  Respondents contend Claimants were paid on an hourly basis and that they have already received 1.5 times the regular rate for each overtime hour worked.

---

[14] The Arbitrator expresses no opinion on whether Mammoth Energy, Inc. and Cobra Energy developed and imposed the work schedules, conditions of employment, payroll practices, and timekeeping practices at issue in this case.  Mammoth Energy, Inc. and Cobra Energy are not parties to this action.

[15] 29 U.S.C. § 207(a) ("No employer shall employ any of his employees … for a workweek longer than [40] hours unless such employee receives compensation for his employment in excess of [40] at a rate not less than one and one-half times the regular rate at which he is employed.")

[16] 29 C.F.R. §§ 778.109 to 778.110.

27.     Some employers compensate their employees on a day-rate basis.[17]  A day rate is a set sum of money paid to an employee for the work the employee performs that day, "without regard to the number of hours worked in the day."[18]  Claimants contend Respondents paid them on a day-rate basis and failed to pay them the overtime compensation that the FLSA requires for day-rate workers.

28.     When an employer pays an employee on a day-rate basis, the regular rate is the total compensation received for the week divided by the total number of hours worked during the week.[19]  For example, if an employer pays a day-rate worker a total amount of $4,200 for the week, and the employee works a total of 84 hours during that week, then the employee's regular rate for that week is $50 ($4,200 / 84 hours).  In this example, the employee is entitled to overtime pay in the amount of $25 per hour for the 44 overtime hours.[20]  Stated differently, a day-rate worker has already received 1.0 times his regular rate for each hour worked, in the form of the day rate, so the employee is only entitled to 0.5 times (i.e., half) his regular rate for each overtime hour worked.[21]

29.     An employer cannot comply with the FLSA's overtime-pay requirement by paying a fixed amount without regard to the number of hours actually worked:

---

[17] *See* 29 C.F.R. § 778.112.

[18] *Id.*; *see also Dufrene v. Browning-Ferris, Inc.*, 207 F.3d 264, 267-68 (5th Cir. 2000).

[19] *See* 29 C.F.R. § 778.109 ("The regular hourly rate of pay of an employee is determined by dividing his total renumeration for employment … in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.").

[20] *See* 29 C.F.R. § 778.112 (explaining that half of the regular rate is owed for each overtime hour worked).

[21] *See Dufrene*, 207 F.3d at 68.

> [I]t is not possible for an employer lawfully to agree with his
> employees that they will receive the same total sum, comprising
> both straight time and overtime compensation, in all weeks *without*
> *regard to the number of overtime hours (if any) worked in any*
> *workweek*. The result cannot be achieved by the payment of a fixed
> salary or by the payment of a lump sum for overtime *or by any other*
> *method or device*.

29 C.F.R. § 778.500(b) (emphasis added).

30.     In this case, Claimants contend Respondents' agents told them during the recruiting

and orientation process that they would be paid a flat sum for each day worked.  Respondents

contend, by contrast, that representatives from Higher Power and 5 Star explained to Claimants

that they would be paid on an hourly basis for a targeted number of hours each day.

31.     Claimants contend their offer letters, paystubs, and time reports (among other

documents, including email and pay-scale sheets) demonstrate that they were in fact paid the same

total sum for each day that they worked, regardless of how many hours they actually worked—

i.e., that they were paid on a day-rate basis.  Respondents contend that the same documents prove

that Claimants were paid on an hourly basis for a targeted number of hours each day.   The

Arbitrator addresses these issues below.

### b.     The Offer Letters

32.     Most Claimants received offer letters listing the amount they will earn "per day."

The offer letters also provide that the "per day" amount "will be broken down hourly over 16 hours

daily."  The following excerpt shows how this information was displayed on the offer letters:

| Start Date | 11-1-2017 |
|---|---|
| Starting Hourly Rate | $35.00 |
| Puerto Rico Storm Rate (16 hour paid shift on island) | $1,250.00 per day that will be broken down hourly over 16 hours daily. |

*See* Bates No. 8450, Ex. 48.

33.     Some offer letters have an "Hourly" amount listed next to the "broken down hourly

over 16 hours daily" language.  For example, Ms. Garcia's "Hourly" amount is listed as $47.30:

| Start Date | TBD- The day of your flight down to Puerto Rico |
|---|---|
| Starting Hourly Rate | $32.00 |
| Puerto Rico Storm Rate | $1000.00 per day that will be broken down hourly over 16 hours daily. Hourly $47.30 |

*See* Bates No. 8575, Ex. 72.

34.     The listed hourly amount is not the "per day" amount "broken down over 16 hours daily."  For example, $1,000 divided 16 is $62.50, not $47.30.

35.     The offer letters also indicate the goal is to work 12 hours a day, but that situations may arise that could require "longer hours," not to exceed 16 hours a day (i.e., that the hours will fluctuate depending on work requirements for the day):

> Our goal is to work 12 hours a day and not to work at night.  As many of you know and are accustomed to with storms, certain situations may arise that could require longer hours, but will not exceed 16 hours.

*See* Bates No. 8575, Ex. 72.

36.     As explained below, the Arbitrator finds the offer letters support the Arbitrator's conclusion that Claimants were paid on a day-rate basis.

### c.     The Paystubs

37.     Each paystub covers a 14-day pay period.  Each 14-day pay period is comprised of two 7-day workweeks under the FLSA.  The paystubs show a "Regular" and "Overtime" rate for each Claimant.  The "Overtime" rate is 1.5 times more than the "Regular" rate.

38.     The paystubs reveal that Respondents used different methodologies to ensure that Claimants received their "per day" amount for each day that they worked.  The methodology depended on whether Claimants worked fewer than seven days during either of the workweeks in the pay period.

## 1.     Weeks When Claimants Worked Seven Days

39.     In pay periods where Claimants worked every day, the paystub show exactly 224 hours.  This equates to 112 hours per workweek.  The paystubs show 40 regular hours and 72 overtime hours for such workweeks.

40.     The "Regular" rate multiplied by 40 regular hours, plus the "Overtime" rate multiplied by 72 overtime hours, results in an amount that is substantially equivalent (within pennies) to the "per day" amount (on the offer letter) multiplied by seven days.  The math works the same way over a two-week pay period: the "Regular" rate multiplied by 80 regular hours, plus the "Overtime" rate multiplied by 144 overtime hours, results in an amount that is substantially equivalent (within pennies) to the "per day" amount (on the offer letter) multiplied by 14 days.

41.     For example, on June 29, 2018, Mr. Garcia's paystub reflects the gross amount of $14,000.80 (which is substantially equivalent to the $1,000 "per day" amount multiplied by 14 days):

## Earnings Statement                                          LUIS GARCIA

| Pay Date: | 06/29/2018 | Company: 0UB44 - 5 STAR ELECTRIC LLC | Emp #: A4FM |
| Period Start: | 06/11/2018 | 170 BEAN CEMETERY RD | Dept: PR - Puerto Rico |
| Period End: | 06/24/2018 | MADISONVILLE  KY  42431   (405) 608-8191 | Pay Basis: Hourly |

|  |  | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|---|
| **Earnings** |  |  |  |  |  |
| Regular |  | 47.30 | 80.00 | 3784.00 | 18541.60 |
| Overtime |  | 70.95 | 144.00 | 10216.80 | 45975.60 |
| Day Rate |  |  |  | 0.00 | 11486.00 |
|  | **Gross** |  | 224.00 | 14000.80 | 76003.20 |

*See* Bates No. 6035, Ex. 80.

