IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| AARON MALDONADO, *et al.*, § <br> § <br> *Plaintiffs*, § <br> § <br> v. § <br> § <br> MAMMOTH ENERGY SERVICES, § <br> INC., COBRA ACQUISITIONS, LLC, § <br> HIGHER POWER ELECTRICAL, LLC, § <br> and 5 STAR ELECTRIC, LLC, § <br> § <br> *Defendants*. § | Case No. 5:21-cv-00085-OLG |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants Mammoth Energy Services, Inc. ("Mammoth"), Cobra Acquisitions, LLC, ("Cobra"), Higher Power Electrical, LLC ("HPE"), and 5 Star Electric, LLC ("5 Star") (collectively, "Defendants") file this Motion for Summary Judgment against Plaintiffs[1], and in support thereof would show as follows:

### ISSUE PRESENTED

Whether Plaintiffs' claims are barred by the two-year statute of limitations under the Fair Labor Standards Act ("FLSA") where **no evidence** suggests that Defendants acted "willfully" to *allegedly* violate the FLSA and, instead, the evidence conclusively demonstrates that Defendants took affirmative steps—actions that were not required—to ensure compliance with the FLSA when they consulted with an employment law expert to develop the hourly with overtime compensation plan promulgated to pay Plaintiffs.

---

[1] Since the filing of this lawsuit, 56 Plaintiffs have been dismissed. *See* Dkts. 15, 36. Defendants have moved to dismiss Jimmie Moore, Jr. for failure to prosecute, which is currently pending. Dkt. 38. The remaining Plaintiffs are Jose Aponte, Bryan Duff, Jorge Espinell, Gerardo Garcia, Benjamin Hargrove, Aaron Maldonado, Kevin Pearson, Donald Roberts, Miguel Rosario, and Juan Santiago.

**SUMMARY OF ARGUMENT**

Plaintiffs were hired by Cobra, HPE, and 5 Star to restore power in Puerto Rico following two devastating hurricanes in 2017 and initiated this action under the FLSA against Defendants for an alleged failure to pay overtime wages on a purported day rate.  To the contrary, Plaintiffs' pay records conclusively demonstrate that they were paid hourly with overtime and received all compensation to which they were entitled under the FLSA.

Plaintiffs' claims are time barred by the applicable two-year statute of limitations, which applies to FLSA unpaid overtime compensation claims.  However, if an employer's statutory violation was willful, a three-year statute of limitations applies. 29 U.S.C. § 255(a); *Singer v. City of Waco,* 324 F.3d 813, 821 (5th Cir. 2003).  Here, it is undisputed that all the Plaintiffs in this case failed to join the lawsuit within two years of the end of their respective employment with Defendants so they must show evidence of willfulness to survive summary judgment.

The summary judgment evidence conclusively establishes that Defendants consulted outside counsel in developing their pay plan.  Plaintiffs have no evidence Defendants acted willfully.  Thus, Defendants are entitled to summary judgment on this issue that Plaintiffs' claims are barred by the applicable two-year statute of limitations.

**FACTUAL BACKGROUND**

In early September 2017, Hurricane Irma devastated Puerto Rico as a category five storm. Buildings were destroyed and lives were lost.  *See* Ex. 1, Mark Layton Dec. at ¶¶3, 5.  A few short weeks later, Hurricane Maria made a direct hit on Puerto Rico as a category four hurricane, causing additional catastrophic damage to the island, exacerbated by an enormous storm surge and high winds.  Ex. 1, Layton Dec. at ¶3.  In particular, the entire electrical grid, which was already decaying and in need of repair, was decimated.  *Id*. at ¶4.  The island had no power, 95% of the

2

cell towers were down, 50% of the island had no running water, and sewage was running down the streets of San Juan.  *Id*.  Without power, the island could not even begin to repair the devastation.  *Id*. at ¶5.  It was a humanitarian crisis that ultimately resulted in over 2,900 deaths and more than $90,000,000,000.00 in damage.  *Id*.

Cobra is an infrastructure services company that provides maintenance and repair services to utilities.  *Id*. at ¶3.  Shortly after the storm, Cobra executives met with Puerto Rican officials to offer assistance in restoring the electricity–a critical task to provide relief to Puerto Rican citizens.  *Id*. at ¶6.  These meetings culminated in Cobra and the Puerto Rico Electrical Power Authority ("PREPA")[2] entering a contract on October 19, 2017, for Cobra to restore power.  *Id*. at ¶6.

