**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **AARON MALDONADO,** *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 5:21-cv-00085** |
| **MAMMOTH ENERGY SERVICES, INC., COBRA ACQUISITIONS, LLC, HIGHER POWER ELECTRICAL, LLC, and 5 STAR ELECTRIC, LLC,** | § | |
| | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

**APPENDIX IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
EXHIBITS 1 THROUGH 6-A**

Dated this 2nd day of August, 2024.

**PORTER HEDGES LLP**

William R. Stukenberg
Texas Bar No. 24051397
Federal ID No. 55792
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6611
Facsimile: (713) 226-6211
Email: wstukenberg@porterhedges.com

*Attorney-in-charge for Defendants
Mammoth Energy Services, Inc.,
Cobra Acquisitions, LLC,
Higher Power Electrical, LLC, and 5 Star
Electric, LLC*

15485036

Pursuant to Local Rule CV-7(c), Defendants file this Appendix in support of their Motion for Summary Judgment.

## **Index of Evidence Supporting Moton for Summary Judgment**

Declaration of Mark Layton............................................................................................ Exhibit 1

Declaration of Jeffrey Beagle ........................................................................................ Exhibit 2

Transcript of Steven Broussard's Deposition ................................................................ Exhibit 3

Declaration of Steven Broussard ................................................................................... Exhibit 4

Draft Offer Letter........................................................................................................... Exhibit 5

Transcript of Mark Layton's Deposition ..................................................................... Exhibit 6-A

**DATED:**  August 2, 2024.                     Respectfully submitted,


By: */s/ William R. Stukenberg*
William R. Stukenberg, *Attorney-in-Charge*
Texas Bar No. 24051397
Federal I.D. No. 55792
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6611
Facsimile:  (713) 226-6211
wstukenberg@porterhedges.com

*Attorney-in-Charge for Defendants*
*Mammoth Energy Services, Inc.*
*d/b/a Cobra Energy, 5-Star and*
*Higher Power Electrical, LLC*

Of Counsel:

M. Harris Stamey
State Bar No. 24060650
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6619
Facsimile: (713) 226-6219
hstamey@porterhedges.com

Jamie L. Houston
State Bar No. 24097847
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
jhouston@porterhedges.com

Emil M. Sadykhov
State Bar No. 24110316
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6720
Facsimile: (713) 226-6320
esadykhov@porterhedges.com
**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed the foregoing document in accordance with the protocols for e-filing through the CM/ECF system in the United States District Court for the Western District of Texas, San Antonio Division, on August 2, 2024, and therefore has been served upon all counsel of record in accordance with such e-filing protocols.

*/s/ William R.Stukenberg*
William R. Stukenberg

15485036

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **AARON MALDONADO,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | |
| v. | § | **Case No. 5:21-cv-85** |
| | § | |
| **MAMMOTH ENERGY SERVICES,** | § | |
| **INC., COBRA ACQUISITIONS, LLC,** | § | |
| **HIGHER POWER ELECTRICAL, LLC,** | § | |
| **and 5 STAR ELECTRIC, LLC,** | § | |
| | § | |
| *Defendants*. | § | |

## DECLARATION OF MARK LAYTON

I, Mark Layton, declare as follows:

1.  My name is Mark Layton.  I am over the age of eighteen (18).  I have never been convicted of a felony or crime involving moral turpitude.  I am fully competent to make this declaration.  I have personal knowledge of all the facts stated herein or have derived these facts from a review of business records, and the statements herein are true and correct.

2.  I am the Chief Financial Officer of Mammoth Energy Services, Inc., Cobra Acquisitions, LLC ("Cobra") and Higher Power Electrical, LLC ("HPE") (collectively "the Defendants").  I am aware of a lawsuit brought by Aaron Maldonado and others against the Defendants based on allegations that they, along with others, were not paid overtime for work performed on behalf of the Defendants.

3.  Cobra is an infrastructure services company that provides maintenance and repair services to utilities.  Cobra contacted the Puerto Rico Electrical Power Authority ("PREPA") to offer its services after Hurricane Irma (category 5) and Hurricane Maria (category 4), devastated the island of Puerto Rico in September 2017.  Both storms caused significant damage to the electrical grid and destroyed many buildings on the island.

4.  As a result of the hurricanes, the infrastructure for an already decaying electrical grid was decimated.  When Hurricane Maria hit Puerto Rico just a few weeks after Hurricane Irma, the additional catastrophic damage to the island was exacerbated by an enormous storm surge accompanied by high winds.  The island of Puerto Rico had no power, approximately 95% of the cell service towers were down, and approximately 50% of the island was without running water.  Sewage was running

13454347

**EXHIBIT**

**1**

through the streets of San Juan.

5.      Restoring power was critical to beginning the recovery efforts.  Without power, the island could not begin to repair the absolute devastation.  The people of Puerto Rico experienced a humanitarian crisis that resulted in the death of over 2,900 people and damage in excess of $90,000,000,000.00.

6.      Shortly after the storm, Cobra executives met with Puerto Rican officials to offer assistance in repairing the electrical grid.  On October 19, 2017, Cobra entered into a contract with PREPA to restore electricity.

7.      Cobra began work immediately to launch this intense and logistically challenging work.  This work included acquiring and deploying hundreds of bucket trucks and other work vehicles from ports across the country to Puerto Rico.  Cobra was also tasked with securing and delivering the equipment necessary to perform the repair and restoration work, which was delivered to the island by barge and an Antonov, the largest aircraft in the world.  Cobra also had to find and secure housing for the workers by chartering two large barges that could each sleep hundreds.  Cobra also contracted with two affiliated companies, HPE and 5-Star Electric, LLC ("5-Star"), to provide the workers and equipment to perform the work.  Time was of the essence given the humanitarian crisis and lives at stake.

8.      An advance team arrived in Puerto Rico within days of the signing of the PREPA contract, and equipment and crews started arriving in late October and early November 2017.  Cobra was in charge of the logistics, housing and security and 5-Star and HPE were responsible for recruiting personnel to perform the work and ascertaining how to pay the employees.

9.      Keith Ellison, then-President of Cobra, developed the daily labor budgets for the various classifications of linemen who would be working in Puerto Rico.  These budgeted amounts were then listed on the wage scale which was used to  recruit workers.  The wage scale was a target amount of compensation sufficient to begin recruiting workers to perform the work in a very demanding environment while maintaining some profit margin.  The wage scale contained amounts ranging from $600 to $1,400 per day worked, or $219,000 to $511,000 annually.   This was considerably more than linemen and similar laborers earn in the continental United States.

10.     The day after creating the daily labor budgets and wage scale, Ellison, HPE, and 5-Star then turned to Mammoth Energy Inc. ("Mammoth Inc.") for assistance in developing a pay plan that would closely mirror the rates contained in the wage scale and comply with the FLSA.  Mammoth Inc. is a sister company to Cobra, 5-Star, and HPE.  Mammoth Inc. provides back-office support services, such as accounting and human resources services, to these subsidiaries for a fee pursuant to a shared services agreement.  Mammoth Energy Services, Inc. is the ultimate parent company of Mammoth Inc., Cobra, 5-Star and HPE.  Mammoth Energy

2

Services, Inc. does not have and never has had any employees.

11.    Ellison informed me that it was my responsibility to figure out how to pay the employees and the details and mechanics of a pay plan.  For his part, Ellison did not know the specifics of how the workers would be paid as he was focusing on the remaining logistical tasks to get the project moving, such as securing and deploying equipment.

12.    To develop the pay plan, I directed Jeff Beagle, Vice President of Human Resources of Mammoth Inc., to confer with outside counsel to develop a compliant pay practice based on the daily labor budgets.  Beagle is a human resources specialist with over ten years of experience, including experience with compliance with wage and hour laws.  On October 19, 2017, Beagle contacted Steve Broussard, an employment law attorney with over twenty-five years of experience at the time and who had previously worked with Mammoth Inc. on other employment law issues to develop the pay plan.  Beagle initially explored paying the employees based on a day rate.  Broussard responded that we could do so, but we would have to pay overtime on top of the day rate—and he explained how the calculation of overtime on a day rate could be accomplished.  After discussing a day rate plan with operational management, we quickly pivoted to an hourly plus overtime pay plan that would approximate daily rates contained in the wage scale provided that employees worked the anticipated weekly schedule.

13.    Developing the hourly pay plan was an iterative process and Beagle created various spreadsheets with different pay plans which were circulated among the group.  Ultimately a pay plan was chosen utilizing an anticipated schedule of seven days a week and 16-hour days.  Using this schedule and the daily labor budgets for each position, we derived hourly rates for each position such that if linemen worked the anticipated weekly schedule and were paid the hourly and overtime rates, they would earn on average an amount that closely approximated the amounts contained in the wage scale.  However, due to the hourly and overtime nature of the pay plan, a worker would never earn an amount close, or equal, to the daily amounts listed on the wage scale for any single day worked.

14.    Seven sixteen-hour shifts per week is the standard weekly schedule in the industry for storm work.  One of the reasons for a sixteen-hour shift is that under Department of Transportation ("DOT") and Occupational Safety and Health Administration ("OSHA") regulations, certain covered employees are not permitted to work beyond sixteen-hour shifts unless eight hours of rest time is provided.  Although DOT and OSHA regulations are generally suspended during a national emergency, such as the emergency caused by Hurricanes Irma and Maria, the sixteen-hour limits are a natural cap on the hours worked per day.  Additionally, safety concerns militated against allowing workers to work more than sixteen hours per day.  Further, the nature of the operations being performed generally limited the work to daylight hours.

15.    Because it was critical for HPE and 5-Star to immediately begin recruiting linemen to work in Puerto Rico, the wage scale was used to do so before the pay plan had been designed and implemented.  Both HPE and 5-Star advertised the positions to candidates as providing a targeted amount of expected pay, subject to an offer letter and additional details that were being developed during the emergency situation that would be provided upon hire.

16.    All employees ultimately hired were given offer letters informing them of the anticipated schedule and pay details, and they attended orientation seminars held in either Texas, Kentucky, or occasionally Puerto Rico.  Employees filled out onboarding paperwork and were advised that they would be paid an hourly rate with overtime, and the target amount of their compensation would be based on 16-hour shifts, seven days per week.  The orientation included information regarding safety, housing and related human resources materials.  After orientation, the employees flew to Puerto Rico to begin work.

17.    Employees generally worked a full seven days a week for a total of 112 hours (7 days x 16 hours per day).  However, if an employee did not work the anticipated schedule, they would earn less than the daily amounts budgeted for the position as reflected on the wage scale.  It is my understanding that Missy Davis in Human Resources at 5-Star asked Beagle what should be done in short weeks where employees were paid less than what had been budgeted for their position.  Reflecting the fact that this scenario created an increase in profit margin, Beagle informed her that they could, but were not required to, pass the increase in profit margin along to the employees in the form of a discretionary bonus.  The rationale was to keep the employees' morale and employee relations high through the tumultuous humanitarian crisis.  In total, less than 2% of the workweeks included any discretionary payments.  In many instances, Defendants did not make the discretionary payments.  Such instances included circumstances where an employee missed work or was suspended for malfeasance.  Employees generally worked the anticipated schedule and would typically only fall short of the targeted hours when the employee deployed to the island or ceased work for Defendants.

18.    In the summer of 2018, Cobra entered into a subsequent contract with PREPA as the project moved from emergency response and power restoration to reconstruction.  As a result, the compensation structure changed, effective July 23, 2018.  The sixteen-hour shifts were replaced with twelve-hour shifts, and discretionary payments were no longer made.  The project ended and HPE and 5-Star concluded operations in Puerto Rico by March 2019.  Throughout the project, from inception to conclusion, not a single employee complained about the manner of their compensation, including any purported failure to pay overtime.  My mobile number is listed on employees' pay stubs, and I received calls from employees about various issues, such as employment verification, but I never received any calls regarding any alleged failure to pay overtime or beliefs that employees were not being compensated appropriately.  Similarly, Defendants were never notified by the Department of Labor or any other person or organization that the

13454347

SimplyAgree Sign signature packet ID: fcee1324-2dfa-4654-9915-41c311f47e87

compensation structure was purportedly unlawful.

DECLARANT SAYETH FURTHER NOT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed:   August 2, 2024

_Mark Layton_
Mark Layton

5

13454347

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **AARON MALDONADO,** *et al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **Case No. 5:21-cv-00085-OLG** |
| | § | |
| **MAMMOTH ENERGY SERVICES,** | § | |
| **INC., COBRA ACQUISITIONS, LLC,** | § | |
| **HIGHER POWER ELECTRICAL, LLC,** | § | |
| **and 5 STAR ELECTRIC, LLC,** | § | |
| | § | |
| *Defendants.* | § | |
| | § | |
| | § | |

## DECLARATION OF JEFF BEAGLE

I, Jeff Beagle, declare as follows:

1.       My name is Jeff Beagle. I am over the age of 18 years. I have never been convicted of a felony or crime involving moral turpitude. I am fully competent to make this declaration. I have personal knowledge of all the facts stated herein or have derived these facts from a review of business records, and the statements herein are true and correct.

2.       I am the former Director of Human Resources for Mammoth Energy Services, Inc. as well as its subsidiaries Cobra Acquisitions, LLC ("Cobra"), Higher Power Electrical, LLC ("HPE") and 5 Star Electric, LLC ( "5 Star") (collectively, the "Defendants") in the lawsuit brought by Mr. Aaron Maldonado and others in the above-referenced case based on allegations that they were not paid overtime for work performed on behalf of the Defendants.

3.       Following the two hurricanes, Irma and Maria, that devastated Puerto Rico in September 2017, Cobra entered into a contract with the Puerto Rico Electrical Authority to rebuild the electrical grid. Cobra oversaw the logistics and HPE and 5 Star were responsible for recruiting

1

15389727v1

**EXHIBIT**

**2**

the personnel to perform the work and ascertaining how to pay the employees. Mr. Keith Ellison, the then-President of Cobra, developed a wage scale that consisted of a target amount or rate of compensation to entice employees to go to work in a very demanding environment. Mr. Ellison directed Mr. Mark Layton, the Chief Financial Officer, to figure out the details and mechanics of a pay plan. I was directed by Mark Layton to confer with outside counsel to develop a compliant pay practice that would pay at or near the target rate.

4.      On October 20, 2017, I contacted attorney Steve Broussard of Hall Estill, a 150-lawyer firm headquartered in Tulsa, Oklahoma. Mr. Broussard practiced employment law for over 25 years and had considerable expertise with wage and hour matters. Over the next several weeks, I discussed and evaluated numerous pay plans with Mr. Broussard, sometimes speaking multiple times per day. This was an iterative process, as I initially indicated the Defendants were interested in paying employees on a day rate basis. The sole purpose in contacting Mr. Broussard was to ensure that the pay plan was lawful under the Fair Labor Standards Act ("FLSA").

5.      After initially leaning towards the day rate, the Defendants shifted to an hourly plus overtime approach.  It was expected that the workers would typically work daylight hours, or roughly 12 hours per day. Although the workers were expected to work or be on call for 16 hours per day for each day worked. If they worked over 16 hours, they were paid for the extra hours. Sixteen-hour shifts are the industry custom and practice in storm work. The significance of the 16 hours is that hours worked beyond 16 trigger rest time requirements under the Department of Transportation ("DOT") and Occupational Safety and Health Administration Regulations ("OSHA").

6.      With the assistance of Mr. Broussard, the Defendants determined an hourly rate that would account for expected overtime and approximate, albeit not match, the targeted rates.

2

An assumption was made that an employee would work 16 hours a day, 7 days a week for a total of 112 hours per week. Accounting for 40 hours of regular time and 72 hours of overtime, I then established an hourly rate that would result in approximating the targeted rates as set forth below:

| Position | Targeted Pay Rate Per Day | Regular Hourly Rate (up to 40 hours per week) | Overtime Rate (hours worked over 40 per week) | Weekly Wage (7 days at 16 hours per day; 40 Regular Rate hours and 72 Overtime Rate hours) |
|---|---|---|---|---|
| General Foreman | $1,400.00 | $66.22 | $99.33 | $9,800.56 |
| Foreman | $1,250.00 | $59.12 | $88.68 | $8,749.76 |
| Journeyman Lineman | $1,000.00 | $47.30 | $70.95 | $7,000.40 |
| Class A Lineman | $900.00 | $42.57 | $63.86 | $6,300.72 |
| Class B Lineman | $800.00 | $37.84 | $56.76 | $5,600.32 |
| Hot Apprentice/Class C | $700.00 | $33.11 | $49.67 | $4,900.64 |
| Operator | $800.00 | $37.84 | $56.76 | $5,600.32 |
| Groundsman | $600.00 | $28.38 | $42.57 | $4,200.24 |
| Mechanic | $900.00 | $42.57 | $63.86 | $6,300.72 |

The foregoing pay scale reflects the hourly plan inclusive of overtime that was ultimately used to set employees' compensation by position.

7.      I next sent Mr. Broussard an email with the foregoing calculations as set forth above, and later discussed the mechanics of the plan with him. Mr. Broussard understood that the purpose of the calculations was to adopt one of the pay plans discussed and comply with the FLSA. Since Mr. Broussard had approved the pay plan as compliant, I then disseminated that information to the senior leadership of HPE and 5 Star, as well as various administrative personnel for implementation. Defendants believed and continue to believe that the pay practice complied with the FSLA.

8.      I also sent Mr. Broussard a draft offer letter, attached to the Motion as Exhibit 5. The offer letter advised employees that the goal was to work 12 hours per day, but as customary with storm work certain situations could arise that could require longer hours, but not to exceed 16 hours. The offer letter further explained that they would be paid a target amount for each day worked which would be paid hourly over a 16-hour shift. Mr. Broussard reviewed the letter and approved it for distribution.

9.      If the employee worked more than 16 hours, the Defendants would pay the extra hours. When employees did not work a full 7 days work week, the hourly with overtime earnings did not equal the target rate of compensation. The reason for the shortfall is there was not enough overtime hours to get to the target amount. Defendants had the option, but not the obligation, to pay discretionary bonuses in short weeks to meet the targeted amounts of compensation for one day of work. Such payments were discretionary and made by the leadership on the island.

10.      Sometimes the Defendants elected not to make these payments when an employee worked less than a full week. The undisputed evidence is that management retained the right to decide whether to make these payments. Employees who did not work an entire week because of the employee's own misconduct or scheduling issues did not receive discretionary payments, and the pay stubs reflect numerous instances where the bonuses were not paid.

11.      For example, in Exhibit 9 the pay stubs of two employees Dennis Moore and Corey Barnes both dated July 13, 2018, reflect that Moore and Barnes worked less than 112 anticipated hours in the work week. The pay stubs reflect that they both worked a total of 96 hours, comprised of 40 regular hours and 56 overtime hours. Mr. Moore's pay was adjusted up and Mr. Barnes did not receive an adjustment. The fact that the payments were made in some instances and not others reflect the discretionary nature of additional compensation.

4

12.     In the next example in Exhibit 10, there is a pay stub received by Dennis Moore with a pay date of 09-18-2018 where he was credited with working 208 hours, comprised of 80 regular hours and 128 overtime hours. There is another pay stub received by one of his co-workers, Mr. Cody Johnson on the same date. Mr. Johnson was credited with working the same number of regular and overtime hours. However, Mr. Moore was credited with an adjustment and Mr. Johnson did not receive a rate adjustment. Again, this is a further reflection of the discretionary nature of the payments as it was not a guaranteed part of the compensation plan.

13.     The following exhibits reflect other examples where two colleagues that worked an identical number of hours received different treatment.  See Exhibits 11 and 12. In each instance, one received a discretionary payment to adjust their compensation upward and the other did not. These exhibits further support my understanding that these adjustments were discretionary and not guaranteed or paid to everyone who worked a short week.

14.     The pay stubs contained in this set of exhibits are reflective of the pay plan that I designed in consultation with Mr. Broussard. The documents show the hourly and overtime pay plan with discretionary adjustments to a budgeted figure as established by the leadership on the island.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 2 day of August , 2024.

Jeff Beagle

15389727v1

```
1                    UNITED STATES FEDERAL COURT
                      WESTERN DISTRICT OF TEXAS
2                        SAN ANTONIO DIVISION

3     AARON MALDONADO, et al,      )
                                   )
4     Plaintiffs,                  )
                                   )
5                                  )
      VS.                          )  CASE NO. 5:21-cv-85-OLG
6                                  )
                                   )
7     MAMMOTH ENERGY SERVICES,     )
      INC., COBRA ACQUISITIONS,    )
8     LLC, HIGHER POWER            )
      ELECTRICAL, LLC AND 5        )
9     STAR ELECTRIC, LLC           )
                                   )
10    Defendants.                  )

11    * * * * * * * * * * * * * * * * * * * * * * * * * *

12                       ORAL DEPOSITION OF
                          STEVEN BROUSSARD
13                          MAY 9, 2024
                         (REPORTED REMOTELY)
14

15    * * * * * * * * * * * * * * * * * * * * * * * * * *

16      ORAL DEPOSITION OF STEVEN BROUSSARD, produced as a

17    witness at the instance of the PLAINTIFFS, and duly

18    sworn, was taken in the above-styled and numbered cause

19    on MAY 9, 2024, from 9:04 a.m. to 10:31 a.m., before

20    Deborah Garney Viator, RPR, CSR No. 2394, Louisiana CCR

21    No. 99011, in and for the State of Texas, reported by

22    machine shorthand, at the offices of Hall Estill,

23    521 East 2nd Street, Suite 1200, Tulsa, Oklahoma 74120,

24    pursuant to the Federal Rules of Civil Procedure and the

25    provisions stated on the record or attached hereto.
```

**EXHIBIT**

**3**

NELL MCCALLUM & ASSOCIATES, INC.    409-838-0333
NELL McCALLUM & ASSOCIATES

1

APPEARANCES

FOR THE PLAINTIFFS:
   Mr. Douglas B. Welmaker (via ZOOM)
   SBOT NO. 00788641
   WELMAKER LAW, PLLC
   409 North Fredonia, Suite 118
   Longview, Texas 75601
   doug@welmakerlaw.com
FOR THE DEFENDANTS AND STEVEN BROUSSARD:
   Mr. Eugene M. Nettles (via ZOOM)
   SBOT NO. 14927300
   Mr. M. Harris Stamey (via ZOOM)
   SBOT NO. 24060650
   PORTER HEDGES LLP
   1000 Main Street, Floor 36
   Houston, Texas 77002
   enettles@porterhedges.com

2

CERTIFIED QUESTIONS
NUMBER                    PAGE/LINE
   (NONE)


     *******

4

INDEX
          PAGE
Appearances.........................................2
Stipulations.........................................5

STEVEN BROUSSARD
   Examination by Mr. Welmaker....................5
   Examination by Mr. Nettles....................37
   Reexamination by Mr. Welmaker................41
   Reexamination by Mr. Nettles.................46
   Reexamination by Mr. Welmaker................47

Signature and Changes.............................50
Reporter's Certificate...........................52

EXHIBITS
NUMBER DESCRIPTION                        PAGE
  1   Email Chain Dated 10/18/2017...........49
  2   Email Chain Dated 10/20/2017...........49
  3   Email Chain Dated 11/26/2017...........49
  4   Offer of Employment Template............49
  5   Email Dated 10/23/2017..................49
  6   Hourly Rate Conversion Produced in
      Native Format...........................49
  7   Spreadsheet.............................49

3

THE REPORTER:  Stipulations?
MR. NETTLES:  Under the Federal Rules.
MR. WELMAKER:  I agree.
     STEVEN BROUSSARD,
having been first duly remotely sworn, testified as
follows:
     EXAMINATION
     (9:04 A.M.)
BY MR. WELMAKER:
   Q.  Good morning, Mr. Broussard.  Can you state
your full name for the record, please?
   A.  Yes.  Steven Broussard.
   Q.  All right.  And you are in Oklahoma City;
correct?
   A.  No, I'm in Tulsa.
   Q.  I'm sorry, Tulsa.
     And would you mind reading off the address
for your firm one more time, please, into the record.
   A.  Yes.  It is 521 East Second Street, Suite 1200,
Tulsa, Oklahoma 74120.
   Q.  Okay.  And that is for the law firm of
Hall Estill?
   A.  Yes.
   Q.  Okay.  And you're an attorney with Hall Estill;
correct?

5

2

**Page 6**

1    A.   That's correct.
2    Q.   And how long have you been with Hall Estill?
3    A.   Over 36 years.
4    Q.   Okay.  Have you worked for anyone else once you
5    received your law degree?
6    A.   No.
7    Q.   Okay.  And are you board certified?
8    A.   No.
9    Q.   All right.  Can you -- can you summarize your
10   experience with wage and hour law for me?
11   A.   Yes.  I assist employers -- or have assisted
12   employers with respect to wage and hour issues and in
13   defense of claims related to wage and hour matters.
14   Q.   And is that your primary focus; or do you do
15   other types of employment law, litigation and advice?
16   A.   Yes, I do other types of employment law, as
17   well, litigation and advice.
18   Q.   Okay.  What percentage of your practice is made
19   up of wage and hour law?
20   A.   That's going to vary from time to time.  I
21   don't know if I can give you an actual percentage
22   because it could be on a weekly basis at times, I'm
23   advising clients with regard to wage and hour law.  It
24   might be -- 30 days may go by.  But I don't know if I
25   can give you a breakdown.

6

**Page 8**

1    Q.   And if you will let me finish my question
2    before you start to answer, then I will let you finish
3    your answer before I begin the next question.  Is -- is
4    that acceptable?
5    A.   Yes.
6    Q.   And, really, the final ground rule is that if I
7    ask you a question that you don't understand, please
8    feel free to ask me to rephrase the question.  I'm --
9    I'm more than happy to do so.
10        And if you answer my question, I'm going
11   to assume that you understood it; is that fair?
12   A.   Yes.
13   Q.   Okay.  For purposes of this deposition, anytime
14   I say "Mammoth," I'm referring to Mammoth Energy
15   Services, Inc.  Do you understand that?
16   A.   Yes.
17   Q.   Anytime I say "Cobra," I'm referring to Cobra
18   Acquisitions, LLC; okay?
19   A.   Okay.
20   Q.   Anytime I say "5 Star," I'm referring to 5 Star
21   Electric, LLC; is that okay?
22   A.   Okay.
23   Q.   And anytime I say "Higher Power," I'm referring
24   to Higher Power Electrical, LLC; all right?
25   A.   Okay.

8

**Page 7**

1    Q.   Okay.  I -- I think that's fair.
2         My name is Doug Welmaker, and I represent
3    a group of linemen that went down to Puerto Rico in 2017
4    and 2018 and were employed by all four of the defendants
5    in this case -- Mammoth, Cobra, 5 Star, and Higher
6    Power.
7         Do you understand that?
8    A.   I don't understand who they were employed by.
9    And --
10   MR. NETTLES:  I'm sorry.  And I'm going to
11   object to the form of the question, too, in that it
12   assumes facts not in evidence.
13   Q.   (BY MR. WELMAKER)  Yeah, I'm just trying to set
14   the stage to let you know that I am -- I have -- let's
15   put it this way:  I've brought suit against Mammoth,
16   Cobra, Higher Power, and 5 Star for unpaid overtime for
17   this group of linemen.
18        Do you understand that?
19   A.   I understand that you represent the plaintiffs,
20   yes.
21   Q.   Okay.  You know the ground rules for a
22   deposition.  No shaking of your head, no "huh-uh" or
23   "uh-huh," because the court reporter can't get that
24   down; right?
25   A.   Yes.

7

**Page 9**

1    Q.   Just for purposes of -- of moving this along
2    and speeding it up.  Excuse me.
3         So have you represented Mammoth Energy
4    Services in the past?
5    A.   I have, in the past, represented affiliates or
6    companies that may be owned by Energy Services.
7    Q.   Okay.  Do you know if you've ever represented
8    or provided advice to Mammoth Energy Services, Inc.?
9    A.   I'm not exactly sure of which entity it may be
10   of Mammoth that I would have provided some advice to.
11   It's possible.  I just can't tell you exactly which
12   Mammoth entity I might have provided advice to in terms
13   of the name "Mammoth."
14   Q.   Okay.  Does it help if I narrow the date range
15   down to the 2017-2018 period of time?
16   A.   Not necessarily.
17   Q.   Okay.  Have you represented Cobra Acquisitions,
18   LLC, in the past?
19   A.   I would say, with respect, that, yes.
20   Q.   Okay.  Did you give Cobra Acquisitions, LLC,
21   advice in the 2017 to 2018 period?
22   A.   I believe I did.
23   Q.   Okay.  Have you provided advice to 5 Star
24   Electric, LLC, in the 2017-2018 period?
25   A.   Possibly.

9

1    Q.  You're not sure about that?
2    A.  Well, I -- I -- again, I -- I've represented or
3  provided advice to numerous companies affiliated with
4  Mammoth.  I can't tell you exactly which entities,
5  necessarily, and which time frame.  So it's pretty
6  possible that I did.
7    Q.  Okay.  And my final question on this is:  Have
8  you provided advice to Higher Power Electrical, LLC, in
9  the 2017-2018 time period?
10    A.  That's also very possible.
11    Q.  Okay.  Just with respect to -- to cases similar
12  to mine, where attorneys are suing the four entities
13  involved in this case for unpaid overtime, how many
14  times have you given a deposition?
15    A.  Once.
16    Q.  Okay.  And when was that deposition taken?
17    A.  I think it was a couple of years ago.
18    Q.  Okay.  So is it true that in about late
19  October -- or let's just say late 2017, you were
20  approached to give advice to Mammoth or its subsidiaries
21  about a pay plan for workers that were going down to
22  Puerto Rico to help restore the electrical grid after
23  Hurricanes Maria and Irma?
24    A.  I believe I was approached by one of those
25  entities in October of 2017.

10

1    Q.  Okay.  What sort of advice were you asked to
2  provide?
3    A.  Well, there was a number of things we were
4  looking at and advised to ask.  One of them was related
5  to wage and hour issues, with respect to workers in
6  Puerto Rico.  There were a number of other issues
7  that -- some related to other employment matters and
8  some related to some other matters that -- I don't know
9  if they would necessarily be considered employment
10  issues.
11    Q.  Okay.  Do you remember who first approached you
12  about the Puerto Rico project in October, 2017?
13    A.  I think it was one of two individuals.
14    Q.  And -- and who were those individuals?
15    A.  It would have been either Jeff Beagle or
16  Mark Layton.
17    Q.  Okay.  And who was Jeff Beagle with?
18    A.  At that time, Jeff Beagle worked for one of the
19  Mammoth entities, at least as far as I understood.
20    Q.  And who was Mark Layton with?
21    A.  He was also with one of the Mammoth entities.
22    Q.  Okay.
23    A.  And when I say "Mammoth entities," I want to
24  make sure it's related to Mammoth as you described it.
25  It's not exactly necessarily the defendant in this

11

1  lawsuit.
2    Q.  Okay.  Do you know which Mammoth entity it was?
3    A.  I really would not know without looking at the
4  information or talking to Mark or Jeff.
5    Q.  Okay.  So just to help out here, I'm going to
6  try to share my screen and show you what's been marked
7  as Exhibit No. 1.  Do you have those printed out in
8  front of you, or are you --
9    A.  No.  If you want to put it on the screen, I can
10  look at it on the screen.
11    Q.  Okay.  Are you going to be able to see it okay?
12    A.  If I can't, I'll let you know.
13    Q.  Okay.
14    A.  And I think Gene may try to pull it up on his
15  iPad.
16    Q.  All right.  It's thinking (screen sharing).
17    A.  If you'd like, Gene pulled it up for us on the
18  iPad okay.
19    Q.  Okay.  So what I'm showing you has been marked
20  as Exhibit 1.  The Bates stamps are 2366 to 2367.  And
21  what I'd like to draw your attention to is this bottom
22  half of the email.
23    A.  Yes.
24    Q.  So it looks like this email is from
25  Jeff Beagle, jbeagle@mammothenergy.com, to you.  And it

12

1  is dated October 18th, 2017.
2       Do you see that?
3    A.  Yes, sir.
4    Q.  Okay.  Looking at Mr. Beagle's signature block
5  at the bottom of this email, does that help refresh your
6  memory as to which entity employed Mr. Beagle?
7    A.  I don't know.  There's a Mammoth Energy email
8  address, but it doesn't indicate to me which -- who he
9  was actually employed by.
10    Q.  Okay.  And what was Mr. Beagle's position when
11  he emailed you on October 18th?
12    A.  I understood to be an HR director.
13    Q.  Okay.  So he was telling you that there's a
14  possibility of deploying about 250 employees to work in
15  Puerto Rico for six to twelve months, and it looks like
16  he's wanting to generally consult with you about that.
17       Do you agree with that?
18    A.  Yes.
19    Q.  Okay.  So that is October 18th.
20       Let me go to Exhibit 2, which is Bates
21  stamped 2373 through 2375.
22    A.  Okay.
23    Q.  And so what I would like you to do is go to the
24  bottom of 2374, which is the second page, and ask you if
25  you can see the email from Keith Ellison here.  That's

13

1  just the header. We'll go to the body of it.
2      A.  Yeah, I -- I see on -- starting on Page 2374,
3  going on 2375, looks like there's an email from
4  Keith Ellison.
5      Q.  Okay.  And it's dated the next day, October
6  the 19th, 2017.  Do you agree with that?
7      A.  I agree, yes.  October 19, 2017.
8      Q.  Okay.  And who is Keith Ellison with?
9      A.  I don't know.
10     Q.  Did you ever have any direct communications
11  with Mr. Ellison?
12     A.  None that I can recall.
13     Q.  Okay.  And if we look on 2374, we see the
14  email -- or the body of the email that Mr. Ellison sent.
15  And it's -- it's talking about the fact that we're
16  awarded a contract for 250 linemen and as we're paying the
17  following, and then it sets out the job titles and the
18  day rate for each job title.
19         Do you see that?
20     A.  Yes, sir.
21     Q.  Do you remember being forwarded this email?
22     A.  I don't have any specific recollection but,
23  obviously, it looks like it is connected or at least
24  it -- to the email that I sent to Jeff on the 20th of
25  October.

