**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **AARON MALDONADO,** *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 5:21-cv-00085** |
| **MAMMOTH ENERGY SERVICES,** | § | |
| **INC., COBRA ACQUISITIONS, LLC,** | § | |
| **HIGHER POWER ELECTRICAL, LLC,** | § | |
| **and 5 STAR ELECTRIC, LLC,** | § | |
| | § | |
| *Defendants*. | § | |
| | § | |
| | § | |

**SUPPLEMENTAL APPENDIX 6 IN SUPPORT OF DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**
**EXHIBITS 16 THROUGH 19**

Dated this 2nd day of August, 2024.

**PORTER H EDGES LLP**

William R. Stukenberg
Texas Bar No. 24051397
Federal ID No. 55792
1000 Main Street, 36th Floor
Houston, Texas  77002
Telephone: (713) 226-6611
Facsimile: (713) 226-6211
Email: wstukenberg@porterhedges.com

*Attorney-in-charge for Defendants*
*Mammoth Energy Services, Inc.,*
*Cobra Acquisitions, LLC,*
*Higher Power Electrical, LLC, and 5 Star*
*Electric, LLC*

Pursuant to Local Rule CV-7(c), Defendants file this Appendix in support of their Motion for Summary Judgment.

## <u>Index of Evidence Supporting Moton for Summary Judgment</u>

Transcript of Ben Hargrove's Deposition .................................................................... Exhibit 16

Transcript of Donald Roberts' Deposition ................................................................... Exhibit 17

Transcript of Rodriguez Aponte's Deposition ............................................................. Exhibit 18

Transcript of Miguel Rosario's Deposition ................................................................. Exhibit 19

**DATED:** August 2, 2024.

Respectfully submitted,

By: */s/ William R. Stukenberg*
William R. Stukenberg, *Attorney-in-Charge*
Texas Bar No. 24051397
Federal I.D. No. 55792
**PORTER HEDGES LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6611
Facsimile:  (713) 226-6211
wstukenberg@porterhedges.com

***Attorney-in-Charge for Defendants***
***Mammoth Energy Services, Inc.***
***d/b/a Cobra Energy, 5-Star and***
***Higher Power Electrical, LLC***

Of Counsel:

M. Harris Stamey
State Bar No. 24060650
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6619
Facsimile: (713) 226-6219
hstamey@porterhedges.com

Jamie L. Houston
State Bar No. 24097847
Porter Hedges LLP
1000 Main Street, 36th Floor

15501797

Houston, Texas 77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
jhouston@porterhedges.com

Emil M. Sadykhov
State Bar No. 24110316
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6720
Facsimile: (713) 226-6320
esadykhov@porterhedges.com
**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

I certify that I filed the foregoing document in accordance with the protocols for e-filing through the CM/ECF system in the United States District Court for the Western District of Texas, San Antonio Division, on August 2, 2024, and therefore has been served upon all counsel of record in accordance with such e-filing protocols.

*/s/ William R.Stukenberg*
William R. Stukenberg

15501797

1       IN THE UNITED STATES DISTRICT COURT

        FOR THE WESTERN DISTRICT OF TEXAS

2           SAN ANTONIO DIVISION

3 AARON MALDONADO, ET AL    )

                      )

4 vs.                 ) CASE NO. 5:21-cv-85

                      )

5 MAMMOTH ENERGY SERVICES,  )

 INC., COBRA ACQUISITIONS, )

6 LLC, HIGHER POWER      )

 ELECTRICAL, LLC AND 5 STAR)

7 ELECTRIC, LLC          )

8

9              ORAL DEPOSITION

10            BENJAMIN HARGROVE

11             March 18, 2024

12

13     ORAL DEPOSITION OF BENJAMIN HARGROVE, produced

14 as a witness at the instance of the Defendant and

15 duly sworn, was taken in the above-styled and

16 numbered cause on the 18th day of March, 2024, from

17 9:37 a.m. to 11:30 a.m., before Shauna Foreman,

18 Certified Shorthand Reporter in and for the State of

19 Texas, reported by computerized stenotype machine at

20 the offices of Porter Hedges, 1000 Main Street, 36th

21 Floor, Houston, Texas, pursuant to the Federal Rules

22 of Civil Procedure and the provisions stated on the

23 record or attached hereto.

24

25

EXHIBIT

16

```
1              APPEARANCES
2  FOR PLAINTIFFS:
3      DOUGLAS B. WELMAKER, ESQ.
       WELMAKER LAW
4      409 N. Fredonia
       Suite 118
5      Longview, Texas  75601
       E-mail: doug@welmakerlaw.com
6
   FOR DEFENDANTS:
7
       EUGENE M. NETTLES, ESQ.
8      PORTER HEDGES
       1000 Main Street
9      36th Floor
       Houston, Texas  77002
10     E-mail: enettles@porterhedges.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 2
```

```
1               INDEX
2                            PAGE
3  BENJAMIN HARGROVE
4  Examination by Mr. Nettles .......................4
5
6              EXHIBITS
7
8  NO.        DESCRIPTION            PAGE
9  Exhibit 1    Notice of Deposition      5
   Exhibit 2    Notice of Transition      9
10 Exhibit 3    Time Detail Report       31
   Exhibit 4    Interrogatories          35
11 Exhibit 5    Earnings Statements      41
   Exhibit 6    W-2 2017                 59
12 Exhibit 7    W-2 2018                 60
13
14
15
16
17
18
19
20
21
22
23
24
25
                                    Page 3
```

```
1              BENJAMIN HARGROVE,
2  having been first duly sworn, testified as follows:
3               EXAMINATION
4      Q.   (BY MR. NETTLES)  State your full name for
5  the record, please, sir.
6      A.   Benjamin Lee Hargrove.
7      Q.   That's L-E-E?
8      A.   Yes, sir.
9      Q.   And your birth date?
10     A.   September 2nd, 1981.
11     Q.   And you're 43?
12     A.   42.  43 in September.
13     Q.   All right.  Where do you live?
14     A.   In Midland, Texas, at the moment.
15     Q.   And how are you currently employed?
16     A.   I work for an electric utility there in
17 Midland full-time.
18     Q.   And what is the name of that company?
19     A.   Oncore Electric.
20     Q.   Oncore?
21     A.   O-N-C-O-R.
22     Q.   And how long have you worked for Oncore
23 Electric?
24     A.   I've been employed by them directly just
25 shy of two years now, and I was a contractor for them
                                    Page 4
```

```
1  for the two years prior to that.
2      Q.   All right.  I'm going to show you what we
3  have now marked as Exhibit 1.  That is a copy of your
4  deposition notice.
5           You understand that you are being
6  deposed here today in Houston, Texas?
7      A.   Yes, sir.
8      Q.   Have you ever been to Houston before?
9      A.   Yes, sir.
10     Q.   Okay.
11          (Exhibit 1 marked)
12     Q.   (BY MR. NETTLES)  And you're at the law
13 offices at 1000 Main?
14     A.   Yes, sir.
15     Q.   And you understand that I'm one of the
16 lawyers that represents the defendants in this case?
17     A.   Yes, sir.
18     Q.   And you're here today with your lawyer; is
19 that correct?
20     A.   That is correct, yes, sir.
21     Q.   Have you ever given a deposition before?
22     A.   No, sir, I have not.
23     Q.   You understand generally what the rules are
24 with respect to a deposition?
25     A.   I don't know in any kind of thorough
                                    Page 5
```

Veritext Legal Solutions
346-293-7000

1 manner.  No, sir, I would say not.
2    Q.  I'm assuming your lawyer has at least
3 talked to you --
4    A.  Yes, sir.
5    Q.  -- a little bit about what a deposition is
6 about?
7    A.  Yes, sir.
8    Q.  You understand you need to answer out, to
9 begin with?
10    A.  Answer out?
11    Q.  Answer out.  You need to answer verbally.
12    A.  Okay.  Yes, sir.
13    Q.  You can't nod your head.
14    A.  I understand.  Yes, sir.
15    Q.  All right.  And if you don't understand a
16 question, you can stop me and ask me to repeat it or
17 tell me you don't understand.
18    A.  Okay.
19    Q.  So can we have the agreement that if I ask
20 you a question and you answer that it that you've
21 understood the question?
22    A.  Yes, sir, I agree.
23    Q.  Any time you want to stop and take a break,
24 you're free to do that, as well.
25    A.  Okay.

Page 6

1    Q.  And you understand you're under oath,
2 right?
3    A.  Yes, sir.  I understand that.
4    Q.  Have you ever testified before in any kind
5 of a proceeding?
6    A.  Not that I can recall, no, sir.
7    Q.  Never been involved in a lawsuit before?
8    A.  No, sir.
9    Q.  Never been married and divorced?
10    A.  No, sir.
11    Q.  Are you currently married?
12    A.  No, sir.
13    Q.  Ever had a traffic ticket?
14    A.  Yes.
15    Q.  Did you have to go to court?
16    A.  No, sir.
17    Q.  All right.  So you've never been sued
18 before?
19    A.  No, sir.
20    Q.  All right.  Never been charged with a
21 crime?
22    A.  I have been -- I've been arrested.  I don't
23 believe I've been convicted.
24    Q.  What were you arrested for?
25    A.  In 2007, I was arrested for possession of a

Page 7

1 controlled substance in Williamson County, Texas.  I
2 was placed on deferred adjudication.  I completed my
3 probation successfully.  And then as far as I
4 understand, I was not convicted of that crime.
5    Q.  Maybe it was expunged?
6    A.  I believe so, yes, sir.
7    Q.  Was that marijuana?
8    A.  No, sir.  That was cocaine, less than half
9 a gram.
10    Q.  Okay.  Other than that, nothing else?
11    A.  No, sir.  That's it.
12    Q.  All right.  And did you have to go to
13 court?
14    A.  Yes.
15    Q.  All right.  So have you ever seen the
16 complaint that was filed in this case?  When I say
17 "complaint," it's the civil lawsuit that's pending in
18 federal court.
19    A.  I believe it may have been sent to me, but
20 I -- I don't believe that I read it thoroughly.
21    Q.  So just to sort of backing up on this
22 thing, you were -- as I understand, your hire date
23 was December the 8th of '17?
24    A.  That sounds correct, yes, sir.
25    Q.  And were you hired to go specifically to

Page 8

1 Puerto Rico?
2    A.  Yes, sir, that's correct.
3    Q.  All right.  And you were hired at that time
4 by -- was it Higher Power?
5    A.  Higher Power, yes, sir.
6    Q.  All right.  And your termination date, as I
7 recall, was April 19, '19.
8    A.  Yes.  However, I was -- when I resigned, we
9 were working directly for Cobra Energy Services at
10 that point.  I transitioned from Higher Power to
11 Cobra I believe in that July date, the 23rd of -- was
12 that '18, I believe?
13    Q.  Right.
14    A.  Yes, sir.
15    Q.  When you made that transition, did you do
16 it in Puerto Rico, or were you back --
17    A.  No, we did it in Puerto Rico.
18    Q.  Okay.  And as I recall -- that may have
19 been the time --
20       MR. NETTLES:  Go ahead and mark this.
21       (Exhibit 2 marked)
22    Q.  (BY MR. NETTLES)  Now, Exhibit 2 is a
23 notice of transition from -- it says "restoration
24 project into reconstruction," the effective date
25 being July 23rd, '18, right?

Page 9

3 (Pages 6 - 9)

1    A.  Yes, sir.
2    Q.  And this is a notice to you that your hours
3  were going to change, right?
4    A.  Yes, sir.
5    Q.  Instead of working 16 hours a day and seven
6  days a week, you were working six days and 12 hours;
7  is that correct?
8         MR. WELMAKER:  Objection.  Form.
9    Q.  (BY MR. NETTLES)  Go ahead.
10        MR. WELMAKER:  Any time I object and I
11  don't instruct you not to answer, you can go ahead
12  and answer.  Go ahead.
13    A.  My understanding was this was the
14  transition point from having our day rate and then
15  moving forward with -- I believe we were also given a
16  per diem during this time period, too, whereas before
17  they provided housing and some meals.
18        So to me, this was kind of the
19  demarcation point between the day rate, they provided
20  a hotel and some meals, to we were responsible for
21  our -- finding our own place to stay, we were paid a
22  per diem, and then an hourly rate with overtime.
23    Q.  (BY MR. NETTLES)  Did your hours change, as
24  well?
25    A.  When you say "hours," are you referring

Page 10

1  to --
2    Q.  How about your work schedule?  If you look
3  on this document --
4    A.  Right.  Our work schedule was pretty
5  similar.  I think our rotation back home may have
6  changed or we may have firmed it up from what we were
7  previously doing, but our day-to-day operations were
8  pretty similar, from my recollection.
9    Q.  All right.  With respect to the complaint
10  that was filed, you understand that the complaint was
11  filed against a number of other parties?  For
12  instance, Mammoth Energy Services was named.
13    A.  Yes, sir.
14    Q.  And that's not -- you never worked for
15  Mammoth Energy Services, correct?
16    A.  Well, at the time -- and I don't remember
17  when exactly this happened, but my understanding was
18  that Higher Power was owned by Mammoth, as well as
19  Cobra.  We had supervision from Cobra personnel when
20  we were on the island.  So even though I was working
21  for Higher Power, we all knew they were somehow under
22  this Mammoth umbrella.  I don't know to what detail,
23  but that was all our understanding.
24    Q.  With respect to your paychecks, it only
25  came from Higher Power at that --

Page 11

1    A.  I believe that's correct, yes, sir.
2    Q.  And maybe later from Cobra?
3    A.  Yes.  Later, it was from Cobra.
4    Q.  Okay.  Let's go back to -- I say the
5  beginning, but tell me a little bit about yourself.
6         Where are you from?
7    A.  I originally grew up in Georgetown, Texas,
8  north of Austin.  Attended Georgetown High School.  I
9  left there and spent a couple of years at Texas Tech.
10  Enlisted in the Army, got out in 2005.  I was
11  stationed at Fort Campbell, Kentucky.  And then
12  ultimately finished up my undergraduate degree at
13  University of Texas at Austin in 2014.  Actually had
14  a job with an oil and gas company in Austin, and then
15  moved over and started doing -- my first job was
16  doing electrical distribution design.  That got me
17  into the power line industry.  That was probably
18  somewhere around 2013, if I recall.
19    Q.  All right.  Let me kind of back up on the
20  dates a little bit.
21    A.  Sure.
22    Q.  What year did you end up getting out of
23  high school?
24    A.  2000.
25    Q.  All right.  And then you went to Tech,

Page 12

1  straight there?
2    A.  Yes, sir.  My freshman year was at Texas
3  Tech University.
4    Q.  In 2000 or 2001?
5    A.  I believe fall of 2000, spring of 2001.
6    Q.  You stayed there two years?
7    A.  I was only there a year and left and went
8  to a different college in Waco, Texas.
9    Q.  Baylor or what?
10    A.  TSTC.  Texas State Technical College-Waco.
11  I did pilot training there.
12    Q.  How long did you stay there?
13    A.  I was only there a year, I believe.  And
14  that was during the time when 911 happened, and I
15  enlisted.  I think initially it was into the Air
16  Force Reserves, but ended up transferring into the
17  Army not long after that.
18    Q.  And that would have been --
19    A.  2002 time frame.
20    Q.  Okay.  And how long did you stay in the
21  Army?
22    A.  Three years.
23    Q.  And when you signed up, was that the
24  minimum or --
25    A.  Yes, sir, that was the minimum.

Page 13

4 (Pages 10 - 13)

1    Q.   All right.  And in the Army, what did you
2  do?
3    A.   I was a logistics specialist.
4    Q.   All right.
5    A.   I -- basically warehouse kind of
6  operations.  Nothing too exciting.
7    Q.   Where were you stationed?
8    A.   Fort Campbell, Kentucky, was my -- I was
9  stationed in multiple places; but Fort Campbell,
10 Kentucky, for the longest period of time.
11   Q.   And you were honorably discharged?
12   A.   Yes, sir.
13   Q.   So that takes us to roughly 2005 or --
14   A.   Yes.
15   Q.   All right.  So what happened in 2005?
16   A.   I came back home.  I think I was trying to
17 go to attend college part-time to keep working on my
18 degree, and that would have been Texas State or --
19 what did they use to call it back in the day --
20 Southwest Texas.  They had a campus that was in Round
21 Rock, and I was taking classes part-time there.  My
22 recollection is a little fuzzy, to be honest.
23        But not long after that, I decided to
24 attend helicopter training.  Not in the military, but
25 privately in Florida.  And that may have been around

1  2006.
2    Q.   How long did you do that?
3    A.   I was only there for, I would say, three
4  months before my parents ended up getting a divorce
5  and then my funding ran out and I returned home.
6    Q.   So did you ever do anything with the pilot
7  training, helicopter training?
8    A.   Unfortunately not, no, sir.
9    Q.   So going forward, you said you ended up
10 getting a degree from Texas in 2014?
11   A.   That is correct, yes, sir.
12   Q.   What kind of degree did you get?
13   A.   I got a bachelor of arts in geography.
14   Q.   Okay.  So between 2006 and 2014, what did
15 you do?
16   A.   I believe I -- I think I drove a dump track
17 for a little over -- maybe a year or two before my
18 arrest.  And then once I got arrested, I decided to
19 return to school and finish my degree.  And I was
20 enrolled in school full-time I think until around
21 2010 or '11 and then started basically full-time
22 employment.  All I lacked was Spanish.  And in the
23 college of liberal arts at the time I was attending
24 the university, they required four years, and it was
25 really difficult for me.  That was the last thing

1  that prevented me from receiving my diploma.  It took
2  me until 2014, as well as spending a few months in
3  Mexico in a total immersion kind of program, to get
4  to the point where I could pass that fourth-year
5  Spanish class and ultimately finish my degree.
6    Q.   So you have a diploma?
7    A.   Yes, sir.
8    Q.   That's good.
9         During that period of time, were you
10 actually working for any company in particular?
11   A.   Yes.  Initially right out of college --
12 well, right before I graduated University of Texas,
13 it was Drilling Info, and I believe that was maybe
14 around 2011.
15   Q.   Okay.
16   A.   And I would guess I would have been there
17 for six to 12 months before I started working for
18 Lamar Technical Services out of Cedar Park.  And that
19 would have been, I guess, around 2011 or '12.  Again,
20 my dates aren't -- I'm not real sure.  I would have
21 to look back at --
22   Q.   So let's pick up from the time you got your
23 degree.
24        Who did you work with after that?
25   A.   I believe I was still employed with Lamar

1  Technical Services.  I left them and went to work for
2  Rio Grande Electric Co-op in Alpine, Texas, maybe
3  around 2013.
4    Q.   Was that your first venture into the
5  electrical side of things?
6    A.   Lamar Technical Services was my first
7  venture.  They are a contractor, and we worked a lot
8  for -- Guadalupe Valley Electric Co-op was our main
9  client.
10   Q.   And what did you do there?
11   A.   Guadalupe Valley Electric Co-op is situated
12 in Gonzales, and that was -- I believe kind of in the
13 Eagle Ford shale.  And so, they had a lot of -- a lot
14 of oil field customers that needed high-voltage
15 power.
16        So we designed and did -- I wouldn't
17 say engineering because we didn't have, you know, a
18 licensed engineer on staff, but we did basic design
19 for the co-op, told them, you know, "This is all the
20 poles and materials you need.  This is how we would
21 like to construct this power line.  This is where it
22 ends for the customer," and we would go out and stake
23 it in the field.
24   Q.   So what were you doing?  What kind of work?
25   A.   Basic design, drafting, and staking.

1   Q.   And when you got to Rio Grande Electrical
2  Co-op, what were you doing?
3   A.   The same thing.
4   Q.   Design, drafting, and staking?
5   A.   Yes, sir.
6   Q.   And for how long?
7   A.   I wasn't there very long before I tried to
8  move over and become a lineman, and my boss at the
9  time didn't allow me to do that.  So I ended up
10  resigning from there and got hired on with a company
11  called Power Secure.  And I believe that was around
12  2013.
13   Q.   And what were you doing for Power Secure?
14   A.   I was an apprentice on a transmission bare
15  hand crew working out in West Texas as a contractor
16  for Oncore.
17   Q.   And for how long were you with Power
18  Source -- Power Secure?
19   A.   I was with Power Secure roughly two years
20  before I left and worked for Excel Energy.
21   Q.   All right.  How long with Excel?
22   A.   About six months before I came back to
23  Power Secure.
24   Q.   So you went back to Power Secure.  Why did
25  you make that change?

Page 18

1   A.   I was offered a promotion to become a
2  project manager.
3   Q.   And what did you do as a project manager?
4   A.   Helped really assist with personnel,
5  equipment, project controls, and financials with all
6  of our transmission and substation projects, kind of
7  for Oncore in the West Texas and metroplex area.
8   Q.   And how long did that job last?
9   A.   About a year and a half.
10   Q.   So I'm not sure where we are time-wise.
11   A.   I think this would have been towards the
12  fall of -- well, 2016 project manager for Power
13  Secure.  Did that for a year and a half.  So that
14  would have put us late summer or fall of 2017.
15   Q.   That would have been roughly -- or getting
16  close to the time you went to work for the Higher
17  Power; is that correct?
18   A.   That is correct, yes, sir.
19   Q.   So when you went to work or you ended up
20  going to work for Higher Power and going to Puerto
21  Rico, how did that come about?
22   A.   Some of the guys that I had worked with at
23  Power Secure, we were all kind of fed up with Power
24  Secure and looking for next opportunity.  And then
25  word started getting around about what some of the

Page 19

1  companies were offering as far as compensation to go
2  to Puerto Rico and work.
3   Q.   This is after the hurricanes?
4   A.   Yes, sir.  After Hurricane Maria, yes, sir.
5  And that got all of our attention.  I wasn't with the
6  group of guys that I initially knew that went down
7  there first.  I want to say they went right after --
8  I can't recall when they went, but they told me how
9  much they were making per day, and that got me really
10  interested.  And then I ultimately went through
11  orientation in Amarillo and then ended up down there,
12  as you said, in December of 2017.
13   Q.   Now, the one thing I do not have -- I don't
14  have your offer letter or any of the documents
15  related to your getting hired.
16   A.   Yes, sir.
17   Q.   And you don't have that either, I take it?
18   A.   I told Doug I need to look in some other
19  places.  If I do find that, I'll be sure to give it
20  to him.
21   Q.   So what happened in your orientation?  What
22  were you told?
23   A.   From my recollection, Robert Malcom, who I
24  think at the time was the president of Higher Power,
25  had us all in maybe a conference room of a hotel and

Page 20

1  visited with each one of us to determine our
2  experience and then give us a classification,
3  whether, you know, you were a journeyman, lineman, a
4  foreman, or I guess some level of apprentice.  And
5  once you -- once they determined your classification,
6  they had a day rate for, you know, that
7  classification that they were bringing you on as.
8   Q.   So what was your classification?
9   A.   Apprentice.
10   Q.   And as an apprentice, what were you making?
11  Do you recall?
12   A.   My day rate was $700 a day.
13   Q.   Did they also tell you how much you were
14  making an hour?
15   A.   I can't recall.  I just remember 700 a day
16  was what stuck with me.
17   Q.   So you're in Amarillo.  You're with a bunch
18  of guys.
19   A.   Yes, sir.
20   Q.   And did you know some of the guys you were
21  with at that time?
22   A.   I don't believe so, no.  Most of the guys
23  that I knew were already on the island working.
24   Q.   All right.  So when you got to the island,
25  tell me how all that happened.  Because you had to go

Page 21

6 (Pages 18 - 21)

1 from Texas to Puerto Rico. They obviously flew you
2 in, I'm assuming?
3    A. That's correct. I want to say it was
4 either Amarillo to Houston -- and I can't remember if
5 we had a stop in Miami before we ultimately arrived
6 in San Juan at the major airport there.
7    Q. Did you fly commercial?
8    A. Yes, sir.
9    Q. Okay. Now, prior to going, you know,
10 having this experience with Higher Power, going to
11 Puerto Rico, had you ever done any storm work before?
12    A. Yes, sir. Once or twice while I was on
13 that bare hand crew for Oncore Electric, but it
14 wasn't -- it wasn't nearly the same kind of storm
15 work, I would say. These were smaller outages from a
16 smaller weather event.
17    Q. Wasn't anything of the magnitude in --
18    A. No, sir.
19    Q. -- when you got to Puerto Rico?
20    A. Certainly not.
21    Q. So timing-wise now, let's sort of try to
22 get down to specifics.
23       You were hired in -- at least I'm
24 showing your hire date early December of '17.
25    A. Yes, sir.

Page 22

1    Q. So when you went from Amarillo, you get
2 hired, you go to Puerto Rico, you land. Tell me what
3 happens -- where you went, what you did, et cetera.
4    A. There was a day or two of, I think, maybe
5 some kind of in-processing before I ended up going to
6 Ponce, which is where I met up with the rest of the
7 guys that were now on this helicopter crew.
8    Q. So you were on a helicopter crew?
9    A. Yes, sir.
10    Q. And that was in where?
11    A. Initially it was in Ponce, I believe. Kind
12 of on the southern end, more in the center of the
13 island. I could be mistaken on the name of that. I
14 would have to -- I guess I could Google it.
15    Q. So where were you staying?
16    A. In a hotel there close to downtown. I
17 don't recall the name of the hotel.
18    Q. Okay. Did you get all your meals there?
19    A. All meals were offered with a sack lunch
20 that -- yes, all meals were offered.
21    Q. So the fact that you were on a helicopter
22 crew, what does that mean?
23    A. I don't know how familiar you are with that
24 island. It's -- it looks roughly the shape of
25 Tennessee. It's elongated and east-west. There's a

Page 23

1 central mountain chain that's also oriented with an
2 easterly-westerly kind of orientation. And any
3 transmission circuit that went across that chain of
4 mountains creates new challenges.
5       Typically when we build a high-voltage
6 transmission line, if the terrain's pretty flat, you
7 can do it all with ground equipment. When you start
8 getting into terrain where it's steep, mountainous,
9 then your regular rubber-tired vehicles don't do so
10 well because of the steep inclination.
11       What we were told when we were down
12 there is a lot of those circuits that they built
13 originally were built with using helicopters. And by
14 that, I mean that they used helicopters to transport
15 smaller pieces of equipment, do some small
16 excavations, and then fly these structures out, set
17 them.
18       There was -- most of them had four
19 guy-wires so you could plumb them up with the
20 guy-wires, and then you would also use helicopters
21 during stringing operations. Initially when you
22 string conductor, you start by pulling a rope out.
23 You pull it through a structure on these big wheels
24 or dollies to the other end of your pull where you
25 have your conductor. You'll attach that rope to the

Page 24

1 conductor, and then you go in reverse -- you pull the
2 rope, which pulls the conductor in. Once your
3 conductor gets in, then you sag the conductor and go
4 back and permanently attach it to all the structures.
5    Q. So what you're describing, is that
6 something you actually did on the island at that
7 time?
8    A. Yes, sir. Our role on the helicopter crew
9 was to augment the ground crew. For the places that
10 the ground crew could not go due to terrain, we went
11 and basically did the same thing that they were going
12 to do.
13    Q. So did you get materials to the mountainous
14 terrain part of it with the helicopter?
15    A. Manpower, materials, tools, and equipment
16 were all transported with the helicopter to wherever
17 we needed to go.
18    Q. The helicopter is big enough to put a
19 telephone pole on it?
20    A. We didn't transport structures. Let me
21 back up and say there was more than one type of
22 helicopter being utilized. Some helicopters had a
23 larger capacity to lift a bigger load. The ones we
24 were using were smaller, and they were used to
25 transport men and tools and equipment.

Page 25

7 (Pages 22 - 25)

1    Q.   So with respect to your prior helicopter
2  training, did that have anything to do with why you
3  got on this crew?
4    A.   No, sir.
5    Q.   Okay.  So the fact that you got on a
6  helicopter crew was just by chance?
7    A.   No, sir.  It was from my relationship with
8  the guys who went down before me, from working with
9  them at Power Secure.  I developed a relationship
10  with these guys.  They were the ones who told me how
11  to come down, told me how much everybody was making.
12  That's the reason I ended up down there on a crew.
13    Q.   Was there, like, a foreman that you
14  reported to that --
15    A.   Yes, sir.
16    Q.   Was that Chad Menneke or --
17    A.   No, sir.  That was Jake Fiorenti.  He was
18  our general foreman.
19    Q.   Spell his last name.
20    A.   I could be wrong.  F-I-O-R-E-N-T-I.
21  Actually, I might have him in my phone, if you want
22  me to verify.
23    Q.   Just the spelling would be good.
24    A.   Sure.  F-I-O-R-E-N-T-I, Fiorenti.
25    Q.   And I can go find the document, but there

Page 26

1  is a document that reflects a name of Chad Menneke,
2  M-E-N-N-E-K-E.
3        Do you know who that is?
4    A.   I believe he may have been our president,
5  but that was when we were with Cobra.  I really --
6  I'm not too familiar.  The last name is familiar.  I
7  just don't know his involvement when we initially
8  went down.
9    Q.   So with respect -- you were staying at a
10  hotel downtown, and did you continue to stay at that
11  hotel the entire time you were there?
12    A.   No, sir.  No.
13    Q.   Where did you go after that?
14    A.   Where did we go?  My situation was slightly
15  different because in the midst of that time -- I
16  believe it was in February or March of '18 -- I would
17  have to look at my time sheets to get the exact
18  dates, but it should be reflected in my time sheets.
19  But I left to go work in Corpus Christi learning
20  distribution, which is something I hadn't had a
21  chance to do before.
22    Q.   When you say you left, you quit?
23    A.   I didn't quit.  I still was employed by
24  Higher Power, but I left the island and began working
25  in Corpus Christi.

Page 27

1    Q.   With Higher Power?
2    A.   Yes, sir.  And that was for a period of two
3  to three months, maybe.
4    Q.   You were doing what now?
5    A.   Distribution work.
6    Q.   At their request or your request, or how
7  did that work?
8    A.   Kind of at my request.  There was a guy
9  there on the island who was very experienced in
10  distribution and told me if I went back with him to
11  Corpus Christi, I could learn distribution and get my
12  journeyman's certificate pretty quickly.  However,
13  that never really panned out.
14    Q.   What happened?
15    A.   He ended up quitting.  And I asked if I
16  could come back down to the island and they said yes,
17  so I returned to the island.
18    Q.   Okay.  And when you got back to the island,
19  what were you doing then?
20    A.   I returned to the same helicopter crew.  I
21  believe at that point in time, we were at a place
22  called Las Palmas.  That was on the southeast coast
23  of the island.  We were staying in -- it's like a
24  resort almost, or a gated community.  Pretty
25  substantial, had golf courses and a lot of condos and

Page 28

1  townhomes.
2    Q.   Sounds like it was nice.
3    A.   It was -- it was a step up from the hotel
4  in Ponce, yes, sir.  It wasn't terrible at all.
5    Q.   And were you still flying out every day to
6  do the job in the helicopter?
7    A.   Yes.  The way we did our operations is we
8  all had three-quarter to 1-ton pickup trucks with
9  ladder racks, and our ladders and all of our tools
10  and equipment would be on those trucks.  We would
11  leave every morning and go to a designated landing
12  zone or what we called an LZ.
13    Q.   In the truck?
14    A.   In the truck.  From there, the helicopter
15  would arrive, and we would work out of that LZ almost
16  as like a yard.
17    Q.   You said LD?
18    A.   LZ, which stood for landing zone.
19    Q.   Got you.  In other words, you had all of
20  your equipment and tools and everything on the truck?
21    A.   We would take it off the truck, attach it
22  to the helicopter, and we would fly out and start
23  going to work.
24    Q.   Got you.  And the crew -- how many folks on
25  your crew?

Page 29

8 (Pages 26 - 29)

1    A.   There were maybe two to three crews under
2  Jake's supervision.  The details on this are a little
3  fuzzy.  I would say anywhere between four to eight
4  men on a crew.
5    Q.   Were you on the same crew continuously?
6    A.   No, sir.  I think I switched crews once.
7  But then after that, it was the same crew until we
8  left the island.
9    Q.   Let's try to get -- let's do this.  Let's
10 get, like, an orientation on dates and timing when
11 you were on the island.
12       So we -- if we go back to the very
13 beginning --
14   A.   Yes.
15   Q.   That would have been in 20 --
16   A.   '17.
17   Q.   -- 17.  When you started, it was -- yeah,
18 late '17?
19   A.   Right.
20   Q.   So when you got to the island, you were
21 first at the hotel?
22   A.   In Ponce, yes, sir.
23   Q.   Ponce, right?
24   A.   I believe so.
25   Q.   P-O-N-C-E?

Page 30

1    A.   Correct.
2    Q.   So we go from late '17 until -- when was
3  it, March of '18?
4    A.   I would have to refer to my time sheets.  I
5  don't know that -- I don't have it in front of me,
6  but it should be broken down.
7    Q.   I've got your time sheets, so I'll let you
8  see that.
9    A.   Okay.
10   Q.   You can tell from looking at the time
11 sheets?
12   A.   Yes, sir.
13   Q.   Well, let's just do that.  Let's just look
14 at your -- no reason not to at this point.
15       (Exhibit 3 marked)
16   Q.   (BY MR. NETTLES)  All right.  I'm going to
17 show you what's been marked as Exhibit Number 3.
18       And what document do you have in front
19 of you?
20   A.   Looks like a time detail report.  The date
21 range goes from December 6th of 2017 until April 30th
22 of 2019.  I'm going to use this to reference when I
23 left the island to go do that distribution work.
24   Q.   Have you seen this time detail report
25 before?

Page 31

1    A.   Yes, sir.
2    Q.   And you know what Paycom is?
3    A.   Yes, sir.  Paycom was an app that we used
4  to, I guess, look at our time entries and see a
5  detailed pay stub, I believe.
6    Q.   Right.
7    A.   That's typically what I used it for.  I
8  looked at my net pay when it was directly deposited.
9    Q.   The main thing you wanted to know was what
10 your net was, correct?
11   A.   Correct.
12   Q.   But you would also look at your gross, too,
13 correct?
14   A.   Well, can you define gross and net?
15   Q.   Didn't you want to know what deductions
16 were being taken out of your check?
17   A.   I never really paid that much attention, if
18 I'm being honest, to my deductions.  It was what's
19 being deposited into my account.
20   Q.   Okay.  But if you go to Paycom, you were
21 able to look at your gross pay and your net pay --
22   A.   I believe that information was available if
23 you wanted to look at it, yes, sir.
24   Q.   All right.  Go ahead.
25   A.   So it appears -- looking at this on Page 4,

Page 32

1  beginning on the 27th of February 2018 is when I
2  began work in Corpus Christi.  And looks like I may
3  have taken a week off prior to that.  So maybe my
4  last day on the island appears to have been
5  February 17th of 2018.
6    Q.   So I'm on Page 4.  And if you look at --
7  starting on Tuesday, 2/27 --
8    A.   Yes, sir.
9    Q.   How can you tell that you were in Corpus?
10   A.   So if you look at -- let's see what they
11 are calling this column here.  Allocation, the column
12 in the center of the page.
13   Q.   Okay.
14   A.   As you can see, when I was on the island,
15 it says, you know, Higher Power Electrical, LLC
16 Unassigned.
17   Q.   Right.
18   A.   And then there is a different entry
19 beginning on the 27th of February, 2018, where it
20 says Higher Power Electrical -- Garrett Travis was my
21 foreman, and then it says AEP Western.  We were
22 working for AEP, American Electric Power, another
23 large investor-owned utility.
24   Q.   That was part of Higher Power, though?
25   A.   You can see it still says Higher Power, but

Page 33

9 (Pages 30 - 33)

1 the client -- the folks we were doing the work for
2 was AEP.
3    Q.  Okay.  And you can see that went on all the
4 way until, it looks like, March 30th?
5    A.  I believe --
6    Q.  Oh, past that?
7    A.  Yeah, past that.
8    Q.  All the way to May, it looks like.  Well,
9 no, even past that.  Let's see.
10    A.  Looks like June 11th is when I went back
11 down to the island.
12    Q.  All right.  So you start on 2/27 to
13 June 11th, right?
14        Is that fair?
15    A.  Well, I wonder why it transferred to Steven
16 McLean.  That's a gentleman I don't remember.  You
17 know, it may have -- again, my recollection -- I
18 apologize, sir.  It's not the best.  I mean, if this
19 is correct, then it looks like I ended my time in
20 Corpus Christi on June the 10th and returned to
21 Puerto Rico on June the 11th.
22    Q.  So from roughly 2/27/18 to June 10th, 2018,
23 you were in Corpus?
24    A.  That's -- according to this time sheet.  If
25 this time sheet is correct, then I would say that's
                                                    Page 34

1 what happened, yes, sir.
2    Q.  All right.  So from the time period before
3 when you started in the end of '17, that period of
4 time until 2/27/18, you were working out of Ponce?
5    A.  Correct.  Yes, sir.
6    Q.  And so, we've got roughly a period of --
7 December, January, February.  So about three months,
8 right?
9    A.  Correct.  Yes, sir.
10    Q.  So tell me -- let's talk about these first
11 three months.
12    A.  Okay.
13    Q.  Let's break it down this way.  You got the
14 first three months.  That's Period 1.  Period 2,
15 you've got the time in Corpus Christi.
16        Now, your time in Corpus Christi
17 doesn't involve this lawsuit at all, correct?
18    A.  No, sir.  Not to my understanding.
19    Q.  All right.  So -- and that goes until
20 June 2018?
21    A.  Yes, sir.  According to this Paycom, these
22 team sheets, that's what it indicates.
23        (Exhibit 4 marked)
24    Q.  (BY MR. NETTLES)  So I'm going to show you
25 one other thing while we're doing this just to --
                                                    Page 35

1        MR. NETTLES:  Mark this as the next
2 exhibit, please.
3    Q.  (BY MR. NETTLES)  I'm going to show you
4 what is being marked as Exhibit 4, which are
5 plaintiff's responses to defendants' discovery.
6    A.  Okay.
7        MR. NETTLES:  Doug, are you going to
8 get him to swear to these things at some point?
9        MR. WELMAKER:  Yeah.
10    Q.  (BY MR. NETTLES)  If you look at -- there
11 is a damage calculation that's being made here, and
12 if you look at -- starting in February of '18 that it
13 shows zero across --
14    A.  Yes, sir.
15    Q.  But if you go down to May of '18, it
16 starts -- at the end of May, it starts picking up
17 damages again.
18    A.  Yes, sir.
19    Q.  So will you and your lawyer verify this
20 issue on when you were in Corpus and when you got
21 back and what the damages are?
22        MR. WELMAKER:  Yeah.  We're going to
23 have to do that.  I mean, I'll tell you what my
24 thinking was off the record.  But, yes, we will agree
25 to do that.
                                                    Page 36

1        MR. NETTLES:  Okay.  I think that's
2 fine otherwise.
3        MR. WELMAKER:  Okay.
4    Q.  (BY MR. NETTLES)  So with respect to --
5 let's go -- let's talk about the third period when
6 you got back from Corpus.  Let's just use June of
7 2018, okay?
8    A.  Okay.
9    Q.  We'll figure out what the exact time period
10 was.  But when you got back from Corpus, that's when
11 you were staying in this gated community, correct?
12    A.  Correct.  Yes, sir.
13    Q.  And were you at that location in terms of
14 your crew until you left?
15    A.  No, sir.
16    Q.  All right.  So how long were you at that
17 spot?
18    A.  I would have to refer back.  I believe I
19 have some previous e-mails where we -- you know,
20 again, referring back to the date in July of 2018
21 when we transitioned from our day rates to hourly
22 overtime with a per diem, after that time period in
23 July, we were responsible for our own housing.  And
24 initially we remained in that gated community, if I
25 had to guess, another two to four months.  And then
                                                    Page 37

1 from there we moved to a more centrally-located city
2 called Caguas, and that is where --
3    Q.   Spell that.
4    A.   Man, that's a good question.  I'm guessing
5 C-A-G-U-A-S.  I remained in Caguas until we left the
6 island in April of 2019.
7    Q.   All right.  So I think in fairness to what
8 we're doing here, we're going to focus on the time
9 periods that you're seeking damages in this case.
10    A.   Yes, sir.
11    Q.   So that's what I'm going to ask about.  And
12 let's talk about the period -- you know, the first
13 three months that you were there.
14    A.   Yes, sir.
15    Q.   And what I want to talk about is the -- a
16 little bit about your orientation and what you did on
17 a daily basis.
18         MR. NETTLES:  Why don't we take just a
19 real short break?
20         MR. WELMAKER:  Yeah, yeah.
21         (Recess from 10:27 a.m. to 10:39 a.m.)
22    Q.   (BY MR. NETTLES)  We're back on the record.
23    A.   Yes, sir.
24    Q.   All right, sir.  Let's talk about -- you
25 know, I -- I told you that I wanted to talk about the

1 first three months --
2    A.   Yes.
3    Q.   -- basically, but let's also talk about
4 your orientation.
5         So when you were -- went through
6 orientation and your classification and what you were
7 going to make, you understood that it was 700 bucks a
8 day, right?
9    A.   Yes, sir.  That's correct.
10    Q.   Did they ever talk to you about an hourly
11 rate, overtime, how many days a week you would work,
12 how many hours a day you would work, and all that in
13 the beginning?
14    A.   You're referring to during orientation?
15    Q.   Yes.
16    A.   My only take-away from orientation was --
17 at least to the point that I can recall now -- was my
18 specific day rate of $700 per day.  I'm struggling to
19 remember -- I want to say maybe they wanted us to
20 work six weeks continuously before we had a break,
21 but I don't feel very confident about that.  My main
22 take-away was my day rate.
23    Q.   So there weren't any other take-aways?  How
24 many hours a day were you working?  Did they talk to
25 you about that?

1    A.   If they did, I don't recall.
2    Q.   All right.  What about in terms of -- well,
3 let me ask it another way.
4         Were you working sunrise to sunset?
5 How were you working?
6    A.   Typically, we would start our day well
7 before sunrise, usually around, you know, anywhere --
8 depending on where our landing zone was and how long
9 of a trip that was -- because it varied.  You know,
10 we operated out of Ponce, but we would go to various
11 different locations.
12    Q.   Right.
13    A.   So depending on where the landing zone was
14 and what time we were going to liaise with the
15 aircraft, anywhere, I would say, between 4:00 to
16 6:00 a.m., which my recollection was before sunrise
17 every morning that we were working.  And then we
18 would work typically until dark.
19    Q.   You wouldn't take off on the helicopter
20 before sunrise, would you?
21    A.   So this kind of brings up something unique
22 about our work in that I believe there's federal
23 aviation regulation that stipulates you cannot do the
24 type of work we were doing, which I believe the FAA
25 refers to as human external cargo, during nighttime.

1 It has to be done during daytime hours or daylight
2 hours.
3         So to answer your question, we
4 couldn't do any flying or work until official
5 daylight time started.
6    Q.   Okay.  It was -- I'm just trying to think
7 of the time of the year.  Was Puerto Rico on Daylight
8 Savings Time, or do you know?
9    A.   I don't recall if they observed that or
10 not.  I think that they may have, but I don't -- you
11 know, in today's modern age where our cell phones
12 automatically account for it, I don't know that we --
13 you know, I don't recall noting that if we did
14 change.
15    Q.   Okay.  So the other thing we talked about
16 earlier was your earnings statement, right?
17         MR. NETTLES:  Let's mark this, too,
18 please.
19    Q.   (BY MR. NETTLES)  I'm going to show you now
20 what's been marked as Exhibit 5.
21         (Exhibit 5 marked)
22    Q.   (BY MR. NETTLES)  So if you look at the way
23 this is set up, the very first page on this exhibit,
24 I believe, is going to reflect your last pay period.
25    A.   Okay.

1   Q.  Does that appear to be correct?
2   A.  It appears to be correct.  Is it worth
3 mentioning that this is outside of the window that
4 we're talking about today?
5         MR. WELMAKER:  Just wait for him to
6 ask you the questions.
7   Q.  (BY MR. NETTLES)  I'm going to talk about
8 the window, but I'm just trying to orient you to the
9 document --
10   A.  Yes, sir.
11   Q.  -- that this is the last pay period.
12   A.  Yes, sir.
13   Q.  If you go look at the very first page --
14 excuse me.
15         If you look at the very last page,
16 which has got a Bates label at the bottom where it
17 says FED000213 -- do you see that?
18   A.  Yes, sir.  I see this page.
19   Q.  All right.  And that would have been a page
20 reflecting what should be your first pay period,
21 correct?
22   A.  Appears to be, yes, sir.
23   Q.  So let's go to -- where I want you to turn
24 now is to go to Page FED000207.
25   A.  207?  Okay.

Page 42

1   Q.  And this appears to be a pay period during
2 the time that you're seeking damages in the case,
3 correct?
4   A.  Yes, sir.  It does appear to be that way.
5   Q.  All right.  And so, this is a pay date of
6 2/23/18?
7   A.  Yes.
8   Q.  And the period start is 2/5/18 to 2/18/18,
9 correct?
10   A.  That matches what I see, yes, sir.
11   Q.  All right.  Now, these are from the Pay.com
12 records, correct?  If you were to go into your app
13 and look at your pay where it has -- and I know you
14 said you only looked at the net pay, but have you
15 ever gone into -- or did you ever go into the app and
16 at least look at the data that was available?
17   A.  I don't recall.  To be honest with you, I
18 really -- I don't remember.
19   Q.  Do you ever remember looking at anything
20 that reflected an earning -- earnings
21 regular/overtime, your rate?
22   A.  If I did, it would have been a very seldom
23 occasion.  Just nothing stands out to me.
24   Q.  All right.  Let's do this.  This is pretty
25 easy math.

Page 43

1         You were working -- if you were to
2 take $700 a day and multiply it times 14, you would
3 get 9800, correct?
4   A.  Yes, sir.  I would agree with that math.
5   Q.  All right.  Here, they have a pay reflected
6 at 9856, which is slightly different, correct?
7   A.  Yes, that is a different figure.
8   Q.  And if you look down at the -- that's why I
9 asked you whether you had ever looked at your
10 deductions for Medicare, it says social security,
11 Puerto Rico withholding, Puerto Rico disability.
12 Those are taxes.  Excuse me.  And then there are
13 deductions for dental, FSA, medical, all of these
14 different things, correct?
15   A.  Yes, sir.
16   Q.  Were you aware that there was money being
17 taken out for these type of deductions?
18   A.  Yes, I was aware that there were deductions
19 and taxes.  Yes, sir.
20   Q.  All right.  And you obviously -- strike
21 that.
22         Did you ever get a paper -- I say a
23 paper -- paycheck or anything that would reflect this
24 information in the mail or by paper or anything of
25 the sort?

Page 44

1   A.  The only paper document I can recall would
2 have been my W-2 for taxes.
3   Q.  Okay.
4   A.  I believe everything was electronic through
5 that app, but I -- I can't be certain.
6   Q.  But your W-2 that you got for taxes
7 wouldn't -- was there anything on your W-2 that would
8 reflect whether you were getting paid by the hour or
9 you were getting paid as a salary or anything of that
10 sort?
11   A.  I'm not familiar enough with the form.  I
12 want to say it shows maybe your gross earnings, but I
13 don't know if it was broken down in that way that
14 you're asking about.
15   Q.  All right.  So other than your W-2, was
16 there anything else that you would have gotten in a
17 paper format from the company, as you recall?
18   A.  To my recollection, I don't recall any
19 other paper document indicating any detailed pay.
20   Q.  So when you got back -- I say when you got
21 back.  When you -- let's say that at some point,
22 whether you were paying your taxes or whatever you
23 were doing, did you ever go back and look at the
24 Pay.com or print out anything from Pay.com to reflect
25 what you were getting on a -- I guess you got paid,

Page 45

12 (Pages 42 - 45)

1  what, every two weeks?
2      A.  I think that is correct, yes, sir.
3      Q.  Did you ever go back and look at during
4  that two-week period how your pay was broken up?
5      A.  I'm trying to recall.  And I think you said
6  Pay.com.  It was Paycom.
7          I don't recall printing anything out,
8  to be honest with you, sir.  I think any time I
9  referenced that, it was either what was going to be
10  directly deposited, as I said before, you know, my
11  net pay distribution after my taxes and deductions,
12  as well as looking at my personal checking account
13  where it was deposited.
14      Q.  All right.  So in the beginning -- let's
15  talk about your daily activity from the very
16  beginning on the -- past orientation.
17          But when you were -- for the first
18  three months when you were leaving before sunrise,
19  did you-all have a safety meeting every day?
20      A.  I believe that we -- there was a meeting
21  every morning.  And then once we arrived to our
22  landing zone, we would conduct a job hazard or job
23  safety analysis and all sign it.  There was meetings
24  in the morning.  That was mainly for our on-site
25  management, our foremen, and our general foremen to

Page 46

1  discuss what we were needing to do that day.  We
2  weren't a part of that meeting, but there were
3  meetings every morning.
4      Q.  But you would have a -- what you would call
5  more of a safety meeting at the landing zone?
6      A.  Yes, sir.
7      Q.  Before you went out?
8      A.  Correct.  Before we began work, I would
9  say.
10      Q.  All right.  So were you ever involved in
11  driving the truck or handling any type of equipment
12  yourself?
13      A.  I would say I didn't handle any equipment.
14  I did frequently drive one of our company trucks
15  with, as I said before, our ladders and tools and
16  rigging.
17      Q.  And when you say "frequently," were you
18  actually in charge of doing that?
19      A.  I was not in charge.  Our foreman was in
20  charge, but we would frequently rotate -- whoever
21  drove out to the landing zone in the morning would
22  typically not be the same person who drove from the
23  landing zone back in the evenings.  We would rotate
24  our drivers.
25      Q.  So did you ever -- you were working

Page 47

1  basically seven days a week at that time in the very
2  beginning, correct?
3      A.  Yes, sir.  That is correct.
4      Q.  And were you ever -- and we talked about
5  the fact that you were working sun up until sundown.
6  So it sounds like, based on what you're telling me,
7  that it was more than 12 hours.
8      A.  There were obviously variations depending
9  on where we were going.  And more so for us, weather
10  played a big factor in -- if it was too windy, if it
11  was raining, if it was cloudy, it made it much more
12  difficult for us to do our work out of the
13  helicopter.
14      Q.  So what did you do if you didn't do your
15  work out of the helicopter?
16      A.  We would remain on-site.  We would assist
17  the ground crew if necessary or basic housekeeping:
18  Reorganizing our trucks, cleaning and inspecting our
19  tools.  We always found usually something to do
20  during the workday if we weren't able to do what we
21  were normally doing.
22      Q.  So in the beginning -- at the beginning of
23  the day and at the end of the day, did they have a
24  system in place to account for everybody?  Everybody
25  was checking in and --

Page 48

1      A.  If they did, it was not known to me.
2      Q.  Didn't they want to make sure that, you
3  know, if you had a small crew, four- to six-man crew,
4  that everybody was on board, meaning that they were
5  there and going to be on the helicopter?  Point being
6  if somebody was sick and you needed to replace that
7  person, certainly that was a known quantity, correct?
8      A.  I would say that given our smaller crew
9  size, accountability was very easy to do.
10      Q.  Okay.  Did you take off holidays, sick
11  days, anything of the sort?
12      A.  While we were on the island, no.  And as a
13  matter of fact, I recall working on Christmas Day of
14  2017.
15      Q.  How about sick -- did you ever get sick on
16  the island?
17      A.  Not that I can recall, no, sir.
18      Q.  Okay.  Did you ever return home for any
19  vacation period when you were there?
20      A.  I believe so.  I believe -- I'm not as
21  confident, but I believe that I returned home -- I'm
22  not real confident on that.
23      Q.  Okay.  Was there a company out there called
24  Tech Serve?
25      A.  Yes.

Page 49

13 (Pages 46 - 49)

1     Q.   And what did they do?
2     A.   I believe that they were inspecting our
3  work.  But other than that, I don't really know much
4  more about them.  But they were on the island, yes,
5  sir.
6          Let me add to that that during the
7  early period, I don't recall seeing them around.
8  That wasn't until later in our time on the island
9  that we began to see them more.  So I'm not sure when
10  they got there and began their work, time frame-wise.
11     Q.   Were they documenting stuff, or what were
12  they -- taking pictures?
13     A.   I can't speak to their scope of work or
14  their contract.  I'm actually employed now as an
15  inspector, so I'm familiar with the job.  I just
16  don't know when they got there and what their scope
17  of work would have been in regards to what we were
18  doing.
19     Q.   Okay.  Now, your main complaint in this
20  case is that you were not getting paid for
21  overtime -- is that correct -- during a period of
22  time?
23     A.   Yes, sir.
24     Q.   How did you know that -- after you quit the
25  company, before this lawsuit was filed, how did you

1  you hired him, right?
2     A.   I would imagine.  I don't recall at the
3  moment.
4     Q.   Well, let's put it this way.  You're not
5  paying him by the hour, correct?
6     A.   I'm not aware of Mr. Welmaker's
7  compensation for his time on this case, to be honest
8  with you.
9     Q.   Well, doesn't it work like if he's not
10  successful getting you money, that that's the way
11  you're going to get money and the way he's going to
12  get paid?
13     A.   Again, I am no expert in the law.  I don't
14  know if we fail to win our case the accounting for
15  that or, you know, if we win -- that's beyond me.  I
16  can't speak to that.
17     Q.   And you don't have any idea -- well, you at
18  least have an idea based on these interrogatories
19  what sort of damages are being claimed there?
20     A.   That is correct, yes, sir.
21     Q.   And before that, did you have any idea of
22  what your damages were?
23     A.   No, sir.  I had no idea at all.
24     Q.   Okay.  When you were on the island and went
25  to work for $700 a day, had you ever made $700 a day

1  get in touch with your lawyer and know there was a
2  lawsuit or people were bringing lawsuits?  What
3  brought it to your attention?
4     A.   As I recall, this isn't something that I
5  solicited on my own.  A group of us became aware that
6  it was against the law for Higher Power -- and again,
7  I'm no expert in the law, but we became aware that
8  paying us a day rate was incorrect, I guess.  And
9  then that's when I expressed interest in joining the
10  lawsuit.
11     Q.   So how did you hear about it?  I guess
12  that's what I'm --
13     A.   Word of mouth, I would say.
14     Q.   Okay.  And how did you know to call
15  Mr. Welmaker, your lawyer?
16     A.   As I recall, I believe it started with a
17  gentleman named Dale O'Neal, and then Mr. Welmaker
18  either contacted me -- I can't recall if I contacted
19  Mr. Welmaker or he contacted me sometime thereafter.
20     Q.   Okay.  Now, your agreement with
21  Mr. Welmaker is what we call a contingent fee
22  agreement; is that correct?
23     A.   I am unfamiliar and unaware what kind of
24  agreement --
25     Q.   Well, you had to have signed something when

1  before?
2     A.   No, sir.
3     Q.   Was that, like, maybe twice -- two or three
4  times the money you had ever made in a day?
5     A.   It was substantially more than I had made
6  stateside working in this industry.
7     Q.   All right.  When you were on the island,
8  did you ever complain to anybody that you were not
9  getting paid overtime?
10     A.   Not that I can recall, no, sir.
11     Q.   When you were on the island, did you ever
12  recall when you looked at the Paycom app to look at
13  your money that there was -- it was reflected that
14  you were getting paid hourly and overtime pay?
15          MR. WELMAKER:  Objection.  Form.
16  Asked and answered.  You can go ahead and answer.
17     A.   Could you -- the question is a bit
18  confusing to me.
19     Q.   (BY MR. NETTLES)  So you've looked at --
20  let's go back to Exhibit 5.
21     A.   Yes, sir.
22     Q.   You've looked at the -- and let's go back
23  to the page that I had talked to you about earlier.
24     A.   207?
25     Q.   Right.  If you were to go into the app back

1 then and you looked at the earnings -- first of all,
2 if you look at the very top right-hand corner, it
3 reflects hourly, correct?
4    A.  I do see an hourly rate, yes, sir.
5    Q.  All right.  And if you go down and look at
6 Earnings, it has regular and overtime, correct?
7    A.  Yes, I would agree with that.
8    Q.  All right.  And the overtime is -- I
9 believe it's going to -- if you look at it, it will
10 be one and a half times the regular, correct, if you
11 do the math?
12    A.  Well, in my experience in this line of
13 work, yes, I would say -- I would agree in saying
14 overtime is usually time-and-a-half.  However, I
15 would also say I have never been paid an hourly rate
16 that is reflected here with the 11 cents and then 67
17 cents.  Usually it's a flat rate for my hourly pay
18 and then obviously, as you mentioned before,
19 time-and-a-half for your overtime.
20    Q.  All right.  So I guess what I'm asking is
21 that had you gone into the app, you would have been
22 able to look at what would have had -- your taxes,
23 deductions, gross pay, net pay, correct?
24    A.  If that information was available, then
25 yes, sir, I should have been able to see that.

*Page 54*

1    Q.  But that is something that you looked at
2 from time to time?
3    A.  I would say my -- when I used the app to
4 look at my pay, it was my net pay, what can I expect
5 to be coming into my account.  I generally didn't
6 look at gross or deductions.  It was always, like,
7 what is the end pay coming into my account?
8    Q.  So my only question is this:  Had you
9 wanted to look at all of this data, it was available
10 at that time?
11    A.  If I -- if I wanted to double check that my
12 day rate times the number of days equaled my gross as
13 shown here then, yes, I should have been able to
14 check that.
15    Q.  And had you done that, you would have seen
16 regular, overtime, and the same numbers you're
17 looking at here?
18    A.  I will speak for myself, but there were
19 times when I would check with my co-workers about
20 does the rough accounting make sense?  Are we getting
21 paid what they promised to pay us?  And that was
22 always, you know, gross figures.  We, to my
23 recollection, did not pay attention to an hourly
24 rate.
25        And moreover, we never kept a time

*Page 55*

1 sheet, a daily time sheet, which I have done --
2 outside of this period of work, always kept a daily
3 time sheet in this line of work.
4    Q.  Talking about stateside?
5    A.  Yes, sir.
6    Q.  Have you ever been -- strike that.
7        Have you ever worked outside of the
8 States for a storm or other catastrophe any other
9 time other than in Puerto Rico?
10    A.  No, sir.
11    Q.  Have you ever worked any storm-related
12 issues -- whether they were hurricanes or earthquakes
13 or anything else -- stateside?
14    A.  I have worked on storm projects.  However,
15 as I mentioned before earlier, they were miniscule in
16 comparison to this event.
17    Q.  So let me just make sure I understand your
18 testimony.
19        You're not testifying that the data
20 that's on Exhibit 5 was not available.  You're just
21 saying it's not something they looked at?
22    A.  I would say that it's not something that I
23 recall studying.  I can't speak to the availability
24 of the information, but I would -- I would imagine it
25 was available.

*Page 56*

1    Q.  And again, just to make sure that I'm
2 clear, when you got back home to the States after
3 this job, did you ever go, for tax purposes, and
4 print out the data that was on Paycom?
5    A.  No, sir.
6    Q.  All right.  So when you did your taxes,
7 basically you would get your W-2 and that would be
8 it?
9    A.  That is correct, yes, sir.
10    Q.  Okay.  So the other document that we looked
11 at was the earnings statement, correct, Exhibit 3?
12    A.  Exhibit 3 appears to be our time detail
13 report from Paycom.
14    Q.  Now, is this something you ever looked at?
15    A.  If I did, it would have been to count the
16 number of days that I was receiving my day rate.  I
17 don't -- it doesn't look too familiar to me, to be
18 honest.  Exhibit 5 looked maybe slightly more
19 familiar.
20    Q.  Okay.  So you were never concerned whether
21 they had you down for 16 hours or 12 hours or how
22 many hours in a day?
23        MR. WELMAKER:  Objection.  Form.
24        MR. NETTLES:  I'm sorry?
25        MR. WELMAKER:  Form objection.

*Page 57*

1    A. I referred to this to make sure that I was
2 compensated for my work during that day that I was on
3 the island.
4    Q. (BY MR. NETTLES) When you say "during that
5 day," you mean a particular day?
6    A. Yes.
7    Q. So you weren't looking at whether they had
8 you down for 112 hours or --
9    A. No, sir. I was not concerned about my
10 hours. I don't know any of my co-workers who were
11 concerned about checking the validity of our hours.
12    Q. Were you ever in a situation where you had
13 to go back out after you got back to the hotel or to
14 your place you were staying?
15    A. For work?
16    Q. Yes, sir.
17    A. No, sir.
18    Q. Was that a potential expectation, that you
19 would be called back out?
20    A. Not that I was aware of. And to that
21 point, we would frequently go to happy hour after
22 work or have drinks together with no expectation we
23 would be returned to work until the next morning.
24        MR. NETTLES: Doug, why don't we take
25 a minute, get off the record, let me see if I have

1    A. Yes.
2    Q. And then if you go over to Exhibit 7, your
3 income was 178,652.57, correct?
4        (Exhibit 7 marked)
5    A. That's what mine says, yes, sir.
6    Q. (BY MR. NETTLES) Have you ever made that
7 much money before in any other year?
8    A. I don't recall, no, sir. I don't believe I
9 did.
10    Q. Okay. So that would have been, at least to
11 date -- lifetime working, that would have been the
12 most money you've made in one year?
13    A. To date?
14    Q. To date. 12 months.
15    A. No, sir.
16    Q. You made more than that?
17    A. Yes.
18    Q. Where would that be?
19    A. Now.
20    Q. How much are you making a year now?
21    A. I think my W-2 from last year was somewhere
22 around 260 for Box 1. $260,000.
23    Q. Okay. That's good. 2023?
24    A. Correct. Yes, sir.
25    Q. All right. How about in 2022? How did you

1 anything else?
2        MR. WELMAKER: Okay. Sure.
3        (Recess from 11:10 a.m. to 11:12 a.m.)
4    Q. (BY MR. NETTLES) Just in terms of the
5 amount of time you were working, basically it was
6 like one year, four months or so for the company?
7    A. You're asking about the total time I was
8 there?
9    Q. Yes, sir.
10    A. Yes, sir. I believe that's correct.
11 Around a year and a half, slightly under that.
12    Q. You worked the entire year of 2018?
13    A. Well, I was in -- recall the two to three
14 months I left Puerto Rico.
15    Q. Right, for the distribution.
16    A. Yes, sir. With the exception of that, yes.
17    Q. Right. I'm going to mark this here
18 eventually, but your W-2 -- do you recall how much
19 money you made working for Higher Power in 2018?
20    A. I do not, no, sir.
21    Q. All right. Let's mark this as one exhibit.
22        (Exhibit 6 marked)
23    Q. (BY MR. NETTLES) So if you look at
24 Exhibit 6, you can see that your income was
25 12,841.43?

1 do?
2    A. I would have to refer to my W-2. I don't
3 recall that. The reason I recall '23 is I just, you
4 know, did my taxes.
5    Q. Got you. Well, let me ask the question
6 another way.
7        Up until 2018, had you ever made that
8 much money before?
9    A. I don't believe so, no, sir.
10    Q. Okay. Since 2018, obviously you did last
11 year.
12    A. Yes.
13    Q. Was there any other year you made over
14 200,000?
15    A. I would say from the time I began as a
16 contract inspector that I had made more than I made
17 in 2018.
18    Q. As an inspector?
19    A. Yes, sir. I would say starting from the
20 end of 2019, the beginning of 2020 -- since that
21 time, I've made more than I did as reflected on my
22 W-2 in 2018.
23    Q. So you're now -- currently that's your
24 role, as a contract inspector?
25    A. Currently my role is an inspector for the

1 utility.  Two years ago before I hired on with the
2 utility, I was a contract inspector.  So now I am an
3 in-house inspector.
4    Q.  And what do you do as an inspector?
5    A.  Our roles consist of going to check on
6 various transmission projects, as well as substation
7 projects, ensuring that those projects are performed
8 safely, that they conform to the design
9 specifications of our engineering department, and to
10 help aid in any hurdles or setbacks that may arise.
11       MR. NETTLES:  All right.  Now let's
12 get off the record and let me see if I have anything
13 else.
14       MR. WELMAKER:  Okay.
15       MR. NETTLES:  Just give me five
16 minutes.
17       (Recess from 11:17 a.m. to 11:26 a.m.)
18       MR. NETTLES:  I'm not going to mark
19 this.  This is an exhibit that was previously marked,
20 Doug, in another deposition.  And it's got -- it's
21 marked as Exhibit 151 before, and it's a -- it shows
22 the wage scale.
23    Q.  (BY MR. NETTLES)  Did you ever see this or
24 something similar to this during your orientation?
25    A.  I believe it was similar.

Page 62

1 your lawyers.
2    A.  No, sir.  Not anybody else.
3    Q.  Dale O'Neal, who is he?
4       MR. WELMAKER:  He's the referring
5 attorney that got in touch with me.
6    Q.  (BY MR. NETTLES)  All right.
7    A.  Yes.
8    Q.  So he's a lawyer?
9       MR. WELMAKER:  Yes.
10    A.  To answer your question, Mr. Nettles, no
11 one besides the attorneys I've discussed this case
12 to -- with.
13    Q.  (BY MR. NETTLES)  Do you know any of the
14 other plaintiffs?
15    A.  I don't believe so, no.
16    Q.  You never worked with them, don't know them
17 individually?
18    A.  I don't know that I've seen everyone's
19 name.
20    Q.  Right.
21    A.  But the few that I have seen I don't think
22 were on our crew, so I don't know them.
23    Q.  Okay.  So it's fair to say that there's
24 nobody that was on your crew that you know that's in
25 this lawsuit?

Page 64

1    Q.  Where you would see a per day and a per
2 hour rate?
3    A.  Yes, sir.  Per day is what I paid attention
4 to.
5    Q.  Right.  But do you remember seeing
6 something that said "per hour Puerto Rico storm"?
7    A.  No.  I remember paying attention to the per
8 day.  If we're talking in, you know, regards to my
9 orientation before I left stateside, yes, sir, that's
10 what I was focused on.
11    Q.  You're not saying you didn't see this.  You
12 just don't recall?
13    A.  Right.  I just don't recall.
14    Q.  So with respect to your deposition and
15 getting ready for it and whatnot, did you meet with
16 your lawyer in advance?
17    A.  Yes.
18    Q.  All right.  Did you talk to anybody that
19 has been involved in this lawsuit -- or have you at
20 any time?
21    A.  The only people I've talked to is I had
22 some e-mail correspondence with Dale O'Neal, and then
23 obviously more recently with my attorney, Doug
24 Welmaker.
25    Q.  Let's talk about the people that are not

Page 63

1    A.  Not to my knowledge.
2    Q.  Okay.  Now, were you aware when this
3 complaint was filed that there were certain
4 plaintiffs that had, quote/unquote, an arbitration
5 clause in their contract and they arbitrated their
6 case and the case was stayed with respect to a
7 certain number of folks?
8    A.  If I was informed of that, I don't recall
9 it.
10    Q.  Okay.  Do you know why it's taken so long
11 for your case to get to court?
12    A.  No, sir.  I'm unaware.
13    Q.  And you're unaware that it was stayed and
14 the stay was lifted and it's now going to trial?
15    A.  I believe Doug has told me it's possibly
16 going to trial.
17    Q.  Well, it's -- there's what is,
18 quote/unquote, a trial setting.  Are you aware of
19 that?
20    A.  As I said before, Doug has made mention
21 that there is a possibility of a trial.  Again, he
22 may have worded it the way you did.  I just -- I'm
23 unfamiliar with legal terminology.
24       MR. NETTLES:  Okay.  Doug, I'm going
25 to pass the witness.

Page 65

17 (Pages 62 - 65)

**Page 66**

1    MR. WELMAKER:  We will reserve all our
2  questions until trial.
3    (Whereupon at 11:30 a.m. the
4  deposition was adjourned.)
5    (Signature not requested.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 68**

1    I, BENJAMIN HARGROVE, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5    _____
6         BENJAMIN HARGROVE
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10    Before me,              on this day
11  personally appeared BENJAMIN HARGROVE, known to me or
12  proved to me under oath of _____or
13  through _____(description of
14  identity card or other document) to be the person
15  whose name is subscribed to the foregoing instrument
16  and acknowledged to me that he/she executed the same
17  for the purpose and consideration therein expressed.
18    Given under my hand and seal of office on this
19  day of            ,    .
20
21    _____
22         NOTARY PUBLIC IN AND FOR
23         THE STATE OF _____
24  My Commission Expires: _____
25  ____No Changes Made ____Amendment Sheet Attached

**Page 67**

1      CHANGES AND SIGNATURE
2  WITNESS NAME:  Benjamin Hargrove
3  DATE OF DEPOSITION: March 18, 2024
4  PAGE LINE  CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

**Page 69**

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF TEXAS
2        SAN ANTONIO DIVISION
3  AARON MALDONADO, ET AL   )
   vs.              ) CASE NO. 5:21-cv-85
4  MAMMOTH ENERGY SERVICES, )
   INC., COBRA ACQUISITIONS, )
5  LLC, HIGHER POWER       )
   ELECTRICAL, LLC AND 5 STAR)
6  ELECTRIC, LLC         )
7
8      REPORTER'S CERTIFICATE
9   ORAL DEPOSITION OF BENJAMIN HARGROVE
10        March 18, 2024
11
12    I, Shauna Foreman, Certified Shorthand Reporter
13  in and for the State of Texas, hereby certify to the
14  following:
15    That the witness, Benjamin Hargrove, was duly
16  sworn by the officer and that the transcript of the
17  oral deposition is a true record of the testimony
18  given by the witness;
19    That the original deposition was delivered
20  to Eugene M. Nettles.
21    That a copy of this certificate was served on
22  all parties and/or the witness shown herein on
23  _____.
24    I further certify that pursuant to FRCP Rule
25  30(f)(1), the signature of the deponent:

18 (Pages 66 - 69)

1     _____was requested by the deponent or a party
2 before the completion of the deposition and that the
3 signature is to be before any notary public and returned
4 within 30 days (or _____ days, per agreement of counsel)
5 from date of receipt of the transcript.  If returned, the
6 attached Changes and Signature page contains any changes
7 and the reasons therefor;
8    __x___was not requested by the deponent or a
9 party before the completion of the deposition;
10    I further certify that I am neither counsel for,
11 related to, nor employed by any parties or attorneys
12 in the action in which this testimony is taken, and
13 further that I am not financially or otherwise interested
14 in the outcome of this action.
15    Certified to by me on this the 1st day
16 of April, 2024.
17
18
19       Shauna Foreman, CSR
      Texas CSR 3786
20       Expiration:  10/31/2025
      Veritext Legal Solutions
21       300 Throckmorton Street
      Suite 1600
22       Fort Worth, Texas  76102
      Tel. (817)336-3042
23       Firm No. 571
24
25
                  Page 70

1 COUNTY OF HARRIS   )
2 STATE OF TEXAS     )
3    I hereby certify that the witness was notified
4 on _____ that the witness has 30 days (or
5 _____ days, per agreement of counsel) after being
6 notified by the officer that the transcript is available
7 for review by the witness and if there are changes in
8 the form or substance to be made, then the witness shall
9 sign a statement reciting such changes and the reasons
10 given by the witness for making them;
11    That the witness' signature was/was not
12 returned as of _____, 2024.
13    Subscribed and sworn to on this the _____
14 day of _____, 2024.
15
16
17       Shauna Foreman
18       Shauna Foreman, CSR
      Texas CSR 3786
19       Expiration:  10/31/2025
      Veritext Legal Solutions
20       300 Throckmorton Street
      Suite 1600
21       Fort Worth, Texas  76102
      Tel. (817)336-3042
22       Firm No. 571
23
24
25
                  Page 71

19 (Pages 70 - 71)

**[1 - 6:00]**

| 1 |
|---|
| **1**  3:9 5:3,11 |
| 29:8 35:14 |
| 60:22 69:25 |
| **10/31/2025** |
| 70:20 71:19 |
| **1000**  1:20 2:8 |
| 5:13 |
| **10:27**  38:21 |
| **10:39**  38:21 |
| **10th**  34:20,22 |
| **11**  15:21 54:16 |
| **112**  58:8 |
| **118**  2:4 |
| **11:10**  59:3 |
| **11:12**  59:3 |
| **11:17**  62:17 |
| **11:26**  62:17 |
| **11:30**  1:17 66:3 |
| **11th**  34:10,13 |
| 34:21 |
| **12**  10:6 16:17 |
| 16:19 48:7 |
| 57:21 60:14 |
| **12,841.43**  59:25 |
| **14**  44:2 |
| **14131**  70:18 |
| 71:17 |
| **151**  62:21 |
| **16**  10:5 57:21 |
| **1600**  70:21 |
| 71:20 |
| **17**  8:23 22:24 |
| 30:16,17,18 |
| 31:2 35:3 |

| 178,652.57  60:3 |
|---|
| **17th**  33:5 |
| **18**  1:11 9:12,25 |
| 27:16 31:3 |
| 36:12,15 67:3 |
| 69:10 |
| **18th**  1:16 |
| **19**  9:7,7 |
| **1981**  4:10 |
| **1st**  70:15 |

| 2 |
|---|
| **2**  3:9,11,12 |
| 9:21,22 35:14 |
| 45:2,6,7,15 |
| 57:7 59:18 |
| 60:21 61:2,22 |
| **2/18/18**  43:8 |
| **2/23/18**  43:6 |
| **2/27**  33:7 34:12 |
| **2/27/18**  34:22 |
| 35:4 |
| **2/5/18**  43:8 |
| **20**  30:15 |
| **200,000**  61:14 |
| **2000**  12:24 |
| 13:4,5 |
| **2001**  13:4,5 |
| **2002**  13:19 |
| **2005**  12:10 |
| 14:13,15 |
| **2006**  15:1,14 |
| **2007**  7:25 |
| **2010**  15:21 |
| **2011**  16:14,19 |

| 2013  12:18 |
|---|
| 17:3 18:12 |
| **2014**  12:13 |
| 15:10,14 16:2 |
| **2016**  19:12 |
| **2017**  3:11 |
| 19:14 20:12 |
| 31:21 49:14 |
| **2018**  3:12 33:1 |
| 33:5,19 34:22 |
| 35:20 37:7,20 |
| 59:12,19 61:7 |
| 61:10,17,22 |
| **2019**  31:22 |
| 38:6 61:20 |
| **2020**  61:20 |
| **2022**  60:25 |
| **2023**  60:23 |
| **2024**  1:11,16 |
| 67:3 69:10 |
| 70:16 71:12,14 |
| **207**  42:25 |
| 53:24 |
| **23**  61:3 |
| **23rd**  9:11,25 |
| **260**  60:22 |
| **260,000**  60:22 |
| **27th**  33:1,19 |
| **2nd**  4:10 |

| 3 |
|---|
| **3**  3:10 31:15,17 |
| 57:11,12 |
| **30**  69:25 70:4 |
| 71:4 |

| 300  70:21 |
|---|
| 71:20 |
| **30th**  31:21 34:4 |
| **31**  3:10 |
| **336-3042**  70:22 |
| 71:21 |
| **35**  3:10 |
| **36th**  1:20 2:9 |
| **3786**  70:19 |
| 71:18 |

| 4 |
|---|
| **4**  3:4,10 32:25 |
| 33:6 35:23 |
| 36:4 |
| **409**  2:4 |
| **41**  3:11 |
| **42**  4:12 |
| **43**  4:11,12 |
| **4:00**  40:15 |

| 5 |
|---|
| **5**  1:6 3:9,11 |
| 41:20,21 53:20 |
| 56:20 57:18 |
| 69:5 |
| **571**  70:23 |
| 71:22 |
| **59**  3:11 |
| **5:21**  1:4 69:3 |

| 6 |
|---|
| **6**  3:11 59:22,24 |
| **60**  3:12 |
| **67**  54:16 |
| **6:00**  40:16 |

**[6th - attach]**

| | | | |
|---|---|---|---|
| **6th** 31:21 | 48:24 55:5,7 | **aid** 62:10 | **appearances** |
| **7** | **accountability** | **air** 13:15 | 2:1 |
| | 49:9 | **aircraft** 40:15 | **appeared** 68:11 |
| **7** 3:12 60:2,4 | **accounting** | **airport** 22:6 | **appears** 32:25 |
| **700** 21:12,15 | 52:14 55:20 | **al** 1:3 69:3 | 33:4 42:2,22 |
| 39:7,18 44:2 | **acknowledged** | **allocation** | 43:1 57:12 |
| 52:25,25 | 68:16 | 33:11 | **apprentice** |
| **75601** 2:5 | **acquisitions** | **allow** 18:9 | 18:14 21:4,9 |
| **76102** 70:22 | 1:5 69:4 | **alpine** 17:2 | 21:10 |
| 71:21 | **action** 70:12,14 | **amarillo** 20:11 | **april** 9:7 31:21 |
| **77002** 2:9 | **activity** 46:15 | 21:17 22:4 | 38:6 70:16 |
| **8** | **actually** 12:13 | 23:1 | **arbitrated** 65:5 |
| | 16:10 25:6 | **amendment** | **arbitration** |
| **817** 70:22 | 26:21 47:18 | 68:25 | 65:4 |
| 71:21 | 50:14 | **american** 33:22 | **area** 19:7 |
| **85** 1:4 69:3 | **add** 50:6 | **amount** 59:5 | **army** 12:10 |
| **8th** 8:23 | **adjourned** 66:4 | **analysis** 46:23 | 13:17,21 14:1 |
| **9** | **adjudication** | **answer** 6:8,10 | **arrest** 15:18 |
| | 8:2 | 6:11,11,20 | **arrested** 7:22 |
| **9** 3:9 | **advance** 63:16 | 10:11,12 41:3 | 7:24,25 15:18 |
| **911** 13:14 | **aep** 33:21,22 | 53:16 64:10 | **arrive** 29:15 |
| **9800** 44:3 | 34:2 | **answered** | **arrived** 22:5 |
| **9856** 44:6 | **affix** 68:2 | 53:16 | 46:21 |
| **9:37** 1:17 | **age** 41:11 | **antonio** 1:2 | **arts** 15:13,23 |
| **a** | **ago** 62:1 | 69:2 | **asked** 28:15 |
| | **agree** 6:22 | **anybody** 53:8 | 44:9 53:16 |
| **a.m.** 1:17,17 | 36:24 44:4 | 63:18 64:2 | **asking** 45:14 |
| 38:21,21 40:16 | 54:7,13 | **apologize** 34:18 | 54:20 59:7 |
| 59:3,3 62:17 | **agreement** 6:19 | **app** 32:3 43:12 | **assist** 19:4 |
| 62:17 66:3 | 51:20,22,24 | 43:15 45:5 | 48:16 |
| **aaron** 1:3 69:3 | 70:4 71:5 | 53:12,25 54:21 | **assuming** 6:2 |
| **able** 32:21 | **ahead** 9:20 | 55:3 | 22:2 |
| 48:20 54:22,25 | 10:9,11,12 | **appear** 42:1 | **attach** 24:25 |
| 55:13 | 32:24 53:16 | 43:4 | 25:4 29:21 |
| **above** 1:15 | | | |
| 68:3 | | | |
| **account** 32:19 | | | |
| 41:12 46:12 | | | |

Page 2

**[attached - case]**

**attached** 1:23 68:25 70:6
**attend** 14:17,24
**attended** 12:8
**attending** 15:23
**attention** 20:5 32:17 51:3 55:23 63:3,7
**attorney** 63:23 64:5
**attorneys** 64:11 70:11
**augment** 25:9
**austin** 12:8,13 12:14
**automatically** 41:12
**availability** 56:23
**available** 32:22 43:16 54:24 55:9 56:20,25 71:6
**aviation** 40:23
**aware** 44:16,18 51:5,7 52:6 58:20 65:2,18
**aways** 39:23

**b**

**b** 2:3
**bachelor** 15:13
**back** 9:16 11:5 12:4,19 14:16 14:19 16:21 18:22,24 25:4 25:21 28:10,16 28:18 30:12 34:10 36:21 37:6,10,18,20 38:22 45:20,21 45:23 46:3 47:23 53:20,22 53:25 57:2 58:13,13,19
**backing** 8:21
**bare** 18:14 22:13
**based** 48:6 52:18
**basic** 17:18,25 48:17
**basically** 14:5 15:21 25:11 39:3 48:1 57:7 59:5
**basis** 38:17
**bates** 42:16
**baylor** 13:9
**began** 27:24 33:2 47:8 50:9 50:10 61:15
**beginning** 12:5 30:13 33:1,19 39:13 46:14,16 48:2,22,22 61:20
**believe** 7:23 8:6 8:19,20 9:11 9:12 10:15 12:1 13:5,13 15:16 16:13,25 17:12 18:11 21:22 23:11 27:4,16 28:21 30:24 32:5,22 34:5 37:18 40:22,24 41:24 45:4 46:20 49:20,20,21 50:2 51:16 54:9 59:10 60:8 61:9 62:25 64:15 65:15
**benjamin** 1:10 1:13 3:3 4:1,6 67:2 68:1,6,11 69:9,15
**best** 34:18
**beyond** 52:15
**big** 24:23 25:18 48:10
**bigger** 25:23
**birth** 4:9
**bit** 6:5 12:5,20 38:16 53:17
**board** 49:4
**boss** 18:8
**bottom** 42:16
**box** 60:22
**break** 6:23 35:13 38:19 39:20
**bringing** 21:7 51:2
**brings** 40:21
**broken** 31:6 45:13 46:4
**brought** 51:3
**bucks** 39:7
**build** 24:5
**built** 24:12,13
**bunch** 21:17

**c**

**c** 4:21 30:25 38:5
**caguas** 38:2,5
**calculation** 36:11
**call** 14:19 47:4 51:14,21
**called** 18:11 28:22 29:12 38:2 49:23 58:19
**calling** 33:11
**campbell** 12:11 14:8,9
**campus** 14:20
**capacity** 25:23
**card** 68:14
**cargo** 40:25
**case** 1:4 5:16 8:16 38:9 43:2 50:20 52:7,14 64:11 65:6,6 65:11 69:3

**[catastrophe - controlled]**

**catastrophe**
    56:8
**cause**  1:16
**cedar**  16:18
**cell**  41:11
**center**  23:12
    33:12
**central**  24:1
**centrally**  38:1
**cents**  54:16,17
**certain**  45:5
    65:3,7
**certainly**  22:20
    49:7
**certificate**
    28:12 69:8,21
**certified**  1:18
    69:12 70:15
**certify**  69:13,24
    70:10 71:3
**cetera**  23:3
**chad**  26:16
    27:1
**chain**  24:1,3
**challenges**  24:4
**chance**  26:6
    27:21
**change**  10:3,23
    18:25 41:14
    67:4
**changed**  11:6
**changes**  67:1
    68:25 70:6,6
    71:7,9

**charge**  47:18
    47:19,20
**charged**  7:20
**check**  32:16
    55:11,14,19
    62:5
**checking**  46:12
    48:25 58:11
**christi**  27:19,25
    28:11 33:2
    34:20 35:15,16
**christmas**
    49:13
**circuit**  24:3
**circuits**  24:12
**city**  38:1
**civil**  1:22 8:17
**claimed**  52:19
**class**  16:5
**classes**  14:21
**classification**
    21:2,5,7,8 39:6
**clause**  65:5
**cleaning**  48:18
**clear**  57:2
**client**  17:9 34:1
**close**  19:16
    23:16
**cloudy**  48:11
**coast**  28:22
**cobra**  1:5 9:9
    9:11 11:19,19
    12:2,3 27:5
    69:4

**cocaine**  8:8
**college**  13:8,10
    14:17 15:23
    16:11
**column**  33:11
    33:11
**come**  19:21
    26:11 28:16
**coming**  55:5,7
**commercial**
    22:7
**commission**
    68:24
**community**
    28:24 37:11,24
**companies**  20:1
**company**  4:18
    12:14 16:10
    18:10 45:17
    47:14 49:23
    50:25 59:6
**comparison**
    56:16
**compensated**
    58:2
**compensation**
    20:1 52:7
**complain**  53:8
**complaint**  8:16
    8:17 11:9,10
    50:19 65:3
**completed**  8:2
**completion**
    70:2,9

**computerized**
    1:19
**concerned**
    57:20 58:9,11
**condos**  28:25
**conduct**  46:22
**conductor**
    24:22,25 25:1
    25:2,3,3
**conference**
    20:25
**confident**  39:21
    49:21,22
**conform**  62:8
**confusing**
    53:18
**consideration**
    68:17
**consist**  62:5
**construct**  17:21
**contacted**
    51:18,18,19
**contains**  70:6
**contingent**
    51:21
**continue**  27:10
**continuously**
    30:5 39:20
**contract**  50:14
    61:16,24 62:2
    65:5
**contractor**  4:25
    17:7 18:15
**controlled**  8:1

Page 4

**[controls - deposition]**

**controls** 19:5
**convicted** 7:23
  8:4
**copy** 5:3 69:21
**corner** 54:2
**corpus** 27:19
  27:25 28:11
  33:2,9 34:20
  34:23 35:15,16
  36:20 37:6,10
**correct** 5:19,20
  8:24 9:2 10:7
  11:15 12:1
  15:11 19:17,18
  22:3 31:1
  32:10,11,13
  34:19,25 35:5
  35:9,17 37:11
  37:12 39:9
  42:1,2,21 43:3
  43:9,12 44:3,6
  44:14 46:2
  47:8 48:2,3
  49:7 50:21
  51:22 52:5,20
  54:3,6,10,23
  57:9,11 59:10
  60:3,24 68:3
**corresponden...**
  63:22
**counsel** 70:4,10
  71:5
**count** 57:15
**county** 8:1 68:8
  71:1

**couple** 12:9
**courses** 28:25
**court** 1:1 7:15
  8:13,18 65:11
  69:1
**creates** 24:4
**crew** 18:15
  22:13 23:7,8
  23:22 25:8,9
  25:10 26:3,6
  26:12 28:20
  29:24,25 30:4
  30:5,7 37:14
  48:17 49:3,3,8
  64:22,24
**crews** 30:1,6
**crime** 7:21 8:4
**csr** 70:19,19
  71:18,18
**currently** 4:15
  7:11 61:23,25
**customer** 17:22
**customers**
  17:14
**cv** 1:4 69:3

**d**

**daily** 38:17
  46:15 56:1,2
**dale** 51:17
  63:22 64:3
**damage** 36:11
**damages** 36:17
  36:21 38:9
  43:2 52:19,22

**dark** 40:18
**data** 43:16 55:9
  56:19 57:4
**date** 4:9 8:22
  9:6,11,24
  22:24 31:20
  37:20 43:5
  60:11,13,14
  67:3 70:5
**dates** 12:20
  16:20 27:18
  30:10
**day** 1:16 10:5
  10:14,19 11:7
  11:7 14:19
  20:9 21:6,12
  21:12,15 23:4
  29:5 33:4
  37:21 39:8,12
  39:18,18,22,24
  40:6 44:2
  46:19 47:1
  48:23,23 49:13
  51:8 52:25,25
  53:4 55:12
  57:16,22 58:2
  58:5,5 63:1,3,8
  68:10,19 70:15
  71:14
**daylight** 41:1,5
  41:7
**days** 10:6,6
  39:11 48:1
  49:11 55:12
  57:16 70:4,4

**71:4,5
**daytime** 41:1
**december** 8:23
  20:12 22:24
  31:21 35:7
**decided** 14:23
  15:18
**deductions**
  32:15,18 44:10
  44:13,17,18
  46:11 54:23
  55:6
**defendant** 1:14
**defendants** 2:6
  5:16 36:5
**deferred** 8:2
**define** 32:14
**degree** 12:12
  14:18 15:10,12
  15:19 16:5,23
**delivered** 69:19
**demarcation**
  10:19
**dental** 44:13
**department**
  62:9
**depending** 40:8
  40:13 48:8
**deponent** 69:25
  70:1,8
**deposed** 5:6
**deposited** 32:8
  32:19 46:10,13
**deposition** 1:9
  1:13 3:9 5:4,21

**[deposition - ended]**

5:24 6:5 62:20
63:14 66:4
67:3 68:2 69:9
69:17,19 70:2
70:9
**describing** 25:5
**description** 3:8
68:13
**design** 12:16
17:18,25 18:4
62:8
**designated**
29:11
**designed** 17:16
**detail** 3:10
11:22 31:20,24
57:12
**detailed** 32:5
45:19
**details** 30:2
**determine** 21:1
**determined**
21:5
**developed** 26:9
**diem** 10:16,22
37:22
**different** 13:8
27:15 33:18
40:11 44:6,7
44:14
**difficult** 15:25
48:12
**diploma** 16:1,6
**directly** 4:24
9:9 32:8 46:10

**disability** 44:11
**discharged**
14:11
**discovery** 36:5
**discuss** 47:1
**discussed** 64:11
**distribution**
12:16 27:20
28:5,10,11
31:23 46:11
59:15
**district** 1:1,1
69:1,1
**division** 1:2
69:2
**divorce** 15:4
**divorced** 7:9
**document** 11:3
26:25 27:1
31:18 42:9
45:1,19 57:10
68:14
**documenting**
50:11
**documents**
20:14
**doing** 11:7
12:15,16 17:24
18:2,13 28:4
28:19 34:1
35:25 38:8
40:24 45:23
47:18 48:21
50:18

**dollies** 24:24
**double** 55:11
**doug** 2:5 20:18
36:7 58:24
62:20 63:23
65:15,20,24
**douglas** 2:3
**downtown**
23:16 27:10
**drafting** 17:25
18:4
**drilling** 16:13
**drinks** 58:22
**drive** 47:14
**drivers** 47:24
**driving** 47:11
**drove** 15:16
47:21,22
**due** 25:10
**duly** 1:15 4:2
69:15
**dump** 15:16

**e**

**e** 2:5,10 4:7,7
26:20,24 27:2
27:2,2 30:25
37:19 63:22
**eagle** 17:13
**earlier** 41:16
53:23 56:15
**early** 22:24
50:7
**earning** 43:20
**earnings** 3:11
41:16 43:20

45:12 54:1,6
57:11
**earthquakes**
56:12
**east** 23:25
**easterly** 24:2
**easy** 43:25 49:9
**effective** 9:24
**eight** 30:3
**either** 20:17
22:4 46:9
51:18
**electric** 1:7
4:16,19,23
17:2,8,11
22:13 33:22
69:6
**electrical** 1:6
12:16 17:5
18:1 33:15,20
69:5
**electronic** 45:4
**elongated**
23:25
**employed** 4:15
4:24 16:25
27:23 50:14
70:11
**employment**
15:22
**ended** 13:16
15:4,9 18:9
19:19 20:11
23:5 26:12
28:15 34:19

Page 6

**[ends - floor]**

| | | | |
|---|---|---|---|
| **ends** 17:22 | **exact** 27:17 | **expiration** | **fee** 51:21 |
| **energy** 1:5 9:9 | 37:9 | 70:20 71:19 | **feel** 39:21 |
| 11:12,15 18:20 | **exactly** 11:17 | **expires** 68:24 | **field** 17:14,23 |
| 69:4 | **examination** | **expressed** 51:9 | **figure** 37:9 |
| **enettles** 2:10 | 3:4 4:3 | 68:17 | 44:7 |
| **engineer** 17:18 | **excavations** | **expunged** 8:5 | **figures** 55:22 |
| **engineering** | 24:16 | **external** 40:25 | **filed** 8:16 11:10 |
| 17:17 62:9 | **excel** 18:20,21 | | 11:11 50:25 |
| **enlisted** 12:10 | **except** 68:3 | **f** | 65:3 |
| 13:15 | **exception** | **f** 26:20,24 | **financially** |
| **enrolled** 15:20 | 59:16 | 69:25 | 70:13 |
| **ensuring** 62:7 | **exciting** 14:6 | **faa** 40:24 | **financials** 19:5 |
| **entire** 27:11 | **excuse** 42:14 | **fact** 23:21 26:5 | **find** 20:19 |
| 59:12 | 44:12 | 48:5 49:13 | 26:25 |
| **entries** 32:4 | **executed** 68:16 | **factor** 48:10 | **finding** 10:21 |
| **entry** 33:18 | **exhibit** 3:9,9,10 | **fail** 52:14 | **fine** 37:2 |
| **equaled** 55:12 | 3:10,11,11,12 | **fair** 34:14 | **finish** 15:19 |
| **equipment** | 5:3,11 9:21,22 | 64:23 | 16:5 |
| 19:5 24:7,15 | 31:15,17 35:23 | **fairness** 38:7 | **finished** 12:12 |
| 25:15,25 29:10 | 36:2,4 41:20 | **fall** 13:5 19:12 | **fiorenti** 26:17 |
| 29:20 47:11,13 | 41:21,23 53:20 | 19:14 | 26:24 |
| **esq** 2:3,7 | 56:20 57:11,12 | **familiar** 23:23 | **firm** 70:23 |
| **et** 1:3 23:3 69:3 | 57:18 59:21,22 | 27:6,6 45:11 | 71:22 |
| **eugene** 2:7 | 59:24 60:2,4 | 50:15 57:17,19 | **firmed** 11:6 |
| 69:20 | 62:19,21 | **far** 8:3 20:1 | **first** 4:2 12:15 |
| **evenings** 47:23 | **exhibits** 3:6 | **february** 27:16 | 17:4,6 20:7 |
| **event** 22:16 | **expect** 55:4 | 33:1,5,19 35:7 | 30:21 35:10,14 |
| 56:16 | **expectation** | 36:12 | 38:12 39:1 |
| **eventually** | 58:18,22 | **fed** 19:23 | 41:23 42:13,20 |
| 59:18 | **experience** 21:2 | **fed000207** | 46:17 54:1 |
| **everybody** | 22:10 54:12 | 42:24 | **five** 62:15 |
| 26:11 48:24,24 | **experienced** | **fed000213** | **flat** 24:6 54:17 |
| 49:4 | 28:9 | 42:17 | **flew** 22:1 |
| **everyone's** | **expert** 51:7 | **federal** 1:21 | **floor** 1:21 2:9 |
| 64:18 | 52:13 | 8:18 40:22 | |

Page 7

**[florida - guadalupe]**

**florida** 14:25
**fly** 22:7 24:16
  29:22
**flying** 29:5 41:4
**focus** 38:8
**focused** 63:10
**folks** 29:24
  34:1 65:7
**following** 69:14
**follows** 4:2
**force** 13:16
**ford** 17:13
**foregoing** 68:1
  68:15
**foreman** 1:17
  21:4 26:13,18
  33:21 47:19
  69:12 70:19
  71:18
**foremen** 46:25
  46:25
**form** 10:8
  45:11 53:15
  57:23,25 71:8
**format** 45:17
**fort** 12:11 14:8
  14:9 70:22
  71:21
**forward** 10:15
  15:9
**found** 48:19
**four** 15:24
  24:18 30:3
  37:25 49:3
  59:6

**fourth** 16:4
**frame** 13:19
  50:10
**frcp** 69:24
**fredonia** 2:4
**free** 6:24
**frequently**
  47:14,17,20
  58:21
**freshman** 13:2
**front** 31:5,18
**fsa** 44:13
**full** 4:4,17
  15:20,21
**funding** 15:5
**further** 69:24
  70:10,13
**fuzzy** 14:22
  30:3

**g**

**g** 38:5
**garrett** 33:20
**gas** 12:14
**gated** 28:24
  37:11,24
**general** 26:18
  46:25
**generally** 5:23
  55:5
**gentleman**
  34:16 51:17
**geography**
  15:13
**georgetown**
  12:7,8

**getting** 12:22
  15:4,10 19:15
  19:25 20:15
  24:8 45:8,9,25
  50:20 52:10
  53:9,14 55:20
  63:15
**give** 20:19 21:2
  62:15
**given** 5:21
  10:15 49:8
  68:18 69:18
  71:10
**go** 7:15 8:12,25
  9:20 10:9,11
  10:12 12:4
  14:17 17:22
  20:1 21:25
  23:2 25:1,3,10
  25:17 26:25
  27:13,14,19
  29:11 30:12
  31:2,23 32:20
  32:24 36:15
  37:5 40:10
  42:13,23,24
  43:12,15 45:23
  46:3 53:16,20
  53:22,25 54:5
  57:3 58:13,21
  60:2
**goes** 31:21
  35:19
**going** 5:2 10:3
  15:9 19:20,20

22:9,10 23:5
  25:11 29:23
  31:16,22 35:24
  36:3,7,22 38:8
  38:11 39:7
  40:14 41:19,24
  42:7 46:9 48:9
  49:5 52:11,11
  54:9 59:17
  62:5,18 65:14
  65:16,24
**golf** 28:25
**gonzales** 17:12
**good** 16:8
  26:23 38:4
  60:23
**google** 23:14
**gotten** 45:16
**graduated**
  16:12
**gram** 8:9
**grande** 17:2
  18:1
**grew** 12:7
**gross** 32:12,14
  32:21 45:12
  54:23 55:6,12
  55:22
**ground** 24:7
  25:9,10 48:17
**group** 20:6
  51:5
**guadalupe** 17:8
  17:11

Page 8

**[guess - inspector]**

| | | | |
|---|---|---|---|
| **guess**  16:16,19 | **hear**  51:11 | **honest**  14:22 | **i** |
| 21:4 23:14 | **hedges**  1:20 2:8 | 32:18 43:17 | |
| 32:4 37:25 | **helicopter** | 46:8 52:7 | **idea**  52:17,18 |
| 45:25 51:8,11 | 14:24 15:7 | 57:18 | 52:21,23 |
| 54:20 | 23:7,8,21 25:8 | **honorably** | **identity**  68:14 |
| **guessing**  38:4 | 25:14,16,18,22 | 14:11 | **imagine**  52:2 |
| **guy**  24:19,20 | 26:1,6 28:20 | **hotel**  10:20 | 56:24 |
| 28:8 | 29:6,14,22 | 20:25 23:16,17 | **immersion**  16:3 |
| **guys**  19:22 20:6 | 40:19 48:13,15 | 27:10,11 29:3 | **inclination** |
| 21:18,20,22 | 49:5 | 30:21 58:13 | 24:10 |
| 23:7 26:8,10 | **helicopters** | **hour**  21:14 | **income**  59:24 |

**h**

**half**  8:8 19:9,13
54:10,14,19
59:11
**hand**  18:15
22:13 54:2
68:18
**handle**  47:13
**handling**  47:11
**happened**
11:17 13:14
14:15 20:21
21:25 28:14
35:1
**happens**  23:3
**happy**  58:21
**hargrove**  1:10
1:13 3:3 4:1,6
67:2 68:1,6,11
69:9,15
**harris**  71:1
**hazard**  46:22
**head**  6:13

24:13,14,20
25:22
**help**  62:10
**helped**  19:4
**hereto**  1:23
**high**  12:8,23
17:14 24:5
**higher**  1:6 9:4
9:5,10 11:18
11:21,25 19:16
19:20 20:24
22:10 27:24
28:1 33:15,20
33:24,25 51:6
59:19 69:5
**hire**  8:22 22:24
**hired**  8:25 9:3
18:10 20:15
22:23 23:2
52:1 62:1
**holidays**  49:10
**home**  11:5
14:16 15:5
49:18,21 57:2

45:8 52:5
58:21 63:2,6
**hourly**  10:22
37:21 39:10
53:14 54:3,4
54:15,17 55:23
**hours**  10:2,5,6
10:23,25 39:12
39:24 41:1,2
48:7 57:21,21
57:22 58:8,10
58:11
**house**  62:3
**housekeeping**
48:17
**housing**  10:17
37:23
**houston**  1:21
2:9 5:6,8 22:4
**human**  40:25
**hurdles**  62:10
**hurricane**  20:4
**hurricanes**
20:3 56:12

60:3
**incorrect**  51:8
**index**  3:1
**indicates**  35:22
**indicating**
45:19
**individually**
64:17
**industry**  12:17
53:6
**info**  16:13
**information**
32:22 44:24
54:24 56:24
**informed**  65:8
**initially**  13:15
16:11 20:6
23:11 24:21
27:7 37:24
**inspecting**
48:18 50:2
**inspector**  50:15
61:16,18,24,25
62:2,3,4

Veritext Legal Solutions
346-293-7000

**[instance - lifted]**

**instance** 1:14
11:12
**instruct** 10:11
**instrument**
68:15
**interest** 51:9
**interested**
20:10 70:13
**interrogatories**
3:10 52:18
**investor** 33:23
**involve** 35:17
**involved** 7:7
47:10 63:19
**involvement**
27:7
**island** 11:20
21:23,24 23:13
23:24 25:6
27:24 28:9,16
28:17,18,23
30:8,11,20
31:23 33:4,14
34:11 38:6
49:12,16 50:4
50:8 52:24
53:7,11 58:3
**issue** 36:20
**issues** 56:12

**j**

**jake** 26:17
**jake's** 30:2
**january** 35:7
**job** 12:14,15
19:8 29:6

46:22,22 50:15
57:3
**joining** 51:9
**journeyman**
21:3
**journeyman's**
28:12
**juan** 22:6
**july** 9:11,25
37:20,23
**june** 34:10,13
34:20,21,22
35:20 37:6

**k**

**k** 27:2
**keep** 14:17
**kentucky** 12:11
14:8,10
**kept** 55:25 56:2
**kind** 5:25 7:4
10:18 12:19
14:5 15:12
16:3 17:12,24
19:6,23 22:14
23:5,11 24:2
28:8 40:21
51:23
**knew** 11:21
20:6 21:23
**know** 5:25
11:22 17:17,19
21:3,6,20 22:9
23:23 27:3,7
31:5 32:2,9,15
33:15 34:17

37:19 38:12,25
40:7,9 41:8,11
41:12,13 43:13
45:13 46:10
49:3 50:3,16
50:24 51:1,14
52:14,15 55:22
58:10 61:4
63:8 64:13,16
64:18,22,24
65:10
**knowledge**
65:1
**known** 49:1,7
68:11

**l**

**l** 4:7
**label** 42:16
**lacked** 15:22
**ladder** 29:9
**ladders** 29:9
47:15
**lamar** 16:18,25
17:6
**land** 23:2
**landing** 29:11
29:18 40:8,13
46:22 47:5,21
47:23
**large** 33:23
**larger** 25:23
**las** 28:22
**late** 19:14
30:18 31:2

**law** 2:3 5:12
51:6,7 52:13
**lawsuit** 7:7
8:17 35:17
50:25 51:2,10
63:19 64:25
**lawsuits** 51:2
**lawyer** 5:18 6:2
36:19 51:1,15
63:16 64:8
**lawyers** 5:16
64:1
**ld** 29:17
**learn** 28:11
**learning** 27:19
**leave** 29:11
**leaving** 46:18
**lee** 4:6
**left** 12:9 13:7
17:1 18:20
27:19,22,24
30:8 31:23
37:14 38:5
59:14 63:9
**legal** 65:23
70:20 71:19
**letter** 20:14
**level** 21:4
**liaise** 40:14
**liberal** 15:23
**licensed** 17:18
**lifetime** 60:11
**lift** 25:23
**lifted** 65:14

Veritext Legal Solutions
346-293-7000

**[line - mentioning]**

line 12:17
  17:21 24:6
  54:12 56:3
  67:4
lineman 18:8
  21:3
little 6:5 12:5
  12:20 14:22
  15:17 30:2
  38:16
live 4:13
llc 1:6,6,7 33:15
  69:5,5,6
load 25:23
located 38:1
location 37:13
locations 40:11
logistics 14:3
long 4:22 13:12
  13:17,20 14:23
  15:2 18:6,7,17
  18:21 19:8
  37:16 40:8
  65:10
longest 14:10
longview 2:5
look 11:2 16:21
  20:18 27:17
  31:13 32:4,12
  32:21,23 33:6
  33:10 36:10,12
  41:22 42:13,15
  43:13,16 44:8
  45:23 46:3
  53:12 54:2,5,9

  54:22 55:4,6,9
  57:17 59:23
looked 32:8
  43:14 44:9
  53:12,19,22
  54:1 55:1
  56:21 57:10,14
  57:18
looking 19:24
  31:10 32:25
  43:19 46:12
  55:17 58:7
looks 23:24
  31:20 33:2
  34:4,8,10,19
lot 17:7,13,13
  24:12 28:25
lunch 23:19
lz 29:12,15,18

**m**

m 2:7 27:2
  69:20
machine 1:19
made 9:15
  36:11 48:11
  52:25 53:4,5
  59:19 60:6,12
  60:16 61:7,13
  61:16,16,21
  65:20 68:25
  71:8
magnitude
  22:17
mail 2:5,10
  44:24 63:22

mails 37:19
main 1:20 2:8
  5:13 17:8 32:9
  39:21 50:19
major 22:6
make 18:25
  39:7 49:2
  55:20 56:17
  57:1 58:1
making 20:9
  21:10,14 26:11
  60:20 71:10
malcom 20:23
maldonado 1:3
  69:3
mammoth 1:5
  11:12,15,18,22
  69:4
man 38:4 49:3
management
  46:25
manager 19:2,3
  19:12
manner 6:1
manpower
  25:15
march 1:11,16
  27:16 31:3
  34:4 67:3
  69:10
maria 20:4
marijuana 8:7
mark 9:20 36:1
  41:17 59:17,21
  62:18

marked 5:3,11
  9:21 31:15,17
  35:23 36:4
  41:20,21 59:22
  60:4 62:19,21
married 7:9,11
matches 43:10
materials 17:20
  25:13,15
math 43:25
  44:4 54:11
matter 49:13
mclean 34:16
meals 10:17,20
  23:18,19,20
mean 23:22
  24:14 34:18
  36:23 58:5
meaning 49:4
medical 44:13
medicare 44:10
meet 63:15
meeting 46:19
  46:20 47:2,5
meetings 46:23
  47:3
men 25:25 30:4
menneke 26:16
  27:1
mention 65:20
mentioned
  54:18 56:15
mentioning
  42:3

**[met - okay]**

met   23:6
metroplex   19:7
mexico   16:3
miami   22:5
midland   4:14
   4:17
midst   27:15
military   14:24
mine   60:5
minimum
   13:24,25
miniscule
   56:15
minute   58:25
minutes   62:16
mistaken   23:13
modern   41:11
moment   4:14
   52:3
money   44:16
   52:10,11 53:4
   53:13 59:19
   60:7,12 61:8
months   15:4
   16:2,17 18:22
   28:3 35:7,11
   35:14 37:25
   38:13 39:1
   46:18 59:6,14
   60:14
morning   29:11
   40:17 46:21,24
   47:3,21 58:23
mountain   24:1

mountainous
   24:8 25:13
mountains   24:4
mouth   51:13
move   18:8
moved   12:15
   38:1
moving   10:15
multiple   14:9
multiply   44:2

**n**

n   2:4 4:21
   26:20,24 27:2
   27:2 30:25
name   4:4,18
   23:13,17 26:19
   27:1,6 64:19
   67:2 68:15
named   11:12
   51:17
nearly   22:14
necessary
   48:17
need   6:8,11
   17:20 20:18
needed   17:14
   25:17 49:6
needing   47:1
neither   70:10
net   32:8,10,14
   32:21 43:14
   46:11 54:23
   55:4
nettles   2:7 3:4
   4:4 5:12 9:20

9:22 10:9,23
31:16 35:24
36:1,3,7,10
37:1,4 38:18
38:22 41:17,19
41:22 42:7
53:19 57:24
58:4,24 59:4
59:23 60:6
62:11,15,18,23
64:6,10,13
65:24 69:20
never   7:7,9,17
   7:20 11:14
   28:13 32:17
   54:15 55:25
   57:20 64:16
new   24:4
nice   29:2
nighttime
   40:25
nod   6:13
normally   48:21
north   12:8
notary   68:22
   70:3
noted   68:3
notice   3:9,9 5:4
   9:23 10:2
notified   71:3,6
noting   41:13
number   11:11
   31:17 55:12
   57:16 65:7

numbered   1:16
numbers   55:16

**o**

o   4:21,21 26:20
   26:24 30:25
o'neal   51:17
   63:22 64:3
oath   7:1 68:12
object   10:10
objection   10:8
   53:15 57:23,25
observed   41:9
obviously   22:1
   44:20 48:8
   54:18 61:10
   63:23
occasion   43:23
offer   20:14
offered   19:1
   23:19,20
offering   20:1
office   68:18
officer   69:16
   71:6
offices   1:20
   5:13
official   41:4
oh   34:6
oil   12:14 17:14
okay   5:10 6:12
   6:18,25 8:10
   9:18 12:4
   13:20 15:14
   16:15 22:9
   23:18 26:5

Veritext Legal Solutions
346-293-7000

**[okay - pilot]**

28:18 31:9
32:20 33:13
34:3 35:12
36:6 37:1,3,7,8
41:6,15,25
42:25 45:3
49:10,18,23
50:19 51:14,20
52:24 57:10,20
59:2 60:10,23
61:10 62:14
64:23 65:2,10
65:24
**once** 15:18 21:5
21:5 22:12
25:2 30:6
46:21
**oncore** 4:19,20
4:22 18:16
19:7 22:13
**ones** 25:23
26:10
**op** 17:2,8,11,19
18:2
**operated** 40:10
**operations** 11:7
14:6 24:21
29:7
**opportunity**
19:24
**oral** 1:9,13 69:9
69:17
**orient** 42:8
**orientation**
20:11,21 24:2

30:10 38:16
39:4,6,14,16
46:16 62:24
63:9
**oriented** 24:1
**original** 69:19
**originally** 12:7
24:13
**outages** 22:15
**outcome** 70:14
**outside** 42:3
56:2,7
**overtime** 10:22
37:22 39:11
43:21 50:21
53:9,14 54:6,8
54:14,19 55:16
**own** 10:21
37:23 51:5
**owned** 11:18
33:23

**p**

**p** 30:25
**page** 3:2,8
32:25 33:6,12
41:23 42:13,15
42:18,19,24
53:23 67:4
70:6
**paid** 10:21
32:17 45:8,9
45:25 50:20
52:12 53:9,14
54:15 55:21
63:3

**palmas** 28:22
**panned** 28:13
**paper** 44:22,23
44:24 45:1,17
45:19
**parents** 15:4
**park** 16:18
**part** 14:17,21
25:14 33:24
47:2
**particular**
16:10 58:5
**parties** 11:11
69:22 70:11
**party** 70:1,9
**pass** 16:4 65:25
**past** 34:6,7,9
46:16
**pay** 32:5,8,21
32:21 41:24
42:11,20 43:1
43:5,13,14
44:5 45:19
46:4,11 53:14
54:17,23,23
55:4,4,7,21,23
**pay.com** 43:11
45:24,24
**pay.com.** 46:6
**paycheck** 44:23
**paychecks**
11:24
**paycom** 32:2,3
32:20 35:21
46:6 53:12

57:4,13
**paying** 45:22
51:8 52:5 63:7
**pending** 8:17
**people** 51:2
63:21,25
**performed** 62:7
**period** 10:16
14:10 16:9
28:2 35:2,3,6
35:14,14 37:5
37:9,22 38:12
41:24 42:11,20
43:1,8 46:4
49:19 50:7,21
56:2
**periods** 38:9
**permanently**
25:4
**person** 47:22
49:7 68:14
**personal** 46:12
**personally**
68:11
**personnel**
11:19 19:4
**phone** 26:21
**phones** 41:11
**pick** 16:22
**picking** 36:16
**pickup** 29:8
**pictures** 50:12
**pieces** 24:15
**pilot** 13:11 15:6

**[place - reasons]**

**place** 10:21 28:21 48:24 58:14
**placed** 8:2
**places** 14:9 20:19 25:9
**plaintiff's** 36:5
**plaintiffs** 2:2 64:14 65:4
**played** 48:10
**please** 4:5 36:2 41:18
**plumb** 24:19
**point** 9:10 10:14,19 16:4 28:21 31:14 36:8 39:17 45:21 49:5 58:21
**pole** 25:19
**poles** 17:20
**ponce** 23:6,11 29:4 30:22,23 35:4 40:10
**porter** 1:20 2:8
**porterhedges....** 2:10
**possession** 7:25
**possibility** 65:21
**possibly** 65:15
**potential** 58:18
**power** 1:6 9:4,5 9:10 11:18,21 11:25 12:17

17:15,21 18:11 18:13,17,18,19 18:23,24 19:12 19:17,20,23,23 20:24 22:10 26:9 27:24 28:1 33:15,20 33:22,24,25 51:6 59:19 69:5
**president** 20:24 27:4
**pretty** 11:4,8 24:6 28:12,24 43:24
**prevented** 16:1
**previous** 37:19
**previously** 11:7 62:19
**print** 45:24 57:4
**printing** 46:7
**prior** 5:1 22:9 26:1 33:3
**privately** 14:25
**probably** 12:17
**probation** 8:3
**procedure** 1:22
**proceeding** 7:5
**processing** 23:5
**produced** 1:13
**program** 16:3
**project** 9:24 19:2,3,5,12

**projects** 19:6 56:14 62:6,7,7
**promised** 55:21
**promotion** 19:1
**proved** 68:12
**provided** 10:17 10:19
**provisions** 1:22
**public** 68:22 70:3
**puerto** 9:1,16 9:17 19:20 20:2 22:1,11 22:19 23:2 34:21 41:7 44:11,11 56:9 59:14 63:6
**pull** 24:23,24 25:1
**pulling** 24:22
**pulls** 25:2
**purpose** 68:17
**purposes** 57:3
**pursuant** 1:21 69:24
**put** 19:14 25:18 52:4

**q**

**quantity** 49:7
**quarter** 29:8
**question** 6:16 6:20,21 38:4 41:3 53:17 55:8 61:5 64:10

**questions** 42:6 66:2
**quickly** 28:12
**quit** 27:22,23 50:24
**quitting** 28:15
**quote** 65:4,18

**r**

**r** 4:21 26:20,24
**racks** 29:9
**raining** 48:11
**ran** 15:5
**range** 31:21
**rate** 10:14,19 10:22 21:6,12 39:11,18,22 43:21 51:8 54:4,15,17 55:12,24 57:16 63:2
**rates** 37:21
**read** 8:20 68:1
**ready** 63:15
**real** 16:20 38:19 49:22
**really** 15:25 19:4 20:9 27:5 28:13 32:17 43:18 50:3
**reason** 26:12 31:14 61:3 67:4
**reasons** 70:7 71:9

Page 14

**[recall - right]**

**recall** 7:6 9:7
9:18 12:18
20:8 21:11,15
23:17 39:17
40:1 41:9,13
43:17 45:1,17
45:18 46:5,7
49:13,17 50:7
51:4,16,18
52:2 53:10,12
56:23 59:13,18
60:8 61:3,3
63:12,13 65:8
**receipt** 70:5
**receiving** 16:1
57:16
**recently** 63:23
**recess** 38:21
59:3 62:17
**reciting** 71:9
**recollection**
11:8 14:22
20:23 34:17
40:16 45:18
55:23
**reconstruction**
9:24
**record** 1:23 4:5
36:24 38:22
58:25 62:12
69:17
**records** 43:12
**refer** 31:4
37:18 61:2

**reference** 31:22
**referenced** 46:9
**referred** 58:1
**referring** 10:25
37:20 39:14
64:4
**refers** 40:25
**reflect** 41:24
44:23 45:8,24
**reflected** 27:18
43:20 44:5
53:13 54:16
61:21
**reflecting**
42:20
**reflects** 27:1
54:3
**regards** 50:17
63:8
**regular** 24:9
43:21 54:6,10
55:16
**regulation**
40:23
**related** 20:15
56:11 70:11
**relationship**
26:7,9
**remain** 48:16
**remained** 37:24
38:5
**remember**
11:16 21:15
22:4 34:16
39:19 43:18,19

63:5,7
**reorganizing**
48:18
**repeat** 6:16
**replace** 49:6
**report** 3:10
31:20,24 57:13
**reported** 1:19
26:14
**reporter** 1:18
69:12
**reporter's** 69:8
**represents** 5:16
**request** 28:6,6
28:8
**requested** 66:5
70:1,8
**required** 15:24
**reserve** 66:1
**reserves** 13:16
**resigned** 9:8
**resigning** 18:10
**resort** 28:24
**respect** 5:24
11:9,24 26:1
27:9 37:4
63:14 65:6
**responses** 36:5
**responsible**
10:20 37:23
**rest** 23:6
**restoration**
9:23
**return** 15:19
49:18

**returned** 15:5
28:17,20 34:20
49:21 58:23
70:3,5 71:12
**reverse** 25:1
**review** 71:7
**rico** 9:1,16,17
19:21 20:2
22:1,11,19
23:2 34:21
41:7 44:11,11
56:9 59:14
63:6
**rigging** 47:16
**right** 4:13 5:2
6:15 7:2,17,20
8:12,15 9:3,6
9:13,25 10:3
11:4,9 12:19
12:25 14:1,4
14:15 16:11,12
18:21 20:7
21:24 30:19,23
31:16 32:6,24
33:17 34:12,13
35:2,8,19
37:16 38:7,24
39:8 40:2,12
41:16 42:19
43:5,11,24
44:5,20 45:15
46:14 47:10
52:1 53:7,25
54:2,5,8,20
57:6 59:15,17

**[right - sir]**

59:21 60:25
62:11 63:5,13
63:18 64:6,20
**rio**   17:2 18:1
**robert**   20:23
**rock**   14:21
**role**   25:8 61:24
61:25
**roles**   62:5
**room**   20:25
**rope**   24:22,25
25:2
**rotate**   47:20,23
**rotation**   11:5
**rough**   55:20
**roughly**   14:13
18:19 19:15
23:24 34:22
35:6
**round**   14:20
**rubber**   24:9
**rule**   69:24
**rules**   1:21 5:23

**s**

**s**   38:5
**sack**   23:19
**safely**   62:8
**safety**   46:19,23
47:5
**sag**   25:3
**salary**   45:9
**san**   1:2 22:6
69:2
**savings**   41:8

**saying**   54:13
56:21 63:11
**says**   9:23 33:15
33:20,21,25
42:17 44:10
60:5
**scale**   62:22
**schedule**   11:2,4
**school**   12:8,23
15:19,20
**scope**   50:13,16
**seal**   68:18
**secure**   18:11,13
18:18,19,23,24
19:13,23,24
26:9
**security**   44:10
**see**   31:8 32:4
33:10,14,25
34:3,9 42:17
42:18 43:10
50:9 54:4,25
58:25 59:24
62:12,23 63:1
63:11
**seeing**   50:7
63:5
**seeking**   38:9
43:2
**seen**   8:15 31:24
55:15 64:18,21
**seldom**   43:22
**sense**   55:20
**sent**   8:19

**september**   4:10
4:12
**serve**   49:24
**served**   69:21
**services**   1:5 9:9
11:12,15 16:18
17:1,6 69:4
**set**   24:16 41:23
**setbacks**   62:10
**setting**   65:18
**seven**   10:5 48:1
**shale**   17:13
**shape**   23:24
**shauna**   1:17
69:12 70:19
71:18
**sheet**   34:24,25
56:1,1,3 68:25
**sheets**   27:17,18
31:4,7,11
35:22
**short**   38:19
**shorthand**   1:18
69:12
**show**   5:2 31:17
35:24 36:3
41:19
**showing**   22:24
**shown**   55:13
69:22
**shows**   36:13
45:12 62:21
**shy**   4:25
**sick**   49:6,10,15
49:15

**side**   17:5
**sign**   46:23 71:9
**signature**   66:5
67:1 68:2
69:25 70:3,6
70:18 71:11,17
**signed**   13:23
51:25
**similar**   11:5,8
62:24,25
**sir**   4:5,8 5:7,9
5:14,17,20,22
6:1,4,7,12,14
6:22 7:3,6,8,10
7:12,16,19 8:6
8:8,11,24 9:2,5
9:14 10:1,4
11:13 12:1
13:2,25 14:12
15:8,11 16:7
18:5 19:18
20:4,4,16
21:19 22:8,12
22:18,25 23:9
25:8 26:4,7,15
26:17 27:12
28:2 29:4 30:6
30:22 31:12
32:1,3,23 33:8
34:18 35:1,5,9
35:18,21 36:14
36:18 37:12,15
38:10,14,23,24
39:9 42:10,12
42:18,22 43:4

**[sir - substance]**

43:10 44:4,15
44:19 46:2,8
47:6 48:3
49:17 50:5,23
52:20,23 53:2
53:10,21 54:4
54:25 56:5,10
57:5,9 58:9,16
58:17 59:9,10
59:16,20 60:5
60:8,15,24
61:9,19 63:3,9
64:2 65:12
**site** 46:24 48:16
**situated** 17:11
**situation** 27:14
58:12
**six** 10:6 16:17
18:22 39:20
49:3
**size** 49:9
**slightly** 27:14
44:6 57:18
59:11
**small** 24:15
49:3
**smaller** 22:15
22:16 24:15
25:24 49:8
**social** 44:10
**solicited** 51:5
**solutions** 70:20
71:19
**somebody** 49:6

**sorry** 57:24
**sort** 8:21 22:21
44:25 45:10
49:11 52:19
**sounds** 8:24
29:2 48:6
**source** 18:18
**southeast** 28:22
**southern** 23:12
**southwest**
14:20
**spanish** 15:22
16:5
**speak** 50:13
52:16 55:18
56:23
**specialist** 14:3
**specific** 39:18
**specifically**
8:25
**specifications**
62:9
**specifics** 22:22
**spell** 26:19 38:3
**spelling** 26:23
**spending** 16:2
**spent** 12:9
**spot** 37:17
**spring** 13:5
**staff** 17:18
**stake** 17:22
**staking** 17:25
18:4
**stands** 43:23

**star** 1:6 69:5
**start** 24:7,22
29:22 34:12
40:6 43:8
**started** 12:15
15:21 16:17
19:25 30:17
35:3 41:5
51:16
**starting** 33:7
36:12 61:19
**starts** 36:16,16
**state** 1:18 4:4
13:10 14:18
68:7,23 69:13
71:2
**stated** 1:22
**statement**
41:16 57:11
71:9
**statements**
3:11
**states** 1:1 56:8
57:2 69:1
**stateside** 53:6
56:4,13 63:9
**stationed** 12:11
14:7,9
**stay** 10:21
13:12,20 27:10
65:14
**stayed** 13:6
65:6,13
**staying** 23:15
27:9 28:23

37:11 58:14
**steep** 24:8,10
**stenotype** 1:19
**step** 29:3
**steven** 34:15
**stipulates**
40:23
**stood** 29:18
**stop** 6:16,23
22:5
**storm** 22:11,14
56:8,11,14
63:6
**straight** 13:1
**street** 1:20 2:8
70:21 71:20
**strike** 44:20
56:6
**string** 24:22
**stringing** 24:21
**structure** 24:23
**structures**
24:16 25:4,20
**struggling**
39:18
**stub** 32:5
**stuck** 21:16
**studying** 56:23
**stuff** 50:11
**styled** 1:15
**subscribed**
68:15 71:13
**substance** 8:1
71:8

Page 17

**[substantial - time]**

| | | | |
|---|---|---|---|
| **substantial** | 39:16,22,23 | **telling** 48:6 | **think** 11:5 |
| 28:25 | 40:19 44:2 | **tennessee** 23:25 | 13:15 14:16 |
| **substantially** | 49:10 58:24 | **termination** | 15:16,20 19:11 |
| 53:5 | **taken** 1:15 | 9:6 | 20:24 23:4 |
| **substation** 19:6 | 32:16 33:3 | **terminology** | 30:6 37:1 38:7 |
| 62:6 | 44:17 65:10 | 65:23 | 41:6,10 46:2,5 |
| **successful** | 70:12 | **terms** 37:13 | 46:8 60:21 |
| 52:10 | **takes** 14:13 | 40:2 59:4 | 64:21 |
| **successfully** 8:3 | **talk** 35:10 37:5 | **terrain** 24:8 | **thinking** 36:24 |
| **sued** 7:17 | 38:12,15,24,25 | 25:10,14 | **third** 37:5 |
| **suite** 2:4 70:21 | 39:3,10,24 | **terrain's** 24:6 | **thorough** 5:25 |
| 71:20 | 42:7 46:15 | **terrible** 29:4 | **thoroughly** |
| **summer** 19:14 | 63:18,25 | **testified** 4:2 7:4 | 8:20 |
| **sun** 48:5 | **talked** 6:3 | **testifying** 56:19 | **three** 13:22 |
| **sundown** 48:5 | 41:15 48:4 | **testimony** | 15:3 28:3 29:8 |
| **sunrise** 40:4,7 | 53:23 63:21 | 56:18 69:17 | 30:1 35:7,11 |
| 40:16,20 46:18 | **talking** 42:4 | 70:12 | 35:14 38:13 |
| **sunset** 40:4 | 56:4 63:8 | **texas** 1:1,19,21 | 39:1 46:18 |
| **supervision** | **tax** 57:3 | 2:5,9 4:14 5:6 | 53:3 59:13 |
| 11:19 30:2 | **taxes** 44:12,19 | 8:1 12:7,9,13 | **throckmorton** |
| **sure** 12:21 | 45:2,6,22 | 13:2,8,10 | 70:21 71:20 |
| 16:20 19:10 | 46:11 54:22 | 14:18,20 15:10 | **ticket** 7:13 |
| 20:19 26:24 | 57:6 61:4 | 16:12 17:2 | **time** 3:10 4:17 |
| 49:2 50:9 | **team** 35:22 | 18:15 19:7 | 6:23 9:3,19 |
| 56:17 57:1 | **tech** 12:9,25 | 22:1 69:1,13 | 10:10,16 11:16 |
| 58:1 59:2 | 13:3 49:24 | 70:19,22 71:2 | 13:14,19 14:10 |
| **swear** 36:8 | **technical** 13:10 | 71:18,21 | 14:17,21 15:20 |
| **switched** 30:6 | 16:18 17:1,6 | **therefor** 70:7 | 15:21,23 16:9 |
| **sworn** 1:15 4:2 | **tel** 70:22 71:21 | **thing** 8:22 | 16:22 18:9 |
| 69:16 71:13 | **telephone** | 15:25 18:3 | 19:10,16 20:24 |
| **system** 48:24 | 25:19 | 20:13 25:11 | 21:21 25:7 |
| **t** | **tell** 6:17 12:5 | 32:9 35:25 | 27:11,15,17,18 |
| | 21:13,25 23:2 | 41:15 | 28:21 31:4,7 |
| **t** 26:20,24 | 31:10 33:9 | **things** 17:5 | 31:10,20,24 |
| **take** 6:23 20:17 | 35:10 36:23 | 36:8 44:14 | 32:4 34:19,24 |
| 29:21 38:18 | | | |

**[time - utilized]**

34:25 35:2,4
35:15,16 37:9
37:22 38:8
40:14 41:5,7,8
43:2 46:8 48:1
50:8,10,22
52:7 54:14,19
55:2,2,10,25
56:1,3,9 57:12
59:5,7 61:15
61:21 63:20
**times** 44:2 53:4
54:10 55:12,19
**timing** 22:21
30:10
**tired** 24:9
**today** 5:6,18
42:4
**today's** 41:11
**together** 58:22
**told** 17:19 20:8
20:18,22 24:11
26:10,11 28:10
38:25 65:15
**ton** 29:8
**took** 16:1
**tools** 25:15,25
29:9,20 47:15
48:19
**top** 54:2
**total** 16:3 59:7
**touch** 51:1 64:5
**towards** 19:11
**townhomes**
29:1

**track** 15:16
**traffic** 7:13
**training** 13:11
14:24 15:7,7
26:2
**transcript**
69:16 70:5
71:6
**transferred**
34:15
**transferring**
13:16
**transition** 3:9
9:15,23 10:14
**transitioned**
9:10 37:21
**transmission**
18:14 19:6
24:3,6 62:6
**transport**
24:14 25:20,25
**transported**
25:16
**travis** 33:20
**trial** 65:14,16
65:18,21 66:2
**tried** 18:7
**trip** 40:9
**truck** 29:13,14
29:20,21 47:11
**trucks** 29:8,10
47:14 48:18
**true** 68:3 69:17
**try** 22:21 30:9

**trying** 14:16
41:6 42:8 46:5
**tstc** 13:10
**tuesday** 33:7
**turn** 42:23
**twice** 22:12
53:3
**two** 4:25 5:1
13:6 15:17
18:19 23:4
28:2 30:1
37:25 46:1,4
53:3 59:13
62:1
**type** 25:21
40:24 44:17
47:11
**typically** 24:5
32:7 40:6,18
47:22

**u**

**u** 38:5
**ultimately**
12:12 16:5
20:10 22:5
**umbrella** 11:22
**unassigned**
33:16
**unaware** 51:23
65:12,13
**under** 7:1
11:21 30:1
59:11 68:12,18
**undergraduate**
12:12

**understand** 5:5
5:15,23 6:8,14
6:15,17 7:1,3
8:4,22 11:10
56:17
**understanding**
10:13 11:17,23
35:18
**understood**
6:21 39:7
**unfamiliar**
51:23 65:23
**unfortunately**
15:8
**unique** 40:21
**united** 1:1 69:1
**university**
12:13 13:3
15:24 16:12
**unquote** 65:4
65:18
**use** 14:19 24:20
31:22 37:6
**used** 24:14
25:24 32:3,7
55:3
**using** 24:13
25:24
**usually** 40:7
48:19 54:14,17
**utility** 4:16
33:23 62:1,2
**utilized** 25:22

Page 19

**[vacation - wrong]**

| v | | |
|---|---|---|
| **vacation** 49:19 | **warehouse** 14:5 | 27:8 28:10 |
| **validity** 58:11 | **way** 29:7 34:4,8 | 34:3,10 39:5 |
| **valley** 17:8,11 | 35:13 40:3 | 47:7 52:24 |
| **variations** 48:8 | 41:22 43:4 | **west** 18:15 19:7 |
| **varied** 40:9 | 45:13 52:4,10 | 23:25 |
| **various** 40:10 | 52:11 61:6 | **westerly** 24:2 |
| 62:6 | 65:22 | **western** 1:1 |
| **vehicles** 24:9 | **we've** 35:6 | 33:21 69:1 |
| **venture** 17:4,7 | **weather** 22:16 | **whatnot** 63:15 |
| **verbally** 6:11 | 48:9 | **wheels** 24:23 |
| **verify** 26:22 | **week** 10:6 33:3 | **williamson** 8:1 |
| 36:19 | 39:11 46:4 | **win** 52:14,15 |
| **veritext** 70:20 | 48:1 | **window** 42:3,8 |
| 71:19 | **weeks** 39:20 | **windy** 48:10 |
| **visited** 21:1 | 46:1 | **wires** 24:19,20 |
| **voltage** 17:14 | **welmaker** 2:3,3 | **wise** 19:10 |
| 24:5 | 10:8,10 36:9 | 22:21 50:10 |
| **vs** 1:4 69:3 | 36:22 37:3 | **withholding** |

| w | | |
|---|---|---|
| | 38:20 42:5 | 44:11 |
| **w** 3:11,12 45:2 | 51:15,17,19,21 | **witness** 1:14 |
| 45:6,7,15 57:7 | 53:15 57:23,25 | 65:25 67:2 |
| 59:18 60:21 | 59:2 62:14 | 69:15,18,22 |
| 61:2,22 | 63:24 64:4,9 | 71:3,4,7,8,10 |
| **waco** 13:8,10 | 66:1 | 71:11 |
| **wage** 62:22 | **welmaker's** | **wonder** 34:15 |
| **wait** 42:5 | 52:6 | **word** 19:25 |
| **want** 6:23 20:7 | **welmakerlaw...** | 51:13 |
| 22:3 26:21 | 2:5 | **worded** 65:22 |
| 32:15 38:15 | **went** 12:25 | **words** 29:19 |
| 39:19 42:23 | 13:7 17:1 | **work** 4:16 11:2 |
| 45:12 49:2 | 18:24 19:16,19 | 11:4 16:24 |
| **wanted** 32:9,23 | 20:6,7,8,10 | 17:1,24 19:16 |
| 38:25 39:19 | 23:1,3 24:3 | 19:19,20 20:2 |
| 55:9,11 | 25:10 26:8 | 22:11,15 27:19 |
| | | 28:5,7 29:15 |

29:23 31:23
33:2 34:1
39:11,12,20
40:18,22,24
41:4 47:8
48:12,15 50:3
50:10,13,17
52:9,25 54:13
56:2,3 58:2,15
58:22,23
**workday** 48:20
**worked** 4:22
11:14 17:7
18:20 19:22
56:7,11,14
59:12 64:16
**workers** 55:19
58:10
**working** 9:9
10:5,6 11:20
14:17 16:10,17
18:15 21:23
26:8 27:24
33:22 35:4
39:24 40:4,5
40:17 44:1
47:25 48:5
49:13 53:6
59:5,19 60:11
**worth** 42:2
70:22 71:21
**wrong** 26:20

Veritext Legal Solutions
346-293-7000

**[x - zone]**

| x |
|---|
| **x**   70:8 |

| y |
|---|
| **yard**   29:16 |
| **yeah**   30:17 |
| 34:7 36:9,22 |
| 38:20,20 |
| **year**   12:22 13:2 |
| 13:7,13 15:17 |
| 16:4 19:9,13 |
| 41:7 59:6,11 |
| 59:12 60:7,12 |
| 60:20,21 61:11 |
| 61:13 |
| **years**   4:25 5:1 |
| 12:9 13:6,22 |
| 15:24 18:19 |
| 62:1 |

| z |
|---|
| **zero**   36:13 |
| **zone**   29:12,18 |
| 40:8,13 46:22 |
| 47:5,21,23 |

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
 2                    SAN ANTONIO DIVISION
 3   AARON MALDONADO, ET AL       X
                                  X
 4   VS.                          X
                                  X  CASE NO. 5:21-cv-85
 5   MAMMOTH ENERGY SERVICES,     X
     INC., COBRA ACQUISITIONS,    X
 6   LLC, HIGHER POWER ELECTRICAL, X
     LLC AND 5 STAR ELECTRIC, LLC  X
 7
 8
 9
10
11
12                    ORAL DEPOSITION OF
13                      DONALD ROBERTS
14                       JULY 2, 2024
15
16
17
18
19        ORAL DEPOSITION OF DONALD ROBERTS, produced as a
20   witness at the instance of the Defendant and duly sworn, taken
21   in the above styled and numbered cause on the 2nd day of July,
22   2024, from 1 p.m. to 1:58 p.m., before Vickie J. Coody,
23   Certified Shorthand Reporter No. 1672 in and for the State of
24   Texas, via Zoom, pursuant to the Federal Rules of Civil
25   Procedure.
```

EXHIBIT
17

Page 1

| | |
|---|---|
| 1        A P P E A R A N C E S | 1        THE REPORTER:  Today is July 2, 2024.  We are |

```
1          A P P E A R A N C E S
2   FOR THE PLAINTIFF:
3     MR. DOUGLAS WELMAKER
        Welmaker Law, PLLC
4       409 N. Fredonia, Suite 118
        Longview, Texas 75601
5
6   FOR THE DEFENDANT:
7     MR. JAMIE L. HOUSTON
        Porter Hedges LLP
8       1000 Main Street, 36th Floor
        Houston, Texas  77002
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                          Page 2
```

```
1          THE REPORTER:  Today is July 2, 2024.  We are
2   on the record at 1 p.m.  This is the oral deposition of DONALD
3   ROBERTS being conducted remotely through video teleconference.
4          My name is Vickie Coody.  My CSR number is 1672.  I
5   will be administering the oath and reporting the deposition
6   remotely by stenographic means from my office located in
7   Abilene, Texas.
8          The witness is located in Moultrie, Georgia.  He has
9   been identified to me by his driver's license.
10          Will counsel please state your appearances for the
11   record and anyone else present in the room with you?
12          MR. WELMAKER:  Yes.  Doug Welmaker, counsel for
13   plaintiffs and for Donald Roberts.  And there's nobody else
14   here.
15          MR. HOUSTON:  Jamie Houston.  I am the lawyer
16   for Mammoth Energy Services, 5 Star Electric, Higher Power
17   Electrical, and Cobra.
18          THE REPORTER:  Raise your right hand for me
19   please, Donald.
20          Do you solemnly swear or affirm that you are Donald
21   Roberts, and that the testimony you give here today will be
22   the truth, the whole truth, and nothing but the truth, under
23   the penalty of perjury?
24          THE WITNESS:  I do.
25          THE REPORTER:  Thank you, sir.
                                          Page 4
```

```
1                INDEX
2   APPEARANCES..............................2
3   DONALD ROBERTS
4     Examination by Mr. Houston...........5
5   Witness's Signature Page/Corrections....40
6   Reporter's Certificate..................42
7          EXHIBITS
8   Exhibit A..............................19
9     Offer of Employment
10  Exhibit B..............................26
11    Policy
12  Exhibit C..............................26
13    Policy
14  Exhibit D..............................27
15    Employee Checklist
16
17         (Exhibits not provided to the reporter)
18
19
20
21
22
23
24
25
                                          Page 3
```

```
1          DONALD ROBERTS,
2   having been first duly sworn, testified as follows:
3              EXAMINATION
4   BY MR. HOUSTON:
5     Q.  Mr. Roberts, will you say your full name for the
6   record, please?
7     A.  It's Donald Ray Roberts, II.
8     Q.  Uh, before we get started, um, I'm going to go over
9   just a couple of ground rules for you to make this, um,
10  efficient.  Uh, the first is that, we obviously have a court
11  reporter here today and she's jotting down our discussion, and
12  so in order for her to do that effectively, uh, she needs to
13  be sure that we don't talk over each other.  So I'll ask
14  questions and, you know, if you'll allow me to get the full
15  question out, and then I will allow you to provide a full
16  response, and then we'll go back and forth until the
17  conclusion.  Is that good by you?
18    A.  Yes, sir.
19    Q.  Great.  Uh, second thing is:  Verbal responses.
20  Obviously I can see you through this video, uh, but the
21  transcript cannot see your movement.  And so verbal auditory
22  responses would be great.  Deal?
23    A.  Yes, sir.
24    Q.  Okay.  If there's a question you don't understand,
25  uh, feel free to let me know and I'll rephrase it or ask it
                                          Page 5
```

1 again. Is that okay with you?

2    A.   Yes, sir.

3    Q.   Okay.  Um, first, uh, would you start by giving me

4 your home address, please?

5    A.   3718 Georgia Highway 133 North, Doerun, Georgia

6 31744.

7    Q.   And how long have you resided at this address?

8    A.   Four or five years when I bought the house.

9    Q.   Are you from Georgia?

10    A.   Yes, sir.

11    Q.   Uh, do you live alone?

12    A.   No.  I got a wife and a little girl.

13    Q.   Okay.  Do you have a high school degree?

14    A.   Yes, sir.

15    Q.   What year did you finish high school?

16    A.   '96.

17    Q.   Any other, uh, degrees?

18    A.   No, sir.

19    Q.   What about any trainings or certifications?

20    A.   Uh, nothing more than safety training on the job, I

21 guess.

22    Q.   Um, and as far as on the job, I'm assuming that you

23 mean as a lineman?

24    A.   Yes, sir.

25    Q.   What did you do prior to becoming a lineman?

Page 6

1    A.   I worked at a PVC pipe plant in Adel, Georgia, and

2 built mobile homes for a couple of years right out of high

3 school.

4    Q.   You said that was right out of high school?

5    A.   Pretty much, yes, sir.

6    Q.   Okay.  Are you currently employed?

7    A.   Yes, sir.

8    Q.   Where?

9    A.   In California.

10    Q.   How long have you been, uh, working in California?

11    A.   About four years.

12    Q.   Um, how often are you in California for work?

13    A.   I work three months at a time.  Come home every

14 three months for a couple weeks.

15    Q.   And, uh, are you a lineman out there as well?

16    A.   Yes, sir.

17    Q.   Have you ever been deposed before?

18    A.   Mmm, no, sir.

19    Q.   Uh, have you --

20    A.   Not --

21    Q.   Sorry?

22    A.   When I was at that pipe plant, somebody got hurt on

23 the job.  I believe I was in my early 20s.  I think he got

24 hurt or something.  Might have been a deposition there.  I

25 can't remember.  It was something like this.

Page 7

1    Q.   Got it.  Uh, somebody you worked with got hurt on

2 the job and then you participated in some kind of way in -- in

3 that?

4    A.   Yeah.  I had to be, like, a witness in a

5 deposition.

6    Q.   Got it.  Okay.  Is that the only time that you've

7 been deposed?

8    A.   Yeah, I believe so, yes, sir.

9    Q.   You ever been a party to a lawsuit other than this

10 one?

11    A.   No, sir.

12    Q.   Did you have to give any other testimony in that

13 workplace incident?

14    A.   Do what, now?

15    Q.   Sure.  Did you have to give any testimony other

16 than what you did when -- when you were deposed in that

17 workplace incident?  Basically, did you have to go to court --

18    A.   No, sir.

19    Q.   -- to testify?

20       Okay.  Have you ever testified in court?

21    A.   No; no, sir.

22    Q.   Do you remember who you got your paychecks from

23 when you work -- when you worked in Puerto Rico?

24    A.   It was all online.

25    Q.   You said -- say that again?

Page 8

1    A.   It was on a computer online through some app.

2    Q.   Got it.  Do you know which company issued those

3 paychecks?

4    A.   No, sir.

5    Q.   What company did you work for?

6    A.   5 Star.

7    Q.   And you never worked for Mammoth Energy?

8    A.   I mean, I -- I heard that they were part of it,

9 them and Cobra.

10    Q.   Were part of what?

11    A.   They was part of the company, I think, Cobra and 5

12 Star.

13    Q.   Like, they were related companies?

14    A.   Yeah.

15    Q.   Uh, do you remember your supervisor's names?

16    A.   Uh, the two I remember is Richard and a guy named

17 David.

18    Q.   Richard and David?

19    A.   Yeah.

20    Q.   Were they supervising you at different times, or

21 did they overlap?

22    A.   They were -- they were the general foremans.  My

23 super -- my foreman was named Billy Evans on the crew that I

24 was on.

25    Q.   Have you spoken with Mr. Evans since you left

Page 9

3 (Pages 6 - 9)

1  Puerto Rico?
2      A.  Couple of times.
3      Q.  Uh, did you all discuss this lawsuit?
4      A.  Uh, no, sir.  I haven't talked to him in two or
5  three years, probably.
6      Q.  Okay.  Uh, you don't remember Richard's last name?
7      A.  No, sir.  It's been so long ago, I can't -- no.
8      Q.  Got it.  The general foremen, Richard and David,
9  they both worked for 5 Star as well?
10     A.  Uh, yes, sir.
11     Q.  And the same for Billy Evans?
12     A.  Yes, sir.
13     Q.  Uh, what did you do to prepare for your deposition
14  today?
15     A.  Talked to my lawyer.
16     Q.  Did you look at any documents?
17     A.  Yes, sir.
18     Q.  And did you send him any documents?
19     A.  Mmm, no, sir.  I didn't have none to send him.
20  Couldn't find them.
21     Q.  Uh, have you produced all the documents that you
22  believe you have --
23     A.  Yes.
24     Q.  -- that are responsive?
25     A.  Yes, sir.

Page 10

1      Q.  And you also, uh -- sorry.  Strike that.
2          Did you send, uh, any photographs to your lawyer?
3      A.  I did a hat that I had.
4      Q.  And what hat is that?
5      A.  It's a Cobra hat that I still have laying around.
6      Q.  Was that your hat?
7      A.  Yes, sir.
8      Q.  Uh, did you buy it?
9      A.  No, sir.
10     Q.  Where did you get it from?
11     A.  My shop.
12     Q.  Somebody gave it to you, or you found it, or what?
13     A.  Somebody gave it to me up there in Puerto Rico.
14  They passed them out to everybody.
15     Q.  Do you still wear it?
16     A.  No.  It's hanging up in my shop.  That's where I
17  hide all my keys to my tractor and my four wheelers and all my
18  toys I've got.
19     Q.  Got it.  Uh, have you ever -- have you talked to
20  anybody else, um, who is a plaintiff in this lawsuit about
21  this lawsuit?
22     A.  No, sir.
23     Q.  Do you know any of the other plaintiffs in this
24  lawsuit?
25     A.  I'm not really sure.  I haven't really got to

Page 11

1  really stare at the -- list for a long amount of time.
2          (Speaking simultaneously)
3      Q.  Oh, sorry.
4      A.  Yes, sir.
5      Q.  So you have seen the list?
6      A.  I did briefly.
7      Q.  Okay.  Uh, but you don't recall talking to anybody
8  from that list about this lawsuit?
9      A.  No, sir.
10     Q.  Uh, do you still work with anybody who you worked
11  with in Puerto Rico?
12     A.  No, sir.
13     Q.  How did you come to learn about the job in Puerto
14  Rico?
15     A.  I was working in Florida.  Just started there three
16  or four months -- ain't been there long -- and a guy that was
17  staying in the same campground as I was living at -- I brought
18  my camper down there, and he had his camper out there, and I
19  guess he knew somebody that was -- that was going, and through
20  one person to another, I kind of just the right place at the
21  right time.  Just knew somebody that knew somebody within the
22  company that was going.
23     Q.  Got it.  Uh, were you employed at the time?
24     A.  Yes, sir.
25     Q.  What made you decide to leave your job that you had

Page 12

1  to go work for 5 Star?
2      A.  Just wanted to go down there and be part of the --
3  the rebuild down there.
4      Q.  What did you hear about the job before you applied
5  for it?
6      A.  That they were -- the pay, that they were paying
7  $1,000 a day.
8      Q.  Was that more than what you were making at your
9  other job?
10     A.  Yes, sir.
11     Q.  And so was that part of the reason you went down to
12  Puerto Rico, the thousand bucks a day?
13     A.  That was part of it, yes, sir.
14     Q.  And the person who told you that, do you remember
15  his name?
16     A.  No.  That's been so long ago.  I ain't -- he didn't
17  never go, neither.  He backed out.  So pretty much never seen
18  him again after -- when we did go.
19     Q.  Got it.  Um, and did he send you any fliers or any,
20  uh, job postings, or did he just tell you verbally what the
21  job was paying?
22     A.  Verbally what it was paying.
23     Q.  Did you do anything to confirm what the pay was?
24     A.  No, sir.  Just went out on a limb hoping for the
25  best.  Rolled the dice.

Page 13

4 (Pages 10 - 13)

1    Q.   And did you get the best?
2    A.   Sir?
3    Q.   Say again?
4    A.   I didn't hear you.  What did you say?
5    Q.   Oh, yeah.  I -- I said, so did you get the best?
6    A.   Oh, yeah.  The disc?
7    Q.   The best.  You said you were hoping for the best.
8    A.   Oh.
9    Q.   Did you end up getting that?
10   A.   Pretty -- I mean, it was definitely better than
11   what -- where I was.
12   Q.   Good.  How did you apply for the job?
13   A.   I think it was, uh -- I had to fill something out
14   over line, I think, and then they called and they took the
15   first wave and I -- I was on the list for the first wave.
16   Q.   So you were part of the initial group that went
17   down there when things were still --
18   A.   I was there from the very start, yeah.  We had to
19   unload the trucks off the -- off the pier once they got off
20   the -- the barge.
21   Q.   So you slept on the barge when you were first
22   there?
23   A.   When I was first there, I think the first week or
24   two, they had us in the -- some type of resort.  But after
25   they got the barges set up, yeah.  As soon as they got them

Page 14

1    set up, I probably slept on them for nine or ten months,
2    probably.
3    Q.   Okay.  Uh, before you went to Puerto Rico, you
4    filled out something online, you think, and got a call.  Was
5    there an interview?
6    A.   Mmm, no, sir.  Just -- just a time to -- a date and
7    a time to be in Kentucky for orientation, I believe.
8    Q.   Got it.  Um, and did you drive up to Kentucky?
9    A.   Yes, sir.
10   Q.   How long was your orientation?
11   A.   Probably couple hours, maybe.  There was hundreds
12   of people in there, I think.
13   Q.   Uh, do you know what they talked about at
14   orientation in those couple of hours?
15   A.   I don't remember.
16   Q.   Uh, did they talk about safety?
17   A.   I don't -- if they did, it wasn't a whole lot of --
18   so much going on.  It was chaos up in there.
19   Q.   Okay.  So you don't remember anything from
20   orientation in terms of what was discussed?
21   A.   Not much at all.
22   Q.   Okay.  How soon after orientation did you leave for
23   Puerto Rico?
24   A.   Seemed like it was the next day, I believe.
25   Q.   So you drove up with your car and left it in

Page 15

1    Kentucky?
2    A.   I left -- I left it there for a year and a half.
3    Q.   And so you took clothes with you when you went up?
4    A.   Yes, sir.
5    Q.   Okay.  Um, had you been -- had you decided that you
6    were going to go to Puerto Rico when you drove up to Kentucky?
7    A.   Yes, sir.
8    Q.   So it didn't matter what they told you the
9    compensation was as long as it was close to what you were told
10   by your friend?
11   A.   Yes, sir.
12   Q.   And you just wanted to help as well, right?
13   A.   Yes, sir.
14   Q.   Okay.  And you got on a plane, I'm sure, uh, the
15   next day or so; is that right?
16   A.   We got -- got on a, uh, bus.  I think we bussed
17   to a -- I think we flew -- flew private, I think.  Or a
18   charter plane, I mean.
19   Q.   Got it.  Did you sign any papers at orientation?
20   A.   Oh, yeah.  I signed a bunch of them.
21   Q.   You don't remember what those were?
22   A.   Oh, we barely had time to sign them, much less to
23   sit down and read them.
24        (Speaking simultaneously)
25   Q.   Oh, sorry.

Page 16

1    A.   It was a lot of them.
2    Q.   A lot of papers?
3    A.   Yeah.  A bunch of them.
4    Q.   And was it just typical new-hire stuff as -- as you
5    have seen from job to job?
6    A.   For the most part, yes, sir.
7    Q.   Got it.  Did you ask anybody any questions about
8    the job?
9    A.   Uh, I think the only questions most people were
10   asking was, like, how long we had to work before we could come
11   home, you know, for a break or whatnot.
12   Q.   Was that a concern of yours?
13   A.   Uh, yeah, it kind of was.  I mean, I got a wife and
14   kid, so kind of wondering when I would be able to see them.
15   Q.   Got it.  And do you recall what you were told?
16   A.   Uh, yes, sir.  It was, like, work six weeks and be
17   off two weeks.  And then when we got there, it changed from
18   six weeks to four months before we could come home.
19   Q.   Got it.  When you got to Puerto Rico, I'm guessing
20   you landed in San Juan; is that right?
21   A.   Yes, sir.
22   Q.   Did you stay overnight in San Juan?
23   A.   Uh, no.  They took us -- it may have been part of
24   San Juan, but they took us to wherever that resort was.
25   Q.   Okay.  It wasn't the Isla Verde, was it?

Page 17

5 (Pages 14 - 17)

1    A.  I can't -- I don't --
2       (Speaking simultaneously)
3    A.  It was a nice resort, but it had been flooded and
4 destroyed from the hurricane, but they got it back up and
5 going.
6    Q.  So it wasn't the Isla Verde, then.  Got it.
7       All right.  Did you work the first day you were at
8 the resort?
9    A.  I think we hung around there for a day or two
10 before we went and got the trucks off the barge.
11    Q.  Okay.  And then were you assigned to a certain part
12 of the island at that point?
13    A.  I don't believe so.
14    Q.  You were still close to San Juan?
15    A.  Yes, sir.  Until we got our equipment.
16    Q.  And that was a couple of days later?
17    A.  I think.  I'm pretty sure so.
18    Q.  Okay.  Now, you were hired as a journeyman?
19    A.  Yes, sir.
20    Q.  What does it take to become a journeyman?
21    A.  You got to be able to do underground, primary, got
22 to be, uh, qualified in all areas of, uh, power line,
23 overhead, underground, substation.
24    Q.  Um, and so when you went to get the equipment, it
25 was the entire group of -- of workers?

Page 18

1    A.  Yeah.  Yes, sir.  It was a big group.
2    Q.  So it didn't matter --
3       (Speaking simultaneously)
4    Q.  Sorry.
5    A.  Yeah.  I have -- I have so much -- so many -- so
6 many trucks coming in that it took everybody to drive them
7 back.
8    Q.  Okay.  So it was a big group and not just based on
9 job position, right?
10    A.  That's right.  As long as you had a commercial
11 driving license.
12    Q.  And so you did some of the driving?
13    A.  Yes, sir.
14    Q.  Do you recall going through a background check?
15    A.  Uh, I don't recall, but I'm sure they did, though.
16    Q.  What were you told about how much you were expected
17 to work in terms of hours per day?
18    A.  Mmm, I don't think they ever told us anything along
19 that lines, that I can recall.
20    Q.  You said they didn't tell you?
21    A.  Not that I can remember.
22    Q.  Got it.  Okay.  Uh, I'm going to mark this as
23 Exhibit A.  Let's see.
24       Mr. Roberts, are you able to see my screen?
25    A.  Yeah, I can see it.

Page 19

1    Q.  Uh, do you recognize your own handwriting?
2    A.  Yes, sir.
3    Q.  Okay.  Is this your name?
4    A.  Yes, sir.
5    Q.  And it looks like you wrote it?
6    A.  Yes, sir.
7    Q.  Okay.  This is an Offer of Employment from 5 Star,
8 and I'm guessing you've seen it since you wrote your name on
9 it, right?
10    A.  Yes, sir.
11    Q.  Okay.  And there's a portion in here where it says,
12 on the first line, We are pleased that you have accepted the
13 position of journeyman lineman.  Then it tells you about a
14 special assignment in Puerto Rico which is expected to be
15 completed within one year.  Do you see that?
16    A.  Yes, sir.
17    Q.  Then it follows, Our goal is to work twelve hours a
18 day and not to work at night.  Do you see that?
19    A.  Yes, sir.
20    Q.  Okay.  Do you recall the expectation being that you
21 work about twelve hours a day and not at night?
22    A.  I don't recall it, but...
23    Q.  Okay.  Fair enough.  Uh, do you see where there's
24 also this part where it says, As many of you know and are
25 accustomed to with storms, certain situations may arise that

Page 20

1 could require longer hours, but will not exceed sixteen hours.
2 Do you see that?
3    A.  Yes, sir.
4    Q.  Did you ever work more than sixteen hours?
5    A.  Uh, no, sir.
6    Q.  Did you ever work sixteen?
7    A.  Not that I can remember.  We worked --
8    Q.  Sorry?
9    A.  We worked from sunup to sundown.
10    Q.  Okay.  And would you say that's about twelve hours?
11    A.  Yes, sir.
12    Q.  Do you recall when you would have received this
13 offer of employment?
14    A.  I would have -- probably in orientation, maybe.  I
15 don't know.
16    Q.  Okay.  And so if you look down a little bit to the
17 chart, there's a start date that's November 1st, 2017.  Does
18 that sound around the time when you were at orientation?
19    A.  Yes, sir.
20    Q.  And you see here there's a starting hourly rate of
21 $32.  Do you see that?
22    A.  Yes, sir.
23    Q.  Okay.  And then there's a Puerto Rico storm rate,
24 which is sixteen hour paid shift.  Do you see that?
25    A.  Yes, sir.

Page 21

6 (Pages 18 - 21)

1   Q.  Okay.  Then if you go over, it tells you $1,000 per
2   day that will be broken down hourly over sixteen hours daily.
3   Do you see that?
4   A.  Yes, sir.
5   Q.  Do you recall seeing that at orientation?
6   A.  No, sir, I don't recall that.  It's been a long
7   time ago.
8   Q.  I get it.  Uh, would it be fair to say this is your
9   signature here?
10  A.  Yes, sir.
11  Q.  Okay.  Did you ever recall, um, what time you
12  started work in the mornings?
13  A.  I think it was 6.
14  Q.  Okay.  So on the six-hour -- sorry.  On a
15  twelve-hour shift, you would work 6 a.m. to 6 p.m.; is that
16  right?
17  A.  Yes, sir.
18  Q.  You recall working past 6 p.m., correct?
19  A.  I don't -- I don't recall working past 6.
20  Q.  And so to be sure that I'm clear:  You don't
21  recall, uh, working past 6, but you're not saying that you
22  didn't work past 6, right?  You just don't remember?
23  A.  Yeah.  I mean, it's so long ago.  I just know we
24  were -- we were in right before dark every day.
25  Q.  Okay.

Page 22

1   A.  I think it would be safe to say a good twelve hours
2   is probably what we worked every day.
3   Q.  Was it pretty hard work?
4   A.  Some days were.
5   Q.  Do you recall, uh, stopping work early?  Weather or
6   equipment problems, what have you?
7   A.  No, I don't recall.
8   Q.  Okay.
9   A.  Maybe if they had, like, people come in from 5 Star
10  and Cobra a couple of times, they had, like, a big safety
11  meeting, a few days early, we'd come in.
12  Q.  Okay.  And, uh, somebody would talk about safety
13  procedures or safety issues?
14  A.  Uh, not only that, but just how much time, if they
15  think we're going to be up there longer, or stuff, you know,
16  within the company.
17  Q.  Okay.
18  A.  How it was looking as far as time-wise.
19  Q.  And you -- do you remember the names of the people
20  who were --
21  A.  Lord, no.
22  Q.  I'm sorry?
23  A.  Lord, no.
24  Q.  Got it.  Okay.  Lord, no.  Got it.  All right.
25      Um, were you paid biweekly?

Page 23

1   A.  Every two weeks.
2   Q.  Was this the most money you'd made on a job?
3   A.  At that point it was.
4   Q.  You didn't have reason to complain about the money
5   you were making, did you?
6   A.  No, sir.
7   Q.  And so you didn't -- to be sure that I'm clear:
8   And so you did not complain to anybody, right?
9   A.  No, sir.  It looked -- looked right on my check.
10  That was all I was more or less concerned about on what they
11  said they were going to pay.
12  Q.  Got it.  Uh, and when you say it looked right on
13  your check, how were you looking at your check?
14  A.  $1,000 a day.  I was getting paid every two weeks,
15  so my check was saying 14,000 every two weeks, so --
16      (Speaking simultaneously)
17  Q.  Yeah.  I followed that.  Uh, my question is:  What
18  were you using to look at the money you were receiving?  Was
19  it a pay stub, or was it -- did -- did you check an online
20  bank account, or what?
21  A.  I checked that online app that they have.  It's a
22  PayPal, or whatever it was at the time.  I can't remember.
23  Q.  Was it Paycom?
24  A.  Uh, Paycom, yeah.
25  Q.  And so you would go to Paycom and, uh, what did

Page 24

1   Paycom show?
2   A.  It showed that your gross pay, what your gross pay
3   was.
4   Q.  Got it.  Um, do you recall seeing that the gross
5   pay was not exactly $14,000?
6   A.  Yeah.  It was a few cents away.
7   Q.  And that didn't give you any concern, right?
8   A.  No, sir.
9   Q.  And so you never said to anybody, Hey, I got
10  more -- more money than I expected, right?
11  A.  Uh, no, sir.
12  Q.  Got it.  Did you ever look at the hours that were
13  reported in Paycom?
14  A.  I did.
15  Q.  And what was your understanding of those hours on
16  the Paycom app?
17  A.  That was how they was making that $1,000 a day
18  work.  They had to break it down into numbers and make it all
19  add up.
20  Q.  Okay.  That's what the offer letter said, right?
21  A.  $1,000 a day.
22  Q.  Over sixteen hours daily, right?
23  A.  (No response)
24  Q.  I couldn't hear you if you said something.
25  A.  I said, I guess you can look at it like that if

Page 25

1 you -- you can make it look however you want to make it look,

2 but they said $1,000 a day so that's what I was looking for.

3      Q.   Okay.  Did you talk to anybody further, uh, about

4 how much you were making or how much you should make once you

5 got to Puerto Rico?

6      A.   No, sir.

7      Q.   Okay.  I'm marking this as Exhibit B.

8           Mr. Roberts, is this your signature here near the

9 bottom?

10     A.   Yes, sir.

11     Q.   I'm going to ask you whether or not you recall

12 seeing this document.

13     A.   I seen so many on that day.

14     Q.   Got it.  Okay.  Uh, but this is just the 5 Star

15 logo, right?  Do you see that?  It's -- it's black and white,

16 but...

17     A.   Yes, sir.

18     Q.   Okay.  And then you initialed receiving these

19 policies, right?

20     A.   Yes, sir.

21     Q.   Okay.  I'm marking this as Exhibit C.

22          Is this your signature, Mr. Roberts?

23     A.   Yes, sir.

24     Q.   Okay.  And you don't remember receiving this one

25 either, right?

Page 26

1      A.   Mmm, no, sir.

2      Q.   Okay.  Uh, but again, here we have the 5 Star logo,

3 right?

4      A.   Yes, sir.

5      Q.   And this basically is a policy that just says,

6 return our stuff at the end of your employment, right?

7      A.   Right.

8      Q.   Okay.  Mr. Roberts, I'm showing you what I am

9 marking as Exhibit D.  Uh, this is an Employee Checklist.

10 Now, you don't recognize this document, right?

11     A.   There's so many of them.  I'd be lying if I said.

12     Q.   Okay.  Uh, do you remember providing a copy of your

13 driver's license?

14     A.   I don't remember.

15     Q.   Do you remember taking a drug test?

16     A.   I do.

17     Q.   And do you recall, um, taking your social security

18 card or your birth certificate up to Kentucky with you?

19     A.   I'm sure I did, but it was so long ago.

20     Q.   Okay.  Now, I know you said that before your work

21 with 5 Star you were in Florida, right?

22     A.   Yes, sir.

23     Q.   Uh, was that storm work?

24     A.   No, sir.

25     Q.   Had you done storm work before?

Page 27

1      A.   Oh, gosh.  Around -- yeah, I've done several of

2 them.  Worked on a couple of hurricanes, couple of ice storms,

3 couple of tornadoes.

4      Q.   And -- and this was before Puerto Rico, or...

5      A.   Yeah.

6      Q.   Okay.  So do you typically do storm work?

7      A.   No.  I mean, I don't -- I don't storm chase.  I

8 don't -- I don't do that, no.

9      Q.   Okay.  Okay.  In July of 2018, do you recall, um,

10 there being a contract change and the -- and the schedule

11 changing for you guys?

12     A.   Yes, sir.

13     Q.   What do you remember about that?

14     A.   I think they started giving us Sundays off.

15     Q.   So instead of seven days a week, you were working

16 six days a week?

17     A.   I believe so.

18     Q.   Were you still working twelve hours a day?

19     A.   Uh, yes, sir.

20     Q.   Okay.  And you stayed in Puerto Rico employed into

21 2019, right?

22     A.   Yeah.  One of the last ones to leave.

23     Q.   Uh, first in, last out?

24     A.   Yes, sir.

25     Q.   Was that the end of the project?

Page 28

1      A.   As far as I know it was.

2      Q.   And so you were otherwise happy working in Puerto

3 Rico?

4      A.   For the most part, yes, sir.

5      Q.   And then after Puerto Rico, you came back and

6 continued to work for 5 Star?

7      A.   No, sir.

8      Q.   Where did you go after that?

9      A.   I took a month off and hooked up to my camper and

10 went to California and I've been here since.

11     Q.   Got it.  And you're currently in Georgia?

12     A.   I'm on -- I'm in Georgia on vacation for the 4th of

13 July.

14     Q.   Okay.  Do you know whether or not, uh, someone kept

15 track of your time in Puerto Rico?

16     A.   I don't -- I don't know how they done that, to be

17 honest with you.  I don't know if it was my foreman, if he

18 done a time sheet every day, or -- or -- or how they done it.

19     Q.   Do you -- do you remember a company called Tech

20 Serve?

21     A.   I think so.

22     Q.   Do you recall any interactions with, uh, the people

23 who worked for Tech Serve?

24     A.   I remember one guy, but I -- I don't know if that's

25 who he worked for or not, but he was kind of always around.

Page 29

8 (Pages 26 - 29)

1 But I'm not sure what -- what his job was. I -- I'm not --
2 I'm not 100-percent.
3    Q.  Okay.  Do you recall what he was doing when he was
4 around?
5    A.  Seemed like he was, like, maybe over safety or
6 something.
7    Q.  And so what gave you that impression?
8    A.  Because he was always just standing around and
9 watching.
10    Q.  Okay.  Uh, and you weren't responsible for
11 supervising anybody, right?
12    A.  No, sir, I wasn't.
13    Q.  Have you ever worked a job where you were on call?
14    A.  I may have couple of times in the past.  Uh, as a
15 matter of fact, I think when we worked in Atlanta every now
16 and then they would tell us not to go out drinking because we
17 was on call tonight.
18    Q.  When you were in Puerto Rico, uh, were you ever
19 called back to work?
20    A.  No, sir.
21    Q.  Uh, could you have been called back to work?
22    A.  Not that I know of, because they never told us that
23 we were -- anybody was on call, so most of us always went out
24 and there was one bar close to our barge that everybody went
25 to, so...

Page 30

1    Q.  Uh, do you remember there being a policy about no
2 drinking?
3    A.  No, sir.
4    Q.  And so it's your position that you were paid a day
5 rate, right?
6    A.  Yes, sir.
7    Q.  So if you were paid a day rate, um, would you
8 expect to be able to be called back out?
9    A.  I don't understand the question.
10    Q.  Got it.  Uh, if you were being paid for the day as
11 you, uh, allege, do you think that you were subject to being
12 called out when you were needed that day at any time?
13    A.  Uh, being they never told nobody that we was on
14 call, I didn't expect them to.  We wasn't notified, you know,
15 You on call, so we treated it as if we wasn't on call.
16    Q.  You say you treated it as if you were not?
17    A.  Yes, not.
18    Q.  Okay.  Uh, do you think that you could have refused
19 to go back out to handle work if you were asked?
20    A.  No, sir.
21    Q.  You said yes?
22    A.  I wouldn't have refused if they would have told us.
23    Q.  Got it.  Do you ever remember working after dark?
24    A.  No, sir.
25    Q.  Um, in the, uh, fall months and the winter months,

Page 31

1 do you recall what time it got dark?
2    A.  I don't think the time changes there.
3    Q.  You don't think the time changes?
4    A.  I don't think it did.  It may have.  I don't recall
5 them having a time change over there.  I could be wrong.
6    Q.  Okay.  So set the time part aside.  Um, it seems
7 like in the summer months it stays light later into the day,
8 right?
9    A.  (Witness nods head)
10    Q.  And so I'm asking about the other months, the --
11 the winter months where it seems that the sun isn't out quite
12 as much.  Do you remember if you still were working --
13    A.  No.
14    Q.  -- sunrise to sunset at that point?
15    A.  We -- I think we started heading in between 5 and 6
16 every day.
17    Q.  Okay.  And so you didn't work after dark, right?
18    A.  No, sir.
19    Q.  Okay.  When you got back to -- got back from a
20 shift, did you guys go to a laydown yard?
21    A.  Uh, some days we did.  Uh, when we was staying on
22 the barges, we parked the -- most of the equipment outside
23 the -- the barge.
24    Q.  Did you have to, uh, clean equipment when you got
25 back?

Page 32

1    A.  No, sir.
2    Q.  So at what point did you have to clean equipment?
3    A.  We never cleaned equipment.
4    Q.  Okay.  Uh, did you ever have to repair equipment?
5    A.  No.  They had mechanics out there doing that.
6    Q.  Okay.  And so your job was only servicing the power
7 lines?
8    A.  Yes, sir.
9    Q.  And driving?
10    A.  That's right.
11    Q.  How many people worked in your crew?
12    A.  Five.
13    Q.  Uh, you, uh, was it -- you said there was a
14 foreman, a general foreman?
15    A.  Yes, sir.
16    Q.  Who else?
17    A.  Kenneth Bevels, a guy.
18    Q.  Bevels?
19    A.  Ken -- Ken Bevels was -- was one guy on my crew.
20 Bruce Mathis was another guy.  Billy Evans was the foreman.
21 Uh, some guy named Bob.  I don't know Bob's last name.
22    Q.  Okay.  Uh, and the people on your crew changed
23 during your time there, right?
24    A.  Yes, sir.
25    Q.  Okay.  And you haven't spoken with the people on

Page 33

9 (Pages 30 - 33)

1 your crews about your claims in this lawsuit, right?
2     A.   No, sir.
3     Q.   Did you eventually branch out of the San Juan area?
4     A.   Uh, yes, sir.
5     Q.   Where did you go?
6     A.   It was over there where the barges were, right
7 where the eye comes through.
8     Q.   And that's where you spent just all of your time?
9     A.   Where I spent the majority of it.  I can't remember
10 the name of that city.  Humacao, something.
11    Q.   Yeah, that's it.
12         Okay.  Um, how far of a drive is that from, uh, the
13 laydown yard?
14    A.   It's a little bit of a drive, but we always parked
15 in Humacao at the, uh -- at the barges, so we didn't have to
16 park at the yard and then get on a bus.  We just parked
17 outside the barge in our equipment.
18    Q.   Uh, do you recall checking in with someone every
19 morning?
20    A.   No, sir.  Uh, not -- I mean, I had my own foreman,
21 so I -- I -- maybe he done it.  I don't know.  Probably the
22 one that checked in for everybody.
23    Q.   Got it.  Okay.  And during your time in Puerto
24 Rico, you would travel to different parts of the island,
25 right, because you guys would repair a certain part and then

1        (Speaking simultaneously)
2     A.   We as a crew always ate together.
3     Q.   Right.  So it sounds like, you know, if everybody
4 just mutually agreed --
5     A.   We'd -- we'd find a stopping point with whatever we
6 were doing around lunchtime.
7     Q.   Uh, could the foreman say, No, we won't eat lunch
8 right now.  We'll work another thirty minutes?
9     A.   Probably.
10    Q.   But that never happened?
11    A.   Not to my knowledge.
12    Q.   Okay.  And what did you do for dinner?
13    A.   They had food for us there at the barge for dinner,
14 too.
15    Q.   How did it taste?
16    A.   It tasted all right sometimes.  It wasn't the best
17 in the world, but it would do it.  It would get the job done.
18    Q.   Got it.  Um, to go back to lunch for a second.  Uh,
19 how long would you guys stop for lunch?
20    A.   Probably thirty minutes.
21    Q.   Okay.  What did you take?  A sandwich or something?
22    A.   They would -- they had us sandwiches packed in
23 little boxes.  But it was awful, though.  It was horrible.
24    Q.   Sounds like it.
25         What was the process for when you wanted to go back

1 progress a little farther, right?
2     A.   Yes, sir.
3     Q.   Uh, to the best of your estimation, what's the
4 furthest you had to travel in one day for a job?
5     A.   Thirty minutes to an hour, maybe.
6     Q.   Okay.  And that's each way?
7     A.   I guess you can say that.
8     Q.   Were you provided breakfast in the mornings?
9     A.   I had, uh, breakfast on the barge.
10    Q.   And you would eat the breakfast?
11    A.   Uh-huh.
12    Q.   What did you do for lunch?
13    A.   We would go get something to eat.  When we first
14 started, they -- they packed us food for a while.  We brought
15 it with us.  But after a while, we were allowed to go get us
16 something.
17    Q.   Who decided when you guys stopped for lunch?
18    A.   It's up to our discretion.
19    Q.   So could you one day say, All right, I'm going to
20 work and it's time for lunch?
21    A.   We could.
22    Q.   Pardon me?
23    A.   We could.
24    Q.   And so by we, I'm -- I'm -- I'm talking about you
25 specifically.  Not the --

1 Stateside?
2     A.   What do you mean?
3     Q.   Sure.  If you wanted to see your wife and daughter,
4 uh, what did you need to do?
5     A.   On a break?
6     Q.   Yeah.  So if you wanted time away from Puerto Rico,
7 how did that work?  I mean, because you couldn't just walk out
8 the door and fly away, right?
9     A.   Right.  They, uh -- I think the first time or two
10 they -- they bought us tickets to go home.
11    Q.   So you would tell somebody that, Hey, I'm -- I'm
12 going home?
13    A.   Yeah.  We would give them a two or three weeks
14 notice on when we was planning to go home.  But --
15    Q.   And -- sorry.
16    A.   But I think we had to -- we had to -- we had to get
17 our four months in.  We had to work 127 days straight before
18 they let us go home.  Once we got to that point, once we
19 started getting close to that point, All right, we coming up
20 on our four months.  We ready to go home for a couple of
21 weeks, so...
22    Q.   Did, uh, the crew take time off together, or would
23 you go home and come back and somebody else leaves after that?
24    A.   Yeah.  They, uh -- for the most part, I think our
25 whole crew left together at the same time.

10 (Pages 34 - 37)

1   Q.  Got it.
2   A.  And then, uh, they had people coming in relieving
3  everybody.  I think that's when they maybe flew in that second
4  wave, I think.
5   Q.  Were you ever disciplined, um, while you were in
6  Puerto Rico?
7   A.  No, sir.
8   Q.  Were you ever sick?
9   A.  No, sir.
10   Q.  Going back to your pay:  Uh, did anyone ever talk
11  to you about an hourly rate and an overtime rate?
12   A.  No, sir.
13   Q.  And so the only mention of it that, um -- the only
14  mention of the hourly rate would have been in the offer
15  letter?
16   A.  Yeah.  I was only mention of the, uh, daily rate.
17   Q.  Say that again?
18   A.  I said, I was only -- I was only told I was getting
19  a daily rate.
20   Q.  And you don't remember who told you that, right?
21   A.  That's what they was saying, everybody that was --
22  that were going.  Everybody I knew, the group I fell in, we
23  would just talk about the daily rate, what they were paying by
24  the day.
25   Q.  How much money are you seeking in this lawsuit?

Page 38

---

1                    CHANGES AND SIGNATURE
2  PAGE  LINE  CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

Page 40

---

1   A.  Just my overtime.
2   Q.  But you don't have that figure in your mind?
3   A.  I've -- I've seen it.
4   Q.  Okay.  Uh, is there anything that I have not asked
5  you about that you would testify to at trial?
6   A.  I don't understand.  Do what, now?
7   Q.  Sure.  Is there anything else you want to share
8  with me about your claims that you believe support your
9  contention that you were not paid overtime?
10   A.  No, sir.
11        MR. HOUSTON:  You've been my best witness
12  today.
13        I'll pass the witness.
14        MR. WELMAKER:  All right.  We'll reserve all
15  questions until trial.
16        THE REPORTER:  Can I get y'all's orders,
17  please?
18        MR. WELMAKER:  Read and sign, please.
19        MR. HOUSTON:  And the same for me.  Standard is
20  fine.
21        THE REPORTER:  Thank y'all.
22
23        (End of proceedings)
24
25

Page 39

---

1    I, DONALD ROBERTS, have read the foregoing deposition and
2  hereby affix my signature that same is true and correct,
3  except as noted.
4
5          _____
6              DONALD ROBERTS
6
7  STATE OF TEXAS          X
8  COUNTY OF _____    X
9    BEFORE ME, _____, on this day personally
10  appeared DONALD ROBERTS, known to me, or proved to me through
11  identity card or other document or person, to be the person
12  whose name is subscribed to the foregoing instrument and
13  acknowledged to me that he executed the same for the purposes
14  and consideration therein expressed.
15    Given under my hand and seal of office this _____ day of
16  _____, A.D., 2024.
17
18
19          _____
19          Notary Public in and for the
          State of Texas
20
21
22
23
24
25  Job No. HOU6770119

Page 41

---

11 (Pages 38 - 41)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

AARON MALDONADO, ET AL      X
                            X
VS.                         X
                            X  CASE NO. 5:21-cv-85
MAMMOTH ENERGY SERVICES,    X
INC., COBRA ACQUISITIONS,   X
LLC, HIGHER POWER ELECTRICAL, X
LLC AND 5 STAR ELECTRIC, LLC  X

REPORTER'S CERTIFICATION
DEPOSITION OF DONALD ROBERTS
JULY 2, 2024

I, Vickie J. Coody, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, DONALD ROBERTS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the amount of time used by each party at the deposition is as follows:

Mr. Houston - 58 minutes

That the deposition transcript was submitted on _____ to the attorney for Plaintiff for examination, signature, and return to Veritext on or before 30 days;

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes all parties of record:

Mr. Douglas B. Welmaker, Attorney for Plaintiff;
Mr. Jamie L. Houston, Attorney for Defendant;

Page 42

---

doug@welmakerlaw.com

July 18, 2024

Maldonado, Aaron Et Al v. Mammoth Energy Services, Et Al

DEPOSITION OF: Donald Roberts (# 6770119)

The above-referenced witness transcript is available for read and sign.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those on the attached Errata Sheet.

The witness should sign and notarize the attached Errata pages and return to Veritext at errata-tx@veritext.com.

According to applicable rules or agreements, if the witness fails to do so within the time allotted, a certified copy of the transcript may be used as if signed.

        Yours,

        Veritext Legal Solutions

Page 44

---

That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Sworn to by me this 18th day of July, 2024.

*Vickie J. Coody*

VICKIE J. COODY, Texas CSR 1672
Expiration Date: 8/31/25

Page 43

12 (Pages 42 - 44)

**[1 - assignment]**

| 1 | 3 | 9 |
|---|---|---|
| **1**  1:22 4:2 | **30**  42:20 | **96**  6:16 |
| **1,000**  13:7 22:1 | **31744**  6:6 | |

**a**

| 1 | 3 | a |
|---|---|---|
| 24:14 25:17,21 | **32**  21:21 | **a.d.**  41:16 |
| 26:2 | **36th**  2:8 | **a.m.**  22:15 |
| **100**  30:2 | **3718**  6:5 | **aaron**  1:3 42:3 |

**ain't**  12:16 13:16
**al**  1:3 42:3 44:3 44:3
**allege**  31:11
**allotted**  44:15
**allow**  5:14,15
**allowed**  35:15
**amount**  12:1 42:15
**antonio**  1:2 42:2
**anybody**  11:20 12:7,10 17:7 24:8 25:9 26:3 30:11,23
**app**  9:1 24:21 25:16
**appearances** 3:2 4:10
**appeared**  41:10
**applicable**  44:7 44:14
**applied**  13:4
**apply**  14:12
**area**  34:3
**areas**  18:22
**aside**  32:6
**asked**  31:19 39:4
**asking**  17:10 32:10
**assigned**  18:11
**assignment** 20:14

**1**
**1**  1:22 4:2
**1,000**  13:7 22:1 24:14 25:17,21 26:2
**100**  30:2
**1000**  2:8
**118**  2:4
**127**  37:17
**13115**  43:12
**133**  6:5
**14,000**  24:15 25:5
**1672**  1:23 4:4 43:12
**18**  44:2
**18th**  43:9
**19**  3:8
**1:58**  1:22
**1st**  21:17

**2**
**2**  1:14 3:2 4:1 42:8
**2017**  21:17
**2018**  28:9
**2019**  28:21
**2024**  1:14,22 4:1 41:16 42:8 43:9 44:2
**20s**  7:23
**26**  3:10,12
**27**  3:14
**2nd**  1:21

**3**
**30**  42:20
**31744**  6:6
**32**  21:21
**36th**  2:8
**3718**  6:5

**4**
**40**  3:5
**409**  2:4
**42**  3:6
**4th**  29:12

**5**
**5**  1:6 3:4 4:16 9:6,11 10:9 13:1 20:7 23:9 26:14 27:2,21 29:6 32:15 42:6
**58**  42:17
**5:21**  1:4 42:4

**6**
**6**  22:13,15,15 22:18,19,21,22 32:15
**6770119**  44:4

**7**
**75601**  2:4
**77002**  2:8

**8**
**8/31/25**  43:13
**85**  1:4 42:4

**9**
**96**  6:16

**a**
**a.d.**  41:16
**a.m.**  22:15
**aaron**  1:3 42:3 44:3
**abilene**  4:7
**able**  17:14 18:21 19:24 31:8
**above**  1:21 44:5
**accepted**  20:12
**account**  24:20
**accuracy**  44:8
**accustomed**  20:25
**acknowledged**  41:13
**acquisitions**  1:5 42:5
**action**  43:5,8
**add**  25:19
**address**  6:4,7
**adel**  7:1
**administering**  4:5
**affirm**  4:20
**affix**  41:2
**ago**  10:7 13:16 22:7,23 27:19
**agreed**  36:4
**agreements**  44:14

**[assuming - clear]**

**assuming** 6:22
**ate** 36:2
**atlanta** 30:15
**attached** 44:10
  44:12
**attorney** 42:19
  42:24,25
**auditory** 5:21
**available** 44:6
**awful** 36:23

**b**

**b** 3:10 26:7
  42:24
**back** 5:16 18:4
  19:7 29:5
  30:19,21 31:8
  31:19 32:19,19
  32:25 36:18,25
  37:23 38:10
**backed** 13:17
**background**
  19:14
**bank** 24:20
**bar** 30:24
**barely** 16:22
**barge** 14:20,21
  18:10 30:24
  32:23 34:17
  35:9 36:13
**barges** 14:25
  32:22 34:6,15
**based** 19:8
**basically** 8:17
  27:5

**becoming** 6:25
**believe** 7:23 8:8
  10:22 15:7,24
  18:13 28:17
  39:8
**best** 13:25 14:1
  14:5,7,7 35:3
  36:16 39:11
**better** 14:10
**bevels** 33:17,18
  33:19
**big** 19:1,8
  23:10
**billy** 9:23 10:11
  33:20
**birth** 27:18
**bit** 21:16 34:14
**biweekly** 23:25
**black** 26:15
**bob** 33:21
**bob's** 33:21
**bottom** 26:9
**bought** 6:8
  37:10
**boxes** 36:23
**branch** 34:3
**break** 17:11
  25:18 37:5
**breakfast** 35:8
  35:9,10
**briefly** 12:6
**broken** 22:2
**brought** 12:17
  35:14

**bruce** 33:20
**bucks** 13:12
**built** 7:2
**bunch** 16:20
  17:3
**bus** 16:16
  34:16
**bussed** 16:16
**buy** 11:8

**c**

**c** 2:1 3:12 26:21
**california** 7:9
  7:10,12 29:10
**call** 15:4 30:13
  30:17,23 31:14
  31:15,15
**called** 14:14
  29:19 30:19,21
  31:8,12
**camper** 12:18
  12:18 29:9
**campground**
  12:17
**car** 15:25
**card** 27:18
  41:11
**case** 1:4 42:4
**cause** 1:21
**cents** 25:6
**certain** 18:11
  20:25 34:25
**certificate** 3:6
  27:18
**certification**
  42:7

**certifications**
  6:19
**certified** 1:23
  42:10 44:16
**certify** 42:11
  43:4
**change** 28:10
  32:5 40:2
**changed** 17:17
  33:22
**changes** 32:2,3
  40:1 44:9
**changing** 28:11
**chaos** 15:18
**charges** 43:2
**chart** 21:17
**charter** 16:18
**chase** 28:7
**check** 19:14
  24:9,13,13,15
  24:19
**checked** 24:21
  34:22
**checking** 34:18
**checklist** 3:15
  27:9
**city** 34:10
**civil** 1:24
**claims** 34:1
  39:8
**clean** 32:24
  33:2
**cleaned** 33:3
**clear** 22:20
  24:7

**[close - donald]**

**close** 16:9
18:14 30:24
37:19
**clothes** 16:3
**cobra** 1:5 4:17
9:9,11 11:5
23:10 42:5
**come** 7:13
12:13 17:10,18
23:9,11 37:23
**comes** 34:7
**coming** 19:6
37:19 38:2
**commercial**
19:10
**companies** 9:13
**company** 9:2,5
9:11 12:22
23:16 29:19
**compensation**
16:9
**complain** 24:4
24:8
**completed**
20:15
**computer** 9:1
**concern** 17:12
25:7
**concerned**
24:10
**conclusion** 5:17
**conducted** 4:3
**confirm** 13:23
**consideration**
41:14

**contention** 39:9
**continued** 29:6
**contract** 28:10
**coody** 1:22 4:4
42:10 43:12
**copies** 43:3
**copy** 27:12
44:16
**correct** 22:18
41:2
**corrections** 3:5
**counsel** 4:10,12
43:4
**county** 41:8
**couple** 5:9 7:2
7:14 10:2
15:11,14 18:16
23:10 28:2,2,3
30:14 37:20
**court** 1:1 5:10
8:17,20 42:1
**crew** 9:23
33:11,19,22
36:2 37:22,25
**crews** 34:1
**csr** 4:4 43:12
**currently** 7:6
29:11
**cv** 1:4 42:4

**d**

**d** 3:14 27:9
**daily** 22:2
25:22 38:16,19
38:23

**dark** 22:24
31:23 32:1,17
**date** 15:6 21:17
43:13
**daughter** 37:3
**david** 9:17,18
10:8
**day** 1:21 13:7
13:12 15:24
16:15 18:7,9
19:17 20:18,21
22:2,24 23:2
24:14 25:17,21
26:2,13 28:18
29:18 31:4,7
31:10,12 32:7
32:16 35:4,19
38:24 41:9,15
43:9
**days** 18:16 23:4
23:11 28:15,16
37:17 42:20
**deal** 5:22
**decide** 12:25
**decided** 16:5
35:17
**defendant** 1:20
2:6 42:25 43:2
**definitely** 14:10
**degree** 6:13
**degrees** 6:17
**deposed** 7:17
8:7,16
**deposition** 1:12
1:19 4:2,5 7:24

**8:5 10:13 41:1**
42:8,13,16,18
42:21 43:1,2
44:4
**destroyed** 18:4
**dice** 13:25
**different** 9:20
34:24
**dinner** 36:12
36:13
**disc** 14:6
**disciplined**
38:5
**discretion**
35:18
**discuss** 10:3
**discussed** 15:20
**discussion** 5:11
**district** 1:1,1
42:1,1
**division** 1:2
42:2
**document**
26:12 27:10
41:11
**documents**
10:16,18,21
**doerun** 6:5
**doing** 30:3 33:5
36:6
**donald** 1:13,19
3:3 4:2,13,19
4:20 5:1,7 41:1
41:5,10 42:8
42:12 44:4

Page 3

**[door - further]**

**door** 37:8
**doug** 4:12 44:1
**douglas** 2:3
  42:24
**drinking** 30:16
  31:2
**drive** 15:8 19:6
  34:12,14
**driver's** 4:9
  27:13
**driving** 19:11
  19:12 33:9
**drove** 15:25
  16:6
**drug** 27:15
**duly** 1:20 5:2
  42:12

**e**

**e** 2:1,1
**early** 7:23 23:5
  23:11
**eat** 35:10,13
  36:7
**effectively** 5:12
**efficient** 5:10
**either** 26:25
**electric** 1:6
  4:16 42:6
**electrical** 1:6
  4:17 42:6
**employed** 7:6
  12:23 28:20
  43:5
**employee** 3:15
  27:9

**employment**
  3:9 20:7 21:13
  27:6
**energy** 1:5 4:16
  9:7 42:5 44:3
**entire** 18:25
**equipment**
  18:15,24 23:6
  32:22,24 33:2
  33:3,4 34:17
**errata** 44:10,12
  44:13
**estimation** 35:3
**et** 1:3 42:3 44:3
  44:3
**evans** 9:23,25
  10:11 33:20
**eventually** 34:3
**everybody**
  11:14 19:6
  30:24 34:22
  36:3 38:3,21
  38:22
**exactly** 25:5
**examination**
  3:4 5:3 42:19
**exceed** 21:1
**except** 41:3
**executed** 41:13
**exhibit** 3:8,10
  3:12,14 19:23
  26:7,21 27:9
**exhibits** 3:7,17
  43:3

**expect** 31:8,14
**expectation**
  20:20
**expected** 19:16
  20:14 25:10
**expiration**
  43:13
**expressed**
  41:14
**eye** 34:7

**f**

**fact** 30:15
**fails** 44:15
**fair** 20:23 22:8
**fall** 31:25
**far** 6:22 23:18
  29:1 34:12
**farther** 35:1
**federal** 1:24
**feel** 5:25
**fell** 38:22
**figure** 39:2
**fill** 14:13
**filled** 15:4
**financially** 43:7
**find** 10:20 36:5
**fine** 39:20
**finish** 6:15
**first** 5:2,10 6:3
  14:15,15,21,23
  14:23 18:7
  20:12 28:23
  35:13 37:9
**five** 6:8 33:12

**flew** 16:17,17
  38:3
**fliers** 13:19
**flooded** 18:3
**floor** 2:8
**florida** 12:15
  27:21
**fly** 37:8
**followed** 24:17
**following** 42:11
  42:22
**follows** 5:2
  20:17 42:16
**food** 35:14
  36:13
**foregoing** 41:1
  41:12
**foreman** 9:23
  29:17 33:14,14
  33:20 34:20
  36:7
**foremans** 9:22
**foremen** 10:8
**forth** 5:16
**found** 11:12
**four** 6:8 7:11
  11:17 12:16
  17:18 37:17,20
**fredonia** 2:4
**free** 5:25
**friend** 16:10
**full** 5:5,14,15
**further** 26:3
  43:4,6

Page 4

[furthest - instance]

**furthest**  35:4

**g**

**general**  9:22
  10:8 33:14
**georgia**  4:8 6:5
  6:5,9 7:1 29:11
  29:12
**getting**  14:9
  24:14 37:19
  38:18
**girl**  6:12
**give**  4:21 8:12
  8:15 25:7
  37:13
**given**  41:15
  42:14,21
**giving**  6:3
  28:14
**go**  5:8,16 8:17
  13:1,2,17,18
  16:6 22:1
  24:25 29:8
  30:16 31:19
  32:20 34:5
  35:13,15 36:18
  36:25 37:10,14
  37:18,20,23
**goal**  20:17
**going**  5:8 12:19
  12:22 15:18
  16:6 18:5
  19:14,22 23:15
  24:11 26:11
  35:19 37:12
  38:10,22

**good**  5:17
  14:12 23:1
**gosh**  28:1
**great**  5:19,22
**gross**  25:2,2,4
**ground**  5:9
**group**  14:16
  18:25 19:1,8
  38:22
**guess**  6:21
  12:19 25:25
  35:7
**guessing**  17:19
  20:8
**guy**  9:16 12:16
  29:24 33:17,19
  33:20,21
**guys**  28:11
  32:20 34:25
  35:17 36:19

**h**

**half**  16:2
**hand**  4:18
  41:15
**handle**  31:19
**handwriting**
  20:1
**hanging**  11:16
**happened**
  36:10
**happy**  29:2
**hard**  23:3
**hat**  11:3,4,5,6
**head**  32:9

**heading**  32:15
**hear**  13:4 14:4
  25:24
**heard**  9:8
**hedges**  2:7
**help**  16:12
**hey**  25:9 37:11
**hide**  11:17
**high**  6:13,15
  7:2,4
**higher**  1:6 4:16
  42:6
**highway**  6:5
**hire**  17:4
**hired**  18:18
**home**  6:4 7:13
  17:11,18 37:10
  37:12,14,18,20
  37:23
**homes**  7:2
**honest**  29:17
**hooked**  29:9
**hoping**  13:24
  14:7
**horrible**  36:23
**hou6770119**
  41:25
**hour**  21:24
  22:14,15 35:5
**hourly**  21:20
  22:2 38:11,14
**hours**  15:11,14
  19:17 20:17,21
  21:1,1,4,10
  22:2 23:1

  25:12,15,22
  28:18
**house**  6:8
**houston**  2:7,8
  3:4 4:15,15 5:4
  39:11,19 42:17
  42:25
**huh**  35:11
**humacao**  34:10
  34:15
**hundreds**
  15:11
**hung**  18:9
**hurricane**  18:4
**hurricanes**
  28:2
**hurt**  7:22,24
  8:1

**i**

**ice**  28:2
**identified**  4:9
**identity**  41:11
**ii**  5:7
**impression**
  30:7
**incident**  8:13
  8:17
**includes**  42:23
**index**  3:1
**information**
  42:21
**initial**  14:16
**initialed**  26:18
**instance**  1:20

**[instrument - majority]**

**instrument**
41:12
**interactions**
29:22
**interested**  43:7
**interview**  15:5
**isla**  17:25 18:6
**island**  18:12
34:24
**issued**  9:2
**issues**  23:13

**j**

**j**  1:22 42:10
43:12
**jamie**  2:7 4:15
42:25
**job**  6:20,22
7:23 8:2 12:13
12:25 13:4,9
13:20,21 14:12
17:5,5,8 19:9
24:2 30:1,13
33:6 35:4
36:17 41:25
**jotting**  5:11
**journeyman**
18:18,20 20:13
**juan**  17:20,22
17:24 18:14
34:3
**july**  1:14,21 4:1
28:9 29:13
42:8 43:9 44:2

**k**

**ken**  33:19,19
**kenneth**  33:17
**kentucky**  15:7
15:8 16:1,6
27:18
**kept**  29:14
**keys**  11:17
**kid**  17:14
**kind**  8:2 12:20
17:13,14 29:25
**knew**  12:19,21
12:21 38:22
**know**  5:14,25
9:2 11:23
15:13 17:11
20:24 21:15
22:23 23:15
27:20 29:1,14
29:16,17,24
30:22 31:14
33:21 34:21
36:3
**knowledge**
36:11
**known**  41:10

**l**

**l**  2:7 42:25
**landed**  17:20
**law**  2:3
**lawsuit**  8:9
10:3 11:20,21
11:24 12:8
34:1 38:25

**lawyer**  4:15
10:15 11:2
**laydown**  32:20
34:13
**laying**  11:5
**learn**  12:13
**leave**  12:25
15:22 28:22
**leaves**  37:23
**left**  9:25 15:25
16:2,2 37:25
**legal**  44:19
**letter**  25:20
38:15
**license**  4:9
19:11 27:13
**light**  32:7
**limb**  13:24
**line**  14:14
18:22 20:12
40:2
**lineman**  6:23
6:25 7:15
20:13
**lines**  19:19 33:7
**list**  12:1,5,8
14:15
**little**  6:12 21:16
34:14 35:1
36:23
**live**  6:11
**living**  12:17
**llc**  1:6,6,6 42:6
42:6,6

**llp**  2:7
**located**  4:6,8
**logo**  26:15 27:2
**long**  6:7 7:10
10:7 12:1,16
13:16 15:10
16:9 17:10
19:10 22:6,23
27:19 36:19
**longer**  21:1
23:15
**longview**  2:4
**look**  10:16
21:16 24:18
25:12,25 26:1
26:1
**looked**  24:9,9
24:12
**looking**  23:18
24:13 26:2
**looks**  20:5
**lord**  23:21,23
23:24
**lot**  15:17 17:1,2
**lunch**  35:12,17
35:20 36:7,18
36:19
**lunchtime**  36:6
**lying**  27:11

**m**

**made**  12:25
24:2
**main**  2:8
**majority**  34:9

Veritext Legal Solutions
346-293-7000

**[make - overlap]**

**make** 5:9 25:18
26:1,1,4
**making** 13:8
24:5 25:17
26:4
**maldonado** 1:3
42:3 44:3
**mammoth** 1:5
4:16 9:7 42:5
44:3
**mark** 19:22
**marking** 26:7
26:21 27:9
**mathis** 33:20
**matter** 16:8
19:2 30:15
**mean** 6:23 9:8
14:10 16:18
17:13 22:23
28:7 34:20
37:2,7
**means** 4:6
**mechanics** 33:5
**meeting** 23:11
**mention** 38:13
38:14,16
**mind** 39:2
**minutes** 35:5
36:8,20 42:17
**mmm** 7:18
10:19 15:6
19:18 27:1
**mobile** 7:2
**money** 24:2,4
24:18 25:10

38:25
**month** 29:9
**months** 7:13,14
12:16 15:1
17:18 31:25,25
32:7,10,11
37:17,20
**morning** 34:19
**mornings**
22:12 35:8
**moultrie** 4:8
**movement** 5:21
**mutually** 36:4

**n**

**n** 2:1,4
**name** 4:4 5:5
10:6 13:15
20:3,8 33:21
34:10 41:12
**named** 9:16,23
33:21
**names** 9:15
23:19
**near** 26:8
**need** 37:4
**needed** 31:12
**needs** 5:12
**neither** 13:17
43:4
**never** 9:7 13:17
13:17 25:9
30:22 31:13
33:3 36:10
**new** 17:4

**nice** 18:3
**night** 20:18,21
**nine** 15:1
**nods** 32:9
**north** 6:5
**notarize** 44:11
**notary** 41:19
**note** 44:9
**noted** 41:3
**notice** 37:14
**notified** 31:14
**november**
21:17
**number** 4:4
**numbered** 1:21
**numbers** 25:18

**o**

**oath** 4:5
**obviously** 5:10
5:20
**offer** 3:9 20:7
21:13 25:20
38:14
**office** 4:6 41:15
**officer** 42:13,22
**officer's** 43:1
**oh** 12:3 14:5,6
14:8 16:20,22
16:25 28:1
**okay** 5:24 6:1,3
6:13 7:6 8:6,20
10:6 12:7 15:3
15:19,22 16:5
16:14 17:25
18:11,18 19:8

19:22 20:3,7
20:11,20,23
21:10,16,23
22:1,11,14,25
23:8,12,17,24
25:20 26:3,7
26:14,18,21,24
27:2,8,12,20
28:6,9,9,20
29:14 30:3,10
31:18 32:6,17
32:19 33:4,6
33:22,25 34:12
34:23 35:6
36:12,21 39:4
**once** 14:19 26:4
37:18,18
**ones** 28:22
**online** 8:24 9:1
15:4 24:19,21
**oral** 1:12,19 4:2
42:13
**order** 5:12
**orders** 39:16
**orientation**
15:7,10,14,20
15:22 16:19
21:14,18 22:5
**original** 43:2
**outcome** 43:7
**outside** 32:22
34:17
**overhead** 18:23
**overlap** 9:21

Page 7

**[overnight - pursuant]**

**overnight**
17:22
**overtime**  38:11
39:1,9
**own**  20:1 34:20

**p**

**p**  2:1,1
**p.m.**  1:22,22
4:2 22:15,18
**packed**  35:14
36:22
**page**  3:5 40:2
**pages**  44:12
**paid**  21:24
23:25 24:14
31:4,7,10 39:9
**papers**  16:19
17:2
**pardon**  35:22
**park**  34:16
**parked**  32:22
34:14,16
**part**  9:8,10,11
13:2,11,13
14:16 17:6,23
18:11 20:24
29:4 32:6
34:25 37:24
**participated**
8:2
**parties**  42:23
43:5
**parts**  34:24
**party**  8:9 42:15

**pass**  39:13
**passed**  11:14
**past**  22:18,19
22:21,22 30:14
**pay**  13:6,23
24:11,19 25:2
25:2,5 38:10
**paychecks**  8:22
9:3
**paycom**  24:23
24:24,25 25:1
25:13,16
**paying**  13:6,21
13:22 38:23
**paypal**  24:22
**penalty**  4:23
**people**  15:12
17:9 23:9,19
29:22 33:11,22
33:25 38:2
**percent**  30:2
**perjury**  4:23
**person**  12:20
13:14 41:11,11
**personally**  41:9
**photographs**
11:2
**pier**  14:19
**pipe**  7:1,22
**place**  12:20
**plaintiff**  2:2
11:20 42:19,24
**plaintiffs**  4:13
11:23

**plane**  16:14,18
**planning**  37:14
**plant**  7:1,22
**please**  4:10,19
5:6 6:4 39:17
39:18
**pleased**  20:12
**pllc**  2:3
**point**  18:12
24:3 32:14
33:2 36:5
37:18,19
**policies**  26:19
**policy**  3:11,13
27:5 31:1
**porter**  2:7
**portion**  20:11
**position**  19:9
20:13 31:4
**postings**  13:20
**power**  1:6 4:16
18:22 33:6
42:6
**prepare**  10:13
**preparing**  43:2
**present**  4:11
**pretty**  7:5
13:17 14:10
18:17 23:3
**primary**  18:21
**prior**  6:25
**private**  16:17
**probably**  10:5
15:1,2,11
21:14 23:2

34:21 36:9,20
**problems**  23:6
**procedure**  1:25
**procedures**
23:13
**proceeding**
43:6
**proceedings**
39:23
**process**  36:25
**produced**  1:19
10:21
**progress**  35:1
**project**  28:25
**proved**  41:10
**provide**  5:15
**provided**  3:17
35:8
**providing**
27:12
**public**  41:19
**puerto**  8:23
10:1 11:13
12:11,13 13:12
15:3,23 16:6
17:19 20:14
21:23 26:5
28:4,20 29:2,5
29:15 30:18
34:23 37:6
38:6
**purposes**  41:13
**pursuant**  1:24
42:21

**[pvc - sandwiches]**

| | | | |
|---|---|---|---|
| **pvc** 7:1 | 30:3 32:1,4 | **reporter's** 3:6 | 22:24 23:24 |
| **q** | 34:18 | 42:7 | 24:8,9,12 25:7 |
| **qualified** 18:22 | **received** 21:12 | **reporting** 4:5 | 25:10,20,22 |
| **question** 5:15 | **receiving** 24:18 | **require** 21:1 | 26:15,19,25 |
| 5:24 24:17 | 26:18,24 | **reserve** 39:14 | 27:3,6,7,10,21 |
| 31:9 | **recognize** 20:1 | **resided** 6:7 | 28:21 30:11 |
| **questions** 5:14 | 27:10 | **resort** 14:24 | 31:5 32:8,17 |
| 17:7,9 39:15 | **record** 4:2,11 | 17:24 18:3,8 | 33:10,23 34:1 |
| **quite** 32:11 | 5:6 42:14,23 | **response** 5:16 | 34:6,25 35:1 |
| **r** | **referenced** 44:5 | 25:23 | 35:19 36:3,8 |
| **r** 2:1 | **refused** 31:18 | **responses** 5:19 | 36:16 37:8,9 |
| **raise** 4:18 | 31:22 | 5:22 | 37:19 38:20 |
| **rate** 21:20,23 | **related** 9:13 | **responsible** | 39:14 |
| 31:5,7 38:11 | 43:4 | 30:10 | **roberts** 1:13,19 |
| 38:11,14,16,19 | **relieving** 38:2 | **responsive** | 3:3 4:3,13,21 |
| 38:23 | **remember** 7:25 | 10:24 | 5:1,5,7 19:24 |
| **ray** 5:7 | 8:22 9:15,16 | **return** 27:6 | 26:8,22 27:8 |
| **read** 16:23 | 10:6 13:14 | 42:20 44:12 | 41:1,5,10 42:8 |
| 39:18 41:1 | 15:15,19 16:21 | **richard** 9:16,18 | 42:12 44:4 |
| 44:6,8 | 19:21 21:7 | 10:8 | **rolled** 13:25 |
| **ready** 37:20 | 22:22 23:19 | **richard's** 10:6 | **room** 4:11 |
| **really** 11:25,25 | 24:22 26:24 | **rico** 8:23 10:1 | **rules** 1:24 5:9 |
| 12:1 | 27:12,14,15 | 11:13 12:11,14 | 44:14 |
| **reason** 13:11 | 28:13 29:19,24 | 13:12 15:3,23 | **s** |
| 24:4 40:2 | 31:1,23 32:12 | 16:6 17:19 | **s** 2:1 |
| **rebuild** 13:3 | 34:9 38:20 | 20:14 21:23 | **safe** 23:1 |
| **recall** 12:7 | **remotely** 4:3,6 | 26:5 28:4,20 | **safety** 6:20 |
| 17:15 19:14,15 | **repair** 33:4 | 29:3,5,15 | 15:16 23:10,12 |
| 19:19 20:20,22 | 34:25 | 30:18 34:24 | 23:13 30:5 |
| 21:12 22:5,6 | **rephrase** 5:25 | 37:6 38:6 | **san** 1:2 17:20 |
| 22:11,18,19,21 | **reported** 25:13 | **right** 4:18 7:2,4 | 17:22,24 18:14 |
| 23:5,7 25:4 | **reporter** 1:23 | 12:20,21 16:12 | 34:3 42:2 |
| 26:11 27:17 | 3:17 4:1,18,25 | 16:15 17:20 | **sandwich** 36:21 |
| 28:9 29:22 | 5:11 39:16,21 | 18:7 19:9,10 | **sandwiches** |
| | 42:10 | 20:9 22:16,22 | 36:22 |

**[saying - started]**

| | | | |
|---|---|---|---|
| saying  22:21 | seven  28:15 | 15:6,9 16:4,7 | 12:19,21,21 |
| 24:15 38:21 | several  28:1 | 16:11,13 17:6 | 23:12 37:11,23 |
| says  20:11,24 | share  39:7 | 17:16,21 18:15 | soon  14:25 |
| 27:5 | sheet  29:18 | 18:19 19:1,13 | 15:22 |
| schedule  28:10 | 44:10 | 20:2,4,6,10,16 | sorry  7:21 11:1 |
| school  6:13,15 | shift  21:24 | 20:19 21:3,5 | 12:3 16:25 |
| 7:3,4 | 22:15 32:20 | 21:11,19,22,25 | 19:4 21:8 |
| screen  19:24 | shop  11:11,16 | 22:4,6,10,17 | 22:14 23:22 |
| seal  41:15 | shorthand  1:23 | 24:6,9 25:8,11 | 37:15 |
| second  5:19 | 42:10 | 26:6,10,17,20 | sound  21:18 |
| 36:18 38:3 | show  25:1 | 26:23 27:1,4 | sounds  36:3,24 |
| security  27:17 | showed  25:2 | 27:22,24 28:12 | speaking  12:2 |
| see  5:20,21 | showing  27:8 | 28:19,24 29:4 | 16:24 18:2 |
| 17:14 19:23,24 | sick  38:8 | 29:7 30:12,20 | 19:3 24:16 |
| 19:25 20:15,18 | sign  16:19,22 | 31:3,6,20,24 | 36:1 |
| 20:23 21:2,20 | 39:18 44:6,11 | 32:18 33:1,8 | special  20:14 |
| 21:21,24 22:3 | signature  3:5 | 33:15,24 34:2 | specifically |
| 26:15 37:3 | 22:9 26:8,22 | 34:4,20 35:2 | 35:25 |
| seeing  22:5 | 40:1 41:2 | 38:7,9,12 | spent  34:8,9 |
| 25:4 26:12 | 42:19 43:12 | 39:10 | spoken  9:25 |
| seeking  38:25 | signed  16:20 | sit  16:23 | 33:25 |
| seemed  15:24 | 44:17 | situations | standard  39:19 |
| 30:5 | simultaneously | 20:25 | standing  30:8 |
| seems  32:6,11 | 12:2 16:24 | six  17:16,18 | star  1:6 4:16 |
| seen  12:5 13:17 | 18:2 19:3 | 22:14 28:16 | 9:6,12 10:9 |
| 17:5 20:8 | 24:16 36:1 | sixteen  21:1,4,6 | 13:1 20:7 23:9 |
| 26:13 39:3 | sir  4:25 5:18,23 | 21:24 22:2 | 26:14 27:2,21 |
| send  10:18,19 | 6:2,10,14,18,24 | 25:22 | 29:6 42:6 |
| 11:2 13:19 | 7:5,7,16,18 8:8 | slept  14:21 | stare  12:1 |
| serve  29:20,23 | 8:11,18,21 9:4 | 15:1 | start  6:3 14:18 |
| services  1:5 | 10:4,7,10,12,17 | social  27:17 | 21:17 |
| 4:16 42:5 44:3 | 10:19,25 11:7 | solemnly  4:20 | started  5:8 |
| servicing  33:6 | 11:9,22 12:4,9 | solutions  44:19 | 12:15 22:12 |
| set  14:25 15:1 | 12:12,24 13:10 | somebody  7:22 | 28:14 32:15 |
| 32:6 | 13:13,24 14:2 | 8:1 11:12,13 | 35:14 37:19 |

Veritext Legal Solutions
346-293-7000

**[starting - tonight]**

starting   21:20
state   1:23 4:10
    41:7,19 42:11
states   1:1 42:1
stateside   37:1
stay   17:22
stayed   28:20
staying   12:17
    32:21
stays   32:7
stenographic
    4:6
stop   36:19
stopped   35:17
stopping   23:5
    36:5
storm   21:23
    27:23,25 28:6
    28:7
storms   20:25
    28:2
straight   37:17
street   2:8
strike   11:1
stub   24:19
stuff   17:4 23:15
    27:6
styled   1:21
subject   31:11
submitted
    42:18
subscribed
    41:12
substation
    18:23

suite   2:4
summer   32:7
sun   32:11
sundays   28:14
sundown   21:9
sunrise   32:14
sunset   32:14
sunup   21:9
super   9:23
supervising
    9:20 30:11
supervisor's
    9:15
support   39:8
sure   5:13 8:15
    11:25 16:14
    18:17 19:15
    22:20 24:7
    27:19 30:1
    37:3 39:7
swear   4:20
sworn   1:20 5:2
    42:12 43:9

**t**

take   18:20
    36:21 37:22
taken   1:20
    42:22 43:6
talk   5:13 15:16
    23:12 26:3
    38:10,23
talked   10:4,15
    11:19 15:13
talking   12:7
    35:24

taste   36:15
tasted   36:16
tech   29:19,23
teleconference
    4:3
tell   13:20 19:20
    30:16 37:11
tells   20:13 22:1
ten   15:1
terms   15:20
    19:17
test   27:15
testified   5:2
    8:20
testify   8:19
    39:5
testimony   4:21
    8:12,15 42:14
    42:22 44:8
texas   1:1,24 2:4
    2:8 4:7 41:7,19
    42:1,11 43:12
thank   4:25
    39:21
thing   5:19
things   14:17
think   7:23 9:11
    14:13,14,23
    15:4,12 16:16
    16:17,17 17:9
    18:9,17 19:18
    22:13 23:1,15
    28:14 29:21
    30:15 31:11,18
    32:2,3,4,15

37:9,16,24
    38:3,4
thirty   35:5 36:8
    36:20
thousand   13:12
three   7:13,14
    10:5 12:15
    37:13
tickets   37:10
time   7:13 8:6
    12:1,21,23
    15:6,7 16:22
    21:18 22:7,11
    23:14,18 24:22
    29:15,18 31:12
    32:1,2,3,5,6
    33:23 34:8,23
    35:20 37:6,9
    37:22,25 42:15
    42:22 44:15
timeframe   44:7
times   9:20 10:2
    23:10 30:14
today   4:1,21
    5:11 10:14
    39:12
together   36:2
    37:22,25
told   13:14 16:8
    16:9 17:15
    19:16,18 30:22
    31:13,22 38:18
    38:20
tonight   30:17

Veritext Legal Solutions
346-293-7000

**[took - white]**

**took** 14:14 16:3
17:23,24 19:6
29:9
**tornadoes** 28:3
**toys** 11:18
**track** 29:15
**tractor** 11:17
**training** 6:20
**trainings** 6:19
**transcript** 5:21
42:13,18 43:3
44:5,16
**travel** 34:24
35:4
**treated** 31:15
31:16
**trial** 39:5,15
**trucks** 14:19
18:10 19:6
**true** 41:2 42:14
**truth** 4:22,22
4:22
**twelve** 20:17,21
21:10 22:15
23:1 28:18
**two** 9:16 10:4
14:24 17:17
18:9 24:1,14
24:15 37:9,13
**tx** 44:13
**type** 14:24
**typical** 17:4
**typically** 28:6

**u**

**uh** 5:8,10,12,19
5:20,25 6:3,11
6:17,20 7:10
7:15,19 8:1
9:15,16 10:3,4
10:6,10,13,21
11:1,2,8,19
12:7,10,23
13:20 14:13
15:3,13,16
16:14,16 17:9
17:13,16,23
18:22,22 19:15
19:22 20:1,23
21:5 22:8,21
23:5,12,14
24:12,17,24,25
25:11 26:3,14
27:2,9,12,23
28:19,23 29:14
29:22 30:10,14
30:18,21 31:1
31:10,11,13,18
31:25 32:21,21
32:24 33:4,13
33:13,21,22
34:4,12,15,18
34:20 35:3,9
35:11 36:7,18
37:4,9,22,24
38:2,10,16
39:4
**um** 5:8,9 6:3,22
7:12 11:20

13:19 15:8
16:5 18:24
22:11 23:25
25:4 27:17
28:9 31:7,25
32:6 34:12
36:18 38:5,13
**under** 4:22
41:15
**underground**
18:21,23
**understand**
5:24 31:9 39:6
**understanding**
25:15
**united** 1:1 42:1
**unload** 14:19
**used** 42:15
44:16
**using** 24:18

**v**

**v** 44:3
**vacation** 29:12
**verbal** 5:19,21
**verbally** 13:20
13:22
**verde** 17:25
18:6
**verify** 44:8
**veritext** 42:20
44:12,19
**veritext.com.**
44:13
**vickie** 1:22 4:4
42:10 43:12

**video** 4:3 5:20
**vs** 1:4 42:4

**w**

**walk** 37:7
**want** 26:1 39:7
**wanted** 13:2
16:12 36:25
37:3,6
**watching** 30:9
**wave** 14:15,15
38:4
**way** 8:2 35:6
**wear** 11:15
**weather** 23:5
**week** 14:23
28:15,16
**weeks** 7:14
17:16,17,18
24:1,14,15
37:13,21
**welmaker** 2:3,3
4:12,12 39:14
39:18 42:24
**welmakerlaw...**
44:1
**went** 13:11,24
14:16 15:3
16:3 18:10,24
29:10 30:23,24
**western** 1:1
42:1
**whatnot** 17:11
**wheelers** 11:17
**white** 26:15

Veritext Legal Solutions
346-293-7000

[wife - zoom]

**wife**  6:12 17:13
  37:3
**winter**  31:25
  32:11
**wise**  23:18
**witness**  1:20
  4:8,24 8:4 32:9
  39:11,13 42:12
  42:14 44:5,7,9
  44:11,15
**witness's**  3:5
**wondering**
  17:14
**work**  7:12,13
  8:23 9:5 12:10
  13:1 17:10,16
  18:7 19:17
  20:17,18,21
  21:4,6 22:12
  22:15,22 23:3
  23:5 25:18
  27:20,23,25
  28:6 29:6
  30:19,21 31:19
  32:17 35:20
  36:8 37:7,17
**worked**  7:1 8:1
  8:23 9:7 10:9
  12:10 21:7,9
  23:2 28:2
  29:23,25 30:13
  30:15 33:11
**workers**  18:25
**working**  7:10
  12:15 22:18,19

22:21 28:15,18
  29:2 31:23
  32:12
**workplace**  8:13
  8:17
**world**  36:17
**wrong**  32:5
**wrote**  20:5,8

|  |  | **x** |
| --- | --- | --- |

**x**  1:3,3,4,4,5,5,6
  1:6 41:7,8 42:3
  42:3,4,4,5,5,6,6

|  |  | **y** |
| --- | --- | --- |

**y'all**  39:21
**y'all's**  39:16
**yard**  32:20
  34:13,16
**yards**  32:21
**yeah**  8:4,8 9:14
  9:19 14:5,6,18
  14:25 16:20
  17:3,13 19:1,5
  19:25 22:23
  24:17,24 25:6
  28:1,5,22
  34:11 37:6,13
  37:24 38:16
**year**  6:15 16:2
  20:15
**years**  6:8 7:2
  7:11 10:5

|  | **z** |  |
| --- | --- | --- |

**zoom**  1:24

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                   SAN ANTONIO DIVISION
3    AARON MALDONADO, ET AL      )
                                 )
4    vs.                         ) CASE NO. 5:21-cv-85
                                 )
5    MAMMOTH ENERGY SERVICES,    )
     INC., COBRA ACQUISITIONS,   )
6    LLC, HIGHER POWER           )
     ELECTRICAL, LLC and 5 STAR  )
7    ELECTRIC, LLC               )
8

9                      ORAL DEPOSITION
10                  JOSE RODRIGUEZ APONTE
11                       May 3, 2024
12

13       ORAL DEPOSITION OF JOSE RODRIGUEZ APONTE,
14   produced as a witness at the instance of the
15   Defendant and duly sworn, was taken remotely by Zoom
16   in the above-styled and numbered cause on the 3rd day
17   of May, 2024, from 2:05 p.m. to 6:05 p.m., before
18   Shauna Foreman, Certified Shorthand Reporter in and
19   for the State of Texas, reported by computerized
20   stenotype machine, pursuant to the Federal Rules of
21   Civil Procedure and the provisions stated on the
22   record or attached hereto.
23
24
25

**EXHIBIT**

_____ **18** _____

exhibitsticker.com

                                            Page 1

| | |
|---|---|
| 1        APPEARANCES | 1      (Interpreter sworn.) |
| 2 FOR PLAINTIFFS: | 2      JOSE RODRIGUEZ APONTE, |
| 3   DOUGLAS WELMAKER, ESQ. | 3 having been first duly sworn, testified as follows: |

1        APPEARANCES
2 FOR PLAINTIFFS:
3   DOUGLAS WELMAKER, ESQ.
   WELMAKER LAW
4   400 N. Fredonia
   Suite 118
5   Longview, Texas 75601
   E-mail: doug@welmakerlaw.com
6
  FOR DEFENDANTS:
7
  ANTHONY ARTEAGA
8   EMIL SADYKHOV, ESQ.
   PORTER HEDGES
9   1000 Main Street
   36th Floor
10   Houston, Texas 77002
   E-mail: esadykhov@porterhedges.com
11
  ALSO PRESENT:
12
   Diego Acosta, Interpreter
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

---

1      (Interpreter sworn.)
2      JOSE RODRIGUEZ APONTE,
3 having been first duly sworn, testified as follows:
4      EXAMINATION
5   Q. (BY MR. SADYKHOV) All right. Thank you
6 very much.
7      Mr. Rodriguez, would you please state
8 your full name for the record?
9   A. Jose Alberto Rodriguez Aponte. Good
10 afternoon.
11   Q. Which do you prefer, Mr. Rodriguez or
12 Mr. Aponte?
13   A. So my first last name is Rodriguez. So
14 Jose Alberto Rodriguez. Mr. Rodriguez.
15   Q. Thank you. I appreciate that.
16      So, Mr. Rodriguez, I'm one of the
17 attorneys representing the defendants in this
18 lawsuit. And just for purposes of the record, the
19 defendants are Mammoth Energy Services, Inc., 5 Star
20 Electric, LLC, Higher Power Electrical, LLC, and
21 Cobra Acquisitions, LLC.
22      And I just want to say, first of all,
23 thank you for being here. I appreciate you taking
24 the time. Before we get started, I just wanted to go
25 over a couple quick ground rules for the deposition.

Page 4

---

1       INDEX
2           PAGE
3 JOSE RODRIGUEZ APONTE
4 Examination by Mr. Sadykhov .......................4
  Examination by Mr. Welmaker ....................68
5 Further Examination by Mr. Sadykhov ..............78
6
7       EXHIBITS
8
9 NUMBER     DESCRIPTION      PAGE
10 Exhibit 1   Complaint      13
  Exhibit 2   Earnings Statements    28
11 Exhibit 3   Time Detail Report    51
  Exhibit 4   Earnings Statements    58
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

---

1      Is that okay?
2   A. No, I don't.
3   Q. So first, the court reporter is writing
4 down everything we say, so it's important for the
5 transcript for you to wait until I'm done finishing
6 my question before you say your answer.
7      Does that make sense?
8   A. Okay. Understood.
9   Q. Also, because everything is being written
10 down, it's important that when you're answering a
11 question, you have to give me a verbal answer -- like
12 yes, no, something else -- because we can't take down
13 a shake of the head or a no.
14      Does that make sense?
15   A. Understood.
16   Q. Thank you.
17      And if you need a break at any time,
18 just let me know. We'll probably do a break around
19 every hour. And the only thing I ask is if you do
20 need a break, just -- and there's a question pending,
21 you know, on the table at that time, I want you to
22 answer the question first before we break.
23      Is that okay?
24   A. Understood.
25   Q. And finally, you understand that you're

Page 5

---

1 under oath today, correct?
2    A.  Understood, yes.
3    Q.  Thank you.
4         Would you please state your address
5 for the record, your home address?
6    A.  Well, where I'm at right now in Puerto
7 Rico, my address is Calle Violeta -- C-A-L-L-E,
8 V-I-O-L-E-T-A -- E6, Urbanizacion,
9 U-R-B-A-N-I-C-I-Z-I-O-N --
10         INTERPRETER:  Sorry.  I mixed that up.
11    A.  U-R-B-A-N-I-Z-A-C-I-O-N, Estancias,
12 E-S-T-A-N-C-I-A-S, space D-E, space Santa Barbara, in
13 Gurabo, Puerto Rico.
14         Would you like me to put it down on a
15 piece of paper so I could show it to you and it would
16 be more precise?
17    Q.  (BY MR. SADYKHOV)  Yeah, I guess if you
18 want to do that, that would be great.
19         So, Mr. Rodriguez, how long have you
20 lived at this address?
21    A.  So I have been here for over 20 years, but
22 I did leave to go work five years in the U.S.  I am,
23 however, back here now in Puerto Rico working with
24 the same company that I was working for in the U.S.
25 but living here.

Page 6

1    Q.  What company were you working for in the
2 U.S.?
3    A.  Mastec.
4    Q.  And what years were those?
5    A.  So I've been working with them from around
6 2020, 2021 -- not continuously because the contracts
7 sometimes are interrupted.  But now they have a
8 project here, and I'm here with them now.
9    Q.  And by "here," do you mean Puerto Rico or
10 the United States?
11    A.  Yes, in Puerto Rico.
12    Q.  Got it.  So what years -- or which five
13 years did you live in the United States?
14    A.  So maybe it wasn't five years.  That's
15 just, like, an estimate.  You know, maybe it was
16 around four or so.  You know, not being precise.  But
17 that's why I said five.
18    Q.  I appreciate that, Mr. Rodriguez.  Thank
19 you for clarifying.  I'm just trying to get an idea
20 of, I guess, the year you started living there and
21 the year you ended.  You said around 2020, 2021.  I
22 only count three or four years from then.
23         So I just want to make sure that I
24 understand, you know, how long you lived in the U.S.
25 and when that was.

Page 7

1    A.  Well, that's what I'm saying.  I'm not
2 sure.  It could be three, four, five years.  I've
3 been working with companies, you know, that, you
4 know, it's not constant because they have contracts
5 and they finish.
6    Q.  I think I understand now.
7         So what you're saying is from around
8 2020 to 2021, since then you've been working on and
9 off in America occasionally; is that right?
10    A.  Yes, correct.
11    Q.  And did you -- before 2020 or 2021, had you
12 ever lived or worked in the United States?
13    A.  Not living, per se.  Just, you know,
14 interruptedly because when the contracts are
15 finished.
16    Q.  Okay.  Let me ask it this way.
17         When was the very first time that you
18 went to the United States for work, intermittent or
19 continuously?
20    A.  I don't quite recall well, but I think it
21 was in 2020.
22    Q.  So, again, just to make sure we're clear on
23 the record.  Before 2020, you had never worked in the
24 United States?
25    A.  I'm not quite sure of those dates.  But

Page 8

1 before that date, I'm pretty sure that I had not
2 worked in the U.S.
3    Q.  Got it.  Thank you.
4         Do you live alone, or are you married?
5    A.  Married.
6    Q.  Any kids?
7    A.  Two children.
8    Q.  Thank you.
9         Do you have a high school degree or a
10 GED?
11    A.  Yes, I graduated high school.
12    Q.  And was that in Puerto Rico?
13    A.  Correct, yes.
14    Q.  And did you ever attend college?
15    A.  Yes.  I did three years in the University
16 of Puerto Rico, but I didn't get my bachelor's.
17    Q.  Got it.  Do you have any other -- sorry.
18 Scratch that.
19         Did you go to technical school at all?
20    A.  Well, when I was an employee of the -- the
21 authority of the electric energy, I did take some
22 courses with them.
23    Q.  And did you receive any certifications or
24 licenses as a result of those courses?
25    A.  Yes, correct.

Page 9

3 (Pages 6 - 9)

1    Q.   You said you received a certification of
2 some sort, right?
3    A.   Yes, as lineman.  We call them celador de
4 lineas, what you guys call lineman.
5    Q.   And did they give you an actual paper
6 certificate or any sort of document?
7    A.   Yes, sir.
8    Q.   And do you still have that?
9    A.   Yes, sir.
10    Q.   And I'll ask that you please provide that
11 to your attorney at the end of this deposition.  It
12 doesn't have to happen right now, but at some point
13 after we're done.
14    A.   Yes.  I have it here with me at home.
15    Q.   Thank you.
16         What did you do for work right after
17 attending college for three years?
18    A.   To PREPA, Puerto Rico Energy Power
19 Authority.
20    Q.   And was that your first job after going to
21 school?
22    A.   Yes, sir.
23    Q.   Where are you currently employed?
24    A.   In Mastec.
25    Q.   And is that -- is that also the

*Page 10*

1 with me in my wallet.
2    Q.   Sure, yeah.  And I didn't mean right this
3 second but, you know, I just wanted to know whether
4 you have the IDs in your possession or not.  And
5 after our deposition, I'll ask that you please either
6 send a picture or otherwise give your attorney a copy
7 of both of those, okay?
8    A.   Okay.
9    Q.   Thank you.
10         All right.  Have you ever been deposed
11 before or in a deposition?
12    A.   No, never.
13    Q.   I'm sure it's not something you were
14 looking forward to doing in your life, right?
15    A.   Correct.  That is right, but everybody gets
16 their turn.
17    Q.   I like that.  I'll try to refrain from
18 making any more jokes.  I realize that the
19 translation doesn't land the same.
20    A.   Okay.
21    Q.   All right.  Have you ever been part of a
22 lawsuit in any capacity like this but not in a
23 deposition?
24    A.   No, never.
25    Q.   Have you ever been charged with any crimes?

*Page 12*

1 intermittent work, or are you now working full-time?
2    A.   Well, right now, this one I've been at for
3 five, six months.  We started in August of '23, and
4 they haven't told us it's going to finish.  So --
5    Q.   What is your job title with Mastec?
6    A.   Journeyman lineman.
7    Q.   And is that similar to the work that you
8 performed for Cobra?
9    A.   Correct, yes.
10    Q.   So have you always done this kind of work?
11    A.   Well, from some years ago until now because
12 before, you start as a lineman apprentice and, you
13 know, as the years go by and you get experience, they
14 move you up.
15    Q.   Got it.  But always the field of work
16 working on electrical power lines, right?
17    A.   Correct.
18    Q.   Thank you.
19         And earlier before the deposition
20 started, you mentioned a driver's license.
21         Do you have a Puerto Rican driver's
22 license or a United States one or both?
23    A.   Both.
24    Q.   And do you have a copy of both of those?
25    A.   Well, currently -- copies, no.  I have them

*Page 11*

1    A.   No, never.
2    Q.   All right.  I am going to pull up what I'm
3 marking as Exhibit Number 1.
4         MR. SADYKHOV:  And, Shauna, after the
5 deposition, Anthony will send you the exhibits that I
6 have marked.
7         (Exhibit 1 marked)
8         MR. SADYKHOV:  Could you please let
9 Mr. Rodriguez know that I am going to share my screen
10 for him to be able to look at an exhibit I want to
11 show him?
12    Q.   (BY MR. SADYKHOV)  All right.  Can you see
13 my screen here?
14    A.   Yes.
15    Q.   Have you ever seen this document before?
16    A.   Not that document.
17    Q.   Okay.  So I'll just represent to you that
18 this is the original lawsuit document that you and
19 your attorneys have filed.  And up here at the top,
20 it says it was filed on February 2nd, 2021.
21         Does that sound familiar to you?
22    A.   Well, I'm not sure -- I see it now.  I
23 hadn't seen my name, you know.  I couldn't see all of
24 it.  Yes, I have seen that document recently.
25    Q.   Okay.  Thank you.

*Page 13*

4 (Pages 10 - 13)

1        Are you aware that the case has been
2   set for trial this December?
3        A.   Yes.
4        Q.   Do you plan to go to court and attend the
5   trial?
6        A.   Yes.
7        Q.   All right.  Now I want to turn your
8   attention to the defendants listed here at the top.
9   I'm about to highlight them.
10          Do you see what I'm highlighting?
11       A.   Yes.  Well, I'm seeing what you have
12  highlighted.
13       Q.   Correct.  Yeah.  And those are the
14  defendants that you've sued in this lawsuit.  And I
15  just wanted to ask you:  Which one of these four
16  defendants did you work for?
17       A.   Well, from what I understand, it was Cobra
18  Acquisitions.
19       Q.   Have you ever heard of Mammoth Energy
20  Services?
21       A.   So yes.  There was endless amounts of names
22  of companies that were working out there in Puerto
23  Rico.  But me personally, I was hired by Cobra.  I
24  worked for Cobra.
25       Q.   I appreciate that, Mr. Rodriguez, but my

Page 14

1   question was just that -- was just whether or not you
2   had heard about Mammoth Energy Services or not.
3        A.   Yes, I've heard -- I heard this name,
4   Mammoth Energy.  But again, I was hired by Cobra
5   Acquisitions.  Did I hear about Mammoth Energy
6   Services?  Yes, I did.
7        Q.   Thank you.
8          What -- what did you hear about
9   Mammoth?
10       A.   Well, no, nothing.  You would just, you
11  know, hear the name of the companies that were out in
12  Puerto Rico working for when Hurricane Maria came,
13  you know.  I really just -- you know, I just was
14  working.  You know, you would hear about these other
15  companies that were working here, but I concentrated
16  on my work, followed instructions from Cobra and, you
17  know, I didn't pay attention to anyone else but what
18  Cobra was telling me, you know.  Anything else to me
19  was, well, irrelevant.
20       Q.   And so, all you had basically heard about
21  Mammoth was that they were just a different company
22  working on the same kind of work that you guys were
23  doing; is that right?
24       A.   Yes.
25       Q.   Thank you.

Page 15

1        Did you ever get -- I'm sorry.  You
2   never got a paycheck from Mammoth, correct?
3        A.   No.  Yes, no.  Well, the very few pay stubs
4   that I saw, they came from Cobra since it was through
5   Paycom and -- well, you know.
6        Q.   And we'll talk about Paycom in a little
7   bit, but I appreciate you bringing it up.
8          Did -- did any of your supervisors
9   work for Mammoth?
10       A.   I'm unaware of that, if they were.  You
11  know, they weren't wearing any clothing that said so,
12  you know.  They would just wear the hats and the
13  shirts, but the only name that I saw on those were
14  Cobra.
15       Q.   Okay.  Did you ever apply for employment
16  with Mammoth?
17       A.   No.  That I'm aware of, you know.  I was
18  under the understanding that Cobra was the one that
19  hired and that I was only working for them.
20       Q.   I appreciate the explanation,
21  Mr. Rodriguez.  I just want to caution you, I'm
22  actually not trying to -- I'm just trying to get the
23  answers to the questions.  The whole deposition will
24  go a lot faster without the extra explanation because
25  my job here is just to find out the information.  So

Page 16

1   if you could just stick to answering just the
2   question, everything will go a lot faster.  For
3   example, I didn't ask, you know, whether you were
4   working for Cobra or being directed by Cobra.  I'm
5   only asking about Mammoth.
6        A.   Okay.
7        Q.   I'm not trying to be a jerk.  I just want
8   it to go by fast.
9        A.   Understood.
10       Q.   Have you ever heard of Higher Power
11  Electrical?
12       A.   Yes.
13       Q.   And same with Mammoth?  You just heard of
14  them as a company working there?
15       A.   Yes.
16       Q.   Okay.  And you never got a paycheck from
17  Higher Power, right?
18       A.   No.
19       Q.   "No" as in you never got a paycheck from
20  them?
21       A.   No.  Like a check showing with the
22  watermark saying Higher Power?  No.
23       Q.   Thank you.
24          And you didn't have any supervisors
25  that worked for Higher Power either, correct?

Page 17

5 (Pages 14 - 17)

1      A.   To my understanding, no.  I didn't know
2  anybody from that company, so no.
3      Q.   And did you ever apply for employment with
4  Higher Power?
5      A.   No.
6      Q.   Thank you.  And I think you know where I'm
7  going into.
8           Have you ever heard of 5 Star
9  Electric, LLC?
10     A.   Yes, because of the shirts and the trucks
11 that I would see that said 5 Star.  But again, like
12 the others, I didn't know anything about them.
13     Q.   Okay.  Thank you.
14          And you never got a paycheck from 5
15 Star, correct?
16     A.   No.  I never received a payment that did
17 not come from Cobra.
18     Q.   And no supervisors from 5 Star either,
19 correct?
20     A.   No.
21     Q.   Did you ever apply for employment with 5
22 Star?
23     A.   Never.
24     Q.   And forgive me if I asked already, but did
25 you ever apply for employment with Higher Power?

1  worked with me called me to tell me that a lawsuit
2  had been placed and that I was -- that it had to do
3  with me.
4      Q.   When you say it had to do with you, what do
5  you mean?
6      A.   Well, that it was a class lawsuit and that
7  I would be part of the people who would be suing.
8      Q.   What was the reason that you understood you
9  to be suing?
10     A.   For unpaid overtime.
11     Q.   How is it that you're claiming that you
12 weren't paid overtime?
13     A.   Well, because we had a set rate, and we saw
14 that there was something that wasn't being paid
15 completely.
16     Q.   What was it that wasn't being paid
17 completely?
18     A.   So that, I wouldn't be able to explain.
19 The detailing of it on the pay stub was confusing, so
20 I wouldn't be able to answer because I don't
21 understand it.  But from what I'm aware of, it's,
22 well, unpaid overtime.
23     Q.   Thank you.  I appreciate that.  And to the
24 extent that it's true, "I don't know" is perfectly
25 fine.  Don't feel like you can't answer with that.

1      A.   Never.
2      Q.   Thank you.
3           So going back to the complaint real
4  quick.  Like I mentioned, it was filed on
5  February 2nd of 2021.
6           Do you see where I'm highlighting
7  that?
8      A.   Yes.
9      Q.   Thank you.
10          And I have your -- in the records,
11 your termination date is shown as -- or your last
12 date working for Cobra is shown as April 6th, 2019,
13 although I think that your last day of employment
14 might have been -- your last full day of work might
15 have been March 15th of 2019.
16          Does any of that sound familiar?
17     A.   I don't remember.  I don't recall.
18     Q.   Does it sound familiar that you last worked
19 for Cobra sometime in the first half of 2019?
20     A.   Yes.  Towards the beginning of 2019, I was
21 still employed with them.
22     Q.   In between your last day working for Cobra
23 in 2019 and when this lawsuit was filed in February
24 of 2021, how did you find out that you had a claim?
25     A.   Well, because some of the people that had

1           And did you talk to your lawyer,
2  Mr. Welmaker, before the case was filed?  Let me
3  preface that.  I don't want to know what you talked
4  about with your attorney.  I just want to know
5  whether or not you spoke with your attorney before
6  the case was filed.
7      A.   So we did have one.  But when all of this
8  was going on, I wasn't, like, one of the people who
9  was doing most of the things.  I was, like, one of
10 the last ones to know since, well, I live far, you
11 know.  So I was kind of like the last one to find out
12 about where the process was going.  I think even
13 after they changed attorneys to attorney Douglas from
14 another law firm.  But I've never been -- you know,
15 I've been informed, but not completely informed of
16 everything.
17     Q.   Okay.  Did you sign an agreement with
18 Mr. Welmaker?
19     A.   I'm not really quite sure what you're
20 trying to ask me, if I signed an agreement with him.
21 I'm not sure what --
22     Q.   Yeah, sure.  I understand.
23          Did you sign a retainer agreement or
24 any agreement for Mr. Welmaker to be your attorney?
25     A.   From what I understand, yes.  You know, we

1  got -- I'm not quite sure how it happened.  We did
2  get papers.  Some of it were in English.  So I'm not
3  a hundred percent sure how it happened, but I'm sure
4  that at one point he must have told me that he was
5  going to be representing me and that I said yes and
6  that I was in agreement that he continued
7  representing.
8      Q.  And you had mentioned some other
9  ex-co-workers of yours that you said were kind of --
10  had led or at least notified you about the lawsuit
11  and were kind of taking a more active role in it than
12  you are.
13          Are -- and I'm going to go ahead and
14  read a list of four names -- three names, and just
15  let me know if those were those co-workers, okay?
16      A.  So I would like to remind you that, you
17  know, some of these -- if you're going to ask me
18  about, like, the American people, I may be able to
19  remember one or, you know, maybe not.  Some of these
20  people, you know, they were from Oklahoma, and we
21  just worked together.
22          So I don't, you know, really remember
23  everybody's name.  So I'm not sure if I'll be able to
24  answer that question for you.  I remember the people
25  that were on my group; but, again, I'm not sure I'll
                                                      Page 22

1      MR. SADYKHOV:  Okay.  Hey, Doug, I
2  think we're at a good breaking point.  Say, like,
3  five minutes?  Is that cool?
4      MR. WELMAKER:  Yeah, sure.
5      (Recess from 3:00 p.m. to 3:08 p.m.)
6      Q.  (BY MR. SADYKHOV)  Mr. Rodriguez, you
7  understand that we're back on the record and that
8  you're still under oath?
9          You're muted, Mr. Rodriguez.
10      A.  Okay.
11      Q.  Do you understand that you're still under
12  oath?
13      A.  I understand, yes.
14      Q.  Okay.  Thank you.
15          Did you do anything to prepare for
16  your deposition today?
17      A.  No.
18      Q.  Okay.  Did -- and again, I don't want to
19  know what you said, the substance of what you said,
20  but did you speak with Mr. Welmaker before the
21  deposition today?
22      A.  So, no.  All I got was a message saying
23  that I had to download the Zoom app and that I had to
24  take the day off because 2:00 p.m. Texas time is
25  3:00 p.m. Puerto Rico time.  I had to be somewhere
                                                      Page 24

1  be able to answer that truly.
2      Q.  Okay.  No problem.  If you don't know, you
3  don't know.  That's all right.
4          Was one of the gentlemen you spoke
5  with about the lawsuit Juan Santiago?
6      A.  No.
7      Q.  What about Miguel Rosario?
8      A.  Yes, I do know Miguel Rosario.
9      Q.  What did you-all discuss about the case?
10      A.  Well, that there was a case because of the
11  overtime and that there were some people that were in
12  charge of making the lawsuit and that they would let
13  me know.
14      Q.  Did he mention who the people in charge of
15  making the lawsuit were?
16      A.  No, never.
17      Q.  Okay.  Did you know Mr. Jorge Rivera?
18      A.  Yes.
19      Q.  And what did you discuss concerning the
20  lawsuit with him?
21      A.  No, nothing.  You know, to stay aware of
22  everything, to keep myself in the game, to answer and
23  make sure to follow up and, you know, to -- if they
24  call, to answer and make sure that the process keeps
25  going, you know.  That was it.
                                                      Page 23

1  where there wasn't any noise or anything to take the
2  call for my deposition.
3      Q.  And when -- when did you receive that text?
4  Do you recall?
5      A.  Well, no.  You know, just -- it was last
6  week.  They told us that they were going to be taking
7  our statements and that I just -- you know, to be
8  careful to not let the -- be aware of the date and
9  for me not to -- for me to be able to do my -- my
10  deposition, to take the day from work to be somewhere
11  where I had phone signal and there wasn't any noise
12  because it was going to be through Zoom.  And
13  yesterday I received another e-mail just telling me
14  how to, you know, log in and understand everything
15  and to be ready by 2:45.
16      Q.  And you received that text from your
17  attorney or from someone else?
18      A.  It's from the attorney only, and it's the
19  text from Douglas Welmaker.
20      Q.  Okay.  Thank you.  Did you -- actually,
21  scratch that.
22          So I guess it's safe to assume you
23  didn't review any documents to prepare for today,
24  correct?
25      A.  I don't have any documents, you know.  I
                                                      Page 25

7 (Pages 22 - 25)

1 wasn't a foreman, nor a GF. Nothing. You know, you
2 have documents. You probably have more documents
3 than I do. I don't have any.
4    Q. And so, like I mentioned earlier, my
5 question was actually a little bit different, and I'm
6 just asking you to answer my questions. My only
7 question was whether or not you had reviewed any
8 documents, not whether or not you have any documents.
9        But my understanding is you didn't
10 review any; is that correct?
11    A. I did not review any documents.
12    Q. Thank you.
13        Did you speak with any of your
14 ex-co-workers or any of the other plaintiffs in this
15 lawsuit before today?
16    A. No. Only to text us to ask us if we had
17 been put on the list to do, well, this interview that
18 you are doing right now.
19    Q. Did you discuss this lawsuit or your claims
20 with any of the other plaintiffs who have filed the
21 lawsuit with you?
22    A. Well, no. Only, you know, the comments of,
23 you know, if -- how the case was going and, you know,
24 to try to see where the process were and try to
25 inform myself. You know, just the basic things,

Page 26

1 understand that it was because there was some
2 overtime that it wasn't paid and that's why the
3 lawsuit was made, you know. I said that I couldn't
4 give you the data with it because from what I
5 understood, the pay stubs for the check didn't
6 specify how they were detailing the payment. And
7 when we saw that the money was missing, that's when I
8 went on the lawsuit.
9    Q. (BY MR. SADYKHOV) Okay. Well, since you
10 brought up the pay stubs and the checks, why don't we
11 take a look at some of the ones that you've produced
12 just recently to us in this case?
13        Do you recall producing pay stubs to
14 us, giving them to your lawyer?
15    A. Well, you have to ask him about that. He
16 has all that. I don't.
17    Q. Okay. Give me one second. I'm going to
18 share my screen and mark what we're calling
19 Exhibit 2, I believe. So this will be Exhibit 2.
20        (Exhibit 2 marked)
21    Q. (BY MR. SADYKHOV) Can you see my screen
22 here?
23    A. Yes.
24    Q. Does this document look familiar to you?
25    A. Well, from the name that I see there, it's

Page 28

1 seeing if somebody had any information of what was
2 going on.
3    Q. And earlier you testified that you weren't
4 quite sure what the reason for your claim is. You
5 know that you're owed overtime, but you don't know
6 why it is that you're owed it; is that correct?
7    A. Well, no. I understand that it's because
8 of nonpayment of overtime since we didn't see how
9 they were detailing the payments.
10    Q. Did you try to clarify that point with the
11 other plaintiffs?
12    A. Well, no, never really. You know, I'm very
13 busy with work, and I never actually talked to them
14 about it, you know. Just only about, you know, that
15 I was going to be waiting for them, you know, to see
16 what happens. But, you know -- but from what I'm
17 aware of, you know, it's just for unpaid overtime.
18    Q. But you put your name on the lawsuit,
19 correct?
20    A. That's correct, yes.
21    Q. And so, you put your name on the lawsuit
22 without knowing what your -- what exactly you are
23 claiming?
24        MR. WELMAKER: Object to form.
25    A. So I'll repeat it again. You know, I

Page 27

1 one of my pay stubs from my payments.
2    Q. And you don't recall giving this and these
3 other pay stubs to your attorney?
4    A. Well, I don't know. These, probably they
5 got them from the company, you know. That's
6 probably -- I don't know where they got them from
7 because once the job was over, I didn't have any more
8 access to Paycom to look at it.
9    Q. Mr. Rodriguez, do you remember -- or were
10 you asked to search for documents in response to a
11 request made by the defendants in this case?
12    A. Well, I don't know. I might have had one
13 copy just as evidence to prove that I worked with
14 them at one point. But, you know, as far as all of
15 this, they might have done it from the company.
16    Q. My question, again, was a little bit
17 different.
18        Were you asked to go look for
19 documents or did you look for documents in response
20 to a request by the defendants in this case?
21        INTERPRETER: Come again on the
22 question, Counsel.
23    Q. (BY MR. SADYKHOV) Yeah. My question was a
24 little different. My question was: Did you look for
25 responsive or relevant documents in response to a

Page 29

1 request by the defendants in this case?
2     A.  Well, I just had, like, two or three stubs,
3 you know, like I said before.  I never kept them.
4 You know, maybe one, two, or three stubs that I had
5 kept.  That's it.
6     Q.  So you did give some paychecks or pay stubs
7 to your attorney, correct?
8     A.  I don't recall.  I don't recall doing so,
9 you know.  If they have that documentation, they must
10 have gotten it from the company.
11     Q.  Mr. Rodriguez, how would -- how would your
12 attorneys have gotten this document from the company,
13 and why would they then produce it in response to our
14 request for documents?
15          Are you sure you did not give this
16 document to your attorney?
17     A.  I honestly cannot tell you because I don't
18 remember doing so.  You know, at the beginning that
19 this all began, I might have sent it to them.  But I
20 don't know.  Like I said, you know, I looked at the
21 information.  I might have taken two or three screen
22 shots of the Paycom.  If I did send it to them, I
23 don't know.
24     Q.  So it's at least possible that you gave the
25 document we're looking at to your lawyer, right?

1 It's at least possible?
2     A.  The only thing -- the only thing that I can
3 tell you is that I don't remember if I did or not
4 because I don't know.
5     Q.  That's fair.
6          So going back to my question earlier,
7 did you look around your house or your office or
8 anything like that for documents that are relevant to
9 the case?
10     A.  I didn't have any.  The only thing that I
11 could have had was from Paycom.  So I never looked
12 because I knew I didn't have anything.  Nothing ever
13 came in the mail or anything for me.  You know, all I
14 did was whenever payday came along, I went to see if
15 the payment was made and that was it.
16     Q.  I think I understand.  So just to make sure
17 I got your testimony clearly, you did not search for
18 any documents in response to requests by the
19 defendants, correct?
20     A.  Well, I had seen that I wasn't being paid
21 overtime, you know, that I was only being paid daily
22 rate, just for a rate.
23          MR. SADYKHOV:  I'm going to object as
24 nonresponsive.
25     Q.  (BY MR. SADYKHOV)  Mr. Rodriguez, that's

1 not the question that I asked you.  And I'm going to
2 ask that you please only answer the questions that
3 I'm asking you or else our Friday is going to drag on
4 a long time.  Please just answer yes or no.
5          You did not look for documents because
6 you didn't have any, right?
7     A.  When you are referring to documents, are
8 you referring to the pay stubs?
9     Q.  Any documents.  For instance, do you
10 remember signing an employment agreement with Cobra?
11     A.  Yes.
12     Q.  Do you still have that document?
13          MR. SADYKHOV:  That didn't sound like
14 a yes or no.
15          MR. WELMAKER:  Do you want me to try
16 and say something?
17          MR. SADYKHOV:  Yeah, if you want to go
18 off the record -- let's go off the record real quick,
19 Shauna.
20          (Recess from 3:35 p.m. to 3:36 p.m.)
21     Q.  (BY MR. SADYKHOV)  All right.
22 Mr. Rodriguez, I'll just ask again.  Like I said,
23 just to keep the record clean -- again, I'm not
24 trying to be a jerk.  I just need clean answers and a
25 clean record.

1          So you did not look for documents in
2 response to requests by defendants, correct?
3     A.  Yes, I looked for the documents.  I looked
4 for the stubs to verify they were paying me right,
5 and I did.  I did look.
6     Q.  In connection with this lawsuit, correct?
7     A.  Correct.
8     Q.  Where did you look?
9     A.  In the pictures that I had from Paycom.
10     Q.  Did you look for any -- and again, like,
11 for instance, your contract or any other physical
12 documents in your house or anywhere else?
13     A.  No, no.
14     Q.  So -- one second.  One of the documents
15 that we had requested from you in this case was to
16 produce any documents relating to any licenses,
17 agreements, or certifications.
18          Are you aware that we've requested
19 that in this case?
20     A.  No.
21     Q.  In your discovery responses, you had said
22 that you don't have any of those kind of documents;
23 but earlier you testified that you do have one of
24 your certifications at least, correct?
25          MR. WELMAKER:  That's my fault.  I

1  didn't follow up with some of those with him.  So --
2         MR. SADYKHOV:  Okay.
3         MR. WELMAKER:  I'll go back and
4  supplement what we don't --
5         MR. SADYKHOV:  Yeah.
6     A.  You guys asked, and I -- so the thing is
7  that, you know, you asked me about the certification
8  and, you know, as a lineman, that's why I was able to
9  get a job as a lineman.  Well, they never actually
10 even asked me for it since they already knew that I
11 worked as a lineman.  So the -- the company never
12 asked for it because they knew that I was a
13 journeyman lineman.
14    Q.  (BY MR. SADYKHOV)  I understand that.  And
15 again, I appreciate it, but my reasons for asking are
16 a little bit different and, candidly, my reasons are
17 for me to know.  All I'm trying to do here is to get
18 information about stuff that I'm allowed to find out
19 about.  So I'm not trying to trick you.  I just want
20 you to answer the question that I've asked.  And in
21 this case, I'm just asking about some of the
22 documents.
23        One of the other documents that we
24 asked for, for example, was, you know, your driver's
25 license.  And again, I understand that you do have
                                            Page 34

1  that, but that's something that we'll work out with
2  your attorney.  That's between us.
3         So I just want you to answer the
4  questions that I'm asking you, okay?  You don't need
5  to elaborate unless I ask.  Is that okay?
6     A.  Okay.
7     Q.  All right.  Did you ever receive an offer
8  letter from Cobra?  And by "offer letter," I mean an
9  offer of employment.
10    A.  No.
11    Q.  You don't remember receiving a letter that
12 has, you know, an offer with hours and then signing
13 it and returning it back, or like an hourly rate?
14    A.  And so, no.  They called me.  They told me
15 to report to the office.  You know, they just sent me
16 an invitation if I wanted to work for them, to report
17 at the office, fill out some paperwork and, once it
18 was ready, I would be ready to work.
19        MR. WELMAKER:  Can we go off the
20 record one more time?
21        MR. SADYKHOV:  Yes, please.
22        (Recess from 3:44 p.m. to 3:45 p.m.)
23    Q.  (BY MR. SADYKHOV)  So did someone call you
24 to give you that offer?
25    A.  Yes.
                                            Page 35

1         (Discussion off the record)
2     Q.  (BY MR. SADYKHOV)  You said earlier,
3  Mr. Rodriguez, that you received the invitation
4  orally; is that correct?
5     A.  Correct.
6     Q.  And do you remember who called you to give
7  you the offer?
8     A.  Yes.
9     Q.  Thank you.  You're doing a really great job
10 of answering just what I'm asking.  Go ahead.
11    A.  Go ahead.
12    Q.  Now I'll ask:  So who was the person who
13 called?
14    A.  Waylon Gore.
15    Q.  And what did he tell you when he called
16 you?
17    A.  Well, that he found out that we could work
18 and that if I wanted to take some work here working
19 with the Hurricane Maria.
20    Q.  And did he tell you anything about how you
21 would be paid?
22    A.  No.
23    Q.  And you decided to go to Puerto Rico
24 without knowing how you would be compensated for the
25 work?
                                            Page 36

1     A.  That all the information would be given to
2  me at the office when the paperwork was done.
3     Q.  But without knowing how much your
4  compensation would be, how did you know it would be
5  worth it to go there for the job?
6     A.  Well, because of experience.  I'll talk to
7  somebody else who is working over there as a lineman
8  or a journeyman, and they tell me and how much they
9  are making and I can more or less see how much they
10 are paid.
11    Q.  I think I understand.  So basically you
12 didn't know exactly how much you would be paid, but
13 you thought it would be more than you were being paid
14 at the time.
15        Is that a fair statement?
16    A.  Well, no.  I wasn't working anywhere at the
17 time.
18    Q.  I understand.  Got it.  So there was
19 nothing to compare it to, right?
20    A.  Exactly, because I wasn't working.
21    Q.  Understood.  Thank you.
22        When did you first find out -- I'm
23 sorry.  Scratch that.
24        Did Waylon say anything about how you
25 would be paid, the method of payment?
                                            Page 37

1     A.   No.
2     Q.   So he didn't say anything about it being
3  hourly pay or a salary or anything like that?
4     A.   No.  They told me at the office.
5     Q.   And when you say "the office," is that in
6  Puerto Rico?
7     A.   Yes.  Where they sent me to fill out the
8  paperwork, the office in Puerto Rico, yes.
9     Q.   And that was during your orientation,
10 correct?
11    A.   Correct.
12    Q.   Do you recall attending that orientation?
13    A.   Yes.
14    Q.   Give me one second.
15         Do you remember what was discussed at
16 the orientation?
17    A.   No.
18    Q.   Do you recall if that's when you were first
19 told about your rate of pay?
20    A.   Yes.
21    Q.   Do you recall what you were told about your
22 rate of pay?
23    A.   Yes.  A thousand dollars a day.
24    Q.   Did anyone mention anything about that
25 daily rate being broken down into an hourly rate?

1  But like clock-out time, there wasn't never a
2  clock-out time.
3     Q.   How did you know when it was time to go
4  home for the day?
5     A.   Well, that, I didn't decide.  It was either
6  the foreman or the GF would come and they would say
7  the weather -- it started raining and there wasn't
8  any visibility and that was it for work that day.
9     Q.   But if the -- so I guess if the sun went
10 down, you wouldn't have enough visibility to work,
11 correct?
12    A.   Correct.  So sometimes we have lights, but
13 sometimes we were up in the mountains, too, and there
14 was fog.  And because of it, you know, we couldn't --
15 we couldn't work.
16    Q.   So on a clear day with perfect visibility,
17 perfect weather, how do you know when to end the day?
18    A.   Like I said, I wasn't the GF.  I was a
19 lineman -- nor a foreman, so I wasn't the person who
20 decided that.
21    Q.   So your day ended when your supervisor told
22 you to go home, right?
23    A.   Exactly.  Well, they were the bosses, you
24 know, and they were the ones who decided until when
25 we were going to have to work.

1     A.   No, no.
2     Q.   Do you recall filling out paperwork at the
3  orientation?
4     A.   I don't remember.
5     Q.   Okay.  Did they ever discuss your shifts or
6  how many hours you would be working at the
7  orientation?
8     A.   They didn't talk about a shift.  They just
9  said about re-establishing the electrical service
10 and, once done, taking the day off.
11    Q.   I'm sorry.  Say that last part again.
12    A.   And once it was done, taking the day off.
13    Q.   Got it.  So what you mean is at the end of
14 the day when you were done working for the day, you
15 were free to go is what you're saying?
16    A.   Well, we would work until, you know, the
17 visibility or the weather would, you know -- as much
18 as it would allow us.
19    Q.   Is it fair to say that your shift was sun
20 up to sun down?
21    A.   You could say yes.
22    Q.   Did you have a certain set shift schedule?
23 Did you have to be there at a certain time and end at
24 a certain time?
25    A.   Only to start work at 6:00 in the morning.

1     Q.   Got it.  I'm just trying to go through and
2  cut out some of these questions.
3         What was -- what was your -- so, I
4  guess, did you ever work more than 16 hours in a day,
5  to your recollection?
6     A.   More than 16 hours?  No.
7     Q.   What would you say is the maximum number of
8  hours in a day that you had to work when you were
9  employed by Cobra?
10    A.   16.
11    Q.   Okay.  So 16 was the maximum?
12    A.   If I'm not mistaken, I think the most that
13 we worked were 16.
14    Q.   Because you mentioned that you would start
15 at 6:00 a.m.  And so, 12 hours of work would be
16 6:00 p.m.  And 16 hours of work, that means you would
17 be getting off at 10:00 p.m.
18         Does that sound familiar?
19    A.   Yes, up until 10:00.
20    Q.   Thank you for clarifying that.  I
21 appreciate it.
22         And did you work seven days a week?
23    A.   Yes.
24    Q.   At the end of the day -- actually, sorry.
25 Let me ask this.

1        While you were working for Cobra,
2    where did you live on the island?
3        A.  In Gurabo, Puerto Rico.
4        Q.  And did you go home at the end of the day,
5    or did you stay in a hotel?
6        A.  I went home.
7        Q.  Is it the same home that -- that we talked
8    about earlier when we started the deposition?
9        A.  Yes.
10       Q.  And so, you never had to stay at a hotel?
11   You always got to go home?
12       A.  Well, I had the hotel.  But, you know,
13   since I had a home, you know, whenever I could, I
14   would go back to the house.  If it was too late, then
15   I would stay, you know, where they had available for
16   us to stay.
17       Q.  So it just depended on the situation?
18       A.  Yes, because -- you know, if it was far
19   away.  But if I could, I would go back.  But if not,
20   I would stay wherever they had us stay.
21       Q.  Would it be fair to say on days when you
22   worked 16 hours you would stay at the hotel versus
23   going home?
24       A.  Affirmative.
25       Q.  To the hotel?

Page 42

1    on standby, never.
2        Q.  What do you mean by it was spoken of?
3        A.  Well, I actually never heard them say
4    anything.  I know that in our line of work they do
5    have some workers that they put on standby for
6    electrical.  But me myself, nor any group that I
7    worked close with, Cobra told us that we were on
8    standby or told them that they were on standby.
9        Q.  I understand that no one told you that you
10   were on standby, but my question was a little bit
11   different.
12       My question was:  You understood, did
13   you not, that after your shift if you were called
14   back for emergency that you would be expected to go
15   back, correct?
16       A.  Well, in our line of work, that is done.
17   But I was never told before going home to be ready to
18   turn back around to come back to work.
19       Q.  I understand that you were never told that.
20   And again, that's not what I was asking.  That will
21   be a question for later.
22       What I'm asking is:  You understood,
23   did you not, that if there was an emergency, you
24   might be required to go back to work?
25       A.  Yes, yes.

Page 44

1        A.  Yes.
2        Q.  Do you -- let me ask it this way.
3        Can you estimate how many times you
4    had to stay at the hotel versus going home?  A rough
5    percentage is fine.
6        A.  I don't recall, but normally I would stay
7    where they had us stay because I was about an hour
8    and a half away from home.  It was far.
9        Q.  So more often than not, you would stay at
10   the hotel?
11       A.  Yes.  Yes, due to tiredness and the
12   distance.
13       Q.  So would it be fair to say that more often
14   than not, you worked close to 16 hours?
15       A.  I couldn't answer that question.  It was so
16   much going on.  I wouldn't be able to give you an
17   accurate answer.  I don't know.
18       Q.  Okay.  "I don't know" is fine.  Thank you.
19       So when you went -- when you were done
20   at the end of your shift -- at the end of the
21   workday, you understood that if there was some sort
22   of emergency, you could be called back to come back
23   to work, correct?
24       A.  So we never -- well, it was spoken of.  But
25   myself personally that they told me that I would be

Page 43

1        Q.  Thank you.
2        And if they had called you back and
3    you didn't show up or you just refused, what do you
4    think would happen?  Would they fire you?
5        A.  Well, they would have suspended me.  I
6    don't know the rules.  Suspension or fired me.
7        Q.  Okay.  Thank you.
8        And earlier you mentioned that there
9    wasn't a set amount of hours that you would work in
10   one shift; is that correct?
11       A.  That's correct.
12       Q.  So if you had been there from 6:00 a.m. to
13   6:00 p.m. but there was some work that required you
14   to stay until 7:00 or 8:00, you couldn't just refuse
15   and go home, correct?
16       A.  Correct.  We left when the scheduled work
17   for that day was completed.
18       Q.  And that -- whenever the scheduled work was
19   completed, that was dictated by Cobra, correct?
20       A.  Correct.
21       Q.  And so, you had to listen to what your
22   supervisor said, right?
23       A.  Correct.
24       Q.  And you could be suspended or fired if you
25   didn't listen, right?

Page 45

12 (Pages 42 - 45)

1    A.  Correct.
2    Q.  Thank you.
3          And all of what we've been talking
4   about -- you know, following supervisor directions,
5   staying as long as needed to get the job done -- you
6   understood that all to be part of your working
7   relationship with Cobra, your agreement with Cobra.
8          Is that fair to say?
9          INTERPRETER:  Can you come again on
10  that question, Counsel?
11   Q.  (BY MR. SADYKHOV)  Yeah.  Everything that
12  we've been talking about, it forms part of your
13  agreement or your working relationship with Cobra?
14          MR. WELMAKER:  Objection.  Form.
15   Q.  (BY MR. SADYKHOV)  You can still answer,
16  Mr. Rodriguez.
17   A.  Can you repeat the question?  Or was it
18  decided that I shouldn't answer the question?  I
19  didn't understand what my attorney had said.
20          MR. WELMAKER:  Any time I object,
21  unless I specifically tell you not to answer, you can
22  go ahead and answer.
23   A.  So should I answer in this case or not?
24   Q.  (BY MR. SADYKHOV)  Yes, please.
25   A.  Could you repeat the question, please?

Page 46

1          MR. SADYKHOV:  Shauna, could you
2   please repeat that?
3          (The record was read as requested.)
4    A.  Yes.  I only followed instructions from my
5   foreman, whatever they would say, if we kept working,
6   if we stopped working, you know.  Either the GF or
7   the foreman, you know, whatever they would say.
8    Q.  (BY MR. SADYKHOV)  And that was your
9   understanding of your agreement with Cobra, correct?
10   A.  Yes.
11   Q.  Thank you.
12          MR. SADYKHOV:  I think now would be a
13  good time for a five-minute break.  We've been going
14  over an hour.
15          (Recess from 4:16 p.m. to 4:31 p.m.)
16   Q.  (BY MR. SADYKHOV)  Mr. Rodriguez, before --
17   A.  Yes.
18          (Discussion off the record)
19          MR. SADYKHOV:  Let's go off the
20  record.
21          (Recess from 4:32 p.m. to 4:34 p.m.)
22   Q.  (BY MR. SADYKHOV)  Mr. Rodriguez, are you
23  ready to go back on the record?
24   A.  I'm ready.  Something went wrong with the
25  volume of the phone.

Page 47

1    Q.  No problem.  We got it fixed.
2          All right.  Before -- before working
3   for Cobra, had you ever done storm work before?
4    A.  Yes.
5    Q.  When and where?
6    A.  In Puerto Rico.
7    Q.  When was that?
8    A.  George.
9    Q.  And then later Maria and Irma, correct?
10   A.  So in 1989, Hurricane Hugo.  1998,
11  Hurricane George and Maria.  So those.
12   Q.  What was the company that you worked for?
13   A.  PREPA, Puerto Rico Energy Power Authority.
14   Q.  How did you hear about the -- the storm
15  work opportunity for Hurricane Maria?
16   A.  So since I had already worked in Puerto
17  Rico with PREPA, you know, they -- one way or
18  another, they knew that I knew the system and the
19  geography in Puerto Rico.  I had actually retired
20  right when the hurricane came in 2017, and they must
21  have got my number, Mr. Waylon Gore, and he offered
22  work since I knew the area.
23   Q.  And you had never worked for Cobra before
24  you took on the Hurricane Maria job, right?
25   A.  No.

Page 48

1    Q.  Why did you stop working for Cobra?
2    A.  So I didn't -- once they left Puerto Rico,
3   then I no longer wanted to, you know, keep working
4   with them since the contract in Puerto Rico was over.
5   So I didn't want to keep working with them.
6    Q.  Got it.  And your job title was operator;
7   is that correct?
8    A.  No.  Journeyman lineman.
9    Q.  Thank you.  Sorry about that.  4:40 on a
10  Friday in Texas.
11          All right.  Who did you -- what was
12  the name of your supervisor that you reported to?
13   A.  Estevan.  So Steve was -- his name was
14  Estevan.  He was, like, a Mexican-American.  His last
15  name was Olivares.
16   Q.  Estevan Olivares?
17   A.  I'm going to write it down on a piece of
18  paper to show it to you.
19   Q.  Thank you for that.
20   A.  That was my foreman.
21   Q.  Got it.  Thank you.
22          Before you went out to the work site
23  for the day, was there somewhere where you gathered
24  with the other members of your crew?
25   A.  Correct.

Page 49

13 (Pages 46 - 49)

1    Q.   Was that the yard?
2    A.   The yard is correct.  That's right.  The
3  yard.  Do you need me to tell you the town it's in,
4  or have you asked me that yet?
5    Q.   I don't think I asked, but go ahead and let
6  me know.  What town was the yard in?
7    A.   Yabucoa, Puerto Rico.
8    Q.   Always the same -- same yard?
9    A.   We did change yards.  Not the same.
10    Q.   Okay.  Do you recall around how many times,
11  how many different yards?
12    A.   So in Yabucoa in Roosevelt Road.  In Ceiba
13  in the rainforest, El Yunque.
14    Q.   I think our reporter needs clarification on
15  the spelling.
16         INTERPRETER: I'll go ahead and
17  suggest the spelling for Yabucoa.  I believe that's
18  Y-A-B-U-C-O-A.  Roosevelt Road, that's in English, I
19  believe.  Ceiba, C-E-I-B-A.  And El Yunque is E-L
20  space Y-U-N-Q-U-E.
21    Q.   (BY MR. SADYKHOV)  Did you pick up your
22  equipment for the day in the yard also?
23    A.   Yes.
24    Q.   And where did you -- let me ask you this.
25         Did Cobra provide you with any meals?

Page 50

1    A.   Yes.
2    Q.   Have you ever seen a document like this
3  before?
4         MR. SADYKHOV:  I can zoom in or scroll
5  down, whatever he needs me to do.
6    A.   Can you make it larger for me, please?  I'm
7  not sure here if this is a pay stub or what kind of
8  chart this is.
9    Q.   (BY MR. SADYKHOV)  It's -- so it's
10  basically -- it's a time detail report.  And so, it's
11  a report that we got from the company that --
12         (Simultaneous cross-talk.)
13    Q.   (BY MR. SADYKHOV)  So you have never seen
14  this document before, right?
15    A.   No.
16    Q.   This is your name at the top, though,
17  correct?
18    A.   Yes.
19    Q.   You never filled out any sort of time
20  sheets or hours reports, did you?
21    A.   No.  The foreman did that.
22    Q.   Okay.  And the foreman was Estevan
23  Olivares?
24    A.   I understand that to be so, but I don't
25  know if it was him or not and when they did it or

Page 52

1    A.   So, they would not give us any food.  They
2  would give us time to go buy and get the food or
3  bring it if needed, but they would not provide us
4  with the food.
5    Q.   And they didn't feed you guys at the hotel?
6    A.   Sometimes, depending on the time you were
7  able to make it back, you would be able to catch some
8  food, but sometimes there wasn't any.
9    Q.   Okay.  But you were able to eat your
10  regular meals whenever you normally did, right?  You
11  were able to eat your breakfast, lunch, and dinner
12  while working?
13    A.   Well, we always ate.  With this type of
14  work, you had to have something to eat, even if it
15  meant just eating something quickly and continuing
16  work.  But we had to eat.
17    Q.   Okay.  I'm going to pull up on my screen
18  what I'm marking as Exhibit 3, I believe.  I told
19  myself I wasn't going to lose track, but I did.  I
20  think we're on 3.
21         COURT REPORTER:  That's correct.
22         (Exhibit 3 marked)
23    Q.   (BY MR. SADYKHOV)  Okay.  I'm going to
24  share my screen.  Mr. Rodriguez, can you see this
25  document that I have on the screen?

Page 51

1  not, you know.  I wasn't aware of that.  It was not
2  part of my duties.
3    Q.   How did you know that someone was filling
4  out time sheets for you?
5    A.   Well, I saw that they were filling out
6  documents daily.  I'm guessing that it's from
7  verifying that you went to work that day.
8    Q.   So you're saying you saw them filling out
9  time sheets and turning them in to verify that you
10  had worked that day?
11         MR. WELMAKER:  Objection.  Form.
12  That's not what he said.
13    A.   Come again.  Come with the question again.
14         INTERPRETER:  Interpreter will repeat.
15    A.   So that's not what I said.  All I said was
16  that they filled out paperwork, but I don't know what
17  it was.  I know that -- you know, that that's what
18  they were doing.  They had to do, like, the job
19  briefing paperwork.  I'm not a foreman.  I don't know
20  what they were doing.
21    Q.   (BY MR. SADYKHOV)  Why did you mention time
22  sheets?
23    A.   Well, I said possibly it could be.  You
24  know, I don't know.  It possibly could be the job
25  briefings, you know.  I don't know.

Page 53

14 (Pages 50 - 53)

1    Q.   Okay.  And you don't remember your exact
2 start and end dates of employment, right?
3    A.   So I started around the first or second
4 week of May in 2018, and I came to finish working
5 about March or April of 2019.
6    Q.   Is there any reason to believe that
7 May 15th is not your accurate start date?  May 15th
8 of 2018.  I'm sorry.
9    A.   Yes, it could be.  I'm not quite sure, but
10 I know that it was in May.
11    Q.   And do you have any reason to believe that
12 your last full workday wasn't March 15th of 2019?
13    A.   I'm not sure if -- it was either the 15th
14 of March or the 15th of April.  I'm unsure.
15    Q.   You don't know either way, correct?
16    A.   I don't know.  I don't remember.  I don't
17 remember.
18    Q.   One second.
19         While you were working for Cobra, did
20 you ever take any time off for any vacations?
21    A.   So yes, there were some days that we took
22 off that we went out, that they gave us.  The
23 disaster started, you know, slowing down.  They were
24 giving us certain Sundays off.  Yes, Sundays.
25    Q.   Only Sundays?  You didn't take any other

Page 54

1         MR. WELMAKER:  Yeah, go ahead and
2 translate.
3         MR. SADYKHOV:  My question was whether
4 or not he's seeking overtime damages for those days
5 when he didn't perform any work.
6    A.   So I cannot really answer that or know.  I
7 can't say because maybe I did go to work and there's
8 a mistake in the document that you're showing me.  So
9 I really can't say.
10    Q.   (BY MR. SADYKHOV)  All right.
11         MR. WELMAKER:  Just to be clear, if
12 there's no time written down there, I'm not seeking
13 damages for that.
14         MR. SADYKHOV:  I appreciate that.
15 Thank you.  And I will try to use that stipulation to
16 streamline.
17    Q.   (BY MR. SADYKHOV)  Let me just ask really
18 quick:  Do you remember taking around two, maybe two
19 and a half weeks off maybe in October or November of
20 2018?
21    A.   No.  You couldn't do that like that.  This
22 was an emergency.  This was a storm.  You couldn't
23 take days off like that.
24    Q.   Do you recall taking paid time off or PTO
25 around the time that you stopped working for Cobra?

Page 56

1 time off?
2    A.   So I don't remember really if I did take
3 some days of that they gave us or if I went on
4 vacation.  I really don't -- don't recall if they,
5 you know, gave us some days off, as well.
6    Q.   Does July 2nd through July 10th of 2018
7 sound familiar to you, taking that -- that time off?
8    A.   In 2018?
9    Q.   2018.
10    A.   I see what you have highlighted there.  I
11 just don't recall.  I'm not sure if I already had
12 something scheduled at the time.
13    Q.   So you don't know one way or the other, but
14 it's possible that you weren't working those days?
15    A.   So, yes, I don't remember the reason.  I'm
16 not sure what happened during those days.  Maybe I
17 got sick.  I don't know.
18    Q.   And so, you're not claiming overtime for
19 any days when you didn't perform any work at all,
20 correct?
21         MR. WELMAKER:  We'll stipulate we're
22 not seeking damages for that time.
23         MR. SADYKHOV:  Okay.  Thank you.
24 Appreciate it, Doug.  And, Diego, I'm not sure if you
25 got the chance to translate.

Page 55

1    A.   So the thing is I'm not sure because I
2 don't recall taking any vacations or, you know,
3 having them give us so many days off like that, you
4 know.  I remember once we were getting done with the
5 reconstruction of the electric system them giving us
6 a couple of days off.  But that many days off, I
7 don't recall.
8    Q.   Were you offered paid time off as a
9 benefit?
10    A.   The thing is that, you know, this is an
11 emergency.  They don't use that, you know.  Whenever,
12 you know, there's a storm, you know, they cancel,
13 like, vacations.
14    Q.   My question was a little different.
15         Do you remember if they offered it as
16 a benefit tied to your employment?  Whether or not
17 you took vacation or whether or not you could have --
18 whether or not you did or could have, was it a
19 benefit that was offered to you?
20    A.   I don't remember.
21    Q.   Okay.  Thank you.
22         All right.  We're going to go back to
23 Exhibit 2 for now.
24         MR. SADYKHOV:  You know what?
25 Actually, I'm going to mark as Exhibit 4 these

Page 57

1 earnings statements, Anthony, just so you know.
2        (Exhibit 4 marked)
3    Q.  (BY MR. SADYKHOV) So, Mr. Rodriguez,
4 earlier we looked at some check stubs that you had
5 produced through your attorney, and I'll just
6 stipulate to you that these are the ones that we
7 produced from the company.
8        Do you see that they are a little
9 different?
10    A.  Well, yes.  Now that I'm looking at it like
11 that open, yes, yes.
12    Q.  Okay.  All right.  The first page is
13 Bates-labeled 7.  So this appears to be a paycheck
14 from Cobra Acquisitions, LLC.  This is for the pay
15 period of March 18th, 2019, through March 31st, 2019.
16        Do you see where I've read that?
17    A.  Can you make it bigger, please, so that I
18 can see the dates that you're talking about?
19        Yes, that says March 5th --
20    Q.  The pay date is April 5th.  The period is
21 March 18th.
22    A.  That's right.  That's what that says.
23    Q.  So this is -- this is -- you would agree
24 that this is a pay stub or a check stub similar to
25 the ones that we looked at earlier that you had

1 produced through your attorney, right, but not
2 exactly?
3    A.  Being the same date -- I can't recall if
4 that's the same date or not.
5    Q.  So over here, do you see here where it says
6 "Pay basis:  Hourly"?
7        Do you see where I've read that?
8    A.  Yes.
9    Q.  Do you understand what that means?
10    A.  Well, the basic payment per hour.
11    Q.  Thank you.
12    A.  I'm going to put my phone to the charger
13 right now.  Give me a moment.
14        MR. SADYKHOV:  Doug, we're getting
15 close.
16        MR. WELMAKER:  And just, by the way,
17 Emil, the pay period that is being questioned, the
18 last day is July 23rd of 2018.  The period in
19 question as far as my guys are concerned and their
20 overtime claims are concerned ends July 23rd, 2018.
21 Anything after that, I'm not seeking recovery for
22 because that's when the pay changed a little bit.
23        MR. SADYKHOV:  Yeah.  I'm playing
24 catch-up a little bit.
25        MR. WELMAKER:  Yeah, I know you are.

1        MR. SADYKHOV:  But thank you.  I
2 appreciate that, Doug.
3        MR. WELMAKER:  Sure.
4    Q.  (BY MR. SADYKHOV) All right.  All right.
5 So, Mr. Rodriguez, I'll stipulate that this is
6 another similar pay stub.  It's just a different pay
7 period that's within the relevant time period.
8        Do you understand that this is just a
9 different version of what we just looked at?
10    A.  Yes.  It has a different date, yes.
11    Q.  And so, it says "hourly" here.  It also
12 says "regular" and your rate and "overtime," along
13 with a different rate of 70.95.
14        Do you see where I've read that?
15    A.  Yes.
16    Q.  And so, you had seen these paychecks
17 before, right, because you could access them through
18 the Paycom app; is that correct?
19    A.  So the thing is I just wasn't sure -- I was
20 just making sure that the payment came in when it was
21 supposed to because I was under the understanding
22 that they were going to be paying me a thousand
23 dollars a day.  How they detailed it on the pay stub,
24 I wasn't aware of that.  All I knew is that I was
25 going to be paid a thousand dollars a day.  How they

1 placed it there, I don't know.
2    Q.  So you had access to these and you had seen
3 them before while you were still employed by Cobra,
4 correct?
5    A.  Yes.  I saw some, yes.  I saw it at the
6 beginning to make sure what they were saying.  And
7 then, you know, it was a thousand dollars a day, and
8 I would make sure that it was being deposited as
9 such.
10        MR. SADYKHOV:  I'm going to object to
11 everything after "I saw some, yes," as nonresponsive.
12 You don't need to translate that, Diego.
13    Q.  (BY MR. SADYKHOV) So you had seen these
14 check stubs before while you were working for Cobra,
15 correct?  Yes or no?
16    A.  Yes.
17    Q.  But you just testified that you were under
18 the understanding that you were being paid a day
19 rate; is that right?
20    A.  That I was going to be paid a thousand
21 dollars a day.  That's what I was charging because
22 that's what they told me that they were going to be
23 paying.
24    Q.  Okay.  And so, if that's what they told you
25 but this check stub that you had access to said

1 something else, did that bring up any questions or
2 make you curious? Did you ever wonder why this isn't
3 a day rate?
4     A.  Well, no, you know.  That's what they sent
5 in.  You know, I wasn't curious because they told me
6 that they were paying me a thousand dollars a day.
7     Q.  And as long as you were receiving the
8 equivalent of a thousand dollars a day, you're saying
9 you just didn't care about the details in the check;
10 is that correct?
11    A.  Exactly.
12    Q.  And so -- scratch that.
13         And so, it's possible, wouldn't you
14 agree, that Cobra was calculating your pay on an
15 hourly rate?  They were just reaching the same
16 results that they knew you wanted?
17    A.  From what I understood it to be, yes.  You
18 know, I didn't understand how they were detailing it
19 on that.  So that's what I understood.
20    Q.  And did you understand that you were being
21 paid for 16 hours a day and that it was roughly or at
22 least close to the equivalent of the day rate that he
23 [sic] was seeking?
24    A.  So I'll say it again, you know.  I just
25 followed instructions.  Whatever time they told me to

Page 62

1     Q.  I understand that, but I'm asking you a
2 different question.  I'll move on.
3         So would you change your testimony
4 earlier when you said that the check that you
5 produced didn't show any hours?  Now that we're
6 looking at it and it refreshes your memory, do you
7 want to change that testimony?
8     A.  Well, the thing is that that's not the
9 check there.  The check is at the bottom where that
10 green one is.  If you say "the check," I consider it
11 to be the green part.  Now, the stub, you know, it
12 does have the details on it.  If you tell me about
13 the check, then it's the one that's in color.
14    Q.  All right.  Yes or no, do you agree that
15 the pay stub shows an hourly rate of pay and the
16 amount of hours that you worked?
17    A.  That's what it says there.  There's some
18 hours there that are being detailed, yes.
19    Q.  So -- got it.  So your answer is yes, the
20 pay stubs do reflect hours worked and an hourly rate,
21 correct?
22    A.  That's what the stub says, correct.
23    Q.  Thank you.
24         Now we'll go down to Bates label 28 --
25 29.  I'm sorry.  We're almost done, Mr. Rodriguez.  I

Page 64

1 leave work, I would leave.
2     Q.  But did you understand that you were being
3 paid for 16 hours a day?
4     A.  No, because I wasn't working per hour, you
5 know.  They told me that I was going to be making a
6 thousand dollars a day.
7     Q.  And to be fair, you were making close to
8 that amount; isn't that right?
9     A.  Well, what they told me that they were
10 going to give me.
11    Q.  Earlier when we first talked about the
12 checks that you had produced to your attorney, I
13 believe you testified that they did not show any sort
14 of hours worked.
15         Do you recall testifying to that?
16    A.  No.  So what I said is that I hadn't seen
17 that document, that chart that you showed me.  But
18 the -- from the pay stubs that the attorney showed
19 me, he didn't show them to me.  I had a picture of
20 those.
21    Q.  Okay.  But the ones we looked at before,
22 they do show your hours, don't they?
23    A.  That's what it says there, you know.  They
24 can detail it how they want, you know.  What I was
25 being paid was a thousand dollars a day.

Page 63

1 promise.
2         All right.  Do you see here where it
3 says -- I'm sorry.  We're going back to 28.  All
4 right.  Do you see here where it says your hourly
5 rate times -- plus your overtime hourly rate times
6 the amount of hours and that's how they are
7 calculating this portion?
8         Do you understand that?
9     A.  Well, yes, I see where it says regular,
10 overtime.  And I don't see the other part because
11 it's a bit small.  If you can make that bigger for
12 me, please.  I do see it there, regular, overtime,
13 and day rate.  I do see how they broke it down here.
14    Q.  Thank you.
15         And so, this is a two-week pay period,
16 correct?
17    A.  Yes.  From the 28th through the 10th.
18    Q.  And two weeks is 14 days, correct?
19    A.  Yes.  From the 28th -- yes.
20    Q.  Thank you.
21         And so, if you were truly paid a day
22 rate of a thousand dollars per day for 14 days, your
23 total compensation should be $14,000 flat, no cents,
24 correct?
25    A.  Correct, yes.

Page 65

17 (Pages 62 - 65)

1    Q.   And do you see that's not the case
2  here?
3    A.   Well, I see 14,000 there.
4    Q.   But --
5       (Simultaneous cross-talk.)
6    Q.   (BY MR. SADYKHOV)  14,000.80, correct?
7    A.   With 80 cents.
8    Q.   So it's not the same number as 14,000 and
9  zero cents, correct?
10   A.   That's correct.  That's what it says there,
11 14,000.80.
12   Q.   Thank you.
13       Did you ever ask anyone about that
14 discrepancy?
15   A.   So, you know, they are giving me a thousand
16 and it's for 14 days and I see 14,000, you know, then
17 it's right.  You know, where those 80 cents came
18 from -- you know, nobody asked where they came from,
19 you know.  It was 80 cents -- you know, I don't know.
20 Nobody asked.
21   Q.   Better to just keep quiet and take the
22 extra pay, right?
23   A.   You know, somebody -- you could say
24 somebody made a mistake or something.  You know, I
25 saw 80 cents there but, you know, I don't know.

Page 66

1    Q.   Do you know how much you're seeking in
2  damages in this case, in total damages?
3    A.   I have an idea more or less, but no.  The
4  answer is no.
5    Q.   Do you know the -- can you give me an
6  approximate number of how much you're seeking?
7    A.   No.  I don't know.  I have no idea.
8    Q.   Okay.  Did you ever complain to anyone at
9  Cobra about the way that you were paid?
10   A.   No.
11   Q.   Have you ever earned more at another job
12 than you have at Cobra?
13   A.   No.
14   Q.   Did you ever complain about your hours that
15 you were working?
16   A.   Like I said -- and I'll repeat it -- I was
17 being paid a rate of a thousand dollars a day.
18       MR. SADYKHOV:  I'm going to object as
19 nonresponsive.  That is not my question.
20   Q.   (BY MR. SADYKHOV)  My question was:  Did
21 you ever complain to anyone about the number of hours
22 you were working?
23   A.   No.
24   Q.   Thank you.
25       MR. SADYKHOV:  All right.  Can we go

Page 67

1  off the record real quick?  I think I'm done, but I
2  have to check my outline.
3       MR. WELMAKER:  Sure.
4       (Recess from 5:34 p.m. to 5:36 p.m.)
5    Q.   (BY MR. SADYKHOV)  I just wanted to clarify
6  one thing with you.  And I know we went over it, so
7  I'm very sorry to ask again.  But did you -- you
8  testified earlier that you never worked in the United
9  States prior to around 2020; is that correct?
10   A.   No.
11       MR. SADYKHOV:  All right.  No further
12 questions.
13       MR. WELMAKER:  All right.  As you can
14 imagine, I have questions.  So what I would like to
15 do is see if I can't share the screen --
16       MR. SADYKHOV:  I thought you were
17 kidding.
18       MR. WELMAKER:  No, no.  I'm
19 unfortunately serious.
20       (Discussion off the record)
21       EXAMINATION
22   Q.   (BY MR. WELMAKER)  Mr. Rodriguez, I'm going
23 to ask you a couple of questions, and what I want you
24 to do is listen to my question and just give me the
25 shortest answer that you can that is still truthful,

Page 68

1  okay?
2       So did you understand that,
3  Mr. Rodriguez?
4    A.   Yes, I understand.
5    Q.   Okay.  What I'm showing you is a document
6  that you've already seen before.  At the very bottom,
7  it's Bates stamp 28.
8       Do you see that?
9    A.   Is that the date that you're talking about?
10   Q.   It's a stamp at the bottom.
11   A.   Yes, yes.  I do see it.
12   Q.   Okay.  And this is one of your paychecks,
13 correct?
14   A.   Yes.
15   Q.   Okay.  And you were paid, as you testified,
16 a thousand dollars a day, right?
17   A.   Yes, correct.
18   Q.   And in a typical pay period, you've got 14
19 days, correct?
20   A.   Correct.
21   Q.   Okay.  And what is your gross pay as
22 reflected on this check?
23   A.   $14,000.80.
24   Q.   Okay.  What -- and if you need my help
25 calculating this for you, I can help you.

Page 69

18 (Pages 66 - 69)

1    What is a thousand dollars a day times
2 14 days?
3    A.  $14,000.
4    Q.  Okay.  So is part of your claim -- or is
5 the entirety of your claim that you were only paid
6 your day rate for all days worked and there's no
7 overtime payment to you in this check?
8    A.  I am only being paid what was promised to
9 me, the thousand dollars a day.
10    Q.  Okay.  So a thousand dollars a day times 14
11 days is $14,000, correct?
12    A.  Yes, correct.
13    Q.  Okay.  And if you're averaging about 12
14 hours a day, then you're working more than 40 hours
15 each week, correct?
16    A.  I'm sorry.  I interrupted.  I didn't catch
17 that.
18    Q.  If you're working about 12 hours a day and
19 you're working seven days a week, then you're working
20 more than 40 hours each week, correct?
21    A.  I believe so, correct.
22    Q.  Well, you're working 84 hours a week if
23 you're working 12 hours a day, seven days a week?
24    A.  Correct.
25    Q.  12 times 7 is 84.  I'm just going to make

Page 70

1 that representation to you.
2    INTERPRETER:  I'm sorry, Counsel.  I
3 didn't catch that.
4    MR. WELMAKER:  12 hours times seven
5 days is 84 hours.  I'm going to make that
6 representation to him, and I want him to assume it's
7 true.
8    MR. SADYKHOV:  Objection.  Form.
9    Q.  (BY MR. WELMAKER)  Do you understand -- do
10 you understand that if you're working on average 12
11 hours a day, in a seven-day period you will be
12 working 84 hours?
13    A.  Yes.  If I work 12 hours, seven days, it's
14 84 hours, yes.
15    Q.  Okay.  So you're working more than 40 hours
16 in a week in weeks in which you worked 12 hours a
17 day, seven days a week, correct?
18    A.  Correct.
19    Q.  Okay.  Are you being paid extra for working
20 more than 40 hours in a week, according to this
21 check?
22    A.  No.
23    Q.  And that's because you're getting paid a
24 thousand dollars a day times the number of days that
25 you worked, correct?

Page 71

1    A.  Correct, yes.
2    Q.  And you're not being paid in addition to
3 that $1,000 a day times 14 days except for 80 cents
4 on this check; is that correct?
5    MR. SADYKHOV:  I'll object to form.
6    A.  Correct.
7    Q.  (BY MR. WELMAKER)  Okay.  What I would like
8 to do is bring your attention to another paycheck.
9 It is Bates stamp 25 at the bottom.
10    Do you see that, Mr. Rodriguez?
11    A.  Yes, I can see it.
12    Q.  And this is one of your paychecks, correct?
13    A.  Yes.
14    Q.  Okay.  And can you tell me what the gross
15 amount is on this paycheck?
16    A.  Can you make that bigger for me?  I just
17 see the 12, but since you highlighted in blue --
18    Q.  Okay.
19    (Simultaneous cross-talk.)
20    A.  $12,000.
21    Q.  (BY MR. WELMAKER)  Let's go to your time
22 sheets and check out what you worked on that
23 particular pay period.  This pay period runs from
24 July 9th to July 22nd on the 12,000-dollar check.
25    Do you see that?

Page 72

1    A.  I do see it.  Correct, yep.
2    Q.  All right.  Let's go to your time sheets
3 for that period.  I'm looking at Bates Page 31 and
4 Bates 32.
5    For the period of July 9th, you only
6 worked one, two, three, four, five.  You didn't work
7 Monday and Tuesday, according to this pay -- this
8 time record, correct?
9    A.  Well, supposedly, right, they only have
10 there 12,000.  That's only that I went 12 days, like
11 I didn't go two days.
12    Q.  Correct.  So in this pay period, you're
13 missing two days, whereas normally it would be 14
14 days, correct?
15    A.  Correct.
16    Q.  So if you're being paid a day rate of a
17 thousand dollars a day and you worked 12 days in the
18 pay period, what would you expect to be paid?
19    A.  If I worked for 12 days at a thousand
20 dollars a day, then $12,000.
21    Q.  And that's what's reflected on this
22 paycheck, isn't it?
23    A.  Correct.
24    Q.  And I'm going back to Bates 28.  This shows
25 that you worked -- you were paid 14,000.80.

Page 73

19 (Pages 70 - 73)

1         Do you see that?
2    A.  Yes, I see it.  For me to be able to tell,
3 can you make that bigger?  I didn't want you to ask
4 me under oath and I'm answering something that I
5 can't see what it is.  I see it.  14,000.80.
6    Q.  Okay.  Do you know how the extra 80 cents
7 got on there?
8         MR. SADYKHOV:  Objection.  Form.
9    A.  No.  I don't know what -- what they are
10 from.
11    Q.  (BY MR. WELMAKER)  Do you understand the
12 formula that the defendants used to reverse your day
13 rate into an hourly rate?
14         MR. SADYKHOV:  Objection.  Form.
15    A.  No.
16    Q.  (BY MR. WELMAKER)  Did anyone explain to
17 you that they were reverse engineering your day rate
18 into hourly rates?
19         MR. SADYKHOV:  Objection.  Form.
20    A.  Could you repeat that question for me,
21 please?
22    Q.  (BY MR. WELMAKER)  Did anyone explain to
23 you that they were using a formula to reverse
24 engineer your day rates into hourly rates?
25         MR. SADYKHOV:  Same objection as

Page 74

1    Q.  Okay.  And this pay period is from May 28th
2 to June 10th, correct?
3    A.  Yes.  May 28th through June the 10th.
4    Q.  So let's go to your paychecks -- your time
5 detail report.  And May 28th, it's on Bates 30.  It's
6 this period right here.  And so, for each of these
7 days, your so-called time is 16 hours every single
8 day.
9         Do you see that?
10    A.  Yes.
11    Q.  Did you work 16 hours even every single
12 day?
13    A.  No.
14    Q.  Is this an accurate representation of the
15 hours that you worked?
16    A.  No.
17    Q.  Is it even possible for you to work exactly
18 16 hours a day in a one-week period?
19         MR. SADYKHOV:  Objection.  Form.
20    A.  No.
21    Q.  (BY MR. WELMAKER)  Nobody was tracking your
22 time, were they?
23         MR. SADYKHOV:  Objection.  Form.
24    A.  I'm sorry.  I didn't hear the question.
25    Q.  (BY MR. WELMAKER)  Nobody was tracking your

Page 76

1 earlier.
2    A.  No.
3    Q.  (BY MR. WELMAKER)  So then you didn't
4 understand that the formula the defendants used got
5 close to what your day rate was but it couldn't quite
6 get there?  You didn't know that, did you?
7         MR. SADYKHOV:  Objection.  Form.
8    A.  I couldn't have known that.
9    Q.  (BY MR. WELMAKER)  All right.  Let's -- you
10 were asked earlier about your hourly rate.  Do you
11 see the -- on this paycheck -- and it's Bates 28.
12         Can you tell me what your so-called
13 hourly rate is here?
14    A.  The rate hourly?
15    Q.  Yes.  The purported hourly rate, yes.
16         MR. SADYKHOV:  Objection.  Form.
17    A.  So from what I see from the stub here and
18 if I'm understanding correctly your question, it says
19 47.30 and 70.95.
20         MR. WELMAKER:  So I just want to know
21 what it purports to be as his hourly rate.
22         MR. SADYKHOV:  Objection.  Form.
23    Q.  (BY MR. WELMAKER)  I've helped you out by
24 highlighting.
25    A.  Supposedly, 47.30 an hour.

Page 75

1 time, were they?
2         MR. SADYKHOV:  Objection.  Shauna, I
3 objected.  I don't know if you heard me.
4    A.  Supposedly, yes.  But -- no, but yes.
5    Q.  (BY MR. WELMAKER)  Let's just look at one
6 day where you supposedly worked 16 hours.  Your
7 hourly rate is 47.30, correct?
8    A.  Uh-huh.
9    Q.  Is that a yes?
10    A.  Yes.
11    Q.  I'm going to -- do you have a calculator on
12 your phone?  Can you use it?
13         MR. SADYKHOV:  You can probably pull
14 one up, Doug, if you want to, on your screen.
15         MR. WELMAKER:  Can anybody see this
16 calculator?
17    A.  I have a calculator.
18    Q.  (BY MR. WELMAKER)  All right.  I'm going to
19 just multiply 47.3, which is your supposed hourly
20 rate, times 16 hours.  The calculation results in the
21 number 756.80.  I want you to assume that that's a
22 correct calculation, Mr. Rodriguez.
23    A.  756.80 is what 16 hours -- like 47.30
24 equals to me.
25    Q.  What was your promised day rate?

Page 77

20 (Pages 74 - 77)

1      A.  A thousand dollars.
2      Q.  Is $1,000 equal to $756.80?
3      A.  That's not correct.
4      Q.  But according to your paycheck, you're paid
5  47.30 per hour.  So how do you explain the
6  discrepancy?
7           MR. SADYKHOV:  Objection to form.
8      A.  That they are not paying me the amount for
9  the day that I'm supposed to be getting.
10          MR. WELMAKER:  I have no further
11 questions.
12          MR. SADYKHOV:  I will have a couple of
13 follow up.  Sorry, everybody.
14          FURTHER EXAMINATION
15     Q.  (BY MR. SADYKHOV)  Mr. Rodriguez, just now
16 you agreed with your attorney -- while he was
17 questioning you, you agreed with him that -- or you
18 stated now in your testimony that they did not pay
19 you the correct hourly rate; is that correct?  I'm
20 sorry.  Scratch that.
21          They didn't pay you the correct day
22 rate that they promised.  That's what you just said,
23 correct?
24          MR. WELMAKER:  Objection.  Form.  You
25 can answer.

Page 78

1 not -- it's not -- it doesn't match with what they
2 were supposed to pay me.
3      Q.  (BY MR. SADYKHOV)  Correct.  Because they
4 were calculating it based on hours, right?  That is
5 the discrepancy?
6           MR. WELMAKER:  Objection.  Form.  You
7 can answer.
8      A.  Well, that's how they were calculating it,
9 as it said on the stub, by hour.
10     Q.  (BY MR. SADYKHOV)  Right.  So you would
11 agree with me that you're not being paid a day rate,
12 right?
13          MR. WELMAKER:  Objection.  Form.
14     A.  Well, I'm not being paid what they
15 promised, the daily thousand dollars.
16     Q.  (BY MR. SADYKHOV)  Right.  So they are not
17 paying you the promised day rate, yes or no?
18     A.  According to what the pay stub says, they
19 are not paying it.
20          MR. SADYKHOV:  I'll pass the witness.
21          MR. WELMAKER:  No further questions.
22 We'll reserve until the time of trial.
23          (Whereupon at 6:05 p.m. the deposition
24          was adjourned.)
25          (Signature not requested.)

Page 80

1           THE WITNESS:  May I answer?
2           MR. WELMAKER:  Yes.
3      A.  Come again with the question, please.
4      Q.  (BY MR. SADYKHOV)  So just now when your
5 attorney was questioning you, you had mentioned -- or
6 you had testified that -- that the discrepancy in the
7 pay he was showing you was because they were not
8 paying you the correct day rate.
9           Do you recall saying that just now?
10          MR. WELMAKER:  Objection.  Form.
11     A.  Yes, I do remember.  Yes.
12     Q.  (BY MR. SADYKHOV)  And that's because 16
13 hours times $47.30 is $756.80, right?
14     A.  Correct.
15     Q.  So wouldn't you agree with me that your pay
16 is being calculated based on hours multiplied by a
17 rate of pay?
18          MR. WELMAKER:  Objection.  Form.
19          INTERPRETER:  This is the interpreter
20 speaking.  Let me address him.  So he didn't quite
21 hear the question.  Could you repeat, please?
22          MR. SADYKHOV:  Shauna, I'm going to
23 need you to read it back again.
24          (The record was read as requested.)
25     A.  Well, according to the calculation, it's

Page 79

1           CHANGES AND SIGNATURE
2 WITNESS NAME:  Jose Rodriguez Aponte
3 DATE OF DEPOSITION: May 3, 2024
4 PAGE LINE  CHANGE              REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25  Job No. HOU6679392

Page 81

21 (Pages 78 - 81)

**Page 82**

1    I, JOSE RODRIGUEZ APONTE, have read the foregoing

2  deposition and hereby affix my signature that same is

3  true and correct, except as noted above.

4

5       _____

6            JOSE RODRIGUEZ APONTE

7  THE STATE OF _____)

8  COUNTY OF _____)

9

10    Before me,            on this day

11  personally appeared JOSE RODRIGUEZ APONTE, known to

12  me or proved to me under oath of

13  _____or through

14  _____(description of identity card

15  or other document) to be the person whose name is

16  subscribed to the foregoing instrument and

17  acknowledged to me that he/she executed the same for

18  the purpose and consideration therein expressed.

19    Given under my hand and seal of office on this

20  day of            ,   .

21

22       _____

23            NOTARY PUBLIC IN AND FOR

24            THE STATE OF _____

25  My Commission Expires: _____

**Page 83**

1  _____No Changes Made _____Amendment Sheet Attached

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 84**

1        IN THE UNITED STATES DISTRICT COURT

         FOR THE WESTERN DISTRICT OF TEXAS

2            SAN ANTONIO DIVISION

3  AARON MALDONADO, ET AL   )

   vs.              ) CASE NO. 5:21-cv-85

4  MAMMOTH ENERGY SERVICES, )

   INC., COBRA ACQUISITIONS, )

5  LLC, HIGHER POWER        )

   ELECTRICAL, LLC and 5 STAR)

6  ELECTRIC, LLC        )

7

8        REPORTER'S CERTIFICATE

9    ORAL DEPOSITION OF JOSE RODRIGUEZ APONTE

10        May 3, 2024

11

12    I, Shauna Foreman, Certified Shorthand Reporter

13  in and for the State of Texas, hereby certify to the

14  following:

15    That the witness, Jose Rodriguez Aponte, was

16  duly sworn by the officer and that the transcript of

17  the oral deposition is a true record of the testimony

18  given by the witness;

19    That the original deposition was delivered

20  to Emil Sadykhov.

21    That a copy of this certificate was served on

22  all parties and/or the witness shown herein on

23  _____.

24    I further certify that pursuant to FRCP Rule

25  30(f)(1), the signature of the deponent:

**Page 85**

1    _____was requested by the deponent or a party

2  before the completion of the deposition and that the

3  signature is to be before any notary public and returned

4  within 30 days (or _____ days, per agreement of counsel)

5  from date of receipt of the transcript.  If returned, the

6  attached Changes and Signature page contains any changes

7  and the reasons therefor;

8    __x____was not requested by the deponent or a

9  party before the completion of the deposition;

10    I further certify that I am neither counsel for,

11  related to, nor employed by any parties or attorneys

12  in the action in which this testimony is taken, and

13  further that I am not financially or otherwise interested

14  in the outcome of this action.

15    Certified to by me on this the 6th day

16  of May, 2024.

17

18

19       *Shauna Foreman*

        Shauna Foreman, CSR

        Texas CSR 3786

20       Expiration:  10/31/2025

        Veritext Legal Solutions

21       300 Throckmorton Street

        Suite 1600

22       Fort Worth, Texas  76102

        Tel. (817)336-3042

23       Firm No. 571

24

25

22 (Pages 82 - 85)

1  COUNTY OF HARRIS   )
2  STATE OF TEXAS    )
3      I hereby certify that the witness was notified
4  on _____ that the witness has 30 days (or
5  _____ days, per agreement of counsel) after being
6  notified by the officer that the transcript is available
7  for review by the witness and if there are changes in
8  the form or substance to be made, then the witness shall
9  sign a statement reciting such changes and the reasons
10  given by the witness for making them;
11      That the witness' signature was/was not
12  returned as of _____, 2024.
13      Subscribed and sworn to on this the _____
14  day of _____.
15
16
17

*Shauna Foreman*

18                  Shauna Foreman, CSR
                    Texas CSR 3786
19                  Expiration:  10/31/2025
                    Veritext Legal Solutions
20                  300 Throckmorton Street
                    Suite 1600
21                  Fort Worth, Texas  76102
                    Tel. (817)336-3042
22                  Firm No. 571
23
24
25
                                        Page 86

Veritext Legal Solutions
346-293-7000

**[1 - 6:00]**

**1**

**1**  3:10 13:3,7
84:25
**1,000**  72:3 78:2
**10/31/2025**
85:20 86:19
**1000**  2:9
**10:00**  41:17,19
**10th**  55:6 65:17
76:2,3
**118**  2:4
**12**  41:15 70:13
70:18,23,25
71:4,10,13,16
72:17 73:10,17
73:19
**12,000**  72:20,24
73:10,20
**13**  3:10
**14**  65:18,22
66:16 69:18
70:2,10 72:3
73:13
**14,000**  65:23
66:3,8,16 70:3
70:11
**14,000.80**  66:6
**14,000.80.**
66:11 69:23
73:25 74:5
**14131**  85:18
86:17
**15th**  19:15 54:7
54:7,12,13,14

**16**  41:4,6,10,11
41:13,16 42:22
43:14 62:21
63:3 76:7,11
76:18 77:6,20
77:23 79:12
**1600**  85:21
86:20
**18th**  58:15,21
**1989**  48:10
**1998**  48:10

**2**

**2**  3:10 28:19,19
28:20 57:23
**20**  6:21
**2017**  48:20
**2018**  54:4,8
55:6,8,9 56:20
59:18,20
**2019**  19:12,15
19:19,20,23
54:5,12 58:15
58:15
**2020**  7:6,21 8:8
8:11,21,23
68:9
**2021**  7:6,21 8:8
8:11 13:20
19:5,24
**2024**  1:11,17
81:3 84:10
85:16 86:12
**22nd**  72:24
**23**  11:3

**23rd**  59:18,20
**25**  72:9
**28**  3:10 64:24
65:3 69:7
73:24 75:11
**28th**  65:17,19
76:1,3,5
**29**  64:25
**2:00**  24:24
**2:05**  1:17
**2:45**  25:15
**2nd**  13:20 19:5
55:6

**3**

**3**  1:11 3:11
51:18,20,22
81:3 84:10
**30**  76:5 84:25
85:4 86:4
**300**  85:21
86:20
**31**  73:3
**31st**  58:15
**32**  73:4
**336-3042**  85:22
86:21
**36th**  2:9
**3786**  85:19
86:18
**3:00**  24:5,25
**3:08**  24:5
**3:35**  32:20
**3:36**  32:20
**3:44**  35:22

**3:45**  35:22
**3rd**  1:16

**4**

**4**  3:4,11 57:25
58:2
**40**  70:14,20
71:15,20
**400**  2:4
**47.3**  77:19
**47.30**  75:19,25
77:7,23 78:5
79:13
**4:16**  47:15
**4:31**  47:15
**4:32**  47:21
**4:34**  47:21
**4:40**  49:9

**5**

**5**  1:6 4:19 18:8
18:11,14,18,21
84:5
**51**  3:11
**571**  85:23
86:22
**58**  3:11
**5:21**  1:4 84:3
**5:34**  68:4
**5:36**  68:4
**5th**  58:19,20

**6**

**68**  3:4
**6:00**  39:25
41:15,16 45:12
45:13

Page 1

**[6:05 - appreciate]**

| | |
|---|---|
| **6:05**  1:17 80:23 | 25:9 34:8 |
| **6th**  19:12 85:15 | 43:16 51:7,7,9 |

**7**

**7**  58:13 70:25
**70.95.**  60:13
  75:19
**756.80**  77:23
  78:2 79:13
**756.80.**  77:21
**75601**  2:5
**76102**  85:22
  86:21
**77002**  2:10
**78**  3:5
**7:00**  45:14

**8**

**80**  66:7,17,19
  66:25 72:3
  74:6
**817**  85:22
  86:21
**84**  70:22,25
  71:5,12,14
**85**  1:4 84:3
**8:00**  45:14

**9**

**9th**  72:24 73:5

**a**

**a.m.**  41:15
  45:12
**aaron**  1:3 84:3
**able**  13:10
  20:18,20 22:18
  22:23 23:1

51:11 74:2
**above**  1:16
  82:3
**access**  29:8
  60:17 61:2,25
**accurate**  43:17
  54:7 76:14
**acknowledged**
  82:17
**acosta**  2:12
**acquisitions**
  1:5 4:21 14:18
  15:5 58:14
  84:4
**action**  85:12,14
**active**  22:11
**actual**  10:5
**actually**  16:22
  25:20 26:5
  27:13 34:9
  41:24 44:3
  48:19 57:25
**addition**  72:2
**address**  6:4,5,7
  6:20 79:20
**adjourned**
  80:24
**affirmative**
  42:24
**affix**  82:2
**afternoon**  4:10
**ago**  11:11

**agree**  58:23
  62:14 64:14
  79:15 80:11
**agreed**  78:16
  78:17
**agreement**
  21:17,20,23,24
  22:6 32:10
  46:7,13 47:9
  85:4 86:5
**agreements**
  33:17
**ahead**  22:13
  36:10,11 46:22
  50:5,16 56:1
**al**  1:3 84:3
**alberto**  4:9,14
**allow**  39:18
**allowed**  34:18
**amendment**
  83:1
**america**  8:9
**american**  22:18
  49:14
**amount**  45:9
  63:8 64:16
  65:6 72:15
  78:8
**amounts**  14:21
**answer**  5:6,11
  5:22 20:20,25
  22:24 23:1,22
  23:24 26:6
  32:2,4 34:20
  35:3 43:15,17

**agree**  46:15,18,21,22
  46:23 56:6
  64:19 67:4
  68:25 78:25
  79:1 80:7
**answering**  5:10
  17:1 36:10
  74:4
**answers**  16:23
  32:24
**anthony**  2:7
  13:5 58:1
**antonio**  1:2
  84:2
**anybody**  18:2
  77:15
**aponte**  1:10,13
  3:3 4:2,9,12
  81:2 82:1,6,11
  84:9,15
**app**  24:23
  60:18
**appearances**
  2:1
**appeared**  82:11
**appears**  58:13
**apply**  16:15
  18:3,21,25
**appreciate**  4:15
  4:23 7:18
  14:25 16:7,20
  20:23 34:15
  41:21 55:24
  56:14 60:2

**[apprentice - cancel]**

**apprentice**
11:12
**approximate**
67:6
**april** 19:12
54:5,14 58:20
**area** 48:22
**arteaga** 2:7
**asked** 18:24
29:10,18 32:1
34:6,7,10,12,20
34:24 50:4,5
66:18,20 75:10
**asking** 17:5
26:6 32:3
34:15,21 35:4
36:10 44:20,22
64:1
**assume** 25:22
71:6 77:21
**ate** 51:13
**attached** 1:22
83:1 85:6
**attend** 9:14
14:4
**attending**
10:17 38:12
**attention** 14:8
15:17 72:8
**attorney** 10:11
12:6 21:4,5,13
21:24 25:17,18
29:3 30:7,16
35:2 46:19
58:5 59:1

63:12,18 78:16
79:5
**attorneys** 4:17
13:19 21:13
30:12 85:11
**august** 11:3
**authority** 9:21
10:19 48:13
**available** 42:15
86:6
**average** 71:10
**averaging**
70:13
**aware** 14:1
16:17 20:21
23:21 25:8
27:17 33:18
53:1 60:24

**b**

**b** 6:9,11 50:18
50:19
**bachelor's** 9:16
**back** 6:23 19:3
24:7 31:6 34:3
35:13 42:14,19
43:22,22 44:14
44:15,18,18,24
45:2 47:23
51:7 57:22
65:3 73:24
79:23
**barbara** 6:12
**based** 79:16
80:4

**basic** 26:25
59:10
**basically** 15:20
37:11 52:10
**basis** 59:6
**bates** 58:13
64:24 69:7
72:9 73:3,4,24
75:11 76:5
**began** 30:19
**beginning**
19:20 30:18
61:6
**believe** 28:19
50:17,19 51:18
54:6,11 63:13
70:21
**benefit** 57:9,16
57:19
**better** 66:21
**bigger** 58:17
65:11 72:16
74:3
**bit** 16:7 26:5
29:16 34:16
44:10 59:22,24
65:11
**blue** 72:17
**bosses** 40:23
**bottom** 64:9
69:6,10 72:9
**break** 5:17,18
5:20,22 47:13
**breakfast**
51:11

**breaking** 24:2
**briefing** 53:19
**briefings** 53:25
**bring** 51:3 62:1
72:8
**bringing** 16:7
**broke** 65:13
**broken** 38:25
**brought** 28:10
**busy** 27:13
**buy** 51:2

**c**

**c** 6:7,9,11,12
50:18,19
**calculated**
79:16
**calculating**
62:14 65:7
69:25 80:4,8
**calculation**
77:20,22 79:25
**calculator**
77:11,16,17
**call** 10:3,4
23:24 25:2
35:23
**calle** 6:7
**called** 20:1
35:14 36:6,13
36:15 43:22
44:13 45:2
75:12 76:7
**calling** 28:18
**cancel** 57:12

**[candidly - computerized]**

**candidly** 34:16
**capacity** 12:22
**card** 82:14
**care** 62:9
**careful** 25:8
**case** 1:4 14:1
  21:2,6 23:9,10
  26:23 28:12
  29:11,20 30:1
  31:9 33:15,19
  34:21 46:23
  66:1 67:2 84:3
**catch** 51:7
  59:24 70:16
  71:3
**cause** 1:16
**caution** 16:21
**ceiba** 50:12,19
**celador** 10:3
**cents** 65:23
  66:7,9,17,19,25
  72:3 74:6
**certain** 39:22
  39:23,24 54:24
**certificate** 10:6
  84:8,21
**certification**
  10:1 34:7
**certifications**
  9:23 33:17,24
**certified** 1:18
  84:12 85:15
**certify** 84:13,24
  85:10 86:3

**chance** 55:25
**change** 50:9
  64:3,7 81:4
**changed** 21:13
  59:22
**changes** 81:1
  83:1 85:6,6
  86:7,9
**charge** 23:12
  23:14
**charged** 12:25
**charger** 59:12
**charging** 61:21
**chart** 52:8
  63:17
**check** 17:21
  28:5 58:4,24
  61:14,25 62:9
  64:4,9,9,10,13
  68:2 69:22
  70:7 71:21
  72:4,22,24
**checks** 28:10
  63:12
**children** 9:7
**civil** 1:21
**claim** 19:24
  27:4 70:4,5
**claiming** 20:11
  27:23 55:18
**claims** 26:19
  59:20
**clarification**
  50:14

**clarify** 27:10
  68:5
**clarifying** 7:19
  41:20
**class** 20:6
**clean** 32:23,24
  32:25
**clear** 8:22
  40:16 56:11
**clearly** 31:17
**clock** 40:1,2
**close** 43:14
  44:7 59:15
  62:22 63:7
  75:5
**clothing** 16:11
**cobra** 1:5 4:21
  11:8 14:17,23
  14:24 15:4,16
  15:18 16:4,14
  16:18 17:4,4
  18:17 19:12,19
  19:22 32:10
  35:8 41:9 42:1
  44:7 45:19
  46:7,7,13 47:9
  48:3,23 49:1
  50:25 54:19
  56:25 58:14
  61:3,14 62:14
  67:9,12 84:4
**college** 9:14
  10:17
**color** 64:13

**come** 18:17
  29:21 40:6
  43:22 44:18
  46:9 53:13,13
  79:3
**comments**
  26:22
**commission**
  82:25
**companies** 8:3
  14:22 15:11,15
**company** 6:24
  7:1 15:21
  17:14 18:2
  29:5,15 30:10
  30:12 34:11
  48:12 52:11
  58:7
**compare** 37:19
**compensated**
  36:24
**compensation**
  37:4 65:23
**complain** 67:8
  67:14,21
**complaint** 3:10
  19:3
**completed**
  45:17,19
**completely**
  20:15,17 21:15
**completion**
  85:2,9
**computerized**
  1:19

Page 4

**[concentrated - days]**

| | | | |
|---|---|---|---|
| **concentrated** 15:15 | 27:6,19,20 | **couple** 4:25 | 25:10 38:23 |
| **concerned** 59:19,20 | 30:7 31:19 | 57:6 68:23 | 39:10,12,14,14 |
| **concerning** 23:19 | 33:2,6,7,24 | 78:12 | 40:4,8,16,17,21 |
| **confusing** 20:19 | 36:4,5 38:10 | **courses** 9:22,24 | 41:4,8,24 42:4 |
| **connection** 33:6 | 38:11 40:11,12 | **court** 1:1 5:3 | 45:17 49:23 |
| **consider** 64:10 | 43:23 44:15 | 14:4 51:21 | 50:22 53:7,10 |
| **consideration** 82:18 | 45:10,11,15,16 | 84:1 | 59:18 60:23,25 |
| **constant** 8:4 | 45:19,20,23 | **crew** 49:24 | 61:7,18,21 |
| **contains** 85:6 | 46:1 47:9 48:9 | **crimes** 12:25 | 62:3,6,8,21,22 |
| **continued** 22:6 | 49:7,25 50:2 | **cross** 52:12 | 63:3,6,25 |
| **continuing** 51:15 | 51:21 52:17 | 66:5 72:19 | 65:13,21,22 |
| **continuously** 7:6 8:19 | 54:15 55:20 | **csr** 85:19,19 | 67:17 69:16 |
| **contract** 33:11 | 60:18 61:4,15 | 86:18,18 | 70:1,6,9,10,14 |
| 49:4 | 62:10 64:21,22 | **curious** 62:2,5 | 70:18,23 71:11 |
| **contracts** 7:6 | 65:16,18,24,25 | **currently** 10:23 | 71:11,17,24 |
| 8:4,14 | 66:6,9,10 68:9 | 11:25 | 72:3 73:16,17 |
| **cool** 24:3 | 69:13,17,19,20 | **cut** 41:2 | 73:20 74:12,17 |
| **copies** 11:25 | 70:11,12,15,20 | **cv** 1:4 84:3 | 74:24 75:5 |
| **copy** 11:24 | 70:21,24 71:17 | **d** | 76:8,12,18 |
| 12:6 29:13 | 71:18,25 72:1 | | 77:6,25 78:9 |
| 84:21 | 72:4,6,12 73:1 | **d** 6:12 | 78:21 79:8 |
| **correct** 6:1 | 73:8,12,14,15 | **daily** 31:21 | 80:11,17 82:10 |
| 8:10 9:13,25 | 73:23 76:2 | 38:25 53:6 | 82:20 85:15 |
| 11:9,17 12:15 | 77:7,22 78:3 | 80:15 | 86:14 |
| 14:13 16:2 | 78:19,19,21,23 | **damages** 55:22 | **days** 41:22 |
| 17:25 18:15,19 | 79:8,14 80:3 | 56:4,13 67:2,2 | 42:21 54:21 |
| 25:24 26:10 | 82:3 | **data** 28:4 | 55:3,5,14,16,19 |
| | **correctly** 75:18 | **date** 9:1 19:11 | 56:4,23 57:3,6 |
| | **counsel** 29:22 | 19:12 25:8 | 57:6 65:18,22 |
| | 46:10 71:2 | 54:7 58:20 | 66:16 69:19 |
| | 85:4,10 86:5 | 59:3,4 60:10 | 70:2,6,11,19,23 |
| | **count** 7:22 | 69:9 81:3 85:5 | 71:5,13,17,24 |
| | **county** 82:8 | **dates** 8:25 54:2 | 72:3 73:10,11 |
| | 86:1 | 58:18 | 73:13,14,17,19 |
| | | **day** 1:16 19:13 | 76:7 85:4,4 |
| | | 19:14,22 24:24 | |

**[days - either]**

86:4,5
**de** 10:3
**december** 14:2
**decide** 40:5
**decided** 36:23
  40:20,24 46:18
**defendant** 1:15
**defendants** 2:6
  4:17,19 14:8
  14:14,16 29:11
  29:20 30:1
  31:19 33:2
  74:12 75:4
**degree** 9:9
**delivered** 84:19
**depended**
  42:17
**depending** 51:6
**deponent** 84:25
  85:1,8
**deposed** 12:10
**deposited** 61:8
**deposition** 1:9
  1:13 4:25
  10:11 11:19
  12:5,11,23
  13:5 16:23
  24:16,21 25:2
  25:10 42:8
  80:23 81:3
  82:2 84:9,17
  84:19 85:2,9
**description** 3:9
  82:14

**detail** 3:11
  52:10 63:24
  76:5
**detailed** 60:23
  64:18
**detailing** 20:19
  27:9 28:6
  62:18
**details** 62:9
  64:12
**dictated** 45:19
**diego** 2:12
  55:24 61:12
**different** 15:21
  26:5 29:17,24
  34:16 44:11
  50:11 57:14
  58:9 60:6,9,10
  60:13 64:2
**dinner** 51:11
**directed** 17:4
**directions** 46:4
**disaster** 54:23
**discovery**
  33:21
**discrepancy**
  66:14 78:6
  79:6 80:5
**discuss** 23:9,19
  26:19 39:5
**discussed** 38:15
**discussion** 36:1
  47:18 68:20
**distance** 43:12

**district** 1:1,1
  84:1,1
**division** 1:2
  84:2
**document** 10:6
  13:15,16,18,24
  28:24 30:12,16
  30:25 32:12
  51:25 52:2,14
  56:8 63:17
  69:5 82:15
**documentation**
  30:9
**documents**
  25:23,25 26:2
  26:2,8,8,11
  29:10,19,19,25
  30:14 31:8,18
  32:5,7,9 33:1,3
  33:12,14,16,22
  34:22,23 53:6
**doing** 12:14
  15:23 21:9
  26:18 30:8,18
  36:9 53:18,20
**dollar** 72:24
**dollars** 38:23
  60:23,25 61:7
  61:21 62:6,8
  63:6,25 65:22
  67:17 69:16
  70:1,9,10
  71:24 73:17,20
  78:1 80:15

**doug** 2:5 24:1
  55:24 59:14
  60:2 77:14
**douglas** 2:3
  21:13 25:19
**download**
  24:23
**drag** 32:3
**driver's** 11:20
  11:21 34:24
**due** 43:11
**duly** 1:15 4:3
  84:16
**duties** 53:2

**e**

**e** 2:5,10 6:7,8
  6:12,12 25:13
  50:19,19,20
**e6** 6:8
**earlier** 11:19
  26:4 27:3 31:6
  33:23 36:2
  42:8 45:8 58:4
  58:25 63:11
  64:4 68:8 75:1
  75:10
**earned** 67:11
**earnings** 3:10
  3:11 58:1
**eat** 51:9,11,14
  51:16
**eating** 51:15
**either** 12:5
  17:25 18:18
  40:5 47:6

Page 6

**[either - finish]**

54:13,15
**el** 50:13,19
**elaborate** 35:5
**electric** 1:7
4:20 9:21 18:9
57:5 84:6
**electrical** 1:6
4:20 11:16
17:11 39:9
44:6 84:5
**emergency**
43:22 44:14,23
56:22 57:11
**emil** 2:8 59:17
84:20
**employed**
10:23 19:21
41:9 61:3
85:11
**employee** 9:20
**employment**
16:15 18:3,21
18:25 19:13
32:10 35:9
54:2 57:16
**ended** 7:21
40:21
**endless** 14:21
**ends** 59:20
**energy** 1:5 4:19
9:21 10:18
14:19 15:2,4,5
48:13 84:4
**engineer** 74:24

**engineering**
74:17
**english** 22:2
50:18
**entirety** 70:5
**equal** 78:2
**equals** 77:24
**equipment**
50:22
**equivalent** 62:8
62:22
**esadykhov** 2:10
**esq** 2:3,8
**establishing**
39:9
**estancias** 6:11
**estevan** 49:13
49:14,16 52:22
**estimate** 7:15
43:3
**et** 1:3 84:3
**everybody**
12:15 78:13
**everybody's**
22:23
**evidence** 29:13
**ex** 22:9 26:14
**exact** 54:1
**exactly** 27:22
37:12,20 40:23
59:2 62:11
76:17
**examination**
3:4,4,5 4:4
68:21 78:14

**example** 17:3
34:24
**except** 72:3
82:3
**executed** 82:17
**exhibit** 3:10,10
3:11,11 13:3,7
13:10 28:19,19
28:20 51:18,22
57:23,25 58:2
**exhibits** 3:7
13:5
**expect** 73:18
**expected** 44:14
**experience**
11:13 37:6
**expiration**
85:20 86:19
**expires** 82:25
**explain** 20:18
74:16,22 78:5
**explanation**
16:20,24
**expressed**
82:18
**extent** 20:24
**extra** 16:24
66:22 71:19
74:6

**f**

**f** 84:25
**fair** 31:5 37:15
39:19 42:21
43:13 46:8
63:7

**familiar** 13:21
19:16,18 28:24
41:18 55:7
**far** 21:10 29:14
42:18 43:8
59:19
**fast** 17:8
**faster** 16:24
17:2
**fault** 33:25
**february** 13:20
19:5,23
**federal** 1:20
**feed** 51:5
**feel** 20:25
**field** 11:15
**filed** 13:19,20
19:4,23 21:2,6
26:20
**fill** 35:17 38:7
**filled** 52:19
53:16
**filling** 39:2
53:3,5,8
**finally** 5:25
**financially**
85:13
**find** 16:25
19:24 21:11
34:18 37:22
**fine** 20:25 43:5
43:18
**finish** 8:5 11:4
54:4

**[finished - green]**

| | | | |
|---|---|---|---|
| **finished** 8:15 | 86:18 | **ged** 9:10 | 46:22 47:19,23 |
| **finishing** 5:5 | **forgive** 18:24 | **gentlemen** 23:4 | 50:5,16 51:2 |
| **fire** 45:4 | **form** 27:24 | **geography** | 56:1,7 57:22 |
| **fired** 45:6,24 | 46:14 53:11 | 48:19 | 64:24 67:25 |
| **firm** 21:14 | 71:8 72:5 74:8 | **george** 48:8,11 | 72:21 73:2,11 |
| 85:23 86:22 | 74:14,19 75:7 | **getting** 41:17 | 76:4 |
| **first** 4:3,13,22 | 75:16,22 76:19 | 57:4 59:14 | **going** 10:20 |
| 5:3,22 8:17 | 76:23 78:7,24 | 71:23 78:9 | 11:4 13:2,9 |
| 10:20 19:19 | 79:10,18 80:6 | **gf** 26:1 40:6,18 | 18:7 19:3 21:8 |
| 37:22 38:18 | 80:13 86:8 | 47:6 | 21:12 22:5,13 |
| 54:3 58:12 | **forms** 46:12 | **give** 5:11 10:5 | 22:17 23:25 |
| 63:11 | **formula** 74:12 | 12:6 28:4,17 | 25:6,12 26:23 |
| **five** 6:22 7:12 | 74:23 75:4 | 30:6,15 35:24 | 27:2,15 28:17 |
| 7:14,17 8:2 | **fort** 85:22 | 36:6 38:14 | 31:6,23 32:1,3 |
| 11:3 24:3 | 86:21 | 43:16 51:1,2 | 40:25 42:23 |
| 47:13 73:6 | **forward** 12:14 | 57:3 59:13 | 43:4,16 44:17 |
| **fixed** 48:1 | **found** 36:17 | 63:10 67:5 | 47:13 49:17 |
| **flat** 65:23 | **four** 7:16,22 | 68:24 | 51:17,19,23 |
| **floor** 2:9 | 8:2 14:15 | **given** 37:1 | 57:22,25 59:12 |
| **fog** 40:14 | 22:14 73:6 | 82:19 84:18 | 60:22,25 61:10 |
| **follow** 23:23 | **frcp** 84:24 | 86:10 | 61:20,22 63:5 |
| 34:1 78:13 | **fredonia** 2:4 | **giving** 28:14 | 63:10 65:3 |
| **followed** 15:16 | **free** 39:15 | 29:2 54:24 | 67:18 68:22 |
| 47:4 62:25 | **friday** 32:3 | 57:5 66:15 | 70:25 71:5 |
| **following** 46:4 | 49:10 | **go** 4:24 6:22 | 73:24 77:11,18 |
| 84:14 | **full** 4:8 11:1 | 9:19 11:13 | 79:22 |
| **follows** 4:3 | 19:14 54:12 | 14:4 16:24 | **good** 4:9 24:2 |
| **food** 51:1,2,4,8 | **further** 3:5 | 17:2,8 22:13 | 47:13 |
| **foregoing** 82:1 | 68:11 78:10,14 | 29:18 32:17,18 | **gore** 36:14 |
| 82:16 | 80:21 84:24 | 34:3 35:19 | 48:21 |
| **foreman** 1:18 | 85:10,13 | 36:10,11,23 | **gotten** 30:10,12 |
| 26:1 40:6,19 | | 37:5 39:15 | **graduated** 9:11 |
| 47:5,7 49:20 | **g** | 40:3,22 41:1 | **great** 6:18 36:9 |
| 52:21,22 53:19 | | 42:4,11,14,19 | **green** 64:10,11 |
| 84:12 85:19 | **game** 23:22 | 44:14,24 45:15 | |
| | **gathered** 49:23 | | |

**[gross - invitation]**

**gross** 69:21
72:14
**ground** 4:25
**group** 22:25
44:6
**guess** 6:17 7:20
25:22 40:9
41:4
**guessing** 53:6
**gurabo** 6:13
42:3
**guys** 10:4 15:22
34:6 51:5
59:19

**h**

**half** 19:19 43:8
56:19
**hand** 82:19
**happen** 10:12
45:4
**happened** 22:1
22:3 55:16
**happens** 27:16
**harris** 86:1
**hats** 16:12
**head** 5:13
**hear** 15:5,8,11
15:14 48:14
76:24 79:21
**heard** 14:19
15:2,3,3,20
17:10,13 18:8
44:3 77:3
**hedges** 2:8

**help** 69:24,25
**helped** 75:23
**hereto** 1:22
**hey** 24:1
**high** 9:9,11
**higher** 1:6 4:20
17:10,17,22,25
18:4,25 84:5
**highlight** 14:9
**highlighted**
14:12 55:10
72:17
**highlighting**
14:10 19:6
75:24
**hired** 14:23
15:4 16:19
**home** 6:5 10:14
40:4,22 42:4,6
42:7,11,13,23
43:4,8 44:17
45:15
**honestly** 30:17
**hotel** 42:5,10
42:12,22,25
43:4,10 51:5
**hou6679392**
81:25
**hour** 5:19 43:7
47:14 59:10
63:4 75:25
78:5 80:9
**hourly** 35:13
38:3,25 59:6
60:11 62:15

64:15,20 65:4
65:5 74:13,18
74:24 75:10,13
75:14,15,21
77:7,19 78:19
**hours** 35:12
39:6 41:4,6,8
41:15,16 42:22
43:14 45:9
52:20 62:21
63:3,14,22
64:5,16,18,20
65:6 67:14,21
70:14,14,18,20
70:22,23 71:4
71:5,11,12,13
71:14,15,16,20
76:7,11,15,18
77:6,20,23
79:13,16 80:4
**house** 31:7
33:12 42:14
**houston** 2:10
**hugo** 48:10
**huh** 77:8
**hundred** 22:3
**hurricane**
15:12 36:19
48:10,11,15,20
48:24

**i**

**idea** 7:19 67:3
67:7
**identity** 82:14

**ids** 12:4
**imagine** 68:14
**important** 5:4
5:10
**index** 3:1
**inform** 26:25
**information**
16:25 27:1
30:21 34:18
37:1
**informed** 21:15
21:15
**instance** 1:14
32:9 33:11
**instructions**
15:16 47:4
62:25
**instrument**
82:16
**interested**
85:13
**intermittent**
8:18 11:1
**interpreter**
2:12 4:1 6:10
29:21 46:9
50:16 53:14,14
71:2 79:19,19
**interrupted** 7:7
70:16
**interruptedly**
8:14
**interview** 26:17
**invitation**
35:16 36:3

Veritext Legal Solutions
346-293-7000

**[irma - lines]**

irma  48:9
irrelevant
  15:19
island  42:2

**j**

jerk  17:7 32:24
job  10:20 11:5
  16:25 29:7
  34:9 36:9 37:5
  46:5 48:24
  49:6 53:18,24
  67:11 81:25
jokes  12:18
jorge  23:17
jose  1:10,13 3:3
  4:2,9,14 81:2
  82:1,6,11 84:9
  84:15
journeyman
  11:6 34:13
  37:8 49:8
juan  23:5
july  55:6,6
  59:18,20 72:24
  72:24 73:5
june  76:2,3

**k**

keep  23:22
  32:23 49:3,5
  66:21
keeps  23:24
kept  30:3,5
  47:5

kidding  68:17
kids  9:6
kind  11:10
  15:22 21:11
  22:9,11 33:22
  52:7
knew  31:12
  34:10,12 48:18
  48:18,22 60:24
  62:16
know  5:18,21
  7:15,16,24 8:3
  8:4,13 11:13
  12:3,3 13:9,23
  15:11,13,13,14
  15:17,18 16:5
  16:11,12,17
  17:3 18:1,6,12
  20:24 21:3,4
  21:10,11,14,25
  22:15,17,19,20
  22:22 23:2,3,8
  23:13,17,21,23
  23:25 24:19
  25:5,7,14,25
  26:1,22,23,23
  26:25 27:5,5
  27:12,14,14,15
  27:16,17,25
  28:3 29:4,5,6
  29:12,14 30:3
  30:4,9,18,20,20
  30:23 31:4,13
  31:21 34:7,8
  34:17,24 35:12

35:15 37:4,12
39:16,17 40:3
40:14,17,24
42:12,13,15,18
43:17,18 44:4
45:6 46:4 47:6
47:7 48:17
49:3 50:6
52:25 53:1,3
53:16,17,17,19
53:24,24,25,25
54:10,15,16,23
55:5,13,17
56:6 57:2,4,10
57:11,12,12,24
58:1 59:25
61:1,7 62:4,5
62:18,24 63:5
63:23,24 64:11
66:15,16,17,18
66:19,19,19,23
66:24,25,25
67:1,5,7 68:6
74:6,9 75:6,20
77:3
knowing  27:22
  36:24 37:3
known  75:8
  82:11

**l**

l  6:7,7,8 50:19
label  64:24
labeled  58:13
land  12:19

larger  52:6
late  42:14
law  2:3 21:14
lawsuit  4:18
  12:22 13:18
  14:14 19:23
  20:1,6 22:10
  23:5,12,15,20
  26:15,19,21
  27:18,21 28:3
  28:8 33:6
lawyer  21:1
  28:14 30:25
leave  6:22 63:1
  63:1
led  22:10
left  45:16 49:2
legal  85:20
  86:19
letter  35:8,8,11
license  11:20
  11:22 34:25
licenses  9:24
  33:16
life  12:14
lights  40:12
line  44:4,16
  81:4
lineas  10:4
lineman  10:3,4
  11:6,12 34:8,9
  34:11,13 37:7
  40:19 49:8
lines  11:16

**[list - name]**

list  22:14 26:17
listed  14:8
listen  45:21,25
  68:24
little  16:6 26:5
  29:16,24 34:16
  44:10 57:14
  58:8 59:22,24
live  7:13 9:4
  21:10 42:2
lived  6:20 7:24
  8:12
living  6:25 7:20
  8:13
llc  1:6,6,7 4:20
  4:20,21 18:9
  58:14 84:5,5,6
log  25:14
long  6:19 7:24
  32:4 46:5 62:7
longer  49:3
longview  2:5
look  13:10
  28:11,24 29:8
  29:18,19,24
  31:7 32:5 33:1
  33:5,8,10 77:5
looked  30:20
  31:11 33:3,3
  58:4,25 60:9
  63:21
looking  12:14
  30:25 58:10
  64:6 73:3

lose  51:19
lot  16:24 17:2
lunch  51:11

**m**

machine  1:20
made  28:3
  29:11 31:15
  66:24 83:1
  86:8
mail  2:5,10
  25:13 31:13
main  2:9
make  5:7,14
  7:23 8:22
  23:23,24 31:16
  51:7 52:6
  58:17 61:6,8
  62:2 65:11
  70:25 71:5
  72:16 74:3
making  12:18
  23:12,15 37:9
  60:20 63:5,7
  86:10
maldonado  1:3
  84:3
mammoth  1:5
  4:19 14:19
  15:2,4,5,9,21
  16:2,9,16 17:5
  17:13 84:4
march  19:15
  54:5,12,14
  58:15,15,19,21

maria  15:12
  36:19 48:9,11
  48:15,24
mark  28:18
  57:25
marked  13:6,7
  28:20 51:22
  58:2
marking  13:3
  51:18
married  9:4,5
mastec  7:3
  10:24 11:5
match  80:1
maximum  41:7
  41:11
meals  50:25
  51:10
mean  7:9 12:2
  20:5 35:8
  39:13 44:2
means  41:16
  59:9
meant  51:15
members  49:24
memory  64:6
mention  23:14
  38:24 53:21
mentioned
  11:20 19:4
  22:8 26:4
  41:14 45:8
  79:5
message  24:22

method  37:25
mexican  49:14
miguel  23:7,8
minute  47:13
minutes  24:3
missing  28:7
  73:13
mistake  56:8
  66:24
mistaken  41:12
mixed  6:10
moment  59:13
monday  73:7
money  28:7
months  11:3
morning  39:25
mountains
  40:13
move  11:14
  64:2
multiplied
  79:16
multiply  77:19
muted  24:9

**n**

n  2:4 6:9,9,11
  6:11,12 50:20
name  4:8,13
  13:23 15:3,11
  16:13 22:23
  27:18,21 28:25
  49:12,13,15
  52:16 81:2
  82:15

Veritext Legal Solutions
346-293-7000

**[names - page]**

names  14:21
22:14,14
need  5:17,20
32:24 35:4
50:3 61:12
69:24 79:23
needed  46:5
51:3
needs  50:14
52:5
neither  85:10
never  8:23
12:12,24 13:1
16:2 17:16,19
18:14,16,23
19:1 21:14
23:16 27:12,13
30:3 31:11
34:9,11 40:1
42:10 43:24
44:1,3,17,19
48:23 52:13,19
68:8
noise  25:1,11
nonpayment
27:8
nonresponsive
31:24 61:11
67:19
normally  43:6
51:10 73:13
notary  82:23
85:3
noted  82:3

notified  22:10
86:3,6
november
56:19
number  3:9
13:3 41:7
48:21 66:8
67:6,21 71:24
77:21
numbered  1:16

**o**

o  6:8,9,11
50:18
oath  6:1 24:8
24:12 74:4
82:12
object  27:24
31:23 46:20
61:10 67:18
72:5
objected  77:3
objection  46:14
53:11 71:8
74:8,14,19,25
75:7,16,22
76:19,23 77:2
78:7,24 79:10
79:18 80:6,13
occasionally
8:9
october  56:19
offer  35:7,8,9
35:12,24 36:7
offered  48:21
57:8,15,19

office  31:7
35:15,17 37:2
38:4,5,8 82:19
officer  84:16
86:6
okay  5:1,8,23
8:16 12:7,8,20
13:17,25 16:15
17:6,16 18:13
21:17 22:15
23:2,17 24:1
24:10,14,18
25:20 28:9,17
34:2 35:4,5,6
39:5 41:11
43:18 45:7
50:10 51:9,17
51:23 52:22
54:1 55:23
57:21 58:12
61:24 63:21
67:8 69:1,5,12
69:15,21,24
70:4,10,13
71:15,19 72:7
72:14,18 74:6
76:1
oklahoma
22:20
olivares  49:15
49:16 52:23
once  29:7 35:17
39:10,12 49:2
57:4

ones  21:10
28:11 40:24
58:6,25 63:21
open  58:11
operator  49:6
opportunity
48:15
oral  1:9,13 84:9
84:17
orally  36:4
orientation
38:9,12,16
39:3,7
original  13:18
84:19
outcome  85:14
outline  68:2
overtime  20:10
20:12,22 23:11
27:5,8,17 28:2
31:21 55:18
56:4 59:20
60:12 65:5,10
65:12 70:7
owed  27:5,6

**p**

p.m.  1:17,17
24:5,5,24,25
32:20,20 35:22
35:22 41:16,17
45:13 47:15,15
47:21,21 68:4
68:4 80:23
page  3:2,9
58:12 73:3

**[page - power]**

| | | | |
|---|---|---|---|
| 81:4 85:6 | 58:14,20,24 | **pending** 5:20 | **piece** 6:15 |
| **paid** 20:12,14 | 59:6,17,22 | **people** 19:25 | 49:17 |
| 20:16 28:2 | 60:6,6,23 | 20:7 21:8 | **placed** 20:2 |
| 31:20,21 36:21 | 62:14 63:18 | 22:18,20,24 | 61:1 |
| 37:10,12,13,25 | 64:15,15,20 | 23:11,14 | **plaintiffs** 2:2 |
| 56:24 57:8 | 65:15 66:22 | **percent** 22:3 | 26:14,20 27:11 |
| 60:25 61:18,20 | 69:18,21 72:23 | **percentage** | **plan** 14:4 |
| 62:21 63:3,25 | 72:23 73:7,12 | 43:5 | **playing** 59:23 |
| 65:21 67:9,17 | 73:18 76:1 | **perfect** 40:16 | **please** 4:7 6:4 |
| 69:15 70:5,8 | 78:18,21 79:7 | 40:17 | 10:10 12:5 |
| 71:19,23 72:2 | 79:15,17 80:2 | **perfectly** 20:24 | 13:8 32:2,4 |
| 73:16,18,25 | 80:18 | **perform** 55:19 | 35:21 46:24,25 |
| 78:4 80:11,14 | **paycheck** 16:2 | 56:5 | 47:2 52:6 |
| **paper** 6:15 10:5 | 17:16,19 18:14 | **performed** 11:8 | 58:17 65:12 |
| 49:18 | 58:13 72:8,15 | **period** 58:15,20 | 74:21 79:3,21 |
| **papers** 22:2 | 73:22 75:11 | 59:17,18 60:7 | **plus** 65:5 |
| **paperwork** | 78:4 | 60:7 65:15 | **point** 10:12 |
| 35:17 37:2 | **paychecks** 30:6 | 69:18 71:11 | 22:4 24:2 |
| 38:8 39:2 | 60:16 69:12 | 72:23,23 73:3 | 27:10 29:14 |
| 53:16,19 | 72:12 76:4 | 73:5,12,18 | **porter** 2:8 |
| **part** 12:21 20:7 | **paycom** 16:5,6 | 76:1,6,18 | **porterhedges....** |
| 39:11 46:6,12 | 29:8 30:22 | **person** 36:12 | 2:10 |
| 53:2 64:11 | 31:11 33:9 | 40:19 82:15 | **portion** 65:7 |
| 65:10 70:4 | 60:18 | **personally** | **possession** 12:4 |
| **particular** | **payday** 31:14 | 14:23 43:25 | **possible** 30:24 |
| 72:23 | **paying** 33:4 | 82:11 | 31:1 55:14 |
| **parties** 84:22 | 60:22 61:23 | **phone** 25:11 | 62:13 76:17 |
| 85:11 | 62:6 78:8 79:8 | 47:25 59:12 | **possibly** 53:23 |
| **party** 85:1,9 | 80:17,19 | 77:12 | 53:24 |
| **pass** 80:20 | **payment** 18:16 | **physical** 33:11 | **power** 1:6 4:20 |
| **pay** 15:17 16:3 | 28:6 31:15 | **pick** 50:21 | 10:18 11:16 |
| 20:19 28:5,10 | 37:25 59:10 | **picture** 12:6 | 17:10,17,22,25 |
| 28:13 29:1,3 | 60:20 70:7 | 63:19 | 18:4,25 48:13 |
| 30:6 32:8 38:3 | **payments** 27:9 | **pictures** 33:9 | 84:5 |
| 38:19,22 52:7 | 29:1 | | |

**[precise - reasons]**

| | | | |
|---|---|---|---|
| **precise** 6:16 | **provide** 10:10 | 44:10,12,21 | 62:3,15,22 |
| 7:16 | 50:25 51:3 | 46:10,17,18,25 | 64:15,20 65:5 |
| **preface** 21:3 | **provisions** 1:21 | 53:13 56:3 | 65:5,13,22 |
| **prefer** 4:11 | **pto** 56:24 | 57:14 59:19 | 67:17 70:6 |
| **prepa** 10:18 | **public** 82:23 | 64:2 67:19,20 | 73:16 74:13,13 |
| 48:13,17 | 85:3 | 68:24 74:20 | 74:17 75:5,10 |
| **prepare** 24:15 | **puerto** 6:6,13 | 75:18 76:24 | 75:13,14,15,21 |
| 25:23 | 6:23 7:9,11 | 79:3,21 | 77:7,20,25 |
| **present** 2:11 | 9:12,16 10:18 | **questioned** | 78:19,22 79:8 |
| **pretty** 9:1 | 11:21 14:22 | 59:17 | 79:17 80:11,17 |
| **prior** 68:9 | 15:12 24:25 | **questioning** | **rates** 74:18,24 |
| **probably** 5:18 | 36:23 38:6,8 | 78:17 79:5 | 74:24 |
| 26:2 29:4,6 | 42:3 48:6,13 | **questions** 16:23 | **reaching** 62:15 |
| 77:13 | 48:16,19 49:2 | 26:6 32:2 35:4 | **read** 22:14 47:3 |
| **problem** 23:2 | 49:4 50:7 | 41:2 62:1 | 58:16 59:7 |
| 48:1 | **pull** 13:2 51:17 | 68:12,14,23 | 60:14 79:23,24 |
| **procedure** 1:21 | 77:13 | 78:11 80:21 | 82:1 |
| **process** 21:12 | **purported** | **quick** 4:25 19:4 | **ready** 25:15 |
| 23:24 26:24 | 75:15 | 32:18 56:18 | 35:18,18 44:17 |
| **produce** 30:13 | **purports** 75:21 | 68:1 | 47:23,24 |
| 33:16 | **purpose** 82:18 | **quickly** 51:15 | **real** 19:3 32:18 |
| **produced** 1:14 | **purposes** 4:18 | **quiet** 66:21 | 68:1 |
| 28:11 58:5,7 | **pursuant** 1:20 | **quite** 8:20,25 | **realize** 12:18 |
| 59:1 63:12 | 84:24 | 21:19 22:1 | **really** 15:13 |
| 64:5 | **put** 6:14 26:17 | 27:4 54:9 75:5 | 21:19 22:22 |
| **producing** | 27:18,21 44:5 | 79:20 | 27:12 36:9 |
| 28:13 | 59:12 | | 55:2,4 56:6,9 |
| **project** 7:8 | | **r** | 56:17 |
| **promise** 65:1 | **q** | **r** 6:9,11 | **reason** 20:8 |
| **promised** 70:8 | **question** 5:6,11 | **rainforest** | 27:4 54:6,11 |
| 77:25 78:22 | 5:20,22 15:1 | 50:13 | 55:15 81:4 |
| 80:15,17 | 17:2 22:24 | **raining** 40:7 | **reasons** 34:15 |
| **prove** 29:13 | 26:5,7 29:16 | **rate** 20:13 | 34:16 85:7 |
| **proved** 82:12 | 29:22,23,24 | 31:22,22 35:13 | 86:9 |
| | 31:6 32:1 | 38:19,22,25,25 | |
| | 34:20 43:15 | 60:12,13 61:19 | |

Veritext Legal Solutions
346-293-7000

**[recall - right]**

| | | | |
|---|---|---|---|
| **recall** 8:20 | **records** 19:10 | **report** 3:11 | **result** 9:24 |
| 19:17 25:4 | **recovery** 59:21 | 35:15,16 52:10 | **results** 62:16 |
| 28:13 29:2 | **referring** 32:7 | 52:11 76:5 | 77:20 |
| 30:8,8 38:12 | 32:8 | **reported** 1:19 | **retainer** 21:23 |
| 38:18,21 39:2 | **reflect** 64:20 | 49:12 | **retired** 48:19 |
| 43:6 50:10 | **reflected** 69:22 | **reporter** 1:18 | **returned** 85:3,5 |
| 55:4,11 56:24 | 73:21 | 5:3 50:14 | 86:12 |
| 57:2,7 59:3 | **refrain** 12:17 | 51:21 84:12 | **returning** |
| 63:15 79:9 | **refreshes** 64:6 | **reporter's** 84:8 | 35:13 |
| **receipt** 85:5 | **refuse** 45:14 | **reports** 52:20 | **reverse** 74:12 |
| **receive** 9:23 | **refused** 45:3 | **represent** | 74:17,23 |
| 25:3 35:7 | **regular** 51:10 | 13:17 | **review** 25:23 |
| **received** 10:1 | 60:12 65:9,12 | **representation** | 26:10,11 86:7 |
| 18:16 25:13,16 | **related** 85:11 | 71:1,6 76:14 | **reviewed** 26:7 |
| 36:3 | **relating** 33:16 | **representing** | **rican** 11:21 |
| **receiving** 35:11 | **relationship** | 4:17 22:5,7 | **rico** 6:7,13,23 |
| 62:7 | 46:7,13 | **request** 29:11 | 7:9,11 9:12,16 |
| **recently** 13:24 | **relevant** 29:25 | 29:20 30:1,14 | 10:18 14:23 |
| 28:12 | 31:8 60:7 | **requested** | 15:12 24:25 |
| **recess** 24:5 | **remember** | 33:15,18 47:3 | 36:23 38:6,8 |
| 32:20 35:22 | 19:17 22:19,22 | 79:24 80:25 | 42:3 48:6,13 |
| 47:15,21 68:4 | 22:24 29:9 | 85:1,8 | 48:17,19 49:2 |
| **reciting** 86:9 | 30:18 31:3 | **requests** 31:18 | 49:4 50:7 |
| **recollection** | 32:10 35:11 | 33:2 | **right** 4:5 6:6 |
| 41:5 | 36:6 38:15 | **required** 44:24 | 8:9 10:2,12,16 |
| **reconstruction** | 39:4 54:1,16 | 45:13 | 11:2,16 12:2 |
| 57:5 | 54:17 55:2,15 | **reserve** 80:22 | 12:10,14,15,21 |
| **record** 1:22 4:8 | 56:18 57:4,15 | **response** 29:10 | 13:2,12 14:7 |
| 4:18 6:5 8:23 | 57:20 79:11 | 29:19,25 30:13 | 15:23 17:17 |
| 24:7 32:18,18 | **remind** 22:16 | 31:18 33:2 | 23:3 26:18 |
| 32:23,25 35:20 | **remotely** 1:15 | **responses** | 30:25 32:6,21 |
| 36:1 47:3,18 | **repeat** 27:25 | 33:21 | 33:4 35:7 |
| 47:20,23 68:1 | 46:17,25 47:2 | **responsive** | 37:19 40:22 |
| 68:20 73:8 | 53:14 67:16 | 29:25 | 45:22,25 48:2 |
| 79:24 84:17 | 74:20 79:21 | | 48:20,24 49:11 |

Veritext Legal Solutions
346-293-7000

**[right - send]**

50:2 51:10
52:14 54:2
56:10 57:22
58:12,22 59:1
59:13 60:4,4
60:17 61:19
63:8 64:14
65:2,4 66:17
66:22 67:25
68:11,13 69:16
73:2,9 75:9
76:6 77:18
79:13 80:4,10
80:12,16
**rivera**   23:17
**road**   50:12,18
**rodriguez**   1:10
1:13 3:3 4:2,7
4:9,11,13,14,14
4:16 6:19 7:18
13:9 14:25
16:21 24:6,9
29:9 30:11
31:25 32:22
36:3 46:16
47:16,22 51:24
58:3 60:5
64:25 68:22
69:3 72:10
77:22 78:15
81:2 82:1,6,11
84:9,15
**role**   22:11
**roosevelt**   50:12
50:18

**rosario**   23:7,8
**rough**   43:4
**roughly**   62:21
**rule**   84:24
**rules**   1:20 4:25
45:6
**runs**   72:23

**s**

**s**   6:12,12
**sadykhov**   2:8
3:4,5 4:5 6:17
13:4,8,12 24:1
24:6 28:9,21
29:23 31:23,25
32:13,17,21
34:2,5,14
35:21,23 36:2
46:11,15,24
47:1,8,12,16,19
47:22 50:21
51:23 52:4,9
52:13 53:21
55:23 56:3,10
56:14,17 57:24
58:3 59:14,23
60:1,4 61:10
61:13 66:6
67:18,20,25
68:5,11,16
71:8 72:5 74:8
74:14,19,25
75:7,16,22
76:19,23 77:2
77:13 78:7,12
78:15 79:4,12

79:22 80:3,10
80:16,20 84:20
**safe**   25:22
**salary**   38:3
**san**   1:2 84:2
**santa**   6:12
**santiago**   23:5
**saw**   16:4,13
20:13 28:7
53:5,8 61:5,5
61:11 66:25
**saying**   8:1,7
17:22 24:22
39:15 53:8
61:6 62:8 79:9
**says**   13:20
58:19,22 59:5
60:11,12 63:23
64:17,22 65:3
65:4,9 66:10
75:18 80:18
**schedule**   39:22
**scheduled**
45:16,18 55:12
**school**   9:9,11
9:19 10:21
**scratch**   9:18
25:21 37:23
62:12 78:20
**screen**   13:9,13
28:18,21 30:21
51:17,24,25
68:15 77:14
**scroll**   52:4

**se**   8:13
**seal**   82:19
**search**   29:10
31:17
**second**   12:3
28:17 33:14
38:14 54:3,18
**see**   13:12,22,23
14:10 18:11
19:6 26:24
27:8,15 28:21
28:25 31:14
37:9 51:24
55:10 58:8,16
58:18 59:5,7
60:14 65:2,4,9
65:10,12,13
66:1,3,16
68:15 69:8,11
72:10,11,17,25
73:1 74:1,2,5,5
75:11,17 76:9
77:15
**seeing**   14:11
27:1
**seeking**   55:22
56:4,12 59:21
62:23 67:1,6
**seen**   13:15,23
13:24 31:20
52:2,13 60:16
61:2,13 63:16
69:6
**send**   12:6 13:5
30:22

Page 16

**[sense - stay]**

sense  5:7,14
sent  30:19
  35:15 38:7
  62:4
serious  68:19
served  84:21
service  39:9
services  1:5
  4:19 14:20
  15:2,6 84:4
set  14:2 20:13
  39:22 45:9
seven  41:22
  70:19,23 71:4
  71:11,13,17
shake  5:13
share  13:9
  28:18 51:24
  68:15
shauna  1:18
  13:4 32:19
  47:1 77:2
  79:22 84:12
  85:19 86:18
sheet  83:1
sheets  52:20
  53:4,9,22
  72:22 73:2
shift  39:8,19,22
  43:20 44:13
  45:10
shifts  39:5
shirts  16:13
  18:10

shortest  68:25
shorthand  1:18
  84:12
shots  30:22
show  6:15
  13:11 45:3
  49:18 63:13,19
  63:22 64:5
showed  63:17
  63:18
showing  17:21
  56:8 69:5 79:7
shown  19:11,12
  84:22
shows  64:15
  73:24
sic  62:23
sick  55:17
sign  21:17,23
  86:9
signal  25:11
signature  80:25
  81:1 82:2
  84:25 85:3,6
  85:18 86:11,17
signed  21:20
signing  32:10
  35:12
similar  11:7
  58:24 60:6
simultaneous
  52:12 66:5
  72:19
single  76:7,11

sir  10:7,9,22
site  49:22
situation  42:17
six  11:3
slowing  54:23
small  65:11
solutions  85:20
  86:19
somebody  27:1
  37:7 66:23,24
sorry  6:10 9:17
  16:1 37:23
  39:11 41:24
  49:9 54:8
  64:25 65:3
  68:7 70:16
  71:2 76:24
  78:13,20
sort  10:2,6
  43:21 52:19
  63:13
sound  13:21
  19:16,18 32:13
  41:18 55:7
space  6:12,12
  50:20
speak  24:20
  26:13
speaking  79:20
specifically
  46:21
specify  28:6
spelling  50:15
  50:17

spoke  21:5 23:4
spoken  43:24
  44:2
stamp  69:7,10
  72:9
standby  44:1,5
  44:8,8,10
star  1:6 4:19
  18:8,11,15,18
  18:22 84:5
start  11:12
  39:25 41:14
  54:2,7
started  4:24
  7:20 11:3,20
  40:7 42:8 54:3
  54:23
state  1:19 4:7
  6:4 82:7,24
  84:13 86:2
stated  1:21
  78:18
statement
  37:15 86:9
statements
  3:10,11 25:7
  58:1
states  1:1 7:10
  7:13 8:12,18
  8:24 11:22
  68:9 84:1
stay  23:21 42:5
  42:10,15,16,20
  42:20,22 43:4
  43:6,7,9 45:14

**[staying - thank]**

| | | | |
|---|---|---|---|
| **staying** 46:5 | **sued** 14:14 | **suspended** 45:5 | 75:12 |
| **stenotype** 1:20 | **suggest** 50:17 | 45:24 | **telling** 15:18 |
| **steve** 49:13 | **suing** 20:7,9 | **suspension** | 25:13 |
| **stick** 17:1 | **suite** 2:4 85:21 | 45:6 | **termination** |
| **stipulate** 55:21 | 86:20 | **sworn** 1:15 4:1 | 19:11 |
| 58:6 60:5 | **sun** 39:19,20 | 4:3 84:16 | **testified** 4:3 |
| **stipulation** | 40:9 | 86:13 | 27:3 33:23 |
| 56:15 | **sundays** 54:24 | **system** 48:18 | 61:17 63:13 |
| **stop** 49:1 | 54:24,25 | 57:5 | 68:8 69:15 |
| **stopped** 47:6 | **supervisor** | | 79:6 |
| 56:25 | 40:21 45:22 | **t** | **testifying** 63:15 |
| **storm** 48:3,14 | 46:4 49:12 | **t** 6:8,12 | **testimony** |
| 56:22 57:12 | **supervisors** | **table** 5:21 | 31:17 64:3,7 |
| **streamline** | 16:8 17:24 | **take** 5:12 9:21 | 78:18 84:17 |
| 56:16 | 18:18 | 24:24 25:1,10 | 85:12 |
| **street** 2:9 85:21 | **supplement** | 28:11 36:18 | **texas** 1:1,19 2:5 |
| 86:20 | 34:4 | 54:20,25 55:2 | 2:10 24:24 |
| **stub** 20:19 52:7 | **supposed** 60:21 | 56:23 66:21 | 49:10 84:1,13 |
| 58:24,24 60:6 | 77:19 78:9 | **taken** 1:15 | 85:19,22 86:2 |
| 60:23 61:25 | 80:2 | 30:21 85:12 | 86:18,21 |
| 64:11,15,22 | **supposedly** | **talk** 16:6 21:1 | **text** 25:3,16,19 |
| 75:17 80:9,18 | 73:9 75:25 | 37:6 39:8 | 26:16 |
| **stubs** 16:3 28:5 | 77:4,6 | 52:12 66:5 | **thank** 4:5,15,23 |
| 28:10,13 29:1 | **sure** 7:23 8:2 | 72:19 | 5:16 6:3 7:18 |
| 29:3 30:2,4,6 | 8:22,25 9:1 | **talked** 21:3 | 9:3,8 10:15 |
| 32:8 33:4 58:4 | 12:2,13 13:22 | 27:13 42:7 | 11:18 12:9 |
| 61:14 63:18 | 21:19,21,22 | 63:11 | 13:25 15:7,25 |
| 64:20 | 22:1,3,3,23,25 | **talking** 46:3,12 | 17:23 18:6,13 |
| **stuff** 34:18 | 23:23,24 24:4 | 58:18 69:9 | 19:2,9 20:23 |
| **styled** 1:16 | 27:4 30:15 | **technical** 9:19 | 24:14 25:20 |
| **subscribed** | 31:16 52:7 | **tel** 85:22 86:21 | 26:12 36:9 |
| 82:16 86:13 | 54:9,13 55:11 | **tell** 20:1 30:17 | 37:21 41:20 |
| **substance** | 55:16,24 57:1 | 31:3 36:15,20 | 43:18 45:1,7 |
| 24:19 86:8 | 60:3,19,20 | 37:8 46:21 | 46:2 47:11 |
| | 61:6,8 68:3 | 50:3 64:12 | 49:9,19,21 |
| | | 72:14 74:2 | |

Veritext Legal Solutions
346-293-7000

**[thank - understand]**

55:23 56:15
57:21 59:11
60:1 64:23
65:14,20 66:12
67:24
**therefor** 85:7
**thing** 5:19 31:2
31:2,10 34:6
57:1,10 60:19
64:8 68:6
**things** 21:9
26:25
**think** 8:6,20
18:6 19:13
21:12 24:2
31:16 37:11
41:12 45:4
47:12 50:5,14
51:20 68:1
**thought** 37:13
68:16
**thousand** 38:23
60:22,25 61:7
61:20 62:6,8
63:6,25 65:22
66:15 67:17
69:16 70:1,9
70:10 71:24
73:17,19 78:1
80:15
**three** 7:22 8:2
9:15 10:17
22:14 30:2,4
30:21 73:6

**throckmorton**
85:21 86:20
**tied** 57:16
**time** 3:11 4:24
5:17,21 8:17
11:1 24:24,25
32:4 35:20
37:14,17 39:23
39:24 40:1,2,3
46:20 47:13
51:2,6 52:10
52:19 53:4,9
53:21 54:20
55:1,7,12,22
56:12,24,25
57:8 60:7
62:25 72:21
73:2,8 76:4,7
76:22 77:1
80:22
**times** 43:3
50:10 65:5,5
70:1,10,25
71:4,24 72:3
77:20 79:13
**tiredness** 43:11
**title** 11:5 49:6
**today** 6:1 24:16
24:21 25:23
26:15
**together** 22:21
**told** 11:4 22:4
25:6 35:14
38:4,19,21
40:21 43:25

44:7,8,9,17,19
51:18 61:22,24
62:5,25 63:5,9
**took** 48:24
54:21 57:17
**top** 13:19 14:8
52:16
**total** 65:23 67:2
**towards** 19:20
**town** 50:3,6
**track** 51:19
**tracking** 76:21
76:25
**transcript** 5:5
84:16 85:5
86:6
**translate** 55:25
56:2 61:12
**translation**
12:19
**trial** 14:2,5
80:22
**trick** 34:19
**trucks** 18:10
**true** 20:24 71:7
82:3 84:17
**truly** 23:1
65:21
**truthful** 68:25
**try** 12:17 26:24
26:24 27:10
32:15 56:15
**trying** 7:19
16:22,22 17:7
21:20 32:24

34:17,19 41:1
**tuesday** 73:7
**turn** 12:16 14:7
44:18
**turning** 53:9
**two** 9:7 30:2,4
30:21 56:18,18
65:15,18 73:6
73:11,13
**type** 51:13
**typical** 69:18

| u |
|---|

**u** 6:9,11 50:18
50:20,20
**u.s.** 6:22,24 7:2
7:24 9:2
**uh** 77:8
**unaware** 16:10
**under** 6:1
16:18 24:8,11
60:21 61:17
74:4 82:12,19
**understand**
5:25 7:24 8:6
14:17 20:21
21:22,25 24:7
24:11,13 25:14
27:7 28:1
31:16 34:14,25
37:11,18 44:9
44:19 46:19
52:24 59:9
60:8 62:18,20
63:2 64:1 65:8
69:2,4 71:9,10

**[understand - work]**

74:11 75:4
**understanding**
16:18 18:1
26:9 47:9
60:21 61:18
75:18
**understood** 5:8
5:15,24 6:2
17:9 20:8 28:5
37:21 43:21
44:12,22 46:6
62:17,19
**unfortunately**
68:19
**united** 1:1 7:10
7:13 8:12,18
8:24 11:22
68:8 84:1
**university** 9:15
**unpaid** 20:10
20:22 27:17
**unsure** 54:14
**urbanizacion**
6:8
**use** 56:15 57:11
77:12
**used** 74:12 75:4
**using** 74:23

**v**

**v** 6:8
**vacation** 55:4
57:17
**vacations** 54:20
57:2,13

**verbal** 5:11
**verify** 33:4 53:9
**verifying** 53:7
**veritext** 85:20
86:19
**version** 60:9
**versus** 42:22
43:4
**violeta** 6:7
**visibility** 39:17
40:8,10,16
**volume** 47:25
**vs** 1:4 84:3

**w**

**wait** 5:5
**waiting** 27:15
**wallet** 12:1
**want** 4:22 5:21
6:18 7:23
13:10 14:7
16:21 17:7
21:3,4 24:18
32:15,17 34:19
35:3 49:5
63:24 64:7
68:23 71:6
74:3 75:20
77:14,21
**wanted** 4:24
12:3 14:15
35:16 36:18
49:3 62:16
68:5
**watermark**
17:22

**way** 8:16 43:2
48:17 54:15
55:13 59:16
67:9
**waylon** 36:14
37:24 48:21
**we've** 33:18
46:3,12 47:13
**wear** 16:12
**wearing** 16:11
**weather** 39:17
40:7,17
**week** 25:6
41:22 54:4
65:15 70:15,19
70:20,22,23
71:16,17,20
76:18
**weeks** 56:19
65:18 71:16
**welmaker** 2:3,3
3:4 21:2,18,24
24:4,20 25:19
27:24 32:15
33:25 34:3
35:19 46:14,20
53:11 55:21
56:1,11 59:16
59:25 60:3
68:3,13,18,22
71:4,9 72:7,21
74:11,16,22
75:3,9,20,23
76:21,25 77:5
77:15,18 78:10

78:24 79:2,10
79:18 80:6,13
80:21
**welmakerlaw...**
2:5
**went** 8:18 28:8
31:14 40:9
42:6 43:19
47:24 49:22
53:7 54:22
55:3 68:6
73:10
**western** 1:1
84:1
**witness** 1:14
79:1 80:20
81:2 84:15,18
84:22 86:3,4,7
86:8,10,11
**wonder** 62:2
**work** 6:22 8:18
10:16 11:1,7
11:10,15 14:16
15:16,22 16:9
19:14 25:10
27:13 35:1,16
35:18 36:17,18
36:25 39:16,25
40:8,10,15,25
41:4,8,15,16,22
43:23 44:4,16
44:18,24 45:9
45:13,16,18
48:3,15,22
49:22 51:14,16

Veritext Legal Solutions
346-293-7000

**[work - zoom]**

53:7 55:19
56:5,7 63:1
71:13 73:6
76:11,17
**workday**  43:21
54:12
**worked**  8:12,23
9:2 14:24
17:25 19:18
20:1 22:21
29:13 34:11
41:13 42:22
43:14 44:7
48:12,16,23
53:10 63:14
64:16,20 68:8
70:6 71:16,25
72:22 73:6,17
73:19,25 76:15
77:6
**workers**  22:9
22:15 26:14
44:5
**working**  6:23
6:24 7:1,5 8:3
8:8 11:1,16
14:22 15:12,14
15:15,22 16:19
17:4,14 19:12
19:22 36:18
37:7,16,20
39:6,14 42:1
46:6,13 47:5,6
48:2 49:1,3,5
51:12 54:4,19

55:14 56:25
61:14 63:4
67:15,22 70:14
70:18,19,19,22
70:23 71:10,12
71:15,19
**worth**  37:5
85:22 86:21
**write**  49:17
**writing**  5:3
**written**  5:9
56:12
**wrong**  47:24

| x |
|---|

**x**  85:8

| y |
|---|

**y**  50:18,20
**yabucoa**  50:7
50:12,17
**yard**  50:1,2,3,6
50:8,22
**yards**  50:9,11
**yeah**  6:17 12:2
14:13 21:22
24:4 29:23
32:17 34:5
46:11 56:1
59:23,25
**year**  7:20,21
**years**  6:21,22
7:4,12,13,14,22
8:2 9:15 10:17
11:11,13

**yep**  73:1
**yesterday**
25:13
**yunque**  50:13
50:19

| z |
|---|

**z**  6:9,11
**zero**  66:9
**zoom**  1:15
24:23 25:12
52:4

Federal Rules of Civil Procedure

Rule 30


(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

```
1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE WESTERN DISTRICT OF TEXAS

3                      SAN ANTONIO DIVISION

4     AARON MALDONADO, et al        )

                                    )

5              Plaintiffs,          )

       VS.                          )

6                                   )

      MAMMOTH ENERGY SERVICES, INC., )CASE NO. 5:21-cv-85

7     COBRA ACQUISITIONS, LLC, HIGHER)

      POWER ELECTRICAL, LLC, and     )

8     5 STAR ELECTRIC, LLC,          )

                                    )

9              Defendants.          )

10        ************************************************

11                    ORAL DEPOSITION OF

12                     MIGUEL ROSARIO

13                      MAY 2, 2024

14                    (Taken Remotely)

15        ************************************************

16    ORAL DEPOSITION OF MIGUEL ROSARIO produced as a witness

17    at the instance of the Defendants, was taken in the

18    above-styled and numbered cause on the 2nd day of May,

19    A.D. 2024, from 2:03 P.M. to 4:16 P.M., before Sharon

20    Kiosse Poulos, CSR in and for the State of Texas,

21    reported by shorthand machine, at the residence of the

22    deponent, located at G-17 Calle Hermes Villas De Buena

23    Vista, in the City of Bayamon, Puerto Rico, pursuant to

24    the Federal Rules of Civil Procedure.

25
```

Page 1

EXHIBIT

19

1 APPEARANCES:
2 For the Plaintiffs:
3 DOUGLAS B. WELMAKER, ESQ.
  WELMAKER LAW, PLLC
4 409 North Fredonia, Suite 118
  Longview, Texas 75601
5 doug@welmakerlaw.com
6 For the Defendants:
7 EUGENE M. NETTLES, ESQ.
  EMIL SADYKHOV, ESQ.
8 PORTER HEDGES LLP
  1000 Main Street, 36th Floor
9 Houston, Texas 77002
  (713) 226-6611
10 enettles@porterhedges.com
11 Also Present:
12 Diego Acosta, interpreter
13 Anthony Arteaga
14
15
16
17
18
19
20
21
22
23
24
25

Page 2

1                 INDEX
2 Appearances.........................................2
3 MIGUEL ROSARIO
4 Examination by Mr. Nettles.........................4
5 Witness's Signature Page/Corrections..............60
6 Reporter's Certificate............................62
7                EXHIBITS
8 NO.  DESCRIPTION                         MARKED
9 Exhibit 1 - Resume................................5
10 Exhibit 2 - Employment application...............18
11 Exhibit 3 - Employment offer letter..............21
12 Exhibit 4 - Checks and pay stubs.................32
13 Exhibit 5 - Plaintiffs' Original Complaint.......44
14 Exhibit 6 - Time detail report...................49
15 Exhibit 7 - Timesheets...........................53
16 Exhibit 8 - Job detail report....................56
17 Exhibit 9 - Text messages........................57
18
19
20
21
22
23
24
25

Page 3

1            DIEGO ACOSTA,
2 having been duly sworn, interpreted as follows:
3            MIGUEL ROSARIO,
4 having been duly sworn, testified through the
5 interpreter as follows:
6            EXAMINATION
7 BY MR. NETTLES:
8    Q.  What is your date of birth?
9    A.  January 6, 1966.
10   Q.  So I think you're like 58 years old; is that
11 right?
12   A.  Yes, sir.
13   Q.  Okay.  Miguel, you understand your deposition
14 is being taken today in a case that is pending in
15 Federal Court in San Antonio?  You understand that?
16   A.  Yes, sir.
17   Q.  And the case has to do with your employment
18 with a company called 5 Star in Puerto Rico; is that
19 correct?
20        MR. WELMAKER:  Objection; form.
21        Miguel, whenever I object, you can go ahead
22 and answer.
23   A.  Okay.  Yes.  I work at 5 Star.  But all my
24 chief are from Cobra.
25   Q.  All your what?  Checks?

Page 4

1    A.  All of my chief.  Chief.  Chief.  Chief are
2 from Cobra.
3        THE REPORTER:  Are from what?
4        THE WITNESS:  Cobra.
5        THE REPORTER:  Oh, Cobra.  All your checks?
6        THE WITNESS:  No.  All my Chief.  Chief.
7 Chiefs.  Chief.
8        MR. WELMAKER:  My bosses.
9    Q.  (BY MR. NETTLES)  But only your checks came
10 from 5 Star; correct?
11   A.  I think so.
12   Q.  Okay.  Miguel, do you remember that you had a
13 resume that you somehow gave a copy of to 5 Star?
14   A.  It's a long time.  I don't remember that.  Give
15 resume from 5 Star or --
16   Q.  Okay.  Let's -- I'm going to ask -- we're going
17 to mark this as Exhibit 1, and it's under Tab 2.
18        Anthony, I'm going to show it to you.
19 Anthony, can you hear me?
20        MR. ARTEAGA:  Yes.
21        If the host will allow me to use Share
22 Screen.  Disabled participation in screen share.
23        (Exhibit No. 1 marked.)
24   Q.  (BY MR. NETTLES)  If you would make it just a
25 little larger, please.

Page 5

2 (Pages 2 - 5)

1     Miguel, do you recognize this as your
2 resume?
3     A. Yes, sir.
4     Q. All right. If you would go to the third page,
5 please.
6     A. I can do that.
7     Q. Yeah.
8     Now, Miguel, did you write -- did you draft
9 this resume? Did you produce it yourself?
10    A. For myself? No.
11    Q. Who made your resume? Who made it for you?
12    A. My family helped me because I don't write good
13 on a computer.
14    Q. I gotcha. Okay.
15    Look at the very bottom where it says
16 "references and letters of recommendation." The line
17 before that says, "Bilingual ability to communicate and
18 interact effectively, written and verbal, Spanish and
19 English."
20    Do you see that?
21    A. Yes.
22    Q. Is that true?
23    A. Some time.
24    Q. Are you able to read English?
25    A. Not to read too much English. I'm better to

Page 6

1 speak English.
2     Q. Okay. That's fine.
3     Let's go to -- scroll up or go to the next
4 page, which is Page 2, and look -- go down a little bit
5 further, please. A little further.
6     Let's do this. Let's start with education.
7 Now this shows that you went to high school.
8     Did you go to high school in Puerto Rico?
9     A. Yes.
10    Q. Where -- where are you from? Where were you
11 born?
12    A. I live now in Puerto Rico. I live right now in
13 Puerto Rico.
14    Q. You're not living in Puerto Rico now?
15    A. No. I live now in Puerto Rico.
16    Q. All right. Were you born in Puerto Rico?
17    A. No -- yes. Yes. I was born in Puerto Rico.
18    Q. All right. So what city were you born in in
19 Puerto Rico?
20    A. Sorry. San Juan. San Juan.
21    Q. Where do you live now, sir?
22    A. In Puerto Rico, Bayamon.
23    Q. What's the name of the city?
24    A. Bayamon.
25    Q. Will you spell that?

Page 7

1     A. No. I -- I don't be good at spell.
2     MR. NETTLES: Diego, can you help here?
3     THE INTERPRETER: Of course.
4 B-A-Y-A-M-O-N.
5     Q. (BY MR. NETTLES) Bayamon?
6     A. Yeah.
7     Q. That's where you live currently?
8     A. Yes. Right now, yes.
9     Q. Okay. Do you live there with anybody? Are you
10 married and have children or --
11    A. Right now I'm divorced.
12    Q. Okay. So do you live -- do you live in a house
13 with anybody else?
14    A. No.
15    Q. Are you currently employed? Are you working
16 anywhere?
17    A. Yes.
18    Q. Who do you work for?
19    A. MasTec.
20    Q. MasTec?
21    A. Yes.
22    Q. Spell it, please.
23    A. I don't spell good. That's why I tell you. I
24 don't be good with spell.
25    MR. NETTLES: Let Diego figure this out and

Page 8

1 translate it, please.
2     THE INTERPRETER: So that's MasTec.
3 M-A-S-T-E-C-H.
4     Q. (BY MR. NETTLES) Okay. So, Miguel, how long
5 have you worked for MasTec?
6     A. Three years.
7     Q. What do you do for them?
8     A. I'm here to -- a GF.
9     Q. I'm sorry?
10    A. I'm here, general foreman.
11    Q. General foreman.
12    Is this an electrical company?
13    A. Yes.
14    Q. And what do you do? What's the -- strike that.
15    Is MasTec one of the electrical suppliers
16 in Puerto Rico?
17    A. I don't understand what you --
18    Q. What does MasTec do? What kind of company is
19 it?
20    A. Overhead.
21    Q. Do they put lines up?
22    A. Yes.
23    Q. So it's an electrical company?
24    A. Yes.
25    Q. Is it just in Puerto Rico?

Page 9

3 (Pages 6 - 9)

1    A.  Yes.
2    Q.  And as the foreman, what do you do for the
3  company?
4    A.  You see it there in the -- in the -- in the
5  resume.
6    Q.  Okay.  So the resume has the fact that you
7  worked for MasTec.  In the resume it's spelled
8  M-A-S-T-E-C.  And it says you supervise daily work,
9  daily work reports, blueprint -- blueprint reading,
10 materials requisition, handling equipment and heavy
11 vehicles, Category 9.
12        Does that sound like a fair summation of
13 what you do?
14   A.  Yes.
15   Q.  All right.  Now, let's go down on this Page 2 a
16 little bit.  And it reflects training, certification and
17 licenses.
18        Can you see that?
19   A.  Yes.
20   Q.  Can you read that first line?
21   A.  It's very small.  I can't see it.
22   Q.  I'll get him to make it a little bigger.
23        Do you see that now?
24   A.  Yes.
25   Q.  All right.  What does it say?

1    A.  American Safety Health, OSHA, CPR.  Right?
2    Q.  Yes.
3    A.  Yes.
4    Q.  So do you have an OSHA certification?
5    A.  Yes.
6    Q.  CPR and AED, you have those -- that training?
7    A.  Yeah.
8    Q.  And the other --
9        If you'll shrink it just a little bit,
10 Anthony.
11        The other categories reflects that you've
12 been trained on heavy vehicles, bucket truck operator,
13 digger derrick.  Is that true?
14   A.  Yes.
15   Q.  And you have a driver's license, Category 9,
16 operate heavy vehicles, pickup trucks, panel trucks,
17 flatbed trucks.
18        All that is correct?
19   A.  Yes.
20   Q.  And US government motor vehicle operator ID for
21 forklift, fork electric, pallet truck, cherry picker,
22 all that's correct?
23   A.  This is canceled.  Right now, no.
24   Q.  Okay.  Training on conservation and maintenance
25 of power lines.

1    A.  Yes.
2    Q.  Okay.  So let's sort of do it this way just to
3  speed things up, if possible here.
4        After you got out of high school and after
5  you completed your training in terms of doing the
6  electrical work or the lineman electrical school, who
7  did you first go to work for?
8    A.  Tell me that in Spanish because I don't --
9  don't really speak to it with that question in English.
10       (Interpreter speaks with witness.)
11   A.  (Through interpreter.)  That's been so long
12 ago.  Maybe electrical maybe.  It's many years ago.  I'd
13 have to look at my resume to be able to tell.
14   Q.  All right.  Let's try to do this.  I don't want
15 to belabor this.  Go ahead.
16       Anthony, go to the -- let's start at the
17 first page.  Actually let's do this.  Let's go to the
18 second page.
19       And if you look on the second page, it says
20 you were a lineman, trouble man, electric power
21 authority, Puerto Rico, October of '92 to May of '06;
22 correct?
23   A.  Yes.
24   Q.  That reflects what you did at that time?
25   A.  Yes.

1    Q.  And then you were a foreman for MasTec from May
2  of '06 to October of '06; correct?
3    A.  Yes.
4    Q.  Scroll on up.  And then in October you were at
5  Terry's Electric from October of '06 to May of '07;
6  correct?
7    A.  That you see there?
8    Q.  Yes.  Correct?
9    A.  Yes.
10   Q.  All right.  Let's go to the next page, first
11 page.
12       All right.  On the first page it reflects
13 that at one time you were, in January of '07 through
14 February of '13, basically six years, that you were a
15 foreman for NC Contractors and Rental.
16       And that's Bayamon, Puerto Rico; correct?
17   A.  Yes.
18   Q.  So if we flip back to the Page 2 and go back to
19 the top, some of the work that you did like for World
20 Leaders, Terry's Electric, was in Florida; correct?
21   A.  Yes.
22   Q.  So you have worked in the United States and
23 Puerto Rico your whole life?
24   A.  Yes.
25   Q.  Let's go back to Page 1.  From February '13 to

**4 (Pages 10 - 13)**

1 August of '15, you -- when you worked for Willbros T&D,
2 that was in Fort Worth, Texas?
3   A. Yes.
4   Q. What did you do -- what did you do for them?
5   A. Foreman.
6   Q. All right. But everything that you've done on
7 all these jobs relates to repairing and determining what
8 causes of trouble in electrical lines; is that fair?
9   A. Yes.
10   Q. In other words, your entire life has been
11 devoted to being a foreman doing electrical work;
12 correct?
13   A. Yes.
14   Q. Okay. And at the very top of the page it says
15 August of '15 to present in Bayamon, Puerto Rico, that
16 you've been self-employed as a general contractor
17 foreman; correct? Did you hear the question?
18   A. Yeah. I see -- I try to read what happened in
19 the resume. That's what I'm doing now.
20   Q. Okay. We can make it a little bigger if that
21 will help you.
22   A. Yes.
23   Q. So does that -- is the resume accurate where it
24 depicts what you're currently doing now? Is that
25 correct?

Page 14

1   A. I have to give you a copy or you have a copy?
2 I don't know what you're trying to say.
3   Q. That's what I'm asking.
4      Have you -- you provided some documents to
5 your lawyer who provided those to us?
6   A. I don't remember.
7   Q. All right. Well, I don't see a copy of your
8 driver's license. Would you mind giving us a copy of
9 that?
10   A. Now?
11   Q. No. No. No.
12      Well, it looks like we do have it. You
13 don't need to do it.
14   A. Okay.
15   Q. Thank you. It's one of the documents that's
16 been provided.
17      Now, this has an address in Florida in
18 Orlando on Flower Fields Lane. Did you -- did you live
19 there at one time?
20   A. Yes, sir.
21   Q. All right. And how long ago was that? Do you
22 remember?
23   A. I don't remember.
24   Q. You keep this driver's license up? In other
25 words, you get it renewed when it expires?

Page 16

1   A. This resume is old. It's not the -- that I
2 have right now because they say something to August 15
3 to the present, is in that time. It's not from --
4 from -- it's not right now with, I do and this is not --
5 that you try to put that time. This is in that time
6 from August '15 to the present in that time, in that
7 year. It's not from this year. That's what I see here.
8   Q. Yeah. I understand.
9      So right now you're working for MasTec;
10 right?
11   A. That's correct. This is not the real resume
12 update. That resume is not update.
13   Q. I gotcha.
14      But at the time -- at the time it was
15 accurate when -- when you made it; right?
16   A. Yeah. That's maybe -- it's about six years.
17   Q. So let me ask this, Mr. Rosario, are you a US
18 citizen?
19   A. Yes, sir.
20   Q. And you have a driver's license from the US?
21   A. Yes, sir.
22   Q. And what state is it from?
23   A. Florida.
24   Q. All right. Well, at some point have you given
25 us a copy of that driver's license?

Page 15

1   A. Yes, sir.
2   Q. This one expired in '21, it looks like.
3      Do you have a renewed license?
4   A. Yes, sir.
5   Q. Okay. Now, it looks like, or it appears that
6 you went to work for the company early April of 2018.
7 And I say the company. Let's talk about 5 Star at least
8 temporarily.
9      Do you remember that -- filling out an
10 employment application and a lot of different forms for
11 5 Star?
12   A. Yes, sir.
13   Q. And when you filled this out -- and I'm going
14 to show you now -- let's go to, I guess it's going to be
15 Tab 6.
16      MR. WELMAKER: Did you want that ID marked
17 as an exhibit?
18      MR. NETTLES: Yeah. I want to mark the --
19      I'm sorry, Anthony. It's going to be
20 Tab 6.
21      THE REPORTER: So you marked the driver's
22 license, correct, as 2?
23      MR. NETTLES: No. It hasn't been marked
24 yet.
25      MR. WELMAKER: What's the Bates on --

Page 17

5 (Pages 14 - 17)

1        MR. NETTLES:  The employment application is
2   996.
3        Let's mark his resume.  We were going to
4   mark it as 1; correct?
5        MR. SADYKHOV:  Correct.  Yeah.
6        MR. NETTLES:  So on the employment
7   application let's mark it as 2.  The employment
8   application starts on 996.
9        MR. WELMAKER:  Got it.
10       MR. NETTLES:  That's not it.
11       Anthony, it was tab -- that's it right
12   there.
13       (Exhibit No. 2 marked.)
14       Q.  (BY MR. NETTLES)  All right.  Miguel, can you
15   see this well enough?
16       Make it a little bigger, please, Anthony.
17       Can you see that?
18   A.  Yes.
19   Q.  Is that your handwriting?
20   A.  I think so.
21   Q.  You recognize your own handwriting?
22   A.  Yes.
23   Q.  Okay.  So when you filled this application out,
24   it has a date at the top, March 29th of '18.  At that
25   time you were still living in Orlando; is that correct?

1   A.  Now, 5 Star, I don't think so.
2   Q.  Okay.  So when you were filling out the --
3   well, strike that.
4        How did you find out that there was a job
5   opening with 5 Star in Puerto Rico?
6   A.  In the state all the linemens have
7   communication, and somebody -- I don't remember -- they
8   tell me the -- the contact to the people --
9        (Interpreter speaks with witness.)
10       THE INTERPRETER:  Recruitment people?
11       THE WITNESS:  Yeah.
12   A.  And I -- I call them, that man.  I don't
13   remember the name.  But that's the way all the time, all
14   the people working the state.
15   Q.  (BY MR. NETTLES)  So do you remember going to
16   an orientation in Puerto Rico?
17   A.  Yes.
18   Q.  Do you remember what city it was in?
19   A.  I think so.  It's in Humacao.
20   Q.  McCowan?
21   A.  Yeah.
22   Q.  And spell that for me or let's make sure we've
23   got the correct spelling.
24       THE INTERPRETER:  Humacao.  H-U-M-A-C-A-O.
25       MR. NETTLES:  Shari, you might want to

1   A.  Yes.
2   Q.  How long did you live there?
3   A.  I don't remember.
4   Q.  Five years, six years?
5   A.  No, not too long.  I don't remember the -- how
6   many -- how long I'll be there.
7   Q.  Okay.  Did you fill out quite a bit of
8   paperwork?  Do you recall that?
9   A.  (Through interpreter).  That was a long time
10   ago.  Honestly I don't recall.
11   Q.  Okay.  That's fine.
12       Go to Page 999 at the bottom.  Is that your
13   signature, Miguel?
14   A.  (Through interpreter).  That does look like my
15   signature.
16   Q.  Okay.  Go to the top.
17       Now, Mark Tarango and Joe Rendon and Hector
18   Suarez, did any of those folks go to work with you at
19   5 Star?
20   A.  I don't -- no.  They're just people that I know
21   this guy.
22   Q.  Okay.
23   A.  I don't remember.  But maybe in another
24   company.  I don't know very well.
25   Q.  Okay.

1   correct that for the first deposition.
2   Q.  (BY MR. NETTLES)  All right.  So in Humacao,
3   were you at a hotel?  Do you remember?
4   A.  No.  I don't remember the hotel.
5   Q.  Okay.  Did anybody help you fill out the
6   paperwork?
7   A.  We don't understand too many English.  And the
8   people from orientation are people from Cobra, and
9   they -- they be with us to -- we do the -- the paperwork
10   because we don't attempt good -- all the -- they say all
11   the English or whatever it's in the paper.
12   Q.  Did they help you fill it out or help you
13   understand what you were signing?
14   A.  I don't remember good, but I know that there
15   are people with us.  I don't remember the -- what part
16   or something like that, they help me.
17   Q.  But they did have people there helping you?
18   A.  They help everybody.
19   Q.  Okay.  Do you remember signing an offer of
20   employment letter?
21   A.  I don't remember.
22   Q.  Let's go to Tab 7.
23   A.  It's a long time.
24       (Exhibit No. 3 marked.)
25   Q.  (BY MR. NETTLES)  All right.  That's your name

1 at the top; correct?
2    A.  Yeah.  That's my name.
3    Q.  All right.  Scroll down, please.  All right.
4        And so it says that starting hourly rate,
5 $35.  Do you see that?
6    A.  Of course, I see it.
7    Q.  It says, Puerto Rico storm rate 1250 per day
8 broken down hourly.  Over 16 hours daily, hourly 59.12.
9 Did I read that correct?
10    A.  That's what it say.
11    Q.  Do you remember that, that's what they told you
12 when you were there?
13    A.  I don't remember that.
14    Q.  What do you remember?
15    A.  I remember that we have the rates from -- we
16 work in the day.
17    Q.  You had the what?  I'm sorry.
18    A.  That we have the rates.  It's the rate work.
19 The rates that we work in the day, and that is the
20 number, one two -- one two a hundred two fifty.  That is
21 the number.  I remember that.
22    Q.  Okay.  So that's how much you were supposed to
23 get every day?
24    A.  That's what they say the rate is going to be
25 that for me.

Page 22

1    Q.  You're saying the rate, R-A-T-E?  Is that what
2 you're saying?
3    A.  (Through interpreter).  The rate, the daily
4 rate.
5    Q.  Did they ever talk to you about, in addition to
6 the daily rate, that you were going to be paid hourly
7 broken down over 16 hours a day?
8    A.  No.
9    Q.  Sixteen hours daily?
10    A.  No.
11    Q.  You don't remember that?
12    A.  No.  They don't say that.  They say it's going
13 to be the rate to -- they're going to pay up to me one
14 hundred two fifty.  I think so.  From -- from the day.
15    Q.  Have you ever made $1,250 a day before?  In
16 other words, have you ever made that much money in a day
17 before this job in Puerto Rico?
18    A.  No.
19    Q.  Was that a lot of money to you at that time?
20    A.  You see it.  Yes.
21    Q.  Go down to the bottom of this page, please.  Do
22 you see your name there?
23    A.  Yes.
24    Q.  That's your signature, Miguel?
25    A.  Yes.

Page 23

1    Q.  And it was signed, if you can move it over, I
2 think it's signed 4-7-18.
3        Maybe make it little smaller.
4    A.  We sign a lot of documents.  We want only to
5 work, and they tell us the rates.  That's -- that's the
6 truth.
7    Q.  That's the main thing you remember; right?
8    A.  Yeah.
9    Q.  Okay.  Now, did you have a home in Puerto Rico
10 back in April of '18?
11    A.  I have what?
12    Q.  Did you live in Puerto Rico?  Did you have a
13 house there back in 2018?
14    A.  (Through interpreter).  Yes.  I had a home in
15 Puerto Rico.
16    Q.  Where was your home located in Puerto Rico?
17    A.  Back then in Bayamon.
18    Q.  Okay.
19    A.  Or it's rent.  I don't live there.
20    Q.  You just rented it?
21    A.  Yeah.  They have a family there.  I don't live
22 there.  I'm staying in the state.
23    Q.  But you have a family in Bayamon?
24    A.  I have a lot of family in Bayamon.
25    Q.  When you say "a lot" --

Page 24

1    A.  Probably -- a lot of family.  I'm from
2 Puerto Rico.
3    Q.  But when you are talking about family, you're
4 talking about your children or your ex-wives or what?
5    A.  Brothers, everybody.  I live in Puerto Rico.
6 I'm married in Puerto Rico.  I have my mother, everybody
7 live here.
8    Q.  When you say "here," do you mean Puerto Rico or
9 Florida?
10    A.  Puerto Rico.  I live in Florida in that time,
11 and I have family too in Florida.
12    Q.  So you have a family in Florida as well?
13    A.  Yes, sir.
14    Q.  Okay.  So, Miguel, when you went to work in
15 Puerto Rico, did you have a crew that you were
16 supervising as the foreman?
17    A.  Yeah.  When -- when I start in -- in that
18 storm, they put me in charge of a crew, yes.
19    Q.  And as part of that crew, was Jorge Rivera, was
20 he one of the guys on your crew?
21    A.  Jorge Rivera.  I think so.
22    Q.  What about Juan Santiago?
23    A.  I don't remember -- no.  Juan Sanitago.  No.
24    Q.  But Rivera was?
25    A.  Yes.

Page 25

7 (Pages 22 - 25)

1    Q.  What about Jose Rodriguez?  Did you know Jose
2 Rodriguez?
3    A.  Yes.
4    Q.  Was -- was he on your crew?
5    A.  No.  No.
6    Q.  Okay.  How many people were on your crew?  Do
7 you remember?
8    A.  The crew is five guys with -- it's four guys
9 and me.
10    Q.  Okay.  And do you recall -- have you done storm
11 work before?
12    A.  Yes.
13    Q.  On many occasions?
14    A.  Of course.
15    Q.  So when you were down there in Puerto Rico, the
16 whole island was pretty much destroyed and without
17 electricity; correct?
18    A.  You say it, yes.
19    Q.  And your job was to help go out and repair
20 these lines; correct?
21    A.  Yes.
22    Q.  Did they send you to different locations every
23 day?
24    A.  Yes.
25    Q.  Was there any predominant area that you worked

Page 26

1 in?
2    A.  (Through interpreter).  Yes.  We have a chart
3 and different points on the island.
4    Q.  When you say different points, I think you're
5 referring to different cities or locations you would go
6 to?
7    A.  Yes.  Depend what we -- they -- they want to we
8 do.
9    Q.  So how many hours a day did you work?
10    A.  When they come in the morning, you see the sun,
11 and when they go, probably -- I don't know.
12 Different -- maybe thirteen hours or something like
13 that.  Sometimes they go a little more.  Yes.  Twelve.
14 I don't know.  When the suns go and the suns -- so if
15 the suns coming, the suns go.  That's the perfect -- to
16 say.
17    Q.  Where did you stay in the evening in
18 Puerto Rico when you were down there working?
19    A.  They give us a hotel, a room.
20    Q.  Did you go back to the same hotel every night?
21    A.  Yes.
22    Q.  Did you ever change hotels?
23    A.  Yes.  Sometimes.
24    Q.  And would that be because you would be moving
25 cities?

Page 27

1    A.  Towns.
2    Q.  You would go from one town to the next?
3    A.  Depend, yes.  We were on the island.
4    Q.  Right.
5         Miguel, I didn't ask you this in the
6 beginning.  But have you ever given a deposition before
7 like this?
8    A.  Never in my life.
9    Q.  Have you ever been involved in a lawsuit before
10 like this?
11    A.  Never in my life.
12    Q.  Have you ever been in any criminal trouble
13 where you have been arrested or prosecuted?
14    A.  No.
15    Q.  Have you ever had to sue anybody for anything?
16    A.  (Through interpreter).  Never.
17    Q.  Okay.
18         Shari, what was the last question and
19 answer?
20         THE REPORTER:  "You would go from one town
21 to the next?
22         "Answer:  Depend, yes.  We were on the
23 island."
24    Q.  (BY MR. NETTLES)  Okay.  Miguel, when you were
25 on the island and working, do you remember whether or

Page 28

1 not there was any disciplinary action taken against you
2 where they laid you off for three days with no pay?
3    A.  I don't remember.
4    Q.  So do you remember your termination date being
5 like March 15th of 2019?
6    A.  I don't remember.
7    Q.  Do you remember why you stopped working for
8 5 Star?
9    A.  They don't have more work to us.  I think so.
10 I don't remember.  I think so.  Yeah.
11    Q.  Okay.  Did they ever offer you to work back in
12 the States or anything else?
13    A.  No.
14    Q.  Okay.
15    A.  All my chief all the time is the people from
16 Cobra.  You see it in the pictures, hat, all the
17 supervisor, they have people from --
18    Q.  Okay.  How did you learn about the fact that
19 there was a lawsuit that was going to be filed in this
20 case?
21    A.  Tell me that in Spanish, please.
22         (Interpreter speaks with witness.)
23    A.  One of the guys from the State, they tell us
24 to -- to -- what they're going to do it.  I don't
25 remember the name.  One of the guys.

Page 29

8 (Pages 26 - 29)

1    Q.  Okay.  And they tell you who to call or gave
2  you an email address or what?
3    A.  Yeah.  He -- they tell me -- they give it to
4  us --
5        (Interpreter speaks with witness.)
6    A.  (Through interpreter).  They gave us the phone
7  number who we could call.
8    Q.  Okay.  And did you call somebody?  Did you call
9  Mr. Welmaker or somebody?
10    A.  (Through interpreter).  Well, yes.  Once they
11  told us that, we wanted to know.
12    Q.  Okay.
13    A.  I don't know that time is -- his lawyer but I
14  know that we call somebody about this case.  That's --
15  that's what I know.
16    Q.  Did you ever understand what was the nature of
17  the case, what was the reason that there was a case?
18    A.  Yes.
19    Q.  What was it?
20    A.  They don't pay us overtime.
21    Q.  All right.  Did you ever, back when you were
22  with the company and you were getting paychecks, did you
23  ever look at the paychecks, in other words, where you
24  could see your check, what you were getting paid?
25    A.  We have a problem with the application.  That

Page 30

1  time I don't remember the name is -- yeah.  We have a
2  big problem, yeah, with the application, and the way
3  they sees my account.
4    Q.  So were you ever able to get through where you
5  could see how much you were getting paid a week?
6    A.  (Through interpreter).  With time, yes.
7    Q.  All right.  So at some point in time before you
8  left, you could look at your paycheck and look at the
9  pay stub to see how much you were getting paid; correct?
10    A.  (Through interpreter).  Well, yes, I saw their
11  detailed summary there.
12    Q.  Right.
13        And you know that you would get a gross pay
14  and a net pay.  Do you understand?
15    A.  Tell me that in Spanish.
16        (Interpreter speaks with witness.)
17    A.  (Through interpreter).  Well, I'm not good with
18  numbers or the checks, but that's what you could see
19  there.
20    Q.  You could see -- you know they took out
21  deductions for taxes; correct?
22    A.  (Through interpreter).  That's correct.  We all
23  get deducted something.
24    Q.  So you could see at the top the amount you were
25  being paid in a day less deductions and come up with the

Page 31

1  net pay; correct?
2    A.  (Through interpreter).  Like I said and I'll
3  say it again, I'm not really good with numbers.  At the
4  time I didn't really understand what it was, but I do
5  know that there were deductions.
6    Q.  All right.
7        Well, do you -- do you remember -- you
8  worked for the company for slightly over a year;
9  correct?
10    A.  Yes.
11        (Through interpreter).  With Cobra?
12    Q.  Well, I'm talking about 5 Star.
13        Let's mark the next exhibit on the earnings
14  statement.
15        All right.  Do you see that, Miguel?
16    A.  Yes.
17    Q.  Go ahead.  I'm sorry.
18    A.  Yes.
19        You asked me what more information did I
20  have for my statements?  Because I don't see that in
21  the -- the -- in the Paycom we have a lot of problem
22  with that app.
23    Q.  All right.  Let's mark this as the next
24  exhibit.  What number is that going to be?
25        (Exhibit No. 4 marked.)

Page 32

1        MR. WELMAKER:  Gene, can you tell me what
2  the starting Bates number is?
3        MR. NETTLES:  1497.
4    Q.  (BY MR. NETTLES)  Let's go to the very first --
5  excuse me -- the last page 1523.
6        All right.  Miguel, can you see this
7  particular document well enough, or does he need to make
8  it bigger?
9    A.  It's good.
10    Q.  Can you see it well enough?  I'm sorry.
11        MR. SADYKHOV:  I think he's frozen.  His
12  connection looks frozen.
13        MR. NETTLES:  Yeah.
14        Well, maybe this is a good time to take a
15  break, Doug.
16        MR. WELMAKER:  Tell him to call back.
17        (Recess taken from 2:55 until 3:02.)
18    Q.  (BY MR. NETTLES)  In terms of where we were, we
19  were looking at Exhibit 4 and on Page 1523.
20        Ready to get back on the record?
21  Mr. Rosario, you understand we are back on the record?
22    A.  Yes.
23    Q.  All right.  I'm going to go back to -- this is
24  a check, one of the checks and a pay stub, at the top;
25  correct?

Page 33

9 (Pages 30 - 33)

1      A.  What?

2      Q.  Have you seen this document or a document like
3  this before, check and the pay stub?

4      A.  No, sir.  You have more information -- no.  You
5  have more information than I have.

6      Q.  You never saw this or anything like this?

7      A.  No.  Because I have a problem, I tell you about
8  my app, and -- and -- and they don't -- I don't see it.

9      Q.  Well, do you remember that you said in your
10  testimony that you were able to get into it later?  You
11  were able to get into the app and look at your check and
12  the pay stubs?

13      A.  Yes.  Yes.  But they don't have that part down
14  there where they say no -- it's only that I look and I
15  see it.  I don't see all that.

16      Q.  So did you -- on the pay stubs did you see the
17  gross amount you were being paid and the net amount with
18  the deductions?

19      A.  Yeah.

20      Q.  So you've seen that before?

21      A.  This one, I don't remember.

22      Q.  I'm not -- no.  I'm not asking you if you have
23  seen this particular check before.  I'm asking you when
24  you were able to get into Paycom, could you see
25  something similar to this where you had -- had a pay

Page 34

1  stub?

2      A.  Yes.  Oh, yes.  Now I see.

3      Q.  All right.  And so when you were able to look
4  at it, you could look and see where it had withholding
5  taxes and it had Medicare, Social Security, all the
6  deductions?  That's what I'm saying.  You could look at
7  all the deductions; correct?

8      A.  I see some of the deduction here, yes.  Some
9  numbers, yes.

10      Q.  And you could see -- you understand what gross
11  pay is and net pay?

12      A.  Yes.

13      MR. NETTLES:  Diego, let's ask him in
14  Spanish.  I want to make sure this is clear.

15      (Interpreter speaks with witness.)

16      A.  (Through interpreter).  Of course.

17      MR. NETTLES:  All right.  Let's make that a
18  little bigger, Anthony, if you can.

19      Q.  (BY MR. NETTLES)  So you can look and see the
20  gross pay on this check was 8824.76.  Do you see that?

21      A.  (Through interpreter).  I see it.

22      Q.  Go down to the net pay.  Go a little further
23  down, please.  The net pay was 5508.11.  That's quite a
24  bit of difference; correct?  A lot of difference.

25      A.  (Through interpreter).  Yes.

Page 35

1      Q.  And most of that was Puerto Rico withholding.
2  You understood that?

3      A.  (Through interpreter).  I understand, so
4  Puerto Rico has its deductions.

5      Q.  All right.  So you understood that on all of
6  your checks, all of these deductions were coming out of
7  your gross pay; correct?

8      A.  (Through interpreter).  That's what it says
9  there, that it's coming out of the payment.

10      Q.  So you knew that at the time when you were in
11  Puerto Rico.  You -- at some point you could look at
12  this information; correct?

13      A.  (Through interpreter).  Yes.  At one moment I
14  was able to see, yes.

15      Q.  All right.  And also if you could see all that,
16  you could go up and see that you had --

17      Scroll up Anthony, please.

18      -- you could see that there was an amount,
19  a rate being applied for regular time and overtime on
20  this particular pay stub; correct?

21      A.  (Through interpreter).  I see that, so that's
22  what it says there.

23      Q.  And that's something that you saw before when
24  you were in Puerto Rico and looking at this information;
25  correct?

Page 36

1      A.  (Through interpreter).  Yes.  I saw -- yes.  I
2  saw that they had the deductions, but I understood that
3  I was under a day rate.  The way that they detail it,
4  well, I don't know how they did it.

5      Q.  Did you ever tell anybody that you didn't
6  understand how you were being paid and you didn't
7  understand the regular and the overtime rates on your
8  pay stubs?

9      A.  (Through interpreter).  Well, yes, we had our
10  doubts, but we just -- you know, we saw the money came
11  into our bank, and, you know, we just weren't aware of
12  how they were doing the deductions.

13      Q.  Well, when you say you had your doubts, what
14  did you have doubts about?

15      A.  (Through interpreter).  Well, the percentages
16  that they use to be able to deduct that amount of money.

17      Q.  So if there was anything you were complaining
18  about, it wasn't about your overtime rate.  It was about
19  the deductions?

20      A.  (Through interpreter).  So we knew -- we didn't
21  know that we weren't being paid those extra hours.  When
22  we found out, that's the only moment when we realized
23  that there was something wrong there.  But me exactly
24  being able to tell you what the problem was, I -- I
25  couldn't tell you that.

Page 37

10 (Pages 34 - 37)

Page 38

Q. What do you understand the problem is today?
A. (Through interpreter). That they didn't pay us for some overtime that we had to be paid for.
Q. Did you ever talk to anybody when you were working for the company about the fact that you were not being paid overtime or being paid overtime correctly?
A. (Through interpreter). Me personally, no. But it was rumored amongst the guys that there was an issue with the overtime.
Q. When did that rumor go around?
A. (Through interpreter). It was a long time ago. I couldn't give you an exact date.
Q. Was it after you left the job?
A. (Through interpreter). I don't remember if it was before or after.
Q. Well, it's true that during the time you worked there, you never complained to anybody about not being paid overtime correctly; right?
A. (Through interpreter). Exactly, because I didn't know.
Q. All right. On your -- on this document you have in front of you it reflects overtime rates and money; correct?
A. (Through interpreter). That's what I see there.

Page 39

Q. So back when you were working and you were able to access Paycom, you could look at what the check stubs said about being paid regular rates and overtime rates; right?
MR. WELMAKER: Objection; form. We've already been over this.
Q. (BY MR. NETTLES) You can answer it, Miguel.
A. (Through interpreter). Come again on the question, please.
Q. All right. Back when you were with the company and you could access these records, you could see that there was an amount for overtime being applied to your paycheck; correct?
A. (Through interpreter). Well, yes, we saw the numbers there, but I didn't understand fully what those numbers we were looking at were.
Q. Well, you understood enough to know when it said gross, that those are in dollars, and that's how many dollars that were -- you were going to be paid; correct?
A. (Through interpreter). Well, if you're talking about the numbers that we're looking at, of course, I'm able to tell there's a difference.
Q. Did you ever go look at any of your checks and multiply 1250 a day times, let's say, 14 days or --

Page 40

A. (Through interpreter). I -- I don't recall using a calculator to, you know, come about a number like that. Not that I recall, no.
MR. NETTLES: Go to the next -- go to the page before, Anthony, 1522, and go to the very top.
Q. (BY MR. NETTLES) All right. This is a -- if you go look at the very top. Scroll down a little bit more. This is for a -- scroll down a little more. All the way to the top of the document, please.
This is for a pay date of June 29, '18. Do you see that?
A. (Through interpreter). I do see it.
Q. And the period, a start time, was June 11, '18; correct?
A. (Through the interpreter). I can -- I see that.
Q. All right. So you got paid -- you got paid every two weeks; correct?
A. (Through interpreter). Yes. I don't remember very well, but I -- I believe, yes.
Q. All right. Go down, scroll down a little bit more to where there is the gross pay.
All right. If you look at the gross pay, it is for $17,499.52. Do you see that?
A. (Through interpreter). Yes. I do see it.

Page 41

Q. All right. If you were to multiply $1,250 times 14, you would get $17,500.
A. (Through interpreter). If -- if you say so. I don't have a calculator to do it, so that's what you're saying.
Q. Let's just assume that I'm telling you that that's correct. Okay.
All right. Well, here's the calculator. If you multiply 1,250 times 14, do you see at the very top, equals $17,500.
Do you see that?
A. (Through interpreter). I do see it.
Q. All right. Was there ever any occasion where you were checking what you were being paid just to find out if they were paying you for all the days and the time you worked?
A. (Through interpreter). So my answer will be clear here, I worked every day for a year, every day one after the other.
I know that they had deductions. I just wasn't aware of how much it was. I saw that the money was coming in the bank, and like I've said before and I've said it many times, I'm not good with, you know, calculations and numbers.
Q. Did you ever ask anybody to assist you with the

11 (Pages 38 - 41)

Veritext Legal Solutions
346-293-7000

1 calculations and the numbers?
2     A. (Through interpreter). No. Not that I recall,
3 no.
4     Q. You never talked to anybody at the company and
5 said, Hey, look, I'm -- I'm not really good with the
6 math. I need to understand these deductions.
7     A. (Through interpreter). I don't recall doing
8 that.
9     Q. And you never talked to anybody at the company
10 about not understanding the overtime pay that you
11 were -- that's reflected on this document? In other
12 words, the rate and the time period, the hours?
13     A. (Through interpreter). I don't recall. Long
14 time ago.
15     Q. But you certainly had the opportunity to do
16 that if you wanted to; correct?
17     A. (Through interpreter). So like I've said it
18 before, you know, I'm -- I don't really agree with the
19 way you said it. You know, I -- my job, I had a lot of
20 work. My job was to do service and, you know, I don't
21 remember if I did at the time or not have a chance to do
22 so.
23     Q. Did you have a supervisor when you were there?
24     A. (Through interpreter). Yes.
25     Q. Who was your supervisor?

Page 42

1     A. (Through interpreter). I don't remember the
2 name of the supervisor, but it was somebody from the US.
3 I do know that he was a supervisor from Cobra due to
4 the -- due to the clothes that he was wearing.
5     Q. Did he have a shirt on that said Cobra?
6     A. (Through interpreter). All the supervisors
7 did.
8     Q. They had clothing that said Cobra?
9     A. (Through interpreter). They had Cobra's logo.
10     Q. On their shirt or their hat or what?
11     A. (Through interpreter). Shirt and hat. I do
12 remember that they presented themselves as Cobra's
13 supervisors.
14     THE INTERPRETER: Interpreter would like to
15 correct. Supervisors from Cobra.
16     Q. (BY MR. NETTLES) You never got a paycheck from
17 anybody but 5 Star; correct?
18     A. (Through interpreter). I don't remember. I
19 don't remember exactly. I remember that there was an
20 issue with the app, so I'm not sure if they did payment
21 through another company or not. At the moment I don't
22 remember.
23     Q. Well, go back to Exhibit No. 4. And these are
24 all your paychecks. Let's go to -- go to Page 1498.
25     Do you see that paycheck?

Page 43

1     A. (No response).
2     Q. Miguel?
3     A. (Through interpreter). I do see it.
4     Q. Do you see where it says 5 Star?
5     A. (Through interpreter). That's correct.
6     Q. There are all your paychecks, every single
7 paycheck you got the whole time you were with the
8 company are contained in this exhibit, and every one of
9 these checks says 5 Star.
10     A. (Through interpreter). Well, okay. You have
11 more information than I do. I don't have all that
12 information.
13     Q. Well, you can look at it. It's certainly going
14 to be available for you to review and refresh your
15 memory. But you don't have a memory of getting a check
16 from Cobra; do you? You don't remember that; do you?
17     A. (Through interpreter). I don't remember.
18     Q. And your job offer came from 5 Star; correct?
19     A. (Through interpreter). Yes, that is correct.
20     MR. NETTLES: Let's go to Page Tab 3,
21 Anthony, the complaint.
22     Let's mark this as Exhibit 5.
23     (Exhibit No. 5 marked.)
24     Q. (BY MR. NETTLES) Mr. Rosario, can you see this?
25     A. (Through interpreter). Yes, I do see it.

Page 44

1     Q. All right. Let's find your name in there
2 somewhere.
3     All right. Do you see your name that's
4 just been highlighted?
5     A. (Through interpreter). Yes.
6     Q. All right. And go up at the very top of the
7 page. Do you see where the complaint is dated at the
8 top on February 2nd of 2021?
9     A. (Through interpreter). Yes.
10     Q. So do you remember prior to the time this
11 lawsuit was filed, that you discovered there was some
12 kind of a case? Do you remember how long before that
13 that you discovered that there was a case going on?
14     THE INTERPRETER: Counsel, are you -- could
15 you repeat that question for me? I'm not sure if I
16 caught that.
17     Q. (BY MR. NETTLES) Mr. Rosario, the question
18 that I'm trying to ask is that prior to the time this
19 lawsuit was filed in February of 2021, when did you
20 learn about the fact that there was some kind of a case
21 going on involving overtime?
22     A. (Through interpreter). I don't really remember
23 a date. I do remember, you know, talking with my
24 coworkers, and at one point something was sent to my
25 email.

Page 45

12 (Pages 42 - 45)

1    Q.  Was it something sent to your email from some
2  of your coworkers, or who sent it?
3    A.  (Through interpreter).  Honestly I don't
4  remember.  I really don't remember honestly.  You know,
5  they just -- you know, I didn't know, so they -- I just
6  remember them telling me that something was going on
7  because of some overtime that hadn't been paid to us.
8    Q.  Did you save any of those?
9    A.  (Through interpreter).  They must be around.
10  I'm not sure if they're there or not.
11    Q.  Can you look and see if you can find them?
12    A.  (Through interpreter).  Well, right now at this
13  moment I don't really know how to mess with that.
14    Q.  Not at this moment, but sometime after the
15  deposition is over, would you check and see if you can
16  locate any of these emails?
17    A.  (Through interpreter).  I must have them.
18    Q.  All right.  Would you -- if you can find them
19  and locate them, would you send them to your lawyer?
20      You said yes or good?
21    A.  (Through interpreter).  I'm just looking at
22  this document here.  I want to make sure, you know,
23  what -- what I'm going to answer.
24    Q.  Does he want to look at more of this document
25  or --

1    A.  (Through interpreter).  So, yeah, you know, I
2  just don't really remember, you know.  This was in 2021.
3  We're in 2024.  And I just sometimes don't have a good
4  memory for this kind of thing.  I know what's going on.
5  I know what we're working to do.  I know that it's
6  regarding some time that they didn't pay us.  But, you
7  know, like reading it and looking for it now....
8    Q.  Yeah.
9      I want to make it -- make sure it's clear
10  what I'm asking him.
11      I'm asking him if he could try and locate
12  any of the emails he may have gotten before this case
13  was filed.
14    A.  (Through interpreter).  I -- I could verify,
15  yes.
16    Q.  Okay.  And just let your lawyer know.  Thank
17  you.  All right.
18    A.  (Through interpreter).  Honestly I don't know
19  if I have it, but I'll check.
20    Q.  Okay.  Thank you.
21      All right.  Let's look at the very top of
22  this page where you see -- when it says defendants below
23  the V, Mammoth Energy Services, Inc.
24      Are you familiar with that company?
25    A.  (Through interpreter).  Well, yes, those were

1  the companies, Mammoth, Cobra Electric, that they were
2  in charge of the storm here in Puerto Rico.
3    Q.  So what evidence did you see that Mammoth was
4  in charge of anything in Puerto Rico?
5    A.  (Through interpreter).  I -- I do remember.  I
6  don't know where.  I do remember seeing something about
7  Mammoth and Cobra and Power Electric.  I -- I just --
8  you know, I do remember them mentioning it.  If they
9  mentioned it, it's because they were working here.
10    Q.  You didn't have anything do with Mammoth Energy
11  Services, Inc.; did you?
12    A.  (Through interpreter).  I don't recall.  If I
13  did have something to do with it, I don't -- I don't
14  remember.
15    Q.  Well, what about Higher Power Electrical, LLC?
16  You had nothing to do with Higher Power; did you?
17    A.  (Through interpreter).  I had heard about them,
18  that they were also working around here.
19    Q.  I mean, you had nothing to do with Higher
20  Power; did you?
21    A.  (Through interpreter).  Well, you see I
22  remember, from what I recall, you know, there were many
23  supervisors from Cobra.  And, again, I was working to
24  restore electrical service, and who was supervisor of
25  who, well, I don't know.  You know, I remember Cobra

1  being our supervisor and 5 Star, you know.  That's what
2  I could say about that.  I don't know, you know, where
3  you're -- where you're going with this, but that's what
4  I can say.
5    Q.  Yeah.  What I'm asking you is, you had no
6  connection with Higher Power Electrical when you were on
7  the island; right?
8    A.  (Through interpreter).  I don't -- I don't
9  remember.
10      MR. NETTLES:  Okay.  Doug, why don't you
11  let me get off here for five minutes and see I've got
12  anything else.  So let's go off the record, please.
13      (Recess taken from 3:41 until 3:48.)
14    Q.  (BY MR. NETTLES)  Let's go to Tab 8.  Mark this
15  as the next exhibit.  It will be Exhibit 6.
16      All right.  Let's get back on the record.
17      Miguel, you understand we're back on the
18  record?
19    A.  Yes, sir.
20      MR. NETTLES:  The court reporter is ready?
21      THE REPORTER:  Yes.
22      (Exhibit No. 6 marked.)
23    Q.  (BY MR. NETTLES)  If you look at the very --
24  let's go up to the very top of this exhibit.
25      Have you seen anything like this before

1  from Paycom?
2      A. (Through interpreter).  No.
3      Q. All right.  So if you go down and look, this
4  exhibit reflects that your first date, your start date,
5  was 4-7 of '18.
6          Does that sound right to you?
7      A. (Through interpreter).  I don't recall exactly
8  the date.
9      Q. Okay.  And if you go down to the -- let's go to
10 the very last page, which is Page 13 of 13 and Bates
11 labeled 1540.
12         Do you see that it reflects, it looks like,
13 the date is 3-18, March 18, on a Monday?
14     A. (Through interpreter).  Yes.
15     Q. Did you ever get any paid time off payment?
16     A. (Through interpreter).  Let me try to think.
17 Time off.  I don't recall.
18     Q. Do you recall taking any time off at all when
19 you were there?
20     A. (Through interpreter).  I don't remember.
21     Q. You don't remember ever taking a week off here
22 and there going home and taking a break from all
23 this?
24     A. (Through interpreter).  No, not that I'm aware
25 of, I didn't take any.  No.

Page 50

1      Q. All right.  Let's go to Page 2, and it's Bates
2  labeled 1529.  Scroll down to June the 4th through the
3  11th.
4          So this reflects that you did not work from
5  June the 4th of 2018 until the 11th.  You took a week
6  off.
7      A. (Through interpreter).  I -- I don't remember
8  taking a week off.  I don't remember.  That's what it
9  says there, but I don't remember.
10     Q. Go to the next page, Page 3, and look -- it
11 looks like starting at June -- Monday, June 23 -- excuse
12 me -- July 23 to July 30 down at the bottom.
13         So this reflects you took another week off
14 in July of 2018.  Any memory of that?
15     A. (No response.)
16     MR. NETTLES:  Diego?
17     MR. SADYKHOV:  I think he lost audio.
18 Yeah.  He can't hear us.
19     MR. NETTLES:  Trying to fix it, Diego?
20     MR. SADYKHOV:  He says now he's still
21 unable to hear.  Very choppy.  He's -- he's messaging in
22 group chat to all of us.
23     MR. NETTLES:  You're talking about the
24 interpreter now; right?
25     MR. SADYKHOV:  Yes, that's correct.

Page 51

1          Hey, Shari, if -- I was going to say,
2  Shari, do we have a dial-in number?  Because he can stay
3  on video and dial through on his phone.  I've done that
4  before.
5      MR. NETTLES:  Yeah.  We've got one.
6          Why don't we have him get off and come back
7  in.  I think that would be the easiest.
8      THE REPORTER:  Yes.  Off the record.  Yes.
9          (Off the record 3:57 until 3:58.)
10     Q. (BY MR. NETTLES)  Mr. Rosario, I think the last
11 thing that I was asking the witness was --
12         Are we back on the record, Shari?
13     THE REPORTER:  Yes, we are.
14     Q. (BY MR. NETTLES)  So, Mr. Rosario, do you
15 understand we're back?
16     A. (Through interpreter).  Yes.  I actually have a
17 question.
18     Q. Okay.
19     A. (Through interpreter).  On the top part of this
20 document I see that it says Mammoth.
21         (In English)  Yeah.  Before -- you took it
22 from some document from Mammoth.  That's what I want to
23 know.  I see it.  Okay.
24     Q. You've never seen it before, though; right?
25     A. (In English).  Do you want some answers about

Page 52

1  this document in these days and --
2      MR. WELMAKER:  No.  You can ask -- you can
3  ask me those questions, Miguel.
4      THE WITNESS:  Okay.  Don't worry.
5      Q. (BY MR. NETTLES)  So where we are was, you
6  don't remember taking the week off on -- reflected on --
7  from July 23rd to the 30th; correct?
8      A. (Through interpreter).  No.
9      Q. And to be clear, this is the first time you've
10 ever seen this document?
11     A. (Through interpreter).  Yes.
12     MR. NETTLES:  Okay.  We're going to go to
13 the next exhibit, Anthony, under Tab 12.  It's going to
14 be what -- one of the documents he produced as Bates
15 labeled Rosario 5.
16         This will be marked as Exhibit 7.
17         (Exhibit No. 7 marked.)
18     Q. (BY MR. NETTLES)  Miguel, what is this
19 document?
20     A. (Through interpreter).  That's what they call a
21 timesheet.
22     Q. Yes.
23         Were you filling out timesheets when you
24 were there?
25     A. (Through interpreter).  Yes.

Page 53

14 (Pages 50 - 53)

1  Q. If you look down at the very bottom of the
2 page, is that your signature?
3  A. (Through interpreter). Yes. It looks like my
4 signature.
5  Q. Do you have any other timesheets, other than
6 this?
7  A. (Through interpreter). No, not that I recall.
8 I don't recall if I had another one or not.
9  Q. Is it fair to say that you were filling out
10 timesheets the whole time you were there?
11  A. (Through interpreter). Yes.
12  Q. All right. Did they tell you to put sixteen
13 hours down or that's how many hours you were working or
14 how did that go?
15  A. (Through interpreter). They told us to write
16 it like that.
17  Q. Okay.
18  A. (Through interpreter). We were paid for a day
19 of work so that's how we had to fill it out.
20  Q. Well, it says on your timesheet you were paid
21 hourly and overtime. Do you remember that?
22  A. (Through interpreter). Well, no, I would be
23 paid a daily rate, so my daily rate was 1,250.
24  Q. I'm sorry. Will you say that again, please.
25 What?

Page 54

1 Paycom app, so I wasn't really paying attention to that.
2  (Exhibit No. 8 marked.)
3  Q. (BY MR. NETTLES) Let's go to the next exhibit,
4 which is going to be Exhibit 8, and it's the next
5 document 13, Tab 13.
6  Now, this is a document that you produced;
7 correct?
8  A. (Through interpreter). Yes.
9  Q. You gave this to your lawyer to give to me;
10 correct?
11  A. (In English). Yes.
12  Q. Is this something you filled out in your
13 handwriting?
14  MR. SADYKHOV: I think he's frozen again.
15  A. (In English). You can open it a little more,
16 because you only show me little things. You can open
17 more, so I can check out everything.
18  MR. NETTLES: All right. Go ahead and
19 scroll all the way down, Anthony, if you would. And go
20 to the next Page 2. Show his signature down there at
21 the bottom.
22  Q. (BY MR. NETTLES) One of those signatures is
23 yours; correct?
24  A. (Through interpreter). Yes.
25  Q. All right. So my question was: Did you fill

Page 56

1  THE INTERPRETER: Interpreter will repeat.
2 Would you like him to say it again? I'm sorry.
3  MR. NETTLES: Yes. Please say it again,
4 whatever the answer was.
5  A. (Through interpreter). You could -- can you
6 repeat the question so I could also refresh my memory?
7 I'm --
8  Q. (BY MR. NETTLES) All right. So on your pay
9 stubs it reflects that you were -- that you were being
10 paid an hourly rate and overtime.
11  Do you recall that?
12  A. (Through interpreter). But, no, we got paid on
13 a daily rate. It's not like we got paid on overtime or
14 like you're saying. We got paid a daily rate.
15  Q. You know, I've asked you several times whether
16 you went to look and see if you were being paid
17 correctly.
18  Did you ever go do that?
19  MR. WELMAKER: Objection; asked and
20 answered.
21  A. (Through interpreter). Well, like I said, you
22 know, I would check and see if they were paying, but I
23 didn't have much time, you know. I would see that the
24 bank account, it would come in, and I would just work,
25 you know. And, again, I was having problems with the

Page 55

1 out any of this?
2  A. (Through interpreter). Not necessarily would
3 have had to have been me. Anybody could have filled it
4 out. This is the job briefing on this stuff, you know,
5 from what -- it's giving -- it's the job detail sheet
6 from what we're going to be doing.
7  Q. Okay.
8  A. (Through interpreter). So -- but we all had to
9 read it and make sure we knew what we were reading
10 because it's the work that we had to do. That's why
11 everybody had to sign it.
12  (Exhibit No. 9 marked.)
13  Q. (BY MR. NETTLES) Okay. Go to the next
14 exhibit, which is going to be under Tab 19, and ask the
15 witness if he can translate that.
16  A. (Through interpreter). Who? Me?
17  Q. Yes.
18  A. (Through interpreter) Well, all that that says
19 is that there wasn't nothing going on, and there wasn't
20 any more personnel to work on there en Ceiba.
21  MR. NETTLES: Will you translate it for me
22 please, sir.
23  THE INTERPRETER: Of course.
24  "This is Cobra en Ceiba. The auction is up
25 until September the 9th, and they have all ready started

Page 57

15 (Pages 54 - 57)

1 to work without it being adjudicated."
2    Q. (BY MR. NETTLES) So I'm going to go back to
3 the question to the witness.
4       Where did you get this document?
5    A. (Through interpreter). So that's a message
6 right there. That's a text message. As you can tell,
7 that's a message that somebody sent. And then the
8 picture was just evidence of, you know, that we were --
9 Cobra was already working. And then we were working.
10 You know, somebody just took a picture of that. But
11 that's just a comment that somebody had done.
12    Q. Okay.
13    A. (Through interpreter). And then that was
14 resent to me.
15       MR. WELMAKER: Gene, do you know how much
16 longer you have?
17       MR. NETTLES: Very short.
18       Are you going to have any questions?
19       MR. WELMAKER: No, I don't think so.
20       MR. NETTLES: I'm going to pass the
21 witness.
22       MR. WELMAKER: I don't have any. I'll
23 reserve all questions until trial.
24       MR. NETTLES: Okay. That's all I have,
25 Mr. Rosario. Thank you.

Page 58

1    THE INTERPRETER: You need his address or
2 where he is at right now?
3       THE REPORTER: Where he is right now.
4       THE INTERPRETER: So G17 Calle, that's
5 C-A-L-L-E space Hermes, H-E-R-M-E-S, space Villas,
6 V-I-L-L-A-S, space de, D-E, space Buena, B-U-E-N-A,
7 space Vista, V-I-S-T-A, Bayamon, Puerto Rico 00956.
8       THE REPORTER: Thank you.
9       Mr. Welmaker, do you want the same
10 agreement? Signature of the deponent; is that correct?
11       MR. WELMAKER: Yes.
12       (The deposition concluded at 4:16 PM.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 59

1       CHANGES AND/OR CORRECTIONS
2 PAGE    LINE    REASON
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21       _____
            MIGUEL ROSARIO
22
   STATE OF TEXAS    )
23                   )
   COUNTY OF        )
24    Subscribed and sworn to before me by the said
25 witness, MIGUEL ROSARIO, on this the _____ day of

Page 60

1 _____, A.D. 2024.
2
3       _____
   Notary Public in        County,
4  For the State of Texas.
   My Commission expires _____.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25    Job No. HOU6678543

Page 61

16 (Pages 58 - 61)

```
 1  STATE OF TEXAS   )
                     )
 2  COUNTY OF TARRANT )
 3      I, Sharon Kiosse Poulos, a Certified Shorthand
        Reporter in and for Tarrant County, Texas, do hereby
 4  certify that the facts stated by me in the caption to
    the within and foregoing deposition are true; that the
 5  deposition was taken before me pursuant to the agreement
    of the parties; that the within named witness was duly
 6  sworn to testify the truth; that the questions asked and
    the answers given were taken by me and subsequently
 7  transcribed by me and reduced to typewriting by me or
    under my supervision, and that the within and foregoing
 8  typewritten pages constitute and contain a full, true,
    complete and correct transcript of all proceedings had.
 9
        I further certify that I am neither attorney
10  for, related to nor regularly employed by any of the
    parties hereto, and, further, that I am not a relative
11  or employee of any attorney or counsel employed by the
    parties hereto, and that I am not in any way financially
12  interested in the outcome of said proceedings.
        TO CERTIFY WHICH, witness my hand and seal at
13  Fort Worth, Tarrant County, Texas, this 20th day of
    May 2024.
14
15
16  _____
    Sharon Kiosse Poulos, CSR
    Cert. No. 1315 (11/30/2025)
17  Veritext Legal Solutions
    Registration No. 571
18  One City Place
    300 Throckmorton Street,
19  Suite 1600
    Fort Worth, Texas  76102
20  (817) 336-3042
21
22  Cost: _____
23  Paid by: _____
24  Job Number: 6678543
25
                                               Page 62
```

```
 1  doug@welmakerlaw.com

 2          May 20, 2024

 3  Maldonado, Aaron Et Al v. Mammoth Energy Services, Et Al

 4  DEPOSITION OF: Miguel  Rosario (# 6678543)

 5      The above-referenced witness transcript is

 6  available for read and sign.

 7      Within the applicable timeframe, the witness

 8  should read the testimony to verify its accuracy. If

 9  there are any changes, the witness should note those

10  on the attached Errata Sheet.

11      The witness should sign and notarize the

12  attached Errata pages and return to Veritext at

13  errata-tx@veritext.com.

14      According to applicable rules or agreements, if

15  the witness fails to do so within the time allotted,

16  a certified copy of the transcript may be used as if

17  signed.

18          Yours,

19          Veritext Legal Solutions

20

21

22

23

24

25
                                               Page 63
```

17 (Pages 62 - 63)

Veritext Legal Solutions
346-293-7000

**[00956 - 8824.76.]**

**0**

**00956**   59:7
**06**   12:21 13:2,2
   13:5
**07**   13:5,13

**1**

**1**   3:9 5:17,23
   13:25 18:4
**1,250**   23:15
   41:1,9 54:23
**1000**   2:8
**11**   40:13
**11/30/2025**
   62:16
**118**   2:4
**11th**   51:3,5
**12**   53:13
**1250**   22:7
   39:25
**12559**   62:15
**13**   13:14,25
   50:10,10 56:5
   56:5
**1315**   62:16
**14**   39:25 41:2,9
**1497**   33:3
**1498**   43:24
**15**   14:1,15 15:2
   15:6
**1522**   40:5
**1523**   33:5,19
**1529**   51:2
**1540**   50:11
**15th**   29:5

**16**   22:8 23:7
**1600**   62:19
**17**   1:22
**17,499.52.**
   40:24
**17,500**   41:2,10
**18**   3:10 18:24
   24:10 40:10,13
   50:5,13
**19**   57:14
**1966**   4:9

**2**

**2**   1:13 3:2,10
   5:17 7:4 10:15
   13:18 17:22
   18:7,13 51:1
   56:20
**20**   63:2
**2018**   17:6
   24:13 51:5,14
**2019**   29:5
**2021**   45:8,19
   47:2
**2024**   1:13,19
   47:3 61:1
   62:13 63:2
**20th**   62:13
**21**   3:11 17:2
**226-6611**   2:9
**23**   51:11,12
**23rd**   53:7
**29**   40:10
**29th**   18:24
**2:03**   1:19

**2:55**   33:17
**2nd**   1:18 45:8

**3**

**3**   3:11 21:24
   44:20 51:10
**3-18**   50:13
**30**   51:12
**300**   62:18
**30th**   53:7
**32**   3:12
**336-3042**   62:20
**35**   22:5
**36th**   2:8
**3:02**   33:17
**3:41**   49:13
**3:48**   49:13
**3:57**   52:9
**3:58**   52:9

**4**

**4**   3:4,12 32:25
   33:19 43:23
**4-7**   50:5
**4-7-18**   24:2
**409**   2:4
**44**   3:13
**49**   3:14
**4:16**   1:19 59:12
**4th**   51:2,5

**5**

**5**   1:8 3:9,13
   4:18,23 5:10
   5:13,15 17:7
   17:11 19:19
   20:1,5 29:8

**32:12 43:17**
   44:4,9,18,22,23
   49:1 53:15
**53**   3:15
**5508.11.**   35:23
**56**   3:16
**57**   3:17
**571**   62:17
**58**   4:10
**59.12.**   22:8
**5:21**   1:6

**6**

**6**   3:14 4:9
   17:15,20 49:15
   49:22
**60**   3:5
**62**   3:6
**6678543**   62:24
   63:4

**7**

**7**   3:15 21:22
   53:16,17
**713**   2:9
**75601**   2:4
**76102**   62:19
**77002**   2:9

**8**

**8**   3:16 49:14
   56:2,4
**817**   62:20
**85**   1:6
**8824.76.**   35:20

Page 1

**[9 - bayamon]**

| 9 |
|---|
| **9**  3:17 10:11 |
| 11:15 57:12 |
| **92**   12:21 |
| **996**   18:2,8 |
| **999**   19:12 |
| **9th**   57:25 |

| a |
|---|
| **a.d.**   1:19 61:1 |
| **aaron**   1:4 63:3 |
| **ability**   6:17 |
| **able**   6:24 12:13 |
| 31:4 34:10,11 |
| 34:24 35:3 |
| 36:14 37:16,24 |
| 39:1,23 |
| **above**   1:18 |
| 63:5 |
| **access**   39:2,11 |
| **account**   31:3 |
| 55:24 |
| **accuracy**   63:8 |
| **accurate**   14:23 |
| 15:15 |
| **acosta**   2:12 4:1 |
| **acquisitions** |
| 1:7 |
| **action**   29:1 |
| **actually**   12:17 |
| 52:16 |
| **addition**   23:5 |
| **address**   16:17 |
| 30:2 59:1 |
| **adjudicated** |
| 58:1 |

**aed**   11:6
**ago**   12:12,12
16:21 19:10
38:11 42:14
**agree**   42:18
**agreement**
59:10 62:5
**agreements**
63:14
**ahead**   4:21
12:15 32:17
56:18
**al**   1:4 63:3,3
**allotted**   63:15
**allow**   5:21
**american**   11:1
**amount**   31:24
34:17,17 36:18
37:16 39:12
**answer**   4:22
28:19,22 39:7
41:17 46:23
55:4
**answered**
55:20
**answers**   52:25
62:6
**anthony**   2:13
5:18,19 11:10
12:16 17:19
18:11,16 35:18
36:17 40:5
44:21 53:13
56:19

**antonio**   1:3
4:15
**anybody**   8:9,13
21:5 28:15
37:5 38:4,17
41:25 42:4,9
43:17 57:3
**app**   32:22 34:8
34:11 43:20
56:1
**appearances**
2:1 3:2
**appears**   17:5
**applicable**   63:7
63:14
**application**
3:10 17:10
18:1,7,8,23
30:25 31:2
**applied**   36:19
39:12
**april**   17:6
24:10
**area**   26:25
**arrested**   28:13
**arteaga**   2:13
5:20
**asked**   32:19
55:15,19 62:6
**asking**   16:3
34:22,23 47:10
47:11 49:5
52:11
**assist**   41:25

**assume**   41:6
**attached**   63:10
63:12
**attempt**   21:10
**attention**   56:1
**attorney**   62:9
62:11
**auction**   57:24
**audio**   51:17
**august**   14:1,15
15:2,6
**authority**   12:21
**available**   44:14
63:6
**aware**   37:11
41:21 50:24

| b |
|---|
| **b**   2:3 8:4 59:6 |
| **back**   13:18,18 |
| 13:25 24:10,13 |
| 24:17 27:20 |
| 29:11 30:21 |
| 33:16,20,21,23 |
| 39:1,10 43:23 |
| 49:16,17 52:6 |
| 52:12,15 58:2 |
| **bank**   37:11 |
| 41:22 55:24 |
| **basically**   13:14 |
| **bates**   17:25 |
| 33:2 50:10 |
| 51:1 53:14 |
| **bayamon**   1:23 |
| 7:22,24 8:5 |
| 13:16 14:15 |

Page 2

**[bayamon - company]**

24:17,23,24
59:7
**beginning** 28:6
**belabor** 12:15
**believe** 40:20
**better** 6:25
**big** 31:2
**bigger** 10:22
14:20 18:16
33:8 35:18
**bilingual** 6:17
**birth** 4:8
**bit** 7:4 10:16
11:9 19:7
35:24 40:7,21
**blueprint** 10:9
10:9
**born** 7:11,16
7:17,18
**bosses** 5:8
**bottom** 6:15
19:12 23:21
51:12 54:1
56:21
**break** 33:15
50:22
**briefing** 57:4
**broken** 22:8
23:7
**brothers** 25:5
**bucket** 11:12
**buena** 1:22
59:6

**c**

**c** 9:3 10:8 20:24
59:5
**calculations**
41:24 42:1
**calculator** 40:2
41:4,8
**call** 20:12 30:1
30:7,8,8,14
33:16 53:20
**calle** 1:22 59:4
**called** 4:18
**canceled** 11:23
**caption** 62:4
**case** 1:6 4:14
4:17 29:20
30:14,17,17
45:12,13,20
47:12
**categories**
11:11
**category** 10:11
11:15
**caught** 45:16
**cause** 1:18
**causes** 14:8
**ceiba** 57:20,24
**cert** 62:16
**certainly** 42:15
44:13
**certificate** 3:6
**certification**
10:16 11:4
**certified** 62:3
63:16

**certify** 62:4,9
62:12
**chance** 42:21
**change** 27:22
**changes** 60:1
63:9
**charge** 25:18
48:2,4
**chart** 27:2
**chat** 51:22
**check** 30:24
33:24 34:3,11
34:23 35:20
39:2 44:15
46:15 47:19
55:22 56:17
**checking** 41:14
**checks** 3:12
4:25 5:5,9
31:18 33:24
36:6 39:24
44:9
**cherry** 11:21
**chief** 4:24 5:1,1
5:1,1,6,6,7
29:15
**chiefs** 5:7
**children** 8:10
25:4
**choppy** 51:21
**cities** 27:5,25
**citizen** 15:18
**city** 1:23 7:18
7:23 20:18
62:18

**civil** 1:24
**clear** 35:14
41:18 47:9
53:9
**clothes** 43:4
**clothing** 43:8
**cobra** 1:7 4:24
5:2,4,5 21:8
29:16 32:11
43:3,5,8,15
44:16 48:1,7
48:23,25 57:24
58:9
**cobra's** 43:9,12
**come** 27:10
31:25 39:8
40:2 52:6
55:24
**coming** 27:15
36:6,9 41:22
**comment** 58:11
**commission**
61:4
**communicate**
6:17
**communication**
20:7
**companies** 48:1
**company** 4:18
9:12,18,23
10:3 17:6,7
19:24 30:22
32:8 38:5
39:10 42:4,9
43:21 44:8

**[company - disciplinary]**

47:24
**complained**
  38:17
**complaining**
  37:17
**complaint**  3:13
  44:21 45:7
**complete**  62:8
**completed**  12:5
**computer**  6:13
**concluded**
  59:12
**connection**
  33:12 49:6
**conservation**
  11:24
**constitute**  62:8
**contact**  20:8
**contain**  62:8
**contained**  44:8
**contractor**
  14:16
**contractors**
  13:15
**copy**  5:13
  15:25 16:1,1,7
  16:8 63:16
**correct**  4:19
  5:10 11:18,22
  12:22 13:2,6,8
  13:16,20 14:12
  14:17,25 15:11
  17:22 18:4,5
  18:25 20:23
  21:1 22:1,9

26:17,20 31:9
31:21,22 32:1
32:9 33:25
35:7,24 36:7
36:12,20,25
38:23 39:13,20
40:14,18 41:7
42:16 43:15,17
44:5,18,19
51:25 53:7
56:7,10,23
59:10 62:8
**corrections**  3:5
  60:1
**correctly**  38:6
  38:18 55:17
**cost**  62:22
**counsel**  45:14
  62:11
**county**  60:23
  61:3 62:2,3,13
**course**  8:3 22:6
  26:14 35:16
  39:22 57:23
**court**  1:1 4:15
  49:20
**coworkers**
  45:24 46:2
**cpr**  11:1,6
**crew**  25:15,18
  25:19,20 26:4
  26:6,8
**criminal**  28:12
**csr**  1:20 62:16

**currently**  8:7
  8:15 14:24
**cv**  1:6

**d**

**d**  59:6
**daily**  10:8,9
  22:8 23:3,6,9
  54:23,23 55:13
  55:14
**date**  4:8 18:24
  29:4 38:12
  40:10 45:23
  50:4,4,8,13
**dated**  45:7
**day**  1:18 22:7
  22:16,19,23
  23:7,14,15,16
  26:23 27:9
  31:25 37:3
  39:25 41:18,18
  54:18 60:25
  62:13
**days**  29:2 39:25
  41:15 53:1
**de**  1:22 59:6
**deduct**  37:16
**deducted**  31:23
**deduction**  35:8
**deductions**
  31:21,25 32:5
  34:18 35:6,7
  36:4,6 37:2,12
  37:19 41:20
  42:6

**defendants**  1:9
  1:17 2:6 47:22
**depend**  27:7
  28:3,22
**depicts**  14:24
**deponent**  1:22
  59:10
**deposition**  1:11
  1:16 4:13 21:1
  28:6 46:15
  59:12 62:4,5
  63:4
**derrick**  11:13
**description**  3:8
**destroyed**
  26:16
**detail**  3:14,16
  37:3 57:5
**detailed**  31:11
**determining**
  14:7
**devoted**  14:11
**dial**  52:2,3
**diego**  2:12 4:1
  8:2,25 35:13
  51:16,19
**difference**
  35:24,24 39:23
**different**  17:10
  26:22 27:3,4,5
  27:12
**digger**  11:13
**disabled**  5:22
**disciplinary**
  29:1

Veritext Legal Solutions
346-293-7000

**[discovered - fill]**

**discovered**
45:11,13
**district** 1:1,2
**division** 1:3
**divorced** 8:11
**document** 33:7
34:2,2 38:21
40:9 42:11
46:22,24 52:20
52:22 53:1,10
53:19 56:5,6
58:4
**documents**
16:4,15 24:4
53:14
**doing** 12:5
14:11,19,24
37:12 42:7
57:6
**dollars** 39:18
39:19
**doubts** 37:10
37:13,14
**doug** 2:5 33:15
49:10 63:1
**douglas** 2:3
**draft** 6:8
**driver's** 11:15
15:20,25 16:8
16:24 17:21
**due** 43:3,4
**duly** 4:2,4 62:5

**e**

**e** 9:3 10:8 23:1
59:5,5,5,6,6
**early** 17:6
**earnings** 32:13
**easiest** 52:7
**education** 7:6
**effectively** 6:18
**electric** 1:8
11:21 12:20
13:5,20 48:1,7
**electrical** 1:7
9:12,15,23
12:6,6,12 14:8
14:11 48:15,24
49:6
**electricity**
26:17
**email** 30:2
45:25 46:1
**emails** 46:16
47:12
**emil** 2:7
**employed** 8:15
14:16 62:10,11
**employee** 62:11
**employment**
3:10,11 4:17
17:10 18:1,6,7
21:20
**en** 57:20,24
**energy** 1:6
47:23 48:10
63:3

**enettles** 2:10
**english** 6:19,24
6:25 7:1 12:9
21:7,11 52:21
52:25 56:11,15
**entire** 14:10
**equals** 41:10
**equipment**
10:10
**errata** 63:10,12
63:13
**esq** 2:3,7,7
**et** 1:4 63:3,3
**eugene** 2:7
**evening** 27:17
**everybody**
21:18 25:5,6
57:11
**evidence** 48:3
58:8
**ex** 25:4
**exact** 38:12
**exactly** 37:23
38:19 43:19
50:7
**examination**
3:4 4:6
**excuse** 33:5
51:11
**exhibit** 3:9,10
3:11,12,13,14
3:15,16,17
5:17,23 17:17
18:13 21:24
32:13,24,25

33:19 43:23
44:8,22,23
49:15,15,22,24
50:4 53:13,16
53:17 56:2,3,4
57:12,14
**exhibits** 3:7
**expired** 17:2
**expires** 16:25
61:4
**extra** 37:21

**f**

**fact** 10:6 29:18
38:5 45:20
**facts** 62:4
**fails** 63:15
**fair** 10:12 14:8
54:9
**familiar** 47:24
**family** 6:12
24:21,23,24
25:1,3,11,12
**february** 13:14
13:25 45:8,19
**federal** 1:24
4:15
**fields** 16:18
**fifty** 22:20
23:14
**figure** 8:25
**filed** 29:19
45:11,19 47:13
**fill** 19:7 21:5,12
54:19 56:25

Page 5

**[filled - heard]**

**filled** 17:13
18:23 56:12
57:3
**filling** 17:9
20:2 53:23
54:9
**financially**
62:11
**find** 20:4 41:14
45:1 46:11,18
**fine** 7:2 19:11
**first** 10:20 12:7
12:17 13:10,12
21:1 33:4 50:4
53:9
**five** 19:4 26:8
49:11
**fix** 51:19
**flatbed** 11:17
**flip** 13:18
**floor** 2:8
**florida** 13:20
15:23 16:17
25:9,10,11,12
**flower** 16:18
**folks** 19:18
**follows** 4:2,5
**foregoing** 62:4
62:7
**foreman** 9:10
9:11 10:2 13:1
13:15 14:5,11
14:17 25:16
**fork** 11:21

**forklift** 11:21
**form** 4:20 39:5
**forms** 17:10
**fort** 14:2 62:13
62:19
**found** 37:22
**four** 26:8
**fredonia** 2:4
**front** 38:22
**frozen** 33:11,12
56:14
**full** 62:8
**fully** 39:15
**further** 7:5,5
35:22 62:9,10

**g**

**g** 1:22
**g17** 59:4
**gene** 33:1 58:15
**general** 9:10,11
14:16
**getting** 30:22
30:24 31:5,9
44:15
**gf** 9:8
**give** 5:14 16:1
27:19 30:3
38:12 56:9
**given** 15:24
28:6 62:6
**giving** 16:8
57:5
**go** 4:21 6:4 7:3
7:3,4,8 10:15
12:7,15,16,17

13:10,18,25
17:14 19:12,16
19:18 21:22
23:21 26:19
27:5,11,13,14
27:15,20 28:2
28:20 32:17
33:4,23 35:22
35:22 36:16
38:10 39:24
40:4,4,5,7,21
43:23,24,24
44:20 45:6
49:12,14,24
50:3,9,9 51:1
51:10 53:12
54:14 55:18
56:3,18,19
57:13 58:2
**going** 5:16,16
5:18 17:13,14
17:19 18:3
20:15 22:24
23:6,12,13
29:19,24 32:24
33:23 39:19
44:13 45:13,21
46:6,23 47:4
49:3 50:22
52:1 53:12,13
56:4 57:6,14
57:19 58:2,18
58:20
**good** 6:12 8:1
8:23,24 21:10

21:14 31:17
32:3 33:9,14
41:23 42:5
46:20 47:3
**gotcha** 6:14
15:13
**gotten** 47:12
**government**
11:20
**gross** 31:13
34:17 35:10,20
36:7 39:18
40:22,23
**group** 51:22
**guess** 17:14
**guy** 19:21
**guys** 25:20 26:8
26:8 29:23,25
38:8

**h**

**h** 9:3 20:24
59:5
**hand** 62:12
**handling** 10:10
**handwriting**
18:19,21 56:13
**happened**
14:18
**hat** 29:16 43:10
43:11
**health** 11:1
**hear** 5:19 14:17
51:18,21
**heard** 48:17

**[heavy - know]**

**heavy** 10:10
11:12,16
**hector** 19:17
**hedges** 2:8
**help** 8:2 14:21
21:5,12,12,16
21:18 26:19
**helped** 6:12
**helping** 21:17
**hereto** 62:10,11
**hermes** 1:22
59:5
**hey** 42:5 52:1
**high** 7:7,8 12:4
**higher** 1:7
48:15,16,19
49:6
**highlighted**
45:4
**home** 24:9,14
24:16 50:22
**honestly** 19:10
46:3,4 47:18
**host** 5:21
**hotel** 21:3,4
27:19,20
**hotels** 27:22
**hou6678543**
61:25
**hourly** 22:4,8,8
23:6 54:21
55:10
**hours** 22:8 23:7
23:9 27:9,12
37:21 42:12

54:13,13
**house** 8:12
24:13
**houston** 2:9
**humacao** 20:19
20:24 21:2
**hundred** 22:20
23:14

**i**

**index** 3:1
**information**
32:19 34:4,5
36:12,24 44:11
44:12
**instance** 1:17
**interact** 6:18
**interested**
62:12
**interpreted** 4:2
**interpreter**
2:12 4:5 8:3
9:2 12:10,11
19:9,14 20:9
20:10,24 23:3
24:14 27:2
28:16 29:22
30:5,6,10 31:6
31:10,16,17,22
32:2,11 35:15
35:16,21,25
36:3,8,13,21
37:1,9,15,20
38:2,7,11,14,19
38:24 39:8,14
39:21 40:1,12

40:15,19,25
41:3,12,17
42:2,7,13,17,24
43:1,6,9,11,14
43:14,18 44:3
44:5,10,17,19
44:25 45:5,9
45:14,22 46:3
46:9,12,17,21
47:1,14,18,25
48:5,12,17,21
49:8 50:2,7,14
50:16,20,24
51:7,24 52:16
52:19 53:8,11
53:20,25 54:3
54:7,11,15,18
54:22 55:1,1,5
55:12,21 56:8
56:24 57:2,8
57:16,18,23
58:5,13 59:1,4
**involved** 28:9
**involving** 45:21
**island** 26:16
27:3 28:3,23
28:25 49:7
**issue** 38:8
43:20

**j**

**january** 4:9
13:13
**job** 3:16 20:4
23:17 26:19
38:13 42:19,20

44:18 57:4,5
61:25 62:24
**jobs** 14:7
**joe** 19:17
**jorge** 25:19,21
**jose** 26:1,1
**juan** 7:20,20
25:22,23
**july** 51:12,12
51:14 53:7
**june** 40:10,13
51:2,5,11,11

**k**

**keep** 16:24
**kind** 9:18 45:12
45:20 47:4
**kiosse** 1:20
62:3,16
**knew** 36:10
37:20 57:9
**know** 16:2
19:20,24 21:14
26:1 27:11,14
30:11,13,14,15
31:13,20 32:5
37:4,10,11,21
38:20 39:17
40:2 41:20,23
42:18,19,20
43:3 45:23
46:4,5,5,13,22
47:1,2,4,5,5,7
47:16,18 48:6
48:8,22,25,25
49:1,2,2 52:23

**[know - mean]**

55:15,22,23,25
57:4 58:8,10
58:15

**l**

**l** 59:5,5,6,6
**labeled** 50:11
51:2 53:15
**laid** 29:2
**lane** 16:18
**larger** 5:25
**law** 2:3
**lawsuit** 28:9
29:19 45:11,19
**lawyer** 16:5
30:13 46:19
47:16 56:9
**leaders** 13:20
**learn** 29:18
45:20
**left** 31:8 38:13
**legal** 62:17
63:19
**letter** 3:11
21:20
**letters** 6:16
**license** 11:15
15:20,25 16:8
16:24 17:3,22
**licenses** 10:17
**life** 13:23 14:10
28:8,11
**line** 6:16 10:20
60:2
**lineman** 12:6
12:20

**linemens** 20:6
**lines** 9:21 11:25
14:8 26:20
**little** 5:25 7:4,5
10:16,22 11:9
14:20 18:16
24:3 27:13
35:18,22 40:7
40:8,21 56:15
56:16
**live** 7:12,12,15
7:21 8:7,9,12
8:12 16:18
19:2 24:12,19
24:21 25:5,7
25:10
**living** 7:14
18:25
**llc** 1:7,7,8 48:15
**llp** 2:8
**locate** 46:16,19
47:11
**located** 1:22
24:16
**locations** 26:22
27:5
**logo** 43:9
**long** 5:14 9:4
12:11 16:21
19:2,5,6,9
21:23 38:11
42:13 45:12
**longer** 58:16
**longview** 2:4

**look** 6:15 7:4
12:13,19 19:14
30:23 31:8,8
34:11,14 35:3
35:4,6,19
36:11 39:2,24
40:7,23 42:5
44:13 46:11,24
47:21 49:23
50:3 51:10
54:1 55:16
**looking** 33:19
36:24 39:16,22
46:21 47:7
**looks** 16:12
17:2,5 33:12
50:12 51:11
54:3
**lost** 51:17
**lot** 17:10 23:19
24:4,24,25
25:1 32:21
35:24 42:19

**m**

**m** 2:7 8:4 9:3
10:8 20:24
59:5
**machine** 1:21
**made** 6:11,11
15:15 23:15,16
**main** 2:8 24:7
**maintenance**
11:24
**make** 5:24
10:22 14:20

18:16 20:22
24:3 33:7
35:14,17 46:22
47:9,9 57:9
**maldonado** 1:4
63:3
**mammoth** 1:6
47:23 48:1,3,7
48:10 52:20,22
63:3
**man** 12:20
20:12
**march** 18:24
29:5 50:13
**mark** 5:17
17:18 18:3,4,7
19:17 32:13,23
44:22 49:14
**marked** 3:8
5:23 17:16,21
17:23 18:13
21:24 32:25
44:23 49:22
53:16,17 56:2
57:12
**married** 8:10
25:6
**mastec** 8:19,20
9:2,5,15,18
10:7 13:1 15:9
**materials** 10:10
**math** 42:6
**mccowan** 20:20
**mean** 25:8
48:19

**[medicare - oral]**

**medicare** 35:5
**memory** 44:15
  44:15 47:4
  51:14 55:6
**mentioned** 48:9
**mentioning**
  48:8
**mess** 46:13
**message** 58:5,6
  58:7
**messages** 3:17
**messaging**
  51:21
**miguel** 1:12,16
  3:3 4:3,13,21
  5:12 6:1,8 9:4
  18:14 19:13
  23:24 25:14
  28:5,24 32:15
  33:6 39:7 44:2
  49:17 53:3,18
  60:21,25 63:4
**mind** 16:8
**minutes** 49:11
**moment** 36:13
  37:22 43:21
  46:13,14
**monday** 50:13
  51:11
**money** 23:16
  23:19 37:10,16
  38:23 41:21
**morning** 27:10
**mother** 25:6

**motor** 11:20
**move** 24:1
**moving** 27:24
**multiply** 39:25
  41:1,9

**n**

**n** 8:4 59:6
**name** 7:23
  20:13 21:25
  22:2 23:22
  29:25 31:1
  43:2 45:1,3
**named** 62:5
**nature** 30:16
**nc** 13:15
**necessarily**
  57:2
**need** 16:13 33:7
  42:6 59:1
**neither** 62:9
**net** 31:14 32:1
  34:17 35:11,22
  35:23
**nettles** 2:7 3:4
  4:7 5:9,24 8:2
  8:5,25 9:4
  17:18,23 18:1
  18:6,10,14
  20:15,25 21:2
  21:25 28:24
  33:3,4,13,18
  35:13,17,19
  39:7 40:4,6
  43:16 44:20,24
  45:17 49:10,14

49:20,23 51:16
51:19,23 52:5
52:10,14 53:5
53:12,18 55:3
55:8 56:3,18
56:22 57:13,21
58:2,17,20,24
**never** 28:8,11
  28:16 34:6
  38:17 42:4,9
  43:16 52:24
**night** 27:20
**north** 2:4
**notarize** 63:11
**notary** 61:3
**note** 63:9
**number** 22:20
  22:21 30:7
  32:24 33:2
  40:2 52:2
  62:24
**numbered** 1:18
**numbers** 31:18
  32:3 35:9
  39:15,16,22
  41:24 42:1

**o**

**o** 8:4 20:24
**object** 4:21
**objection** 4:20
  39:5 55:19
**occasion** 41:13
**occasions** 26:13
**october** 12:21
  13:2,4,5

**offer** 3:11
  21:19 29:11
  44:18
**oh** 5:5 35:2
**okay** 4:13,23
  5:12,16 6:14
  7:2 8:9,12 9:4
  10:6 11:24
  12:2 14:14,20
  16:14 17:5
  18:23 19:7,11
  19:16,22,25
  20:2 21:5,19
  22:22 24:9,18
  25:14 26:6,10
  28:17,24 29:11
  29:14,18 30:1
  30:8,12 41:7
  44:10 47:16,20
  49:10 50:9
  52:18,23 53:4
  53:12 54:17
  57:7,13 58:12
  58:24
**old** 4:10 15:1
**once** 30:10
**open** 56:15,16
**opening** 20:5
**operate** 11:16
**operator** 11:12
  11:20
**opportunity**
  42:15
**oral** 1:11,16

Veritext Legal Solutions
346-293-7000

**[orientation - problem]**

**orientation**
20:16 21:8
**original**  3:13
**orlando**  16:18
18:25
**osha**  11:1,4
**outcome**  62:12
**overhead**  9:20
**overtime**  30:20
36:19 37:7,18
38:3,6,6,9,18
38:22 39:3,12
42:10 45:21
46:7 54:21
55:10,13
**own**  18:21

**p**

**p.m.**  1:19,19
**page**  3:5 6:4
7:4,4 10:15
12:17,18,19
13:10,11,12,18
13:25 14:14
19:12 23:21
33:5,19 40:5
43:24 44:20
45:7 47:22
50:10,10 51:1
51:10,10 54:2
56:20 60:2
**pages**  62:8
63:12
**paid**  23:6 30:24
31:5,9,25
34:17 37:6,21

38:3,6,6,18
39:3,19 40:17
40:17 41:14
46:7 50:15
54:18,20,23
55:10,12,13,14
55:16 62:23
**pallet**  11:21
**panel**  11:16
**paper**  21:11
**paperwork**
19:8 21:6,9
**part**  21:15
25:19 34:13
52:19
**participation**
5:22
**particular**  33:7
34:23 36:20
**parties**  62:5,10
62:11
**pass**  58:20
**pay**  3:12 23:13
29:2 30:20
31:9,13,14
32:1 33:24
34:3,12,16,25
35:11,11,20,22
35:23 36:7,20
37:8 38:2
40:10,22,23
42:10 47:6
55:8
**paycheck**  31:8
39:13 43:16,25

44:7
**paychecks**
30:22,23 43:24
44:6
**paycom**  32:21
34:24 39:2
50:1 56:1
**paying**  41:15
55:22 56:1
**payment**  36:9
43:20 50:15
**pending**  4:14
**people**  19:20
20:8,10,14
21:8,8,15,17
26:6 29:15,17
**percentages**
37:15
**perfect**  27:15
**period**  40:13
42:12
**personally**  38:7
**personnel**
57:20
**phone**  30:6
52:3
**picker**  11:21
**pickup**  11:16
**picture**  58:8,10
**pictures**  29:16
**place**  62:18
**plaintiffs**  1:5
2:2 3:13
**please**  5:25 6:5
7:5 8:22 9:1

18:16 22:3
23:21 29:21
35:23 36:17
39:9 40:9
49:12 54:24
55:3 57:22
**pllc**  2:3
**pm**  59:12
**point**  15:24
31:7 36:11
45:24
**points**  27:3,4
**porter**  2:8
**porterhedges....**
2:10
**possible**  12:3
**poulos**  1:20
62:3,16
**power**  1:7
11:25 12:20
48:7,15,16,20
49:6
**predominant**
26:25
**present**  2:11
14:15 15:3,6
**presented**
43:12
**pretty**  26:16
**prior**  45:10,18
**probably**  25:1
27:11
**problem**  30:25
31:2 32:21
34:7 37:24

Page 10

**[problem - rent]**

38:1
**problems** 55:25
**procedure** 1:24
**proceedings**
62:8,12
**produce** 6:9
**produced** 1:16
53:14 56:6
**prosecuted**
28:13
**provided** 16:4
16:5,16
**public** 61:3
**puerto** 1:23
4:18 7:8,12,13
7:14,15,16,17
7:19,22 9:16
9:25 12:21
13:16,23 14:15
20:5,16 22:7
23:17 24:9,12
24:15,16 25:2
25:5,6,8,10,15
26:15 27:18
36:1,4,11,24
48:2,4 59:7
**pursuant** 1:23
62:5
**put** 9:21 15:5
25:18 54:12

**q**

**question** 12:9
14:17 28:18
39:9 45:15,17
52:17 55:6

56:25 58:3
**questions** 53:3
58:18,23 62:6
**quite** 19:7
35:23

**r**

**r** 23:1 59:5
**rate** 22:4,7,18
22:24 23:1,3,4
23:6,13 36:19
37:3,18 42:12
54:23,23 55:10
55:13,14
**rates** 22:15,18
22:19 24:5
37:7 38:22
39:3,3
**read** 6:24,25
10:20 14:18
22:9 57:9 63:6
63:8
**reading** 10:9
47:7 57:9
**ready** 33:20
49:20 57:25
**real** 15:11
**realized** 37:22
**really** 12:9 32:3
32:4 42:5,18
45:22 46:4,13
47:2 56:1
**reason** 30:17
60:2
**recall** 19:8,10
26:10 40:1,3

42:2,7,13
48:12,22 50:7
50:17,18 54:7
54:8 55:11
**recess** 33:17
49:13
**recognize** 6:1
18:21
**recommendat...**
6:16
**record** 33:20
33:21 49:12,16
49:18 52:8,9
52:12
**records** 39:11
**recruitment**
20:10
**reduced** 62:7
**referenced** 63:5
**references** 6:16
**referring** 27:5
**reflected** 42:11
53:6
**reflects** 10:16
11:11 12:24
13:12 38:22
50:4,12 51:4
51:13 55:9
**refresh** 44:14
55:6
**regarding** 47:6
**registration**
62:17
**regular** 36:19
37:7 39:3

**regularly** 62:10
**related** 62:10
**relates** 14:7
**relative** 62:10
**remember** 5:12
5:14 16:6,22
16:23 17:9
19:3,5,23 20:7
20:13,15,18
21:3,4,14,15,19
21:21 22:11,13
22:14,15,21
23:11 24:7
25:23 26:7
28:25 29:3,4,6
29:7,10,25
31:1 32:7 34:9
34:21 38:14
40:19 42:21
43:1,12,18,19
43:19,22 44:16
44:17 45:10,12
45:22,23 46:4
46:4,6 47:2
48:5,6,8,14,22
48:25 49:9
50:20,21 51:7
51:8,9 53:6
54:21
**remotely** 1:14
**rendon** 19:17
**renewed** 16:25
17:3
**rent** 24:19

Veritext Legal Solutions
346-293-7000

**[rental - see]**

| | | | |
|---|---|---|---|
| **rental** 13:15 | 13:16,23 14:15 | **rodriguez** 26:1 | 14:14 22:4,7 |
| **rented** 24:20 | 20:5,16 22:7 | 26:2 | 36:8,22 44:4,9 |
| **repair** 26:19 | 23:17 24:9,12 | **room** 27:19 | 47:22 51:9,20 |
| **repairing** 14:7 | 24:15,16 25:2 | **rosario** 1:12,16 | 52:20 54:20 |
| **repeat** 45:15 | 25:5,6,8,10,15 | 3:3 4:3 15:17 | 57:18 |
| 55:1,6 | 26:15 27:18 | 33:21 44:24 | **school** 7:7,8 |
| **report** 3:14,16 | 36:1,4,11,24 | 45:17 52:10,14 | 12:4,6 |
| **reported** 1:21 | 48:2,4 59:7 | 53:15 58:25 | **screen** 5:22,22 |
| **reporter** 5:3,5 | **right** 4:11 6:4 | 60:21,25 63:4 | **scroll** 7:3 13:4 |
| 17:21 28:20 | 7:12,16,18 8:8 | **rules** 1:24 | 22:3 36:17 |
| 49:20,21 52:8 | 8:11 10:15,25 | 63:14 | 40:7,8,21 51:2 |
| 52:13 59:3,8 | 11:1,23 12:14 | **rumor** 38:10 | 56:19 |
| 62:3 | 13:10,12 14:6 | **rumored** 38:8 | **seal** 62:12 |
| **reporter's** 3:6 | 15:2,4,9,10,15 | **s** | **second** 12:18 |
| **reports** 10:9 | 15:24 16:7,21 | | 12:19 |
| **requisition** | 18:11,14 21:2 | **s** 9:3 10:8 59:5 | **security** 35:5 |
| 10:10 | 21:25 22:3,3 | 59:6,7 | **see** 6:20 10:4 |
| **resent** 58:14 | 24:7 28:4 | **sadykhov** 2:7 | 10:18,21,23 |
| **reserve** 58:23 | 30:21 31:7,12 | 18:5 33:11 | 13:7 14:18 |
| **residence** 1:21 | 32:6,15,23 | 51:17,20,25 | 15:7 16:7 |
| **response** 44:1 | 33:6,23 35:3 | 56:14 | 18:15,17 22:5 |
| 51:15 | 35:17 36:5,15 | **safety** 11:1 | 22:6 23:20,22 |
| **restore** 48:24 | 38:18,21 39:4 | **san** 1:3 4:15 | 27:10 29:16 |
| **resume** 3:9 | 39:10 40:6,17 | 7:20,20 | 30:24 31:5,9 |
| 5:13,15 6:2,9 | 40:21,23 41:1 | **sanitago** 25:23 | 31:18,20,24 |
| 6:11 10:5,6,7 | 41:8,13 45:1,3 | **santiago** 25:22 | 32:15,20 33:6 |
| 12:13 14:19,23 | 45:6 46:12,18 | **save** 46:8 | 33:10 34:8,15 |
| 15:1,11,12 | 47:17,21 49:7 | **saw** 31:10 34:6 | 34:15,16,24 |
| 18:3 | 49:16 50:3,6 | 36:23 37:1,2 | 35:2,4,8,10,19 |
| **return** 63:12 | 51:1,24 52:24 | 37:10 39:14 | 35:20,21 36:14 |
| **review** 44:14 | 54:12 55:8 | 41:21 | 36:15,16,18,21 |
| **rico** 1:23 4:18 | 56:18,25 58:6 | **saying** 23:1,2 | 38:24 39:11 |
| 7:8,12,13,14,15 | 59:2,3 | 35:6 41:5 | 40:11,12,15,24 |
| 7:16,17,19,22 | **rivera** 25:19,21 | 55:14 | 40:25 41:9,11 |
| 9:16,25 12:21 | 25:24 | **says** 6:15,17 | 41:12 43:25 |
| | | 10:8 12:19 | |

**[see - stuff]**

| | | | |
|---|---|---|---|
| 44:3,4,24,25 | **shorthand** 1:21 | **solutions** 62:17 | **start** 7:6 12:16 |
| 45:3,7 46:11 | 62:3 | 63:19 | 25:17 40:13 |
| 46:15 47:22 | **show** 5:18 | **somebody** 20:7 | 50:4 |
| 48:3,21 49:11 | 17:14 56:16,20 | 30:8,9,14 43:2 | **started** 57:25 |
| 50:12 52:20,23 | **shows** 7:7 | 58:7,10,11 | **starting** 22:4 |
| 55:16,22,23 | **shrink** 11:9 | **sorry** 7:20 9:9 | 33:2 51:11 |
| **seeing** 48:6 | **sign** 24:4 57:11 | 17:19 22:17 | **starts** 18:8 |
| **seen** 34:2,20,23 | 63:6,11 | 32:17 33:10 | **state** 1:20 |
| 49:25 52:24 | **signature** 3:5 | 54:24 55:2 | 15:22 20:6,14 |
| 53:10 | 19:13,15 23:24 | **sort** 12:2 | 24:22 29:23 |
| **sees** 31:3 | 54:2,4 56:20 | **sound** 10:12 | 60:22 61:4 |
| **self** 14:16 | 59:10 62:15 | 50:6 | 62:1 |
| **send** 26:22 | **signatures** | **space** 59:5,5,6 | **stated** 62:4 |
| 46:19 | 56:22 | 59:6,7 | **statement** |
| **sent** 45:24 46:1 | **signed** 24:1,2 | **spanish** 6:18 | 32:14 |
| 46:2 58:7 | 63:17 | 12:8 29:21 | **statements** |
| **september** | **signing** 21:13 | 31:15 35:14 | 32:20 |
| 57:25 | 21:19 | **speak** 7:1 12:9 | **states** 1:1 13:22 |
| **service** 42:20 | **similar** 34:25 | **speaks** 12:10 | 29:12 |
| 48:24 | **single** 44:6 | 20:9 29:22 | **stay** 27:17 52:2 |
| **services** 1:6 | **sir** 4:12,16 6:3 | 30:5 31:16 | **staying** 24:22 |
| 47:23 48:11 | 7:21 15:19,21 | 35:15 | **stopped** 29:7 |
| 63:3 | 16:20 17:1,4 | **speed** 12:3 | **storm** 22:7 |
| **several** 55:15 | 17:12 25:13 | **spell** 7:25 8:1 | 25:18 26:10 |
| **share** 5:21,22 | 34:4 49:19 | 8:22,23,24 | 48:2 |
| **shari** 20:25 | 57:22 | 20:22 | **street** 2:8 62:18 |
| 28:18 52:1,2 | **six** 13:14 15:16 | **spelled** 10:7 | **strike** 9:14 20:3 |
| 52:12 | 19:4 | **spelling** 20:23 | **stub** 31:9 33:24 |
| **sharon** 1:19 | **sixteen** 23:9 | **star** 1:8 4:18,23 | 34:3 35:1 |
| 62:3,16 | 54:12 | 5:10,13,15 | 36:20 |
| **sheet** 57:5 | **slightly** 32:8 | 17:7,11 19:19 | **stubs** 3:12 |
| 63:10 | **small** 10:21 | 20:1,5 29:8 | 34:12,16 37:8 |
| **shirt** 43:5,10,11 | **smaller** 24:3 | 32:12 43:17 | 39:2 55:9 |
| **short** 58:17 | **social** 35:5 | 44:4,9,18 49:1 | **stuff** 57:4 |

Veritext Legal Solutions
346-293-7000

**[styled - took]**

| | | | |
|---|---|---|---|
| **styled** 1:18 | **t** | **telling** 41:6 | **thirteen** 27:12 |
| **suarez** 19:18 | | 46:6 | **three** 9:6 29:2 |
| **subscribed** | **t** 9:3 10:8 23:1 | **temporarily** | **throckmorton** |
| 60:24 | 59:7 | 17:8 | 62:18 |
| **subsequently** | **t&d** 14:1 | **termination** | **time** 3:14 5:14 |
| 62:6 | **tab** 5:17 17:15 | 29:4 | 6:23 12:24 |
| **sue** 28:15 | 17:20 18:11 | **terms** 12:5 | 13:13 15:3,5,5 |
| **suite** 2:4 62:19 | 21:22 44:20 | 33:18 | 15:6,14,14 |
| **summary** 31:11 | 49:14 53:13 | **terry's** 13:5,20 | 16:19 18:25 |
| **summation** | 56:5 57:14 | **testified** 4:4 | 19:9 20:13 |
| 10:12 | **take** 33:14 | **testify** 62:6 | 21:23 23:19 |
| **sun** 27:10 | 50:25 | **testimony** | 25:10 29:15 |
| **suns** 27:14,14 | **taken** 1:14,17 | 34:10 63:8 | 30:13 31:1,6,7 |
| 27:15,15 | 4:14 29:1 | **texas** 1:2,20 2:4 | 32:4 33:14 |
| **supervise** 10:8 | 33:17 49:13 | 2:9 14:2 60:22 | 36:10,19 38:11 |
| **supervising** | 62:5,6 | 61:4 62:1,3,13 | 38:16 40:13 |
| 25:16 | **talk** 17:7 23:5 | 62:19 | 41:16 42:12,14 |
| **supervision** | 38:4 | **text** 3:17 58:6 | 42:21 44:7 |
| 62:7 | **talked** 42:4,9 | **thank** 16:15 | 45:10,18 47:6 |
| **supervisor** | **talking** 25:3,4 | 47:16,20 58:25 | 50:15,17,18 |
| 29:17 42:23,25 | 32:12 39:21 | 59:8 | 53:9 54:10 |
| 43:2,3 48:24 | 45:23 51:23 | **thing** 24:7 47:4 | 55:23 63:15 |
| 49:1 | **tarango** 19:17 | 52:11 | **timeframe** 63:7 |
| **supervisors** | **tarrant** 62:2,3 | **things** 12:3 | **times** 39:25 |
| 43:6,13,15 | 62:13 | 56:16 | 41:2,9,23 |
| 48:23 | **taxes** 31:21 | **think** 4:10 5:11 | 55:15 |
| **suppliers** 9:15 | 35:5 | 18:20 20:1,19 | **timesheet** 53:21 |
| **supposed** 22:22 | **tell** 8:23 12:8 | 23:14 24:2 | 54:20 |
| **sure** 20:22 | 12:13 20:8 | 25:21 27:4 | **timesheets** 3:15 |
| 35:14 43:20 | 24:5 29:21,23 | 29:9,10 33:11 | 53:23 54:5,10 |
| 45:15 46:10,22 | 30:1,3 31:15 | 50:16 51:17 | **today** 4:14 38:1 |
| 47:9 57:9 | 33:1,16 34:7 | 52:7,10 56:14 | **told** 22:11 |
| **sworn** 4:2,4 | 37:5,24,25 | 58:19 | 30:11 54:15 |
| 60:24 62:6 | 39:23 54:12 | **third** 6:4 | **took** 31:20 51:5 |
| | 58:6 | | 51:13 52:21 |

Veritext Legal Solutions
346-293-7000

**[took - words]**

58:10

**top** 13:19 14:14
18:24 19:16
22:1 31:24
33:24 40:5,7,9
41:10 45:6,8
47:21 49:24
52:19

**town** 28:2,20

**towns** 28:1

**trained** 11:12

**training** 10:16
11:6,24 12:5

**transcribed**
62:7

**transcript** 62:8
63:5,16

**translate** 9:1
57:15,21

**trial** 58:23

**trouble** 12:20
14:8 28:12

**truck** 11:12,21

**trucks** 11:16,16
11:17

**true** 6:22 11:13
38:16 62:4,8

**truth** 24:6 62:6

**try** 12:14 14:18
15:5 47:11
50:16

**trying** 16:2
45:18 51:19

**twelve** 27:13

**two** 22:20,20
22:20 23:14
40:18

**tx** 63:13

**typewriting**
62:7

**typewritten**
62:8

**u**

**u** 20:24 59:6

**unable** 51:21

**under** 5:17
37:3 53:13
57:14 62:7

**understand**
4:13,15 9:17
15:8 21:7,13
30:16 31:14
32:4 33:21
35:10 36:3
37:6,7 38:1
39:15 42:6
49:17 52:15

**understanding**
42:10

**understood**
36:2,5 37:2
39:17

**united** 1:1
13:22

**update** 15:12
15:12

**use** 5:21 37:16

**used** 63:16

**using** 40:2

**v**

**v** 47:23 59:6,7
63:3

**vehicle** 11:20

**vehicles** 10:11
11:12,16

**verbal** 6:18

**verify** 47:14
63:8

**veritext** 62:17
63:12,19

**veritext.com.**
63:13

**video** 52:3

**villas** 1:22 59:5

**vista** 1:23 59:7

**vs** 1:5

**w**

**want** 12:14
17:16,18 20:25
24:4 27:7
35:14 46:22,24
47:9 52:22,25
59:9

**wanted** 30:11
42:16

**way** 12:2 20:13
31:2 37:3 40:9
42:19 56:19
62:11

**we've** 20:22
39:5 52:5

**wearing** 43:4

**week** 31:5
50:21 51:5,8
51:13 53:6

**weeks** 40:18

**welmaker** 2:3,3
4:20 5:8 17:16
17:25 18:9
30:9 33:1,16
39:5 53:2
55:19 58:15,19
58:22 59:9,11

**welmakerlaw...**
2:5 63:1

**went** 7:7 17:6
25:14 55:16

**western** 1:2

**willbros** 14:1

**withholding**
35:4 36:1

**witness** 1:16
5:4,6 12:10
20:9,11 29:22
30:5 31:16
35:15 52:11
53:4 57:15
58:3,21 60:25
62:5,12 63:5,7
63:9,11,15

**witness's** 3:5

**wives** 25:4

**words** 14:10
16:25 23:16
30:23 42:12

**[work - years]**

| | |
|---|---|
| **work**  4:23 8:18 | 15:8,16 17:18 |
| 10:8,9 12:6,7 | 18:5 20:11,21 |
| 13:19 14:11 | 22:2 24:8,21 |
| 17:6 19:18 | 25:17 29:10 |
| 22:16,18,19 | 30:3 31:1,2 |
| 24:5 25:14 | 33:13 34:19 |
| 26:11 27:9 | 47:1,8 49:5 |
| 29:9,11 42:20 | 51:18 52:5,21 |
| 51:4 54:19 | **year**  15:7,7 |
| 55:24 57:10,20 | 32:8 41:18 |
| 58:1 | **years**  4:10 9:6 |
| **worked**  9:5 | 12:12 13:14 |
| 10:7 13:22 | 15:16 19:4,4 |
| 14:1 26:25 | |
| 32:8 38:16 | |
| 41:16,18 | |
| **working**  8:15 | |
| 15:9 20:14 | |
| 27:18 28:25 | |
| 29:7 38:5 39:1 | |
| 47:5 48:9,18 | |
| 48:23 54:13 | |
| 58:9,9 | |
| **world**  13:19 | |
| **worry**  53:4 | |
| **worth**  14:2 | |
| 62:13,19 | |
| **write**  6:8,12 | |
| 54:15 | |
| **written**  6:18 | |
| **wrong**  37:23 | |

|  |
|:---:|
| **y** |

| |
|---|
| **y**  8:4 |
| **yeah**  6:7 8:6 |
| 11:7 14:18 |

Page 16

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.