UNITED STATES FEDERAL COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **AARON MALDONADO,** *et al*, | § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | Case No. 5:21-cv-85-OLG |
| **MAMMOTH ENERGY SERVICES, INC., COBRA ACQUISITIONS, LLC, HIGHER POWER ELECTRICAL, LLC AND 5 STAR ELECTRIC, LLC** | § § § § § § | |
| **Defendants.** | § | |

### PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

                                            Respectfully Submitted,

                                            **WELMAKER LAW, PLLC**

                                            /s/  Douglas B. Welmaker
                                            Douglas B. Welmaker
                                            State Bar No. 00788641
                                            Welmaker Law, PLLC
                                            409 N. Fredonia, Suite 118
                                            Longview, Texas 75601
                                            Phone: (512) 799-2048
                                            Email: doug@welmakerlaw.com

                                            **ATTORNEY FOR PLAINTIFFS**

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing  has been electronically served on all counsel of record via Notice of Electronic Filing on a known Filing User through the CM/ECF system on August 23, 2024.

                                            /s/ Douglas B. Welmaker
                                            Douglas B. Welmaker

I.      Introduction

In their Motion for Summary Judgment, Defendants advance only one argument: Plaintiffs cannot prove, as a matter of law, that Defendants committed a willful violation of the FLSA. As a result, because all Plaintiffs' claims are third year claims, Defendants argue the case should be dismissed. Defendants' motion is without merit and should be denied.[1]

Defendants instituted a day rate plan, promised day rates, and paid day rates. Plaintiffs' actual compensation was nothing more than their number of days worked multiplied by the day rate assigned to each Plaintiffs. Fundamental to the issue of willfulness is the fact that Defendants knew paying a day rate required additional overtime pay because their lawyer told them so. He told them they could pay by the day or by the hour, but that they would have to pay overtime compensation either way. And while he told them they could set the hourly rates to keep the total pay (regular pay plus overtime) within the "budget" (the day rate amount) for the "anticipated hours," Defendants would still have to actually pay by the hour plus pay overtime.

Defendants ultimately chose to pay day rates, but instead of actually paying overtime as they had been instructed to do by their attorney, they opted to make it *appear* as if they were paying overtime by falsifying both their employees' time and payroll documents. Defendants' consultation with an attorney and disregard of advice, as well as their purposeful manipulation of Plaintiffs' time and pay records demonstrates both knowledge of the FLSA's overtime requirements (day rate pay requires overtime pay) as well as a purposeful course of action designed to avoid these requirements. Defendants' conduct in carrying out their scheme to violate the FLSA is, as previously noted, the textbook definition of willfulness.

---

[1] Plaintiffs have discussed why this Court should find that Defendants' FLSA violations were willful, as a matter of law, in their Motion for Partial Summary Judgment, Dkt. 1. Plaintiffs incorporate that Motion into this Response.

2

II.     Discussion

    A.     **Defendants Promised Day Rates.**

From the moment they were awarded a contract with PREPA to perform electrical reconstruction work in Puerto Rico after Hurricane Maria (work for which they were ultimately awarded more than one billion dollars), Defendants announced that they were paying their linemen day rates for all work performed in Puerto Rico.[2] On the same day Cobra Acquisitions, LLC ("Cobra") was awarded the PREPA contract, Keith Ellison, President of Cobra, immediately communicated that Defendants were paying a day rate to fully owned subsidiaries Higher Power Electrical, LLC ("Higher Power") and Five Star Electric, LLC ("Five Star"). Plaintiffs' Motion for Partial Summary Judgment, Dkt. 41, at p. 3. Within several days, Five Star's Human Resources Director, Missy Davis, began publicly circulating/advertising these day rates, in writing, to anyone inquiring about the possibility of working in Puerto Rico, while both Higher Power and Five Star conveyed these day rates to linemen in literally hundreds of orientations in Kentucky and Texas. *See, e.g.,* Dkt. 41 at p. 4, Davis email. *Five months later*, Defendants were still advertising the same day rates contained in Keith Ellison's October 19, 2017 email. Dkt. 41, p. 6, Davis email to Aaron Maldonado dated March 14, 2018.

Despite Defendants' best efforts to recast their day rate plan as an hourly plan, despite the after-the-fact references to "targeted rates" "budgeted rates," and "discretionary bonuses," and despite the suggestion that the final pay plan was something that constantly evolved through multiple "iterations", the reality was that from the time Mr. Ellison announced the day rate plan on October 19, 2017 until July 23, 2018, when Defendants admittedly (and for the first time) migrated their pay

---

[2] Indeed, not only did Defendants communicate their day rate payment plan publicly, but they consistently referred, in a multitude of internal communications, that they were paying linemen day rates.

plan from a day rate to an hourly rate plan, nothing changed. The only real "iterations" involved in the pay plan were how to make the day rate scheme without overtime appear to be an hourly plan with overtime.

