N THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **AARON MALDONADO**, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | **Case No. 5:21-cv-00085-OLG** |
| | § | |
| **MAMMOTH ENERGY SERVICES,** | § | |
| **INC., COBRA ACQUISITIONS, LLC,** | § | |
| **HIGHER POWER ELECTRICAL, LLC,** | § | |
| **and 5 STAR ELECTRIC, LLC,** | § | |
| | § | |
| *Defendants*. | § | |

## DEFENDANTS' RESPONSE TO
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Mammoth Energy Services, Inc. ("Mammoth"), Cobra Acquisitions, LLC, ("Cobra"), Higher Power Electrical, LLC ("HPE"), and 5 Star Electric, LLC ("5 Star") (collectively, "Defendants") file this Response to Plaintiffs' Motion for Partial Summary Judgment (Docket No. 41).

## SUMMARY OF THE ARGUMENT

Plaintiffs are former electrical workers employed to restore power in Puerto Rico following two devastating hurricanes in 2017. Despite their offer letters setting out that they would be paid hourly and being told at orientation that the pay plan was hourly with overtime, Plaintiffs filed this lawsuit over two years after the work was complete and now claim that they were denied overtime pay in violation of the Fair Labor Standards Act ("FLSA"). Plaintiffs seek partial summary judgment on three grounds: (1) Defendant Mammoth Energy Services, Inc. ("Mammoth") jointly employed Plaintiffs (along with Higher Power Electrical, LLC ("Higher Power") or Five Star Electric, LLC ("Five Star"); (2) they were paid a day-rate without overtime; and (3) Defendants' FLSA violations were willful. Plaintiffs' motion should be denied.

1

First, Defendants' summary judgment evidence establishes that Plaintiffs were properly compensated on an hourly plus overtime basis in accordance with the FLSA.  Even if the Court determines that there is a factual dispute on the hourly pay plan, Defendants properly apportioned and built-in overtime wages to comply with the FLSA.  *See Dufrene v. Browning-Ferris, Inc.*, 207 F.3d 264, 268 (2000), *cert. denied*, 531 U.S. 825 (2000); 29 C.F.R. §778.309.  Second, the summary judgment evidence conclusively establishes that Defendants consulted outside counsel in developing their pay plan and Plaintiffs have no evidence that Defendants acted willfully.  Third, Plaintiffs' summary judgment evidence is insufficient as a matter of law to establish the joint and several liability of Mammoth Energy Services Inc.

## FACTUAL BACKGROUND

### I.      Defendants Contract to Restore Power After Consecutive Hurricanes in Puerto Rico.

In early September 2017, Hurricanes Irma and Maria devastated Puerto Rico.  *See* **Exhibit 1,** Declaration of Mark Layton ("Layton Dec."), Defendants' Motion for Summary Judgment, at ¶¶3, 5. Cobra Acquisitions LLC ("Cobra") is an electrical and power company that provides maintenance and repair services to grid operators.  *Id*. at ¶3.  Shortly after the storm, Cobra executives met with Puerto Rican officials to offer assistance in repairing the electrical grid, and ultimately entered into a contract with Puerto Rico Electrical Power Authority ("PREPA")[1] on October 19, 2017, to restore power.  *Id*. at ¶6.

Cobra immediately began commenced tackling this intense and logistically challenging work.  *Id*. at ¶7.  This included acquiring and deploying hundreds of bucket trucks and other work vehicles from ports across the country, delivering heavy equipment by barge and Antonov, and securing housing.  *Id.* at ¶7.  Cobra also contracted with two of its subsidiaries, HPE and 5-Star

---

[1] PREPA is a governmental entity responsible for maintenance and operation of the power grid in Puerto Rico.

Electric, LLC ("5-Star"), to provide workers.  *Id*.  As time was of the essence, an advance team arrived within days of the PREPA contract's execution with equipment and repairmen arriving in late October and early November 2017.  *Id*. at ¶8.

## II.     Defendants' Pay Plan Compensated Workers on an Hourly plus Overtime Basis.

While Cobra managed the logistics for the contract, HPE and 5-Star recruited personnel to perform the work while evaluating how to pay employees.[2]  *Id*. at ¶8.  At that time, Keith Ellison ("Ellison"), President of Cobra, developed a wage scale.  *Id*. at ¶9.  The wage scale was a target amount of compensation that was enough to entice employees to work in a demanding environment while also maintaining some profit margin.  *Id*.  The targeted pay rates offered for field employees were higher than usual rates, ranging from $600 to $1,400 per day worked, or $219,000 to $511,000 per year.  *See* **Exhibit 3**, Email Correspondence, *Cantu v. Mammoth Energy Services, Inc. et al*., Case No. 5:19-cv-00615 (W.D. Tx.) ("*Cantu*"), Ex. 4. This was considerably more than linemen and similar laborers earn in the continental United States. *See* Ex. 1, Layton Dec. at ¶9.

Ellison's pay scale was predicated on a targeted amount a worker could expect to make for every day worked, but Ellison, HPE, and 5-Star turned to Mammoth Energy, Inc. ("Mammoth") (which is not a party to the lawsuit) for assistance in developing the actual pay plan.  *Id*. at ¶9. Mammoth provides back-office support services to Cobra, 5-Star and HPE pursuant to a shared services agreement.  *Id*. at ¶10. Mammoth provides accounting and human resources support to those entities as needed, and those expenses are charged back to the respective entities.  *Id*.  Ellison established the target amounts of pay for the workers and then looked to Mammoth to develop the

---

[2] Storm response companies do not employ hundreds of linemen and related positions on standby for storm recovery work.  As a result, the companies must go out and recruit employees to respond to large-scale storm events.

actual pay plan.  *See* **Exhibit 4,** Deposition of Keith Ellison ("Ellison Depo."), *Cantu*, at 25:3-26:6, 27:23-28:5, 45:23-47:1.

CFO Mark Layton ("Layton") directed Mammoth Vice President of Human Resources Jeff ("Beagle") to consult outside counsel to develop a compliant pay practice that would pay at or near the target rates. Ex. 1, Layton Dec. at ¶12. On October 19, 2017, Beagle contacted attorney Steve Broussard of Hall Estill, a 150-lawyer firm headquartered in Tulsa, Oklahoma.[3] *Id*. Broussard had then practiced employment law for over twenty-five years and had considerable expertise with wage and hour matters. *Id*.

