EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AARON MALDONADO, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | Case No. 5:21-cv-85 |
| | § | |
| MAMMOTH ENERGY SERVICES, INC., COBRA ACQUISITIONS, LLC, HIGHER POWER ELECTRICAL, LLC, and 5 STAR ELECTRIC, LLC, | § § § § | |
| | § | |
| *Defendants*. | § | |

## DECLARATION OF MARK LAYTON

I, Mark Layton, declare as follows:

1. My name is Mark Layton. I am over the age of eighteen (18). I have never been convicted of a felony or crime involving moral turpitude. I am fully competent to make this declaration. I have personal knowledge of all the facts stated herein or have derived these facts from a review of business records, and the statements herein are true and correct.

2. I am the Chief Financial Officer of Mammoth Energy Services, Inc., Cobra Acquisitions, LLC ("Cobra") and Higher Power Electrical, LLC ("HPE") (collectively "the Defendants"). I am aware of a lawsuit brought by Aaron Maldonado and others against the Defendants based on allegations that they, along with others, were not paid overtime for work performed on behalf of the Defendants.

3. Cobra is an infrastructure services company that provides maintenance and repair services to utilities. Cobra contacted the Puerto Rico Electrical Power Authority ("PREPA") to offer its services after Hurricane Irma (category 5) and Hurricane Maria (category 4), devastated the island of Puerto Rico in September 2017. Both storms caused significant damage to the electrical grid and destroyed many buildings on the island.

4. As a result of the hurricanes, the infrastructure for an already decaying electrical grid was decimated. When Hurricane Maria hit Puerto Rico just a few weeks after Hurricane Irma, the additional catastrophic damage to the island was exacerbated by an enormous storm surge accompanied by high winds. The island of Puerto Rico had no power, approximately 95% of the cell service towers were down, and approximately 50% of the island was without running water. Sewage was running

EXHIBIT

1

exhibitsticker.com

through the streets of San Juan.

5. Restoring power was critical to beginning the recovery efforts. Without power, the island could not begin to repair the absolute devastation. The people of Puerto Rico experienced a humanitarian crisis that resulted in the death of over 2,900 people and damage in excess of $90,000,000,000.00.

6. Shortly after the storm, Cobra executives met with Puerto Rican officials to offer assistance in repairing the electrical grid. On October 19, 2017, Cobra entered into a contract with PREPA to restore electricity.

7. Cobra began work immediately to launch this intense and logistically challenging work. This work included acquiring and deploying hundreds of bucket trucks and other work vehicles from ports across the country to Puerto Rico. Cobra was also tasked with securing and delivering the equipment necessary to perform the repair and restoration work, which was delivered to the island by barge and an Antonov, the largest aircraft in the world. Cobra also had to find and secure housing for the workers by chartering two large barges that could each sleep hundreds. Cobra also contracted with two affiliated companies, HPE and 5-Star Electric, LLC ("5-Star"), to provide the workers and equipment to perform the work. Time was of the essence given the humanitarian crisis and lives at stake.

8. An advance team arrived in Puerto Rico within days of the signing of the PREPA contract, and equipment and crews started arriving in late October and early November 2017. Cobra was in charge of the logistics, housing and security and 5-Star and HPE were responsible for recruiting personnel to perform the work and ascertaining how to pay the employees.

9. Keith Ellison, then-President of Cobra, developed the daily labor budgets for the various classifications of linemen who would be working in Puerto Rico. These budgeted amounts were then listed on the wage scale which was used to recruit workers. The wage scale was a target amount of compensation sufficient to begin recruiting workers to perform the work in a very demanding environment while maintaining some profit margin. The wage scale contained amounts ranging from $600 to $1,400 per day worked, or $219,000 to $511,000 annually. This was considerably more than linemen and similar laborers earn in the continental United States.

10. The day after creating the daily labor budgets and wage scale, Ellison, HPE, and 5-Star then turned to Mammoth Energy Inc. ("Mammoth Inc.") for assistance in developing a pay plan that would closely mirror the rates contained in the wage scale and comply with the FLSA. Mammoth Inc. is a sister company to Cobra, 5-Star, and HPE. Mammoth Inc. provides back-office support services, such as accounting and human resources services, to these subsidiaries for a fee pursuant to a shared services agreement. Mammoth Energy Services, Inc. is the ultimate parent company of Mammoth Inc., Cobra, 5-Star and HPE. Mammoth Energy

2

13454347

Services, Inc. does not have and never has had any employees.

11. Ellison informed me that it was my responsibility to figure out how to pay the employees and the details and mechanics of a pay plan. For his part, Ellison did not know the specifics of how the workers would be paid as he was focusing on the remaining logistical tasks to get the project moving, such as securing and deploying equipment.

