Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 1 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 1 of 67 (Page 1)
MARK LAYTON - April 15, 2022                    EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

FRANCISCO CANTU, et al.    )
)
)
vs.                        ) CASE NO. 5:19-cv-00615
)
MAMMOTH ENERGY SERVICES,   )
INC., et al.               )

ORAL AND VIDEOTAPED DEPOSITION OF
MARK LAYTON
APRIL 15TH, 2022
(Volume 1)

The ORAL AND VIDEOTAPED DEPOSITION OF MARK LAYTON, produced as a witness at the instance of the Plaintiffs and duly sworn, was taken in the above-styled and numbered cause on the 15th day of April, 2022, from 8:44 a.m. to 3:47 p.m., before Robin Rios, Certified Shorthand Reporter in and for the State of Texas, reported by computerized stenotype machine at Porter Hedges, LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT 3

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 2 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 23 of 67
Page 23 (Pages 86-89)

MARK LAYTON - April 15, 2022

Page 86

1 times.
2          (Plaintiffs' Exhibit 166 marked.)
3     Q    (By Mr. Moulton) All right. In Exhibit 166,
4 you're kind of jumping the gun with me, but I think this
5 is -- we're going to lead into that discussion in
6 detail. But on Exhibit 166, we have an email from Jeff
7 -- actually, I'm sorry, from Missy Davis -- she's with
8 HR in Higher -- in 5 Star -- to Jeff Beagle, who's part
9 of the shared services with Mammoth Energy, Inc., and
10 also with Alexander Kalman.
11          She's asking about how -- a mathematical
12 explanation on the PR pay rates, correct?
13     A    Yes.
14     Q    Okay. And specifically, how to process it
15 because she's -- she's having to put pencil to paper,
16 right?
17     A    She's not necessarily asking how to physically
18 process it. She's asking for a mathematical explanation
19 as to how the payroll for the Puerto Rico employees will
20 be processed.
21     Q    And Jeff Beagle delivers. In his email he
22 gives her a spreadsheet that's going to outline that for
23 her, correct?
24     A    It appears that, yes, he sends her a -- a
25 calculation.

Page 87

1     Q    Okay. Did you ever talk with Missy about what
2 she felt about the calculations?
3     A    I don't recall any conversations between
4 myself and -- and Missy in regards to the calculations.
5     Q    Okay.
6          (Plaintiffs' Exhibit 167 marked.)
7     Q    (By Mr. Moulton) All right. So in
8 Exhibit 167, we're going to look at it in native format
9 because it's an Excel spreadsheet and Excel spreadsheets
10 have formulas, which I'm sure you're familiar with,
11 right?
12     A    Yes, sir.
13     Q    Okay. CFO, you're -- you're pretty
14 experienced with spreadsheets. Is that fair to say?
15     A    I can operate in Excel, yes.
16     Q    Okay. So if we look at, like, cells and see
17 what the formulas are doing, you can -- you would --
18 you'll understand them, at least on basic ones?
19     A    Hopefully.
20     Q    Okay.
21          All right. We're going to look at this
22 then and like I say, we're --
23          MR. MOULTON: I can't put a sicker
24 necessarily on the front of it for the court reporter
25 maybe later we'll figure out how to label it, but this

Page 88

1 is -- this Excel spreadsheet is Bates numbered Mammoth
2 3292 confidential dot xlsx. That's the -- that's the
3 name of the document.
4     Q    (By Mr. Moulton) Now, earlier you were telling
5 me about a process for coming up with hourly rates that
6 fit with what you call a -- the targeted rates, correct?
7     A    Generally, yes.
8     Q    All right. On this spreadsheet, those
9 targeted rates are under the column I, "Budget Day
10 Rate," correct?
11     A    Yes, sir.
12     Q    Okay. Do you understand how these hourly
13 rates were figured, or do we have to walk through it?
14     A    I have an understanding, yes.
15     Q    Okay. So basically if we take the budget day
16 rate and we multiply it by 7 and divide by 148, we'll
17 get the hourly rate, correct?
18          MR. STUKENBERG: Objection, form.
19     A    I believe you -- you oversimplified the -- the
20 calculation.
21     Q    (By Mr. Moulton) All right. Let's kind of
22 back up then. In K where I'm -- where I'm highlighting,
23 there's a rate that says 59.12. That corresponds to a
24 foreman, which corresponds to a budget day rate of 1250.
25 It's all on the same row, correct?

