DONALD KEITH ELLISON  -  May 4, 2022

---

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DIVISION OF TEXAS

FRANCISCO CANTU, et al.,
        Plaintiffs,
versus          Civil Action No. 5:19-CV-00615

MAMMOTH ENERGY SERVICES, INC., et al.

        Defendants.
................................

        Transcript of the videotape deposition of
Donald Keith Ellison, taken before me on May 4, 2022, at
about 9:25 a.m. Mountain Time.

APPEARANCES:
DAVID I. MOULTON, ESQ.
Bruckner Burch, PLLC
8 E. Greenway Plaza
Suite 1500
Houston, Texas 77046
        On behalf of the Plaintiffs
BILL LEONE, ESQ.
HARRIS STAMEY, ESQ.
Norton Rose Fulbright
1225 17th Street, Suite 3050
Denver, Colorado 80202
        On behalf of the witness and Defendants.

VIDEOGRAPHER: Walt Mathorn

APPEARANCES continued on next page.

---

EXHIBIT 24

1   APPEARANCES, continued
2
3
4   JAKLYN GARRETT, ESQ.
5
6       On behalf of the witness.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

        INDEX
WITNESSES                    PAGE

DONALD KEITH ELLISON

    Examination by Mr. Moulton      5
    Examination by Mr. Leone       76

        EXHIBITS

Plaintiffs'
No.     Identification      Marked  Admitted

222   Keith Ellison's       22
      LinkedIn profile
136   Cobra Executive Team  28
      Organizational chart

131   E-mail chain          30

52    Example of offer letter  38

143   E-mail from Jeff Beagle  41

187   PR storm rate         42

151   PR storm per-day rates  47

140   E-mail chain          57

209   November 20 e-mail chain  61

223   E-mail from Ken Kinsey  62
      dated Monday, November 27
      Bates No. 3305

137   Pay scale for Puerto Rico 65

165   E-mail from J.D. Kinzie  66
      with attachment called SLSX

---

Page 4

1   EXHIBITS, continued
2
3
        EXHIBITS
4
5
6   Plaintiffs'
    No.     Identification      Marked  Admitted
7
8   139     Higher Power pay scale  66
9   224     E-mail of October 8     68
10  225     Copy of contract with   69
            Cobra and PREPA
11
12  226     Fourth Amendment to     73
            contract
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT

5

DONALD KEITH ELLISON - May 4, 2022

Page 25

1 employees?
2 A. No, sir.
3 Q. Okay. So you had — you did not manage the
4 compensation of the employees?
5 A. No, sir. We had a payroll department/HR that
6 would handle that.
7 Q. Okay. So for the Higher Power and 5 Star
8 employees, who would manage the compensation of those
9 workers?
10 MR. LEONE: Objection; form.
11 THE WITNESS: There would have been HR
12 personnel and payroll personnel.
13 BY MR. MOULTON:
14 Q. Were there any other folks involved in
15 determining how those folks were paid other than the
16 folks at Higher Power and 5 Star?
17 MR. LEONE: Objection; form.
18 THE WITNESS: Not to my knowledge.
19 BY MR. MOULTON:
20 Q. Okay. So you had nothing to do with setting
21 their pay policies?
22 MR. LEONE: Objection; form.
23 THE WITNESS: It was driven through HR and
24 payroll.
25 BY MR. MOULTON:

Page 26

1 Q. I'm sorry. So you had nothing to do with it?
2 Your answer is nonresponsive. I want to know if you have
3 had anything to do with setting the payroll policies for
4 the folks at 5 Star and Higher Power.
5 MR. LEONE: Objection; form.
6 THE WITNESS: No, sir.
7 BY MR. MOULTON:
8 Q. Did Jeff Beagle have anything to do with
9 setting the pay policies for the folks at 5 Star or
10 Higher Power?
11 MR. LEONE: Objection; form. What is the time
12 period we're talking about?
13 MR. MOULTON: We're talking about — if that's
14 your "form" problem then I'll clarify, sir. We can pull
15 back up.
16 BY MR. MOULTON:
17 Q. For the questions I'm asking I'm talking about
18 during the time period of the work — I'm talking about
19 the workers in Puerto Rico during the time period of when
20 they started working to restore power under Cobra until
21 that project ended, so we're talking about October 2017
22 in Puerto Rico until that work ended, okay? So I'm
23 asking you, did you have anything to do with setting the
24 pay policies that concerned the folks that were working
25 on that project in Puerto Rico to restore power?

Page 27

1 A. No, sir.
2 Q. Okay. Did Mr. Beagle have anything to do with
3 setting their pay?
4 A. I believe Mr. Beagle would have been
5 responsible for making sure payroll was processed by the
6 HR.
7 Q. Did he have any role in determining what pay
8 plan would apply to those workers?
9 A. I'm uncertain. I believe he would have and
10 outside counsel would determine what was fair and right.
11 Q. Okay. So Mr. Beagle did have a role in
12 consulting with counsel trying to make sure that the
13 employees were paid properly under Cobra?
14 A. I'm sorry. Could you rephrase the question or
15 reask the question?
16 Q. So Mr. Beagle had a role in making sure that
17 the employees under Cobra were paid properly?
18 A. Yes.
19 Q. And you had no role — you had no part of that?
20 MR. LEONE: Objection; form.
21 THE WITNESS: No.
22 BY MR. MOULTON:
23 Q. Were you involved in setting the rates of pay
24 for the workers in Puerto Rico?
25 A. Yes.

