**EXHIBIT 6**

```
                    UNITED STATES FEDERAL COURT
                     WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION

AARON MALDONADO, et al,      )
                             )
Plaintiffs,                  )
                             )
                             )
VS.                          )  CASE NO. 5:21-cv-85-OLG
                             )
                             )
MAMMOTH ENERGY SERVICES,     )
INC., COBRA ACQUISITIONS,    )
LLC, HIGHER POWER            )
ELECTRICAL, LLC AND 5        )
STAR ELECTRIC, LLC           )
                             )
Defendants.                  )
```

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF
STEVEN BROUSSARD
MAY 9, 2024
(REPORTED REMOTELY)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL DEPOSITION OF STEVEN BROUSSARD, produced as a witness at the instance of the PLAINTIFFS, and duly sworn, was taken in the above-styled and numbered cause on MAY 9, 2024, from 9:04 a.m. to 10:31 a.m., before Deborah Garney Viator, RPR, CSR No. 2394, Louisiana CCR No. 99011, in and for the State of Texas, reported by machine shorthand, at the offices of Hall Estill, 521 East 2nd Street, Suite 1200, Tulsa, Oklahoma 74120, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

EXHIBIT 3

NELL McCALLUM & ASSOCIATES, INC.   409-838-0333
NELL McCALLUM & ASSOCIATES

1

**Page 6**

1   A. That's correct.
2   Q. And how long have you been with Hall Estill?
3   A. Over 36 years.
4   Q. Okay. Have you worked for anyone else once you
5   received your law degree?
6   A. No.
7   Q. Okay. And are you board certified?
8   A. No.
9   Q. All right. Can you -- can you summarize your
10  experience with wage and hour law for me?
11  A. Yes. I assist employers -- or have assisted
12  employers with respect to wage and hour issues and in
13  defense of claims related to wage and hour matters.
14  Q. And is that your primary focus; or do you do
15  other types of employment law, litigation and advice?
16  A. Yes, I do other types of employment law, as
17  well, litigation and advice.
18  Q. Okay. What percentage of your practice is made
19  up of wage and hour law?
20  A. That's going to vary from time to time. I
21  don't know if I can give you an actual percentage
22  because it could be on a weekly basis at times, I'm
23  advising clients with regard to wage and hour law. It
24  might be -- 30 days may go by. But I don't know if I
25  can give you a breakdown.

**Page 8**

1   Q. And if you will let me finish my question
2   before you start to answer, then I will let you finish
3   your answer before I begin the next question. Is -- is
4   that acceptable?
5   A. Yes.
6   Q. And, really, the final ground rule is that if I
7   ask you a question that you don't understand, please
8   feel free to ask me to rephrase the question. I'm --
9   I'm more than happy to do so.
10      And if you answer my question, I'm going
11  to assume that you understood it; is that fair?
12  A. Yes.
13  Q. Okay. For purposes of this deposition, anytime
14  I say "Mammoth," I'm referring to Mammoth Energy
15  Services, Inc. Do you understand that?
16  A. Yes.
17  Q. Anytime I say "Cobra," I'm referring to Cobra
18  Acquisitions, LLC; okay?
19  A. Okay.
20  Q. Anytime I say "5 Star," I'm referring to 5 Star
21  Electric, LLC; is that okay?
22  A. Okay.
23  Q. And anytime I say "Higher Power," I'm referring
24  to Higher Power Electrical, LLC; all right?
25  A. Okay.

