Case 5:21-cv-00085-OLG  Document 56-7  Filed 08/23/24  Page 1 of 5
Case 5:19-cv-00615-DAE  Document 121-6  Filed 06/15/22  Page 2 of 19

Page 1

JEFFREY ATLEE BEAGLE  -  April 18, 2022                    EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


FRANCISCO CANTU and          )CIV A. NO.:5:19-CV-00615
NORBERTO ELIZONDO,           )
individually and             )JURY TRIAL DEMANDED
on behalf of all others      )
similarly situated,          )CLASS/COLLECTIVE ACTION
                             )PURSUANT TO 29 USC
          Plaintiffs,        )SECTION 216(b)/FED R.
                             )CIV. R. CIV. P. 23
                             )
vs.                          )
                             )
MAMMOTH ENERGY SERVICES,     )
INC., d/b/a COBRA ENERGY     )
and HIGHER POWER             )
ELECTRICAL, LLC,             )
                             )
          Defendants.        )



VIDEOTAPED DEPOSITION OF JEFFREY ATLEE BEAGLE

TAKEN ON BEHALF OF THE PLAINTIFFS

IN OKLAHOMA CITY, OKLAHOMA

ON APRIL 18, 2022



REPORTED BY:  KAREN B. JOHNSON, CSR

### JEFFREY ATLEE BEAGLE - April 18, 2022

Page 26

1  A    Okay.

2  Q    And you provided another explanation in
3  this process in Exhibit 176 to Mr. Kinsey, so
4  let's look at this.

5       (Plaintiff's Exhibit Number 176 marked for
6       identification and made part of the
7       record)

8  Q    (By Mr. Moulton) Exhibit 176, Mammoth
9  3515, we got J.D. Kinsey writing to Alex and
10 you're going to be answering the question up here.
11 Let's look at this.  "Hey, Alex, I was doing some
12 math based on a breakdown that you've given me, it
13 was the breakdown of what the guys are supposed to
14 make per day and the breakdown per hour.  If the
15 breakdown per hour is correct, it doesn't match up
16 to the day rate.  I was just hoping that you could
17 help me to better understand the math part.  I'm
18 attaching the file that I was looking at."

19      And then you ask if he's accounting for
20 over 40, you clear it up that it's supposed to be
21 over 40, but not eight and eight.  But the part
22 that I want to ask you about is on the top here,
23 your answer to Mr. Kinsey about how to calculate
24 the rates, and let's look at this.

25      "If you take the 16-hour days with seven

Page 27

1  days in a workweek, you'll get 112 hours.
2  Anything over 40 in a workweek is time and a half.
3  So if you take for the week 40 hours times the
4  base, then 72 hours times the base times one and a
5  half, you'll get the equivalent of the day rate
6  times seven."  Is that how y'all figured out what
7  the rates should be?

8  A    Yeah, like I said, I think we consulted
9  with Steve Broussard that there was this
10 expectation from -- from Keith of kind of what the
11 positions would pay from a budgeted standpoint or
12 what they would be expected to make in the field,
13 and then we tried to work with Steve to come up
14 with the correct approach to hit that target.

15 Q    And I believe that you actually prepared a
16 spreadsheet that would show how these calculations
17 were made; correct?

18 A    Probably, yes, yeah.

19 Q    All right.  Let's -- let's look at it,
20 let's look at it here, and just for -- what I'm
21 going to show you is a native Excel file.

22 A    Okay.

23      (Plaintiff's Exhibit Number 167 previously
24      marked for identification and made part of
25      the record)

Page 28

1  Q    (By Mr. Moulton) For the court reporter,
2  this is Exhibit 167, it's Mammoth 3292 in Excel.
3  I don't have an exhibit sticker on it because
4  we're going to look at the formulas.

5       So looking at this spreadsheet, are you
6  familiar with it?  Should we walk through it a
7  little bit?

8  A    It does look familiar.

9  Q    Okay.  So the way I understand it is that
10 you've come up with a total adjusted hours by
11 taking the regular hours and then plus one and a
12 half, the overtime hours, and come up with an
13 adjusted hours of 148, do you see that?

14 A    Okay.

15 Q    In Column H, okay.  Then you have your
16 budgeted day rates in Column I, and then if you
17 were to get your -- if a person, if one of the
18 workers was getting their day rate for the whole
19 week, and Column J has amounts due and earned for
20 the whole week; correct?

