AARON KYLE BLACKERBY - April 20, 2022

```
                IN THE UNITED STATES DISTRICT COURT        EXHIBIT 8
                 FOR THE WESTERN DISTRICT OF TEXAS
                        SAN ANTONIO DIVISION

FRANCISCO CANTU, et al.,      *
     Plaintiffs,              *
                              *
VS.                           *  C. A. NO. 5:19-cv-00615
                              *
MAMMOTH ENERGY SERVICES,      *
INC., et al.                  *
     Defendants               *


***********************************************************

              ORAL AND VIDEOTAPED DEPOSITION OF
                    AARON KYLE BLACKERBY
                       APRIL 20, 2022

***********************************************************


     ORAL AND VIDEOTAPED DEPOSITION of AARON KYLE
BLACKERBY, produced as a witness at the instance of the
Plaintiffs, and duly sworn, was taken in the above-styled
and numbered cause on the 20th day of April, 2022,
between the hours of 9:36 a.m. and 11:27 a.m., before
ANGIE D. KYSAR, CSR, in and for the State of Texas,
reported by machine shorthand, at the offices of
Revolution at 800, 800 South Polk Street, Amarillo, Texas
in accordance with the Federal Rules of Civil Procedure
and the agreements hereinafter set forth.
```

EXHIBIT
2

GOOD TO GO PROCESS SERVICE
713-351-7061

Case 5:21-cv-00085-OLG   Document 56-8   Filed 08/23/24   Page 2 of 3
Case 5:19-cv-00615-DAE   Document 124-2   Filed 07/27/22   Page 17 of 26

AARON KYLE BLACKERBY - April 20, 2022

Page 62

1  the number of days you worked?
2     A.  Yes, sir.
3     Q.  Do you remember a person named Manolo Cordero?
4     A.  Yes, sir.
5     Q.  Okay.  Who was Manolo Cordero?
6     A.  I brought him over.  He was on island maybe for
7  30 days.  He wasn't there real long.  He had a CDL, so we
8  used him to drive, we used him to mechanic.  He came and
9  helped us test some trucks for a short period of time.
10    Q.  Now as part of your duties as supervisor, were
11 you supposed to review anything about the worker's pay or
12 hours and pay code?
13    A.  No, sir.  There's really nothing to review when
14 it was a day rate.
15    Q.  I got you.  So let's look at -- I want to show
16 you Exhibit 198 nevertheless, just to be -- make -- make
17 it real clear.
18        MR. STUKENBERG:  I mean, David, he just
19 testified he never saw any of this, reviewed any of it,
20 approved any of it and had no role whatsoever.  What are
21 we doing?
22    Q.  (By Mr. Moulton)  Mr. Blackerby, I just want to
23 make sure even though you said that, are you -- we're
24 looking at Exhibit 198 now.  Do you see that on your
25 screen?

Page 63

1     A.  Yeah.
2     Q.  Okay.  This -- from what I understand, what
3  we -- what we understand in this case is a time detail
4  report.  And I see your name is all over it, but I want
5  to -- to confirm this is not a document that you would
6  have had a role in approving?
7     A.  No, sir.
8     Q.  Okay.  So this -- and just forgive me, I'm
9  just -- just trying to figure out what's going on here.
10 I see a column on this document that says supervisor
11 approval, and it says A. Blackerby and it goes -- there's
12 a lot of them for you, which I'm assuming is you.
13        Do you know anything about why this
14 document might have your name as approving?
15    A.  No, sir.  There was a -- they had some people
16 that -- the Kinsey kid, a couple other people that
17 handled time and all that.  They did all the approval,
18 everything.  You'd just send them when the guys are gone
19 and send them when they're on island.
20        MR. MOULTON:  Okay.  And, Mr. Stukenberg,
21 just bear with me here.  I've got another question about
22 this.
23        MR. STUKENBERG:  I'm going to object to any
24 questions about this document.  The witness testified
25 he's never seen it before and has no familiarity with it.

Page 64

1         MR. MOULTON:  Duly noted, Counsel.
2     Q.  (By Mr. Moulton)  So -- so now just another
3  question on this, Mr. Blackerby.  In the middle of
4  this -- you know, I know you haven't seen this before,
5  but I just want to make sure this doesn't like jog your
6  memory or anything.  Under allocation it has Aaron
7  Blackerby - unassigned, and like there's this 486.32
8  number.  Do you know what any of this is?
9     A.  No, sir.
10        MR. STUKENBERG:  Same objection.
11    Q.  (By Mr. Moulton)  And this is not something
12 you've ever seen?
13    A.  No, sir.
14    Q.  Okay.  Now with respect to the -- with respect
15 to the guys at least that you supervised, mechanics and
16 your support staff, did you ever have occasion to review
17 their actual payroll records, like their pay stubs?
18    A.  Yeah.  There were some occasions some guys
19 would complain that maybe they got gypped a day.  It's
20 just typical, you know.
21    Q.  Right.  So if -- if they get -- if they get
22 shorted a day, what were they supposed to do about it?
23    A.  I mean, nobody ever got shorted a day.  It was
24 a day rate.  It was very simple.  But guys are going to
25 complain.  It's just kind of the nature of the beast.

