**EXHIBIT 14**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| AARON MALDONADO, *et al.*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Case No. 5:21-cv-00085-OLG |
| | § | |
| MAMMOTH ENERGY SERVICES, INC., COBRA ACQUISITIONS, LLC, HIGHER POWER ELECTRICAL, LLC, and 5 STAR ELECTRIC, LLC, | § § § § § | |
| | § | |
| *Defendants.* | § § § | |

## DECLARATION OF JEFF BEAGLE

I, Jeff Beagle, declare as follows:

1. My name is Jeff Beagle. I am over the age of 18 years. I have never been convicted of a felony or crime involving moral turpitude. I am fully competent to make this declaration. I have personal knowledge of all the facts stated herein or have derived these facts from a review of business records, and the statements herein are true and correct.

2. I am the former Director of Human Resources for Mammoth Energy Services, Inc. as well as its subsidiaries Cobra Acquisitions, LLC ("Cobra"), Higher Power Electrical, LLC ("HPE") and 5 Star Electric, LLC ("5 Star") (collectively, the "Defendants") in the lawsuit brought by Mr. Aaron Maldonado and others in the above-referenced case based on allegations that they were not paid overtime for work performed on behalf of the Defendants.

3. Following the two hurricanes, Irma and Maria, that devastated Puerto Rico in September 2017, Cobra entered into a contract with the Puerto Rico Electrical Authority to rebuild the electrical grid. Cobra oversaw the logistics and HPE and 5 Star were responsible for recruiting

1

15389727v1

**EXHIBIT 2**

the personnel to perform the work and ascertaining how to pay the employees. Mr. Keith Ellison, the then-President of Cobra, developed a wage scale that consisted of a target amount or rate of compensation to entice employees to go to work in a very demanding environment. Mr. Ellison directed Mr. Mark Layton, the Chief Financial Officer, to figure out the details and mechanics of a pay plan. I was directed by Mark Layton to confer with outside counsel to develop a compliant pay practice that would pay at or near the target rate.

4. On October 20, 2017, I contacted attorney Steve Broussard of Hall Estill, a 150-lawyer firm headquartered in Tulsa, Oklahoma. Mr. Broussard practiced employment law for over 25 years and had considerable expertise with wage and hour matters. Over the next several weeks, I discussed and evaluated numerous pay plans with Mr. Broussard, sometimes speaking multiple times per day. This was an iterative process, as I initially indicated the Defendants were interested in paying employees on a day rate basis. The sole purpose in contacting Mr. Broussard was to ensure that the pay plan was lawful under the Fair Labor Standards Act ("FLSA").

5. After initially leaning towards the day rate, the Defendants shifted to an hourly plus overtime approach. It was expected that the workers would typically work daylight hours, or roughly 12 hours per day. Although the workers were expected to work or be on call for 16 hours per day for each day worked. If they worked over 16 hours, they were paid for the extra hours. Sixteen-hour shifts are the industry custom and practice in storm work. The significance of the 16 hours is that hours worked beyond 16 trigger rest time requirements under the Department of Transportation ("DOT") and Occupational Safety and Health Administration Regulations ("OSHA").

6. With the assistance of Mr. Broussard, the Defendants determined an hourly rate that would account for expected overtime and approximate, albeit not match, the targeted rates.

2

15389727v1

An assumption was made that an employee would work 16 hours a day, 7 days a week for a total of 112 hours per week. Accounting for 40 hours of regular time and 72 hours of overtime, I then established an hourly rate that would result in approximating the targeted rates as set forth below:

