UNITED STATES FEDERAL COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| AARON MALDONADO, *et al*, § § § Plaintiffs, § § v. § § MAMMOTH ENERGY SERVICES, INC., § COBRA ACQUISITIONS, LLC, HIGHER § POWER ELECTRICAL, LLC AND 5 STAR § ELECTRIC, LLC § § Defendants. § | Case No. 5:21-cv-85-OLG |

**PLAINTIFFS' REPLY TO DEFENDANTS' RESPONSE
TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully Submitted,

**WELMAKER LAW, PLLC**

/s/ *Douglas B. Welmaker*
Douglas B. Welmaker
State Bar No. 00788641
Welmaker Law, PLLC
409 N. Fredonia, Suite 118
Longview, Texas 75601
Phone: (512) 799-2048
Email: doug@welmakerlaw.com

**ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been electronically served on all counsel of record via Notice of Electronic Filing on a known Filing User through the CM/Dkt. system on August 30, 2024.

/s/ *Douglas B. Welmaker*
Douglas B. Welmaker

As they have throughout this litigation, Defendants continue to float the concepts of "developing a wage scale" and creating a "target amount of compensation" and engaging in an "iterative process" with reference to compensation of their linemen, as if, prior to commencement of work in Puerto Rico, they were truly contemplating paying something other than the day rate first espoused by Keith Ellison in October 19, 2017.[1]  Mr. Ellison clearly stated that Defendants intended to pay a day rate for each position needed on the island, and Defendants consistently adhered to Mr. Ellison's day rates, both in their marketing prior to the commencement of work and in their at-times frantic attempts to insure that linemen who worked short weeks were grossed up to their promised day rates once work began.

Defendants attempt to use their consultation of outside counsel Steven Broussard as a sort of never ending insurance policy, providing cover for the various post-consultation modifications to the payment plan, even though these modifications were never reviewed by Mr. Broussard, who never even knew what payment plan Defendants ultimately chose to use.  Defendants now admit that the post-consultation modifications to the original plan were indeed made, after the fact, by Jeffrey Beagle, who is not attorney, but who, Defendants helpfully note, "had years of HR experience." Dkt. 55, p. 7, FN 7.

Defendants spend a great deal of time repeating the same claims and the same version of facts previously set forth in their Motion for Summary Judgment, their Response to Plaintiffs' Motion for Partial Summary Judgment, and their Response to Plaintiffs' Motion for Collateral

---

[1] It is clear none of these concepts were actually in play during the relevant period, and that they are nothing more than lawyer created terms, developed after the fact, in an attempt to justify Defendants' flagrant attempt to avoid compliance with the FLSA, which was spearheaded by Jeffrey Beagle, Mammoth Energy Services, Inc's head of Human Resources. Indeed, there is not <u>one</u> reference to "targeted amount" or "targeted rate" in any of the thousands of documents produced by Defendants in this litigation.  This is because the idea of targeted amounts or rates did not exist at the time Defendants claim to have utilized it.  There are, however, dozens of emails and documents referencing day rates, used by both Defendants' executives and Defendants' payroll personnel.

2

Estoppel. However, Defendants have also included additional "facts" and arguments that merit this Reply.

**A.      Plaintiffs' Typical Schedule and "On Call Work"**

Defendants attempt to justify the 16 hours of work that the linemen were credited with on their "timesheets" (and upon which the reverse engineered hourly rate was premised)[2] by arguing that "workers were expected to work or be on call for sixteen hours a day." Dkt. 55, p. 5. Defendants actually represent the following as established fact, based on selected excerpts from a few deposition transcripts:

> (1) [Plaintiffs] sometimes performed work for up to 16 hours; (2) [Plaintiffs] never worked more than 16 hours; (3) [Plaintiffs] were on-call for up to 16 hours; and (4) Defendants sometimes called [Plaintiffs] back to work. Defendants also attribute similar conclusions to Mark Layton, who admitted he was rarely, if ever, in Puerto Rico: "Plaintiffs worked or were on call to work sixteen hours per day. Ex. 2, Layton Depo. at 107:18-23.

