FILED
June 09, 2025
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: _____NM_____
            DEPUTY

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| AARON MALDONADO *et al.*, § <br> § <br> **Plaintiffs,** § <br> § <br> v.    § <br> § <br> MAMMOTH ENERGY SERVICES, § <br> INC. *et al.*,   § <br> § <br> **Defendants.** § | CIVIL NO. SA-21-CV-85-OLG |

### O R D E R

Pending before the Court are the following motions:

- Plaintiffs Aaron Maldonado, Ben Hargrove, Bryan Duff, Donald Roberts, Gerardo Garcia. Jorge Luis Rivera Espinell, Jose Rodriguez Aponte, Juan M. Santiago, Kevin Pearson, and Miguel E. Rosario's (collectively, "Plaintiffs") Motion for Partial Summary Judgment ("Plaintiffs' Motion for Summary Judgment") (Dkt. No. 41), to which Defendants Mammoth Energy Services, Inc. ("Mammoth Services"), Cobra Acquisitions, LLC ("Cobra"), Higher Power Electrical, LLC ("Higher Power"), and 5 Star Electric, LLC ("5 Star") (collectively, "Defendants") filed a response (Dkt. No. 55), and Plaintiffs filed a reply (Dkt. No. 61);

- Defendants' Motion for Summary Judgment (Dkt. No. 43) (together with Plaintiffs' Motion for Summary Judgment, the "Motions for Summary Judgment") (Dkt. Nos. 41; 43), to which Plaintiffs filed a response (Dkt. No. 54), and Defendants filed a reply (Dkt. No. 59); and

- Plaintiffs' Motion to Strike Portions of Defendants [sic] Summary Judgment Evidence (the "Motion to Strike") (Dkt. No. 57), to which Defendants filed a response (Dkt. No. 58).

For the reasons that follow, the Motion to Strike (Dkt. No. 57) and the Motions for Summary Judgment (Dkt. Nos. 41; 43) are **DENIED**.

### I.   BACKGROUND

**A.   Procedural History**

On February 2, 2021, Plaintiffs initiated this Fair Labor Standards Act ("FLSA") case arising from Defendants' alleged joint employment of Plaintiffs and failure to pay overtime wages.

*See* Dkt. No. 1 at 6–8. At the parties' request, the Court stayed this action pending the resolution of a related arbitration proceeding. *See* Dkt. Nos. 14–15. After that action concluded, the Court lifted the stay and entered a scheduling order. *See* Text Order dated April 10, 2023; Dkt. No. 26.

On August 2, 2024, the parties filed the Motions for Summary Judgment presently pending before the Court. *See* Dkt. Nos. 41; 43. On August 23, 2024, the parties filed responses thereto. *See* Dkt. Nos. 54–55. That same day, Plaintiffs filed the Motion to Strike. *See* Dkt. No. 57. On August 30, 2024, the parties filed replies in support of the Motions for Summary Judgment. *See* Dkt. Nos. 59; 61. At that time, Defendants also filed a response in opposition to the Motion to Strike. *See* Dkt. No. 58.

### B.   Factual Background

In September 2017, Hurricanes Irma and Maria hit Puerto Rico and, as a result, the "electrical grid was decimated." Dkt. No. 44 at 4. Indeed, after Hurricane Maria, "Puerto Rico had no power." *Id.* Restoring power was of central importance because, without it, "the island could not begin to repair the absolute devastation." *Id.* at 5.

Mammoth Services is the parent corporation of numerous businesses (collectively, the "Mammoth Network"), including Cobra, Higher Power, and 5 Star. *See* Dkt. No. 41-1 at 4. In the aftermath of Hurricanes Irma and Maria, "Cobra executives met with Puerto Rican officials to offer assistance in repairing the electrical grid." Dkt. No. 44 at 5. On October 19, 2017, the Puerto Rico Electric Power Authority ("PREPA") awarded Cobra the contract to restore electricity to Puerto Rico. *Id.* While Cobra was responsible for securing much of the equipment needed for the project, it contracted with Higher Power and 5 Star to furnish both labor and equipment. *Id.*

On the same day Cobra secured the PREPA contract, Keith Ellison ("Ellison"), the president of Cobra, emailed executives of Higher Power and 5 Star to request help recruiting workers. *See* Dkt. No. 41-3 at 3. In an effort to facilitate recruitment, Ellison established several "per day" rates for different classifications of employees, such as foremen and lineman. *See* Dkt. Nos. 41-1 at 19–20; 41-3 at 3. The day rates set by Ellison were used for recruitment shortly thereafter. *See, e.g.*, Dkt. No. 41-4 at 1 (setting forth the day rates provided by Ellison and informing a prospective employee that his "daily pay" would be "the same no matter what the hours are").