## 2.     Weeks When Claimants Worked Fewer than Seven Days; Issuance of Gross-Up Payments

42.     When Claimants worked fewer than seven days in a workweek in the pay period, the hours on the paystubs do not add up to 224, and the paystubs show an additional type of

payment.

43.     In these instances, the paystubs show a payment labeled as a "Day Rate."  The "Day Rate" sometimes matches the "per day" amount listed on the offer letter multiplied by the number of days worked.  For example, on June 1, 2018, Mr. Garcia's paystub reflects $6,000 in "Day Rate" pay (as explained in the next section, Mr. Garcia worked <u>six</u> days in one workweek in this pay period and seven days in the other workweek):

## Earnings Statement                                                        LUIS GARCIA

| | | | | | |
|---|---|---|---|---|---|
| Pay Date: | 06/01/2018 | Company: 0UB44 - 5 STAR ELECTRIC LLC | | | Emp #: A4FM |
| Period Start: | 05/14/2018 | 170 BEAN CEMETERY RD | | | Dept: PR - Puerto Rico |
| Period End: | 05/27/2018 | MADISONVILLE KY  42431 | (405) 608-8191 | | Pay Basis: Hourly |

| | | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|---|
| **Earnings** | | | | | |
| Regular | | 47.30 | 40.00 | 1892.00 | 12865.60 |
| Overtime | | 70.95 | 72.00 | 5108.40 | 30650.40 |
| Day Rate | | | | 6000.00 | 6486.00 |
| | **Gross** | | 112.00 | 13000.40 | 50002.00 |

*See* Bates No. 6037, Ex. 80.

44.     Similarly, on June 15, 2018, Mr. Garcia's paystub reflects $5,000 in "Day Rate" pay (as explained in the next section, Mr. Garcia worked <u>five</u> days in one workweek in this pay period and seven days in the other workweek):

## Earnings Statement                                                        LUIS GARCIA

| | | | | | |
|---|---|---|---|---|---|
| Pay Date: | 06/15/2018 | Company: 0UB44 - 5 STAR ELECTRIC LLC | | | Emp #: A4FM |
| Period Start: | 05/28/2018 | 170 BEAN CEMETERY RD | | | Dept: PR - Puerto Rico |
| Period End: | 06/10/2018 | MADISONVILLE KY  42431 | (405) 608-8191 | | Pay Basis: Hourly |

| | | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|---|
| **Earnings** | | | | | |
| Regular | | 47.30 | 40.00 | 1892.00 | 14757.60 |
| Overtime | | 70.95 | 72.00 | 5108.40 | 35758.80 |
| Day Rate | | | | 5000.00 | 11486.00 |
| | **Gross** | | 112.00 | 12000.40 | 62002.40 |

*See* Bates No. 6036, Ex. 80.

45.     The above-referenced "Day Rate" payments listed on the paystubs ($6,000 and $5,000) are evenly divisible by the "per day" amount listed on the offer letter ($1,000).  The Arbitrator shall refer to these payments as "Gross-Up Payments, Type 1."

46.     On some occasions when Claimants did not work seven days during one of the workweeks in the pay period, the "Day Rate" payments are not evenly divisible by the "per day" amount listed on the offer letter.  For example, on April 20, 2018, Mr. Garcia's paystub reflects $486.00 in "Day Rate" pay (as explained below, Mr. Garcia worked <u>two</u> days during one workweek in this pay period and seven days in the other workweek in this pay period):

## Earnings Statement                                                    LUIS GARCIA

| Pay Date: | 04/20/2018 | Company: 0UB44 - 5 STAR ELECTRIC LLC | Emp #: A4FM |
| Period Start: | 04/02/2018 | 170 BEAN CEMETERY RD | Dept: PR - Puerto Rico |
| Period End: | 04/15/2018 | MADISONVILLE  KY  42431   (405) 608-8191 | Pay Basis: Hourly |

|  | | Rate | Hours/Units | Current Period | Year To Date |
| --- | --- | --- | --- | --- | --- |
| **Earnings** | | | | | |
| Regular | | 47.30 | 72.00 | 3405.60 | 3405.60 |
| Overtime | | 70.95 | 72.00 | 5108.40 | 5108.40 |
| Day Rate | | | | 486.00 | 486.00 |
| | **Gross** | | 144.00 | 9000.00 | 9000.00 |

*See* Bates No. 6040; Ex. 80.

47.     The above-referenced "Day Rate" payment listed on the paystub ($486) is not evenly divisible by the "per day" amount listed on the offer letter ($1,000).  The Arbitrator shall refer to these payments as "Gross-Up Payments, Type 2."  The Arbitrator uses the general term "Gross-Up Payments" to refer to both types of payments.

48.     The Gross-Up Payments appear on the paystubs when Claimants work fewer than seven days in a workweek.  The purpose of the Gross-Up Payments was to ensure that Claimants received their "per day" amount for each day they worked during the workweek.  *See* Bates No.

3037, Ex. 90 (email from Beagle explaining that the wages will be "grossed up" if they "do not equal out to the day rate."); *see also* Bates No. 3041, Ex. 123 (email from Beagle explaining that wages "did not calculate out to the full day rate since it was not a full week … [so he was] calculating that 'gross up' now so any mid-week employees are made whole ….").

49. Thus, when Respondents made Gross-Up Payments, Claimants ended up receiving a gross amount that was either equal to the "per day" amount multiplied by the number of days worked (example directly above; $9,000 paid when nine days were worked) or a gross amount that was substantially equivalent to the "per day" amount multiplied by the number of days worked (prior examples; $12,000.40 paid when 12 days were worked, and $13,000.40 paid when 13 days were worked).

50. If Claimants worked all seven days in each workweek in the pay period, then Respondents did not need to issue Gross-Up Payments.  As explained more below, on those occasions, Respondents entered 224 hours for the pay period (regardless of the real number of hours worked), and the system would generate a gross amount that was substantially equivalent to the "per day" amount set forth in the offer letters multiplied by 14 days.  *See* Bates No. 2927, Ex. 95 (email from Kalman explaining this fact); Bates No. 3028, Ex 2 (email from Beagle explaining that if "you take the 16 hour shifts over a 7 day work week with the applicable overtime of 1.5x for anything over 40, you will see it nets out to the day rate over a week period.").

51. As a result, Claimants always received a gross amount on par with the "per day" amount set forth in their offer letters multiplied by the number of days worked, regardless of how many hours they actually worked.

     **d.**    **The "Discretionary Bonus" Argument**

52. Respondents have characterized the Gross-Up Payments as discretionary bonuses.

Payments in the form of a discretionary bonus are excluded from the regular rate.[22]  To qualify as a discretionary bonus, the employer must maintain discretion on whether the bonus will be paid and how the bonus will be calculated.[23]  Also, the bonus is not excludable from the regular rate if "any prior contract, agreement, or promise caus[es] the employee to expect such payments regularly … ."[24]

53.     The Arbitrator concludes the Gross-Up Payments were not discretionary bonuses. Respondents did not maintain discretion on whether the Gross-Up Payments would be paid because Respondents regularly issued the Gross-Up Payments when Claimants worked fewer than seven days in a workweek.  Davis and JD Kinsey regularly tracked this information and manually entered Gross-Up Payments to ensure that employees received their "per day" compensation.  *See* Bates No. 2883, Ex. 91; Bates No. 2885, Exs. 92 and 94.