Cobra immediately commenced tackling logistical hurdles to restore power in what was comparable to a military deployment.  Ex. 1, Layton Dec. at ¶7.  This included acquiring and deploying hundreds of bucket trucks and other work vehicles from ports across the country.  *Id.* at ¶7.  Cobra also had to secure and deliver the equipment to perform the work, which was delivered by barge and Antonov (the largest aircraft in the world).  *Id.* at ¶7.  Cobra secured housing for workers by chartering two large barges that could each sleep hundreds.  *Id*.  Cobra also contracted with two of its affiliated companies, HPE and 5-Star, to provide workers and equipment to perform the work.  *Id*.  Because lives were at stake, time was of the essence to restore power.  *Id*.  An advance team arrived within days of the contract being signed and equipment and repairmen started arriving within a week.  *Id*. at ¶8.

While Cobra worked through this logistics fire drill, HPE and 5-Star had to recruit personnel to perform the work and ascertain how to pay the employees.[3]  Ex. 1, Layton Dec. at ¶8.

---

[2] PREPA is a governmental entity responsible for maintenance and operation of the power grid in Puerto Rico.
[3] Storm response companies do not employ hundreds of linemen and related positions on standby for storm recovery work.  Typically, most crews are occupied with existing customers.  As a result, the companies must go out and recruit employees to respond large-scale storm events.

3

15500435

At that time, Keith Ellison ("Ellison"), then-President of Cobra, developed the daily labor budgets for the various classifications of linemen who would be working in Puerto Rico. *Id*. at ¶9. These budgeted amounts were then listed on the wage scale that was being used for recruiting. *Id*. The wage scale was a target amount of compensation that was enough to draw interest to go work in a very demanding environment while also maintaining some profit margin. *Id*. The wage scale contained amounts ranging from $600 to $1,400 per day worked. *Id.*; Ex. 4. This was considerably more than linemen and similar laborers earn in the continental United States. Ex.1, Layton Dec. at ¶9.

The day after creating the labor budgets and wage scale, Ellison, HPE, and 5-Star turned to Mammoth Energy, Inc. ("Mammoth Inc.") for assistance in developing a pay plan that closely mirrored the rates in the wage scale and complied with the FLSA. *Id*. at ¶10. Mammoth provides back-office support services to Cobra, 5-Star and HPE pursuant to a shared services agreement. *Id*. For example, Mammoth Inc. provides accounting and human resources support to those entities as needed, and those expenses are then charged back to the respective entities. *Id*.

Ellison established the target amounts of pay for the workers and then looked to Mammoth Inc. to develop the actual pay plan. Ex. 1, Layton Dec. at ¶9. Ellison did not know the specifics of how the workers would be paid, so long as they earned wages close to the targeted amount. *Id*. at ¶11. Ellison told Chief Financial Offer Mark Layton ("Layton") that it was his responsibility to figure out how to pay employees and sort out the details, while Ellison focused on the remaining logistical tasks to get the project moving, such as securing and deploying equipment. *Id.*

Layton directed Mammoth Inc.'s Director of Human Resources Jeff Beagle ("Beagle") to confer with outside counsel to develop a compliant pay practice that would pay at or near the target

rates.[4]  *Id.* at ¶12; Ex.3, Broussard Depo. at pp. 12-13.  On October 18, 2017, Beagle contacted attorney Steve Broussard of Hall Estill, a 150-lawyer firm headquartered in Tulsa, Oklahoma.[5] Ex.2, Beagle Dec. at ¶4; Ex.3, Broussard Depo. at p. 13.  Broussard practiced employment law for over thirty years and had considerable expertise with wage and hour matters.  Ex. 3, Broussard Depo. at p.6.

Over the next several weeks, Beagle and Broussard (sometimes Layton) discussed and evaluated numerous pay plans, sometimes speaking multiple times per day.  *See* Ex.2, Beagle Dec. at ¶4, Ex. 4, Broussard Dec. at ¶4; Ex. 6, Layton Depo. at pp. 53-55.  This was an iterative process where the benefits and drawbacks of differing pay practices were discussed.  Ex.1, Layton Dec. at ¶13; Ex. 6, Layton Depo. at p. 55. Various spreadsheets Beagle created with different pay plans were circulated among the group.  Ex. 1, Layton Dec. at ¶13; Ex. 4, Broussard Dec. at ¶4; Ex. 6, Layton Depo. at p. 55.  Beagle initially explored paying the employees based on a day rate.  Ex.1, Layton Dec. at ¶12.  Broussard responded that Defendants could do so, but they would have to pay overtime on top of the day rate—and he explained how the calculation of overtime on a day rate could be accomplished.  *Id*.  After discussing a day rate plan with operational management, Defendants quickly pivoted to an hourly plus overtime pay plan that would approximate daily rates contained in the wage scale, provided employees worked the anticipated weekly schedule.  *Id*.; Ex.4, Broussard Dec. at ¶ 4; Ex.2, Beagle Dec. at ¶5; Ex.6A, Layton Depo. pp. 85-86.