14

1      Q.  Okay.
2      A.  Yeah, I -- do what?
3      Q.  Go ahead.
4      A.  Yeah, and that's all I can say on that.
5      Q.  Okay.  So the middle email is from Mr. Beagle,
6  and it is to you.  And it looks like he's forwarding
7  this same email from Mr. Ellison to you and cc'ing
8  Ken Kinsey and Alexander Kalman.  Do you agree with
9  that?
10     A.  Are you talking about the email that's dated
11  October 20th, where he's addressed it to Ken, (reading):
12  Ken, below are the in- -- intended day rates?
13     Q.  Yes.
14     A.  Yes, I see that email.
15     Q.  Okay.  So he's forwarding Mr. Ellison's email
16  to you as part of this email; is that correct?
17     A.  It -- it appears that I did get this email,
18  yes.
19     Q.  It -- it -- so is he forwarding Mr. Ellison's
20  email to you?
21     A.  I got it.  I would assume that Jeff was --
22  intended to have this sent to me.
23     Q.  Okay.  All right.  And who was Mr. Kinsey with?
24     A.  I'm not sure.
25     Q.  Did you ever deal directly with him?

15

1      A.  I don't remember any conversations with him.
2      Q.  Who was Mr. Kalman with?
3      A.  I think he worked with Jeff.
4      Q.  Okay.  All right.  So this is forwarded to you.
5         And then on the next page, 2373, at the
6  bottom half of the page, you provide some advice based
7  on the information that you've received; is that
8  correct?
9      A.  Yes.
10     Q.  Okay.  All right.  The advice that you're
11  providing in your email, dated October 20th, 2017, at
12  4:00 p.m., is to Mammoth Energy; is that correct?
13     A.  It says it's Jeff Beagle.
14     Q.  Okay.  And --
15     A.  Also -- Ken Kinsey is also copied on it.
16     Q.  Okay.  And if we look back at the email to you,
17  where he's -- where Mr. Beagle is forwarding
18  Mr. Ellison's email, Ken Kinsey's email address
19  indicates a cobratd.com email; is that correct?
20     A.  That's correct.
21     Q.  Okay.  Would you assume from that, that he's --
22  Mr. Kinsey's with Cobra?
23     A.  I mean, you could make that assumption.
24     Q.  Okay.  So in your opinion, are you providing
25  advice in your email, on Page 2373, to Mammoth and the

16

1  subsidiaries that were going to be doing work in
2  Puerto Rico?
3      A.  In my opinion, I was providing information that
4  was to be used and for the subsidiaries that would be
5  providing or doing work in Puerto Rico.  And I think at
6  this particular time, it was my impression that
7  Mr. Beagle was providing administrative services of some
8  sort to those entities; but you'd have to talk to him
9  about that.
10     Q.  Okay.  And the entities that -- that Mr. Beagle
11  was providing administrative support to were Cobra,
12  5 Star, and Higher Power, to your understanding?
13     A.  At this time, it -- I may have been aware of
14  Cobra.  I'm not sure about the others; but I think that
15  ultimately it's very possible that the others that
16  you've indicated, outside of Mammoth, I was providing
17  some assistance with regard to hiring employees to
18  work in Puerto Rico.
19     Q.  And with respect to pay plans; is that correct?
20     A.  With respect to pay issues.
21     Q.  Okay.  All right.  And the first paragraph
22  of -- of your response here at 4:00 p.m. talks about
23  offer letters.  Do you agree with that?
24         Do you need some time to read it, or are
25  you already familiar with it?

17

1    A.  Let's see.  Just one second.
2    Q.  Take your time.
3    A.  I think that first paragraph, yes, I talk about
4  a statement for Puerto Rico law, the signed statement,
5  acknowledging that the terms of their employment
6  relationship, while working in Puerto Rico, would be
7  governed by the laws of their home states or another
8  jurisdiction --
9    Q.  Okay.
10    A.  -- yes.
11    Q.  And so do you recall reviewing any offer
12  letters provided to you by Mammoth Energy?
13    A.  Yes.
14    Q.  Okay.  Do you recall reviewing any offer
15  letters provided by Cobra Acquisitions?
16    A.  Let me back up just a second.
17       You mentioned Mammoth Energy.  I don't
18  recall that.  And I don't recall -- yeah, there wasn't
19  anything by Mammoth -- Mammoth Energy.  I don't remember
20  any offer letters from them.
21       But I do recall I looked at a template for
22  an offer letter for one of the other entities, and I
23  can't remember which entity that was right now.
24    Q.  Who -- who provided you the offer letters that
25  you reviewed?

18

1    A.  The -- what I reviewed was provided to me by
2  Jeff Beagle.
3    Q.  Okay.  So this first part of your email, you're
4  talking about basically how to prevent Puerto Rico law
5  from applying to the linemen that went down to
6  Puerto Rico; is that correct?
7    A.  Well, not exactly.  So as I remember,
8  Puerto Rico's Labor Transformation and Flexibility Act
9  had just gone into -- in -- gone into effect, and it
10  provided, with respect to employees working temporarily
11  in Puerto Rico, with some exemptions for wage and hour
12  laws in Puerto Rico.
13       There were some -- as I understood it at
14  the time, there were some laws that would still apply to
15  those individuals that would be -- that would make them
16  applicable -- or applicable to them with respect to
17  Puerto Rico law.  I think Workers' Comp, and there may
18  have been some other issues like tax and discrimination.
19    Q.  Taxes, discrimination, and Workers' Comp is
20  what you say in Paragraph 3.
21    A.  Yes.  Yes.
22    Q.  Okay.  So what you're doing is you're advising
23  them, in order to avoid Puerto Rico law applying to
24  these linemen, they needed to specify in the offer
25  letters that -- offer letter that some other state law

19

1  would apply to each worker; is that correct?
2    A.  That's what my note says, yes.
3    Q.  Okay.  Did you understand that Mammoth would be
4  using these offer letters with Cobra, Higher Power, or
5  5 Star?
6    A.  I didn't understand that Mammoth would be
7  making any offers because, my understanding, it was
8  either going to -- and -- and maybe -- and I'm not even
9  sure Cobra was going to -- Acquisitions was going to be
10  making offers.
11       My understanding, that there were some
12  affiliated companies that were going to be doing hiring
13  and bringing employees in to work in Puerto Rico.  I
14  don't remember Mammoth being actually one of those
15  entities, and I'm not sure about Cobra Acquisitions.
16  Because that doesn't sound like -- that doesn't sound
17  like -- I don't think Cobra Acquisitions was, either.  I
18  think it had to do with these other entities.
19    Q.  Okay.  Do you know one way or the other on
20  Cobra Acquisitions, though?
21    A.  I don't remember seeing anything in terms of a
22  template for Cobra Acquisitions so I -- I don't know.  I
23  just don't know.
24    Q.  Okay.  Do you know if Mr. Beagle was going to
25  distribute the offer letters to Cobra or Higher Power or

20

1  5 Star?
2    A.  I -- I don't know what he -- what he actually
3  did with it or what his intent was, but I -- I was under
4  the impression that he was helping put together these
5  offer letters for certain entities that would be hiring
6  individuals and having them work in Puerto Rico.
7       And those -- and, again, I -- and I'm
8  not -- it may have been some of the other defendants
9  other than Mammoth in this case.  I don't believe it was
10  Cobra Acquisitions, but I do know -- at least, I -- I
11  saw one or two -- and you probably have those
12  documents -- but I saw one or two that had the actual
13  name of the -- of a company.
14    Q.  Okay.
15    A.  It might have been Higher Power.
16    Q.  Okay.  And -- and as part of the advice you
17  were providing, you weren't expected to follow up to
18  make sure that the offer letters were actually sent out
19  by Mammoth or its subsidiaries, were you?
20    A.  I did not.
21    Q.  So you don't know if they were sent out, and
22  you don't know if they were received back; correct?
23    A.  That's correct.
24    Q.  And you took no role in ensuring that Mammoth
25  or its subsidiaries actually implemented the advice that

21

**Page 22**

1   you're providing about the offer letters here; correct?
2       A. Other than possibly talking to Jeff Beagle and
3   providing my suggestions, I can't think of anything
4   else.
5       Q. Okay. And are you talking about talking to
6   Jeff Beagle in this email or at a subsequent time?
7       A. There were conversations that I had with Jeff,
8   and I know there were discussions. But when you talk
9   about implementation, for example, I -- I didn't say,
10  you know, "Hey, Jeff, I need to see copies of all the
11  signed agreements; and I need to make sure I know what
12  day it goes out." There was none of that.
13      Q. That wasn't your role?
14      A. I'm trying -- that wasn't -- yeah, that was
15  not -- well, yeah, I didn't -- I was not involved in
16  that at all.
17      Q. Okay. So you don't know what was sent out; and
18  you don't know what was signed and sent back, correct,
19  with respect to offer letters?
20      A. Yeah, I -- I -- I couldn't tell you what was
21  signed.
22      Q. Okay. Let me show you Exhibit 3. And before
23  we start on this, obviously, I don't want to get into
24  any privileged issues. So that's not my goal here.
25      A. Okay.

**Page 24**

1       Q. It looks like you responded back to Jeff, on
2   November 26, at 9:32 a.m., and asked him to send you a
3   copy of the offer letter signed by the employee in
4   question that you're discussing.
5       A. Yes.
6       Q. Okay. And then at the top, we see, from
7   Jeff Beagle to you, an email dated November 26, at
8   11:00 o'clock a.m.; and he says, "This is a sample."
9           Do you remember seeing this email?
10      A. Yes.
11      Q. Okay. So without getting into privilege
12  issues, were you -- or can -- can you tell me what --
13  what you were doing, generally?
14      A. It was not a wage and hour issue. So that -- I
15  can tell you that. It was -- it had to do with another
16  issue.
17      Q. Okay. All right. That's fine.
18          And so with respect to your desire to look
19  at the offer letter, what did you hope to get from your
20  review?
21      A. I was looking to see if the
22  (ZOOM interruption) --
23          THE REPORTER: Mr. Broussard, we've lost
24  you.
25          Doug, do you want to go off the

**Page 23**

1       Q. And this is Bates stamped 2261 through 2263.
2       A. Yes.
3       Q. And at the bottom, we see an email to Keith --
4   from Keith Ellison to Jeff Beagle, and it just says
5   "Terminated Staff"; correct?
6       A. Let's see here. I see one from -- is it one
7   from Jeff Beagle to Keith Ellison, dated November 21,
8   2017?
9       Q. Yeah, this is from -- it's on Page 2261; and
10  it's just at the bottom, from Keith Ellison to
11  Jeff Beagle, dated November 21st, at 10:55 a.m.
12      A. Oh, shoot. Hold on a second. Yeah, let me
13  see. Oh, I see it on -- on your screen. Okay.
14          And that's -- yes, I see that. Okay.
15      Q. Okay. So --
16      A. Yes.
17      Q. Then it looks like Beagle sent an email,
18  November 26, 2017, at 9:21. It doesn't say who to, and
19  everything else has been redacted. But a couple of
20  minutes later you respond and say, "Jeff, can you send
21  me a copy of the offer letter signed by the employee?"
22          Do you see that?
23      A. (Distorted audio)
24      Q. Were you able to see that, Mr. Broussard?
25      A. I'm sorry. What was the question, again?

**Page 25**

1   record?
2           MR. WELMAKER: Sure.
3           THE REPORTER: Okay. We are off the
4   record.
5           (RECESS FROM 9:34 A.M. TO 9:35 A.M.)
6           THE REPORTER: Okay. We are back on the
7   record.
8           (THE PRECEDING QUESTION WAS READ BACK)
9           THE REPORTER: And then the answer that I
10  have is, "I was looking to see if the"; and then that's
11  when we lost you.
12      A. All right. So what I was going to say is I was
13  looking to see, in the offer letter, if it might have
14  some information that I might deem pertinent to the
15  issue that was not the way -- not a wage and hour issue
16  that I was looking at.
17          MR. WELMAKER: Okay. All right. So let's
18  go off the record and see if we can get your -- your IT
19  folks to -- to pull back up the screen. Worst case
20  scenario, we can just do it through Gene's iPad; but
21  let's -- let's see what they can do.
22          THE WITNESS: Yeah, we'll be right back.
23          THE REPORTER: Okay. We are off the
24  record.
25          (RECESS FROM 9:38 A.M. TO 9:50 A.M.)

1    THE REPORTER: We'll go back on the
2  record.
3    Q.  (BY MR. WELMAKER)  Okay (screen sharing).  We
4  were looking at Exhibit No. 3, with respect to the
5  questions I was asking you, Mr. Broussard.
6    And at the top, Mr. Beagle is telling you,
7  in response to your request to see the letter, "This is
8  a sample."  And it says, as an attachment, "5 Star Offer
9  Letter Template."
10    Do you see that?
11    A.  Yes, sir.
12    Q.  And that is, again, Bates stamp 2261.  We end
13  at 2263.
14    So I'm showing you now Bates stamp 2264.
15  I've marked this as Exhibit No. 4.
16    And does this appear to be the offer
17  letter that Mr. Beagle asked you to review?
18    A.  That looks like the template that's referred to
19  in the previous exhibit.
20    Q.  Okay.  And so if you go down where I've
21  enlarged it, under "Puerto Rico Storm Rate," can you
22  read for me what it says on the right-hand table of that
23  column?
24    A.  Yes.  (Reading): $900 per day that will be
25  broken down hourly over 16 hours daily.

26

1    Q.  Okay.  As part of the advice that you provided
2  to Mammoth, or the Mammoth entities, did you instruct
3  Mammoth on, instead of paying a day rate, to take one
4  week's pay, under a day rate system, and break it down
5  into an hourly system?
6    A.  No.  What we talked about was different
7  options.  Day rate was one of those.  Paying by the hour
8  was another one.
9    Q.  Okay.  Were those the two options that you
10  talked about?
11    A.  There may have been other things we talked
12  about, but I think when -- as far as I remember, at the
13  end of our conversations about that, those were the two
14  options that were -- we were focusing on.
15    Q.  Okay.  So one of the options that you talked
16  about was to pay hourly, with time-and-a-half or
17  overtime hours; correct?
18    A.  Yes.
19    Q.  And then one was to pay a day rate, and that
20  would be the standard half-time rate for overtime
21  damages; correct?
22    A.  That's correct.
23    Q.  Okay.  And so let me go back to your Exhibit 2.
24  And I'm going to increase the -- there (indicating).
25    And so you talked about two different ways

27

1  of doing it, hourly and day rate.
2    Do you know which -- which plan they --
3  they wound up using?
4    A.  No.
5    Q.  Okay.  So I'm showing you -- it's part of
6  Exhibit 2.  It's -- it's, again, Bates stamp 2373.  Here
7  you're talking about -- and correct me if I'm
8  summarizing anything wrong -- you're talking about if
9  Puerto Rico law doesn't apply, then you're going to have
10  to pay overtime in accordance with the Fair Labor
11  Standards Act; is that correct?
12    A.  And possibly whatever state -- other state --
13  or state law that might apply.
14    Q.  Okay.  So if a state law provides additional
15  protections in addition to the FLSA, you would have to
16  deal with those additional protections, as well;
17  correct?
18    A.  That's correct.
19    Q.  Okay.  Then it looks like you provide a method
20  for calculating overtime, under the FLSA, based on a day
21  rate; is that correct?
22    A.  Yes, but that's -- it's -- there's an error in
23  that sentence.
24    Q.  Okay.  So instead of saying the employee would
25  receive 1.5 times that amount, what should it say?

28

1    A.  To half time.
2    Q.  Okay.  So the correct way to calculate overtime
3  for a day rate is to take half time and divide it -- and
4  multiply it by the number of hours over 40; correct?
5    A.  Yeah, number of hours -- the regular rate over
6  40, yes.
7    Q.  Let me just -- I just want to clarify.
8    So how would you calculate overtime on a
9  day rate?
10    A.  Well, you take the total compensation you
11  receive -- or you take the day rate, for example, that
12  would be paid and then the hours worked during that --
13  that particular workweek, and you divide that day rate
14  by those hours worked in order to get the regular rate.
15  And that regular rate is what you would use to determine
16  the overtime, daily.
17    Q.  Okay.  So basically it's a half-time
18  calculation, as opposed to the hourly time-and-a-half
19  calculation; correct?
20    A.  That's correct.
21    Q.  All right.  So you advised Mammoth and its
22  subsidiaries that if they were going to pay a day rate,
23  they were going to have to pay overtime on that day rate
24  if employees worked more than 40 hours in a week;
25  correct?

29

1    A.  It would -- yeah, depending on how many hours
2  they worked, yes, they may have some.  And, again, I --
3  it -- I just -- you mentioned Mammoth.  I don't believe
4  Mammoth had any employees out there.  But, yes, they
5  added -- it was half time.  They'd have to pay overtime
6  for hours over 40.
7    Q.  Okay.  I want to show you what I have marked as
8  Exhibit No. 5 (screen sharing).
9    A.  Yes.
10   Q.  Do you recall seeing this email or getting this
11 email?
12   A.  I don't know if I recall it.  I may -- I may be
13 familiar with whatever the attachment was.
14   Q.  Okay.  So the Bates stamp on Exhibit 5 is 2312?
15   A.  Yes.
16   Q.  And then just for ease of identification of --
17 of the exhibits, I have marked 23 -- the next
18 consecutive document, 2313, as Exhibit No. 6.  Do you
19 see that?
20   A.  Yes.
21   Q.  Okay.  This document was produced in native
22 format to me.  So what I'm -- because I can't load a
23 spreadsheet into my Trial Presentation software, I'm
24 going to try to share my computer screen now.
25   A.  Okay.

                                                    30

1    Q.  So I'm stopping the share, starting the share,
2  and I'm trying to show you -- (screen sharing).
3        Okay.  Can you see what I am trying to
4  share with you right now?
5    A.  I see a -- looks like a spreadsheet.
6    Q.  Okay.  And at the top, it says
7  Mammoth-Maldonado-FED-2313.  Do you -- can -- are you
8  able to see that?
9    A.  Yes.
10   Q.  Okay.  So I've zoomed on it a little bit.  Does
11 that help you see it or are our pictures in the way?
12   A.  It's a little better.  I -- I -- I can make it
13 out.
14   Q.  Okay.  So if you need me to move it, just ask
15 me and I'll do that.
16   A.  Okay.
17   Q.  So is this the document that was attached to
18 what we previously referenced as Exhibit 5?
19   A.  It could be.
20   Q.  Okay.  I will tell you that it's in sequence --
21   A.  Uh-huh.
22   Q.  -- behind the transmittal email, which was
23 FED-2312.  So it appears, to me, to be the attachment to
24 the transmittal email.
25        Is there anything about this that -- that

                                                    31

1  looks different from what you recall being attached to
2  that email?
3    A.  I can't say if there's anything different.
4  It -- it may very well be what was attached to that
5  email.  It's just that I -- you know, over the period of
6  time that's gone by, I couldn't tell you if it's exactly
7  it; but it looks familiar.
8    Q.  Okay.  Do you recall reviewing this
9  spreadsheet?
10   A.  I recall looking at a spreadsheet, and this may
11 be it.
12   Q.  Okay.  And were you asked to review it for a
13 particular reason?
14   A.  No.
15   Q.  Okay.  Why -- why did Mr. Beagle send this
16 spreadsheet to you, if you know?
17   A.  Yeah, I -- I don't know if I can answer for
18 him; but as I remember at the time, we were talking
19 about different options in terms of the day rate,
20 possibly an hourly rate.  And as I understood it, this
21 was an internal document, kind of an accounting
22 document, and nothing that was -- in terms of trying to
23 kind of look at different scenarios, kind of breaking
24 out the pay and under a day rate, potentially.  And
25 then, of course, under an hourly rate and projected

                                                    32

1  issues with regard to overtime.
2        But I don't remember this being -- I --
3  the way I viewed it is more of an internal document,
4  because we -- I don't think they had decided at that
5  time what they were going to do in terms of pay.
6    Q.  Okay.  So at this point in time, to the best of
7  your recollection, they're still trying to figure out
8  exactly how they're going to pay these Puerto Rico
9  linemen; correct?
10   A.  I think so.  And I think I might have looked at
11 this, too, to make sure that we weren't going to have
12 any minimum wage issues.  And so I -- I remember this
13 was kind of a -- more for me, anyway, as a kind of a --
14 an internal document that they might have been looking
15 at in-- internally and -- you know, but it wasn't, in
16 my mind, anything final.
17   Q.  Okay.  And so one of the things that you were
18 focused on when you were looking at this was potential
19 minimum wage issues?
20   A.  Yeah.  I just wanted to make sure that their
21 hourly rate would -- would actually exceed; and it did,
22 of course, the minimum -- minimum wage rate --
23   Q.  Okay.
24   A.  -- or minimum...
25   Q.  Were you also looking at this for other

                                                    33

1   reasons, such as the -- the individuals' titles?
2       A.  You know, I don't -- I don't know if I could
3   say we were necessarily doing that.  I think the -- as
4   my understanding, these folks, except for perhaps the
5   foreman, these were -- all would have been individuals
6   who were nonexempt, doing manual type of labor out in
7   the field.  So I don't remember if we had a discussion
8   about the foreman or not.
9       Q.  Okay.  Did you have a discussion about any of
10  the other titles on this spreadsheet?
11      A.  I don't remember any specific discussions about
12  those titles.
13      Q.  And so as I -- I think you testified before,
14  and correct me if I'm wrong, you never got a -- a final
15  determination as to the pay system that was going to be
16  used for the Puerto Rico linemen; is that correct?
17      A.  That's correct.
18      Q.  Okay.  So they -- they -- Mammoth and its
19  subsidiaries could have gone with a day rate, which they
20  would have had to pay overtime on; correct?
21      A.  That's correct.
22      Q.  And they could --
23      A.  With regard to, at least, some of the employees
24  out there.  I -- you know, I think they had some
25  managers out there, obviously, would have been an --

34

1   exempt.  But, yeah, with regard to some employees, they
2   would have.
3           Mammoth -- Mammoth wouldn't have been
4   working out there, had their employees there.  It would
5   have been the subsidiaries or affiliated companies that
6   would have been controlled by that.
7       Q.  Working down at Puerto Rico at that time?
8       A.  Yes.
9       Q.  Okay.  So let's just -- I think you make a good
10  point with respect to the nonexempt employees.
11      A.  Uh-huh.
12      Q.  If Mammoth or its subsidiaries was going to pay
13  them a day rate, then they're still going to have to pay
14  overtime on that day rate if these in- -- individuals
15  worked more than 40 hours in a workweek; right?
16      A.  I think that was our discussion, yes.
17      Q.  Okay.  And is that your opinion?  Is that the
18  advice that you provided?
19      A.  Yes.
20      Q.  Okay.  And by the same token, if -- if these
21  folks were going to be paid hourly and they worked more
22  than 40 hours in a workweek, then they're going to be
23  paid overtime at time and a half; correct?
24      A.  Yes.
25      Q.  Okay.  So were those the two options that you

35

1   discussed with Beagle and other Mammoth representatives,
2   day rate and hourly pay?
3       A.  Those were the two, I think, that -- that we --
4   the primary discussion.  I think there might have been
5   some discussions about possibly the fluctuating workweek
6   and how we would handle that, but I don't think that was
7   applicable under the circumstances.
8           And there may have been some other
9   discussions about other matters or options, prior to
10  kind of -- at least in my mind -- focusing on the day
11  rate and hourly pay issues.
12      Q.  Okay.  Did you ever talk about a -- a third
13  option that would be hourly, but boosted up to the day
14  rate?  So that if the pay fell below promised day rate,
15  it would be brought up to what it was promised?
16      A.  I don't know if I remember any conversations
17  about that.
18      Q.  Okay.  Did you ever discuss a system that even
19  though it was hourly, Mammoth or its subsidiaries would
20  pay additional compensation in addition to the hourly
21  rates?
22      A.  I don't remember that.
23      Q.  Okay.  So the two plans that you were looking
24  at were just hourly and day rate, and -- and you weren't
25  contemplating a mixed plan as a potential third option;

36

1   correct?
2       A.  I think my last -- the last I remember, we left
3   it -- in terms of discussions were, you know, did they
4   go with the day rate; do they go with an hourly rate?
5   Those were things that I remember, at the end of the
6   day, that they were discussing.  Now -- but I don't
7   remember any other particular method.
8           MR. WELMAKER:  Okay.  I'll pass the
9   witness.
10          MR. NETTLES:  Guys, let's take just a
11  short break.  I think I've got a handful of questions,
12  and that'll be it.
13          MR. WELMAKER:  Okay.
14          THE WITNESS:  Okay.
15          THE REPORTER:  Okay.  We're off the
16  record.
17          (RECESS FROM 10:07 A.M. TO 10:11 A.M.)
18          THE REPORTER:  We're back on the record.
19              EXAMINATION
20          (10:11 A.M.)
21  BY MR. NETTLES:
22      Q.  Mr. Broussard, my name is Gene Nettles; and you
23  understand that I'm a lawyer with Porter & Hedges and
24  represent the defendants in this case?
25      A.  Yes.

37

1    Q.  All right.  So you've answered various
2  questions this morning from Mr. Welmaker concerning what
3  you were doing in October of 2017; is that correct?
4    A.  Yes, sir.
5    Q.  The purpose -- was it your understanding of the
6  purpose for which you were hired by Mr. Beagle at that
7  time would have been for the companies -- and we talked
8  about Mammoth and its subsidiaries -- to be compliant
9  with the Fair Labor Standards Act?
10    A.  That's correct.  That was one of the things
11  that I believe I was tasked to do in 2017, in October of
12  that year.
13    Q.  Now, you also stated that you drafted some
14  language and you sent that in an email.  And it was
15  marked as one of the exhibits by Mr. Welmaker for your
16  deposition; correct?
17    A.  That is correct.
18    Q.  And what is your understanding that happened to
19  that language?
20    A.  My understanding was Mr. Beagle incorporated
21  that language in templates that may have been used by
22  those subsidiaries that were hiring individuals and
23  deploying them to Puerto Rico.
24    Q.  And one of those templates was marked as an
25  exhibit, as well; is that correct?

38

1    A.  I believe that template may have also had
2  that -- yes, may have been -- that information in
3  that particular template, yes, sir.
4    Q.  And you drafted the template -- template and
5  reviewed the -- and I -- excuse me.
6        You drafted language that was incorporated
7  in the template, and you reviewed the template for the
8  subsidiaries to determine whether or not it was
9  compliant with the Fair Labor Standards Act and Puerto
10  Rico laws; is that correct?
11        MR. WELMAKER: Objection, form.
12    A.  Yeah, I -- I remember reviewing a template that
13  had been prepared and advised Mr. Beagle that I believe
14  it was compliant with the Fair Labor Standards Act and
15  with Puerto Rico law.
16    Q.  (BY MR. NETTLES)  And -- and that was your
17  purpose in doing so?
18    A.  Yes, sir.
19        MR. WELMAKER: Objection, form.
20    Q.  (BY MR. NETTLES)  Just so the record is clear,
21  state again:  What was your purpose in looking at the
22  template that was provided to you?
23    A.  My purpose was to -- to make sure -- or to try
24  to provide legal advice with respect to whether it would
25  be compliant with Federal law and also with respect to

39

1  the new Puerto Rico law that had been enacted.
2    Q.  All right.  Did anybody with Mammoth or any of
3  the related entities ever express to you any intent,
4  effort, or interest in trying to come up with a pay
5  system to avoid paying overtime?
6    A.  No.
7    Q.  Now, what were the two pay plans that were
8  under evaluation that you talked to Mr. Beagle about?
9    A.  So --
10        MR. WELMAKER: Objection, form.
11    A.  So at the very end of what would be my
12  conversations about the -- the pay plans that I had with
13  Mr. Beagle, we were focused on the -- possibly of a day
14  plan or an hourly plan.  And so, ultimately, at least
15  from my perspective, those were the two things that --
16  that we were -- that were under consideration.
17    Q.  (BY MR. NETTLES)  And were there any other
18  options or plans that were under consideration, based on
19  your knowledge at that time?
20    A.  Not at that time, as far as I could -- could
21  tell.
22    Q.  And on the hourly with overtime arrangement,
23  were you of the opinion that taking a target level of
24  compensation associated with an assumed number of hours
25  to come to an hourly rate with overtime would be

40

1  compliant?
2    A.  Yeah --
3        MR. WELMAKER: Objection, form.
4    A.  Yeah.  I -- I don't -- I don't see any issue
5  with that at all.  I think companies do that all the
6  time.  They try to figure out, you know, what it is
7  that -- you know, what the -- what the wage rate might
8  be by trying to figure out -- working within certain
9  targets or limitations.  So I don't see an issue with
10  that at all.
11    Q.  (BY MR. NETTLES)  And based on what you know
12  from the hourly with overtime plan that you and
13  Mr. Beagle and Layton discussed, was it your opinion
14  that was compliant with the Fair Labor Standards Act?
15    A.  Yes, sir.
16        MR. WELMAKER: Objection, form.
17        MR. NETTLES: I'll pass the witness back,
18  Doug.
19        REEXAMINATION
20        (10:16 A.M.)
21  BY MR. WELMAKER:
22    Q.  Okay.  I just have a couple of questions,
23  Mr. Broussard.
24    A.  Uh-huh.
25    Q.  So correct me if I'm wrong, did you just

41

1   testify that -- that some of the advice that you gave
2   was incorporated into an offer letter template?
3       A.  Yeah.  So if you notice the -- the --
4       Q.  I just want to know yes or no.
5       A.  Yes.
6       Q.  Okay.  And was this offer letter template
7   distributed by Mammoth or its subsidiaries?
8       A.  I don't know -- I can't tell you if it was
9   actually distributed.  My understanding was that the
10  subsidiaries -- or at least some of those subsidiaries
11  would be distributing offer letters based on the
12  templates.
13      Q.  Okay.  But you don't know whether it was
14  distributed or not; correct?
15      A.  I don't.
16      Q.  And it wasn't within the scope of -- of your
17  retention by Mammoth or its subsidiaries to follow up
18  and find out if -- if the offer letter that we're
19  discussing was distributed; correct?
20      A.  That's correct.
21      Q.  Okay.  You stated that you reviewed a template
22  and told Mr. Beagle -- an offer letter template and told
23  Mr. Beagle that it was compliant under the FLSA.  Do you
24  remember saying that?
25      A.  Yes, sir.

42

1       Q.  Okay.  What template are you talking about?
2       A.  There was a template that was provided to me in
3   October, and it -- I think it incorporated -- it was
4   after I sent the email out that -- the lengthy email
5   with regard to Puerto Rico law.  And then there was some
6   suggested language with regard to what might go into an
7   offer letter.
8       Q.  And was that template provided to you in email?
9       A.  What's that?
10      Q.  Was that template provided to you by email?
11      A.  Yes.
12      Q.  Okay.  So if it was provided to you by email, I
13  should have a copy of that; correct?
14      A.  I -- I don't know.  I wasn't involved in the
15  discovery of this case, but I would assume so.
16      Q.  Okay.  So was the template that you were
17  provided, that you were emailed, different from the
18  template that we reviewed earlier?
19      A.  I believe there -- there was a difference.  I
20  don't think it -- first of all, I don't think it was the
21  same company.  And then, secondly, I noticed you had
22  highlighted, in the template we showed today, something
23  regard -- and then I read the information about the, I
24  guess, compensation or pay -- it didn't have that
25  language.

43

1       Q.  Okay.  What language did it have?
2       A.  It had some other language, in terms of -- I
3   think it was in parentheses, maybe something effect --
4   that effectively said hourly or salaried or something
5   like that.
6       Q.  Okay.  As we sit here today, do you recall
7   exactly what that letter said with respect to
8   compensation?
9       A.  I can't remember the specifics of it, other
10  than that it was in a template form and it -- I don't
11  remember -- nothing else stands out with regard to
12  compensation.  I just remember that the -- whatever was
13  in the compensation box, it was in parentheses.  And so
14  it was sort of like an either/or, or something like
15  that.  It -- it hadn't been -- as far as I could tell --
16  been a decision made on, you know, identifying a
17  specific compensation package.
18      Q.  Okay.  So at that point in time that you
19  reviewed that particular template --
20      A.  Uh-huh.
21      Q.  -- Mammoth and its subsidiaries were still
22  trying to decide, in your opinion, how to pay the
23  linemen that were going down to Puerto Rico; is that
24  correct?
25      A.  Yeah, I -- I don't know if I can -- maybe.  I

44

1   mean, I -- I don't know what happened, in terms of when
2   they made a decision.  I just know that during my
3   conversations that we were talking about this, the
4   impression I got was that they were trying to figure out
5   which way to go.
6       Q.  Okay.
7       A.  And I don't know, when I looked at that
8   template, if they had already decided that or not.
9       Q.  All right.  When was the last time that you
10  looked at the template that we're discussing right now?
11      A.  I may have seen a copy of it yesterday when I
12  was preparing for the deposition.
13      Q.  Okay.  And who showed that to you?
14      A.  It was provided to me by my counsel.
15      Q.  And who was that?
16      A.  Mr. Nettles.
17      Q.  Okay.  With respect to advice that you provided
18  Mammoth or its subsidiaries regarding payment of
19  overtime, either hourly or day rate, did you review any
20  paychecks to determine whether or not Mammoth was
21  complying -- or Mammoth subsidiaries were complying with
22  any of the advice that you provided them?
23      A.  No.
24      Q.  That wasn't part of the scope of why you
25  were retained, was it?