Probably no testimony serves to encapsulate the true intention of Defendants to obfuscate the fact that Defendants were paying day rates than the testimony of Alex Kalman, Mammoth's HR Specialist, in which he discusses the use of gross ups (referred to here as "true ups") in relation to day rates:

> Q. Did you review -- with the true ups that were done that we see, did you view that as being a way of paying day rates or did you do it differently?
>
> A. Are you asking for my professional opinion?
>
> Q. Yes.
>
> A. My professional opinion is yes, *they were paying day rates and they were finding a way around it.*
>
> Q. Okay. And why do you feel that way?
>
> A. Because Keith [Ellison] said that this is what we were paying them as day rates, and then *we were required to find a way around that.*
>
> Q. Okay. So by finding a way around, you're talking about coming up with this hourly system plus these true ups that end up paying them their day rates?
>
> A. Yes.

Dkt. 41, Exh. M, 84-86:4 (emphasis added).

Defendants were paying day rates and Defendants were actively engaged in covering this up. Jeff Beagle, Director of HR for Mammoth Energy Services, Inc., actually created a spreadsheet where, among other things, he calculated the precise amount of overtime that would be owed per position under a day rate plan. Dkt. 41, Exh. H, Column P. Had Defendants followed their attorney's advice and paid overtime under their day rate plan, Mr. Beagle correctly calculated they would have owed an additional $1,350.00 to $2,812.50 *per week* per lineman. *Id*. Defendants have already

realized a savings of millions of dollars, as not all linemen brought suit, and some linemen, such as Plaintiffs, were only able to bring suit at the tail end of the limitations period.[3]

### B. Outside Counsel Warned Defendants that Day Rate Pay Required Overtime.

On October 20, 2017, Defendants' attorney Stephen Broussard advised Jeff Beagle, HR Director for Mammoth Energy Services, Inc.[4] about the plan to pay day rates to the linemen. Dkt. 41, Exh. F, Broussard Depo. 10:14-21; 12:21-23; 15:14-16:16.  Broussard gave Beagle two options for complying with the FLSA: (1) pay a day rate plus overtime; or (2) pay by the hour (again, plus overtime) and set the hourly rate such that the total pay (regular pay plus overtime) stayed within the day rate "budget" based on the anticipated hours. Dkt. 41, Exh. F, at 22:3-23:19; 38:18-39:10. Importantly, and a fact omitted by Defendants in their Motion, after advising Beagle about these two options, *Broussard did not review Defendants' actual pay practices to check compliance with his advice, nor did he know which of the two options he presented were ultimately utilized*. *Id*. at 22:22-23:2.  Even more importantly, Broussard admitted that did *not* provide any advice to Defendants about mixing day rates and hourly rates, *id*. at 39:18-40:3, paying hourly and grossing up the pay to the promised day rate amount, *id*. at 28:11-14, or paying day rates in addition to hourly rates. *Id*. at 28:15-19.  All three of these modifications were subsequently incorporated by Beagle into Defendants' pay plan, and all three modifications establish Defendants chose the day rate option, albeit, and against the advice of counsel, without payment of overtime.

Defendants argue that meeting with Broussard about a day rate plan and an hourly plan somehow immunizes them from subsequent liability for implementation of a *completely different* payment plan: "The summary judgment evidence conclusively establishes that Defendants consulted

---

[3] For example, 100 linemen paid at the lowest rate of $600 per day working 12 hours per day, 7 days per week over the course of 7 months would be owed an additional $3,334,100.00 in unpaid overtime ($4,200/84 hrs/2 x 44 OT hours x 30.31 weeks x 100 individuals).

[4] *See* Declaration of Jeff Beagle, Defendants' Exhibit 2, ¶ 2, Dkt. 44, p. 9 ("I am the former Director of Human Resources for Mammoth Energy Services, Inc.").

outside counsel in developing their pay plan." Dkt. 43, p. 2. Indeed, Defendants actually represent to this Court that Broussard "blessed" the pay plan ultimately utilized by Defendants, Dkt. 43, p. 16. The following exchange in Mr. Broussard's deposition provides some necessary context to this claim:

> Q: It sounds like to me that they didn't present to you a specific plan about how they were going to pay and ask for your blessing, if you will, on it… Dkt. 41, Exh. F, 21:22-23.
>
> A: Yeah. I would say this. I would say what they did was they presented -- I presented two different options from a legal perspective, how to comply with the Fair Labor Standards Act. I was fairly certain they would go with either of those options. Okay. And if they -- and if they went with one of those options in the way we discussed, they would be in compliance in my mind with the Fair Labor Standards Act. So that's really where it was. It wasn't a matter of -- I mean, I guess you could say there were two plans … that they were considering. Now which one they chose, I don't know. But I know there were two different plans that they were talk -- we --that it came down to at that point in time. *Id.*, 22:1-15.
>
> Q: And then just to clarify. What – what were the two plans? *Id.*, 22:16-17.
>
> A: One was to pay -- pay on an hourly basis, which would mean then the regular rate for overtime purposes would be the hourly rate, and the other one was potentially a day rate plan. *Id.*, 22:18-21.
>
> Q: Okay. Um, and then so going forward, and just -- just to -- to confirm. You didn't review actual payroll records at any point to determine whether or not those records and that payment plan was -- was in compliance? *Id.*, 22:22-25; 23:1.
>
> A: No. *Id.*, 23:2.
>
> Q: Okay. And so you -- you -- what you did is --y'all -- y'all discussed two different options. The day rate plan and the hourly plan, and talked with them about either one of -- that either one could comply with the FLSA? *Id.*, 23:3-7.
>
> A. Right. *Id.*, 23:8.
>
> Q. Okay. And with it -- and if it was a day rate, they would have to pay an additional half time for hours worked over 40, correct? *Id.*, 23:9-11.
>
> A. That's correct. *Id.*, 23:12

> Q. And if they are going with the hourly system. The hourly system would have the overtime because you'd do an hourly rate plus -- or, you know, and a time and a half for after 40, correct? *Id*., 23:13-16
>
> A. Right. *Id*., 23:17.

Recognizing the limitations contained in Mr. Broussard's testimony, where he admits only that he advised Defendants about paying either an hourly rate with overtime or a day rate with overtime, Defendants introduce a Declaration from Jeff Beagle in which he provides, for the very first time, brand new and previously undisclosed information about his interactions with Mr. Broussard, discussing, without producing, detailed contents of undated emails ostensibly sent to Mr. Broussard, and divulging Mr. Broussard's previously unexpressed mental impressions about this new evidence. Defendants' Exhibit 2, ECF 44, pp. 9-13. Notably, none of the details contained in ¶¶5-7 of Mr. Beagle's Declaration regarding Mr. Beagle's interactions with Mr. Broussard are referenced in Mr. Broussard's deposition or in Mr. Broussard's Declaration.[5]

In his Declaration, Mr. Beagle states under oath, that Mr. Broussard not only "understood the purpose" of Mr. Beagle's new "calculations," but that Mr. Broussard "approved" such calculations as being an FLSA "compliant" pay plan, *id*. at ¶7, a fact that Mr. Beagle then "disseminated" to all concerned. *Id*. at ¶7, p. 11.[6] This is simply not true. While Mr. Beagle did send *one* spreadsheet with hourly rate calculations to Mr. Broussard on October 23, 2017, Exhibit

---

[5] Plaintiffs' object as hearsay and move to strike all portions of Mr. Beagle's Declaration in which he purports to recount any testimony from Mr. Broussard. Plaintiffs also object as hearsay and move to strike the "chart" recounted by Mr. Beagle in his Declaration that he claims he allegedly provided to Mr. Broussard in an undated and unproduced email, as it constitutes hearsay, and as Defendants have failed to produce this email, if it exists, even though same was specifically requested in discovery. Plaintiffs move to strike any and all mental impressions Mr. Beagle claims to have divined from any interaction with Mr. Broussard as same constitutes nothing more than rank speculation without any evidentiary foundation.

[6] Defendants engaged in a similar tactic in *Francisco Cantu, et al. v. Mammoth Energy Services et al,* CA No. SA:19-cv-00615-DAE (W.D.Tex), claiming in Mr. Layton's sworn declaration that Mr. Broussard jointly determined, along with Mr. Layton and Mr. Beagle, the *final* pay plan to be used in Puerto Rico. *See* Declaration of Mark Layton ¶12, Dkt 119 p. 6, filed 6/15/2: "After initially leaning toward paying a day rate, *Broussard, Beagle, and I ultimately decided* to use an hourly plus overtime pay plan that would approximate the targeted rates." (emphasis added). Defendants have since omitted this statement from Mr. Layton's current Declaration.