Over the next several weeks, Beagle and Broussard (and sometimes Layton) discussed and evaluated numerous pay plans, sometimes speaking multiple times per day.  *See* Ex.3, *Cantu,* Ex. 4; *See also* **Exhibit 5,** Steven Broussard Dec. ("Broussard Dec."), *Defendants' Motion for Summary Judgment*, at ¶4. This was an iterative process where the benefits and drawbacks of differing pay practices were discussed.  Ex. 1, Layton Dec. at ¶13.  Various spreadsheets with different pay plans were circulated among the group.  **Exhibit 6**, Broussard Depo. ("Broussard Depo"), *Cantu*, at 18:21-20:1; **Exhibit 2**, Layton Depo., *Cantu*, at 87:6-93:23. Beagle initially indicated that Defendants were interested in paying employees on a day rate basis. Ex. 3, *Cantu*, Ex. 4.  Broussard responded that Defendants could do so but would need to pay overtime on top of the day rate and explained how such a calculation was done.  *Id*.  Broussard, Beagle, and Layton all testified that the purpose of consulting Broussard was to make sure the pay plan was lawful under the FLSA.  See **Exhibit 7,** Deposition of Jeff Beagle ("Beagle Depo."), *Cantu*, at 88:25-89:10; Ex 6, Broussard Depo. at 35:17-36:4, 36:19-37:18; Ex. 2, Layton Depo. at 93:8-13.

---

[3] https://www.hallestill.com/.

At the same time, HPE and 5-Star were actively recruiting linemen, mechanics, and other workers to deploy to Puerto Rico.  Ex. 1, Layton Dec. at ¶15.  Because the timing was critical, they could not delay recruiting while the details of the pay practice were determined.  *Id*.  Both companies advertised and informed candidates about the target amount of pay they could expect, which was subject to an offer letter and additional details upon hire.  *Id.*

After initially leaning toward a day rate, Broussard, Beagle, and Layton shifted to a plan implementing an hourly plus overtime approach.  Ex.7, Beagle Depo. at 81:4-9; Ex. 2, Layton Depo. at 93:20-94:2; Ex. 1, Layton Dec. at ¶12.[4]  Because of the nature of the operations being performed, Defendants anticipated that the workers would typically work daylight hours.  Ex. 1, Layton Dec. at ¶14.  However, workers were expected to work or be on call for sixteen hours a day.  *Id.*; *see also* **Exhibit 8**, Blackerby Depo, *Cantu*, at 84:5-15.  While the workers had a sixteen hour on call shift, the workers would be paid for every additional hour if they worked beyond sixteen hours based on their hourly rate.  Ex. 7, Beagle Depo. at 93:18-23.

Notably, sixteen-hour shifts are industry practice in storm work.  Ex. 1, Layton Dec. at ¶14.  Any hours worked beyond sixteen triggers rest time requirements under Department of Transportation ("DOT") and Occupational Safety and Health Administration regulations ("OSHA"), creating a natural cap on hours worked per day.  Ex. 7, Beagle Depo., *Cantu*, at 93:2-17; Ex. 1, Layton Dec. at ¶14; Ex. 8, Blackerby Depo., *Cantu,* at p. 65:12-19.

Broussard, Beagle, and Layton determined an hourly rate that would account for expected overtime and approximate, albeit not match, the targeted rates.  *Id*. at ¶12-13. Specifically, Beagle assumed that an employee worked sixteen hours a day, seven days a week, for a total of 112 hours

---

[4] Plaintiffs point to discussions regarding paying on a day rate basis as evidence that Plaintiffs were paid a day rate, *see* Pltf's Mtn pp. 2-5; however, and critically, these discussions all predate the final decision and implementation of an hourly pay plan.  As a result, it is of no relevance to the plan that was actually used.

per week.  Ex. 7, Beagle Depo., *Cantu*, at 26:7-27:14. Accounting for forty hours of regular time and seventy-two hours of overtime, Beagle then established an hourly rate that would result in approximating the target rates.  *Id*. at 25:1-7.

Beagle sent Broussard an email with the foregoing calculations, and they later discussed the mechanics of the plan.  *Id*. at 27:23-28; *See* **Exhibit 9**, *Cantu*; Ex. 13.  Broussard understood that the purpose of the calculations was to adopt one of the pay plans discussed and comply with the FLSA.  Ex. 6, Broussard Depo. at 21:17-23:8.  Once counsel approved the pay plan as compliant, Beagle then disseminated that information to senior leadership as well as various administrative personnel for implementation.  Ex. 7, Beagle Depo. at 89:20-23.  Defendants believed (and continue to believe) that the pay practice complies with the FLSA.[5]  *Id*. at 89:11-13.

Beagle also sent Broussard a draft offer letter.  Ex. 6, Broussard Depo. at 36:13-18.  The offer letter advised employees that the "goal [was] to work 12 hours a day," but, as customary with storm work, "certain situations [could] arise that could require longer hours, but not to exceed 16 hours." *See* **Exhibit 10**, *Cantu*, Ex 7.  The offer letter further explained that they would be paid a target amount for each day worked which would be paid "hourly over a sixteen-hour shift."  *Id*.  Broussard reviewed the offer letter and approved it for distribution.  Ex 6, Broussard Depo. at 9:16-13:4; Ex. 4.

All employees 5-Star and HPE ultimately hired were given offer letters detailing the hourly arrangement at orientation seminars.  *See* **Exhibit. 11**, Deposition of Missy Davis ("Davis Depo."), *Cantu*, at 39:6-17.  Employees were advised at every orientation that they would be paid hourly

---

[5] Plaintiffs repeatedly characterize the plan as a "day rate," pointing to sporadic references in some witness testimony and limited errors on a few pay stubs.  Pltf's Mtn 2-6.  Defendants' Human Resources personnel testified that using those references was easier to communicate expected compensation than "hourly plus overtime to reach a targeted rate."  Ex. 11 at 97:25-98:19.  The summary judgment evidence demonstrates that the methodology used was not a day rate.

with overtime to earn the target rate of compensation.  Ex. 1, Layton Dec. at ¶16; Ex. 11, Davis Depo. at 90:4-91:4; **Exhibit 23**, Gerardo Depo. at 47:11-48:11 (Plaintiff Garcia testifying that the hourly breakdown was explained at orientation).

Plaintiffs were paid in accordance with this pay plan. *See* **Exhibit 12** (Pay Scale), *Cantu*, Ex. 14.  Plaintiffs worked or were on call to work sixteen hours per day.  Ex. 2, Layton Depo. at 107:18-23.  Defendants' payroll personnel would log in the HRIS system sixteen hours per day for the days worked.  *Id*. at 97:15-98:6. Employees were then paid hourly with overtime for all hours worked in excess of forty in a workweek. *Id*. at 99:2-9.  **It is undisputed that Plaintiffs' paystubs reflect that they were paid hourly with overtime.[6]**  The amount of Plaintiffs' pay was also not stated in whole numbers as would be expected if they were paid targeted day rates (*e.g.*, $600.00, $700.00, $800.00, etc.).

### III.    Defendants Paid Discretionary Bonuses During Limited Shorter Workweeks.

When the payroll practice was being implemented, Missy Davis, the 5-Star HR manager, noted that when employees did not work seven days in a workweek, the hourly with overtime earnings did not equal the target rate of compensation.  Ex 11, Davis Depo. at 43:20-44:4. The reason for the shortfall is that there was not enough overtime hours worked to get to the target amount. *Id*. at 43:20-44:8. Davis asked Beagle how to address the situation. *Id*. at 48:2-21.  Beagle responded that Defendants could, but were not required to, pay a discretionary bonus to bring employees to the target rate of compensation.[7] Ex. 7, Beagle Depo. 95:22-24, 96:4-97:19.