12. To develop the pay plan, I directed Jeff Beagle, Vice President of Human Resources of Mammoth Inc., to confer with outside counsel to develop a compliant pay practice based on the daily labor budgets. Beagle is a human resources specialist with over ten years of experience, including experience with compliance with wage and hour laws. On October 19, 2017, Beagle contacted Steve Broussard, an employment law attorney with over twenty-five years of experience at the time and who had previously worked with Mammoth Inc. on other employment law issues to develop the pay plan. Beagle initially explored paying the employees based on a day rate. Broussard responded that we could do so, but we would have to pay overtime on top of the day rate—and he explained how the calculation of overtime on a day rate could be accomplished. After discussing a day rate plan with operational management, we quickly pivoted to an hourly plus overtime pay plan that would approximate daily rates contained in the wage scale provided that employees worked the anticipated weekly schedule.

13. Developing the hourly pay plan was an iterative process and Beagle created various spreadsheets with different pay plans which were circulated among the group. Ultimately a pay plan was chosen utilizing an anticipated schedule of seven days a week and 16-hour days. Using this schedule and the daily labor budgets for each position, we derived hourly rates for each position such that if linemen worked the anticipated weekly schedule and were paid the hourly and overtime rates, they would earn on average an amount that closely approximated the amounts contained in the wage scale. However, due to the hourly and overtime nature of the pay plan, a worker would never earn an amount close, or equal, to the daily amounts listed on the wage scale for any single day worked.

14. Seven sixteen-hour shifts per week is the standard weekly schedule in the industry for storm work. One of the reasons for a sixteen-hour shift is that under Department of Transportation ("DOT") and Occupational Safety and Health Administration ("OSHA") regulations, certain covered employees are not permitted to work beyond sixteen-hour shifts unless eight hours of rest time is provided. Although DOT and OSHA regulations are generally suspended during a national emergency, such as the emergency caused by Hurricanes Irma and Maria, the sixteen-hour limits are a natural cap on the hours worked per day. Additionally, safety concerns militated against allowing workers to work more than sixteen hours per day. Further, the nature of the operations being performed generally limited the work to daylight hours.

3

13454347

15. Because it was critical for HPE and 5-Star to immediately begin recruiting linemen to work in Puerto Rico, the wage scale was used to do so before the pay plan had been designed and implemented. Both HPE and 5-Star advertised the positions to candidates as providing a targeted amount of expected pay, subject to an offer letter and additional details that were being developed during the emergency situation that would be provided upon hire.

16. All employees ultimately hired were given offer letters informing them of the anticipated schedule and pay details, and they attended orientation seminars held in either Texas, Kentucky, or occasionally Puerto Rico. Employees filled out onboarding paperwork and were advised that they would be paid an hourly rate with overtime, and the target amount of their compensation would be based on 16-hour shifts, seven days per week. The orientation included information regarding safety, housing and related human resources materials. After orientation, the employees flew to Puerto Rico to begin work.

17. Employees generally worked a full seven days a week for a total of 112 hours (7 days x 16 hours per day). However, if an employee did not work the anticipated schedule, they would earn less than the daily amounts budgeted for the position as reflected on the wage scale. It is my understanding that Missy Davis in Human Resources at 5-Star asked Beagle what should be done in short weeks where employees were paid less than what had been budgeted for their position. Reflecting the fact that this scenario created an increase in profit margin, Beagle informed her that they could, but were not required to, pass the increase in profit margin along to the employees in the form of a discretionary bonus. The rationale was to keep the employees' morale and employee relations high through the tumultuous humanitarian crisis. In total, less than 2% of the workweeks included any discretionary payments. In many instances, Defendants did not make the discretionary payments. Such instances included circumstances where an employee missed work or was suspended for malfeasance. Employees generally worked the anticipated schedule and would typically only fall short of the targeted hours when the employee deployed to the island or ceased work for Defendants.

18. In the summer of 2018, Cobra entered into a subsequent contract with PREPA as the project moved from emergency response and power restoration to reconstruction. As a result, the compensation structure changed, effective July 23, 2018. The sixteen-hour shifts were replaced with twelve-hour shifts, and discretionary payments were no longer made. The project ended and HPE and 5-Star concluded operations in Puerto Rico by March 2019. Throughout the project, from inception to conclusion, not a single employee complained about the manner of their compensation, including any purported failure to pay overtime. My mobile number is listed on employees' pay stubs, and I received calls from employees about various issues, such as employment verification, but I never received any calls regarding any alleged failure to pay overtime or beliefs that employees were not being compensated appropriately. Similarly, Defendants were never notified by the Department of Labor or any other person or organization that the

4

13454347

SimplyAgree Sign signature packet ID: fceg1d24-2dfa-4654-9915-43c3115d7e87

compensation structure was purportedly unlawful.

DECLARANT SAYETH FURTHER NOT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed:   August 2, 2024

*Mark Layton*
Mark Layton

5

13454347