Page 89

1     A    Yes, sir.
2     Q    Okay. So in that cell we have 8,750, which is
3 7 times 1,250 divided by 148, correct?
4     A    That's correct.
5     Q    Okay. So the hourly rate is determined by
6 taking the day rate times 7 and dividing it by 148. Do
7 you agree with me now?
8     A    That's the -- that's the day rate divided by
9 the -- the total hours adjusted for overtime, yes.
10     Q    Right. And it's -- and in this -- in the pay
11 plan that was established, you guys were targeting a
12 16-hour day, right?
13     A    There was a 16-hour day that was required of
14 employees in Puerto Rico --
15     Q    Right.
16     A    -- yes, where they were either working or on
17 call to work.
18     Q    All right. So -- and, like, I'm not trying to
19 get into all that right now, but just trying to
20 understand the spreadsheet.
21          So the target here is 7 times 16 hours is
22 112 under the total, correct?
23     A    Yes, sir.
24     Q    Okay. And this is -- this is kind of a neat
25 solution to make it simple for calculating your hourly

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 3 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 24 of 67

MARK LAYTON - April 15, 2022

Page 90

1 rates if you ask me because what they do is they take
2 the -- they divide that 112 into 40 and 72. You can see
3 that there, right, on Columns E and F, right?
4   A   Yes.
5   Q   Okay. And then if you take your overtime
6 hours of 72 and multiply them by one and a half, that's
7 going to give you the overtime adjusted of a hundred and
8 eight hours, correct?
9   A   That's correct.
10  Q   So now you kind of normalize it and kind of
11 say, okay, the total hours adjusted is 148, which
12 becomes the number you're dividing by for the -- these
13 hourly rate calculations, correct?
14  A   Yes, sir.
15  Q   Okay. Did you prepare -- did you prepare this
16 spreadsheet?
17  A   No, sir.
18  Q   Do you know who did it?
19  A   I believe this spreadsheet was prepared by
20 Mr. Beagle based on my review of the documents.
21  Q   Okay.
22      All right. So the hourly rate here is --
23 we can count -- for these -- for these budget day rates,
24 we can get to the hourly rate figure just by multiplying
25 it by 7 and dividing by 148, correct?

Page 91

1       MR. STUKENBERG: Objection, form --
2   A   Run that through me -- run that calculation
3 through me again, please.
4   Q   (By Mr. Moulton) Yeah. For these hourly rates
5 that are listed in Column K, which going to -- which are
6 the hourly rates you guys used on the island, correct?
7 We can get them -- we can calculate them by just taking
8 the budget day rate times 7 and dividing by 148.
9       That's what that figure is, right?
10  A   Yes.
11  Q   Okay. Now, over here between N and Q columns,
12 there's several numbers calculated here. Do those
13 numbers mean anything to you?
14      If you need to see any cell, let me know.
15  A   Can I look at P?
16  Q   Yes, sir.
17      MR. STAMEY: Did you freeze?
18  Q   (By Mr. Moulton) Are you not seeing P?
19  A   No, sir. I'm still in N.
20  Q   I'll just try refreshing the screen and see
21 what happens. Do you see it now?
22  A   No, sir.
23  Q   All right.
24      MR. STUKENBERG: There you go. Now
25 you're moving.