Page 28

1 Q. And what was your role in setting their rates
2 of pay?
3 A. Myself and the operations team determined per
4 classification of employee what the maximum pay status
5 would be for each position.
6 Q. Okay. Were you also part of setting the
7 holiday pay policy?
8 A. Not to my knowledge.
9 Q. What about the time-keeping policy of the
10 workers in Puerto Rico, what was their role with that, if
11 any?
12 A. No, sir, I don't believe I would have had any
13 involvement in that.
14 Q. Mr. Ellison, we're going to show you Exhibit
15 136 and in this exhibit we're going to go to the page
16 that's Bates numbered Mammoth 3816. It has the
17 organizational chart with Cobra executive team. Can you
18 see that on your screen, sir?
19 A. I believe so.
20 Q. Okay. So here it shows you as president. Are
21 the folks that are shown as your direct reports here, is
22 this correct?
23 A. Yes, sir, with the exception of the outside
24 counsel.
25 Q. You mean general counsel?

7 (Pages 25 to 28)

DONALD KEITH ELLISON   -   May 4, 2022

Page 45

1   A. I said I didn't have a dog in that fight.
2   Q. In the hunt?
3   A. In the hunt, period. We weren't fighting.
4   BY MR. MOULTON:
5   Q. On Exhibit 143 you clearly do because you, as
6   president of Cobra, say I'm very good with it?
7       MR. LEONI: Objection to form; and it's
8   argumentative.
9       THE WITNESS: Yes, sir, I said that.
10  BY MR. MOULTON:
11  Q. So sitting here today, you're not able to
12  recall what version of the offer letter you approved or
13  disapproved?
14  A. Not unless you show me the one that was
15  attached to this e-mail thread.
16  Q. I can't tell. What the production I got from
17  the defendants, I don't know which one it was. I thought
18  I had the right one just because it's the one that seems
19  to match, but I can get the e-mail you did.
20      MR. LEONE: Objection to form. This was four
21  years ago.
22  BY MR. MOULTON:
23  Q. All right. So eventually you were aware that
24  Mr. Beagle and a few others at Mammoth spoke with a
25  lawyer named Mr. Brusard (ph) about pay. Did you know

Page 46

1   about that?
2   A. I knew that Mr. Beagle was going to seek
3   outside counsel's advice to ensure that what the company
4   was doing was legal and proper.
5   Q. Okay. But you weren't up -- you weren't a part
6   of the discussions with counsel about that?
7   A. No, sir.
8   Q. So you don't know what was said or not said in
9   the meetings with lawyers?
10  A. No, sir.
11  Q. Were you shown any e-mails about what the
12  outside counsel said about how to pay the workers or not
13  pay the workers?
14  A. Not to my knowledge.
15  Q. Is it your understanding that Mr. Beagle worked
16  out some hourly rates that if the worker worked the
17  entire week would get the equivalent of their day rate
18  times seven?
19  A. Not to my knowledge.
20  Q. You weren't aware of that?
21  A. No, sir.
22  Q. Okay. So in your opinion how were the workers
23  being paid?
24  A. I didn't know.
25  Q. You didn't know how they were paid?

Page 47

1   A. No, sir.
2   Q. Okay. So you've never seen Cobra's pay scale?
3   A. The pay scale that was originally suggested as
4   to what the maximum was per classification?
5   Q. So you know about that one. Did you ever see
6   one -- were you ever aware of a pay scale that had those
7   amounts broken into hours?
8   A. I don't recall.
9   Q. Look at Exhibit 151. Do you recognize Exhibit
10  151?
11  A. I see it but, I mean, I don't recall having
12  reviewed it.
13  Q. Okay. So this is the first time you've ever
14  seen this document?
15  A. I can't say it's the first time, but based on a
16  lot that has transpired over the last four years I don't
17  remember.
18  Q. All right. Will you agree with me on Exhibit
19  151 that the PR storm per-day rates are the rates that
20  you set forth in your October 19th e-mail, right?
21  A. I agree that that's the proposed rate.
22  Q. Were you ever aware that the company decides to
23  start grossing up the worker's pay to a day rate, does
24  that sound familiar to you at all?
25  A. Can you rephrase the question?

Page 48

1   Q. Yes.
2       Were you aware that the company grossed up the
3   worker's pay up to the day rate amount when they worked
4   less than a full week?
5   A. No, sir, I wasn't aware that that was taking
6   place at the time.
7   Q. Okay. So as far as you knew they were just
8   being paid their day rate?
9       MR. LEONE: Objection; form.
10      THE WITNESS: As far as I knew they were being
11  paid whatever -- whatever was worked out between them and
12  HR and payroll when they came on for the days that they
13  worked.
14  BY MR. MOULTON:
15  Q. So you don't know how the workers were paid, is
16  that what you're saying?
17  A. That is correct.
18  Q. Okay. So you never had any discussions with
19  Jeff Beagle about the policy to gross up the day rates,
20  or I'm sorry, to gross up the hourly pay up to the day
21  rate?
22  A. Not that I recall.
23  Q. He never talked to you about it?
24  A. Not that I recall.
25  Q. Do you recall any conversations about grossing

12  (Pages 45 to 48)