**Page 7**

1   Q. Okay. I -- I think that's fair.
2       My name is Doug Welmaker, and I represent
3   a group of linemen that went down to Puerto Rico in 2017
4   and 2018 and were employed by all four of the defendants
5   in this case -- Mammoth, Cobra, 5 Star, and Higher
6   Power.
7       Do you understand that?
8   A. I don't understand who they were employed by.
9   And --
10      MR. NETTLES: I'm sorry. And I'm going to
11  object to the form of the question, too, in that it
12  assumes facts not in evidence.
13  Q. (BY MR. WELMAKER) Yeah, I'm just trying to set
14  the stage to let you know that I am -- I have -- let's
15  put it this way: I've brought suit against Mammoth,
16  Cobra, Higher Power, and 5 Star for unpaid overtime for
17  this group of linemen.
18      Do you understand that?
19  A. I understand that you represent the plaintiffs,
20  yes.
21  Q. Okay. You know the ground rules for a
22  deposition. No shaking of your head, no "huh-uh" or
23  "uh-huh," because the court reporter can't get that
24  down; right?
25  A. Yes.

**Page 9**

1   Q. Just for purposes of -- of moving this along
2   and speeding it up. Excuse me.
3       So have you represented Mammoth Energy
4   Services in the past?
5   A. I have, in the past, represented affiliates or
6   companies that may be owned by Energy Services.
7   Q. Okay. Do you know if you've ever represented
8   or provided advice to Mammoth Energy Services, Inc.?
9   A. I'm not exactly sure of which entity it may be
10  of Mammoth that I would have provided some advice to.
11  It's possible. I just can't tell you exactly which
12  Mammoth entity I might have provided advice to in terms
13  of the name "Mammoth."
14  Q. Okay. Does it help if I narrow the date range
15  down to the 2017-2018 period of time?
16  A. Not necessarily.
17  Q. Okay. Have you represented Cobra Acquisitions,
18  LLC, in the past?
19  A. I would say, with respect, that, yes.
20  Q. Okay. Did you give Cobra Acquisitions, LLC,
21  advice in the 2017 to 2018 period?
22  A. I believe I did.
23  Q. Okay. Have you provided advice to 5 Star
24  Electric, LLC, in the 2017-2018 period?
25  A. Possibly.

**Page 10**

1  Q. You're not sure about that?
2  A. Well, I -- I -- again, I -- I've represented or
3  provided advice to numerous companies affiliated with
4  Mammoth. I can't tell you exactly which entities,
5  necessarily, and which time frame. So it's pretty
6  possible that I did.
7  Q. Okay. And my final question on this is: Have
8  you provided advice to Higher Power Electrical, LLC, in
9  the 2017-2018 time period?
10  A. That's also very possible.
11  Q. Okay. Just with respect to -- to cases similar
12  to mine, where attorneys are suing the four entities
13  involved in this case for unpaid overtime, how many
14  times have you given a deposition?
15  A. Once.
16  Q. Okay. And when was that deposition taken?
17  A. I think it was a couple of years ago.
18  Q. Okay. So is it true that in about late
19  October -- or let's just say late 2017, you were
20  approached to give advice to Mammoth or its subsidiaries
21  about a pay plan for workers that were going down to
22  Puerto Rico to help restore the electrical grid after
23  Hurricanes Maria and Irma?
24  A. I believe I was approached by one of those
25  entities in October of 2017.

**Page 11**

1  Q. Okay. What sort of advice were you asked to
2  provide?
3  A. Well, there was a number of things we were
4  looking at and advised to ask. One of them was related
5  to wage and hour issues, with respect to workers in
6  Puerto Rico. There were a number of other issues
7  that -- some related to other employment matters and
8  some related to some other matters that -- I don't know
9  if they would necessarily be considered employment
10  issues.
11  Q. Okay. Do you remember who first approached you
12  about the Puerto Rico project in October, 2017?
13  A. I think it was one of two individuals.
14  Q. And -- and who were those individuals?
15  A. It would have been either Jeff Beagle or
16  Mark Layton.
17  Q. Okay. And who was Jeff Beagle with?
18  A. At that time, Jeff Beagle worked for one of the
19  Mammoth entities, at least as far as I understood.
20  Q. And who was Mark Layton with?
21  A. He was also with one of the Mammoth entities.
22  Q. Okay.
23  A. And when I say "Mammoth entities," I want to
24  make sure it's related to Mammoth as you described it.
25  It's not exactly necessarily the defendant in this