21 A    Right.

22 Q    Then in K we get like what the hourly
23 rates you would need to get to -- to you so that
24 if they work the whole week with 16 hours per day
25 times seven, with the regular and the overtime,

Page 29

1  that's the amount of pay, that's the hourly rate
2  that would need -- that they would need to get for
3  that to work in Column K; correct?

4  A    Correct.

5  Q    Okay.  And here you're checking your math,
6  make sure it works in the Column L?  And I'm
7  asking you, is that what you're --

8  A    Yes, yes.

9  Q    And in Columns N through Q, it looks like
10 there's a calculation here of how much the
11 overtime would be owed if a day rate were being
12 paid, do you agree with that?

13 A    Say that again.

14 Q    In Columns N through Q, it looks like
15 you're calculating how much overtime would be owed
16 if the workers were paid a day rate?

17      MR. STUKENBERG:  Objection; form.

18      THE WITNESS:  I don't know what that

19 means.

20 Q    (By Mr. Moulton) Okay.  So Column N, I
21 see -- let's see if we can kind of work through
22 it, may just be a lot to take in.  So if you take
23 the L2 divided by D2, that figure in Column N, to
24 me that looks like a calculation of what a regular
25 rate would be for a person if they had been paid a

## JEFFREY ATLEE BEAGLE  -  April 18, 2022

Page 86

1  are the benefits that were, in fact, offered to
2  the workers?
3      A    To the best of my recollection, it seems
4  right, yes.
5      Q    Okay.  Were you ever a part of any
6  discussions about whether or not either Higher
7  Power or 5 Star had enough money in their accounts
8  to cover payroll?
9      A    I -- I -- not that I specifically recall,
10  but it's possible that would have worked with
11  accounting or something like that.
12      Q    Okay.  And do you know how Mammoth would
13  handle finances as far as transferring to and from
14  its entities?
15      A    I don't recall now.
16      Q    Were you part of what they call the
17  treasury shared function?
18      A    I don't think so.  I did a little bit of
19  treasury when I first started with Stingray when
20  they were very small, but not with Mammoth, no.
21      Q    Okay.  So in your position as HR director
22  with Mammoth Energy, Inc., you're part of a shared
23  resource for all the entities of Mammoth; right?
24      A    Correct.
25      Q    Okay.  In your opinion, what does that

Page 87

1  mean when you're part of a shared resource,
2  what -- how does that -- how does your work affect
3  everyone else?
4      A    I think we're there to provide services
5  that maybe the subsidiary or related parties don't
6  have internally within their own kind of vertical,
7  that could be HR support, accounting support,
8  finance support, to kind of consult and guide them
9  in their business operations.
10      Q    Okay.  When -- when you guys were
11  consulting with Mr. Broussard about the pay plan,
12  which entities was that going to apply to?
13      A    It would have been Higher Power and 5 Star
14  and potentially Cobra, but I can't recall.
15      Q    Okay.  But -- and the way I understand it,
16  you weren't an employee of either of those
17  entities; right?
18      A    I was not.
19      Q    Or an employee, I mean.
20      A    Yeah, employee, correct.
21      Q    You were only employed by Mammoth Energy,
22  Inc.?
23      A    Yes, at that time, yes.
24          MR. MOULTON:  Will, I'm going to pass this
25  witness.

Page 88

1          MR. STUKENBERG:  Great.  Thank you, Dave.
2  I've got a couple of questions.  As it -- and,
3  Dave, if you can't hear me, let me know.
4                  CROSS-EXAMINATION
5  BY MR. STUKENBERG:
6      Q    As it relates to Mr. Kalman and
7  Mr. Kinsey, what role, if any, did they have in
8  establishing the pay structure?
9      A    Very little.  I think Alex was more of a
10  payroll coordinator, he actually joined us from
11  our payroll provider, so that kind of technical
12  knowledge on the system was why he was brought in.
13  And I don't think J.D. had any, I think he may
14  have even joined after the practice was kind of
15  already in the process or developed.
16      Q    Okay.  So their role was not to create the
17  payroll system?
18      A    Correct.
19      Q    Okay.  They were more execution processing
20  payroll?
21      A    Correct.
22      Q    And is that true for the bonus payments or
23  gross-ups that we've been talking about today?
24      A    Correct.
25      Q    Okay.  Why did you all consult