Page 65

1     Q.  Okay.  Well, I guess my question is more like
2  if someone complained to you about being shorted a day,
3  what would -- what would you do?
4     A.  I would just review it, what day did you miss,
5  were you on island, were you not on island, was it a
6  travel day, did you show up to work that day, basic
7  questions.
8     Q.  Okay.  So -- and you're saying that -- through
9  that questioning process, you -- there was never someone
10 who was really shorted a day; is that what you're saying?
11    A.  No.  They were all well compensated.
12    Q.  Okay, okay.  In Puerto Rico, were the -- either
13 the mechanics or -- or were you aware of any of the
14 linemen ever having to fill out like driver hour logs or
15 driver safety logs, things like that?
16    A.  No, sir, because we're under a national -- so
17 in response to your question, anytime there's a national
18 disaster and it's deemed a national disaster, all DOT
19 laws and regulations go out the window.  It's all about
20 the storm response.  We did not do driver logs.  There
21 was no DOT, there was no DOT enforcement on island
22 whatsoever.
23    Q.  All right.  Mr. Blackerby, have you answered
24 all my questions truthfully today?
25    A.  Yes, sir.

Case 5:21-cv-00085-OLG   Document 56-8   Filed 08/23/24   Page 3 of 3
Case 5:19-cv-00615-DAE   Document 124-2   Filed 07/27/22   Page 22 of 26

Page 22 (Pages 82-85)

**AARON KYLE BLACKERBY - April 20, 2022**

Page 82

1 titled in Cobra?
2    A.   Yes, sir.
3         MR. MOULTON:  Objection, form.
4    Q.   (By Mr. Stukenberg)  And it was acquired by
5 Cobra?
6         MR. MOULTON:  Objection, form.
7    A.   Yes, sir.
8    Q.   And it was paid for by Mammoth?
9    A.   Yes, sir.  Mammoth owns Cobra.
10   Q.   And -- and do you know how the account --
11        (Battery in speaker low.)
12        THE WITNESS:  Dang, the battery is low.
13        THE VIDEOGRAPHER:  Can we go off the record
14 for a second?
15        MR. STUKENBERG:  Sure.
16        THE VIDEOGRAPHER:  Going off the record.
17 End of tape number 1 at 11:08.
18        (A recess was taken.)
19        THE VIDEOGRAPHER:  Going back on the
20 record.  Beginning of tape number 2.
21   Q.   (By Mr. Stukenberg)  You hired mechanics and
22 those that supported the mechanic function; is that
23 correct?
24   A.   Yes, sir.
25   Q.   You didn't hire the linemen?

Page 83

1    A.   No, sir.
2    Q.   You're not aware of the hours that the linemen
3 worked?
4    A.   No, sir.
5    Q.   You're not aware of how the linemen were
6 actually paid?
7    A.   Just what they said.  Officially, no.
8    Q.   In the war room meeting, was there any
9 discussion as to the expected number of hours people
10 would work in a day?
11   A.   Hurricane response, you're expected to -- it's
12 a hurricane, people are dying.  You're working till they
13 tell you to go home.
14   Q.   Okay.  And are you familiar with the concept
15 that the linemen were expected to work or be available to
16 work for 16 hours a day?
17        MR. MOULTON:  Objection, form.
18   A.   The linemen; no, sir.  My guys were.  The
19 mechanics and support staff, we worked until everybody
20 went home.  Everything was done.
21   Q.   Okay.
22   A.   Cannot speak on the linemen, just my guys.
23   Q.   Okay.  So you can't speak about the linemen,
24 just your guys.  That's -- that's really all you can
25 testify to, is about the mechanics; is that accurate?

Page 84

1         MR. MOULTON:  Objection, form.
2    A.   Yes, sir.
3    Q.   I'm sorry, I couldn't hear you.
4    A.   Yes, sir.
5    Q.   Okay.  And as it relates to the mechanics, if
6 there was an issue that required the mechanics once they
7 were home to deploy back into the field, were they
8 expected to -- to be available to do so?
9    A.   Yes, sir.  We did on a number of occasions.
10   Q.   And that did happen?
11   A.   Yes, sir.
12   Q.   So they were expected to be effectively on call
13 if they were needed?
14   A.   Yes, sir.  If I could go out there, they could
15 go out there.
16   Q.   And was there a policy prohibiting the
17 consumption of alcohol?
18   A.   Yes, sir.
19   Q.   And was that because people may be called out
20 to go work even once they were home from a shift?
21   A.   No, sir.  It was a policy.  It came down from
22 Cobra.  Keith said no drinking on storm, it puts people
23 at risk.  That was --
24   Q.   Okay.
25   A.   -- all the way down, nobody's to drink.

Page 85

1    Q.   Nobody was allowed to drink?
2    A.   Yes, sir.  That was the official stance.
3    Q.   And was that actually true in practice?
4    A.   You ever met a lineman?
5    Q.   Got it.
6    A.   They drink a lot.  I'm sorry, they drink a lot.
7 I mean, it's just -- you couldn't -- they were searched
8 before they went on the barges.  Their rooms were
9 searched for alcohol.  Yes, people still did drink.
10   Q.   And once people were back at the barge or the
11 hotel, were they discouraged from leaving to go out?
12   A.   I never stayed on the barge, and I didn't put
13 my guys on the barge, so I couldn't tell you.  I staged
14 my guys at -- I staged my guys at other places.
15   Q.   And where your guys were staged, were they --
16 once they were at wherever they were staged and done for
17 the day, were they expected to kind of stay there or were
18 they permitted to go out and about?
19   A.   I mean, they could do what they wanted.
20   Q.   Got it.  And, again, your testimony today is --
21 is limited to the mechanics because that's the scope of
22 your knowledge?
23   A.   Or what I --
24        MR. MOULTON:  Objection, form.
25   A.   Or what I saw with my own two eyes.