| Position | Targeted Pay Rate Per Day | Regular Hourly Rate (up to 40 hours per week) | Overtime Rate (hours worked over 40 per week) | Weekly Wage (7 days at 16 hours per day; 40 Regular Rate hours and 72 Overtime Rate hours) |
|---|---|---|---|---|
| General Foreman | $1,400.00 | $66.22 | $99.33 | $9,800.56 |
| Foreman | $1,250.00 | $59.12 | $88.68 | $8,749.76 |
| Journeyman Lineman | $1,000.00 | $47.30 | $70.95 | $7,000.40 |
| Class A Lineman | $900.00 | $42.57 | $63.86 | $6,300.72 |
| Class B Lineman | $800.00 | $37.84 | $56.76 | $5,600.32 |
| Hot Apprentice/Class C | $700.00 | $33.11 | $49.67 | $4,900.64 |
| Operator | $800.00 | $37.84 | $56.76 | $5,600.32 |
| Groundsman | $600.00 | $28.38 | $42.57 | $4,200.24 |
| Mechanic | $900.00 | $42.57 | $63.86 | $6,300.72 |

The foregoing pay scale reflects the hourly plan inclusive of overtime that was ultimately used to set employees' compensation by position.

7.  I next sent Mr. Broussard an email with the foregoing calculations as set forth above, and later discussed the mechanics of the plan with him. Mr. Broussard understood that the purpose of the calculations was to adopt one of the pay plans discussed and comply with the FLSA. Since Mr. Broussard had approved the pay plan as compliant, I then disseminated that information to the senior leadership of HPE and 5 Star, as well as various administrative personnel for implementation. Defendants believed and continue to believe that the pay practice complied with the FSLA.

15389727v1

8. I also sent Mr. Broussard a draft offer letter, attached to the Motion as Exhibit 5. The offer letter advised employees that the goal was to work 12 hours per day, but as customary with storm work certain situations could arise that could require longer hours, but not to exceed 16 hours. The offer letter further explained that they would be paid a target amount for each day worked which would be paid hourly over a 16-hour shift. Mr. Broussard reviewed the letter and approved it for distribution.

9. If the employee worked more than 16 hours, the Defendants would pay the extra hours. When employees did not work a full 7 days work week, the hourly with overtime earnings did not equal the target rate of compensation. The reason for the shortfall is there was not enough overtime hours to get to the target amount. Defendants had the option, but not the obligation, to pay discretionary bonuses in short weeks to meet the targeted amounts of compensation for one day of work. Such payments were discretionary and made by the leadership on the island.

10. Sometimes the Defendants elected not to make these payments when an employee worked less than a full week. The undisputed evidence is that management retained the right to decide whether to make these payments. Employees who did not work an entire week because of the employee's own misconduct or scheduling issues did not receive discretionary payments, and the pay stubs reflect numerous instances where the bonuses were not paid.

11. For example, in Exhibit 9 the pay stubs of two employees Dennis Moore and Corey Barnes both dated July 13, 2018, reflect that Moore and Barnes worked less than 112 anticipated hours in the work week. The pay stubs reflect that they both worked a total of 96 hours, comprised of 40 regular hours and 56 overtime hours. Mr. Moore's pay was adjusted up and Mr. Barnes did not receive an adjustment. The fact that the payments were made in some instances and not others reflect the discretionary nature of additional compensation.

15389727v1

12. In the next example in Exhibit 10, there is a pay stub received by Dennis Moore with a pay date of 09-18-2018 where he was credited with working 208 hours, comprised of 80 regular hours and 128 overtime hours. There is another pay stub received by one of his co-workers, Mr. Cody Johnson on the same date. Mr. Johnson was credited with working the same number of regular and overtime hours. However, Mr. Moore was credited with an adjustment and Mr. Johnson did not receive a rate adjustment. Again, this is a further reflection of the discretionary nature of the payments as it was not a guaranteed part of the compensation plan.

13. The following exhibits reflect other examples where two colleagues that worked an identical number of hours received different treatment. See Exhibits 11 and 12. In each instance, one received a discretionary payment to adjust their compensation upward and the other did not. These exhibits further support my understanding that these adjustments were discretionary and not guaranteed or paid to everyone who worked a short week.

14. The pay stubs contained in this set of exhibits are reflective of the pay plan that I designed in consultation with Mr. Broussard. The documents show the hourly and overtime pay plan with discretionary adjustments to a budgeted figure as established by the leadership on the island.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed this 2 day of August, 2024.

_____
Jeff Beagle