Dkt. 55, p. 13.

The reality is that Plaintiffs generally worked from sunup to sundown, and typically worked, in their estimates, somewhere around 12 hours per day, although this figure could vary, depending upon travel time and actual daylight hours.[3] No Plaintiff ever testified that they always worked the same amount of hours per day, nor did any Plaintiff testify that they worked exactly 12 hours per day. Importantly, no one will ever know precisely how many hours Plaintiffs worked each day because instead of recording Plaintiffs' hours worked, as required by the FLSA, Defendants simply took attendance in the mornings and left it at that.

---

[2] Defendants even admit that the basis for Beagle's fake hourly rate was the assumption that linemen would work 16 hours a day, a fact that was simply not true. Dkt. 55, p. 14. Indeed, Missy Davis alluded to the fact that safety concerns prohibited working 16 hours a day in her email attached to Plaintiffs' Motion for Partial Summary Judgment, Dkt. 41, p. 4. Linemen testified that they would typically work from sunup to sundown, which generally came to 12 hours, sometimes more, sometimes less. *See infra* at pp. 4-5.

[3] Indeed, none of the Plaintiffs knew the exact number of daylight hours that existed per day during the period of time they performed work for Defendants.

For example, Plaintiff Juan Aponte testified as follows:

Q. Is it fair to say that your shift was sunup to sundown?
A. You could say, yes.[4]

Dkt. 50, p. 86, Aponte Deposition, 39:19-21.

Plaintiff Miguel Rosario testified as follows:

Q. So how many hours a day did you work?
A. When they come in the morning, you see the sun, and when they go, probably -- I don't know. Different -- maybe thirteen hours or something like that. Sometimes they go a little more. Yes. Twelve. I don't know. When the suns go and the suns -- so if the suns coming, the suns go. That's the perfect – to say.

Dkt. 50, p. 129, Rosario Deposition, 27:9-16.

Plaintiff Aaron Maldonado testified as follows:

Q. So, when you were there, were you working seven days a week?
A. Yes.
Q. Were you working 16-hour days or 12-hour days or how would you describe it?
A. Primarily we worked sunup to sundown for safety purposes.

Dkt. 56-20, p. 2, Maldonado Deposition, 48:19-25.

Q. And did you figure out what the sunup to sundown was during that time period you're talking about in the summer months where the day is longer than 12 hours? Do you know?
A. I couldn't tell you if they were or they weren't.
Q. All right. But basically you were working sunup to sundown?
A. Yes, sir.
Q. Whatever that was?
A. Yes.
Q. If it was 13 or 14, that's what you were doing?
A. I guess that would depend, but it's roughly 12 hours.
Q. Do you know what time you would start in the morning?
A. Start times would vary but usually consistent with 6:00 or 7:00.
Q. And what time would you get back to your lodging?
A. Relatively close to 6:00 was that rough time. Like I said, it wasn't necessarily exact.

Dkt. 56-20, p. 4, Deposition of Aaron Maldonado, 73:4-23

Plaintiff Donald Roberts testified as follows:

A. We worked from sunup to sundown.

---

[4] A number of Plaintiffs, Mr. Aponte included, had to testify through an interpreter as they spoke only Spanish.

Q. Okay. And would you say that's about twelve hours?
A. Yes, sir.

Dkt. 50, p. 52, Roberts Deposition, p. 21, lines 4-11.

Benjamin Hargrove testified that he could only do his work, which typically was in helicopter, during daylight hours, Dkt. 50, p. 14, Hargrove Deposition, p. 40, lines 19-25, 41 1-5, and while he agreed that he worked approximately 12 hours per day, he also stated that this figure might vary based on the locations he was assigned to work, and variations would occur based on weather conditions. Dkt. 50, p. 16, Hargrove Depo, p. 48, lines 4-13.