Ellison then informed Mark Layton ("Layton"), an executive of Mammoth Services, that it was his "responsibility to figure out how to pay the employees and the details and mechanics of a pay plan." Dkt. No. 44 at 6. Layton directed Jeff Beagle ("Beagle"), an executive of Mammoth Energy Inc. ("Mammoth Energy"),[1] another business in the Mammoth Network, to help him with this task. *Id.* Layton instructed Beagle to confer with outside counsel to develop a "compliant pay practice." *Id.* Beagle contacted Steve Broussard ("Broussard"), an experienced employment attorney, to develop a pay plan. *Id.* Broussard advised Beagle that it would be permissible to pay employees day or hourly rates but that, in either case, employees must receive overtime pay. *See* Dkt. Nos. 41-3 at 2; 41-6 at 5–7.

After consulting with Broussard, Beagle determined that hourly rates, rather than day rates, would be more cost effective. *See* Dkt. Nos. 41-8; 41-9 at 8. Employees were expected to work far more than forty hours a week. *See* Dkt. No. 44 at 6 ("Seven sixteen-hour shifts per week is the standard weekly schedule in the industry for storm work."). If employees were paid by the day, they would be entitled to significant overtime wages above and beyond the day rates. *See*

---

[1] As discussed in greater detail below, the parties dispute whether Beagle acted on behalf of Mammoth Services or Mammoth Energy.

3

Dkt. No. 41-8. If employees were paid by the hour, Beagle could adjust the hourly rates to account for projected overtime. *See id.* In making his calculations, Beagle assumed that employees would work sixteen hours a day, seven days a week and then worked backward to determine what hourly rates were necessary for employees to reach a close approximation of the day rates. *See* Dkt. No. 41-9 at 7–9.[2]

During the hiring process, employees signed offer letters providing that they would be paid a fixed sum per day, but that their pay would be "broken down hourly over [sixteen] hours daily." Dkt. No. 44 at 31; *see* Dkt. No. 48 at 90. Similarly, employees were purportedly advised during orientation "that they would be paid an hourly rate with overtime, and the target amount of their compensation would be based on [sixteen] hour shifts, seven days per week." Dkt. No. 44 at 7. In practice, Beagle's pay plan suffered from two significant irregularities.

First, employees were not expected to track their time. They worked on an attendance basis. That is, when employees showed up for a shift, they were credited with sixteen hours of work. *See* Dkt. Nos. 41-10 at 18, 24; 41-13 at 83. This was true even though employees rarely worked sixteen hours a day. Dkt. Nos. 41-4 at 1; 44 at 12.[3] On some occasions, employees were not paid hourly rates at all and, instead, their wages were hard coded at a fixed "Day Rate." *E.g.*, Dkt. No. 41-15.

Second, when employees did not work seven days a week, their average earnings dropped significantly because, as Beagle put it, they did not work sufficient "overtime hours to get to the

---

[2] The simplest expression of this equation is $148x = 7y$, where "x" is the regular hourly rate and "y" is the per day rate. For example, Maldonado was promised $1,000.00 per day, so his regular hourly rate would be calculated as follows: (1) $148x = 7*\$1,000.00$; (2) $148x = \$7,000.00$; (3) $x = \$7,000.00/148$; (4) $x = \$47.30$. Because Beagle rounded up to the nearest cent, employee compensation usually exceeded the day rates by a negligible amount.