54.     Layton testified at the hearing, and Beagle testified via deposition, that there were multiple instances where employees worked fewer than seven days and did not receive the Gross-Up Payments.  However, Respondents have not provided records sufficient to establish that alleged fact.  Conversely, the Parties submitted exhibits showing many weeks where Claimants worked fewer than seven days and received the Gross-Up Payments.

55.     The Arbitrator also finds the payment amounts were not discretionary.   As explained above, the Gross-Up Payments were based on a formula designed to ensure Claimants received their "per day" amount for each day worked.  *See* Bates No. 3037, Ex. 90 (email from Beagle explaining that the wages will be "grossed up" if they "do not equal out to the day rate.");

---

[22] 29 U.S.C. § 207(e)(3)(a).

[23] *Id.*; 29 C.F.R. § 778.211.

[24] 29 C.F.R. § 778.211.

*see also* Bates No. 3041, Ex. 123.

56.     Claimants and Respondents also had an understanding that Claimants would receive a "per day" amount—as set forth in the offer letters—and the Gross-Up Payments were necessary to ensure that Claimants in fact received their "per day" amount.

57.     Therefore, the Arbitrator concludes the Gross-Up Payments were not discretionary bonus payments.

### e.     Actual Hours Worked and the Time Reports

58.     Respondents generally took attendance at the beginning of each workday, but Respondents did not track or record the hours that Claimants worked each day,[25] and  Respondents did not require Claimants to record their work hours.  *See* Bates No. 2997, Ex. 109 (email from JD Kinsey explaining that employees do not record their own time).

59.     The Parties submitted a Time Detail Report for each Claimant.  Kalman informed JD Kinsey that everyone who is on a "day rate" will be paid correctly if he enters 16 hours on the time records.  *See* Bates No. 2927, Ex. 95 ("We should have everyone that is just their day rate converted to hourly so when you enter the 16 hours it should take care of it from there.").

60.     JD Kinsey (and other HR/Payroll employees) generally entered 16 hours for every day if the employee worked seven days during the workweek.[26]  As a result, Respondents entered a total of 112 hours for workweeks in which Claimants worked seven days, regardless of how many hours Claimants worked.[27]

61.      When Claimants did not work seven days in a workweek, JD Kinsey (or another

---

[25] Layton conceded this point at the hearing.

[26] On some occasions, when Respondents issued Gross-Up Payments, Respondents did not enter any hours into the Time Detail Report.

[27] For those weeks, the "Pay Code" is generally listed as "Fixed: (R)."  By contrast, when Claimants did not work seven days in a workweek, the "Pay Code" is often listed as "Fixed: (DYR)."

HR/Payroll employee) entered a specific dollar amount into the system—either Gross-Up Payment, Type 1 or Gross-Up Payment, Type 2.

62.    For example, Mr. Garcia's Time Detail Report leading up to his June 1, 2018 paycheck shows a specific dollar amount ($1,000; Gross-Up Payment, Type 1):

| Total Units/Hours For Week: | | | | | | | 112.00 | |
|---|---|---|---|---|---|---|---|---|
| Mon (05/14) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | $1000.00 | 0.00 | 0.00 | jkinsey (05/27/2018) |
| Tue (05/15) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | $1000.00 | 0.00 | 0.00 | jkinsey (05/27/2018) |
| Wed (05/16) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | $1000.00 | 0.00 | 0.00 | jkinsey (05/27/2018) |
| Thu (05/17) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | $1000.00 | 0.00 | 0.00 | jkinsey (05/27/2018) |
| Fri (05/18) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | $1000.00 | 0.00 | 0.00 | jkinsey (05/27/2018) |
| Sat (05/19) | | -- | -- | | | | | | jkinsey (05/27/2018) |
| Sun (05/20) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | $1000.00 | 0.00 | 0.00 | jkinsey (05/27/2018) |
| Total Units/Hours For Week: | | | | | | | 0.00 | |
| Mon (05/21) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Tue (05/22) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Wed (05/23) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Thu (05/24) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Fri (05/25) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Sat (05/26) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Sun (05/27) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | 16.00 | 16.00 | jkinsey (05/27/2018) |
| Total Units/Hours For Week: | | | | | | | 112.00 | |

*See* Bates No. 6041, Ex. 73.

63.    The Time Detail Report leading to Mr. Garcia's April 20, 2018 paycheck also shows a specific dollar amount ($436; Gross-Up Payment, Type 2):

| Date | Pay Code | IN | OUT | Allocation | Tax Profile | Missing | Dollars | Total Hrs. | Total Hrs./Day | Employee Approval | Supervisor Approval |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Sun (04/01) | | -- | -- | | | | | | | | jkinsey (04/15/2018) |
| Total Units/Hours For Week: | | | | | | | | | 0.00 | | |
| Mon (04/02) | | -- | -- | | | | | | | | jkinsey (04/15/2018) |
| Tue (04/03) | | -- | -- | | | | | | | | jkinsey (04/15/2018) |
| Wed (04/04) | | -- | -- | | | | | | | | jkinsey (04/15/2018) |
| Thu (04/05) | | -- | -- | | | | | | | | jkinsey (04/15/2018) |
| Fri (04/06) | | -- | -- | | | | | | | | jkinsey (04/15/2018) |
| Sat (04/07) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Sun (04/08) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Total Units/Hours For Week: | | | | | | | | | 32.00 | | |
| Mon (04/09) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Tue (04/10) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Wed (04/11) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Thu (04/12) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2010) |
| Fri (04/13) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Sat (04/14) | Fixed: (R) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | 16.00 | | jkinsey (04/15/2018) |
| Sun (04/15) | Fixed: (R) | a | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | | 16.00 | | jkinsey (04/15/2018) |
| Sun (04/15) | Fixed: (DYR) | n/a | n/a | [PRJ-5 STAR ELECTRIC LLC-Unassigned--Unassigned-- | | | $486.00 | 0.00 | 16.00 | | jkinsey (04/15/2018) |
| Total Units/Hours For Week: | | | | | | | | | 112.00 | | |

*See* Bates No. 6041, Ex. 73.

64.     The Arbitrator finds the Time Detail Reports do not accurately account for the hours Claimants worked each workweek.

65.     Claimants credibly testified they generally worked around 12 hours per day, but some days they worked more and some days they worked less (i.e., their hours fluctuated).[28] Respondents did not adequately rebut this testimony.   The Arbitrator finds that the hours each Claimant worked fluctuated (generally from 10 to 14 hours per day), but the Arbitrator will assume 12 hours of work per day pursuant to the Parties' stipulation regarding hours worked for purposes of calculating any alleged damages.[29]

---

[28] Claimants' testimony is consistent with the 12-hour "goal" set forth in the offer letters.

[29] The Parties stipulated that, in the event the Arbitrator finds liability, 12 hours per day is an appropriate measure for calculating damages.  The Parties entered into this stipulation strictly for the purposes of calculating potential damages.  Accordingly, the Arbitrator has not considered this stipulation when assessing potential liability.

### f.      The Alleged On-Call Time

66.      Respondents contend Claimants were paid on an hourly basis, for 16 hours each day, regardless of whether they were physically working during the entire 16-hour period. According to Respondents, Claimants were "on call" when they finished performing their work for the day, such that Claimants' actual hours worked, and their on-call time, would always add up to 16 hours each day.