Ultimately a pay plan was chosen utilizing an anticipated schedule of seven days a week and sixteen-hour days. Ex.1, Layton Dec. at ¶13.  Using this schedule and the daily labor budgets for each position, Defendants derived hourly rates for each position such that if an employee

---

[4] Beagle was a human resources specialist with over a decade of experience in human resources matters, including wage and hour compliance.
[5] https://www.hallestill.com/ (last visited August 2, 2024).

worked the anticipated weekly schedule at hourly and overtime rates, they would earn on average an amount that closely approximated the amounts budgeted in the wage scale. *Id*. Due to the hourly and overtime nature of the pay plan, a worker would not earn the daily amounts listed in the budged wage scale for any single day worked. *Id*.

It was expected that the workers would typically work daylight hours, or roughly twelve hours a day. Ex. 1, Layton Dec. at ¶14. However, workers were expected to work or be on call for sixteen hours a day, each day worked. *Id*. As Beagle explained at the time, if they worked over sixteen hours, Defendants would pay them for the extra hours. Ex.2, Beagle Dec. at ¶5.

Notably, sixteen-hour shifts and seven days a week are industry practice for storm work. Ex. 1, Layton Dec. at ¶14. The significance of the sixteen hours is that hours worked beyond sixteen trigger rest time requirements under Department of Transportation ("DOT") and Occupational Safety and Health Administration ("OSHA") regulations. Ex.2, Beagle Dec. at ¶5; Ex. 1, Layton Dec. at ¶14. While DOT and OSHA requirements are generally suspended during a national emergency, the sixteen-hour limits are a natural cap on the hours worked per day. Ex.1, Layton Dec. at ¶14. Beyond the legal requirements, safety was important to the companies and working more than sixteen hours in a day could become unsafe. *Id.* at ¶14. When deciding to establish sixteen-hour shifts, the intent was to make sure Defendants paid for hours worked, even if that meant paying more. Broussard advised on this particular topic, and this is one of the reasons shifts were set at sixteen hours. *Id*.

Broussard, Beagle, and Layton determined an hourly rate for sixteen-hour shifts that would account for expected overtime and closely approximate, albeit not match, the targeted rates. *Id*. at ¶12. Specifically, Beagle assumed that an employee worked sixteen hours a day, seven days a week, for a total of 112 hours per week. Ex.2, Beagle Dec. at ¶6. Accounting for forty hours of

regular time and seventy-two hours of overtime at a time-and-a-half premium, Beagle then established an hourly rate scale that would approximate the target rates. *Id*. at ¶6.

Beagle sent Broussard an email with the foregoing calculations, and they later discussed the mechanics of the plan. Ex.2, Beagle Dec. at ¶7. Beagle indicated in an email to Broussard that the purpose of the review was "**to ensure we fall within FLSA boundaries.**" Ex.7, Email from Beagle to Broussard at pp. 2-3 (emphasis added). Broussard understood the purpose of the calculations was to adopt one of the pay plans discussed and comply with the FLSA. Ex.4, Broussard Dec. at ¶ 4; Ex.2, Beagle Dec. at ¶4; Ex.3, Broussard Depo. at p. 38; Ex.6A, Layton Depo. at p. 53.

At the same time, HPE and 5-Star were out recruiting linemen, mechanics, and other workers to deploy to Puerto Rico. Ex. 1, Layton Dec. at ¶15. Given the humanitarian crisis, Defendants focused on providing much needed relief while the details of the pay practice were solidified. *Id*. Both companies advertised and informed candidates about the target amount of pay they could expect, which was subject to an offer letter and additional details upon hire. *Id*.

Beagle also sent Broussard a draft offer letter. Ex.2, Beagle Dec. at ¶8; Ex.4, Broussard Depo. at pp. 18-19. The offer letter advised employees that the "goal [was] to work 12 hours a day," but, as customary with storm work, "certain situations [could] arise that could require longer hours, but not to exceed 16 hours." Ex.2, Beagle Dec. at ¶8; Ex.5 (Offer Letter). The offer letter further explained that they could earn a target amount for each day worked which would be paid "hourly" over a sixteen-hour shift. Ex.2, Beagle Dec. at ¶8; Ex.5 (Offer Letter). Broussard reviewed the offer letter and made suggestions to Beagle about its contents. Ex. 3, Broussard Depo. at pp. 21-22, 38-39; Ex.1, Layton Dec. at ¶15. With the offer letter approved, Beagle then

7

15500435

disseminated that information to senior leadership of HPE and 5-Star as well as various administrative personnel for implementation. Ex.2, Beagle Dec. at ¶7.