45

**Page 46**

1    A. I was not -- I was not asked to do that.
2    Q. Okay. And you didn't do that; correct?
3    A. That's correct.
4    Q. Okay. So just to be clear, you didn't review
5 actual payroll records at any point to determine whether
6 or not those records and the payment plan was in
7 compliance with the FLSA; correct?
8    A. That's correct.
9    MR. WELMAKER: I'll pass the witness.
10    MR. NETTLES: Let me get off again and
11 just see. I don't think I've got anything else, but
12 just give me a couple of minutes here.
13    THE WITNESS: All right.
14    THE REPORTER: We're off the record.
15    (RECESS FROM 10:22 A.M. TO 10:27 A.M.)
16    THE REPORTER: Back on the record.
17    REEXAMINATION
18    (10:27 A.M.)
19 BY MR. NETTLES:
20    Q. Mr. Broussard, just a -- maybe another question
21 or two.
22    With respect to the individuals that you
23 talked to, with respect to the defendants in this case,
24 Mammoth and the related subsidiaries, did you talk to
25 anyone else other than Jeff Beagle?

**Page 47**

1    A. I would have had a conversation, at least one
2 conversation, involving Mark Layton.
3    Q. And what do you remember about that
4 conversation in particular and when it occurred?
5    A. It was on a weekend, and it had to do with --
6 we were talking about, again, I think, the options in
7 terms of -- of pay. I can't remember all the specifics
8 of it, but I -- I'm certain we talked about the hourly
9 issue and also day rates. And that was, again -- he
10 was -- he was on the line with myself and -- and
11 Jeff Beagle.
12    Q. Okay. And why do you remember that in
13 particular?
14    A. I just remember it because I -- I was having
15 that conversation on my back deck at home, and it was on
16 a weekend.
17    Q. Okay.
18    MR. NETTLES: All right. I think with
19 that, I'm going to pass the witness back, Doug.
20    REEXAMINATION
21    (10:28 A.M.)
22 BY MR. WELMAKER:
23    Q. All right. Mr. Broussard, I'd like to ask you
24 a couple of more questions about that.
25    So this call with Mr. Layton, when did

**Page 48**

1 that occur?
2    A. That would have been sometime in October. It
3 was -- it was on a weekend.
4    Q. Okay. And at that point in time, did you have
5 the sense that they had -- or that Mr. Layton or
6 Mr. Beagle had made a decision as to which pay system to
7 use, an hourly system or a day rate system?
8    A. No, I don't think so.
9    Q. Okay. And what advice did you provide them in
10 that phone call?
11    A. Yeah, I -- the only thing I can remember at
12 this time -- and we may have discussed other things,
13 too -- with having to do with, you know, how the -- kind
14 of -- and I think it was -- it may have been more for
15 Mark's benefit, kind of explaining how the day rate
16 worked and the hourly system would work, maybe talked
17 about what the antic- -- anticipated length of the
18 project would be. And I -- but I can't remember
19 anything more specific than that.
20    MR. WELMAKER: Okay. I'll pass the
21 witness.
22    MR. NETTLES: Let me just check one more
23 time. I think that's all I have, Doug, but give me just
24 a couple of minutes here, please.
25    THE REPORTER: Okay. We're off the

**Page 49**

1 record.
2    (RECESS FROM 10:29 A.M. TO 10:31 A.M.)
3    THE REPORTER: Okay. We're back on the
4 record.
5    MR. NETTLES: No further questions. Pass
6 the witness.
7    MR. WELMAKER: All right. Thank you very
8 much, Mr. Broussard.
9    THE WITNESS: All right. Thank you.
10    THE REPORTER: Gene, do you need a copy of
11 the deposition?
12    MR. NETTLES: Yes.
13    THE REPORTER: And what about signature?
14    MR. NETTLES: Yes.
15    (EXHIBIT NO. 1 THROUGH EXHIBIT NO. 7
16 PROVIDED AND MARKED)
17    (THE DEPOSITION WAS CONCLUDED AT 10:31 A.M.)
18
19
20
21
22
23
24
25

ERRATA SHEET

DEPOSITION OF: STEVEN BROUSSARD; MAY 9, 2024

| PAGE | LINE | CHANGE | REASON |
|------|------|--------|--------|
| 4 | | | |
| 5 | | | |
| 6 | | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | | | |
| 13 | | | |
| 14 | | | |
| 15 | | | |
| 16 | | | |
| 17 | | | |
| 18 | | | |
| 19 | | | |
| 20 | | | |
| 21 | | | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Signature:_____ Date:_____

50

---

I, STEVEN BROUSSARD, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
STEVEN BROUSSARD

THE STATE OF _____ )

COUNTY OF _____ )

Before me, _____, on this day personally appeared STEVEN BROUSSARD, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, 2024.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF _____

51

---

UNITED STATES FEDERAL COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

AARON MALDONADO, et al,  )
                          )
Plaintiffs,               )
                          )
                          )
VS.                       ) CASE NO. 5:21-cv-85-OLG
                          )
                          )
MAMMOTH ENERGY SERVICES,  )
INC., COBRA ACQUISITIONS, )
LLC, HIGHER POWER         )
ELECTRICAL, LLC AND 5     )
STAR ELECTRIC, LLC        )
                          )
Defendants.               )

REPORTER'S CERTIFICATION

DEPOSITION OF STEVEN BROUSSARD

MAY 9, 2024

(REPORTED REMOTELY)

I, DEBORAH GARNEY VIATOR, a Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the Witness, STEVEN BROUSSARD, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the Witness;

That the deposition transcript was submitted on

52

---

_____, 2024, to the Witness or to the attorney for the Witness for examination, signature, and return to the offices of Nell McCallum & Associates, Inc., by _____, 2024;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

FOR THE PLAINTIFFS:

Mr. Douglas B. Welmaker (via ZOOM)
SBOT NO. 00788641
WELMAKER LAW, PLLC
409 North Fredonia, Suite 118
Longview, Texas 75601
doug@welmakerlaw.com

FOR THE DEFENDANTS AND STEVEN BROUSSARD:

Mr. Eugene M. Nettles (via ZOOM)
SBOT NO. 14927300
Mr. M. Harris Stamey (via ZOOM)
SBOT NO. 24060650
PORTER HEDGES LLP
1000 Main Street, Floor 36
Houston, Texas 77002
enettles@porterhedges.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties or

53

---

14

NELL MCCALLUM & ASSOCIATES, INC.   409-838-0333
NELL McCALLUM & ASSOCIATES

1   attorneys in the action in which this proceeding was
2   taken, and further that I am not financially or
3   otherwise interested in the outcome of the action.
4
5        Further certification requirements pursuant to the
6   Federal Rules of Civil Procedure will be certified to
7   after they have occurred.
8
9        SWORN TO AND SUBSCRIBED by me in Beaumont, Texas, on
10   this _____ day of _____, 2024.
11
12        _____
13        DEBORAH GARNEY VIATOR, RPR
14        Texas CSR No. 2394
15        Expiration Date:  August 31, 2024
16        Firm Registration No. 143
17        Nell McCallum & Associates, Inc.
18        3560 Delaware Street, Suite 402
19        Beaumont, Texas 77706
20        (409)838-0333/(409)832-4501
21
22
23
24
25
                                                        54

1        REPORTER FIRM'S FURTHER CERTIFICATION
2        The Changes and Signature Pages were/were not
3   returned to the deposition officer on
4   _____, 2024;
5        If returned, the attached Changes and Signature
6   Pages contain any changes and reasons therefor;
7        The original deposition was delivered to
8   MR. DOUGLAS B. WELMAKER, for safekeeping on
9   _____, 2024;
10        That a copy of this certificate was served on all
11   parties shown herein.
12        SWORN TO AND SUBSCRIBED by me in Beaumont, Texas,
13   on this _____ day of _____,
14   2024.
15
16        _____
17        DEBORAH GARNEY VIATOR, RPR
18        Texas CSR No. 2394
19        Expiration Date:  August 31, 2024
20        Firm Registration No. 143
21        Nell McCallum & Associates, Inc.
22        3560 Delaware Street, Suite 402
23        Beaumont, Texas  77706
24        (409)838-0333/(409)832-4501
25
                                                        55

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **AARON MALDONADO**, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **Case No. 5:21-cv-85** |
| | § | |
| **MAMMOTH ENERGY SERVICES,** | § | |
| **INC., COBRA ACQUISITIONS, LLC,** | § | |
| **HIGHER POWER ELECTRICAL, LLC,** | § | |
| **and 5 STAR ELECTRIC, LLC,** | § | |
| | § | |
| *Defendants*. | § | |

## DECLARATION OF STEVEN BROUSSARD

I, Steven Broussard, declare as follows:

1.      My name is Steven Broussard. I am over the age of eighteen (18). I have never been convicted of a felony or crime involving moral turpitude. I am fully competent to make this declaration. I have personal knowledge of all the facts stated herein or have derived these facts from a review of business records, and the statements herein are true and correct.

2.      I am a lawyer and member of the Hall Estill firm located in Tulsa, Oklahoma where I have practiced law for the past 36 years. My Curriculum Vitae can be accessed at https://www.hallestill.com/our-team/steven-a-broussard. As a member of the Labor & Employment Law Section of the firm, I specialize in employment matters ranging from labor disputes to discrimination claims. One of my areas of specialty is representing employers with respect to wage and hour issues and disputes.

3.      Following the two hurricanes, Irma and Maria, that devastated Puerto Rico in September 2017, I was contacted by Mr. Jeff Beagle, the HR Director for Mammoth Energy Services, Inc. ("Mammoth") on October 18, 2017. He advised me that one of the Mammoth subsidiaries had entered a contract with the Puerto Rico Electrical Power Authority ("PREPA") to restore power to the island. He contacted me for assistance in developing a pay plan for the workers that was compliant with the Federal Labor Standards Act ("FLSA") and Puerto Rico law.

4.      Over the next weeks, Mr. Beagle and I, and, at least on one occasion, along with Mark Layton, the CFO for Mammoth, discussed and evaluated pay plans.

1

**EXHIBIT**

**4**

exhibitsticker.com

Beagle initially indicated that the Defendants were interested in paying employees on a day rate basis. I responded that they could do so but would need to pay overtime on top of the day rate and explained how such a calculation was done. We also discussed an hourly pay rate approach. I understood that Beagle and Layton were intent on adopting a pay plan, possibly based on a day or hourly rate, compliant with the FLSA.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this $\underline{30^{th}}$ day of July 2024.

_____
Steven Broussard



Re: Offer of Employment

Dear _____

Thank you for your interest in employment with 5 Star Electric LLC. We are pleased that you have accepted the position of Class A Lineman.  You have been hired to work on a special assignment repairing infrastructure in Puerto Rico, which is expected to be completed within one (1) year. Our goal is to work 12 hours a day and not to work at night. As many of you know and are accustomed to with storms, certain situations may arise that could require longer hours, but will not exceed 16 hours.  Although the company will attempt to place you in non-project related work please understand that this is a project-based position and 5 Star cannot guarantee continued employment after the project has concluded.  Additionally, this position is "at-will" and we recognize that you retain the option, as does 5 Star, of ending your employment with 5 Star at any time, with or without notice and with or without cause.  Finally, your employment relationship with 5 Star Electric LLC will be governed by the OKLAHOMA law.

This letter will serve as written confirmation of our discussions regarding your employment with the Company.  This offer of employment is contingent upon the successful completion of all pre-employment requirements including but not limited to background screens, MVRs, and drug screens.

The Company intends to move quickly to fill this position.  Below is the framework for the proposed employment offer.  Please note that the offer assumes your willingness to relocate to travel to work locations.

| | |
|---|---|
| Start Date | |
| Starting Hourly Rate | |
| Puerto Rico Storm Rate | **$900.00 per day that will be broken down hourly over 16 hours daily.** |
| Medical/Dental/Vision Insurance | Eligible first of the month following start of employment. |
| Additional Benefits | 401(k) plan (company contribution currently suspended; company paid life insurance at two times earnings, short and long term disability – eligible first of month following start of employment |



EXHIBIT

5

5 Star Electric LLC – 14201 Caliber Drive Suite 300 – Oklahoma City, OK 73134

CONFIDENTIAL



This offer is also contingent upon your representation by signing below that as of your first day of employment you are not subject to a non-compete, non-solicitation or any other type of agreement that would preclude your employment with or impact the performance of your job responsibilities with the Company.

Your employment with the Company is "at will", which means that either you or the Company may terminate your employment relationship at any time, without notice or cause.  This offer of employment is not intended to create a contract between you and the Company.

Regards,

Please sign below in the space provide to acknowledge you have read this acknowledgment and agree with its terms. If you have any questions, please contact Ken Kinsey or Human Resources.

Agreed By:_____

**Signature & Date**

5 Star Electric LLC – 14201 Caliber Drive Suite 300 – Oklahoma City, OK 73134

MAMMOTH-MALDONADO-FED002492

```
 1                  UNITED STATES FEDERAL COURT
                    WESTERN DISTRICT OF TEXAS
 2                     SAN ANTONIO DIVISION

 3    AARON MALDONADO, et al        )
                                    )
 4    VS.                           )  Cause No. 5:21-cv-85-OLG
                                    )
 5    MAMMOTH ENERGY SERVICES, INC., )
      COBRA ACQUISITIONS, LLC,      )
 6    HIGHER POWER ELECTRICAL, LLC,  )
      AND 5 STAR ELECTRIC, LLC      )

 7

 8

 9        **********************************************

10                        ORAL DEPOSITION

11             DEFENDANTS' DESIGNATED REPRESENTATIVE

12                         MARK LAYTON

13                        JUNE 20, 2024

14                          VOLUME 1

15                     (REPORTED REMOTELY)

16        **********************************************

17

18        ORAL DEPOSITION of MARK LAYTON, produced as a witness at

19    the instance of the Plaintiffs, and duly sworn, was taken in

20    the above-styled and numbered cause on the 20th day of June,

21    2024, from 9:41 a.m. to 5:33 p.m., before Rhonda K. Ashman,

22    CSR, RPR, in and for the State of Texas, reported by

23    stenographic means via Zoom, in Oklahoma City, Oklahoma,

24    pursuant to the Federal Rules of Civil Procedure and the

25    provisions stated on the record or attached hereto.
```

EXHIBIT
6-A

```
 1                    A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         Mr. Douglas B. Welmaker, Esq.
           WELMAKER LAW, PLLC
 4         409 North Fredonia
           Suite 118
 5         Longview, Texas  75601
           Phone (512) 799-2048
 6         doug@welmakerlaw.com

 7    FOR THE DEFENDANTS:

 8         Mr. William Stukenberg, Esq.
           PORTER HEDGES, LLP
 9         1000 Main Street
           Suite 3600
10         Houston, Texas  77002
           Phone (713) 226-6000
11         wstukenberg@porterhedges.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           I N D E X

2    Appearances . . . . . . . . . . . . . . . . . 2

3    Exhibit Index . . . . . . . . . . . . . . . 4

4    Examination by Mr. Welmaker. . . . . . . . . . .6

5    Signature and Corrections. . . . . . . . . . .177

6    Reporter's Certificate . . . . . . . . . . . .179

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   E X H I B I T   L I S T

 2    NO.              DESCRIPTION                      PAGE

 3    Exhibit  1       Plaintiffs' Notice of Intention to
                        Take Deposition of All Defendants'
 4                      Designated Representatives        6

 5    Exhibit  2       October 19, 2017, announcement    28

 6    Exhibit  3       February 21, 2018, announcement   33

 7    Exhibit  4       June 7, 2019, announcement        36

 8    Exhibit  5       Emergency Master Service Agreement
                        For PREPA's Electrical Grid Repairs
 9                      Hurricane Maria                  38

10    Exhibit  6       Email correspondence             46

11    Exhibit  7       Email correspondence             88

12    Exhibit  9       Email correspondence             94

13    Exhibit 10       Spreadsheet                      96

14    Exhibit 11       Snapchat message                100

15    Exhibit 13       Email correspondence            107

16    Exhibit 14       Email correspondence            111

17    Exhibit 15       Email correspondence            115

18    Exhibit 16       Email correspondence            116

19    Exhibit 17       Email correspondence            118

20    Exhibit 18       Email correspondence            120

21    Exhibit 19       Email correspondence            125

22    Exhibit 22       Email correspondence            141

23    Exhibit 23       Email correspondence            147

24    Exhibit 24       Email correspondence            147

25    Exhibit 26       Email correspondence            148
```

```
 1                    E X H I B I T S (CONTINUED)

 2    NO.             DESCRIPTION                        PAGE

 3    Exhibit 28      Email correspondence               131

 4    Exhibit 29      Mammoth Energy Services, Inc.,
                       Policy Prohibiting Insider Trading
 5                     And Unauthorized Disclosure of
                       Information to Others             161
 6
      Exhibit 30      Intellectual Property, Confidentiality
 7                     and Non-Interference Agreement    163

 8    Exhibit 31      Time Detail Report                 164

 9    Exhibit 33      Email correspondence               165

10    Exhibit 34      Personnel Action Form (PAF)        168

11    Exhibit 36      Earnings Statements/Checks           57

12    Exhibit 43      Earnings Statements/Checks           59

13    Exhibit 58      Personnel File                     159

14    Exhibit 72      Time Detail Report                 103

15    Exhibit 75      Offer of Employment correspondence   68

16

17

18

19

20

21

22

23

24

25
```

P R O C E E D I N G S

1
2          THE COURT REPORTER:  We are on the record at
3     9:41 a.m.  Before I swear in the witness, would Counsel,
4     please, state their appearances and transcript orders for the
5     record.
6          MR. WELMAKER:  Doug Welmaker for the plaintiffs
7     in this action.  And I would like a condensed.
8          MR. STUKENBERG:  And Will Stukenberg on behalf
9     of the defendants, and I'll take a full transcript and a
10    condensed, please.
11                    MARK LAYTON,
12    having been first duly sworn, testified as follows:
13                E X A M I N A T I O N
14    BY MR. WELMAKER:
15         Q.   Can you state your name for the record, please.
16         A.   Mark Layton.
17         Q.   All right.  And Mr. Layton, I have noticed your
18    deposition today.  And I'm going to assume that you've seen
19    that.  And I also want to show you a copy of that.  Let's see
20    if I can do it.  Give me one second to get this going.
21              It always works in practice, and then when I try
22    to do a deposition, it just doesn't do what it's supposed to
23    do.
24              (Exhibit 1 marked.)
25              MR. STUKENBERG:  Exhibit 1, to the extent that's

1    helpful.

2                    MR. WELMAKER:  What?

3                    MR. STUKENBERG:  Exhibit 1 to the extent that's

4    helpful.

5                    MR. WELMAKER:  Yeah, let me try to get it going

6    one more time.

7                    Okay.  Can everybody see what I've marked as

8    Exhibit 1?

9                    THE WITNESS:  Yes.

10                   MR. STUKENBERG:  Yes.

11       Q.  (BY MR. WELMAKER)  Okay.  And so, Mr. Layton, this is

12   the corporate rep notice, the 30(b)(6) notice, for the

13   representatives of all four defendants in this case.

14                   And I'll give you plenty of time to look through

15   it.  And especially look at Schedule A and see if you're

16   familiar with this or if you've ever seen this before.

17       A.  Yes.  Counsel provided a copy of this to me.

18       Q.  Okay.  And have you reviewed the items set forth on

19   Schedule A?

20       A.  Yes.

21       Q.  And are you ready to testify about all of those

22   items?

23       A.  Yes.

24                   MR. STUKENBERG:  Except subject to our

25   objections that we served, Doug, obviously.

1          MR. WELMAKER:  All right.

2      Q.   (BY MR. WELMAKER)  So this is the third time that

3  we've met; is that correct?

4      A.   I don't know.  Sounds directionally correct.

5      Q.   Okay.  And a lot of the questions that I have asked

6  you, I've asked you before, but I have to ask them again for

7  purposes of this lawsuit.  And also, I'm sure some things have

8  changed since we last spoke.

9          So can you tell me what your current positions

10  are with respect to any of the Mammoth entities, any of the

11  Cobra entities?

12      A.   I'm not sure I understand the context of any of the

13  Mammoth entities or any of the Cobra entities.

14      Q.   Okay.  So, for example, the first entity that I want

15  to ask you about is Mammoth Energy Services, Inc.

16      A.   Okay.

17      Q.   What is your relationship to that entity?

18      A.   I am the chief financial officer and secretary of

19  Mammoth Energy Services, Inc.

20      Q.   And how long have you held those positions?

21      A.   Since sometime in 2016.

22      Q.   Okay.  Have you dropped any positions that you used

23  to hold with Mammoth Energy Services, Inc., since 2016 through

24  today?

25          MR. STUKENBERG:  Objection, form.

1          A.   I'm not sure what drop positions means.

2          Q.   (BY MR. WELMAKER)  Have you only held those two

3    positions since 2016 through today with Mammoth Energy

4    Services?

5          A.   Those are my roles.  I don't understand what the

6    context of positions is.

7          Q.   Have you occupied any other officer positions with

8    Mammoth Energy Services, Inc., since 2016?

9          A.   Officer positions, no, sir.

10         Q.   Okay.  And with respect to Mammoth Energy Services,

11   what are your roles with Mammoth Energy Services, Inc.?

12         A.   I believe that's what I just answered.  So I don't

13   understand the question.

14         Q.   I'm sorry.  It's Mammoth Energy, Inc., is what I

15   meant to ask about.

16         A.   With Mammoth Energy, Inc., I am the chief financial

17   officer.  That is my employing entity.

18         Q.   Do you occupy any other officer positions with

19   Mammoth Energy, Inc.?

20         A.   No.

21         Q.   Okay.  What about are you associated in any way with

22   Mammoth Energy Partners, LLC?

23         A.   Yes.

24         Q.   Okay.  In what way?

25         A.   I am the chief financial officer of that entity.

1    Q.   Do you occupy any other positions with this entity?

2    A.   No.

3    Q.   How long have you been CFO of Mammoth Energy

4    Partners?

5    A.   I believe since sometime in either 2014 or 2015.  I

6    don't recall which.

7    Q.   And how long were you or have you been CFO of Mammoth

8    Energy, Inc.?

9    A.   Since its formation in, I believe, 2016.

10   Q.   Okay.  Who are the other officers of Mammoth Energy

11   Services, Inc.?

12   A.   The other officer is Arty Straehla.  He is both the

13   CEO as well as a director.  I don't necessarily consider

14   directors as officers.

15   Q.   What would you consider a director to be?

16   A.   A director.

17   Q.   Okay.  Are there any other officers or directors of

18   Mammoth Energy Services, Inc.?

19   A.   There are other directors, yes.

20   Q.   Who are the other directors?

21   A.   Arthur Amron, Arthur Smith, James Palm, Paul Jacobi

22   and Dr. Corey Booker.

23   Q.   And if I wanted to look into those individuals in

24   more detail, I could go to Mammoth Energy Services' website?

25   A.   Yes, among other places.

1    Q.   What other places could I go?

2    A.   You could go to the SEC's website.

3    Q.   All right.  And who are the other officers or

4    directors of Mammoth Energy, Inc.?

5    A.   The other officer at Mammoth Energy, Inc., is Arty

6    Straehla.  He is the chief executive officer.  I believe the

7    directors of that entity are Mr. Straehla and myself.

8    Q.   And who are the other officers or directors of

9    Mammoth Energy Partners, LLC?

10    A.   Mammoth Energy Partners, LLC, is an LLC, so it

11    doesn't have directors.  The officers are Mr. Straehla and

12    myself as the CEO and CFO respectively.

13    Q.   Mr. Straehla is the CEO?

14    A.   Yes.

15    Q.   Okay.  With respect to Cobra Acquisitions, LLC, that

16    was an entity that was formed by Mammoth Energy Services, Inc.,

17    in 2017; is that correct?

18    A.   No.

19    Q.   When was it formed?

20    A.   I believe that entity was formed in 2016.

21    Q.   And who was it formed by?

22    A.   It was formed by Mammoth Energy Partners.

23    Q.   And at the time of its formation, who were its

24    officers?

25    A.   As I recall, I believe the officers were Mr. Straehla

1    and myself as the CEO and CFO respectively.

2         Q.   And is Cobra Acquisitions still an ongoing entity?

3         A.   Yes.

4         Q.   Are both you and Mr. Straehla still the CFO and CEO

5    respectively?

6         A.   I believe you reversed those.

7         Q.   Is Mr. Straehla still the CEO?

8         A.   Yes.

9         Q.   And are you still the CFO?

10        A.   Yes.

11        Q.   Okay.  Are there any subsidiaries underneath Cobra

12   Acquisitions, LLC?

13        A.   No.

14        Q.   What does Cobra Acquisitions, LLC, operate to do

15   today?

16        A.   Today, that entity still has a receivable from the

17   Puerto Rico Electric Power Authority and still has some

18   administrative functions relative to the work that was

19   performed in Puerto Rico.

20        Q.   Back in 2017 and 2018?

21        A.   I believe the work started in October of 2017.  And

22   work in regards to power restoration in Puerto Rico ended in

23   March 2019.

24        Q.   So if Cobra Acquisitions, LLC, ever receives the

25   money that PREPA owes it, do -- is the reason for its existence

1   terminated?

2        A.   It's a hypothetical situation, so we'll evaluate that

3   entity and its existence, you know, as we need to.

4        Q.   Is that the plan as we sit here today?

5        A.   There's no plan as of today, so I can't answer a

6   hypothetical situation about facts uncertain in the future.

7        Q.   Well, I'm gonna ask you to assume a number of

8   hypotheticals today.  So my hypothetical is if it gets paid by

9   PREPA, is it contemplated that Cobra Acquisitions may shut

10  down?

11              MR. STUKENBERG:  Go ahead and object, form.

12       A.   Again, I'm not gonna speculate as to some

13  hypothetical situation that may or may not occur in the future.

14  I don't know.  It's a hypothetical.

15       Q.   (BY MR. WELMAKER)  Has it been discussed?

16       A.   No.

17       Q.   Have Cobra Acquisitions' plans moving forward as of

18  today or at any time in the future been discussed?

19       A.   I'm not sure I understand the question.

20       Q.   Has anybody talked about what to do with Cobra

21  Acquisitions, LLC, moving forward?

22       A.   In regards to what context?

23       Q.   Operation as a business.

24       A.   The entity continues to operate as a business today

25  as it has since formation, so I'm not understanding the context

1    of your question.

2        Q.    How many employees does Cobra Acquisitions, LLC, have

3    right now?

4        A.    Today, none.

5        Q.    What was the maximum number of employees that it had

6    in 2017/2018?

7        A.    I don't recall.

8        Q.    Can you give me your best estimate?

9        A.    I don't recall.  I don't track head count by Cobra

10   Acquisitions, and I don't believe that was a topic that you

11   asked me to prepare for.  So I don't recall off the top of my

12   head.

13       Q.    Is it a number greater than 50?

14       A.    Again, I don't recall.

15       Q.    So you don't recall whether it's zero or whether it's

16   10,000?

17       A.    It was greater than zero and less than 10,000, if

18   that's the contextual range that you'd like to put together.

19       Q.    Is it greater than 50 at any time?

20       A.    I don't recall whether it peaked 50 or not.

21       Q.    Did it hit 40 at any time?

22       A.    I don't recall.

23       Q.    Did it have 30 employees at any one time?

24       A.    I don't recall.

25       Q.    Did it ever have employees that were stationed in

1    Puerto Rico in 2017 and 2018?

2         A.    Yes.

3         Q.    And how many employees did it have?

4         A.    I don't know.

5         Q.    If I told you about 15, would that jog your memory?

6         A.    I don't recall how many employees that it had at any

7    point in time.

8         Q.    Would you have any reason to argue with the number of

9    15 employees in Puerto Rico in 2017 and 2018?

10        A.    I don't recall how many employees it had, so I don't

11   have that detail.  It's not something that I looked at.

12        Q.    All right.  Let's talk Cobra Energy.  What is Cobra

13   Energy's formal name, legal time?

14        A.    As of what point in time?

15        Q.    Well, let's start at 2017 and bring it up to today.

16        A.    I believe in 2017 the formal name was Cobra Energy,

17   LLC.

18        Q.    What about 2018?

19        A.    2018, I believe was the same.

20        Q.    2019?

21        A.    2019, I believe it held the same name as well.

22        Q.    All right.  What about 2020?

23        A.    Sometime in, I think, 2020 or 2021, the name of that

24   entity was changed to Lion Power Services, LLC.

25        Q.    All right.  Hang on a second, Mr. Layton.  I've

1  lost -- I lost volume.

2           MR. WELMAKER:  Can anybody hear me?

3           MR. STUKENBERG:  We can hear you.

4      Q.   (BY MR. WELMAKER)  Okay.  Mr. Layton, can you hear

5  me?

6      A.   Yes.

7      Q.   Okay.  All right.  So you were saying sometime in

8  2020 or 2021 something happened?

9      A.   I believe I stated that my recollection was that in

10 sometime in either 2020 or 2021 the name of Cobra Energy, LLC,

11 was changed to Lion Power Services, LLC.

12     Q.   Was Lion Power Services, LLC, in existence prior to

13 that name change by Cobra Energy, LLC?

14     A.   I'm not sure I follow the context of the question.

15 The name of the entity was changed at the point in time that I

16 referenced earlier.

17     Q.   Was it changed to Lion Power Services, LLC, or was it

18 merged into Lion Power, LLC?

19     A.   Same as my answer.  The name was changed.

20     Q.   To the best of your knowledge, did Lion Power

21 Services, LLC, exist prior to Cobra changing its name to Lion

22 Power Services?

23     A.   I'm not sure I understand the question.  But to the

24 extent that the question is whether or not there was an entity

25 named Lion Power Services prior to that date, the answer is no.

**NELL McCALLUM & ASSOCIATES, INC.**

1    Q.    Okay.  That's what I was trying to figure out.

2          What was the basis for changing Cobra Energy,

3    LLC's, name to Lion Power Services, LLC?

4    A.    No basis other than we decided to change the name of

5    the entity.

6    Q.    Who came up with the name Lion Power Services?

7    A.    I don't recall who came up with that name.

8    Q.    Okay.  So was there an entity in 2017 or 2018 called

9    Cobra TD or Cobra T and D?

10   A.    I believe there was an entity at one point in time

11   that had that name.

12   Q.    What name did it have specifically?

13   A.    I don't recall the exact name.  It contained T and D,

14   but I don't recall the exact naming.

15   Q.    Okay.  Was that a DBA, or was it an LLC or other

16   formal entity?

17   A.    I don't recall.

18   Q.    Do you know when it started its existence?

19   A.    I don't recall the start of its existence.  I recall

20   some naming feature that contained that in Circa 2017.

21   Q.    Do you know who its officers or directors were?

22   A.    No.

23   Q.    Do you know what happened to Cobra T and D?

24   A.    Not specifically, no.  But it's no longer an entity

25   inside of the group of companies.

1    Q.   And when you say "group of companies," are you or do
2    you agree that Mammoth Energy Services, Inc., is at the top of
3    that group of companies?
4    A.   Mammoth Energy Services, Inc., is the ultimate parent
5    of a group of companies.
6    Q.   Okay.  And as the ultimate parent of a group of
7    companies, does it encompass all the companies that we have
8    talked about so far today?
9              MR. STUKENBERG:  Objection, form.
10   A.   I'm not sure which companies you're referencing.
11   We've referenced a couple of companies that are no longer in
12   existence, so I'm not sure I follow your question.
13   Q.   (BY MR. WELMAKER)  Before those companies that we've
14   referenced went out of existence, was it the parent of those
15   companies?
16   A.   I believe so to the extent there was an entity that
17   was named Cobra T and D.  As I stated earlier, I don't recall
18   whether that was an entity or whether that was a DBA or what
19   the situation was with that entity or name.
20   Q.   Was Cobra Acquisitions a subsidiary of Mammoth Energy
21   Services, Inc.?
22   A.   As I answered earlier, Cobra Acquisitions was a
23   subsidiary of Mammoth Energy Partners, LLC.
24   Q.   Was it also a subsidiary of Mammoth Energy Services,
25   Inc.?

1   A.   Cobra Acquisitions was wholly owned by Mammoth Energy

2   Partners, LLC.

3   Q.   And Mammoth Energy Partners, LLC, is wholly owned by

4   Mammoth Energy Services, Inc.; is that correct?

5   A.   That's correct.

6   Q.   Okay.  When we talk about 5 Star Electric, LLC, and

7   Higher Power Electrical, LLC, I'm just going to refer to them

8   by their shorthand names.  Is that okay with you?  Can we have

9   that agreement?

10   A.   Sure, that's fine with me.

11   Q.   Okay.  And you've had enough depositions taken where

12   I feel like we don't need to go over the standard ground rules

13   to not talk when I'm talking, I won't talk when you're talking

14   because it's hard for the court reporter to get it down.  The

15   most important one, though, is that if I ask you a question and

16   you answer, I'm going to assume that you understand it.

17          Is that acceptable to you?

18   A.   Sure.

19   Q.   And if you don't understand a question, I'm more than

20   happy to rephrase it.

21   A.   Okay.

22   Q.   All right.  So 5 Star, that 5 Star was established in

23   2017 -- well, let me strike that.

24          When did 5 Star move within the -- or come

25   within the Mammoth universe?

1          MR. STUKENBERG:  Objection, form.

2     A.   I'm not sure what the context of the Mammoth universe

3 is.  5 Star Electric was acquired by Cobra Acquisitions in

4 either, I think, June or July or thereabouts of 2017.

5     Q.   (BY MR. WELMAKER)  And was Higher Power also acquired

6 by Cobra Acquisitions in June or July of 2017?

7     A.   No.  That's incorrect.  As I recall, Higher Power was

8 acquired, I think, in either March or April of 2017.