7

A, Fed 2312 (transmittal email) and Exhibit B, Fed 2313 (native spreadsheet attached to the transmittal email), Mr. Broussard's testimony about this spreadsheet reflected that he was unclear about exactly why the spreadsheet had been sent to him, ultimately concluding that his primary purpose in reviewing the spreadsheet was to check job titles to ensure minimum wage was being paid properly.[7] He also admitted that at the time he received the spreadsheet, Defendants were still in the process of trying to decide how to pay the linemen:

> Q. And so it looks like to me this is a method of saying, let's take the -- the -- what someone would receive as a day rate over a week, and let's figure out what the hourly rates would be. So if they work the entire week like we're expecting, they would end up getting their day rates for the week. Does that make sense?
>
> A. I don't know.
>
> Q. Okay.
>
> A. Well, I will -- I will tell you this.
>
> Q. Okay.
>
> A. When I got this particular document [the spreadsheet], it was --I was focused on the titles. I also looked at the budgeted day rate, um, and I looked at the hours. I was trying to get a sense if there was a minimum -- if the minimum wage would be met. And as I looked at this particular document, this looked to me as a -- maybe a budgeting document. I don't think they had settled on, are we going to do a day rate? Are we going to do an hourly rate? At this point in time, I think they were still discussions about that. And so they do have like an implied hourly rate, a gross weekly, a day rate, budget day rate. They have got various figures out there, and I think at -- you know, from what I could tell looking at this, is they were still trying to decide what to do.
>
> Q. Okay. Did you -- did you ever -- were you ever privy to -- privy to what they ended up doing?
>
> A. I don't think I ever got a final, um, determination. I talked to Jeff Beagle. Jeff was the person, my primary contact. And we talked about a day rate. We talked about -- we may have even talked about a fluctuating work week, which wouldn't work in this situation, and hourly. And I -- and I don't know exactly where they

---

[7] There does not appear to be any evidence in the thousands of documents Defendants produced that any other spreadsheets or calculations were sent to, much less reviewed by, Mr. Broussard, and tellingly, Defendants do not attach such spreadsheet/calculations or email to their Motion.

ended up. But from my perspective, they could have gone with a day rate. They could have gone with an hourly rate. Um, but I don't know what happened, and -- because I know there was some discussion going back and forth trying to figure out.

Dkt 41, Ex. F, 20:2-25; 21:1-15.[8]

Mr. Broussard never "blessed" Defendants' final pay plan, because he did not ever know what pay plan Defendants ultimately utilized. He discussed with Defendants a day rate plan, which he warned needed to include overtime pay, and he discussed an hourly plan, which he also warned needed to include overtime pay.[9] Moreover, while Defendants consulted Mr. Broussard about both an hourly and a day rate plans, the facts conclusively establish that 1) Defendants subsequently *modified* the pay plans presented to Broussard, 2) did not consult Broussard about these modifications, and 3) proceeded to pay plaintiffs a day rate without payment of overtime, in direct contravention of Mr. Broussard's advice. Defendants' attempt to somehow impute Broussard's legal

---

[8] Directly contrary to Mr. Broussard's sworn testimony set forth above that 1) he understood the pay plan to still be in flux at the time he reviewed this spreadsheet; 2) he reviewed this spreadsheet from a budgetary standpoint and 3) he primarily reviewed the spreadsheet to determine minimum wage compliance, Mr. Beagle, testifying about the *very same* spreadsheet in his deposition, claimed that Mr. Broussard pronounced this spreadsheet to also be "FLSA complaint" in spite of the fact that Broussard testified to nothing of the sort:

> (Exhibit 134 previously marked for identification and made part of the record). Q. (By Mr. Stukenberg): Do you recall this e-mail? [the email and accompanying spreadsheet to which Mr. Stukenberg refers are attached hereto as Exhibits A and B, Fed 2312 and Fed 2313, *supra*] And it may be helpful to see the attachment that goes with it. A. Yes, I believe this is the e-mail that had the file we looked at earlier as well. Q. And it's similar, it's just a different iteration. A. Okay. Q. If you'll see here, the hours per day were 11? A. Okay. Q. Did you discuss this compensation system with Mr. Broussard? A. Yes. Q. And what was Mr. Broussard's feedback about the compensation system as structured here? A. *That it was compliant under the FLSA.*" Deposition of Jeff Beagle, Dkt. 41, Exh. I, p. 91: 22-25; 92:1-4 (emphasis added).

[9] Indeed, with respect to hourly pay, Mr. Broussard could recall only generally engaging in discussions about how hourly rates might be set, although he did not recall what such rates would be, nor did he recall any specifics about how such rates were going to be determined: "And I remember in terms of the hourly, there was some discussion about how do we -- you know, how do we -- how do we settle upon an hourly rate, and what --what would that be. Um, and I -- and -- and -- because they were working within a budget. Um, but I don't remember the specifics in terms of them deciding on a particular rate, or how they were going to do it, but we talked about that. And I -- because I just can't remember the details of it. Dkt. 41, Exh. F, 38: 9-17.

imprimatur to their day-rate-without-overtime plan about which he was unaware is disingenuous, at best.