---

[6] Although Defendants developed an approved and compliant pay plan based on hourly compensation plus overtime, there were occasional payroll processing errors.  For example, James Kinsey, who was responsible for entering time into the payroll system, on a few rare occasions shortcut the payroll procedures and entered a hard code for an amount of money instead of entering the number of hours worked to generate that amount of pay.  Ex. 2, Layton Depo, *Cantu*, at 141:5-21.  Tellingly, James Kinsey was ultimately terminated for these very errors.  *Id*. at 141:17-24.

[7] Plaintiffs complain that Broussard did not review Defendants' actual pay practice to confirm compliance, and did not advise about "mixing rates," and "grossing up" pay.  Pltf's Mtn at p. 3.  The decision to later implement

Although HPE and 5-Star had the option, but not the obligation, to pay discretionary bonuses in short weeks to meet the targeted amount of compensation, *Id.* at 93:24-96:20, they generally did so for purposes of maintaining morale.  *Id.* at 54:12-23, 94:7-19; Ex. 1, Layton Dec. at ¶17.  Employees were working long hours in grueling conditions, and Defendants wanted to maintain positive employee relations.  *Id.*, at ¶17.  As a result, Defendants, on occasion, elected to make discretionary payments.  Ex. 7, Beagle Depo. at 94:7-24; Ex. 2, Layton Depo. at 111:5-10, 127:10-12.  Employees generally worked a full seven days, and this situation typically only arose when the employee deployed to the island or left their employment.  Ex. 1, Layton Dec. ¶17.  In total, less than 2% of workweeks included these payments.  *Id.*

In many instances, Defendants elected not to make these payments when an employee worked less than a full week.  Ex. 1, Layton Dec. at ¶17; **Exhibit 14**, Declaration of Jeff Beagle ("Beagle Dec."), *Defendants' Motion for Summary Judgment*, at ¶10.  For example, if an employee did not work a full work week due to the employee's own malfeasance, such as being suspended or missing work, Defendants would not make the discretionary payments.  Ex. 1, Layton Dec. at ¶17.  The undisputed evidence is that management retained the right to decide whether to make these payments.  Ex. 14, Beagle Dec. at ¶10. Employees who did not work an entire week because of the employee's own misconduct or scheduling issues did not receive the discretionary payments, and the pay stubs reflect numerous instances where the bonuses were not paid.  *Id.*

For example, the pay stubs of two employees, Dennis Moore, and Corey Barner, both dated July 13, 2018, reflect that both Moore and Barner worked less than the 112 anticipated hours in the work week. *See* **Exhibit 15**, Paystubs of Moore and Barner, *Defendants' Motion for Summary Judgment*.  The paystubs reflect that they both worked a total of 96 hours comprised of 40 regular

---

discretionary bonuses was made by Beagle, who had years of HR experience.  Ex. 7, Beagle Depo. at 10:19-12:22, 93:24-96:20; Ex. 6, Broussard Depo. at 9:16-13:4.

hours and 56 overtime hours.  *Id.* at p. 1; Ex. 14, Beagle Dec. at ¶11.  Moore's pay was adjusted up, but Barner did not receive an adjustment.  *Id.*  The fact that the payments were made in some instances and not others reflect the discretionary nature of the additional compensation. *Id.*

In another example, Moore's pay records dated May 18, 2018, demonstrate he was credited with working 208 hours, comprised of 80 regular hours and 128 overtime hours.  *Id.* at ¶12; Ex.15 at p. 2.  On another paystub received, Cody Johnson was credited with working the same number of regular and overtime hours as Moore, but Moore received an adjustment which Johnson did not. *Id.* at ¶12; Ex. 15 at p. 4.  Again, this is a further reflection of the discretionary nature of the payments, as it was not a guaranteed part of the compensation plan.  *Id.* at ¶12.

Additional pay records reflect numerous other instances where two colleagues worked the same hours and received different treatment.  *See* **Exs. 15-16**, *Defendants' Motion for Summary Judgment*, *Exs*. 9-12 (Paystub Analyses of Dennis Moore, Cody Johnson, Lawrence Williams, Jr., and Juan Zamora, Jr.).  In each instance, one employee received a discretionary payment to adjust his compensation upward and one did not.  *See id*.  These records offer further support for the conclusion that these adjustments were discretionary and not guaranteed or paid to everybody who worked a short week. In addition, these pay stubs are reflective of the pay plan that Beagle designed in consultation with Broussard.  Ex. 14, Beagle Dec. at ¶14.  The documents show the hourly and overtime pay plan with discretionary adjustments to a budgeted figure as set forth by the leadership on the island.  *Id.*

Although Defendants promulgated an approved and compliant pay plan based on hourly compensation plus overtime, there were occasional payroll processing errors.  James Kinsey, who was responsible for entering time into the payroll system, on a few rare occasions shortcut the payroll procedures and entered a "hard code" for an amount of money instead of entering the

9

number of hours worked to generate that amount of pay.  For instance, during the period of May

14, 2018, through May 20, 2018, Kinsey hard coded $1,000.00 for Maldonado instead of entering

the hours he worked during the shifts that week.  Ex.13, Maldonado's Time Detail Report at p. 2.

Kinsey's errors resulted in overpayments to employees.   Notably, Kinsey was ultimately

terminated for these very errors he made while processing Plaintiffs' compensation.  **Exhibit 17**,

*Defendants' Motion for Summary Judgment*, Layton Depo. at p. 115.

In the summer of 2018, Cobra entered a subsequent contract with PREPA as the project

moved from emergency response to the recovery phase.  Ex. 1, Layton Dec. at ¶18.  With the new

contract effective July 23, 2018, the hourly compensation structure was changed, and employees

worked twelve-hour shifts (instead of sixteen-hour shifts) and six days per week (instead of the

full week).  *Id*.  It is undisputed that the Plaintiffs are not seeking damages beyond the effective

date of the new contract, July 23, 2018.

While Plaintiffs now claim that they are entitled to overtime, not one ever complained

about their manner of compensation until this lawsuit, presumably because the employees were

being paid overtime while making more money than any had in their entire lives.  Ex.1, Layton

Dec. at ¶9, 18.  Defendants believed (and continue to believe) that the pay practice complies with

the FLSA.  Ex. 14, Beagle Dec. at ¶7.

## ARGUMENT AND AUTHORITIES

### I.    Summary Judgment Standard.

Summary judgment should only be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to a judgment as a matter of law."  FED.