Page 92

1   A   It's in P now, but for some reason I'm not
2 seeing the formula on -- on my screen.
3   Q   (By Mr. Moulton) Can you see it now?
4   A   No, sir.
5       Okay. Now I've got it.
6   Q   Okay.
7       Have you had a chance to look at that
8 now?
9   A   Yeah. Can I look at N again?
10      Okay.
11  Q   So do you recognize what these calculations
12 are between N and Q?
13  A   This appears to -- to be a high-level analysis
14 of what the pay may look like if a day rate pay practice
15 is established.
16  Q   Right. And specifically it would -- it shows
17 how much overtime extra would have to be paid and what
18 the total pay would have to be, correct?
19  A   It shows what it would look like if a pay
20 practice was established to pay the day rate at the
21 amounts in Column I. So this is part of the analytics
22 and the iterative dialogue between Mr. Beagle and
23 Mr. Broussard.
24  Q   Right.
25      Okay. So if -- if the company had

Page 93

1 adopted a pay -- a day rate plan, these calculations
2 between N and Q are showing what -- what the payroll
3 would -- would look like?
4       MR. STUKENBERG: Objection, form.
5   A   It shows what it would look like if the
6 entities established a day rate plan and if the entities
7 adopted the amounts in Column I in regards to day rate.
8   Q   (By Mr. Moulton) Okay. And what -- and you --
9 you heard Mr. Broussard testify yesterday. Do you agree
10 that there was a discussion between either a day rate
11 plan or an hourly plan with him? Do you recall that?
12  A   Yes, there were several discussions with
13 Mr. Broussard about compliant plans and structure.
14  Q   Right. And the -- but there was basically --
15 basically it was narrowed down to two options. Either
16 the company would go with a hourly plan, or it was
17 thinking about a day rate plan. And -- and he didn't
18 know what y'all -- what y'all went with. But do you
19 know which one y'all went with?
20  A   Mr. Broussard provided two compliant options.
21 One being an hourly and overtime plan. The other being
22 a day rate plan with overtime applied to those day
23 rates.
24  Q   Okay. And which one did the companies go
25 with?

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 4 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 25 of 67

MARK LAYTON - April 15, 2022

Page 94

1   A   **The employers, as it relates to this matter,**
2   **adopted an hourly and overtime plan.**
3   Q   Okay. That's your testimony. That's what you
4   believe?
5   A   That's not only my testimony, that's what the
6   pay records indicate.
7   Q   Okay. We'll look at that in a minute.
8       (Plaintiffs' Exhibit 151 marked.)
9   Q   (By Mr. Moulton) Now, I also want to show you
10  what's been previously marked as Exhibit 151, which was
11  introduced by your counsel yesterday. And does
12  Exhibit 151 reflect the final version of Cobra's pay
13  scale?
14  A   That appears to mirror the -- the hourly rates
15  of the pay scales that were adopted by Cobra
16  Acquisitions, Higher Power Electrical, and 5 Star.
17  Q   And not Cobra?
18  A   I mentioned Cobra Acquisitions.
19  Q   Okay. So Cobra Acquisitions and it -- and its
20  subsidiaries performing in -- performing work in Puerto
21  Rico used this pay scale in Exhibit 151?
22  A   To -- to clarify your -- your question, Cobra
23  Acquisitions acquired Higher Power and 5 Star. Once
24  the -- the Puerto Rico contract was won by Cobra
25  Acquisitions, then Cobra Acquisitions transferred its

Page 95

1   membership interest in both Higher Power and 5 Star to
2   Cobra Energy, Inc.
3   Q   So --
4   A   So Cobra Acquisitions no longer had membership
5   interest in either Higher Power or 5 Star; and thus, had
6   no subsidiaries.
7   Q   So Exhibit 151 is the pay scale that applied
8   to the plaintiffs in this case that were working for
9   Higher Power?
10  A   In this particular matter, I don't believe
11  Cobra Acquisitions is a defendant in this matter.
12  Q   That -- I'm not asking that. I just want to
13  know -- ignore -- I'm not even asking you about who's
14  sticker's on top right now. These numbers, the numbers
15  that y'all determined -- like, we just saw the
16  spreadsheet. These are the figures in PR -- "PR Storm -
17  Per Hour," "PR Storm - Per Day," these positions, this
18  is the pay scale for the guys in Higher Power and 5 Star
19  working on the island in Puerto Rico, correct?
20  A   This is the hourly scale that was established
21  for the employees of Higher Power and 5 Star.
22  Q   Thank you.
23      (Plaintiffs' Exhibit 145 marked.)
24  Q   (By Mr. Moulton) Here's an exhibit previously
25  marked as 145, Plaintiff's Exhibit 145. We have an