**Page 12**

1  lawsuit.
2  Q. Okay. Do you know which Mammoth entity it was?
3  A. I really would not know without looking at the
4  information or talking to Mark or Jeff.
5  Q. Okay. So just to help out here, I'm going to
6  try to share my screen and show you what's been marked
7  as Exhibit No. 1. Do you have those printed out in
8  front of you, or are you --
9  A. No. If you want to put it on the screen, I can
10  look at it on the screen.
11  Q. Okay. Are you going to be able to see it okay?
12  A. If I can't, I'll let you know.
13  Q. Okay.
14  A. And I think Gene may try to pull it up on his
15  iPad.
16  Q. All right. It's thinking (screen sharing).
17  A. If you'd like, Gene pulled it up for us on the
18  iPad okay.
19  Q. Okay. So what I'm showing you has been marked
20  as Exhibit 1. The Bates stamps are 2366 to 2367. And
21  what I'd like to draw your attention to is this bottom
22  half of the email.
23  A. Yes.
24  Q. So it looks like this email is from
25  Jeff Beagle, jbeagle@mammothenergy.com, to you. And it

**Page 13**

1  is dated October 18th, 2017.
2     Do you see that?
3  A. Yes, sir.
4  Q. Okay. Looking at Mr. Beagle's signature block
5  at the bottom of this email, does that help refresh your
6  memory as to which entity employed Mr. Beagle?
7  A. I don't know. There's a Mammoth Energy email
8  address, but it doesn't indicate to me which -- who he
9  was actually employed by.
10  Q. Okay. And what was Mr. Beagle's position when
11  he emailed you on October 18th?
12  A. I understood to be an HR director.
13  Q. Okay. So he was telling you that there's a
14  possibility of deploying about 250 employees to work in
15  Puerto Rico for six to twelve months, and it looks like
16  he's wanting to generally consult with you about that.
17     Do you agree with that?
18  A. Yes.
19  Q. Okay. So that is October 18th.
20     Let me go to Exhibit 2, which is Bates
21  stamped 2373 through 2375.
22  A. Okay.
23  Q. And so what I would like you to do is go to the
24  bottom of 2374, which is the second page, and ask you if
25  you can see the email from Keith Ellison here. That's

**Page 18**

1  A. Let's see. Just one second.
2  Q. Take your time.
3  A. I think that first paragraph, yes, I talk about
4  a statement for Puerto Rico law, the signed statement,
5  acknowledging that the terms of their employment
6  relationship, while working in Puerto Rico, would be
7  governed by the laws of their home states or another
8  jurisdiction —
9  Q. Okay.
10 A. — yes.
11 Q. And so do you recall reviewing any offer
12 letters provided to you by Mammoth Energy?
13 A. Yes.
14 Q. Okay. Do you recall reviewing any offer
15 letters provided by Cobra Acquisitions?
16 A. Let me back up just a second.
17    You mentioned Mammoth Energy. I don't
18 recall that. And I don't recall — yeah, there wasn't
19 anything by Mammoth — Mammoth Energy. I don't remember
20 any offer letters from them.
21    But I do recall I looked at a template for
22 an offer letter for one of the other entities, and I
23 can't remember which entity that was right now.
24 Q. Who — who provided you the offer letters that
25 you reviewed?

**Page 19**

1  A. The — what I reviewed was provided to me by
2  Jeff Beagle.
3  Q. Okay. So this first part of your email, you're
4  talking about basically how to prevent Puerto Rico law
5  from applying to the linemen that went down to
6  Puerto Rico; is that correct?
7  A. Well, not exactly. So as I remember,
8  Puerto Rico's Labor Transformation and Flexibility Act
9  had just gone into — in — gone into effect, and it
10 provided, with respect to employees working temporarily
11 in Puerto Rico, with some exemptions for wage and hour
12 laws in Puerto Rico.
13    There were some — as I understood it at
14 the time, there were some laws that would still apply to
15 those individuals that would be — that would make them
16 applicable — or applicable to them with respect to
17 Puerto Rico law. I think Workers' Comp, and there may
18 have been some other issues like tax and discrimination.
19 Q. Taxes, discrimination, and Workers' Comp is
20 what you say in Paragraph 3.
21 A. Yes. Yes.
22 Q. Okay. So what you're doing is you're advising
23 them, in order to avoid Puerto Rico law applying to
24 these linemen, they needed to specify in the offer
25 letters that — offer letter that some other state law