Page 89

1  Mr. Broussard?
2      A    We wanted to, I think, just -- simple
3  answer, we wanted to do it the right way.  We
4  wanted to do it in a compliant manner and just had
5  some questions on how to make sure we were doing
6  that.
7      Q    Okay.  And so the purpose was to make sure
8  that you all were in compliance with the Fair
9  Labor Standards Act?
10      A    Correct.
11      Q    And did you believe you were in compliance
12  with the Fair Labor Standards Act?
13      A    Yes.
14          MR. MOULTON:  Objection; form.
15      Q    (By Mr. Stukenberg) Were you at any point
16  given any indication that you were anything but in
17  compliance with the Fair Labor Standards Act?
18          MR. MOULTON:  Objection; form.
19          THE WITNESS:  No.
20      Q    (By Mr. Stukenberg) Mr. Broussard approved
21  the offer letters that ultimately went out in this
22  case as being compliant?
23      A    Yes.
24          MR. MOULTON:  Objection; form.
25      Q    (By Mr. Stukenberg) What was the original

**JEFFREY ATLEE BEAGLE - April 18, 2022**

Page 90

1  target number of hours per day, do you recall?
2      A    I think it was either 10 or 12.
3      Q    Okay.  And then ultimately, that migrated
4  to 16?
5      A    Correct.
6      Q    Why was that increased to 16?
7      A    I think 16 was the maximum that anybody
8  would ever work, it was also the amount time that
9  they were expected to be on call and available
10  even if they'd returned to the company-provided
11  housing to go back out to the field, so 16 is what
12  we set it at to compensate for that on-call time.
13      Q    Okay.  Let's take a look at --
14          MR. STUKENBERG:  Anthony, it will be my 5,
15  but it will be something else.
16          MR. MOULTON:  Sorry?
17          MR. STUKENBERG:  I'm going to have Anthony
18  pull up a document for me.
19          MR. MOULTON:  Which one?
20          MR. STUKENBERG:  We have a different
21  numbering system, so he's going to pull it up.
22          MR. MOULTON:  No, you don't.  I have all
23  your exhibits, bro.
24          MR. STUKENBERG:  He's going to pull it up
25  as 5 and then he's going to tell you what number

Page 91

1  it is that's in your system.
2          MR. MOULTON:  Oh, okay.  Are you using the
3  same number you used before, Exhibit 5?
4          MR. STUKENBERG:  No.
5          MR. MOULTON:  Okay.
6          MR. STUKENBERG:  I'm not marking it as
7  Exhibit 5.
8          MR. MOULTON:  If you'll note, is it a new
9  one or what are you doing?
10          MR. STUKENBERG:  No, it's one we used, I
11  just don't know the number, the previous number.
12  Anthony may not be there.  Anthony, are you there?
13          MR. ARTEAGA:  I'm here, sir.  Can you guys
14  see it?
15          MR. STUKENBERG:  No.
16          MR. ARTEAGA:  No?  Okay.
17          THE WITNESS:  We can see it.
18          MR. ARTEAGA:  How about now?  Okay.
19          (Exhibit Number 134 previously marked for
20          identification and made part of the
21          record)
22      Q    (By Mr. Stukenberg) Do you recall this
23  e-mail?  And it may be helpful to see the
24  attachment that goes with it.
25      A    Yes, I believe this is the e-mail that had

Page 92

1  the file we looked at earlier as well.
2      Q    And it's similar, it's just a different
3  iteration.
4      A    Okay.
5      Q    If you'll see here, the hours per day were
6  11?
7      A    Okay.
8      Q    Did you discuss this compensation system
9  with Mr. Broussard?
10      A    Yes.
11      Q    And what was Mr. Broussard's feedback
12  about the compensation system as structured here?
13      A    That it was compliant under the FLSA.
14          MR. STUKENBERG:  Let's also take a look
15  at, Anthony, what is my 12.  And let's scroll to
16  the third e-mail down.
17          (Exhibit Number 142 previously marked for
18          identification and made part of the
19          record)
20      Q    (By Mr. Stukenberg) Do you recall this
21  e-mail, Mr. Beagle?
22      A    Yes.
23      Q    Okay.  Let's go up to the first page.  Do
24  you see the e-mail from you to Mr. Whitsell on
25  October 24th at 1:23?