Defendants' claims about "on call" work[5] are similarly called into question by the very depositions submitted in support of their Motions. For example, Plaintiff Donald Roberts testified that not only was he not "on call", "most of us always" went out to a bar after work:

Q. Have you ever worked a job where you were on call?
A. I may have couple of times in the past. Uh, as a matter of fact, I think when we worked in Atlanta every now and then they would tell us not to go out drinking because we was on call tonight.
Q. When you were in Puerto Rico, uh, were you ever called back to work?
A. No, sir.
Q. Uh, could you have been called back to work?
A. Not that I know of, because they never told us that we were -- anybody was on call, so most of us always went out and there was one bar close to our barge that everybody went to, so...

Dkt. 50, p. 55, Roberts Deposition, p. 30, lines 13-25.

Q. Got it. Uh, if you were being paid for the day as you, uh, allege, do you think that you were subject to being called out when you were needed that day at any time?
A. Uh, being they never told nobody that we was on call, I didn't expect them to. We wasn't notified, you know, You on call, so we treated it as if we wasn't on call.
Q. You say you treated it as if you were not?
A. Yes, not.

Dkt. 50, p. 55, Roberts Deposition, p. 31, lines 10-17.

Benjamin Hargrove testified similarly:

---

[5] The fiction that Plaintiffs were "on call" for up to 4 hours every day is vital to justifying Defendants' assignment of 16 hours every day to each Plaintiff.

Q.      Were you ever in a situation where you had to go back out after you got back to the hotel or to your place you were staying?
A.      For work?
Q.      Yes, sir.
A.      No, sir.
Q.      Was that a potential expectation, that you would be called back out?
A.      Not that I was aware of. And to that point, we would frequently go to happy hour after work or have drinks together with no expectation we would be returned to work until the next morning.

Dkt. 50, p. 19, Deposition of Benjamin Hargrove, p 58:12-23.

Aaron Maldonado testified as follows:

Q.      Did you ever think that you were on call?
A.      No.
Q.      How many times did you go back out in the field after you were done working for the day?
A.      Roughly three.[6]

Dkt. 56-20, p. 3, Deposition of Aaron Maldonado, 49:1-5

      Finally, when asked about being on standby or on call, Mr. Aponte testified that it was never spoken of, with respect to either himself or anyone with whom he worked, and that no one ever told him he was going to be on standby:

Q.      So when you went -- when you were done at the end of your shift -- at the end of the workday, you understood that if there was some sort of emergency, you could be called back to come back to work, correct?
A.      So we never -- well, it was spoken of. But myself personally that they told me that I would be on standby, never.
Q.      What do you mean by it was spoken of?
A.      Well, I actually never heard them say anything. I know that in our line of work they do have some workers that they put on standby for electrical. But me myself, nor any group that I worked close with, Cobra told us that we were on standby or told them that they were on standby.

Dkt. 50, p. 86, Aponte Deposition, 43:19-25; 44:1-8.

---

[6] Interestingly, Defendants' take Mr. Maldonado's testimony that he may have returned to the field on roughly *3* occasions and represent to the Court that Mr. Maldonado testified as follows: "After a typical 12-hour shift, **Maldonado was called back out to work on multiple occasions**. *Id*. at 72:5." Dkt. 55, p. 13 (emphasis in original).

**B.      Plaintiffs Did not Work the Same Amount of Hours Every Week, Nor was there a Set Shift Time Established**

In seeking to establish that there was no FLSA violation, Defendants argue that:

> Plaintiffs' testimony proves they worked and were on-call for 16-hour shifts—no more and no less. The set shifts started at 6:00 a.m. [7]

and

> Because Plaintiffs worked and were available to be called out for 16 hours per day beginning at 6:00 a.m., they were paid *with respect to hours worked* in compliance with the FLSA. *See Cantu*, 2023 WL 3681704, at *7 (explaining if the workers did not work more or less than the scheduled shift, the pay plan may comply with the FLSA) (citing *Acosta*, 919 F.3d at 364).