[3] Defendants argue that their employees either worked or were on call for a total of sixteen hours per day. *See* Dkt. No. 55 at 7. The relevance of this assertion is questionable. *See DePriest v. River W. LP*, 187 F. App'x 403, 405 (5th Cir. 2006). But more fundamentally, whether employees were on call at all is heavily disputed. *See, e.g.*, Dkt. No. 50 at 55 ("Q. When you were in Puerto Rico, uh, were you ever called back to work? A. No, sir. Q. Uh, could you have been called back to work? A. Not that I know of, because they never told us that we were—anybody was on call, so most of us always went out and there was one bar close to our barge that everybody went to so.").

4

target amount." Dkt. No. 44 at 12. This caused confusion and frustration. *See, e.g.*, Dkt. No. 41-19. To rectify this issue, Beagle instructed Missy Davis ("Davis") and Alexander Kalman ("Kalman"), two human resources officers, to run internal reports, determine when employees missed work, and pay "gross ups" to match the day rates. *See* Dkt. No. 41-20 at 1 ("The plan is at the end of each hitch to run a report of wages earned vs. days worked. If there is a negative balance (i.e., it does not equal out to the day rate) it will be grossed up on their next payroll once their hitch is done."); *see also* Dkt. Nos. 41-13 at 52; 41-23 at 14–16. While some employees received gross ups each time they missed work, others did not. *See, e.g.*, Dkt. No. 47 at 148. Layton and Beagle assert that these inconsistencies flow from the fact that the gross ups were discretionary bonuses used to boost employee morale and not intended as day rate compensation. *See* Dkt. No. 44 at 7, 12. However, James D. Kinsey ("Kinsey"), another human resources officer, testified that some missed gross ups were the result of an administrative failure on his part; that is, he sometimes missed employees who were due for gross ups. *See* Dkt. No. 41-10 at 35.

## II.     LEGAL STANDARD

Summary judgment is appropriate if the record—including depositions, documents, electronically stored information, affidavits or declarations, admissions, and interrogatory answers—"shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a), (c). At this stage, the movant bears the burden of identifying those portions of the record it believes demonstrate the "absence of a genuine issue of material fact," *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)), or "pointing out 'the absence of evidence supporting the non[-]moving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 913 (5th Cir. 1992)).

If the movant meets its burden, the non-moving party must present specific facts that show "the existence of a 'genuine' issue concerning every essential component of its case." *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (quoting *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998)); *see also Lincoln Gen. Ins. Co.*, 401 F.3d at 349. The non-movant cannot create a dispute of fact with "conclusory allegations" or "unsubstantiated assertions." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts. *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

"A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. In considering the evidence presented, courts review the facts and inferences to be drawn from the record in the light most favorable to the non-moving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003) (citing *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999)). A court may not, however, "make credibility determinations or weigh the evidence," as those tasks are among those specifically reserved for the jury. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (collecting cases).

## III.    ANALYSIS

### A.    Motion to Strike

#### 1.    Employment Records

In support of summary judgment, Defendants submit pay stubs from several employees. In some instances, these employees missed work, but their wages were not grossed up. *E.g.*, Dkt. No. 47 at 148. On this basis, Defendants assert that the gross ups were discretionary bonuses and were not intended as day rate compensation. *See* Dkt. No. 43 at 10–12. Plaintiffs argue that Defendants impermissibly cherry-picked pay stubs. *See* Dkt. No. 57 at 2. In addition, because these employees are not parties in this lawsuit, Plaintiffs contend that their pay stubs are irrelevant. *Id.* at 3. Even if the pay stubs were relevant, Plaintiffs assert that they are inadmissible hearsay. *Id.* The Court disagrees.[4]

Relevancy is a prerequisite to admissibility. *See* FED. R. EVID. 402. But the threshold is quite low. *See* 2 CLIFFORD S. FISHMAN & ANNE TOOMEY MCKENNA, JONES ON EVIDENCE § 11:5 (7th ed. 2024). Evidence is relevant so long as "it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence." FED. R. EVID. 401. The fact that some employees did not consistently receive gross ups when they missed work tends to show that Plaintiffs' compensation was part of a discretionary bonus program rather than a means of paying day rates. Plaintiffs' arguments to the contrary go to the weight of the evidence, not whether it satisfies the liberal relevancy standard. *See* 2 FISHMAN & MCKENNA, *supra*, § 11:5.