67.      For example, if an employee worked 13 hours during the day, then he would be on call for 3 hours.  Likewise, if he worked 12 hours, he would on call for 4 hours.  Therefore, Respondents argue, Claimants were in fact paid on an hourly basis for 16 hours each day. Respondents contend the offer letters support their on-call argument because the letters provide that "certain situations may arise that could require longer hours, but will not exceed 16 hours."[30]

68.      Claimants argue that they were never on call for any period of time and that the words "on call" do not appear on any documents.  According to Claimants, Respondents invented the on-call argument within the context of this litigation, as a way to explain why 16 hours was entered for every day of work.

69.      Claimants credibly testified that they were generally free to do whatever they wanted once they returned from the field for the day.[31]  The Parties spent considerable time at the hearing focused on whether Claimants were permitted to consume alcohol once they returned from the field for the day.  The Arbitrator concludes that even if Claimants were prohibited from

---

[30] Respondents further argue that 16 hours is a natural cap on hours worked per day because any work beyond 16 hours will trigger rest-time requirements under Department of Transportation and Occupational Safety and Health Administration regulations.

[31] Claimants conceded they would have gone back into the field to perform additional work if their supervisors would have asked them to do so, but most Claimants explained that they would have done so because they were willing to do whatever it took to get the job done for the day.

consuming alcohol, that fact would not establish that they were on call.

70.     Respondents did not track or record the alleged on-call hours,[32] and the Time Detail Reports, paystubs, and offer letters do not specifically reference any on-call time.  The language concerning "16 hours" in the offer letters does not establish that Claimants were on call for up to 16 hours.  Respondents did not establish that Claimants were called back into the field to perform additional work during the alleged on-call time, and none of the Claimants believed that they were on call when they returned from their fieldwork for the day.  The Arbitrator finds that Claimants were not on call during any portion of their deployment and that they were not paid on an hourly basis for any alleged on-call time.

### g.     Additional Findings and Conclusions

71.     Based on the evidence and arguments presented, the Arbitrator finds that Claimants were paid on a day-rate basis.  Claimants believed they were being paid a set amount for each day of work regardless of how many hours they worked during the day.  Their beliefs were reasonably based on the information set forth in their offer letters, the representations made to them by Respondents' agents during the recruiting and orientation process, and the fact that they received compensation each week that was equal to or substantially equivalent (within pennies) to their "per day" amount multiplied by the number of days they worked.

72.     The offer letters provide that Claimants would receive a set amount each day. While it is true that the offer letters also provide that the "per day" amount will be "broken down hourly over 16 hours daily," the Arbitrator finds that language merely references how the total amount paid for 14 days will be made to appear on the paystubs when Claimants work 14 days in

---

[32] Therefore, even if the alleged on-call hours could be construed as hours worked, Respondents have not provided sufficient evidence to establish that the hours totaled 16 each day.

a pay period.  For example, as noted above, when Mr. Garcia worked 12 days in a pay period, the total amount paid was not "broken down hourly" on the paystubs.

73.     Claimants have also submitted several dozen internal documents, including email from HR and Payroll representatives, that reference the rate of pay as a "day rate" or an amount "per day."   For example, Beagle frequently references a "per day" amount in his email correspondence with management and HR/Payroll employees.  Likewise, when Respondents were preparing to change their pay practices in the summer of 2018, JD Kinsey wrote that "we are getting ready to transition from Day Rate to Hourly rate here in Puerto Rico."  *See* Bates No. 2997, Ex. 109.

74.     To prove that Claimants were paid on an hourly basis, Respondents must first establish that they kept track of Claimants' actual hours worked.  The Arbitrator finds that Respondents did not do so.  Instead, Respondents entered 16 hours for each day, regardless of the actual number of hours worked.  As a result, if Claimants worked seven days, the paystubs reflect 112 hours (224 hours based on a two-week pay period), regardless of how many hours they actually worked.

75.     Respondents argue that, even if they paid a fixed amount per day (or per shift), they have already met their overtime-pay obligations because the FLSA allows employers to pay a fixed sum for a fixed amount of overtime hours:

> Where an employee works a regular fixed number of hours in excess of [40 hours] each workweek, it is, of course, proper to pay him in addition to his compensation for [the first 40 hours] a fixed sum in any such week for his overtime work, determined by multiplying his overtime rate by the number of overtime hours regularly worked.

29 C.F.R. § 778.309 (Titled, Fixed Sum for Constant Amount of Overtime).

76.     The regulation and other authorities that Respondents rely upon to support their

argument are inapplicable because Claimants did not work "a regular fixed number of hours."[33] Claimants' work hours fluctuated, and Respondents did not keep track of them (or the alleged on-call hours).[34]   Moreover, as Beagle explained, the pay practice was premised on the fact that Claimants would rarely, if ever, work 16 hours in a day (i.e., the opposite of regularly working 16 hours in day).[35]   *See* Bates No. 3497, Ex. 115.   Therefore, Respondents could not satisfy the FLSA's overtime-pay requirement by paying a fixed sum for 112 hours per week.

77.   Employers cannot satisfy the FLSA's overtime-pay requirement by paying a fixed sum without regard to the number of hours worked:

> [A] lump sum which is paid for work performed during overtime hours without regard to the number of overtime hours worked does not qualify as an overtime premium … The reason for this is clear. If the rule were otherwise, an employer … could merely label as overtime pay [an amount] sufficient to take care of compensation for the maximum number of hours that would be worked.

29 C.F.R § 778.310 (Titled, "Fixed Sum for Varying Amounts of Overtime"); *see also* 29 C.F.R. § 778.500(b).

78.   But that is what Respondents did in this case.   They paid a lump sum without regard to actual hours worked.   *See* Bates No. 3497, Ex. 115 (email from Beagle explaining that they are "paying for a 16 hour shift *regardless of time worked*") (emphasis added).   This is indicative of a day rate.[36]

---

[33] *See Walsh v. KDE Equine, LLC*, 56 F.4th 409, 413 (6th Cir. 2022) ("Section 778.309 'only applies when an employee works a fixed number of overtime and non-overtime hours.'") (quoting *United States Dep't of Labor v. Fire & Safety Investigation Consulting Services*, LLC, 915 F.3d 277 (4th Cir. 2019)).

[34] *See id*. (holding that Section 778.309 did not apply because "the hours that the employees worked from week to week fluctuated ….").

[35] Respondents initially considered paying for a 12-hour shift, but they were concerned the actual hours would "go over," which they understood would then require them to "pay additional time over what was budgeted."   *See* Bates No. 3477, Ex. 115.

[36] *See* 29 C.F.R. § 778.112; *Dufrene*, 207 F.3d at 68.

79.     When Claimants worked seven days in a workweek, the pay practice resulted in them receiving an amount equal to or substantially equivalent to their "per day" amount for each day they worked, regardless of how many hours they worked.  When Claimants worked fewer than seven days in a workweek, the pay practice (through the use of Gross-Up Payments) generated the same result—Claimants received compensation equal to or substantially equivalent to their "per day" amount for each day worked, regardless of how many hours they worked.  Therefore, Claimants' weekly compensation was based on the number of days they worked.  Their compensation was not based on the number of hours they worked.

### C.     Did Respondents Pay Overtime Compensation in Accordance with the FLSA?

80.     Respondents did not pay Claimants the overtime premium that the FLSA requires for day-rate workers.  When an employer pays an employee on a day-rate basis, the regular rate is the total compensation received for the week divided by the total number of hours worked during the week.[37]

81.     As explained above, if a day-rate worker receives $4,200 in total compensation for the week and works 84 hours during that week, then the employee's regular rate for that week is $50 ($4,200 / 84 hours).  In this example, the employee is entitled to $25 an hour in overtime pay for the 44 overtime hours.[38]  Stated differently, a day-rate worker has already received 1.0 times his regular rate for each hour worked, in the form of the day rate, so the employee is only entitled to 0.5 times (i.e., half) his regular rate for each overtime hour worked.[39]

---

[37] *See* 29 C.F.R. § 109 ("The regular hourly rate of pay of an employee is determined by dividing his total renumeration for employment … in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid.").