Based upon the hourly rate calculations derived to approximate the target amounts approved by Broussard, Beagle prepared the following scale, showing the hourly plan inclusive of overtime ultimately used to set Plaintiffs' compensation:

| Position | Targeted Pay Rate Per Day | Regular Hourly Rate (up to 40 hours per week) | Overtime Rate (hours worked over 40 per week) | Weekly Wage (7 days at 16 hours per day; 40 Regular Rate hours and 72 Overtime Rate hours) |
|---|---|---|---|---|
| Foreman | $1,250.00 | $59.12 | $88.68 | $8,749.76 |
| Journeyman Lineman | $1,000.00 | $47.30 | $70.95 | $7,000.40 |
| Class A Lineman | $900.00 | $42.57 | $63.86 | $6,300.72 |
| Class B Lineman | $800.00 | $37.84 | $56.76 | $5,600.32 |
| Hot Apprentice | $700.00 | $33.11 | $49.67 | $4,900.64 |
| Apprentice/ Groundsman | $600.00 | $28.38 | $42.57 | $4,200.24 |

Ex.2, Beagle Dec. at ¶6.

All employees 5-Star and HPE ultimately hired were given offer letters informing them of the anticipated schedule, pay details, and orientation seminars in either Texas, Kentucky, or occasionally Puerto Rico. *See* Ex.1, Layton Dec. at ¶16; *see also*, *e.g.*, Ex.14, Executed Offer Letter of Named-Plaintiff Aaron Maldonado. The orientation included information regarding safety, housing, and related human resources matters. Ex.1, Layton Dec. at ¶15. Notably, employees were advised at every orientation that they would be paid hourly with overtime, and that such hourly with overtime payments would result in their earning close to the target rate of compensation. *Id*. at ¶15.

As the Plaintiffs' pay records indicate, employees were paid in accordance with this plan. Employees worked or were on call to work sixteen hours per day. *Id.* at ¶14. The employees were then paid hourly with overtime for all hours worked in excess of forty in a workweek. *See* Ex.8. It is undisputed that the paystubs reflect that Plaintiffs were paid hourly with overtime. *Id.* Additionally, Plaintiffs' earnings statements all reflect the "pay basis" was "hourly." *See generally* Ex.8.

Perhaps the most obvious indication that Plaintiffs were not paid a day rate is the fact that their compensation generally did not equal whole numbers as would be expected if they were actually paid the targeted day rates (*e.g.*, $600.00, $700.00, $800.00). For example, during the two-week period from April 2, 2018, through April 15, 2018, Named-Plaintiff Aaron Maldonado's pay records reflect that he was paid a "regular" rate of $47.30 for 80 hours and 144 hours of "overtime" at a rate of $70.95, for a total of $14,000.**80**:

## Earnings Statement

AARON MALDANADO

| Pay Date: | 04/20/2018 | Company: 0UB44 - 5 STAR ELECTRIC LLC | Emp #: A4B9 |
| --- | --- | --- | --- |
| Period Start: | 04/02/2018 | 170 BEAN CEMETERY RD | Dept: PR - Puerto Rico |
| Period End: | 04/15/2018 | MADISONVILLE  KY  42431   (405) 608-8191 | Pay Basis: Hourly |

| | Rate | Hours/Units | Current Period | Year To Date |
| --- | --- | --- | --- | --- |
| **Earnings** | | | | |
| Regular | 47.30 | 80.00 | 3784.00 | 7476.20 |
| Overtime | 70.95 | 144.00 | 10216.80 | 18588.90 |
| Day Rate | | | 0.00 | 127.70 |
| **Gross** | | 224.00 | 14000.80 | 26192.80 |

Ex.8C at p. 124, Maldonado's Earnings Statement.