9     Q.   By Cobra Acquisitions?

10     A.   Yes.

11     Q.   Okay.  Once Cobra acquired 5 Star, did Cobra change

12 any officer positions or appoint any officers to 5 Star?

13     A.   I'm not sure I follow the question.

14     Q.   Who were the officers before -- for 5 Star, who were

15 the officers before their acquisition by Cobra Acquisitions?

16     A.   Before the acquisition, I don't recall.

17     Q.   Okay.  Who were the officers in 5 Star after the

18 Cobra acquisition?

19     A.   Following the acquisition, I believe the officers

20 were Mr. Straehla, myself and Mr. Whitsell.

21     Q.   And Mr. Straehla would have been CEO; is that

22 correct?

23     A.   Yes.

24     Q.   And you would have been CFO?

25     A.   Yes.

1      Q.   And Whitsell would have been president?

2      A.   He would have been either president or vice

3  president.  I don't recall which.

4      Q.   And following Higher Power's acquisition by Cobra

5  Acquisitions, LLC, who were the officers?

6      A.   As I recall, the officers of Higher Power were

7  Mr. Straehla, myself and Mr. Malcolm.

8      Q.   With Mr. Straehla being CEO, you being CFO and

9  Mr. Malcolm being what?

10      A.   As I recall, Mr. Malcolm was either president or vice

11  president.  I don't recall which.

12      Q.   Is 5 Star still a functioning entity?

13      A.   I don't know what the context of a functioning entity

14  is, but 5 Star is still an operating entity, yes.

15      Q.   And where does it primarily operate?

16      A.   That entity operates in Kentucky, Indiana, Ohio,

17  Georgia, Utah and probably a few other states.

18      Q.   Do you know how many employees it currently has?

19      A.   I believe it has currently somewhere between 4' and

20  500 employees.

21      Q.   And with respect to Higher Power, where does it

22  currently operate?

23      A.   Higher Power currently operates in Oklahoma as well

24  as in Texas.

25      Q.   Approximately how many employees does it have?

```
1        A.    Today has approximately 50 employees.

2        Q.    All right.  And just so we can get names correct, I

3   want to ask you about a couple of names and their titles.

4              The first is Jeff Beagle.  Is Jeff Beagle still

5   employed with any of the companies that we've discussed?

6        A.    No.

7        Q.    When did his employment separate?

8        A.    I don't recall the exact date.

9        Q.    Was it within the last year?

10       A.    No.

11       Q.    Why did Mr. Beagle separate from whatever entity he

12  was working for?

13       A.    As I recall, he was offered another opportunity with

14  another entity.

15       Q.    Which of the entities that we've already discussed

16  did Jeff Beagle perform services for?

17       A.    What's -- what's the context of services?  If you're

18  asking who his employing entity was, he was employed by Mammoth

19  Energy, Inc.

20       Q.    Was he ever employed by any of the other entities

21  that we discussed?

22       A.    No.

23       Q.    What was his position with Mammoth Energy, Inc.?

24       A.    I believe his title was director of human resources.

25       Q.    What about Alexander Kalman, is he still employed by
```

1    any of the entities that we've discussed?

2         A.    No.

3         Q.    When did his employment terminate?

4         A.    I don't recall the date.

5         Q.    Do you know why it terminated?

6         A.    I don't recall the specifics of his departure.

7         Q.    Do you recall the generalities of his departure?

8         A.    I don't recall why or when he left.  He's no longer

9    an employee.

10        Q.    Did he leave on his own volition, or was he fired?

11        A.    I don't recall the specifics.

12        Q.    Who did Mr. Kalman -- who was Mr. Kalman employed by?

13        A.    He was employed by Mammoth Energy, Inc.

14        Q.    Let me go back up to Mammoth Energy Services, Inc.

15   There is some -- we've got you and Mr. Straehla as the

16   officers, and then we've got a number of directors.  At any

17   point in time from 2016 up through today, has Mammoth Energy

18   Services, Inc., had any employees?

19        A.    Mammoth Energy Services, Inc., since its formation

20   has never had any employees.

21        Q.    And with respect to Mammoth Energy, Inc., from 2016

22   through today, has it ever had any employees?

23        A.    Yes.

24        Q.    How many does it have today?

25        A.    Approximately 50 to 60.

1    Q.   And back when everyone was in Puerto Rico in 2017 and

2    2018, how many employees did it have?

3    A.   I'm not sure I understand the question or what the

4    relation to Puerto Rico has to do with anything as it relates

5    to the time frame.

6    Q.   With respect to Mammoth Energy, Inc., how many

7    employees did it have during the time period of November 2017

8    through July 22, 2018?

9    A.   I don't recall the specific number.

10   Q.   Do you have any idea?

11   A.   In regards to range, likely somewhere between 50 and

12   80.

13   Q.   Okay.  What was Mr. Kalman's title while he was

14   employed by Mammoth Energy, Inc.?

15   A.   I believe, as I recall, his title was payroll

16   coordinator.

17   Q.   And did he coordinate payroll for 5 Star and for

18   Higher Power?

19   A.   As I recall, both of those entities had payroll

20   clerks inside of the respective entities.

21   Q.   Okay.  Aside from that, did he coordinate payroll for

22   Higher Power and 5 Star?

23            MR. STUKENBERG:  Object to form.

24   A.   I don't understand what the context of coordination

25   is.

1      Q.   (BY MR. WELMAKER)  Okay.  Well, you told me he was a

2  payroll coordinator.  Did he perform any of the duties

3  associated with the function of a payroll coordinator for

4  Higher Power or 5 Star?

5      A.   Again, I believe that both Higher Power and 5 Star

6  had payroll coordinators or payroll clerks inside of each of

7  the respective entities.

8      Q.   Okay.  Did Mr. Kalman assist those payroll

9  coordinators or clerks with their duties?

10      A.   I'm not sure what the context of "assist" is.  As

11  Mr. Kalman was --

12      Q.   Everyday normal meaning of the word "assist."

13      A.   Can I answer my question before you talk over me,

14  please?

15      Q.   No.  Just answer my question or we will be here all

16  day long.

17      A.   If you're going talk over me, then we're going to

18  call a soon end to this because --

19      Q.   Oh, are you going to call an end to it, Mr. Layton?

20  Are you going to shut it down?

21           MR. STUKENBERG:  Doug, in your rules, you said

22  you would not talk over Mr. Layton and Mr. Layton would not

23  talk over you.  He was in the middle of answering his question.

24  If you don't like his answer, you can try to clarify it

25  obviously or ask a different question.  But you should give him

1   the courtesy to allow him to answer.

2           MR. WELMAKER:  I'm not gonna sit here and let

3   Mr. Layton give speeches the entire day and burn my time.  I'm

4   just not gonna do it.

5           MR. STUKENBERG:  I don't think he was giving a

6   speech.  I think he was giving context to his answer.  But we

7   can -- if you want to ask him the question, he'll give you his

8   answer.

9           MR. WELMAKER:  Can you read back the question I

10  just asked, Court Reporter, Ms. Ashman?

11          (Whereupon, the requested portion of the

12  transcript was read.)

13      Q.   (BY MR. WELMAKER)  And do you have an answer for that

14  question, Mr. Layton?

15      A.   Yes.  I'm not sure what the context of "assist" means

16  in Mr. Kalman's role.  He was a resource that was available to

17  both 5 Star and Higher Power to answer questions that they may

18  have in regards to processing payroll.

19          As I recall, both Higher Power and 5 Star had

20  payroll clerks inside of those entities that were responsible

21  for the day-to-day processing of payroll.

22      Q.   Did Mr. Kalman ever formulate policy or procedures to

23  be used by Higher Power or 5 Star?

24      A.   Formulate policy, no.  That would be above his pay

25  grade, so to speak.

1    Q.   Okay.  Who would have formulated policy for Higher

2  Power or 5 Star?

3    A.   Higher Power or 5 Star policy would have come from

4  the officers inside of those respective entities.

5    Q.   So you and Mr. Straehla?

6    A.   And I believe I referenced the other officers inside

7  of those entities earlier.

8    Q.   And does that include payroll policies?

9    A.   Payroll policies would be included inside of that

10  structure, if you will.

11    Q.   Who is Keith Ellison?

12    A.   Keith Ellison is an individual.

13    Q.   Is he a human being?  I mean, you can answer like

14  that too, and we can be here all day long.  I didn't ask if he

15  is an individual.  Who is he with?  I mean, do I have to spell

16  out all my questions for you?

17          MR. STUKENBERG:  Doug, I think if you want to

18  ask a question and be precise, then ask the question and

19  Mr. Layton will answer it.

20          MR. WELMAKER:  It gets to a point where I don't

21  have to ask if somebody is a human being or an individual or an

22  animal or a vegetable or a mineral.  I've got basic knowledge

23  that Mr. Ellison is an individual.  I mean, we can be here all

24  day long.

25          MR. STUKENBERG:  Doug, again, if you just want

1  to ask your questions, Mr. Layton will answer.

2      Q.   (BY MR. WELMAKER)  Who is Keith Ellison as he relates

3  to any of the entities that we have spoken about today?

4      A.   In regards to which time frame?

5      Q.   From 2017 through today.

6      A.   In 2017, Mr. Ellison would have been the president,

7  as I recall, of both Cobra Acquisitions as well as Cobra

8  Energy.  I believe he held those roles in 2018 as well as at

9  least some portion of 2019.  He left employment, I believe, in

10  sometime in the back half of 2019.  Has not held a role for any

11  of the entities discussed today since that time frame.

12      Q.   Before he became president of Cobra Acquisitions

13  and/or Cobra Energy, where was he employed, if you know?

14      A.   I don't recall.

15      Q.   In 2017, when he became president of Cobra

16  Acquisitions, who else was employed by Cobra Acquisitions?

17      A.   At that time, I don't recall who the employees were

18  of Cobra Acquisitions.

19      Q.   Were there any employees of Cobra Acquisitions at

20  that time?

21      A.   Again, I don't recall the specific head count or

22  employees of Cobra Acquisitions going back seven years.

23      Q.   In 2017 -- let me strike that.

24           (Exhibit 2 marked.)

25      Q.   (BY MR. WELMAKER)  I'm gonna show you Exhibit

1    Number 2, which is just a press release I pulled off the

2    Mammoth Energy Services website, and ask you to read that,

3    please.  It's got three pages.  So if you want me to flip to

4    pages 2 and 3, please just let me know.

5                    MR. STUKENBERG:  Give me just a second, Doug, if

6    you would.

7                    MR. WELMAKER:  Yeah.  Sure.

8                    MR. STUKENBERG:  Is it Exhibit 2?

9                    MR. WELMAKER:  Yeah.  Can you guys see it up on

10   the screen?

11                   THE WITNESS:  Yes.

12                   MR. STUKENBERG:  So I don't show that this was

13   produced, Doug.  Am I wrong?

14                   MR. WELMAKER:  No, it was not produced.  I just

15   pulled it up yesterday or the day before.

16                   MR. STUKENBERG:  I'm going to go ahead and

17   object to any questions based on the fact that it wasn't

18   produced prior to the deposition.  But you can go ahead and ask

19   questions.

20       Q.   (BY MR. WELMAKER)  Do you need to see the second or

21   third page, Mr. Layton?

22       A.   Yes, that would be great.

23       Q.   All right.  Tell me when you're ready.

24       A.   I'm ready.  Okay.  I'm ready for the next page.

25       Q.   Oh, sorry.

1      A.   Okay.

2      Q.   Did you have anything to do with the writing of this

3 press release?

4      A.   I'm not sure what the context of anything to do with

5 it means.  I was aware of it, certainly.

6      Q.   Did you provide input into it?

7      A.   I don't recall.

8      Q.   Did you review it before it was released?

9      A.   I likely saw it before it was released, yes.

10     Q.   Did you edit it?

11     A.   I don't recall.

12     Q.   Is this something that you would have edited?

13     A.   Again --

14          MR. STUKENBERG:   Objection, form.

15     A.   -- I don't recall the specificity of this document in

16 whether or not I edited the document.

17     Q.   (BY MR. WELMAKER)  And so Mammoth Energy Services,

18 Inc., is traded on Nasdaq, correct?

19     A.   Yes.

20     Q.   And symbol is TUSK, right?

21     A.   Yes.

22     Q.   Okay.  So it says, Mammoth Energy Services, Inc.,

23 today announced that its wholly owned subsidiary, Cobra

24 Acquisitions, signed a contract to aid in the restoration of

25 utility infrastructure on the island of Puerto Rico.

1          Do you agree with that statement?

2     A.   Document states what it states.

3     Q.   Do you have any reason to doubt what it states?

4     A.   Again, the document states what it states.

5     Q.   I'm asking you if you have any reason to doubt what

6  it states.

7     A.   The document states what it states.

8     Q.   I'm asking you if you have any reason to doubt what

9  it states.

10    A.   I can see what it states.  It's on the screen.

11    Q.   Do you have any reason to doubt what it states?

12    A.   The document states what it states.

13    Q.   Do you have any reason to doubt what it states?

14    A.   Again, the document's on the screen, and it states

15  what it states.

16    Q.   Do you have any reason to doubt what it states?  Is

17  there anything in here that jumps out at you as being incorrect

18  or improper in any way?

19    A.   There's nothing in here that's improper.

20    Q.   Is there anything in there that's wrong or

21  untruthful?

22    A.   There's nothing in here that's untruthful.

23    Q.   And then it states, Arty Straehla, Mammoth's chief

24  executive officer stated:  We are honored to be chosen to help

25  restore the electric utility infrastructure for the residents

1    of Puerto Rico.

2              Do you see that highlighted portion?

3         A.   Yes, I do.

4         Q.   Okay.  So why is Mr. Straehla referring to both Cobra

5    and Mammoth Energy Services, Inc., as "we"?  Was this contract

6    awarded to Mammoth Energy Services, Inc.?

7         A.   The release says clearly that the contract was

8    awarded to Cobra Acquisitions.

9         Q.   Then why is Mr. Straehla saying, as Mammoth's chief

10   executive officer, we are honored to be chosen to help restore

11   the electrical utility infrastructure?

12        A.   As I stated earlier, Mr. Straehla is also the chief

13   executive officer of Cobra Acquisitions.

14        Q.   Did Mr. -- when did Mr. Straehla become chief

15   executive officer of Cobra Acquisitions?

16        A.   As I recall, it would have been sometime late 2016.

17        Q.   And when was Cobra Acquisitions formed?

18        A.   Sometime in late 2016.

19             MR. STUKENBERG:  Doug, we've been going about an

20   hour.  Do you want to take a break just when you get to a

21   stopping point?  You can finish with this document if you want

22   to or just whenever you get to somewhere where it's good to

23   take a break.

24             MR. WELMAKER:  Yeah, let me just do this one.

25   It's another press release.  It shouldn't be long.

```
 1              MR. STUKENBERG:  Sure.

 2              (Exhibit 3 marked.)

 3      Q.   (BY MR. WELMAKER)  I've marked this as Exhibit 3.

 4  It's another press release I pulled from the Mammoth Energy

 5  Services, Inc., website.  And this one is 15 pages long.  But

 6  you have it in front of you.  I'm just gonna ask you about the

 7  second page.

 8              MR. STUKENBERG:  So again, we'll object to

 9  questions about any exhibits that were not produced prior to

10  the deposition.  Subject to those objections, Mr. Layton can

11  answer questions about it.

12      Q.   (BY MR. WELMAKER)  Tell me when you are ready,

13  Mr. Layton.

14      A.   I'm ready.

15      Q.   Okay.  So on page 2, I've got it highlighted, and it

16  says, During 2017, Mammoth broadened -- well, first of all,

17  let's go back.

18              This is a press release that Mammoth Energy

19  Services, Inc., released dated February 21, 2018.  It says that

20  on the top of the page.

21              Do you see that?

22      A.   Yes, I do.

23      Q.   Do you have any reason to doubt that what I've just

24  said is incorrect or improper?

25      A.   Not that I see.
```

1      Q.    On the second page, the highlighted portion says,

2    During 2017, Mammoth broadened its services offerings by

3    expanding into the utility infrastructure business with the

4    formation of Cobra Acquisitions, LLC, and the acquisitions of

5    Higher Power Electrical in April 2017 and 5 Star Electric, LLC,

6    in July 2017.

7            Did I read that correctly?

8      A.    Yes.

9      Q.    Is that a true statement?

10     A.    Yes.

11     Q.    Then it says, Effective October 19, 2019, Cobra

12   entered into an emergency master services agreement with PREPA

13   for repairs to PREPA's electrical grid as a result of Hurricane

14   Maria.

15            Is that a true statement?

16     A.    Yes.

17     Q.    Okay.  Did Mammoth ever report any of the proceeds

18   that Cobra Acquisitions received from this contract with PREPA

19   on its balance sheet or any other public filing?

20            MR. STUKENBERG:  Sorry.  Would you repeat that?

21   You kind of broke up in the middle a little bit.

22            MR. WELMAKER:  Sure.

23     Q.    (BY MR. WELMAKER)  Did Mammoth include any of the

24   monies Cobra Acquisitions received from PREPA on its balance

25   sheet or any other public filing?

```
1              And when I say "Mammoth," I mean Mammoth Energy

2    Services, Inc.

3         A.   The financial position and result of operations of

4    Cobra Acquisitions would be included in Mammoth Energy

5    Services, Inc.'s, financial statements.

6         Q.   All right.  Would the same be true for any monies

7    received by 5 Star being reported by Cobra Acquisitions, LLC,

8    on any kind of a balance sheet or any other public filing?

9         A.   I'm not sure I understand the question.

10        Q.   Okay.  Did Cobra Acquisitions, LLC, ever report on a

11   balance sheet or any other public filing proceeds that 5 Star

12   or Higher Power received as a result of the work in Puerto

13   Rico?

14        A.   I don't recall any Cobra Acquisitions, LLC, public

15   filings of financial statements.

16        Q.   Okay.

17             MR. WELMAKER:  All right.  Let's take -- well,

18   how long do you want to take?

19             MR. STUKENBERG:  How about ten minutes?

20             MR. WELMAKER:  That's fine.

21             (Break from 10:40 a.m. to 10:55 a.m.)

22        Q.   (BY MR. WELMAKER)  Okay.  Mr. Layton, can you hear me

23   okay?

24        A.   Yes.

25        Q.   By the way, are you in Oklahoma today?
```

**NELL McCALLUM & ASSOCIATES, INC.**

1     A.   Yes, I am.

2          (Exhibit 4 marked.)

3     Q.   (BY MR. WELMAKER)  I'm showing you what I've marked

4     as Plaintiff's Exhibit Number 4.  This is the -- another press

5     release from the Mammoth Energy Services, Inc.'s, website.

6          MR. STUKENBERG:  And again, we'll object to any

7     documents that were not produced prior to the deposition.

8     Subject to those objections, Mr. Layton can answer questions

9     about it.

10    Q.   (BY MR. WELMAKER)  All right, Mr. Layton.  You are

11    free to review this, and let me know when you are done.

12    A.   Okay.  Can I see the next page, please?

13         Okay.

14    Q.   Okay.  This is a press release dated June 17, 2019.

15    Did you have anything to do with the creation of this press

16    release?

17    A.   I'm not sure what that context means.  I likely saw

18    the press release before it was issued.

19    Q.   Did you edit it before it was issued?

20    A.   I have no recollection one way or the other.

21    Q.   Okay.  It says at the top, Mammoth issues statement

22    regarding its work in Puerto Rico.

23         Do you see that?

24    A.   Yes.

25    Q.   And so Mammoth did do work in Puerto Rico; is that

1   correct?

2       A.   That's not what the document states.

3            Cobra is a wholly owned subsidiary of Mammoth,

4   and Cobra had the contract and performed work in Puerto Rico.

5       Q.   Why does it say, Mammoth issues statement regarding

6   its work?

7       A.   Again, Cobra is a wholly owned subsidiary, so its

8   operations and statement of financial position are included

9   inside of Mammoth's results.

10      Q.   Okay.  So work done by Cobra Acquisitions is

11  effectively considered work done by Mammoth Energy Services,

12  Inc.?

13      A.   Again, the work performed by Cobra was performed by

14  Cobra.  I'm not sure what connection you're trying to make.

15  Cobra is a wholly owned subsidiary of Mammoth Energy Services,

16  Inc., through Mammoth Energy Partners, LLC.

17      Q.   Why wouldn't it say, Mammoth issues statement

18  regarding Cobra's work in Puerto Rico?  Would that be a more

19  accurate statement?

20      A.   It's a different statement.  It could have stated

21  that.  The document states what it states.  It's not

22  misleading.

23            (Exhibit 5 marked.)

24      Q.   (BY MR. WELMAKER)  Okay.  And this is going to be the

25  final document that I haven't produced.  But I did produce it

1    in the other arbitration, and I'm sure that you're familiar

2    with the contract between Cobra Acquisitions and PREPA.

3              Have you ever seen that document before?

4        A.   Which document are you speaking about?  I can't see

5    anything other than a press release on the screen.

6        Q.   I'm referring to Exhibit 5, which, to my

7    understanding, is the document that was signed with PREPA that

8    Mr. Ellison later described as being awarded to Cobra, et al.

9              Have you seen this document before?

10             MR. STUKENBERG:  And again, we'll make the same

11   objection as to questions pertaining to documents that weren't

12   produced in this litigation.  Subject to those objections,

13   Mr. Layton can answer your questions.

14       A.   Yes, I believe I've seen this document before.

15       Q.   (BY MR. WELMAKER)  Okay.  Did you help draft it?

16       A.   We can't tell who drafted this particular document.

17       Q.   Were you asked to help draft the document before it

18   was formalized?

19       A.   Again, I'm not sure who held the pen on the drafting.

20   I was certainly involved in the negotiation of terms inside of

21   the document before it was executed.  But in regards to who

22   actually drafted it, I don't have that visibility.

23       Q.   But you were asked to provide input into it?

24       A.   I was aware of the negotiation.  And, yes, I provided

25   some input in regards to the negotiation of the document.

1     Q.   Do you recall what input you provided?

2     A.   Not specifically, no.

3     Q.   Was there a presentation made by Mammoth or Cobra to

4   PREPA prior to this document being signed?

5     A.   In regards to what context?

6     Q.   Services that Mammoth or Cobra could offer PREPA for

7   the restoration process.

8     A.   Mammoth in regards -- I assume you're talking about

9   Mammoth Energy Services, Inc.?

10     Q.   I don't know.  I don't know what you are talking

11   about.

12     A.   I can't answer your question without some level of

13   specificity.

14     Q.   Did any Mammoth entity or any Cobra entity make a

15   presentation to PREPA prior to this contract being signed about

16   the services that would be offered for the restoration project

17   in Puerto Rico?

18     A.   I'm not sure I understand your question.  I think,

19   you know, to try and help, Cobra Acquisitions held a meeting,

20   at least one, with PREPA in regards to discussing the

21   capabilities of Cobra Acquisitions.  But again, Mammoth Energy

22   Services, Inc., has never had any employees, so there's no

23   presentation from Mammoth Energy Services, Inc., to PREPA.

24          I'm not sure what the context of a presentation

25   is, but there were certainly a dialogue prior to the

1    negotiation of this contract in regards to the capabilities of

2    Cobra Acquisitions.

3         Q.   All right.  Was a presentation made by Mammoth

4    Energy, Inc., to PREPA prior to this contract being signed?

5         A.   I'm not seeing any documentation or aware of any

6    presentation from Mammoth Energy, Inc., to PREPA.

7         Q.   All right.  This is page 34, if you want to flip to

8    it.  It's the signature page for the contract.  And my question

9    is:  Why is Keith Ellison not signing this document?

10        A.   Mr. Straehla executed the document as the CEO of

11   Cobra Acquisitions.

12        Q.   Why didn't Mr. Ellison execute it?

13        A.   I can't answer that.  I can just tell you that

14   Mr. Straehla executed it as the CEO of Cobra Acquisitions.

15        Q.   Page 35 of the 52-page document says, The

16   contractor's proposal is attached as Exhibit A.  And this next

17   page looks like a copy of a slide show.

18             Have you ever seen this document before?

19        A.   I've seen a copy of this presentation, yes.

20        Q.   Okay.  Who put this presentation together?

21        A.   In regards to who put it together, I don't recall who

22   put it together or have any visibility on that.

23        Q.   Did you ever review it before it was presented to

24   PREPA?

25        A.   View it, no.

1      Q.   Hear about it, edit it?

2      A.   I didn't review it, so had no ability to edit it.

3      Q.   Were you aware of its existence before it was

4  presented to PREPA?

5      A.   No.

6      Q.   How did you find out that it was going to be

7  presented to PREPA?

8      A.   I don't believe I found out about it until it was an

9  exhibit to the agreement, so I don't believe I had any

10  visibility on this presentation prior to the agreement that was

11  entered into between Cobra and PREPA.

12      Q.   Okay.  When it says Mammoth Energy on here, which

13  entity is that talking about?

14      A.   I don't believe that's referencing any entity.  This

15  proposal is from Cobra as a subsidiary of Mammoth Energy

16  Partners, LLC.

17      Q.   Where does it say Mammoth Energy Partners, LLC, on

18  there?

19      A.   It doesn't say it anywhere on there.

20      Q.   Okay.  So we've got a logo of Mammoth Energy.

21  Underneath it, it says, Cobra Energy Services.  I don't know

22  that we've talked about Cobra Energy Services yet.

23           What -- is that an actual legal entity?

24      A.   I don't believe so.

25      Q.   Was it a trade name or a DBA?

1      A.    Not that I'm aware of.

2      Q.    Who was involved with Cobra Energy Services?

3      A.    Again, I don't believe that was an entity or a trade

4  name.

5      Q.    Why is it being used here?

6      A.    Again, I didn't formulate this document, so I can't

7  answer that question.

8      Q.    So Cobra Energy Services had no employees then; is

9  that correct?

10     A.    Given that it's not an entity or a trade name, then,

11 yes, one can -- one can come to the conclusion that it had no

12 employees.

13     Q.    The next page says, Cobra Resources.  And at the

14 bottom, it says, Mammoth Energy Services (Nasdaq TUSK.)

15           Would that be referring to Mammoth Energy

16 Services, Inc.?

17     A.    Yes, that's the parent and publicly traded entity.

18     Q.    And that's the Nasdaq symbol for Mammoth Energy

19 Services, Inc., also, isn't it?

20     A.    Yes.

21     Q.    Why is Mammoth Energy Services' name at the bottom of

22 this presentation?

23     A.    Again, wasn't responsible for the formulation of this

24 document, so I can't put myself in the head of whoever put this

25 together.

1    Q.   Would this have been put together from a high-level

2  individual at Mammoth or Cobra?

3    A.   Again, there are no employees at Mammoth Energy

4  Services, Inc., so there's nobody there to put it together.

5  I've answered a couple of times now.  I don't know who put this

6  together, so I can't speculate.

7    Q.   One of the next pages shows a picture of some of the

8  barges that were apparently going to be used, some of the

9  linemen.  Who paid for the rental or use of the barges?

10    A.   In regards to the barges that were utilized to house

11  linemen, those barges were chartered by and paid for by Cobra

12  Acquisitions.

13    Q.   Okay.  And what about the food that was provided from

14  the barges, same answer?

15    A.   I'm not sure I understand the question.  There were

16  kitchens that were in place on the barges, and the food costs

17  were borne by Cobra Acquisitions to the extent that those

18  cafeterias produced food.

19    Q.   How much did the -- what was the total capital outlay

20  for the use of the barges during the 2017/2018 time period?

21    A.   In regards to the total charter amount, I don't

22  recall off the top of my head.

23    Q.   Who paid for that total charter amount?

24    A.   I answered that previously, Cobra Acquisitions.

25    Q.   And did Cobra Acquisitions do that with funds

1    provided by Mammoth Energy Services, Inc.?

2         A.    No.   Cobra Acquisitions had its own inflow of cash.

3    So certainly was receiving during that time period.   Cash flow

4    from PREPA associated with the two contracts in place between

5    Cobra Acquisitions and PREPA.

6         Q.    Did Mammoth Energy Services, Inc., ever provide funds

7    to Cobra Acquisitions in the 2017/2018 time period?

8         A.    Mammoth Energy Services, Inc., no, I don't believe

9    so.

10        Q.    Did Mammoth Energy, Inc., ever provide funds to Cobra

11   Acquisitions during that same time period?

12        A.    Mammoth Energy, Inc., no, I don't believe so.

13        Q.    Did Mammoth Energy Partners provide funds to Cobra

14   Acquisitions during that time period?

15        A.    Mammoth Energy Partners may have -- may have provided

16   advances of cash and received prepayments of cash from Cobra

17   Acquisitions during time frame.

18        Q.    Do you know how much cash was advanced?

19        A.    No.

20        Q.    On the 47th page, we have another Mammoth Energy

21   logo.   Underneath it, it says, Keith Ellison, President, Cobra

22   Energy.   Keithellison@mammothenergy.com.

23             Was Mr. Ellison using a Mammoth Energy email

24   address?

25        A.    That would appear to be the case.

1    Q.    Was there ever a Cobra Acquisitions' email address?

2    A.    I believe there was, yes.

3    Q.    Do you know if Mr. Ellison ever used that address?

4    A.    I don't know whether Mr. Ellison had a Cobra

5    Acquisitions email or not.

6    Q.    Why does it state the Mammoth Energy Services

7    corporate office underneath the phone number there?

8    A.    Again, wasn't involved in the preparation of this

9    document, so can't put myself in the head of whoever put this

10   document together.

11   Q.    And then at the bottom of it, it has

12   Mammothenergy.com as a website, correct?

13   A.    The document states what it states.

14   Q.    Okay.  And if we go to Mammothenergy.com, whose

15   website is that?

16   A.    That website would have links to a number of legal

17   entities, so I'm not sure I understand the question.

18   Q.    If we go to Mammothenergy.com, are we gonna see that

19   the company referenced there is Mammoth Energy Services, Inc.?

20   A.    Again, there are going to be a number of companies

21   referenced there.  Mammoth Energy Services, Inc., is the

22   parent.  There are a number of subsidiaries underneath Mammoth

23   Energy Services, Inc., that would also have places or

24   references contained from that web page.

25   Q.    And when I go to that website, it says, Mammoth

```
 1   Energy remains unpaid by PREPA for vital Hurricane Maria
 2   recovery work.
 3              Is that still the case?
 4        A.   I don't have the website up, so I can't see what
 5   you're looking at.
 6        Q.   But what I'm asking you, though, is:  Is Mammoth
 7   Energy still not paid by PREPA for work performed during
 8   Hurricane Maria?
 9        A.   PREPA still owes Cobra Acquisitions approximately
10   $350 million as of the last publicly released information.
11        Q.   And when was that information released?
12        A.   That would have been released in April.
13        Q.   So the contract was signed between PREPA and Cobra
14   Acquisitions when?
15        A.   In October of 2017.
16        Q.   All right.  I'm showing you what's been marked as
17   Exhibit 6.
18              (Exhibit 6 marked.)
19        Q.   (BY MR. WELMAKER)  Which is Bates 2373 through 2375.
20   And feel free to review it on your screen or have me move
21   through it.  And let me know when you're -- when you have
22   familiarized yourself with this document.
23        A.   Which document is this again?
24        Q.   This is Exhibit 6, Bates-stamped 2373 through 75.
25        A.   I'm going to pull that up on my screen briefly just
```

1    so I can flip through it.

2         Q.   Okay.  Sure.

3         A.   Okay.

4         Q.   All right.  What I'd like to do is direct your

5    attention to the very last page and -- well, let's go to the

6    page before just so we can see who the email is from.

7              At the bottom -- and it's highlighted -- it's

8    from Keith Ellison to Ken Kinsey with -- well, let me ask you:

9    Who is Ken Kinsey with at this point in time?

10        A.   At that particular time, I think Mr. Kinsey was vice

11   president of operations for Cobra Acquisitions.

12        Q.   Why is his email kenkinsey@cobratd.com?

13        A.   I can't answer why he utilized that email.

14        Q.   Did he have more than one?

15        A.   I would venture to guess that he likely had more than

16   one email address, yes.

17        Q.   Okay.  And certainly, you had more than one email

18   address, correct?

19        A.   For which time period?

20        Q.   2017/2018.

21        A.   Yes.

22        Q.   Did you have a specific email for each of the

23   companies that you were CFO for?

24        A.   No.

25        Q.   Was there any rhyme or reason to when you used a

```
 1   particular email over another?
 2        A.   I guess that would depend on the particular
 3   circumstance.
 4        Q.   For example, if you're dealing with a Mammoth Energy
 5   issue, are you going to use a Stingray email?
 6        A.   Which Mammoth Energy entity or issue are you
 7   referencing?
 8        Q.   Either.  Any.
 9        A.   It would depend on the particular facts and
10   circumstances.
11        Q.   So if you're talking to someone from Mammoth Energy,
12   Inc., about pay on Puerto Rico in the Puerto Rico time period
13   that we're concerned with, are you going to use a particular
14   email address, or does it matter to you?
15        A.   I suppose it would depend on the circumstances and,
16   you know, I don't control who emails me on which email address.
17   So there are a number of variables.
18        Q.   Like you might just be replying to something?
19        A.   I don't follow the statement.
20        Q.   It's not worth going into.
21             So Robert Malcolm is on this email chain.  He is
22   the president of Higher Power?
23        A.   That's correct.
24        Q.   Who is Steve Wolf?
25        A.   Steve Wolf was a salesperson for either Cobra Energy
```

1   or Cobra Acquisitions.  I don't recall which.

2        Q.    Why is he on this email?

3        A.    I didn't send the email, so I can't answer that.

4        Q.    Who is Ken Godwin?

5        A.    Ken Godwin was a superintendent for Higher Power.

6        Q.    And who is Jared Chappell?

7        A.    Jared Chappell was an accountant employed by Mammoth

8   Energy, Inc.

9        Q.    All right.  On the next page, we have Mr. Ellison

10  stating that, We've been awarded 120-day minimum contract for

11  250 linemen in Puerto Rico.  And he lists out a pay scale here.