### C. Defendants Devised a Scheme to Apportion Day Rates Over Artificial Hourly Rates.

Jeff Beagle admitted that he reverse engineered hourly rates for all linemen in Puerto Rico using the day rates set forth by Ellison in his October 19, 2017 letter and assuming 16 hour days, 7 days per week, which comes to 40 regular hours and 72 overtime hours in a workweek. Dkt. 41, Exh. I, Beagle Depo. 24:7-25:21; 26:2-27:14. Beagle used this formula: hourly rate = promised day rate*7÷148. *Id*. Beagle calculated the "hourly rate" for each position's day rate in Excel. *Id*. at 27:15-29:4.

Cobra listed, for each position, the same day rates set by Ellison and the hourly rates calculated by Beagle on its "Puerto Rico Pay Scale." Dkt. 41, Exh. I, Beagle Depo. 35:21-36:11, Dkt. 41, Exh. M, Kalman Depo. 44:13-45:13, and Higher Power copied these rates in its offer letters. Dkt. 41, Exh. B, Ellison Depo. 66:15-67:5; Dkt. 41, Exh. J, J. Kinsey Depo. 31:20-23.

### D. Defendants' Claim that Plaintiffs' Paychecks Lacked Whole Numbers is Nothing More than a Rounding Issue

Defendants argue, without citation to any authority, that "Perhaps the most obvious indication that Plaintiffs were not paid a day rate is the fact that their compensation generally did not equal whole numbers as would be expected if they were actually paid the targeted day rates (*e.g.*, $600.00, $700.00, $800.00)." Dkt. 45, p. 9. Of course, this ignores the fact that the only reason this occurs is because Defendants' themselves caused the discrepancy about which they now complain by reverse engineering Plaintiffs' day rates. To fully understand Defendants' position, Plaintiff Jorge Rivera's paycheck is used below.

```
Earnings Statement                                                    JORGE RIVERA

Pay Date:      07/13/2018     Company: 0UB44 - 5 STAR ELECTRIC LLC           Emp #: A4G0
Period Start:  06/25/2018     170 BEAN CEMETERY RD                    Dept: PR - Puerto Rico
Period End:    07/08/2018     MADISONVILLE  KY  42431   (405) 608-8191       Pay Basis: Hourly

                              Rate    Hours/Units   Current Period   Year To Date
Earnings
  Regular                     37.84      80.00          3027.20        19374.08
  Overtime                    56.76     144.00          8173.44        49040.64
  Day Rate                                                 0.00          388.80

              Gross                     224.00         11200.64        68803.52
```

Exhibit C, Bates Fed 0601

Mr. Rivera was promised a day rate of $800. Defendants argue that $800 multiplied by 14 days should come out to exactly $11,200.00, and because Mr. Rivera's paycheck shows $11,200.64, the additional 64 cents somehow proves that Mr. Rivera was not paid a day rate. The appearance of the additional 64 cents on Mr. Rivera's check is explained by the fact that Defendants rounded up Mr. Rivera's fake hourly rate when they reverse engineered it.

Mr. Beagle testified that he reverse-engineered Plaintiffs' day rates by multiplying any given day rate by 7 days, and then dividing that number by 148. *Supra* at 9. For a lineman with a day rate of $800, therefore, the reverse engineered hourly rate is technically $37.83783784, as set forth below:

| Day Rate | Days | Day Rate x 7 days | Divided by 148 hours |
|---|---|---|---|
| $800.00 | 7 | $5,600.00 | 37.83783784 |

Because including an hourly rate of $37.837837.84 on a paycheck would appear suspect, Defendants simply rounded the hourly rate up to $37.84. As a result, Mr. Rivera's paycheck appears exactly like that portion of the screenshot below shaded in green, complete with the additional 64 cents. Had the hourly rate not been rounded up, the total pay for the two week period would appear as that portion shaded in blue, which is the "whole number" Defendants argue is missing from Mr. Rivera's pay:

| Pay (2 weeks) | Hours | Hourly Rate rounded up | Totals | | Hourly rate not rounded up | Hours | Totals |
|---|---|---|---|---|---|---|---|
| Regular | 80 | $37.84 | $3,027.20 | | 37.83783784 | 80 | 3027.027027 |
| Overtime | 144 | $56.76 | $8,173.44 | | 56.75675676 | 144 | 8172.972973 |
| | | | $11,200.64 | | | | 11200 |

In other words, the $0.64 remainder exists because Defendants reverse engineered an hourly rate and simply rounded it up.

E.  **Defendants' Gross Ups Evidence Defendants' Day Rate Pay; they were Neither Discretionary Nor Used to Boost Morale**

Even though they claimed to pay hourly, Defendants admit that they did not track hours worked,[10] and that anyone who showed up for even part of a day was paid their full day rate.[11] If a lineman worked a short week, then Defendants grossed up the lineman's pay so that it was equivalent to the day rate promised to the lineman multiplied by days worked.