R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

After the movant meets its Rule 56(c) burden, "the non-movant must come forward with 'specific facts' showing a genuine factual issue for trial." *Houston v. Tex. Dep't of Agric.,* 17 F.4th 576, 581 (5th Cir. 2021) (quoting references omitted). The nonmovant "must identify specific evidence in the record and articulate the `precise manner' in which the evidence" aids their case. *Shah v. VHS San Antonio Partners, L.L.C.,* 985 F.3d 450, 453 (5th Cir. 2021) (quoting reference omitted). All reasonable inferences are drawn in the nonmovant's favor. *Loftin v. City of Prentiss,* 33 F.4th 774, 779 (5th Cir. 2022).

## II.   The FLSA.

Unless an exemption applies, the FLSA requires certain employers pay employees overtime wages for more than 40 hours of work in a week.  *See* 29 U.S.C. § 207(a).  Although the FLSA permits plaintiffs to proceed as a collective, 29 U.S.C. § 216(b), Plaintiffs here are proceeding ___**individually.**___  *See* Dkt. 1.  As such, they each bear their own summary judgment burden of proof and may not rely on representative evidence to support their individual claims.  *See Swales v. KLLM Transport Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021).

## III.   Plaintiffs were paid hourly with overtime in compliance with the FLSA.

Plaintiffs rely almost exclusively on summary judgment evidence, including deposition testimony, introduced in *Cantu v. Mammoth Energy Servs.*, No. SA-19-CV-615-DAE, 2023 WL 3681704 (W.D. Tex. 2023), to argue they are entitled to summary judgment.  In *Cantu*, another group of linemen brought identical claims against Defendants under the FLSA arguing that they were paid a day rate without overtime for work performed in Puerto Rico in the aftermath of hurricanes Maria and Irma.  *Id*. at *1.  The workers in *Cantu*, much like Plaintiffs here, argued that they were entitled to summary judgment because: (1) Defendants advertised and recruited using day rates; (2) Defendants did not track hours; and (3) they received grossed up wages and hard-

coded day rates.  *Id*. at *4.  In denying the workers' summary judgment motion, Judge Ezra concluded that there was a fact issue, explaining that "a reasonable jury could find that Plaintiffs were paid either a day rate or an hourly rate."  *Id*. at *5.

Here, Plaintiffs push the same arguments and proffer much of the same evidence advanced in *Cantu* with no articulable reason why a different result should obtain in this case.  As explained below, the evidence shows a web of fact issues that precludes summary judgment.

### A.  Plaintiffs were paid by the hour.

Plaintiffs were not paid a daily rate and were instead paid by the hour.  Plaintiffs contend that they were paid a day rate because they allegedly received the same amount of pay "regardless of the actual hours worked."  Plts' Mtn at 27.  Again, Plaintiffs' offer letters set out that they would be paid for 16-hour shifts, "broken down hourly," although they were expected to usually work 12 hours per day.  *See*, *e.g.*, **Exhibit 18**, Plaintiff Aaron Maldonado's Offer Letter.  The other four hours were reserved as compensable on-call time, which allowed flexibility if certain situations arose that required longer hours.  *See* Ex. 10, *Cantu*, Ex 7; Ex. 14, Beagle Dec. at ¶ 5.

Plaintiffs' testimony proves they worked and were on-call for 16-hour shifts—no more and no less.  The set shifts started at 6:00 a.m.  **Exhibit 19**, Aponte Deposition at 39:22-25.  Most work was performed from sunup to sundown.  *Id*. at 39:19-21.  Plaintiff Jose Aponte ("Aponte") **admits that he sometimes worked exactly 16 hours per day**, or until 10:00 p.m.  *Id*. at 41:3-19.  With respect to hours the maximum hours worked per day, Aponte testified that **"the *most* that [they] worked were 16."**  *Id*. at 41:3-13 (emphasis added).  Aponte also admits that **he could be called back out to work** after a sunup to sundown shift, such as if an emergency arose.  *Id*. at 44:22-25.  Similar to Aponte, Plaintiff Aaron Maldonado ("Maldonado") testified that he usually worked 12 hours per day (sunup to sundown), sometimes an extra hour or two (14 hours), but never more

than 16 hours. **Exhibit 20**, Aaron Maldonado Deposition ("Maldonado Depo") at 48:22-25, 72:11-73:16. After a typical 12-hour shift, **Maldonado was called back out to work on multiple occasions**. *Id*. at 72:5. Plaintiff Donald Roberts ("Roberts") also acknowledges that shifts started at 6:00 a.m. **Exhibit 21**, Donald Roberts Deposition ("Roberts Depo") at 21:4-11. Like Maldonado, Roberts testified that he worked 12 hours per day and never worked more than 16 hours a day. *Id*. at 21:4-7, 22:11-17. Plaintiffs' own testimony conclusively demonstrates that: (1) they sometimes performed work for up to 16 hours; (2) they never worked more than 16 hours; (3) they were on-call for up to 16 hours; and (4) Defendants sometimes called them back to work.

There is no evidence that Plaintiffs ever worked *less than* a full shift for any reason (*e.g.*, worked four hours because of illness) such that they were not on-call for an entire 16-hour shift. Indeed, Plaintiffs have not pointed to any evidence (e.g., their deposition testimony, affidavits, declarations) to describe the hours they allegedly worked. Plaintiffs cannot genuinely argue that they worked any hours for which they were not compensated or, conversely, compensated for hours they did not work. Because Plaintiffs worked and were available to be called out for 16 hours per day beginning at 6:00 a.m., they were paid *with respect to hours worked* in compliance with the FLSA. *See Cantu*, 2023 WL 3681704, at *7 (explaining if the workers did not work more or less than the scheduled shift, the pay plan may comply with the FLSA) (citing *Acosta*, 919 F.3d at 364).

### B. Defendants' pay plan does not set artificially low regular rates or otherwise circumvent the FLSA's requirements.

Defendants paid Plaintiffs a fixed hourly wage and an overtime premium for hours worked in excess of 40 in a workweek. The "regular rate" of pay is "the hourly rate *actually paid* the employee for the normal, non-overtime workweek." *Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945) (emphasis in original). In other words, if an employee receives an

13

hourly rate, the "regular rate" is the hourly rate.  29 C.F.R. § 778.110(a).  To set Plaintiffs' respective regular rate, Defendants, like most companies, started with a budgeted amount they could pay. Ex.14, Beagle Dec. at ¶ 6.  Defendants understood that Plaintiffs would be scheduled to work 16-hour shifts, seven days a week, for a total of 112 hours per week.  *Id.*

Using the budgeted rates, Beagle determined the hourly amounts that workers could earn for working the set full shifts.  *Id.* at ¶ 6.  Beagle also anticipated the scenario where a worker crossed the 40-hour threshold in a week, so Beagle factored in the appropriate time-and-a-half overtime premium that would be applied to the regular rate.  *Id.*; *see also Dufrene*, 207 F.3d at 268 (explaining method for calculating the regular and overtime rates).