Page 96

1   offer letter for Daniel Wood, and the first couple pages
2   aren't signed. Let's go to the one that's signed.
3       So Mammoth 2725 in this exhibit. Looks
4   like his start date is going to be on July 8th, 2018,
5   correct?
6   A   Yes, sir.
7   Q   Okay. And if you'll notice here, it says,
8   "Puerto Rico Storm Rate (on island) 42.57 at 16 hours
9   per day at $900 per day."
10      Do you agree with that -- that that's
11  what that says?
12  A   That's what's written in there, yes.
13  Q   Yes. Okay.
14      And then if we go back to Exhibit 151,
15  the pay scale, that appears on there, right? Don't we
16  see, like, for example, Class A Lineman is 900 at 42.57?
17  A   It's 42.57 at 16 hours per day, which equates
18  to $900 per day if the employee works seven days a week
19  and is available to work or works for 16 hours per
20  shift.
21  Q   All right. I'm so glad you clarified that
22  because as you've -- as you pointed out, if you take 16
23  times any of these PR storm per hour rates in
24  Exhibit 151, you don't get the day rate, correct?
25      MR. STUKENBERG: You mean the per day?

Page 97

1   Q   (By Mr. Moulton) Yeah. You don't get the
2   storm per day numbers. Do you agree with that?
3   A   If you just take 16 times any of these per
4   hour rates?
5   Q   Right.
6   A   No.
7   Q   Right. And if -- and -- and so -- and by
8   extension, the way I understand the payroll to have
9   worked, be -- what y'all would do is basically pay --
10  according to you guys, you'd pay 16 hours per day.
11  Where I'd call it credit, you'd call it, you know -- if
12  he works one day on the island, you're going to -- on
13  the payroll documents, you're going to show 16 for his
14  hours, correct?
15  A   If an employee shows up for work in Puerto
16  Rico and works and/or is available to work, then there
17  is 16 hours recorded for that employee for the day --
18  Q   Right.
19  A   -- for time worked and for time on call.
20  Q   Okay. And you would then take these rates and
21  do the math for what the hourly and the overtime would
22  be depending on the hours you were crediting, like, 16,
23  32, 48, and so on?
24  A   Well, to back up, so the -- the pay practice
25  was these employees were hourly. They were input into

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 5 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 28 of 67

MARK LAYTON - April 15, 2022

Page 106

```
 1          MR. MOULTON:  I know, but, you know,
 2  he's --
 3       Q     (By Mr. Moulton) All right.  Let's go back to
 4  Exhibit 167.  I don't know if you ever noticed, but in
 5  this spreadsheet -- let me go back to the hourly rates
 6  that were calculated, that 1 times 7 divided by 148,
 7  it's showing, like, on this first one, 59.12.
 8          Do you see that?
 9       A     I see that.
10       Q     Okay.  Now, obviously, if we see the full
11  calculation, I mean, it's going on and on.  But if you
12  just use 59.12 and you do this "Check Figure" on L,
13  you're going to be off by a few pennies by -- based on
14  the application of the math you're talking about,
15  correct?
16       A     And the math matters --
17       Q     Right.  The --
18       A     -- and the mechanics matter.
19       Q     It does, and you love to say that.  And I
20  agree with you.  Mechanics matter.  We'll go look at
21  mechanics.
22          MR. STUKENBERG:  Objection to the side
23  bar.
24       Q     (By Mr. Moulton) But my point is -- is that if
25  you use 59.12 instead of this whole number here or this
```

Page 107

```
 1  long, you know, unrounded number, the amount you
 2  calculate that he will get for the week will be slightly
 3  off of what the -- the target day rate is, correct?
 4       A     In this instance 59.12 is the hourly rate.
 5  The employee works the hours.  The mechanics and the
 6  math work out however they work out in regards to
 7  regular and overtime.
 8       Q     And he's not going to get exactly 8750 to the
 9  dot, right?  It's going to be a little off?
10       A     This employee would get whatever their
11  calculation is for regular and overtime --
12       Q     Right.  And we'll --
13       A     -- based on their hourly rate.
14       Q     Right.  So at 59.12 is it 8,750; or is it
15  8,750 and a few pennies?  Do you know?
16       A     It's 59.12 times however many hours the
17  employee works during the pay period.
18       Q     Okay.  In Puerto Rico what typically happened
19  was every day worked was credited 16 hours, correct?
20       A     In Puerto Rico what happened was that
21  employees that showed up and either worked or were
22  available to work on call, we recorded 16 hours per day
23  for those employees.  To the extent those employees
24  worked more than their 16 hours, we had processes and
25  procedures in place through the chain of command to
```