**Page 20**

1  would apply to each worker; is that correct?
2  A. That's what my note says, yes.
3  Q. Okay. Did you understand that Mammoth would be
4  using these offer letters with Cobra, Higher Power, or
5  5 Star?
6  A. I didn't understand that Mammoth would be
7  making any offers because, my understanding, it was
8  either going to — and — and maybe — and I'm not even
9  sure Cobra was going to — Acquisitions was going to be
10 making offers.
11    My understanding, that there were some
12 affiliated companies that were going to be doing hiring
13 and bringing employees in to work in Puerto Rico. I
14 don't remember Mammoth being actually one of those
15 entities, and I'm not sure about Cobra Acquisitions.
16 Because that doesn't sound like — that doesn't sound
17 like — I don't think Cobra Acquisitions was, either. I
18 think it had to do with these other entities.
19 Q. Okay. Do you know one way or the other on
20 Cobra Acquisitions, though?
21 A. I don't remember seeing anything in terms of a
22 template for Cobra Acquisitions so I — I don't know. I
23 just don't know.
24 Q. Okay. Do you know if Mr. Beagle was going to
25 distribute the offer letters to Cobra or Higher Power or

**Page 21**

1  5 Star?
2  A. I — I don't know what he — what he actually
3  did with it or what his intent was, but I — I was under
4  the impression that he was helping put together these
5  offer letters for certain entities that would be hiring
6  individuals and having them work in Puerto Rico.
7     And those — and, again, I — and I'm
8  not — it may have been some of the other defendants
9  other than Mammoth in this case. I don't believe it was
10 Cobra Acquisitions, but I do know — at least, I — I
11 saw one or two — and you probably have those
12 documents — but I saw one or two that had the actual
13 name of the — of a company.
14 Q. Okay.
15 A. It might have been Higher Power.
16 Q. Okay. And — and as part of the advice you
17 were providing, you weren't expected to follow up to
18 make sure that the offer letters were actually sent out
19 by Mammoth or its subsidiaries, were you?
20 A. I did not.
21 Q. So you don't know if they were sent out, and
22 you don't know if they were received back; correct?
23 A. That's correct.
24 Q. And you took no role in ensuring that Mammoth
25 or its subsidiaries actually implemented the advice that

Page 22:

```
 1  you're providing about the offer letters here; correct?
 2     A.  Other than possibly talking to Jeff Beagle and
 3  providing my suggestions, I can't think of anything
 4  else.
 5     Q.  Okay.  And are you talking about talking to
 6  Jeff Beagle in this email or at a subsequent time?
 7     A.  There were conversations that I had with Jeff,
 8  and I know there were discussions.  But when you talk
 9  about implementation, for example, I -- I didn't say,
10  you know, "Hey, Jeff, I need to see copies of all the
11  signed agreements; and I need to make sure I know what
12  day it goes out."  There was none of that.
13     Q.  That wasn't your role?
14     A.  I'm trying -- that wasn't -- yeah, that was
15  not -- well, yeah, I didn't -- I was not involved in
16  that at all.
17     Q.  Okay.  So you don't know what was sent out; and
18  you don't know what was signed and sent back, correct,
19  with respect to offer letters?
20     A.  Yeah, I -- I -- I couldn't tell you what was
21  signed.
22     Q.  Okay.  Let me show you Exhibit 3.  And before
23  we start on this, obviously, I don't want to get into
24  any privileged issues.  So that's not my goal here.
25     A.  Okay.
```