Page 93

1      A    Yes.
2      Q    Again, what was the significance of the
3  16-hour shift?
4          MR. MOULTON:  Object to form.
5          THE WITNESS:  Again, I think it was the
6  kind of maximum that a colleague would be asked to
7  work because there could be certain things that
8  are triggered over that 16-hour time frame in a
9  given day, DOT or OSHA, depending on kind of the
10  role they were in.  So that was the maximum we'd
11  ever ask them to work.  And then they were
12  essentially kind of on call that entire time and
13  so that's where we budgeted or kind of came up
14  with that 16-hour shift, because that's the amount
15  of time they would be on call, the maximum they'd
16  work and we wanted to compensate them fully for
17  that time.
18      Q    (By Mr. Stukenberg) And what would have
19  happened if they worked over 16 hours?
20      A    They would have been paid.
21      Q    So the practice was to pay them if they
22  worked over 16?
23      A    Yeah.
24      Q    Got it.  Let's talk a little bit about
25  these bonuses or gross-ups or payroll adjustments

## JEFFREY ATLEE BEAGLE - April 18, 2022

Page 94

1  we've been talking about today.  Do you know what
2  I'm referring to?
3      A     Yes.
4      Q     What phrase would you like to use?
5  Doesn't really matter to me, whatever you want.
6      A     Let's use gross-up, that's fine.
7      Q     Okay.  Can you please describe what the
8  purpose of these gross-ups were?
9      A     Yes, I think it was more than anything, it
10  was a decision by the organization, by management,
11  from a kind of morale standpoint that you know,
12  we had these targeted day rates and situations
13  where they were not met, for employee retention
14  purposes, felt strongly that we should consider
15  paying those out in certain situations.  Again, I
16  don't think they were owed per se, because we
17  structured their compensation for an hourly rate,
18  but it was more of a retention and morale decision
19  than anything.
20      Q     Were they generally paid?
21      A     I believe in most cases they were, there
22  were certainly instances that I can recall where
23  they weren't always paid, but I think generally
24  they were, they were paid.
25      Q     Can you tell us about some of the

Page 95

1  instances you recall where they weren't paid?
2      A     I couldn't recall names, but I just
3  remember certain situations where maybe personal
4  situations arise, whatever it may have been,
5  somebody didn't work a full shift and management
6  on-site elected not to pay those additional
7  amounts.
8      Q     Okay.  So you recall an instance anyway
9  where management elected not to pay a gross-up
10  when a person worked a short week because the
11  individual took personal time or something?
12      A     Right.
13      Q     Any other instances you recall where the
14  decision was made not to pay the gross-ups?
15      A     Not specifically.
16      Q     Okay.  Is it your recollection that it did
17  happen from time to time?
18      A     Yes.
19      Q     And that was a decision made at the Puerto
20  Rico management level?
21      A     Correct.
22      Q     Could you have elected to disapprove
23  anybody's gross-up if you wanted to?
24      A     If I had a reason to, I could have.
25      Q     What about Mark Layton's authority, if

Page 96

1  any, as it related to these gross-ups?
2      A     Yeah, he could have decided not to pay
3  those as well.
4      Q     So are you familiar with the requirement
5  or as to the requirement to pay overtime on
6  discretionary bonuses?
7      A     Yes.
8            MR. MOULTON:  Objection to form.
9      Q     (By Mr. Stukenberg) And what is your
10  general understanding?
11            MR. MOULTON:  Objection; form.
12            THE WITNESS:  Discretionary bonuses do not
13  have to be included in the regular rate of pay for
14  overtime calculations.
15      Q     (By Mr. Stukenberg) And so why were these
16  gross-ups in Puerto Rico not included in the
17  overtime calculations?
18            MR. MOULTON:  Objection; form.
19            THE WITNESS:  Because we felt they were
20  discretionary.
21      Q     (By Mr. Stukenberg) Okay.  We saw a couple
22  of paystubs where it had a DYR code and a flat
23  amount entered, it just said day rate, is that
24  consistent with what the pay practice was here?
25      A     No.

Page 97

1      Q     What, if anything, were those paystubs,
2  what do those reflect?
3      A     Well, they were intended to reflect the
4  16-hour shifts that they would have been on call
5  for the days that they were available and ready
6  for work.  When it was entered like a day rate
7  like that, the only thing I can think of is either
8  got lazy or got in a hurry and didn't follow the
9  appropriate protocol.
10      Q     Okay.  So somebody either got lazy or made
11  a mistake?
12      A     Yeah.
13      Q     Do you consider those to accurately
14  reflect the actual pay practice the company
15  embraced under the advice of Mr. Broussard?
16      A     No.
17      Q     Do you believe that the company was
18  obligated to pay gross-ups?
19      A     No.
20            MR. MOULTON:  Objection; form.
21      Q     (By Mr. Stukenberg) There were exempt
22  employees who were paid their base compensation,
23  plus a day rate, do you recall that?
24      A     Yes.
25      Q     And we've seen various e-mails where you