Dkt. 55, pp. 12-13.

The testimony from Plaintiffs simply does not support these claims. Defendants nevertheless argue that Plaintiffs' testimony shows Plaintiffs worked the *exact* same amount of hours every day, and even go so far as to argue that Plaintiffs had an established *shift start time*. Dkt. 55, p. 12. As a result, Defendants argue, they were justified in paying Plaintiffs the exact same amount of overtime every week.

As noted above and in FN 6, *infra*, while one or two Plaintiffs may have estimated that the start of work was generally 6:00 am, this was certainly not the testimony of all Plaintiffs, as almost all Plaintiffs testified that work *generally* started at sunup and ended at sundown, with variations due to amount of sunlight hours available per day, travel time, and weather. Probably more importantly, however, is that Defendants could not have paid Plaintiffs with respect to "hours

---

[7] Of the ten depositions Defendants took of the Plaintiffs, Defendants take 2 isolated excerpts (one from Mr. Aponte, who was testifying through a translator and one from Donald Roberts, who qualified his statement) and state that such testimony establishes that the work shift definitively started at 6:00 am, and then try to expand this testimony to include all ten Plaintiffs. Importantly, both Aponte and Roberts testified that work began at sunup. *See supra* at pp. 4-5. The testimony to which Defendants refer with respect to Mr. Roberts is as follows: "Q. Okay. Did you ever recall, um, what time you started work in the mornings? A. *I think it was 6*. Q. Okay. So on the six-hour sorry. On a twelve-hour shift, you would work 6 a.m. to 6 p.m.; is that right? A. Yes, sir." (emphasis added). Dkt. 56-21, p. 3, Roberts deposition, 22:11-17.

worked" because Defendants *did not know* how many hours each Plaintiff worked, as they did not track time.[8]

Nevertheless, Defendants argue that their pay plan properly compensated Plaintiffs at the same regular and overtime rate that did not vary from week to week because Plaintiffs worked the same number of hours each week. Dkt. 55, p. 15.

The fundamental flaw in Defendants' argument is that there is no evidence whatsoever that Plaintiffs worked the same amount of hours every week. Plaintiffs testimony does not support this claim. More importantly, because Defendants' did not track Plaintiffs' time, Defendants' have no evidence supporting this claim either. There *is* evidence, however, that Defendants paid a fixed amount of overtime per week, regardless of hours worked, in violation of the FLSA. An employer does not comply with the FLSA's overtime-pay requirement if it pays a fixed amount without regard to the number of hours actually worked:

> [I]t is not possible for an employer lawfully to agree with his employees that they will receive the same total sum, comprising both straight time and overtime compensation, in all weeks *without regard to the number of overtime hours (if any) worked in any workweek*. The result cannot be achieved by the payment of a fixed salary or by the payment of a lump sum for overtime or by any other method or device.

29 C.F.R. § 778.500(b) (emphasis added).

Additionally, employers cannot satisfy the FLSA's overtime-pay requirement by paying a fixed sum without regard to the number of hours worked:

> [A] lump sum which is paid for work performed during overtime hours without regard to the number of overtime hours worked does not qualify as an overtime premium ... The reason for this is clear. If the rule were otherwise, an employer ...

---

[8] Defendants *did not track* actual hours worked by Plaintiffs in Puerto Rico prior to July 23, 2018. Dkt. 41, Exh. M, Kalman Depo. at 46:10-14; 82:25-83:5. Instead, Defendants tracked daily work attendance for Plaintiffs in Puerto Rico. Exh. M, Kalman Depo. at 83:6-17; Dkt. 41, Exh. J, J. Kinsey Depo. at 60:10-16; 67:15-18. If a Plaintiff worked at all on a day in Puerto Rico, J. Kinsey, the payroll manager, entered "16.00" hours for the day in the Time Detail Report ("TDR"). Dkt. 41, Exh. J, J. Kinsey Depo. at 53:16-21; 60:10-16; 67:15-18, 92:4-13.