Hearsay includes any out of court statement offered "to prove the truth of the matter asserted." FED. R. EVID. 801(c). "Hearsay is not competent summary judgment evidence unless its

---

[4] In passing, Plaintiffs request permission to supplement the summary judgment record with other pay stubs from employees who, like Plaintiffs, consistently received gross ups. *See* Dkt. No. 57 at 3. Likewise, Plaintiffs ask to reopen discovery for the purpose of deposing Beagle about the pay stubs. *Id.* Plaintiffs provide no basis in law or fact for either of their conclusory requests. Accordingly, both are **DENIED**. *See* W.D. TEX. LOC. R. CV-7(c)(1).

proponent can show that the statement can be presented in an admissible form at trial." *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024) (internal citations omitted) (first citing *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987); and then citing *Patel v. Tex. Tech Univ.*, 941 F.3d 743, 746 (5th Cir. 2019)). The pay stubs are records of regularly conducted activities and are thereby excepted from the rule against hearsay. *See* FED. R. EVID. 803(6). Defendants may lay a proper foundation for their admission at trial.

### 2. Beagle Declaration

In support of summary judgment, Defendants rely on Beagle's sworn declaration. In his declaration, Beagle states that, after consulting with Broussard, he calculated hourly rates for employees on the Puerto Rico project. *See* Dkt. No. 44 at 11. Beagle includes a graphical depiction of those calculations. *Id.* According to Beagle, he emailed his calculations to Broussard. *Id.* Thereafter, Beagle states that he "discussed the mechanics of the plan" with Broussard, who "approved the pay plan as compliant." *Id.* Plaintiffs argue that Beagle impermissibly references hearsay statements made by Broussard. Dkt. No. 57 at 4. Likewise, Plaintiffs contend that Beagle's graph is itself hearsay. *Id.* Finally, Plaintiffs assert that Beagle's statements about Broussard's mental impressions are inadmissible because they constitute "nothing more than rank speculation." *Id.* The Court disagrees.

First, Plaintiffs do not clearly identify which "statements" attributable to Broussard constitute hearsay. *See* Dkt. No. 57 at 4. Failing to do so makes it difficult for the Court to evaluate the merits of their argument. *Cf. United States v. Lewis*, 796 F.3d 543, 546 (5th Cir. 2015) ("A loosely formulated and imprecise objection will not preserve error." (quoting *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998)) (internal quotation marks omitted)). Insofar as Plaintiffs contest Beagle's recollection that Broussard "approved the pay plan as compliant,"

Dkt. No. 44 at 11, that statement is not hearsay. It is not offered for its truth. That is, it is not offered to prove that the pay plan was, in fact, compliant. Instead, it is offered to prove that any noncompliance was unintentional.

Second, Beagle's graph is not hearsay. Beagle calculated the hourly rates himself, and he is free to testify at trial with respect to his computational methods. Third, Plaintiffs do not specify which of Beagle's statements involve "mental impressions" drawn from his interactions with Broussard. *See* Dkt. No. 57 at 3–4. The Court declines to speculate in the absence of a specific argument. For these reasons, as well as those set forth above, the Motion to Strike is **DENIED**.[5]

## B.  Motions for Summary Judgment

### 1.  Joint Employment

Liability for failing to pay overtime wages under the FLSA "attaches to individuals and entities who qualify as an 'employer.'" *Bandy v. TRC Sols., Inc.*, No. 22-cv-144, 2023 WL 8285219, at *2 (W.D. Tex. Nov. 30, 2023) (citing *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 971 (5th Cir. 1984)). An employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). This definition is broad and expansive. *See McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989) (per curiam) (holding that the term "employer" is construed "more broadly" than "in traditional common law applications"). Indeed, under the FLSA, an employee may have "two or more employers at the same time." *Itzep v. Target Corp.*, 543 F. Supp. 2d 646, 652 (W.D. Tex. 2008).