[38] *See* 29 C.F.R. § 778.112 (explaining that one-half of the regular rate is owed for each overtime hour worked).

[39] *See Dufrene*, 207 F.3d at 268.

82.    Respondents owe Claimants overtime compensation, using the method described above, for the Claims that accrued in the applicable limitations period, as explained below.

**D.    Have Claimants Established a Willful Violation?**

83.    The Claims accrued entirely within the third year preceding this action. Accordingly, to recover damages, Claimants must prove that Respondents willfully violated the FLSA.[40]   To meet this burden, Claimants must show that Respondents either 1) "knew" the pay practice resulted in FLSA violations or 2) "showed reckless disregard" for whether the pay practice resulted in FLSA violations.[41]

84.    The Arbitrator concludes that Respondents' pay practices were not willful violations of the FLSA during workweeks in which Claimants worked seven days.  During those workweeks, Respondents should have paid overtime pay in accordance with 29 C.F.R. § 778.112. But Claimants cannot collect damages for those workweeks because the Claims accrued entirely within the third year preceding this action.

85.    The Arbitrator concludes, however, that Respondents showed reckless disregard for whether its pay practices complied with the FLSA during workweeks in which Claimants were issued Gross-Up Payments.  For those workweeks, Claimants are owed overtime pay calculated using the following formula: total compensation for the workweek / total hours worked during the workweek * 0.5 * total overtime hours worked during the workweek.

86.    The Arbitrator reaches this conclusion because the Gross-Up Payments were regularly paid to ensure that Claimants received their promised "per day" amount for each day worked during the workweek.  Respondents did not consult with their legal counsel, Broussard,

---

[40] 29 U.S.C. § 255(a).

[41] *See McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-35 (1998).

regarding the legal implications of making the Gross-Up Payments.  Layton's hearing testimony and Broussard's deposition testimony confirms this fact.  The failure to consult with legal counsel regarding the aspect of a payment plan is not, standing alone, enough to establish a willful violation of the FLSA.

87.     In this case, however, Broussard had already advised Respondents that employees paid on a day-rate basis are entitled to additional overtime pay for any hours that they work over 40 in a workweek.  By paying the Gross-Up Payments (to ensure workers received their "per day" amounts), Respondents showed reckless disregard for whether they were in compliance with the FLSA during those workweeks.

### E.      Have Respondents Established a Good Faith Defense?

88.     Respondents have asserted a good faith defense.[42]  To establish a good faith defense, Respondents must prove the act or omission giving rise to the alleged violation was in "good faith" and that they had "reasonable grounds" for believing the act or omission was not a violation of the FLSA.[43]  If Respondents fail to establish a good faith defense, Claimants are entitled to liquidated damages.[44]  If Respondents establish a good faith defense, the Arbitrator has "sound discretion" to award no liquidated damages, partial liquidated damages, or full liquidated damages.[45]

89.     In this case, the Arbitrator's inquiry is limited to the workweeks in which Respondents issued Gross-Up Payments.  The Arbitrator concludes that the willful finding, as set

---

[42] *See* 29 U.S.C. § 260.

[43] *Id*.

[44] *Id*. § 216(b).

[45] *Id*. § 260.

forth above, precludes Respondents from establishing a good faith defense.[46]  Therefore, Claimants

are entitled to an award of liquidated damages, as explained below.

### F.    Have Respondents Established the HCE Exemption?

90.    Respondents contend Claimants who held the position of Superintendent, General

Foreman, or Foreman are not entitled to overtime pay because they fall within the FLSA's highly

compensated employee exemption ("the HCE Exemption").[47]  The Arbitrator finds that Claimants

were not paid on a salary basis.  As explained above, Claimants were paid on a day-rate basis and

their pay depended on the number of days they worked each week.  The Arbitrator therefore

concludes that Respondents cannot establish the HCE exemption.

### G.    Specific Awards

91.    When calculating damages, the Arbitrator uses the total days worked and total

compensation paid (as set forth in the damages models) for each workweek, for each Claimant,

during his Claims Period.  Pursuant to the Parties' stipulation, the Arbitrator uses 12 hours of work

for each day worked.  The Arbitrator uses the following formula to calculate damages: total

compensation for the workweek / total hours worked during the workweek * 0.5 * total overtime

hours worked during the workweek.[48]

92.    The Arbitrator concludes that 5 Star Electric, LLC and Mammoth Energy Services,

Inc. are jointly and severally liable to each Claimant on the chart below for the back pay and

---

[46] *See Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 513 F.3d 1150, 1166 (11th Cir. 2008) (collecting cases in support of majority rule that a finding of a willful violation precludes a good-faith defense).

[47] *See* 29 C.F.R. § 541.601.

[48] This methodology is consistent with Respondents' Damages Model No. 2.  The Arbitrator notes, however, that Respondents' model does not account for weeks in which Claimants received Gross-Up Payment, Type 1.  The Arbitrator's award accounts for all workweeks in which Respondents issued either type of Gross-Up Payment.

liquidated damages amounts listed next to his name:

| Joint and Several Liability for 5 Star Electric, LLC and Mammoth Energy Services, Inc. | | |
|---|---|---|
| Claimant | Back Pay | Liquidated Damages |
| Billy Cambron | $3,149.99 | $3,149.99 |
| Dennis Conners | $0.00 | $0.00 |
| Billy Franks | $2,769.90 | $2,769.90 |
| Luis Garcia | $4,127.28 | $4,127.28 |
| Daniel Lozoya | $1,100.06 | $1,100.06 |
| Salvador Miranda | $752.31 | $752.31 |
| Abel Miranda | $6,217.94 | $6,217.94 |
| Baltazar Oyervides | $1,833.33 | $1,833.33 |
| Joel Salazar | $1,245.27 | $1,245.27 |
| Saul Sanchez | $3,166.66 | $3,166.66 |
| Enrique Sanchez, Jr. | $1,100.06 | $1,100.06 |
| Michael Springmeyer | $715.15 | $715.15 |
| Jorge Torres | $1,568.50 | $1,568.50 |
| Efrain Villastrigo | $1,600.00 | $1,600.00 |
| Kardeius McClendon | $3,333.34 | $3,333.34 |

93.     The Arbitrator concludes that Higher Power Electrical, LLC and Mammoth Energy Services, Inc. are jointly and severally liable to each Claimant on the chart below for the back pay and liquidated damages amounts listed next to his name:

| Joint and Several Liability for Higher Power Electrical, LLC and Mammoth Energy Services, Inc. | | |
|---|---|---|
| Claimant | Back Pay | Liquidated Damages |
| Michael Drabant | $5,133.63 | $5,133.63 |
| Anthony Eaton | $0.00 | $0.00 |
| Damian Gray | $2,400.01 | $2,400.01 |
| Warren Houston | $3,646.15 | $3,646.15 |
| Brandon McNatt | $233.33 | $233.33 |

| | | |
|---|---|---|
| William Nix | $3,434.06 | $3,434.06 |
| Steve Olivares | $2,291.60 | $2,291.60 |
| Aaron Smith | $0.00 | $0.00 |
| Kendall Smith | $200.00 | $200.00 |
| Terrence Summers | $1,950.19 | $1,950.19 |
| James Thompson | $1,121.12 | $1,121.12 |
| Michael Wallace | $300.00 | $300.00 |
| Casey Waymire | $2,089.50 | $2,089.50 |

94.     The Arbitrator concludes that Mammoth Energy Services, Inc. is liable to Jordan Rodriguez for $800.00 in back pay and $800.00 in liquidated damages.