This payroll record is in line with the pay scale Beagle developed with Broussard. If Maldonado was paid a $1,000.00 day rate as he contends, his compensation would reflect $14000.**00**—a whole number and no cents ($1,000 x 14 days). To be sure, the breakdown of

weekly hours—regular and overtime—further illustrates that it was not mathematically possible for Maldonado to earn $1,000.00 per day:

|       | Total Pay  | Regular Pay                          | Overtime Pay                         |
|-------|------------|--------------------------------------|--------------------------------------|
| Day 1 | $756.80    | (16 hours * $47.30) = $756.80        | $0                                   |
| Day 2 | $756.80    | (16 hours * $47.30) = $756.80        | $0                                   |
| Day 3 | $946.00    | (8 hours * $47.30) = $378.40         | (8 hours * $70.95) = $567.60         |
| Day 4 | $1,135.20  | $0                                   | (16 hours * $70.95) = $1,135.20      |
| Day 5 | $1,135.20  | $0                                   | (16 hours * $70.95) = $1,135.20      |
| Day 6 | $1,135.20  | $0                                   | (16 hours * $70.95) = $1,135.20      |
| Day 7 | $1,135.20  | $0                                   | (16 hours * $70.95) = $1,135.20      |
| **TOTAL** | **$7,000.40** | **$1,892.00**                  | **$5,108.40**                        |

Basic mathematical principles illustrate the fatal flaw in Plaintiffs' theory.

It was later noted by Beagle and another employee that when employees did not work a full seven days in a work week, the hourly with overtime earnings did not equal the target rate of compensation. Ex.1, Layton Dec. at ¶17; Ex. 2, Beagle Dec. at ¶9. The reason for the shortfall is there were not enough overtime hours to get to the target amount. Ex. 2, Beagle Dec. at ¶9. Defendants recognized that this scenario created an increase in Defendants' profit margin, so Beagle explained that Defendants had the option, but not the obligation, to pass on the savings to the employee by paying discretionary bonuses in short weeks to meet the targeted amount of compensation for one day of work. *Id*.; Ex.1, Layton Dec. at ¶17. Such payments were discretionary and made by the leadership on the island. Ex. 2, Beagle Dec. at ¶9. The rationale was to keep the employees' morale and employee relations high through the tumultuous humanitarian crises. Ex. 1, Layton Dec. at ¶17. Employees generally worked a full seven (7) days, and this situation typically only arose when the employee deployed to the island or left

employment. *Id*. In total, less than 2% of the work weeks included these discretionary payments. *Id.*; Ex.15A, 1006 Summary at ¶10.

In many instances, Defendants elected not to make these payments when an employee worked less than a full week. Ex. 1, Layton Dec. at ¶17; Ex. 2, Beagle Dec. at ¶10. For example, if an employee did not work a full work week due to the employee's own malfeasance, such as being suspended or missing work, Defendants would not make the discretionary payments. Ex. 1, Layton Dec. at ¶17. The undisputed evidence is that management retained the right to decide whether to make these payments. Ex. 2, Beagle Dec. at ¶10. Employees who did not work an entire week because of the employee's own misconduct or scheduling issues did not receive the discretionary payments, and the pay stubs reflect numerous instances where the bonuses were not paid. *Id.*

For example, the pay stubs of two employees, Dennis Moore and Corey Barner, both dated July 13, 2018, reflect that both Moore and Barner worked less than the 112 anticipated hours in the work week. Ex.9, Pay stubs of Moore and Barner. The pay stubs reflect that they both worked a total of 96 hours comprised of 40 regular hours and 56 overtime hours. *Id.* at p. 1; Ex.2, Beagle Dec. at ¶11. Moore's pay was adjusted up, but Barner did not receive an adjustment. *Id.*; Ex.2, Beagle Dec. at ¶11. The fact that the payments were made in some instances and not others reflects the discretionary nature of the additional compensation. Ex.2, Beagle Dec. at ¶11.

In another example, Moore's pay records dated May 18, 2018, demonstrate he was credited with working 208 hours, comprised of 80 regular hours and 128 overtime hours. *Id*. at ¶12; Ex.9 at p. 2. On another paystub received, Cody Johnson was credited with working the same number of regular and overtime hours as Moore, but Moore received an adjustment which Johnson did not.

*Id*. at ¶12; Ex.9 at p. 4.  Again, this is a further reflection of the discretionary nature of the payments, as it was not a guaranteed part of the compensation plan. *Id*. at ¶12.

Additional pay records reflect numerous other instances where two colleagues worked the same hours and received different treatment.  *See* Exs. 9-12 (Paystub Analyses of Dennis Moore, Cody Johnson, Lawrence Williams, Jr., and Juan Zamora, Jr.).  In each instance, one employee received a discretionary payment to adjust his compensation upward and one did not.  *See id*.  These records offer further support for the conclusion that these adjustments were discretionary and not guaranteed or paid to everybody who worked a short week.

In addition, these pay stubs are reflective of the pay plan that Beagle designed in consultation with Broussard.  Ex.2, Beagle Dec. at ¶14.  The documents show the hourly and overtime pay plan with discretionary adjustments to a budgeted figure as set forth by the leadership on the island.  *Id*.