12  He says, We are paying the following.

13             Can you read what I've highlighted there out

14  loud?

15       A.    I believe the context of a pay scale is incorrect.

16  But the document states what it states in regards to positions

17  and budgeted amounts.

18       Q.    All right.  Where does it say on here that these are

19  budgeted amounts?

20       A.    Subsequent to this email, Mr. Ellison and myself,

21  along with Mr. Beagle and I believe Mr. Kinsey, had a

22  conversation about these budgeted amounts where Mr. Ellison

23  conveyed the budgeted amounts and his desire for us to develop

24  a pay plan.

25       Q.    Okay.

1          MR. WELMAKER:  Objection, nonresponsive.

2     Q.  (BY MR. WELMAKER)  Where does it say on here that

3  these are budgeted amounts?

4     A.  Again, it doesn't say on there.  That was through a

5  subsequent conversation between Mr. Ellison, myself, Mr. Beagle

6  and Mr. Kinsey.

7     Q.  All right.

8          MR. WELMAKER:  Objection to everything after the

9  word "here."

10    Q.  (BY MR. WELMAKER)  How much does it say that a GF is

11  going to get?

12    A.  On this particular document, the budgeted amount for

13  a general foreman is $1400 per day.

14    Q.  All right.  Again, where does it say budgeted?

15    A.  Again, the budgeted amount came from a subsequent

16  conversation between Mr. Ellison and myself, as well as

17  Mr. Beagle and Mr. Kinsey.

18    Q.  All right.

19         MR. WELMAKER:  Objection, nonresponsive.

20    Q.  (BY MR. WELMAKER)  Would you read me what is

21  highlighted, please?

22    A.  The document states what it states.

23    Q.  I'm asking you to read it into the record.

24    A.  This subset of the document states:  We are paying

25  the following:  GF, $1400 per day.  Foreman, $1,250 per day.

1    Journeyman/lineman $1,000 per day.  A class, 900.  B class,

2    800.  Hot apprentice, 700.  Apprentice/groundman, looks like

3    600.  It's really small on my screen.

4        Q.   Okay.  So when it says "per day," does that mean if

5    you show up and work any amount of time, you're going to get

6    the amount listed in this highlighted portion?

7        A.   Again, the document states what it states.  I can

8    talk about process-wise and my personal involvement in

9    conversations with Mr. Ellison.

10       Q.   I'm just asking you to confine your opinion based on

11   what we're looking at right here.

12       A.   The document states what it states.  I can talk to

13   you about process, the development of the pay plan as well as

14   individual conversations I had with Mr. Ellison, Mr. Beagle and

15   others.

16       Q.   Are these -- is this highlighted portion what we

17   would consider Puerto Rico pay?

18       A.   These are budgeted amounts for positions relative to

19   restoration work performed in Puerto Rico for which we sought

20   advice from external counsel and used these budgeted amounts to

21   derive a pay plan.

22            MR. WELMAKER:  Objection, nonresponsive to your

23   entire answer.

24       Q.   (BY MR. WELMAKER)  On the page before that, we see

25   that Jared Chappell takes Mr. Ellison's email and forwards it

1    to Mr. Beagle and Mr. Kalman.

2              Do you see that?

3        A.   Yes.

4        Q.   Why did Mr. Chappell forward this to Mr. Beagle and

5    Mr. Kalman?

6        A.   I'm not anywhere on this email, so I can't speculate

7    as to why Mr. Chappell forwarded the email.

8        Q.   Okay.  Have you ever seen this email before?

9        A.   I have.  And I can talk about process and how these

10   budgeted amounts evolved into a number of discussions, but I'm

11   not anywhere on this email chain.

12       Q.   So the answer to my question is you don't know why

13   Mr. Chappell sent this to Mr. Beagle or Mr. Kalman?

14       A.   I believe I've answered that I'm not anywhere on this

15   email chain, so I can't speculate as to why Mr. Chappell

16   forwarded this email.

17       Q.   All right.  The next email in the middle of the page

18   says from Jeff Beagle:  Ken, below are the intended rates we'd

19   like to mirror.  Working seven days a week -- well, let me back

20   up.  It says:  Below are the intended day rates we'd like to

21   mirror.

22              So is it your contention that we are not talking

23   about day rates at this point in time?

24       A.   So the email states what it states.  Contextually and

25   process-wise, Mr. Beagle reached out to Mr. Broussard at my

1  direction to take the budgeted amounts and come up with an FLSA

2  compliant pay plan, which Mr. Beagle references in the last

3  sentence of this email.  So at this particular time, no

4  decision has been made as to what that pay plan will look like.

5      Q.   At this particular time, then, how do you know that

6  they're budgeted rates and not simply day rates?

7      A.   At this particular time, as I mentioned earlier, I

8  had been personally involved in a conversation with Mr. Ellison

9  and Mr. Beagle and Mr. Mr. Kinsey in regards to these budgeted

10 amounts, which is why Mr. Beagle is reaching out to

11 Mr. Broussard.  He's doing that at my direction.

12     Q.   If these were budgeted day rates, why didn't they

13 just use the word budgeted day rates?

14     A.   Again, it's Mr. Ellison's email.  He conveyed to me

15 that those were budgeted amounts, and we took those budgeted

16 amounts and I directed Mr. Beagle to reach out to Mr. Broussard

17 for his advice in developing a compliant pay plan.

18     Q.   And did you do that via email or through a phone

19 call?

20     A.   What?  What are you referring to?

21     Q.   You directed Mr. Beagle to get in touch with

22 Mr. Broussard.  Is that what you just said?

23     A.   Yes.

24     Q.   Did you do that through an email or a phone call?

25 Because I don't have any emails from you saying that.

1      A.    I did that face-to-face.

2      Q.    Okay.  So when you see Mr. Beagle emailing this to

3   Steve Broussard in the middle of the page on October 20, 2017,

4   he's not saying budgeted day rates.  He's just saying these are

5   the intended day rates we'd like to mirror.

6            So this email was sent after you had already

7   told him it was a budgeted day rate?

8      A.    This email was sent after we received the budgeted

9   amounts from Mr. Ellison to Mr. Broussard for Mr. Broussard's

10  advice on developing a compliant pay plan, which Mr. Beagle

11  makes abundantly clear in the last sentence.

12     Q.    All right.  Let's go to the first page.  And this is

13  Mr. Broussard on October 20, 2017, emailing Mr. Beagle, CC'ing

14  Mr. Kinsey and Mr. Kalman.

15            Do you see that?

16     A.    Yes.

17     Q.    Okay.  So a highlighted portion is basically

18  saying -- it's Mr. Broussard saying, If you pay a day rate,

19  you're going to have to pay overtime.

20            Do you agree with that?

21     A.    Mr. Broussard's email speaks for itself.  Generalized

22  he's saying that if you pay a day rate, then you would need to

23  calculate overtime.

24     Q.    And pay it, right?

25     A.    Yes.

1    Q.   So what other alternative pay schemes or pay

2  processes did Mr. Broussard discuss with anyone from Mammoth or

3  Cobra?

4              MR. STUKENBERG:   Objection, form.

5    A.   So the evaluation of a pay plan was an iterative

6  process that took place over a period of time between

7  Broussard, Beagle, as well as conversations with me.  The

8  analysis that was performed took the budgeted amounts from

9  Mr. Ellison.  There was a spreadsheet that was bounced back and

10  forth between Beagle and Broussard that was discussed on a

11  couple of occasions that utilized those budgeted amounts to

12  calculate and ultimately implement an hourly plan that we can

13  see on the pay stubs.

14    Q.   (BY MR. WELMAKER)  Okay.  And when did this iterative

15  process end?

16    A.   In regards to an end date, the first payroll in

17  Puerto Rico would have been approximately early part of

18  November.  So at that point, we can see, you know, hourly pay

19  stubs for skilled labor in Puerto Rico that references the

20  hourly rates as well as overtime hours and overtime rates that

21  was ultimately decided upon based on direct advice from

22  Mr. Broussard as well as discussions with the operational team.

23    Q.   Okay.  So, again, when did the iterative process end?

24    A.   Again, the first payroll would have been run sometime

25  early November of '17.

1      Q.   Okay.  And so did you ever or anyone else ever take

2   any of the pay stubs that were paid out to any of the linemen

3   in Puerto Rico and then run those by Mr. Broussard?

4      A.   Did I ever?  I'm not sure I understand the question.

5      Q.   Did anyone take any of the pay stubs issued to any of

6   the line workers in Puerto Rico and run those pay stubs by

7   Broussard and ask him to review them?

8      A.   Prior to the commencement of litigation, no, not that

9   I'm aware of based on my review of documents.

10     Q.   Are you aware that anybody else ran any pay stubs by

11  Mr. Broussard once payroll started in Puerto Rico?

12     A.   Again, based on my review of the documents, I've not

13  seen that.

14     Q.   Okay.  So did you or anyone else consult

15  Mr. Broussard about what I'm gonna call a pay rate boost or

16  what you're gonna call a discretionary bonus?  Did anybody run

17  that concept by Mr. Broussard?

18     A.    In regards to what?  I think you're speculating about

19  what my testimony may or may not be, so I'm not understanding

20  your question.

21     Q.   We'll get to examples of paychecks where my clients

22  were given random bonuses to bring their pay up to exactly days

23  worked times day rate.  Did anybody run those bonuses by

24  Mr. Broussard?

25     A.   If you're asking whether or not Mr. Broussard was

1    contacted about discretionary bonuses, Mr. Beagle did receive

2    advice from Mr. Broussard over a period of years from likely

3    2014 through 2016, 2017, relative to discretionary bonuses paid

4    to both hourly as well as salaried employees.

5         Q.   But I'm talking about the discretionary bonuses that

6    we'll see in this case.  Or do you want me to just show them to

7    you and then we can kind of narrow it down?  Let's do that.

8    Let's do that.  So this is going to be part of 36.

9                   (Exhibit 36 marked.)

10                  MR. WELMAKER:  Will, this is what I was talking

11   about.  I tried to mark it as 36, but it marked it on the very

12   first page.  So how do you want to --

13                  MR. STUKENBERG:  So I would think the entire

14   earning statement records for that particular individual would

15   be the exhibit, and then you can refer by Bates number to

16   whatever particular pages you would like to ask questions is

17   what makes sense to me.

18                  MR. WELMAKER:  Yeah.  Duff has pay stubs for --

19   this is Bryan Duff.  He has got 50 pay stubs.  Let me -- so

20   what I've marked as Exhibit 36 is Duff pay stubs Bates-stamped

21   44 through 93.

22                  MR. STUKENBERG:  Okay.

23                  MR. WELMAKER:  And what I'm looking at right

24   here is it's going to be Exhibit 36 Bates-stamped page 93.

25                  MR. STUKENBERG:  And Doug, just for clarity, I

 1  know there is approximately 80 exhibits that you sent over.  I

 2  don't know if you're going to cover all 80 today.  To the

 3  extent that an exhibit's not covered, what's your intention to

 4  include it with the transcript?

 5              MR. WELMAKER:  I'm not sure if I understand.

 6              MR. STUKENBERG:  Sure.  So you sent over

 7  approximately 80 exhibits, proposed exhibits to the deposition.

 8  Do you intend to have all 80 of those as exhibits to the

 9  deposition or only those that you discuss?

10              MR. WELMAKER:  Whatever is easier for you.  I

11  mean, I don't care.  Do you want to just limit it to what was

12  discussed?

13              MR. STUKENBERG:  That would seem to make sense

14  to me.

15              MR. WELMAKER:  Yeah, let's just do it that way.

16              MR. STUKENBERG:  Okay.

17              MR. WELMAKER:  Some of these are going to be a

18  little bit more difficult because there are two sets of pay

19  stubs produced and two sets of timesheets produced for some of

20  these individuals.  But I guess we'll just get to that when we

21  get to it.

22              I'm just gonna do one of these right now.  And

23  then during lunch, I'll try to make it so that it's easier

24  because of the problems that I'm having with the exhibit

25  labels.

```
1                    (Exhibit 43 marked.)
2                    MR. WELMAKER:  This is Gerardo Garcia's pay
3    stubs.  It's from Exhibit 43.  Let me try to get -- the
4    starting Bates number is 117.  The ending Bates number is 140.
5                    MR. STUKENBERG:  And, again, this is Exhibit 43?
6                    MR. WELMAKER:  Yeah, we're moving on to 43.
7                    MR. STUKENBERG:  Okay.  And just so you're
8    aware, the screen still reflects 39.
9                    MR. WELMAKER:  Right.  All right.  So is that
10   better?  This is going to be 43, Bates-stamped page 140.
11                   MR. STUKENBERG:  Yeah, I see it.
12                   MR. WELMAKER:  Okay.
13       Q.  (BY MR. WELMAKER)  So from this pay stub, Mr. Layton,
14   can you tell how many hours Mr. Garcia worked?
15       A.   During this particular pay period, it looks like he
16   worked 144 hours.
17       Q.   And if he's getting 16 hours a day, which he's
18   getting, right?
19       A.   I would need to see the Time Detail Report.
20       Q.   All right.  So let's go -- this is 4/2 to 4/15.  So
21   4/2 to 4/15, how many hours is it reflected that he's working
22   per day?
23       A.   16 hours per day from 4/7 to 4/15 it appears.  4/16.
24   Is it 4/15 or 16?  I don't know.  It's awfully small on my
25   screen.
```

1          MR. STUKENBERG:  I believe it's 4/15.

2     Q.   (BY MR. WELMAKER)  Okay.  So there is an extra 486

3 listed in his pay; is that correct?  Do you see that?

4     A.   Yes, I do.

5     Q.   4/15.  And under this particular paycheck for that

6 same period of time, it's listed as a day rate of 486.

7     A.   Correct.

8     Q.   Do you see that?

9     A.   I see it.

10    Q.   Was Mr. Garcia paid on a day rate basis?

11    A.   No.  You can see that four -- the nine days that

12 Mr. Garcia worked, he was paid for 72 regular hours and 72

13 overtime hours, which should have been -- looking at the Time

14 Detail Report -- 32 hours in the first week of regular time and

15 40 hours of regular time in the second week.

16    Q.   Okay.  So he was making a thousand dollars a day, and

17 he worked nine days; is that right?

18    A.   Actually, if you look at it -- so on -- if we can

19 pull back up the Time Detail Report.  So for Saturday, 4/7, he

20 would have had 16 hours.  And if we can flip back over to the

21 earnings statement.  So he would have 47.30.  He worked

22 16 hours on Saturday and 16 hours on Sunday, so that would have

23 been 32 hours times 32.  That would have been $1,513.60 for

24 those two days or $756.80 for each one of those days, Saturday

25 and Sunday.

1          MR. WELMAKER:  All right.  Objection,

2    nonresponsive.

3      A.   He was --

4      Q.   (BY MR. WELMAKER)  Why was he paid a day rate of $486

5    in this paycheck?

6          MR. STUKENBERG:  Mr. Welmaker, if you could let

7    Mr. Layton finish his answer, please.  I think he was still

8    answering your last question.

9          MR. WELMAKER:  Everything was completely

10   nonresponsive.

11     Q.   (BY MR. WELMAKER)  Why was he paid $486 as a day rate

12   on this paycheck?

13     A.   If I can complete my previous answer, please, I think

14   we can walk to the pay --

15     Q.   All I want to know is why is this $486 here.

16     A.   Again, if I could, please, complete my previous

17   answer, I think I can walk through the pay for each day in this

18   two-week pay period and answer the question in relation to the

19   discretionary bonus that was paid under the day rate code.

20     Q.   All right.  Well, is it a discretionary bonus?

21     A.   Again, I'd like to revert and complete my previous

22   answer.

23     Q.   All right.  Well, you can do that when Mr. Stukenberg

24   takes you on redirect.

25     A.   If you're not gonna allow me to complete my answers,

1    then I'm not sure how we can complete this.  I'd like to

2    complete my previous answer, please.

3        Q.   I know how we can complete it.  It's just by you

4    answering my questions, and then we can move on.

5        A.   And I'm trying.  And one of your deposition rules was

6    that we not interrupt each other, yet this is the second time

7    you've gone down that path and cut off my answer.  So if you

8    can please --

9        Q.   Yeah, because I'm not going to sit here and let you

10   give a speech and burn all my time.

11            Do you know why, yes or no, the $486 is added to

12   this individual's pay under the day rate code?

13       A.   I respectfully ask for the ability to complete my

14   previous answer.

15       Q.   It's a yes or no question.

16       A.   You've interrupted me multiple times, and I'm trying

17   to answer your question.  And I'd ask that you respectfully

18   allow me to complete my answer to your previous question that

19   you interrupted my answer on.

20       Q.   Do you know why Mr. Garcia was given a $486 bonus on

21   this paycheck, yes or no?

22       A.   Again, I'd like to complete the answer to the

23   previous question that I've been interrupted and not allowed to

24   answer.

25       Q.   So you're not going to answer my question?

1          MR. STUKENBERG:  That's not what he said.

2          MR. WELMAKER:  It's a yes or no question.

3     That's it.  It's yes or no.

4          Q.   (BY MR. WELMAKER)  Do you know why the 486 is on here

5     or do you not?

6          A.   If you would allow me to answer the previous

7     question, I may be able to address the question that you're

8     currently asking.  But as of now, you've interrupted me

9     multiple times and not allowed me to complete my answer.

10         Q.   You can complete your answer when Mr. Stukenberg

11    takes you.  I'm just asking for a simple yes or no question.

12         A.   And I'm asking, as the witness, to be able to

13    complete the answer to the previous question that you've

14    interrupted me several times on.

15         Q.   We're gonna go through a bunch of these, and we're

16    not gonna have time for you to give me a speech on every single

17    one of these.

18         A.   If I need to add context as the witness and answer

19    the question as I see fit, then that's my right as the witness

20    to answer uninterrupted with the context that I feel is

21    necessary.

22         Q.   No.  You can answer my questions or we can just move

23    on.  You're not gonna sit here and give me a speech on every

24    single one of these.  I don't need the Mark Layton extended

25    version on this.  It's just a yes or no question.

```
1        A.   Sir, if you'd allow me to finish the previous

2   question, I'd certainly appreciate that ability to try to help

3   you and answer the previous question that was left unanswered.

4        Q.   Go ahead and do it then.  Go ahead.

5        A.   I was trying to speak, and you interrupted me again.

6   Like, this is nonproductive for you to keep interrupting me.

7        Q.   What's nonproductive is your speeches.  That's

8   nonproductive.

9        A.   That's argumentative.  And I've tried to answer your

10  question.

11       Q.   You're not the attorney.  You're not asserting

12  objections.

13            MR. STUKENBERG:  He's just trying to answer your

14  questions, Doug.

15            MR. WELMAKER:  He's trying to give me a speech,

16  Will.  This is the one hundredth deposition that he's taken.

17  He knows the answer.

18       Q.   (BY MR. WELMAKER)  But go ahead.  Go ahead,

19  Mr. Layton.

20       A.   Can we flip back to the Time Detail Report again?

21  I've forgotten the days now that you've interrupted me so many

22  times.

23       Q.   Do you have these documents in front of you as well?

24  Did I email them?

25       A.   Yes.  I was trying to look at it on screen.  But if
```

1    you'll give me the exhibit, I'll pull them up.

2         Q.   I'll pull it up.  Can you see it?

3         A.   All I see is the earnings statement.  So on 4/7, we

4    can flip back to the earnings statement.  4/7 was a Saturday.

5    Regular rate of 47.30 for 16 hours.  Mr. Garcia would have

6    earned $756.80.  Sunday, 4/8, would have been another 16

7    regular hours, so Mr. Garcia would have earned $756.80.

8              4/9 would have begun a new work week, so

9    16 hours at the regular rate of 47.30.  4/9 and 4/10 would have

10   each been at the regular rate, and Mr. Garcia would have earned

11   $756.80 for each day.  4/11 would have been split eight hours

12   at regular rate of 47.30 and eight hours at the overtime rate

13   of 70.95.  So regular earnings, I think, he would have earned

14   378.40.  Overtime earnings on 4/11, he would have earned

15   567.60.

16             Days 4/12, 4/13, 4/15, 4/16 would have each been

17   at overtime.  So 16 times 70.95, Mr. Garcia would have earned

18   $1,135.20 for each one of those four days.  So that gets

19   regular earnings for that period -- let's see -- $3,405.60.

20   And overtime earnings of $5,108.40.

21             In addition, Mr. Garcia was credited with a

22   discretionary bonus.  Appears to be 486, but the number's

23   relatively small.

24        Q.   My question is:  Why was he given a bonus of $486?

25        A.   That was a discretionary bonus paid to Mr. Garcia.

1    Process-wise at the time, the superintendents had the ability

2    to -- and as well as the presidents of the respective

3    entities -- had the ability to pass through discretionary

4    bonuses to the linemen.

5                 Again, Mr. Beagle had received previous advice

6    in 14 through 17 in regards to discretionary bonuses, and these

7    relatively small amounts were paid from time to time to workers

8    in Puerto Rico based on criteria set by the superintendents and

9    presidents, which would include good attitude, you know,

10   working safely, showing up on time, things of that nature.

11        Q.   Okay.  So I didn't need all the additions and

12   subtractions and multiplications for you to answer my question.

13   All I wanted to know was why was the 486 provided.  And your

14   response was, It's a discretionary bonus.  We could have cut

15   out all of that.

16               So first of all, why was that discretionary

17   bonus given?

18        A.   Again, the superintendents and presidents had the

19   ability to pay these discretionary bonuses, and they were

20   generally based on the criteria that I mentioned:  attitude,

21   safety, showing up on time.

22        Q.   Does this particular bonus have anything to do with

23   the fact that Mr. Garcia was supposed to make a thousand

24   dollars a day and he worked nine days?  Did it have anything to

25   do with bringing his pay up to exactly nine days times a

1    thousand dollars?

2         A.   So if you work through the math, Mr. Garcia earned

3    $756.80 for four days.  And I think he earned $946 for one day.

4    And then on the overtime days, he earned $1,135.20 for each one

5    of those days.  In addition, Mr. Garcia was given a

6    discretionary bonus of 486.

7         Q.   Did the 486 have anything to do with bringing his pay

8    up to his promised day rate of $1,000 times the days that he

9    worked?

10        A.   So Mr. Garcia wasn't promised anything.  Mr. Garcia

11   was an hourly employee, which is reflected on his pay stub, and

12   he was compensated for the hours he worked or available -- was

13   available to work for the nine days in the pay period.  In

14   addition to that amount, Mr. Garcia was granted a discretionary

15   bonus.

16        Q.   Did the discretionary bonus have anything to do with

17   Mr. Garcia not getting the full promised day rate of a thousand

18   dollars a day for the nine days that he worked, yes or no?

19        A.   Again, Mr. Garcia wasn't promised anything.

20   Mr. Garcia was not under an employment contract.  Mr. Garcia

21   was an hourly employee.

22              Now, if Mr. Garcia worked or was available to

23   work for a full work week, you can average his amount on a per

24   day basis and get a daily average of what he would earn for a

25   full period.  That would be relatively close but not exact to

1  the daily budgeted amounts.

2              As is the function with all hourly employees,

3  you have to look at the days worked throughout the period and

4  where they're at in regular versus overtime hours to calculate

5  what their earnings were during that particular work week.

6              (Exhibit 75 marked.)

7      Q.   (BY MR. WELMAKER)  All right.  I'm showing you what's

8  been marked as Exhibit 76 [sic.]  Do you see it?

9      A.   Yes.  It's very small on my screen.

10     Q.   Okay.  This is for Mr. Garcia.  And it says his

11  Puerto Rico storm rate is a thousand dollars per day.

12              Do you see that?

13     A.   I believe the document states a thousand dollars per

14  day that will be broken down hourly over 16 hours daily.

15  Hourly, 47.30.

16     Q.   Okay.  So regardless of how it's broken down, he's

17  being told he will get a thousand dollars per day.

18              Do you agree with that?

19     A.   No.

20     Q.   Okay.  All right.  Let me ask you this:  So you don't

21  agree that he's being told he's going to make a thousand

22  dollars a day, right?  You disagree with that statement, yes or

23  no?

24     A.   Mr. Garcia is an hourly employee.  So he has to work

25  for the hours or be available to work, and then he's

1   compensated accordingly.

2       Q.    Okay.  So should the thousand dollars per day even be

3   in there?

4       A.    I'm not sure the thousand dollars per day means

5   anything one way or another.  This is not a binding contract.

6       Q.    I'm not asking if it's a contract.  Is it what he was

7   told that he was going to be paid?

8       A.    In what he was told he was being paid as an at-will

9   employee is insignificant.  What matters is how he was actually

10  paid.  And he was paid as an hourly employee.  And you can see

11  the regular and overtime hours.  You can see the overtime rate

12  is one and a half times the regular rate.  And so the mechanics

13  are reflected on the earnings statement that Mr. Garcia

14  received.

15      Q.    Okay.  So does anything on this offer letter mean

16  anything to you?

17      A.    In regards to the offer letter, no, it's relatively

18  insignificant based on the advice of Mr. Broussard and --

19      Q.    Okay.

20      A.    -- the fact that Mr. Garcia is an at-will employee.

21      Q.    All right.  So if Mr. Garcia is getting -- so in your

22  opinion, we ignore the thousand dollars per day.  What you're

23  focused on is the 47.30 hourly rate; is that correct?

24      A.    What I'm focused on is the mechanics of the earning

25  statements which reflect the pay plan that was implemented.

1    Q.   Okay.  So if Mr. Garcia is going to be paid $47.30

2    per hour and he works 16 hours a day but he only works one day

3    in a two-week time period, how much is he gonna make?

4    A.   For one day, he makes $756.80.

5    Q.   Okay.  So he wouldn't be making the thousand dollars

6    per day that's reflected in this document, would he?

7    A.   Again, that's the nature of an hourly employee.

8    Q.   Okay.  And did anybody from Mammoth or Cobra ever

9    address the fact that when someone works less than a full

10   two-week period that their rates need to be adjusted?  Did that

11   ever come up?

12   A.   There was certainly an identification that if an

13   employee worked a short week, which was relatively infrequent

14   in nature, that there could be an instance in which you may

15   have an employee due to the short week earn less than an

16   average amount that's represented here --

17   Q.   Okay.  Earn less than the average 1,000 per day?

18        MR. STUKENBERG:   If -- Mr. Welmaker, if you can

19   let him finish his answer, please.

20   A.   Yes.  So on average, if the employee worked a short

21   week or didn't work the targeted hours, then they would earn

22   less than an average.  And that's the case with every hourly

23   employee.  If you come up with a budget of, you know, $52,000

24   per year for an hourly employee and they work less than that,

25   then they're certainly going to earn less than a thousand

1    dollars per week.  Likewise, if they work more than that, then

2    they would earn more.  That's the nature of hourly employees.

3    You can give them target amounts based on estimates, you know,

4    that they may be able to earn.  But as an hourly employee, it's

5    a function of hours worked or available to work in the work

6    week.

7         Q.   (BY MR. WELMAKER)  And so going back to Exhibit 43,

8    140, is the 486 that we see under the day rate column, is that

9    a discretionary bonus that was given to Mr. Garcia to get him

10   up to his average rate?

11        A.   Discretionary bonus paid to Mr. Garcia for safety,

12   attitude, showing up on time, at the discretion of the

13   superintendent or president at 5 Star.

14        Q.   Did it have anything to do with bringing his pay up

15   to the average targeted rate?

16        A.   It recognized that if an employee worked a short week

17   that the supervisors I've referenced had the ability to bonus

18   individuals reflective of that increased margin that the

19   company realized as a result of the short week.

20             So, again, as with all discretionary bonuses,

21   sometimes they were paid and sometimes they were not.  And we

22   can see that borne out in the check stubs of Mr. Garcia as well

23   as other employees.

24        Q.   Okay.  So if Mr. Garcia's offer letter says a

25   thousand dollars per day and his Time Detail Reports show that

1    he worked nine days, does this 486 day rate bonus have anything

2    to do with bringing up his pay to the thousand dollars a day

3    multiplied by nine days worked?

4              MR. STUKENBERG:  Objection, form.

5         A.   Again, the 486 was a discretionary bonus that was

6    paid to Mr. Garcia.  We can walk through the mechanics and what

7    Mr. Garcia earned for each of the nine days in this pay period.

8    And those amounts along with the discretionary bonus of $486

9    comprise the gross amount.

10        Q.   (BY MR. WELMAKER)  Okay.  So the 486 in this specific

11   example could have been just because he's got a good attitude,

12   right?

13        A.   That was one of the factors that --

14        Q.   It could have -- go ahead.  I'm sorry.

15        A.   That was one of the factors that the superintendents

16   as well as the president had as criteria.  Good attitude, show

17   up on time, working safely.

18        Q.   And so this $486 bonus could have had nothing to do

19   with his pay shortfall that we see here?

20             MR. STUKENBERG:  Objection, form.

21        A.   Well, there is no shortfall.  Mr. Garcia was paid for

22   each of the hours he worked and was paid for overtime for each

23   hour in excess of 40 hours in each work week.

24        Q.   (BY MR. WELMAKER)  Okay.  So let me see if I

25   understand this.  So the $486 that was bonused here, that was a

1    discretionary bonus, correct?

2         A.   Yes.

3         Q.   It wasn't done to make him whole, correct?

4         A.   That's correct.

5         Q.   Okay.  And it had nothing to do with the fact that

6    he -- his offer letter says a thousand dollars a day and he

7    worked nine days?

8              MR. STUKENBERG:  Objection, form.

9              That's not what the letter says.

10             MR. WELMAKER:  Will, it's objection, form.

11   That's it.

12        Q.   (BY MR. WELMAKER)  It had nothing to do with the fact

13   that he -- his offer letter says a thousand dollars a day and

14   he worked nine days.  It had nothing to do with that, right?

15             MR. STUKENBERG:  Same objection.

16        A.   Is there a question pending?

17        Q.   (BY MR. WELMAKER)  Yeah.  It had nothing to do -- the

18   486 bonus had nothing to do with the fact that his offer letter

19   said a thousand dollars a day.  He worked nine days, and that

20   brought him to less than $9,000.  It had nothing to do with

21   bringing his pay up to $9,000, correct?

22             MR. STUKENBERG:  Objection, form.

23        A.   His offer letter referenced his hourly rate, which we

24   can see.  Regular rate of 47.30.  We can see that Mr. Garcia

25   was paid for the regular hours --

```
1        Q.   (BY MR. WELMAKER)  Just answer my question.  Did it,
2   yes or no, have anything to do with the shortfall?
3        A.   Again, if you could, please, restrain yourself and
4   allow me to answer the questions and stop interrupting me.
5        Q.   I'm gonna ask you -- I'm asking you yes or no
6   questions.  And if you don't want to answer yes or no
7   questions, we'll shut the deposition down.  We'll talk to the
8   judge, and we'll get this over with a lot quicker.  I don't
9   need your calculations.  Just yes or no.  If I want
10  calculations, I'll ask for them.
11              MR. STUKENBERG:  And Doug, sometimes answers
12  need context.
13              MR. WELMAKER:  I've been given 20 minutes of
14  context in this situation.  I don't need the context again.
15              MR. STUKENBERG:  Well, not all questions are yes
16  or no answers.
17              MR. WELMAKER:  If they're not, then you can fix
18  it on redirect.
19              MR. STUKENBERG:  If you don't like his answer,
20  you don't like his answer, but his answer is his answer.
21              MR. WELMAKER:  His answer is gonna have us in a
22  seven-day deposition.  We're not going through the mathematics
23  of every single paycheck that I'm gonna show him.  I'm not
24  doing it.  The judge wouldn't let us do it at trial.  There is
25  no way the judge is gonna let us do that.
```

1    Q.    (BY MR. WELMAKER)  Mr. Layton, I'm gonna ask you

2    again:  Did the $486 bonus have anything to do with the fact

3    that his promised day rate in the hour [verbatim] letter

4    multiplied by days worked should have put him at $9,000, but it

5    didn't?

6              MR. STUKENBERG:  Objection, form.

7    A.    Again, there's no promise of anything in the offer

8    letter.  The offer letter references a number of things,

9    including his hourly rate of $47.30, which we can see directly

10   on this earnings statement.  And we can see that Mr. Garcia was

11   paid for regular hours at his regular rate up to 40 hours in

12   each work week and paid for overtime hours in excess of

13   40 hours in each work week at 1.5 times $47.30.

14   Q.    (BY MR. WELMAKER)  So is it your -- is it your

15   opinion that the 486 was just a random good faith, hey, you're

16   doing a good job bonus?

17   A.    The $486 was a discretionary bonus at the criteria

18   and discretion of the superintendents as well as the president

19   that they passed to Mr. Garcia at their sole discretion.

20   Sometimes this was done and sometimes it was not at their

21   discretion.

22   Q.    Was that bonus ever given to employees to bring their

23   pay up to the targeted pay rate times day work -- days worked?

24   A.    There were discretionary amounts paid in various

25   increments, if you will, so I can't answer an ever question

1    like that.

2         Q.   Okay.  So if we look at this -- and we're still on

3    43, 140 -- if you assume that he is supposed to be paid $9,000

4    a day [sic] and he works nine days, using the hourly method,

5    he's not getting to a thousand dollars a day.  But he just

6    happens to be given $486 that brings him to exactly a thousand

7    dollars a day.  Is that a coincidence in your opinion?

8              MR. STUKENBERG:  Objection, form.

9         A.   I believe you said he was being paid $9,000 a day.

10   So kind of lost me.

11        Q.   (BY MR. WELMAKER)  Let me clarify myself.  If he's

12   being paid a thousand dollars a day and he works nine days,

13   under the hourly method, he's not going to get $9,000.  But

14   with this $486 bonus, it gets him to exactly $9,000.  Is that a

15   coincidence?