The argument that Defendants' gross ups were "discretionary" and intended to boost morale is simply not credible. Additionally, such an argument flies in the face of the testimony of JD Kinsey, Payroll Manager for Cobra who processed payroll for the linemen working in Puerto Rico, Dkt. 41, Exh. J, 29: 22-24[12] and who processed gross ups that occurred as a result of short weeks. *Id*. at 52; 2-6; 44:25; 45:1-12; 46: 21-25; 47:1-3.

Mr. Kinsey testified that if there was a shortage in a lineman's promised day rate, he was the point of contact, and "if an individual did not work the full 7 days, then yes, *I would have to do* an adjustment to meet their expected compensation", *id*. at 47:13-18, with the "expected compensation"

---

[10] *See* Dkt. 41 at p. 11 ("Indeed, and key to this case, Defendants *did not track* actual hours worked by Plaintiffs in Puerto Rico prior to July 23, 2018. Exh. M, Kalman Depo. at 46:10-14; 82:25-83:5. Instead, Defendants tracked daily work attendance for Plaintiffs in Puerto Rico. Exh. M, Kalman Depo. at 83:6-17; Exh. J, J. Kinsey Depo. at 60:10-16; 67:15-18. If a Plaintiff worked at all on a day in Puerto Rico, J. Kinsey, the payroll manager, entered "16.00" hours for the day in the Time Detail Report ("TDR"). Exh. J, J. Kinsey Depo. at 53:16-21; 60:10-16; 67:15-18, 92:4-13").
[11] Dkt. 41 at p. 3 ("Ellison testified that as long as an employee showed up for work, he would be entitled to receive the full rate for each of the positions delineated in the email. Exh. B, 32:16-25").
[12] Mr. Kinsey's name appears on all ten plaintiffs' Time Detail Reports under the "Supervisor Approval" column. *See, e.g.*, timesheet for Aaron Maldonado set forth above, Mammoth Fed 255, far right column; *see also* Defendants' Exhibit 15-B, Appendix Dkt. 49, Plaintiffs' Time Daily Reports.

12

being the lineman's promised day rate, *id*. at 45:7-12.  Mr. Kinsey had to calculate the gross ups manually, and agreed that he was not 100% perfect in adding in the amounts to be grossed up. *Id*. at 113:1-18.

With respect to Defendants' claim that the gross ups were discretionary morale boosters, Mr. Kinnsey testified that he did not recall anyone telling him not to gross up pay for short weeks, *id*. at 134:17-22.  When asked by defense counsel whether he was aware of situations in which a lineman worked a short week but did <u>not</u> receive a gross up, Mr. Kinsey responded, "I know there were times I missed making gross adjustments" and that he was not aware whether there were times which individuals did not receive gross ups that were not the result of him making an error. *Id*. at 137: 2-11.  Sometimes Kinsey simply missed gross-ups and the workers didn't get grossed up by mistake. *Id*. at 117:16-118:14.

Mr. Kinnsey testified that it was his belief that he even explained the gross up process to linemen at their orientations, although he could not be sure if he explained this process at all of the orientations he attended.  *Id*. 161:21-23; 162:2-3.

Below is just one of many examples in which a Plaintiff received a gross up that brought his pay up to the promised day rate in a short week.  The paycheck for Plaintiff Maldonado for the pay period from March 19, 2018 through April 1, 2018, his first week on the island reads as follows:

**Earnings Statement**                                                              **AARON MALDANADO**

Pay Date: 04/06/2018    Company: 0UB44 - 5 STAR ELECTRIC LLC          Emp #: A4B9
Period Start: 03/19/2018   170 BEAN CEMETERY RD                        Dept: PR - Puerto Rico
Period End: 04/01/2018    MADISONVILLE  KY  42431    (405) 608-8191    Pay Basis: Hourly

|  | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|
| **Earnings** | | | | |
| Regular | 47.30 | 74.00 | 3500.20 | 3692.20 |
| Regular | 32.00(*) | 6.00 | 192.00 | 0.00 |
| Overtime | 70.95 | 118.00 | 8372.10 | 8372.10 |
| Day Rate | | | 127.70 | 127.70 |

*Denotes an override during payroll processing.

| **Gross** | | 198.00 | 12192.00 | 12192.00 |

Exhibit D, Bates Fed 254.  Below is Mr. Maldonado's corresponding timesheet:

13

| Day | Pay Code | ID | OD | Project | | Amount | Units | Hours | | User |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Units/Hours For Week: | | | | | | | | 0.00 | | |
| Mon (03/19) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | $127.70 | 0.00 | 0.00 | | jkinsey (04/01/2018) |
| Tue (03/20) | | ID 08:00 AM | OD 02:00 PM | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 6.00 | 6.00 | | jkinsey (04/01/2018) |
| Wed (03/21) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Thu (03/22) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Fri (03/23) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Sat (03/24) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Sun (03/25) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Total Units/Hours For Week: | | | | | | | | 86.00 | | |
| Mon (03/26) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Tue (03/27) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Wed (03/28) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Thu (03/29) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Fri (03/30) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Sat (03/31) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Sun (04/01) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | 16.00 | 16.00 | | jkinsey (04/01/2018) |
| Total Units/Hours For Week: | | | | | | | | 112.00 | | |

Exhibit E, Bates Fed 255.[13]

Mr. Maldonado did not work Monday, March 19, 2018 (reflected by the allotment of "0.00" hours for that day), and worked 6 hours on Tuesday, March 20, 2018 (reflected by 6 hours at his standby rate of $32.00 generally paid to new arrivals on the island for their first day).[14] The day after his arrival, he worked 12 standard days, as demonstrated by the "16.00" in the hours column for these days. Based upon his promised day rate of $1,000, Mr. Maldonado should have been paid $1,000 per day, or $12,000.00.

Because Mr. Maldonado worked less than 7 days in the second week, however, his pay, using Defendants' reverse engineered rate, was just below the $12,000.00 he had been promised. Under Defendants' reverse engineered method, for the 12 standard workdays, Maldonado received $3,500.20 in "regular pay" and $8,372.10 in "overtime pay" or $11,872.30, which is $127.70 short of his promised day rate for 12 days. As a result, Defendants grossed up Mr. Maldonado's pay by

---

[13] This gross up is also reflected on Maldonado's timesheet for the one day he did no work. Notably, the pay code for this entry is (DYR), which stands for "Day Rate."

[14] This also demonstrates that Defendants were indeed able to record actual time worked when they desired to do so. Standby time was usually provided for the first day or two after arrival on the island, *see, e.g.,* Exhibit F, showing standby rates for journeymen linemen being paid $1,000 per day at $32 an hour. Bates Fed 2182

14

exactly $127.70, so that he would be paid his promised $12,000.00 for 12 days' work, noting such gross up as a "Day Rate" on his paycheck. Defendants want this Court to believe that this miniscule, yet extremely precise gross up was a "discretionary bonus" given to Mr. Maldonado during his very first week of work to keep up his morale.

As noted in the email below by Jeff Beagle, working partial weeks such as the week Mr. Maldonado worked shown above would result in a lineman's pay being "shorted" and as a result, Beagle was calculating what he termed the "gross up" so that "any midweek employees are *made whole*…"(emphasis added). Notably absent is any language referencing discretionary bonuses, or bonuses being given to keep up morale, or any sort of bonus whatsoever. This is because Defendants' subterfuge was mathematically imprecise, and the gross ups were needed, as quickly as possible, to maintain the illusion by drawing as little attention to the ruse as possible.

> **From:** Jeff Beagle
> **Sent:** Friday, November 17, 2017 8:15 AM
> **To:** Missy Davis <missy.davis@5-starelectricllc.com>; Ken Kinsey <kkinsey@cobratd.com>
> **Cc:** JD Kinsey <jkinsey@cobratd.com>; Shelly Wheeler <swheeler@hpeservices.net>; Alexander Kalman <akalman@Mammothenergy.com>
> **Subject:** RE: Payroll
>
> That's great Missy! We appreciate all you have done in this process and what you continue to do!
>
> The other item will be on the gross up for pay. Since we are paying 16 hours per day to ge the daily rate for the week, as you noted depending on when the employee arrived (the day of the week) they may have been "shorted" some pay as it did not calculate out to the full day rate since it was not a full week. I am calculating that "gross up" now so any mid-week employees are made whole and we will submit that today. So if that is an issue that is brought up, know it is being resolved.
>
> Jeff Beagle, HR Director
> Phone: 405.608.8195
> Fax: 405.437.2550
> Email: jbeagle@mammothenergy.com
> 14201 Caliber Drive Ste 300, Oklahoma City, OK 73134

Mammoth Fed 1935, Dkt. 41, Exh. L.