Plaintiffs rely on *Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1039 (5th Cir. 2010) as support for their argument that Defendants developed an "artificial regular rate."  Plts' Mtn at 19.  *Gagnon* does not support Plaintiffs' proposition.  In *Gagnon*, the plaintiff received a per diem payment in addition to his base pay that was improperly excluded from a daily rate calculation.  *Id*.  The court found that the defendants violated the FLSA by avoiding paying a permissible regular rate by artificially designating a portion of the plaintiff's wages as straight time at $5.50 an hour, and a portion as per diem, which fluctuated based on hours worked.  *Id*. at 1041.

Here, Plaintiffs' hourly and overtime rates **never** fluctuated.  The hourly rates never included per diem or any other compensation.  As such, there were no "artificially low rates" that paid no real premium for overtime work, or additional pay that was improperly characterized to avoid including it in the regular rate.  Moreover, Plaintiffs' regular rates were not artificially low, as they ranged from $28.38 to $66.22 per hour and they only (sometimes) received a small fraction of compensation in the form of discretionary bonuses.  Ex. 14, Beagle Dec. at ¶ 6.  Importantly, Plaintiffs' regular rate **never** varied with the amount of time they worked.

14

**C.  Defendants properly apportioned hourly and overtime pay.**

Plaintiffs appear to claim that the process of setting the regular rate was improper because Beagle used a budget and "reverse engineered an hourly rate from the promised day rate."  Plts' Mtn at 7.  Beagle's method of developing the regular rate by factoring in overtime based on the hours Plaintiffs were expected to work complies with the FLSA.  *Acosta*, 919 F.3d at 364 ("An employer may lawfully do what [defendants] claim they did here, starting with a fixed salary and a shift schedule and working backwards to compute hourly rates and overtime rates.").  "The FLSA is not concerned with how an employee is paid—hourly, by the piece, a day rate, or otherwise. The only question is whether time-and-a-half is paid, based on the appropriate regular rate, for hours over 40 in a single workweek."  *Serrano v. Republic Servs., Inc.*, 227 F. Supp. 3d 768, 769 n.1, 772 (S.D. Tex. 2017).

Even if construed as apportioning or paying a flat rate, Defendants' pay plan properly compensated Plaintiffs at the same regular and overtime rate that did not vary from week to week because Plaintiffs worked the same number of hours each week.  *See Sanchez v. Schlumberger*, 2020 WL 11036210, at *2-3 (S.D. Tex. May 26, 2020); *Senegal v. Fairfield Indus., Inc.*, 2018 WL 6079354, at *6 (S.D. Tex. Nov. 21, 2018) (recognizing that defendants' daily rate policy was in compliance with the FLSA if plaintiffs worked a fixed amount of hours per day); *Serafin v. TomKats, Inc.*, 2013 WL 940914, at *3 (E.D.N.Y Mar. 11, 2013) (rejecting plaintiff's claims that defendant "artificially" divided his daily salary into straight time and overtime periods where defendant asserted a consistent hourly rate).

None of the cases Plaintiffs rely on hold that it is contrary to the FLSA for an employer to apportion between regular and overtime hours on a weekly basis based on hours expected to be worked each day (a shift), so long as the employee is paid based on the hours worked – which is

15

the case here.  In *Mumby v. Pure Energy Servs, (USA), Inc.*, 636 F.3d 1266, 1268-69 (10th  Cir. 2011), the employer improperly paid a daily rate to employees working 7 days a week for 12 hours a day that included 8 regular time hours and 4 hours of overtime each day.  Therefore, instead of receiving 44 hours of overtime out of the 84 hours worked per week, the workers only received 28 hours.  *Id*.  Likewise, the court in *Lee v. Vance Exec. Prot. Inc.*, 7 F. App'x 160, 165 (4th Cir. 2001), disapproved of a similar situation where security guards paid a daily rate were undercompensated for overtime because they often worked 12-hour shifts 6 days per week and were paid straight time for the first 8 hours and 4 overtime hours.  *Also see Walling v. Helmerich & Payne, Inc.*, 323 U.S. 37, 38-399 (1944) (Employer's split-day plan that did not compensate employees for additional pay until more than 80 hours had been worked violated the FLSA).

Unlike in *Mumby*, *Lee*, and *Walling*, Plaintiffs received overtime pay for each hour worked over 40 in the workweek.  Again, Plaintiffs did not work more or less than 16 hours in any single day, and they were compensated for each hour they worked.  As such, Plaintiffs were paid for every hour worked at the same hourly and overtime rates without variation.

**IV.**     **Discretionary bonuses Plaintiffs received do not violate the FLSA.**

Plaintiffs complain that bonuses they received should have been included in the regular rate because they were allegedly not discretionary.  Plts' Mtn at 21.  As addressed above, discretionary bonuses were paid to Plaintiffs only in limited circumstances to maintain morale, usually when they were unable to work a full week when leaving from or arriving in Puerto Rico. These bonuses were lawful because they were completely discretionary and properly excluded from the regular rate.  *See* 29 C.F.R. § 778.211.

## A.  The bonuses Plaintiffs received were discretionary.

Defendants sometimes paid discretionary bonuses to workers to maintain morale in the hurricane-ravaged environment.  Plaintiffs argue that the bonuses were not discretionary "because Defendants promised day rates," Plts' Mtn at 24, and paid bonuses in "*every single pay period* in which a Plaintiff worked less than 14 days," *id.* at 7 n.6 (emphasis in original).  Plaintiffs' argument falls under its own weight because sometimes workers did *not* receive a bonus at all.  For example, Donald Roberts' paystub for the period from October 30, 2017, to November 12, 2017 reveals that he worked 129 hours and received $6,242.40.  Although Roberts worked less than 14 days during this period, he did not receive a bonus.

### Earnings Statement                                      DONALD ROBERTS II

| Pay Date: | 11/17/2017 | Company: 0UB44 - 5 STAR ELECTRIC LLC | Emp #: A3L8 |
| Period Start: | 10/30/2017 | 170 BEAN CEMETERY RD | Dept: PR - Puerto Rico |
| Period End: | 11/12/2017 | MADISONVILLE KY 42431   (405) 608-8191 | Pay Basis: Hourly |

|  | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|
| **Earnings** | | | | |
| Regular | 32.00(*) | 49.00 | 1568.00 | 0.00 |
| Regular | 47.30 | 16.00 | 756.80 | 2324.80 |
| Overtime | 70.95 | 48.00 | 3405.60 | 3405.60 |
| Stand by | 32.00(*) | 16.00 | 512.00 | 512.00 |
| *Denotes an override during payroll processing.* | | | | |
| **Gross** | | 129.00 | 6242.40 | 6242.40 |

**Exhibit 24** (Roberts' Paystub).  The same was true for many other workers.  *See* Ex. 16, (Workers' Paystubs Analysis).