Page 108

```
 1  capture that such that the employee would be
 2  compensated.
 3       Q     Have you done an analysis to see for the --
 4  when people are working in Puerto Rico how many -- like,
 5  what percentage of the time that the hours on their time
 6  sheet is not 16.00?
 7       A     I've looked at a number of time sheets.  Some
 8  would be less than -- than 16 hours.  The majority of
 9  the time that I've seen, based on my review, is that the
10  employees would be paid for the 16 hours that they
11  either worked or were on call.
12       Q     So what it's going to show in the payroll
13  records then overwhelmingly, like over 99 percent of the
14  time, is 16.00 because they were there working or on
15  call, correct?
16       A     That was the standard shift during the
17  requisite time period for which employees either worked
18  or were on call to work --
19       Q     So --
20       A     -- in Puerto Rico.
21       Q     So overwhelmingly then, in the payroll records
22  on -- for days, it's 16.00 hours per day?
23       A     16 hours was the hours worked and/or on call
24  for the employees in Puerto Rico.  That was the standard
25  shift.
```

Page 109

```
 1       Q     I mean but exactly 16.00, right?
 2       A     That would be the majority of the time.  There
 3  were some incidences where it would have been different
 4  than 16 hours.
 5       Q     Do you know how many?
 6       A     I don't have the -- the calculus on that.
 7       Q     Okay.  Very small minority?
 8       A     Based on my review of the records, it would be
 9  a minority of the time that there would be something
10  different than 16 hours worked or available to work for
11  the employees in Puerto Rico.
12          (Plaintiffs' Exhibit 169 marked.)
13       Q     (By Mr. Moulton) Are you aware of -- so we're
14  going to go to Plaintiff's Exhibit 169, and let's start
15  at the bottom here.  Let's kind of work our way through.
16  It's a little -- little long.  They're talking about
17  making corrections, JD Kinsey and these people were
18  talking about making corrections to the payroll.
19          Do you agree with that?
20       A     That's what the email says.
21       Q     Okay.  So JD Kinsey's asking, on January 9th,
22  at 3 -- of 2018 at 3:17, this email on -- spans 3158 and
23  3159 as far as the Bates numbers.  So JD Kinsey's
24  asking, "Hey Alex and Bethany, here is an updated
25  spreadsheet.  To the best of my knowledge I have added
```

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 6 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 29 of 67

Page 29 (Pages 110-113)

**MARK LAYTON - April 15, 2022**

Page 110

1 all hourly employees that did not work a full 14 day
2 schedule. I put how many days they worked, the
3 classification, their rate, and what they 'should'
4 receive for the check. I don't know what you want to
5 process this or adjust amount owed versus the amount
6 their hourly rate shows."
7      Do you know what he's talking about?
8  A   Yes, I do.
9  Q   Okay. What does he mean?
10 A   So Mr. Kinsey is saying we've got these hourly
11 employees that have worked something less than a 14-day
12 schedule. Running through the mechanics of that
13 calculation, their hourly rate for regular and overtime
14 wages, he's identified a small population of employees,
15 it appears, that based on that regular and overtime
16 calculation, these employees would earn an amount
17 different than their targeted earning amount, which
18 would be an amount of -- that you brought up several
19 times of X amount per day in the event the employee
20 works each day during the payroll period at the hours
21 for each shift.
22 Q   Right. So the correction would be to -- to
23 reconcile -- or to bring up the -- what the date -- what
24 the hourly pay was up to that targeted amount, correct?
25 A   I wouldn't characterize that as a correction.