Page 23:

```
 1     Q.  And this is Bates stamped 2261 through 2263.
 2     A.  Yes.
 3     Q.  And at the bottom, we see an email to Keith --
 4  from Keith Ellison to Jeff Beagle, and it just says
 5  "Terminated Staff"; correct?
 6     A.  Let's see here.  I see one from -- is it one
 7  from Jeff Beagle to Keith Ellison, dated November 21,
 8  2017?
 9     Q.  Yeah, this is from -- it's on Page 2261; and
10  it's just at the bottom, from Keith Ellison to
11  Jeff Beagle, dated November 21st, at 10:55 a.m.
12     A.  Oh, shoot.  Hold on a second.  Yeah, let me
13  see.  Oh, I see it on -- on your screen.  Okay.
14         And that's -- yes, I see that.  Okay.
15     Q.  Okay.  So --
16     A.  Yes.
17     Q.  Then it looks like Beagle sent an email,
18  November 26, 2017, at 9:21.  It doesn't say who to, and
19  everything else has been redacted.  But a couple of
20  minutes later you respond and say, "Jeff, can you send
21  me a copy of the offer letter signed by the employee?"
22         Do you see that?
23     A.  (Distorted audio)
24     Q.  Were you able to see that, Mr. Broussard?
25     A.  I'm sorry.  What was the question, again?
```

Page 24:

```
 1     Q.  It looks like you responded back to Jeff, on
 2  November 26, at 9:32 a.m., and asked him to send you a
 3  copy of the offer letter signed by the employee in
 4  question that you're discussing.
 5     A.  Yes.
 6     Q.  Okay.  And then at the top, we see, from
 7  Jeff Beagle to you, an email dated November 26, at
 8  11:00 o'clock a.m.; and he says, "This is a sample."
 9         Do you remember seeing this email?
10     A.  Yes.
11     Q.  Okay.  So without getting into privilege
12  issues, were you -- or can -- can you tell me what --
13  what you were doing, generally?
14     A.  It was not a wage and hour issue.  So that -- I
15  can tell you that.  It was -- it had to do with another
16  issue.
17     Q.  Okay.  All right.  That's fine.
18         And so with respect to your desire to look
19  at the offer letter, what did you hope to get from your
20  review?
21     A.  I was looking to see if the
22         (ZOOM interruption) --
23         THE REPORTER:  Mr. Broussard, we've lost
24  you.
25         Doug, do you want to go off the
```

Page 25:

```
 1  record?
 2         MR. WELMAKER:  Sure.
 3         THE REPORTER:  Okay.  We are off the
 4  record.
 5         (RECESS FROM 9:34 A.M. TO 9:35 A.M.)
 6         THE REPORTER:  Okay.  We are back on the
 7  record.
 8         (THE PRECEDING QUESTION WAS READ BACK)
 9         THE REPORTER:  And then the answer that I
10  have is, "I was looking to see if the"; and then that's
11  when we lost you.
12     A.  All right.  So what I was going to say is I was
13  looking to see, in the offer letter, if it might have
14  some information that I might deem pertinent to the
15  issue that was not the way -- not a wage and hour issue
16  that I was looking at.
17         MR. WELMAKER:  Okay.  All right.  So let's
18  go off the record and see if we can get your -- your IT
19  folks to -- to pull back up the screen.  Worst case
20  scenario, we can just do it through Gene's iPad; but
21  let's -- let's see what they can do.
22         THE WITNESS:  Yeah, we'll be right back.
23         THE REPORTER:  Okay.  We are off the
24  record.
25         (RECESS FROM 9:38 A.M. TO 9:50 A.M.)
```