> could merely label as overtime pay [an amount] sufficient to take care of compensation for the maximum number of hours that would be worked.

29 C.F.R § 778.310 ("Fixed Sum for Varying Amounts of Overtime"); *see also* 29 C.F.R. § 778.500(b).

Finally, regardless of Defendants' alleged "discretionary bonuses" and "gross-ups" (that were nothing more than a subterfuge to get the reverse engineered hourly rates to match the promised day rate), Defendants violated the FLSA because, instead of paying actual overtime for hours worked in excess of forty each workweek, Defendants decided in advance how much days were worth, regardless of the hours Plaintiffs actually worked, and then labeled portions of the total compensation as regular and overtime using Beagle's reverse engineered rates. Such "hypothetical retrospective construction" of a rate structure that supposedly includes overtime thwarts "the goals of the [FLSA]." *United States Dep't of Lab. v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 286 (4th Cir. 2019) and is therefore in violation of the FLSA.

**C.     Conclusion**

The compensation scheme developed by Defendants outside of and apart from consultation with Steve Broussard, a scheme that completely ignored Broussard' advice, was nothing more than a day rate without overtime, a plan that Mr. Broussard warned Defendants was prohibited by the FLSA.

Defendants were put on notice that such a scheme would violate the FLSA, yet they proceeded with their day rate plan anyway, and then tried to cover their tracks by fraudulently manipulating Plaintiffs' time sheets and paychecks to make them appear that Plaintiffs were being paid hourly with overtime.  That Defendants were paying their linemen a day rate was no secret, nor was it difficult to discern.  All of Defendants' employees knew they were paying the

linemen in Puerto Rico a day rate, a fact confirmed by, among other things, 1) the multitude of internal emails discussing payment of day rates, ranging from the highest ranking employee of Defendants down to the lowest, 2) the gross ups made to bring Plaintiffs' pay in line with their promised day rates[9], 3) the fake paychecks purporting to reflect hourly and overtime pay, but in reality reflecting total compensation as being nothing more than days worked multiplied by the promised day rate, 4) the fake timesheets reflecting 16 hours every day for every lineman, even though Defendants failed to record time, and even though Plaintiffs neither worked 16 hours every day nor did they agree that they were on call every day; 5) the tortured mathematical framework underlying the reverse engineering of Plaintiffs day rates, premised on all Plaintiffs working the exact same amount of hours week in and week out, and 6) Alexander Kalman's admission (in his position as a fact witness) that he observed Keith Ellison informing everyone that Defendants were paying day rates, and they were then "required to find a way around that." Dkt. 41, Exhibit M, Kalman Deposition, 84-86:4.

---

[9] With respect to the argument that Defendants attempt to make by showing that on occasion gross ups or true ups were not paid, which Defendants argue demonstrates conclusively that all gross ups were discretionary, Dkt. 55, pp. 17-18, the fact remains that JD Kinnsey, who was in charge of processing payroll, testified that he did not always gross up pay in short weeks *not* because such gross ups or "bonuses" were discretionary, but simply because he mistakenly overlooked these weeks. *See* Dkt. 54, p. 13.  Further, with respect to Defendants' claim that the gross ups were discretionary morale boosters, Mr. Kinnsey testified that he did not recall anyone telling him not to gross up pay for short weeks, Exhibit J at 134:17-22.   When asked by defense counsel whether he was aware of situations in which a lineman worked a short week but did not receive a gross up, Mr. Kinsey responded, "I know there were times I missed making gross adjustments" and that he was not aware whether there were times which individuals did not receive gross ups that were not the result of him making an error. *Id.* at 137: 211.   Sometimes Kinsey simply missed gross-ups and the workers didn't get grossed up by mistake. *Id.* at 117:16-118:14.