Employer status is determined under the economic reality test. Under this test, courts evaluate "whether the alleged employer: (1) possessed the power to hire and fire the employees,

---

[5] The Court notes that Beagle's declaration is largely cumulative of other evidence in the record, including Broussard's deposition transcript and the email exchange between Beagle and Broussard. *See* Dkt. Nos. 41-6; 41-7. Therefore, the Court's ruling on these evidentiary issues is ultimately immaterial.

9

(2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014) (quoting *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012)) (internal quotation marks omitted). "But all four of the factors need not be present in each case to find an employee-employer relationship." *Ako v. Arriva Best Sec., Inc.*, No. 22-cv-1751, 2024 WL 4174918, at *5 (N.D. Tex. Aug. 19, 2024) (citing *Gray*, 673 F.3d at 357), *R. & R. adopted*, 2024 WL 4181048 (N.D. Tex. Sept. 12, 2024). "In joint employer contexts, each employer must meet the economic reality test." *Orozco*, 757 F.3d at 448 (citing *Gray*, 673 F.3d at 355).

Plaintiffs assert that there is "more than sufficient evidence" to establish that they were employed by Mammoth Services in addition to their primary employers, Higher Power and 5 Star. *See* Dkt. No. 41 at 16.[6] Plaintiffs seek summary judgment with respect to this issue. *Id.* at 2. Defendants disagree. For their part, Defendants argue that the evidence demonstrates that Plaintiffs were not employed by Mammoth Services or, at a minimum, that fact issues preclude summary judgment. *See* Dkt. No. 55 at 23–27. The Court agrees in part with Defendants.

Plaintiffs rely on two key sets of facts in support of their position. First, Beagle held himself out as the director of human resources for Mammoth Services and, in that role, consulted with Broussard to establish pay rates and instructed human resources personnel to gross up employee wages. *See* Dkt. No. 41 at 13–15. These facts clearly suggest that Beagle acted on behalf of Mammoth Services to control Plaintiffs' work schedules and establish their rates and methods of payment. *See, e.g.*, Dkt. Nos. 41-6 at 4–7; 41-8; 41-9 at 7–8; 41-12 at 2; 41-13 at 52; 41-20 at 1;

---

[6] Plaintiffs also rely upon 29 C.F.R. § 791.2 in support of their assertion that Mammoth Services was their employer. *See* Dkt. No. 41 at 16. But this regulation was rescinded in 2021, *see* Rescission of Joint Employer Status Under the Fair Labor Standards Act Rule, 86 Fed. Reg. 40939 (July 30, 2021), a fact Plaintiffs fail to mention. *See* Dkt. No. 41.

10

41-23 at 14–16; 44 at 6, 10–12. Second, many internal documents distributed to employees bore Mammoth Services' name and logo. *See* Dkt. No. 41 at 15–16. These documents tend to show that Mammoth Services maintained a supervisory role over the employment practices of the Mammoth Network. *See* Dkt. Nos. 41-18 at 1; 41-24 at 1–2.

However, as Plaintiffs concede, Beagle's role at Mammoth Services is disputed. *See* Dkt. No. 41 at 13. Layton testified that Beagle worked on behalf of Mammoth Energy rather than Mammoth Services. *See* Dkt. No. 44 at 54. The Court cannot resolve this issue without weighing evidence and making credibility determinations, both of which are prohibited at the summary judgment stage. *See Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 160 (5th Cir. 2021) (quoting *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)). Because fact issues exist with respect to this key topic, Plaintiffs are not entitled to judgment as a matter of law. Accordingly, summary judgment is **DENIED**.

### 2.     Day Rates or Hourly Rates

Under the FLSA, employees who work more than forty hours per week are entitled to receive overtime compensation at a rate of at least one and a half times their regular rate. *See* 29 U.S.C. § 207(a)(1). An employee's regular rate generally includes "all remuneration for employment." *Id.* § 207(e). However, the regular rate does not include compensation paid "at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." *Id.* § 207(e)(3). "Thus, regular bonuses are to be included in the calculation of regular rate of pay, but discretionary bonuses are excludable from the regular rate of pay." *Moore v. Performance Pressure Pumping Servs., LLC*, No. 15-cv-432, 2017 WL 1501436, at *12 (W.D. Tex. Apr. 26, 2017) (internal citations omitted) (citing 29 C.F.R. §§ 778.209, 778.211).