95.     The Arbitrator concludes that Claimants' attorneys are entitled to an award for attorneys' fees and costs, as permitted under the FLSA.[49]   Claimants shall submit a petition for attorneys' fees and costs on or before March 17, 2023, and Respondents shall submit a response on or before March 24, 2023.  This is a Final Award on all issues submitted to the Arbitrator, except the issues of attorneys' fees and costs.  The Arbitrator shall retain jurisdiction only to decide the issues of attorneys' fees and costs.

SO ORDERED ON MARCH 8, 2023

_____
ARBITRATOR DENNIS CLIFFORD

---

[49] *See* 29 U.S.C. § 216(b).

| | |
|---|---|
| BASULTO et al., | § |
| | § |
|     INDIVIDUAL CLAIMANTS, | §   ARBITRATOR: DENNIS A. CLIFFORD |
| | § |
| V. | § |
| | § |
| MAMMOTH ENERGY SERVICES, INC., | § |
| COBRA ACQUISITIONS, LLC, HIGHER | §   ARBITRATION NOS.: |
| POWER ELECTRICAL, LLC, and 5 STAR | § |
| ELECTRIC, LLC, | §   21:A-001 to 21:B-043 |
| | § |
|     RESPONDENTS. | § |

## **AWARD FOR ATTORNEYS' FEES AND COSTS**

### I.    **Findings of Fact and Conclusions of Law**

1.    On March 8, 2023, the Arbitrator issued a Final Award on all issues except attorneys' fees and costs.  The Parties have fully briefed the issue of attorneys' fees and costs.  The Arbitrator has considered the admissible evidence submitted by the Parties and issues this Final Award addressing attorneys' fees and costs.

2.    Claimants seek $556,234.60 in attorneys' fees and $35,143.37 for costs and expenses.  For the reasons that follow, the Arbitrator awards $439,129.35 in attorneys' fees and $33,652.65 for costs and expenses.

3.    Claimants' attorneys are entitled to an award for reasonable attorneys' fees and costs under the Fair Labor Standards Act ("FLSA").[1]  The Arbitrator applies the lodestar method to determine attorneys' fees.  The Arbitrator first determines the reasonable hourly rates and the number of hours productively spent on the matter.  The Arbitrator then multiplies the applicable rates and hours to arrive at a lodestar amount.  The Arbitrator then accounts for any factors that may warrant a modification of the lodestar amount.

---

[1] *See* 29 U.S.C. § 216(b).

### A.      The Hourly Rates

4.      Claimants submitted the following hourly rates for approval: Douglas Welmaker - $650, Josef Buenker - $650, Aaron Johnson - $575, and Andy Barrett - $150.

#### 1.      Relevant Community

5.      The Parties dispute whether the Arbitrator should look to rates charged by attorneys in Puerto Rico or rates charged by attorneys in Houston and other Texas cities to determine reasonable hourly rates for this matter.  Claimants note that Respondents hired lawyers based in Houston for this matter, thereby demonstrating that it was reasonable to hire Texas-based lawyers who specialize in FLSA matters to litigate the claims at issue.[2]  Claimants also submitted evidence from an experienced wage-and-hour practitioner, Mr. Richard J. (Rex) Burch, regarding the dearth of FLSA litigation in Puerto Rico and the lack of highly experienced FLSA lawyers in Puerto Rico.[3]

6.      Respondents submitted a declaration from Mr. Juan Felipe Santos in an effort to rebut Mr. Burch's testimony.   Mr. Santos is an experienced employment lawyer and the managing partner of Jackson Lewis's office in Puerto Rico.  Mr. Santos explained that many wage-and-hour lawsuits are filed in local court in Puerto Rico and that Puerto Rico has a surplus of attorneys.[4]  Mr. Santos also stated that he has litigated multiple wage-and-hour cases against competent attorneys from the plaintiff's bar in Puerto Rico.[5]

7.      After a careful review of the record, the Arbitrator concludes that Puerto Rico is

---

[2] *See Centurytel of Chatham, LLC v. Sprint Commc'ns Co. LP*, No. CV 09-1951, 2016 WL 4005965, at *9 (W.D. La. July 25, 2016).

[3] Claimants' Ex. C., Burch Decl. ¶¶ 16-18.

[4] Respondents' Ex. B., Santos Decl. ¶ 9.

[5] *Id*. ¶ 10.

not the relevant community from which to determine hourly rates for this dispute.  None of the lawyers in this case regularly practice in Puerto Rico.  Given the complex nature of this dispute, both sides were compelled to hire experienced Texas-based lawyers who specialize in wage-and-hour litigation.  The Arbitrator concludes that Puerto Rico plaintiffs' wage-and-hour bar is not sufficiently broad enough to justify assigning Puerto Rico rates for this matter, particularly in light of the evidence submitted regarding the complexity of this matter and the undesirable nature of the claims (i.e., the two-year statute of limitations had already run and the ability to recover damages required a willfulness showing).[6]  Accordingly, to establish the applicable rates in this matter, the Arbitrator considers rates charged by comparable lawyers in federal courts in Texas, with a particular emphasis on the Dallas-area and Houston-area markets, where the lawyers in this matter regularly practice.

### 2.    Reasonableness of the Rates

8.    Based on the evidence submitted regarding their comparable backgrounds and experience with FLSA matters, the Arbitrator concludes that Mr. Welmaker and Mr. Buenker should have the same rate.  Thus, the Arbitrator has considered evidence regarding Mr. Welmaker's rate when deciding Mr. Buenker's rate.

9.    Claimants submitted evidence attempting to establish that $650 per hour is a

---

[6] *See Esso Standard Oil Co. (Puerto Rico) v. Lopez Freytes*, 577 F. Supp. 2d 553, 557 (D.P.R. 2008) (An out-of-town specialist may command a higher rate for his services if the case requires specialized abilities not amply reflected among local lawyers, or when a specialist was required for the handling of the case and a smaller community does not have one available.); *see also Vieques Conservation & Historical Trust, Inc. v. Martínez*, 313 F.Supp.2d 40, 46 (D.P.R. 2004); *Maceira v. Pagán*, 698 F.2d 38, 40 (1st Cir. 1983).  An out-of-town specialist may also collect such fees when a case is undesirable and capable attorneys within the forum are not willing to prosecute or defend. *R.I. Med. Soc'y v. Whitehouse*, 323 F.Supp.2d 283, 292 (D.R.I. 2004) (citing *Williams v. Poulos*, Nos. 94–2057 & 94–2058, 1995 WL 281451, at *4 (1st Cir. May 12, 1995)).  In ascertaining the rates to be awarded, the district court need not rely on information supplied by the parties, and remains free to utilize its own knowledge of attorneys' fees in the relevant area. *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1190 (1st Cir.1996); *Phetosomphone v. Allison Reed Group, Inc.*, 984 F.2d 4, 8 (1st Cir. 1993).

reasonable rate for Mr. Welmaker.  Mr. Burch testified as follows:

> Having practiced employment law in this market for approximately 25 years, I am aware of the rates charged by other, comparable lawyers. In my experience, $650 an hour is a reasonable rate for a lawyer of reasonably comparable skill, experience, and reputation. Several factors inform this opinion.[7]

10.     Mr. Burch stated his opinion was also based on the fact that Mr. Welmaker accepted a risky case that likely precluded him from working on other cases, the limited number of FLSA attorneys in Puerto Rico, and the fact that Respondents hired one of AMLaw's "Top 50" largest firms in America, Porter Hedges, to defend their interest in this matter.[8]

11.     Mr. Drew Herrmann, an experienced wage-and-hour attorney in the Dallas/Fort Worth area, testified that "$650 hourly rate is reasonable and in line with the market hourly rates charged by other attorneys with similar experience and expertise litigating wage and hour cases."[9] To support his testimony, Mr. Herrmann cited several cases in which federal district courts in Texas found that rates higher than $650 per hour were reasonable.[10]

12.     Mr. Herrmann also testified that the $150 per hour rate charged by Claimants' paralegal, Andy Barrett, is reasonable.[11]  In support, Mr. Herrmann cited several cases in which

---

[7] Claimants' Ex. C., Burch Decl. ¶ 14.