Although Defendants promulgated an approved and compliant pay plan based on hourly compensation plus overtime, there were occasional payroll processing errors.  James Kinsey, who was responsible for entering time into the payroll system, on a few rare occasions shortcut the payroll procedures and entered a "hard code" for an amount of money instead of entering the number of hours worked to generate that amount of pay.  For instance, during the period of May 14, 2018 through May 20, 2018, Kinsey hard coded $1,000.00 for Maldonado instead of entering the hours he worked during the shifts that week. Ex.13, Maldonado's Time Detail Report at p. 2.  Kinsey's errors resulted in overpayments to employees.  Notably, **Kinsey was ultimately terminated for these very errors he made while processing Plaintiffs' compensation.** Ex.6A, Layton Depo. at p. 115.[6]

---

[6] Defendants' exhibits that exceed the filing system's 200-page maximum are divided into subparts A, B, and C.

15500435

In the summer of 2018, Cobra entered a subsequent contract with PREPA as the project moved from emergency response to the recovery phase. Ex. 1, Layton Dec. at ¶18. With the new contract effective July 23, 2018, the hourly compensation structure was changed, and employees worked twelve-hour shifts (instead of sixteen-hour shifts) and six days per week (instead of the full week). *Id*. **It is undisputed that the Plaintiffs are not seeking damages beyond the effective date of the new contract, July 23, 2018**.

More than two years later, on February 2, 2021, Plaintiffs filed this Complaint against Defendants under the FLSA. Dkt. 1. While Plaintiffs now claim that they are entitled to overtime, not one ever complained about their manner of compensation until this lawsuit, presumably because the employees were being paid overtime while making more money than any had in their entire lives. Ex.1, Layton Dec. at ¶17. Defendants believed (and continue to believe) that the pay practice complies with the FLSA. Ex.2, Beagle Dec. at ¶7.

## ARGUMENT AND AUTHORITIES

**I.     Applicable Rule 56 Legal Standard**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with `specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.,* 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted). The nonmovant "must identify specific evidence in the record and articulate the `precise manner' in which the evidence" aids their *case. Shah v. VHS San Antonio Partners, L.L.C.,* 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted). All reasonable inferences are drawn in the nonmovant's favor. *Loftin v. City of Prentiss,* 33 F.4th 774, 779 (5th Cir.

2022). It is well-settled that a nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Jones v. Gulf Coast Rest. Grp., Inc.,* 8 F.4th 363, 369 (5th Cir. 2021) (internal citation omitted).

## II.     Plaintiffs' Claims Are Barred by the Applicable Two-Year Statute of Limitations

A two-year statute of limitations applies to FLSA misclassification and unpaid overtime compensation claims, but if an employer's statutory violation was willful, a three-year statute of limitations applies. 29 U.S.C. § 255(a); *Singer v. City of Waco,* 324 F.3d 813, 821 (5th Cir. 2003). Here, it is undisputed that all the Plaintiffs in this case failed to join the lawsuit within two years of the end of their respective employment with Defendants. As explained below, Defendants are entitled to summary judgment because Plaintiffs, who have only third-year claims, cannot establish that Defendants acted willfully under the FLSA for the three-year statute of limitations to apply. *See Solis v. Crescent Drilling and Prod., Inc.*, 2022 WL 10757401, at *2 (W.D. Tex. Oct. 17, 2022) ("Solis did not work for Crescent during the two-year limitations period governing ordinary FLSA violations. Therefore, Crescent can only be liable for any unpaid overtime compensation owed if Solis is able to prove that Crescent willfully violated the FLSA.").

### A. Willfulness:  Plaintiffs Bear the Burden of Proof

Plaintiffs carry the burden of proving that any alleged violation of the FLSA was willful. *Cox v. Brookshire Grocery Co.*, 919 F. 2d 354, 356 (5th Cir. 1990).  To establish a willful violation, the employee must prove that the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 248 (5th Cir. 2016) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)). The Supreme Court has noted that "willful" as it is commonly used is synonymous with "voluntary," "deliberate," and "intentional." *McLaughlin*, 486 U.S. at 133.  "Ordinary violations"

14

fall under the two-year period, whereas the third year is dedicated to actions that are willful, deliberate, or intentional.  *Solis*, 2022 WL 10757401 at *2.