16             MR. STUKENBERG:  Objection, form.

17        Q.   (BY MR. WELMAKER)  Is that bonus just randomly

18   calculated as a coincidence, or was it meant to bring him up to

19   exactly $9,000?

20             MR. STUKENBERG:  Same objection.

21        A.   The bonus was based on the discretion of the

22   managers.  Mr. Garcia was paid on an hourly and overtime basis,

23   as I detailed out earlier.  And then in addition to the hourly

24   and overtime hours, he was granted a discretionary bonus.

25        Q.   (BY MR. WELMAKER)  And it just so happens that the

1    discretionary bonus gets him to $1,000 a day times the nine

2    days he works, right?  That's just a coincidence?

3         A.   Again, there were four days on which he earned

4    $756.80.  I think an additional day that he earned $946 and

5    another four days where he earned $1,135.20 depending on where

6    he was at in the work week and whether he was at regular or

7    overtime earnings.

8         Q.   Let's go to Bates 134, Exhibit 43.  Here,

9    Mr. Garcia's day rate is now $135.

10                  Do you see that?

11        A.   Yes.

12        Q.   Okay.  So I guess if he's getting bonused on doing

13   good work or being a good employee, he's not that good of an

14   employee, right?  I mean $135 bonus, that's -- that's not gonna

15   make any difference to anybody really, is it?

16                  Let me ask you this:  Have you ever looked at an

17   employee's performance and said, That employee is doing so

18   good, I think I'll give them $135 bonus?

19                  Have you ever done that?

20        A.   I've approved several bonuses throughout my career.

21        Q.   Have any of them ever been $135 over a two-week pay

22   period?

23        A.   I don't recall the amounts from smallest to greatest

24   amount.  They've been all over the place.  That's the nature of

25   discretionary bonuses.

1      Q.   Have you ever given $135 bonus?

2      A.   That exact amount, no.  I've given certainly small

3   bonuses of 50, 75, hundred dollars.  They vary all over the

4   place.

5      Q.   Let's go to Bates 133 for Mr. Garcia.

6           MR. STUKENBERG:  And Doug, as we flip to that

7   page, what are you thinking for lunch here?  I'm not in any

8   particular rush.  Just want to know your plan.

9           MR. WELMAKER:  Do you want to say 45 minutes, or

10  is that too long, too short?

11          MR. STUKENBERG:  I mean, Mr. Layton, is that

12  enough time for you to get something?

13          THE WITNESS:  45 minutes works for me.

14          MR. WELMAKER:  Let's do 45 minutes.  Let me

15  finish this one and --

16          MR. STUKENBERG:  No, no.  Take your time.  It's

17  getting to be about that time, so just wanted to know what your

18  plan was.

19          MR. WELMAKER:  Yeah, I get it.

20     Q.   (BY MR. WELMAKER)  So on this document, which is

21  Bates-stamped 133, Mr. Garcia is given a random bonus of

22  $405.20.

23          And just out of curiosity, Mr. Layton, do you

24  ever give bonuses with extra cents added on?

25     A.   Discretionary bonuses can be all over the place.

1    That's their nature of discretionary bonus --

2        Q.    Sure.  But I'm asking you.

3        A.    And I'm asking again, if you would, please, stop

4    talking over me.  Like, it interrupts my thought process and

5    ability to answer your questions clearly and concisely.

6        Q.    I apologize.  Are you done?

7        A.    Yes.

8        Q.    Have you ever given a bonus of X dollars and 23 cents

9    or 20 cents?

10       A.    Yes.  Discretionary bonuses are all over the place.

11   They can be in random amounts.  That's the nature of

12   discretionary bonuses.

13       Q.    And so you've given a bonus with, like, an extra 20

14   cents on it, right?

15       A.    The nature of discretionary bonuses, they can be all

16   over the place.

17       Q.    I'm asking about you.

18       A.    The nature of discretionary bonuses is that they can

19   be all over the place --

20       Q.    I'm asking about you.

21       A.    -- in terms of -- again, this is about the tenth time

22   you've been rude and interrupted me.  It's problematic for me

23   to be able to clearly and concisely answer your questions when

24   you routinely are talking over me and interrupting my thought

25   process.

1    Q.   Do you know what you're routinely doing?  You're

2    routinely not answering my questions.  If you would just listen

3    to the question, we could get out of here much quicker.

4              MR. STUKENBERG:  And I think he's trying to

5    answer your question, Doug.

6    Q.   (BY MR. WELMAKER)  Let me clarify it.

7              Yes or no, have you ever given a bonus with

8    extra cents on it like a 405.20?  Yes or no?

9    A.   Are you asking me as a supervisor or me in my

10   corporate rep capacity for these entities?

11   Q.   At any point in your life.

12   A.   Clearly as a corporate rep, there are bonuses that we

13   can see that have odd dollars and cents in these pay records.

14   In my 25-year career, I've paid discretionary bonuses all over

15   the place that include odd number cents.  I've paid thousands

16   of them.

17   Q.   That's all I wanted to know.  So this period of time

18   is from July 9th to July 22nd.

19              Do you see that?

20   A.   Yes.

21   Q.   I'm showing you Mr. Garcia's Time Detail Report for

22   the first part of the week.  7/9, 7/10, 7/11, 7/12.  It doesn't

23   appear that he worked, correct?

24   A.   Correct.

25   Q.   Doesn't appear that he worked on 7/13, 7/14 or 7/15,

```
 1   correct?

 2        A.   Yes.

 3        Q.   How many days did Mr. Garcia work in the second pay

 4   period from 7/16 to 7/22?

 5        A.   I'm not sure I understand your question or context of

 6   a second pay period.

 7        Q.   I'm sorry.  The second week of the two-week pay

 8   period from 7/16 to 7/22, how many days did he work?

 9        A.   Appears to have been four days.

10        Q.   Okay.  His offer letter says he's making a thousand

11   dollars a day.

12             MR. STUKENBERG:  Objection, form.

13        Q.   (BY MR. WELMAKER)  So if he worked $1,000 a day times

14   four days, he would theoretically be entitled to $4,000.  And

15   he just happens to get a discretionary bonus of $405.20 that

16   magically brings his pay up to $4,000.

17             My question to you is:  Was this related to the

18   amount of time that he worked, or was this just a performance

19   for doing a good job?

20             MR. STUKENBERG:  Objection, form.

21        A.   The amount of time that he worked was 64 hours for

22   which he was compensated 40 regular hours at $47.30, and you

23   get regular earnings of $1,892.  In addition, he was

24   compensated for 24 hours of overtime at $70.95 for overtime

25   earnings of $1,702.80.  In addition, Mr. Garcia was credited
```

1    with a discretionary bonus of $405.20 based on the criteria

2    that I mentioned earlier.

3         Q.   (BY MR. WELMAKER)  Did that criteria have anything to

4    do with bringing his pay up to the targeted rate of a thousand

5    dollars a day?

6         A.   The criteria are the criteria.  The amount paid does

7    recognize that if Mr. Garcia had worked a full work week, his

8    daily average would have been higher.  But the reality of the

9    situation is, is that because Mr. Garcia worked a short work

10   week, Cobra Acquisitions realized higher margins on those days,

11   so elected to pass through on a discretionary basis some of

12   those margins to Mr. Garcia as compared to budgeted labor

13   amounts.  So one could take that that, you know, no good deed

14   goes unpunished for passing through a discretionary bonus to an

15   employee.

16             MR. WELMAKER:  I'll object to your

17   editorializing.  Thank you for your answer.  If you'd answer

18   like that, we can get out of here a lot quicker.  And

19   Mr. Layton, I apologize for getting frustrated.  I'm going to

20   try to do better.

21             Let's just take 45 minutes for lunch.

22             (Break from 12:28 p.m. to 1:25 p.m.)

23        Q.   (BY MR. WELMAKER)  Okay.  Mr. Layton, I want to go

24   back to what we had as Exhibit 6.  It was 2373 through 2375.

25             Can you see that okay?

1          A.    It's pretty small on my screen.

2          Q.    Okay.  Hang on a second.  Is that better?

3          A.    Yes.

4          Q.    All right.  If there's anything that you can't see

5     because it's too small or blurry, just let me know, and I'll --

6     I'll make it so that you can see it.

7                So let me just go up, if I can.  This is

8     Broussard's response to Jeff Beagle.  So we are on Exhibit 6.

9     Broussard responds on October 20, 2017.  And we've covered some

10    of this.  He is saying that if Mammoth chooses to pay a day

11    rate under the FLSA, then Mammoth would have to pay overtime on

12    hours worked over 40.  And that's highlighted at the bottom.

13               Do you see that?

14               MR. STUKENBERG:  Objection, form.

15         A.    The email states what it states.  Broussard doesn't

16    reference Mammoth anywhere in that response that I can see.

17         Q.    (BY MR. WELMAKER)  I'm sorry.  Let me clarify that.

18    Broussard is responding to Jeff Beagle, who appears to be the

19    HR director for some Mammoth entity.

20               And is it your prior testimony that he was the

21    HR director for Mammoth Energy, Inc.?

22         A.    Yes.

23         Q.    Okay.  He's also responding to Ken Kinsey.  And Ken

24    Kinsey was with Cobra; is that correct?

25         A.    Either Cobra Energy or Cobra Acquisitions.  I don't

1   remember which was his employer.

2       Q.   Okay.  And then Alexander Kalman, was Mr. Kalman with

3   Mammoth Energy, Inc.?

4       A.   Yes.

5       Q.   Okay.  So he's responding and discussing in the

6   highlighted portion how overtime would be calculated if Mammoth

7   chose to pay on a day rate.

8               Do you see that?

9       A.   Again, there's no reference to Mammoth anywhere in

10  this email.

11      Q.   I'm sorry.  I keep -- I'm just defaulting back to the

12  defendant -- well, that's not even correct.

13               He's responding to Beagle, Kinsey and Kalman

14  saying that if the pay system chosen was a day rate, that

15  overtime would have to be paid on that.

16               MR. STUKENBERG:  Objection, form.

17               MR. WELMAKER:  What's the objection, Will?  Let

18  me try to clarify it.

19               MR. STUKENBERG:  Well, you're paraphrasing what

20  the email says, and so my objection is gonna be form, but it's

21  just the email reads what it says.

22               MR. WELMAKER:  Okay.

23               MR. STUKENBERG:  I'm trying not to give a

24  speaking objection.

25               So to the extent that helps, I'll object as long

1   as you're paraphrasing what the email says.

2            MR. WELMAKER:  Okay.  All right.

3       Q.   (BY MR. WELMAKER)  So I am going to say that I'm

4   paraphrasing what the email says.  And he's -- Mr. Broussard is

5   talking about how overtime would be paid if a day rate program

6   was utilized.  And I've tried to highlight that.

7            Do you see that highlighted portion?

8       A.   Yes.

9       Q.   Okay.  So what alternative pay schemes or pay methods

10  did Mr. Broussard review?  What was he presented with?

11      A.   So there were a number of conversations with

12  Broussard.  You see the response here to Beagle's initial

13  inquiry.  I believe there was a Sunday afternoon phone call a

14  couple of days after this email on which I participated that we

15  had -- we being Beagle, Broussard, myself -- had a dialogue

16  about pay plan structure, using budgeted amounts to derive

17  hourly rates, the applicability of Puerto Rico law, some

18  workers' comp aspects, a number of things.  But as it centered

19  around pay practices, there was a call on Sunday.  I think

20  Beagle had a couple of calls on the following week culminating

21  in an Excel file that Mr. Broussard advised us was compliant

22  with the FLSA.

23           MR. WELMAKER:  Objection, nonresponsive.

24      Q.   (BY MR. WELMAKER)  Did he give you two options, you

25  could pay hourly with overtime or day rate with overtime?

1      A.    There were two options analyzed; a day rate being one

2    of them, and then the second option was an hourly and overtime

3    plan.  What was ultimately implemented was an hourly and

4    overtime plan that we can see on the earnings statements.

5      Q.    Okay.  And we've been over some of the day rate

6    adjustments in paychecks prior to breaking for lunch.

7            Did Mr. Broussard ever review those

8    discretionary bonuses that we looked at prior to lunch?

9      A.    So you call those payments one thing.  We refer to

10   them as something different.  So recognizing that we have a

11   difference of opinion on what those are or aren't,

12   Mr. Broussard had advised over a period of previous years that

13   I referenced earlier, 2014 through 2017, in regards to

14   discretionary bonus payments upon which we relied.

15     Q.    Okay.  When he was talking in the past about

16   discretionary bonus payments, what was he saying about them?

17     A.    So the advice we received in regards to discretionary

18   bonus payments as it relates to hourly and salaried employees

19   generally centered on that, you know, A, they're not

20   guaranteed.  You know, they need to be relatively infrequent in

21   both occurrence and in amount.

22            I think one key point is that, you know, there

23   was no advice given at any point on key words or catch words

24   that we couldn't utilize to make discretionary bonus payments

25   nor were we given any advice on thresholds as it relates to,

1    you know, how often they could be paid or should be paid in

2    compliance with standards as it relates to the discretionary

3    nature.  In other words, there's no mathematical barrier on

4    which to measure a discretionary bonus as to whether or not

5    it's discretionary.

6         Q.   Okay.  And was he talking about discretionary bonuses

7    in terms of including them in the regular rate or not?

8         A.   I'm not sure I understand your question.

9         Q.   Was the topic of discretionary bonuses brought up in

10   the context of whether such discretionary bonuses would be

11   included in the regular rate for purposes of calculating

12   overtime?  Is that why you guys were talking about it?

13        A.   I don't understand the connection between the two, so

14   I'm not following your question.

15        Q.   Let me do it a different way.  I'm showing you again

16   Fed 133, which is part of Exhibit 43.  Did you ever show

17   Mr. Broussard a paycheck with a bonus such as that contained in

18   this document, and in this particular one it's for 405.20?

19        A.   What's the question?

20        Q.   Did you ever show him -- well, let me ask you this:

21   Did you ever show him any pay stubs from the time that payroll

22   started in Puerto Rico?

23        A.   Ever is a long time.  I'm sure that once the

24   litigation commenced --

25        Q.   All right.

1     A.    -- he probably saw them, and that would be

2     privileged.  So prior to that --

3     Q.    All right.  So let me clarify.  From October 2017 to

4     July 22, 2018, did you ever show Mr. Broussard any pay stubs

5     from any of the workers in Puerto Rico and ask him to review

6     them?

7     A.    Not specifically that I've seen.

8     Q.    That you know of.  Do you know of anybody doing that?

9     A.    Again, not specifically that I've seen.

10    Q.    Did Mr. Broussard know that you were giving these

11    discretionary bonuses to workers in Puerto Rico during the time

12    period of late October 2017 to July 22 of 2018?

13    A.    Not that I'm aware of.  Again, we had received

14    previous advice from Broussard on discretionary bonuses and

15    relied on that prior advice in regards to discretionary bonuses

16    when these discretionary bonuses were paid.

17            MR. WELMAKER:  Objection to everything after the

18    word "again."

19            (Exhibit 7 marked.)

20    Q.    (BY MR. WELMAKER)  I'm showing you what's been marked

21    as Exhibit 7.  And I'm interested in the highlighted part.

22    It's from Missy Davis to a potential applicant dated

23    October 23rd, 2017.

24            Can you see that?

25    A.    It's very small on my screen.

1      Q.   Is that better?

2      A.   Yes.

3      Q.   Okay.  Missy says the following:  Below is the pay

4  scale for Puerto Rico.  We will be working no more than 12 days

5  because that's all they will allow.  Your daily pay is the same

6  no matter what the hours are.

7           Do you agree that the workers that were going

8  over to Puerto Rico were gonna have a daily pay that was going

9  to be the same no matter what the hours were?

10     A.   No, I don't agree with that.  And further, I can't

11 see who this email is from.  But I don't believe this email

12 based on the quick snippet I saw is from any of your claimants.

13     Q.   All right.  I'm going to let you review the entire

14 email.  And I'll represent to you that it's from Missy Davis.

15           Do you know who Missy Davis is?

16     A.   Missy Davis was an HR representative for 5 Star.  I

17 don't recall what her exact title was.

18     Q.   Okay.  Do you want to take a second and read it?

19     A.   The document states what it states.  I think for

20 context, this document is not indicative of pay records.  And

21 this email would have been sent before anyone was hired.  So

22 just to frame the email, I don't know that it has a lot of

23 value.

24     Q.   Okay.  Is Missy Davis advertising the pay rates for

25 potential employees to go to Puerto Rico and work for 5 Star?

1    A.   The email states what it states.  I think if you look

2  at the earnings statements, you can see that the employees were

3  paid hourly and overtime.  I've not seen in my review of

4  thousands of pay records that any employees were paid with an

5  email or deposited an email in their checking account.

6    Q.   Is --

7              MR. WELMAKER:  Objection, nonresponsive.

8    Q.   (BY MR. WELMAKER)  Is Missy Davis advertising that

9  5 Star is going to be paying foremen $12,500 -- $1,250 per day,

10 journeymen/linemen 1,000 per day, A class, 900 a day, B class

11 800 a day, hot apprentice 700 a day and apprentice groundsman

12 600 a day?  Is that what she's advertising?

13   A.   The email states what it states.  This is before any

14 pay plan had been finalized, before anybody had been hired and

15 is not indicative of the pay plan that was implemented and

16 reflected on the earnings statements.

17             MR. WELMAKER:  Objection, nonresponsive.

18   Q.   (BY MR. WELMAKER)  I'm asking you what Missy Davis is

19 doing here.  Is she relaying the very same rates that

20 Mr. Ellison relayed to everybody in his original email, yes or

21 no?

22   A.   Mr. Ellison relayed budgeted amounts that were

23 conveyed to Mr. Broussard.  Those budgeted amounts were used to

24 derive hourly rates in a compliant pay practice that was

25 implemented, and we can see from the Excel sheet that

1    Mr. Broussard approved the mechanics of the implementation of

2    those mechanics on the earnings statements received by skilled

3    workers in Puerto Rico.

4         Q.   Okay.

5              MR. WELMAKER:  Objection, nonresponsive to

6    everything you just said.

7         Q.   (BY MR. WELMAKER)  I had a yes or no question for

8    you, Mr. Layton.  Is Missy Davis communicating the very same

9    pay rates that Mr. Ellison communicated to everyone else that

10   we just looked at?  Is she communicating that to other people

11   in this email?

12        A.   I believe her email is what -- with one particular

13   person.  She is conveying amounts that agree to the budgeted

14   amounts that Mr. Ellison had set forth that were utilized to

15   derive the pay practice and pay plan approved by Mr. Broussard.

16             Again, this email is not a contract.  It's not

17   binding.  At this point in time, contextually, no pay plan has

18   been implemented and discussions are ongoing with

19   Mr. Broussard.

20        Q.   All right.

21             MR. WELMAKER:  I'm gonna object to that as

22   nonresponsive too.

23        Q.   (BY MR. WELMAKER)  Let me show you -- let me try to

24   do it like this:  We're looking at some rates here that Missy

25   Davis is communicating to a third party.  Do you agree with

 1   that?

 2        A.   The email states what it states.  I'm not on this

 3   email --

 4        Q.   I'm not asking you to tell me if it states what it

 5   states.  Do you see the numbers that she's communicating on a

 6   day rate basis here?

 7        A.   Here's the deal, if you keep interrupting me, I'm

 8   gonna end this.

 9        Q.   Okay.  Do it.  Go ahead and end it, Mr. Layton.  And

10   then we'll reconvene when the judge tells us that we'll

11   reconvene.

12        A.   I'm following your rules of not interrupting,

13   Mr. Welmaker.  So, please, allow me to finish my answers.

14        Q.   In this email, Missy Davis is saying foremen, 1250

15   per day.  That's in Exhibit 7.  Let's go back and look at what

16   Mr. Ellison is saying.  Foremen, 1250 per day.

17             Are those the same numbers?

18        A.   The emails speak for themselves.

19        Q.   Are they the same numbers?

20        A.   Again, the emails speak for themselves.  Those two

21   numbers are the same.

22        Q.   She's saying -- Ellison is saying journeymen/linemen

23   a thousand dollars per day.  Missy Davis, journeymen/linemen a

24   thousand dollars per day.

25             Do you see that?

1    A.   I can't see Mr. Ellison's email that -- they state

2    what they state.

3    Q.   Would you agree that Missy Davis is using the same

4    numbers and terminology that Mr. Ellison is using?

5    A.   Again, the emails state what they state.

6    Q.   So you're not gonna answer my question?

7         MR. WELMAKER:  Will, I'm not here to ask

8    Mr. Layton to tell me that the emails state what they state.

9    That's not an answer.

10        MR. STUKENBERG:  I think it is an answer.  I

11   mean, you're just reading emails.

12        MR. WELMAKER:  I'm asking if they're the same.

13   I'm asking if Missy Davis' email is the same as Mr. Ellison's

14   email.

15        MR. STUKENBERG:  Do you want to show him

16   Mr. Ellison's email?

17        MR. WELMAKER:  I just did.

18        MR. STUKENBERG:  And just so I understand, is

19   the question:  Do both emails use 1,250, that number is in both

20   emails?  Is that the question?

21        MR. WELMAKER:  The question is:  Is Missy Davis

22   tracking the same payment language that's in Mr. Ellison's

23   email?  That's all I'm asking.

24   Q.   (BY MR. WELMAKER)  This is Mr. Ellison's email.

25   A.   I can't see Mr. Ellison's email.  So when you keep

```
1    saying, This is Mr. Ellison's email, I can't see that.
2                MR. STUKENBERG:  Yeah, that's not coming up.
3                MR. WELMAKER:  Okay.  Sorry.
4         Q.   (BY MR. WELMAKER)  This is Mr. Ellison's email.  This
5    is Missy Davis' email.
6                Do you have any reason to disagree with the
7    observation that Missy Davis' email is using the same numbers
8    that Mr. Ellison's email is using?
9         A.   The numbers look the same.  They state what they
10   state.
11        Q.   When Missy Davis says, Your daily pay is the same no
12   matter what the hours are, is she describing a day rate?
13        A.   I don't know what she's describing.  That's factually
14   inaccurate and not what's represented in the pay stubs that you
15   have.
16        Q.   Did someone tell Missy Davis to send this out, or did
17   she just do it on her own?
18        A.   I can't tell that from this email.
19        Q.   Do you know?  Not -- just based on your personal
20   knowledge as the corporate rep for all four entities.
21        A.   Do I know whether she sent the email on her own?  No.
22        Q.   Did she get reprimanded for sending out this email?
23        A.   Not that I'm aware of.
24        Q.   I'm showing you what's been marked as Exhibit 9.
25                (Exhibit 9 marked.)
```

```
 1        Q.   (BY MR. WELMAKER)  And it is three pages.  So tell me
 2   when you're ready to talk about it.
 3        A.   If you could expand the size of that a little bit.  I
 4   can't read it.
 5        Q.   Tell me where -- do you want it at the top expanded
 6   and then to go down?
 7        A.   Yeah.  That would be great.  Thank you.
 8        Q.   Do you want me to start at the last page and go up?
 9        A.   Top down is fine.
10        Q.   Okay.
11        A.   Okay.  Okay.
12        Q.   Okay.  That's the end of the first page.  I'm
13   starting at the top of the second page.
14        A.   Okay.  All right.
15        Q.   Okay.  Are you ready to talk about this exhibit?
16        A.   Yes.
17        Q.   Have you seen this email before?
18        A.   Not that I recall.
19        Q.   Okay.  It's from J.D. Kinsey to Jeff Beagle,
20   Alexander Kalman, Ken Kinsey and Keith Ellison.  It's dated
21   November 21st, 2017.  And it is entitled Updated Pay Structure.
22             Did I read that correctly?
23        A.   Yes.
24        Q.   Okay.  Mr. Kinsey says, Hey, Jeff and Alex.  This is
25   the pay structure that Keith and Ken have agreed on for the
```

1    employees in Puerto Rico -- PR.

2              Did I read that correct?

3        A.   Yes.

4        Q.   Okay.  So is he saying that Keith Ellison and Ken

5    Kinsey have gotten together and created or assisted in creating

6    the pay structure applicable to Puerto Rico employees?

7        A.   The email states what it states.  That's not what I

8    read it.

9        Q.   How do you read it?

10       A.   This entire email chain appears to be referencing

11   salaried employees and a structure around the salaried

12   employees.

13             MR. WELMAKER:  Okay.  So this is Bates-stamped

14   1976 -- I mean 1975.  I'm marking this next one -- it's

15   Bates-stamped 1976 -- as Exhibit 10.

16             (Exhibit 10 marked.)

17       Q.   (BY MR. WELMAKER)  It's one of the natives that I

18   sent over, but I tried to PDF it just for ease of reference.

19             So this is ostensibly what Mr. Kinsey attached

20   to the email that we just read.

21             MR. STUKENBERG:  Just to clarify, Doug, Is it

22   attached, or are you guessing it's attached?  Help me

23   understand.

24             MR. WELMAKER:  I'm using the Bates stamp order

25   to determine that it is attached.

1          MR. STUKENBERG:  Okay.  But you don't actually

2    have the native with the attachment?

3          MR. WELMAKER:  Well, I've got the native here.

4    I mean, I can try to share my --

5          MR. STUKENBERG:  The native email, I mean.

6          MR. WELMAKER:  Oh, I see, like -- I think the

7    native email is gonna be the one immediately preceding this in

8    the Bates stamp order.  Am I wrong?

9          MR. STUKENBERG:  I don't know.  I'd have to look

10   at the actual native email.  But you can go ahead and ask him

11   questions.  I guess we'll just make an objection that there's

12   not a foundation this is actually the attachment.  We're just

13   assuming it is based on the Bates order, which is what I think

14   I understood you to say.

15         MR. WELMAKER:  Yeah, I mean, so here's 1975.

16   This is native 1976.  So if you want, here is 1975, the same

17   email just without my highlighting.  Hey, Jeff and Alex, this

18   is the pay structure.  1975 at the bottom.  1976, produced in

19   native format.  And then I assume that the spreadsheet that

20   says Mammoth 1976 is the attached spreadsheet.  I don't know

21   how else to interpret that.

22         MR. STUKENBERG:  Sure.  Now I understand what

23   you're saying.  I don't know offhand.  So I'll just go ahead

24   and object on that basis.  But you can go ahead.

25         MR. WELMAKER:  Yeah, I don't understand what

```
1    your objection is.

2                    MR. STUKENBERG:  We are assuming that this is

3    the attachment just based on the Bates numbers, correct?

4                    MR. WELMAKER:  Well --

5                    MR. STUKENBERG:  I'm just objecting that this is

6    not actually the attachment.  I don't know if it is or not.

7                    MR. WELMAKER:  Okay.  If it's represented by a

8    placeholder that says 1976 and I'm showing you the native that

9    says 1976, I just -- I don't know what else to do.

10                   MR. STUKENBERG:  Sure.  I understand.

11                   MR. WELMAKER:  Okay.

12        Q.    (BY MR. WELMAKER)  And so what I want to draw your

13   attention to, Mr. Layton, this email was sent November 21st,

14   2017.  Assuming I'm right and that this is an attachment to

15   this email, which I think it is, we're in November 20 -- 21st,

16   2017.

17                   And do you agree that the numbers for the

18   general foremen, the foremen, the journeymen/linemen, et

19   cetera, are the same as those set forth in Mr. Ellison's email

20   from October 19th?  And I can go back and I can switch and show

21   them to you, if you want.

22        A.    Those appear to be the same as the budgeted amounts

23   that Mr. Ellison communicated.

24        Q.    Okay.  And up here, this column that I've shaded in

25   green is saying Day Rate, correct?
```

1    A.   Yes.  Those are all salaried employees, which is what

2    that email chain appears to be referencing.

3    Q.   Okay.  Is this group from 28 to 35 considered to be

4    salaried employees?

5    A.   The general foremen, I believe, were salaried

6    employees.  The foremen and below were all hourly employees as

7    we can see on their earning statements.

8    Q.   And here, though, it's stating that they're being

9    paid a day rate, correct?

10   A.   It's not stating they're being paid anything.  It's

11   an Excel file that states what it states.  If we want to see

12   what they're being paid, we'd go to their earnings statements

13   which showed they were paid hourly and overtime for the foremen

14   and below.

15   Q.   Okay.

16            MR. WELMAKER:  Objection, nonresponsive.

17   Q.   (BY MR. WELMAKER)  The numbers following each

18   position description from, let's say, 29 to 35 have appeared or

19   have been placed in a column labeled Day Rate, correct?

20   A.   The document states what it states.

21   Q.   Is that correct?

22   A.   The document states what it states.

23   Q.   Is it correct?

24   A.   Again, third time, the document states what it

25   states.

1      Q.    Are the numbers that we're seeing in columns -- in

2   Rows 29 through 35 in a column that says Day --

3      A.    You broke up.  Can you repeat that, please?

4      Q.    Do you see Column D?

5      A.    Yes.

6      Q.    What does it say?

7      A.    It has a number of items in Column D.  The heading is

8   Day Rate.

9      Q.    Okay.  Under the Day Rate heading, are there numbers

10  supplied for Rows 29 through 35?

11     A.    Yes.  Again, the document states what it states.  If

12  we wanted to see how each of these classifications were

13  actually paid, we'd go to their earnings statements, which

14  reflected they were paid hourly and overtime.

15     Q.    Okay.

16             MR. WELMAKER:  Objection to everything after the

17  word "if."

18     Q.    (BY MR. WELMAKER)  I'm showing you what's been marked

19  as Exhibit 11.

20             (Exhibit 11 marked.)

21     Q.    (BY MR. WELMAKER)  Which came from Aaron Maldonado

22  and was sent over prior to Mr. Maldonado's deposition.  This

23  appears to be from Missy Davis.  And she's talking about

24  orientation scheduled for March 20, 2018.

25             Do you see that?

1    A.   Yes.

2    Q.   Talking about hotel arrangements, physicals, DOT.  So

3  now we're in March of 2018.  And she has set out what she calls

4  a pay scale.

5         Do you see that?

6    A.   Yes.

7    Q.   Can you read to me what the pay scale says?

8    A.   It states what it states.

9    Q.   I'm asking you to read it, please.

10    A.   Foremen, $1250 per day.  JL, 1,000 per day.  Class A,

11  900 per day.  Class B, 800 per day.  Hot apprentice, 700 per

12  day.  Groundmen, 600 per day.

13    Q.   And if we go back to Missy Davis' email from almost

14  four months earlier, those are exactly the same rates that

15  she's citing in that email, aren't they?

16    A.   For context, I don't think the budgeted amounts

17  changed throughout the storm-restoration period.

18    Q.   I'm not asking for context.  I'm just asking if

19  they're the same.

20    A.   And I answered your question that they're the same

21  throughout --

22    Q.   They --

23    A.   Look, I'm not gonna sit here all day and have you

24  interrupt my answers.  It interrupts my thought process, and I

25  can't continue to try to answer your questions completely and

1  concisely if you're gonna continue to interrupt me.

2      Q.  Are you done?

3      A.  I'm not the one that's interrupting you.  You're the

4  one interrupting me.  And I'm asking you again to please stop

5  so that I can answer the questions completely and concisely.

6      Q.  Are the rates that Missy Davis set forth in this

7  October 23, 2017, email the same as the rates that she sets

8  forth in Exhibit 11, which is in March of 2018?

9      A.  They appear to be the same.  For context, the

10  budgeted amounts did not change throughout the

11  storm-restoration period.

12      Q.  Okay.

13      A.  If we want to see how these employees were actually

14  paid, we'd go to their earnings statements and we can see that

15  they were paid hourly and overtime.

16      Q.  All right.

17          MR. WELMAKER:  Objection, nonresponsive to

18  everything after "for context."

19      Q.  (BY MR. WELMAKER)  I'm gonna shift gears and ask a

20  little bit about time.  Was everyone credited with working 16

21  hours per day?

22          THE COURT REPORTER:  I'm sorry.  You froze up.

23  Can you repeat that for me?

24      Q.  (BY MR. WELMAKER)  Was everyone credited in Puerto

25  Rico in, let's just say, the time periods that are applicable

1  to my case, February 2, 2018, through July 22, 2018.  Were all

2  those men on the island credited with working 16 hours a day?

3       A.   Are you talking about specifically your ten people or

4  who is the universe of people?  I don't understand.

5       Q.   The linemen.  You can confine it to my guys also, if

6  that makes it easier.

7       A.   I don't know how I can answer a universal question.

8  I don't think that's a topic you designated for me to review

9  the thousands of pay stubs, so I'm not sure I can answer a

10 universal question.  If you can dial it in, I'll try to answer

11 it as best I can.

12                 (Exhibit 72 marked.)

13      Q.   (BY MR. WELMAKER)  I'm gonna show you what's been

14 marked as Exhibit 72, Juan Santiago's Time Detail Report.

15            Do you see his Total Hours work column?

16      A.   Yes.  Could you enlarge that a little bit?  I can't

17 read it.

18      Q.   There's a day rate here.  But for purposes of what

19 I'm trying to do, just ignore it.  Let me ask you this:  Did

20 Mammoth track time of the linemen that were working in Puerto

21 Rico?

22      A.   Which Mammoth are you referring to, and how does that

23 relate to the 5 Star Electric employing entity that appears to

24 be referenced on this --

25      Q.   Sorry.  That's my fault.

1                Did -- let's just confine it to Higher Power and

2    5 Star.  Did they track time for employees working in Puerto

3    Rico?

4        A.   Yes.  And that's reflected on the Time Detail Reports

5    for each of the employees.

6        Q.   And would you be referring to the Time Detail Report

7    we're looking at right here?

8        A.   Yes.

9        Q.   Okay.  So how did they track time?  I want you to

10   list every single way time was tracked by Mammoth -- I mean, by

11   5 Star or Higher Power.