Defendants utilized a similarly precise gross up with Plaintiff Jorge Rivera when he only worked 12 days in a 14 day period. Mr. Rivera was promised a day rate of $800, so he should have been paid $800 x 12 days, or $9,600. However, as previously noted, the reverse engineering process

15

breaks down when a lineman works less than 7 days in a workweek.  Here, Mr. Rivera only worked 5 of 7 days in his second work week, and, using his reverse engineered hourly and overtime rates, only earned $9,384.32.  In order to bring his pay up to his promised day rate of $9,600.00, Defendants grossed up Mr. Rivera's pay by exactly $215.68 (terming it a "day rate" on his paycheck, and using the code for day rate, "DYR", on his timesheet).  Defendants want this Court to believe that such bonuses were not given to ensure Mr. Rivera was paid his full day rate as he was promised, but solely to make sure Mr. Rivera's morale stayed high, or to reward him for being a hard worker.[15]

**Earnings Statement** — JORGE RIVERA

Pay Date: 07/27/2018  
Period Start: 07/09/2018  
Period End: 07/22/2018  
Company: 0UB44 - 5 STAR ELECTRIC LLC  
170 BEAN CEMETERY RD  
MADISONVILLE KY 42431  (405) 608-8191  
Emp #: A4G0  
Dept: PR - Puerto Rico  
Pay Basis: Hourly

| Earnings | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|
| Regular | 37.84 | 80.00 | 3027.20 | 22401.28 |
| Overtime | 56.76 | 112.00 | 6357.12 | 55397.76 |
| Day Rate | | | 215.68 | 604.48 |
| Gross | | 192.00 | 9600.00 | 78403.52 |

| Day | Code | | | Project | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Mon (07/09) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | jkinsey (07/22/2018) |
| Mon (07/09) | Fixed: (DYR) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | $215.68 | 0.00 | 16.00 | jkinsey (07/22/2018) |
| Tue (07/10) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Wed (07/11) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Thu (07/12) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |

**MAMMOTH ENERGY**  
Client: (0M062)  
**Time Detail Report**  
Date Range (04/01/2018 - 04/30/2019)  
Freeze Time (Unknown)  
Generated (07/30/2021 11:12:11)

| Day | Code | | | Project | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Fri (07/13) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Sat (07/14) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Sun (07/15) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Total Units/Hours For Week: | | | | | | | | | 112.00 | |
| Mon (07/16) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Tue (07/17) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Wed (07/18) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Thu (07/19) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Fri (07/20) | Fixed: (R) | n/a | n/a | [PR]-5 STAR ELECTRIC LLC-Unassigned---Unassigned-- | | | | 16.00 | 16.00 | jkinsey (07/22/2018) |
| Sat (07/21) | | -- | -- | | | | | | | jkinsey (07/22/2018) |
| Sun (07/22) | | -- | -- | | | | | | | jkinsey (07/22/2018) |
| Total Units/Hours For Week: | | | | | | | | | 80.00 | |

*See* Rivera's paycheck, Exhibit G, Bates stamped Fed 600, and timesheets, Exhibit H, bates stamped 610-611.

      **F.     Defendants' Mocked Up Paychecks Are Meaningful Only As Evidence of Willfulness.**

Defendants place great reliance on the terms "hourly" and "overtime" on Plaintiffs' paychecks as "proof" that they paid hourly with overtime. As Judge Ezra correctly observed in a sister case in which he addressed the very same argument made in that matter, also by Mammoth, "the words 'hourly' or 'broken down hourly' have no talismanic quality when included on paystubs." *Cantu et al. v. Mammoth Energy Services et al*., SA:19-cv-00615-DAE (W.D.Tex. February 28, 2023), Dkt. 138.[16] Instead, one "must consider how the employees were actually paid" to determine the appropriate FLSA overtime regulations to apply to each particular case. *Acosta v. Min & Kim Inc.,* No. 15-cv-14320, 2018 WL 500333, at *5 (E.D. Mich. January 22, 2018) affd, 919 F.3d 361 (6th Cir. 2019).

By disregarding the advice of their counsel who warned them to either pay overtime in addition to day rates or to actually pay by the hour with overtime, Defendants knowingly violated the FLSA (or at the very minimum, recklessly disregarded it). Instead of paying by the hour, Defendants promised day rates, paid day rates, and then created false time records and issued paystubs that attempted to disguise their day rate pay plan as hourly pay. Such behavior is the very essence of willfulness. *See, e.g., Mata v. Caring for You Home Health, Inc.,* 94 F. Supp. 3d 867, 878-80 (S.D. Tex. 2015) *Mata*, 94 F.3d at 879-80 (after defendants were informed that their pay scheme was not in compliance with the FLSA, they simply re-labeled rates on their paystubs, and

---

[16] It should be noted that Judge Ezra in that case was also presented with competing motions for summary judgment, just as in this case, and effectively denied both (dismissing only Plaintiffs' Puerto Rico based wage claims). Importantly, as discussed more fully in Plaintiffs' Motion for Collateral Estoppel, Dkt. 42, this was prior to a full blown trial on the merits, which has now occurred.

then continued violating the FLSA, demonstrating willfulness). Defendants' Motion for Summary Judgment on the issue of willfulness should be denied.