Other times workers received a bonus that did *not* equal the alleged "day rate."  During the period from April 2 to April 15, 2018, Juan Santiago worked 144 hours over 9 days.  Santiago was given a discretionary bonus of $339.84, which did not amount to the so-called daily rate he claims he was promised:

Earnings Statement                                                    JUAN SANTIAGO

| Pay Date: | 04/20/2018 | Company: 0UB44 - 5 STAR ELECTRIC LLC | Emp #: A4G5 |
| Period Start: | 04/02/2018 | 170 BEAN CEMETERY RD | Dept: PR - Puerto Rico |
| Period End: | 04/15/2018 | MADISONVILLE KY 42431 (405) 608-8191 | Pay Basis: Hourly |

|  | Rate | Hours/Units | Current Period | Year To Date |
|---|---|---|---|---|
| **Earnings** | | | | |
| Regular | 33.11 | 72.00 | 2383.92 | 2383.92 |
| Overtime | 49.67 | 72.00 | 3575.88 | 3575.88 |
| Day Rate | | | 339.84 | 339.84 |
| **Gross** | | 144.00 | 6299.64 | 6299.64 |

**Exhibit 25**, Juan Santiago's Earning Statement.

The evidence plainly demonstrates that the bonus payments were not "forced" "to make up the difference" of the alleged day rates.  Plts' Mtn at 8.

**B.  Discretionary bonuses are not included in the "regular rate."**

The discretionary bonuses paid on occasion were not included in the regular rate calculation and did not run afoul of the FLSA.  Plaintiffs rely on *Acosta v. Min & Kim Inc.*, 2018 WL 500333 (E.D. Mich. Jan. 22, 2018), *aff'd*, 919 F.3d 361 (6th Cir. 2019), but that case does not support Plaintiffs' arguments.  In *Acosta*, the defendant restaurant's pay practices were deemed unlawful because employees were not paid overtime wages because their "guaranteed wage" remained consistent without respect to the number of hours they worked.  *Id*. at *5.  Employees were "expected to work six days a week for a total of 52 hours," and they "were paid a flat day rate and were paid the same whether they worked 40 hours a week" or more.  *Id.* at *1-2.  Payroll records only provided the amount of compensation and did not record hours.  *Id.*  After a government investigation, the restaurant attempted to "reconstruct[]" hours worked by using the amounts paid to arrive at an hourly and overtime rate, but those calculations yielded figures at a tenth of a percent for an hourly wage (*e.g.*, $8.882, $11.765, $10.084).

When the employer changed its practice post-investigation, it claimed to pay a target salary negotiated with the employee, and a rate was derived from that figure including 40 regular hours,

overtime, and a "bonus" each pay period.  *Id.*  However, that system improperly resulted in a "negative" bonus (reduction in pay) if the employee worked less than 12 days in a two-week pay period, and bonuses were not properly included in the "regular rate" calculation.  *See* 29 U.S.C. § 207(e).

The court recognized that if properly implemented, a compensation formula based on the same figure each week could be FLSA-compliant.  *Acosta*, 2018 WL 500333, at *7.  The court stated: "[i]t is possible that Defendants could pay their employees the same amounts if they selected an hourly rate and paid overtime compensation as required by the FLSA, as they did with their system of paying a 'guaranteed wage,' but what matters is not just the end result, but the methodology used."  *Id*.  "The problem in *Acosta* was that the weekly compensation did not 'vary with actual hours worked' and therefore did not include 'overtime' as the Act defines it. … The employer conceded that sometimes employees worked more than the 52 weekly hours anticipated by their calculations."  *Cantu*, 2023 WL 3681704, at *5 (quoting *Acosta*, 2018 WL 500333, at *10).  As Judge Ezra previously recognized, Defendants here "make no such concession."  *Id*. Instead, the evidence in this case shows that Plaintiffs *did not* work beyond 16 hours in a single day, and therefore never worked more than the anticipated hours.  Similarly, there is no evidence demonstrating that Plaintiffs ever worked less than a full 16-hour shift.  Defendants did not improperly exclude Plaintiffs' discretionary bonuses from their regular rate.

### C.  Any overtime is limited to the bonus amounts.

Assuming, *arguendo*, hat the bonus payments at issue were non-discretionary (despite the evidence to the contrary), then the *only* overtime due is on the bonus amounts for which overtime was not paid.  *See, e.g.*, *Mata v. Caring For You Home Health, Inc.*, 94 F. Supp. 3d 867, 876-77 (S.D. Tex. 2015) (calculating overtime on nondiscretionary bonus only).  Federal Regulations

provide that non-discretionary bonus payments must be included in the regular rate and explain how overtime is to be paid on such bonuses.  29 C.F.R. §§778.100, 778.209(a); *accord Tarango v. Chemix Energy Servs., LLC*, 2021 WL 1269905, at *3 (W.D. Tex. Apr. 6, 2021) ("Section 7(e) of the FLSA provides that the 'regular rate' at which an employee is employed shall be deemed to include all remuneration for employment paid to, or on behalf of, the employee, but shall not be deemed to include eight specific categories of compensation, including certain discretionary bonuses and *per diem* payments).  Specifically, any overtime (if any) is only owed on the excess payment that was not included in the regular rate in the first instance.  *Id.*  While Defendants maintain that the bonuses were discretionary such that no overtime is due, out of an abundance of caution, Defendants have demonstrated that summary judgment should be limited to overtime on the bonus amounts as set forth in 29 C.F.R. §778.110(b).

## V.   <u>Plaintiffs have no evidence of a willful FLSA violation.</u>

One of the issues raised in this case that Judge Ezra did not rule on in *Cantu* is whether Plaintiffs can carry their burden to show Defendants willfully violated the FLSA to extend the statute of limitations from two years to three.  On August 2, 2024, Defendants moved for summary judgment on this issue, which is currently pending.  Dkt. 43.  Defendants respond to Plaintiffs' argument below to the extent it raises additional points.

Plaintiffs argue that Defendants willfully violated the FLSA and "ignored" their counsel who advised them to pay hourly with overtime or pay a daily rate with overtime.  Plts' Mtn at 26.  Plaintiffs' position is unsupported by the evidence.

As an initial matter, Defendants' pay practices comply with the FLSA, and thus, there was no violation of the statute, so there certainly was not a willful one.  Plaintiffs' argument wholly

ignores the evidence that Defendants selected an hourly with overtime plan after weeks of development with counsel.

Defendants retained outside counsel to review their pay plan and followed advice of counsel in implementing it. Even if the pay plan was improper, which Defendants vociferously dispute, Plaintiffs have not pointed to any evidence that Defendants intentionally or recklessly violated the FLSA. Defendants had no obligation to consult Broussard but did so anyway to ensure compliance with the FLSA. Over the course of several weeks Defendants worked with Broussard to develop a compliant pay plan.

A willful violation requires a showing that the employer either "knew or showed reckless disregard as to whether its conduct was prohibited by the [FLSA]." *Steele v. Leasing Enterprises, Ltd.*, 826 F.3d 237, 238 (5th Cir. 2016) (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-34 (1988)). Mere negligence is not sufficient because "willful" conduct connotes "'voluntary,' 'deliberate,' and 'intentional'" acts." *Dalheim v. KDFW-TV*, 706 F. Supp. 493, 511 (N.D. Tex. 1988) (citing *McLaughlin*, 486 U.S. at 133).