Page 111

1 That would be a calculation of a discretionary amount
2 that could either be paid to the employee for employee
3 goodwill or not paid to the employee based on the
4 decision of the employee's managers.
5  Q   Okay. So these adjustments that we're talking
6 about are, in your opinion, a bonus?
7  A   These adjustments would be discretionary
8 amounts related to employee goodwill that could be
9 either paid or not paid based on the discretion of their
10 managers.
11 Q   Okay. Did you ever talk to JD Kinsey about
12 this?
13 A   Did I personally ever talk to Mr. Kinsey?
14 Q   Uh-huh, about this.
15 A   No, sir.
16 Q   Okay. So you wouldn't know why Mr. Kinsey
17 believes that these adjustments are owed or not, as he
18 says?
19      MR. STUKENBERG: Where does he say owed?
20 I don't see where he says that.
21 A   Yeah, I don't believe that is --
22 Q   (By Mr. Moulton) "I don't know how you" --
23 A   -- stated.
24 Q   "I don't know how you want to process this or
25 adjust amount owed versus the amount their hourly rate

Page 112

1 shows."
2      Do you know what he means?
3  A   He's saying I've identified these amounts this
4 can either be processed for employee goodwill or not
5 processed. Mr. Kinsey's a clerk. It's not his job to
6 either approve or disprove. He's identified these
7 instances, but he has no ability to approve or not
8 approve any of these items that he's identified.
9  Q   So do you know why he thinks they're owed or
10 not?
11     MR. STUKENBERG: He doesn't say.
12 Q   (By Mr. Moulton) I'm asking you do you know.
13 A   This email doesn't say.
14 Q   Okay. Well, do you know apart from this
15 email?
16 A   I've testified as to what the calculation
17 represents.
18 Q   So you don't know why JD Kinsey thinks its
19 owed?
20     MR. STUKENBERG: That doesn't say that he
21 thinks it's owed.
22     MR. MOULTON: Yeah, he does.
23     MR. STUKENBERG: Where?
24     MR. MOULTON: It just says right there
25 the word "owed." It says that --

Page 113

1      MR. STUKENBERG: It says, I don't know
2 how you want to process this or adjust the amount. He's
3 not saying you owe money.
4      MR. MOULTON: Owed -- "adjust amount owed
5 versus the amount their hourly rate shows."
6  Q   (By Mr. Moulton) Do you know what this means?
7 Just tell me. I mean, do you know what he means by all
8 that? Do you have an opinion?
9  A   I've testified as to what the calculation was.
10 Q   Yeah, I'm not -- I'm not asking that though.
11 I'm asking do you know what JD Kinsey means in this
12 email?
13     MR. STUKENBERG: Objection. The email
14 says what it is.
15 Q   (By Mr. Moulton) Do you know what JD Kinsey
16 means?
17 A   The email speaks for itself.
18 Q   Okay. So the email does speak for itself.
19 Apart from what's written in the email, you don't know
20 anything else about what JD Kinsey's talking about here?
21 A   That completely mischaracterizes my testimony
22 about the analysis that Mr. Kinsey put together. So to
23 say that I don't know anything --
24 Q   And, yeah, I --
25 A   -- it splits my testimony --

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 7 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 33 of 67
Page 32 (Pages 126-129)

**MARK LAYTON - April 15, 2022**

Page 126

```
 1  37.84 is the rate that is associated with a target rate
 2  of $800 per day, correct?
 3      A    I don't recall where 37.84 maps to. Appears
 4  to be correct, yes.
 5      Q    All right. If we go back to Exhibit 151, we
 6  see the "PR Storm - Per Hour" rate of 37.84 is right
 7  next to the "PR Storm - Per Day" of $800; and you call
 8  that a target rate, right?
 9      A    $800 is a target rate, yes.
10      Q    Okay. So looking at this pay stub for Tyler
11  Halford back in Exhibit 170, by looking at this pay
12  stub, can you tell me how many days he worked in -- for
13  this pay period?
14      A    He appears to likely have worked for ten days.
15      Q    Okay. And why do you say that?
16      A    16 hours per day --
17      Q    Times 10 equals 160, right?
18      A    Yep.
19      Q    Okay. Now, a -- a guy whose target rate is
20  $800 per day, if he works ten days, his target pay would
21  be $8,000, right?
22      A    If he works ten days, then his pay would be
23  whatever it calculates to be. It would not be $800 to
24  the penny. It would calculate whatever the math is.
25      Q    Okay. So you're saying that his -- that his
```