**Page 34**

1 reasons, such as the -- the individuals' titles?
2    A. You know, I don't -- I don't know if I could
3 say we were necessarily doing that. I think the -- as
4 my understanding, these folks, except for perhaps the
5 foreman, these were -- all would have been individuals
6 who were nonexempt, doing manual type of labor out in
7 the field. So I don't remember if we had a discussion
8 about the foreman or not.
9    Q. Okay. Did you have a discussion about any of
10 the other titles on this spreadsheet?
11    A. I don't remember any specific discussions about
12 those titles.
13    Q. And so as I -- I think you testified before,
14 and correct me if I'm wrong, you never got a -- a final
15 determination as to the pay system that was going to be
16 used for the Puerto Rico linemen; is that correct?
17    A. That's correct.
18    Q. Okay. So they -- they -- Mammoth and its
19 subsidiaries could have gone with a day rate, which they
20 would have had to pay overtime on; correct?
21    A. That's correct.
22    Q. And they could --
23    A. With regard to, at least, some of the employees
24 out there. I -- you know, I think they had some
25 managers out there, obviously, would have been an --

**Page 35**

1 exempt. But, yeah, with regard to some employees, they
2 would have.
3        Mammoth -- Mammoth wouldn't have been
4 working out there, had their employees there. It would
5 have been the subsidiaries or affiliated companies that
6 would have been controlled by that.
7    Q. Working down at Puerto Rico at that time?
8    A. Yes.
9    Q. Okay. So let's just -- I think you make a good
10 point with respect to the nonexempt employees.
11    A. Uh-huh.
12    Q. If Mammoth or its subsidiaries was going to pay
13 them a day rate, then they're still going to have to pay
14 overtime on that day rate if these in- -- individuals
15 worked more than 40 hours in a workweek; right?
16    A. I think that was our discussion, yes.
17    Q. Okay. And is that your opinion? Is that the
18 advice that you provided?
19    A. Yes.
20    Q. Okay. And by the same token, if -- if these
21 folks were going to be paid hourly and they worked more
22 than 40 hours in a workweek, then they're going to be
23 paid overtime at time and a half; correct?
24    A. Yes.
25    Q. Okay. So were those the two options that you

**Page 36**

1 discussed with Beagle and other Mammoth representatives,
2 day rate and hourly pay?
3    A. Those were the two, I think, that -- that we --
4 the primary discussion. I think there might have been
5 some discussions about possibly the fluctuating workweek
6 and how we would handle that, but I don't think that was
7 applicable under the circumstances.
8        And there may have been some other
9 discussions about other matters or options, prior to
10 kind of -- at least in my mind -- focusing on the day
11 rate and hourly pay issues.
12    Q. Okay. Did you ever talk about a -- a third
13 option that would be hourly, but boosted up to the day
14 rate? So that if the pay fell below promised day rate,
15 it would be brought up to what it was promised?
16    A. I don't know if I remember any conversations
17 about that.
18    Q. Okay. Did you ever discuss a system that even
19 though it was hourly, Mammoth or its subsidiaries would
20 pay additional compensation in addition to the hourly
21 rates?
22    A. I don't remember that.
23    Q. Okay. So the two plans that you were looking
24 at were just hourly and day rate, and -- and you weren't
25 contemplating a mixed plan as a potential third option;

**Page 37**

1 correct?
2    A. I think my last -- the last I remember, we left
3 it -- in terms of discussions were, you know, did they
4 go with the day rate; do they go with an hourly rate?
5 Those were things that I remember, at the end of the
6 day, that they were discussing. Now -- but I don't
7 remember any other particular method.
8        MR. WELMAKER: Okay. I'll pass the
9 witness.
10        MR. NETTLES: Guys, let's take just a
11 short break. I think I've got a handful of questions,
12 and that'll be it.
13        MR. WELMAKER: Okay.
14        THE WITNESS: Okay.
15        THE REPORTER: Okay. We're off the
16 record.
17        (RECESS FROM 10:07 A.M. TO 10:11 A.M.)
18        THE REPORTER: We're back on the record.
19        EXAMINATION
20        (10:11 A.M.)
21 BY MR. NETTLES:
22    Q. Mr. Broussard, my name is Gene Nettles; and you
23 understand that I'm a lawyer with Porter & Hedges and
24 represent the defendants in this case?
25    A. Yes.