Plaintiffs assert that, despite receiving hourly rates on their pay stubs, they were actually paid day rates. That is, regardless of how many hours they worked per day or how many days they worked per week, Plaintiffs always received approximately the same daily compensation. *See* Dkt. No. 41 at 23. Plaintiffs seek summary judgment with respect to this issue. *Id.* at 2. Defendants argue that Plaintiffs were expressly informed during orientation that they would be paid by the hour, not the day. *See* Dkt. No. 55 at 6–7. Defendants also contend that any gross ups were just discretionary bonuses distributed to boost morale. *Id.* at 16.

The evidence points in two directions. On one hand, Plaintiffs were initially told that they would be paid per day. *See* Dkt. No. 41-4 at 1. Although Beagle purported to establish hourly rates, *see* Dkt. No. 41-8, Plaintiffs were not required to track their hours, *see* Dkt. Nos. 41-10 at 18, 24; 41-13 at 83, and, whenever they missed work, their wages were grossed up to reach a close approximation of the day rates. *See* Dkt. No. 41-20 at 1. Even some human resources officers believed that they were grossing up employee wages to match the day rates. *See* Dkt. Nos. 41-10 at 13; 41-13 at 52. In fact, Kinsey routinely hard coded gross ups at a fixed "Day Rate." *E.g.*, Dkt. No. 41-15. The combination of these facts strongly suggests that Plaintiffs were paid day rates rather than hourly rates and were, therefore, unlawfully deprived of overtime wages.

On the other hand, Plaintiffs were purportedly advised during orientation that they would be paid by the hour. Dkt. No. 44 at 7. Their pay stubs indicated as much. *See* Dkt. No. 47. Furthermore, some employees did not receive gross ups when they missed work. *E.g.*, *id.* at 148. And Kinsey was eventually terminated for hard coding day rates. *See* Dkt. No. 56-2 at 8. The combination of these facts suggests that, as Defendants put it, employees were "sometimes paid discretionary bonuses to . . . maintain morale in the hurricane-ravaged environment." Dkt. No. 55 at 17. At a minimum, the conflicting evidence demonstrates the existence of fact issues which the

Court cannot resolve at this juncture. Accordingly, summary judgment is **DENIED**.

### 3. Willfulness

The FLSA includes a two year statute of limitations, which is extended to three years for claims arising from any willful violation of the FLSA. *See* 29 U.S.C. § 255(a). "To prove a willful violation, the plaintiff must establish that 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute.'" *Ramos v. Al-Bataineh*, 599 F. App'x 548, 551 (5th Cir. 2015) (per curiam) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988)).

Plaintiffs argue that "Defendants' conduct is the textbook definition of willfulness." *See* Dkt. No. 41 at 24–29. Therefore, Plaintiffs seek summary judgment with respect to this issue. *Id.* at 2. Defendants argue that there is no evidence of willfulness. Dkt. No. 43 at 1–2, 18. According to Defendants, even if they did violate the FLSA, any such violation was clearly not willful because they repeatedly consulted with legal counsel to ensure compliance. *See id.* at 15–17. Absent willfulness, Defendants assert that Plaintiffs' claims are barred by the two year statute of limitations. *See id.* at 1–2, 14. The Court disagrees with the parties.

As discussed at length above, the record is replete with factual disputes. One plausible reading of the record is that Beagle ignored Broussard's advice and paid day rates disguised as hourly rates (through a gross up scheme) to avoid paying overtime wages. However, it is also plausible that Beagle followed Broussard's advice, paid hourly rates, and directed the distribution of discretionary bonuses. The Court's willfulness analysis turns on the resolution of these factual disputes. Because the Court cannot resolve these issues at this stage, summary judgment is **DENIED**.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Strike (Dkt. No. 57) and the Motions for Summary Judgment (Dkt. Nos. 41; 43) are **DENIED**.

**IT IS SO ORDERED.**

**SIGNED** this ___9___ day of June, 2025.

_____
ORLANDO L. GARCIA
United States District Judge