[8] *Id*. at ¶¶ 15-18.

[9] Claimants' Ex. G., Herrmann Decl. ¶ 8.

[10] *Id*. ¶ 7; *see Advanced Physicians, S.C. v. Connecticut General Life Ins. Co*., 2021 WL 6248370, at *6 (N.D. Tex. Dec. 17, 2021) (finding reasonable rates ranging from $537 to $862 per hour in an ERISA action); *Crane v. Rave Rest. Grp., Inc*., No. 4:20-CV-13-ALM, 2022 U.S. Dist. LEXIS 23330, at *13-14 (E.D. Tex. Feb. 9, 2022) (finding hourly rates in Sherman and Dallas Texas area to be similar and approving hourly rates ranging from $925.00 to $600 per hour for partners); *Slipchenko v. Brunel Energy, Inc*., 2015 U.S. Dist. LEXIS 8177, 2015 WL 338358, at *19 (S.D. Tex. Jan. 23, 2015) (noting that billing rates— ranging "from $240-$260 for paralegals, $415-$530 for associates, and $635-$775 for partners—are generally comparable to the rates charged by the Texas-based defense counsel in this action" and are rates courts have regularly approved "for representing Claimants in class action litigation").

[11] Claimants' Ex. G., Herrmann Decl. ¶ 9.

courts found paralegal rates higher than $150 per hour were reasonable.[12]

13.     Another attorney, Mr. Allen Vaught, provided testimony explaining that, in 2016, a court in the Norther District of Texas entered an order in an FLSA case finding that an attorney with 16 years of experience had a reasonable hourly rate set at $655 per hour.[13]

14.     Mr. Welmaker provided a declaration in which he chronicled many of his prior fee awards over the past several years, culminating in an approval of $525 per hour on January 10, 2022.[14]  In his declaration, Mr. Welmaker also explains that this matter was one of the most difficult cases that he has ever faced, and that it nearly caused him to shut down his law practice altogether.[15]  Mr. Welmaker's declaration also provides that Mr. Buenker's and Mr. Johnson's hourly rates are reasonable given their experience, skill, and years of practice handling employment and FLSA cases.[16]

15.     Respondents submitted rebuttal evidence and argument regarding the appropriate hourly rates for this matter.  As noted above, Mr. Santos testified that Puerto Rico is the appropriate locale for rate setting, and that rates generally top out at $400 per hour in Puerto Rico.[17]

16.     Respondents also submitted a declaration from Mr. Eric D. Wade.  Mr. Wade is an experienced attorney at Porter Hedges, and he is familiar with rates in the Houston area.  He supports Mr. Santos's testimony.  He also points out that, in the alternative, if jurisdictions outside

---

[12] *Id.*; *see Indus. Print Techs., LLC v. Cenveo, Inc.*, No. 3:15-md-02614-M, 2020 U.S. Dist. LEXIS 156538 (N.D. Tex. June 12, 2020) ($225 per hour); *Tech Pharm. Servs., LLC v. Alixa Rx LLC*, 298 F. Supp. 3d 892, 906-07 (E.D. Tex. 2017) ($150.00 to $250.00 per hour); *Crane v. Rave Rest. Grp., Inc.*, No. 4:20-CV-13-ALM, 2022 U.S. Dist. LEXIS 23330, at *13-14 (E.D. Tex. Feb. 9, 2022) ($195.00 per hour).

[13] Claimants' Ex. F., Vaught Decl. ¶ 23; *see Areizaga v. ADW Corp.*, No. 3:14-cv-2899-B, 2016 WL 3406071, at *4 (N.D. Tex. June 21, 2016).

[14] Claimants' Ex. A., Welmaker Decl. ¶ 5.

[15] Claimants' Ex. A., Welmaker Decl. ¶ 14.

[16] *Id.* at ¶ 17.

[17] Respondents' Ex. B., Santos Decl. ¶¶ 12-13.

of Puerto Rico are considered, then a reasonable hourly rate for Mr. Welmaker may be more in line with recent awards he received in May 2020, May 2021, and January 2022, which were in the range of $500 - $525.[18]  Mr. Wade also notes that the $650 per hour rate advanced by Claimants would constitute a 25 percent annual increase from the rates that were recently approved for Mr. Welmaker.[19]

17.     The Arbitrator concludes that the reasonable hourly rates for this matter are as follows:

| Name | Hourly Rate |
|---|---|
| Douglas Welmaker, JD | $585 |
| Josef Buenker, JD | $585 |
| Aaron Johnson, JD | $485 |
| Andy Barrett, Paralegal | $150 |

18.     These rates are comparable to recent fee awards obtained by Claimants' counsel in wage-and-hour cases in federal courts in the Northern, Western, and Southern Districts of Texas, with an increase to account for inflation and the complexity of this matter.  The Arbitrator notes that a considerable amount of the work performed in this case occurred throughout 2022, and the rates approved by the Arbitrator in this matter constitute a 10 percent increase from the rate approved by Judge Counts for Mr. Welmaker in *Garcia v. Grist, et al.*, 7:20-cv-093-DC, Dkt. 23 (W.D. Tex. May 27, 2021).

19.     The Arbitrator's conclusion is also based on the above-cited decisions in which federal courts in Texas have approved rates higher than the rates approved by the Arbitrator in this matter.  In reaching this decision, the Arbitrator has taken into account all evidence submitted, including but not limited to the evidence cited above regarding prior rate approvals, the dearth of

---

[18] Respondents' Ex. C., Wade Decl. ¶¶ 18-20.

[19] *Id.* ¶ 20.

FLSA litigation in Puerto Rico, the lack of highly-experienced FLSA lawyers in Puerto Rico, and the complexity of this matter.

### B.    The Hours Worked

20.    Mr. Welmaker's declaration states that he did not bill for all of the time that he spent working on this matter, and even though his law partners spent a significant amount of time consulting with him on the case, neither of them recorded any of their time for doing so.[20]  Mr. Welmaker also wrote off approximately five percent of his billings to account for time that was possibly unnecessary or duplicative.

21.    Respondents argue that time spent working on behalf of Claimants who dropped their claims or were dismissed for failure to participate in discovery is not recoverable.  The Arbitrator agrees with Respondents, but the Arbitrator notes that Mr. Welmaker has already reduced his fee request by five percent to account for unnecessary or duplicative work, and he (and his partners) did not bill for all hours worked on this matter.  After carefully reviewing the record, the Arbitrator concludes that Mr. Welmaker's time should be reduced by 20.5 hours to account for the fact that some Claimants dropped their claims or were dismissed for failure to participate in discovery.  The Arbitrator also considers this factor when deciding whether to adjust the fee amount, as explained further below.