"Evidence of willfulness may include statements by management that they were aware that employees were being paid incorrectly." *Williams v. Guardian Living Services, Inc.*, No. 4:17-CV-01901, 2018 WL 7253963, at *2 (S.D. Tex. Aug. 16, 2018) (citing *Singer v. City of Waco, Tex.*, 324 F.3d 813, 821–22 (5th Cir. 2003)).  "Willfulness may also be shown where an employer was notified by a relevant agency that its payment practices likely violated the FLSA and the employer failed to investigate and remedy the violation." *Id.* (citing *Reich v. Bay, Inc.*, 23 F.3d 110, 117 (5th Cir. 1994)).  "Mere negligence does not suffice." *Hoenninger v. Leasing Enterprises, Ltd.*, 803 F. App'x 756, 760 (5th Cir. 2020).  "[A]n unreasonable violation does not necessarily constitute a willful violation." *Steele*, 826 F.3d at 248 (internal quotations omitted).

### B.  All the Evidence Supports a Finding That Defendants Did Not Act Willfully

The evidence in this case supports the fact that Defendants did not act willfully and, instead, relied on the advice of counsel to comply with the FLSA and had no indication whatsoever that the pay plan allegedly violated the FLSA.  Mammoth Inc. immediately consulted with experienced outside counsel at the outset to develop compliant pay practices.  Ex.3, Broussard Depo. at p.6, 10-12; Ex.2, Beagle Dec. at ¶4, Ex. 6, Layton Depo. at p. 53.  The very same day that Cobra signed the contract with PREPA, Mammoth Inc. contacted 25-year employment attorney, Broussard, who had considerable expertise with wage and hour law.  Ex.3, Broussard Depo. at pp. 6, 10. Additionally, Mammoth Inc. intentionally chose Beagle, a human resources specialist with over a decade of experience in human resources matters, including wage and hour compliance, to work with Broussard to develop FLSA-compliant pay practices.  Ex.4, Broussard Dec. at ¶ 3; Ex.1, Layton Dec. at ¶11.  Again, Broussard and Layton both testified that the purpose of consulting

15

Broussard was to make sure the pay plan was lawful under the FLSA. Ex.3, Broussard Depo. at p. 38; Ex. 6, Layton Depo. at p. 53. *See also* Ex.2, Beagle Dec. at ¶4.

Beagle and Broussard (and sometimes Layton) worked together for several weeks, sometimes speaking multiple times a day, to discuss and evaluate options for the pay plan. Ex.6A, Layton Depo. at p. 55; Ex. 4., Broussard Dec. at ¶ 4. Throughout the process, Broussard explained the wage and hour requirements of the different pay options and how the calculations would work. Ex. 3, Broussard Depo. at pp. 27-33.

Ultimately, Broussard presented two pay plan options that he believes comply with the FLSA—a day rate option or an hourly rate option. Ex. 3, Broussard Depo. at pp. 37-41. Broussard testified that either option would comply with the FLSA. *Id.* Indeed, Defendants could have elected to pay Plaintiffs a day rate with overtime and still met the targeted rates. Nevertheless, Defendants decided on the hourly plus overtime approach as blessed by Broussard. Ex. 2, Beagle Dec. at ¶¶6-7; Ex. 3, Layton Depo. at p. 55. Thus, at every step along the way, Defendants actively sought to "investigate potential liability under the FLSA" and relied on the advice of counsel to ensure that they were acting in accordance with the Act. *Steele*, 836 F.3d at 246.

Defendants' proactive actions in investigating the legality of its compensation plan and consulting and relying on the advice of counsel, while not required, are sufficient to support a finding that they did not act willfully. *See Ikossi-Anastasiou*, 579 F.3d 546, 553 (5th Cir. 2009) (finding no evidence of willful conduct in absence of evidence employer actually knew that pay structure violated the FLSA or that it ignored or failed to investigate complaints); *Halferty v. Pulse Drug Co., Inc.*, 826 F.2d 2, 3 (5th Cir. 1987) (finding no willfulness where employer "consulted with its attorney, and examined the DOL bulletin"); *Richardson v. NES Global, LLC*, 2024 WL 1658250, at *9 (S.D. Tex. Apr. 17, 2024) (granting summary judgment in favor of employer in

alleged day rate case where "NES also consulted with in-house counsel in determining whether each employee met the Retainer policy, cutting against a finding of willfulness."). "And if *no* reliance on the advice of counsel does not by itself rise to the level of recklessness, then surely reliance on the incomplete or even erroneous advice of counsel would not." *Clay v. New Tech Glob. Ventures, LLC*, No. CV 16-296-JWD-CBW, 2019 WL 1028532, at *6 (W.D. La. Mar. 4, 2019) (emphasis in original) (citing *Johnson v. Big Lots Stores, Inc.*, 604 F. Supp. 2d 903, 924 (E.D. La. 2009)).