12       A.   So the process that was implemented, generally, the

13   employees were required to show up at a yard in most cases

14   around 7:00 a.m.  The foreman and general foreman would, you

15   know, take note of who was there.  That would be communicated

16   to the superintendents as well as to the payroll folks.  And

17   then the processes at the end of the day were that the foreman

18   and general foreman were aware of the DOT standard at 16 hours,

19   which requires an eight-hour rest period or reset.  We set that

20   16-hour threshold intentionally such that there were processes

21   to identify, report and capture any hours in excess of 16 hours

22   so that employees could be compensated in the event they worked

23   more than 16 hours.

24                One, because we felt it was highly unlikely that

25   the employees would exceed 16 hours due to the daylight periods

1    in Puerto Rico being about 12 hours.  The customer being PREPA

2    that didn't want to work at night.  The general lack of

3    lighting to be able to work at night.  And most important, the

4    increased safety hazard that comes along with working at night.

5    And then contextually, during this particular time period that

6    we were looking at, a lot of the work was done in the El Yunque

7    National Forest for which work was restricted by the U.S.

8    Forest Service in regards to ingress and egress as well as

9    through the paths in which we could access the forest.  But I

10   think most importantly, we relied on the foremen, which are

11   also hourly employees.

12           So to the extent their crews worked more than

13   16 hours, the foremen had a self-benefiting incentive to report

14   any excess hours to be compensated for.  And we'd seen that

15   work in other named storms in which foremen would capture a

16   report and employees would be paid for excess hours.  So

17   process-wise that's what we implemented.

18       Q.   Okay.

19           MR. WELMAKER:  So all that I'm objecting to as

20   nonresponsive.

21       Q.   (BY MR. WELMAKER)  And my question to you is this:

22   How was time tracked?  Was there a piece of paper that people

23   would sign in on the time that they arrived at the safety

24   meeting?  Was there a piece of paper that people would sign out

25   on when they finished for the day?  Was there an iPad that they

1  signed in or signed out on?  I want to know how 5 Star and

2  Higher Power went about tracking and recording actual hours

3  worked.  I don't care if they went over 16 hours.  I'm not

4  talking about that.

5         How did they record actual hours worked?

6     A.   That's an extremely compound question.  And I gave

7  you the process that was implemented such that we, as the

8  employer, had a process to identify hours worked in excess of

9  16 hours and report and pay for those hours.  If you would

10  break down that compound question, I'll be happy to try to

11  address each one of those points.  But process-wise, I've

12  covered that.

13     Q.   Did Higher Power or 5 Star note the time an employee

14  began working each day?

15     A.   The exact hour and minute, no.  There were processes

16  in place and supervisors had knowledge and we'd seen it work

17  previously in order to capture, report and compensate for hours

18  in excess of 16.

19     Q.   All right.  Let me help you.  I don't care about

20  hours in excess of 16.  I'm never gonna ask about that.  So you

21  can just exclude that from all further answers.

22         How did Higher Power or 5 Star write down or

23  otherwise record the time an employee reported for duty in the

24  morning?

25     A.   Again, the foreman and general foreman were aware of

1    when their crews showed up in the morning.  They were also

2    aware of the 16-hour DOT threshold.  The foremen were

3    self-incented to report their crews working in excess of

4    16 hours.  So exact hour and minute of start time, that's not

5    captured anywhere.

6                      However, there were processes in place for those

7    foremen and general foremen to identify, capture and report any

8    hours in excess of 16 hours.

9         Q.   Okay.  So nobody wrote down the time somebody

10   reported to work in the morning; is that correct?

11        A.   That's correct.

12        Q.   Did anybody write down the time each person took for

13   lunch?

14        A.   No.

15        Q.   Did anybody write down the time a person stopped

16   working each day?

17        A.   No.  But there were processes in place such that if

18   an employee worked more than 16 hours that the foreman could

19   identify, capture and report that we'd seen effective in

20   previous storm-restoration efforts, for which we implemented in

21   this particular effort as well.

22        Q.   Okay.  I'm gonna show you what has been marked as

23   Exhibit 13.

24                      (Exhibit 13 marked.)

25        Q.   (BY MR. WELMAKER)  And I'll start by enlarging it at

1   the top.  And just tell me when you're ready for me to move it

2   down.

3        A.   Okay.  All right.  Okay.  Okay.

4        Q.   Okay.  Is that enough for you to have familiarized

5   yourself with it?

6        A.   Yeah.  I'm not anywhere on any of these emails or

7   referenced in any of these emails, but I can talk about

8   processes in place at the time.

9        Q.   Okay.  What I want to draw your attention to is on

10   the second page where Alexander -- Alexander Kalman on the

11   first -- on this first page is asking for a number of questions

12   to be answered.  And above that, Ken Kinsey is providing

13   answers.

14             It's the second question that I'm interested in.

15   Mr. Kalman has said:  In the same vein, can we confirm that

16   hourly employees should only receive their day rate and not

17   their hourly rate in addition to their day rate, correct?

18             And then Mr. Kinsey says:  All hourly employees

19   will get their PR rate only.

20             What does he mean when he says:  All hourly

21   employees will get their PR rate only?

22        A.   The email states what it states.  Again, I'm not on

23   any of these emails nor am I referenced in any of these emails.

24   I can talk about process, and we can certainly look at earning

25   statements to see how the hourly employees were paid which

1  reflect that they were paid hourly and overtime.

2      Q.   Do you know what is meant when he says:  All hourly

3  employees will get their PR rate only?

4      A.   Again, I'm not on this email.  I'm not referenced in

5  this email.  I'm happy to discuss process, and we can clearly

6  see on the earning statements that the hourly employees were

7  paid regular and overtime.

8      Q.   Okay.  Have you seen this email before?

9      A.   I believe so.

10      Q.   Have you testified about this email before?

11      A.   I don't recall.  But again, I'm not on this email.

12  I'm not referenced in this email.  The email states what it

13  states.

14      Q.   Okay.  I don't think my designation of the corporate

15  representative is contingent upon whether you are on or in an

16  email.

17              MR. WELMAKER:  Is that your reading of it, Will?

18              MR. STUKENBERG:  I mean, I think it depends on

19  which particular topic.  But as a general matter, yes, to the

20  extent that that information is reasonably available and

21  accessible to Mr. Layton, he can testify as to what the

22  company's knowledge is.

23      Q.   (BY MR. WELMAKER)  Can you do that, Mr. Layton?

24      A.   Yes.  We can see on the earning statements that the

25  hourly employees were paid hourly and overtime.

1    Q.   Okay.  What does it mean when it says:  All hourly

2   employees will get their PR rate only?

3    A.   Again, I'm not on this email.  I'm not referenced in

4   this email.  If we want to see how the employees were paid, we

5   can look at the earning statements and see exactly how they

6   were paid.  They were paid hourly and overtime.

7    Q.   Let me ask you a question.  When you got my

8   deposition notice asking you to familiarize yourself with a

9   number of different subjects, how much time did you spend

10  preparing for this deposition?

11          MR. STUKENBERG:  For this particular deposition

12  or cumulatively for depositions in this litigation?  I just

13  want to get a clarification on that because there is a lot of

14  overlap.

15          MR. WELMAKER:  This particular one.

16   A.   This particular deposition, I probably spent ten to

17  15 hours on.

18   Q.   (BY MR. WELMAKER)  When did you spend that time?

19   A.   Over the last three or four weeks.

20   Q.   What documents did you review to prepare for this

21  deposition today?

22   A.   A number of different documents.

23   Q.   Which ones?

24   A.   Are you asking specific documents or class, like

25  class of documents?  What's the question entail?

1       Q.   You can answer both.

2       A.   Some of those will be likely covered by privilege

3   that were provided by Counsel.   In a broader context, I

4   reviewed a number of time detail records as well as earning

5   statements for the claimants that you represent.

6       Q.   Did you review any of the emails that have been

7   produced in this case?

8       A.   Specific to this particular deposition?   No.   I've

9   reviewed a number of these emails at previous points in time.

10      Q.   I'm gonna show you what's been marked as Exhibit 14.

11           (Exhibit 14 marked.)

12      Q.   (BY MR. WELMAKER)   Tell me when you're done reviewing

13  it.

14      A.   Okay.

15      Q.   At the bottom, why is Mr. Kalman trying to locate

16  offer letters if the offer letters were effectively

17  meaningless?   Who cares what the offer letters say basically is

18  what you've told me, right?

19           MR. STUKENBERG:   Objection, form.

20      A.   My previous testimony speaks for itself.

21      Q.   (BY MR. WELMAKER)   Well, no, I'm asking why do you

22  think Mr. Kalman is looking for offer letters if what is

23  contained in those offer letters is meaningless?

24      A.   I can't speculate for Mr. Kalman.   From the

25  perspective of an at-will employee, correct.   What I had

1    referenced earlier is that the advice we've been given is that

2    those offer letters are largely meaningless.

3        Q.   I don't -- I want to clarify this by saying, I don't

4    want to provide -- I don't want you to give me any information

5    that your attorneys gave you.

6             Who provided you with the advice that the offer

7    letters are meaningless?

8        A.   In regards to at-will employees, the advice we had

9    been given over a period of time from Mr. Broussard is that the

10   offer letters were largely meaningless.  What matters is how --

11   how the employees were compensated.  And if we want to see how

12   the employees were compensated, we can go look at their

13   earnings statements.  They're all at-will employees.  There are

14   no contracts.  There's no assertion of a breach of contract.

15       Q.   Okay.  Mr. Kalman continues:  I can't find offer

16   letters for them showing their day rate.

17            Should he have used the term "day rate" there?

18       A.   I don't know.  I'm not involved anywhere on this

19   conversation or referenced in this conversation or have the

20   ability to see whether these are salaried employees.  So I have

21   no context to answer your question.

22       Q.   All right.  If we're going to confine answers to

23   whether you're on an email, because you're on one email, if

24   that's the standard for me asking questions, we're gonna shut

25   it down right now and we'll just get a ruling from the judge on

1   whether that's the scope of my 30(b)(6.)  Is that what we're

2   doing?

3        A.   I've answered all of your questions so far.  So I'm

4   not sure what the argumentative statement is about.

5        Q.   I thought it was pretty simple and self-explanatory.

6   If you're going to couch your nonresponse to my answers or my

7   questions by telling me that you're not on the email so that

8   you just can't venture a response about what it's about, then

9   there's no point in continuing, Mr. Layton.

10       A.   Your decision as to whether to continue or not is

11  your decision.  You're parsing my answer because presumably you

12  didn't like it.  But I've answered every question you've posed

13  so far.

14            MR. WELMAKER:  Will, are we going to limit

15  Mr. Layton's 30(b)(6) deposition to only those emails that he

16  has been CC'd on or is involved directly in?

17            MR. STUKENBERG:  No.

18            MR. WELMAKER:  Because I don't think that's how

19  it works.

20            MR. STUKENBERG:  We are not.  And I don't think

21  that that's what Mr. Layton has done.  I think he's pointed out

22  the limitations in the scope of knowledge.  As you know, Doug,

23  Kalman, Davis, these people are no longer employed.  Trying to

24  get in the head of a former employee and what they meant when

25  they used particular words is beyond the scope of what we can

1    reasonably discover as a company to present the witness.  To

2    the extent Mr. Layton knows and is sitting in his corporate

3    capacity as to what Mr. Kalman meant or why he used a

4    particular word, you know, he obviously will testify to that.

5    But, you know, we are not limiting the deposition to only what

6    emails that Mr. Layton is on.  We are limiting it to what

7    Mr. Layton can reasonably discover given this happened

8    seven years ago involving former employees.

9         Q.   (BY MR. WELMAKER)  All right.  Let's move on to the

10   next one.

11              MR. STUKENBERG:  Doug, I'm not trying to

12   interrupt your rhythm, but we've been going about an hour.  So

13   just whenever you get to a good stop, that'd be good.

14              MR. WELMAKER:  Now is fine.

15              MR. STUKENBERG:  Okay.  Do you want to just take

16   ten minutes?

17              MR. WELMAKER:  Sure.

18              (Break from 2:31 p.m. to 2:47 p.m.)

19        Q.   (BY MR. WELMAKER)  So Mr. Layton, when we were

20   talking about time, is it true that almost universally everyone

21   was credited with working 16 hours a day?

22        A.   I don't know what the context of "almost universally"

23   is.  I think as you look, based on my review of the time detail

24   records, that the vast majority of the time employees were

25   credited with 16 hours per day for working or being available

1   to work while in Puerto Rico.

2        Q.   All right.  I have just a ridiculous amount of

3   exhibits, but I'm going to try to reduce what I'm going to ask

4   you about just in the interest of time.

5             The next document I'm showing you has been

6   marked as Exhibit 15.

7             (Exhibit 15 marked.)

8        Q.   (BY MR. WELMAKER)  Hang on a second.  Let me just --

9   I'm trying to make it so that it's bigger.  Okay.  It is just

10  two pages, so tell me, Mr. Layton, when you're ready to move to

11  the bottom part.

12       A.   Okay.  Okay.

13       Q.   So I'm drawing your attention to the highlighted

14  part.  Missy Davis, HR manager for 5 Star saying:  There are

15  many times we entered day rates for the guys in payroll rather

16  than entering their 16 hours each day.

17             Was that normal policy, to enter in day rates as

18  opposed to 16 hours a day?

19       A.   The policy was 16 hours per day.  Based on my review

20  of the records, this would appear to be an instance where Missy

21  Davis is raising an issue in relation to JD Kinsey inputting

22  hard coded amounts as opposed to hours which causes an issue

23  for her hours reporting.  This is one of the issues that

24  Mr. Kinsey was counseled on and ultimately led to his

25  termination I think a couple of months after this email.

1      Q.    She's also asking, Do we have another way to track

2    hours worked in PR besides Paycom?  How is Paycom tracking

3    hours?

4      A.    Paycom was tracking hours through the Time Detail

5    Report.  So that you can see in regards to the 16-hour entries

6    inside of Paycom.

7      Q.    So Paycom was just picking up the 16 hours that had

8    been entered into the Time Detail Reports?

9      A.    I'm not sure I follow the connection there.  There

10   were 16 hours per day being input that is reflected in the Time

11   Detail Report that we can see.

12     Q.    I'm showing you what's been marked as Exhibit 16.

13           (Exhibit 16 marked.)

14     Q.    (BY MR. WELMAKER)  And it's just one page.  Let me

15   know if you need me to move it so you can see it better.

16     A.    If you could expand it just a little bit, that would

17   help.  Thank you.  Okay.

18     Q.    All right.

19     A.    Okay.

20     Q.    So what I want to ask you about is the top part.

21   This is from Ken Kinsey, November 17, 2017.  He's saying, There

22   are employees complaining they did not get paid what they

23   expected.  JD is going to gather information so the concern can

24   be addressed.  We need to know what the linemen were told when

25   they were hired.

1          Is what the linemen were told when they were

2   hired going to be reflected in the offer letters?

3      A.   That may or may not be the case.  So based on what

4   I've seen, the offer letters are one data point, and then the

5   overwhelming majority of the linemen attended an orientation in

6   either Kentucky for 5 Star or in Plainview, Texas, in the case

7   of Higher Power in which they covered a number of things.

8   Compensation being one of them, along with safety,

9   vaccinations, you know, travel, things of that nature.

10     Q.   Would you agree that the offer letter would be a good

11  starting point to determine what they were told when they were

12  hired?

13     A.   I would agree that it's a data point.  I don't know

14  that I agree with the rest of the conclusion that you make.

15  It's certainly an item along with what was discussed at

16  orientation, along with what we can see in the pay records.

17     Q.   Here it looks like the employees are complaining

18  because their pay records are not reflecting what they were

19  told that they were going to get when they were hired.  So how

20  are the pay records going to help in this particular situation?

21     A.   I think you're making an assumption in your

22  statement.  I think process-wise what's occurring at this

23  particular time is there were a number of questions about tax

24  withholding, specifically as it relates to -- excuse me --

25  Puerto Rico tax withholding to -- I think it will be hard or

1    impossible for me to agree with your conclusion based on my

2    knowledge of what was going on at the time.

3         Q.   All right.  When Ken Kinsey says, I hope they were

4    not expecting their day rate to be without taxes, what's he

5    talking about?  Should he have said targeted day rate or

6    budgeted day rate?

7         A.   I think as you know -- look, again, I'm not copied or

8    referenced in this email.  But I think you can see in a number

9    of these emails that the term "day rate" is not a legal term of

10   art in these emails.  So the team is using the terminology of

11   day rate to mean budgeted rate, which means the hourly rates

12   that were derived, approved by Broussard in regards to

13   mechanics and that we see on the check stubs.

14        Q.   Why do you think that they're using it in that

15   fashion here?

16        A.   Based on my review of the documents, along with

17   information I've gained, you know, through my review and

18   inquiry.  They're not utilizing day rate as the legal term of

19   art like you'd like to utilize it.  They're utilizing day rate

20   to reference the budgeted amounts that Mr. Ellison communicated

21   early on.

22        Q.   The next document is Exhibit 17.  It's just one page.

23             (Exhibit 17 marked.)

24        Q.   (BY MR. WELMAKER)  Tell me when you're ready to talk

25   about it.

1      A.    I'm ready.

2      Q.    All right.  So what Missy Davis is saying is that --

3   well, why don't you tell me what you think she's saying here

4   especially with respect to the highlighted part.

5      A.    Again, not copied, not referenced on this email, but

6   the context is the nature of any hourly employee.  If you take

7   an hourly employee that's paid $25 an hour and if that employee

8   doesn't work 40 hours in a work week and the communication had

9   been to the employee that they could earn $52,000 per year,

10  clearly if they don't work the 40 hours in a work week, they're

11  not gonna make a thousand dollars, which would not, you know,

12  be around targeted number that the employee could make if they

13  worked all the hours in a work week.  That's the nature of

14  hourly employees.  So she is raising the issue that, hey, if

15  the employees don't work the hours, they're not going to earn

16  an average.  And that's the -- that's the case with every

17  single hourly employee.

18     Q.    Okay.  Is she saying -- could it be that she's saying

19  that if somebody doesn't work a full two-week period that the

20  formula that's used for the employee goes off kilter and has to

21  be supplemented with a bonus or a gross-up?

22           MR. STUKENBERG:  Objection, form.

23     A.    No.  What she's saying is that with an hourly

24  employee, if you're calculating an average for an hourly

25  employee, then using that average to communicate with the

1   employee, if the employee doesn't work the targeted number of

2   hours, then that average doesn't work.  It's a function of

3   being an hourly employee forecasting the number of hours that

4   they could work in a work week.  If they don't work those

5   hours, then the average doesn't work.  That's the nature of an

6   hourly compensation program.

7        Q.   So when she says, It messes up the day rate stuff,

8   what is she talking about?  She didn't say it's messing up the

9   hourly stuff.

10       A.   She's talking about a daily average as it compares to

11  the budget.  Again, the day rate terminology is used loosely

12  through a number of emails to reference the budgeted amount.

13  With any hourly employee, you have to convert their earnings to

14  a work week, and you can roll that forward to a month, divide

15  it back to a day to communicate what their average could be if

16  they worked a targeted number of hours.  But to the extent that

17  the days worked or hours differ, then the average differs.

18  That's, again, the nature of every hourly employee.

19            (Exhibit 18 marked.)

20       Q.   (BY MR. WELMAKER)  All right.  Finally, we have an

21  email from you in Exhibit 18.

22            Can you see that?

23       A.   No, sir.  It's too small.  That's better.  Thank you.

24       Q.   Tell me when you're ready to talk about it.

25       A.   I'm ready.

1      Q.   Okay.  So first, at the bottom, this is you writing

2  an email to Jeff Beagle, right?

3      A.   Correct.

4      Q.   Why are you using your Stingray address?  Yes,

5  Stingray Energy?

6      A.   I don't know.  That's what address came up, so that's

7  the address I used for that particular email.

8      Q.   Okay.  When you say "our employees," who are you

9  referring to?

10      A.   This particular email chain was centered around the

11  logistics team in Puerto Rico along with the advanced or

12  management team that we sent to Puerto Rico that were all

13  salaried employees.

14      Q.   Why didn't you specify that in the email?

15      A.   I believe I subsequently specified that in the

16  hallway conversation with Mr. Beagle, which is why he responds

17  in reference to the executive management group and in relation

18  to the logistics team.

19      Q.   When you say, "Are we paying them base salary plus a

20  day rate," what did you mean by the term "day rate"?

21      A.   In this case, as it relates to salaried employees,

22  there was a day rate plan in place for them.  So I was

23  inquiring about how they were being compensated specifically as

24  this inquiry references related to salaried employees.

25      Q.   Okay.  So you're asking about people with a base

1   salary plus a day rate.  And so what is your understanding of

2   day rate as you're using it in this email?  A set amount per

3   day regardless of hours worked?

4        A.   Again, these are salaried employees.  So as it

5   relates to this email, it doesn't have a correlation to hours

6   worked because this particular inquiry is for salaried

7   employees.

8        Q.   Right.  But in order to get your salary plus your day

9   rate, would you just have to show up for a day to get the day

10  rate?

11       A.   In relation to salaried employees or what?  What's

12  the context of the question?

13       Q.   Yeah, you're asking about do they get salary and day

14  rate; do they get their base salary plus a day rate.  So what

15  I'm trying to understand is what's your understanding of the

16  day rate that you're referring to in this email?  Define day

17  rate as you're using it in this email.

18       A.   This email references the day rate compensation for

19  salaried employees.

20       Q.   And what is the day rate compensation?

21       A.   The day rate compensation varied based on the

22  salaried employee's position.

23       Q.   Okay.  I'm not interested in the hour part of it.

24  What is the other aspect of the day rate compensation?

25       A.   I'm not understanding your question.

**NELL McCALLUM & ASSOCIATES, INC.**

1    Q.   I'm not interested in the monetary part of the day

2    rate compensation.  I just want to know what -- how would you

3    define the word "day rate" in your email?  You say day rate,

4    right?  So you know what it means or else you wouldn't be using

5    the words "day rate."  What do you mean when you use the words

6    "day rate" in this email?

7    A.   Again, I've answered that previously.  This is the

8    day rate compensation program as it relates to salaried

9    employees in Puerto Rico.

10   Q.   And what is the day rate compensation program as it

11   relates to salaried employees in Puerto Rico?

12   A.   Salaried employees in Puerto Rico in many cases

13   received a day rate along with their base salary.

14   Q.   Okay.  And what is a day rate in this context?

15   A.   In this context, it was a daily rate that the

16   salaried employees received in addition to their base salary

17   while working in Puerto Rico.

18   Q.   That they would be entitled to each day that they did

19   work, right?

20   A.   I'm not sure what the context of entitlement is.

21   That's what they were compensated for in addition to their base

22   salary for days that they worked in Puerto Rico as it relates

23   to the salaried employees.

24   Q.   All right.  If somebody worked five days --

25   four days, are they gonna get a day rate for five days?

1          MR. STUKENBERG:  Can you repeat that, Doug?  I

2   just want to make sure I heard it correctly.

3          Q.   (BY MR. WELMAKER)  If someone worked four days,

4   they're going to get their salary for the entire work.  We know

5   how salaries worked.  But if they didn't work Friday, are they

6   going to get the day rate pay for Friday?

7          A.   If the employee is off on Friday or not in Puerto

8   Rico on Friday, then generally they would not receive the day

9   rate in this case for the salaried employees in Puerto Rico.

10         Q.   What if they worked one hour on Friday, are they

11  gonna get the day rate?

12         A.   I guess it would depend on context as it relates to

13  the salaried employee.  I'm not aware of any instance in which

14  that occurred, so I'm not following the hypothetical.

15         Q.   All right.  Look at the very top where Mr. Beagle

16  responds to you.  It looks like he's confining the first

17  sentence to hourly employees only.

18              Do you agree with that?

19         A.   Yes, the first sentence references hourly employees.

20         Q.   Okay.  And he says, They get an effective day rate at

21  a 16-hour shift.

22              Do you agree with that statement?

23         A.   In that particular --

24              MR. STUKENBERG:  Objection, form.

25         A.   -- context, his statement states what he states.

1    What he's getting at and the way I understood it is that if the

2    employees worked the entire work week, they would earn on

3    average an amount very close to the budgeted amounts.  Again,

4    day rate is a term that's utilized by the team as shorthand

5    that references those budgeted amounts that were utilized in

6    conversation with Broussard and upon which Broussard ultimately

7    gave a green light in relation to the calculation of the hourly

8    rates that were ultimately implemented.

9          MR. WELMAKER:  Objection, nonresponsive.

10   Q.   (BY MR. WELMAKER)  For an hourly employee that gets

11   an effective day rate at a 16-hour shift if he works less than

12   a full week, he's going to get less than the targeted amount,

13   correct?

14   A.   Yes.  And that's the nature of hourly employees, and

15   that's what we see in practice in the pay stubs.

16   Q.   Okay.  Does -- were employees that were in that

17   situation, was their pay supplemented with what you would call

18   discretionary bonuses?

19   A.   In some cases, the employees received discretionary

20   bonuses.  In other cases, they did not.  And we see that borne

21   out across the pay stubs.  That's the nature of discretionary

22   bonuses.  Sometimes, they're paid.  Sometimes, they're not.

23   Q.   I'm gonna show you Exhibit 19.  It's got seven pages.

24          (Exhibit 19 marked.)

25   Q.   (BY MR. WELMAKER)  So just tell me when to advance.

1       A.   Just to be more efficient, I may pull that up on

2  screen just to flip through it at my own pace.

3       Q.   Okay.

4       A.   Okay.

5       Q.   All right.  So I want to direct your attention to the

6  last page, 1886.  JD Kinsey is asking Alex Kalman, There are

7  going to be many guys that will need to have their rates

8  adjusted.  Whether because they're new to the island or they

9  were on rotation.  How do you want me to gather that

10 information for you?

11            And then at the top of the next page, he says,

12 Hey, Alex and Bethany, here's an updated spreadsheet.  To the

13 best of my knowledge, I have added all hourly employees that

14 did not work a full 14-day schedule.  I put how many days they

15 worked, the classification, their rate and what they should

16 receive for the check.  I don't know how you want to process

17 this or adjust amount owed versus the amount their hourly rate

18 shows.

19            So what Mr. Kinsey is talking about -- and

20 correct me if I'm wrong -- is if an employee works less than a

21 full 14-day period, his pay is going to be less than the

22 targeted pay amount, right?

23      A.   Yes.  The pay would be less than the budgeted

24 amounts.  Again, that's the nature of hourly employees.  If

25 they work less, then they earn less, and that's what's

1   reflected on the check stubs.

2       Q.   So he says he put also what they should receive for

3   the check, which, I guess, would be the targeted rate that they

4   were promised in their offer letter multiplied by the days

5   worked.  And is what he's asking here how are we gonna make up

6   the shortfall?

7       A.   I think your context of saying what they were

8   promised is inaccurate.  That's not the case.  So Mr. Kinsey is

9   identifying and the team is circulating a spreadsheet

10  process-wise that identifies the short weeks.  This

11  spreadsheet, if you want to view it from a process standpoint,

12  is really a conversation starter such that the team can review

13  it with the managers to make sure that they have the right

14  dates that employees came on or off the island such that, you

15  know, they make sure to double-check the input in the payroll

16  system.

17          It was also a conversation starter for the

18  discretionary bonuses, meaning that the managers had a labor

19  budget to operate within.  And they had the ability to grant

20  these discretionary bonuses based on the criteria that I

21  mentioned earlier today.

22          So based upon that information, the managers

23  could take a look at it.  And if they so opted, they had some

24  room within their budget for these short work weeks to offer

25  discretionary bonuses to the employees.  And, in fact --

1      Q.   And so --

2      A.   -- if --

3      Q.   Go ahead.

4      A.   If you were to look at the detail and follow them

5   through to the check stubs, you would see that in some cases

6   the discretionary bonuses were paid, and in other cases they

7   were not.

8      Q.   So the problem comes up when someone works less than

9   a full work week; is that correct?

10                MR. STUKENBERG:  Objection, form.

11      A.   It's not a problem.  It's a function of an hourly

12   employee.  So the hourly employee earns whatever they earn

13   based on the hours worked and their rate and whether or not

14   they're in the overtime.  From a management perspective, if the

15   employee works a short week, that creates a budget surplus, if

16   you will, for the manager for which they have discretion which

17   in sometimes they utilize that discretion to make discretionary

18   bonuses.  In other points in time, they didn't.

19      Q.   (BY MR. WELMAKER)  Okay.  And then on 1884, Kinsey

20   again is discussing the shortfall here:  All of the guys that

21   Marc supplied us with have adjusted their time accordingly, but

22   because of the rate structure, when someone has even one day

23   off, it affects the overall rate and so their time needs to be

24   adjusted or a day rate entered to adjust for the missing

25   amount.

1          Where does he in that statement talk about

2    whether it's discretionary or whether the adjustment could be

3    made?

4         A.   I think contextually as you look at this, JD Kinsey

5    has no ability to authorize a discretionary payment to anybody.

6    JD Kinsey is a payroll clerk.  So to put the dialogue in

7    context, he has no authority to approve any pay adjustment, pay

8    change, discretionary bonus for anyone.  That has to be

9    approved by a supervisor.

10        Q.   Okay.  But do you agree when -- because of the rate

11   structure, when someone has one day off, it affects the overall

12   rate?

13             MR. STUKENBERG:  Objection, form.

14        A.   The nature of hourly employees is that if they work

15   less hours than a targeted or budgeted amount, then they will

16   earn something different than that targeted or budgeted amount.

17   If you look at the, quote/unquote, rate, you can see from each

18   of your ten claimants that their hourly rate was not adjusted

19   while they were in Puerto Rico unless they were promoted,

20   demoted, rolled off the island.  When they were on the island,

21   they received the same hourly rate, so it was not an instance

22   in which the hourly rate was manipulated or changed.  The

23   employees' hourly rates were consistent absent, you know, a

24   promotion, demotion, demobilization.

25        Q.   (BY MR. WELMAKER)  Well, what you also saw was that

1   if they worked less than a full two-week period, their day --

2   their rates were adjusted up with different levels of what you

3   would call a discretionary bonus to get them to their targeted

4   rates, right?

5          MR. STUKENBERG:  Objection, form.

6       A.   That's not what's reflected in the earning

7   statements.  So I would disagree with your statement.  The

8   earning statements --

9       Q.   (BY MR. WELMAKER)  All right.  We'll go through

10  those --

11      A.   The earning statements reflect something completely

12  different than your conclusory statement.

13      Q.   Okay.  Well, we will look at that, and we'll see

14  who's right.

15          On the very first page of Exhibit 19, we have

16  Alex Kalman saying, I'm still working through all the changes

17  on the spreadsheet to get the actual amount owed for each

18  employee.  Please send me any additional changes needed as soon

19  as possible.

20          Where does it talk about discretionary bonuses

21  for each employee?

22      A.   Again, the process of discretionary bonuses I've

23  discussed earlier, as well as the characteristics and approval

24  thresholds.  If you were to pull this particular spreadsheet,

25  you would see that there are numerous individuals listed on the

1    spreadsheet that did not receive any discretionary bonus.

2              So, again, the process was for the team to

3    circulate the spreadsheet for conversation generator that

4    encompassed a number of things.  Short work week,

5    direct-deposit issues relative to routing or account numbers,

6    change in pay if there were a promotion or demotion.  The

7    spreadsheet referenced a number of issues.  But I think the key

8    takeaway as it relates to this email is you'll see that there

9    were numerous individuals on this particular spreadsheet that

10   received no discretionary bonus.

11        Q.   Okay.  Well, why does he use the term actual amount

12   owed?  If it's -- if these adjustments are discretionary, why

13   is he talking in terms of actual amount owed?

14        A.   Again, similar to previous, Mr. Kalman has no ability

15   to approve any discretionary bonus.  This Excel sheet that's

16   being circulated is merely a conversation generator.

17   Ultimately, any discretionary bonus had to be approved by an

18   operational supervisor meaning either a superintendent or

19   president of the organization.  And they base their criteria on

20   morale, safety, showing up on time, things I mentioned earlier.

21        Q.   I'm showing you what's been marked as Exhibit 28.

22   It's three pages.

23              (Exhibit 28 marked.)

24        Q.   (BY MR. WELMAKER)  Do you want me to enlarge it for

25   you?

1    A.   Yeah.  That's great.  Thank you.

2    Q.   Can I move to the next page?

3    A.   Yes, please.

4         Okay.  Okay.  All right.  Okay.

5    Q.   All right.  So I want to draw your attention to the

6    highlighted part on Bates-stamped 1935.  So this is Jeff

7    Beagle, the HR director, for Mammoth Energy, correct?

8    A.   Mammoth Energy, Inc., yes.

9    Q.   And he's saying, Gross up for pay.  The other item

10   will be on the gross up for pay.  What is a gross up for pay?

11   A.   He's identifying the short work week issue as it

12   relates to the budgeted amounts, it appears.

13   Q.   He says, Since we're paying 16 hours per day to get

14   the daily rate for the week, as you know, depending on when the

15   employee arrived (the day of the week) they may have been

16   shorted some pay as it did not calculate out to the full day

17   rate since it was not a full week.

18        That's what we've been talking about, right?  If

19   you don't work a full week, it doesn't get you to the full

20   targeted amount, right?

21   A.   Yes.

22   Q.   Okay.  So the HR director for Mammoth Energy, Inc.,

23   is saying for those people we're going to gross up their pay to

24   make it equal to targeted amount; is that right?

25   A.   That's not what he's stating.  So if you look at the

1  process that was ultimately implemented, it resulted in the

2  circulation of a spreadsheet amongst the HR folks that was

3  utilized to generate a conversation with the operational

4  personnel.  And the operational personnel had the optionality

5  to offer discretionary bonuses within their budgeted labor

6  amounts or to not.