As Plaintiffs tacitly acknowledge, Broussard endorsed the hourly with overtime pay plan Defendants selected and never advised *against* paying bonuses. Plts' Mtn at 5. Plaintiffs' contention that Defendants acted willfully must be supported by some evidence that Defendants knew or recklessly disregarded that the pay plan violated the FLSA. Plaintiffs rely on the deposition testimony of an HR Specialist for Mammoth Energy, Inc., Alexander ("") to support their assertion that Defendants paid a daily rate. Plaintiffs cling to testimony from Kalman to suggest that Defendants "admitted" to "find[ing] a way around" the FLSA. *Id*. at p. 28.

Plaintiffs gloss over Kalman's testimony acknowledging that Defendants were striving to comply with the FLSA. Ex. 10, Kalman Depo. at pp. 84-85. Kalman, who is not designated as an

15534874v1

expert, expressly provided an otherwise inadmissible "opinion" when stating that he believed Defendants "were paying day rates and they were finding a way around it." *See id.* Kalman's "opinion" was based on Keith Ellison emailing the budgeted day rates on October 19, 2017, **before** Ellison put it to Layton and Beagle to figure out how to structure the pay plan. Of course, that was **before** they consulted Broussard and picked one of the FLSA-compliant options. Next, Plaintiffs argue that Ellison sent an email a month later in November 2017 reiterating that workers would be paid a day rate, but there is no evidence whatsoever that Ellison was ever made aware of Beagle's choice or had any role in developing the way Plaintiffs were actually paid. Kalman's testimony is not an "admission."

Plaintiffs also repeatedly rely on references to a "day rate" when being recruited to suggest that is how they were paid. As Kinsey explained, the vernacular of "day rate" was used as shorthand instead of having to refer to the pay plan as "daily expected compensation based on a 16-hour day pay hourly with overtime." **Exhibit 22**, J. Kinsey Deposition ("Kinsey Depo"), *Cantu,* at p. 128. The hourly breakdown was explained to Plaintiffs at orientation. Ex. 23, Garcia Depo. at 47:11-48:11. The reference to "day rate" simply meant the rate the "guys expected to get paid for their day of work." Ex. 22, Kinsey Depo. at p. 128.

Plaintiffs' contention that Defendants allegedly contrived a scheme to save money is baseless and lacks support. As Broussard explained, Defendants had the option to pay day rates with overtime. Defendants could have compensated Plaintiffs at approximately the same amounts they received under the hourly with overtime plan by simply setting a day rate at a threshold that accounted for anticipated overtime (as was done with the hourly pay plan). After all, Plaintiffs were not concerned with the mechanics of the pay plan—they merely wanted to know how much

they could earn for working the set shifts because the pay was substantially more money than they could earn stateside.  Ex.1, Layton Dec. at ¶¶9, 18.

The evidence shows that Defendants consulted counsel for the purpose of complying with the FLSA and never implemented a pay plan that Broussard did not approve.  In the absence of Defendants knowingly or recklessly violating the FLSA, Plaintiffs' motion for summary judgment must be denied.

**VI.**     **Defendant Mammoth Energy Services, Inc. had no employment relationship with Plaintiffs.**

Mammoth, the corporate parent to Mammoth Energy, Inc., is a distinct and separate legal entity from its separate subsidiary.  Mammoth is a public entity that has no employees. Mark Layton, CFO, and Jeff Beagle, Vice President of HR, the individuals involved in developing a payment plan, were employed with a separate Mammoth entity—Mammoth Energy, Inc.  Plaintiffs never asserted any claims against Mammoth Energy, Inc. in this lawsuit.

**A.**     **The "economic realities" factors preclude a finding that Mammoth was Plaintiffs' employer.**

"Whether a party is an employer or joint employer for purposes of the FLSA is essentially a question of fact."  *Donovan v. Sabine Irrigation Co.*, 695 F. 2d 190, 194 (5th Cir. 1983). To determine joint employer status, the Fifth Circuit applies an "economic reality" test to decide whether a joint employment relationship exists.  *Gray v. Powers,* 673 F.3d 352, 355 (5th Cir. 2012) (citing *Goldberg v. Whitaker House Co-op., Inc.,* 366 U.S. 28, 33 (1961)).  The factors for the economic reality test include: (1) the power to hire and fire the employees, (2) supervision or control over employees' work schedules or conditions of employment, (3) determination of the rate and method of payment, and (4) maintenance of employment records.  *See Gray*, 673 F.3d at 354-55 (quoting *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010)); *accord Watson v.*

*Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990) (recognizing that the "economic reality" test includes those same four issues).

To hold a parent company liable under a joint employer theory for alleged FLSA violations, the Fifth Circuit requires a showing of "actual operational control" over the employment of the employees. *Gray,* 673 F.3d at 355. In the context of corporate entities, there is a "strong presumption that a parent corporation is not the employer of its subsidiary's employees," and "[o]nly evidence of control suggesting a significant departure from the ordinary relationship between a parent and its subsidiary . . . is sufficient to rebut this presumption." *Lusk v. Foxmeyer Health Corp.,* 129 F.3d 773, 778 (5th Cir. 1997) (emphasis added). Indeed, "it should not lightly be inferred that Congress intended to disregard [corporate form] in the context of the FLSA." *Gray*, 673 F.3d at 356 (quoting *Baystate Alt. Staffing, Inc. v. Herman,* 163 F.3d 668, 677 (1st Cir. 1998)); *also see In re Enterprise Rent-A-Car Wage and Hour Employment Practices Litig*., 643 F.3d 462, 471 (3d Cir. 2012) (parent company was not joint employer with subsidiaries' managers under the FLSA); *Maddock v. KB Homes, Inc*., 631 F. Supp. 2d 1226, 1237 (W.D. Cal. 2007) (parent corporation was not joint employer of subsidiary's employee under the FLSA).

In cases where there may be more than one employer, courts "must apply the economic realities test to each individual or entity alleged to be an employer, and each must satisfy the four part test." *Gray,* 673 F.3d at 355 (quoting *Graves*, 909 F.2d at 1556). Claimants' arguments fail because they cannot point to evidence demonstrating the requisite operational control, or the existence of the economic reality factors as to Mammoth to satisfy the four-part test.

**B.     Mammoth did not maintain the kind of operational control required to satisfy the "economic realities" test.**

It is undisputed that Mammoth has no employees and is effectively a corporate shell. *See* Plts' Mtn at p. 13. Thus, Plaintiffs cannot offer evidence that Mammoth engaged in any conduct

sufficient to satisfy the economic reality test, or to show any actual operational control. There is no evidence that Mammoth acted directly or indirectly in the interest of an employer in relation to Plaintiffs. Applying the economic reality test factors, as set forth below, Mammoth did not maintain the kind of operational control required to satisfy the "economic realities" test.