Page 127

```
 1  target would have been 3,027.2 plus 4540.8?
 2      A    That's what he would have earned during that
 3  pay period.
 4      Q    Okay. And this additional -- this day rate
 5  boost of 432 that brings him to exactly his target rate
 6  is an error?
 7           MR. STUKENBERG: Objection, form.
 8      A    It's not a day rate boost. I've not
 9  characterized anything as a, quote, unquote, day rate
10  boost. I have testified that there were instances in
11  which we made discretionary bonuses to employees. There
12  were other instances in which we did not.
13      Q    (By Mr. Moulton) So the --
14      A    In this particular case, the characterization
15  of that discretionary bonus under the day rate pay code
16  was an error in selection of pay code.
17      Q    So it should have been bonus?
18      A    Yes, sir.
19      Q    Okay. How come no one ever fixed this?
20      A    It's an error of pay code; and statistically,
21  if you look at this error, this error occurred less than
22  2 percent of the time.
23      Q    So it wasn't worth fixing? Is that what
24  you're saying?
25      A    That's not what I said. I said statistically
```

Page 128

```
 1  this error is a minute portion of the overall population
 2  for hourly employees.
 3      Q    And that's the reason you're giving for why it
 4  wasn't fixed?
 5      A    It was an error in selection of pay code.
 6      Q    Okay. No one ever noticed and caught this
 7  error and fixed it?
 8      A    It's a discretionary amount that was paid to
 9  the employees. The selection of the pay code was an
10  error. It's a minute percentage of the overall
11  population both in terms of dollar amount as well as
12  occurrence.
13      Q    So the $432 is a discretionary amount
14  determined by who?
15      A    That would be a discretionary amount that
16  would have been approved by the employee's supervisor.
17      Q    Okay. How do you guys track that?
18      A    It's tracked -- it was input under an
19  inappropriate code here.
20      Q    No. I'm not asking that. You're -- you're
21  saying the employee's supervisor approved specifically a
22  432 adjustment for Tyler Halford, correct?
23      A    My testimony was that Mr. Halford received a
24  discretionary amount of $432 in this particular pay
25  period.
```

Page 129

```
 1      Q    And you're saying that his supervisor had to
 2  specifically approve it for it to go through, right?
 3      A    That's correct.
 4      Q    Okay. What documents would reflect these
 5  approvals?
 6      A    The approval process would be contained inside
 7  of the HR/IS system in regards to the payroll processing
 8  procedures.
 9      Q    What are those documents called?
10      A    Those are electronic approvals the majority of
11  the time. In some instances, those approvals could have
12  been either verbal or in writing via paper or email.
13      Q    Okay. So what's the form called to get your
14  discretionary amount added if you're Tyler Halford?
15  What do you do?
16      A    If you're Tyler Halford, you have no input in
17  that process. That's at the discretion of the
18  supervisor, not at Mr. Halford.
19      Q    So on every single payroll that doesn't have a
20  full week, the supervisor is going to review it and
21  decide whether or not he's going to apply the
22  discretionary amount?
23      A    Supervisors have discretion in regards to the
24  payment of any discretionary bonuses.
25      Q    Okay. What's the form called for doing this?
```

Case 5:21-cv-00085-OLG   Document 56-2   Filed 08/23/24   Page 8 of 8
Case 5:19-cv-00615-DAE   Document 124-3   Filed 07/27/22   Page 36 of 67

Page 36 (Pages 138-141)