22.    Respondents also argue that a downward adjustment is warranted for travel time. The Arbitrator agrees.  Mr. Welmaker recorded 39.5 hours for travel time and Mr. Buenker recorded what appears to be approximately one hour for travel time.  Mr. Welmaker billed for his travel time at a reduced rate of $400 per hour, and Mr. Buenker billed his travel time at his regular rate.  The Arbitrator concludes that Mr. Welmaker and Mr. Buenker's non-working travel time

---

[20] Claimants' Ex. A., Welmaker Decl. ¶ 9.

should be $275 per hour, an amount that is slightly less than half of their approved hourly rates. This reduction is consistent with the approach taken by numerous courts.[21]

23.    After carefully reviewing all of the billing records, the Arbitrator concludes that all other hours billed on this matter were for productive purposes.  Therefore, the Arbitrator concludes the following rates and hours shall apply for purposes of establishing a lodestar number:

| Name | Hourly Rate | Hours | Lodestar Amount |
|---|---|---|---|
| Douglas Welmaker, JD | $585 | 728.4 | $426,114 |
| | Travel - $275 | Travel - 39.5 | $10,863 |
| Josef Buenker, JD | $585 | 32.4 | $18,954 |
| | Travel - $275 | Travel - 1.0 | $275 |
| Aaron Johnson, JD | $485 | 18.6 | $9,021 |
| Andy Barrett, Paralegal | $150 | 151.3 | $22,695 |
| | | | **$487,922** |

### C.    Factors Warranting an Increase or Reduction of Fees

24.    There is a strong presumption the lodestar number is the reasonable fee.[22] However, courts have articulated factors that may be considered when deciding whether the lodestar number should be adjusted upward or downward.  Relevant factors include but are not limited to: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill required to perform the legal service properly; (4) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer; (5) the fee customarily charged in the locality for similar legal services; (6) the amount involved and the results obtained; (7) awards in similar cases; (8) the time limitations imposed by the client or the circumstances; (9) the nature and length of the professional relationship with the client; (10) the

---

[21] *See Hilton v. Executive Self Storage Associates, Inc.*, No. No. H-06-2744, 2009 WL 1750121, *12 (S.D. Tex. June 18, 2009); *Bd. of Supervisors of La. State Univ. v. Smack Apparel*, No. 04–1593, 2009 WL 927996, at *6 (E.D. La. Apr. 2, 2009) ("[T]ravel time ... is usually compensated at 50% of actual time.").

[22] *See Perdue v. Kenny A.*, 559 U.S. 542, 552 (2010).

undesirability of the case; (11) the experience, reputation, and ability of the lawyer performing the services; and (12) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.  The Arbitrator has discretion to enhance or decrease the award based on these various factors.

25.    Claimants do not seek an upward adjustment of the lodestar amount, and Respondents submitted evidence and argument attempting to establish that a downward adjustment is appropriate because Claimants did not segregate their fees, the fees customarily charged in Puerto Rico allegedly top out at $400 per hour, three Claimants did not recover any damages, several Claimants dropped their claims, and several Claimants obtained small awards.

26.    The Arbitrator has reduced the compensable time by 20.5 hours to account for the fact that several Claimants dropped their claims or were dismissed, so the Arbitrator will not further reduce the award for solely those reasons.  Similarly, for the reasons articulated above, the Arbitrator declines to further reduce the fee award to account for rates typically charged in Puerto Rico.  The Arbitrator also declines to further reduce the fee award based solely on the fact that some Claimants obtained small awards.[23]

27.    However, the Arbitrator agrees with Respondents that a reduction is warranted to account for the degree of success obtained, which includes consideration of the fact that the billings were not fully segregated, some Claimants dropped their claims or were dismissed, some Claimants obtained small awards, and three Claimants did not recover any damages.  In light of these facts, the Arbitrator exercises his discretion to reduce the lodestar amount by 10 percent.

---

[23] *See Singer v. City of Waco, Tex.*, 324 F.3d 813, 829-30 (5th Cir. 2003) (upholding trial court's decision to not reduce fee in case where plaintiffs sought $5 million in damages but only recovered $180,000; *Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 392 (5th Cir. 2000) ("while a low damages award is one factor which a district court may consider in setting the amount of attorney's fees, this factor alone should not lead the district court to reduce a fee award.").

### D.   Recoverable Costs and Expenses

28.   Claimants seek costs and expenses totaling $35,143.37 for various expenditures including case filing, process service, arbitration filing, printing, airfare, hotels, parking, uber/taxis, meals, and software purchased specifically for this case.

29.   Respondents contend the expenditures are not recoverable unless they fit within one of the categories listed under 28 U.S.C § 1920.  There is a split of authority on this issue, and the Arbitrator agrees with the cases holding that travel and related expenses are recoverable in FLSA cases.[24]  However, the Arbitrator agrees the expenses for software purchased for this case and other case-specific services are not recoverable.   These expenses include EZ Texting (software), Upwork (spreadsheets), Trialpad (software), and Reflector (software).  In addition, the process-service charge for the enforcement proceeding is not recoverable in this arbitration.  These expenses total $1,490.72.   The Arbitrator concludes that all other costs and expenses are reasonable and necessary.

## II.   Conclusion

30.   The Arbitrator awards Claimants' counsel a total of $439,129.35 in attorneys' fees and $33,652.65 in costs and expenses.  For the reasons articulated in this award and the prior award:

> a.   Respondents 5 Star Electric, LLC and Mammoth Energy Services, Inc. are jointly and severally liable for $254,989.57 in attorneys' fees and $19,541.11 in costs and expenses.

---

[24] *See Calderon v. Witvoet*, 112 F.3d 275, 276 (7th Cir. 1997) (travel and related expenses were recoverable not as costs, but as expenses, because they were the type of expense that a lawyer normally includes with a bill for professional services); *see also Herold v. Hajoca Corp.*, 864 F.2d 317, 323 (4th  Cir. 1988) (where attorney's fees are expressly authorized as they are in 29 U.S.C. § 216(b), trial court is not limited to Rule 54(d), but has authority to include litigation expenses as part of a reasonable attorney's fee).

b.     Higher Power Electrical, LLC and Mammoth Energy Services, Inc. are jointly and severally liable for $177,897.64 in attorneys' fees and $13,633.17 in costs and expenses; and

c.     Mammoth Energy Services, Inc. is liable for $6,242.13 in attorneys' fees and $478.37 in costs and expenses.

31.    The awarded fees and costs and expenses shall accrue at a post-award interest rate of 4.75% through the time that the awarded amounts are paid in full.[25]

32.    The Parties agreed that any award rendered during the arbitration shall remain confidential.  Accordingly, the Arbitrator deems this Award (and the Award issued on March 8, 2023) as confidential and reminds the Parties to abide by their agreement regarding confidentiality.

33.    The Award issued on March 8, 2023, attached hereto, and incorporated by reference, was intended to be and was a Final Award on all issues except attorneys' fees and costs.

34.    This is a Final Award on attorneys' fees and costs.

35.    The Arbitrator has no remaining jurisdiction on any issues.

SO ORDERED ON MAY 19, 2023

_____
ARBITRATOR DENNIS CLIFFORD

---

[25] *See* 28 U.S.C. § 1961, 18 U.S.C. § 3612, and 40 U.S.C. § 258(e)(1).

11