Likewise, there is no quantum of evidence to show that Defendants had any reason to believe that the compensation pay allegedly violated the FLSA. There is no evidence that Plaintiffs ever complained that they were not being compensated in accordance with the FLSA. *See* Ex.1, Layton Dec. at ¶18. In fact, Plaintiffs readily admit that they never complained about their pay. *See*, *e.g.*, Ex. 16, Hargrove Depo. at 53:7-10; Ex. 17, Roberts Depo. at 24:4-8; Ex. 18, Aponte Depo. at 67:8-10; Ex. 19, Rosario Depo. at 38:16-20. Despite having access to Layton's mobile phone number on their pay stubs, Plaintiffs never reached out with concerns regarding overtime while, at the same time, utilizing the line of communication to obtain employment verifications and raise other questions. Ex.1, Layton Dec. at ¶18. More than two years passed after Plaintiffs stopped working for Defendants in Puerto Rico before any protestations about an alleged entitlement to overtime by the filing of this lawsuit.

Similarly, Defendants were never notified by the Department of Labor or any other person or organization that the compensation structure was purportedly unlawful. *Id*. Defendants believed, and continue to believe, that Plaintiffs were compensated in accordance with the FLSA. In the absence of evidence that Defendants were aware that the compensation structure was unlawful but disregarded it, summary judgment is appropriate. *Compare Mohammadi v.*

*Nwabuisi*, 605 F. App'x 329, 332 (5th Cir. 2015) ("[E]mployers act willfully when they know their pay structures violate the FLSA or ignore complaints brought to their attention.") *with Brunet v. GB Premium OCTG Servs., LLC*, 2024 WL 1235571, at *9 (S.D. Tex. Feb. 7, 2024) (finding no willfulness where there was no evidence that "Defendant was aware of the FLSA's requirements and yet chose not to follow the law.").

Although employees' pay was correct the vast majority of the time, there were isolated instances where a "hard code" day rate was entered, but only in 36 of 1291 (2.79%) of the cumulative days Plaintiffs worked. *See* Ex.15A, 1006 Summary at ¶11. The few isolated instances where Plaintiffs' pay records indicate that they received a day rate were not approved and are why Kinsey was terminated. Moreover, there is no evidence that anybody with authority to enforce the pay plan implemented by Defendants acted willfully. *See Brock v. Claridge Hotel and Casino*, 711 F. Supp. 779, 783 (D.N.J. 1989) (The government agency plaintiff "merely showed that this one individual did not take the necessary steps to ensure that the guarantee was given effect. What was essential for the government to have shown, and what it failed to prove, was that the individual responsible for enforcing the guarantee knowingly or recklessly failed to do so.")

At bottom, these errors do not support a finding that Defendants acted willfully. *See Acosta v. Lifetime Living, Inc.*, 2020 WL 10758976, at *8 (S.D. Tex. June 4, 2020) ("While the policy was not adequately implemented as to the Plaintiff, there is no evidence to suggest that this was 'deliberate' or 'intentional.' Put simply, Plaintiff has failed to show that Defendant 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.'") (quoting *McLaughlin*, 486 U.S. at 133).

## CONCLUSION

Based on the foregoing, Defendants request that their summary judgment be granted, and

Plaintiffs' claims dismissed with prejudice.

|  |  |
|---|---|
| **DATED:** August 2, 2024 | Respectfully submitted,<br><br>**PORTER HEDGES LLP**<br><br>By: */s/ William R. Stukenberg*<br>William R. Stukenberg, *Attorney-in-Charge*<br>Texas Bar No. 24051397<br>Federal I.D. No. 55792<br>1000 Main Street, 36th Floor<br>Houston, Texas 77002<br>Telephone: (713) 226-6611<br>Facsimile:  (713) 226-6211<br>wstukenberg@porterhedges.com<br><br>***Attorney-in-Charge for Defendants Mammoth Energy Services, Inc. d/b/a Cobra Energy, 5-Star and Higher Power Electrical, LLC*** |

Of Counsel:

M. Harris Stamey
State Bar No. 24060650
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6619
Facsimile: (713) 226-6219
hstamey@porterhedges.com

Jamie L. Houston
State Bar No. 24097847
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
jhouston@porterhedges.com

Emil M. Sadykhov
State Bar No. 24110316
Porter Hedges LLP
1000 Main Street, 36th Floor

15500435

Houston, Texas 77002
Telephone: (713) 226-6720
Facsimile: (713) 226-6320
esadykhov@porterhedges.com

***Attorneys for Defendants
Mammoth Energy Services, Inc.
d/b/a Cobra Energy, 5-Star and
Higher Power Electrical, LLC***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record via CM/ECF filing on August 2, 2024.

/s/ *Jamie Houston*
Jamie L. Houston