7             And if we look what happened in the payroll

8  records, we can see that, in fact, sometimes just discretionary

9  bonuses were paid.  And in other times, they were not.  And

10  that's the nature of discretionary bonuses.  But we can see in

11  clear detail in the records that sometimes they were made and

12  sometimes they weren't.

13     Q.   Is it that sometimes they weren't because somebody

14  missed them?

15     A.   Sometimes they weren't paid because they're

16  discretionary.  So based on the criteria that I mentioned, they

17  weren't promised.  They weren't guaranteed.  The operational

18  supervisors had budgeted amounts that they could work within.

19  And sometimes they offered discretionary amounts to the

20  employees and sometimes they didn't.  And that's at the

21  discretion of the managers.

22     Q.   Okay.  Are you aware of a situation where somebody

23  was eligible for a discretionary bonus and they weren't given

24  it for a specific reason?

25     A.   You don't have to have a specific reason to not grant

1   a discretionary bonus, so --

2       Q.   Well, then how do you know -- how do you know if it's

3   not being granted because it was just overlooked?

4               MR. STUKENBERG:  Again, Doug, if you would let

5   Mr. Layton finish his answer, please.  I don't think he was

6   done.

7       Q.   (BY MR. WELMAKER)  Go ahead.  I'm sorry.  I didn't

8   mean to interrupt you.

9       A.   So, again, discretionary bonuses, sometimes they're

10  paid.  Sometimes they're not.  That's at the discretion of the

11  manager.  You don't necessarily document the negative or a

12  disapproval of a discretionary bonus.  You either approve it

13  and pay it or you don't.  And you can see clearly in the pay

14  records that sometimes discretionary bonuses were paid, and

15  sometimes they were not.  And that's completely at the

16  discretion of the operational managers.

17      Q.   How do you distinguish those discretionary bonuses

18  that were not paid on purpose versus those that were simply

19  missed?

20      A.   Again, there wasn't a requirement to make these

21  discretionary bonuses.  So as we look at the detail, there were

22  none that were missed.  They were either approved by

23  supervisors and paid or they were not approved and not paid.

24               So the connotation that they were missed is

25  inappropriate from my standpoint.  The employees were paid for

1    the hours that they worked and reflected on their earnings

2    statements.  In some instances, they received discretionary

3    bonuses as approved by supervisors.  And in other instances

4    they didn't.  That's the nature of discretionary bonuses.

5        Q.   And we'll get into this in a second, but is there any

6    paperwork showing any kind of approval of a discretionary bonus

7    or disapproval of a discretionary bonus?

8        A.   Again, I wouldn't expect to see a disapproval.  I've

9    not seen a disapproval of a discretionary bonus in my 25-year

10   career.  It's either approved and paid or it's not.  You don't

11   document a disapproval in regards to documentation of

12   approvals.  These were done verbally.  They were done in small

13   amounts that were within the budgeted amounts that were set

14   forth in regards to labor.

15            So as you look at it from a supervisor's

16   standpoint, the supervisors were given budgeted labor amounts.

17   They were living within those budgets.  And in some cases, they

18   approved discretionary bonuses that were within their

19   operational budgets.  And again, they were relatively small in

20   amount and infrequent in nature.

21       Q.   So what you're saying is there is no form reflecting

22   either an approval or a disapproval of these discretionary

23   bonuses; is that correct?

24       A.   There's nothing in writing nor would I necessarily

25   expect that there would be given the relatively nominal amounts

1    involved combined with the fact that we're dealing

2    situationally at this particular time frame with an island that

3    had 1 and a half percent of the island that had power.  So

4    communications on the island in this November time frame were

5    virtually nonexistent for the most part.  There was

6    approximately 1.5 percent of the island that had electricity at

7    this time.  In addition, the cell phone communication grid on

8    the island suffered a similar fate to the electrical grid in

9    that it was functionally completely destroyed.

10       Q.   All right.  Well, in light of the fact that

11   communication was extremely difficult, as you just relayed to

12   us, how is it that we're going to have a situation where a

13   supervisor is going to call up, I guess, some sort of a manager

14   and say, hey, is this guy doing a good job?  Should we give him

15   $110.20 bonus?  And that's all gonna be done before the next

16   payroll comes up.  So how did that process work?

17       A.   General foremen are working supervisors meaning that

18   they're out in the field.  They liaise regularly with the

19   superintendents that are also out in the field.  So have daily

20   communications as to their crews, how effective or ineffective

21   their crews were, the morale of their crews, whether or not

22   they showed up on time.  And then as you roll through the chain

23   of command, certainly, the superintendents would have occasion

24   to discuss with the office personnel the crews that either

25   performed or didn't perform and be able to approve any

1    discretionary bonuses that they desired.

2         Q.    Okay.  So you've got a situation where they've got,

3    like, the people that need the potential discretionary bonuses,

4    I guess, their names are gonna be on a piece of paper because

5    they're not gonna be able to be memorized, right?  So they're

6    going to take the piece of paper out into the field because

7    there's virtually no communication, and they're going to go to

8    the manager and say, hey, this guy, 53.46, yes or no, is he

9    good enough to give him 53.46?  And this next guy, 110.58,

10   good, yes or no?  How is that gonna work, practically speaking?

11                  MR. STUKENBERG:  Object to form.

12        Q.    (BY MR. WELMAKER)  I mean, that's ridiculous.

13                  MR. STUKENBERG:  Objection, form.  Objection to

14   commentary.

15        A.    Do you have a question that you want me to --

16        Q.    (BY MR. WELMAKER)  Yeah.  How does it work?

17        A.    Then if you would ask me how it works rather than the

18   prologue of a compound question of a bunch of assumptions that

19   you're making, then that would make this go a lot smoother, in

20   my opinion.

21        Q.    Go ahead.

22        A.    What's the question?

23        Q.    How does it work?

24        A.    In regards to the approval, again, I mentioned kind

25   of the chain of command from foreman to general foreman to

1    superintendent.  The superintendents routinely liaise with the

2    office staff in regards to where work was being assigned as

3    well as the performance in the field of that work.  So the

4    superintendents would have contact with personnel on the ground

5    such as JD Kinsey to be able to go through these spreadsheets

6    or discussion generators as you may look at them to say, hey,

7    these linemen or these skilled laborers work short weeks.  We

8    understand that creates a surplus in your labor budget.  Would

9    you like to offer any of these discretionary bonuses?  If so,

10   let me know.  If not, then we'll process the payroll as is.  So

11   that corresponds with the interaction between the

12   superintendents and the office staff on a routine basis.

13        Q.   So is the discretionary bonus process, is it tracked

14   in any way?

15        A.   I'm not sure what I -- what the context of tracked

16   any way means.  You can see that there were discretionary

17   bonuses paid on the earnings statements.  You can see those

18   amounts on the Time Detail Reports.  I'm not sure I understand

19   what the context of tracked means.

20        Q.   So Supervisor A needs to determine whether to give a

21   $50 bonus to lineman because of his rate is potentially up for

22   being adjusted.  Is there any kind of a form saying, Yes, he

23   approved, the supervisor approved?  Is there any kind of

24   recording of that process?

25        A.   In regards to paper documentation?  No.  We've

1    covered that previously.  There's no paper document --

2         Q.   Electronic.  Electronic.  Spreadsheets.

3         A.   Again, I'm trying to answer your questions.  You're

4    talking over me again.  And if you'd just let me finish my

5    answers, I'd probably address the majority of your questions

6    without these constant interruptions.

7         Q.   Are there electronic spreadsheets or any other

8    electronic methods by which an adjustment -- a discretionary

9    adjustment is reflected, recorded, accepted, rejected,

10   whatever?

11        A.   There are no paper documents that would show an

12   approval.  There aren't any electronic documents that I've seen

13   in regards to Excel sheets that would reference an approval.

14   You can see the Excel documents that are used as conversation

15   generators, if you will, that were circulated.  And then you

16   see from those documents that some discretionary bonuses were

17   paid and others were not, if you go from those Excel sheets to

18   the detailed earning statements.  The detailed earning

19   statements and time detail records would each reflect amounts

20   that were paid.

21        Q.   And so is this all originating from payroll and then

22   it goes from payroll to a supervisor?  Payroll alert

23   supervisor, hey, this person may be entitled to a discretionary

24   adjustment?

25        A.   Again, there's no entitlement.  It's a discretionary

1   payment.  So if it was paid, it was paid.  There is no

2   entitlement to anything.

3        Q.   They may be eligible.  Does payroll get in touch with

4   the supervisor and say that there may be some eligibility for a

5   discretionary adjustment?

6        A.   There is no eligibility.  A discretionary payment is

7   a discretionary bonus.  It's at the discretion of the

8   supervisor.

9        Q.   If the person doesn't work a full week and they're

10  below their targeted amount, does payroll then get in touch

11  with the supervisor and say, hey, what are you gonna do?  Are

12  you gonna give a discretionary bonus?  How does that work?  I'm

13  trying to figure out does it originate from payroll.

14             MR. STUKENBERG:  Objection, form.

15       A.   The conversation could start from payroll.  It could

16  start from the supervisor.  So one, the supervisor has to

17  notify the payroll group that I have an employee that is either

18  transferring off the island or transferring to the island such

19  that the payroll department knows that that person is in Puerto

20  Rico.  So the discussion can go either way in regards to when

21  an employee arrives or leaves the island for this work.

22       Q.   (BY MR. WELMAKER)  All right.  I'm going to show you

23  Exhibit 24.

24             (Exhibit 24 marked.)

25       Q.   (BY MR. WELMAKER)  It is three pages.  It says my

1    screen sharing is paused.  I'm not sure why.  Hang on.

2              MR. STUKENBERG:  I can still see your screen,

3    but it's Exhibit 28.

4              THE WITNESS:  Yeah.  And if you're having

5    technical difficulties, I wouldn't mind a five-minute break to

6    grab something to drink.

7              MR. WELMAKER:  That's fine.

8              (Break from 3:43 p.m. to 3:57 p.m.)

9         Q.   (BY MR. WELMAKER)  Okay.  So let's go to Exhibit 22.

10   And it's two pages.

11             (Exhibit 22 marked.)

12        Q.   (BY MR. WELMAKER)  And I'll increase the top half.

13   And then let me know when you're ready to increase the bottom

14   half.

15        A.   I'm ready.  Okay.  Okay.

16        Q.   All right.  So this is JD Kinsey at the bottom:

17   Here's the weekly update as well as some documentation received

18   this week.  The Bates stamp on this is 1870.

19             MR. WELMAKER:  And so, Will, try to make you

20   feel good, but you're still gonna object.  So here's the

21   document.  It's a spreadsheet produced in native format 1871.

22   And then 1871 is one of the ones I just emailed because it's

23   too big for me to PDF.  So can y'all pull that up on your own

24   screens and we can walk through it?

25        A.   Are we supposed to be looking at 1871, or which one

1    would you like to look at?

2         Q.   (BY MR. WELMAKER)  Yes.  1871 and it's a native

3    spreadsheet.  Are you able to pull it up?

4         A.   I'm trying.  Okay.

5         Q.   If you can't, I can try to share my computer screen,

6    although I'm not sure --

7         A.   I've got it.

8         Q.   Okay.

9              MR. WELMAKER:  Will, do you have it?

10             MR. STUKENBERG:  Pull it up, and I'll just go

11   ahead and lodge my objection to the extent this is not the

12   actual exhibit to the email.

13             MR. WELMAKER:  Even though it is.

14             MR. STUKENBERG:  I follow its numbering is

15   sequential, but go ahead and object just in the event that it's

16   not.

17             MR. WELMAKER:  Okay.

18        Q.   (BY MR. WELMAKER)  Okay.  So the email that it's

19   attached to is JD Kinsey saying, Here's the weekly update as

20   well as some documentation received this week dated January 21,

21   2018.

22             So what this -- it's got tabs at the bottom.

23   And the first tab I'm gonna click on -- well, at the top it

24   says, Mammoth-Maldonado-FED 1871 Confidential.  That's what the

25   spreadsheet title is.  Then I'm going to the first tab on the

```
 1   left that says Corrections Needed 1/26/18.

 2              MR. WELMAKER:  Does everybody see that?

 3        A.   Yes.

 4              MR. WELMAKER:  Will, do you got it?

 5              MR. STUKENBERG:  Yes.

 6        Q.   (BY MR. WELMAKER)  Okay.  So -- and I went into the

 7   properties to see who originated it.  For what it's worth, it

 8   says -- I'm not gonna ask about this.  Under Properties under

 9   Summary it says, Author:  Alex Kalman.  Under Statistics, it

10   says:  Created Thursday, January 4, 2018.  For what all that's

11   worth.

12              Anyway, so I'm looking at Corrections Needed,

13   1/26/18.  Have you seen a spreadsheet like this before,

14   Mr. Layton?

15        A.   I've seen a similar version, yes.

16        Q.   Okay.  So it looks like we've got about 15 or so

17   people.  These are all 5 Star's showing days worked.  Everybody

18   worked 12, except one person worked 13.  The classification for

19   each is provided.  The rate is provided.  For example, Jason

20   Engle is noted as a $1,000 day rate.  The day rate adjustment

21   amount is needed or that -- I think is what they're saying.  In

22   Column I, that's the day rate adjustment that needs to be made.

23   And then description of the issue, Day rate adjustment amount

24   needed equals did not work entire two-week period in PR.

25              MR. WELMAKER:  Does everybody see what I'm
```

1    talking about?

2         A.   Yes.

3              MR. STUKENBERG:   To the spreadsheet you're

4    referencing?

5              MR. WELMAKER:   Yes.   In native 1871.   Under the

6    tab that says Corrections Needed, 1/26/18.

7         Q.   (BY MR. WELMAKER)   So Mr. Layton, are these all going

8    to be folks that didn't work a full two-week period that didn't

9    get their -- I've blanked out on the term -- their promised

10   rate.   I know you don't like that term.   What do you use?

11   Targeted.   Targeted.

12             So these people because they didn't work a full

13   two weeks are short the amounts in Column I, and the -- this

14   document that's being distributed by JD Kinsey saying, They all

15   need to have a day rate adjustment to get their pay up to the

16   targeted amount for a two-week period.

17             MR. STUKENBERG:   Objection, form.

18        Q.   (BY MR. WELMAKER)   Do you agree with what I've said,

19   Mr. Layton?

20             MR. STUKENBERG:   Objection, form.

21        Q.   (BY MR. WELMAKER)   If not, tell me what you think

22   this shows.

23        A.   So I think from a high-level perspective, this is

24   indicative that the process of identifying the linemen and when

25   they were working or not working was effective, meaning that

1   you can see that you've got looks like 19 linemen that were

2   identified on this particular tab that worked a short pay

3   period.  So my takeaway is that the processes in place to

4   identify who was working or not working or people rolling on or

5   off the island were effective.  Secondarily, this tab

6   references, you know, the testimony that I gave earlier

7   relative to discussion starters.  So this would identify those

8   employees that worked a short pay period and then serve as, you

9   know, a conversation starter with operational management for

10  that operational management to be able to approve a

11  discretionary bonus if they so desire.

12      Q.   Okay.  But it is identifying people who work short

13  weeks and as a result are short on their pay from their

14  targeted amount, right?

15      A.   Well, they're not short on their pay.  There is a

16  difference between the targeted earnings based upon an

17  estimated number of hours over an entire work week.  And the

18  result is the same result as you would see of any hourly

19  employee that doesn't work the budgeted estimated, however you

20  phrase that, number of hours in a work week.  So it's merely a

21  function of hours and an hourly employee.

22      Q.   Okay.  So the next tab, Corrections Needed, 1/9/18.

23  These are all 5 Star employees all noted as being day rates.

24  And the description of the issue is provided.

25           Again, it seems to me to be the same as Tab 1.

1    And I assume, Mr. Layton, you're just gonna say this is a

2    conversation starter as to whether an adjustment needs to be

3    provided, right?

4              MR. STUKENBERG:  Objection, form.

5        A.   Again, this was a tool utilized by the payroll and

6    operations team to generate discussions.

7        Q.   (BY MR. WELMAKER)  All right.  The next tab,

8    Corrections Needed, 1/12/18, same type of situation.  These are

9    all 5 Star folks.  And description of the issue generally

10   appears to be employee did not work a full period.  Time is

11   entered by mistake, not able to approve time.  The next -- do

12   you disagree with that, Mr. Layton?

13             MR. STUKENBERG:  Objection, form.

14       A.   What was the question?

15       Q.   (BY MR. WELMAKER)  I'm just trying to generally

16   describe it.

17       A.   The document states what it states, so the data that

18   is reflected in the document is whatever is in there.  In

19   regards to process, I've covered that ad nauseam.

20       Q.   Okay.  And then the next term is Higher Power terms

21   PR, so I guess they've either resigned or been terminated and

22   as a result, they've worked a short week.  And again, I guess

23   the document speaks for itself.  I don't have any further

24   questions about that.

25             All right.  And then we're going to pull up my

```
 1   last -- we're going to go to Exhibit 23, and I'm gonna enlarge
 2   it.  And then --
 3                    MR. STUKENBERG:  Did I hear you say this is your
 4   last exhibit?
 5                    MR. WELMAKER:  No.  But I am cutting out a
 6   ridiculous amount of exhibits, so...
 7                    It's my last native exhibit.
 8                    (Exhibit 23 marked.)
 9        Q.   (BY MR. WELMAKER)  So this is Exhibit 23.  Tell me if
10   you need -- tell me when you need to move it.
11        A.   I'm ready.
12        Q.   Actually, I think I can get -- all right.  Let's just
13   do 24.  It's a longer one so we don't have to go into two.
14   Tell me when you're ready to move it.
15        A.   I'm ready.
16        Q.   Okay.  I'm moving it to the second page.
17        A.   Okay.
18        Q.   And then the last page is copy of hourly rate
19   conversions.  So I'm going to -- so this is 23.  I lost screen
20   sharing.  Well, we're not going to screen share for the native
21   anyway, so let's just try to pull that up.  And it's the
22   last -- the last native spreadsheet.
23                    MR. STUKENBERG:  2018?
24                    MR. WELMAKER:  Hang on a second.  I'm trying to
25   pull it up.  Yeah, 2018.
```

1          MR. STUKENBERG:  Okay.  I'll go ahead and object

2    to the extent that 2018 native is not actually the attachment

3    to the exhibit in 24.  But go ahead and ask your questions.

4          Q.   (BY MR. WELMAKER)  All right.  So what I did, I

5    skipped down to Exhibit 26, which is 2017.  It's -- Exhibit 26

6    is Missy asking for the mathematical explanation.  Then Beagle

7    saying, Please find attached Excel file, which is what we're

8    gonna look at.

9          (Exhibit 26 marked.)

10         Q.   (BY MR. WELMAKER)  He explains basically how it's

11   being calculated.  2017 is the second page of that, and then

12   the spreadsheet is Mammoth-Maldonado-FED 2018.

13         So Mr. Layton, do you have a copy of that?  Are

14   you able to pull it up?

15         A.   The Excel file, yes.

16         Q.   The one that says 2018 on it?

17         A.   Yes.

18         Q.   All right.  Now my computer is frozen.  So I'm gonna

19   stop the share for a second.  That will help.

20         Okay.  So Mr. Layton, do you know what the

21   spreadsheet is that we're looking at?

22         A.   Yes.  I've seen it before.

23         Q.   Okay.  And this is native spreadsheet 2018.

24   Basically, it is Mr. Beagle's explanation as to how the hourly

25   and targeted or budgeted day rates were.

1          MR. STUKENBERG:  Objection, form.

2     A.    Are you asking me whether I agree with that or not?

3     Q.    (BY MR. WELMAKER)  Yes.

4     A.    Or what's the question?

5     Q.    Well, what do you -- what is your take on what this

6  spreadsheet is?  What is it showing you?

7     A.    So this is the spreadsheet that Mr. Beagle shared

8  with Mr. Broussard in relation to seeking advice on a compliant

9  plan.  Mr. Broussard ultimately approved the mechanics of this

10 spreadsheet along with deriving an hourly rate from a budget.

11 So that was discussed in depth with Mr. Broussard in regards to

12 whether or not it was compliant to derive an hourly rate based

13 on a budgeted amount.

14          We utilized that advice, input the days of the

15 week, the hours per day, compared that to the budget.  And as

16 you see, we get hourly rates in Column K.  And if you take

17 these hourly rates and look at the pay stubs, you'll see that

18 we implemented these hourly rates based on the advice of

19 Broussard.

20          If one were to further take these check figures

21 and remove some of the rounding, you'd see that it would agree

22 to the gross weekly pay for full work weeks such that the team

23 implemented the pay scale as approved by Mr. Broussard.

24          Secondarily, you'd see that on the first sheet

25 if we wanted to derive a day rate, we certainly could have, and

1    explored that, that would get relatively close to the budgeted

2    amounts.  The operational team did not want to implement a day

3    rate plan and advised that they wanted to implement an hourly

4    plan, which is what was ultimately implemented and reflected in

5    the earnings statements of the claimants.

6         Q.   Okay.  So Columns N through Q are what a true day

7    rate plan would look like with true overtime based on that

8    plan, correct?

9         A.   If you look at the -- if you look at the first sheet,

10   sheet one with the Parenthetical 2, you can see that in order

11   to live within the budgeted amounts, it's possible to derive

12   day rates that would get close to the budgeted amounts.

13        Q.   Yeah.  And that's using total hours per day of 12,

14   which is not what you used, right?

15        A.   Again, that's showing the possibility of deriving a

16   day rate.  So the hours --

17        Q.   Sure.  But that's not -- that's not what you used,

18   so, I mean, what's the point of you talking about it?

19        A.   We --

20        Q.   You used 16 hours a day, right?

21        A.   Maybe we can talk about it if you'd let me finish my

22   answer, yet again.

23        Q.   Did you use 12 hours a day for purposes of

24   calculation of your hourly rates?

25        A.   In one of the iterations, we used 12 hours.  And we

1  ran through the calculations with Mr. Broussard.  We also

2  discussed those options with the operational team in regards to

3  hourly versus day rate plan.  So you see 12 hours on the first

4  sheet.  The operations team didn't desire to further pursue a

5  day rate plan, so we pivoted all of our discussion to an hourly

6  and overtime plan.

7           Ultimately, following the pivot to an hourly and

8  overtime plan, we ended up landing on 16 hours per day based on

9  some of the characteristics that I described earlier today in

10 regards to processes, to capture report and pay any hours that

11 exceeded 16 hours per day.

12      Q.   Okay.

13      A.   So what you see here at 16 hours per day are those

14 calculations approved by Mr. Broussard and the discussions with

15 the operations team that followed.

16      Q.   And we don't have any emails from Mr. Broussard

17 saying I approve of this or I've gotten this spreadsheet and

18 here are my thoughts, do we?

19      A.   We --

20           MR. STUKENBERG:  Objection, form.

21      A.   -- discussed this with Mr. Broussard.  There are

22 several emails that have been produced in regards to

23 conversations with Broussard including the circulation of an

24 iteration of this spreadsheet.

25      Q.   (BY MR. WELMAKER)  An iteration, but is it this exact

1  spreadsheet?

2      A.   It's very similar to this spreadsheet.  The

3  iterations of the spreadsheet were discussed in detail with

4  Mr. Broussard on a Sunday afternoon call that I personally

5  participated in.

6      Q.   Did you take any notes from that call?

7      A.   No, sir, I did not.

8      Q.   Okay.  So you used 16 hours a day ultimately,

9  correct?

10      A.   Yes.

11      Q.   And that's the number of hours you expected your

12  employees or 5 Star, Higher Power employees to work while on

13  the island, correct?

14      A.   That's not how I view it.  So if you look at it

15  through my lens, we knew that the employees would work less

16  hours.  We compensated them for 16 hours per day for working or

17  being available to work knowing that at some points we may get

18  close to the 16 hours, but more times than not, they would work

19  less than 16 hours.

20      Q.   All right.  So was the 16 hours, like, a scheduled

21  plan?

22      A.   I don't understand what the "scheduled plan" means.

23      Q.   You scheduled everyone for 16 hours whether it was

24  going to be actual work or work plus on-call time, correct?

25      A.   I don't know what that means.  We set the 16-hour

1    threshold based on the fact that 16 hours is fairly commonplace

2    in named storms.  Secondarily, we had process and procedures in

3    place through the supervisors to identify any hours in excess

4    of 16 hours based on past experience and their knowledge of the

5    DOT regs requiring an eight-hour reset.

6        Q.   Okay.  So you didn't just pull the 16-hour figure out

7    of thin air.  That's basically what storm work is, right?

8        A.   I don't understand what the context is.  In named

9    storms, it's not uncommon to have 16-hour shifts, if you will.

10   We pulled the 16 hours based on conversations with management

11   and our desire to compensate employees for all hours worked or

12   available to work, combined with processes that we had in place

13   to capture, report and pay for any hours in excess of 16 hours

14   per day.

15       Q.   Okay.  So it was basically a 16-hour shift, right?

16       A.   It was 16 hours that we set as a threshold or an

17   expectation for employees to work or be available to work.

18       Q.   Okay.  And it -- you didn't use the 12-hour figure

19   ultimately; is that correct?

20       A.   That's correct.

21       Q.   Okay.  And so if we look over at sheet one, the tab

22   that says Sheet One, in Columns N through Q, that shows what

23   you would have to pay for the same job classifications if you

24   were paying on a pure day rate, correct?

25       A.   Not necessarily.  So you're assuming that they're

1    paid a day rate, and you're assuming that the budgeted amounts

2    would be those rates.  So I'm not sure I follow your --

3        Q.   All right.  Why don't you tell me what you think N

4    through Q is.  What is it?

5        A.   N appears to be a calculation of the total for a week

6    divided by hours in the week.  O is half that.  P is a

7    calculation of overtime hours times Column O.  Column Q is

8    Column P plus Column L.

9        Q.   So tell me, what is column Q?  What does it

10   represent?

11       A.   Column P plus Column L.

12       Q.   Is it the total amount that would be due if you paid

13   overtime on a day rate basis?

14       A.   If you assume that what was implemented were these

15   daily amounts, these amounts were not implemented on -- these

16   budgeted amounts were not implemented on a day rate plan.  They

17   were --

18       Q.   If you -- go ahead.

19            Mr. Layton, do you understand how a conversation

20   works?  It's not always going to end perfectly.  And just

21   because I start talking doesn't mean I'm trying to purposely

22   interrupt you.  It's just a part of a conversation.

23            MR. STUKENBERG:  Well, Doug, this isn't a

24   conversation.  It's a deposition.  It's important that the

25   transcript be clean.

```
 1              MR. WELMAKER:  I don't think Mr. Layton is

 2    worried about a transcript.  He's getting personally offended,

 3    and I'm not trying to do that.

 4         A.   I'm following your rules of not talking over each

 5    other.

 6         Q.   (BY MR. WELMAKER)  Forget about my rules.  Okay?  I'm

 7    just trying to get information from you.  And I'm not trying to

 8    be rude.  So if I jump in, it's just because that's a mistake.

 9    I mean, I didn't follow polite procedure, but I wasn't doing it

10    on purpose.  Sometimes I think you're done, and you're not

11    done.

12         A.   Okay.

13         Q.   I'm not trying to do this on purpose.

14         A.   Nobody accused you of doing it on purpose.

15         Q.   Would you agree that Column Q is what you have to pay

16    if you did a pure day rate plan with overtime?

17         A.   Based on hypotheticals, it's possible, but that's not

18    what was implemented.  So what was implemented was an hourly

19    and overtime plan that we can see on the earnings statements.

20         Q.   Correct.  But it looks like somebody calculated what

21    your exposure would be if you did a pure day rate plan,

22    correct?

23              MR. STUKENBERG:  Objection, form.

24         A.   What that calculated represents some historical

25    calculations.  They're not calculating exposure under your
```

1    concocted speculation.  So this was an iterative spreadsheet

2    that was bounced back and forth.  You can tie these hourly

3    rates to the earnings statements and see that what

4    Mr. Broussard advised upon and what we implemented, in fact,

5    agrees to the hourly rates that are reflected on the earnings

6    statements of your claimants.

7         Q.   (BY MR. WELMAKER)  It's a lot cheaper to do it the

8    way that you did it as opposed to doing it on a pure day rate

9    basis, isn't it?

10        A.   What we implemented was based on the advice of

11   Mr. Broussard.  Had we wanted to derive day rates that fell

12   within the budgeted amounts, you can see through the mechanics

13   here that we were clearly capable of doing that and decided not

14   to.  We decided to implement an hourly plan, and you can

15   clearly see that on the earnings statements.

16        Q.   So you did an hourly plan even though you didn't

17   track hours; is that right?

18              MR. STUKENBERG:  Objection, form.

19        A.   We tracked hours.  Your statement belies the evidence

20   that you have.  You can see hours on the time detail reports

21   for each of your claimants.

22        Q.   (BY MR. WELMAKER)  Yeah, it's the same hour every

23   time.  16 hours every single time, right?

24        A.   What's reflected is what's reflected.  Your

25   statements are not productive.

1    Q.   I'm here to be productive, man.  That's my main goal,

2    Mr. Layton.

3              On exhibit -- oh, my gosh.  Let me try to

4    reconnect.

5              On Exhibit 26, which is what we were just

6    looking at, at the top, Missy Davis says, This is stupid, like

7    so stupid.

8              Did anybody ever talk to her and ask why she

9    thought this plan was stupid?

10   A.   I don't think she's stating that the plan is stupid.

11   I think the context is, is that complying with the FLSA and

12   paying the employees hourly is complex.  It takes a lot of

13   work.  So if you put yourself through -- you know, look at it

14   through her lens, she's saying this is complicated to input the

15   hours and pay -- pay the employees on an hourly basis.  It

16   would be really easy to just plug in a day rate and be done

17   with it.  And that's not what was implemented.  So through her

18   lens, it's a lot of additional work to track and input hours

19   for each employee every day.

20   Q.   Well, she's not tracking hours.  She's putting 16 for

21   everybody, right?

22   A.   That's tracking hours.  And clearly, the

23   communication stream in regards to the days worked was

24   functional because you can see in the Excel spreadsheets where

25   it's routinely captured where employees worked a short week.

1   So the ability to track and communicate whether or not an

2   employee is working in Puerto Rico clearly was effective based

3   on the spreadsheets that were circulated.

4       Q.   All right.  I'm gonna show you Exhibit 24.  Again,

5   this is Missy asking for the mathematical explanation.  Above

6   that is Jeff Beagle providing the spreadsheet that we just

7   looked at.  Above that is Missy saying, What happens if they

8   come home on a Tuesday or something?  And the next page, on

9   November 14, Mr. Kalman is saying, We'll be in touch with our

10  management team on how to handle this.

11          Do you see that?

12      A.   Yes.

13      Q.   Then Jeff Beagle says, I think we just run a gross-up

14  at the end of their hitch and pay the balance on the next

15  check.  And he asks Mr. Kalman his thoughts.  And Mr. Kalman

16  says, Sounds good to me.

17          So are they contemplating just running a

18  gross-up on those periods of time where an employee works less

19  than a full week, the full two-week pay period?

20      A.   It would appear they're having a discussion based on

21  my knowledge of what's happening at the time about what happens

22  in a short week.  And what happened was is the team identified

23  the short weeks.  They utilized the Excel file, an example of

24  which we reviewed earlier as a conversation starter, to, one,

25  make sure that we had proper reporting of days worked for the

1  employees secondarily to research and address other issues

2  associated with payroll.  And then also to serve as a

3  conversation starter with general foremen and superintendents

4  in regards to whether or not they wanted to make any

5  discretionary bonus payments within their budgeted labor

6  amounts.

7      Q.   Where does it say that I think we should consider

8  discretionary gross-ups on either of these two emails?

9      A.   You're not going to necessarily see that in these

10  emails.  What you can see is clearly the documents in evidence

11  of what was implemented.  So we can see through reviewing the

12  Excel files as well as the underlying earnings statements as

13  well as my inquiry from superintendents of the implementation

14  of discretionary bonus payments on occasion relative to some of

15  these short weeks and the criteria upon which they were paid

16  from time to time.

17      Q.   Going to Exhibit 58, this is part of Jorge Luis

18  Rivera's file.

19           (Exhibit 58 marked.)

20      Q.   (BY MR. WELMAKER)  Bates-stamped 763.  At the top it

21  says, 2018 Mammoth Energy Services Enrollment Change Form.  And

22  it looks like Mammoth Energy Services, Inc., is providing

23  health benefits; is that correct?

24      A.   No, that's not correct.  The health benefits were

25  provided by this individual's employing entity.  It's a

1    multi-employer plan.

2        Q.    Why is Mammoth Energy Services, Inc., at the top of

3    this written out as well as with their logo?

4        A.    It's a form.  It states what it states.  There's

5    plenty of case law out there about logos and forms and whether

6    or not they're applicable.  In this particular case, this

7    employee's benefits would have been provided by his employing

8    entity.  They would have paid for those benefits.  Again,

9    multi-employer plan.

10       Q.    On any of the benefit paperwork, have you seen it say

11   that this is a multi-employer plan?

12       A.    I've not reviewed every single piece of paperwork.

13       Q.    Have you ever seen it say that, though?

14       A.    Again, I've not reviewed it.  In my job

15   responsibility, I don't routinely review enrollment forms.

16       Q.    All right.  The same exhibit, Exhibit 58, Bates 764,

17   2018 Mammoth Energy Services Enrollment Change Form.  At the

18   bottom it says, Employee Signature.  No mention of anybody else

19   on this page, is there?

20       A.    The document states what it states.  The benefits

21   were provided by his employer.  You can see that his employer

22   withheld any premiums or benefits from his earnings statements

23   and his employer paid for those benefits.

24       Q.    All right.  And Mammoth Energy Services Spousal

25   Surcharge Affidavit, that's Exhibit 58, Bates 765.  Again, no