First, no one employed with Mammoth exercised hiring or firing decisions. *See Gray*, 673 F.3d at 355. Plaintiffs do not and cannot point to a single instance where Mammoth hired or terminated one of the individual Plaintiffs. In fact, **Plaintiffs readily admit "…, even though evidence may not exist reflecting that Mammoth Energy Services could directly hire and fire Plaintiffs**, this factor is not dispositive." *See* Plts' Mtn at p. 13 (emphasis added). There is also no evidence that Mammoth made any offers of employment whatsoever to Plaintiffs. None of the evidence offered by the Plaintiffs when construed together is sufficient to transform Mammoth, an entity with zero employees, to the employer for the ten or so Plaintiffs.

Second, Plaintiffs also fail to reference any instance of Mammoth's supervision or control over Plaintiffs' work schedules or conditions of employment. Plaintiffs readily acknowledge that Jeff Beagle was employed by and received paychecks from Mammoth Energy, Inc. (not a party to this lawsuit) but they nonetheless assert that Beagle, acting on Mammoth's behalf, "…developed the schedules, conditions of employment, payroll practices, and timekeeping practices at issue in this case." Plts' Mtn at 13-14. Plaintiffs further assert that the evidence reflects that Beagle imposed those conditions and practices on employees of 5 Star and Higher Power, including Plaintiffs in this case. Plts' Mtn at 14. However, upon scrutiny of such evidence (Plaintiffs' Exhibit S), such allegations are not supported. Plaintiffs' evidence suggests that an offer letter template was developed by Beagle on behalf of Mammoth Services, Inc. and was forwarded to Scott Whitsell of 5 Star. However, the preparation of an offer letter by Beagle (employed with a different

entity) is no evidence that Mammoth was involved in the interview process or had any control over who was offered employment let alone developing the schedule, conditions of employment, payroll practices, etc. The FLSA is clear that "the potential joint employer's request, recommendation, or suggestion does not constitute indirect control that can demonstrate joint employer status." 29 C.F.R.at §791.2(a)(3)(ii).

Plaintiffs do not identify any scenario where Mammoth (which has no employees), changed the schedule of any Plaintiffs or supervised any of them.  Rather, "[j]oint employer status depends, in part, on whether supervision goes beyond general instructions," such that the potential joint employer takes an "overly active role" in the oversight of the employee.  *In re HMR Food Holding, LP*, 602 B.R. 855, 870 (Bankr. D. Del. 2019), citing *Layton v. DHL Exp. (USA), Inc*., 686 F.3d 1172, 1178 (11th Cir. 2012).  No such evidence exists here.

Third, Mammoth did not determine the rate and method of payment of Plaintiffs' compensation.  *See Gray*, 673 F.3d at 355.  Plaintiffs further assert that Beagle, functioning as HR Director for Mammoth Energy Services, devised the very mechanics of the Plaintiffs' pay rate. Yet, Plaintiffs' Motion clearly establishes that it was Keith Ellison, in his capacity as President of Cobra Acquisitions, LLC, who was responsible for setting rates of pay for all the workers in Puerto Rico.  *See* Plts Mtn at p. 3.  Plaintiffs' evidence is insufficient to establish that Mammoth was somehow responsible for determining the rate and method of Plaintiffs' compensation.  Control over certain functions for payroll is not sufficient to meet the economic realities test.  *See e.g. Cavallaro v. UMass Mem'l Health Care, Inc*., 971 F. Supp. 2d 139, 149 (D. Mass. 2013) (parent company's centralized human resources and payroll records insufficient to show parent company exercised control over plaintiff's employment conditions).

Fourth, Mammoth did not maintain employment records for 5 Star or HPE.  *See Gray*, 673 F.3d at 355.  To demonstrate that Mammoth maintained employment records, Plaintiffs rely on insignificant and cherry-picked documents.  Notably, Plaintiffs do not rely on the most critical indicia of maintaining records under the FLSA: the hours worked.  *Plaintiffs' Motion* at 15-16; *see also Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 144 (2d. Cir. 2008) (noting that records of hours worked are the "employment records on the matter most relevant to overtime obligations under the FLSA"); *Godlewska v. Human Dev. Ass'n, Inc.*, 916 F. Supp. 2d 246 (E.D.N.Y. 2013), *aff'd*, 561 F. App'x 108 (2d. Cir. 2014) (holding that where "maintaining employment records is primarily [a contractor's] responsibility, and [a putative joint employer's] review of certain records is 'only an extension' of [the putative joint employer's quality control procedures,… the fourth factor is not satisfied.").

Here, for example, a Paycom interface which lists Mammoth in isolated fashion along with what appears to be a license number is insufficient to show that Mammoth maintained the time records.  *See*, *e.g.*, Plaintiffs' Ex. N (Time Detail Report).  Much more prevalent throughout the Paycom evidence Plaintiffs rely on are indicators that HPE or 5 Star were the employer.  Despite listing Mammoth with the same attendant "client" number on the Paycom files, the section of the Time Detail Reports that list critical information such as "pay class: hourly" and employee's current employment status, it also lists HPE (Higher Power).  *Id.*

In sum, there is no evidence that Mammoth hired or fired the Plaintiffs, supervised and controlled Plaintiffs' work schedules or conditions of employment to a substantial degree, determined their rate and methods of payment, or maintained their employment records.  The Court should deny Plaintiffs' Motion on this issue.  At the very least, Mammoth's status as a joint employer for purposes of the FLSA is essentially a question of fact.

27

## **CONCLUSION**

Based on the foregoing, Plaintiffs' Motion for Partial Summary Judgment should be denied.

Respectfully submitted,

By: */s/ William R. Stukenberg*
William R. Stukenberg, *Attorney-in-Charge*
Texas Bar No. 24051397
Federal I.D. No. 55792
**Porter Hedges LLP**
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6611
Facsimile: (713) 226-6211
wstukenberg@porterhedges.com

*Attorney-in-Charge for Defendants*
*Mammoth Energy Services, Inc.*
*d/b/a Cobra Energy, 5-Star and*
*Higher Power Electrical, LLC*

Of Counsel:

M. Harris Stamey
State Bar No. 24060650
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6619
Facsimile: (713) 226-6219
hstamey@porterhedges.com

Jamie L. Houston
State Bar No. 24097847
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6608
Facsimile: (713) 226-6208
jhouston@porterhedges.com

15534874v1

Emil M. Sadykhov
State Bar No. 24110316
Porter Hedges LLP
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6720
Facsimile: (713) 226-6320
esadykhov@porterhedges.com
***Attorneys for Defendants***
***Mammoth Energy Services, Inc.***
***d/b/a Cobra Energy, 5-Star and***
***Higher Power Electrical, LLC***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served on all counsel of record via CM/ECF filing on August 23, 2024.

<u>/s/ *Jamie Houston*</u>
Jamie L. Houston

15534874v1