**MARK LAYTON - April 15, 2022**

Page 138

1  Q    Who else besides Mr. Kinsey would -- for the
2  time in Puerto Rico for these discretionary amounts as
3  you call them, who would be entering them besides
4  Mr. Kinsey into the Time Detail Reports?
5       A    Based on my review of the data, the
6  overwhelming majority of the time for which this
7  particular pay code was inappropriately selected was
8  performed by JD Kinsey.
9       Q    Who else would have done it though?  Anyone
10 else?
11      A    There may have been some payroll clerks that
12 utilized this inappropriate day code as well.  I would
13 characterize other employees as utilizing this
14 inappropriate pay code as a relatively minute percentage
15 of the population.  In other words, Mr. Kinsey, based on
16 my review, appears to have been the individual that
17 utilized this day code about 90-plus percent of the
18 time.
19      Q    Okay.  And I'm -- I'm sorry.  I just -- I
20 think we're just talking about two different things, all
21 right?  I feel like you're not answering my question.
22 If I want to talk to other people that potentially may
23 have been entering in these -- these rates or these --
24 these discretionary amounts as you call them, we know
25 Mr. Kinsey would enter them.  Who else, if anyone, would

Page 139

1  enter them into the Time Detail Report?
2            MR. STUKENBERG:  If you know.
3       A    Mr. Kalman may have done some payroll entry as
4  it relates to -- to Puerto Rico.  I don't recall any
5  other clerks off the top of my head.
6       Q    (By Mr. Moulton) Would Missy Davis also enter
7  in payroll?
8       A    I don't recall instances in which Missy Davis
9  input payroll for Puerto Rico related wages.  She
10 certainly would have had inquiry access and visibility
11 on Puerto Rico wages and -- and may have input some
12 small percentage of the population as it relates to
13 Puerto Rico entry.  But in large part, it was Mr. JD
14 Kinsey that input Puerto Rico hourly -- hours and wages.
15      Q    All right.  Moving along with Mr. Tyler
16 Halford.  Looking at the pay period February 5th to
17 February 18th, which is Bates No. Mammoth 535 inside
18 Exhibit 170.
19           Looking at this pay stub, can you tell me
20 how many days he worked?
21      A    Appears to have worked 80 hours, which would
22 be approximately five days.
23      Q    Approximately or exactly?
24      A    I would assume that on the face of this it was
25 probably exactly five days, but I'd have to look at the

Page 140

1  Time Detail Report to confirm that.
2       Q    Which we can do, should be able to do.
3  February 5th, February 18th -- so in that first week of
4  February 5th, I'm counting five days?
5       A    Looks like five days over a two-week period.
6       Q    Well, actually -- yeah, five over a two-week
7  because that 518.72 is a double entry for Monday.  So
8  that's actually four in the first week and one on the
9  second week, correct?
10           Do you agree with that?
11      A    Based on the -- the hours, it looks like there
12 were five days worked over a two-week period.
13      Q    Okay.  And -- and so, again, he was paid
14 $518.72 under the day rate pay code, which brings up his
15 hourly pay calculation up to $4,000, correct?
16      A    It brings up his gross for the pay period to
17 $4,000.
18      Q    Yes, which is exactly what 800 times 5 would
19 be, right?
20      A    800 times 5 is 4,000, yes.
21      Q    Moving right along with Robby Alvear.  In
22 Robby Alvear here, we have an example of him being paid
23 a flat $6,400 for the pay period April 30th to May 13th.
24           Do you see this?
25      A    Yes, I do.

Page 141

1       Q    Okay.  Do you happen to know how many days or
2  hours he worked?
3       A    I can't tell that based on the data on this
4  earning statement.
5       Q    So April 30th to May 13th.  That's going to be
6  this first one here in this Time Detail Report.  If we
7  want to know how many days he worked, how would we
8  figure that out?
9       A    It appears he has entries on eight days.
10      Q    Right.  He has an $800 entered for eight days
11 for this pay period, correct?
12           MR. STUKENBERG:  You're talking about the
13 two-week pay period?
14           MR. MOULTON:  Yes.
15      A    That's correct.  There are eight days at day
16 rate pay code of $800 per day.
17      Q    (By Mr. Moulton) So for every day in this pay
18 period that Mr. Alvear worked, he was paid $800 for each
19 one of those days?
20      A    That appears to be what was input, yes.  That
21 was -- that was a payroll input error by Mr. Kinsey.
22      Q    Another error?
23      A    And Mr. Kinsey was counseled for those errors
24 and ultimately terminated for -- for those errors.
25      Q    Sure.  It's all mistakes?